UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FILED

2019 JAN -8 AM 11: 26

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

UNITED STATES OF AMERICA

v.

JOHN R. NETTLETON

Case No. 3:19-cr- 1-J- 32 PDB

| | |
|---|---|
| Ct. 1: | 18 U.S.C. §§ 1512(b)(3) and 2 |
| Ct. 2: | 18 U.S.C. §§ 1512(c)(2) and 2 |
| Ct. 3: | 18 U.S.C. §§ 1001(a)(1) and 2 |
| Cts. 4-5: | 18 U.S.C. §§ 1519 and 2 |
| Cts. 6-10: | 18 U.S.C. § 1001(a)(2) |

## INDICTMENT

The Grand Jury charges:

Unless otherwise indicated, at all times material to this Indictment:

### BACKGROUND

1.     The defendant, JOHN R. NETTLETON ("NETTLETON") is a Captain in the United States Navy ("Navy"), a department of the United States government. In or about June 2012, he was named the Commanding Officer ("Commander") of Naval Station Guantanamo Bay ("GTMO") at Guantanamo Bay, Cuba.

2.     GTMO, located in the southeast corner of Cuba, is a U.S. military installation that serves the Navy.  Several thousand U.S. military members, civilian personnel, and their families reside at GTMO.

3.     GTMO is part of the Navy Region Southeast ("NRSE"), which is based at Naval Air Station Jacksonville, located in Jacksonville, Florida.   As the Commander of GTMO, NETTLETON reported to the Commander of the Navy

Region Southeast ("CNRSE") and the members of his or her command staff.   In January 2015, the CNRSE was Rear Admiral M.J. and her Chief of Staff was Captain C.G.

4.      In or about approximately May 2011, Christopher M. Tur ("Tur") and his family, which consisted of his wife ("Tur's Spouse") and two children, moved to GTMO, where Tur had obtained a position as a civilian employee of the Navy.   By approximately January 2015, Tur was employed as the Loss Prevention Safety Manager at the Navy Exchange, a general store serving the GTMO community.   U.S. Coast Guard personnel found Tur dead in the waters of Guantanamo Bay on January 11, 2015.

### NETTLETON's Obligations as Commander of GTMO

5.      As the Commander of GTMO, NETTLETON was required by laws, Navy regulations, and orders from his superior officers to ensure the safety and well-being of persons under his command at GTMO, such as Tur, including but not limited to the following:

　　　　a.      Pursuant to 10 U.S.C. § 5947, NETTLETON was required to show in himself "a good example of virtue, honor, patriotism, and subordination; to be vigilant in inspecting the conduct of all persons who are placed under [his] command; to guard against and suppress all dissolute and immoral practices, and to correct, according to the laws and regulations of the Navy, all persons who are guilty of them; and to take all necessary and proper measures, under the laws, regulations, and customs of naval service, to promote

2

and safeguard the morale, the physical well-being, and the general welfare of the officers and enlisted persons under [his] command or charge."

b.      Pursuant to U.S. Navy Regulation Ch. 8, § 1, art. 0802 (also codified at 32 C.F.R. § 700.802), "[t]he responsibility of the commanding officer for his or her command is absolute," "[t]he authority of the commanding officer is commensurate with his or her responsibility," and the commanding officer has a "continued responsibility for the safety, well-being, and efficiency of the entire command." Additionally, "[t]he commanding officer . . . shall exercise leadership through personal example, moral responsibility, and judicious attention to the welfare of persons under their control or supervision."

c.      Pursuant to U.S. Navy Regulation Ch. 8, § 1, art. 0820, the commanding officer must "maintain a satisfactory state of health and physical fitness of the personnel under his . . . command."

d.      Pursuant to U.S. Navy Regulation Ch. 8, § 1, art. 0826 (also codified at 32 C.F.R. § 700.826), "[t]he commanding officer shall take appropriate action to safeguard personnel."

e.      Pursuant to instructions from the Chief of Naval Operations, OPNAVINST 5530.14E (also referred to as the Physical Security and Law Enforcement Program), Chapter 3, § 0300(a), NETTLETON was responsible for maintaining the "good order and discipline of [his] command."

6.      As the Commander of GTMO, NETTLETON was required by laws, Navy regulations, and orders from his superior officers to provide his superior officers

and the Navy with complete information in his possession about events at GTMO, such as when a civilian or contractor was missing, severely injured, or had died, including but not limited to the following:

      a.    Pursuant to CNRSE Notice 5214, which was issued on or about May 2, 2013 to provide commanders of Navy installations in the NRSE with guidance on when and how to report information to the CNRSE in the form of Commander's Critical Information Requirements ("CCIR") reports, NETTLETON was required to provide CCIR reports that were "both timely and as complete as possible, answering questions such as who, what, when, where and why," as well as "[f]ollow-on reports providing additional or corrected information," for a variety of incidents such as the "UNEXPECTED death or critical injury of any . . . [Department of Defense] civilian, or contractor assigned to a CNRSE installation," "[a]ny request for assistance in search and rescue operations where personnel and/or resources within the CNRSE [Area of Responsibility] would potentially be involved," and "[a]ny report of a missing . . . [Department of Defense] civilian, or contractor assigned to a CNRSE installation."

      b.    Pursuant to the Office of the Chief of Naval Operations ("OPNAV") Instruction 3100.6H, which was issued on or about February 3, 2006 to provide procedures for commanding officers to report certain incidents at Navy installations to the Chief of Naval Operations ("CNO") and other Navy commanders using "Navy Blue" messages, NETTLETON was required to

ensure an accurate Navy Blue message was prepared and sent for major incidents involving personnel at GTMO, such as the "[d]eath or serious personal injury of a civilian."

     c.     Pursuant to U.S. Navy Regulation Ch. 8, § 1, art. 0815 (also codified at 32 C.F.R. § 700.815), NETTLETON was required "in the event of the death of any person within his or her command" to "ensure that the cause of death and the circumstances under which death occurred are established, that the provisions of the Manual of the Judge Advocate General are adhered to in documenting the cause and circumstances, and that the appropriate casualty report is submitted."

