**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**CASE NO. 3:19-cr-00001-TJC-PDB**

**UNITED STATES OF AMERICA,**

**v.**

**JOHN R. NETTLETON,**
        **Defendant.**
_____/

**MOTION TO SUPPRESS**

Defendant JOHN R. NETTLETON, by and through undersigned counsel, files this Motion to Suppress and states as follows:

**BACKGROUND FACTS**

In January 2015, Defendant was a Captain in the U.S. Navy and the Commanding Officer of Naval Station Guantanamo Bay. At that time, Defendant reported to the Commander of the Navy Region Southeast ("CNRSE") Admiral M.J. and her Chief of Staff Captain C.G.

Defendant is charged in a ten-count indictment with:

Count One, Obstruction of Justice for knowingly engaging in misleading behavior toward another person with the intent to hinder, delay, and prevent the communication to agents of the Navy Criminal Investigative Service (NCIS) and members of the Naval Station Guantanamo Bay's Security Department, information relating to the commission and possible commission of a federal offense, and attempt to do so, in violation of 18 U.S.C. § 1512(b)(3), and 2;

Count Two, Obstruction of Justice for corruptly obstructing, influencing, and impeding official proceedings of the Department of the Navy investigation into the circumstances

1

surrounding the disappearance, injury, and death of Christopher Tur, a Department of Navy court martial, and a Federal grand jury proceeding, in violation of 18 U.S.C. § 1512(c)(2), and 2;

Count Three, Concealment of Material Facts, for knowingly and willfully falsifying, concealing, and covering up by trick, scheme, and device, a material fact, during the investigation by the Navy, with the intent to falsify and conceal the facts he knew about the circumstances surrounding the disappearance, injury, and death of Tur, in violation of 18 U.S.C. § 1001(a)(1), and 2;

Count Four, Falsification of Records, for knowingly concealing, covering up, falsifying, and making false entries in records and documents, that is a Navy Blue communication sent to Navy officials, with the intent to impede, obstruct, and influence the investigation and proper administration of the Department of the Navy investigation into the circumstances surrounding the disappearance, injury, and death of Tur, in violation of 18 U.S.C. § 1519, and 2;

Count Five, Falsification of Records, for knowingly concealing, covering up, falsifying, and making false entries in records and documents to his superior officers with the intent to impede, obstruct, and influence the investigation and proper administration of the Department of the Navy investigation into the circumstances surrounding the disappearance, injury, and death of Tur, in violation of 18 U.S.C. § 1519, and 2; and

Counts Six through Ten, False Statements, for willfully and knowingly making false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Executive Branch of the United States Government, in violation of 18 U.S.C. § 1001(a)(2).

As indicated in the indictment, Counts One, Two, Three, Five, Seven, and Ten are based in whole or part on statements or other communications Defendant made to Admiral M.J. and/or Captain C.G.

For reasons explained below, any and all statements Defendant made to Admiral M.J. and Captain C.G. beginning on January 12, 2015, and thereafter should be suppressed due to such statements having been given involuntarily.

## MEMORANDUM OF LAW

I.   **ARTICLE 31 OF THE UNIFORM CODE OF MILITARY JUSTICE EXISTS TO PROTECT SERVICE MEMBERS FROM MAKING COMPELLED SELF-INCRIMINATING STATEMENTS**

Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831 ("Article 31") protects service members from being compelled to answer questions which may tend to lead to incriminating responses. Under Article 31, no person may

> request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

10 U.S.C. § 831(b).

Rights warnings are required if "(1) the person being interrogated is a suspect at the time of the questioning, and (2) the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry." *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000). The protections of Article 31 must be read even when a suspect is not in custody. *United States v. Baird,* 851 F.2d 376, 383 (D.C. Cir. 1988).

"The Article 31(b) warning requirement provides members of the armed forces with statutory assurance that the standard military requirement for a full and complete response to a superior's inquiry does not apply in a situation when the privilege against self-incrimination may be invoked." *United States v. Swift*, 53 M.J. at 445. "Because of the effect of superior rank or official position upon one subject to military law, the mere asking of a question under certain

3

circumstances is the equivalent of a command." *United States v. Duga*, 10 M.J. 206, 209 (C.M.A. 1981), *abrogated on other grounds by United States v. Jones*, 73 M.J. 357, 361–62 (C.A.A.F. 2014).

