**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                    Case No. 3:19-cr-1-J-32PDB

JOHN R. NETTLETON

---

**ORDER**

In an apparent issue of first impression, the Court must determine whether a high-ranking Navy officer's noncustodial, unwarned statements to two superior officers were involuntary solely because of the "subtle pressure" to respond to orders inherent in military command relationships.

This case is before the Court on Defendant John Nettleton's Motion to Suppress (Doc. 33) and the Government's response (Doc. 43).[1] On September 18, 2019, the Court held a hearing on this motion, the record of which is incorporated herein.[2]

---

[1] Nettleton filed six pretrial motions, and the Government filed a single omnibus response. However, the Court has ruled on the other five motions in a separate Order. (Doc. 45).

[2] The Court notes that in certain circumstances, a defendant is entitled to an evidentiary hearing on his motion to suppress. Jackson v. Denno, 378 U.S. 368, 380 (1964). Here, Nettleton never requested an evidentiary hearing, and it is not apparent from the motion that he is entitled to one. See United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir. 1985) (stating that to be entitled to an evidentiary hearing, the defendant must proffer "facts contrary to or in addition to those alleged by the [Government] which, if proven, would indicate the confession was involuntary."); see also Order, Doc. 44 (stating that neither party requested an evidentiary hearing but

**I. BACKGROUND**[3]

Captain John R. Nettleton (Ret.) faces a ten-count indictment following the investigation of the suspicious death of a civilian Navy employee, Christopher Tur, at Naval Station Guantanamo Bay, in Guantanamo Bay, Cuba. (Doc. 1). In January 2015, Nettleton was the Commanding Officer of Guantanamo and had been since June 2012. Id. ¶ 1. He reported to Admiral M.J., the Commander of Navy Region Southeast based in Jacksonville, Florida, and her chief of staff Captain C.G. Id. ¶ 3. Tur worked as a civilian employee for the Navy and lived on Guantanamo with his wife (who was also a Navy civilian employee) and their two children. Id. ¶ 4.

On the evening of January 9, 2015, there was a hail and farewell in the basement of the Guantanamo officer's club, called the Bayview, to greet the incoming Executive Officer ("XO"), A.R., and say goodbye to the outgoing XO. Id. ¶ 16. Nettleton, Tur, and Tur's wife all attended the hail and farewell, and each were seen consuming several alcoholic drinks. Id. ¶ 17. Around 10:00 p.m. outside of the Bayview, Tur began yelling at his spouse and Nettleton, accusing them of having an affair. Id. ¶ 18. At the urging of his new XO, Nettleton left the Bayview and proceeded toward his residence. Id.

---

that the Court would schedule one if it became necessary). Neither party, at the motion hearing or since, has requested an evidentiary hearing.

[3] These facts are taken from the indictment and other filings provided by the Government. Nettleton did not produce any evidence or dispute the central facts.

Sometime between 10:30 and 10:45 p.m. that evening, Tur called a civilian resident of Guantanamo, K.W., and told her "he was 'at the Skipper's house' and that he had 'just knocked the Skipper out.' K.W. also heard [Nettleton] stating words to the effect that Tur had 'just knocked him out.'" Id. ¶ 20. Nettleton's daughter, J.N., was in her room on the second floor of the Nettleton home. She texted several people that she heard her father and another person fighting downstairs. Id. ¶¶ 21–27. At one point, she went downstairs and saw a man on a cell phone standing near her father, who was laying on the floor. Id. J.N. "eventually realized" the man she saw was Tur. Id. ¶ 22. J.N.'s text messages began at 10:46 and lasted until 11:28 p.m. Id. ¶¶ 21, 27. After the fighting noises ceased, Nettleton, who was shirtless, went into J.N.'s room and spoke with her briefly. Id. ¶ 28.

