UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CASE NO. 3:19-cr-00001-TJC-PDB |
| | ) |
| JOHN R. NETTLETON, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S STATEMENT OF JURISDICTION AND VENUE**

The Government respectfully submits this statement of jurisdiction and venue, per the Court's Order issued on September 20, 2019. Dkt. 45. For the reasons discussed herein and at any hearing on this matter, jurisdiction and venue are proper in the United States District Court for the Middle District of Florida.

Federal district courts and military courts have concurrent jurisdiction over federal offenses committed on military bases, such as the Naval Air Station, Guantanamo ("GTMO") in Guantanamo Bay, Cuba. Additionally, the Military Extraterritorial Jurisdiction Act also provides jurisdiction in district court for federal offenses committed abroad by a service member, like the Defendant, after he has been discharged. Therefore, this Court has jurisdiction over all counts in this matter.

Venue is also appropriate in the Middle District of Florida for several reasons. First, some of the charged offenses involved conduct committed in the Middle District of Florida, such as where the Defendant made false statements, in violation of 18 U.S.C. § 1001, to persons who were located in the Middle District of Florida. Second,

to the extent the offenses were committed outside of the Middle District of Florida and any other district because they were committed in GTMO, 18 U.S.C. § 3238 provides that venue is proper in the district in which the defendant was first arrested. The Defendant here was arrested in Jacksonville, Florida, which is located in the Middle District of Florida. Therefore, venue also is proper in this Court.

## I.   PROCEDURAL BACKGROUND

On January 8, 2019, the Defendant, John R. Nettleton ("Defendant"), then a Captain in the U.S. Navy, was charged by a grand jury sitting in and for the Middle District of Florida in a ten-count Indictment (Dkt. 1) with one count of Obstruction of Justice, in violation of 18 U.S.C. § 1512(b)(3) (Count One); one count of Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(2) (Count Two); one count of Concealment of Material Facts, in violation of 18 U.S.C. § 1001(a)(1) (Count Three); two counts of Falsification of Records, in violation of 18 U.S.C. § 1519 (Counts Four and Five); and four counts of False Statements, in violation of 18 U.S.C. § 1001(a)(2) (Counts Six through Ten). The Defendant was arrested for these charges in Jacksonville, Florida on or about January 9, 2019. Trial is currently scheduled to begin on July 6, 2020.

## II.   FACTS

The charges in this case stem from the death and investigation into the death of Christopher M. Tur ("Tur"), a civilian, at the Naval Air Station, Guantanamo ("GTMO") in Guantanamo Bay, Cuba on or about January 9, 2015. Tur died after an altercation with the Defendant at the Defendant's home regarding Tur's accusation

that the Defendant was engaged in an extramarital affair with Tur's wife ("Tur's Spouse").

The Defendant served as the Commanding Officer ("Commander") of GTMO from June 2012 until he was relieved of command on January 21, 2015. As the Commander of GTMO, Nettleton had responsibility to ensure the safety and well-being of persons under his command at GTMO. Dkt. 1 at ¶ 5. GTMO is part of the Navy Region Southeast ("NRSE"), which is based at Naval Air Station Jacksonville, located in Jacksonville, Florida. *Id*. at ¶ 3. As the Commander of GTMO, the Defendant reported to the Commander of the Navy Region Southeast ("CNRSE") and the members of the command staff. *Id*. In January 2015, the CNRSE was Rear Admiral M.J. and her Chief of Staff was Captain C.G. *Id*.

Tur, Tur's Spouse, and their children moved to GTMO in May 2011. *Id*. at ¶ 4. Tur was employed as the Loss Prevention Safety Manager at the Navy Exchange, a general store serving the GTMO community. *Id*.

In the early evening of January 9, 2015 there was a "Hail and Farewell" party at the "Hanger Bar" in the basement of the GTMO Officer's Club, which is also known as the "Bayview," to greet the new incoming GTMO Executive Officer ("XO"), and to say goodbye to the outgoing XO. *Id*. at ¶ 16.

According to many accounts, the Defendant, Tur, and Tur's Spouse each consumed a significant amount of alcohol at the Hail and Farewell, and the Defendant and Tur's Spouse spent time near each other in view of other guests, including Tur. *Id*. at ¶ 17. At approximately 10:00 p.m., outside of the Bayview, Tur yelled at the

Defendant and Tur's Spouse, accusing them of having an extramarital affair. *Id*. at ¶ 18. The new XO interceded and convinced the Defendant to go to his house, which was just a short distance away at the end of the peninsula on which the Bayview is located, known as "Deer Point." *Id*.

