IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Jacksonville, Florida |
| Plaintiff, | Case No. 3:19-cr-1-J-32PDB |
| vs. | January 8, 2020 |
| JOHN R. NETTLETON, | 9:22 a.m. |
| Defendant. | Courtroom No. 10D |

_____

JURY TRIAL
(VOLUME III)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

Shannon M. Bishop, RDR, CRR, CRC
221 North Hogan Street, #150
Jacksonville, FL  32202
Telephone:  (904)549-1307
dsmabishop@yahoo.com

(Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

> **TODD GEE, ESQ.**
> **PETER MARSHALL NOTHSTEIN, ESQ.**
> US Department of Justice
> 1400 New York Avenue NW
> Washington, DC  20005

DEFENSE COUNSEL:

> **COLBY VOKEY, ESQ.**
> The Law Firm of Colby Vokey, P.C.
> 6924 Spanky Branch Court
> Dallas, TX  75248
>
> **TERENCE LENAMON, ESQ.**
> Terence Lenamon P.A.
> 245 SE 1st Street, Suite 404
> Miami, FL  33131
>
> **DANIEL SCHWARZ, ESQ.**
> Daniel Schwarz, P.A.
> 245 SE 1st Street, Suite 404
> Miami, FL 33131

T A B L E   O F   C O N T E N T S

Page No.

WITNESSES FOR THE GOVERNMENT:

**JULIA NETTLETON**
Direct Examination................................   8
Cross-Examination.................................  53
**LARA MARIE SABANOSH**
Direct Examination................................  59
Cross-Examination................................. 134
Redirect Examination.............................. 168
Recross-Examination............................... 177
Further Redirect Examination...................... 188
**ANTHONY THIBODEAUX**
Direct Examination................................ 190
Cross-Examination................................. 205
**ERIC MICHAEL BOHYER**
Direct Examination................................ 217
Cross-Examination................................. 233
Redirect Examination.............................. 240
Recross-Examination............................... 240
**ALONZA JUNIOR ROSS**
Direct Examination................................ 244

E X H I B I T S   R E C E I V E D

<u>Page No.</u>

<u>Government's Exhibits:</u>

  1 ........................................... 215
  3 ........................................... 242
357A, 357, 358, 97, and 98 .....................   5

<u>Court's Exhibits:</u>

1.............................................. 131

*JURY TRIAL - VOLUME III*

1        P R O C E E D I N G S

2     January 8, 2020                              9:22 a.m.

3                          - - -

4          COURT SECURITY OFFICER:  All rise.  The United States

5     District Court in and for the Middle District of Florida is now

6     in session.  The Honorable Timothy J. Corrigan presiding.

7          Please be seated.

8          THE COURT:  Good morning.  Does the government have

9     any matters before we call the first witness?

10         MR. GEE:  Just briefly, Your Honor.  I think we've

11    agreed to some more exhibits.

12         THE COURT:  Okay.

13         MR. GEE:  These are -- we've agreed to the admission

14    of a couple of e-mails, Exhibits 357A, 357 --

15         THE COURT:  I'm sorry.  I'm having trouble hearing.

16    Okay.  Go ahead.  357A?

17         MR. GEE:  357A, 357, and 358.  And two photographs

18    that are 97 and 98.

19         Thank you, Your Honor.

20         THE COURT:  Is that correct, Mr. Vokey?

21         MR. VOKEY:  That's correct, Your Honor.

22         THE COURT:  Those exhibits will be admitted without

23    objection.

24       (Government's Exhibits 357A, 357, 358, 97, and 98 received

25    into evidence.)

1           THE COURT:  Anything else from the government?

2           MR. GEE:  I don't think so.  Thank you.

3           MR. VOKEY:  No, Your Honor.

4           THE COURT:  So Ms. Nettleton is the witness; is that

5    correct?

6           MR. NOTHSTEIN:  Yes.  Would you like her in the box?

7           THE COURT:  Yeah.  Go ahead and bring her in.

8           We'll have the jury, please.

9      (Witness enters the courtroom.)

10          THE COURT:  Good morning.

11          COURT SECURITY OFFICER:  All rise for the jury.

12     (Jury enters, 9:24 a.m.)

13          COURT SECURITY OFFICER:  You may be seated.

14          THE COURT:  Well, good morning, ladies and gentlemen.

15   Thank you for being here on time.  As you see, we're getting a

16   little bit of an early start and we are ready to go with the

17   next witness.  We will have testimony all day today.  Obviously

18   I'll be giving you a break later this morning, and then we'll

19   probably have our lunch break about 12:30.

20          So thank you all for being here.

21          And, Ms. Diaz, if you'll swear the witness, please.

22          COURTROOM DEPUTY:  Do you solemnly swear that the

23   testimony you are about to give before this court will be the

24   truth, the whole truth, and nothing but the truth, so help you

25   God?

1      THE WITNESS:  I do.

2      COURTROOM DEPUTY:  Please state your full name and

3  spell your last name for the record.

4      THE WITNESS:  Julia Nettleton, N-e-t-t-l-e-t-o-n.

5      COURTROOM DEPUTY:  Thank you, ma'am.

6      THE COURT:  Ms. Nettleton, I'm guessing that you're a

7  little nervous and I'm guessing you've never done this before.

8      Is that right?

9      THE WITNESS:  Yes.

10      THE COURT:  Okay.  So that's all perfectly

11  understandable and normal.  So the only things I'm going to ask

12  you to do is to try to keep your voice up, because you do have

13  a light voice.  We have a microphone there.  So if you can kind

14  of face toward that and keep your voice up as best you can.

15      They're going to ask you some questions and then your

16  father's lawyers are going to ask you some questions.

17      And if you don't understand a question or you need

18  them to clear it up, just tell them -- ask them to do that and

19  they will do that for you.

20      And all we're asking you to do is to tell the truth

21  as best you can.  Okay?

22      THE WITNESS:  Okay.

23      THE COURT:  All right.  You may proceed.

24      MR. NOTHSTEIN:  Thank you, Your Honor.

25      **JULIA NETTLETON, GOVERNMENT'S WITNESS, SWORN**

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | DIRECT EXAMINATION                                           |
| 2  | BY MR. NOTHSTEIN:                                             |
| 3  | Q.   Good morning, Ms. Nettleton.                            |
| 4  | A.   Good morning.                                           |
| 5  | Q.   Ms. Nettleton, how old are you?                         |
| 6  | A.   20.                                                     |
| 7  | Q.   20?                                                     |
| 8  | A.   Yes.                                                    |
| 9  | Q.   And without getting into specifically where, are you in |
| 10 | school right now?                                            |
| 11 | A.   Yes.                                                    |
| 12 | Q.   And what year in school are you?                        |
| 13 | A.   I'm a senior in college.                                |
| 14 | Q.   Are you also working while you're in school?            |
| 15 | A.   Yes.                                                    |
| 16 | Q.   Where are you working?                                  |
| 17 | A.   Walt Disney.                                            |
| 18 | Q.   Must be a fun job.                                      |
| 19 | A.   Yes.                                                    |
| 20 | Q.   Ms. Nettleton -- excuse me.                             |
| 21 | Ms. Nettleton, are you related to the defendant John         |
| 22 | Nettleton?                                                   |
| 23 | A.   Yes.                                                    |
| 24 | Q.   How are you related?                                    |
| 25 | A.   He's my father.                                         |

1    Q.    What's your mother's name?

2    A.    Leslee Stafford, yes.

3    Q.    Do you have any brothers or sisters?

4    A.    I have two older brothers.

5    Q.    And what are their names?

6    A.    John and Jacob.

7    Q.    And what are their ages?

8    A.    23 and 26.

9    Q.    Which one's older?

10   A.    John.

11   Q.    John is 26 and Jacob is 23?

12   A.    Yes.

13   Q.    Does John go by another name?

14   A.    Friday.

15   Q.    Is that what you all typically call him?

16   A.    Yes.

17          THE COURT:  Mr. Nothstein, I'm going to ask, if you

18   don't mind, either to be behind that podium or behind this one,

19   because the microphone will pick you up better that way.

20          MR. NOTHSTEIN:  Absolutely, Your Honor.  Thank you.

21          THE COURT:  Thank you.

22   BY MR. NOTHSTEIN:

23   Q.    Ms. Nettleton, I'd like to turn your attention back to

24   January of 2015.  Where were you living at that point?

25   A.    Guantanamo Bay, Cuba.

1  Q.    Were you living at the naval station?

2  A.    Yes.

3  Q.    How long -- as of January 2015, about how long had you

4  lived there?

5  A.    Two-and-a-half years, I believe.

6  Q.    And at that time -- I'm sorry to make you do math on the

7  stand.  How old were you at that time?

8  A.    15.  15, yeah.

9  Q.    When you were living at Naval Station Guantanamo, who else

10  was living in your house with you?

11  A.    In January?

12  Q.    In January 2015, yes.

13  A.    I think there's just me and my mom and dad.

14  Q.    Where were your brothers at that time?

15  A.    They both lived in Pensacola.

16  Q.    Were they in school?

17  A.    Yes.

18  Q.    Were they going to the same school?

19  A.    Yes.

20  Q.    Did you-all have any pets with you at the house?

21  A.    Yes.  We had three.

22  Q.    You did?  What kind?  Dog?  Cat?  Bird?

23  A.    Two dogs and a cat.

24  Q.    And what were the dogs' names?

25  A.    Toby and Cash.

1    Q.    Any significance to those names?

2    A.    Toby Keith and Johnny Cash.

3    Q.    Ms. Nettleton, I'd like to talk a little bit about how

4    your actual house was laid out.  And I'm going to ask Ms. Reid

5    to please pull up Government's Exhibit 59.

6            MR. NOTHSTEIN:  And if I may approach, Your Honor, to

7    provide the witness with a copy?

8            THE COURT:  Yes.

9            MR. NOTHSTEIN:  Thank you.

10   BY MR. NOTHSTEIN:

11   Q.    Ms. Nettleton, I believe you can see Government's

12   Exhibit 59 on the screen.  I also just gave you a copy to keep

13   in front of you, if that's helpful.

14   A.    Thank you.

15   Q.    Do you recognize this diagram, Ms. Nettleton?

16   A.    Yes.

17   Q.    What are we looking at?

18   A.    The first floor of our house.

19   Q.    Okay.  So I kind of want to walk through a little bit of

20   this diagram.  The reason I wanted to give you a copy to have

21   in front of you is we're going to show you some pictures on the

22   screen and you will have the diagram to look at as well.

23            So in the bottom of the diagram there's sort of a --

24   an octagon shape.  What was that?

25   A.    That was, like, the fountain in front of our house.  It

 1  was like -- the outer part of the octagon was, like, the

 2  walkway.  It went around with a little path in the middle.

 3  There was, like, a fountain, just to get to our front door.

 4          MR. NOTHSTEIN:  And, Ms. Reid, may I please have

 5  Government's Exhibit 190?

 6  BY MR. NOTHSTEIN:

 7  Q.   Do you recognize this photo, Ms. Nettleton?

 8  A.   Yes.

 9  Q.   What is it?

10  A.   The front of our house.

11  Q.   Moving inside the house --

12          MR. NOTHSTEIN:  If we can go back to 59, please.

13  BY MR. NOTHSTEIN:

14  Q.   I see there's a -- it says on the diagram there's a porch

15  and an entrance foyer.  Just kind of describe for us, if you

16  wouldn't mind, how it looked when you went inside your house.

17  A.   So if you walked in those doors, it would be the staircase

18  immediately to the right and then a bathroom on the other side,

19  and then you could just see, like, in the living room.

20  Q.   And how many stories is your house?

21  A.   Two.

22  Q.   Did the foyer go all the way up to the second floor?  Was

23  it open?

24  A.   Yes.  You could see from the foyer up to -- so if you were

25  on the second floor, you could see.

1  Q.   Okay.

2         MR. NOTHSTEIN:  May I have Government's Exhibit 250,

3  please?

4  BY MR. NOTHSTEIN:

5  Q.   Do you recognize this photo, Ms. Nettleton?

6  A.   Yes.

7  Q.   What is this a picture of?

8  A.   The top of the staircase.

9  Q.   Is the -- what we're looking down into, is that the foyer?

10  A.   Yes.

11         MR. NOTHSTEIN:  And may I have Government's

12  Exhibit 252, please?

13  BY MR. NOTHSTEIN:

14  Q.   What is that a photograph of?

15  A.   The hallway looking into the staircase.

16  Q.   So if I was -- the last picture, if I had taken a big old

17  step backwards, is this what we're looking at?

18  A.   Yes.

19         MR. NOTHSTEIN:  Could I have 59 again, please,

20  Ms. Reid?

21  BY MR. NOTHSTEIN:

22  Q.   Okay.  And, Ms. Nettleton, if it helps, there's a small --

23  I guess pen is the word, stylus there to the right.  You can

24  actually draw on that screen.

25  A.   Okay.

1   Q.   But if you can just say -- looking in through the foyer

2   into the living room, it says there on the right there's a

3   master bedroom.  Whose room is that?

4   A.   My mom and dad's.

5   Q.   And then into the living room, what was generally in the

6   living room?

7   A.   So in the living room there's a TV here and then a couch

8   here, and then I think also here and the other seating like

9   here and here, like on this side.

10  Q.   I see.

11  A.   And like a table in the middle.  And then in this -- like,

12  this space literally labeled "living room," there was nothing.

13  It was just like a lot of space.  And then another room started

14  on the other side of, like, the L.

15  Q.   Okay.  And so where it says "living room" on the map, that

16  was open, the way you've indicated for -- for the record,

17  you've indicated the map on the diagram is that to the right

18  there was a sitting area with a TV where you all could, I

19  guess, hang out and watch television?

20  A.   Yes.

21  Q.   Going the other direction where it says "sitting room,"

22  what was there?

23  A.   Do you mean literally in the sitting room?

24  Q.   Yeah.  Just generally, what did you have over there?

25  A.   Like in the diagram there's just a couch and a chair.

1    Q.    No.  In your house at the time.

2    A.    No, I mean, like exactly like -- it looked just like that.

3    Q.    Oh, it did?  Okay.

4          MR. NOTHSTEIN:  May I have Government's Exhibit 301,

5    please?

6    BY MR. NOTHSTEIN:

7    Q.    What are we looking at here, Ms. Nettleton?

8    A.    The sitting room with the two couches and the table.

9    Q.    And does this photo, Government's Exhibit 301 -- is this

10   what your sitting room looked like in January of 2015?

11   A.    The chairs weren't there.

12   Q.    The chairs in the foreground?

13   A.    Yes.

14   Q.    But the couches and then looks like there's something

15   behind the couches, were those there?

16   A.    Yes.

17   Q.    What is that that was behind the couches?

18   A.    Um --

19   Q.    Or, I'm sorry, behind the chairs and kind of between the

20   couches.

21   A.    It was like a box that we used as a little table, but it

22   was full of, like, craft supplies.

23   Q.    Got you.

24          So, Ms. Nettleton, I see that there's a door on the

25   left side of this photo.  If you went through that door, what's

1   through there?

2           MR. NOTHSTEIN:  And if we could have Government's

3   Exhibit 59 again, please, to take a look at it.

4   BY MR. NOTHSTEIN:

5   Q.   So what would be sort of through that -- the door on the

6   sitting room?

7   A.   On the left side?

8   Q.   Yeah.

9   A.   I don't know.

10  Q.   Okay.  What was next to the sitting room where it says

11  "barroom"?  What did you have in there?

12  A.   It was a barroom.

13  Q.   Okay.

14          MR. NOTHSTEIN:  May I have Government's 312, please?

15  BY MR. NOTHSTEIN:

16  Q.   Do you recognize this photo, Ms. Nettleton?

17  A.   Yes.

18  Q.   What is this a picture of?

19  A.   The little bar area in our house.

20  Q.   And does the scene as depicted in Government's 312 -- is

21  that how the barroom looked in January 2015?

22  A.   Yes.

23  Q.   Is there anything significantly different?

24  A.   Not to my knowledge.

25          MR. NOTHSTEIN:  And may I have Government's

1  Exhibit 314, please?

2  BY MR. NOTHSTEIN:

3  Q.   Ms. Nettleton, do you recognize this photograph?

4  A.   Yes.

5  Q.   Okay.  What is this a photograph of?

6  A.   A different angle of the bar area.

7  Q.   So if I had been looking where we were in the last

8  picture, taking a big step to the right, this is what I would

9  see?

10  A.   Yes.

11  Q.   What is that in the corner?

12  A.   It's a butcher block.

13  Q.   Was that there in January 2015?

14  A.   Yes.

15  Q.   What did you use it for?

16  A.   As a table.

17       MR. NOTHSTEIN:  And now may I have Government's

18  Exhibit 327, please?

19  BY MR. NOTHSTEIN:

20  Q.   What do we see here through the doorway?

21  A.   The kitchen.

22       MR. NOTHSTEIN:  And back to Exhibit 59, please.

23  BY MR. NOTHSTEIN:

24  Q.   The kitchen, what you just saw, Ms. Nettleton, can you

25  just kind of circle it on the map, on 59?

1    A.    The whole thing or the area we just saw?

2    Q.    The whole thing, the whole room.

3           So for the record, you just circled the room cleverly

4    labeled "kitchen"?

5    A.    Yes.

6           MR. NOTHSTEIN:   And then may I have Government's

7    Exhibit 196, please?

8    BY MR. NOTHSTEIN:

9    Q.    What is this?   What is depicted in Government's 196,

10   Ms. Nettleton?

11   A.    I'm not sure.   I don't remember.

12   Q.    Okay.   Not a problem.   Thank you.

13          MR. NOTHSTEIN:   May I have 59 again, please,

14   Ms. Reid?

15   BY MR. NOTHSTEIN:

16   Q.    Now, this is a diagram of the first floor, Ms. Nettleton?

17   A.    Uh-huh (affirmative).

18   Q.    And you said the house was two stories?

19   A.    Yes.

20   Q.    Where was your room?

21   A.    My room was -- it would be over, I guess, the sitting

22   room, maybe, or over the living room.

23   Q.    Okay.   Can you just kind of mark that on the diagram for

24   the jurors?

25          So it looks like you're marking the top left corner,

1    for the record, of the living room area?

2    A.    Yes.

3    Q.    Turning to January 2015, though -- I specifically want to

4    talk about the night of January 9th.  Were you staying in a

5    different room that night?

6    A.    Yes.

7    Q.    Which room were you staying in that night?

8    A.    The one adjacent to mine.

9    Q.    And so where would that be on this diagram for the second

10   floor?

11   A.    Like, here, I guess.

12   Q.    And that's -- so you're marking right above the sitting

13   room?

14   A.    I think so.

15   Q.    Thereabouts?

16   A.    Yes.

17   Q.    Were those two rooms connected in any way --

18   A.    Yes.

19   Q.    -- your other room and the one you were in that night?

20   A.    Uh-huh (affirmative).  They shared a bathroom.

21   Q.    Is there a term for that?

22   A.    Jack and Jill.

23   Q.    Tell us a little bit about what the house was like.  As

24   you were sitting in your room, for example, on an average day,

25   were you able to hear what was going on downstairs?

1  A.    I honestly don't remember what I could hear at 15.

2  Q.    Sure.  Do you remember anything about the doors creaked or

3  the stairs creaked, made noises like that?

4  A.    It was a pretty old house, so there were some creaks.

5  Q.    Okay.  Now, before we get into some specifics -- we're

6  going to talk about January 9th, but just a few general

7  questions.

8        When you were living in Guantanamo Bay -- and I

9  appreciate this was several years ago -- how did you-all

10  communicate on the phone?  How did the phones work at

11  Guantanamo Bay?

12  A.    There were no cell phones, so we would mostly use

13  landlines.  And then there was people -- like certain people

14  who had -- like, with jobs would have, like, cell phones they

15  could just use to call, but there wasn't anything like iPhones

16  or things like that.

17  Q.    So these weren't smart phones?

18  A.    Right.

19  Q.    And you say they had cell phones, but they kind of weren't

20  like ours.  Was it your understanding they could call on the

21  base?

22  A.    Right.  Exactly.

23  Q.    Was it your understanding they could call outside the

24  base?

25  A.    I'm not sure.  I think there was a process, but it wasn't

 1   easy.

 2   Q.    Okay.  And the phones on base, did they have, you know,

 3   regular numbers with an area code and ten digits after that?

 4   A.    No.

 5   Q.    Okay.  What were the numbers like?

 6   A.    They were either five- or six-digit numbers.

 7   Q.    Did you have one of those cell phones?

 8   A.    No.

 9   Q.    How about inside your house?  Did you all have landlines,

10   we'll call them, you know, wired phones?

11   A.    Yes.

12   Q.    Do you remember how many you had?

13   A.    I believe we had four inside the house.  Or four handsets.

14   Q.    Four handsets.  How many actual phone numbers do you think

15   you had?

16   A.    Two.

17   Q.    Do you remember what they were?

18   A.    I don't.

19   Q.    Do you know where the phone sets -- handsets were located?

20   A.    They're throughout the house.  We -- I know there was one

21   in the living room and one in my brother's room, but I don't

22   remember where the other two were.

23   Q.    Do you recall if there was one in the kitchen?

24   A.    I don't.

25   Q.    So I think you said you did not have one of the cell

1   phones, right?

2   A.   Correct.

3   Q.   Did you have another way to contact people?

4   A.   I would message people on my iPad.

5   Q.   Did your iPad have a cellular plan or only Wi-Fi?

6   A.   No, it was just on the Wi-Fi.

7   Q.   And I know that some places you go out there might be a

8   public Wi-Fi or Wi-Fi in the Starbucks.  But at Guantanamo Bay

9   where could you actually access Wi-Fi?

10  A.   In my house or in the ice cream shop.

11  Q.   Didn't know there was an ice cream shop.

12       Could you access it at school?

13  A.   I don't know.  I never brought it to school.

14  Q.   And on your iPad what apps did you use to contact people?

15  A.   Kik, iMessage, and Snapchat.

16  Q.   Did you use FaceTime at all, the video?

17  A.   No.  The internet wasn't really -- it wasn't fast enough,

18  I guess, for it.

19  Q.   All right.  And at the risk of sounding my age, I'm going

20  to go through these apps and ask you to describe them just a

21  little bit for us.

22  A.   Okay.

23  Q.   What's iMessage?

24  A.   It's just a standard Apple message, but it worked

25  through -- like if other people had iPhones or iPads and Wi-Fi.

1   Q.   And Snapchat, how does that work?

2   A.   It's where you take pictures or send messages and the

3   messages and pictures disappear after a certain amount of time.

4   Q.   That's sort of one of the features of it, right?

5   A.   Yes.

6   Q.   And you say you can send messages and you can sort of text

7   on it like you could with a text message, right?

8   A.   Right.

9   Q.   Would those disappear just like the photos would?

10   A.   Yes.

11   Q.   What's Kik Messenger?

12   A.   Kik was just an app for people who didn't have cell

13   phones, basically.  And it is how we would all, like,

14   communicate with each other, because anybody could use it,

15   like, without having an iPhone.

16   Q.   And I guess how did you decide -- was there any kind of

17   rhyme or reason to how you decided to contact people or just

18   whatever was most convenient?

19   A.   I think it was what was most popular.

20   Q.   Now, were you able to make phone calls off the base to the

21   mainland, like if you wanted to talk to your brothers, for

22   example?

23   A.   I didn't know how, but if I asked my parents then, like,

24   generally, yes.

25   Q.   Okay.  And do you remember how they would do it?  Did you

1    ever see them sort of set up a call for you?

2    A.    Yes.

3    Q.    What would they do?

4    A.    I think it was just, like -- like, you'd type the number

5    and then also something else, but I don't remember now.

6    Q.    Did you have anybody in the mainland you would want to

7    talk to besides your brothers?

8    A.    No.

9    Q.    Speaking of talking to, when you had your iPad, you'd

10   message.  I guess who are some of your friends on base that you

11   might message with on a regular basis?

12   A.    I don't know.  My neighbor, my boyfriend.

13   Q.    Okay.  What was your boyfriend's name?

14   A.    Keegan.

15   Q.    What was his last name?

16   A.    McManus.

17   Q.    And he lived in Guantanamo Bay too?

18   A.    Yes.

19   Q.    And you mentioned your neighbor.  What's your neighbor's

20   name?

21   A.    Tyler Heath.

22   Q.    And where did he live?

23   A.    Three houses down from me.

24   Q.    Did you go to school with these folks?

25   A.    I did.

1    Q.   I'd like to ask you about a few other people that you knew

2    there, knew some classmates.  Did you know Savannah and Madison

3    Tur?

4    A.   Yes.

5    Q.   How did you know them?

6    A.   From school.

7    Q.   Were they in the same grade as you?

8    A.   No.

9    Q.   Which of them -- were either in the same grade?

10   A.   No.

11   Q.   Were they older or younger?

12   A.   Savannah was the same age as Jacob, my brother, and

13   Madison was a year younger than me.

14   Q.   Did you socialize with them regularly?

15   A.   Yes.

16   Q.   Did you know their parents?

17   A.   No.

18   Q.   If you saw them, would you recognize them?

19   A.   Yes.

20   Q.   Now, I'd like to turn your attention to January 9th.  Do

21   you remember that day?

22   A.   Kind of.

23   Q.   What was -- or who was home that weekend?

24   A.   Just me and my dad.

25   Q.   Where was your mom?

1  A.   In Pensacola.

2  Q.   Do you know what she was doing in Pensacola?

3  A.   I do not.

4  Q.   And where were your brothers?

5  A.   In Pensacola.

6  Q.   Were they in school at that time?

7  A.   Yes.

8  Q.   I'm sorry if I already asked this.  Did they go to the

9  same school?

10  A.   Yes.

11  Q.   Now, that night, that evening, what did you do?  Did you

12  go out with your friends?

13  A.   I don't know.  I don't think I did anything.

14  Q.   Okay.  Do you know what your dad was doing that night?

15  A.   He was going to some sort of event.

16  Q.   Did you know the name of the event?

17  A.   No.

18  Q.   Or what kind of event it was?

19  A.   At the time I did.  Now I don't.

20  Q.   Do you know where it was?

21  A.   I did at the time.

22  Q.   Okay.  If I showed you your grand jury transcript, would

23  it refresh your recollection as to what you knew at the time?

24  A.   Probably.

25  Q.   I show you what's been marked --

1           MR. NOTHSTEIN:  May I approach, Your Honor?

2           THE COURT:  Yes.

3    BY MR. NOTHSTEIN:

4    Q.   -- Government's Exhibit 396.

5           So do you recognize that document, ma'am?

6    A.   Yes.

7    Q.   This is your prior grand jury transcript.  Would you mind

8    just taking a look at page 10.  Just kind of read that to

9    yourself and tell me if it reminds you.

10          THE COURT:  Are you ready, ma'am?

11          THE WITNESS:  Yes.

12   BY MR. NOTHSTEIN:

13   Q.   Do you remember where your dad went?

14   A.   The Tiki Bar, down the street.

15   Q.   And did your dad come home from the Tiki Bar at some

16   point?

17   A.   Yes.

18   Q.   And what happened when your dad got home?

19   A.   He came inside and talked to me for a few minutes, and

20   then I went to bed.

21   Q.   And where -- I guess do you remember where you were

22   sitting when he came in?

23   A.   I was sitting in the living room.

24   Q.   Was that that TV area that you showed us before?

25   A.   Yes.

1    Q.    Do you remember what your dad was wearing?

2    A.    I don't.

3    Q.    And did you have any kind of conversation with him?  You

4    said you talked to him briefly.  Did you have any kind of

5    discussion?

6    A.    Not that I can remember.

7    Q.    Had you ever seen your dad drink before?

8    A.    Yes.

9    Q.    Did he seem like he had been drinking to you?

10   A.    Yes.

11   Q.    Did he seem like it was a lot?

12   A.    He seemed like he was a five out of ten, on a scale.

13   Q.    So about -- about midway?

14   A.    Yes.

15   Q.    After this conversation with your dad, what did you do?

16   A.    I went to bed.

17   Q.    And what did you do when you went upstairs?

18   A.    I got in bed.

19   Q.    Okay.  Did you do anything else?  Did you talk to anybody?

20   A.    I was on my iPad.

21   Q.    Okay.  So you went to your bedroom, but not to sleep?

22   A.    Correct.

23   Q.    Okay.  Now, before you went upstairs, did you see your dad

24   go back and get a beer or anything?

25   A.    No.

1  Q.    And when you went upstairs and you were on your iPad, who
2  were you talking with?
3  A.    I'm not sure.
4  Q.    At some point after going upstairs, did you hear something
5  from downstairs?
6  A.    Yes.
7  Q.    What did you hear?
8  A.    I heard the front door open and then I heard someone start
9  yelling.
10 Q.    And what did you hear the person yelling?
11 A.    It was someone talking -- they were accusing my dad of
12 sleeping with their wife.  And then also complaining about
13 their marriage.
14 Q.    Did you recognize the voice?
15 A.    I did not.
16 Q.    Did you hear any other voices?  Like, did you hear your
17 dad?
18 A.    Yes.
19 Q.    What -- could you hear what your dad was saying?
20 A.    I don't remember what specifically was said.
21 Q.    And from what you could hear, where did you think they
22 were in the house?
23 A.    Well, I knew exactly where they were, because I had left
24 my room at this point.
25 Q.    Okay.  Where did you go?

1  A.   So I stepped out of the room I was staying in and into the

2  hall to the -- the banister, where we saw into the foyer

3  earlier, and I could see two people.

4          MR. NOTHSTEIN:  May I have Government's Exhibit 250,

5  please?

6  BY MR. NOTHSTEIN:

7  Q.   Ms. Nettleton, is this where you were looking?

8  A.   Yes.

9  Q.   And where were the two people standing?  If you can mark

10  with the little pen or draw on the screen.

11  A.   So -- sorry.  My orientation is kind of off, so I'm trying

12  to figure out where.

13  Q.   Let me ask you this, were you able to see both of them?

14  A.   Yes, I believe so.

15  Q.   And at this point, when you saw the other person, was it a

16  man or a woman?

17  A.   It was a man.

18  Q.   And did you recognize him at that point?

19  A.   No.  I couldn't see him clearly enough.

20  Q.   From what you could see, were they having any physical

21  contact?

22  A.   No.

23  Q.   Had you heard anything at this point that sounded like

24  physical contact?

25  A.   No.

1   Q.    And from what you could tell looking down, did they see

2   you?

3   A.    No.

4   Q.    Did they say anything to you?

5   A.    No.

6   Q.    And when you first looked down there, I guess, could you

7   tell -- I guess were they already standing there, or was either

8   one of the men -- your father or the other man -- like walking

9   into the other room?

10  A.    So when I got -- I left my room as soon as I heard the

11  door open.  I walked over there.  And I saw a man standing with

12  his back to our door and my father walking towards him.

13  Q.    So your father didn't let him in?

14  A.    Correct.

15  Q.    Were you able to hear anything specific about what the man

16  was saying when he was accusing your father of having an affair

17  with his wife?

18  A.    I can't remember specifically.

19  Q.    Okay.  What did you do after seeing your father and this

20  man in the foyer?

21  A.    I went back into my room.

22  Q.    Did you do anything with your door when you went in the

23  room?

24  A.    I locked my door.

25  Q.    Why did you lock it?

1  A.   Because I didn't know who the man was.

2  Q.   How were you feeling at the time?

3  A.   Freaked out.

4  Q.   I know this is difficult, ma'am.  Why were you freaked

5  out?

6  A.   Sorry.

7  Q.   It's okay.  Take your time.

8       THE COURT:  I'm not sure that's a necessary question.

9  I -- maybe it's --

10      MR. NOTHSTEIN:  I'll move on, Your Honor.

11      THE COURT:  -- maybe it's kind of obvious.

12      MR. NOTHSTEIN:  I'll move on, Your Honor.

13  BY MR. NOTHSTEIN:

14  Q.   Ms. Nettleton, after you went into your room, did you do

15  anything else?  Did you contact anyone?

16  A.   Yes.

17  Q.   Who did you contact?

18  A.   I texted my boyfriend.

19      MR. NOTHSTEIN:  May I approach again, Your Honor?

20      THE COURT:  Yeah.

21  BY MR. NOTHSTEIN:

22  Q.   Ms. Nettleton, I'm going to hand you Government's

23  Exhibit 29.  Do you recognize that document?

24  A.   Yes.

25  Q.   In fact, did I give you this to you yesterday to take a

1    look at?

2    A.    Yes.

3    Q.    And after looking at it, do you recognize sort of what's

4    on this document?

5    A.    Yes.

6              MR. NOTHSTEIN:  May I have Government's Exhibit 29,

7    please, Ms. Reid?

8    BY MR. NOTHSTEIN:

9    Q.    I'd like to turn your attention, ma'am, to -- there's a

10   text message at 10:22 and 46 seconds.

11             MR. NOTHSTEIN:  Will you please highlight or, I'm

12   sorry, zoom in on those two, please?

13   BY MR. NOTHSTEIN:

14   Q.    Do you see that text message there in front of you,

15   Ms. Nettleton?

16   A.    Yes.

17   Q.    So this is a text message -- actually, the receiver is

18   unknown.  It says, "There's a dude in my house.  Apparently he

19   also got shit-faced at this party.  I just went to bed and told

20   my dad to go to bed.  Then I hear voices about this dude

21   yelling at my dad about something to do with his wife."

22             Do you know who you sent that text message to?

23   A.    I'm not sure.

24   Q.    Moving next to text message at 10:46 p.m. --

25             THE COURT:  If we can -- we can refer to the

1    explicative another way, please.

2             MR. NOTHSTEIN:  Yes, sir.

3    BY MR. NOTHSTEIN:

4    Q.    In this text, Ms. Nettleton -- this is from Julia -- this

5    is from you to Keegan McManus.  And you say, "Oh, my God.  My

6    dogs won't stop barking because there's people outside.  I'm

7    literally about to tear my hair out."

8             What was happening -- and there's about 20 minutes in

9    between those two text messages, Ms. Nettleton.

10            And let me back up for a second.  The first text we

11   looked at, do you have an idea about how close in time did you

12   send that to when you saw your dad and the other man in the

13   foyer?

14   A.    I'm not sure.

15   Q.    Do you think it was a long time or a short time?

16   A.    Short.

17   Q.    So what do you recall happened between 10:22 and 10:46

18   when you said that the dogs wouldn't stop barking?

19   A.    After I went back in my room, I don't know how much

20   longer -- how much time had passed before I started hearing

21   loud noises downstairs.  And then it stopped and my dog started

22   barking and didn't stop barking, like, for several minutes

23   straight.

24   Q.    So just to kind of get that time line.  So at some point

25   after the man was in the foyer, you heard loud noises and then

1  they stopped and then the dog started barking really loudly?

2  A.   Yes.

3  Q.   At that point had -- had you gone downstairs at all?

4  A.   No.

5  Q.   And just to back up for a second, just looking back at

6  10:40, there's about three Snapchat -- or unknown messages in a

7  row.

8        Were you contacting anyone else at the time?  Were

9  you -- were you contacting your brother?

10  A.   Yes.

11  Q.   Okay.  Do you remember what you said to him?  Do you

12  recall?

13  A.   I texted him about what was happening, but -- so I don't

14  know if I actually sent this message at 10:46, because all --

15  like a lot of these messages are out of order because our

16  internet was so bad, because I know -- I don't think I messaged

17  my brother until after I went downstairs.

18  Q.   Okay.  So when you say the internet was bad, sometimes you

19  would get the -- you'd have a conversation but you'd get the --

20  A.   Right.

21  Q.   -- messages out of order?

22  A.   Like a lot of -- like, there's other places where it's

23  obvious the messages are being sent out of order.

24  Q.   Right.  Right.

25        So there was a time when you heard your dogs barking

1  really loudly?

2  A.   Correct.

3  Q.   After you heard your dogs barking really loudly, what did

4  you do?

5  A.   My dog didn't stop barking for several minutes straight,

6  and it's weird because he's not really a barker.  So I went

7  downstairs and all the noises had stopped.  Then I thought,

8  like there was no one there.

9        So I went downstairs and saw my dog standing on the

10  edge of our carpet barking at someone.

11  Q.   Will you hold there for one second, ma'am?

12       MR. NOTHSTEIN:  Could you please, Ms. Reid, give us

13  Exhibit 59?

14  BY MR. NOTHSTEIN:

15  Q.   Ms. Nettleton, for -- which of your dogs was barking?

16  A.   Toby.

17  Q.   Toby.

18       And you said you walked downstairs and the noises you

19  had heard had stopped; is that right?

20  A.   Correct.

21  Q.   What did those noises sound like, by the way?

22  A.   They were, like, loud, like kind of thumping noises.

23  Q.   Could you hear any words being spoken?

24  A.   No.

25  Q.   Could you hear people talking with indiscernible words?

1  A.   I don't think so.

2  Q.   So you just heard some thumping noises?

3  A.   Correct.

4  Q.   So by the time you went downstairs, those had stopped?

5  A.   Yes.

6  Q.   Now, could you please just show us on the map -- you said

7  the dog was standing at the edge of the carpet.

8  A.   Right.

9  Q.   If you could mark with an X on there where the dog was,

10 A.   Around, like, here, I think.  A little -- a little more to

11 the left.

12 Q.   Is that sort of towards -- sort of between the living room

13 and the sitting room?

14 A.   Right.  We had a rug under our dining room set and he was

15 standing at the edge of that.