### Applicable Provisions of the Uniform Code of Military Justice

7.     The Uniform Code of Military Justice ("UCMJ") is created by federal law and defines the military justice system and criminal offenses under military law.

8.     A court martial is a judicial proceeding convened by an authorized officer of the Navy to determine the guilt or innocence of an officer or enlisted person of a particular offense prohibited by the UCMJ.   A finding of guilt after a court martial may result in a variety of punishments from the less serious, such as reprimand, to the more serious, such as a dishonorable discharge or a sentence of imprisonment.

9.     Article 107 of the UCMJ makes an offense subject to court martial the signing of "any false record, return, regulation, order, or other official document,

knowing it to be false, or [making] any other false official statement knowing it to be false," with the intent to deceive.

10.     Article 128 of the UCMJ prohibits assault, which is defined as an "attempt[] or offer[] with unlawful force or violence to do bodily harm to another person, whether or not the attempt or offer is consummated." Assault is punishable by a court martial.

11.     Article 133 of the UCMJ provides that any "commissioned officer . . . who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct." Both adultery and drunkenness may constitute "conduct unbecoming an officer and a gentleman."

12.     Article 134 of the UCMJ makes subject to court martial "all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty."

**Relevant Naval Investigative Bodies and Procedures**

13.     The Naval Criminal Investigative Service ("NCIS") is a federal law enforcement agency within the Navy with authority and responsibilities that include the initiation, conduct, and direction of criminal investigations. NCIS performs its duties under the authority of the Secretary of the Navy. NCIS investigates possible violations of federal law and of the UCMJ. NCIS investigations may result in a federal grand jury proceeding or a court martial.

6

14.     The GTMO Security Department is a Navy component under the authority of the commanding officer of GTMO that is tasked with ensuring various aspects of security on GTMO.  The Security Department has departments focused on specific areas, such as harbor safety, base patrol, and the Criminal Investigative Division ("CID").  CID consists of investigators that investigate potential violations of laws, rules, and regulations at GTMO.

15.     The Navy also investigates potential criminal and administrative wrongdoing by its officers and others through a "command investigation."  A command investigation is conducted by another Navy officer assigned by the commanding officer of the subject of the investigation.  A command investigation is conducted according to the rules and procedures of the Manual of the Judge Advocate General.  The potential consequences of a command investigation range from non-punitive and non-judicial actions to court martial.  It was within Admiral M.J.'s authority to order a command investigation of incidents that occurred at GTMO and the conduct and activities of the personnel there, including NETTLETON.

### FACTUAL ALLEGATIONS
### Friday, January 9, 2015

16.     On or about January 9, 2015, starting at approximately 6:30 p.m., there was a "Hail and Farewell" party at the "Hanger Bar" in the basement of the GTMO Officer's Club, which is also known as the "Bayview."  The purpose of the party was to greet the new incoming GTMO Executive Officer ("XO"), A.R., and to say goodbye to the outgoing XO.

7

17.     NETTLETON, Tur, and Tur's Spouse were present at the party, and each consumed several alcoholic drinks.   During the party, NETTLETON and Tur's Spouse spent time near one another in view of other party guests, including Tur.

18.     At approximately 10:00 p.m., outside of the Bayview, Tur yelled at NETTLETON and Tur's Spouse, accusing them of having an extramarital affair. XO A.R. encouraged NETTLETON to leave, and NETTLETON walked away in the direction of his residence, which was located nearby on the same road as the Bayview.

19.     After NETTLETON arrived at his residence, he encountered his daughter, J.N., who was the only other family member staying at the family home on the night of January 9, 2015.   J.N. went upstairs, and NETTLETON remained downstairs.

20.     Between approximately 10:30 p.m. and 10:45 p.m., K.W., a civilian resident of GTMO, spoke with Tur on the telephone.  Tur stated words to the effect that he was "at the Skipper's house" and that he had "just knocked the Skipper out." K.W. also heard NETTLETON stating words to the effect that Tur had "just knocked him out."  Tur terminated the call.

21.     At approximately 10:46 p.m., J.N., who was still upstairs in NETTLETON's residence, sent an electronic message to a friend, K.M., which stated:

> Oh my fucking god my dogs won't stop barking because
> there's ducking [sic] people outside I'm literally about to
> tear my hair out.

22.     Shortly thereafter, J.N. heard sounds coming from downstairs at NETTLETON'S residence, went downstairs, and observed her father lying on the

ground on the first floor of the home. She also observed an adult male, who she eventually realized was Tur, standing near NETTLETON and attempting to use a cell phone. J.N. did not observe any blood, and she returned to her room without being seen.

23.   At approximately 10:55 p.m., J.N. sent an electronic message to K.M. which stated:

> I just went downstairs to get the dog to stop barking and like literally what I see is this dude standing there on his phone and my dad is lying on the ground I think and like I'm so confused and terrified and he like literally didn't even notice me and i just ran back upstairs and like [the dog] won't stop barking at him and I've got no idea what's going on.

24.   At approximately 10:56 p.m., J.N. sent an electronic message to another friend, T.H., stating:

> Um well my dad's really drunk and some other dude is here and they're like getting into a fight downstairs and I'm hiding.