Article 31(b) ensures that service members are protected from making incriminatory statements due to the "subtle pressures which existed in military society." *Ibid* (*citing United States v. Armstrong,* 9 M.J. 374, 378 (C.M.A. 1980)). Although one would think this purpose behind Article 31, protecting service members from making incriminating confessions due to deference to a superior officer, would justify extending Article 31 protections beyond merely court-martials, federal courts have held that Article 31 does not apply in federal criminal proceedings. *United States v. Newell*, 578 F.2d 827, 832–833 (9th Cir. 1978) (Article 31 does not "purport to apply to federal court proceedings."); *United States v. Singleton*, 600 F.2d 553, 555 (5th Cir. 1979) ("[B]y its terms [Article 31] is limited to evidence used in a trial by court-martial."); *United States v. Santiago,* 966 F.Supp.2d 247, 258 (S.D.N.Y. Aug. 13, 2013).

## II.    FIFTH AMENDMENT PROTECTIONS EXCEED THE TRADITIONAL SCOPE OF *MIRANDA* IN CASES INVOLVING STATEMENTS MADE IN A MILITARY CONTEXT

The Fifth Amendment prescribes, in pertinent part, that: "No person ... shall be compelled in any criminal case to be a witness against himself ..." While courts have declined to apply the Article 31 exclusionary rule in federal criminal proceedings, and Defendant was not "in custody" for purposes of *Miranda,* the exclusionary rule does apply to suppress evidence that is derived from statements that are obtained involuntarily. *See Mincey v. Arizona,* 437 U.S. 385, 398 (1978) ("use against a defendant of his *involuntary* statement is a denial of due process of law").

The Fifth Amendment protects statements that are involuntary due to their military context, even when *Miranda's* literal application would not. While not directly applicable in

Federal Court, Article 31 of the Uniform Code of Military Justice is within the purview of the Fifth Amendment. *See United States v. Armstrong*, 9 M.J. at 380. Military Courts have provided that "it was the intent of Congress in [Article 31] to secure [military service members] the same rights secured to those of the civilian community under the Fifth Amendment to the Constitution of the United States -- no more and no less." *United States v. Eggers*, 11 C.M.R. 191, 195 (U.S. C.M.A. 1953). "[W]hile Article 31(a) and the Fifth Amendment coincide in scope and while Article 31(b) was enacted to serve the purpose of avoiding coerced statements in violation of both provisions, unique factors in the military environment—unknown in the civilian setting—" have resulted in Article 31(b) having a broader scope than *Miranda. United States v. Ravenel*, 26 M.J. 344, 349 (C.M.A. 1988).

The Fifth Amendment must protect against statements compelled as a result of an inferior-superior military relationship. Superior-inferior military relationships can have a devastating effect on voluntariness of a statement. *See United States v. Lewis,* 12 M.J. 205 (1982). The very nature of the superior-inferior relationship in the military, as such existed between Defendant and Admiral M.J. and Captain C.G., creates an environment where an inferior officer is compelled to respond to the wishes and dictates of his superiors; the "inherent tendency" of the superior-inferior relationship is to induce an inferior to respond to questions by the superior. *Id* at 206.

> Sitting by designation, retired Supreme Court Justice David H. Souter wrote that
>
> whenever a member of the services is questioned in circumstances mandated by a superior's order, he is in the situation that *Miranda* was meant to address, where the line between voluntary and involuntary response is at least so blurred that the Fifth Amendment guarantee is in jeopardy.

*United States v. Rogers,* 659 F.3d 74, 79 (1st Cir. 2011).

The Court of Military Appeals has repeatedly discussed the pressures that exist in military society as a result of the superior-inferior relationship.

> The purpose of Article 31(b) apparently is to provide servicepersons with a protection which, at the time of the Uniform Code's enactment, was almost unknown in American courts, but which was deemed necessary because of subtle pressures which existed in military society ... Conditioned to obey, a serviceperson asked for a statement about an offense may feel himself to be under a special obligation to make such a statement. Moreover, he may be especially amenable to saying what he thinks his military superior wants him to say - whether it is true or not. Thus, the serviceperson needs the reminder required under Article 31 to the effect that he need not be a witness against himself ... To paraphrase a remark by Mr. Justice Steward in *Rhode Island v. Innis* ... "(t)he concern of the (Congress) in (enacting Article 31(b)) was that the 'interrogation environment' created by the interplay of interrogation and (military relationships) would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory incrimination" contained in Article 31(a) of the Uniform Code of Military Justice.

*United States v. Armstrong,* 9 M.J. at 378 (citations omitted).