The following day, Saturday, January 10, K.W. and R.B., a member of the Navy, began looking for Tur, who had not returned home. Id. ¶ 29. The two went to Nettleton's residence and asked if Tur was there. Id. Nettleton told them that Tur had been there the night before, but that he left after Nettleton told him to do so. Id. Nettleton refused R.B.'s request to search the backyard for Tur. Id. Later that day, Nettleton told the Command Duty Officer to have the Security Department search for Tur. Id. ¶ 30. Nettleton told the Command Duty Officer that the last place anyone saw Tur was the Bayview. Id. Based on the search by the Security Department, Naval Criminal Investigative Service opened a

3

missing person investigation. Id. ¶ 34. Around 5:00 p.m. that evening, Nettleton directed the XO to expand the search party, but the search was halted after dark due to potentially dangerous conditions. Id. ¶¶ 35–36. Later that evening, Lieutenant J.C. drafted a Navy Blue message to send to Navy officials regarding Tur's disappearance. Lieutenant J.C. sent the draft to Nettleton and the XO. The message stated that Tur was last seen at the Bayview. Nettleton did not correct this information. Id. ¶¶ 41–42.

Also on January 10, Nettleton spoke with Captain C.G. and informed him that a civilian had gone missing and a search was underway. Id. ¶ 33. Nettleton did not tell Captain C.G. about Tur's accusations at the hail and farewell, or about his altercation with Tur at his house afterward. Id. ¶ 33. That evening, Nettleton sent an email to Admiral M.J. and others, informing her that a civilian was missing, that a search was underway, that alcohol was involved, and that Tur had gotten drunk and gone missing before. Id. ¶ 38. Admiral M.J. requested additional information, which Nettleton provided, stating that Tur may have been suicidal and "got physical with [his wife] at the bayview [sic] . . . ." Id. ¶¶ 39–40. Admiral M.J. instructed Nettleton to call her at 8:00 a.m. the next morning. (Doc. 43-2 at 2).

The following morning, Nettleton spoke on the telephone with Admiral M.J. in the XO's presence. Nettleton updated Admiral M.J. on the search efforts, but despite the XO's urging, did not inform Admiral M.J. about the events that

4

occurred at the Bayview. Id. ¶ 45. Nettleton told the XO that Admiral M.J. did not need to know about that. Id. The XO, who K.W. had previously informed about Tur's phone call and statement that he was "at the Skipper's house," asked Nettleton if Tur had gone to his house; Nettleton responded that he had not. Id. ¶¶ 45–46.

Around 11:00 a.m. January 11, Tur's body was located by the Coast Guard floating toward Cuba's territorial waters. Id. ¶ 47. An autopsy revealed that Tur died from drowning, but that he also suffered broken ribs and a laceration on his head before drowning. Id. ¶ 55. During the search for Tur, individuals found a bloody paper-towel in Nettleton's backyard. Id. ¶ 48. NCIS collected the paper towel and a later DNA test showed the blood belonged to Tur. Id.

On January 12, the Navy Inspector General's Office informed Admiral M.J. and Captain C.G. that someone filed an anonymous complaint against Nettleton alleging that he was having an affair with Tur's wife. Id. ¶ 52; (Doc. 43-2 at 2). At this point, Nettleton had still not informed Admiral M.J. or Captain C.G. that he and Tur had been in an altercation at the command-sponsored hail and farewell. (Docs. 1 ¶¶ 54–56; 43-2 at 2). On January 13, at Admiral M.J.'s direction, Nettleton called her. During this call, he informed her that Tur had gone missing after the hail and farewell, that Tur accused him of having an affair with Tur's wife (which he denied), and that Tur arrived at his house and yelled at him but that Tur then left his house and returned to the

Bayview. (Doc. 43-2 at 3). Admiral M.J. "told [Nettleton] to go find NCIS and explain everything to them" as he had to her, id., but Nettleton never relayed this information to NCIS, (Doc. 1 ¶ 54). On January 14 or 15, Nettleton called Captain C.G. to provide him additional details regarding what happened. Nettleton told Captain C.G. for the first time that he had gotten into an altercation with Tur at the Bayview, and that Tur had come to his house afterward. Nettleton still did not tell Captain C.G. that he and Tur fought inside his home. (Doc. 43-1 at 14–16). At this point, Captain C.G. did not want to ask any questions that could potentially "taint" any proceedings down the road, and just listened to what Nettleton had to say. (Doc. 43-1 at 16).

NCIS began investigating Tur's death, and on January 17, Captain C.G. told Admiral M.J. that NCIS officials had learned that Tur and Nettleton got into a physical fight inside Nettleton's home on January 9. (Doc. 43-2 at 4). On January 20, Admiral M.J. decided to relieve Nettleton of command, and relieved him the following day. Id.