Shortly after the Defendant returned to his residence, Tur arrived at the Defendant's residence and continued his accusations. The altercation between the Defendant and Tur vacillated between conversation, confrontation, and violence. At one point, Tur called a friend and stated that he was "at the Skipper's house" and that he had "just knocked the Skipper out." *Id*. at ¶ 20. The friend was able to hear the Defendant stating words to the effect that Tur had "just knocked him out." *Id*. Later, the Defendant's teenage daughter—the only other person in the Defendant's home that night—heard from her upstairs bedroom shouting and sounds of a physical altercation coming from the floor below. *Id*. at ¶¶ 21-27. At one point, she went to the ground floor and saw Tur standing over her father, who was lying on the kitchen floor. *Id*. at ¶ 22. Later that evening, after the sounds of fighting had stopped, the Defendant came into his daughter's room without a shirt on, and she did not notice any injuries or blood on him. *Id*. at ¶ 28.

Forensic testing conducted after a search of the Defendant's home between January 20 and 24 by agents of the Navy Criminal Investigative Service ("NCIS"), pursuant to a Command Authorized Search and Seizure, revealed Tur's blood in several rooms of the first floor of the Defendant's house, as well as on the walkway to the Defendant's boat dock. *Id*. at ¶¶ 48, 58. The entrance to the walkway is located a

short distance from the side door of the Defendant's home where Tur's blood was found. NCIS agents also recovered a paper towel with Tur's blood on it in the bushes next to the walkway to the dock. *Id.* at ¶ 48.

The next morning, January 10, Tur's Spouse could not find Tur, so she and the friend who Tur had called to say he had "knocked out" the Defendant contacted the Defendant to see if knew where Tur had gone after the Defendant's house. *Id.* at ¶ 29. The Defendant said that he did not know, but did not tell Tur's Spouse or the friend that Tur had come inside and that there had been a fight that left Tur injured and bloody. *Id.* Over the course of January 10 and into January 11, the GTMO Security Department conducted a search for Tur. *Id.* at ¶¶ 30-46. NCIS also began a law enforcement investigation into Tur's disappearance. At approximately 11:00 a.m. on January 11, Tur's body was found floating in the waters just off the coast of GTMO, nearly in Cuban water. *Id.* at ¶ 47. At that point, NCIS's investigation became a death investigation.

An autopsy of Tur's body conducted on January 13 concluded that the cause of Tur's death was drowning, but that before he died, he suffered broken ribs and soft tissue damage. *Id.* at ¶ 55. Tur also had a laceration on his head. *Id.*

The charges against the Defendant stem from his concealment of material facts and affirmative statements he made to other Navy officers and personnel from approximately the morning of January 10 through January 15, which are detailed in the Indictment (*id.* at ¶¶ 30-56).

On January 21, 2015 the Defendant was removed from command by Rear Admiral M.J.

## III. JURISDICTION

### A. Legal Principles

Under 28 U.S.C. § 3231, federal district courts have "original jurisdiction . . . of all offenses against the laws of the United States." The statutes for all the offenses charged in the Indictment provide for federal jurisdiction over matters within the jurisdiction of the executive branch, which would include investigations conducted by executive branch agencies like the Navy and NCIS, or explicitly provide that there is extraterritorial jurisdiction over the offense. *See* 18 U.S.C. § 1001(a) (2018) (extending to "any matter within the jurisdiction of the executive . . . branch of the Government of the United States"); 18 U.S.C. § 1512(h) (2018) (providing "extraterritorial Federal jurisdiction over an offenses under this section"); 18 U.S.C. § 1519 (2018) (applying to "any matter within the jurisdiction of any department or agency of the United States"[1]). Accordingly, this Court would have jurisdiction over all of the charged offenses by statute.[2]

---

[1] The term "department" means "one of the executive departments enumerated in section 1 of Title 5," and the term "agency" includes any department. 18 U.S.C. § 6. Title 5 defines several departments, including the Department of the Navy. 5 U.S.C. § 102.