16 Q.   And do you know -- does your dog do that a lot?

17 A.   He was really old.  He didn't -- he refused to walk on

18 tile, so that's why he was standing there.  He couldn't go any

19 further.

20 Q.   When you came downstairs -- did you go down those stairs

21 in the foyer?

22 A.   Yes.

23 Q.   When you got down to the living room and saw your dog,

24 which way was he pointing, or looking?

25 A.   Towards the kitchen.

1   Q.   Okay.  Was he still barking when you got down there?

2   A.   Yes.

3   Q.   Did you look in towards the kitchen?

4   A.   Yes.

5   Q.   What did you see?

6   A.   I saw my dad lying face down on the ground, but I could

7   only see, like, the lower half of him.  And I saw a man

8   standing over him typing on a cell phone.

9   Q.   Could you just maybe show us on the map -- you said you

10  saw your dad laying down.

11  A.   Right.

12  Q.   Where was he laying?

13  A.   So this doesn't look right because my mark isn't very

14  good, but -- so my dad was laying, like, here.  And then there

15  was a person, like, standing over him.

16  Q.   So your dad was kind of laying between the barroom and the

17  kitchen?

18  A.   Right.

19  Q.   And I think you said you could only see half of him?

20  A.   Correct.

21  Q.   Which half could you see?

22  A.   The bottom.

23  Q.   So which way were his -- was his head pointing and which

24  way was he pointing?

25  A.   I think he was face down.

1  Q.   I guess, was his head in the kitchen or head in the

2  barroom?

3  A.   Head in the kitchen.

4  Q.   So you could see his legs?

5  A.   Right.

6  Q.   Could you see anything -- the man that was standing over

7  him -- I guess, how well could you see him?

8  A.   I could only see, like -- he was turned, like, to where I

9  could see his -- like, I could see the phone in his hand, but I

10  couldn't -- like, I could see part of his face but not well

11  enough to know who it is, because the light was off.

12  Q.   Did he see you?

13  A.   No.

14  Q.   What was the man doing?

15  A.   Typing.

16  Q.   And do you know what he was typing on?

17  A.   A cell phone.

18  Q.   Did it look like -- what did it look like he was doing

19  with the cell phone?

20  A.   I assumed he was calling someone.

21  Q.   But did he ever pick the phone up and put it to his ear?

22  A.   I didn't witness it.

23  Q.   Did you hear him say anything --

24  A.   No.

25  Q.   -- or any voice coming from the phone?

1  A.    No.

2  Q.    What did you -- could you see any injuries or, like, blood

3  anywhere?

4  A.    No.

5  Q.    Could you see any injuries on your dad?

6  A.    No.

7  Q.    How long did you sort of look at them?

8  A.    Maybe 30 seconds.

9  Q.    Okay.  What did you do next?

10 A.    I went back upstairs -- well, I ran upstairs.

11 Q.    Did you have -- before you ran upstairs, did you have any

12 kind of conversation with either the man or your father?

13 A.    No.

14 Q.    After you went upstairs, what did you do?

15 A.    I texted my brother.

16 Q.    Okay.  And what did you text your brother to tell him?

17 A.    I told him what was happening, because I didn't know what

18 to do.

19 Q.    What did he tell you?

20        Or did he respond?

21 A.    He told me to call him.

22 Q.    Okay.  And did you do that?

23 A.    Yes.

24 Q.    And what happened when you talked to him?

25 A.    I explained more what was going on.  He told me he was

1  going to call dad.

2  Q.   After that -- well, do you know if he actually contacted

3  your father?

4  A.   Yes.

5  Q.   Before we get to that, when you got upstairs, did you hear

6  any other noises?

7  A.   Yes.

8  Q.   What did you hear?

9  A.   About a minute or two after I got back upstairs, I started

10  hearing the same noises I was hearing before, like the thumping

11  and kind of banging noises again.

12  Q.   And you said "the thumping or banging noises."

13       Could you tell at all what kind of thumping or

14  banging it was?

15  A.   I honestly don't know.

16  Q.   Okay.

17  A.   It -- I didn't see it.  It could have been -- it sounded

18  like things like hitting the wall to me or hitting furniture.

19  Q.   And when you say "things," what kind of things you think

20  was hitting the wall or furniture?  Could you tell?

21  A.   I don't know.

22  Q.   Okay.  As you were hearing these noises, did you -- did

23  you text anyone else other than your brother?

24  A.   Yes.

25       MR. NOTHSTEIN:  Could we have -- I guess Exhibit 29

1    again, please?

2            And there's a 10:55 text message we're going to look

3    at.

4    BY MR. NOTHSTEIN:

5    Q.   Do you see the text messages we've zoomed in on there,

6    Ms. Nettleton?

7    A.   Yes.

8    Q.   In this text you say -- this is from you to Keegan.  "I

9    just went downstairs to get the dog to stop barking.  Literally

10   what I see is this dude standing there on his phone and my dad

11   is lying on the ground and I think -- and I'm, like, so

12   confused and terrified, so I ran back upstairs."  Kind of

13   summarizing.

14           Is this the text that you sent?

15   A.   Yes.

16   Q.   And just to be clear, how close in time was this to after

17   you had just gone upstairs?

18   A.   I'm not sure.

19   Q.   Was it a short time or a long time?

20   A.   I imagine short.

21   Q.   Okay.  Now, let's just now turn down to a couple of text

22   messages, also at 10:55.

23           Do you see these text messages, Ms. Nettleton?

24   A.   Yes.

25   Q.   Okay.  And these are with, the first name Tyler, Heath.

1              Is that your friend you described to us?

2   A.   Correct.

3   Q.   And do you recall sending these text messages to Tyler?

4   A.   Yes.

5   Q.   And how -- I guess, again, how -- this is close in time to

6   the Keegan text messages?

7   A.   Yes.

8   Q.   You said, "They're getting into a fight downstairs."

9   A.   Right.

10  Q.   Why did you think there was a fight?

11  A.   Because it started with a man coming into my house and

12  screaming at my father, so I just assumed that was what was

13  going on.

14  Q.   In this time after you've come upstairs, after seeing your

15  father and again hearing the noises, you said there was

16  screaming.

17            Were you able to hear voices at that time?

18  A.   Not that I recall.

19  Q.   So were you able to hear anyone sort of cursing your dad,

20  calling him names, like an MF'er?

21  A.   Not that I can remember.

22  Q.   So I'd like to turn now to -- there's some text messages

23  at 11:22.

24            Ms. Nettleton, these will be on the page -- sorry --

25  6 in front of you.  But we'll put them on the screen as well.

1         Looks like these are Kik Messenger messages with
2    Keegan.
3         And here -- do you see these text messages we're
4    talking about?
5    A.   Yes.
6    Q.   And you say, "I texted my brother, told him what was
7    happening because I could still hear the fighting and he tried
8    calling dad like six times.  I could hear dad answer the phone
9    downstairs.  Things have been quiet since then."
10         So I guess the first question is:  When you sent
11    these text messages to Keegan, Mr. McManus, were the loud
12    noises still going on?
13    A.   No.
14    Q.   And you said there that -- you referenced your brother
15    calling the house.  So I think you told us before and I took a
16    little bit of an aside.  So I apologize.
17         So you said you had asked your brother -- or talked
18    to your brother and he said he was going to call your dad.
19    A.   Yes.
20    Q.   Do you know if he did call your dad?
21    A.   Yes.
22    Q.   How do you know that?
23    A.   The phone rang.
24    Q.   Do you know which phone rang?
25    A.   I'm not sure which line.  It was one of the landlines.

1    But I'm not sure which one.

2    Q.    Do you know -- I think you said there was one upstairs in

3    your brother's room.

4    A.    Right.

5    Q.    Do you know if that one rang?

6    A.    I don't remember it ringing.

7    Q.    But you were able to hear some phone ringing?

8    A.    Right.  I know -- I could hear the one from the living

9    room.

10   Q.    Okay.

11   A.    But I think it was a separate line than the one upstairs.

12   Q.    Okay.  And then you say here in the text message, "I could

13   hear dad answer the phone downstairs."

14         What did you actually hear, do you believe, your

15   father answer the phone?

16   A.    Honestly, I don't know.  I don't remember now.

17   Q.    Do you remember hearing him say hello?

18   A.    I don't remember.

19   Q.    Would it refresh your recollection if we showed you your

20   grand jury testimony?

21   A.    Yes.

22   Q.    I'm going to show you, Ms. Nettleton --

23         Would you like some water, Ms. Nettleton?

24   A.    Sure.

25         Thank you.

1   Q.   I'm going to show you Government's Exhibit 397.  And

2   please just take a look -- this is another time you testified

3   before the grand jury, right?

4   A.   Yes.

5   Q.   And if you could look at page 70, I believe it is.  And

6   just kind of read it to yourself and tell me if you remember.

7   I'm sorry.  70 or 71.

8   A.   Yes.

9   Q.   Okay.  Now, take a look at that.

10          Do you remember if you heard anything?

11  A.   In 2017 I thought I did.

12  Q.   Uh-huh (affirmative).

13  A.   But I honestly couldn't tell you.  I don't want to say I

14  did now, but then I said that I thought I heard somebody say

15  hello, but the reason I knew somebody had answered the phone is

16  because it didn't ring for the full amount of time the phone

17  rings.  It didn't...

18  Q.   I see.  So -- someone kind of picked it up and it didn't

19  ring.

20  A.   Right.

21  Q.   That's what it sounded like, okay.

22          Now, after that, when the phone got picked up, did

23  you hear any additional noises, like the noises you heard

24  before, the thumping and so forth?

25  A.   No.

1  Q.   Did you speak to your brother at any point that night?

2  A.   I believe he -- after he called my dad, I think he called

3  me, but I don't remember what we talked about.

4  Q.   Did you see your father again that night?

5  A.   Yes.

6  Q.   And when did you see him?

7  A.   I'm not sure how long later, but he came up to my room.

8  Q.   And what happened when he came up to your room?

9  A.   He thought I was in my bedroom, so he went through my

10 bedroom and I wasn't there, so he knocked on the bathroom door,

11 where I was in the guest room, and I opened it, and I think we

12 had a short conversation.

13 Q.   Do you remember what you talked about?

14 A.   I don't.

15 Q.   Do you remember if your dad mentioned what had happened

16 downstairs?

17 A.   I think he might have, but I honestly don't remember the

18 content of the conversation.

19 Q.   Okay.  Prior to your dad coming upstairs, since the time

20 you had gone upstairs after he came home till that moment, had

21 you spoken to your dad at all?

22 A.   No.

23 Q.   I'd like to turn to page 13 of Exhibit 59.

24      Ms. Nettleton, do you see there on the screen it

25 looks as though there's a text message from your brother to you

1    at a little after midnight?

2          And your brother says, "Love you, Jules.  Stay

3    strong, I always got your back."

4          Do you remember getting those text messages that

5    night?

6    A.    Vaguely.

7    Q.    So you think you were actually awake when you got those?

8    A.    Yes.

9    Q.    Do you think -- do you recall if those came before or

10   after your father came in your room?

11   A.    I believe after.

12   Q.    When your father came in your room, what was he wearing?

13   A.    He was wearing the shorts he had on earlier.  I think

14   that's it.

15   Q.    Was he wearing a shirt?

16   A.    No.

17   Q.    And remind us, what kind of shirt was he wearing?  Do you

18   remember?

19   A.    I don't remember.

20   Q.    Do you remember if it had a pattern on it or anything?

21   A.    I'm not sure.

22   Q.    So you could -- were you able to sort of see his whole

23   torso and so forth?

24   A.    Yes.

25   Q.    Did he appear to have any injuries on him?

1  A.   I didn't see any.

2  Q.   Did you see any blood on him anywhere?

3  A.   No.

4  Q.   How did he seem; you know, out of breath, anything like

5  that?

6  A.   No, not that I remember.

7  Q.   Was there anything that sort of stood out to you?

8  A.   No.  But I wasn't -- I wasn't looking for anything.

9  Q.   After your dad came in your room, I guess at some point

10  did you go to bed that night?

11  A.   At some point.

12  Q.   What did you do the next day?

13  A.   The next day I left the house early to go do something for

14  school, I think.

15  Q.   Do you know how -- how early it was?

16  A.   9:00, I think, maybe earlier.

17  Q.   The sun was up?

18  A.   Yes.

19  Q.   How did you actually leave the house?  In other words,

20  what door did you go out of?

21  A.   The front door.

22  Q.   So did you come straight down the foyer and out?

23  A.   Yes.

24  Q.   Did you walk through any of the rest of the house?

25  A.   No.

1  Q.   Just in that short time you were walking the first floor,

2  did you see anything out of -- out of place or anything

3  strange?

4  A.   No.

5  Q.   Did you talk to your father before you left?

6  A.   I might have told him good-bye.  It might have just been

7  like a shouted good-bye, though.  I don't know if I actually

8  spoke to him.

9  Q.   What were you doing that day?

10 A.   I don't really remember.  I think it was something for a

11 school project.

12 Q.   Did you come home later in the day?

13 A.   Yes.

14 Q.   When you came home, was your father there?

15 A.   Yes.

16 Q.   Did you-all have a conversation about what had happened

17 the night before?

18 A.   Yes.

19 Q.   And what did he tell you?

20 A.   He didn't tell me specifically what happened.  He told me

21 Mr. Tur had -- came into the house, or -- and -- that's all I

22 really remember.

23 Q.   Did he say anything about the noises you had heard?  Did

24 he explain what that was?

25 A.   I honestly can't remember.

1  Q.   Did he tell you anything about Mr. Tur being hurt?

2  A.   He didn't mention him being hurt.

3  Q.   You said he mentioned that Mr. Tur was missing.

4          Did he say anything about the kind of efforts they

5  were taking to find him?

6  A.   I believe he told me -- like, explained, like, the

7  situation as it was happening, like, on base, but -- I think

8  that's it.

9  Q.   Do you remember asking him any questions about sort of,

10  you know, what had happened, just say, like, "Hey, what was

11  that noise last night?"

12  A.   I honestly can't remember.

13  Q.   Okay.  And do you remember whether that -- whether or not

14  your father mentioned -- he mentioned that Mr. Tur had accused

15  him of having an affair that night?

16  A.   I don't know if he mentioned it.

17  Q.   Okay.  We'll look at -- would taking a look at your grand

18  jury testimony refresh your recollection, possibly?

19  A.   Sure.

20  Q.   There's two you have there.  The one from 2015, if you

21  wouldn't mind taking a look at page 31.  Just kind of read that

22  to yourself and look up.

23          Okay.  Do you remember now if you had that

24  conversation with your dad?

25  A.   I was pretty vague then, too.  I -- I think we talked

1  about it a little, but I don't know.  He told me that Mr. Tur

2  had come in and was, like, accusing him of, like, sleeping with

3  his wife, I guess, and then that's -- I didn't -- I didn't want

4  to talk about it.

5  Q.    Of course.

6  A.    So...

7  Q.    Ms. Nettleton, did you notice anything out of place in

8  your house that day?

9  A.    I did not.

10  Q.    Did you see, like, blood on the walls or anything?

11  A.    No, I didn't.

12  Q.    Did you tell your dad you had been communicating with

13  people that night?

14  A.    I did.

15  Q.    Did he have any response to that?

16  A.    No.

17          MR. NOTHSTEIN:  The Court's indulgence for a moment.

18          THE COURT:  Ma'am, do you need -- if you want some

19  water, you can get some.

20          THE WITNESS:  Thank you.

21          MR. NOTHSTEIN:  Nothing further at this time,

22  Your Honor.

23          THE COURT:  Are you doing all right?  Do you need a

24  break or anything?

25          THE WITNESS:  I'm okay.  Thank you, though.

1      THE COURT:  All right, then.  Cross-examination.

2                **CROSS-EXAMINATION**

3  BY MR. VOKEY:

4  Q.   Ms. Nettleton -- Ms. Nettleton, good morning.

5  A.   Good morning.

6  Q.   Just a few questions.

7        When you had gone downstairs and Toby was barking --

8  A.   Yes.

9  Q.   -- and you saw your dad laying on the floor --

10  A.   Right.

11  Q.   -- that had to be kind of terrifying.

12  A.   It was.

13  Q.   In fact, you thought he might even be dead at that point?

14  A.   Right.

15  Q.   Back up a little bit.  When you first walked -- when you

16  first heard the noise when somebody came in your house and you

17  walked to the stairs, that person had already walked in the

18  house and then you could see your father approaching, correct?

19  A.   Correct.

20  Q.   So that's how you know that nobody let him in?

21  A.   Right.

22  Q.   He broke in your house?

23  A.   Right.

24  Q.   And one of your text messages said something -- it was

25  kind of a string of text messages and -- about you went to bed,

1   you told your dad to go to bed?

2   A.   Correct.

3   Q.   That was when he first arrived?

4   A.   Yes.

5   Q.   So when you're describing -- that's when he first came

6   home and he tossed on the couch and he went to bed -- you told

7   him to go to bed?

8   A.   Right.

9   Q.   Okay.  I just wanted to make sure.

10           And the government attorney asked you about banging,

11  right?

12  A.   Uh-huh (affirmative).

13  Q.   And when you were hearing that banging, you were upstairs,

14  the doors were closed?

15  A.   Correct.

16  Q.   So you're not quite sure what that banging was?

17  A.   Right.

18  Q.   Kind of could have been anything?

19  A.   Yes.

20  Q.   You said it sounded like somebody could have been hitting

21  the door, the wall or the door, or something like that?

22  A.   Right.

23  Q.   Okay.  And when -- when your dad came upstairs to see you

24  and he didn't have a shirt on and you said you didn't see any

25  injuries on him, you didn't see any blood?

1    A.    No.

2    Q.    Okay.  And the next morning when you left for the school

3    project, you didn't see, like, blood all over the house?

4    A.    Right.  I only saw the foyer, but even when I came home

5    from the project, I didn't see blood or anything out of place.

6    Q.    So when you woke up to go, you just kind of got ready and

7    then left -- left?

8    A.    Right.

9    Q.    Okay.  You also mentioned that there were two landlines in

10   the house.

11   A.    Yes.

12   Q.    So one of them was a home phone.  The other one was your

13   father's office phone; is that right?

14   A.    There were -- oh.  So there were two sets of, like --

15   handsets that had different numbers, and also there was a phone

16   in the office, but I think it had one of the same numbers as

17   the handset, but I don't remember.

18   Q.    So there were -- just to make sure we're clear, there were

19   two phone numbers for the house?

20   A.    Yes.

21   Q.    Two land line phone numbers for the house?

22   A.    Correct.

23   Q.    Okay.  And one of them was an office phone that your

24   father had for work that was hooked up in his house?

25   A.    Right.

1   Q.   Okay.  And that next -- that next day, Saturday, you said

2   you -- you left and had gone to do what you think may be a

3   school project or something --

4   A.   Right.

5   Q.   -- came back and talked to your dad.

6        And you told your dad that you had been communicating

7   with other people.

8   A.   Yes.

9   Q.   And did your dad tell you to erase communications or stop

10  communicating or anything at all?

11  A.   No.

12       MR. VOKEY:  That's all the questions I have.

13       THE COURT:  Okay.  Redirect?

14       MR. NOTHSTEIN:  No questions, Your Honor.

15       THE COURT:  All right.  Ms. Nettleton, you may step

16  down.  Thank you very much.

17       THE WITNESS:  Thank you.

18       THE COURT:  They'll show you out.

19       THE WITNESS:  Okay.

20       THE COURT:  Thank you.

21    (Witness excused.)

22       THE COURT:  Who's the government's next witness?

23       MR. NOTHSTEIN:  Lara Sabanosh.

24       May we approach, Your Honor?

25       THE COURT:  Yes.

1          (Sidebar conference:)

2               MR. GEE:  I was just going to say, Your Honor, I

3     don't know if the Court wants to take its morning break, but it

4     might just take a second to get set up and also make sure she

5     doesn't bump into the crowd that's transitioning right now.

6     There's a lot of emotions.

7               MR. VOKEY:  (Inaudible.)

8               THE COURT:  Okay.  All right.  It's a little bit

9     early, but that's fine.

10              MR. GEE:  Just five.  Just wanted to -- there are

11    some Turs in the hallway.

12              THE COURT:  That's fine.  All right.

13         (The following proceedings occurred in open court, in the

14    presence of the jury:)

15              THE COURT:  Ladies and gentlemen, it's going to take

16    us a few minutes to get set up for the next witness, so we're

17    going to go ahead and take an early break.  It'll just be a

18    ten-minute break.  So it's 10:25.  I'll ask you to be ready to

19    come out at 25 to 11:00.

20              Please remember my instructions.  Thank you.

21              COURT SECURITY OFFICER:  All rise for the jury.

22         (Jury exits, 10:24 a.m.)

23              THE COURT:  All right.  We're in recess for ten

24    minutes.

25              COURT SECURITY OFFICER:  All rise.

1          (Recess from 10:24 a.m. to 10:35 a.m.; all parties

2   present.)

3          COURT SECURITY OFFICER:  All rise.  This Honorable

4   Court is back in session.

5          Please be seated.

6          THE COURT:  We ready for the jury?

7          MR. GEE:  We are.  Thank you, Your Honor.

8          COURT SECURITY OFFICER:  All rise for the jury.

9   (Jury enters, 10:36 a.m.)

10          COURT SECURITY OFFICER:  You may be seated.

11          THE COURT:  All right, ladies and gentlemen.  We have

12   a new witness.

13          Ms. Diaz, if you'll swear the witness, please.

14          COURTROOM DEPUTY:  Do you solemnly swear that the

15   testimony you are about to give before this court will be the

16   truth, the whole truth, and nothing but the truth, so help you

17   God?

18          THE WITNESS:  I do.

19          COURTROOM DEPUTY:  Please state your full name and

20   spell your last name for the record, please.

21          THE WITNESS:  Lara Marie Sabanosh, S-a-b-a-n-o-s-h.

22          THE COURT:  All right.  Ms. Sabanosh, Mr. Gee is

23   going to have some questions for you and then one of

24   Captain Nettleton's lawyers will have some questions as well.

25          All right?

1      LARA MARIE SABANOSH, GOVERNMENT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3   BY MR. GEE:

4   Q.    Good morning, Ms. Sabanosh.

5   A.    Good morning.

6   Q.    Where are you from originally?

7   A.    San Jose, California.

8   Q.    Where did you grow up?

9   A.    A little bit of everywhere.

10  Q.    What's your educational background?

11  A.    I have a bachelor's, master's, and I've completed two

12  Ph.D.s.

13  Q.    And since about February of 2015, where have you been

14  employed?  Since February of 2015.

15  A.    Fleet and Family Support Center.

16  Q.    Okay.  And where, for the Fleet and Family Support Center?

17  A.    Pensacola, Florida.

18  Q.    And what is the Fleet and Family Support Center in

19  Pensacola, Florida?  What do you guys do there?

20  A.    We do mental health and support military personnel

21  classes.

22  Q.    And what is your current position there?

23  A.    I'm a transition assistant program manager.

24  Q.    So are you a federal employee?

25  A.    I am, yes.

1  Q.   Now, Ms. Sabanosh, we don't need to get into too many

2  details about it, but did you have an incident that affected

3  your health a little while ago?

4  A.   I did, yes.

5  Q.   What -- what was that?

6  A.   I was in -- I was rear-ended in a car accident a little

7  over a year ago.

8  Q.   How -- how fast were you hit?

9  A.   Over 50 miles an hour.

10  Q.   And was that -- did that have an effect on your health?

11  A.   It did, yes.

12  Q.   In general what -- what's sort of going on with your

13  health now because of that?

14  A.   I have several herniated disks from my neck to lower back.

15  I have frontal lobe damage, post-concussion syndromes, and --

16  among other things that I have wrong with me.

17  Q.   Are you on medical leave now from those injuries from your

18  work?

19  A.   Yes.

20  Q.   And are you receiving medical treatment for them?

21  A.   I am, yes.

22  Q.   Are you on any medications here today that affect your

23  ability to understand my questions or -- or in giving your

24  answers?

25  A.   No.  I have come off medications to be here today.

1  Q.   Do these injuries still sometimes affect your ability to

2  sit still and pay attention and things like that?

3  A.   They do, yes.

4  Q.   Okay.  If at some point you need a break, just let me

5  know.  Okay?

6  A.   Thank you.

7  Q.   Now, did you know a person named Christopher Tur?

8  A.   I did, yes.

9  Q.   What was your relationship to him?

10  A.   He was my husband.

11  Q.   Where did you originally meet?

12  A.   We met in 1994 while I was home on break from college.

13  Q.   And, Ms. Sabanosh, I know this is difficult, but if you

14  can, just try to keep your voice up, too, a little bit so the

15  folks can hear you.  Okay?

16  A.   Sorry.

17  Q.   There's a microphone there in front of you, but just be

18  sure to speak loud and clear as best you can.  Okay?

19  A.   Sorry.

20  Q.   All right.  So you said that you were on a break from

21  college.  And what was going on in his life at that point?

22  A.   He was home on leave from the military.

23  Q.   And where was this that y'all met?

24  A.   In Pennsylvania.

25  Q.   When did y'all get married?

1    A.    The following December in 1995.

2    Q.    So y'all dated for about how long before you got married?

3    A.    A year.

4    Q.    Approximately how long were you married to Mr. Tur?

5    A.    Just under 20 years.

6    Q.    And were you still married in January 2015?

7    A.    We were, yes.

8    Q.    Did you have any children?

9    A.    Two, yes.

10   Q.    What was their ages?

11   A.    Madison was getting ready to turn 15, and Savannah was 18

12   at the time.

13   Q.    Where was Madison, the younger -- 15-year-old, living in

14   January of 2015?

15   A.    At home with us.

16   Q.    And where was your older daughter at that point?

17   A.    At college.

18   Q.    Ms. Sabanosh, did your husband pass away in January of

19   2015?

20   A.    He did, yes.

21   Q.    Who was Mr. Tur's employer at the time that he died?

22   A.    Navy Exchange.

23   Q.    Approximately when did he go to work for the Navy

24   Exchange?

25   A.    Ten years, 2005.

1    Q.    Okay.  What is the Navy Exchange?

2    A.    They're a retail store for the military.

3    Q.    And what was his position with the -- and where was he

4    working for Navy Exchange in January 2015?

5    A.    Naval Station Guantanamo Bay.

6    Q.    What was his position for the Navy Exchange at Guantanamo

7    Bay?

8    A.    He was a loss prevention safety manager.

9    Q.    What did he basically do in that position?

10   A.    Handled theft for the Navy Exchanges.

11   Q.    Did you live -- did you live with him there in GTMO?

12   A.    I did, yes.

13   Q.    Okay.  Approximately when did y'all move to GTMO?

14   A.    2011, May-ish.

15   Q.    Okay.  And did your family live on base there at GTMO?

16   A.    We did, yes.

17   Q.    I'm going to show you a -- a map that's been marked as

18   Exhibit 7.  Just take a moment to orient yourself,

19   Ms. Sabanosh.  Do you kind of recognize what this map is a

20   geographic map of?

21   A.    I do, yes.

22   Q.    What is it a map of?

23   A.    This is the -- the base there, and I can -- the

24   development we lived in -- sorry.  The development we lived in.

25   Q.    Okay.  And where is the development that y'all lived in?

1  A.    On here?

2  Q.    Yes, ma'am.  You can point with that pen.  Uh-huh

3  (affirmative.)

4  A.    Just -- we lived down here.

5  Q.    All right.  So what was there --

6  A.    This was the second house we lived in.

7  Q.    And is that where y'all were living in January 2015?

8  A.    Correct.

9  Q.    And what was the name of that neighborhood?  Do you

10  recall?

11  A.    I don't.  I'm sorry.

12  Q.    That's okay.

13        Just over here, Ms. Sabanosh, there's a building

14  that's marked the Bayview.  What was that?

15  A.    It was -- it was where the Officers Club, and it was also

16  where we would go -- there's a place we could go have brunch

17  and a restaurant within there as well.

18  Q.    Could you walk between the Bayview and your house?

19  A.    Yes.

20  Q.    Had -- had you done that?

21  A.    Many times.

22  Q.    And what is that walk like?

23  A.    It was fine.  There were sidewalks.  It was a safe walk.

24  Q.    And if you left the sidewalks -- so what's, like, say, the

25  terrain like up here, between your house and the Bayview, if

1    you left the sidewalks?

2    A.    Well, there were trails up there.  It wouldn't be my idea

3    of a walk, but -- but you can.  There are people that walk

4    that.

5    Q.    And I'll show you Exhibit 290.  What's this depict?

6    A.    Those are some of the hills up in the GTMO area.

7    Q.    Is this kind of consistent with the landscape there

8    outside of your house --

9    A.    Yes.

10   Q.    -- or between your house and the Bayview?

11   A.    As far as I can remember.

12   Q.    Now, in general, what kinds of things were there to do

13   there on GTMO that you and Chris would do either together or

14   separate?

15   A.    Boating, hiking, swimming, snorkeling, drinking.  I mean,

16   that was -- we'd go to the bars.  Barbecues.  That was pretty

17   much the -- I didn't go diving, but go to the beach.  They have

18   a pool for recreation.  There were events with the schools,

19   things like that.

20   Q.    Did y'all's family have a boat down there?

21   A.    We did have a boat.

22   Q.    Did Chris use the boat?

23   A.    Primarily Chris.  It wasn't necessarily my thing, but we

24   would go out also.  But he was big into fishing, so...

25   Q.    Now, how well would you get to know people on GTMO?

1  A.   Very well.

2  Q.   Why -- why is that?

3  A.   It wasn't as easy to leave, so -- and we couldn't go into

4  Cuba, so we were pretty much within our certain square miles.

5  We saw each other all the time.  We only had one place to go

6  shopping.  There was only really two places to go eat.  And it

7  was the same thing over and over again.

8        People got to be really good at cooking, barbecues,

9  backyard chefs.  So we would get to know each other really well

10  and kind of hop around from house to house and have our, you

11  know -- do our -- do our own things there to have fun.

12        So we -- we worked with people, but we also saw them

13  in a social atmosphere a lot more than we would in the States.

14  And we knew people really well.  You know, we did joke that,

15  you know, a year with people in GTMO was knowing people maybe

16  seven to ten years in the States with other people amongst our

17  own friends.

18  Q.   Were you employed when your family initially moved to GTMO

19  in 2011?

20  A.   I'm sorry.  Could you repeat that?

21  Q.   Yep.

22        Were you employed when you -- your family initially

23  moved to GTMO in 2011?

24  A.   No, I was not.

25  Q.   So whose job brought you guys to GTMO?

1    A.    Chris' did.

2    Q.    And during the last ten years or so of your marriage,

3    whose job was it that had sort of governed where the family was

4    living, yours or Mr. Tur's?

5    A.    Chris'.

6    Q.    Did you eventually become employed at GTMO?

7    A.    I did.

8    Q.    Approximately when did you get that job, approximately?

9    A.    January of 2012.

10   Q.    What position did you get initially at GTMO?

11   A.    For the Fleet and Family, I was the education facilitator

12   at Fleet and Family.

13   Q.    What kinds of things did you do in that position?

14   A.    I taught the classes, education classes on GTMO.

15   Q.    Were you promoted from that position?

16   A.    I applied and -- it was a promotion, but I applied and had

17   to compete for the position that I got.

18   Q.    And what was the new position that you got?

19   A.    I was the director for Fleet and Family.

20   Q.    And was there a period of time where you were an acting

21   director before you became the permanent director?

22   A.    I was, yes.

23   Q.    So -- so approximately when did you become the acting

24   director?

25   A.    About December of 2013.

1  Q.    And approximately when did you become the permanent

2  director?

3  A.    June-ish of 2014.

4  Q.    What were your duties as the director of the Fleet and

5  Family Support Center?

6  A.    To oversee all the positions that were within the

7  facility, the sexual assault, the counseling positions, both

8  the clinical positions as well as the instructing positions

9  that were going on, about a dozen positions within the facility

10 and as well as the administrative positions.

11 Q.    So by this point in 2014, when you had become the

12 director, how did you feel about sort of where your career path

13 was going?

14 A.    I felt I was more on track with what I was, you know -- my

15 education, what I was doing.  It wasn't that I didn't hold

16 management positions before.  I had held management positions.

17 It was just that my career had taken a back seat for a while

18 for -- for what Chris was doing, and now I -- my kids were

19 older, and I was able to focus on my career.

20 Q.    And as you were focusing on your career, how did Chris

21 react over time?

22 A.    He wasn't -- Chris liked when he was in control.  He liked

23 when he could be the breadwinner of the family, when he had the

24 bigger seat at the table.  And it wasn't that my position --

25 early on in our marriage, I had a position where I was making

1   more money, which caused constant fights, so I had stepped down

2   at that time.  And so we were revisiting an issue at this time.

3   But it wasn't that I was making more money, but I had a bigger

4   seat at the table.

5           And so now the fights were bigger again.  He wasn't

6   as important in his mind.  He just wasn't as important.  And so

7   he wanted to know everything I was doing all the time.  Every

8   phone call that came in.  And, unfortunately, my position, it

9   wasn't his business.  I had clinical.  I had people in my

10  building that required confidentiality.  That was the nature of

11  the position.  So it was not his business to know what I was

12  doing in my position.  The people who were getting services in

13  my building deserved that confidentiality and he did not like

14  that.

15  Q.   And so by, say, late 2014, how -- how well were you and

16  Chris getting along in terms of your marriage?

17  A.   Not at all.

18  Q.   Did y'all discuss separation at any point in late 2014

19  or at any point?

20  A.   We had.  I had -- we were -- the fights were getting more

21  and more -- they were interfering more and more with work for

22  me and sleeping because he would want to start conversations or

23  arguments sometimes at 9:00, 10:00, 11 o'clock at night or

24  right when I would go to work.  I was missing work sometimes.

25  So I -- I did finally say that I wanted a divorce.

1   Q.   And had y'all agreed on a divorce yet by the time he -- he

2   passed away?

3   A.   A month before I asked for a divorce.

4   Q.   Okay.  And had y'all agreed to one yet?

5   A.   No, not on his side.

6   Q.   So you were still discussing it?

7   A.   We were still discussing it.

8   Q.   Now, throughout your marriage, when you and Mr. Tur had

9   these arguments, would there ever be occasions where after the

10   argument he would leave and not come home for the night?

11   A.   Yes.

12   Q.   Prior to January 2015, did you ever get in an argument

13   with him at GTMO that resulted in him not coming home for the

14   night?

15   A.   Yes.

16   Q.   Did it happen on more than one occasion at GTMO?

17   A.   Yes.

18   Q.   Roughly, approximately, how many times do you think it

19   happened in those years on GTMO?

20   A.   Probably six or seven times.

21   Q.   And approximately when would you say was the most recent

22   time prior to January 2015 that y'all had gotten in an argument

23   and Mr. Tur hadn't come home for the night, approximately?

24   A.   He -- there was a --

25   Q.   Approximately when do you think it was, Ms. Sabanosh?

1   A.    October.

2   Q.    Okay.  And can you just briefly tell us what happened in

3   that October incident?

4   A.    We had an event -- the Navy Exchange was holding an event,

5   a concert event, and they -- we were all having a good time,

6   and there was a -- he had gone to get some drinks, and when he

7   came back there were some service members standing with us and

8   some friends, and he had decided that the service members were

9   standing too close to me, so when he came over, he started a

10  fight with the service members.

11  Q.    Like an actual physical fight?

12  A.    Like he tried to start an actual physical fight with them.

13  And they were, like, my daughter's age.  And so the friends had

14  to pull him away, told him to go cool off, so he left.  I left

15  soon after, after apologizing.

16        And we walked that long walk home, from that picture.

17  And as we got home, we got into an argument about the

18  altercation.  And then that -- he ended up leaving after things

19  got out of hand, and he didn't come back.  And we ended up

20  trying to find him the next morning.

21  Q.    Did anyone help you try to find him the next morning?

22  A.    Kelly Wirfel.

23  Q.    Who is Kelly Wirfel?

24  A.    She's the base public affairs officer.

25  Q.    What was her relationship like with you?

1    A.    She was a good friend down there at the time and --

2    Q.    Did you and Ms. Wirfel find Mr. Tur?

3    A.    No.  He ended up calling after noon, because he couldn't

4    find his phone, and his response was, "You have my phone."

5          He missed work.  He was supposed to be at work that

6    morning for the Fun Run.  And that was it.  "Where's my phone?"

7    And that was the end of it.

8    Q.    Okay.  Now, at the time that Mr. Tur died in January 2015,

9    had he been describe -- had he -- excuse me -- had he been

10   prescribed any antidepressants?

11   A.    Yes.

12   Q.    What was the antidepressant that he was prescribed and you

13   knew he was taking by that time frame?

14   A.    Prozac.

15   Q.    And would he take the Prozac -- excuse me.  In your

16   observation, would he take the Prozac as prescribed?

17   A.    I don't believe so, no.

18   Q.    What was he doing in your observation with the Prozac?

19   A.    Sometimes he would take it -- he -- we had a routine of

20   taking things at bedtime, but then it became he just would miss

21   things.  He would take them whenever.  He would not have them.

22   He'd kind of double up on pills.  He'd go and get new

23   prescriptions.  He'd have them change his prescriptions.

24         He'd feel that they weren't working, so he'd have

25   them modify the pills, and then he'd kind of make his own --

1  he'd self-medicate how he felt like it.