25.   At approximately 10:57 p.m., J.N. again sent an electronic message to K.M. stating:

> So um now I can hear them fighting really loudly omh I've locked myself into my room.

26.   At approximately 11:22 p.m., J.N. sent an electronic message to K.M. stating:

> so um I like texted my brother and told him what was happening bc I could still here [sic] them fighting and [the dog] was barking at them and I didn't know what to do and he tried calling dad like six times and he didn't answer, but I could hear dad answer the phone downstairs and things have been quiet since then.

27.     From approximately 11:27 p.m. to 11:28 p.m., J.N. had a further electronic message exchange with T.H. as follows:

> J.N. to T.H.: Like they've been fighting for a while and like I was scared so I texted [my brother] and he tried calling dad and they must have stopped because it's quiet again.

> T.H. to J.N.: Were they just yelling?

> J.N. to T.H.: No, I could hear them like actually fighting each other.

> J.N. to T.H.: And I walked downstairs because I didn't know they were there and this dude was standing over my dad who was like laying on the kitchen floor. And like I ran upstairs and after that I could hear them fighting.

28.     After J.N. stopped hearing sounds of fighting from downstairs, NETTLETON entered the upstairs room where she was located.  He was not wearing a shirt, and J.N. did not observe any injuries.  NETTLETON spoke briefly with J.N. and then J.N. went to bed.

### Saturday, January 10, 2015

29.     Starting early in the morning on or about Saturday, January 10, 2015, K.W. and R.B., a member of the Navy that resided at GTMO, began looking for Tur, who had not returned home by then.  They went to NETTLETON's residence and spoke to NETTLETON.  When asked if he was aware of Tur's whereabouts, NETTLETON stated that he was not.  After being informed that Tur had called K.W. on Friday night and said he was at NETTLETON's residence, NETTLETON said that Tur had come to his residence and had spoken with him, but that NETTLETON

told Tur to leave and Tur did. NETTLETON did not state that there was a physical altercation between himself and Tur or that Tur had been injured. R.B. asked for permission to look in NETTLETON's back yard, which NETTLETON refused to grant. K.W. and R.B. left to continue their search for Tur.

30.    At approximately 2:30 p.m. on or about January 10, 2015, after having further discussions with K.W., R.B., and Tur's Spouse about how Tur was still missing, NETTLETON spoke with A.T., the Command Duty Officer ("CDO") for GTMO at the time, and instructed him to have the GTMO Security Department begin searching for Tur. NETTLETON misled CDO A.T. by concealing from him that on or about January 9, 2015, Tur had accused NETTLETON outside of the Bayview of having an extramarital affair with Tur's Spouse, that Tur had later come to NETTLETON's residence after the party, that Tur and NETTLETON had engaged in a physical altercation that left Tur injured, and that NETTLETON knew the last place Tur had been seen by anyone was NETTLETON's residence, not the Bayview. Instead, when asked by CDO A.T. where to search, NETTLETON said the last place Tur had been located was the Bayview.

31.    Based on NETTLETON's order and the information NETTLETON provided, CDO A.T. took steps to arrange for the GTMO Security Department and other GTMO personnel to begin searching for Tur. As a result of NETTLETON's concealment of all relevant facts from CDO A.T., the search for Tur started at the Bayview and was focused on areas north, south, and east of it, but not west towards NETTLETON's residence, where Tur had actually last been seen by NETTLETON.

CDO A.T. also alerted the NRSE in Jacksonville, Florida of the missing person and the search that had been commenced.

32.     As a result of the commencement of the search for Tur, CID opened a missing person investigation based on the disappearance of Tur.  However, without information about Tur's accusations at the Bayview on Friday night or his appearance at NETTLETON's residence and the physical altercation there, CID investigators did not question NETTLETON or take other steps to focus their missing person investigation on Tur's presence at NETTLETON's residence and NETTLETON's knowledge of the circumstances surrounding Tur's disappearance.

33.     On or about January 10, 2015, NETTLETON spoke with Captain C.G. NETTLETON explained that a civilian living and working at GTMO had gone missing that morning, and that a search was underway for him.  NETTLETON misled Captain C.G. by concealing from him that Tur had gone missing on or about January 9, 2015 after attending a command event earlier in the evening, the Hail and Farewell party at the Bayview for the incoming and outgoing XOs, at which NETTLETON had been present.  NETTLETON further misled Captain C.G. by concealing from him that on or about January 9, 2015, Tur had accused NETTLETON outside of the Bayview of having an extramarital affair with Tur's Spouse, that Tur had later come to NETTLETON's residence after the party, that Tur and NETTLETON had engaged in a physical altercation that left Tur injured, and that NETTLETON knew the last place Tur had been seen by anyone was NETTLETON's residence.

34.    At approximately 5:00 p.m. on or about January 10, 2015, the GTMO Security Department informed NCIS officers at GTMO of the disappearance of Tur. NCIS opened a missing person investigation.  However, without information about Tur's accusations at the Bayview on Friday night or his appearance at NETTLETON's residence and the physical altercation there, NCIS investigators did not question NETTLETON at that time, or take other steps to focus their missing person investigation on Tur's presence at NETTLETON's residence and NETTLETON's knowledge of the circumstances surrounding Tur's disappearance.

35.    At approximately 5:00 p.m. on or about January 10, 2015, NETTLETON spoke with XO A.R. and instructed him to have the entire Command Duty Office, a larger group of GTMO personnel than what is available in the GTMO Security Department, enlisted in the search for Tur.  However, NETTLETON misled XO A.R. by concealing from him that Tur came to NETTLETON's residence after the Hail and Farewell party ended and they engaged in a physical altercation inside the residence that left Tur injured.