The court has explained that a service member is "educated from the beginning of his military career that failure to respond to the wishes of a superior is most often punishable under the Uniform Code of Military Justice." *United States v. Ravenel,* 26 M.J. at 349 n.3 (noting that "the subtleties of the superior-subordinate relationship and the conditioned response, consciously created from the first day of basic training, to respond almost unthinkingly to the wishes of a military superior" cause the court to interpret Article 31 in a very broad fashion in order to protect service members from compelled self-incrimination).

## III. THE COURT SHOULD SUPPRESS DEFENDANT'S STATEMENTS TO ADMIRAL M.J. AND CAPTAIN C.G. BEGINNING ON JANUARY 12, 2015, AND THEREAFTER BECAUSE THEY WERE INVOLUNTARILY MADE

### a) Defendant's statements to Admiral M.J. and Captain C.G. beginning on January 12, 2015, were involuntarily given

Defendant's statements to Admiral M.J. and Captain C.G. from January 12, 2015, thereafter were involuntarily given. Because of the nature of the superior-inferior relationship,

6

the Fifth Amendment required a rights warning due to the military context in which these statements were made. In determining whether a defendant's will was over-borne in a particular case, the totality of all the surrounding circumstances must be considered. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

Defendant's statements to Admiral M.J. and Captain C.G. are involuntary due to the inherent "subtle pressures" and "subtle coercion" of their military relationship. When questioned by a superior in the military, it certainly cannot be said that an inferior simply may voluntarily choose not to respond. *United States v. Armstrong,* 9 M.J. at 378; *United States v. Ravenel,* 26 M.J. at 349 n.3. It should not be taken lightly that Admiral M.J. is a Navy Rear Admiral, one of the highest ranks in the military. An admiral's is the Navy's equivalent of a general. As Defendant's commander, Admiral M.J. had the inherent authority to order Defendant into arrest or confinement if he refused to answer questions. Article 9 of the Uniform Code of Military Justice provides:

> A commissioned officer, a warrant officer or a civilian subject to this chapter or to trial thereunder may be ordered into arrest or confinement only by a commanding officer to whose authority he is subject, by an order, oral or written, delivered in person or by another commissioned officer. The authority to order such persons into arrest or confinement may not be delegated.

10 U.S.C. § 809(c).

Captain C.G. was Admiral M.J.'s chief of staff and a direct superior to Defendant in the chain of command. Captain C.G.'s relationship to Admiral M.J. provided a threat that failure to cooperate with Captain C.G. would result in Admiral M.J. exercising Article 9's power to order a subordinate into arrest or confinement. Refusal to respond to Admiral M.J. or Captain C.G.'s questioning could have also resulted in administrative punishment or punishment under the Uniform Code of Military Justice for a violation of Article 89, disrespect toward a superior

commissioned officer (10 U.S.C. § 889); Article 90, willfully disobeying superior commissioned officer (10 U.S.C. § 890); Article 92, failure to obey an order or regulation (10 U.S.C. 892); Article 133, conduct unbecoming of an officer and a Gentleman (10 U.S.C. 933); and, Article 134, general article prohibiting conduct prejudicial to good order and discipline (10 U.S.C. 934).

Defendant's statements to Admiral M.J. and Captain C.G. beginning on January 15, 2015, were involuntary partly because of the timing of the questioning. Admiral M.J. and Captain C.G. questioned Defendant after Tur's body was located, a paper towel with Tur's blood was found at Nettleton's home, and Admiral M.J. and Captain C.G. had received an anonymous complaint regarding Defendant and Tur. Under these circumstances, Admiral M.J. and Captain C.G. would have suspected Defendant of some sort of misconduct beginning at least on January 12. This suspicion is a significant factor in their questioning of Defendant that would have compelled him to make an involuntary statement.

The inherently coercive force of military organization implicated in questioning a service member led Congress to create Article 31 years before *Miranda*. To meet this coercive force, Article 31 requires a rights warning during a questioning by a superior officer once there is a suspicion that the service member committed an offense, regardless of custody. *United States v. Swift*, 53 M.J. at 446. Military Courts have interpreted this right to be coextensive with the Fifth Amendment. *United States v. Eggers*, 11 C.M.R. at 195. At no point relevant herein was Defendant informed that he did not have to answer his superior's questions. In fact, he wasn't advised of his right to remain silent until on or about January 20, 2015. As a result, Defendant was denied his shield to the coercive force of military relationships that is required by the Fifth Amendment.

The location of Defendant's command also contributes to the involuntariness of his statements. Defendant was the Commanding Officer of Naval Station Guantanamo Bay at Guantanamo Bay, Cuba. Operating in a base in a hostile region adds to the coerciveness and pressure of Admiral M.J.'s and Captain C.G.'s questioning. Questioning by a superior officer regarding the death of a Navy employee in a hostile region creates additional pressure to produce an involuntary statement.