Nettleton was indicted by a federal grand jury for: obstruction of justice in violation of 18 U.S.C. § 1512(b)(3) (Count One); obstruction of justice in violation of § 1512(c)(2) (Count Two); concealment of material facts in violation of § 1001(a)(1) (Count Three); falsification of records in violation of § 1519 (Counts Four and Five); and false statements in violation of § 1001(a)(2) (Counts Six through Ten). (Doc. 1 ¶¶ 60–79). Nettleton moves to suppress all

6

statements he made to Admiral M.J. or Captain C.G. after January 11 as being involuntary. (Doc. 35).

## II. DISCUSSION

Nettleton argues that any statements he made to Admiral M.J. or Captain C.G. beginning January 12 or thereafter were involuntary and, thus, their use at trial would violate the Fifth Amendment. (Doc. 35 at 3). The thrust of Nettleton's argument is that the "subtle pressures" and "subtle coercion" of the superior–subordinate military relationship rendered his statements involuntary. (Doc. 35 at 7). He argues that although neither Article 31 of the Uniform Code of Military Justice ("UCMJ")[4] nor Miranda[5] are implicated, the uniqueness of the situation concerning his unwarned statements renders them violative of the Fifth Amendment's prohibition on compulsory self-incrimination.

Article 31 and Miranda protect individuals by requiring warnings of their constitutional rights before certain questioning. Article 31, which applies to members of the military, requires that "an accused or a person suspected of an offense" be informed of "the nature of the accusation" and his rights before being questioned. 10 U.S.C. § 831(b). Miranda requires that warnings be given before

---

[4] 10 U.S.C. § 831(b) (2018).

[5] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

custodial interrogations, which the Supreme Court has defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. Thus, Article 31 is broader, requiring warnings before questioning any individual suspected of wrongdoing; whereas Miranda protects only those in custody or its equivalent. See 10 U.S.C. § 831(b); Miranda, 384 U.S. at 444. "Because of the inherently coercive environment of the military command structure, more self-incrimination protections have been given accused servicemen than their civilian counterparts." Calley v. Callaway, 519 F.2d 184, 202 n.30 (5th Cir. 1975)[6] (explaining that "[t]he Court of Military Appeals has, in many instances, extended the constitutional rights of servicemen beyond those accorded to civilians.").

The Government argues that Miranda does not apply because Nettleton was not in custody, that Article 31 does not apply to federal proceedings, and that even if Article 31 did apply, the Government did not violate it. (Doc. 43 at 2). Nettleton concedes that neither Miranda nor Article 31 apply here because he was not in custody (which is required to receive Miranda protections), and Article 31 applies only to trials by court-martial. (Doc. 35 at 4); see also § 831(d)

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down by the close of business on September 30, 1981.

8

("No statement obtained from any person in violation of this article . . . may be received in evidence against him in a trial by court-martial." (emphasis added)). Nonetheless, Nettleton argues that admitting his unwarned statements rewards forum shopping because the Government can circumvent Article 31 by bringing federal charges to a grand jury instead of UCMJ offenses to a court-martial. Thus, while conceding that neither Miranda nor Article 31 apply, Nettleton asks the Court to take pieces from each doctrine and apply them here to exclude his statements as involuntary. He urges the Court to find that, despite the other factors indicating that his statements were voluntary, the conditioning of Navy personnel to follow orders required Admiral M.J. and Captain C.G. to warn Nettleton of his rights before questioning him about the circumstances of Tur's death. The Court is unpersuaded.

Whether a statement was involuntarily given is examined under the totality of circumstances, including "the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The ultimate inquiry is whether the statements were "the product of an essentially free and unconstrained choice[,]" Hubbard v. Haley, 317 F.3d 1245, 1252–53 (11th Cir. 2003) (quotations and citations omitted), and not given because "the defendant's will was overborne at the time he confessed." Lynumn v. Illinois, 372 U.S. 528, 534 (1963). The Supreme Court and Eleventh Circuit have listed many non-exclusive factors that bear on voluntariness—the

9

defendant's age, education, intelligence, length of incarceration, nature of interrogation, use of physical punishment, or the use of promises or inducements—but "the absence of official coercion is a sine qua non of effective consent. . . ." Hubbard, 317 F.3d at 1253 (citing United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996)).