[2] While the particular statutes charged in the Indictment have a jurisdictional reach that would extend even to locations over which the United States has no control, it should be noted that the Supreme Court has held that "the United States, by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty

Additionally, since the defendant is no longer a member of the military subject to prosecution under the Uniform Code of Military Justice ("UCMJ"), the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. § 3261 (2018), also provides jurisdiction in federal district court over the charged offenses. The MEJA has a "broad scope." *United States v. Slatten*, 865 F.3d 767, 783 (D.C. Cir. 2017). It provides that "[w]hoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States . . . while a member of the Armed Forces subject to [the UCMJ] shall be punished as provided for that offense," provided that the person "ceases to be subject" to the UCMJ. 18 U.S.C. § 3261(a)(2), (d). In essence, the MEJA "extends federal criminal jurisdiction to persons who commit criminal acts while a member of the Armed Forces but later cease to be subject to military jurisdiction." *See United States v. Green*, 654 F.3d 637, 641 (6th Cir. 2011) (upholding prosecution in federal district court, pursuant to MEJA, of a former member of the military for sexual assault and murder committed in Iraq when he was in the military).[3] Here, the false statements, concealment, and

---

over [GTMO]," a fact that is "obvious and uncontested." *Boumediene v. Bush*, 553 U.S. 723, 755 (2008).

[3]     That a court martial in military court could have been used to prosecute the Defendant for federal offenses does not impact this Court's jurisdiction. "Federal courts have at the very least concurrent jurisdiction with military courts over violations of the laws of the United States by military personnel whether on or off the military reservation."     *See United States v. Walker*, 552 F.2d 566, 567 (4th Cir. 1977) (citing *Grafton v. United States*, 206 U.S. 333, 348 (1907) (permitting prosecution in civilian court of offense unrelated to service that a member of the military committed on

7

obstruction the defendant committed is prohibited within the territory of the United States as federal crimes. Accordingly, since the defendant has been discharged from the military, this court also has jurisdiction over him pursuant to the MEJA.

## IV. VENUE

### A. Legal Principles

The United States Constitution provides that "when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." *See* U.S. Const. art. III, § 2, cl. 3. Under the Federal Rules of Criminal Procedure, "[u]nless a statute or [procedural] rules permit otherwise," venue generally is proper "in a district where the offense was committed" Fed. R. Crim. P. 18. However, when crimes are committed outside any particular district, Congress has directed by law that 18 U.S.C. § 3238 governs where venue is proper. Section 3238 provides:

> The trial of all offenses begun or committed . . . out of the jurisdiction of any particular State or district, shall be in the district in which the offender . . . is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender . . . or if no such residence is known the indictment or information may be filed in the District of Columbia.

---

military base)). "[S]imply because a member of the armed forces may be punished by military court martial for an offense provides no justification for concluding that a District Court lacks jurisdiction to punish him for the same offense, if such offense is violative of a federal law." *Walker*, 552 F.2d at 567. Concurrent jurisdiction merely offers the government "a choice of where to prosecute." *United States v. Mariea*, 795 F.2d 1094, 1101 (1st Cir. 1986) (citing *Ponzi v. Fessenden*, 258 U.S. 254, 259 (1922)).

*Id.* Thus, when an offense is committed outside any district, the district in which the defendant was arrested or first brought while in custody, or in the alternative, the district of the defendant's last known residence, governs venue. GTMO lies outside any judicial district. *See United States v. Ahumedo-Avendano*, 872 F.2d 367, 371-72 (11th Cir. 1989) (interpreting the meaning of "the United States" in the Maritime Drug Law Enforcement Act to be a parallel venue provision to § 3238, and finding that GTMO was outside of a federal judicial district).

Where an American citizen and U.S. government employee is accused of an offense committed on United States government property that lies outside any State or Territory, venue is proper in the district of first arrest. *See United States v. Holmes*, 670 F.3d 586, 594-95 (4th Cir. 2012) (finding venue proper in Eastern District of Virginia, where defendant was first arrested for conduct that occurred on U.S. military base in Japan); *United States v. Erdos*, 474 F.2d 157, 161 (4th Cir. 1973) (holding venue proper in Eastern District of Virginia, where defendant U.S. embassy employee was first arrested for killing someone inside the embassy); *see also United States v. Chambers*, 898 F.2d 148 (4th Cir. 1990) (defendant who caused six people to die in a car crash on GTMO was tried and convicted in Eastern District of Virginia, where he was first arrested and brought); *United States v. Fuentes*, 877 F.2d 895, 900 (11th Cir. 1989) (ruling venue was proper in Southern District of Florida after defendants arrested on high seas were brought to GTMO and then brought to Dade County, Florida); *Ahumedo-Avendano*, 872 F.2d at 372 (relying on § 3238 to affirm that venue was proper

9

in Southern District of Florida after vessel's crew was seized and transported to GTMO before being brought to Florida).