2  Q.   Now, in your position as the director of the Fleet and

3  Family Support Center and also just living on GTMO, did you

4  interact with his commanding officer?

5  A.   I did, yes.

6  Q.   And who was the commanding officer up until January of

7  2015 that you interacted with?

8  A.   Captain Nettleton.

9  Q.   Do you see him here in court today?

10  A.   I do.

11  Q.   Can you point him out by where he's sitting and what he's

12  wearing?

13  A.   He's in the suit at the table.

14  Q.   What -- what color is his suit?

15  A.   He's wearing a blue suit.

16  Q.   It's okay.

17  A.   Sorry.  He's wearing a blue suit.

18        MR. GEE:  May the record reflect an in-court

19  identification?

20        THE COURT:  Yes, sir.

21  BY MR. GEE:

22  Q.   Did -- did Mr. Tur also interact with -- and I'll refer to

23  him as the defendant.  Did Mr. Tur also interact with the

24  defendant?

25  A.   Yes.

1   Q.    In what kinds of ways would Mr. Tur and the defendant

2   interact?

3   A.    Professionally, and occasionally I guess if they were out

4   on a -- a boat, they would see each other.  Not on each other's

5   boats, but the bay is small, so if they -- Chris would say he

6   would see him when they were out in the bay, they might pass

7   by.

8   Q.    Did -- did your husband actually work for the defendant?

9   Like, was he his supervisor?

10  A.    No.

11  Q.    Was the defendant your supervisor?

12  A.    No.

13  Q.    Okay.  As the director of Fleet and Family Support Center,

14  would you -- would you work with him?

15  A.    Yes.

16  Q.    Okay.  And what kinds of ways would you work with the

17  defendant?

18  A.    Well, he was the CO of the base, so, I mean, I would have

19  to run through if there were -- if there was anything

20  happening.  And even I had an employee who worked for me who

21  wouldn't -- the dynamics on GTMO were different than in other

22  installations.  We were kind of out on our own in some of the

23  things that we did.

24  Q.    What do you mean by that?

25  A.    We -- the Fleet and Family that I work for now does things

1    differently than the Fleet and Family in GTMO, and so the

2    support was very different, and -- meaning what I do here in

3    the installation in Pensacola is not the same as what I would

4    do there.  I would support everybody in GTMO.  I don't do that

5    in -- in Pensacola.  I don't support everybody.

6            So I -- we would have to deal with foreign nationals,

7    civilians, anybody flying into the base.  There were visitors

8    that were coming in.  We had to worry about, you know, just the

9    fact that we were very isolated.  And so there were areas that,

10   you know, we may or may never have to deal with and the

11   what-ifs.  I had an employee that would report incidents

12   directly to the XO and the Skipper and not to me at all.  So

13   there -- it's just different how sometimes things would happen.

14           But I would -- if -- if I would have to, I would meet

15   with the Skipper once a week, and let them know anything that's

16   going on in my world of Fleet and Family.

17           And if I was concerned about cases that were coming

18   through, clinical cases, if I needed anything from -- from my

19   office, if we were going to be scheduling any events, if there

20   was an event I wanted to do at the base, if I needed support

21   for some areas, if I was getting pushback, that kind of stuff.

22   Q.   And in addition to these weekly or so professional

23   interactions with him on -- on the small base, would you

24   observe the defendant just out and about socially?

25   A.   Sure.  We had social events.  There were also -- I mean, I

1   was -- I also attended social events for the Navy Exchange.  We

2   had -- because the Navy Exchange also had social events, I

3   would go to the social events that -- with the Navy Exchange,

4   as well.  So I was there sometimes in a spouse capacity.

5   Sometimes I was there for DOD events on my own as --

6   Q.   And the defendant would attend these kind of NEX events

7   too?

8   A.   Sure.

9   Q.   What about, say, at the Officers Club, other clubs on the

10  base?  Would you see him socially at places like that?

11  A.   Sure.

12  Q.   Now, as you interacted with the defendant living on GTMO

13  and working on GTMO, did your relationship with him change over

14  time?

15  A.   Well, yes.

16  Q.   Okay.  How did your relationship with him evolve over

17  time, say, initially?

18  A.   Well, we -- we worked together, so it became more

19  friendly.

20  Q.   Okay.  And did it at any point evolve into a personal

21  relationship over time?

22  A.   It did, yes.

23  Q.   Can you describe for us how that began?  Like, was there a

24  particular event that really began the movement towards a more

25  personal relationship?

1   A.    There was an evening where there was an officer's call

2   and --

3   Q.    What's an officer's call?

4   A.    An officer's call is a -- at the Officers Club where

5   people would -- the -- the officers would get together and have

6   a drink night I guess is the best way to put it.

7   Q.    A kind of a Navy officer thing, huh?

8   A.    Yeah.

9   Q.    Okay.  And what happened at the --

10  A.    I'm sure there's more to -- but --

11  Q.    What happened at this Officers Club -- I mean, officer's

12  call at the club?

13  A.    Yeah.  And -- and the more I think, it was an admiral's

14  call that evening, but the -- we went over and the Officers

15  Club was packed and -- and there were a lot of people.

16  Actually, there were a lot of JTF, joint task force, so there

17  were -- the Officers Club had -- it was tons of people that

18  evening in there.  And then as the evening wore on, people

19  started to filter out.  They were going elsewhere, leaving,

20  and -- and so there was a small group of us that decided to

21  stay back.

22          Some people went over to -- at the time there was

23  a -- it was like an unauthorized club called The Bear Trap, and

24  so a bunch of people, including my husband and his friend at

25  the time, they went and left to go over to this JTF club.

1  Q.   And what happened to you after they left?

2  A.   We stayed because I had never been there, and we weren't

3  interested in being with the same big, giant group of people.

4  Q.   What happened with you at the club?

5  A.   We stayed.  There was literally only, like, four of us, so

6  we now could karaoke and dance and have drinks and be quiet.

7  So we were there for several hours.

8         And then towards the end of the night, the captain

9  came back and it was -- we started dancing and had a -- a nice

10 evening.  And him and I were dancing, and he turned around

11 and -- while we were dancing, and he said some nice things to

12 me, and I -- I said them back, and it was a very nice evening

13 and --

14 Q.   And -- and just briefly, when you say, "nice things," what

15 do you mean by that?

16 A.   Well, he told me how attractive he thought I was and

17 wanted to know if I felt the same about him.  And I agreed.

18 And -- and then I -- as we were dancing, I realized that he

19 needed to go home.  So I ended up calling my husband and his

20 friend back.  And then I realized that my -- my girlfriend in

21 this scenario had -- we realized that the chaos in the evening

22 had kind of -- so it just -- that was it, the evening shut down

23 very, very quickly.

24 Q.   And approximately when do you think this was at the -- at

25 the admiral's call at the Officers Club?

1    A.    It had to have been after midnight easily and --

2    Q.    What year and what time -- what time of the year do you

3    think?

4    A.    Early 2014.  Spring, maybe May, June.  But --

5    Q.    And, Ms. Sabanosh, after that event, what happened with

6    your relationship with the defendant over time after that

7    event?

8    A.    It was -- I mean, it was flirty.  Nothing much.  I mean,

9    we were just -- I mean, it was a -- a flirty relationship.  We

10   didn't do really -- I mean, we didn't do anything there in

11   GTMO.  It was just kind of flirty, and -- and then but it

12   picked up.  It was more than just, you know, my friend.

13   Q.    What do you mean it picked up there on GTMO?

14   A.    You know, I mean, we were -- we were having -- I was

15   confiding in him more.  I was unhappy and -- but it wasn't --

16   it wasn't -- we weren't doing -- I -- we weren't doing anything

17   at that time, but I -- I was -- I'm happy with where I was at.

18   Q.    Okay.  And, Ms. Sabanosh, over time on GTMO, did you and

19   the defendant have physical contact as this personal

20   relationship evolved?

21   A.    Yes.

22   Q.    What kinds of physical contact did you have at GTMO as the

23   personal relationship evolved?

24   A.    Just kissing.

25   Q.    Now, was there ever a point at which you and the defendant

1   actually had sexual intercourse?

2   A.    Yes.

3   Q.    Where did that occur?

4   A.    In Jacksonville.

5   Q.    Why were you in Jacksonville, Florida?

6   A.    At a management meeting or a -- a training for the week

7   there.

8   Q.    And -- and if you remember, I mean, why was the defendant

9   here?  Personal, professional?  Do you recall?

10  A.    Professional conference.

11  Q.    And where were y'all staying?

12  A.    In GIS, I believe.

13  Q.    Well, in general, is that a house, hotel, building?

14  A.    Hotel.  It was on base.

15  Q.    Were y'all in the same hotel?

16  A.    Uh-huh (affirmative).

17  Q.    I'm sorry.  Is that a -- is that a yes or a no?

18  A.    Yes.

19  Q.    And had that been planned or did that just work out?

20  A.    It just worked out.

21  Q.    And approximately when was this trip to Florida?

22  A.    October.

23  Q.    Of what year?

24  A.    Oh, 2014.

25  Q.    And was that the only time that y'all had sexual

1   intercourse?

2   A.    Yes.

3   Q.    Now, and how -- after you returned from Jacksonville, what

4   happened with respect to this personal relationship over the

5   last couple of months of 2014, sort of what's going on in your

6   life the next couple of months?

7   A.    Nothing.  The -- the next couple of months were -- I was

8   dealing with my marriage at that point.  I was so unhappy, and

9   I really just wanted to deal with where I was going in my

10  marriage, and -- and so the furthest thing was anything else.

11  I just needed to know what I was doing with myself and for my

12  children, and so I was just focusing on that.

13  Q.    Did you discuss with the defendant those things, like what

14  you were doing with yourself and your children?

15  A.    Yes.

16  Q.    In what way?

17  A.    I wanted -- my position originally was -- was meant for

18  sponsorship.  The previous director was actually there on

19  sponsorship.  So they had created a local hire for me, meaning

20  that I was hired without sponsorship when they brought me on

21  board.  So I know that I could be -- I could have my own

22  sponsorship.  So I wanted that to be looked at so I could -- my

23  daughter could be allowed to graduate, I could have my own

24  house, and so I wanted that to be looked at so that, you know,

25  we could stay there and -- and I would just have my own house.

1  Q.    And did you discuss those desires with the defendant?

2  A.    I did, yes.

3  Q.    What -- what was his reaction?

4  A.    I mean, he understood.  You know, it was more of when I

5  was -- you know, I seriously understood and things were getting

6  more than, you know -- than could be pursued, so I -- I needed

7  to really have my ducks in a row before kind of opening that

8  can of worms.

9  Q.    And did you and the defendant ever discuss actually sort

10  of like being together in the future after you were divorced?

11  A.    No, no.

12  Q.    Now, you talked a little bit about a couple of arguments

13  with -- with Chris that came up.  Did the defendant ever

14  observe you in an argument with Mr. Tur and discuss it with you

15  afterwards?

16  A.    There was one where it was -- there was a concert at one

17  point where he threw a drink on me and kind of grabbed me,

18  which prompted a conversation, and -- and we kind of discussed

19  that.

20  Q.    And what was that conversation with the defendant?

21  A.    Just that it was inappropriate and -- and I -- like many

22  of -- I've had conversations with other people about some of

23  the incidents and I backed my way out of them and, you know,

24  talking about, you know, that needs to be addressed, and -- and

25  I'm -- it was my business.

1          And so I said I didn't want my business -- I will

2    deal with it.  And so I didn't want it out there.  And I --

3    when I want to discuss it publicly, then -- then I will, but,

4    otherwise, you know, that wasn't for somebody else to, so

5    please just let it go.

6    Q.   In addition to this single incident, were there historical

7    incidents in your marriage when Chris touched you during

8    arguments in a way that you felt to be inappropriate?

9    A.   Yes.

10   Q.   And did you tell the defendant about some of those

11   historical incidents as well?

12   A.   I did.

13   Q.   And same sort of discussion about -- about it?

14   A.   Yes.

15   Q.   Now, we talked some about Mr. Tur's prescriptions.  Did

16   you ever discuss with the defendant Mr. Tur -- did you ever

17   discuss with the defendant whether Mr. Tur had ever attempted

18   suicide that you recall?

19   A.   I don't think so.  I don't recall.

20   Q.   And, indeed, in your 20-plus years of marriage to Mr. Tur,

21   was there ever an incident that you believed was a real attempt

22   at suicide?

23   A.   No.

24   Q.   Would he ever threaten to commit suicide?

25   A.   He did.

1  Q.   In what context?

2  A.   He was angry, so it was a "If you ever leave me, I'll kill

3  myself."

4        But it was a control mechanism.  But it was --

5  Q.   Did you take it seriously?

6  A.   No.

7  Q.   Now, Ms. Sabanosh, turning to the night of Friday -- or

8  turning to the day of Friday, January 9th, 2015, were you --

9  was there a party planned for that night?

10  A.   I'm sorry?

11  Q.   The night of Friday, January 9th, 2015, was there a party

12  planned for that night?

13  A.   Yes, yes.

14  Q.   What kind of party?

15  A.   The Hail and Farewell.

16  Q.   And did you see your husband that day before the Hail and

17  Farewell party?

18  A.   I did.

19  Q.   In general, what did you guys do together that day before

20  the party?

21  A.   We had lunch.

22  Q.   What about in the evening time prior to the party?

23  A.   We -- we -- actually, we -- we FaceTimed my oldest

24  daughter.  She was at college, so we FaceTimed her for a little

25  bit, made sure that our youngest was set with whatever she was

1  doing that evening.  And then we were picking up Kelly Wirfel,

2  she was going with us, so we were on the phone with her, and we

3  were doing a pre-party phone call with her before we left.

4  Q.   What do you mean by that?

5  A.   We were all excited for the Hail and Farewell, so we did a

6  shot on the phone, me and her.  Chris did not because we didn't

7  do drinking and driving, so we -- he made a shot for us, and we

8  did it on the phone before we left.

9  Q.   Okay.  And so who was driving y'all that night?

10 A.   Chris was.

11 Q.   And what was the plan in terms of how y'all were going to

12 get home?

13 A.   Chris was driving, and then we were taking a Safe Ride

14 home.

15 Q.   So where were you leaving your car?

16 A.   In the Bayview parking lot.

17 Q.   And -- and what's Safe Ride?

18 A.   It is a -- it's just a -- it's exactly how it sounds.

19 It's just a way for people to get home safely.  We would call

20 it and if we -- people had had too much to drink or just wanted

21 a way to get home, you could call it and they would come pick

22 you up no questions asked.

23 Q.   And you said that y'all picked up Ms. Wirfel.  Where did

24 Ms. Wirfel live in relationship to y'all?

25 A.   Right around the corner.

1   Q.   Now, where was this Hail and Farewell party?

2   A.   At the Bayview at the -- this one was in the Hangar club,

3   which was below the Officers Club.

4   Q.   Who was the Hail and Farewell -- excuse me.  Who was the

5   party for?

6   A.   It was for the XOs, so the outgoing, the old XO and

7   bringing in the new XO.

8   Q.   What's the XO's relationship to the commanding officer?

9   A.   Second-in-command.

10  Q.   And why were you invited to -- you and Mr. Tur, why were

11  y'all invited to this Hail and Farewell party for the

12  second-in-command?

13  A.   Department heads were all invited to the Hail and

14  Farewell.

15  Q.   How did -- all right.  Where did y'all park the car?

16  A.   In the parking lot there in front of the Bayview.

17  Q.   Okay.  And approximately what time did you arrive?

18  A.   I believe it was around 6 o'clock.

19  Q.   When you first arrived, what did you and Mr. Tur and

20  Ms. Wirfel do?

21  A.   We got in there and Chris bought us a round of drinks in

22  the -- in the upstairs bar at the Officers Club.

23  Q.   Okay.  Then what happened?

24  A.   Then we went downstairs.

25  Q.   All right.  And what was going on downstairs -- this is

1    the Hangar bar downstairs?

2    A.    Yes.

3    Q.    What was going on down there when you first got there?

4    A.    They were just -- the beginning of the evening, so people

5    awkwardly kind of talking to each other, some pretending to

6    like each other for the evening.  So it was just getting ready

7    for the evening to begin, so everybody is just standing around.

8    Q.    Okay.  And did this Hail and Farewell party, did it have a

9    formal component to it?

10   A.    It did, yes.  So we were all waiting for everyone to get

11   there to get started.

12   Q.    And did that happen, this formal component?

13   A.    It did, uh-huh (affirmative.)

14   Q.    So what is that?

15   A.    You know, people made personal speeches thanking the XO

16   for his time there, Commander Caswell, and then welcoming the

17   new XO kind of thing.  So a lot of people really liked

18   Commander Caswell and his time.

19   Q.    Okay.  And after the formal part of the party ended, did

20   the -- did the party keep going?

21   A.    It did, yes.

22   Q.    And were you socializing with other people as the party

23   kept going?

24   A.    I did, yes.

25   Q.    And was the defendant present at this party?

1  A.   He was, yes.

2  Q.   Was he present after the formal part of the party as well?

3  A.   Yes.

4  Q.   During the party, were you talking with the defendant?

5  A.   I was, yes.

6  Q.   And as the party went on, did you continue drinking?

7  A.   I was, yes.

8  Q.   What were you drinking that night?

9  A.   Jameson and Coke.

10 Q.   Okay.  How would you describe how much you drank?

11 A.   A few.

12 Q.   A few meaning what?

13 A.   I -- I have -- you know what, I don't know.  My bar tab

14 would be deceiving, because it would say a lot more than any

15 normal human being could drink only because if I put my drink

16 down -- my mother told me in college, "If you ever put your

17 drink down, get another one just because you never know," so

18 every time I would put my drink down and walk away, I'd get

19 another one.  So if you look at my bar tab, I would be dead.

20 So I have no idea honestly.

21 Q.   Okay.  Were you intoxicated by the end of the party?

22 A.   Yes.

23 Q.   And as you were socializing with the defendant, was there

24 any point where the two of you were -- were near each other?

25 A.   Oh, yes.  Yeah, everybody was.

1  Q.    Any point at which you and the defendant had any kind of

2  physical contact as you were near each other socializing?

3  A.    Yes.

4  Q.    What kind of physical contact that you recall?

5  A.    The same physical contact I really was having with

6  everyone.  You know, we were -- the room was very small, so we

7  were -- everybody was arm in arm or, you know, you're standing

8  side by side kind of touching up on you.  It's -- it's a

9  basement bar, so we're -- we were very cozy with one another.

10 And I don't mean like one another.  I mean, like everybody is

11 cozy with one another.

12 Q.    Okay.

13 A.    So it just -- as this drinking went on in the evening,

14 everybody was very, very friendly.

15 Q.    Do you think there would have been a point where you would

16 have touched the defendant in any way or him touch you in any

17 way?

18 A.    Sure.

19 Q.    Like doing what?

20 A.    Maybe like an arm around one another.

21 Q.    Now, was Mr. Tur drinking at the party after y'all

22 arrived?

23 A.    Yes.

24 Q.    Okay.  As -- as the party went on, did his demeanor change

25 in any way?

1  A.  It did, yes.

2  Q.  How so?

3  A.  He -- in the beginning, I think he was just like everybody

4  else, but then towards the end his demeanor got -- he got more

5  and more angry as the evening wore on.

6  Q.  And did you and him get into an argument?

7  A.  We did, yes.

8  Q.  Where did y'all get into an argument?

9  A.  In -- the first one was up in the alley of the -- of

10  the -- of the -- of the Hangar.

11  Q.  So the -- the Hangar bar, you mentioned how it's

12  downstairs at the -- at the Bayview at the Officers Club, so is

13  there a -- can you enter it from inside the club?

14  A.  Yes.

15  Q.  And can you exit it from -- from -- in other words, can

16  you exit the Hangar bar in a different way than that internal

17  staircase?

18  A.  Yes.

19  Q.  Okay.  And where does that -- where -- where are those

20  stairs?  Where do they take you?

21  A.  There's a -- there's an exit right next to the bar and

22  they go to an alleyway, and then the other set takes you back

23  up to the Officers Club.

24  Q.  And -- and this alleyway, is that where you -- what

25  happened in this alleyway between you and Mr. Tur?  Is that

1  where you-all got in this argument?

2  A.   The first one, yes.

3  Q.   And how did the argument end?

4  A.   He -- he --

5  Q.   In other words, did you say anything to him at the end of

6  the argument, Ms. Sabanosh?

7  A.   I told him we were done and get his hands off me.

8  Q.   Now, when you went back in -- did you go back in the bar

9  from the alley?

10  A.   I did.  I wanted to get away from him.

11  Q.   Okay.  And did the party -- what was kind of the state of

12  the party by this point?

13  A.   People were leaving.

14  Q.   Okay.  What happened next as people were leaving?

15  A.   I ran through the bar and -- so I -- I ran through the bar

16  and I went through the upstairs trying to get away from him.

17  And so I got out front.

18  Q.   And what was going on as you're getting out front,

19  initially?

20  A.   There was a bunch of people out front.

21  Q.   Was the defendant present?

22  A.   No.

23  Q.   What happened next?

24  A.   He came through the doors at that point.

25  Q.   Hold on a second.  When you go back into the bar from the

1  alley, was there any conversation that the defendant was having

2  with you and other folks?  Were there any plans made or

3  anything like that?

4  A.    Before I went to the alley with Chris?

5  Q.    Well, let's -- Ms. Sabanosh, as the party went on and was

6  wrapping up, what was your -- what was the next plan that was

7  developing, if any?

8  A.    I -- I think at that point I was following, because

9  people -- I knew where people were going.  Before I went to the

10 alley, people were going to the captain's house.

11 Q.    Oh, I see.  Okay.  And how did that occur?  How did that

12 sort of plan start developing?

13 A.    At some point before, there was a conversation about going

14 back to the house to have drinks.

15 Q.    And were y'all just inviting yourself to the captain's

16 house?

17 A.    I don't know how that kind of transpired.

18 Q.    Okay.

19 A.    But when I came out through the front door, everybody was

20 kind of walking that way.  So at this point I thought that was

21 the best place for me to be.

22 Q.    Okay.  And then what happened next?

23 A.    I got in the front of the group and Chris came pushing

24 through the doors and started yelling.  He was yelling "whore,"

25 all kinds of -- "my wife's a whore."

1         And I just stood there.

2    Q.    What was your --

3    A.    I just stood there.

4    Q.    Okay.  What happened next as you stood there?

5    A.    And he kept yelling.  And then he started yelling things

6    and then he went to get -- he got angrier and angrier, and then

7    he went to wind forward and then he went to try to come forward

8    again and come at me again.  And then the captain stood in

9    front of me and then I thought -- then at that point I think he

10   thought he'd punch anybody, punch the captain, punch whoever

11   was standing in front of him.  The intent was to come punch me.

12   He already tried to punch me in the alley.  He was going to

13   punch him -- punch me again.  So -- but the captain stood in

14   front of me.  And at that point the -- Randy grabbed Chris,

15   somebody else grabbed him, too.  I think -- I believe the XO

16   grabbed the captain.  And then the situation diffused.  Kelly

17   grabbed me.

18        And I asked for help from the XO.  The XO sent Chris

19   home.

20   Q.    Okay.  And did you see Mr. Tur start heading home?

21   A.    He did.  He started to head up the street as if he was

22   walking like our normal path home.

23   Q.    Okay.

24   A.    And then I asked for help from the XO.  He was useless.

25   And I -- Kelly -- he told me to go home with Kelly Wirfel

1   and -- not even my own house.  And --

2   Q.    Ms. Sabanosh, I'm going to --

3   A.    I know.  And I --

4   Q.    Ms. Sabanosh, what happened next with Ms. Wirfel?

5   A.    He -- Kelly took me into the ladies room so that I

6   could -- she had to go to the -- we were going to wait for Safe

7   Ride.  And then while I was in there I was laying on the couch

8   and Chris came back in again and he -- he got on top of me and

9   then we -- was able to grab him.  And I don't know what he was

10  saying in there.  And then she grabbed him and got him out, and

11  then she locked the door.

12  Q.    Okay.  What happened next with you?

13  A.    We heard plates breaking.  And that was the last time I

14  saw him.  We waited I don't know how long.  And then -- and

15  then when the coast was clear, she had me sit on the chair out

16  there and then we -- the XO and the -- and her put me on a --

17  her and I on a Safe Ride back to her house.

18  Q.    So where did you spend the night?

19  A.    At Kelly's.

20  Q.    And where was your daughter?

21  A.    At our house.

22  Q.    Now, we're talking about your -- your level of

23  intoxication that night.  Were you paying much attention to

24  your phone that night?

25  A.    No.  I put it in Kelly's bag, thinking Chris had his

1  phone.  So if we needed anything -- he was pretty on his phone

2  all the time.

3  Q.   And at a later point, Ms. Sabanosh, in the days to come,

4  did you ever look at your text messages from Mr. Tur?

5  A.   I did.  Somewhere in all of it I went to go text to find

6  out when -- where he was and there was a text message.  I don't

7  remember what it had said, though.

8  Q.   Okay.  Would taking a look at some of the text messages --

9  A.   It would.

10  Q.   -- refresh your recollection?

11  A.   Yes.

12        MR. GEE:  May I approach, Your Honor?

13        THE COURT:  Yes.

14  BY MR. GEE:

15  Q.   I want to show you what's been previously marked as

16  Government's Exhibit 28.  I'm just directing your attention to

17  the second line.  If you'd read the second and the third line

18  and the fourth line.

19  A.   This one?

20  Q.   Yes, ma'am.

21  A.   "It's time."

22  Q.   Does that refresh your recollection about what the text --

23  A.   Yes.

24  Q.   -- the last text you got from Mr. Tur was?

25  A.   Yes.

1    Q.    What was it?

2    A.    "It's time."

3    Q.    Do you know --

4    A.    And -- and at --

5    Q.    Do you have any idea what he was referring to at that

6    point?

7    A.    I don't, no.

8    Q.    Let's turn your attention to the next day, Saturday,

9    January 10th.  What happened for you first that morning that

10   you recall?

11   A.    I got up.  Kelly had said that she was going to get

12   breakfast.  And I was pretty upset with what had happened the

13   night before.

14   Q.    So what happened next, Ms. Sabanosh?

15   A.    She -- she came back with Randy and no breakfast.  And

16   they had been over to my house and told me that Chris had not

17   come home.

18   Q.    So what did you do as a result of this information?

19   A.    I went home and I -- they wanted to go look for Chris

20   right then and there.  And I was not interested in doing that

21   at that moment.

22   Q.    Were you -- were you worried about Mr. Tur being missing

23   at that point?

24   A.    No.

25   Q.    Why not?

1    A.    Because he had done this so many times before.  And I

2    wanted to go check on my daughter who had been by herself and

3    be with her, and go take a shower and cool off myself.  So I

4    did that.

5           And then Kelly had -- they kind of pushed to go do

6    the search.  So I was like, "Fine."

7           And I didn't say anything to my daughter about not

8    coming back or anything.  And so then we -- we went and looked

9    at all the usual spots when he did it before.

10   Q.    What do you mean, "the usual spots"?

11   A.    The boat, just around, like -- just different areas.  We

12   even went to the hospital.  Just drove around the marina, see

13   if he was tinkering down there.

14   Q.    Did you find him?

15   A.    No.

16   Q.    Okay.  What happened after you didn't find him for a

17   while?

18   A.    Kelly said that maybe it's time that we go talk to the

19   Skipper.  I was really angry now.  And so I said, "Fine."

20          And so we went into the main building, to the

21   Skipper's office, and had a meeting.  He was there.

22   Q.    Who's present for this meeting?

23   A.    Randy Barger, Kelly, myself, and the Skipper, the captain.

24   Q.    And what was the defendant -- first of all, what's his

25   physical appearance in this meeting?

 1   A.    He looked fine.

 2   Q.    Was he coherent, seemed to understand what you guys were

 3   talking about?

 4   A.    Sure.  He was -- he looked like he was just working, like

 5   a normal day.

 6   Q.    And what was your sort of state of mind in this office

 7   meeting?

 8   A.    I was angry.  Because the night before was the -- a bad

 9   night.

10   Q.    Okay.

11   A.    And -- and then he just did a disappearing routine like he

12   had done so many times in my mind at this point.  So -- and he

13   assaulted me three times, so I'm pretty angry.

14   Q.    So given sort of your state of mind, can you sort of

15   describe how the -- how the meeting occurred, the parts that

16   you recall?

17   A.    My presence in there was a little different than I think

18   everybody else's was.  I -- the discussion of searching, I --

19   in my mind, I -- I thought, "Well, you know, he -- this is what

20   he does."  So he could have been out there for more hours, you

21   know, but I said, well, you know, he could have been up in the

22   hills, on the trails.  As long as he had his pack of smokes and

23   his Doc Martens, he's pretty savvy.  You know.  Pretty savvy on

24   the trails.  He's good.

25            So, I mean, he sat 50 yards from my house for all

1   night long watching me and he was -- thought that was pretty

2   funny.

3   Q.   In addition to saying that you thought he'd be good on the

4   trails as long as he had a pack of smokes and his Doc Martens,

5   did you express any other -- like, did you express, for

6   example, that he had done this before?

7   A.   Yes.  It wasn't at this point a real big secret.  I also

8   talked about at this point that now I no longer -- I wanted to

9   file an actual domestic violence report.  I was -- I wanted

10  sponsorship.  I wanted -- I wanted to be -- and he was not

11  welcome home.  I did not want him back in the house.  He could

12  go stay in somebody else's -- I don't know where he was going

13  to stay, but it wasn't with me and my daughter.

14          I think I even -- I probably said he was a lunatic.

15  Q.   And how did the meeting conclude?  Was there any sort of

16  agreement or what's kind of the topic of discussion by the end

17  of the meeting, as you recall?

18  A.   That they were going to start a search.  I don't remember

19  any kind of logistics, but I -- I can't say that I was in the

20  frame of mind where I was paying attention at that point to the

21  logistics of the search patterns or anything like that, but

22  I -- you know, there was, "We're going to get something

23  started."

24          And I do know that the movement of it was going to

25  progress at this point.

1  Q.   After you said that -- when you said that your husband

2  would be fine up in the hills, did the defendant at any point

3  in this conversation mention that Mr. Tur had come to his house

4  after the Bayview -- after the party at the Bayview?

5  A.   No.

6  Q.   Did he at any point mention that he had been in a physical

7  altercation with your husband?

8  A.   No.

9  Q.   Did he at any point mention injuring your husband in any

10 way?

11 A.   No.

12 Q.   Was there any discussion at all of your husband coming to

13 the defendant's house in this meeting?

14 A.   No.

15 Q.   What happened next for you after this meeting,

16 Ms. Sabanosh?

17 A.   I went back to my house.  And I did have to tell my

18 youngest that there was now people looking for her father, that

19 we were not sure what was happening.

20       And there was a shared resentment because this was

21 something...

22 Q.   Did you remain at home the rest of that day?

23 A.   Yes.

24 Q.   And as you remained at home, did you get updates about the

25 search?

1  A.    Yes.

2  Q.    Did some of those updates come from the defendant?

3  A.    Yes.

4  Q.    In general, what do you recall the defendant telling you

5  about the updates from the search on Saturday?

6  A.    That there were a lot of people working on it.  They were

7  going door to door, that -- you know, that there -- nothing had

8  been found, but that they were working diligently, and -- and

9  people would be coming out to ask me questions, that kind of

10 stuff.

11 Q.    And these --

12 A.    Oh, and there would be -- they were setting up a -- I

13 guess the word would be headquarters or a -- like, a central

14 unit, maybe, I guess, but it would be at the Bayview.

15        They put a boot on the car so he couldn't come in and

16 take the car, but it would be there at the Bayview.  And they

17 weren't going to hurt him or anything, but that way they

18 could -- you know, when they got him, you know, they could get

19 assistance, you know, in case anything...

20 Q.    And when he described updates on the search to you, at any

21 point did he mention that your husband came to his house the

22 night before?

23 A.    No.

24 Q.    At any point did he mention being in a physical

25 altercation or injuring your husband?

1  A.    No.

2  Q.    Now, turning your attention to the next day, Monday,

3  January 11th -- so it's a Sunday morning.  Did your husband

4  come home overnight?

5  A.    No.

6  Q.    Okay.  And what is sort of your state of mind by Sunday

7  morning?

8  A.    Now I'm much more worried.  I've already now let my oldest

9  daughter know that he's missing, and so we are very concerned.

10  Q.    Was this longer than your husband had gone missing on

11  prior occasions?

12  A.    Yes.

13  Q.    And did you discuss with -- did you have any conversations

14  with the defendant that morning?

15  A.    Yes.

16  Q.    What was your conversation with the defendant about that

17  morning, that Sunday morning?

18  A.    The conversation was about notification and how would I

19  like to be notified, and did I want to be -- it was not

20  necessarily if he was -- I didn't want to -- anyone coming to

21  the house, so -- because of Madison.  So regardless of whether

22  he was alive, if he was alive even, I didn't want it at the

23  house.  I felt it was too confusing for Madison at this point.

24  So I wanted to be at another location.

25  Q.    And you told him that?

1  A.    Yes.

2  Q.    And when you discussed sort of what you wanted to have

3  happen, if you had to be notified -- and you were speaking

4  about notification of what, Ms. Sabanosh, with the defendant?

5  A.    Anything.

6  Q.    Okay.  And at any point in this conversation with the

7  defendant about notification on Sunday morning, did he tell you

8  that Mr. Tur had come to his house after the Bayview?

9  A.    No.

10 Q.    At any point in this conversation Sunday morning, did he

11 tell you that he and your husband had been in a fight or that

12 he had injured your husband in any way?

13 A.    No.

14 Q.    Okay?  Do you need -- take your time.

15         Ms. Sabanosh, that Sunday morning, did you meet --

16         THE COURT:  Hold on a second, Mr. Gee.

17         Ms. Sabanosh, would you like to take a break?

18         THE WITNESS:  No.  I'm good.  Thank you.

19         THE COURT:  Okay.

20         THE WITNESS:  Thank you.

21         THE COURT:  Go ahead, sir.

22         MR. GEE:  Thank you, Your Honor.

23 BY MR. GEE:

24 Q.    Ms. Sabanosh, that Sunday morning, were you interviewed by

25 anyone?

1    A.    Yes.

2    Q.    Who were you interviewed by that Sunday morning?

3    A.    NCIS.

4    Q.    And, in general, what did you understand to be the purpose

5    of this interview with NCIS that Sunday morning?

6    A.    They were -- at that point they were supposed to be doing

7    a search for Chris.  They were assisting with the search for

8    Chris.

9    Q.    And prior to your testimony here today, have you had an

10   opportunity to review the transcript of that interview from

11   that Sunday morning?

12   A.    I have, yes.

13   Q.    And in that interview on Sunday, in general, what kind of

14   information were you providing?  Just briefly, just in general.

15   A.    In general, it was our -- our background of our marriage,

16   our life there, and a lot of what I've been asked today, even.

17   Q.    And in that interview, did you describe some of the issues

18   in your marriage with Mr. Tur?

19   A.    I did.  Yes.

20   Q.    And did one of the agents interview -- excuse me,

21   interviewing you, ask you if he --

22            MR. VOKEY:  Objection.  Leading.

23            THE COURT:  I haven't heard the question yet.  Go

24   ahead and ask your question, Mr. Gee.  And then I'll rule on

25   the objection.

1   BY MR. GEE:

2   Q.   Ms. Sabanosh, during that interview, were you asked

3   whether you'd ever had an affair?

4            THE COURT:  Overruled.  You may answer the question,

5   ma'am.

6            THE WITNESS:  I'm sorry.  Can you repeat it, though?

7   BY MR. GEE:

8   Q.   Yes, ma'am.

9            In that interview on Sunday with NCIS, were you asked

10  whether you'd ever had an affair?

11  A.   Yes, I was.

12  Q.   And -- and was your response in the negative?

13  A.   Yes, it was.

14  Q.   And, Ms. Sabanosh, in that interview at any point, did you

15  describe the personal relationship with the defendant that

16  we've talked about here today, in that Sunday, January 11th,

17  interview?

18  A.   I'm sorry?  Can you repeat that?

19  Q.   In that first interview with NCIS on Sunday, did you

20  describe this personal relationship with the defendant?

21  A.   No, I did not.

22  Q.   Okay.  And why after -- why didn't you -- in response to

23  the question of whether or not you had an affair, you answered

24  in the negative.  Why did you do that and why not volunteer

25  this information about your relationship with the defendant?

1  A.   Because they -- they told me that the purpose that they

2  were there for was to search for Chris, and I didn't feel that

3  that was what they were doing when they asked those questions.

4  Q.   If at any point up until this point the defendant had told

5  you that Mr. Tur had come to his house after the Bayview and

6  they got into a fight, would your answers to some of these

7  questions have been different?

8          MR. VOKEY:   Objection.   Relevance.

9          THE COURT:   I'm going to overrule the objection on

10  the same grounds that I did yesterday regarding the elements of

11  Count One.

12          You may proceed.

13  BY MR. GEE:

14  Q.   Do you need me to repeat the question?

15  A.   Yes, please.

16  Q.   If at any point in these prior conversations with the

17  defendant he had told you that Mr. Tur came to his house and

18  they got into a fight after the incident at the Bayview, would

19  some of the answers to these questions in your interview with

20  NCIS have been different?

21  A.   Yes.

22  Q.   In what way would it have been different if you had been

23  supplied that information by the defendant?