36.    After it began getting dark on or about January 10, 2015, NETTLETON again spoke with XO A.R., and they decided that the land search for Tur should be stopped for the evening, due to potentially dangerous conditions for personnel searching in the dark.

37.    At approximately 6:00 p.m. on or about January 10, 2015, NETTLETON spoke with Captain C.G. and informed him that the search was being stopped for the evening, but would resume in the morning.  NETTLETON misled

13

Captain C.G. by continuing to conceal from him that Tur had gone missing on or about January 9, 2015 after attending a command event earlier in the evening, the Hail and Farewell party at the Bayview for the incoming and outgoing XOs, at which NETTLETON had been present.   NETTLETON also misled Captain C.G. by continuing to conceal from him that on or about January 9, 2015, Tur had accused NETTLETON outside of the Bayview of having an extramarital affair with Tur's Spouse, that Tur had later come to NETTLETON's residence after the party, that Tur and NETTLETON had engaged in a physical altercation that left Tur injured, and that NETTLETON knew the last place Tur had been seen by anyone was NETTLETON's residence.

38.    At approximately 7:55 p.m. on or about January 10, 2015, NETTLETON sent an email to Admiral M.J., copying Captain C.G. and other Navy officials, to inform Admiral M.J. of the situation with Tur.  NETTLETON wrote:

> Admiral - We are searching for an NEX employee, [Tur], he was last seen at the O'Club around 0100, and may have walked to the Marine Hill mini mart (based on charge card info) some time after that.  We have Security, Marines and dogs searching Windward.  Security and Coast Guard are conducting searches of the Bay.  This is the spouse of our [Fleet and Family Support Center's] director, [Tur's Spouse].  Alcohol is a factor and this has happened before, never for this long though.  We are preparing for the worst and hoping for the best, Chaplains ready if needed.  We will expand the search parties tomorrow morning with help from the tenants. [Operational Reports] going out shortly. Nothing needed at this time, V/r JR

39.    At approximately 10:01 p.m. on or about January 10, 2015, Admiral

M.J. responded, writing:

> Can you give me some understanding of extent of search
> conducted, and whether there could be places that he might
> be "sleeping" this off . . . . friend, other. NCIS involved? Is
> [Tur's Spouse] frantic?    And, was there a domestic
> argument [sic] involved.  Any thoughts that he would be
> suicidal.

40.    At approximately 10:45 p.m. on or about January 10, 2015,

NETTLETON replied:

> Search - As much as we could get to in the hills before night
> fall – still searching some with flashlights, [night vision
> goggles], told them to take it easy during the night search -
> harbor using [forward-looking infrared] and/or [night
> vision goggles] looking along the coastline.  We went door
> to door in the [bachelors officers quarters] and his
> neighborhood.  Yes trying to find the places to sleep it off,
> we are also checking new and demo housing, and
> warehouses.
>
> [Tur's Spouse] is calm, she is waiting, had to call one of her
> daughters in college in Pennsylvania, other is here with her.
> NCIS is involved.  Yes to domestic argument and yes to
> suicidal, I say that only because he is on several meds and
> was drinking heavily. [Tur's Spouse] said he got physical
> with her at the bayview which is why she left.

After this email, Admiral M.J. instructed NETTLETON by email to call her at 8:00

a.m. the next morning, and NETTLETON wrote back that he would.

41.    At approximately 8:00 p.m. on or about January 10, 2015, Lieutenant

J.C. prepared a draft of a "Navy Blue" message to be transmitted to Navy officials

regarding the disappearance of Tur.  Lieutenant J.C. sent an email with an attached

draft of the Navy Blue to NETTLETON and XO A.R. for their review and approval.

The draft of the Navy Blue provided information about Tur, his disappearance, and the search for him. In a category marked, "LOCATION OF INCIDENT," the answer provided was "BAYVIEW COMPLEX." As part of the summary of the event, the notice stated, "VICTIM LAST SEEN LEAVING BAYVIEW COMPLEX AT 0030 EST."

42.     At approximately 9:10 p.m. on or about January 10, 2015, NETTLETON thanked Lieutenant J.C. for drafting and disseminating the notice, but misled XO A.R. and Lieutenant J.C. by failing to correct the false information in it.

43.     At no point on or about January 10, 2015 did NETTLETON inform Admiral M.J. or any of his superior officers or subordinates that on or about January 9, 2015, Tur had accused NETTLETON outside of the Bayview of having an extramarital affair with Tur's Spouse, that Tur had later come to NETTLETON's residence after the party, that Tur and NETTLETON had engaged in a physical altercation that left Tur injured, and that NETTLETON knew the last place Tur had been seen by anyone was NETTLETON's residence.

### Sunday, January 11, 2015

44.     On or about the morning of Sunday, January 11, 2015, XO A.R. spoke with NETTLETON to seek permission to request that the U.S. Coast Guard use a helicopter from one of its vessels docked at GTMO to assist in the search for Tur. NETTLETON refused to permit XO A.R. to make the request.

45.     At approximately 8:00 a.m. on or about January 11, 2015, NETTLETON spoke with Admiral M.J. by telephone in XO A.R.'s presence.

16

NETTLETON provided Admiral M.J. with information about the search for Tur. During the call, XO A.R. prompted NETTLETON to tell Admiral M.J. about what had happened at the Bayview between NETTLETON and Tur on or about January 9, 2015, but NETTLETON did not. After the call ended, XO A.R. asked NETTLETON why he had not told Admiral M.J. about the events at the Bayview on January 9, and NETTLETON replied that Admiral M.J. "did not need to know" those facts.