Defendant's statements are the perfect example of the dangers a military relationship can have on Fifth Amendment rights. The fact that Defendant's conversations were over the phone does not affect the involuntariness of the statement. The superior-inferior military relationship, of course, is still existent in this context. Regardless of how the questioning was conducted, Defendant was subject to the inherently coercive force and pressure of a superior military officer's questioning. The only way to cure this force and pressure was to provide a rights warning, yet no warning was given.

The fact that Defendant and Captain C.G. were technically the same rank does not remove the coercive force and pressure of their military relationship. Captain C.G. was above Defendant in the chain of command, thus establishing an inferior-superior relationship. Additionally, Captain C.G.'s relationship with Admiral M.J. as the chief of staff put Captain C.G. in a role as the direct advisor to Defendant's commander. Consequently, Captain C.G. carried much of the same weight and authority of Admiral M.J. in corresponding with subordinates in the chain of command.

Given the totality of the surrounding circumstances surrounding Defendant's statements to Admiral M.J. and Captain C.G. on January 12, 2015 and thereafter, Defendant's will was over-borne and the statements were provided involuntarily. The force and pressures of the

superior-inferior relationships, combined with the timing of the questioning and the lack of a rights warning, all contribute to an overwhelming force that resulted in involuntary statements.

      **b) Admiral M.J. and Captain C.G. failed to give Defendant any rights warnings as was required by the Fifth Amendment in order to render Defendant's statements voluntary**

The Court should suppress Defendant's statements because Admiral M.J. and Captain C.G. failed to give a rights warning as required by the Fifth Amendment. Interpreting the Fifth Amendment, *Miranda* requires a rights warning when there is a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). However, in the military context, "the application of the literal language of *Miranda* would have little meaning, and, more importantly, would reduce the essence of its holding to a hollow shell." *United States v. Shafer*, 384 F. Supp. 486, 489 (N.D. Ohio 1974). In order to meet the demands of the Fifth Amendment, "it is necessary to translate the terms of *Miranda* into a military context so as to effectuate their meaning." *Ibid.* Looking to military courts for guidance, Federal Courts have interpreted superior-inferior military relationships as the analog of custody. *See, e.g.,ibid.* ("Clearly, 'custody' of military personnel does not require the same restraints as in civilian life; similarly, 'interrogation' takes on a far different meaning in a military environment, where any superior officer has the right to demand that his questions be answered."); *United States v. Rogers*, 659 F.3d at 79 ("whenever a member of the services is questioned in circumstances mandated by a superior's order, he is in the situation that *Miranda* was meant to address, where the line between voluntary and involuntary response is at least so blurred that the Fifth Amendment guarantee is in jeopardy.").

In *Shafer*, members of the Ohio National Guard were involved in a shooting incident on campus at Kent State. *United States v. Shafer*, 384 F. Supp. at 487. After the incident, various guardsmen acknowledged firing their weapon. *Id.* These guardsmen were taken as a group to a

gymnasium with no law enforcement officers present. *Id.* They were then told by a superior officer, using "precatory language," to provide written statements for the sole purpose of producing a "firing incident report." *Id.* The district looked to military jurisprudence for guidance. *Id* at 488. The court determined that Article 31 required a rights warning because a superior officer requested the written statement in the course of an official investigation. *Id* at 490. The court then noted that "a request for a statement in the course of an official investigation by a person with authority over the accused is sufficient to trigger the need for Article 31 warnings which are the military cognate of the *Miranda* warnings." *Ibid.* The court ordered the written statements of the guardsmen to be suppressed.

In *Rogers*, child pornography was found on a non-commissioned Naval officer's (NCO) computer. The NCO's commander ordered him to go home where he was questioned by non-military police. *United States v. Rogers*, 659 F.3d at 76. Showing no signs of distress, the NCO made various incriminating statements. *Id* at 76 - 77. The First Circuit Court of Appeals, guided by military jurisprudence, determined that custodial conditions existed because the NCO was not free to terminate the interrogation and leave. *Id* at 78 – 79 ("he was not advised that he was free to have nothing to do with the enquiring police officers"). This deprivation of freedom was caused by the commander's order which carried at least the "subtle coercion" and "subtle pressure," unique to the military, to speak with the police. *Id* at 78. The court determined that the Defendant had been in custody for *Miranda* purposes. The court ordered the NCO's statements to be suppressed. *Id* at 79.