Other than the "subtle coercion" and "subtle pressure" that Nettleton contends existed, all other factors indicate that Nettleton's statements were voluntary. See Bustamonte, 412 U.S. at 226; Hubbard, 317 F.3d at 1252–53. Nettleton is highly educated, and not only was he a senior Naval officer with significant responsibilities,[7] but he was considered by Admiral M.J. as one of her higher-rated installation commanders. (Doc. 43-2 at 5). Further, he was never physically restrained during his interactions with Admiral M.J. and Captain C.G. (some of which were initiated by him), received no physical punishment, and was not made promises or threatened. See Bustamonte, 412 U.S. at 226; Hubbard, 317 F.3d at 1252–53. Nettleton also understood his rights to refuse questioning and request a lawyer. (Doc. 43 at 26).

Although he concedes there is no authority directly on point, Nettleton relies on two cases to argue that because Admiral M.J. and Captain C.G. were

---

[7] Nettleton was responsible for more than 5,000 military and civilian personnel on Guantanamo, a base that receives significant political, diplomatic, and media scrutiny.

10

superior officers with the ability to punish him under the UCMJ, his unwarned statements were involuntary. (Doc. 35 at 10–13 (relying on United States v. Rogers, 659 F.3d 74, 76 (1st Cir. 2011) (Souter, J.); and United States v. Shafer, 384 F. Supp. 486, 488 (N.D. Ohio 1974))). Nettleton asserts that absent warnings, he faced a dilemma: refuse to answer Admiral M.J. or Captain C.G.'s questions and face potential discipline for violating the UCMJ, or answer the questions and risk self-incrimination. However, neither the facts nor the cases relied upon support Nettleton's assertion.

In Rogers, the defendant, an enlisted member of the Navy, was ordered by his commanding officer to report to two NCIS investigators in the parking lot, who then told him to go to his house. 659 F.3d at 76. When the defendant arrived home, local and state law enforcement were searching his house and questioning his pregnant wife. Id.

The district court found that the defendant was not in custody, and therefore Miranda did not apply. Id. The First Circuit disagreed, finding that the defendant was not free to terminate his discussions with the police at his house because he had been ordered to be there by his commanding officer. Id. at 78–79. Justice Souter explained:

> [I]t is fair to say that whenever a member of the services is questioned in circumstances mandated by a superior's order, he is in the situation that Miranda was meant to address, where the line between voluntary and involuntary response is at least so blurred that the Fifth Amendment guarantee is in jeopardy.

11

Id. at 79. Because of the "subtle coercion" and "subtle pressures" inherent in military organization, the defendant's "situation at [his] house would have left any member of the armed services reasonably feeling that he lacked free choice to extricate himself, and sufficiently compelled to answer to authority." Id.

Similarly, being ordered by a superior officer to report to a specific location and provide a written statement after a shooting requires Miranda warnings. Shafer, 384 F. Supp. at 490. Shafer concerned the questioning of national guardsmen after the shooting at Kent State. Id. at 487. Following the incident, the guardsmen who had fired their weapons were ordered to a gymnasium and told to write statements for "firing incident reports." Id. The court held that the guardsmen were entitled to Miranda warnings, id. at 490, finding that custody of military personnel occurs when there is assumption of control over their movements, such as "ordering a person to appear at a specified time and place for the purpose of making a statement." Id. at 489. Additionally, having been questioned by superior officers with disciplinary authority in the course of an official investigation, the guardsmen had been interrogated. Id. at 490. Thus, the unwarned statements were inadmissible at trial. Id.

These cases do not help Nettleton for several reasons. First, Nettleton concedes Miranda does not apply,[8] which was the basis for suppression in Rogers and Shafer. See Rogers, 659 F.3d at 76; Shafer, 384 F. Supp. at 490; (Doc. 35 at 4). Even absent this concession, Nettleton was not subject to custodial interrogation. He was in Cuba, and spoke to Admiral M.J. and Captain C.G., who were in the continental United States, via email and telephone. As such, he was not "deprived of his freedom of action in any significant way[,]" Miranda, 384 U.S. at 444, and any direction by Admiral M.J. or Captain C.G. to call them did not result in a "reasonabl[e] feeling that [Nettleton] lacked free choice to extricate himself. . . ." Rogers, 659 F.3d at 79. Unlike the officials in Rogers, Admiral M.J. and Captain C.G. were not law enforcement, nor were they investigating accusations about Nettleton's conduct or Tur's death. See id. at 76; (Doc. 43-2 at 2). Nettleton contends that Admiral M.J. and Captain C.G. suspected him of wrongdoing (either adultery, which is punishable under the UCMJ, or involvement in Tur's death) beginning on January 12—the day after Tur's body was discovered, a bloody paper towel was