### B. Application

As an initial matter, venue is proper in the Middle District of Florida for some of the charged offenses because the offenses were committed there, at least in part. *See* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."); *United States v. Ashdown*, 509 F.2d 793, 796 (5th Cir. 1975) (finding that venue was proper in the Western District of Texas when the fraudulent scheme spread across multiple judicial districts). Here, the investigation of Tur's disappearance and death were overseen by the Defendant's superior officer, Rear Admiral M.J., and her Chief of Staff, Captain C.G., who were both serving at the CNRSE, which is located at Naval Air Station Jacksonville in the Middle District of Florida. They received many of Nettleton's misleading and false communications in emails and telephone calls while they were in Jacksonville. *See, e.g.*, Dkt. 1 at ¶¶ 3, 37, 38, 40, 41, 42, 43, 45, 49, 53. As a result, Nettleton's charged obstruction, concealment of material facts, and falsification of records directed at M.J. and C.G. (Counts One through Five, Count Seven, and Count Ten) all have proper venue in the Middle District of Florida. *See United States v. Hernando Ospina*, 798 F.2d 1570, 1577 (11th Cir. 1986) (holding venue was proper in a § 1001 scheme to conceal when the Defendant "formulated" and carried out "virtually all of the affirmative acts comprising that scheme" in the Southern District of Florida because "venue [was] proper in any district in which the

offense [was] begun, continued, or completed"); *see also United States v. Aldissi*, 758 F. App'x 694, 702, 705-06 (11th Cir. 2018) (affirming § 1519 conviction after defendants in Florida falsified and then provided documents to compliance investigators); *United States v. Fahnbulleh*, 752 F.3d 470, 477 (D.C. Cir. 2014) (finding venue was proper in a §1512 prosecution in district where defendants caused fraudulent reports to be sent); *United States v. Mixon*, No. CR140631TUCJGZLAB, 2015 WL 13735755, at *2 (D. Ariz. June 9, 2015), report and recommendation adopted, No. CR1400631001TUCJGZ, 2015 WL 5934840 (D. Ariz. Oct. 13, 2015) (holding that "[v]enue is proper in Arizona, Washington, D.C. and Atlanta, GA, the places where the alleged offenses [including § 1519] started, continued, and were completed.").

Additionally, to the extent that any of the offenses have no connection to other districts given that Nettleton was in GTMO at the time of his charged conduct, venue in this matter is appropriate in the Middle District of Florida. Nettleton perpetrated the offenses in GTMO, which is not in any state or district. *See Ahumedo-Avendano*, 872 F.2d at 371. Thus, 18 U.S.C. § 3238 provides that venue would be appropriate in the district in which the defendant was arrested. Here, the Defendant was arrested in Jacksonville, Florida, which is in the Middle District of Florida. Furthermore, the first alternative venue under § 3238 is the district of the Defendant's last known residence at the time of indictment, which was also in Jacksonville, Florida. *See* § 3238 ("[A]n indictment or information may be filed in the district of the last known residence of the offender[.]").

11

## V. <u>CONCLUSION</u>

For the reasons stated above, this Court has jurisdiction over this matter and it has proper venue in the Middle District of Florida.

        Respectfully submitted,

        */s/ Todd Gee*
        *Counsel for the Government*
        TODD GEE
        Deputy Chief, Public Integrity Section
        Todd.Gee2@usdoj.gov
        PETER M. NOTHSTEIN
        Trial Attorney, Public Integrity Section
        Peter.Nothstein@usdoj.gov
        Criminal Division
        U.S. Department of Justice
        1331 F Street, NW
        3rd Floor
        Washington, DC, 20005
        Telephone:  (202) 514-1412

        DATED:  October 18, 2019

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendant.

Dated: October 18, 2019         /s/ *Todd Gee*
                              Todd Gee, Deputy Chief
                              Peter M. Nothstein, Trial Attorney
                              Public Integrity Section
                              Criminal Division
                              U.S. Department of Justice