24  A.   I would have answered all their questions.

25  Q.   Ms. Sabanosh, how did this interview with NCIS end, that

1  Sunday interview?

2  A.   They stopped the interview and asked if I could come with

3  them.  And, oh, crap, they asked if we could go into another

4  room.  And as I walked around the corner there was a -- there

5  was a table full of people, the captain in dress uniform and a

6  dozen other people standing there so that they could tell me

7  that they found his body.

8  Q.   Was the defendant present when you were told that they had

9  found your husband's body?

10  A.   Yes.

11  Q.   And did -- did you talk with the defendant some during

12  that meeting or just after the meeting?

13  A.   No.

14  Q.   Did he offer his condolences in any way?

15  A.   Yes.  I --

16  Q.   Sorry?

17  A.   I think so.  I was really talking to the chaplain, and the

18  chaplain took me home.

19  Q.   And at any point in this meeting when the defendant tells

20  you -- or, I'm sorry, at any point in this meeting when you're

21  notified that your husband had been found dead, was -- did the

22  defendant tell you that he had come to his house that Friday

23  night after the party at the Bayview?

24  A.   No.

25  Q.   At any point did he tell you that he had gotten into a

1    fight with him or that he had injured him in any way?

2    A.    No.

3    Q.    Now, Ms. Sabanosh, after Sunday, January 11th, when you

4    learned that your husband had -- had -- was -- had been -- was

5    deceased, was there a period of time when you were still on

6    GTMO?

7    A.    Yes.

8    Q.    What's going on with you -- just briefly, what's going on

9    with you in GTMO during that period of time?  About how long

10   were you there?

11   A.    I was there another week doing funeral arrangements or

12   services that week.

13   Q.    Were there any services held on GTMO?

14   A.    There was.  They had a service for him.

15   Q.    When was that service?

16   A.    The following Saturday.

17   Q.    Okay.  And was the defendant present at the memorial

18   service for your husband?

19   A.    Yes.

20   Q.    Did you speak with him at the memorial service?  Did he

21   offer condolences or anything like that?

22   A.    Just condolences, yes.  That was it.

23   Q.    Did he speak at the memorial service?

24   A.    I don't think so.  I don't --

25   Q.    And --

1  A.   -- think so.  I don't remember.

2  Q.   And at any point at that memorial service, did he tell you

3  that Mr. Tur had come to his house that night and they had

4  gotten into a fight there?

5  A.   No.

6  Q.   And in relationship to the memorial service that Saturday

7  after Mr. Tur's body had been found on Sunday, approximately

8  when -- was there a point where you left GTMO?

9  A.   I did, yes.

10  Q.   Approximately when did you leave after that?

11  A.   A few days later.

12  Q.   Did your daughter leave as well?

13  A.   Both my daughters left with me.

14  Q.   In that week or so when you were still on GTMO, were you

15  interviewed again by NCIS on or about January 16th?

16  A.   I was, yes.

17  Q.   And in preparation for your testimony here today, have you

18  had an opportunity to review the transcript of that meeting?

19  A.   I did, yes.

20  Q.   Okay.  And, Ms. Sabanosh, in that meeting, were you asked

21  specifically whether you'd ever had intimate contact with the

22  defendant?

23        MR. VOKEY:  Objection.  Leading.

24        THE COURT:  Overruled.

25        THE WITNESS:  I did, yes.

1  BY MR. GEE:

2  Q.    And did you answer in the negative?

3  A.    I did, yes.

4  Q.    And, again, January 16th, now why are you denying physical

5  contact with the defendant in this meeting?

6  A.    They still were saying that this was just them trying to

7  understand Chris's -- what was happening with Chris, and I

8  didn't understand, this had nothing to do with that.  I had two

9  children there and this had nothing to do with that.

10  Q.    Were you aware yet by the time of this second interview

11  with NCIS that Mr. Tur had come to the defendant's house and he

12  had gotten into a fight there?  Did he tell you that at any

13  point, the defendant --

14  A.    No.

15  Q.    -- prior to this second meeting?

16  A.    No, I was not.

17  Q.    If in the second meeting with NCIS, if by that point the

18  defendant had told you that Mr. Tur came to his house after the

19  Bayview and they got in a fight there, what would you have done

20  in the second interview with NCIS when they asked you about

21  your relationship with the defendant?

22  A.    I would have answered differently.

23  Q.    Would you have told them about the relationship?

24  A.    It would have been more relevant.

25  Q.    Now, Ms. Sabanosh, in that little over a week when you

1    were still on GTMO, after your -- your husband died, did you

2    have any conversations with the defendant?

3    A.    I did, yes.

4    Q.    Were they in person, over the phone, both?  Do you recall?

5    A.    Over the phone.

6    Q.    And did you discuss with him these NCIS interviews that

7    you had been through, the two NCIS interviews?

8    A.    I -- for a while I don't think I remembered both of them,

9    just the one, but I was pretty angry about the questioning.

10   Q.    Did -- did you discuss with him the questions about

11   whether you had had an affair or relationship with him?

12   A.    I had, yes.

13   Q.    Did you tell him that you had denied an affair or any kind

14   of relationship or contact with him?

15   A.    I had, yes.

16   Q.    What was his response to that?

17   A.    "Good."

18   Q.    Did he encourage you to correct it in any way, go back to

19   NCIS, tell them the truth?

20   A.    No.

21   Q.    Do you recall anything else about your conversations with

22   the defendant in that little more than a week when you were on

23   GTMO?

24   A.    No.  It was more just about how we were holding up.

25   Q.    In any of those conversations in that week or so when you

1  were still on GTMO, did he tell you that Mr. Tur had come in --

2  come to his house that night after the Bayview, in the week or

3  so when you're still on GTMO?

4  A.   No.  Sorry.

5  Q.   In that week or so when you're still on GTMO, did he tell

6  you at any point that he and Mr. Tur had gotten in a physical

7  altercation that night, or that he had injured Mr. Tur in any

8  way?

9  A.   No.

10  Q.   Just briefly, where are some of the places you -- you went

11  after you left GTMO with your daughter?

12  A.   I was in Pennsylvania, New York, and Virginia.

13  Q.   And staying with various relatives and folks?

14  A.   Various relatives, hotels, yes.

15  Q.   Approximately -- was there a point where after you were in

16  the U.S., you came back to GTMO?

17  A.   I did, yes.

18  Q.   So approximately how long were you in the U.S. before

19  going back to GTMO, approximately?

20  A.   About a month.

21  Q.   And, Ms. Sabanosh, in that month or so when you were here

22  in the U.S. -- without getting into the content of them, were

23  there public reports in the media about the defendant's removal

24  from Guantanamo Bay?

25  A.   There were.

1  Q.   And did some of those public reports reference your

2  husband's death?

3  A.   They did.

4  Q.   Did some of them reference your alleged affair with the

5  defendant?

6  A.   They did.

7  Q.   And did you speak with the defendant after you learned

8  about any of these public -- after you learned about some of

9  these media reports?

10  A.   I did.  He called me the day after they had -- the media

11  broke.

12  Q.   Okay.  And what do you recall about this conversation with

13  the defendant that you had the day after the media broke?

14  A.   He called to let me know that -- he wanted to let me know

15  that, before anybody else said, there was a fight that had

16  occurred between him and Chris, and that Chris had come into

17  his house, sucker-punched him in the back of the head, and they

18  got into a fistfight, and then he had to talk Chris down.  He

19  was all over the place, up and down.  And while his daughter

20  was in the house.

21        You know, one moment he was accusing us of having an

22  affair and then he was, "My marriage is over," and then -- so

23  he was up and down.  And -- and then -- and then I -- he had a

24  bloody nose and so he had to clean it up.  And he -- and then

25  they had a beer together and Chris was good and solid and on

1    his way and it was fine.

2    Q.    Did he describe how Chris got this bloody nose?

3    A.    Well, they got into a fistfight.

4    Q.    So did he describe an actual exchange of blows?

5    A.    Yeah.  It was just a fistfight.  I didn't really ask too

6    many questions.  It was right after this media.  I didn't -- I

7    wasn't in the -- I wasn't asking questions anymore.  It was a

8    long week of a lot of crap dumped on me.  I found out too many

9    things from my husband after --

10   Q.    I understand.

11   A.    -- so I just wasn't asking questions.

12   Q.    Now, Ms. Sabanosh, when you went back to GTMO,

13   approximately how long were you on GTMO?

14   A.    Let's see.  This -- I -- I left April 1st.  So I'm --

15   Q.    Just approximately.  Are you there for --

16   A.    Less than three months.

17   Q.    -- months, weeks?

18   A.    Less than three months, I think.

19   Q.    And after you left GTMO, where did you move to then?

20   A.    Pensacola.

21   Q.    Now, on that time frame after you moved from GTMO to

22   Pensacola, did you have communications with the defendant?

23   A.    I did, yes.

24   Q.    How?

25   A.    A phone call.

1  Q.    All the communications by phone?

2  A.    Yes.

3  Q.    In general, when would the last time be that you recall

4  seeing the defendant in person prior to today?

5  A.    The service that I had in GTMO, so...

6  Q.    And so in these telephone conversations with the defendant

7  after you had moved to Florida, so after April 2015 when you

8  moved to Florida, can you kind of describe what your state of

9  mind is and why you're communicating with the defendant?

10  A.    The -- the conversations just, you know -- they were how

11  are we doing, how are the girls holding up, how's everybody

12  doing.

13        So the -- just normal conversations.  And then -- I

14  mean, we had lost a lot, so state of mind.

15  Q.    Were there ever any conversations with the defendant about

16  any aspects of the investigation?

17  A.    Pertaining to a UCMJ.

18  Q.    Okay.  Tell us about that.

19  A.    There was talk if the -- if we -- we went to a UCMJ.  I

20  was -- I'm not military, so I felt -- I was tired of hearing

21  about these stupid articles and thought, "I'm not military, I

22  shouldn't have to do this, and I wasn't participating in one."

23        I didn't -- I no longer wanted my business dragged

24  out anymore, so I just wasn't going.  I wasn't going to do it.

25  Q.    And -- and you were explaining to him you wouldn't

1    participate in what?

2    A.   In a UCMJ hearing.  Just --

3            THE COURT:  Excuse me, ma'am.  I'm not sure the

4    jury would -- everybody on the jury would necessarily know what

5    a UCMJ is.  So can you either ask a question or do something,

6    please.

7            MR. GEE:  I think she was about to explain.

8    BY MR. GEE:

9    Q.   What's UCMJ, Ms. Sabanosh?

10   A.   It's a military hearing -- it's a hearing for military

11   members.  So it's the code of conduct for military members that

12   they have to adhere to.  So instead of this trial, it would be

13   a trial for those in the military, for their code of conduct.

14   Where it might be okay for civilians to do how they choose, the

15   military is held to a higher code of conduct.  And where it

16   was -- you know, but I'm not military.  So I'm not held to a

17   military code of conduct.

18           And I felt at this point I had been paraded in the

19   court of public opinion.  And I was not interested.  I was a

20   single mother at this point now, and...

21   Q.   And when you said -- when you were telling him you

22   wouldn't participate in any kind of UCMJ proceedings, what did

23   you mean by that?

24   A.   Well, naively I thought that he could go participate in

25   his own court -- military court trial, and I wasn't going.

1  Q.   Did you discuss with him that you would not go?

2  A.   Yes.

3  Q.   And what was his reaction to that?

4  A.   "Okay."  So that was probably very naive on my part.  I'm

5  sure if I got told I had to go, I was going to have to go, but

6  I just was like -- I was -- at this point I was angry, I was

7  tired.  I was trying to be a single mother.  And, you know, I

8  just -- but the idea of if an affair was brought up, then, you

9  know, this is my business and I was tired of people thinking

10  they could be part of my business, so...

11  Q.   Did you discuss in the context of -- the UCMJ discussions

12  that they could include discussions of an affair?

13  A.   Yes.  And I'm like -- and I'm like that loose

14  interpretation, I'm like -- to me I didn't feel that that

15  was -- I'm like -- that word to me just didn't seem to fit.

16  And, to be blunt, they could piss off.

17  Q.   Were there any discussions between the two of you about

18  what would be required to prove there was an affair in these

19  UCMJ proceedings?

20  A.   Right.  Well, they needed two people.  And I wasn't

21  interested, so there was not two people.

22  Q.   What did you guys discuss about how they would need two

23  people?

24  A.   That they needed two people, and without two people, then

25  there was not -- then there wasn't -- now there was no affair.

1   Q.   What did you guys discuss about what they would need two

2   people to do?

3   A.   To prove there was an affair.

4   Q.   And would that require two people to tell the truth about

5   the affair?

6          MR. VOKEY:  Objection.  Relevance.  Speculation.

7          MR. GEE:  I can rephrase it, Your Honor.

8          THE COURT:  Please do.

9   BY MR. GEE:

10  Q.   Did you understand that to mean that it would require two

11  people to tell the truth about the affair, in this conversation

12  with the defendant?  In other words, Ms. Sabanosh, what did you

13  understand it to mean when he said that it would require two

14  people --

15         MR. VOKEY:  Objection.  That is mischaracterizing the

16  statement.

17         THE COURT:  Yeah.  I'm going to sustain that.  I'm

18  not sure I heard a discussion of who was saying what to whom,

19  so I'm going to sustain the objection.

20         MR. VOKEY:  And, Your Honor, actually, I think there

21  was, and it was Captain Nettleton simply replying "Okay."

22         THE COURT:  Well, I tell you what, you -- you don't

23  get to characterize the testimony either.

24         MR. VOKEY:  I understand.

25         THE COURT:  All right.  So I sustained the objection.

1    And what is your question, Mr. Gee?

2    BY MR. GEE:

3    Q.   Ms. Sabanosh, we talked earlier about how you told him

4    that you wouldn't participate in UCMJ proceedings.

5         Do you remember that?

6    A.   Right.

7    Q.   And you said that his answer to that was what?

8    A.   "Good."

9    Q.   Okay.  And when you discussed with him -- or, sorry, when

10   y'all discussed, was this -- who's saying what when discussing

11   how it would require two people to talk about the affair in

12   UCMJ proceedings?  Just you talking, him talking, both of you

13   talking?  Tell us how that's going.

14   A.   Well, mutual.  But I don't know -- I just -- and, for me,

15   and naive, I wasn't attending it.  So there was -- there wasn't

16   any discussion of whether or not I would really have to be

17   there.  I would just sit there and say I'm not attending.

18   Q.   I understand.  And I'm not on the part of the conversation

19   about your presence at the affair.

20   A.   Right.

21   Q.   I'm talking about the conversation about admitting to the

22   affair.

23         Can you tell us about that part of the conversation

24   and what each of you were discussing there?

25   A.   I think it was just more of if there's not two people

1  there, then there's nothing to discuss.

2  Q.    Nothing to discuss about what?

3  A.    An affair.

4  Q.    And who said that?

5  A.    It's mutual.  I'm not sure I'm following.

6  Q.    And, Ms. Sabanosh, moving on with the rest of 2015, was

7  there a point at which you were subpoenaed to appear before the

8  grand jury in the fall of 2015?

9  A.    Yes.

10  Q.    Okay.  And prior to appearing before the grand jury, did

11  you meet with one of my colleagues and NCIS agents?

12  A.    Yes.

13  Q.    Is that approximately October of 2015?

14  A.    Yes.

15  Q.    Was your lawyer present?

16  A.    Yes.

17  Q.    And in that meeting did you -- did you discuss whether or

18  not you had a -- a physical relationship with the defendant?

19  A.    Yes.

20  Q.    And did you admit to the physical relationship in that

21  meeting in October of 2015?

22  A.    Yes.

23  Q.    And why were you willing to admit to it at that point?

24  A.    It was a grand jury request.

25          MR. GEE:  The Court's indulgence.

1        (Counsel confer.)

2              MR. GEE:  Nothing further, Your Honor.  Thank you.

3              THE COURT:  Let me see counsel briefly at sidebar.

4        (Sidebar conference:)

5              THE COURT:  I'm just trying to determine whether we

6    should take our lunch break now or -- how long is the cross

7    going to be?  Is it going to be a while?

8              MR. VOKEY:  It's going to be a while, sir.

9              And, sir, there is something I need to bring up.  I

10   believe the government has just opened the door to something --

11             THE COURT:  All right.  We'll talk about that.

12             Do you want to just go ahead and take our lunch now?

13             Is -- somebody's got -- do you have, like, a witness

14   person that deals with Ms. Sabanosh?

15             MR. GEE:  Uh-huh (affirmative).  Yeah.

16             THE COURT:  Okay.

17       (The following proceedings occurred in open court, in the

18   presence of the jury:)

19             THE COURT:  Ladies and gentlemen, before we proceed

20   to the cross-examination, we're going to go ahead and take our

21   lunch break a little bit earlier than I normally do, just the

22   way it kind of works out here.  I think that makes the most

23   sense.

24             So it's now 12:15.  We'll be back in session at 1:30.

25   So you've got an hour and 15 minutes.

```
 1              Please remember all my instructions.  Don't talk
 2    about the case.  Don't do any research.  Of course, you are
 3    free to use your cell phones on non-case matters.  And I -- I
 4    saw one of you went to Quizno's yesterday and the reviews were
 5    mixed.  But there are other -- there's a Desert Rider, there's
 6    a grilled cheese place right across the street.  There's a
 7    place called Magnificat that's about a block away that's a
 8    pretty good sandwich place.  So there are other places if you
 9    you'd just walk a little bit further, if you're looking for a
10    place.  Of course, you can stay in the building as well.
11              All right.  Just leave your pads, have a nice lunch.
12    We'll see you back here at 1:30.
13              COURT SECURITY OFFICER:  All rise for the jury.
14         (Jury exits, 12:12 p.m.)
15              THE COURT:  All right.  Everybody can be seated,
16    please.
17              Who's the witness coordinator for Ms. Sabanosh?
18    Where is that --
19              MR. GEE:  Agent Dunwoodie is going to walk her out,
20    Your Honor.
21              THE COURT:  So you'll take care of that.  Okay.
22              So, ma'am, I'm going to go ahead and give you your
23    lunch break and if you'll make sure you're back here by 1:30.
24    Okay?
25              THE WITNESS:  Thank you.
```

1        THE COURT:  And Agent Dunwoodie will escort you.

2        All right.  Mr. -- well, we'll wait for the witness

3    to be excused.

4        (Witness temporarily excused.)

5        THE COURT:  All right.  The witness has been excused.

6        Mr. Vokey, you said you had a matter that you wanted

7    to bring to my attention?

8        MR. VOKEY:  Yes, Your Honor.  So, during the direct

9    examination, the government is soliciting information about

10   Captain Nettleton failing to discuss the fight that occurred in

11   the house repeatedly and then go through the detail about when

12   the media broke and the phone call from Captain Nettleton to

13   Ms. Sabanosh and what was going through her mind and her state

14   of mind and what was in that phone call.  And she said from

15   there, "There was a lot of crap dumped on me.  I found out too

16   many things from my husband."

17       So we now want to ask her about what did you find

18   out -- what are those too many things you found out about your

19   husband.  The government has opened that door by getting that

20   testimony.  And I think what we're going to get here is that

21   she finds out that her husband lied about a discharge and

22   should never have been employed by the Navy Exchange.  She's

23   finding out things about her husband that she never knew.  And

24   that's what she's saying when she found out too many things

25   from her husband.

1          THE COURT:  Why is that relevant?

2          MR. VOKEY:  Well, the government has now raised her

3     state of mind, where she is, and the potential impact of

4     finding out this from Captain Nettleton.

5          So the jury is left with this -- of what -- what this

6     impact does upon her personally of what Captain Nettleton said

7     to her, when that's actually a small part of the impact on her.

8          THE COURT:  Okay.  All right.

9          Mr. Gee.

10         MR. GEE:  Your Honor, I didn't ask her about what she

11    was finding out about her husband.  That's not relevant.  She

12    made a stray comment in suggestion -- in response to a larger

13    question about her communications with the defendant about crap

14    being dumped on her and things she was finding out.

15         It wasn't a response to a question.  It was a stray

16    comment.  The idea that that somehow opens the door to trash

17    the decedent in this courtroom in an irrelevant way, we object

18    to and don't agree that that's appropriate.

19         THE COURT:  Okay.  Thank you.

20         Yes, sir.  You can --

21         MR. VOKEY:  Respond?

22         THE COURT:  Yeah.  Sure.

23         MR. VOKEY:  The intent is not to trash Chris Tur,

24    Your Honor.  The intent is to show that Chris Tur was keeping a

25    lot of things from his wife.

1      I think it's relevant during the -- during the

2   search, during what happened in January of 2015, and when --

3   when she's being asked to describe what's going on after his

4   death, she is now finding out things that a wife should

5   absolutely know, that her husband had been kicked out with a

6   bad discharge from the Marine Corps, that the reason he had

7   been kicked out was drug abuse.  And she knew none of that,

8   especially when he's taking Prozac and prescription medications

9   ongoing.

10      THE COURT:  I guess I'm just having a hard time

11   understanding how that's relevant to any of the issues in this

12   case.  I mean, it seems to me that -- as has been the case with

13   all of the witnesses, who, I think, seemed to have been trying

14   to do a credible job of trying to tell the truth as best they

15   remember it, it seems to me that in this case all of the

16   witnesses say some things which may favor the government, they

17   say other things which may favor Captain Nettleton, and they're

18   just doing the best they can.  But I feel like we -- I feel

19   like the witness painted a picture of what was occurring in her

20   marriage and what was going on in pretty vivid detail and how

21   that might have impacted what she was -- how she was acting and

22   what she was telling the investigators and so forth.

23      I just don't -- I'm not -- I'm having a hard time

24   figuring out how her finding out later that her husband maybe

25   had been discharged differently from the Navy or some other

1  thing is really relevant to any of the issues.  That's what I'm

2  having trouble understanding.

3         MR. VOKEY:  Well, the fact that -- that the -- that

4  he had been discharged from the Marine Corps with a bad

5  discharge for drug abuse and the wife never knew about it, when

6  he's having these issues, when he's being -- having

7  prescriptions.

8         THE COURT:  Okay.

9         MR. VOKEY:  When she finds a prescription bottle in

10 his car later on.  So it's much less the characterization of

11 his discharge, more so that he had been discharged for drug

12 abuse and never told his wife.  That's -- and I can ask this

13 without asking about the specific discharge.

14        THE COURT:  Thank you.

15     (Judge confers with court reporter.)

16        THE COURT:  So the actual testimony -- the actual --

17 the actual testimony is -- the answer was -- and the relevant

18 part, "I wasn't asking questions anymore.  It was a long week

19 of a lot of crap dumped on me.  I found out too many things

20 from my husband after" -- and then it interrupted for a

21 question.

22        So it doesn't even appear to me she necessarily was

23 referring to things about her husband -- it says "from her

24 husband," but even regardless of whether it was, I agree with

25 the government, it seemed like a stray comment.  I don't -- I

1    don't think it opens the door.

2         I think that the material that I previously ruled

3    irrelevant about Mr. Tur's prior discharge and whatever else

4    was in those materials, I previously ruled that they were not

5    relevant.  I don't think this opened the door to that and I

6    continue to believe that they're not relevant.  So to the

7    extent that the defendant is seeking to ask questions along

8    those lines, I'm going to deny that request.

9         MR. VOKEY:  Your Honor, and one other area -- this is

10   applicable, too, which is the government has asked her had she

11   known that information would she have said something different

12   to NCIS.

13        We also would like -- likely want to ask her had she

14   known about previous -- prior drug abuse of her husband, would

15   that have changed what she said as well.

16        You know, what's good for the goose is good for the

17   gander.

18        THE COURT:  Mr. Gee, what's your response to that?

19        MR. GEE:  Well, Your Honor, the -- the normal rules

20   of speculation apply to that question.  The reason why we're

21   allowed to ask "if you had known" in this case is because of

22   the misleading count against the defendant.  The normal rule,

23   speculative -- first of all, it needs to be relevant, but,

24   second of all, the normal rule of speculation "what would you

25   have done" applies.  It's not relevant to any of the charged

1   crimes, et cetera.

2          THE COURT:  Yeah.  I just -- Mr. Vokey, I just don't

3   see how it has anything to do with the state of mind of either

4   the witness or of defendant or anybody else that's relevant in

5   this case as to what the conduct of Mr. Tur was in the past.

6          Ms. Sabanosh has vividly testified about how unhappy

7   she was in the marriage and what the issues were, talked about

8   how he had been missing before, talked about all kinds of

9   things, in terms of medication he was taking, intoxication

10  levels.

11         So I -- I feel like the jury has a good understanding

12  of the situation.  And I just don't -- I'm just not seeing how

13  this piece is relevant.  And so I'm going to sustain the

14  objection.

15         But I -- I understand what you're saying, but I

16  just -- I just don't think that it's appropriate in the case.

17         All right.  Anything else?

18         All right.  Then we're in recess until 1:30.

19         COURT SECURITY OFFICER:  All rise.

20     (Recess from 12:23 p.m. to 1:35 p.m.; all parties

21  present.)

22         COURT SECURITY OFFICER:  All rise.  This Honorable

23  Court is back in session.

24         Please be seated.

25         THE COURT:  So the court security officer informs me

1    that at the lunch break a member of the jury asked her, to the

2    effect that they wanted -- the jury -- the jury wanted to know

3    what the charges were again.  They couldn't remember what the

4    charges were and wanted a refresher on what the charges are.

5            Ms. Parks indicated she wasn't able to speak to the

6    jury about the case, and so somebody on the jury wrote down on

7    a piece of paper, "Refresher of the charges requested by jury.

8    Please remind the jury of the actual charges."

9            Now, of course, I'm going to have to remind the jury

10   they're not supposed to be talking about the case, and I will

11   do that.  I don't -- I consider this a relatively innocuous

12   violation of that rule, but I will make sure that I let them

13   know that they're not allowed to be doing that.

14           So I'm prepared to do that.  The question is:  Is

15   there anything else I can or should do to meet their request?

16   And I'll let you-all think about that for a minute.

17           I do have -- Mr. Burns had prepared for me as part of

18   our preparation in the case -- Mr. Burns has prepared for me a

19   very succinct summary of each count of the indictment.

20   Obviously Counts, I believe, Six and Seven have been dismissed,

21   I believe.

22           So I do have the ability to just tell them here's

23   what the charges are that you'll be considering in the case, if

24   anybody thinks that's a good idea.

25           And I'm thinking about it myself.  On one hand, I

1    don't like the fact that the jury is not following the

2    instruction, although they probably don't realize that by

3    asking Ms. Parks that question that that would be a violation

4    of it.

5              And there's part of me that wishes for them not to be

6    sitting there wondering about things when we probably have a

7    fairly easy way to remedy it.  On the other hand, it is

8    unusual, of course, to be talking to the jury about the case

9    while the case is going on.

10             So all of that is by way of filibustering a little

11   bit to give you-all time to think about what -- what it is you

12   think we ought to be doing.

13             And I'll ask you, Mr. Vokey, first, what -- what is

14   your thinking about the matter?

15             MR. VOKEY:  It does sound like it's a minor

16   violation, but I would object to any kind of instruction to

17   them or summary of any kind at this time.

18             THE COURT:  Okay.  Mr. Gee?

19             MR. GEE:  Your Honor, the -- the jury was read a very

20   brief summary of the counts and the statement of the case

21   during voir dire at the very beginning.  Obviously it's a case

22   that has some confusing things going on factually.  I think

23   that the Court could read something similar to that.  I assume

24   the summary you've got is pretty close to what was in our joint

25   statement in the case.  That's Docket 56.

1     THE COURT:  In light of the objection by the

2  defendant to me reading anything to the jury or advising them

3  at this time, I don't think that I'm -- I don't think I am

4  going to do that.  I think it's potentially -- it would be

5  potentially erroneous.  Although I think I could probably do

6  it, I think I won't in light of the objection.

7     If both of you had agreed that I could do something,

8  I -- I probably would do it, but in light of the objection, I

9  won't do it.

10     However, I do not see anything wrong with me, first

11  of all, reminding the jury they can't talk about the case to

12  anybody, including Ms. Parks, but -- and, secondly, noting the

13  inquiry and say that "It's not appropriate at this point for

14  the Court to give you any further instruction on the charges;

15  however, the Court will be instructing you at the end of the

16  case regarding the charges."

17     Any objection to that, Mr. Vokey?

18     MR. VOKEY:  No objection to that.

19     THE COURT:  All right.  Mr. Gee, any objection to

20  that?

21     MR. GEE:  No, Your Honor.

22     THE COURT:  All right.  Let's have the jury.

23     And I'll make this sheet of paper I read to you from,

24  I'll make that Court Exhibit 1.

25     (Court's Exhibit 1 received into evidence.)

1          COURT SECURITY OFFICER:  All rise for the jury.

2      (Jury enters, 1:41 p.m.)

3          THE COURT:  Everybody can be seated, please.

4          So, ladies and gentlemen, I hope you had a nice

5  lunch.  And let me just say I appreciate the diligence that

6  you've been -- been employing as a jury in this case.

7          I'm noticing that everybody's paying close attention

8  and obviously trying to -- to do their best to listen to all

9  the evidence.

10          I did receive a note from the jury.  I don't -- I

11  don't know any particular person, but the jury in effect asking

12  me to give a -- a refresher of the charges in the case or to

13  remind you of what the actual charges are.  And so let me talk

14  to you about that for a minute.  I appreciate the inquiry.  Let

15  me -- let me address the question first and then I'm going to

16  talk to you about something else.

17          So like everything else in the law, there are rules

18  we go by when we're trying a case.  And so you had the opening

19  statements of the lawyers.  Now we're hearing the evidence in

20  the case.  It's not appropriate at this point under our rules

21  for me to talk to you about the charges.

22          However, once the evidence is completely over with,

23  the lawyers will be making their closing arguments and they'll

24  talk about the charges and what they are and so forth.

25          I'll be giving you a complete set of instructions

1    about the charges and what the elements of the charges are and

2    so forth, and you'll have copies of those with you.

3           So -- so you will have an opportunity at the end of

4    the case to -- to hear more about the charges and -- and

5    what -- what your job is as a jury, but it's not appropriate

6    under our rules for me to do that right now, so I -- I

7    apologize if -- if somebody wanted to hear it now, but it's

8    just not something we can do right now.

9           So it does give me the opportunity to remind you that

10   you're not supposed to be talking about the case, and so

11   please, please don't talk about the case.

12          Ms. Parks, Ms. Diaz, all these folks, they are

13   hard-working employees of the court and they will talk to you

14   about anything, but they cannot talk to you about the case,

15   and nor should you be talking to anybody else about the case,

16   nor with each other.

17          And I understand that sometimes, you know, you're --

18   you're trying to do your job, but right now your job is to

19   listen to the evidence, and -- and then later on we'll talk to

20   you about the charges.  At the end of the case, I'll instruct

21   you on the -- on the law.

22          So -- so just please remember, though, that there can

23   be no discussion about the case by the jury.  So, again, I

24   appreciate your diligence.  Nobody has done anything wrong.

25   Nobody is in trouble.  It's just -- we just have to do it the

1    way the law requires, and -- and so I hope that at least

2    answers you the best that I can at the moment.  Okay?

3            Mr. Gee, does the government have any objections or

4    clarifications to the Court's discussion with the jury?

5            MR. GEE:  No, Your Honor.

6            THE COURT:  Mr. Vokey?

7            MR. VOKEY:  No, Your Honor.

8            THE COURT:  All right, then.

9            So you will recall that we're ready for

10    cross-examination, and so who -- Mr. Vokey, are you the one?

11            MR. VOKEY:  I am.

12            THE COURT:  You may proceed, sir.

13                        **CROSS-EXAMINATION**

14    BY MR. VOKEY:

15    Q.    Good afternoon, Ms. Sabanosh.  How are you?

16    A.    Good.  How are you?

17    Q.    Good.

18            So I want to talk to you about a lot of different

19    areas that you testified about earlier.  Okay?

20    A.    Okay.

21    Q.    And you and I were able to speak just last month?

22    A.    Uh-huh (affirmative.)

23    Q.    So I want to talk to you about some of those things we

24    discussed as well.  Okay?

25    A.    Okay.

1    Q.    So to start off, one of the things you said when you first

2    started testifying for the government, you were kind of

3    describing your marriage with -- with -- with Mr. Tur, with

4    Chris Tur, and you said that Chris liked it when he was in

5    control.

6    A.    Yes.

7    Q.    What did you mean by that?

8    A.    He was -- he was -- he just -- he was a very controlling

9    person, so -- and throughout our marriage he was -- he was very

10   controlling.  There were a lot of things he couldn't control in

11   aspects of his own life, and he liked things done a certain

12   way.  And so sometimes it caused friction between us and

13   arguments.  And so he -- he liked to be in control.  I mean,

14   there's --

15   Q.    Okay.

16   A.    Pretty easy statement.

17   Q.    Okay.  And that last year that you were in Guantanamo,

18   things were getting worse?

19   A.    They were, yes.

20   Q.    He became more erratic?

21   A.    Yeah.  We had a pretty -- a roller coaster of a marriage,

22   so at times it -- it got out of control at other times in our

23   marriage, but towards that last year, I was less tolerant of

24   that roller coaster, so...

25   Q.    You -- you were having enough of this?

1  A.   I did, yeah.

2  Q.   So -- and you had talked about several times some -- these

3  disappearances, that he would disappear from the house many

4  times for a day or two?

5  A.   Uh-huh (affirmative).

6  Q.   Right?

7  A.   He did.  And --

8  Q.   And I think in --

9  A.   More like a day.

10  Q.   More like a day.  And I think in GTMO you said it happened

11  like six or seven times?

12  A.   It had, yes.

13  Q.   You talked about the one time after the October 2014

14  customer appreciation day event --

15  A.   Uh-huh (affirmative).

16  Q.   -- where you had an argument and he ended up taking off

17  and you and Kelly Wirfel had to try to find him?

18  A.   I did, yes.

19  Q.   And you mentioned something that -- kind of at the end of

20  your testimony about something about him hiding out very close

21  to the house and watching you look for him?

22  A.   I did, yes.

23  Q.   Was that the same event or was that a different

24  disappearance?

25  A.   No, that was the same event.

1  Q.   Okay.  So -- and when you find out that he's hiding out

2  watching you and Kelly search for him, I mean, that -- that has

3  to be very frustrating?

4  A.   Very, yes.

5  Q.   And in this -- you said this event ended, this

6  disappearance ended when he simply called up -- called you up

7  and said, "Where is my phone?"

8  A.   It did.

9  Q.   And then he came and got his phone --

10  A.   Yes.

11  Q.   -- and went to work?

12  A.   Uh-huh (affirmative).

13  Q.   And did he ever even tell you anything about the

14  disappearance or where he had been?

15  A.   Other than he wasn't far from the house, but outside of

16  that, there was no more discussion.

17  Q.   And was that the norm, that he would disappear and come

18  back and you just wouldn't talk about it?

19  A.   Correct.

20  Q.   So that kind of leaves you with a feeling of I don't know

21  what he's going to do next?

22  A.   Correct.

23  Q.   I mean, if he disappears, you know, who knows where he is?

24  A.   Correct.

25  Q.   So you also mentioned about -- you were asked a series of

1   questions about Prozac?

2   A.    Uh-huh (affirmative).

3   Q.    And that he was -- you were asked if he was taking his --

4   his Prozac as prescribed and you had said no?

5   A.    Correct.

6   Q.    Meaning he was taking it at the wrong time, he was maybe

7   taking too much?

8   A.    If he missed a dose, he would double up, yes.

9   Q.    In fact, I know one of the things that you mentioned when

10  we spoke concerning the Prozac was at first you didn't even

11  know he was on Prozac, he didn't tell you?

12  A.    Correct, yes.  I did not know.

13  Q.    You found out, what, by finding a bottle and then asking

14  him about it?

15  A.    I did, yes.  I didn't know he had gone to the doctor to --

16  in the early -- early on that he had gone and got on a

17  prescription.  He was -- it was by accident that I found the

18  prescription.

19  Q.    And when you asked him about it -- I'm sure when you see a

20  prescription like this, you're probably concerned about your

21  husband?

22  A.    Prozac, yes.

23  Q.    And when you asked him about it, how did he react?

24  A.    That he had gone in and he was getting treatment at the

25  hospital for it.

1  Q.   And I think -- one of the things you had told me before is
2  that he got in your face about it?
3  A.   He was angry, that it was none of my business, so -- that
4  this was -- he was dealing with this and it was not my concern.
5  Q.   So there were a number of things that he was keeping from
6  you concerning your marriage?
7  A.   Quite a few things, actually, but, yes, that was one of
8  them.
9  Q.   So you had -- you had also testified, too, about the time
10 that you -- that there was one time that you and Captain
11 Nettleton had sexual relations --
12 A.   Yes.
13 Q.   -- in -- in Jacksonville?
14 A.   Correct.
15 Q.   And I think you said it was in October of 2014.  Are you
16 sure it wasn't -- it was actually in November of 2014?  Does
17 that sound right?
18 A.   I thought it was October, but if I'm not correct on the
19 month -- I thought it was in October, but I may have the month
20 off.
21 Q.   Okay.  So I wanted to ask you about something else.  So we
22 know that the disappearance of Chris after this customer
23 appreciation event, that was certainly before you had gone to
24 Jacksonville?
25 A.   I'm sorry.  Say that again.