46.    XO A.R., having previously been told by K.W. about the telephone call from Tur on or about January 9, 2015 in which Tur indicated he was at NETTLETON's residence, asked NETTLETON if Tur had in fact come to NETTLETON's house that night. NETTLETON falsely stated that Tur had not.

### Tur's Body Located

47.    At approximately 9:00 a.m. on or about January 11, 2015, Navy personnel and others began searching for Tur again. At approximately 11:00 a.m., a U.S. Coast Guard vessel located Tur's body in the waters of Guantanamo Bay drifting westward and nearing the territorial water border with Cuba.

48.    At approximately 1:00 p.m. on or about January 11, 2015, persons who were still searching for Tur, unaware that his body had been located, discovered a paper towel, with a reddish-brown stain on it, near the base of the pier in NETTLETON's backyard. Later that day, personnel from CID and NCIS arrived at NETTLETON's pier to recover the paper towel. NETTLETON was nearby when one of the Navy personnel recovering the item stated that it appeared to have blood

on it.  NETTLETON responded, "That's probably nothing."   DNA testing later confirmed that the stain on the paper towel was a match for Tur's DNA.

49.     On or about January 11, 2015, NETTLETON spoke with Captain C.G. and informed him that Tur's body had been discovered.  Captain C.G. instructed NETTLETON to provide any information that he had gathered up until that point to NCIS because Tur's death made the investigation a potential criminal matter that NCIS would be investigating.  During this conversation, NETTLETON again misled Captain C.G. by continuing to conceal from him information about NETTLETON's interactions with Tur at the Bayview and at NETTLETON's residence on or about January 9, 2015, including that NETTLETON had been in a physical altercation with Tur in which Tur was injured.

50.     At approximately 4:30 p.m. on or about January 11, 2015, NETTLETON spoke with Admiral M.J. about the recovery of Tur's body. NETTLETON informed her that Tur's body had indications of possible "marine bites," but no other apparent injuries.  During this conversation, NETTLETON again misled Admiral M.J. by continuing to conceal information from her about NETTLETON's interactions with Tur at the Bayview and at NETTLETON's residence on or about January 9, 2015, including that NETTLETON had been in a physical altercation with Tur in which Tur was injured.

**Monday, January 12, 2015 and Thereafter**

51.     On or about January 12, 2015, NETTLETON told XO A.R. that Tur had come to NETTLETON's residence on or about January 9, 2015, contrary to what NETTLETON told XO A.R. on or about January 10, 2015, but that NETTLETON had not allowed Tur inside the house. NETTLETON misled XO A.R. by concealing from him that NETTLETON had been in a physical altercation with Tur inside NETTLETON's residence and that Tur had been injured during the altercation.

52.     On or about January 12, 2015, the Navy Inspector General's Office informed Admiral M.J. and Captain C.G. of an anonymous complaint alleging that NETTLETON and Tur's Spouse had an extramarital affair and were engaging in physical contact at the Bayview during the Hail and Farewell party on or about January 9, 2015.

53.     On or about January 12, 2015 or January 13, 2015, NETTLETON spoke with Captain C.G. and stated that he wanted to address "crazy rumors" he had heard about NETTLETON having an affair with Tur's Spouse. NETTLETON stated to Captain C.G. that "there's absolutely no truth to this rumor. I was not having an affair. None of this is going on." NETTLETON's denial of an extramarital affair with Tur's Spouse was false because NETTLETON knew that he and Tur's Spouse had engaged in an extramarital affair in or about 2014. NETTLETON also misled Captain C.G. by continuing to conceal from him that on or about January 9, 2015, Tur had come to NETTLETON's home after the party at the Bayview, that Tur and NETTLETON had engaged in a physical altercation that left Tur injured, and that

19

NETTLETON knew the last place Tur had been seen by anyone was NETTLETON's residence.

54.    On or about January 13, 2015, NETTLETON told Admiral M.J. for the first time that Tur had gone missing on or about January 9, 2015 after attending a command event earlier in the evening, the Hail and Farewell party at the Bayview for the incoming and outgoing XOs, at which NETTLETON had been present. NETTLETON also said that there was a lot of drinking at this event and there had been an argument between Tur and Tur's Spouse inside the event and also in the parking lot. NETTLETON also told Admiral M.J. for the first time that after he left the Bayview and returned to his residence alone, Tur came there and they engaged in a verbal argument, with Tur accusing NETTLETON of having an extramarital affair with Tur's Spouse. NETTLETON reported to Admiral M.J. that Tur left his residence and went back to the Bayview. NETTLETON assured Admiral M.J. that the allegations Tur made against him were untrue and falsely stated that NETTLETON did not have an extramarital relationship with Tur's Spouse. NETTLETON also misled Admiral M.J. by concealing from her that there was a physical altercation between NETTLETON and Tur at NETTLETON's house on or about January 9, 2015 and that Tur was injured in that altercation. After hearing the new information NETTLETON provided, Admiral M.J. instructed NETTLETON to provide this information to NCIS. NETTLETON did not provide this information to NCIS.

55.    On or about January 13, 2015, an autopsy was conducted on Tur's body by a military medical examiner. The autopsy revealed, among other things, that Tur

20

drowned, but he also had ribs that were fractured with associated soft tissue damage, and that these rib injuries occurred before he died.  The autopsy also found that Tur had a laceration on his head.