Like *Shafer* and *Rogers*, the military context in which Defendant's statements were made should be considered. Both Admiral M.J. and Captain C.G. were in positions of authority over Defendant in the Naval chain of command. Admiral M.J. was Defendant's direct commander,

11

and Captain C.G. was the Admiral's chief of staff. Defendant was required to report to both of these superior officers. Like *Shafer* and *Rogers*, Defendant's statements were made after he appeared to be a suspect in wrongdoing. Beginning on January 12, 2015, he was questioned after Tur's body was located in a body of water, a paper towel with Tur's blood on it was found at Defendant's home, and Admiral M.J. and Captain C.G. had learned of an anonymous complaint regarding Defendant and Tur. The substantial "coercion" and "pressure" inherently caused by a Navy admiral commander and her chief of staff in Defendant's direct chain of command obligated Defendant to respond to their inquiries. Both Admiral M.J. and Captain C.G. failed to provide rights warnings. As a result, Defendant was not in a position where he could reasonably refuse to answer questioning from a superior.

This Court should not rely upon the conclusions of *United States v. Santiago* and *United States v. Baird* because neither case is apposite here. In *Santiago,* the court fails to adequately recognize the "subtle pressures" or "subtle coercion" in the military context that undermines the voluntariness of statements made by inferior officers when questioned by superiors. *United States v. Santiago*, 966 F. Supp. 2d at 261 – 266. The court in *Santiago* applied *Miranda* inflexibly, essentially rejecting the importance of the military context addressed in *Shafer* and *Rogers*. Further, the defendant in *Santiago* was informed that participation in the pertinent interview was voluntary. *Id.* at 261.

Defendant's case is distinguishable from *Baird*, a case where "the investigation did not concern a military offense" and was conducted not by the military branch the defendant was a part of "but by the civilian agency that has full jurisdiction *over* that service." *United States v. Baird*, 851 F.2d at 381. Moreover, the defendant in *Baird* was advised by the civilian investigator "that the interview was going to be voluntary," and that Baird "was free to go

whenever he wanted to." *Id.* at 378. The court in *Baird* recognized that Article 31(b) creates a "presumption of custody requiring the equivalent of *Miranda* warnings whenever a military suspect is caught up in a "chain-of-command" interrogation by military investigators." *Id* at 381. The court then refused to extend the protections of Article 31 because the investigation was for a nonmilitary offense and conducted by nonmilitary investigators. *Ibid.* Regardless of whether this conclusion was mistaken or not, *Baird* does not apply because Defendant, unlike Baird, was caught up in a chain-of-command investigation by military investigators.

Lastly, preventing law enforcement from deliberately circumventing Article 31 and military service member's Fifth Amendment rights requires due consideration of military context, as well. This case began as a military investigation before being turned over to the Justice Department. Failure to consider the military context will allow admission of statements in Federal Court that would be suppressed in Military Courts under Article 31. This would provide an incentive for law enforcement to prosecute cases in Federal Court whenever a service member made an involuntary statement to a superior officer, thus violating the service member's Fifth Amendment rights.

## CONCLUSION

Article 31 of the Uniform Code of Military Justice exists to protect service members from making compelled self-incriminating statements. While Article 31 is not directly applicable in Federal Court, it is coextensive with the Fifth Amendment. The Fifth Amendment demands that Federal Courts consider the military context of a statement when determining its voluntariness. When the circumstances are viewed in their totality, Defendant's statements to Admiral M.J. and Captain C.G. beginning on January 12, 2015, and thereafter were involuntary and should be suppressed.

WHEREFORE, Defendant requests for the Court to grant this Motion to Suppress and enter an order excluding from trial the statements Defendant made to Admiral M.J. and Captain C.G. on January 12, 2015, and thereafter.

Submitted on July 22, 2019, by

s/ Daniel Schwarz
Daniel Schwarz
Fla. Bar No. 84665
Daniel Schwarz, P.A.
245 SE 1st Street, Suite 404
Miami, FL 33131
Phone: (305) 557-4671
Fax: (305) 503-6973
Daniel@danielschwarzlaw.com

Terence Lenamon
Fla. Bar No. 970476
Terence Lenamon, P.A.
245 SE 1st Street, Suite 404
Miami, FL 33131
Phone: (305) 373-9911
Fax: (305) 503-6973
terry@lenamonlaw.com

Colby C. Vokey
Texas Bar No. 24043391
The Law Firm of Colby Vokey PC
6924 Spanky Branch Court
Dallas, Texas 75248
(214) 697-0274
(214) 594-9034 Fax
vokeylaw@colbyvokey.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF, and thereby served on all interested parties.

s/ Daniel Schwarz
Daniel Schwarz