---

[8] Nettleton's position here is inconsistent. He unequivocally says that Miranda does not apply because he was not in custody, (Doc. 35 at 4), but then argues in translating Miranda to a military context that "[f]ederal [c]ourts have interpreted superior-inferior military relationships as the analog of custody." (Doc. 35 at 10). However, this statement appears to just support the contention that because of the inherent coercion in senior and subordinate military interactions, Nettleton's statements were involuntary—not that Nettleton was in the "analog of custody."

13

found next to Nettleton's dock, and an anonymous complaint was filed with the IG claiming Nettleton was having an affair with Tur's wife. But whatever their suspicions, Admiral M.J. and Captain C.G. decided to let NCIS investigate the matter. (Doc. 43-2 at 2 ("[The IG and Admiral M.J.] discussed whether or not [Admiral M.J.] should direct a command investigation to run concurrently with the NCIS investigation. . . . After consulting the IG, [Admiral M.J.] decided that the NCIS investigation would address all of the allegations.")).

Second, the facts here differ materially from those in Rogers and Shafer. Nettleton was not ordered to appear at any specific place to make a statement. See Rogers, 659 F.3d at 76. Although Admiral M.J. outranked Nettleton, and Captain C.G. had the authority of the Admiral behind him, Nettleton was not a junior enlisted servicemember in receipt of an order from a vastly higher-ranking commissioned officer. Further, unlike Rogers and Shafer, the conversations with Admiral M.J. and Captain C.G. were not interrogations; Nettleton initiated some of the conversations and volunteered much of the information absent questions from them. (Doc. 43-1 at 12 ("[Nettleton] said, hey, I need to call you [Captain C.G.] and tell you something. He said that, you know, [he] wanted to provide some additional information.")). In fact, Captain C.G. testified to the grand jury that he purposely avoided asking Nettleton questions. (Doc. 43-1 at 15–16).

Not only are the cases Nettleton relies upon materially different, but the entirety of Nettleton's argument is undercut by his unique factual situation. Nettleton argues that he felt pressured and coerced to make statements to Admiral M.J. and Captain C.G. because they were superior military officers in his chain of command with the ability to punish him under the UCMJ. However, the pressure that Nettleton allegedly felt to speak with Admiral M.J. and Captain C.G.—because of their rank and authority—would have also existed on January 10 and 11, 2015 when Nettleton provided them the alleged false and incomplete information. Essentially, if Nettleton was coerced or pressured into making inculpatory statements purely because of the military command relationship, then he would have felt coerced and pressured to provide Admiral M.J. and Captain C.G. with all the details concerning Tur's disappearance the first time he informed them of the incident—and these false statement charges would not exist. Further, Nettleton was not coerced or pressured by the requirement of obedience, as demonstrated by his failure to comply with Admiral M.J. and Captain C.G.'s directions to report to NCIS everything he had told them. (Doc. 43-2 at 3); (Doc. 1 ¶ 54).

The Court acknowledges that servicemembers are in a unique position requiring them to obey orders from superior officers. But that is only one factor for a court to consider. Here, the totality of the circumstances demonstrates that Nettleton made his statements voluntarily. Nettleton's will was not overborne

by the "inherently coercive environment of the military command structure." Calley, 519 F.2d at 202 n.30; see Lynumn, 372 U.S. at 534. Thus, the Government has satisfied its burden of demonstrating that Nettleton's statements were voluntary. United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) ("The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." (citing Lego v. Twomey, 404 U.S. 477, 489 (1972))).

### III.  CONCLUSION

Accordingly, it is hereby

**ORDERED:**

Nettleton's Motion to Suppress, (Doc. 35), is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida this 11th day of October, 2019.

TIMOTHY J. CORRIGAN
United States District Judge

jb
Copies:

Counsel of Record
U.S. Probation
U.S. Pretrial Services
U.S. Marshals Service
Defendant