1  Q.   The customer appreciation event that you talked about with

2  this disappearance, that was --

3  A.   It was before.

4  Q.   It was before Jacksonville?

5  A.   Yes, it was before.

6  Q.   And I want to ask you about something else that happened

7  in October of 2014.  You went to New York with Chris Tur and

8  a -- and the Camerons?

9         MR. GEE:  Objection.

10        THE COURT:  I'm sorry?

11        MR. GEE:  Objection.

12        THE COURT:  I don't know what the question is.  Let

13  me look at it here.  Let me see counsel at sidebar.

14     (Sidebar conference:)

15        THE COURT:  I don't know what we're talking about.

16        MR. VOKEY:  She had testified on direct about many

17  times of disappearances.  This was a -- another time of a

18  disappearance after the one that she's already described in --

19  before the Jacksonville.  So this is another disappearance

20  event.  She testified there was many, and I'm asking about this

21  one specific one.

22        THE COURT:  What's your objection, Mr. Gee?

23        MR. GEE:  Relevance, Your Honor.  She's testified

24  generally that he disappeared on prior occasions, and counsel

25  is about to get into a lengthy story.  She discussed in the

1  grand jury about a trip to New York City, an aggressive

2  argument at -- at a train station, how aggressive it got.

3  Ultimately he disappeared for a while, then the friends had to

4  hunt him down in New York.  There's no evidence any of this was

5  ever conveyed to the defendant.  It's not relevant to his state

6  of mind, not relevant to the charges in the case, and it would

7  just be a trial within a trial about what happened in New York

8  City.

9        MR. VOKEY:  No, sir.  I don't think it's a trial

10  within a trial.  The government has elicited the fact that

11  there have been many disappearances.

12        THE COURT:  Well, I don't -- I don't want to -- I

13  don't want to do a lot of this, but I -- I think given her

14  direct testimony that was elicited, I will overrule the

15  objection and I will allow you to entertain this.

16        MR. VOKEY:  Thank you, sir.

17     (The following proceedings occurred in open court, in the

18  presence of the jury:)

19  BY MR. VOKEY:

20  Q.   All right.  Ms. Sabanosh, right back where we started.

21  A.   Okay.

22  Q.   So in October of 2014, you went to New York with Chris Tur

23  and some other folks in Guantanamo, some friends, the Camerons?

24  A.   It was actually a little earlier.  We were taking my

25  daughter to college.  She was going to her first semester of

1   school.  And that's when we went to New York with them.

2   Q.   And on this trip to New York when you were with the

3   Camerons, there was another episode with Chris Tur getting

4   upset at you and disappearing?

5   A.   Yes.

6   Q.   And then you-all had to go find him again?

7   A.   Yes.

8   Q.   And when he does this to you -- these are kind of public

9   displays in front of you.  Does he know -- did he know how

10  these made you feel?

11            MR. GEE:  Objection.

12            THE COURT:  Yeah.  That's a hard question for her to

13  answer, I think.  I'm going to sustain it.  There may be a

14  different way to ask it.  I don't --

15            MR. VOKEY:  I'll rephrase it.

16  BY MR. VOKEY:

17  Q.   Did you ever discuss with your husband that these displays

18  made you embarrassed, humiliated?

19            MR. GEE:  Objection.

20            THE COURT:  I'll allow it.

21            THE WITNESS:  Yes.

22  BY MR. VOKEY:

23  Q.   And what was his response?

24  A.   His response was if -- if I would listen to him, then he

25  wouldn't have to do what he was doing.

1  Q.   And what were you doing wrong in New York?

2  A.   Not listening to him.

3  Q.   So I want to talk to you now about -- this word "affair"

4  has been thrown out quite a bit, and we've heard your kind of

5  description of somewhere around June of 2014 you and Captain

6  Nettleton had a closer relationship.

7  A.   Yes.

8  Q.   Just -- just kind of flirting relationship?

9  A.   Uh-huh (affirmative).

10  Q.   Now, during this time, he was also talking to you a lot

11  and listening to you a lot?

12  A.   Yes.

13  Q.   And I think one of the things you had said is, "This the

14  first time in a long time someone has really listened to me"?

15  A.   Yes.

16  Q.   It was a nice thing?

17  A.   It was.

18  Q.   He was very caring with you, he was very understanding, he

19  was considerate?

20  A.   Yes, yes.

21  Q.   And so during some of these conversations is -- is when

22  you disclosed to him problems about your marriage and that

23  there was -- had been abuse?

24  A.   Yes.

25  Q.   And when you were discussing the abuse with him, he raised

1    some concern and said that "Maybe we should report this"?

2    A.    Yes.

3    Q.    And your response was, "Absolutely not.  Under no

4    circumstances do I want you to report it."

5    A.    Correct.

6    Q.    And some people may have a hard time understanding why you

7    would have that position, but I want to talk to you a little

8    bit about that.  Okay?

9    A.    Yes, that's fine.

10   Q.    So your husband was the sponsor for you in Guantanamo?

11   A.    Yes.

12   Q.    Meaning -- this is going to sound crude, but you were kind

13   of -- well, using military language, you were a dependent,

14   right?

15   A.    Correct.

16   Q.    And he is stationed there and you go with him and so do

17   your children?

18   A.    Correct.

19   Q.    You've got a job there, you wanted to have your own

20   career?

21   A.    Yes.

22   Q.    So if there's an issue with your husband and his job, you

23   don't necessarily get to stay in Guantanamo.  Matter of fact,

24   under normal circumstances you'd have to leave if he had to

25   leave?

1  A.   Correct.

2  Q.   And this sponsorship thing, was this one of the things he

3  used as part of the controls when he's talking to you?

4  A.   Yes.

5  Q.   In what way?

6  A.   He would tell me that he could have me removed any time he

7  wanted to.

8  Q.   So when you're talking with Captain Nettleton kind of

9  about this abuse and he's expressing concern about "Maybe we

10  should report this" and you tell him, "No way," were you afraid

11  that this was going to jeopardize your position and -- and your

12  daughter's and -- and your job?

13  A.   I was more worried about where -- what about my daughter?

14  And -- because if -- if he could just discard me, then -- it's

15  a remote island, and so I had to make sure that I was secure in

16  order to make sure she was secure.  And so that was the

17  leverage he was holding over me.

18  Q.   Okay.  And at one point he also kind of used leverage with

19  your other daughter about threatening to withhold and not being

20  able to financially support her for college?

21  A.   Yes.  He was -- he told me that if I left him, he would

22  cut off all funding for -- for school.

23  Q.   That was for Savannah?

24  A.   It was.

25  Q.   That's got to be a difficult thing to hear as a mother?

1   A.    He knew that the girls were important, and so there

2   were -- it's not that he didn't love his girls, but he knew how

3   to make sure that I would listen to him and stop.

4   Q.    Now, one of the things I think when we talked before that

5   kind of struck me is your job as the -- the -- the head of the

6   Fleet and Family Services, your job was to talk to people who

7   were in positions just like you were?

8   A.    Uh-huh (affirmative).

9   Q.    So there wasn't somebody right there on Guantanamo to

10  report this, this would have to go outside of Guantanamo?

11  A.    Yes.

12  Q.    And it probably wouldn't look too favorable with you as

13  the head of Fleet and Family Services needing it yourself?

14  A.    The Navy is a very reactive organization and in some

15  respects the -- really what they do is they're more worried

16  about "Don't embarrass us."  So I was more concerned with

17  protecting my family and how to make sure that they were safe

18  than I was worried about how the Navy looked.

19        So I knew what was going to happen, is that if the --

20  a domestic violence was reported, that all it was -- because

21  I -- that's what I did, it was -- and I knew where it went

22  first.  It was less about securing safety and more about making

23  sure we didn't make it in a headline.

24  Q.    Okay.  You had testified a little earlier also that in

25  your job you get a lot of phone calls and sensitive things and

1  Chris didn't like the fact that you had private phone calls?

2  A.   No.   I would get phone calls at 2 o'clock in the morning,

3  and they would be because somebody would get a -- a call trying

4  to work with MAs, and they could be -- I -- I did have a -- a

5  really good domestic violence advocate who tried to do what she

6  could.   And -- and so she would call to check in on what she --

7  and so there were calls in the middle of the night.   A family

8  advocacy counselor would call in and -- and he just didn't

9  like -- he would want to know who was calling, you know, what

10  did they want, and I couldn't tell him.   It was none of his

11  business, to be blunt.

12  Q.   And -- and he wanted to look at your phone and your iPad

13  and see what was on there?

14  A.   I had one -- I was home sick one day and the XO called and

15  he wanted to know who was calling me while I was in bed, and

16  I -- I mean, I showed him.   I'm like, "It was the XO.   It's the

17  XO calling me."   And so it was kind of getting ridiculous.

18  Q.   And this -- this -- this jealousy or paranoia or whatever

19  he's displaying, is this becoming -- increasing this last year?

20  A.   It had been.   Since I had become the acting -- and when I

21  was acting, I was actually doing two positions, so I was --

22  Q.   Let me back up.   You're saying, "acting."   You were using

23  kind of military-type term.   You were acting --

24  A.   Director.   I was an acting director and I was doing a

25  full-time -- I was in my previous position, so I was doing two

1   40-hour positions at the same time, so I was working a lot of

2   hours.  And so once I started doing that role, I was -- that

3   was when he started getting more and more anxious about my job.

4   Q.   Okay.  And let's talk a little bit more about your job.

5        So you went from one role -- you became kind of freed

6   up and became the acting director of Fleet and Family Services

7   and then you got the job as director?

8   A.   Correct.

9   Q.   And when did you get that job?

10  A.   In June of 2014-ish.  Around June.

11  Q.   Okay.  Now, let me ask you, did you earn that job on your

12  own merits or did Captain Nettleton have anything to do with

13  you getting that job?

14  A.   I earned that job.  I was selected.  I had to apply for

15  it, and I was selected.

16  Q.   And you were selected for that job before this kind of

17  even flirty relationship began with Captain Nettleton, correct?

18  A.   Correct.  I actually was -- it was a -- a second selection

19  process.  I actually wasn't originally selected for the job --

20  Q.   Okay.

21  A.   -- to be honest.

22  Q.   Okay.  So, again, this term "affair" has been thrown out

23  there.  And no question about -- you thought it was October,

24  maybe November -- the time -- there was one time that you had

25  sex.  That was in Jacksonville, Florida, correct?

1  A.   Yes.

2  Q.   And before that, you guys were close friends, there was

3  some flirting going on, correct?

4  A.   Yes.

5  Q.   So -- and I think what I heard you testify was after you

6  came back, you were concentrating on certain other things?

7  A.   Correct.

8  Q.   So after the Jacksonville thing, would you say that was

9  the beginning of an affair or was that a -- kind of a mistake

10  by two people who were very close friends, or how would you

11  characterize it?

12  A.   Two friends that crossed a line, and -- and when we came

13  back, there was nothing going on.  We were -- I was focusing on

14  my marriage at that point and my children.

15  Q.   Okay.  So everything stopped after that --

16  A.   Yeah, everything stopped.

17  Q.   -- that crossing the line?

18  A.   Correct.

19  Q.   So going through the rest of November through December

20  into January, there was no affair going on with Captain

21  Nettleton?

22  A.   Correct.

23  Q.   So at the time of the Bayview incident on January 9th,

24  there was no affair going on with Captain Nettleton?

25  A.   Correct.

1  Q.   Okay.  So -- and I want to back up about -- I think

2  exactly one month before this incident that happened at the

3  Bayview.  You say you were working on your marriage.

4  A.   Correct.

5  Q.   And you had told Chris Tur previously that you wanted a

6  divorce, you wanted out of the marriage?

7  A.   Correct.

8  Q.   And at some point you kind of entered into like a

9  one-month contract or agreement with him?

10 A.   Yes.

11 Q.   Can you tell us about that?

12 A.   So we came back and there had been counseling and that

13 wasn't working.  And then the fighting escalated and I was

14 missing days from work and it became a problem.  And so when I

15 had asked -- I said I wanted a divorce, then we entered into

16 this one-month contract.

17        The one-month contract was I asked for no fighting at

18 Christmas, the girls were coming home, Savannah was coming

19 home.  I didn't want any more of the craziness.

20        In return I had to perform wifely duties.  I had to

21 kiss him when he -- when I left the house, when he came home.

22 I had to be home by 5 o'clock every night.  I had to tell him

23 where I was at all times, and if I didn't answer he would start

24 calling everybody I knew to find out where I was.  He had to --

25 if I was going into a meeting, I had to call him.  When I left

1    the meeting, I had to call him.  And when I got in my car, I

2    had to call him.  And I had to be there to make dinner, and I

3    had to have a smile on my face while I was doing it.

4    Q.   Now, all these wifely duties you described, that was his

5    part of this contract?

6    A.   That was my part of the contract.

7    Q.   But --

8    A.   Or his part.

9    Q.   But he dictated those terms?

10   A.   He dictated those terms.

11   Q.   So, I mean, this sounds to me, Ms. Sabanosh, like he's

12   getting you more and more controlled?

13   A.   Very much so.

14   Q.   Why would you agree to something like that?

15   A.   Because my daughter was coming home and I wanted no

16   fighting and I wanted a nice Christmas.  She had just been away

17   at school, and I didn't want any -- I -- I just wanted a nice

18   Christmas.  Christmas was very important to me.

19   Q.   And you didn't want the -- your girls to know there's all

20   this kind of back-fighting going on?

21   A.   No back-fighting, no drama, no nothing.  We were just

22   going to have a very nice Christmas.  She was coming home.

23   Q.   Okay.  So fast-forward to January 9th when the Bayview

24   incident happens.  Was that the end of this one-month period,

25   kind of probationary period?

1  A.    It was the end of the one month.  And -- and in -- in some

2  respects it was actually -- I was kind of enjoying -- there was

3  no harassing texts I was receiving.

4           I was kind of quiet.  There was a few incidents

5  during that time, but they were relatively minor in -- in the

6  scope of what had been happening.  So we went to lunch that day

7  with friends, and it was actually a very pleasant lunch.

8           So -- but it was more like we were all friends at

9  that point.

10          So we went to lunch, then we came home, and my

11  daughter had already actually gone back to school, so we Skyped

12  with her, and then got Madison settled for the evening, and we

13  were getting ready to go out.

14  Q.    Okay.  So later that night you described when you guys

15  were at the Hangar bar -- or the Hangar Deck, a time where you

16  had both left and gone into the alley and you guys had a fight.

17          Do you remember being asked about that?

18  A.    Yes, uh-huh (affirmative).

19  Q.    He -- he put your -- he put his hands on you again?

20  A.    Yes.

21  Q.    And I think what I heard you say in your testimony is

22  that, "I'm done"?

23  A.    "I am done."

24  Q.    And that's what you said?

25  A.    I did.  "I am done.  We're done."

1 Q.   As in?

2 A.   Marriage is over.

3 Q.   Marriage is over.

4        And was that the final straw or had you already

5 decided by that point?

6 A.   That was the final straw.  That alley was the final straw.

7 He grabbed me so hard that there were fingerprints on my arm.

8 Q.   So in the middle of all -- of all these problems is

9 this -- although one time, a sexual encounter with Captain

10 Nettleton in Jacksonville.

11        And I've just got to ask you:  Did Captain Nettleton,

12 the -- your friendship and then -- and then later the -- that

13 one sexual time, did that have anything to do with the breakup

14 of your marriage?

15 A.   No.

16 Q.   And I think one of the things you said to me was

17 regardless of whether there had been any relationship with

18 Captain Nettleton, you were destined to divorce Chris Tur?

19 A.   Correct, yes.

20 Q.   Because of all the control?

21 A.   Correct.

22 Q.   And the jealously that he displayed about Captain

23 Nettleton that night he had displayed with plenty of other

24 people before?

25 A.   Correct.

1    Q.    That was just --

2    A.    That was just -- he was just another person in a line of

3    other people.

4    Q.    Now, the -- after you guys -- well, let me ask you, that

5    night of January 9th and Kelly Wirfel had to take you home --

6    she took you to her home via Safe Ride, correct?

7    A.    Correct.

8    Q.    Now, before that, had you said something to the XO,

9    Commander Ross?

10   A.    I did.

11   Q.    And what did you say to him?

12   A.    I asked for his help.

13   Q.    And -- and what did he -- I think what you said earlier

14   was he was useless.  What did you mean by that?

15   A.    He was useless.  I asked for his help.  I said that my

16   husband had just attacked me and that I needed his help.

17   And -- and he kind of patted me.  It was like he -- I felt like

18   he was patting me on the head, that, you know, he was more

19   focused on -- I wanted him to help me with Chris, and, you

20   know, that he was violent and out of control, and he wouldn't

21   do anything.  I couldn't get him to -- he said, "Well, he just

22   needs to go cool off.  You know, I sent him home."

23          And, you know, he was -- he's like, "Well, maybe you

24   should divorce him."

25          And I'm like, "That's great, but I need help.  You

1    just sent him to my house."  Okay.

2    Q.    In other words, you can't go home?

3    A.    Right.  He's like -- so he sent me home with Kelly Wirfel.

4    I'm like, "I didn't do anything wrong here, but you just sent a

5    lunatic home to my house.  Thanks.  To my kid.  Great."

6    Q.    And later that night, do you recall -- I know you -- you'd

7    been drinking quite a bit, you were -- you were intoxicated?

8    A.    True.

9    Q.    Do you remember Kelly telling you about the phone call she

10   got from -- from Chris Tur saying that he just knocked out

11   Captain Nettleton?

12   A.    No.

13   Q.    Okay.

14   A.    There was no phone call.  She did not tell me that he --

15   at any time that he was at Captain Nettleton's house.

16   Q.    You don't remember her telling you anything like that?

17   A.    No.

18   Q.    Okay.  You had also mentioned with -- the Prozac and the

19   self-medication, we heard that.  When you guys started

20   searching for him, did you go to -- back to the Jeep at the

21   Bayview and look in there?  I'm going to --

22   A.    I'm sorry.  Go ahead.

23   Q.    Saturday, the 10th of January, when you guys -- when he

24   had to come home and you and Kelly and Randy Barger are out

25   looking for him --

1  A.    Right, yes.

2  Q.    -- did you go back and check his Jeep back at the Bayview?

3  A.    It wasn't the Jeep that was at the Bayview, it was my SUV.

4  Q.    Oh, okay.  I got the wrong one.

5  A.    That's okay.

6  Q.    So at some point did you check his Jeep and find a

7  prescription bottle?

8  A.    It was later on that I -- I checked the Jeep, and in there

9  was an empty bottle of my prescription.  It was tucked down

10 deep inside.  So somewhere he had been taking my -- he

11 apparently was self-medicating with my prescriptions.

12 Q.    What -- what prescription are we talking about?

13 A.    I had been prescribed at the time Percocet for migraines

14 so that when they break through I could take them at home.

15 Q.    And did you have any knowledge that he was taking your

16 Percocet?

17 A.    No.

18 Q.    All right.  I also wanted -- you know, on January 10th

19 when you guys were outside looking for him, I think one thing

20 you -- you told the government when you were testifying is

21 that, "We went looking in the usual spots" --

22 A.    Uh-huh (affirmative).

23 Q.    -- right?

24        And you mentioned the boat and the hospital.  And why

25 are those usual spots?

A.   We had just looked there before, because they're -- we

don't have very many places on the main thoroughfare to go

looking that are open.  The -- the marina is a place where he

would go regularly and tinker with his boat, and so that's an

easy place, even if he was just sitting there fixing it,

talking to people.

          And the hospital, we had looked there once before

even if he had been picked up, if he was -- you know, from

drinking or whatnot, so we would check to see if -- even if

they brought in somebody and didn't get -- if that person

didn't give their name.  So we had just done that before when

we were looking for him.

Q.   Okay.  And you guys -- you said you drove around, too.

Where else were you driving around?

A.   Just on the main roads and by the trails just to see -- by

the golf course.  From -- from where our development was, those

are just the areas we would drive past, so you could see in

them.

Q.   Okay.  So after driving around for a while, I think I

heard what you said, is that Kelly reached out to -- Kelly

Wirfel reached out to Captain Nettleton and he said, "Let's

meet in my office"?

A.   I wasn't there for that call, but he had suggested that we

should go meet with Captain Nettleton.

Q.   Okay.  So you and Randy Barger and Kelly Wirfel went to

1  Captain Nettleton's office?

2  A.    Correct.

3  Q.    So when you were in this office meeting, you guys are

4  discussing a number of things of where Chris might be, where he

5  might be located, where should we search, correct?

6  A.    Correct.

7  Q.    And I know you said when you were here, you're still

8  angry?

9  A.    Correct.

10  Q.    This is embarrassing?

11  A.    Correct.

12  Q.    This is one more time, now it's involving more people?

13  A.    Correct.

14  Q.    And some of the things that were discussed about where he

15  might be was that he was -- he had been at the -- at the

16  Bayview --

17  A.    Yes.

18  Q.    -- right?

19        And you discussed that he might be hiding in the

20  bushes?

21  A.    Yes.

22  Q.    Hiding in abandoned houses?

23  A.    Correct.

24  Q.    And by "abandoned houses," I -- I -- and correct me if I'm

25  wrong, but I think you meant the house the two of you -- your

1  family used to live in in GTMO?

2  A.    Correct.   There was -- we actually started out in another

3  house.   Where we -- where we ended -- we lived in two houses.

4  The house we were when -- I'm trying to explain that easily.

5         The house we were when he passed away is the second

6  house in our time in GTMO.   The house we started out in, that

7  area is -- was abandoned.   They were going to be tearing that

8  down to build -- they were going to eventually build new houses

9  there.   And you could get into those houses, so it wasn't as if

10  people couldn't break into them and -- in some way.

11  Q.    Okay.

12  A.    So I did suggest that.

13  Q.    Okay.   So this is -- again, this is a meeting where I know

14  you're angry and you're kind of concentrated on you want to

15  find him, but you're angry at him.   But a bunch of ideas are

16  thrown out about where he might be, so -- so one of those ideas

17  was he may be hiding out in your old house or the abandoned

18  houses?

19  A.    Correct.

20  Q.    His boat, which you guys had already checked, but that was

21  thrown out there?

22  A.    Correct.   Because that's right down from the Bayview,

23  so...

24  Q.    He could have hiked to Marine Hill, right?

25  A.    At some point.   I -- I don't know if that happened during

1    that meeting, but it -- I know I suggested that at some point.

2    Q.    Okay.  And he liked to go up in the hills there?

3    A.    Yes.

4    Q.    And there were plenty of places for him to hide?

5    A.    Correct.

6    Q.    So yeah.  I think one of the things you said is, "But

7    there are places up there if he wants to hide and not be found,

8    he won't be found"?

9    A.    Correct, he could do it.

10   Q.    Okay.  I'm sorry.  I didn't mean to interrupt you.

11   A.    No, that's fine.

12   Q.    And you also mentioned that there had been a charge at the

13   mini mart, right, showing that -- that he had been there at 2

14   o'clock.  Now, I'll come back to whether that was accurate or

15   not, but at the time you believed that there had been a charge

16   at the mini mart?

17   A.    I don't know if it was said at that meeting or later on in

18   the day.

19   Q.    Okay.  There had been a charge at the mini mart that

20   you -- you had looked up his charge, right?

21   A.    Correct.

22   Q.    Okay.  And at some point either during that meeting or

23   later that day you mentioned this?

24   A.    Correct.

25   Q.    Okay.  Now, you would find out later that -- days later

1  that that charge was just when it was posted, but he hadn't

2  gone there at that time?

3  A.    Correct.

4  Q.    But on Saturday, the 10th, you didn't know that?

5  A.    Correct.

6  Q.    You believed that was the last place -- that was the last

7  place that he had been?

8  A.    It was a possibility, correct.

9  Q.    So discussed in that meeting, the last place he was seen

10  at the Bayview, the last place that he had been was the mini

11  mart?

12  A.    Correct.

13  Q.    And then all these other places he could be hiding?

14  A.    Correct.

15  Q.    And that Big Shaun had said that he went back to the

16  Bayview?

17  A.    I was -- I was given by somebody that Big Shaun had -- he

18  had come back in for more drinks and that our charge card was

19  closed out upstairs.

20  Q.    Okay.  So all these things are kind of coming in on --

21  because you've got to figure out where he might be and then the

22  next step is where we -- where should we start looking, right?

23  A.    Right.

24  Q.    And at the end of this kind of meeting, this is when

25  Captain Nettleton picks up the phone, calls the XO and says,

1   "We need to start searching," correct?

2   A.   Some -- I don't remember when he did that, but I know

3   there was -- there was a -- a discussion that there would be a

4   search happening.

5   Q.   Okay.  Coming from Captain Nettleton saying there's going

6   to be a search?

7   A.   Correct.

8   Q.   And matter of fact, he was actually mentioning I think

9   something you said of zones of search or where we might be

10  searching?

11  A.   Correct.

12  Q.   And that was --

13  A.   And how the -- how the logistics are, I don't know.

14  Q.   Okay.

15  A.   But there would be a searching.

16  Q.   Okay.  And I know some of this meeting you probably were

17  tuning out because you were still angry?

18  A.   Correct.

19  Q.   So -- and I know the government has asked you a number of

20  times whether Captain Nettleton mentions the fight in his house

21  during this meeting, and he did not?

22  A.   Correct.

23  Q.   It was also not discussed what -- during this meeting what

24  even happened at the Bayview the night before?

25  A.   Correct.

1  Q.   He didn't bring it up, you didn't bring it up, Kelly

2  didn't bring it up?

3  A.   Correct.

4  Q.   Because the focus of this meeting was finding Chris?

5  A.   Correct.

6  Q.   And you were -- you would start to be interviewed by NCIS

7  and talked to a number of times?

8  A.   Correct.

9  Q.   And one of the things you said during your direct

10  testimony is that you were angry about the questioning?

11  A.   Correct.

12  Q.   Can you explain that?

13  A.   When they -- when they asked me to come in on the 11th, I

14  wasn't -- I -- they asked me to come in because they said that

15  they were there to assist with the search of Chris.  And then

16  the -- the conversation changed.  I'm not a big fan of one of

17  the agents that was talking and -- I found some of her

18  questions a little offensive.

19       So it changed my -- I felt the focus wasn't where it

20  was supposed to be.  And then --

21  Q.   The focus should have been finding Chris?

22  A.   Finding Chris.  But I -- and then all of a sudden we left

23  the room and -- and then I was really angry with -- because

24  I -- I got really angry with them, because then I thought they

25  brought me in there to ask me these stupid questions and they

1  knew all along.

2  Q.    Okay.

3  A.    But I -- I don't know if that's a little unfair, but it

4  made me angry for the rest of the week.

5  Q.    Okay.  Now, after -- after they had found your husband --

6  and moving down, you said that you had had -- after you left

7  Guantanamo, that you had had conversations with

8  Captain Nettleton again; is that correct?

9  A.    I did, yes.

10  Q.    And I think you said several conversations, like two or

11  three calls, that you had with Captain Nettleton?  Is that

12  about right?

13  A.    I'm sorry.  Can you repeat that?

14  Q.    So after Captain Nettleton was relieved and went back to

15  Florida, how many times did you talk with Captain Nettleton

16  after that?

17  A.    A few times.

18  Q.    Okay.

19  A.    Several.

20  Q.    And I think one of the things that you had told me when we

21  had talked before was that was a pretty bad time in your life

22  and your daughters' lives?

23  A.    Very.

24  Q.    So not only had Chris died and their daughters lost their

25  husband [sic], but there was all kinds of things in the media?

1  A.    There was.

2  Q.    And you were being treated pretty poorly by a lot of

3  different people?

4  A.    Very.  By people who think it -- they thought they --

5  it's -- who think they know, but they don't really know much of

6  anything.  So I just -- from Chris's family to the media to

7  people who don't know us at all, and so, you know, my girls

8  lost a lot of people during that time.  I lost people who --

9  well, I think at the end of the day weren't worth much.  But it

10 was quick and it hurt us greatly.

11        And so those that were left became very important to

12 us, because it was -- it became -- it -- you know, they became

13 who we thought were our closest friends, our true friends.  And

14 we relied on that a lot.  And there weren't very many left

15 standing.  And, you know, we learned a lot of things that a lot

16 of people don't know about today.  And it was important.

17 Q.    Okay.  So when he calls you these few times, was it fair

18 to say -- I think one of the things you told me is that he was

19 the only one who looked in on you and the only one who cared

20 enough to look in on you?

21 A.    Yeah.  He was one of a small few, and it was -- it was

22 very -- it was very kind.

23 Q.    So the government has made a big deal about this -- this

24 conversation you had with him, where the -- the topic of you

25 telling NCIS about the sexual relations, or an affair, or

1  whatever it was, right?

2  A.   Correct.

3  Q.   This was actually a very brief conversation that you had

4  with them?

5  A.   Yeah, on the scope of all the other things we talked

6  about.

7  Q.   This was a few questions back and forth --

8  A.   Sure.

9  Q.   -- a few statements back and forth?

10 A.   Sure.

11 Q.   And you brought it up by saying, "Look, if they want to

12 talk to me about this -- about having an affair, I'm not going

13 to say anything."

14 A.   I don't know.  I'm not sure how it was brought up.  But it

15 was a -- a back-and-forth of sorts.  On the scope of all the

16 things we talked about for those months, it wasn't the focus of

17 everything, but it was -- it was a topic.

18 Q.   Okay.  So when you said, "I'm not going to tell them," his

19 response is what?  "Okay, good"?

20 A.   Sure.

21 Q.   Or, "Okay?"

22 A.   "Okay."  "Fine."  "Good."

23 Q.   All right.  So when you heard him say "Okay, fine," was

24 that just an acknowledgment of "I understand your position"?

25 A.   I don't know.  I mean, it was his response.  So I don't

1  know if I can answer.

2  Q.  So -- well, let me make sure -- make clear.  In that

3  conversation or any other conversation you had with him, did he

4  ever tell you to not speak to anyone?

5  A.  No.

6  Q.  Did he ever tell you to lie?

7  A.  No.

8  Q.  Did he ever tell you, you need to withhold things from

9  federal agents?

10  A.  No.

11  Q.  That you need to withhold things from somebody in the

12  Navy?

13  A.  No.

14  Q.  Did he ever advise you on the actions you needed to be

15  taking?

16  A.  No.

17  Q.  Did he threaten or coerce you to remain silent or to hide

18  things?

19  A.  No.

20  Q.  So he's having a conversation -- you say, "I don't want to

21  talk to him," and he's just saying "okay"?

22  A.  Sure.

23  Q.  Okay.  So -- and these may sound very repetitive, but he

24  didn't do anything to -- in his talks with you to try to

25  hinder, delay, prevent, obstruct, influence, or impede any

1   investigation?

2   A.   No.

3           MR. VOKEY:  Hold on one second.

4           THE COURT:  Okay.

5           THE WITNESS:  Sure.

6       (Counsel confer.)

7           MR. VOKEY:  Ms. Sabanosh, that's all the questions I

8   have.  Thank you for your attention.  Appreciate it.

9           THE WITNESS:  Thank you.

10          THE COURT:  Any redirect?

11          MR. GEE:  Yes, Your Honor.  Thank you.

12                    **REDIRECT EXAMINATION**

13  BY MR. GEE:

14  Q.   Good afternoon, Ms. Sabanosh.

15  A.   Hi.

16  Q.   Let's start on the back end there.

17          When you were back here in the States after moving

18  back to Pensacola, so after April of 2015, there were some

19  questions asked on cross-examination about your conversations

20  with the defendant.

21          Do you remember those?

22  A.   Yes.

23  Q.   And there were some questions asked about -- about how --

24  sort of your relationship in those calls?

25  A.   Okay.

1  Q.   And you felt like the defendant was -- was doing what in

2  those calls?

3  A.   Being nice --

4  Q.   Just generally?

5  A.   Just checking in and being nice.

6  Q.   Was that a comfort to you?

7  A.   Very much.

8  Q.   Did that -- did that keep you close with him still?

9  A.   Just friendly.  Like, I had a couple of people that would

10 do that.  They would kind of check in and make sure we were

11 settling in and -- especially with the girls, checking in and

12 making sure we were okay.

13 Q.   You felt that it was the defendant keeping you friendly

14 with him?

15 A.   Sure.

16 Q.   And in these conversations, this is also in a period of

17 time where he made it clear to you that he thought he was

18 facing potential UCMJ proceedings?

19           MR. VOKEY:   Objection.  Leading.

20           THE COURT:   Sustained.

21 BY MR. GEE:

22 Q.   In these same conversations, did you -- did he discuss

23 with you that he might be facing potential UCMJ proceedings?

24 A.   No.  I don't -- I don't think he thought he was facing

25 them.  I think we just kind of -- if it did.  I was just not

1  interested in participating with anyone.

2  Q.   I understand.

3       Did he discuss with you in these conversations any

4  concerns about potential UCMJ proceedings?

5  A.   I don't -- I don't know --

6  Q.   Well, for example, did it ever come up, the subject of

7  whether or not your personal relationship with him could be a

8  problem for him in the Navy?  Did that come up on these phone

9  calls?

10 A.   Yes.

11 Q.   Okay.  And did that come up in the context of a potential

12 court-martial?

13 A.   Yes.

14 Q.   Okay.  And did that come up -- and a potential

15 court-martial, Ms. Sabanosh, is a -- a court-martial, is that a

16 type of UCMJ proceeding?

17 A.   Yes.

18 Q.   Okay.  Sorry.  All right.

19 A.   Sorry.  Okay.

20 Q.   Now -- and he's talking with you about a potential

21 court-martial, and this would be in this period of time

22 where --

23       MR. VOKEY:  Objection.  Leading.

24       THE COURT:  Well, we haven't heard the question yet.

25       Go ahead, sir.

1  BY MR. GEE:

2  Q.   When he's talking with you about this -- the potential

3  court-martial, is this in the period of time where on the phone

4  he is remaining friends with you?

5           MR. VOKEY:  Leading.

6           THE COURT:  Overruled.

7           You can answer, ma'am.

8           THE WITNESS:  Can you repeat the question?  I'm

9  sorry.

10  BY MR. GEE:

11  Q.   Sure.  When he's talking with you on the phone about

12  potential court-martial proceedings against himself, is this

13  during the time where he is remaining friends with you over the

14  phone?

15  A.   Yes.

16  Q.   Now, defense counsel asked you -- are you a lawyer,

17  Ms. Sabanosh?

18  A.   No.

19  Q.   He asked you some questions there about obstruction,

20  impeding, investigation.

21           Do you remember kind of some of those words being put

22  out?

23  A.   Yes.

24  Q.   Now, let's be clear, were there any discussions in that

25  period of time on the phone with the defendant of the

1  investigation and how it might relate to your relationship?

2  A.    Yes.

3  Q.    And in those conversations, did he ever advise you that --

4  did he ever advise you that if you never admit to the

5  relationship, then it won't be an issue, if -- so if neither

6  one of us ever tell?  Did he ever say that to you, that you

7  recall today?

8  A.    Yes.

9  Q.    Now, there were also some questions asked about this

10  meeting in the office and the different things that came up,

11  right?

12        Do you remember that?  A few minutes ago?

13  A.    I'm sorry.  Can you repeat that?

14  Q.    That's okay.  You're doing okay.

15        There were a couple of conversation about this

16  meeting in the defendant's office that Saturday afternoon --

17  A.    Yes.

18  Q.    -- when folks were searching for Mr. Tur.

19        Do you remember that?

20  A.    Yes.

21  Q.    Okay.  Some of those questions were about the various

22  things that were said in the office?

23  A.    Yes.

24  Q.    And you thought that -- that -- is it right that you

25  thought that either in that office or another there was some

1  sort of conversation about Mr. Tur coming back in the Bayview

2  to close out his check?

3  A.    Yes.

4  Q.    And going back to the night of Friday of January 9th --

5  let me make sure I've got the sequence right.  When the party

6  ends, did -- did you stay in the Bayview?

7  A.    Me?

8  Q.    You and Mr. Tur.

9  A.    No.

10 Q.    Where'd y'all go?

11 A.    I went with Kelly on a Safe Ride.

12 Q.    No, ma'am.  I'm talking about earlier in the evening, when

13 the party first ends, did y'all stay in the Bayview?

14        Ms. Sabanosh, we -- we talked at length.  I'm just

15 trying to keep it short.

16 A.    I'm sorry.

17 Q.    We talked at length in the direct examination about an

18 event that occurs in front of the Bayview?

19 A.    Correct.

20 Q.    Okay.  Is that in front of the Bayview or inside the

21 Bayview?

22        The -- the -- all right.  Let's go back.

23 A.    Yes.

24 Q.    After the party ends?

25 A.    Yes.

1   Q.   All right?  Where did you go after the party ended?

2   A.   I went back inside.

3   Q.   No, ma'am.  Well --

4        MR. VOKEY:  I object.

5        MR. GEE:  I --

6        MR. VOKEY:  Objection.

7        THE COURT:  Yeah.  I guess, Mr. Gee, to the extent

8   we're rehashing testimony that she gave several hours ago, and

9   obviously she's having -- you know, you're not communicating

10  with her very well, is this -- are we -- is there going to be a

11  reason to do all this again or not?

12       MR. GEE:  Yes, Your Honor.  Just very briefly.

13       THE COURT:  All right.

14  BY MR. GEE:

15  Q.   Ms. Sabanosh, was there a period of time where you were in

16  front of the Bayview --

17  A.   Yes.

18  Q.   -- and Mr. Tur was yelling at you?

19  A.   Yes.

20  Q.   And was that after you had exited the Bayview?

21  A.   Yes.

22  Q.   Okay.  And then was there a period of time after that

23  where you went back inside the Bayview?