56.      On or about January 14, 2015 or January 15, 2015, NETTLETON told Captain C.G. that during a party at the Officer's Club on or about January 9, 2015, he got into an altercation with Tur over accusations that NETTLETON was having an extramarital affair with Tur's Spouse and there may have been some pushing and shoving.  NETTLETON said the argument settled down and everyone went their own way, but later that evening Tur showed up at his residence and again accused him of having an affair with Tur's Spouse.  NETTLETON said that he denied the affair to Tur and that Tur's concerns were "tamped back down."  NETTLETON said they had these discussions at the front door of NETTLETON's house, and Tur wanted to come in, but NETTLETON would not allow Tur to do so because NETTLETON's daughter was in the house.  NETTLETON said Tur eventually left.  NETTLETON explained to Captain C.G. that he did not inform him of these events earlier because, "I just didn't think it was particularly relevant" or "warranted being mention[ed]."  NETTLETON misled Captain C.G. by concealing from him that a physical altercation had occurred with Tur inside NETTLETON's house and that Tur had been injured in the altercation.

57.      Tur's Spouse was interviewed by NCIS on or about January 16, 2015.  During that interview, she was asked whether she had an extramarital affair with NETTLETON, and she denied they had such an affair.  After the interview, Tur's

Spouse spoke with NETTLETON about the questions asked by NCIS. Tur's Spouse informed NETTLETON of what she told NCIS and NETTLETON responded "good." Tur's Spouse told NETTLETON she thought her relationship with NETTLETON was "none of their business," and NETTLETON agreed.

58.     Beginning on or about January 20, 2015, NCIS conducted several searches of NETTLETON's home at GTMO and the surrounding property. NCIS discovered suspected bloodstains inside the first floor of NETTLETON's home during these searches. Samples of these bloodstains were taken by investigators and sent to a laboratory for forensic testing. Several of the suspected bloodstain samples were later determined through laboratory testing and analysis to contain blood that matched Tur's DNA.

59.     From on or about January, 21, 2015, when he left GTMO, to in or about November 2016, NETTLETON spoke with Tur's Spouse several times. During these conversations, NETTLETON expressed concerns to Tur's Spouse about the ongoing investigation by NCIS, including expressing concerns that the extramarital affair between NETTLETON and Tur's Spouse could lead to a court martial proceeding against NETTLEON. NETTLETON informed Tur's Spouse that if neither of them admitted they had an extramarital affair to NCIS, then he could not be found guilty of the offense of adultery in a court martial proceeding. Tur's Spouse also said that in the event there was a court martial proceeding, she would refuse to appear and provide testimony, which NETTLETON said was "good to hear."

## COUNT ONE
## (OBSTRUCTION OF JUSTICE)

60.     Paragraphs 1 to 59 are incorporated here by reference.

61.     From on or about January 10, 2015 through the date of this Indictment, in the Middle District of Florida, Naval Station Guantanamo Bay, and elsewhere, the defendant,

## JOHN R. NETTLETON,

did knowingly engage in misleading behavior towards another person with the intent to hinder, delay, and prevent the communication to law enforcement officers, that is, agents of the Navy Criminal Investigative Service and members of the Naval Station Guantanamo Bay's Security Department, information relating to the commission and possible commission of a federal offense, and attempted to do so by, among other things:

    a.     Making false and misleading statements to Navy personnel searching for Tur and investigating his disappearance and death, such as CDO A.T., that Tur was last seen at the Officer's Club/Bayview on or about January 9, 2015;

    b.     Making false and misleading statements to Navy personnel, such as XO A.R., that Tur had not come to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview;

    c.     Making false and misleading statements to Navy personnel, such as XO A.R., that when Tur came to NETTLETON's residence after the Hail and Farewell party on or about January 9, 2015, Tur did not come inside the residence;

    d.     Concealing from Navy personnel that on or about January 9, 2015, Tur came to NETTLETON's residence after the Hail and Farewell party at the Officer's Club/Bayview, NETTLETON and Tur engaged in a physical

altercation inside NETTLETON's residence, and that altercation resulted in Tur being injured;

      e.     Refusing the request by Navy personnel to use a U.S. Coast Guard helicopter in the search for Tur;

      f.     Knowingly permitting a Navy Blue communication providing false information about the last known location of Tur on or about January 9, 2015 to be sent to the Navy on or about January 10, 2015;

      g.     Making false and misleading statements to his superior officers, Captain C.G. and Admiral M.J., orally and in written emails on or about January 10, 2015, January 11, 2015, and January 12, 2015 that the last place Tur was seen was the Officers Club/Bayview on or about January 9, 2015;

      h.     Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015 and January 11, 2015 that Tur had gone missing on or about January 9, 2015 after attending a command event earlier in the evening, the Hail and Farewell party at the Officer's Club/Bayview for the incoming and outgoing XOs, at which NETTLETON had been present, that NETTLETON and others at the party had been intoxicated, and that Tur had accused NETTLETON of having an extramarital affair with Tur's spouse in front of the Officer's Club/Bayview after the party;

      i.     Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015, January 11, 2015, and January 12, 2015 that Tur came to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview;

      j.     Concealing from his superior officers, Captain C.G. and Admiral M.J., that on or about January 9, 2015, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence and that altercation resulted in Tur being injured;

      k.     Falsely stating to his superior officers, Captain C.G. and Admiral M.J., that he had not engaged in an extramarital affair with Tur's Spouse; and

      l.     Encouraging Tur's Spouse to conceal from Navy investigators that she and NETTLETON had engaged in an extramarital affair.

All in violation of Title 18, United States Code, Sections 1512(b)(3), and 2.