24  A.   Yes.

25  Q.   And was there a period of time after that where Mr. Tur

1  confronted you again inside the Bayview?

2  A.   Yes.

3  Q.   So was there -- so he had left the Bayview and then come

4  back inside?

5  A.   Yes.

6  Q.   And that's all during that time when you were still there?

7  A.   Correct.

8  Q.   And the back room that he confronted you in, in the

9  Bayview, where is that in the Bayview?

10  A.   It's over where the restaurant side is.

11  Q.   Okay.  So when you first walk in the Bayview, where is

12  that in relationship to the front door?

13  A.   If you -- if you're looking at it when you walk in, it's

14  to the left.

15  Q.   Okay.

16  A.   The bar is to the right.

17  Q.   And the bar, is that -- the bar is which direction?

18  A.   Well, if you're walking in, the bar's this way, the

19  bathroom's this way.

20  Q.   Okay.  And you can close your tab at the bar to the right

21  with the bathroom on the left?

22  A.   Correct.

23  Q.   There was also some discussion about, in the meeting,

24  various ideas that were thrown out about where he could be,

25  like the Bayview.

1          Do you remember some of those questions?

2     A.    I do.

3     Q.    The mini mart, all these other things?

4     A.    Correct.

5     Q.    Did the defendant at any point in that conversation say

6     that he last saw Chris Tur at his kitchen table bleeding?

7     A.    No.

8     Q.    If in that meeting he had said that he last saw Chris Tur

9     at his kitchen table bleeding, what would you have done?

10          MR. VOKEY:  I'm going to object based on facts not in

11    evidence.

12          THE COURT:  Yeah.  I feel like we've already been

13    down this road.  And now that's a very open-ended question.

14    And I don't think it directly relates to the elements.

15          I'm sustaining the objection.

16    BY MR. GEE:

17    Q.    Ms. Sabanosh, there was also some questions asked about

18    your sponsorship.

19          Are there -- are there other directors of departments

20    on the base besides Fleet and Family Support Services?

21    A.    Yes.  There's other directors.

22    Q.    Okay.  And did other directors -- did any of those other

23    directors serve as sponsors for themselves?

24    A.    They did, yes.

25          MR. GEE:  Nothing further.  Thank you.

| | |
|---|---|
| 1 | THE COURT:  Anything on recross? |
| 2 | MR. VOKEY:  Yes, Your Honor. |
| 3 | **RECROSS-EXAMINATION** |
| 4 | BY MR. VOKEY: |
| 5 | Q.   There were other directors that had -- that were sponsors |
| 6 | there themselves, right? |
| 7 | A.   Correct. |
| 8 | Q.   And it's -- it's possible that you could have gotten a |
| 9 | sponsorship yourself? |
| 10 | A.   Correct. |
| 11 | Q.   There's a process that you have to do to get that? |
| 12 | A.   Correct. |
| 13 | Q.   And that's what you were concerned about, that's what you |
| 14 | wanted to get? |
| 15 | A.   Correct. |
| 16 | Q.   And I'm going to go back and ask you again something |
| 17 | about -- that Mr. Gee just asked you about these conversations |
| 18 | that you had with Captain Nettleton after, you know, he left |
| 19 | Guantanamo -- |
| 20 | MR. GEE:  Objection. |
| 21 | THE COURT:  What's the objection? |
| 22 | MR. GEE:  Beyond -- |
| 23 | THE COURT:  I don't think so.  I think you asked her |
| 24 | a question about it on redirect.  I'm confident this will be |
| 25 | the last time we're going to talk about this topic. |

1    Go ahead, sir.

2    BY MR. VOKEY:

3    Q.   You said that he was -- when Captain Nettleton was calling

4    you, he was checking in, he was being nice?

5    A.   Correct.

6    Q.   All right.  And you were asked whether Captain Nettleton

7    mentioned whether he was facing any -- any court-martial or

8    UCMJ stuff.  You said, "I don't think he thought he was facing

9    any."

10   A.   Correct.

11   Q.   Correct?

12        So the conversation that you had with him was, "In

13   case something does happen, I'm not going to say anything."  Is

14   that a fair way you'd characterize the conversation?

15   A.   Yes.

16   Q.   And Mr. Gee used the term "Did he advise you of what could

17   happen."

18        Now, he used the word "advise."  So that's why I

19   wanted to ask you about that.  He didn't give you any advice or

20   encouragement or tell you what to do in regards to any kind of

21   proceeding whatsoever?

22   A.   Correct.

23   Q.   You didn't feel pressured in any way by Captain Nettleton

24   to take any action or to not take any action?

25   A.   Correct.

1   Q.   All right.  And, in fact, later on you testified in front

2   of a grand jury --

3   A.   Correct.

4   Q.   -- right?

5        And nobody tried to stop you from doing that, right?

6   A.   Correct.

7   Q.   Captain Nettleton didn't -- as a matter of fact, you

8   didn't even -- Captain Nettleton didn't even talk to you about

9   anything dealing with the grand jury, did he?

10  A.   Correct.

11  Q.   And he certainly didn't advise you or pressure you or

12  encourage you not to participate, did he?

13  A.   Correct.

14  Q.   Okay.

15       MR. VOKEY:  That's all the questions, sir.

16       THE COURT:  All right, ma'am.

17       MR. GEE:  May we approach, Your Honor?

18       THE COURT:  I'm sorry?

19       MR. GEE:  May we approach?

20       THE COURT:  Yeah.

21   (Sidebar conference:)

22       MR. GEE:  Your Honor, Mr. Vokey just brought up

23  matters in recross about he didn't try to intimidate him -- or

24  didn't try to intimidate her and interfere with the grand jury,

25  et cetera.  Those are new matters I'd like to be able to ask

1    her in, I guess, re-redirect about how she -- once she got a --

2    when she got the subpoena, got a lawyer, she told -- you know,

3    her lawyer told her to stop speaking to the defendant and it

4    was communicated to the defendant to stop speaking with her.

5         MR. LENAMON:  There is a problem with this, Judge.

6    And the problem is they misrepresented -- you can go back and

7    look at the transcript -- that she testified in front of the

8    grand jury in 2015, and that's inaccurate.

9         When she testified in front of the jury in 2015, she

10   invoked her right -- she had a lawyer because she was being

11   investigated at the time, and nothing to do with Mr. Nettleton.

12        They misrepresented -- this prosecutor misrepresented

13   it -- represented it through his questions and allowed her to

14   answer that and didn't correct her that the actual time that

15   she spoke to the grand jury was two years later in 2017.

16        THE COURT:  I'm not -- I don't really understand that

17   argument.  We can have an argument about whether this is an

18   appropriate line of questioning or whether we have -- whether

19   we have fully exhausted this topic.

20        And it appears to me that Ms. Sabanosh is -- if you

21   ask her a question a certain way, she'll answer it a certain

22   way, and if somebody else asks her, she'll answer a certain

23   way.  I think she's trying to be honest with you, but I don't

24   think she has a -- I don't think she -- it's not like she has a

25   transcript of what was said between the two of them.  And I

1    think she said everything that she could possibly say about

2    this.

3            Now, the only question I have is, you did raise this

4    grand jury matter.  And whether I should let Mr. Gee ask a

5    question about that or not -- I don't understand the timing

6    argument.

7            MR. VOKEY:  Well, sir, let me throw this out, too.

8    We are discussing the same phone conversations that Mr. Gee

9    just brought up with Captain Nettleton, suggesting that there

10   was -- trying to suggest that there was some kind of

11   obstruction dealing with a court-martial proceeding.

12           The count says "court-martial or grand jury."  So I'm

13   not asking about a different conversation.  I'm asking about

14   the same conversation that Mr. Gee was talking about.

15           And I'm asking whether -- was there any other kind of

16   intimidation there?  So this isn't a new matter.  This is the

17   same phone call that we've talked -- that both of us have

18   questioned her on twice.

19           THE COURT:  What do you want to ask her, Mr. Gee?

20           MR. GEE:  Your Honor, the questions were, "You

21   testified in front of the grand jury, the defendant never did

22   anything to try to keep you from testifying in front of the

23   grand jury."  That was sort of the sequence of events, which

24   goes to try to imply that he must not have tried to obstruct

25   her with the court-martial because he didn't try to obstruct

1     her with the grand jury.

2            MR. VOKEY:  No, no.

3            MR. GEE:  And the point is, Your Honor, is that once

4     she received a grand jury subpoena, she got a lawyer and all

5     communications ceased with the defendant.  So there was no

6     opportunity for him to obstruct.

7            MR. VOKEY:  Your Honor, the focus here is on

8     Captain Nettleton, and, again, the count charges obstruction

9     dealing with a court-martial or a grand jury proceeding.  Why

10    she did what she did later on, the point is, in that

11    conversation that we've asked her about four times now, was

12    there anything discussed that was -- that would cause the

13    obstruction, we have covered this.

14           And when Mr. Gee goes back in saying that, "Well, did

15    he advise you," that's why I wanted to go back in and ask that

16    question to see if there was any kind of advice and pressure,

17    encouragement.

18           I think we've covered this area enough.  I think if

19    Mr. Gee wants to ask her that -- the same question I just asked

20    her about, "Did Captain Nettleton do anything with you

21    concerning the grand jury," that's one thing.

22           But to go on to actions she took before a grand jury

23    is completely irrelevant.

24           MR. GEE:  And we're not, Your Honor -- I mean, we're

25    not going to get into the actions in front of the grand jury.

1  The bottom-line point --

2         THE COURT:  Well, does the indictment charge the

3  grand jury as being --

4         MR. VOKEY:  It does, sir.

5         MR. GEE:  It does as well, the superseding.

6         THE COURT:  So then what -- why wouldn't he be able

7  to ask the question he asked?  I mean, he asked the question.

8  He got the answer.  I mean, it's in the charge.  So I -- I just

9  don't -- I mean, how -- how would he not be able to ask that

10 and -- and you -- you now want to show why she wouldn't have --

11 why he wouldn't have been able to obstruct her?

12        MR. GEE:  Your Honor, to be clear, I don't object to

13 the question that Mr. Vokey asked.  But the question was beyond

14 the scope of direct or redirect.  And he raised a new subject

15 on recross.  And it is in the charge, Your Honor.  We're not

16 objecting to that.

17        THE COURT:  Step back.

18     (The following proceedings occurred in open court, in the

19 presence of the jury:)

20        THE COURT:  All right.  Well, ladies and gentlemen,

21 you can see we're having a little conversation here and I

22 think -- I thought it was taking a little too long to have

23 y'all sit there, so we're -- it's a good moment to take a

24 break.

25        And so we'll go ahead and do our 15-minute break.  So

1   it's ten minutes to 3:00.  You'll be back at five after 3:00.

2           Remember my instructions.  Thank you.

3           COURT SECURITY OFFICER:  All rise for the jury.

4       (Jury exits, 2:50 p.m.)

5           COURT SECURITY OFFICER:  You may be seated.

6           THE COURT:  You're almost done, ma'am.  I apologize

7   for the delay.

8           Mr. Gee, I'll let you proffer the questions.  Let me

9   hear the answers and then I'll decide what I'm going to do.

10  BY MR. GEE:

11  Q.   Ms. Sabanosh, there were a series -- Ms. Sabanosh --

12  A.   Yes.

13  Q.   -- there were a series of questions asked by both sides

14  about these conversations with Mr. Tur -- I'm sorry,

15  Mr. Nettleton -- Captain Nettleton after you left GTMO, okay?

16  A.   Okay.

17  Q.   Do you remember those questions?

18  A.   Yes.

19  Q.   Okay.  And are all of those questions before you received

20  a grand jury subpoena?

21  A.   Yes.

22  Q.   And there were also some questions asked about whether

23  Captain Nettleton tried to encourage you not to interfere with

24  the grand jury.

25          Do you remember those questions?

1    A.    Uh...

2    Q.    Regardless, after you got the grand jury subpoena,

3    Ms. Sabanosh, did you have any further communications with

4    Captain Nettleton?

5    A.    No.  No.

6    Q.    In fact, what did you have your attorney do?

7    A.    There -- there was no communication.  The communication

8    stopped before I got any grand jury.

9              THE COURT:  All right.

10             THE WITNESS:  Period.

11             THE COURT:  Okay.  Thank you, ma'am.

12             MR. GEE:  All right.

13             THE COURT:  All right.  I will let you ask whether

14   all communications -- whether every communication occurred

15   before she received -- whether all communications occurred

16   before she received the grand jury and I'll let you ask her

17   whether she had any communication with him after she appeared

18   in front of the grand jury.

19             Those are the two questions; is that right?

20             Mr. Gee?

21             MR. GEE:  That's fine, Your Honor.

22             THE COURT:  You kind of need to pay attention to me.

23             MR. GEE:  I understand.  I apologize, Your Honor.

24             THE COURT:  So I'm trying to determine what I'm going

25   to let you do.

1          So I think I'm going to let you ask whether the

2    discussions with Captain Nettleton were before she received a

3    grand jury subpoena, and I will let you ask whether after she

4    received the subpoena she had any further communications with

5    Captain Nettleton.  Those will be the only two questions I'll

6    permit you to ask.

7          MR. GEE:  Thank you, Your Honor.

8          THE COURT:  So to the extent that there's an

9    objection to that, I'll overrule the objection.  To the --

10         MR. VOKEY:  No objection to those two questions.

11         THE COURT:  All right.  I'll let you ask those two

12   questions.  But that's all.

13         MR. GEE:  Thank you, Your Honor.

14         THE COURT:  Okay.  Are we ready?  Let's have the

15   jury.  Oh, sorry.  I gave them a break, didn't I?

16         Yeah.  All right.  Okay.

17         So -- sorry, Ms. Sabanosh, we're going to have to

18   hold you over until five after 3:00, but then you will be out

19   of here within five minutes of that, okay?

20         So you can take a break and everybody else can take a

21   break.  We'll be back in session at five after.

22         Ma'am, I will ask you while you're on break -- please

23   don't discuss your testimony with anybody.  Okay?

24         Thank you.

25      (Recess from 2:53 p.m. to 3:07 p.m.; all parties present.)

1    COURT SECURITY OFFICER:  All rise.  This Honorable

2  Court is back in session.

3    Please be seated.

4    THE COURT:  All right.  So we've got these two

5  questions, and two only, that the government is going to ask

6  on -- I guess it would be re-redirect, and then the witness is

7  going to stand down; is that correct?

8    MR. GEE:  Yes, Your Honor.

9    THE COURT:  Okay.  And then who is your next witness

10  going to be?

11    MR. NOTHSTEIN:  Anthony Thibodeaux, Your Honor.

12    THE COURT:  And he's ready --

13    MR. NOTHSTEIN:  And he's ready to go.

14    THE COURT:  He's ready to go?  Okay.

15    All right.  Let's have the jury.

16    Let me see counsel briefly while they're getting the

17  jury.

18    COURT SECURITY OFFICER:  All rise for the jury.

19    (Jury enters, 3:08 p.m.)

20    (Sidebar conference:)

21    THE COURT:  Is somebody charged with escorting

22  Ms. Sabanosh?

23    MR. GEE:  (Nods head affirmatively.)

24    THE COURT:  Okay.  Is the agent going to do it?

25    MR. GEE:  The agent's going to walk her right out to

1    another agent.

2          COURTROOM DEPUTY:  Judge, one of the court security

3    officers was going to walk her to the other floor so that he

4    doesn't have to leave the courtroom.

5          THE COURT:  That's fine.  As long as somebody does

6    it.

7          COURTROOM DEPUTY:  Thank you.

8       (The following proceedings occurred in open court, in the

9    presence of the jury:)

10          THE COURT:  All right.  Everybody can have a seat.

11          All right, ladies and gentlemen, we got our problem

12   resolved.  Thanks for your patience.  I hope you had a good

13   break.

14          So Mr. Gee has a couple more questions for

15   Ms. Sabanosh and then her testimony will be concluded.

16          You may proceed, sir.

17          MR. GEE:  Thank you, Your Honor.

18                  **FURTHER REDIRECT EXAMINATION**

19   BY MR. GEE:

20   Q.   Ms. Sabanosh, were your discussions with the defendant

21   before you received a grand jury subpoena?

22   A.   Correct.

23   Q.   And did you have any other communications with him after

24   you received a grand jury subpoena?

25   A.   No.

1        MR. GEE:  Nothing further.

2        THE COURT:  All right.  Thank you, ma'am.  You may

3   step down.

4      (Witness excused.)

5        THE COURT:  Who is the government's next witness?

6        MR. NOTHSTEIN:  The government calls Chief Anthony

7   Thibodeaux.

8      (Chief Thibodeaux enters the courtroom.)

9        COURTROOM DEPUTY:  Do you solemnly swear that the

10   testimony you are about to give before this Court will be the

11   truth, the whole truth, and nothing but the truth, so help you

12   God?

13        THE WITNESS:  Yes, ma'am.

14        COURTROOM DEPUTY:  Please state your full name and

15   spell your last name for the record, sir.

16        THE WITNESS:  Anthony Thibodeaux,

17   T-h-i-b-o-d-e-a-u-x.

18        COURTROOM DEPUTY:  Thank you.  Please be seated, sir.

19        THE COURT:  All right, sir.  It doesn't sound like

20   we're going to have any problem with your voice.  Just scoot

21   your chair up a little bit so you're close to the microphone.

22   And the government is going to have some questions for you and

23   then Captain Nettleton's lawyers as well.  All right?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  You may proceed.

1          MR. NOTHSTEIN:   Thank you, Your Honor.

2          **ANTHONY THIBODEAUX, GOVERNMENT'S WITNESS, SWORN**

3                     **DIRECT EXAMINATION**

4    BY MR. NOTHSTEIN:

5    Q.    Good afternoon, Chief Thibodeaux.

6    A.    Good afternoon.

7    Q.    Would you please tell the jury, tell us a bit about your

8    current rank with the Navy.

9    A.    So I'm currently a senior chief, petty officer in the

10   United States Navy.  That's an E-8 in the Navy.

11   Q.    How long have you been enlisted in the Navy?

12   A.    I've been enlisted just shy of 20 years.

13   Q.    Where are you currently stationed?

14   A.    Currently I'm stationed in Gulfport, Mississippi.

15   Q.    What is your job there?

16   A.    I am the senior enlisted leader for a reserve construction

17   battalion.

18   Q.    What is your specialty?

19   A.    Carpentry.  I do construction.

20   Q.    Prior to being stationed in Gulfport, did you serve at

21   Naval Station Guantanamo?

22   A.    Yes, I did.

23   Q.    How long were you stationed in -- stationed there?

24   A.    Three -- a little over three years.

25   Q.    Were you stationed there in January of 2015?

1  A.   Yes, I was.

2  Q.   When you were stationed at Naval Station Guantanamo in

3  2015, what was your job?

4  A.   I was the senior enlisted for the public works department.

5  Q.   What did the public works department do?

6  A.   So we work with NAVFAC.  They did the facilities on the

7  island.

8  Q.   I know in the Navy we have a lot of acronyms.  What's

9  NAVFAC?

10  A.   Oh, Naval Engineering Forces for the Navy.  They build all

11  the housing and do all the projects around the base, the

12  construction projects.

13  Q.   At that time did you also have a role as something called

14  the command duty officer?

15  A.   Yes, I did.

16  Q.   Could you please explain for us what is a command duty

17  officer?

18  A.   The command duty officer is the person when the leadership

19  on the base is not on duty, so after hours.  We take over and

20  do the maintaining of the little things on base.  And we're

21  also the person that gets called when something happens on base

22  and we facilitate what needs to go on.  So -- go ahead.

23  Q.   Please continue.

24  A.   So, for instance, if something happened with -- there was

25  a fire on base, we would -- they would call us and then we'd

1  make sure the fire department is notified and then they would

2  take over it on scene when they arrived.

3  Q.   So in that example, if there's a fire on base, are you

4  going out and putting out the fire yourselves?

5  A.   No, sir.

6  Q.   You just ensure the right people are putting out the fire?

7  A.   Correct, yes, sir.

8  Q.   Do you do this by yourself or is there a group of people

9  you work with?

10  A.   So there's a duty section in Guantanamo Bay.  It was

11  between eight and 12 enlisted personnel that would work with

12  me.  And they were -- there was a duty section leader, the head

13  of them that would kind of take over.  So I would give them

14  orders what to do and they would carry it out.

15          Normally during a daily operation with the -- the

16  duty section, they would make sure the trash was taken out,

17  they would do colors in the morning and evening and then take

18  care of anything that came up during the day.

19  Q.   You mentioned the eight to 12 folks that are sort of

20  volunteers of the section.  Is that what comprises the duty

21  section?

22  A.   Yes, sir, that is what comprises the duty section.

23  Q.   And is CDO a permanent position you have?

24  A.   No, it's a rotating position, so you would have it once a

25  month or once every three weeks, depending on how many people

1    in the command that were qualified to stand at watch.

2    Q.    And you said -- you talked about being qualified.  Is

3    there some kind of training you have to receive to become a

4    CDO?

5    A.    There is.  You go through a -- what's called a personal --

6    PQS qualification, series of different scenarios, and you get

7    your book signed off, your PQS book, and then you'd go in front

8    of -- at the time it was a port operations officer, and it

9    would be an oral board and then you would get qualified to

10   stand CDO.

11   Q.    And when you are standing CDO, for how long do you do it?

12   A.    24-hour period.

13   Q.    Is there a specific time to a specific time?

14   A.    From -- it was 07 to 07 in Guantanamo Bay.

15   Q.    And as you're acting as CDO, are you given a -- a phone or

16   anything to ensure people can reach you?

17   A.    Yes, I am given a phone.

18   Q.    And then what do you do with that phone when the next CDO

19   takes over?

20   A.    I hand the phone over to them.

21   Q.    I'd now like to turn your attention to January 9th, 2015.

22   Do you recall going to an event that evening at the Bayview?

23   A.    I do, yes, sir.

24   Q.    What was the event?

25   A.    It was a Hail and Farewell for Commander Caswell, the

1   outgoing XO.

2   Q.   How long did you stay?

3   A.   Three hours, roughly.

4   Q.   While you were there, did you have anything to drink?

5   A.   I did.

6   Q.   What did you drink?

7   A.   Probably a beer or two.

8   Q.   Did you run in to a person named Christopher Tur?

9   A.   I did.

10  Q.   Where did you see him?

11  A.   Smoking outside in the alleyway.

12  Q.   Did you see anyone else with him?

13  A.   His wife was with him.

14  Q.   Did you notice anything about them?

15  A.   No.   Normal small talk, had a cigarette and went back

16  inside.

17  Q.   After seeing the Turs, how long -- or where did you go

18  after the party?

19  A.   Majority if not -- I think all of the chiefs left and went

20  to the Chief's Mess, which is down the road.

21  Q.   Did you stay out late that evening?

22  A.   Relatively.   You know, 10:00, 11 o'clock probably.

23  Q.   Did you have any duties with respect to your role as

24  command duty officer the next day?

25  A.   I did.   In the morning.

1    Q.    And what was that?  Were you taking over as CDO that day?

2    A.    So I took over CDO at 7.  So that consists of mustering

3    the duty section, so making sure everybody is there, divvying

4    out the duties.  So on a weekend normally we would pick up the

5    trash from the quarter deck to the downtown and making sure

6    the -- the flag got raised and colors was set for the day.

7    Q.    That morning did you get a call from the commanding

8    officer?

9    A.    I did.

10   Q.    And who was the commanding officer?

11   A.    Captain Nettleton.

12   Q.    Could you please look around and tell me if you see

13   Captain Nettleton in the courtroom today?

14   A.    Yes, I can.

15   Q.    Please identify him by an article of clothing.

16   A.    He's in a suit with a gray shirt -- gray tie, blue shirt.

17         MR. NOTHSTEIN:  Thank you.  For the record, Your

18   Honor?

19         THE COURT:  Yes.

20         MR. NOTHSTEIN:  Thank you.

21   BY MR. NOTHSTEIN:

22   Q.    When Captain Nettleton called you that morning, what did

23   he tell you?

24   A.    He said to get the duty section together, we have a

25   possible missing person on the island.

1  Q.   So what did you do?

2  A.   So I called the duty section leader and told them to get

3  everybody together, we might have to search for a missing

4  person on the island.

5  Q.   After mustering the duty section getting ready for a

6  search, what did you do next?

7  A.   I believe I called -- well, sometime during the -- I spoke

8  to the security watch commander and let them know what we had

9  going on because that's part of what we do is let the security

10  know of anything.

11  Q.   And backing up for a second, though, as your first call,

12  Captain -- in that first call with Captain Nettleton --

13  A.   Uh-huh.

14  Q.   -- did he tell you who was missing or where they were last

15  seen?

16  A.   No.  It was another call shortly thereafter to get more

17  amplifying information on what had happened.

18  Q.   Okay.

19  A.   And that's when I asked him, you know, "Okay.  We got a

20  duty section.  Where do we start searching?"

21  Q.   And what did the defendant tell you when you asked him

22  about that?

23  A.   The Bayview area, start at the Bayview area.

24  Q.   Did he tell you who the person was?

25  A.   He did.  Chris Tur.

1  Q.    Did the defendant tell you that Mr. Tur had come to his

2  house that evening?

3  A.    No, he didn't.

4  Q.    Did he tell you that he and Mr. Tur had gotten into a

5  physical altercation that evening?

6  A.    No, he didn't.

7  Q.    And did he tell you that Mr. Tur had been bleeding when he

8  last saw him?

9  A.    No, he didn't.

10 Q.    If Captain Nettleton had told you those things, what would

11 you have done?

12 A.    Relayed it to the -- the security watch commander.

13 Q.    And for those of us who are aren't familiar with the Navy

14 or Naval Station Guantanamo, who's the watch commander?  What's

15 his responsibility?

16 A.    So he's the one that generally runs the dispatch and runs

17 the -- the actual security detail that is on duty.  So GTMO,

18 like other places, security is not comprised of civilians.

19 It's all military that does the security on the base.

20 Q.    And what are the names of -- what's the title of the

21 people who work in the security department?  What's their --

22 A.    So you have the -- the watch commander who is in charge of

23 the watch for the -- that section and then you have the -- I

24 guess it would go to the master chief and then the assistant

25 security officer and then the security officer.

1   Q.   As far as not the rank, though, who are the folks that

2   work for them actually in the security department?  Are those

3   MAs?

4   A.   MAs, right.  The patrolmen are MAs, generally.

5   Q.   So based on what you heard from the defendant about

6   Mr. Tur being missing and being last seen at the Bayview, what

7   did you do?

8   A.   So we -- so we started searching from the Bayview towards

9   Christmas Tree Hill is what it's called across the street.

10         MR. NOTHSTEIN:  Ms. Reid, may I have Government's

11   Exhibit 6, please?

12         THE COURT:  I apologize.  And maybe this was stated,

13   but what is an MA?

14         MR. NOTHSTEIN:  Oh, I'm sorry.

15         THE WITNESS:  Master-at-Arms.

16   BY MR. NOTHSTEIN:

17   Q.   And what does an MA do on base?

18   A.   So MAs on base are MAs ranked in the Navy as just similar

19   to what a police officer does every day.

20   Q.   So if someone is driving over the speed limit on the base,

21   who stops them?

22   A.   The MAs would.

23   Q.   How about if someone's house is broken into, who do you

24   call?

25   A.   The MAs would do that on that base.

1      MR. NOTHSTEIN:  Could we have 7, please?

2  BY MR. NOTHSTEIN:

3  Q.    Okay.  Chief Thibodeaux, can you see what's been called up

4  on your screen in front of you?

5  A.    I can.

6  Q.    Okay.  Do you recognize -- when it says here "the

7  Bayview," do you recognize that area?

8  A.    Correct.

9  Q.    Okay.  You mentioned that you started your search at the

10 Bayview.  Which direction did you direct the search from there?

11 A.    Do I draw on this thing?

12 Q.    You can.  There's actually a little stylus in front of you

13 you can use.

14 A.    Does it just work like this?  So from here out.

15 Q.    And, Chief Thibodeaux, why did you orient your search

16 going where we have here on the right side of the diagram away

17 from the -- Deer Point to the right?

18 A.    So knowing where Chris Tur lives, is if he was going to

19 leave that area and go towards his house, he would generally

20 take the path -- do you want me to draw the path?

21 Q.    Yes, sir.

22 A.    So he'd generally come across the street to this hill and

23 then there's a goat path that comes down -- down this ridge to

24 this street and then he would come across the field and you can

25 see the faint lines in here and make his way to the

1    neighborhood we all lived in.

2    Q.    You lived in the same neighborhood as Chris Tur?

3    A.    I did.

4    Q.    And who was involved in the search at this point?  Was it

5    just the police section?

6    A.    No.  So by this time it was all -- the security was there.

7    I don't know how much -- or recall how much of security was

8    there, but it was duty section and security at this point.

9    Q.    Were you searching on foot?

10   A.    We were -- well, I was in a -- in a Jeep and everybody

11   else was on foot, besides security.  Security had their patrol

12   cars.

13   Q.    Why didn't you go the other direction from Bayview?

14   A.    So I don't really know what I was thinking at the time,

15   but on this -- this side here is all cliffs and this side is

16   all cliffs.  And then it goes to mangroves, where -- this new

17   pen mark is all mangroves.  And this is all mangroves right

18   here.

19   Q.    Okay.

20   A.    So it was just we used logic that if -- if somebody was

21   drunk and stumbling home, we just -- that's the way we went.

22   Q.    Is that what you thought, Chris Tur was drunk and

23   stumbling home?

24   A.    That's what we thought.  So on -- on these ridges up here

25   where I drew are not exactly easy terrain if you get off the

1   trail.  It's all -- it's steep, sloping terrain on either side.

2   So if something would happen, if somebody were to stumble off,

3   that's where we figured.

4   Q.   We'll come back to the terrain in just one second.  Just

5   for the record, on Government's Exhibit 7 you drew I think a

6   line.  Just for the record, I believe it's on the north side of

7   Deer Point and said those were cliffs?

8   A.   Yes.

9   Q.   And I think around the tip and then the south side --

10  A.   Yes, sir.

11  Q.   -- continuing, those are mangroves?  Is that what you

12  said?

13  A.   Yes, sir.

14  Q.   For those of us not familiar, what's a mangrove?

15  A.   A mangrove is a -- a sharp tree, bush thing that grows in

16  low-lying tidal areas.

17  Q.   Is it pretty dense?

18  A.   It is.  It is really dense.  It -- it's really hard to see

19  it unless you get into it.

20  Q.   Animals tend to live in there?

21  A.   Animals tend to live in there.  There's a bunch of

22  barnacles on the bottom side of it.  It's fish -- it's a good

23  habitat for fish.

24  Q.   Do you fish a lot?

25  A.   I do fish a lot.

1    MR. NOTHSTEIN:  May we have Exhibit 290, Ms. Reid?

2    BY MR. NOTHSTEIN:

3    Q.    You mentioned the terrain around Guantanamo Bay, Chief

4    Thibodeaux.  Do you recognize what's in Government Exhibit 290?

5    A.    I don't know where we're at, but yes, that is the typical

6    terrain.

7    Q.    Where you talked about sort of being sloping and rough?

8    Is that what you're talking about?

9    A.    Right.  Yes, sir.

10   Q.    Does that present challenges in the search?

11   A.    It does because you really can't see in any -- these

12   bushes are dense bushes, so the only real way to see is to get

13   close to them and look underneath them.

14   MR. NOTHSTEIN:  Can we go back to Exhibit 7, please,

15   Ms. Reid?

16   BY MR. NOTHSTEIN:

17   Q.    Chief Thibodeaux, you said that you started the search

18   from the Bayview east because that just made the most sense.

19   If on the morning of September -- I'm sorry -- January 10 of

20   2015 you had been told that Chris Tur had been at the captain's

21   house at the tip of Deer Point at -- late in the evening, let's

22   say, after the Hail and Farewell, how would that have affected

23   how you conducted your search?

24   A.    So we probably would have started at the captain's house.

25   I would have let security know that, but -- so around it, like

1    I showed you, there's really -- not really a walking trail on

2    the north side of it.  All you can do is search by different

3    means, so I wouldn't have sent the duty section down there for

4    safety reasons.

5    Q.   I believe you mentioned at some point you were doing some

6    reporting up to a security officer at the Region?

7    A.   So whenever something happens on the island, we generally

8    make a voice call to Naval Region Southeast which is here in

9    Jacksonville.

10   Q.   And why are you making that reporting?  Why are you making

11   that voice call?

12   A.   Just so -- in case any other assistance is needed.

13   Because GTMO is so closed off, that we can get assistance from

14   somebody else, if we needed it.

15   Q.   Well, how soon in time after you got the report from

16   Captain Nettleton and began the search did you make that voice

17   call, that voice report?

18   A.   I don't recall.  I don't --

19   Q.   Do you think it was close in time or far in time?

20   A.   It was probably after we got the search going close in

21   time, because there was no definite that the person was

22   missing.  It was still early for -- in my terms anyway.

23   Q.   Well, at the time that you made the report, had Chris Tur

24   been found?

25   A.   No, it was a missing person.

1   Q.   So if you're just looking and he might show up later, why

2   even make a report?

3   A.   To make the Region know that something went on.

4   Q.   While you were searching -- I'm sorry.  Back up.

5        When did the search end on September -- or on

6   Saturday, January 10th?

7   A.   So the search ended toward the evening time when the

8   light -- the visibility was restricted.

9   Q.   And why call off the search at that time?

10  A.   So on those hills -- those plants you saw are all thorny

11  plants, so I -- I didn't -- for safety of the duty section, we

12  didn't want people falling off into the thing and having some

13  other mishap.

14  Q.   Moving to the next day, were you still serving as CDO the

15  next day?

16  A.   I was not.  So at 07 I turned over to the next CDO.

17  Q.   What did you do the rest of the day?

18  A.   I went home, changed, and went and helped search some

19  more.

20  Q.   And how much longer did you join the search?

21  A.   Until the search was called off.

22  Q.   And do you know why it was called off?

23  A.   They didn't really say.  They just said the search was

24  called off.

25            MR. NOTHSTEIN:  The Court's indulgence again.

1    (Counsel confer.)

2        MR. NOTHSTEIN:  Nothing further, Your Honor.

3                    **CROSS-EXAMINATION**

4    BY MR. LENAMON:

5    Q.   How you doing, sir?

6    A.   Good.  How are you?

7    Q.   Good.

8        So essentially as the command duty officer, once

9    every three weeks you take a 24-hour period and you're on call

10   and you have some other duties; is that right?

11   A.   Yes, sir.

12   Q.   Okay.  And you have kind of like binders and things to

13   look at about what to do and what calls to make under certain

14   situations; is that correct?

15   A.   We do.

16   Q.   Okay.  And when you conduct a search, you -- what's

17   important to you is you want to know the last -- the

18   information of the last place that a person has been so you can

19   kind of start your search from there, correct?

20   A.   Yes, sir.

21   Q.   And sometimes you get good information and sometimes you

22   get bad information; is that right?

23   A.   That's correct.

24   Q.   And you received information that the last place that

25   Chris Tur was was in the Bayview area --

1    A.    Yes, sir.

2    Q.    -- is that correct?

3          And that's the last place he was seen; is that right?

4    A.    I don't know if it was stated like that, but that's the

5    last place he was known to be.

6    Q.    Okay.  And, also, one of the things that you have

7    mentioned is that three is a delegation process in the

8    military --

9    A.    There is.

10   Q.    -- is that fair to say?

11         Captain Nettleton was the commander, and the XO was

12   below Captain Nettleton, and then you fall somewhere below that

13   as well?

14   A.    Yes, sir.

15   Q.    And so when you do things in the military, things come

16   down the chain, just like you have people below your chain,

17   you're giving those people things to do; is that right?

18   A.    Right.  Yes, sir.

19   Q.    Okay.  And one of the people who are responsible for

20   conducting the search is like the harbor watches, security

21   watch; is that right?

22   A.    Yes, sir.

23   Q.    They actually fill out a piece of paper where they -- they

24   keep track of what they're doing; is that right?

25   A.    I'm not aware of their protocols of exactly --

1  Q.   I want to show you a document and see that -- if that

2  refreshes your memory and it looks like something that you'd

3  recognize.

4       (Counsel confer.)

5  BY MR. LENAMON:

6  Q.   Just take a moment to kind of scan through that and see if

7  you recognize it or if you know what that is.

8  A.   Log entries.

9  Q.   Okay.  So you're familiar with that?

10  A.   Yes.

11  Q.   Okay.  And so at 1526, which is 3:26 p.m., what does the

12  entry tell you?

13           MR. NOTHSTEIN:  Objection, Your Honor.  This is

14  hearsay.  The witness is being asked if his recollection is

15  refreshed.  He's just asked if he knows what this is.

16           THE COURT:  I'm not sure what this document is that

17  you've shown him, so...

18  BY MR. LENAMON:

19  Q.   Could you tell us what that document is, sir?

20  A.   So it looks like an entry from a logbook.

21  Q.   Okay.  And logbook from what?

22  A.   It doesn't -- I don't know what this logbook is.

23  Q.   Okay.  And what does it reference in that -- in those

24  entries?

25  A.   It reference --

1   Q.   Without saying -- specifically reading them, does it

2   reference --

3   A.   It reference --

4   Q.   -- items from the search the day of the search on the

5   10th?