## COUNT TWO
### (OBSTRUCTION OF JUSTICE)

62.     Paragraphs 1 to 59 are incorporated here by reference.

63.     From on or about January 10, 2015 through the date of this Indictment, in the Middle District of Florida, Naval Station Guantanamo Bay, and elsewhere, the defendant,

### JOHN R. NETTLETON,

did corruptly obstruct, influence, and impede official proceedings, that is, the Department of the Navy investigation into the circumstances surrounding the disappearance, injury, and death of Tur, a Department of the Navy court martial, and a Federal grand jury proceeding, and attempted to do so by, among other things:

a.     Making false and misleading statements to Navy personnel searching for Tur and investigating his disappearance and death, such as CDO A.T., that Tur was last seen at the Officer's Club/Bayview on or about January 9, 2015;

b.     Making false and misleading statements to Navy personnel, such as XO A.R., that Tur had not come to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview;

c.     Making false and misleading statements to Navy personnel, such as XO A.R., that when Tur came to NETTLETON's residence after the Hail and Farewell party on or about January 9, 2015, Tur did not come inside the residence;

d.     Concealing from Navy personnel that on or about January 9, 2015, Tur came to NETTLETON's residence after the Hail and Farewell party at the Officer's Club/Bayview, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence, and that altercation resulted in Tur being injured;

e.    Refusing the request by Navy personnel to use a U.S. Coast Guard helicopter in the search for Tur;

f.    Knowingly permitting a Navy Blue communication providing false information about the last known location of Tur on or about January 9, 2015 to be sent to the Navy on or about January 10, 2015;

g.    Making false and misleading statements to his superior officers, Captain C.G. and Admiral M.J., orally and in written emails on or about January 10, 2015, January 11, 2015, and January 12, 2015 that the last place Tur was seen was the Officer's Club/Bayview on or about January 9, 2015;

h.    Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015 and January 11, 2015 that Tur had gone missing on or about January 9, 2015 after attending a command event earlier in the evening, the Hail and Farewell party at the Officer's Club/Bayview for the incoming and outgoing XOs, at which NETTLETON had been present, that NETTLETON and others at the party had been intoxicated, and that Tur had accused NETTLETON of having an extramarital affair with Tur's spouse in front of the Officer's Club/Bayview after the party;

i.    Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015, January 11, 2015, and January 12, 2015 that Tur came to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview;

j.    Concealing from his superior officers, Captain C.G. and Admiral M.J., that on or about January 9, 2015, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence and that altercation resulted in Tur being injured;

k.    Falsely stating to his superior officers, Captain C.G. and Admiral M.J., that he had not engaged in an extramarital affair with Tur's Spouse; and

l.    Encouraging Tur's Spouse to conceal from Navy investigators that she and NETTLETON had engaged in an extramarital affair.

All in violation of Title 18, United States Code, Sections 1512(c)(2), and 2.

## COUNT THREE
## (CONCEALMENT OF MATERIAL FACTS)

64.     Paragraphs 1 to 59 are incorporated here by reference.

65.     On or about January 10, 2015 through the date of this Indictment, in the Middle District of Florida, Naval Station Guantanamo Bay, and elsewhere, in a matter within the jurisdiction of the executive branch of the Government of the United States, and in connection with the investigation being conducted by the Navy into the circumstances surrounding Tur's disappearance, injury, and death, the defendant,

### JOHN R. NETTLETON,

did knowingly and willfully falsify, conceal, or cover up by trick, scheme, and device, a material fact, that is, during the investigation being conducted by the Navy, defendant NETTLETON intended to falsify and conceal the facts he knew about the circumstances surrounding the disappearance, injury, and death of Tur by, among other things:

        a.     Making false and misleading statements to Navy personnel searching for Tur and investigating his disappearance and death, such as CDO A.T., that Tur was last seen at the Officer's Club/Bayview on or about January 9, 2015;

        b.     Making false and misleading statements to Navy personnel, such as XO A.R., that Tur had not come to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview;

        c.     Making false and misleading statements to Navy personnel, such as XO A.R., that when Tur came to NETTLETON's residence after the Hail and Farewell party on or about January 9, 2015, Tur did not come inside the residence;

        d.     Concealing from Navy personnel that on or about January 9, 2015, Tur came to NETTLETON's residence after the Hail and Farewell party

27

at the Officer's Club/Bayview, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence, and that altercation resulted in Tur being injured;

     e.    Knowingly permitting a Navy Blue communication providing false information about the last known location of Tur on or about January 9, 2015 to be sent to the Navy on or about January 10, 2015;

     f.    Making false and misleading statements to his superior officers, Captain C.G. and Admiral M.J., orally and in written emails on or about January 10, 2015, January 11, 2015, and January 12, 2015 that the last place Tur was seen was the Officers Club/Bayview on or about January 9, 2015;

     g.    Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015 and January 11, 2015 that Tur had gone missing on or about January 9, 2015 after attending a command event earlier in the evening, the Hail and Farewell party at the Officer's Club/Bayview for the incoming and outgoing XOs, at which NETTLETON had been present, that NETTLETON and others at the party had been intoxicated, and that Tur had accused NETTLETON of having an extramarital affair with Tur's spouse in front of the Officer's Club/Bayview after the party;

     h.    Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015, January 11, 2015, and January 12, 2015 that Tur came to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview; and

     i.    Concealing from his superior officers, Captain C.G. and Admiral M.J., that on or about January 9, 2015, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence and that altercation resulted in Tur being injured.

All in violation of Title 18, United States Code, Sections 1001(a)(1), and 2.