6   A.   It does.  It does.

7   Q.   Okay.

8   A.   It's what the harbor people did.

9   Q.   Okay.  And would that be something in your -- in your

10  course of duties that you would be told about?

11  A.   The things that are happening on this sheet?

12  Q.   Yes.

13  A.   No.  No, I wouldn't.

14  Q.   So if they're doing security sweeps and things like that

15  from certain locations, who would know about those things?

16  Where would that go?

17  A.   The -- the security officer would know or -- during

18  this -- this instance, I would say the security officer or the

19  desk officer.

20  Q.   Okay.  And the security officer was Tidd?

21  A.   Yes, sir.

22  Q.   Okay.  So he probably should know?

23  A.   He probably should know.

24  Q.   Okay.  So you began searching various areas, and I think

25  the government showed you a map and you indicated that you

1  began searching kind of in a direction away from Captain

2  Nettleton's house; is that right?

3  A.    I did.

4  Q.    Okay.  Now, at some point after Captain Nettleton leaves

5  the island, NCIS begins interviewing various people, including

6  you, about your duties on that particular day and days; is that

7  right?

8  A.    Yes, sir.

9  Q.    Okay.  Do you recognize this gentleman as someone who was

10  involved in any of those interviews?

11  A.    I don't, no.

12  Q.    Okay.  But you do recognize the prosecutors, right?

13  A.    Yes, because I've talked to them a couple of times.

14  Q.    Okay.  And, as a matter of fact, you talked to them on

15  December 8th, 2016, before you testified before the grand jury.

16        Do you remember that?

17  A.    Around that time, yes, sir.

18  Q.    And they talked to you?

19  A.    No, not December 8th.

20  Q.    December 8th, 2016?

21  A.    Oh, ooh.  I have no idea with that, yeah.

22  Q.    Okay.  Would your testimony refresh your recollection?

23  A.    That was before the grand jury testimony?

24  Q.    No.  This was the grand jury testimony.

25  A.    Okay.  Yes.

1  Q.   It would have been December 8th.

2  A.   Okay.

3  Q.   Is that fair to say?

4  A.   It's fair to say.

5  Q.   Okay.  So before you testified before the grand jury, you

6  met with this gentleman here, right?  He's the prosecutor, he's

7  one of the guys?

8  A.   Okay.

9  Q.   And he told you he wanted you to tell the truth, right?

10  A.   Correct.

11  Q.   The truth was important to him, he needed to know what the

12  truth was so he can make the decisions about certain things; is

13  that right?

14  A.   Yes.

15  Q.   Okay.  And, as a matter of fact, at some point in your

16  testimony, he asked you a question, "Had you known that

17  Christopher Tur had been at Captain Nettleton's house" --

18         MR. NOTHSTEIN:  Objection, Your Honor.  It's hearsay.

19  There's no prior inconsistent statement.

20         THE COURT:  I don't know what the answer is going to

21  be.  What's the -- what's the basis for the inquiry?

22         MR. LENAMON:  I'll make it simple, Judge.

23  BY MR. LENAMON:

24  Q.   Didn't you tell this man in front of the grand jury that

25  it was your belief that security was searching the area of

1    Captain Nettleton's house?

2          MR. NOTHSTEIN:  Objection, Your Honor.

3    BY MR. LENAMON:

4    Q.    Isn't that what you told this man?

5          MR. NOTHSTEIN:  Your Honor, hearsay.  The witness did

6    not say anything inconsistent.

7          THE COURT:  No, I'm going to -- I'll overrule it.

8    I'll allow him to answer it.

9          MR. LENAMON:  Judge, can I put this up, page 17 of

10   the grand jury testimony?

11         THE COURT:  No.  Why don't you just -- he hasn't

12   answered the question yet.

13   BY MR. LENAMON:

14   Q.    Isn't that what you said?

15   A.    I don't recall, but...

16   Q.    Okay.  Would anything help refresh your recollection?

17   A.    If you let me see that paper.

18   Q.    Absolutely.

19         MR. LENAMON:  Page 17, Counselor.

20   BY MR. LENAMON:

21   Q.    I have it underlined.

22   A.    Yeah.  It says, "I think security was searching the area

23   at that time."

24   Q.    Okay.  Go up above the next four sentences and read

25   those -- or four or five lines and read those so the jury can

1    understand the context what this prosecutor knows at that

2    moment that you're telling him.

3            MR. NOTHSTEIN:  Objection, Your Honor.

4            THE COURT:  I'm going to sustain the objection.  You

5    need to ask the questions in the way that they're supposed to

6    be asked, and we're not going to personalize it.

7            So if you have a question, ask it.  What's your

8    question?

9    BY MR. LENAMON:

10   Q.   Were you responding to his inquiry about not being able to

11   check Captain Nettleton's residence?

12   A.   I'm not -- I'm not sure I'm understanding your question.

13   Q.   Give me back the page.  I'm going to take it step by step.

14           Did he ask you a question, "Had you known that

15   Christopher Tur had been at Captain Nettleton's house the

16   previous evening before he went missing, what would you have

17   done?"

18           And you answered him, right?

19   A.   Right.

20   Q.   And your answer was, "I would have -- I would have had

21   maybe the boats go around there, but it's really dense around

22   there.  You can't send people to really search in that area."

23           That was your first answer, right?

24   A.   Yes.

25   Q.   And then he asked you a second question.  "I understand

1    that, but you would have then searched the area by Captain

2    Nettleton's house?"

3           And your answer was, "Yeah, but I think security was

4    searching that area at the time, so, dot dot," and he

5    interrupted you and said, "Okay," so he changed the subject.

6           Do you remember that?

7           MR. NOTHSTEIN:  Objection, Your Honor.

8           THE COURT:  Sustained.

9    BY MR. LENAMON:

10   Q.   Did you answer "Yeah, but I think security was searching

11   the area at that time"?

12          MR. NOTHSTEIN:  Objection.  Asked and answered.

13          THE COURT:  I'll let him answer it and then we'll be

14   done with it.

15          THE WITNESS:  Yes.

16          MR. LENAMON:  I have nothing further.

17          THE COURT:  Any redirect?

18          MR. NOTHSTEIN:  The Court's indulgence.

19      (Counsel confer.)

20          MR. NOTHSTEIN:  No questions, Your Honor.

21          THE COURT:  All right.  Thank you, sir.  You may step

22   down.

23          THE WITNESS:  Thank you.

24      (Witness excused.)

25          THE COURT:  Who is the government's next witness?

1          MR. GEE:  The government calls Mr. Bohyer.

2          THE COURT:  All right.

3          MR. GEE:  And, Your Honor, we have a stipulation to

4     read as well.

5          THE COURT:  Okay.  Which stipulation?

6          MR. GEE:  It's Government's Exhibit 1.

7          THE COURT:  Okay.

8        (Mr. Bohyer enters the courtroom.)

9          THE COURT:  Let me -- do you want to do it now?

10         MR. GEE:  That's fine, Your Honor.

11         THE COURT:  Okay.  So, ladies and gentlemen,

12    sometimes in a case rather than having to call a witness or to

13    show things like chain of custody or other things that have to

14    be proven in a case or could be offered as proof in a case,

15    the -- the lawyers for the parties will enter into what's

16    called a stipulation.  A stipulation is just a fancy name for

17    an agreement.

18         And what that means is that what is read to you as

19    the stipulation, you should consider that as evidence in the

20    case just like if the person was on the stand talking about it

21    or just like you had the piece of paper in your hand.

22         And there won't be any evidence to the contrary.  So

23    this is evidence that you can consider in the case as having

24    been put before you as part of the evidence.

25         And these stipulations are exhibits, so you'll

1  actually have them back in the jury room with you.  Okay?  And

2  there may be a series of them over the case, but this is the

3  first one.

4        Government -- Defendant's -- I'm sorry -- it -- it's

5  marked Defendant's Exhibit 1.  Is that supposed to be

6  Government's 1 or is it -- how is it -- how is it marked?

7        MR. GEE:  We all have it marked as Government's

8  Exhibit, Your Honor.

9        THE COURT:  All right.  This is just a -- we'll fix

10  ours.  So Government's Exhibit 1.

11     (Government's Exhibit 1 received into evidence.)

12        THE COURT:  And so Mr. Gee is going to read this to

13  you, and you should consider this as having been proven in the

14  case.

15        Go ahead, sir.

16        MR. GEE:  Thank you, Your Honor.

17        "Counsel for the government, counsel for the defense,

18  and the defendant, hereby" and stipulate -- "hereby agree and

19  stipulate to the following:  On or about Sunday, January 11th,

20  2015, at approximately 11 a.m., U.S. Coast Guard personnel

21  stationed at Naval Station Guantanamo Bay, GTMO, were in a

22  Coast Guard vessel participating in the search for Christopher

23  Tur when they observed a human body floating in the waters of

24  Guantanamo Bay off the coast of the leeward side of GTMO; i.e.,

25  side" -- "i.e., the side of GTMO where its airfield is located,

1    and drifting westwards near the territorial water border with

2    Cuba.

3         "The Coast Guard personnel retrieved the body from

4    the water and it was later positively identified to be the

5    deceased body of Christopher Tur.

6         "Government's Exhibit 9, which the parties agree

7    should be admitted in evidence, is an overhead map of GTMO and

8    the surrounding waters, with a marker on it that illustrates

9    the approximate location of where Mr. Tur's body was located.

10         "After Mr. Tur's body was recovered, it was brought

11    back to GTMO and transported to GTMO's hospital, where it was

12    searched by Naval Criminal Investigative Service and GTMO

13    security department personnel, and then kept secure until an

14    autopsy was performed on it by Dr. Christopher J. Gordon on or

15    about January 13, 2015.

16         "During the search of Mr. Tur's body, his keys and

17    wallet were recovered, but his cellular telephone was not

18    located."

19         THE COURT:  All right.  So that's the stipulation.

20    You should consider that to be evidence in the case as if you

21    heard it from the stand or in a document.  Okay?

22         MR. GEE:  And, Your Honor, may we publish the exhibit

23    that the stipulation agreed to briefly, Exhibit 9?

24         THE COURT:  Sure.  That's fine.

25         MR. GEE:  Can I have 9, please?

1          THE COURT:  So Government's Exhibit 9 was referenced

2    in the stipulation, and that's it right there.

3          MR. GEE:  Thank you, Your Honor.

4          THE COURT:  And, again, you'll have these exhibits

5    back with you.  Okay?

6          All right.  Is the government ready for the witness?

7          MR. GEE:  We are, Your Honor.

8          THE COURT:  All right.  Come forward, sir, please.

9    Right over here.

10         COURTROOM DEPUTY:  Do you solemnly swear that the

11   testimony you are about to give before this Court will be the

12   truth, the whole truth, and nothing but the truth, so help you

13   God?

14         THE WITNESS:  I do.

15         COURTROOM DEPUTY:  Please state your full name for

16   the record and spell your last name as well.

17         THE WITNESS:  Eric Michael Bohyer, B-o-h-y-e-r.

18         COURTROOM DEPUTY:  Thank you.  Please be seated, sir.

19         THE WITNESS:  Yep.

20      **ERIC MICHAEL BOHYER, GOVERNMENT'S WITNESS, SWORN**

21                      **DIRECT EXAMINATION**

22   BY MR. GEE:

23   Q.   Good afternoon, Mr. Bohyer.

24   A.   Good afternoon.

25   Q.   Can you tell us -- tell us where you work presently?

1    A.    I work for Johnny Appleseed Metro Parks in Ohio.

2    Q.    What is it you do there in Ohio?

3    A.    I'm a park foreman.  We maintain 14 different parks

4    throughout our county.

5    Q.    And before being a park foreman there in Ohio, what was

6    your career?

7    A.    U.S. Navy, 20 years.

8    Q.    What was your final rank in the Navy?

9    A.    Petty Officer First Class.

10   Q.    Okay.  And were you ever assigned to the naval station in

11   Guantanamo Bay?

12   A.    Yes, sir.

13   Q.    Approximately when were you assigned to GTMO?

14   A.    February 28th of 2014 I arrived.

15   Q.    And when did you leave?

16   A.    I retired out of Guantanamo, so you have to transfer back

17   to Florida to retire.  I left the island October of '16.

18   Q.    And what was your assignment -- what department were you

19   part of at GTMO?

20   A.    Initially when I got there I was the security watch

21   commander in charge of anywhere from 25 to 35 more junior

22   sailors.  We were in a duty section, so we had our 12-hour

23   shifts, and I was in charge of the safety and security on that

24   at GTMO for the security department.

25   Q.    And, Mr. Bohyer, I'm just going to ask you to speak up a

1    little bit so all of us can hear you, too.

2    A.    Oh, sorry.  That's usually not a problem for me.

3    Q.    You're doing fine.

4          And the security watch commander, that falls under

5    what part of GTMO?

6    A.    As the security watch commander, you're in charge of the

7    safety and security of the entire installation with the

8    exception of the detainee side, which Army handles that.

9    Q.    You said your initial position there was watch commander.

10   Did you eventually have a different position there?

11   A.    Yes, sir.  Later on, after being a watch commander, they

12   sent myself and my partner, MA-1 Vaughan, to MPI school,

13   Military Police Investigator school at Fort Leonard Wood,

14   Missouri for a couple of months.

15         We obtained that schooling and certification.  And

16   then we returned back to Guantanamo Bay and assumed -- shortly

17   after, assumed the responsibilities, myself and him, as a

18   military police investigator for NAS Bay -- Guantanamo Bay.

19   Q.    And as military police investigators, what -- what part of

20   the base do you work for?  What's the department?

21   A.    We still worked at the security department and we handled

22   everything pretty much non-traffic related, lesser crimes than

23   NCIS would handle.  More serious crimes were turned over to

24   NCIS.  But we handled everything pretty much non-traffic

25   related, anywhere from larcenies, assaults, et cetera.

1    Q.    And you mentioned something called NCIS.  What's that?

2    A.    That's the Naval Criminal Investigative Service.

3    Q.    You said something about they do more serious crimes.  Who

4    are "they"?

5    A.    Yeah.  We worked -- we had a relationship with NCIS as a

6    security department as a whole, but MPI, we would go to NCIS

7    quite often and -- and consult with them for questions or

8    information they wanted about someone or some case we were

9    working on.  But they would normally, you know, assume

10    something if it was more of a serious crime, i.e., example

11    would be like a felony or a misdemeanor would be the

12    difference, mainly.

13    Q.    And as an MPI or as a -- as the guys that you oversaw even

14    when you were watch commander in the security department, you

15    talk about how NCIS oversees more serious crimes.  But if

16    you-all in the security department come across, say, one of

17    those more serious crimes occurring, can you still have the

18    power to arrest for those most serious crimes?

19    A.    Yes, sir, we do.  For example, if there was -- happened to

20    be a sexual assault, the first people who's going to be called

21    for something like that would be a security watch commander.

22    They would call our dispatch just like the civilian-side

23    police.  We would respond, take care of the scene, apprehend if

24    we needed to, but we also made a notification right away to

25    NCIS.  And then once they got there, they would assume the

1  case.

2  Q.    And you talked about how NCIS handles more serious crimes.

3  What about even low-level crimes that are committed by senior

4  officers?  Who investigates those?  So, I don't know, an

5  admiral gets caught shoplifting at the NEX, are you going to be

6  investigating that or NCIS?

7  A.    NCIS most likely, yes, sir.

8  Q.    Now, while you lived there on Guantanamo Bay, did you get

9  to know a person named Christopher Tur?

10 A.    I knew of Chris obviously because of my job and just the

11 security department him being the loss prevention manager for

12 the Navy Exchange.  The security department and MPI where I

13 worked, we would respond to larcenies quite often over there

14 for thefts.  And loss prevention obviously would give us the

15 camera footage if they did not catch the suspect or whatnot,

16 and we would take it from there and follow up with that.

17 Q.    Did you have any kind of social relationship with him or

18 any members of his family?

19 A.    No, sir, I did not.

20 Q.    Who was the commanding officer at Guantanamo Bay at the

21 time you were there?

22 A.    Captain Nettleton.

23 Q.    Do you see him here in the courtroom here today?

24 A.    I do, sir.

25 Q.    Can you point him out by where he's sitting and what he's

1    wearing?

2    A.    To my right.

3          MR. GEE:  Can the record reflect an in-court

4    identification?

5          THE COURT:  Yes, sir.

6    BY MR. GEE:

7    Q.    What was your profession -- did you have a professional

8    relationship with the defendant?

9    A.    He was my commanding officer, so I spoke with him briefly

10   from time to time, but usually in the military you use your

11   chain of command, so I would always mainly talk to my security

12   officer, and the security officer was in the same building as

13   the captain, so everything would pretty much get relayed

14   through the chain of command down to me.

15   Q.    What kind of social interactions, if any, would you have

16   with the defendant?

17   A.    Being NAVSTA, in the small -- as small as it is, just off

18   duty, saying hi, passing him, saluting him, et cetera.

19   Q.    Directing your attention to about January 2015, did you

20   attend a Hail and Farewell party -- excuse me -- a Hail and

21   Farewell party on January 9th, 2015?

22   A.    No, sir.

23   Q.    Any recollection of what you may have done that evening?

24   A.    Friday night I was probably at home with the family most

25   likely.

1    Q.    Directing your attention to Saturday, January 10th, what

2    happened with -- for you at work that day, if anything?

3    A.    I was actually -- usually, unless I get called on the

4    weekends, I was off Saturday and Sunday.  Usually I had to go

5    in and get called.

6              But on January 10th, at approximately 1600,

7    4 o'clock p.m., I received a phone call from the security watch

8    commander, who was our duty section -- and that's what I did

9    prior to being MPI -- and got a call from him stating there was

10   a missing persons.  And he identified him as a Christopher Tur.

11   Q.    And after receiving this information from the watch

12   commander, did you do anything as part of a -- to -- did you do

13   anything to try to determine where Mr. Tur might be?

14   A.    Yes, myself and my partner, MA-1 Vaughan at the time, once

15   we found out information of where they lived, his residence,

16   myself and Chris proceeded to his residence to speak with the

17   wife and obtained a -- a voluntary statement from her.

18   Q.    And -- and, Mr. Bohyer, at this point, we're talking about

19   to help search for Mr. Tur.  Is there any kind of investigation

20   going on as well?

21   A.    At the same time the watch commander, he's going to be

22   making his notifications and recalling personnel and starting a

23   search party.  So our patrolmen, just like in the civilian

24   side, we have police cars, we have other patrolmen out in the

25   road, and they're actively looking for a missing person.

1  Q.   And does the -- the military police investigator involved

2  in all this that day, did you speak to anyone from NCIS?

3  A.   I did after speaking with Lara, Chris's wife at the house,

4  I made a phone call to the on-duty NCIS agent, Mr. Bulnes, and

5  let him know we had a missing person at which time he told me

6  to keep him informed of that.

7  Q.   And at this point did you have any reason to believe that

8  there was the kind of major crime yet that involved NCIS

9  involvement?

10 A.   No.  At this point we just have a -- a missing person

11 which, you know, you don't -- you don't know if they're just at

12 a buddy's house or whatnot, so...

13 Q.   And, Mr. Bohyer, that day, were you -- did you, yourself,

14 help like look around for Mr. Tur in any way?

15 A.   Yes.  We -- myself and Chris were actively involved in --

16 in walking and looking on beaches and around buildings and

17 trails.  There's several trails and hills around the base, and

18 there's lots of cliffs, there's -- I mean, anywhere anybody

19 could fall and get hurt and be laying.

20       THE COURT:  I apologize, sir.  You said Chris, and

21 I'm not sure who you're talking about.

22       THE WITNESS:  Oh, Christopher Tur, sir.

23 BY MR. GEE:

24 Q.   But I believe you mentioned a couple of times that your

25 partner's name was what, sir?

1  A.   Oh, oh, yes, sir.  I'm talking about my partner, Chris

2  Vaughan.  Sorry.  I got that confused.

3        THE COURT:  Okay.  So when you say, "Myself and Chris

4  were actively involved in walking around," you're talking about

5  your partner.  And what was his name?

6        THE WITNESS:  Chris Vaughan.

7        THE COURT:  Okay.  Sorry.  We had two Chrises, so it

8  was a little confusing.

9  BY MR. GEE:

10  Q.   We'll call him your partner Mr. Vaughan.

11  A.   I'll just stick with partner, Mr. Vaughan, yes, sir.

12        MR. GEE:  And call up Exhibit 7, Ms. Reid.

13  BY MR. GEE:

14  Q.   Taking a look at Exhibit 7, do you recognize this area,

15  Mr. Bohyer?

16  A.   Yes, sir.

17  Q.   What is this area?

18  A.   The Bayview with the green arrow is the last known place

19  of Christopher Tur.  That was where he was last seen.  The

20  arrow out on the point, that would be Captain Nettleton's home.

21  Q.   And, Mr. Bohyer, does this reflect some of the areas that

22  you searched that day?

23  A.   The incident command post, the watch commander was set up

24  adjacent to the Bayview, but initially the search was not, you

25  know, initially right in that area down by the captain's house.

1  They set up the incident command post by the Bayview.  That's

2  standard procedure.  Because that would be the last place he

3  was seen at.

4  Q.   And where did you search that day, you yourself?

5  A.   We were throughout the -- the entire base looking through

6  the hills, trails, beaches.  We have several beaches on the

7  base.  Kind of everywhere.

8           MR. GEE:  You can take that down.

9  BY MR. GEE:

10  Q.   Were you involved in the investigation and search for Mr.

11  Tur again on Sunday?

12  A.   I was, yes, sir.

13  Q.   And what happened with respect to you and your partner on

14  Sunday?

15  A.   On Sunday myself and my partner, Vaughan, in the morning

16  went back to Chris Tur's house, spoke with his wife, Lara,

17  seeing if there was any updates, if she's heard from him,

18  whatnot.  There was no new updates.

19           At that point, myself and my partner, Chris, my

20  partner, Vaughan, headed to the BCO, base communications

21  office.

22  Q.   And did you eventually learn that morning that something

23  had been discovered?

24  A.   On --

25  Q.   Yes, sir.

1  A.   Yes.

2  Q.   What did you learn?

3  A.   Eleven -- I think it was 11 o'clock we got a notification

4  over the radio that the Coast Guard found a body on the

5  southern boundary.

6  Q.   And what did you do in response to that?

7  A.   Myself and Chris left the -- my partner, Vaughan, left the

8  BCO and proceeded down to the security building, which is where

9  our harbor security boats pull in at.

10       NCIS Special Agent Bisesi was -- arrived, along with

11  our security officer, Lieutenant Tidd.  We then proceeded to go

12  out and meet the Coast Guard boat and -- in the security boat,

13  and we went out to where the body was located.

14  Q.   And did you observe the body?

15  A.   I did, sir, yes.

16  Q.   You said that you had worked with Chris Tur?

17  A.   I knew who he was, yes, sir.

18  Q.   Were you able to recognize the body of Mr. Tur initially?

19  A.   Initially, no, sir.

20  Q.   How did you ultimately identify Mr. Tur?

21  A.   His identification in his back pocket.

22  Q.   What happened next with you and the body?

23  A.   Myself and Lieutenant Tidd and the -- Special Agent Bisesi

24  went from the security boat over to the Coast Guard boat, at

25  which time they already had Chris Tur inside the boat due to

1  obviously being close to Cuban waters.  We -- myself and

2  Lieutenant Tidd obviously identified him by his ID in his back

3  pocket, at which time we carefully placed him -- his body in

4  the body bag.

5  Q.   And what did you do next?

6  A.   We proceeded back to the base.

7  Q.   And what did you do next?

8  A.   We met with the ambulance at the pier and transferred

9  Christopher's body up to the ambulance.

10  Q.   And where did you go next?

11  A.   At that point we went to the naval hospital morgue

12  adjacent to the hospital, along with NCIS agents, to take

13  photographs and to retrieve any belongings out of Chris's

14  pockets.

15  Q.   Did you observe the body at the morgue?

16  A.   I did, sir.  Yes.

17  Q.   In general, what was the condition?

18         MR. LENAMON:  Objection.  Irrelevant.

19         THE COURT:  Mr. Gee, relevance?

20         MR. GEE:  It's relevant because of the delay, Your

21  Honor.

22         THE COURT:  I'll allow it.

23  BY MR. GEE:

24  Q.   In general, what was the condition of the body?

25  A.   His head was very swollen, purple, black and blue, lots of

1    blood coming out of the nose and mouth.  All clothing was on

2    him, shoes.  But due to -- all the blood in his head, it was

3    hard to recognize him.

4    Q.    After the visit to the morgue, was there other evidence

5    you were involved in recovering that day?

6    A.    Yes, sir.

7    Q.    Tell us how that happened.

8    A.    Myself and my partner, Vaughan, met with NCIS agents down

9    by Captain Nettleton's house to the boat ramp.  We retrieved a

10    white bloody paper towel.

11    Q.    How did you know to go there?

12    A.    We were notified by security patrolmen prior that they

13    found a bloody rag down by the water at the CO's house.  At

14    which time they held the perimeter down there on it and did not

15    touch it until agents and stuff arrived.

16    Q.    And when you got there, were folks still guarding the

17    towel?

18    A.    Yes, sir.

19    Q.    Okay.  What happened as you -- as -- were you there as the

20    towel was recovered?

21    A.    Yes, sir.

22    Q.    All right.  I'm going to show you what's been marked as --

23    excuse me, what has been admitted as Government's Exhibit 97.

24          Do you recognize that photograph?

25    A.    Yes, sir.  That's the stairway from the captain's house

1  down to his boat landing. And the towel is off to the side of

2  the railing.

3  Q.  So there's a little stylus there next to you. It's a

4  little hard to see. Can you indicate the towel? There's a

5  little pen next to you you can use to write on the screen,

6  Mr. Bohyer.

7  A.  Oh, sorry.

8  Q.  That's fine.

9  A.  I'll just circle it now. Okay. Right there is the towel.

10 Q.  And if you were walking down the defendant's dock, is this

11 on the left or the right of his dock?

12 A.  Right side.

13 Q.  And I'm going to show you Government's Exhibit 98. What's

14 this a photograph of?

15 A.  Of the towel we're talking about, the bloody towel.

16 Q.  And just to orient ourselves, I'll show you a photograph,

17 Exhibit 221. Can we see here an orientation approximately

18 where the towel was in this photograph?

19 A.  This is the boat ramp going down. Exactly where the towel

20 was, I do not recall on -- the exact location.

21 Q.  Okay. Would it be on the left- or the right-hand side of

22 this dock?

23 A.  The right.

24 Q.  Was the paper towel recovered?

25 A.  It was, sir.

1    Q.   Did you observe the defendant at any point while you were

2    in this area?

3    A.   I did, sir.

4    Q.   What point did he show up, that you recall?

5    A.   NCIS agents already had the towel.  We had the towel up on

6    the road adjacent to the ramp, at which time my partner,

7    Vaughan, and NCIS agents were conducting a blood test on it,

8    just to see if it's actually blood.  And at some point

9    Captain Nettleton then came out of his house.

10   Q.   Did the defendant say anything?

11   A.   Yeah.  He was asking what we found.

12   Q.   Was he told?

13   A.   Yes.

14   Q.   And what was his response?

15   A.   "That's probably nothing."

16   Q.   What was your reaction to him saying that?

17   A.   I thought it was odd.

18   Q.   Why is that?

19   A.   Just because there's someone dead --

20            MR. LENAMON:  Objection.  Speculation.

21            THE COURT:  Yeah.  I'm not sure what the -- what this

22   goes toward, Mr. Gee.  I think he's given the answer.  I think

23   I'm -- let's leave it at that.

24   BY MR. GEE:

25   Q.   Did --

1          THE COURT:  I mean, if you have another question in

2   this area, I'll entertain it, but I just -- go ahead.

3   BY MR. GEE:

4   Q.   Did the defendant's answer of "It's probably nothing," did

5   that stick in your mind, Mr. Bohyer?

6   A.   It did, sir.

7   Q.   Why did it stick in your mind?

8          MR. LENAMON:  Objection.  Relevance.

9          THE COURT:  I'll allow it.

10          THE WITNESS:  Just -- just seemed odd to me.  There's

11   someone dead onboard the captain's installation and, you know,

12   he's responsible for the installation, and I don't know why you

13   would --

14          MR. LENAMON:  Objection, Judge.

15          THE COURT:  Yeah.  I think we're done with that.

16          Let's do something else.

17          MR. GEE:  The Court's indulgence.

18          Nothing further.  Thank you.

19          THE COURT:  Let me see counsel at sidebar a second,

20   please.

21      (Sidebar conference:)

22          THE COURT:  So, Mr. Lenamon, are you -- are you going

23   to do the cross-examination?

24          MR. LENAMON:  Yes.

25          THE COURT:  Okay.  So I don't want -- I have no

1    desire to embarrass you in front of your client or in front of

2    everybody else here or in front of the jury, but I need -- I

3    need you to -- you can certainly conduct a vigorous

4    cross-examination, but I need you to do so professionally.  I

5    need you not to refer to people as this person or that person.

6    I need you to follow the rules of evidence.  So will you do

7    that for me, please, sir?

8              MR. LENAMON:  Yes, sir.

9              THE COURT:  All right.  Thank you.

10                        **CROSS-EXAMINATION**

11   BY MR. LENAMON:

12   Q.    Good afternoon, sir.

13   A.    Good afternoon.

14   Q.    How are you?

15   A.    Good.

16   Q.    So if I understand correctly, sir, essentially in the

17   realm of law enforcement, you had been like a police officer, a

18   uniformed police officer, and NCIS would have been like the

19   detectives.  Is that pretty fair to say?

20   A.    We were still detectives.  It's just they handle more

21   serious crimes.  NCIS can reach out to people off of the

22   island.  But me as being a military investigator, I can only

23   reach out to personnel on the island.

24   Q.    And certainly flashing ahead to when this paper towel was

25   found, NCIS was present during that part of the investigation.

1    Is that fair to say?

2    A.   Yes, sir.

3    Q.   And you are trained on how to question people, obviously,

4    because you're like a law enforcement officer, right?

5    A.   Yes, sir.

6    Q.   And so it's your job to recover information the best way

7    you know how; is that right?

8    A.   Yes, sir.

9    Q.   And many times you have an opinion about what things

10   have -- had occurred and that influences the way you question

11   someone.  Would that be a fair statement?

12   A.   Can you repeat that?

13   Q.   You have an opinion on how things may have occurred --

14   A.   Uh-huh (affirmative).

15   Q.   -- and you take that, obviously, information, and that may

16   influence you on how you question someone.  Is that fair to

17   say?

18   A.   Fair to say.

19   Q.   Okay.  And you, obviously, were told something about what

20   had occurred at the Hail and Farewell on the night of the 10th.

21   Would that be fair to say?

22   A.   At that point I just know that we had a missing person.

23   Q.   So is it your testimony that either through rumor or

24   otherwise, through one of your other fellow officers, no one

25   had told you what had occurred on the 10th at the Hail and

1    Farewell?

2    A.   You mean on the 9th?

3    Q.   The 9th.  I'm sorry.  You're correct.  Yes, sir.

4    A.   No.

5    Q.   Okay.  So when you went and questioned Lara Tur, did you

6    get to a point where she was frustrated with the way you were

7    treating her?

8            Do you remember that?

9            MR. GEE:  Objection.

10           THE COURT:  Overruled.

11           THE WITNESS:  No, sir.

12   BY MR. LENAMON:

13   Q.   So it's your testimony that you never mistreated Ms. Tur?

14   Is that your testimony?

15   A.   I never mistreated Ms. Tur.

16   Q.   But you did question her that morning?

17   A.   Myself and my partner did take a voluntary statement from

18   her, yes, sir.

19   Q.   Okay.  Now, you said that you have many duties, and one of

20   the duties that you have is to check -- you're a camera checker

21   on the base; is that right?

22   A.   No, I'm not a camera checker, sir.

23   Q.   So you never checked any cameras?

24   A.   I did not, sir.

25   Q.   Okay.

1  A.   Unless I had a known reason to go check a camera, I'm not

2  going to check a camera.

3  Q.   Uh-huh (affirmative).  Okay.

4         Now, you would agree with me that the information

5  about what had happened, the statement that you heard, or

6  claimed to have heard Mr. Nettleton -- Captain Nettleton make

7  on the dock, you did not memorialize that information in any of

8  your reports.

9         Is that fair to say?

10        You didn't create a report and generate that; is that

11 right?

12 A.   No.

13 Q.   As a matter of fact, the first time that that came up in a

14 conversation you had was with NCIS; isn't that right?

15 A.   To be honest, I don't recall, sir.

16 Q.   In October of 2016; isn't that right?

17 A.   I don't want to say for sure, because --

18 Q.   And, as a matter of fact, you knew, because you told them

19 that, "I don't think anybody else heard what I heard"; isn't

20 that right?

21 A.   It's a possibility, sir.  But I don't want to give you any

22 information I don't know 100 percent.

23 Q.   So did you tell them or not that, "I don't know who else

24 heard it"?

25 A.   I don't recall.

1  Q.   Okay.  Did you say that in the grand jury?

2  A.   I don't recall that, sir.

3  Q.   Okay.  Would anything refresh your recollection?  Your

4  grand jury testimony?

5  A.   Yeah.  If it was on there.

6  Q.   I'm showing you page 18.  It's within this line here.  You

7  can read the entire paragraph and just let me know when you

8  finish reading it.

9        THE COURT:  Just read it to yourself, sir.

10       THE WITNESS:  Yes, sir.

11       I see it in there, sir.

12  BY MR. LENAMON:

13  Q.   Okay.  And isn't it true that you said, "So and that's the

14  kind of thing that struck me, and I don't know who else heard

15  it, but that was one of those things that after two years it

16  kind of sticks with you and you remember that"?

17  A.   Yes, sir.

18  Q.   Is that your testimony?

19  A.   Yes, sir.

20  Q.   So two years later when NCIS comes to you and starts

21  asking you questions, that's the first time you're telling them

22  about that statement; isn't that true?

23  A.   Yes, sir.

24  Q.   Isn't it true that there was a lot of people there when

25  this was going on?

1    A.    There was a few people there, yes, sir.

2    Q.    There was Agent Bisesi, who is an NCIS agent.  She was

3    there, right?

4    A.    Yes, sir.

5    Q.    Agent Gamble, NCIS agent?

6    A.    Yes, sir.

7    Q.    Lieutenant Tidd?

8    A.    I don't recall if Lieutenant Tidd was there or not.

9    Q.    Okay.  Well, isn't it true that Lieutenant Tidd mentioned

10   that because of the coloration of the blood, that he doubted --

11            MR. GEE:  Objection.

12            THE COURT:  I haven't heard the question yet.

13   BY MR. LENAMON:

14   Q.    Isn't it true that you heard Tidd say that because of the

15   coloration of the blood, that he doubted it was blood?

16            Do you remember that comment?

17   A.    I don't recall, sir.  Sorry.

18   Q.    Do you remember any of the other conversations that was

19   going on between the parties?

20   A.    No, sir.

21   Q.    And you weren't taking down notes, you didn't write any

22   notes, you didn't do anything to memorialize this information;

23   is that right?

24   A.    Yes, sir.

25   Q.    And you said that there was a presumptive blood test done

1  right there and then, right?

2  A.  Yes, sir.

3  Q.  So I imagine if Captain Nettleton is coming down from his

4  house and he sees a whole bunch of agents and there's testing

5  going on, someone certainly is explaining to Captain Nettleton,

6  "Hey, we're going to do a presumptive test of the blood."

7       Do you remember that?

8       MR. GEE:  Objection.  Objection.

9       THE COURT:  Overruled.

10      THE WITNESS:  I don't know if anybody notified

11  Captain Nettleton of the blood test or not, sir, I'll be honest

12  with you.

13  BY MR. LENAMON:

14  Q.  Isn't it true that you're mistaken and you heard --

15  someone else said that, and Captain Nettleton actually said,

16  "Looks like blood to me"; isn't that true?

17  A.  I know what I heard, sir, yes.

18  Q.  And you had to know what you heard because you went in

19  front of a grand jury under the direction of NCIS and the

20  prosecutor, and gave sworn testimony; isn't that right?

21  A.  Yes.

22  Q.  Okay.  You were flown to Jacksonville to do that; is that

23  right?

24  A.  Yes, sir.

25      MR. LENAMON:  I have nothing further, Judge.

1    THE COURT:  Redirect?

2    MR. GEE:  Thank you, Your Honor.

3                    **REDIRECT EXAMINATION**

4    BY MR. GEE:

5    Q.   Mr. Bohyer, there were some questions asked about reports.

6    By the time that you were down there on the dock recovering the

7    paper towel --

8    A.   Yes.

9    Q.   -- had you already been out recovering Mr. Tur's body?

10   A.   Yes.  We already recovered Mr. Tur's body at that point.

11   Q.   And you mentioned that you were down at the dock.  There

12   was someone named Special Agent Bisesi with you.  Who is that?

13   A.   She's an NCIS agent.

14   Q.   And by the time you were down there recovering a paper

15   towel after a body has been found, whose investigation is it

16   then?

17   A.   NCIS.  We're only assisting at that point.

18   Q.   Is it your job to write reports about it at that point?

19   A.   No, sir.  My report would have been much longer if I would

20   have assumed the case after that fact.