## COUNT FOUR
### (FALSIFICATION OF RECORDS)

66.     Paragraphs 1 to 59 are incorporated here by reference.

67.     On or about January 10, 2015, in the Middle District of Florida, Naval Station Guantanamo Bay, and elsewhere, the defendant,

### JOHN R. NETTLETON,

knowingly concealed, covered up, falsified, and made false entries in records and documents, that is a Navy Blue communication sent to Navy officials, with the intent to impede, obstruct, and influence the investigation and proper administration of the Department of the Navy investigation into the circumstances surrounding the disappearance, injury, and death of Tur, a matter within the jurisdiction of the Department of the Navy, a department and agency of the United States.

All in violation of Title 18, United States Code, Sections 1519, and 2.

## COUNT FIVE
### (FALSIFICATION OF RECORDS)

68.    Paragraphs 1 to 59 are incorporated here by reference.

69.    On or about January 10, 2015, in the Middle District of Florida, Naval Station Guantanamo Bay, and elsewhere, the defendant,

### JOHN R. NETTLETON,

knowingly concealed, covered up, falsified, and made false entries in records and documents, that is emails to his superior officers, Admiral M.J. and Captain C.G., with the intent to impede, obstruct, and influence the investigation and proper administration of the Department of the Navy investigation into the circumstances surrounding the disappearance, injury, and death of Tur, a matter within the jurisdiction of the Department of the Navy, a department and agency of the United States.

All in violation of Title 18, United States Code, Sections 1519, and 2.

## COUNT SIX
### (FALSE STATEMENT)

70.     Paragraphs 1 to 59 are incorporated here by reference.

71.     On or about January 10, 2015, at Naval Station Guantanamo Bay, the defendant,

## JOHN R. NETTLETON,

willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Executive Branch of the Government of the United States, by stating to CDO A.T. that Tur was last seen on or about January 9, 2015 at the Officers Club/Bayview.   The statement and representation was false because, as NETTLETON knew, Tur had come to NETTLETON's home on or about January 9, 2015 and was not seen at the Officer's Club/Bayview afterwards.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT SEVEN
## (FALSE STATEMENT)

72.   Paragraphs 1 to 59 are incorporated here by reference.

73.   On or about January 10, 2015, at Naval Station Guantanamo Bay, the defendant,

### JOHN R. NETTLETON,

willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Executive Branch of the Government of the United States, by stating in an email to Admiral M.J. and Captain C.G. that that Tur was last seen on or about January 9, 2015 at the Officer's Club/Bayview.    The statement and representation was false because, as NETTLETON knew, Tur had come to NETTLETON's home on or about January 9, 2015 and was not seen at the Officer's Club/Bayview afterwards.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT EIGHT
### (FALSE STATEMENT)

74.     Paragraphs 1 to 59 are incorporated here by reference.

75.     On or about January 11, 2015, at Naval Station Guantanamo Bay, the defendant,

### JOHN R. NETTLETON,

willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Executive Branch of the Government of the United States, by stating to XO A.R. that Tur not come to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview.   The statement and representation was false because, as NETTLETON knew, Tur had come to NETTLETON's home on or about January 9, 2015.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT NINE
### (FALSE STATEMENT)

76.    Paragraphs 1 to 59 are incorporated here by reference.

77.    On or about January 12, 2015, at Naval Station Guantanamo Bay, the

defendant,

### JOHN R. NETTLETON,

willfully and knowingly made a materially false, fictitious, and fraudulent statement

and representation in a matter within the jurisdiction of the Executive Branch of the

Government of the United States, by stating to XO A.R. that Tur had come to

NETTLETON's residence on or about January 9, 2015, but that he had not come

inside.   The statement and representation was false because, as NETTLETON knew,

Tur had entered NETTLETON's home on or about January 9, 2015, where

NETTLETON and Tur engaged in a physical altercation.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT TEN
### (FALSE STATEMENT)

78.    Paragraphs 1 to 59 are incorporated here by reference.

79.    On or about January 13, 2015, at Naval Station Guantanamo Bay and

in the Middle District of Florida , the defendant,

### JOHN R. NETTLETON,

willfully and knowingly made a materially false, fictitious, and fraudulent statement

and representation in a matter within the jurisdiction of the Executive Branch of the

Government of the United States, by stating to Admiral M.J. and Captain C.G. that NETTLETON and Tur's Spouse were not having an affair. The statements and representations were false because, as NETTLETON knew, he and Tur's Spouse had engaged in an extramarital affair

All in violation of Title 18, United States Code, Section 1001(a)(2).


A TRUE BILL,

Foreperson

ANNALOU TIROL
Acting Chief, Public Integrity Section
Criminal Division, U.S. Department of Justice

By: _____
PETER NOTHSTEIN
Trial Attorney, Public Integrity Section


By: _____
TODD GEE
Deputy Chief, Public Integrity Section

## UNITED STATES DISTRICT COURT
Middle District of Florida
Jacksonville Division

THE UNITED STATES OF AMERICA

vs.

JOHN R. NETTLETON

### INDICTMENT

Violations:

| | |
|---|---|
| Ct. 1: | 18 U.S.C. §§ 1512(b)(3) and 2 |
| Ct. 2: | 18 U.S.C. §§ 1512(c)(2) and 2 |
| Ct. 3: | 18 U.S.C. §§ 1001(a)(1) and 2 |
| Ct. 4-5 | 18 U.S.C. §§ 1519 and 2 |
| Ct. 6-10: | 18 U.S.C. § 1001(a)(2) |

A true bill,

_Lynn Paarmann_
Foreperson

Filed in open court this _8th_ day

of January, 2019.

_Megan N. Chaddock_
Clerk

Bail   $_____

GPO 863 525