21   MR. GEE:  Thank you.

22                    **RECROSS-EXAMINATION**

23   BY MR. LENAMON:

24   Q.   And it's fair to say that someone in one of the search

25   parties searching for Chris Tur had found that paper towel; is

1  that right?

2  A.   One of our security patrolmen.

3  Q.   Searching down --

4  A.   They located --

5  Q.   -- behind Captain Nettleton's house?

6  A.   -- a bloody towel.

7  Q.   They were searching for Chris Tur?

8  A.   Yes, sir.

9  Q.   Okay.  And that was part of the search area, right?

10 A.   I wasn't involved in that search area, because that would

11 be put out at the instant command post from the watch commander

12 and security officer.

13          So I wasn't involved on exactly where the patrolmen

14 were going to search.  So I did not know when we got a call

15 that the patrolmen were down there until they said over the

16 radio they found the bloody towel.

17          MR. LENAMON:  Thank you.

18          THE COURT:  All right, sir.  Thank you very much.

19 You may step down.

20          THE WITNESS:  Okay.

21     (Witness excused.)

22          THE COURT:  Who is the government's next witness?

23          MR. GEE:  Captain Alonza Ross with another

24 stipulation, Your Honor.

25          THE COURT:  All right.  Let's go ahead and do

1    that and we can get -- is it Captain Ross?  Is that --

2            MR. GEE:  Yes, Your Honor.

3            May I approach?

4            THE COURT:  All right.  So this, ladies and

5    gentlemen, is Government's Exhibit 3.  It's another

6    stipulation.  Remember what I just told you about stipulations.

7    And I'll allow Mr. Gee to read that before we hear from Captain

8    Ross.

9            MR. GEE:  Thank you, Your Honor.

10        (Government's Exhibit 3 received into evidence.)

11            MR. GEE:  "Counsel for the government, counsel for

12   the defense, and the defendant, hereby stipulate and agree to

13   the following:  On January 11th, 2015, at approximately 1 p.m.,

14   Carl Davis, a volunteer aiding in the search for Christopher

15   Tur, who was unaware that Mr. Tur's body had been discovered by

16   the Coast Guard earlier that morning, at 11 a.m., discovered

17   several bloody paper towels, Government's Exhibit 38, which the

18   parties agree should be admitted in evidence, near the walkway

19   from the defendant's house to the boat dock, in the location

20   depicted in Government's Exhibit 97 and 98, which the parties

21   agree should be admitted into evidence.

22            "Mr. Davis reported his discovery on the radio and

23   stayed with the paper towel until members of the Naval Station

24   Guantanamo Bay security department arrived.

25            "The security department personnel then remained with

1    the paper towels without altering their position until Naval

2    Criminal Investigative Service personnel arrived, who properly

3    collected and preserved the paper towels consistent with NCIS

4    protocols for handling physical evidence.

5            "The paper towels were then transferred to the U.S.

6    Army Criminal Investigation Laboratory, USACIL facilities, for

7    DNA testing.  USACIL personnel conducted tests on the towels

8    for the presence of blood and DNA using commonly accepted

9    methods using properly calibrated equipment.

10           "The tests revealed that the substance on the paper

11   towel was blood and that the DNA profile developed from the

12   blood matched the DNA profile for Christopher Tur."

13           THE COURT:  Thank you, sir.

14           And you may consider that to be proven in evidence in

15   this case.

16           All right.  Captain, come forward, please.

17           Are you okay without a break?  Anybody need a break?

18   Okay.  Then we're going to go ahead and finish up the day with

19   the captain's testimony.  All right?

20           COURTROOM DEPUTY:  Do you solemnly swear that the

21   testimony you are about to give before this Court will be the

22   truth, the whole truth, and nothing but the truth, so help you

23   God?

24           THE WITNESS:  I do.

25           COURTROOM DEPUTY:  Please state your full name and

1  spell your last name for the record, sir.

2         THE WITNESS:  Alonza Junior Ross, R-o-s-s.

3         COURTROOM DEPUTY:  Thank you.  Please be seated.

4         THE COURT:  All right, sir.  You may proceed.

5         **ALONZA JUNIOR ROSS, GOVERNMENT'S WITNESS, SWORN**

6                    **DIRECT EXAMINATION**

7  BY MR. GEE:

8  Q.   Good afternoon, sir.

9  A.   Good afternoon.

10 Q.   Where are you currently employed?

11 A.   I'm the commanding officer of the Naval Support Activity

12 in Millington, Tennessee.

13 Q.   And what is your current rank?

14 A.   My current rank is a captain, Navy captain.

15 Q.   How long have you been in the Navy?

16 A.   I've been in the Navy 37 years.

17 Q.   And that base that you just mentioned in Tennessee, what

18 do you guys do there?

19 A.   We're the human resource center recruiting -- we're

20 responsible for getting people in the Navy, out of the Navy,

21 and distributing throughout the Navy.

22 Q.   And are you commander of the entire base?

23 A.   I am the commander of the entire base.

24 Q.   How many people work there?

25 A.   Like 7,000.

1  Q.   What kinds of training and experience did you receive

2  throughout your career before becoming a commanding officer?

3  A.   Well, I was prior enlisted, was an enlisted sailor for 12

4  years of my life, and after that I got a commission through the

5  Navy's limited duty officer program.  During my time I've been

6  assigned to ten ships, been their port operations or program

7  manager and the commander of naval installations command.  I've

8  done a tour there.  I've done two tours as an executive officer

9  and now the commanding officer of the base.

10 Q.   Now, Captain Ross, what was your rank in January of 2015?

11 A.   I was a commander.

12 Q.   And where were you serving in approximately January 2015?

13 A.   I was the executive officer of the base in Guantanamo Bay.

14 Q.   Approximately when did you arrive in Guantanamo Bay?

15 A.   Approximately the 30th, 31st of December of 2014.

16 Q.   So by January 9th, 2015, you had been there about how

17 long?

18 A.   A week-and-a-half or so, maybe two weeks, week-and-a-half.

19 Q.   Had you ever served at Guantanamo Bay before that?

20 A.   No, sir, I hadn't.

21 Q.   And from that December 2014 period, when did you serve at

22 GTMO until?

23 A.   I transferred in June of 2016.

24 Q.   What was the position you held at GTMO in those two years

25 or so?

1  A.   I was the Second-in-Command to Captain Nettleton of the

2  naval base there.

3  Q.   Okay.  And what's that position called?

4  A.   It's called the base executive officer.

5  Q.   Is there a nickname for it?

6  A.   XO.

7  Q.   And had you ever been the executive officer or XO at

8  another place before GTMO?

9  A.   I was.  I was the XO at Naval Station Newport, Rhode

10  Island.

11  Q.   Can you explain generally what an XO does?

12  A.   Manning, training, organization, and you're basically

13  ensure the rules are enforced on the base and carry out the --

14  the commanding officer's orders.

15  Q.   And what's sort of your relationship with the commanding

16  officer as an XO?

17  A.   Well, right and left hand, actually.  It's basically

18  three, it's the triad, CO, commanding officer, the executive

19  officer, and the command master chief.  So we are -- one hand

20  is always looking to see what the other hand is doing.  It's a

21  close relationship.

22  Q.   And you mentioned that you were the XO for

23  Captain Nettleton?

24  A.   Yes.

25  Q.   Do you see him here in court today?

1  A.   I do.

2  Q.   Can you point him out where he's sitting and name an

3  article of his clothing?

4  A.   He's sitting there with a gray coat on, gray tie.

5       MR. GEE:  Can the record reflect an in-court

6  identification, Your Honor?

7       THE COURT:  Yes, sir.

8  BY MR. GEE:

9  Q.   Had you ever received the -- and I have to call him the

10 defendant, Captain.  Had you ever served with the defendant

11 before then?

12 A.   No, I hadn't.

13 Q.   Had you ever even met him prior to arriving at GTMO?

14 A.   No, I hadn't.

15 Q.   Now, above Captain Nettleton, who was his direct superior

16 officer above him?

17 A.   At the time it was Admiral Mary Jackson.

18 Q.   And had you ever served with Admiral Jackson yourself

19 prior to January 2015?

20 A.   I had.  In 2010, '11, I -- I worked for her then.

21 Q.   So did you know -- did you know her personally?

22 A.   I did.

23 Q.   Were you familiar with her expectations as a superior

24 officer?

25 A.   I was.

1  Q.   In general, how would you describe her expectations of the

2  folks that worked for her?

3          MR. VOKEY:  Objection.  Relevance.  Speculation.

4          MR. GEE:  I can rephrase, Your Honor.

5          THE COURT:  Go ahead.  Rephrase, please.

6  BY MR. GEE:

7  Q.   How well informed did Admiral Jackson like to be by the

8  officers that reported to her?

9  A.   She --

10          MR. VOKEY:  Objection.  No personal knowledge.

11  Speculation.

12          THE COURT:  I'll let him answer.

13          THE WITNESS:  Admiral Jackson was fair, firm, and

14  impartial.  That's how I can describe how she expected to be

15  informed.

16          MR. VOKEY:  I'm going to object.  Improper character

17  evidence as well.

18          THE COURT:  I understand.  Overruled.

19  BY MR. GEE:

20  Q.   And underneath you and the defendant at GTMO, what's sort

21  of the next layer of command underneath you?

22  A.   There were department heads.  They were responsible for

23  running their different departments throughout the

24  installation.

25  Q.   And give us some examples of these department heads.

1   A.   We had the security officer that ran base security.

2   Morale, Welfare, and Recreation was responsible for outing-type

3   stuff, fishing gear, things of that nature.

4           Fleet and Family Support, that took care of sailors

5   and their families.  The Mess Management specialist, who took

6   care of all the food and stuff and how we did it.  And the

7   things of that sort on the base.

8   Q.   What about security?  Is that underneath you guys?

9   A.   Security was.

10  Q.   And where did you live when you were on the base, Captain?

11  A.   I lived in the barracks over there on the base.

12  Q.   Did you have any family that lived with you on the base?

13  A.   No.  My family couldn't -- couldn't -- they couldn't make

14  it there with me.

15  Q.   Are there families allowed on the base?

16  A.   Families are allowed on the base.

17  Q.   Schools on the base?

18  A.   Schools are on the base.

19  Q.   The -- while you were there at Guantanamo Bay, did you get

20  to know a person named Lara Tur?

21  A.   I did.

22  Q.   Did you work with her?

23  A.   Yes.

24  Q.   What was her position?

25  A.   She was the Fleet and Family Center's director.  She was

1  responsible for the Navy's Fleet and Family Center on the

2  installation.

3  Q.   And in her position as the director of Fleet and Family,

4  would she -- would she interact with the defendant as well?

5  A.   Yes, she would.

6  Q.   Prior to the night of January 9th, 2015, do you recall

7  meeting Ms. Tur's husband?

8  A.   I probably did.  I -- again, I was new on the island.  I

9  didn't really know any of the people too well.

10  Q.   Now, Captain, did you attend an event that occurred on the

11  night of January 9th, 2015?

12  A.   I did.

13  Q.   Where was it?

14  A.   It was at the Hangar Deck which is a little club below the

15  Officers Club on Guantanamo Bay.

16  Q.   What kind of event was it?

17  A.   It was a Hail and Farewell where new people are welcomed

18  onboard the -- the installation and old people are farewelled

19  and they're going off to other places.

20  Q.   And in this case who was being hailed and who was being

21  told farewell?

22  A.   I was being hailed along with a couple of aviators.  And

23  my relief, Commander Caswell, he was being farewelled.

24  Q.   Who was invited to this event?

25  A.   All officers and department heads, and their families.

1   Q.   About what time do you think you arrived, approximately?

2   A.   I figured 1800, 1830.  I think that's 6 p.m.

3   Q.   And can you tell us just a little bit about what you

4   observed going on downstairs in the Hangar bar as the party

5   went on?

6   A.   People just interacting with each other.  Everyone was

7   talking.

8   Q.   Did you observe anything unusual down there?

9   A.   Not down at the Hangar bar, no.

10  Q.   Was Ms. Tur present?

11  A.   Yes, she was.

12  Q.   Was her husband present?

13  A.   Yes, he was.

14  Q.   Was captain -- was the defendant present?

15  A.   Yes, he was.

16  Q.   Do you recall whether you even had any conversations with

17  Mr. Tur at the Hail and Farewell?  Did you speak to him?  Do

18  you recall?

19  A.   I don't recall speaking to him.  I probably spoke to him

20  in passing.

21  Q.   During the Hail and Farewell, did you observe the

22  defendant and Ms. Tur speaking with one another?

23  A.   Yes.

24  Q.   Observe anything unusual about it --

25  A.   No.  She was --

1  Q.    -- what you saw?

2  A.    She was speaking with everyone.

3  Q.    Did you observe them physically touching each other?

4  A.    No.

5  Q.    Now, what happened as the party started to wrap up?

6  A.    Well, I went to the head -- or bathroom.  And as I was

7  coming out, Ms. Tur and the public affairs officer, along with

8  Captain Nettleton, was coming up, and as I walked out of the

9  bathroom, they were stating that they were going to be taking

10  the party to his house.

11  Q.    Whose house?

12  A.    Captain Nettleton's house.

13  Q.    And did you have any reaction to that?

14  A.    Oh, yes.  I approached the captain.  I said, "I think

15  that's a bad idea" to all of them.  I said, "That's not going

16  to happen."  I said to the captain, "I think that's a bad

17  idea."  And I grabbed him and we started walking out of the

18  club.

19  Q.    Why did you tell him it was a bad idea?

20  A.    Well, the optics of it.  He's the commanding officer of

21  the base there.  At the time I don't think his wife was on the

22  installation.  And it would just look bad.

23  Q.    Had you been drinking that evening, sir?

24  A.    Yes, I had.

25  Q.    Approximately how much do you think you had to drink?

1   A.   Three -- three, four beers.

2   Q.   Was your ability to observe things affected?

3   A.   No, they weren't.

4   Q.   What about the defendant?  Had he been drinking?

5   A.   Yes, he had.

6   Q.   What condition was he in?

7   A.   I think he was in -- he was -- he had a lot.  Probably --

8   enough I was worried about him.  That's why I tried to

9   intercede in what was -- they were -- what -- the conversation

10  they were having.

11  Q.   Now, you said that you talked to the defendant, tried to

12  convince him it was a bad idea.  What happened next?

13  A.   We walked out.  He looked over at me after we left the

14  area and he said, "XO, you got a good point."

15       I said, "Sir, I think you need to go home."

16       He said, "Yeah.  I think you -- that's a good idea."

17  Or something along that line.

18       And as we were outside of the entrance out in the

19  parking lot area, Ms. Tur's husband came out of the club and he

20  said something to the effects of this son of a bitch or ass is

21  fucking my wife.

22       And I was shocked.  I said -- I stepped in between

23  them and I said, "Hey, I don't know anything about that.  I do

24  know that this is not the time or place for it and you need to

25  go your way.  And if you don't go, I'll have security take you

1   home."

2           And as I was doing that, I was looking over at the

3   captain and I think I was telling him, "Sir, I think you need

4   to just go."  And as I was between Tur and him,

5   Captain Nettleton had walked off towards his home.

6   Q.   And did -- did the defendant continue going towards his

7   home, as far as you saw?

8   A.   He did.

9   Q.   What happened next with Mr. Tur?

10  A.   He was aggravated.  He was bumping me with his chest, but

11  he finally calmed down and he went off in a different

12  direction.

13  Q.   Okay.  If you walked out the front of the Bayview --

14  Captain?

15  A.   Uh-huh (affirmative).

16  Q.   -- the defendant's house, is it on your right or on your

17  left?

18  A.   It's on the right.

19  Q.   And which direction did Mr. Tur walk when you saw him

20  last?

21  A.   He went to the left.

22  Q.   And what was his demeanor like when he left?

23  A.   He was intoxicated.

24  Q.   Was he still upset?

25  A.   He was upset.

1  Q.   And who else do you recall being out front during this

2  sort of interaction?

3  A.   There were a host of other people, but his wife was there,

4  along with Kelly Wirfel, who was the PAO.  They were waiting

5  for Safe Ride.  And I was trying to clear out the place.

6  Several other people was there.  I think I was -- I probably

7  stayed there an extra hour or two until the area was clear.

8  Q.   Did you ever see Mr. Tur again after you saw him walking

9  that direction, this left out the front door of the Bayview?

10  A.   No, I didn't.

11  Q.   Did you ever see the defendant again that night after you

12  saw him walk right towards his house?

13  A.   No, I didn't.

14  Q.   Did you see anything else unusual when you went home that

15  night?

16  A.   No, I didn't.

17  Q.   About how far is the BOQ from the Bayview?

18  A.   Oh, probably a third-of-a-mile, quarter-of-a-mile walk.

19  Q.   Let's direct your attention to Saturday, January 12th.

20  Were you scheduled to work that morning?

21  A.   No, I wasn't.

22  Q.   What do you recall first occurring that morning?

23  A.   Well, I got a call from Kelly saying that they were

24  looking for Chris Tur.  And I was like, "Okay."

25         But he's -- he's gotten drunk before in the past and

1  he's left and didn't show up, so I'm thinking, well, all right,

2  thanks for the call.  Didn't get the time to dig into that too

3  much because a little later I received a call from

4  Captain Nettleton to ask me about Chris Tur, and I was like --

5  well, first I'm like, well, who's Chris Tur?  And then I

6  recalled who he was.  And I told him I hadn't seen him and he

7  said something about he was missing, but he has done this

8  before and he never -- and he shows up later.  And I said,

9  "Okay, sir.  Go from there."

10 Q.    What happened next?

11 A.    We didn't do much of nothing.  And then later on that day

12 we were talking about it and we hadn't seen him, and then we

13 actually got people out because we started to worry.  We

14 couldn't find him anywhere.  So we had security along with

15 fire, couple of more people on the island, start searching for

16 him.

17 Q.    And -- and were you involved in searching for him?

18 A.    Yes, I was involved in searching for him.  We were looking

19 in the hill area, the boat landing areas, areas where -- it's

20 dangerous out in Guantanamo Bay.  If you're under the ridge

21 lines, you can fall and -- fall into the water and some of the

22 rocks they have out there.  It's easy to get hurt.

23         MR. GEE:  I want to pull up Government's Exhibit 7,

24 please.  Actually, I'm sorry, Exhibit 6, please.

25 BY MR. GEE:

1   Q.   Do you recognize this map?

2   A.   Yes, I do.

3   Q.   What's this a map of?

4   A.   That's the Guantanamo Bay area.

5   Q.   And, Captain Ross, it's actually going to be on a screen

6   in front of you as well, sir, so you can swivel around.

7   A.   Okay.

8   Q.   It will be on the screen right there in front of you.

9   Yes, sir.

10          Captain Ross, there's a little pen right there next

11   to you.  You can use that to write on the screen.  Can you --

12   with that, can you sort of -- did you have an opportunity that

13   day, on Saturday, to sort of observe the areas that were --

14   that you observed being searched?

15   A.   Well, we were pretty much all over the areas surrounding

16   the hill areas in here.

17   Q.   So if you'd put it on the screen.  Instead of looking up

18   at the big screen --

19   A.   Okay.

20   Q.   -- just mark it on the screen in front of you, sir.

21   A.   Yeah.  We basically looked -- the whole area -- over in

22   the area here, all over the place.  I can't say exactly

23   everywhere we checked, but we were split all over the place,

24   and we were looking.

25   Q.   Okay.  And at any point were you -- did you observe anyone

1  searching at the tip of Deer Point?

2  A.   No, I didn't.

3  Q.   Now, at some point that day on Saturday, did Ms. Wirfel

4  give you any additional information about what had happened for

5  her on Friday night?

6  A.   Well, she had talked to me and said, "Did the captain tell

7  you that Chris was going over to his house and was going to

8  knock him out or kick his ass or knock him out, something to

9  that effect?"

10        And I said, "Well, no.  No, he didn't tell me

11  anything about that."

12  Q.   And did she tell you why she was asking this?

13  A.   No, I don't recall that.  She just asked me if I was told

14  that.  And I said no.  I wasn't aware of it.

15        And I thought, well, no, that couldn't have been

16  true, because I was -- when I broke them up, Captain went his

17  way and Tur went his way, went separate ways.

18  Q.   And did Ms. Wirfel describe speaking to Mr. Tur herself at

19  any point that Friday night?

20  A.   Yes, she did say she talked to him basically I think and

21  she said that he told her that he was going to do that.

22  Q.   Now, what did you -- what did you have as a reaction to

23  being told this by Ms. Wirfel?  I mean, you're the

24  Second-in-Command at the base.  What was your reaction when she

25  told you that Mr. Tur said he was going to do this?

1   A.   I didn't have a reaction.  I knew that he was drunk the

2   night before, what I perceived as being drunk before, and I had

3   no reason to think otherwise.  Everyone wants to beat up the

4   captain.  I mean, it's just a fact.

5   Q.   At this point did you think it had actually happened?

6   A.   No, I didn't.

7   Q.   Now, you talked about how you spoke with the defendant

8   that day about the search.  At any point that day, Saturday,

9   did he tell you that Mr. Tur had come to his house?

10  A.   No, he didn't.

11  Q.   At any point that Saturday, did the defendant tell you

12  that he had been in a physical altercation with Mr. Tur?

13  A.   No, he didn't.

14  Q.   At any point that day, did he tell you that he injured

15  Mr. Tur in any way?

16  A.   No, he didn't.

17  Q.   If he had told you any of those things on that Saturday,

18  would you have done anything different?

19  A.   Yes, I would have done something different.

20  Q.   What would you have done?

21  A.   Well, I would have had security and NCIS involved if we

22  now have a person missing and he told me he had gotten in an

23  altercation with him.

24  Q.   How did the search continue as the evening hours came on

25  that Saturday?

1  A.   We continued on until it was starting to get dark.  I then

2  talked with Captain Nettleton.  I said, "Sir, I think it's

3  getting a little dark here.  We probably ought to -- I

4  recommend we secure the search for the night because someone

5  might get hurt.  But we'll start up first thing in the morning,

6  the next morning."  And he said he was good with that, or he

7  authorized us to do it.  And that's exactly -- we secured for

8  the night and started again the next day.

9  Q.   Now, Captain Ross, are you familiar with a document

10  called a -- called a -- colloquially referred to as a NAVY

11  BLUE?

12  A.   Yes, I am.

13  Q.   What is a NAVY BLUE?

14  A.   A NAVY BLUE is death or serious injury to personnel or

15  property that we would send to the CNO, the Chief of Naval

16  Operations, and CC'ing or informing all the fleet commanders

17  that fall under us.

18  Q.   Where is the Chief of Naval Operations that this NAVY BLUE

19  goes to?

20  A.   He's in Washington, D.C.

21  Q.   And is the -- is the Navy Blue an official Navy record?

22  A.   Yes, it is.

23  Q.   I'm going to show you Exhibit 357A.

24       MR. GEE:  I'm going to have Ms. Reid zoom in at the

25  top of the e-mail.

1              That's the first half.  Yep.

2    BY MR. GEE:

3    Q.   All right, Mr. Ross, this e-mail that we're looking at --

4    I'm sorry, it's...

5              MR. GEE:  The Court's indulgence.

6    BY MR. GEE:

7    Q.   So we're looking at 357A now, Mr. Ross.

8              This e-mail, it's dated Sunday, January 11th, at

9    11 -- at 1 a.m. and it's from Jeffrey Crabtree.

10             Do you recall who Jeffrey Crabtree was?

11   A.   Yes, sir, I do.

12   Q.   Who was it?

13   A.   He was the weapons officer on Guantanamo Bay.

14   Q.   Did he go by a nickname?

15   A.   Weps.

16   Q.   And who is it to, Captain?

17   A.   To myself and Captain Nettleton.

18   Q.   What did you understand this e-mail to be about, sir?

19   A.   It was about the missing person, Mr. Tur, who was missing,

20   was sending the SITREP out to the CNO, informing him and the

21   chain of command.

22   Q.   And what is this initial e-mail?  What's going on in this

23   initial e-mail?

24   A.   It's exactly what has happened.  We've done a search.  We

25   can't find the person.

1  Q.   It says here that, "Navy Blue template attached."

2       So what is this e-mail?

3  A.   Well, it's the format for how the Navy Blue should be and

4  how we would send it out.

5       MR. GEE:  And if we can zoom out.

6  BY MR. GEE:

7  Q.   Going to the next page of the document -- and this, for

8  example, Mr. Ross, is this some of that Navy Blue we're talking

9  about?

10 A.   That would be -- that's correct.

11 Q.   Okay.  And let's go to the last page and look at the Item

12 No. 20.

13       MR. GEE:  No, no.  The last page.

14 BY MR. GEE:

15 Q.   And it says in Item No. 20 -- can you just read that for

16 us, Mr. Ross?  Captain Ross, I'm sorry.

17 A.   Okay.  "On Saturday, 10 January 2015, spouse reported

18 victim missing when he did not return home by 1400 Eastern

19 Standard Time.  Victim last seen leaving Bayview complex at

20 zero -- 1230 Eastern Standard Time.  Naval station security

21 land and harbor units, marine security detachment, and duty

22 section personnel are all actively engaged in searching for the

23 missing victim."

24 Q.   So did this document mention anything about Mr. Tur coming

25 to the defendant's home?

1    A.   No, it doesn't.

2    Q.   Or a physical altercation occurring there?

3    A.   No, it doesn't.

4    Q.   Now, let's look at Exhibit 357.

5         MR. GEE:  Zoom in on the top part of this e-mail.

6    BY MR. GEE:

7    Q.   So Exhibit 357, sir --

8         MR. GEE:  Just scroll down a little bit.

9    BY MR. GEE:

10   Q.   Are you responding to that e-mail we just looked at,

11   Captain Ross?

12   A.   Yes.

13   Q.   And did you copy the defendant on your response?

14   A.   Yes, I did.

15   Q.   All right.  And what are you doing now in this e-mail back

16   to Mr. Crabtree?

17   A.   I reviewed it, I discussed it with the captain, and I told

18   Mr. Crabtree to release it, to notify the Regional Operations

19   Center, which is the ROC, and to release the message.

20   Q.   And let's look at Exhibit 358.

21        MR. GEE:  Can we zoom in on the top part of it,

22   please?

23   BY MR. GEE:

24   Q.   And looking now at this next e-mail in the chain at

25   2:10 a.m., who's -- who's writing back now?

1  A.    It's Captain Nettleton.

2  Q.    And what's his -- what's his response to y'all?

3  A.    "Thanks" -- "Thanks, Weps."

4  Q.    At any point did he make any edits to this Navy Blue with

5  respect to the content about the description of the incident?

6  A.    Not that I can recall.

7  Q.    And who is it that is the ultimate approver of Navy Blues

8  going to the Chief of Navy Operations?

9  A.    The base commander.

10  Q.    Now, Captain Ross, turning your attention to Sunday

11  morning, January 11th.  On that Sunday morning -- were you

12  still involved in the search that Sunday morning?

13  A.    Yes, we were.

14  Q.    And did you have any ideas with respect to the search that

15  Sunday morning?

16  A.    No.  We were just still out.  Everyone was back at it

17  again, both harbors.  Everyone was just out looking again.  We

18  started the search all over.

19  Q.    At any point did you have any ideas for things that might

20  enhance the search?

21  A.    Well, I did.  I was -- I talked to the Coast Guard

22  commander and asked her, since we didn't find him on Saturday,

23  if we could get a helo from probably -- I think it was

24  Sector 7, and she said she'd look into it.  And I talked to

25  the -- Captain Nettleton about that and --

1    Q.   Hold on a second, Captain Ross.

2            You said the word "helo."

3            What's a helo?

4    A.   A helicopter, I'm sorry.

5    Q.   And you talked about how you talked to this Coast Guard

6    person about a helicopter?

7    A.   Right.

8    Q.   I mean, you guys are a Navy base, so there -- are there --

9    what's on GTMO?  Are there helicopters on GTMO besides the

10   Coast Guard?

11   A.   No.  There are not any helicopters, but we have a joint

12   confinement facility there that have all branches of service

13   that work there:  Army, Navy, Air Force, Marines, and Coast

14   Guard.  The Coast Guard commander that worked there could reach

15   out to the sector that owned the helicopters in the operating

16   area and could look at getting us one if we needed one.

17   Q.   And whose approval would you need to formally make the

18   request to the Coast Guard to use the helicopter?

19   A.   The commanding officer.

20   Q.   And why did you think a helicopter might help?

21   A.   I was looking at all the resources we could use, would be

22   the best effort to try to find the person if they're missing.

23   Q.   Have you ever been in a helicopter over water?

24   A.   I have.

25   Q.   Does it help you see over water?

1    A.    It does.

2    Q.    Did you discuss the helicopter idea with the defendant?

3    A.    I did.  He seemed a little upset about me doing that.

4    Q.    What do you mean he seemed a little upset about you --

5    with this idea?

6    A.    To the point of, "I don't" -- "I don't authorize flying on

7    the base unless" -- basically without his approval.

8    Q.    And who said that?

9    A.    Captain Nettleton.

10   Q.    What was his demeanor like as he was telling you this?

11   A.    He was flustered.

12   Q.    What was your reaction to this?

13   A.    I thought it was strange.

14   Q.    Was a helicopter ever used in the search for Mr. Tur?

15   A.    No, it wasn't.

16   Q.    After this conversation with him about the helicopter,

17   what happened next that Sunday morning?

18   A.    Well, we were just discussing stuff and was going over

19   some things.  I think I asked him early on the day that --

20   Q.    And, Captain, let me -- let me ask first -- direct your

21   attention, was there ever a point where there was a

22   conversation with Admiral Jackson that Sunday morning?

23   A.    Yes, there was.

24   Q.    Tell us about that.

25   A.    The captain was giving an update on what we were doing and

1    how things were going.  And I was standing in -- listening in

2    to it.  And he was basically going over what we were doing.

3    And I'm there with him...

4    Q.   What is it you recall him telling Admiral Jackson in this

5    update?

6    A.   That we have people out searching, they're looking for

7    him, what all else we're doing to try to find him, boats and

8    stuff in the water, and I was prompting him to, hey, we need to

9    tell her the -- all the details about the Hail and Farewell and

10   the argument that ensued after that so she's aware of

11   everything that happened.

12   Q.   And was he telling her about the Hail and Farewell and the

13   confrontation in front of it?

14   A.   No, he didn't.

15   Q.   And when you say you were prompting him, what do you mean?

16   A.   I was prompting him while he was on the phone.  And once

17   he finished up, he said basically at that time she didn't need

18   to know all that.  So there you go.

19   Q.   He said that?

20   A.   Yes.

21   Q.   Now, did you speak with him that Sunday further about

22   events on the Friday night?

23   A.   I did.

24   Q.   Tell me about that.

25   A.   I was going through the day's events, I think it's later

1  on after we'd found Tur and stuff and I just arbitrarily asked

2  him, "Hey, did -- did he ever -- did he ever show up at your

3  house?"  And he told me, no, he hadn't.

4  Q.    And why did you think to ask him that at this point, did

5  he show up at his house?

6  A.    When I was coming back Saturday, when I talked to Kelly,

7  she said that -- which at first I didn't think much of it, but

8  now all of this is happening and I just decided, let me just

9  ask him again, maybe she was mistaken or something.  And he

10  simply told me, "No, he didn't."

11  Q.    Now, Captain Ross, was there a point where you were

12  interviewed by NCIS investigators on about January 15th, so a

13  couple of days after the body was recovered?

14  A.    Yes, there was.

15  Q.    And did they ask you questions about the Hail and Farewell

16  party?

17  A.    They did.

18  Q.    And did they ask you questions about what you knew had

19  happened on Friday night?

20  A.    Right, they did.

21  Q.    And after you finished that interview with NCIS, did you

22  have another conversation with the defendant?

23  A.    Yes, I did.

24  Q.    Tell us about that conversation on January 15th.

25  A.    I come back and went over it again about that.  We were --

1  at the interview, and I said, "Hey, did he" -- again, I asked

2  him, "Did Tur actually show up at your house?"

3          And he said, "Well, yeah, he showed up there, but I

4  didn't let him in."

5          So now I'm thinking, Well, wait a minute, you told me

6  he didn't show up twice.

7  Q.   Did you recognize that at that point?

8  A.   Yes, I did.

9          MR. GEE:  The Court's indulgence.

10     (Counsel confer.)

11         MR. GEE:  Thank you, Your Honor.  No further

12  questions.

13         THE COURT:  Let me see counsel -- let me see counsel

14  a minute, please.

15     (Sidebar conference:)

16         THE COURT:  You doing the cross?

17         MR. VOKEY:  I am, sir.

18         THE COURT:  Do you have an estimate of how long

19  you'll be?

20         MR. VOKEY:  I would say about 40, 45 minutes.  It's

21  going to be pretty lengthy.

22         THE COURT:  Probably more than we can get done today?

23         MR. VOKEY:  Yes, sir.

24         THE COURT:  So maybe we ought to just call it a day,

25  then, and we'll do it in the morning.

1          He can be held over, I assume?

2          MR. GEE:  Yes, sir.

3          THE COURT:  Okay.  All right.

4      (The following proceedings occurred in open court, in the

5    presence of the jury:)

6          THE COURT:  Well, ladies and gentlemen, we've put in

7    a full day and I'm told the cross-examination will probably

8    take longer than we're going to want to stay around today, so

9    we're going to ask Captain Ross to spend the night and he'll be

10   back in the morning for cross-examination.

11         So I'm going to turn you-all lose.  You can leave

12   your notepads in the seats.

13         Please remember all my instructions.  As soon as you

14   go through that door, nothing about the case, not to each

15   other, not to anybody else.  Don't read anything about it,

16   don't do any research, computer or otherwise.

17         If you'll have a nice evening, I'll ask you to be

18   back in the jury room ready to go at 9:15, like you were this

19   morning.

20         And thank you for your service.

21         COURT SECURITY OFFICER:  All rise for the jury.

22      (Jury exits, 4:52 p.m.)

23         COURT SECURITY OFFICER:  Please be seated.

24         THE COURT:  So, Captain, you will need to come back

25   tomorrow.  If you could be here at 9:15 so we can get a 9:30

1    start, I'll appreciate it.

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Because you have given your direct exam

4    and have not been cross-examined yet, the rules of the Court

5    provide that you not discuss your testimony with anybody.  So

6    just nobody -- no discussion of your testimony overnight, just

7    have a nice evening and be back here at 9:15 tomorrow.  Okay?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Thank you, sir.

10        (Witness temporarily excused.)

11             THE COURT:  All right.  Mr. Gee, could you tell me

12   what the lineup looks like for tomorrow, please?

13             MR. NOTHSTEIN:  Yes, Your Honor.  After Captain Ross

14   we'll be calling Admiral Gray, Admiral Jackson, Dr. Gordon.

15   After that will be Lee Merrill and Tara Culbertson.

16             THE COURT:  All right.  I know who the admirals are,

17   I know who Dr. Gordon is.  Remind me who the -- say the names

18   again.

19             MR. NOTHSTEIN:  Lee Merrill and Tara Culbertson.

20             THE COURT:  And what is their connection?

21             MR. NOTHSTEIN:  They were friends of the defendant

22   who spoke with us.

23             To be candid, Your Honor, in the end we may not

24   actually call those witnesses if we don't feel we need their

25   testimony, but we wanted to alert the Court.

1          THE COURT:  Okay.

2          MR. NOTHSTEIN:  If we do not call those witnesses,

3   the next one would be NCIS Special Agent Jason Boswell.

4          THE COURT:  Okay.  And do you think that will be the

5   day?

6          MR. NOTHSTEIN:  I believe so, Your Honor.  If we did

7   get further than that, it would likely be Special Agent Carrie

8   McNamara, then probably Special Agent Boswell.

9          THE COURT:  All right.  And I do remind everyone we

10  will not be in session on Friday.  So whatever -- wherever we

11  stop tomorrow evening will be wherever we'll pick up on Monday

12  morning.  Okay?

13         MR. NOTHSTEIN:  Yes, sir.

14         THE COURT:  Does the government have anything?

15         MR. NOTHSTEIN:  No, Your Honor.

16         THE COURT:  Mr. Vokey, anything?

17         MR. VOKEY:  No, sir.

18         THE COURT:  Okay.  I'll ask everybody to be -- places

19  at 9:15.  We'll get a 9:30 start.

20         Thank you.

21         MR. NOTHSTEIN:  Your Honor --

22         THE COURT:  Yes.

23         MR. NOTHSTEIN:  Sorry.

24         THE COURT:  So when I said do you have anything and

25  you said no, you meant yes?

1          MR. NOTHSTEIN:  I was incorrect, Your Honor.

2          THE COURT:  Okay.  All right.

3          MR. NOTHSTEIN:  Just briefly, we may have an issue

4   with the e-mails as well.  We're going to try to work that out

5   with the defense.  If we have something to address, we'll let

6   the Court know as soon as we can.

7          THE COURT:  That's fine.  Then I build in the time at

8   9:15 to do that.  I assume 15 minutes will be enough to get it

9   done, I would think.

10          MR. NOTHSTEIN:  Hopefully, Your Honor.

11          THE COURT:  Yeah.  Okay.  All right.  We're in

12   recess.  Thank you.

13          COURT SECURITY OFFICER:  All rise.

14      (The proceedings adjourned at 4:56 p.m.)

15                              - - -

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


     I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


     DATED this 8th day of January, 2020.



     s/Shannon M. Bishop
     Shannon M. Bishop, RDR, CRR, CRC