***JURY TRIAL – VOLUME IV***

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Jacksonville, Florida |
| Plaintiff, | Case No. 3:19-cr-1-J-32PDB |
| vs. | January 9, 2020 |
| JOHN R. NETTLETON, | 9:14 a.m. |
| Defendant. | Courtroom No. 10D |

_____

JURY TRIAL
(VOLUME IV)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

Shannon M. Bishop, RDR, CRR, CRC
221 North Hogan Street, #150
Jacksonville, FL  32202
Telephone:  (904)549-1307
dsmabishop@yahoo.com

(Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

        **TODD GEE, ESQ.**
        **PETER MARSHALL NOTHSTEIN, ESQ.**
        US Department of Justice
        1400 New York Avenue NW
        Washington, DC  20005

DEFENSE COUNSEL:

        **COLBY VOKEY, ESQ.**
        The Law Firm of Colby Vokey, P.C.
        6924 Spanky Branch Court
        Dallas, TX  75248

        **TERENCE LENAMON, ESQ.**
        Terence Lenamon P.A.
        245 SE 1st Street, Suite 404
        Miami, FL  33131

        **DANIEL SCHWARZ, ESQ.**
        Daniel Schwarz, P.A.
        245 SE 1st Street, Suite 404
        Miami, FL 33131

# T A B L E   O F   C O N T E N T S

<u>Page No.</u>

WITNESSES FOR THE GOVERNMENT:

**ALONZA JUNIOR ROSS**
Cross-Examination................................  39
Redirect Examination............................  77
Recross-Examination.............................  84
**CHRISTOPHER SCOTT GRAY**
Direct Examination..............................  87
Cross-Examination............................... 163
Redirect Examination............................ 199
**MARY MARCELLA JACKSON**
Direct Examination.............................. 203
Cross-Examination............................... 260
Redirect Examination............................ 276
Recross-Examination............................. 280

# E X H I B I T S   R E C E I V E D

<u>Page No.</u>

<u>Government's Exhibits:</u>

35.................................................... 98
55, 56, 57, 58, 60 and 61......................... 37
 359 ............................................... 7
 362A ............................................. 12
 377 ............................................. 17
 379 ............................................. 18
 381 ............................................. 20

P R O C E E D I N G S

January 9, 2020                                                    9:14 a.m.

- - -

LAW CLERK:  All rise.

COURTROOM DEPUTY:  United States District Court in and for the Middle District of Florida.  The Honorable Timothy J. Corrigan presiding.

Please be seated.

THE COURT:  Good morning.  When we left off last night, there was some discussion as to the -- as to the -- whether there was disagreement about some of the e-mail traffic.  And I wanted to visit with you-all about that before we get started.

Mr. Gee -- or, Mr. Nothstein, what's the situation?

MR. NOTHSTEIN:  Your Honor, the government -- we provided, late last night, to the defense a list of the documents, some regulations, and some e-mails that we would seek to admit.  It looks like we do not have agreement as to any of them, Your Honor.

So we'd be happy to provide you with a copy of this -- the e-mails we plan to admit so the Court can take a look at it and I can kind of go through them one by one.

THE COURT:  All right.

MR. NOTHSTEIN:  May I approach, Your Honor?

THE COURT:  Yeah.

1    MR. NOTHSTEIN:  Your Honor, I think I'll go first

2  through some of the e-mails.  Like I said, there's also some

3  regulations, but there's some e-mails and other documents that

4  we would -- that we would use.

5    So first as to the e-mails -- first is Government's

6  Exhibit 359.

7    THE COURT:  So are you going to go in order on these?

8  So I'm looking -- so all these first things are all

9  regulations.

10    MR. NOTHSTEIN:  Those are the regulations,

11  Your Honor, I can take them in whatever order the Court likes.

12    THE COURT:  It doesn't matter.  I just want to know

13  where we're starting from.  So we're starting on 359.

14    MR. NOTHSTEIN:  359, Your Honor.

15    THE COURT:  All right.

16    MR. NOTHSTEIN:  So this is an e-mail chain from

17  January -- I'm sorry.  Actually, Your Honor, step back.  I

18  think this was actually already -- sorry.  This was not already

19  admitted.  This is an e-mail chain from January -- starting on

20  January 10, 2015, e-mails from the defendant up to

21  Admiral Jackson and Admiral Gray.

22    THE COURT:  All right.  Stop right there.  So what --

23  I guess I had assumed when I was reading these, Mr. Vokey, that

24  if they were e-mails involving Captain Nettleton and his

25  discussions with Admiral Jackson that they would be --

1         MR. VOKEY:  This one -- that's correct, Your Honor.

2  I do not object to 359.

3         THE COURT:  All right.  I was just told that you

4  didn't agree to any of these.

5         MR. VOKEY:  And I -- they just mentioned it really

6  quick -- quickly, Your Honor.

7         Yes, we do not object to 359.

8         THE COURT:  All right.  Then 359 will be admitted

9  without objection.

10     (Government's Exhibit 359 received into evidence.)

11        THE COURT:  All right.  What's next, Mr. Nothstein?

12        MR. NOTHSTEIN:  Next is Government's 362A.

13        THE COURT:  Yeah.

14        MR. NOTHSTEIN:  This is an e-mail from Monday,

15  January 12th, 2015.  It's an e-mail from Captain Gray to

16  Admiral Jackson.  And Captain Gray at the time was

17  Admiral Jackson's chief of staff.  Admiral Jackson was the

18  commander of the Navy Region Southeast, and so the defendant's

19  immediate superior.

20        This e-mail -- or the testimony we believe will

21  establish, and establishes on its face -- is a summary from the

22  end of the day, and it's Captain Gray reporting to --

23        Ms. Diaz, may we have the laptop projector on the

24  screen, please?

25        THE COURT:  I mean, I don't know who you're showing

1    them to.

2            MR. NOTHSTEIN:  There's some I may want to highlight

3    for the Court, Your Honor.

4            THE COURT:  All right.

5            MR. NOTHSTEIN:  But basically this is Admiral Gray --

6    I'm sorry, Captain Gray recounting what he'd heard from the

7    defendant that day, the information we had received.  The

8    testimony will be this is new information and so forth.  As far

9    as the hearsay on this, Your Honor, potential hearsay -- and

10   this is a business record, I think the witnesses will

11   establish, was kept in the ordinary course, was an official

12   record of the Navy.

13           Additionally, Your Honor, it's a present sense

14   impression as it's Captain Gray recounting the statements from

15   Captain Nettleton shortly after hearing them.  And it's

16   relevant to the concealing and misleading.

17           THE COURT:  And are we hearing from both

18   Admiral Jackson and now I guess he's Admiral Gray; is that

19   right?

20           MR. NOTHSTEIN:  Yes, sir.

21           THE COURT:  What's your response?

22           MR. VOKEY:  Your Honor, we object based on relevance,

23   hearsay.  And, first of all, not a business record -- every

24   e-mail sent is not a business record.  This was an e-mail sent

25   from Captain Gray saying, "hey, here's a wrap-up from today."

1    It is out-of-court statements.  We are going to have these

2    witnesses testify.

3              And additionally on relevance of what Gray says to

4    Jackson is not relevant to Captain Nettleton's actions here.

5    So the government is trying to back-door in how they feel about

6    something, which is not relevant as to Captain Nettleton's

7    actions.  And it's clearly hearsay.

8              MR. NOTHSTEIN:  And if I may, Your Honor --

9              THE COURT:  So I guess -- I guess one of my

10   concerns -- you know, I read all these this morning again.  And

11   I don't -- I never need reading glasses, but I needed them to

12   read these.

13             Is this the way that the Navy does business?  Or are

14   these just -- are these just the way it was copied?  I've never

15   seen smaller print, but...

16             MR. NOTHSTEIN:  Your Honor, I apologize.  That is a

17   feature -- well, not a feature -- it's an unfortunate feature

18   of the system we use for discovery management.  The print

19   sometimes it's quite small.

20             THE COURT:  So I guess one of my concerns is -- in

21   some of this traffic, is that there is discussion about

22   potentially -- potential involvement by Captain Nettleton in

23   the death of Mr. Tur, and -- and I don't know which ones we're

24   going to -- I don't know if we're going to look at all of

25   these, but, you know, of course, that's not what the charge is

1    here.

2           And I'm not too -- I'm concerned about -- there's a

3    lot of stuff in these e-mails that is -- some of it might be

4    pertinent, some of it not so much.  And so I guess I'm kind of

5    wondering -- if you're going to have Admiral Gray here and

6    you're going to have Admiral Jackson here and you can ask them

7    specific questions, I'm wondering why the e-mails need to come

8    in.

9           MR. NOTHSTEIN:  Well, a couple of those points,

10   Your Honor.  First, there are some e-mails that were provided

11   in the exhibit list and provided to the Court that do have a

12   little more detail of suspicion and things like that.  That's

13   not the kind of e-mails that we have here and we seek to admit.

14          As a general matter, the e-mails kind of fall under a

15   couple of categories.  The first are ones that

16   Captain Nettleton is actually on.  And I think all of those are

17   admissible as either statements of party opponent or effect on

18   the listener, or, rather, Your Honor, not maybe necessarily for

19   the truth of the matter asserted in them, but to show that the

20   defendant was communicating regularly with his superior

21   officers, what types of information he was communicating, and

22   what he wasn't telling them.  That's sort of one category.

23          The second are some e-mails that relate to

24   Admiral Jackson and the information she had received and her

25   reporting it up the chain.  Those e-mails are relevant to show,

1  Your Honor, one, that the information she was receiving was

2  material.  It's -- it shows it's material because, as she will

3  say, she knew it was important and she had an obligation to

4  report it to her superior officer.

5       The second, Your Honor -- and these go to a little

6  more of Admiral Jackson's deliberative process and when she

7  decided she had lost confidence in the defendant and relieved

8  him of command.

9       Those are important for two reasons.  One, again, it

10  shows materiality because we have the quantum of evidence that

11  she had while she still maintained confidence in the defendant

12  and what was essentially the tipping point, in other words,

13  what information pushed her over the edge to say, now I no

14  longer do.  That goes to the materiality element of Count

15  Three.

16       It also goes to misleading, Your Honor, because it

17  shows that the -- the sort of iterative nature of the

18  information the defendant was providing over time, therefore

19  showing the misleading.

20       THE COURT:  All right.  Okay.  All right.  Well, I

21  hear you.  I'm inclined to allow 362A.  I think both of the

22  speakers in the e-mail are going to be testifying and I think

23  they can be cross-examined on the e-mail if they -- if there's

24  something in it that's -- that's causing the defendant a

25  problem.  I think that it's -- I think that the e-mail is

1  basically introduced for the effect on the listener, not for

2  the -- not for the truth of the matter, so I'm going to -- I'll

3  admit 362A over objection.

4      (Government's Exhibit 362A received into evidence.)

5           THE COURT:  All right.  What's next?

6           MR. NOTHSTEIN:  367, Your Honor.

7           THE COURT:  Now, this is her reporting to her

8  superior -- Admiral Jackson's reporting to her superior,

9  Admiral Dickson, right --

10          MR. NOTHSTEIN:  That is correct.

11          THE COURT:  -- I mean, I'm sorry, Admiral Smith?

12          MR. NOTHSTEIN:  Admiral Smith, correct.

13          THE COURT:  Right.

14          MR. NOTHSTEIN:  He is an admiral at the Chief of

15 Naval Installation Command, which is actually Admiral Jackson's

16 current position.

17          THE COURT:  And what's the reason to introduce this?

18          MR. NOTHSTEIN:  See, this is -- it is a business

19 record.  Admiral Jackson -- and by the way, I agree with

20 Mr. Vokey that not every single e-mail sent back and forth is a

21 business record necessarily.

22          This is, however.  As Admiral Jackson reports, it was

23 the regular practice of the Navy to, A, conduct these kind of

24 investigations and inquiries, and a regular practice to report

25 the information up as she was receiving -- as she was receiving

1    it.  She had an obligation to do so honestly.  And these are

2    official Navy records.

3         So that's one part of the hearsay, Your Honor.

4         Secondly, again, it's relevant to the materiality.

5    This is -- the question here is:  What was important

6    information that needed to be reported?  So it goes to that

7    element of materiality.

8         It also goes to materiality in terms

9    of Admiral Jackson, I believe, says in the e-mail and will say

10   on the stand, she had not lost confidence in the defendant at

11   this point, in spite of the information she had received.

12        Now, that will change down the line.

13        THE COURT:  All right.  Mr. Vokey?

14        MR. VOKEY:  Your Honor, again, hearsay and relevance.

15   We are getting far afield from what Captain Nettleton has done

16   as far as false statements by him, materiality, any kind of

17   obstruction.

18        So, again, they are able to back-door these things.

19   I disagree that this is a business record, first of all.  What

20   we have is, you know, in any business, to include the Navy,

21   regular e-mails are sent back and forth up to commanders down

22   to subordinates across from staff.  This is another one of

23   Admiral Jackson informing her superior.  It's not a business

24   record.  It's just one of many e-mails that's sent keeping

25   somebody apprised.  And it's not an official report.  It's just

1    an e-mail saying here's the status.

2          THE COURT:  All right.  I understand.  I'm going to

3    think about -- I'm going to think about 367.

4          What's next?

5          MR. NOTHSTEIN:  368, Your Honor.  This, I believe,

6    falls in the category of e-mails that the defendant,

7    Captain Nettleton -- he is the -- originally he was forwarding

8    an e-mail, on January 13th, to Admiral Jackson.  And then

9    there's a discussion on what to do with that, Your Honor.

10         THE COURT:  Yeah.  I -- this was -- as I understood

11   it, this was a fellow -- I don't know who Kendell Stone is, but

12   he obviously had been debarred; is that correct?

13         MR. NOTHSTEIN:  I believe so, Your Honor.

14         THE COURT:  And he's -- and he's trying -- he's

15   writing an e-mail to Captain Nettleton in an effort to, for

16   lack of a better term, "gig" at him, right?  He's trying to --

17   he's trying to harass or be unpleasant to Captain Nettleton and

18   then it gets moved up the chain.

19         Why -- why would I introduce this?

20         MR. NOTHSTEIN:  So, Your Honor --

21         THE COURT:  Why would I admit this?

22         MR. NOTHSTEIN:  This is relevant for two reasons,

23   Your Honor.  And just to step back, the content of Mr. Stone's

24   e-mail, I think the Court is correct, he was just sort of

25   trying to be a thorn in Captain Nettleton's side.

1        The reason that --

2        THE COURT:  And he's an unrelated party?

3        MR. NOTHSTEIN:  Unrelated party completely.  So we

4  could redact Mr. Stone -- the content of Mr. Stone's e-mail.

5  The point here is, Your Honor, two things.  One, I think the

6  general nature of the allegation is relevant, or at least the

7  general content, because it shows what the defendant was

8  reporting up and therefore knew he had to report up to his

9  superior officer.

10        But secondly, Your Honor, you'll see here that

11  Admiral Jackson in the 5:19 p.m. e-mail instructed the

12  defendant to ensure he gives NCIS the e-mail.

13        And the response from the defendant is, "I sent the

14  e-mail to NCIS."

15        Here's why that's important, Your Honor.  The day

16  before, I believe it is, is the first day that the defendant

17  told Admiral Jackson about some of the key details of what

18  happened on January 9th.

19        Admiral Jackson will testify that at the end of that

20  conversation she told the defendant, much like in this e-mail,

21  to report that to NCIS and the testimony will be that he did

22  not.

23        And so that goes to willfulness element, Your Honor,

24  that he was reporting some things that didn't directly

25  implicate him, but --

1      THE COURT:  Are you saying he didn't -- he did not

2  send this e-mail, Mr. Stone, to NCIS?

3      MR. VOKEY:  He did.

4      MR. NOTHSTEIN:  He did.  And so, therefore, the fact

5  that he sent this to Admiral Jackson with instruction, but not

6  other things --

7      THE COURT:  Yeah.  I'm going to -- I take it you're

8  objecting, Mr. Vokey?

9      MR. VOKEY:  Yes.  On relevance, sir.

10     THE COURT:  Yeah.  I just think this is too far

11  afield.  I mean, this is a fellow who's just trying to make

12  trouble and it gets passed up the chain.  You know, I -- there

13  may be testimony about NCIS and what the admiral instructed,

14  but this isn't it.  So I'm going to sustain the objection to

15  368.

16     What's next?

17     MR. NOTHSTEIN:  377, Your Honor.

18     THE COURT:  Yeah.

19     MR. NOTHSTEIN:  Again, this is another e-mail chain

20  with the defendant, again, just shows the nature of the

21  information that Captain Nettleton was sharing with

22  Admiral Jackson, that he wasn't providing other information.

23     THE COURT:  Right.  So this was an inquiry from the

24  *Miami Herald*.  Right?

25     MR. NOTHSTEIN:  Correct.

1        THE COURT:   And then it went up to Captain Nettleton.

2   He then sends it to Admiral Jackson and she responds and he

3   responds, right?

4        MR. NOTHSTEIN:   Correct.

5        THE COURT:   Mr. Vokey, I'm inclined to allow this,

6   but I'll hear from you.

7        MR. VOKEY:   Just the relevance of media inquiries

8   here.

9        THE COURT:   Yeah.

10        MR. VOKEY:   And, I mean, that seems to be the only

11   relevance here.   And it's really not relevant to the -- what

12   we're here with -- the charged offenses are.

13        THE COURT:   Yeah.   Let me see.

14        Yeah, I think it's all right.   Because I think

15   that the -- there is some -- I think the government's entitled

16   to put on some evidence of what was occurring, what was

17   important, what wasn't important, how this was playing out,

18   what Captain Nettleton was telling them and what he wasn't

19   telling them, and I think this is -- and especially since he's

20   involved in this e-mail chain, I think -- I think it's -- I

21   think it's all right.   And we're going to hear from

22   Admiral Jackson.   She can be cross-examined on it if there's

23   questions.

24        So I'm going to overrule the objection and admit 377.

25      (Government's Exhibit 377 received into evidence.)

1    THE COURT:  What's next?

2    MR. NOTHSTEIN:  379, Your Honor.

3    THE COURT:  Yeah.

4    MR. NOTHSTEIN:  And this is just an e-mail between

5  Admiral Jackson and the defendant.  I can go further into --

6  into relevance if the Court has any questions.

7    THE COURT:  Mr. Vokey?

8    MR. VOKEY:  Just a relevance objection.

9    THE COURT:  Yeah.  I'm going to allow it.  It's just

10  an e-mail between Admiral Jackson and Captain Nettleton

11  involving -- tangentially at least, but involving the matter,

12  and is just a pattern of communication during a period in which

13  these were live matters.

14    So I'll -- it's not a -- not going to be the smoking

15  gun by any chance, but I'll -- by any stretch, but I'll allow

16  379 -- overrule the objection.

17    (Government's Exhibit 379 received into evidence.)

18    THE COURT:  What's next?

19    MR. NOTHSTEIN:  380, Your Honor.

20    THE COURT:  Yeah.

21    MR. NOTHSTEIN:  I think this is similar to

22  Exhibit 367, which is another e-mail where Admiral Jackson is

23  reporting up to Admiral Smith the current status.

24    THE COURT:  Yeah.  You know, I'm a little -- I'm not

25  sure about this.  I don't -- I'm not sure why Admiral Jackson's

1  communications with her superior, which contained a lot of

2  information -- and I'm just not sure why that would be -- why

3  that is appropriate.  So I'll give you one more chance to tell

4  me why.

5          MR. NOTHSTEIN:  Thank you Your Honor.  The reason

6  that this is relevant, Your Honor, is that there's going to be

7  testimony and one of the -- about one of the key questions in

8  this case, which were legal duties the defendant had to report

9  information up the chain, essentially.  And that is based on

10 laws, regulations, and the culture of the Navy, the traditions

11 of the Navy in reporting.

12          And the fact that Admiral Jackson is reporting

13 information of this nature and substance, and sometimes at a

14 grandular level, to her superior officer has the tendency to

15 show that the expectation of the Navy in general, commanders

16 more specifically, and those in the Navy Region Southeast,

17 which was a superior command to Naval Station Guantanamo, was

18 that information such as this would be reported up, such that,

19 Your Honor, information that the defendant is alleged to have

20 misled and -- people about and concealed, he could not have

21 believed he did not have to report that information.  The

22 materiality is an element of some of the charges, willfulness

23 and elements on the charges.  This goes to all of that.

24          THE COURT:  All right.  I'll think about it.

25          What's next?

1          So that's 367 and 380 that I reserved on, right?

2          MR. NOTHSTEIN:  Correct, Your Honor.

3          THE COURT:  Go ahead.

4          MR. NOTHSTEIN:  381, Your Honor.  This -- and to be

5   candid, Your Honor, the only sort of really important part of

6   this chain is the statement by Admiral Jackson on January 20th

7   to Captain Eldredge regarding her reasoning for terminating the

8   defendant.

9          THE COURT:  Wait a minute here.  What number are we

10  on?

11         MR. NOTHSTEIN:  Oh, I'm sorry.

12         THE COURT:  381 is just a little e-mail from --

13         MR. NOTHSTEIN:  I got a little out of order,

14  Your Honor.  My apologies.

15         MR. VOKEY:  No objection to this one.  This is just

16  an e-mail from Captain Nettleton.

17         THE COURT:  381 will be admitted without objection.

18      (Government's Exhibit 381 received into evidence.)

19         THE COURT:  What's next?

20         MR. NOTHSTEIN:  383 is the one I began talking about,

21  Your Honor.

22         THE COURT:  Yeah.  I looked at this.  I -- I am very

23  reluctant to consider this.  This is -- as I understand it,

24  this is communications between the Judge Advocate and

25  Admiral Jackson.  It's got all kinds of stuff in here.  And I'm

1    just -- I'm not sure about this.

2            Why would I allow this in?

3            MR. NOTHSTEIN:  Well, Your Honor, as far as the

4    hearsay level of it goes, this is her then existing state of

5    mind so that she is writing to her reasoning for relieving the

6    defendant of command as she is, you know, about to execute that

7    plan.  But as to relevance, Your Honor, this again goes to show

8    materiality and goes to show the misleading -- or shows the

9    defendant was actually misleading her.  One of the reasons that

10   the admiral gives for relieving the defendant of command was

11   the misleading and the trickling out of information so to

12   speak.

13           THE COURT:  Well, I think she can testify to some

14   extent.

15           You know, we're going to -- I don't know how far

16   we're going to go on her reasoning for relieving him.  I assume

17   that, to the extent that her -- the discovery that -- in her

18   mind that Captain Nettleton had not been forthcoming with her

19   is going to be part of that reasoning.

20           But this is kind of the sausage being made between

21   her and the Judge Advocate.  It's got a lot of information in

22   here that -- for example, it says, "I saw the note to CNO.  Why

23   is adultery the very first reason in the note for relieving

24   him?"

25           You know, this is her trying to figure out what the

1     right way to -- to disclose this to her superiors and to talk

2     to Captain Nettleton about.

3           And I just -- I just think it's -- I'm not -- I'm not

4     too inclined on this one. So --

5           MR. NOTHSTEIN: I understand that, Your Honor. I

6     just want to point out, I think that what Admiral Jackson would

7     say, it's not that this is part of the deliberative process but

8     that she was, you know, intending to ascertain from

9     Captain Eldredge whether she should correct the reasoning given

10     to the CNO because it wasn't accurate as to her, and she's

11     saying, "this was my reasoning." So --

12           THE COURT: Well, I think you can ask her that. So

13     I'm going to sustain the objection to 383.

14           All right. What's next?

15           MR. VOKEY: Your Honor --

16           THE COURT: Yeah.

17           MR. VOKEY: And I understand you're sustaining.

18           THE COURT: I'm sorry. I just assumed you were

19     against it.

20           MR. VOKEY: I am -- oh, without a doubt. But I want

21     to comment, because it applies to several e-mails and possibly

22     testimony at this point.

23           To get Admiral Jackson to give an opinion that

24     Captain Nettleton was being dishonest -- what the government is

25     trying to do here is -- why he was relieved is really

1   irrelevant to the charges we're here -- they want to testify

2   that he was relieved -- if the standard is that "I've lost

3   trust and confidence," fine.

4          But if they want to get the admiral -- a witness on

5   the stand, to say, "I am relieving him because he was

6   dishonest," we're asking a witness to testify to the ultimate

7   issue.  That's part of what's in here.  And that's the danger

8   that I see here.

9          The witness cannot give an opinion as to whether

10   something was truthful or not.  That's the purview of the

11   members.

12          THE COURT:  Well, I agree it's a little bit of a

13   line.  But I think she would be able to say that, once she

14   discovered what she didn't know before, that was one of the

15   reasons that she used -- or came to the decision that she'd

16   lost confidence.

17          Didn't she agree to that?

18          MR. VOKEY:  Sure.  But we're here dealing with false

19   statements, we're dealing with misleading, we're dealing with

20   obstruction.  Those offenses are complete by the time that she

21   relieves him.

22          So I don't object to her saying that -- so to tell

23   the story of how the command ended, but why she relieves him

24   has relevance to these charges.

25          THE COURT:  Yeah.  I'm concerned about that as well.

1    I think I'm just going to have to hear questions and have you

2    object.   I mean, I think they're entitled to get into some of

3    that.   How much of it and how detailed, I'm not sure.   And I

4    guess I need to hear some testimony.

5          But I just -- I think this e-mail just has too much

6    extraneous information in it.   It's not -- it's really her

7    talking to her legal counsel, more or less, as far as I can

8    tell.   And I just -- I'm not going to -- I'm not going to allow

9    it.

10         So 383 is out.

11         What's next?

12         MR. NOTHSTEIN:   Thank you.

13         We'll go to 386, Your Honor.

14         THE COURT:   Yeah.

15         MR. NOTHSTEIN:   Before you do that, I'll just make

16   one quick point.   I understand the Court will have to decide a

17   lot of these issues once testimony comes out.

18         But just so it's clear, our point about her relieving

19   him of command is not that she's expressing opinions that he's

20   untruthful or anything like that.   I mean, she certainly knows

21   whether she feels that she was misled.

22         But, rather, Your Honor, it all goes to materiality,

23   which is an element of Count Three and of the other false

24   statement counts.

25         And so if her decision -- she's making a decision to

1    relieve him of command based on --

2         THE COURT:  Well, what I'm saying to you, though, is

3    the materiality of it is demonstrated by the fact that she --

4    if she's prepared to testify that one of the reasons that she

5    relieved Captain Nettleton was that she discovered that he

6    hadn't been forthcoming with her about these issues -- I mean,

7    I think that's materiality, right?

8         MR. NOTHSTEIN:  Right.  That's the point I was trying

9    to make.

10        THE COURT:  What I'm also saying to you is there's

11   about 18 reasons -- I'm exaggerating.

12        There's a bunch of reasons listed in this e-mail.

13   There's other discussions about which should be emphasized and

14   which shouldn't be, and what she's going to say to him when she

15   does it, and what she's going to say to the outside world, what

16   she's going to say to the Commander of Naval Operations, right?

17        CNO, is that what that is?

18        MR. NOTHSTEIN:  Yeah.

19        THE COURT:  Yeah.  I had to get my Marine over here

20   to tell me what that was.  And so -- so I'm less interested in

21   how the sausage was made or how they decided to prioritize it

22   and what exactly they were going to say to him, what exactly

23   they were going to say, but I -- I think I would let her

24   testify as to what effect the failure to disclose things and

25   that she discovered later had on her decision-making.

1        MR. NOTHSTEIN:  Very good.  I understand.  I was

2   actually just referring to the testimony piece of it,

3   Your Honor.

4        THE COURT:  That's what I'm talking about, too.

5        MR. NOTHSTEIN:  And so, Your Honor, I think that the

6   next few that we would address probably fall in that same

7   category of sounds like the Court's not necessarily inclined to

8   introduce --

9        THE COURT:  Let me look at them here.

10        MR. NOTHSTEIN:  386, Your Honor.

11        THE COURT:  Yeah.  I'm not going to admit that.

12        All right.  411?

13        MR. NOTHSTEIN:  411 is the same, Your Honor.  This

14   was her talking point that she prepared to have the

15   conversation with the defendant.

16        THE COURT:  Yeah.  I'm not going to admit that.

17        MR. NOTHSTEIN:  And, Your Honor, just to make the

18   point here, I guess, if nothing else, just for the record, this

19   is not an e-mail that was sent.  The admiral would testify this

20   is what she read from as she had the conversation with the

21   defendant.

22        THE COURT:  And, again, I just don't know that --

23   this isn't a case about why she relieved him of duty.  And

24   the -- the --

25        MR. NOTHSTEIN:  And I agree, Your Honor.

1        THE COURT:  And, I mean, she -- it says she lost

2    confidence in him.  Certainly she can say that.  I guess that's

3    the standard language that's used, right, when you relieve

4    somebody of duty, that you've lost confidence?

5        MR. NOTHSTEIN:  Yes, sir.

6        THE COURT:  And...

7        MR. NOTHSTEIN:  Where this is different, though,

8    Your Honor, if I may --

9        THE COURT:  Yeah.

10       MR. NOTHSTEIN:  -- is that this would be offered for

11   effect on the listener.  The admiral will testify that shortly

12   after the defendant was relieved of command, he returned here

13   to Naval Station Jacksonville, that shortly thereafter he came

14   and had a conversation with the admiral.

15       It wasn't a detailed conversation, but, in that, the

16   defendant acknowledged that he had not lived up to her

17   expectations and we would argue, Your Honor, that part of that

18   response is in response to what she says he had done wrong.

19       THE COURT:  Okay.

20       Yeah.  I -- I think that we're going to have

21   Admiral Jackson on the stand.  You can ask her questions.  She

22   can tell why she did what she did up to a point.  And I just

23   don't know -- this is really just her talking notes.  It says,

24   "What can you expect from a media perspective?  I care for you

25   and your family to work through this."  You know, I just -- I

1    don't think it's a document that belongs in evidence.  That's

2    not to say that Admiral Jackson can't be asked some of these

3    questions from the stand.

4              MR. NOTHSTEIN:  Yes, sir.

5              THE COURT:  All right.  411, that is out.

6              MR. NOTHSTEIN:  I'm sorry, Your Honor.

7              THE COURT:  I'm sorry.  Go ahead, sir.

8              MR. NOTHSTEIN:  The next -- if you turn back to the

9    beginning of your binder.

10             THE COURT:  Well, wait.  I haven't ruled on 367 and

11   380.

12             MR. NOTHSTEIN:  I'm sorry.  I thought the Court was

13   reserving on those.

14             THE COURT:  Well, I'm...

15             MR. VOKEY:  And, Your Honor?

16             THE COURT:  Yeah.

17             MR. VOKEY:  You will note in 367 again, one of the

18   people on this e-mail chain is the lawyer.  So this is, again,

19   planning behind the scenes.  So another reason why --

20             THE COURT:  I'm going to exclude 367 and 380.

21             I think 380 is a closer call because it does reflect

22   Admiral Jackson's decision points as to -- she says, for

23   example, "My gut tells me that on Monday or Tuesday I'll have

24   more information and be able to make a more informed decision

25   regarding what actions I" could take -- or "should take."

1          And I think this is around the time that she's

2     being -- that she's learning more information than she knew

3     previously about Captain Nettleton's statements to her.

4          MR. VOKEY:  And, Your Honor, if you look at

5     paragraph 3 of that one, which is our greatest concern, she's

6     commenting about Captain Nettleton's -- how he's feeling, what

7     he's worried about, what comments he's hearing, and those

8     are -- would be improper speculation as well.

9          THE COURT:  Yeah.

10          MR. VOKEY:  And now she's commenting on the state of

11     mind of the -- of the defendant.

12          THE COURT:  Yeah.

13          MR. NOTHSTEIN:  Well, Your Honor, if I may.  I don't

14     believe the admiral is speculating there.  What she's doing is

15     relaying a statement from the defendant.  So that would be a

16     statement by a party opponent.  So that layer of hearsay is not

17     an issue.

18          MR. VOKEY:  And, Your Honor, she can testify as to

19     what the defendant said, but not testify as to --

20          THE COURT:  Yeah.  I'm going to -- for now I'll

21     sustain 380.  If you want to -- if you feel like you really

22     want it and you think you've established it through the

23     testimony, you can make another run at me on it.  Okay?

24          MR. NOTHSTEIN:  Yes, Your Honor.

25          And I will just note, Your Honor, that we may have to

1    readdress a couple of these as prior consistent statements

2    based on the cross-examination.

3              THE COURT:  Sure.

4              All right.  And now I've got all these regs.  You

5    want everybody to know that there's duties and responsibilities

6    that go with being a commanding officer and so forth, right?

7              MR. NOTHSTEIN:  That's correct, Your Honor.  So

8    Government Exhibits -- I'll just list them off.  We don't need

9    to do one by one necessarily, but 35, 66, 68, 73, 74, and 75,

10   these are all witnesses who will testify -- or some of the

11   regulations that go over some of the statutes and the

12   instructions that are given to commanding officers.

13             One of elements that we have to prove, Your Honor,

14   for Count Three is that the defendant had a legal duty to

15   provide information he is charged with concealing.

16             All these documents, which are records of a --

17   business records of the Navy, the witnesses will testify --

18   establish that duty, and were the guiding laws and regulations

19   and instructions.

20             THE COURT:  Mr. Vokey?

21             MR. VOKEY:  Sir, what the government is doing is

22   throwing out a whole bunch of military regulations that are

23   very vague and non-specific as to a duty, and there's a great

24   danger here of misleading the jury.  So --

25             THE COURT:  In what way?  I mean, I guess it's -- I

1   mean, in some ways you would think it would be an obvious point

2   that Captain Nettleton had a duty to be truthful with his

3   superiors, that he had a duty to be accountable, that he -- you

4   know, all the things that are in these regs, and I agree with

5   you -- I mean, I don't know if we need all this paper, but --

6   but on the other hand, it's not -- I guess I'm not

7   understanding what the prejudice is.  I mean,

8   Captain Nettleton, I don't think, would deny that he had these

9   duties and responsibilities.  So what --

10          MR. VOKEY:  Well, I guess it depends.  Which duty --

11   where is the duty -- other than -- let's hand in, what, six or

12   seven different regulations and say there's a duty in there

13   somewhere?  I mean, we would like to be on notice as to what

14   the duty is.

15          THE COURT:  Yeah.  I do kind of agree with that.  I

16   mean, I'm looking, for example, at Exhibit 73.  I mean, it's

17   like 50 pages long.  It's got things about foreign intelligence

18   and flight lines.  And so I'm a little unclear what exactly it

19   is that we're doing here.

20          I do see there's a -- a CFR -- it looks like a CFR or

21   a Navy reg on the commanding officer.

22          I assume you're going to -- who are you going to

23   question about these, Mr. Nothstein?

24          MR. NOTHSTEIN:  Your Honor, these will be discussed

25   with Admirals Gray and Jackson most likely.  I don't know that

1    we're going to put all these in evidence, Your Honor, I think

2    we may want to refer to many of these.

3              And on the point of notice, Your Honor, I would just

4    go back to the indictment, where, page -- starting on page 2,

5    paragraph 5 in the subparagraphs, we have alleged all of the

6    defendant's duties with these same statutes and regulations.

7              THE COURT:  Well, I'm not -- I am sure in here

8    somewhere are things that would go to truthfulness and

9    accountability and being honest with your superiors.  I don't

10   have any doubt about that.

11             MR. NOTHSTEIN:  Okay.

12             THE COURT:  But I'm opening up the -- Chapter 8.

13   "The commanding officer.  O870.  Movements of ships at a naval

14   station."  Well, that doesn't have anything to do with

15   anything.  So what I'm saying to you is it may be that you can

16   use these regs with your witnesses and ask them to highlight a

17   specific area or something, but to just dump in -- into

18   evidence all this stuff, I don't think makes sense.

19             MR. NOTHSTEIN:  That's not our intent, Your Honor.

20             THE COURT:  Well, I'll let you proceed as you're

21   advised and we'll figure it out, but I -- I agree with

22   Mr. Vokey that I don't want the jury to just have a pile of

23   stuff back there that they don't know what they're doing with

24   it.

25             MR. NOTHSTEIN:  And neither do we, Your Honor.  We do

1    not intend to do that at all.  It wouldn't be helpful.

2              THE COURT:  All right.

3              MR. NOTHSTEIN:  The last one we would address,

4    Your Honor --

5              THE COURT:  I thought we were done.

6              MR. NOTHSTEIN:  I'm sorry.  There was just one more.

7    I think I have the wrong one in here.

8              THE COURT:  Should somebody tell the jury anything?

9              COURTROOM DEPUTY:  Not yet.

10             THE COURT:  Will you tell them I apologize, that it's

11   my fault, that we're discussing some matters and we'll be with

12   them very shortly.

13             COURT SECURITY OFFICER:  Yes, sir.

14             MR. NOTHSTEIN:  The very last one, Your Honor, is

15   Government 83.

16             Do you have a copy of that?

17             THE COURT:  I'm sure I do somewhere.

18             MR. NOTHSTEIN:  I can put it on the screen,

19   Your Honor.

20             THE COURT:  Okay.  It's not in the little notebook

21   you gave me.

22             MR. NOTHSTEIN:  We're going to put it up on the

23   screen, Your Honor, in just a second.

24             Just to preview this, these document -- or this

25   document -- these are some notes that Admiral Jackson will

1    testify she used when she assumed command at Navy Region

2    Southeast -- these were notes she had of a call with all the

3    commanding officers of the installations under her command and

4    that she went through her expectations.

5             Several of these, Your Honor, as Admiral Jackson will

6    testify, are expectations regarding communication, information

7    flow, things of that nature, Your Honor.  Those are relevant to

8    the defendant's knowledge of the expectations, therefore,

9    willfulness, materiality, things of that nature.

10            THE COURT:  Well, is it -- is that relevant to a

11   criminal willfulness?  I mean, that -- that may be the

12   expectations that were given to her -- to him as a commanding

13   officer, but if a -- I mean, what -- what if -- what if the

14   admiral said, "Well, I know the regulations say you only have

15   to report to me once a day, but under my command you're

16   required to report to me three times a day"?

17            Well, is that -- and if he doesn't report three times

18   a day, is that evidence of willfulness in a criminal context or

19   is that just him not following the orders of his superior?

20            I don't really -- I'm not really sure that her

21   overlay on what she expected from him -- or if her expectations

22   were higher than somebody -- some other admiral's was, I don't

23   really understand how that has anything to do with the criminal

24   case.

25            MR. NOTHSTEIN:  So, for one, Your Honor, I don't

1   think that that's going to be the testimony, that she sort of

2   had some other kind of expectations.

3          For example, in the sort of second section here --

4   and I will -- I will just highlight it here, Your Honor --

5   you'll see, Your Honor, the defendant -- or, I'm sorry, Admiral

6   Jackson discussed CCIRs.

7          And this goes to Mr. Vokey's point just now, you

8   know, talking about the regulations.  Well, what are these?

9   Are these just some regs out there sitting on, you know,

10  somebody's desk or sitting on the shelf?

11         Admiral Jackson will say she specifically does

12  discuss the CCIRs.  Those are Commander's Critical Information

13  Reports.  And it's a regulation or an instruction that tells

14  them what -- commanders what they have to report.  And she will

15  say she went over that.  That goes to the --

16         THE COURT:  Well, if she wants to say -- if she wants

17  to get on the stand and say, "There were" -- "There's

18  regulations governing commanding officers, there's regulations

19  governing the command at Guantanamo Bay and that when

20  Captain Nettleton assumed that command, I went over those and

21  emphasized those regulations with him" or something like that,

22  I'll probably let her do that.  But I -- you know, this is just

23  a talking point and a lot of it has nothing to do with -- for

24  example, what does "no stovepipes" mean?  I don't even know

25  what that is.

1           MR. NOTHSTEIN:  I believe the admiral would say that

2    that talks about not stove-piping information, Your Honor, as

3    you said, about information flow.

4           I mean, everything on here is not necessarily

5    relevant.  There's a -- she reminds them all to ensure that the

6    trash is picked up on base.  Although I would say that is

7    relevant to show the level of expectation of what the command

8    was, but --

9           THE COURT:  I don't think so.

10          All right.  Is that it?

11          MR. NOTHSTEIN:  Yes, Your Honor.

12          THE COURT:  Mr. Vokey?

13          MR. VOKEY:  No.  I believe there are some diagrams

14   the government wanted to admit as well and we had no objection

15   to them.

16          THE COURT:  Okay.  What -- are they -- do they have

17   exhibit numbers?

18          MR. NOTHSTEIN:  They do, Your Honor.  I'm sorry.  I

19   don't have it in front of me.  I believe it's...

20          MR. VOKEY:  55, 56, 57, 58, 60, 61.

21          MR. NOTHSTEIN:  Thank you very much.  Yes.  55

22   through 61.

23          THE COURT:  So 55, 56, 57, 58 -- not 59?

24          MR. NOTHSTEIN:  59 as well.  But that's already

25   admitted, I believe, Your Honor.

1    THE COURT:  Oh, okay.  59, 60, 61.

2    Got that, Ms. Diaz?

3    COURTROOM DEPUTY:  Yes, sir.

4    THE COURT:  All right.  They'll be admitted without

5 objection.

6   (Government's Exhibits 55, 56, 57, 58, 60 and 61 received

7 into evidence.)

8    THE COURT:  All right.  So remind me -- we're on

9 cross of commander -- of Captain Ross, and then who's the next

10 witness?

11    MR. GEE:  Admiral Gray, Your Honor.

12    THE COURT:  And then Admiral Jackson after that?

13    MR. GEE:  Yes, Your Honor.

14    THE COURT:  I tell what, since we came in at 9:15 in

15 order to be able to stay with the jury until we can get some

16 work done here, why don't we all take a five-minute comfort

17 break and we'll start at 10 o'clock.

18    COURT SECURITY OFFICER:  All rise.

19    THE COURT:  Tell the jury, too, that we'll start at

20 10 o'clock, so if they need to use the restroom or anything,

21 this is a good time.  Thanks.

22   (Recess from 9:55 a.m. to 9:59 a.m.; all parties present.)

23    COURT SECURITY OFFICER:  All rise.  This Honorable

24 Court is back in session.

25   (Captain Ross enters the courtroom.)

1    COURT SECURITY OFFICER:  All rise.  This Honorable

2    Court is back in session.

3          Please be seated.

4          THE COURT:  Good morning.

5          THE WITNESS:  Good morning.

6          THE COURT:  We ready?

7          MR. LENAMON:  Yes, Judge.

8          THE COURT:  Ready to proceed?

9          MR. NOTHSTEIN:  Yes, Your Honor.

10         THE COURT:  Let's have the jury, please.

11         COURT SECURITY OFFICER:  All rise for the jury.

12     (Jury enters, 10:01 a.m.)

13         COURT SECURITY OFFICER:  Please be seated.

14         THE COURT:  Good morning, ladies and gentlemen.  I

15    apologize for our delay this morning.  I had been working with

16    the lawyers on some issues that we needed to address and we

17    started with what I thought was enough time to get it done and

18    it just took longer than we thought.  So I do apologize to you

19    for the delay.  But I think -- the good news for you is I think

20    some of the work we've done will streamline the presentation

21    here today.

22         So I think in the long run it probably saves some

23    time.  But I appreciate everybody's patience.  You'll recall

24    when we ended our session yesterday that Commander -- I'm

25    sorry, Captain Ross was ready to be cross-examined by

1    Mr. Vokey.  And so he's going to do that momentarily.

2         While he -- while they're getting set up over there,

3    I don't want to forget to remind you that we are not in session

4    tomorrow.  Do not come tomorrow.  Unless you just want to enjoy

5    downtown, do not come tomorrow.

6         We'll be back in session on Monday.  At the end of

7    the day today, I'll talk to you about timing and so forth.  It

8    will be basically the same.  But we are not in session

9    tomorrow, on Friday, so you have that day to use as you wish.

10        So are you ready, Mr. Vokey?

11        MR. VOKEY:  I am, Your Honor.  I have one question

12   from here and then I'll move back up here, if that's all right

13   with the Court.

14        THE COURT:  That's fine.  That's fine.  You may

15   proceed, sir.

16   **ALONZA JUNIOR ROS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

17                    **CROSS-EXAMINATION**

18   BY MR. VOKEY:

19   Q.   I got the exhibit up.  I have Government's Exhibit 6.

20        Captain Ross, good morning.

21   A.   Good morning.

22   Q.   Now, yesterday when you testified, you were asking about

23   -- you were asked about the search --

24   A.   Right.

25   Q.   -- and you with this map indicated in a green line just

1  like I did that that's where the duty section was searching?

2  A.   I was wrong about that.  Now that I look at this map, I

3  was looking at the leeward side, but looking here I was

4  thinking about the ferry that's on this side.  We were in this

5  area, and then these areas back in here.

6  Q.   I mean, Captain Ross, how long were you in GTMO?

7  A.   I was in GTMO a year-and-a-half.

8  Q.   And, I mean, you know the difference between leeward and

9  windward side, right?

10  A.   Yes, I do.

11  Q.   So going back to January 9th, this is your first day on

12  the job, January 9th, 2015?

13  A.   No.  My first day on the job is when I landed on the

14  island, December the 30th or 31st, one of those two days.

15  Q.   That's right.  You've got to do a turnover with the old

16  XO, get up to speed?

17  A.   Yes, sir.

18  Q.   So you had been in this job less than a week, then?

19  A.   That's fair to say.

20  Q.   Been there a few days.  And you'd never been stationed in

21  Guantanamo before?

22  A.   No, I hadn't.

23  Q.   Didn't know all the particulars, and there's -- there's a

24  lot of unusual stuff about Guantanamo.  You would agree with

25  me?

1    A.    I agree.

2    Q.    So you've got a lot to learn when you first get there?

3    A.    Yes, I do.

4    Q.    And when you first get there, you're not aware when you

5    walk on the island about a lot of the dangers, the

6    sensitivities, the restrictions.  I mean, there's a lot that

7    goes into Guantanamo Bay, isn't there?

8    A.    There is.

9    Q.    And let me ask you -- and I'm noticing your uniform.  You

10   are not an aviator; is that correct?

11   A.    No, I'm not.

12   Q.    You're a surface warfare officer?

13   A.    I am.

14   Q.    All right.  So you are not a pilot in any way?

15   A.    I wasn't.

16   Q.    So I want to ask you about a comment you made yesterday

17   about getting a helicopter for the search.

18   A.    Uh-huh (affirmative).

19   Q.    Now, this is something that you thought of on Sunday, the

20   11th, right?

21   A.    Right.

22   Q.    And you contacted the Coast Guard commander and -- about

23   the possibility of getting a helicopter to help in the search?

24   A.    Yes, sir.

25   Q.    So and then you approached Captain Nettleton with that --

1    with that, say, what is it, about 10 o'clock in the morning?

2    A.   That's fair to say, yes.

3    Q.   About an hour before the body was found?

4    A.   I guess so, yes, sir.  I don't remember the particulars,

5    but I did approach him about it.

6    Q.   And you know the body was found at approximately

7    11 o'clock?

8    A.   I do.

9    Q.   So you contacted the Coast Guard commander directly?

10   A.   Yes.  I talked to her earlier that morning.

11   Q.   And when you brought it to Captain Nettleton, he was upset

12   with you?

13   A.   Yes.

14   Q.   And he was upset with you because you had gone directly to

15   another commander asking for support?

16   A.   Okay.

17   Q.   Isn't that correct?

18   A.   I don't know why he was upset.  I know he was upset.

19   Q.   Because he said, "You should have gone to me first"?

20   A.   He said I should have gone to him before I authorize any

21   type of flights.

22   Q.   That's right.

23   A.   Which I don't authorize flights.  I was just seeing if we

24   could get support from the Coast Guard commander that was

25   stationed at the confinement facility.  I was getting all the

1  things in order to come to him to get permission.

2  Q.   He said you should have gone to him first?

3  A.   Yes, he said that.

4  Q.   Now, he never said that -- that necessarily using a

5  helicopter for a search is a bad idea, did he?

6  A.   No, he didn't.

7  Q.   He just said that you should have gone to him first before

8  you contacted the Coast Guard commander?

9  A.   Fair statement.

10  Q.   So let me ask you, as a commanding officer, if you have a

11  commander making a request of another command, that -- that's a

12  command-to-a-command thing, so -- and you understand that

13  Captain Nettleton is upset that you're going to the commander

14  of another unit without going through him?

15  A.   No, I don't understand that.

16  Q.   So let me ask you.  So, for example, if you had a staff

17  officer that worked for you, say -- I mean, I'm sure you have

18  in your current command a lot of staff officers that work for

19  you.

20  A.   Yeah.

21  Q.   Say you have a lieutenant or an ensign on your staff.  Do

22  you want him contacting, say, the commander of the Seventh

23  Fleet directly?

24  A.   No.  I would want him to get the details of what's

25  required before I executed anything because the commander would

1    have to be the one to execute it.

2    Q.    That's exactly right.

3    A.    I would give him all the background information needed to

4    make that decision.  That's what I would expect.

5    Q.    But you wouldn't want that ensign contacting the admiral

6    commander of the Seventh Fleet, would you?

7    A.    Well, I wouldn't contact the Seventh Fleet.  That would

8    have been the Sector 7.  I contacted commander -- commander to

9    commander that was on the installation, so it's a total

10   difference between Seventh Fleet and a standard installation

11   commander.

12   Q.    So let me talk to you about aircraft operations.  You

13   would agree with me that you can't just start up aircraft

14   operations carelessly, right?

15   A.    Totally agree.

16   Q.    There's a lot that goes into it?

17   A.    Yes, sir.

18   Q.    There is safety concerns and there's plenty of other

19   concerns?

20   A.    Yes, sir.

21   Q.    Matter of fact, I think one of the things you said is,

22   "Well, maybe Captain Nettleton knew something that I didn't at

23   the time"?

24   A.    That's always the case.

25   Q.    And there could be many different considerations of why he

1    was hesitant to just say, "Let's ask a helicopter to fly"?

2    A.    Could be.

3    Q.    So, for example, at the time you arrived, right then --

4    we're talking about January 11, just after you arrived, that

5    there had already been -- already been a number of Cuban

6    airspace violations in the period before you arrived at

7    Guantanamo.  Did you know that on that morning?

8    A.    I did not.

9    Q.    And did you know that there had been some international

10   incidents because of that Cuban airspace violations [sic]?

11   A.    I did not.

12   Q.    And violating sovereign airspace, Cuban airspace is not a

13   small thing, is it?

14   A.    No, it's not.

15   Q.    And the terrain at Guantanamo, as we've heard, can be kind

16   of treacherous, right?

17   A.    Yes, sir.

18   Q.    And if you were going to order a helicopter to search, you

19   also have to think about how he might land either to pick

20   somebody up or in case he has an emergency landing?

21   A.    Yes, sir.

22   Q.    And that a helicopter landing on cliffs or dangerous

23   terrain could be a danger to the crew and to the aircraft?

24   A.    I would imagine that helo would [sic] be called to land on

25   a cliff.  It would be called to land at the air station.

1  Q.    If he's called to land, unless he has to make an emergency

2  landing?

3  A.    That's the case for any aircraft.

4  Q.    And also a consideration is that there are still

5  unexploded mine fields out there in -- in Guantanamo, and you

6  have to be very cognizant if you're flying aircraft over

7  unexploded mine fields, correct?

8  A.    Fair to say.

9  Q.    And were you aware on January 11th that Captain Nettleton

10  had negotiated a deal with the -- the Cuban government to allow

11  an exception to the violation of Cuban airspace for civilian

12  medevac planes?  Were you aware of that?

13  A.    Not prior to that.

14  Q.    And that a possible restriction of violation of Cuban

15  airspace could negate that valuable agreement that -- that was

16  designed to save lives?  Did you know that on January 11th?

17  A.    I did not.

18  Q.    And there's also restrictions about flying over the Joint

19  Task Force that we've heard about, the JTF, right?

20  A.    Right.

21  Q.    We've got some very, very sensitive information where

22  we've got those detainees confined, right?

23  A.    True.

24  Q.    So we don't want pilots willy-nilly flying over the JTF

25  and that airspace, correct?

1   A.   Correct.

2   Q.   And you're also worried that there's also restrictions

3   about helicopters taking off pier side because of safety

4   issues?

5   A.   I am aware of that.

6   Q.   And you have to make sure that the pilots are familiar

7   with the terrain, the dangers, the restrictions of everything

8   that they have to fly?

9   A.   Concur.

10   Q.   And before you get a pilot up in the air, it may take a

11   lot of time, days even, maybe training and briefings before you

12   just launch a helicopter up in the air, especially in the area

13   of Guantanamo Bay?

14   A.   It may take days, it may take hours.

15   Q.   You don't have that kind of background, right?

16   A.   No, but I have that experience in dealing with it since I

17   was the port operations officer at the largest naval base in

18   the world that launched and recovered helos all the time and

19   launched and recovered helos off of aircraft carriers, and I

20   was the flight deck officer on the ships that I have been on,

21   so I do have some idea about the operations of helicopters.

22   Q.   Now, Captain -- Captain Nettleton was a helicopter pilot

23   himself, right?

24   A.   True.

25   Q.   And he was -- he had experience and training -- I don't

1   know if you're aware of it -- in maritime combat, special

2   operations, search and rescue?

3   A.    I was aware of that.

4   Q.    So Captain Nettleton is very familiar with search and

5   rescue operations and limitations and safety problems of

6   possibly flying a helicopter around the Guantanamo Bay area?

7   A.    No doubt about that.

8   Q.    So perhaps that morning Captain Nettleton knew something

9   that you didn't and he was concerned about you contacting the

10  commander directly without going through him.  Fair to say?

11  A.    Fair to say.

12  Q.    You testified a little bit about the -- the Navy Blue

13  messages yesterday?

14  A.    Yes, sir.

15  Q.    One second.

16        And I believe that your testimony from yesterday --

17  give me a second to find it in the transcript here.

18        MR. GEE:  Objection.  Reference to transcript.

19        THE COURT:  I'm not sure what -- I'm not sure what

20  we're talking about.  What transcript are you talking about?

21        MR. VOKEY:  It's -- it's the transcript from

22  yesterday's proceedings, Your Honor.

23  BY MR. VOKEY:

24  Q.    So the government was asking you about Exhibit 357, which

25  was the Navy Blue that was sent out, the missing person's

1    report.

2         Do you recall talking about that?

3    A.    Yes, sir.

4    Q.    So that was prepared by a Jeffrey Crabtree, Lieutenant

5    Crabtree, right?

6    A.    That's right.

7    Q.    And he was the senior watch officer?

8    A.    Yes, sir.

9    Q.    And that's kind of his standard duty -- it's one of his

10   duties, is to ensure these, kind of -- high-importance message

11   traffic goes out?

12   A.    Yes, sir.

13   Q.    Navy Blue is one of those?

14   A.    Yes, sir.

15   Q.    And it's kind of a standard, you know, this is a reporting

16   requirement that has to go out?

17   A.    Fair to say.

18   Q.    And you guys actually sent out three of them, right?

19   A.    I can't remember the exact number, but it's two or three.

20   Q.    So you sent out one for a missing persons?

21   A.    And then we sent out that the person -- a death report.

22   And we may have sent out a closing report.

23   Q.    A closing report on the missing persons?

24         THE COURT:   Excuse me one second.

25         Captain, could you keep your voice up?  And I think

1    maybe your hands are in front of the microphone there.

2         Thank you, sir.

3         THE WITNESS:  Yes, sir.

4    BY MR. VOKEY:

5    Q.   So the first one on January 10th, the first -- the first

6    traffic that we see on this is Lieutenant Crabtree saying in an

7    e-mail -- it was to you and Captain Nettleton.

8         It says, "Skipper and XO, Navy Blue template

9    attached.  The CO is currently unreachable, but will notify ROC

10   and release traffic as soon as you give the word."

11   A.   Okay.

12   Q.   8 p.m.  Does that sound right?

13   A.   Yes, sir.

14   Q.   And the response that you gave nine minutes later at 8:09

15   p.m. was, "Weps," which is the nickname for Lieutenant Crabtree

16   because he's a weapons officer, right?

17   A.   Uh-huh (affirmative).

18   Q.   "Weps, notify the ROC and release the attached.  Made a

19   couple of edits," right?

20   A.   Right.

21   Q.   So that's nine minutes after Weps had sent you that e-mail

22   and the Navy Blue?

23   A.   Right.

24   Q.   And you authorized the release of it?

25   A.   I did.

1  Q.   Now, you said yesterday that you discussed it with the

2  captain.  Did you give him a phone call?

3  A.   Yes.  That message -- let me tell you what I mean by

4  authorize and release.  That message was vetted through the

5  captain prior to it being released.

6           I was telling him -- and prior to that message being

7  drawn and written, we had discussed it several different times

8  and reviewed it.  I made the final look at it, made the

9  changes, got permission from the captain to send.  He had to

10 authorize it.

11 Q.   All right.  Let me ask you, between 8 o'clock, when

12 Lieutenant Crabtree says, "Here's the report," and 8:09, you

13 said that you discussed it with the captain?

14 A.   That -- that message was being discussed prior to it even

15 being in the final draft.

16 Q.   You reviewed it, you discussed it with the captain.  Did

17 you discuss it with the captain between 8 o'clock and 8:09?

18 A.   I discussed it with the captain the morning starting all

19 this off.  This didn't just happen.  Navy Blue messages just

20 don't go out then.

21          When this man first -- was determined he was missing,

22 we were making preparations.  The minute that we determined

23 that he was missing, in a long-enough period, the captain

24 decided that we would start looking at the message requirement;

25 hence, he said, "The template is attached."

1    Q.    Captain Ross, listen to my question carefully as I ask it.

2    It says, "I reviewed it, and I discussed it with the captain."

3          Did you discuss it with the captain between 8 o'clock

4    when Lieutenant Weps sent the message to you and nine minutes

5    later when you authorized it?  Are you saying that you talked

6    to him?  Yes or no?

7    A.    I'm saying that I talked to the captain prior to releasing

8    that message.

9    Q.    And I'm asking you between 8 o'clock and 8:09 when you

10   said you authorized the release, did you talk to the captain?

11   A.    I can't remember if I talked to him between that time

12   period.

13   Q.    And would it surprise you that if I told you that the

14   phone records have no phone call with you between you and

15   Captain Nettleton during that period of time, would that

16   surprise you?

17   A.    It probably would surprise me because we were probably

18   inside the building.

19   Q.    So are you saying now that -- that there was no phone

20   call, that --

21   A.    No, I'm not saying that at all.  I'm just saying that it

22   wouldn't surprise me.  It could have been we were in the

23   building.  We could have been out on the grounds.  That's what

24   I'm saying.

25   Q.    Or maybe it's because -- because it's a standard

1    procedure, Weps sent it to you as an urgency to get it out, and

2    you said, "I authorize it goes out," and Captain Nettleton had

3    no weigh-in whatsoever?

4    A.    No, that's not correct.

5    Q.    So -- but what we do have is Captain Nettleton sending an

6    e-mail much, much later saying, "Thanks, Weps, for sending it

7    out," right?

8    A.    Okay.

9    Q.    That's his acknowledgment of thanks, but that was hours

10   later?

11   A.    Okay.

12   Q.    So I want to also talk about some -- some -- some other

13   statements that you said yesterday.  So on Saturday,

14   January 10th, you said that you directly asked Captain

15   Nettleton, "Did Chris Tur come to your house," and he responded

16   "No."

17         Do you remember testifying to that?

18   A.    Yes.

19   Q.    Now, prior to that, you had already received a phone call

20   from Kelly Wirfel about Chris Tur being at Captain Nettleton's

21   house, didn't you?

22   A.    Right.

23   Q.    So you knew he had been there?

24   A.    No, I didn't know he had been there.  I knew what she had

25   told me.  I had no way of confirming that he was there.

1    Q.    If you already knew he had been there, why did you ask

2    Captain Nettleton that?

3    A.    That was later on down the line.  I didn't pay any

4    attention to when I first received that from Kelly.

5    Q.    And if Captain Nettleton knew that Kelly Wirfel had called

6    you, why would he say no?

7    A.    I don't know why he -- how he would know she had called me

8    because he called me right after she -- I talked with her.  I

9    don't know how he would have known that.

10   Q.    That's because that exact conversation didn't occur, did

11   it?  You didn't directly ask him, and he didn't say no to that

12   question?

13   A.    Yes, he did.

14   Q.    Now, there was another question that you did have with

15   him, right, a conversation where Captain Nettleton told you

16   that, "I didn't let him in"?

17         Do you remember that?

18   A.    No.  I remember when he -- we had a conversation.  The

19   first time I asked, he said, "No, he didn't come to the house."

20         Then later on he said, "Yes, he came to the house,

21   but I didn't let him in."

22   Q.    This is a -- so this is a later conversation, right?

23   A.    Yes.

24   Q.    So when Captain Nettleton said, "I didn't let him in," you

25   interpreted that as, what, as he didn't go inside, that Chris

1    Tur hadn't gone inside?  Is that how you took it?

2    A.    That's how I interpreted it.

3    Q.    But it's also possible that when he said, "I didn't let

4    him in" also means that "I'm not the one who let him in, I

5    didn't give him permission," right?  That's another possible

6    interpretation of that -- of that phrase, isn't it?

7    A.    Not my interpretation of it.

8    Q.    And so if someone broke into your house, Captain Ross, and

9    somebody asked you why he was in the house, you said, "I didn't

10   let him in," that would have been because he had broken in the

11   house.  Fair to say?

12   A.    Fair to say.

13   Q.    Now, the night before you also described to government

14   counsel yesterday kind of the events that happened at the

15   Bayview?

16   A.    True.

17   Q.    And you thought it was a bad idea that Captain Nettleton

18   should take all these people back to the house because the

19   level of drinking and everything, right?

20   A.    That was some part of it.

21   Q.    So you walked outside, and there is a scuffle there, there

22   is -- Chris Tur is yelling.  He's yelling at Nettleton and he's

23   yelling at Lara Tur?

24   A.    No.  I walk outside, Chris Tur comes in behind me --

25   Q.    Right.

1  A.    -- and that's when the argument begins.

2  Q.    And he yells at Captain Nettleton and he yells at his

3  wife?

4  A.    Oh, I -- he yelled something to the fact of "This -- this

5  guy is fucking my wife."  That's what he yelled.

6  Q.    Okay.

7  A.    I don't know what he yelled to his wife.  I wasn't paying

8  attention to that.

9  Q.    Okay.  So you don't know what words he said to his wife,

10  you just recall that?

11  A.    I don't recall what he said to his wife.

12  Q.    And one of the things you said is that you sent Captain

13  Nettleton home and he started walking towards his home?

14  A.    Yes.

15  Q.    And Chris Tur wasn't done then, was he?

16  A.    No.  He was still pushing against me, arguing, and he

17  finally calmed down, and he went the opposite direction.

18  Q.    Now, one thing you left out when you were testifying

19  yesterday is when he was bumping his chest up against you, he

20  was telling you that, "I'm going to beat his ass," or "I'm

21  going to kick his ass," right?

22  A.    I guess that's right -- that would be fair to say.  He

23  was -- he was arguing to something.  I don't -- I don't

24  remember exactly.

25  Q.    Well --

1  A.   He was saying that -- I -- it's possible he was saying

2  that.

3  Q.   And do you remember testifying in front of the grand jury

4  November 10th, 2016?

5  A.   Yes, I do.

6  Q.   So in that -- on page 24 of that transcript, the question

7  is, "And he's yelling these things at the captain in reference

8  to his wife.  Is he threatening the captain or is he just

9  accusing the captain?

10         "He's accusing the captain of that, I think maybe

11  once or twice, and he said he was going to beat him up or kick

12  his ass, or something like that."

13  A.   Okay.

14  Q.   Is that right?

15  A.   I would say that's correct.

16  Q.   Because that's your own testimony?

17  A.   Okay.

18  Q.   So Chris Tur is saying that he's going to beat up Captain

19  Nettleton or kick his ass?

20  A.   Well, when he -- when Chris Tur left the place and

21  approached him and was -- I was in between them, that led me to

22  believe that's what his intentions were in the first place.

23  Q.   I'm not asking you about what you thought his intentions

24  were.

25  A.   Well --

1  Q.   I'm asking you:  What did Chris Tur say?  And he said that

2  he was going to beat him up or kick his ass, or something like

3  that, right?

4  A.   That's what I recall.

5  Q.   I mean, because that's what you testified several years

6  ago?

7  A.   Yes.

8  Q.   Now, Captain Ross, you made a number of mistakes

9  January 9th, 10th, and 11th, didn't you?

10  A.   No.

11  Q.   So let me ask you, when you have got a civilian employee

12  who you didn't know very well yelling and threatening to beat

13  up the CO or kick his ass, and what you did was just -- you

14  just told him to go home, right?

15  A.   You're asking me -- you're asking me if I made a lot of

16  mistakes.  I told the answer to you as no.

17  Q.   After he was bumping chests with you and he said he wanted

18  to assault -- attack the CO, kick his ass, you just said --

19  told him to go home; is that right?

20  A.   He can go home or I can have him sent home by security.

21  Q.   And he just started walking home?

22  A.   Yes.

23  Q.   You didn't make sure he got home?

24  A.   No.

25  Q.   You didn't do -- take any steps to check on where Chris

1  Tur actually went after he just started walking?

2  A.   No, I didn't.

3  Q.   Someone who -- not just making a casual comment about "I'd

4  like to kick the CO's ass."  He says, "I'm going to beat his

5  ass.  I'm going to kick his ass."

6          And you took no other steps, right?

7  A.   Say again.  I took --

8  Q.   You took no other steps to ensure that Chris Tur was going

9  home, that he wasn't going to go to the CO's house?

10 A.   No, I didn't.

11 Q.   And we know that he did go to the CO's house, don't we?

12 A.   Well, I guess the end result is that we know that.

13 Q.   So you didn't call security, right?

14 A.   No, I didn't.

15 Q.   And while you were there, we heard Lara Tur testify, Lara

16 Tur asked you for help, didn't she?  Do you remember that?

17 A.   No, I don't remember her asking me for help.

18 Q.   I know you had been drinking that night, too, hadn't you?

19 A.   Yes.

20 Q.   And Lara Tur asked you for help, and you didn't do

21 anything about it?

22 A.   I don't recall her asking me for help for anything.

23 Q.   So we had a potentially violent situation and you just

24 told him to go home and she had to go with Kelly Wirfel, right?

25 A.   No.  She was sitting there with Kelly Wirfel and I ensured

1  that both of them got into Safe Ride and left the scene prior

2  to me leaving.

3  Q.   But that doesn't -- that's not what you did?

4  A.   That's exactly what I did.

5  Q.   You went back to --

6  A.   I stayed.

7  Q.   You went back into the bar --

8  A.   No.

9  Q.   -- and you went to the Tiki Bar --

10  A.   No.

11  Q.   -- and had a few more beers?

12  A.   I did not leave there until everyone had left that area.

13  I ensured everyone had left prior to me leaving.  Then I went

14  back through the Tiki Bar to head back to the BOQ.

15  Q.   So when you testified in front of the grand jury, I didn't

16  see anything in there about you being present --

17          MR. GEE:  Objection.

18          THE COURT:  Yeah, I'm -- I'm not sure that's a proper

19  question, so why don't you rephrase it.

20  BY MR. VOKEY:

21  Q.   You weren't --

22          MR. VOKEY:  I'll rephrase, Your Honor.

23  BY MR. VOKEY:

24  Q.   You weren't present when all these dishes were smashed,

25  were you?

1    A.    No, I wasn't.

2    Q.    And we know -- well, I guess you weren't present when the

3    dishes were smashed.  Those dishes were smashed when Lara Tur

4    was still at the Bayview?

5            MR. NOTHSTEIN:  Objection.

6            THE WITNESS:  I was -- I stayed --

7            THE COURT:  Overruled.

8    BY MR. VOKEY:

9    Q.    Right.  Those dishes -- I mean, you were --

10   A.    I don't know when the dishes were smashed.  I do know that

11   I did not leave the area until everyone had went home and Safe

12   Ride had picked people up.

13   Q.    Well, if you weren't there when the dishes were smashed,

14   obviously you did not, did you?

15   A.    Well, the dishes probably were smashed inside of the club.

16   I was outside of that club, not inside.

17   Q.    Are you aware that he smashed the dishes and then there

18   was another argument with Lara Tur right there inside the door

19   of the Bayview?

20   A.    I will -- I'm not aware of that, but I'm aware that

21   everyone was gone before I left that scene.  That's what I'm

22   aware of.

23   Q.    But if you weren't aware of the dishes smashed with Chris

24   Tur and Lara Tur being there, obviously you weren't there when

25   they left?

1  A.   No, that's incorrect.

2  Q.   And after you sent Chris Tur on his way, you went back

3  into the club and to -- into the club, to Rick's, and then down

4  to the Tiki Bar and you drank a few more beers, didn't you?

5  A.   I went through the Tiki Bar, had a beer, and went back to

6  the room.

7  Q.   You had a few more beers?

8  A.   No, it was not a few more beers.

9  Q.   And you remember that you were interviewed by -- a -- a

10  number of times by NCIS or NCIS and Department of Justice

11  attorneys, right?

12  A.   Yes, sir.

13  Q.   So you were interviewed for the first time on 15th of

14  January 2015.  Does that sound familiar?

15  A.   That sounds familiar.

16  Q.   The second one was on 16 March 2015.  Does that sound

17  familiar?

18  A.   That sounds familiar.

19  Q.   And in that interview, which was with Special Agent

20  Elflein, you said that -- that you -- that you left the parking

21  lot, you went through the Bayview, then Rick's Bar, and out to

22  Tiki Bar where you had a couple more beers, then left sometime

23  later.  Is that what you said to Agent Elflein?

24  A.   That's correct, but you -- I thought it was a beer or so.

25  You said several.  There's a difference between a couple --

1    Q.    I wasn't present during this conversation.

2    A.    Okay.  Well, that would be fair to say.

3    Q.    You told Agent Elflein that you went out to the Tiki Bar

4    where you had a couple more beers.

5    A.    Okay.  A beer or two.

6    Q.    All right.  So I'm asking this because we don't want to

7    exaggerate or get words wrong.  Words matter in a courtroom

8    like this.

9    A.    I certainly agree with that.

10   Q.    And we must be accurate because these people have an

11   important job to do.

12              THE COURT:  I tell you what, why don't you ask a

13   question, sir.

14   BY MR. VOKEY:

15   Q.    So you back in the Tiki Bar and you had a couple more

16   beers?

17   A.    Okay.

18   Q.    Correct?

19   A.    If that's what you say, I had a beer or two, that's

20   correct.

21   Q.    So the other thing is the next morning you got a call from

22   Captain Nettleton concerning Chris Tur, right?

23   A.    True.

24   Q.    So from the time you -- you went to the Tiki Bar and had a

25   few more beers until the next morning, you did nothing about

1   the situation, correct?

2   A.   Correct.

3   Q.   And the next day Captain Nettleton gave you a call and

4   said, "Have you seen Chris?"

5   A.   True.

6   Q.   You said, "Who's Chris?"  And he said, "Chris Tur," right?

7   A.   That's right.  That's correct.

8   Q.   And you said no?

9   A.   Correct.

10  Q.   And what -- on that first phone call, what action did you

11  take at that time?  Anything?

12  A.   No, I didn't.

13  Q.   And then later when you --

14  A.   Are you talking about the phone call that I got from

15  Captain Nettleton?

16  Q.   That's what I am asking you about.

17  A.   Okay.  Well, I did -- no, I didn't take any action from

18  that phone call.  I asked about why.  He said, "Well, he's

19  missing, but he's done this before."

20  Q.   Okay.  And did you take any action at that point?

21  A.   No, nor -- nor neither did he, nor did he direct me to

22  take any action, because if this is something he's done before

23  and you thought it was serious, why wouldn't he direct me to do

24  it?  That's why I'm saying I didn't take any action, one of the

25  reasons why I didn't take any action.

1    Q.    Captain, did you take any action?  That's all I'm asking.

2    A.    And I asked -- and answered that question.

3    Q.    Which is?

4    A.    I did not take any action.

5    Q.    And Kelly Wirfel called you.  And Kelly Wirfel was a staff

6    member there at the base, right?

7    A.    She is.

8    Q.    She's the public affairs officer?

9    A.    She is.

10   Q.    It's an important staff position?

11   A.    All positions at that base are important.

12   Q.    And -- and that's -- you got a call from her, and she told

13   you that Chris Tur had called and said he had knocked the

14   captain out?

15   A.    Was going to knock the captain out or something to that

16   effect.

17   Q.    You're saying that --

18   A.    He was going to kick his butt or knock him out or

19   something to that effect.

20   Q.    Well, this is important.  Are you saying now that she said

21   "Going to knock out" or "knocked out"?

22   A.    Going to -- I don't remember the specifics, and that's

23   what I think I stated, or words to that effect.

24   Q.    Because if Kelly Wirfel had informed you that an assault

25   on a commanding officer had occurred, you better take some

1    action, right?

2    A.    Well, I think if she had informed me that an assault on a

3    commanding officer had occurred, he would have taken action and

4    sound the alarm from his home or called security.  It would

5    have happened long before Kelly Wirfel talked to me.  That's

6    what I would expect would have happened.

7    Q.    Captain Ross, you didn't take any action after this phone

8    call from Captain -- from Kelly Wirfel, did you?

9    A.    No, I didn't.

10   Q.    And she told you that Christopher Tur said he knocked the

11   CO out; is that right?

12   A.    I don't -- I don't recall those exact words.

13   Q.    All right.  Well, let's go through.  You gave five

14   statements to NCIS or NCIS and U.S. Attorneys, right, the

15   Department of Justice attorneys, right?

16   A.    Okay.

17   Q.    So the very first statement as we talked about before was

18   on 15 January 2015?

19   A.    Uh-huh (affirmative).

20   Q.    Right?  Where "Wirfel reportedly told Commander Ross she

21   had spoken to Tur after he left the Bayview, and he stated he

22   went to Captain Nettleton's residence and knocked him out,"

23   right?

24   A.    No.

25   Q.    That's what you told Agent Scherach?

1  A.    Or words to that effect.

2  Q.    It doesn't say words to the effect.  Did you say -- are

3  you saying now that you said words to the effect or did you

4  say, "knocked out"?

5  A.    I'm saying that I probably talked to them and used the

6  term "knocked out, going to knock him out" several different

7  times, but it was words to that effect.

8  Q.    On 16 March 2015, you were interviewed again, the one we

9  just talked about a few minutes ago, by Special Agent Elflein,

10 right?

11 A.    Okay.

12 Q.    And in that conversation with Agent Elflein in that

13 interview, it says, "Wirfel told him that she talked to Tur and

14 Tur stated that he was at Nettleton's house and he had just

15 knocked him out."

16        That's what you told the agent, right?

17 A.    I don't recall those exact words.

18 Q.    And that, "Ross opined at the time that Tur was not being

19 truthful" --

20        MR. GEE:  Objection.

21 BY MR. VOKEY:

22 Q.    -- "was not being truthful."  Was that --

23        MR. GEE:  Objection.

24        THE COURT:  Yeah.  I think -- I think go on to your

25 next statement.

1  BY MR. VOKEY:

2  Q.   And that you told Agent Elflein --

3           MR. GEE:  Objection.  Sorry.  Withdrawn.

4           THE COURT:  Go ahead.

5  BY MR. VOKEY:

6  Q.   -- that you did not think to call security?  Is that what

7  you told him?

8  A.   No, I don't recall saying that.

9  Q.   So is Agent Elflein -- he's mistaken or he's lying about

10  his interview with you?

11  A.   I'm not saying that, but I had no reason at the time to

12  call security.

13  Q.   Well, you certainly have a reason to later say that, "I

14  was going to knock him out," or something was going to happen

15  in the future, because if you, as an executive officer or

16  commander in the Navy, were aware of an assault on a commanding

17  officer and took no action, you could be in a little bit of

18  trouble, couldn't you?

19  A.   Well, I could, but I think it'd be fair to also say if I

20  had derelicted my duty, I wouldn't be sitting here today.

21  Q.   So from 15 January you were interviewed on 16 March?

22  A.   Okay.

23  Q.   You were interviewed again on 8 May 2015.

24           Does that sound right?

25  A.   I suppose it would be.

1   Q.   Again on 26 August 2015, right?

2   A.   Okay.

3   Q.   And finally on 9 November 2016.

4        Does that sound accurate?

5   A.   I had several interviews.  I don't remember the dates.

6   Q.   And you testified in the grand jury on November 10th,

7   2016, didn't you?

8   A.   I don't remember the specific dates.

9   Q.   Would it refresh your recollection if I could show you the

10  transcript of your grand jury as to the date?

11  A.   That's still not going to help me remember the exact date.

12  Q.   Well, let me approach --

13       MR. VOKEY:   May I approach the witness, Your Honor?

14       THE COURT:   Yes.

15  BY MR. VOKEY:

16  Q.   I'm handing you the -- your grand jury testimony.  Just

17  take a look at the --

18  A.   Okay.

19  Q.   -- front page.  And when you've had a chance to look at

20  it, indicate when that occurred, just look up and let me know.

21  A.   November the 10th, 2016.

22  Q.   All right.  And the record of your fifth interview of you,

23  NCIS, occurred on 9 November 2016, correct?

24  A.   Yes.

25  Q.   And you would agree that that's one day before the

1   grand -- the grand jury testimony?

2   A.   I would agree with that.

3   Q.   And in that interview, the day before your grand jury

4   testimony, you were meeting with Agents Dunwoodie, McNamara,

5   and Department of Justice Trial Attorneys Mark Cipolletti and

6   Todd Gee, right?

7   A.   Okay.

8   Q.   And you guys were meeting to discuss your testimony for

9   the following day?

10  A.   Okay.

11  Q.   And when you testify in the grand jury and asked about the

12  call from Kelly Wirfel, the question is, "And did she say

13  anything about what Chris had told her when Chris called her

14  about what he did or was going to do at the captain's house?"

15       Your answer was, "Well, she did.  She said that he

16  told her that he was going to kick his ass, or some words to

17  that effect."

18       Now, you would agree that that's a different --

19            MR. GEE:  Objection.

20            THE COURT:  What's the objection, sir?

21            MR. GEE:  It's incomplete.

22            THE COURT:  I don't have it in front of me.  Are you

23  saying it's -- there's more to the sentence?  Or what are you

24  saying?

25            MR. GEE:  Yes, more to the whole section.  It's

1    misleading.

2          MR. VOKEY:  The -- reading from the transcript,

3    that's what the sentence says, "Well, she did.  She told"

4    me that -- "her that he was going to kick his, or words to that

5    effect."

6          THE COURT:  May I see the transcript?

7          MR. VOKEY:  You may.

8          COURTROOM DEPUTY:  Sir.

9          MR. VOKEY:  Page 31.  It's about five lines down.

10          MR. GEE:  Your Honor, may we approach?

11          THE COURT:  Yeah.

12       (Sidebar conference:)

13          MR. VOKEY:  Right here.  This is what I just read --

14    right here, line 6 and 7 is what I just read.

15          THE COURT:  All right.  And what's your objection?

16          MR. GEE:  Your Honor, the -- this -- this portion is

17    part of a larger series of questions and answers.  It's

18    misleading to just place this one sentence out of context.  The

19    actual conversation begins on page 30, line 11.

20          MR. VOKEY:  Mr. Gee can ask his questions however he

21    wants to.  I'm going to ask him more about this testimony from

22    the grand jury.  That's not the only thing I'm asking about.

23          MR. GEE:  It is nonetheless misleading to read two

24    sentences of his answer when he's asked a series of questions

25    and provides throughout his explanation of what she said,

1    including things like, "I think she said."

2              THE COURT:  Okay.  Hold on a second.

3              All right.  I'm going to overrule the objection and

4    I'll allow you to redirect on it.

5              MR. GEE:  Thank you.

6         (The following proceedings occurred in open court, in the

7    presence of the jury:)

8    BY MR. VOKEY:

9    Q.   Captain Ross, going back to the same question.

10             Do you want me to ask it again?

11   A.   Yes, sir.

12             THE COURT:  Now, I do think, Mr. Gee [sic], it would

13   be helpful if you could show the testimony to Captain Ross if

14   --

15             MR. VOKEY:  You want me to show it to him?

16             THE COURT:  Yes.

17             MR. VOKEY:  I'd be glad to.

18             Approach the witness, Your Honor?

19             THE COURT:  Please.

20   BY MR. VOKEY:

21   Q.   Let me point you to -- we're at page 31 of the transcript,

22   and line 3 is the question and line 6 is the answer.  When

23   you've had a chance to read that question and answer, please

24   look up.

25             THE COURT:  Sorry.  I called you Mr. Gee.  I meant

1   Mr. Vokey.  I was wondering why you were looking at me

2   strangely.

3           MR. VOKEY:  That's fine.

4           THE WITNESS:  Okay.  I read it.

5   BY MR. VOKEY:

6   Q.   So when asked that question by the Department of Justice

7   attorney in this grand jury, your answer is, "Well, she did.

8   She said that he told her he was going to kick his ass, or

9   words to that effect," right?

10   A.   Yes, sir.

11   Q.   Those were your words?

12   A.   I would agree with that.

13   Q.   Now, your very first statement on 15 January, days after

14   this, you said that Kelly Wirfel had called you and said that

15   Tur had said he knocked him out.  And on 16 March, when you

16   were interviewed again, you said the same thing, you told

17   the -- a different special agent that Kelly said he knocked him

18   out.

19   A.   Okay.

20   Q.   Now we get to the grand jury.  And that was changed.  Now

21   it's "going to knock him out," isn't it?

22   A.   Okay, sir.  I'll say --

23   Q.   And this is meeting -- after meeting with two special

24   agents, including Special Agent Dunwoodie and two Department of

25   Justice attorneys the day before your testimony?

1   A.    Okay.

2   Q.    And now your testimony changes from, "Yes, I was told he

3   knocked him out" to "He's going to knock him out."  And those

4   are two different things.

5          You would agree with me, Captain Ross?

6   A.    I would agree.

7   Q.    So at what point did you decide you're going to change

8   your story?  Was it sometime after those first two statements

9   or is it when you're meeting with Department of Justice

10  attorneys or NCIS special agents?

11  A.    I didn't decide to change my story at all.

12  Q.    It just kind of changed on its own?

13  A.    I didn't say that.  I think after interviewing with

14  several people, words change or ends and odds, but, again,

15  going to and -- going to or knocked him out, it's obvious to me

16  he wasn't knocked out, because he called me the next morning.

17  Q.    How is it obvious to you?

18  A.    I'm talking to him on the telephone.

19  Q.    To Chris Tur?

20  A.    No, to Captain Nettleton.

21  Q.    So if somebody's knocked out, they can't speak again

22  later?  Is that what you're saying?

23  A.    Well, if he's speaking again later and he's talking to me

24  on the phone, he's not hurt, he didn't call security, nor did

25  he let me know he had a problem.  So I didn't perceive there

1  would be a problem.

2  Q.   So is there a number of other things that changed in your

3  story as you're going along?

4  A.   I'm just making a statement.

5  Q.   So you are changing your story because it makes you look

6  less responsible, doesn't it?

7  A.   No, I'm not.

8  Q.   Because if you were aware that you got a phone call saying

9  that somebody told me that they knocked out the Skipper, you

10  would absolutely have to take action, call security, you'd call

11  NCIS, call the admiral, right?  And you didn't do any of those

12  things, did you?

13  A.   No, I didn't.

14  Q.   But if you -- if you now change it to say, "Well, I got a

15  call he was going to, I didn't really take it seriously," that

16  kind of relieves your responsibility some, doesn't it?

17  A.   No, it doesn't, because, as I stated, I talked to

18  Captain Nettleton and he didn't appear to have anything wrong

19  with him, the following day.

20  Q.   But Kelly Wirfel had called you?

21  A.   Prior to him.

22  Q.   Kelly Wirfel -- no, you testified earlier that

23  Captain Nettleton called you first --

24  A.   No.

25  Q.   -- and then Kelly called you after that?

1   A.   No, no.  I think it was Kelly called me that morning and

2   later on Admiral -- Captain Nettleton had talked to me.

3   Q.   Now, we've got to make sure.  You said "think."  Because

4   what you testified --

5   A.   Kelly Wirfel called me that morning.

6            THE COURT:  I tell you what, we can't have both of

7   you talking at the same time.

8            Hold on, Captain.

9            What is your question, sir?

10  BY MR. VOKEY:

11  Q.   So you told us before that Captain Nettleton called you

12  and then Kelly Wirfel called you.  Are you changing that now?

13  A.   No.  I talked to both of those that next day.  How about

14  that?

15  Q.   I'm asking you who called you first.

16  A.   What I'm saying is that -- what I'm saying is that I

17  talked to Captain Nettleton and Kelly Wirfel on Saturday.

18  Which day or time, I've probably mixed up.  The time difference

19  is probably mixed up.  But I did talk to both of them.

20  Q.   It's important who called first.  Are you telling us

21  now --

22            MR. GEE:  Objection.

23  BY MR. VOKEY:

24  Q.   -- you don't remember?

25            MR. GEE:  It may not be.

1    THE WITNESS:  It --

2    THE COURT:  I'll tell you what -- okay.  We don't

3  need commentary on -- during an objection.  Y'all are talking

4  over each other.  I feel like we're probably near the end of

5  this discussion.

6    MR. VOKEY:  We are.

7    THE COURT:  All right.  You can ask one or two more

8  questions, you'll answer them, and then let's move on to

9  something else.

10    THE WITNESS:  Yes, sir.

11  BY MR. VOKEY:

12  Q.   So, Captain Ross, let me ask you, as a result of the

13  events that occurred there at the Bayview, 9, 10, 11, did you

14  face any kind of adverse disciplinary action whatsoever?

15  A.   No, sir, I didn't.

16  Q.   In fact, you got promoted to captain sometime after this,

17  didn't you?

18  A.   Yes, I did.

19    MR. VOKEY:  Sir, that's all the questions I've got.

20    THE COURT:  Redirect?

21                     **REDIRECT EXAMINATION**

22  BY MR. GEE:

23  Q.   All right.  Good morning, Captain Ross.

24  A.   Good morning.

25  Q.   Captain Ross, who was it between you and the defendant

1   that knew the truth about whether Captain Nettleton had been

2   knocked out by Mr. Tur?

3   A.    Captain Nettleton.

4   Q.    And at any point did he ever tell you that Mr. Tur had

5   knocked him out?

6   A.    No, he didn't.

7   Q.    You said something about part of the reason that you

8   didn't think it was true was because you spoke to him?

9   A.    That's correct.

10  Q.    Why is that?

11  A.    Well, I was talking to him.  If there were -- if there was

12  a problem, I would have expected for him to say something to

13  me.  And I would have at that time taken action.  But I would

14  not have to take action because, as the captain, he could have

15  taken all the action necessary.

16  Q.    Like what, sir?

17  A.    Called the admiral, called security, called NCIS.  If he

18  was fine, which he was when I talked with him, it led me to

19  believe that he wasn't hit and it was more just Kelly saying

20  maybe this would have happened.

21         At no point did I think he was hurt.

22  Q.    And, Captain Ross, going back for a second, when you spoke

23  to Kelly Wirfel and she told you about this conversation with

24  Mr. Tur, whether it's "knocked out" or "going to knock out,"

25  why aren't you doing something with that information right

1  then?

2  A.    Because talking with Kelly and those groups, they say this

3  has happened before, this guy has gotten inebriated and done

4  this before and come back.  Leading up and past this time,

5  that's all that you could hear about Tur when we was looking

6  for him as time went on.

7          But, again, I talked to the captain and nothing was

8  wrong with him.

9  Q.    There were also some questions asked about the incident at

10  the Bayview and your actions there.  Was the defendant present

11  out front when Chris Tur was yelling?

12  A.    Yes, sir, he was.

13  Q.    Did -- who's the commanding officer of the base, sir?

14  A.    Nettleton.

15  Q.    At that moment, did he have the power to do something

16  about Chris Tur yelling?

17  A.    Yes, he does.

18  Q.    The next morning, would he have had the power to do

19  something about Chris Tur having yelled at him the night

20  before?

21  A.    Yes, he would have.

22  Q.    Like what?

23  A.    He could have had security get with him, he could have

24  informed NCIS to investigate it.  And he could have called the

25  Region, which is the Region Operations Center, our boss, and

1  told what -- what had happened.

2  Q.   Did he do any of those things with respect to even just

3  the argument at the Bayview?

4  A.   Not to my knowledge.

5  Q.   And there was some questions asked, sir, about the -- the

6  helicopter?

7  A.   Right.

8  Q.   You mentioned that you have some familiarity with

9  helicopters even though you're not a pilot?

10  A.   Yes, sir.

11  Q.   How is that, sir?

12  A.   Well, I was a port operations officer.  And I've been -- I

13  was responsible for ships, docking and the non-docking,

14  throughout the Navy.  That's all pretty much I've done my whole

15  career.

16       We all -- we often deal with helicopters.  When I was

17  on the landing troop carrier ships, I was a flight deck officer

18  that dealt with helicopters.

19       I've been on five different platforms where I was

20  a flight deck -- where I've been the flight deck officer.  So I

21  was familiar with helicopters.  And being a port ops officer

22  and operating and dealing with policy in port, I was familiar

23  with what the requirements were for helicopters.

24  Q.   And so that Sunday morning, Captain Ross, when you had the

25  idea to get a helicopter to aid in the search for Mr. Tur, and

1    you spoke with the Coast Guard person on base about its

2    availability, did you think it was going to be a big deal to

3    make such a request?

4    A.    Well, that's the point about it.  I was getting the

5    information, what's required to get a helo if we need to get

6    one.  If I got that information from the commander there, I

7    would take that information back to the captain and say, "Hey,

8    sir, this is the requirement.  We can get one."

9          I do know that when a helicopter is requested, it

10   does raise flags, because everyone is going to know about.  It

11   just doesn't -- you just -- call for a helicopter and want it

12   sent out.  A message goes out.  It's a lot of steps that's

13   required to do that.

14   Q.    And so whose approval did you seek before taking on those

15   steps?

16   A.    I didn't take any of the steps.  I talked with them, but

17   prior to executing anything, I would have to have gotten

18   approval from the captain.

19   Q.    And did he give you that approval?

20   A.    No, he didn't.

21   Q.    Did he say, "You should have talked to me first, but I

22   approve it"?

23   A.    No, he didn't.

24   Q.    Did he say, "I can't approve it because of Cuban airspace

25   issues"?

1  A.    No, he didn't.

2  Q.    Did he say, "I can't approve it because of danger to

3  pilots"?

4  A.    No, he didn't.

5  Q.    And, Captain Ross, you spent how much time on GTMO?

6  A.    A year-and-a-half.

7  Q.    Did the Coast Guard fly its helicopter down there in that

8  year-and-a-half you lived down there?

9  A.    I don't know if they flew their helicopters down there,

10  but they had ships that were operating helicopters down there.

11  Q.    There were also some questions asked about this -- this

12  Navy Blue.  Let's call up Government's Exhibit 357A.

13         All right.  Captain Ross, first off, this Navy

14  Blue --

15  A.    Uh-huh (affirmative).

16  Q.    -- what's the purpose of this -- of a Navy Blue message?

17  A.    That's to let leadership -- senior leadership -- make them

18  aware of something that's significant that's happening on your

19  base or installation.

20  Q.    And you, as the second -- and where does this Navy Blue

21  go?

22  A.    It goes to the Chief of Naval Operations, which is in

23  Washington, D.C., and the fleet commanders.

24  Q.    Do you, as the Second-in-Command of Guantanamo Bay, have

25  the power to issue a Navy Blue?

1  A.   Only when I'm directed to by the captain in his absence.

2  Q.   And so prior to Mr. Crabtree sending this draft of the

3  Navy Blue at 1 a.m., 1 a.m. in the morning, had there been

4  discussions with the defendant about the Navy Blue?

5  A.   Yes, there had.

6  Q.   Discussions about what should be in the Navy Blue?

7  A.   Yes.  A Navy Blue is scrutinized when it's sent by

8  everyone in that chain.  As the captain and from my experience,

9  it has to be right or as close to right as possible because a

10 lot of questions are going to come with it.

11           MR. GEE:  And let's scroll down to -- just scroll

12 down to the next page.  If you can zoom in on item 20, please.

13 BY MR. GEE:

14 Q.   And this part of the Navy Blue, sir, that says "Summary

15 Brief of Description," does this mention anything about Mr. Tur

16 coming to the defendant's house?

17 A.   No, it doesn't.

18 Q.   As you -- or anything about an altercation between the

19 defendant and Mr. Tur?

20 A.   No, it isn't [sic].

21 Q.   As you're discussing with him this Navy Blue that's got to

22 go to Washington that day, did he at any point tell you to put

23 those things in this Navy Blue?

24 A.   No, he didn't.

25           MR. GEE:  Court's indulgence?

1    THE COURT:  Yes.

2    MR. GEE:  Nothing further.  Thank you, Your Honor.

3    **RECROSS-EXAMINATION**

4    BY MR. VOKEY:

5    Q.   Captain Ross, I want to pick up right where government

6    counsel left off.

7    A.   Okay.

8    Q.   That Navy Blue that's sent out said nothing about the

9    incident at the Bayview the night before, right?

10   A.   No, sir.

11   Q.   And that's because the incident the night before at the

12   Bayview, when you sent Captain Nettleton home and Chris Tur was

13   walking away, didn't have anything to do with why he's missing

14   or the fact that he's missing, right?

15   A.   It didn't have anything to do with the facts of why he was

16   missing, but it had played -- it was part of the reason that

17   led us to write the Navy Blue.

18   Q.   But you knew about the Bayview incident, right?  I mean,

19   you were the one moderating it?

20   A.   True.

21   Q.   And you're the one who approved the Navy Blue going out,

22   "Send it, Weps," right?

23   A.   No, I didn't approve it.

24   Q.   Did you not say --

25   A.   I directed --

1   Q.   -- "launch it"?

2   A.   Yes, I did.

3   Q.   Yes, you did?

4   A.   I don't approve Navy Blues.

5   Q.   So -- so that Navy Blue went out, it didn't mention

6   nothing about the Bayview, but you knew all about the Bayview?

7   A.   I did.

8   Q.   So let me go back to government counsel, I think the first

9   question they may have asked you -- the second one was -- they

10  said when it goes to whether you were told he was knocked out

11  or going to knock out, they asked you why you didn't do

12  anything, and your response is, well, because he's done this

13  before, right?  That's what you told government counsel?

14  A.   Yes.

15  Q.   So --

16  A.   That was part of the reason why I didn't do nothing.  It

17  wasn't the whole reason why I didn't do anything.

18         I think I said because he's done it in the past --

19  and I had talked to with the captain.  He appeared to be all

20  right.

21  Q.   The question was whether you said going to knock him out

22  or knocking him out, why didn't you do anything.  It says

23  because he's done this before.  Are you saying he's knocked out

24  Captain Nettleton before?

25  A.   No, I'm not.

1   Q.   In fact, what's happened before is that he's gone missing

2   before, that's right?

3   A.   Exactly.  And that was part of the reason why I wasn't

4   doing -- didn't do anything.

5   Q.   But there's never been any implication that he's knocked

6   out Captain Nettleton before?

7   A.   Never.

8          MR. VOKEY:  No more questions.

9          THE COURT:  All right.  Thank you, Captain, you may

10  step down.

11     (Witness excused.)

12         THE COURT:  Who is the government's next witness?

13         MR. GEE:  Admiral Gray, Your Honor.

14         THE COURT:  If y'all want to stand up and stretch for

15  a minute while we're waiting for the admiral to come in, feel

16  free.  We're not going to take a break yet since we just got

17  started, but we'll take one probably in about 30 minutes.

18     (Admiral Gray enters the courtroom.)

19         COURTROOM DEPUTY:  Do you solemnly swear that the

20  testimony you are about to give before this court will be the

21  truth, the whole truth, and nothing but the truth, so help you

22  God?

23         THE WITNESS:  I do.

24         COURTROOM DEPUTY:  Please state your full name and

25  spell your last name for the record, sir.

```
1          THE WITNESS:  Christopher Scott Gray, G-r-a-y.

2          COURTROOM DEPUTY:  Thank you.  Please be seated, sir.

3          THE COURT:  Good morning.

4          THE WITNESS:  Good morning, Your Honor.

5      CHRISTOPHER SCOTT GRAY, GOVERNMENT'S WITNESS, SWORN

6                      DIRECT EXAMINATION

7  BY MR. GEE:

8  Q.   Good morning, sir.

9  A.   Good morning.

10 Q.   I'm going to put a binder in front of you.  We're going to

11 look at a couple of documents here today.

12 A.   Okay.

13 Q.   You don't need to look at it yet.

14 A.   Okay.

15         THE COURT:  And let me just -- Mr. Gee, before you

16 get started, let me just state for the record that this

17 morning, before the jury came in, the Court admitted

18 Government's Exhibits 359, 362A, 377, 379, and 381.  So those

19 are in evidence.

20         All right.  You may proceed.

21         MR. GEE:  Thank you, Your Honor.

22 BY MR. GEE:

23 Q.   Good morning still.

24 A.   Good morning.

25 Q.   Could you introduce yourself to the jury and tell them
```

 1   where you work.

 2   A.    Sure.  I'm Admiral Christopher Scott Gray.  I am the

 3   commander of Navy Region Northwest.  I'm in the Seattle area

 4   and previously was the chief of staff at Navy Region

 5   Southeastern, Jacksonville, Florida.

 6   Q.    And let's start with what you currently do.  What is it

 7   that you do out there in that Seattle area?

 8   A.    I'm the regional commander, so I have a number of Navy

 9   installations across an 11-state region and a number of smaller

10   facilities, Navy facilities, across that region that I lead and

11   manage.

12   Q.    What kinds of things go on in that region?

13   A.    We have air bases, we have naval bases and shipyards, all

14   kinds of -- all Navy activities from air-to-air training,

15   air-to-surface training, shipboard training, heavy shipboard

16   maintenance, nuclear work.  It kind of runs the gamut.

17   Q.    And, Admiral, you mentioned a little bit about one of your

18   prior assignments.  How long have you been in the Navy total?

19   A.    Over 31 years.

20   Q.    Admiral, can you just tell us, then, briefly some of the

21   major assignments you've had in those 31 years?

22   A.    Sure.  I started out flying airplanes before I graduated

23   to fly in a desk.  I worked my way up through various levels of

24   squadron command.  Started out as a junior officer flying E-2

25   Hawkeyes, became a department head.  So I served at the next

1  level in an in-squadron command.  Went on to do a couple of

2  other assignments and earned the right to come back and command

3  a -- an E-2 squadron, first as the executive officer and then

4  as the commanding officer.

5         Following that I was the operations officer for an

6  aircraft carrier.  We did a couple of deployments, worldwide

7  deployments.  Couple of other assignments overseas.  Then I was

8  selected to be the commanding officer of a Navy installation in

9  Naples, Italy.  So I did that for three years.

10 Q.   How many folks were under your command when you were --

11 A.   Thousands.  There were -- yeah, about 10,000 folks.

12        So -- and then after that job as the commanding

13 officer, I was selected to be the chief of staff of Navy Region

14 Southeast here in Jacksonville.  Following that assignment, I

15 went on to serve as the executive assistant for the Assistant

16 Secretary of the Navy for Energy Installations and Environment,

17 the chief of staff of commander Navy installation commands,

18 which oversees all installations Navy-wide -- Navy

19 installations worldwide, before I was selected to be a regional

20 commander.

21 Q.   And while you were the chief of staff here for the Navy

22 Region Southeast, did you also end up having to take on a

23 second acting capacity?

24 A.   I did.  When -- when this incident at Guantanamo occurred

25 and the commanding officer was relieved, I was the senior

1  captain, right, the most experienced person.  So when that

2  occurred, I went and took over the reins as the -- temporarily

3  as the commanding officer of Guantanamo Bay and also retained

4  my duties as chief of staff.  So it was a very busy time for

5  me.

6  Q.    Approximately how long were you the acting commanding

7  officer of Guantanamo Bay?

8  A.    April of -- from about the middle of January through

9  April-ish.  Almost three months.

10  Q.    2015?

11  A.    2015, correct.

12  Q.    Now, you mentioned Navy Region Southeast.  Can you tell us

13  what that is?

14  A.    Yeah.  There are regions around the world where, you know,

15  the number of states or the areas overseas are divided up into

16  Navy regions so they're more manageable.  There's 72 Navy

17  installations worldwide.  So Region Southeast consisted of 12

18  states in the Southeast from, you know, South Carolina down to

19  Florida and Cuba all the way out to Texas.  So it's a fairly

20  large region.  And I -- in that capacity I worked for Admiral

21  Jackson as her chief of staff.

22  Q.    And approximately when did she become the admiral and you

23  became the chief of staff of the Navy Region Southeast?

24  A.    I got there in September of '14.  And she had only been

25  there a short time.  So I think she was there July -- July-ish,

1   just very briefly before I got there.

2   Q.   And where is y'all's office for that region?

3   A.   It's on Naval Air Station Jacksonville.

4   Q.   Now, you talked a little bit about sort of your personal

5   experience moving through the Navy.  Can you sort of describe

6   generally for officers, before they reach the position of a

7   commanding officer, what's the kind of training and experience

8   they have before they can reach that point?

9   A.   Well, the Navy has various schools to teach you how to do

10  things, right?  For me as an aviator, you know, I came into the

11  Navy, I got some initial basic training, and I was taught how

12  to teach -- how to fly an airplane, essentially.  And so once

13  that is over, you're assigned to a squadron.

14          And so the ultimate goal of almost every naval

15  officer is to chief command in the Navy.  And so you go into a

16  squadron, for example, as an ensign or a JG or young

17  lieutenant, and you kind of work the lower levels of -- of

18  squadron command, right?  You learn the ropes.  And there's

19  essentially three levels in a -- in a basic unit like a

20  squadron.

21          There's kind of the worker bee officers.  There's the

22  department heads who work directly for the CO and XO and run

23  various departments in the squadron like operations or

24  maintenance or safety or admin.

25          And then if you -- if you go to the department head

1    level and you do well, you achieve success, and you're rated

2    highly by the officers above you, you compete against all the

3    other folks in the Navy who have done similar things to be

4    selected to -- to take command of a squadron.

5          And so there's a very rigorous board process that the

6    Navy goes through to select the best and brightest to -- to

7    reward them with command or reward their performance with

8    command.  And so that's kind of the basic level of command.

9          And then for installation command, there's another

10   process.  You succeed at the squadron level command and then

11   there's major command.  The installation command is essentially

12   major command.  And so you go through another screening

13   process, a training and vetting process, to be selected for

14   major command of an installation.  So that's, you know --

15   Q.   And -- and you talked about sort of learning the ropes?

16   A.   Uh-huh (affirmative).

17   Q.   Are there laws and regulations that govern what you can do

18   as a Navy officer, commanding officer?

19   A.   Yeah.  Absolutely.  I mean, they're -- it's laid out in

20   federal regulations, right, the Code of Federal Regulations,

21   Navy regulations, the Uniform Code of Military Justice, various

22   regulations and instructions in the Navy.

23          And as you're -- you know, as you come in as a new

24   person, you're not that familiar with many of those things, but

25   you learn them either through formal schooling or through

1   experience as you -- you know, kind of -- you're trained on the
2   job.
3   Q.    So by the time a person becomes a commanding officer like
4   you, have you become familiar with the laws and regulations
5   that govern what you --
6   A.    You're very familiar with them because you deal with them
7   all the time.  Again, as a young officer, you begin to learn
8   how the Navy works and you experience, you know, and learn the
9   rules of the road to -- so to speak, and then as a department
10  head, you may go to certain schools to educate you on various
11  aspects of your job, additional aspects of your job.

12          And then as you go to command, there are schools
13  specifically for CO command and for military justice and for
14  safety and for other aspects of the job and the additional
15  responsibilities that you'd be taking on.
16  Q.    And part of some of that, does that include training on
17  working with other Navy components?
18  A.    Yes.  I mean, absolutely.  The, you know, key to your
19  success is make sure you always keep your bosses informed and
20  you're ensuring that you're aligning with their expectations to
21  deliver, you know, the product that you want to deliver, which
22  for the military is effective and efficient operation of your
23  unit, right, the combat readiness of your unit.

24          So you learn -- begin to learn as a junior officer
25  what things are important to your boss, right, what -- what

1    things that person needs or likes to know in a timely manner,

2    what's important to communicate up and what's not -- what's not

3    necessarily something that you might want to wake them up in

4    the middle of the night for, but you'd call them first thing in

5    the morning, that kind of thing.

6    Q.    And if at any point a commanding officer has a question

7    about the law or regulations, is there someone they can

8    consult?

9    A.    Sure.  I mean, you have experts on your staff.  As a

10   commanding officer, you have a -- a JAG, right, a Judge

11   Advocate General, your military lawyer, you have experts on

12   your staff if you have questions or concerns you can refer to

13   and they can provide you information.  And then also you have

14   your upper-level chain of command.

15          So in this instance for an installation commanding

16   officer they can refer to folks at the -- experts at the Region

17   or myself as the chief of staff or call the boss and say, "Hey,

18   I've got a -- I have a really challenging problem here, one

19   that I never really anticipated, and I'm looking for your

20   advice and input on -- you know, have you ever seen" -- there

21   are opportunities to get that type of mentoring and feedback

22   and professional expertise, for sure.

23   Q.    And let's talk a little bit about some of those

24   responsibilities that a commanding officer has.

25          Now, in general, does a -- what sort of is the

1  authority and responsibility that a commanding officer has over

2  his command?

3  A.   Well, the Navy makes it very clear, your authority --

4  command is based on essentially three principles:

5  accountability, responsibility, and authority.  And so you have

6  to have the authority that's -- that's commensurate with your

7  responsibility and accountability, right?  So, in other words,

8  you have to be empowered to take actions to do the things in

9  command that will enable your success.  And so given that

10 authority, you are ultimately held absolutely accountable for

11 every -- you know, the effective and efficient operation of

12 your command, the well-being of your people, the -- the ability

13 of your unit to deploy and provide combat readiness, all of

14 those types of things.

15 Q.   Does that include responsibility and authority with

16 respect to discipline in your command and conduct of the people

17 under your command?

18 A.   Yes.  That's a -- that's the fundamental basis of it.  And

19 that's why the Navy sets such very high standards, especially

20 for commanding officers, because they are essentially the head

21 of the military justice organization in a unit.  And so, you

22 know, he -- he may be the judge of -- of folks who are accused

23 of doing wrong in the unit and so, therefore, in order to sit

24 in judgment of someone else, you have -- your integrity has to

25 be unquestioned, right?  Otherwise, it undermines the good

1  order and discipline of the organization.

2  Q.   What about the -- the duties that the law and regulations

3  create for a commanding officer over the welfare and safety of

4  the people under his command?

5  A.   Well, it's -- it's clearly articulated in Navy regulations

6  in a document called "The Charge of Command" that says you're

7  absolutely responsible for the welfare, well-being of --

8         MR. VOKEY:   Objection.

9         THE WITNESS:   -- of the --

10        MR. VOKEY:   Objection.   Hearsay.   Again, quoting

11  the -- quoting the regulations would be improper at this point.

12        THE COURT:   Yeah.   I'll overrule that objection.

13        Go ahead.

14        THE WITNESS:   So it's clearly articulated that you

15  are absolutely responsible, you are -- your responsibility is

16  unquestioned about maintaining the safety and security and

17  well-being of your folks and the efficiency and effectiveness

18  of your command.

19  BY MR. GEE:

20  Q.   Now, you mentioned something about a charge of command.

21  When a person becomes a commanding officer, is there some sort

22  of way they're formally reminded of all these duties and

23  responsibilities?

24  A.   A charge of command is kind of a summary of the Navy's

25  expectations for a commanding officer.   And it's -- it was

1    created to -- to essentially remind folks of what's -- when

2    they agree to accept command, of what they're buying into and

3    what they'll be responsible for before they take command, to

4    ensure that, you know, there's no -- there's no question about,

5    you know, they're ultimately accountable and what those

6    responsibilities are.

7            And before -- before you assume command, you have to

8    read this document, agree that -- you know, that you'll abide

9    by those high standards, and then sign it off to your boss who

10   will keep a copy of it.

11   Q.   Is it provided to commanders as regular practice?

12   A.   Yes.

13   Q.   Is it actually required to be provided?

14   A.   It is, absolutely, by instruction.

15   Q.   And by the time you become a commanding officer, the

16   things that are in the charge of command, are they something

17   that you should be already familiar with or are you learning it

18   for the first time when you get it?

19   A.   It's well-known.  I mean, you -- as you -- again, as you

20   come up through the ranks, it's not something that you had --

21   hadn't seen as a junior officer and -- and/or dealt with and

22   were fully aware of as a department head and then certainly as

23   the CO and XO before you take command.

24   Q.   And, Admiral, take a look at that binder in front of you,

25   please.

1   A.    Is there a specific tab?

2   Q.    That's fine.  Take your time.

3           THE COURT:  Is there a tab?

4           MR. GEE:  It's going to be tab 35, Your Honor.

5           THE WITNESS:  Okay.

6           Okay.  So this is a charge of command.

7   BY MR. GEE:

8   Q.    Is this -- and is this what's given to people before they

9   become commanding officers?

10  A.    It is.

11          MR. GEE:  Your Honor, move to admit 35.

12          MR. VOKEY:  Objection as we discussed earlier.

13          THE COURT:  Yeah.  Let me take a look at it real

14  quick.

15          I'm going to overrule the objection and admit

16  Government's Exhibit 35.

17      (Government's Exhibit 35 received into evidence.)

18          MR. GEE:  Can we call up 35 on the screen, please,

19  Ms. Reid?

20  BY MR. GEE:

21  Q.    And, Admiral, this is -- this document is going to be on

22  the screen in front of you, but it's also right there in the

23  paper version in front of you.  But I may highlight a few

24  things on the screen just briefly.

25  A.    Okay.

1   Q.    So we're going to zoom in first on just paragraph 1.

2         What is it that you understand paragraph 1 of the

3   charge of command to be reminding people that are becoming

4   commanding officers?

5   A.    Well, it's what I just alluded to a moment ago.  Command

6   is the foundation of the success of the Navy.  And so, you

7   know, authority, responsibility, and accountability are the

8   principles upon which effective command is -- is based on.

9   Q.    And scrolling down a little bit to paragraph 4.

10  A.    Paragraph 4, uh-huh (affirmative).

11  Q.    Yes, sir.

12        What does -- I'm sorry, paragraph 5.  I apologize.

13  A.    5?

14  Q.    What does paragraph 5 explain?

15  A.    It talks about being held accountable.  Your -- part of

16  your responsibilities in the charge is that you'll be held

17  accountable to the very high -- you know, the highest standards

18  of personal and professional conduct.

19        You're -- again, as the head law enforcement officer,

20  your -- your conduct must be exemplary, because you are -- you

21  will judge others and are -- and are responsible for holding

22  people under your command accountable as well.

23  Q.    And turning to page 2 of the document.

24  A.    Yeah.  Just continues to go -- you know, talks about the

25  character -- characteristics of a -- of a good commanding

1   officer:  Virtue, honor, patriotism, subordination, vigilant in

2   taking care of the command to guard against dissolute or

3   immoral practices; take all necessary measures under

4   regulations to promote and safeguard the morale, physical

5   well-being, and general welfare of the personnel under your

6   charge.

7   Q.   And, Admiral, does the -- does the document have any

8   reference to some of those kinds of laws we've also talked

9   about as well, sir?

10  A.   It does.  It talks about, you know, the code of federal --

11  Title 10 section of the Code of Federal Regulations.  It

12  references Navy regulations and the standards -- standard

13  organizational manual of the Navy.  References some

14  foundational documents.

15  Q.   And you mentioned how, just generally, Admiral, throughout

16  this document, it talks about trust for a commanding officer.

17  A.   Right.

18  Q.   What do you understand that to mean within the laws and

19  regulations that govern a commanding officer?

20  A.   Well, you have to -- you know, the Navy is an old

21  organization and back -- today we have e-mail and radios and

22  things that -- where we can contact people at all times, but,

23  you know, the basis of command back in the day in the 1700s was

24  the commanding officer would get some general orders and he'd

25  stand away from the shore and you'd never hear from him for

1    nine months until he came back.

2          So trust was inherent in command.  You had to trust

3    unequivocally the good judgment of a commanding officer to do

4    what was right, to follow guidelines, right, and to use his

5    best judgment.  Because you can't possibly brief them or

6    prepare them for every possible circumstance they might

7    encounter upon the seas, and so you have to ensure that they

8    have good judgment and that -- in your best opinion, that

9    they're ready, willing, and able to execute that good judgment

10   in the execution of those duties in the best interests of the

11   Navy and the United States.

12         So that trust is absolutely foundational in any

13   combat organization.

14   Q.   And stepping away from the charge of command for a second,

15   as part of those -- those duties, in general, what -- what does

16   a commanding officer have to do with respect to his superior

17   officers and information about events going on, on his or her

18   base?

19   A.   Well, part of building trust is communicating, right?  And

20   so in this instance if -- if there are things that are

21   happening on your installation that your boss should be made

22   aware of, then it's incumbent upon you to ensure that they are

23   aware of it.  So there are things that occur sometimes on an

24   installation or in a unit that may garner attention outside the

25   unit.  For instance, if -- if somebody is -- has a grievance

1  or, you know, has an issue that has been bubbling and it goes

2  unresolved, then potentially that person might write their

3  Congressman.  Or -- or there may be an incident on your

4  installation that generates media attention, right, and so you

5  don't want your boss caught off guard or not be prepared to

6  react and -- and effectively deal with that situation.

7         So when -- when something like that occurs, you want

8  to make sure that you keep them fully informed and apprised of

9  what's going on or what you're doing about it, because, you

10  know, again, in my instances as the chief of staff, I had

11  previously been a -- an installation commanding officer.  My

12  boss, Admiral Jackson, had previously been.  So, you know, we

13  had been there and done that and we had more experience and

14  could potentially mentor the CO and provide him recommendations

15  based on our -- our depth of experience.

16  Q.   And, Admiral, are there some commands that, more than

17  others, you need to keep your -- your bosses informed about,

18  certain events?

19  A.   Yeah.  I mean, I think -- I think Guantanamo Bay is -- is

20  one of those commands.  It's a unique command, right?  It's

21  a -- it's on -- it's on the island of Cuba, which is not

22  necessarily a friendly nation to our country.  There's a fence

23  line with Cuban troops along it, right?  It's isolated.

24  It's -- it's a community of about 5,000 people who -- again,

25  it's an isolated location, so it becomes very insular.  So

1    anything that happens there not only has the potential to be --

2    to have -- cause an issue on the base but has potential

3    international ramifications if it were to kind of grow into

4    something larger.

5    Q.    And, Admiral, within the Navy Region Southeast that GTMO

6    is in, are there actual specific types of incidents that must

7    be reported by -- by various Navy regulations and orders?

8    A.    Yes.  There's -- there are a couple of Navy instructions,

9    right?  One of them -- one of them is a Navy instruction.  It's

10   called the OPREP -- operational reporting instruction.  And

11   that is a formal Navy document that articulates those types of

12   things that if they are to -- if they were to occur, that you

13   must do a -- you must notify the higher level chain -- Navy

14   chain of command, by voice, call within five minutes and then

15   within an hour do a formal message documenting everything that

16   you know, whether or not this incident is likely to garner

17   media attention or international -- you know, has international

18   ramifications, that kind of thing.

19   Q.    And in the case of this Navy OPREP requirement, where are

20   those going?

21   A.    They go all the way to the Pentagon, to the Chief of Naval

22   Operations.  And so they go to the highest echelons of the Navy

23   command, as well as the intervening levels of command in

24   between.

25   Q.    Like here --

1    A.    Like --

2    Q.    -- like if you send one from GTMO to Washington, does it

3    come here to Jacksonville, too?

4    A.    It does.  So in e-mail parlance, it might be addressed to

5    the Chief of Naval Operations but CC'd on there would be the

6    Region and some of the other various commands that had an

7    interest in the Guantanamo area as well.

8    Q.    And, Admiral, is there sort of a colloquial terminology

9    for some of those kinds of OPREPS that go all the way to

10   Washington?

11   A.    Well, you know, there's an -- OPREPS, Navy unit SITREP, a

12   Navy Blue, which means it's -- if it -- if you send a Navy

13   Blue, it's -- it tells the chain of command by the title that

14   it's something that's likely to garner media attention.

15   Q.    And, sir, those OPREPS that have to go to -- that should

16   be sent to Washington, do the regulations actually give some

17   specifics about some of the specific kinds of incidents that

18   should be reported?

19   A.    Yes.  There are many specifics that are -- you know, it

20   talks about natural disasters, it talks about the death or

21   injury of a -- of somebody under your command, it talks about

22   misconduct by senior officers.  There's just a whole list of

23   things.

24          And, you know, there are -- the other thing is you

25   have to -- you can't possibly describe every situation that

1   somebody might account for, but it's understood and articulated

2   in the message that, hey, if there's something else that's not

3   covered by this that you think is important, you ought to --

4   you ought to make people aware of it as well.  So it goes from

5   the very specific to, you know, there's a kind of general

6   expectation that if something offbeat happens, even if it's not

7   one of these items, that you would report it.

8   Q.   And these -- these OPREPS, within the regulations that

9   require them, are updates required?

10  A.   Yes.  You know, a lot of times a crisis will happen --

11  something will happen and, you know, the time lines for that --

12  those messages are very tight.  Within five minutes you've got

13  to be on the phone telling people what happened and within an

14  hour you have to document it.

15          So you may not necessarily have all the information,

16  you know.  If a bomb goes off somewhere at the -- at the front

17  gate of the base, right, you -- you don't really know what

18  happened.  It could be a terrorist attack or it could be a

19  propane truck that just had a problem, right?  So you would

20  report the information that you initially received and then you

21  would provide additional data as it became available to ensure

22  that the chain of command remained informed.

23  Q.   And these OPREP requirements, are they required to be

24  truthful?

25  A.   Oh, absolutely.

1  Q.    Who's the ultimate approver of these OPREP requirements

2  for a base?

3  A.    The commanding officer.

4  Q.    Within the Navy -- so we talk about OPREPS that go all the

5  way to Washington.  Within the Navy Region Southeast, were

6  there specific requirements for reporting just within the

7  Region?

8  A.    There is.  There's a region instruction that provides some

9  amplification, and it's called the Commander's Critical

10 Information Report -- Requirements, rather.  And it, similarly,

11 goes through a list -- has a list of things that says -- and it

12 breaks them down into the various levels of -- of importance.

13 So, you know, "If these things" -- "If these or these types of

14 things occur, I want you to pick up the phone to the admiral

15 immediately and tell me about it anytime day or night, 24/7, no

16 matter what's going on."

17       Other things of lesser import are, "Hey, you can send

18 me an e-mail and then follow up with a call, you know, at

19 7 o'clock in the morning.

20       And -- and then -- you know, kind of minor things,

21 but things that -- that the boss would like to know, "You can

22 just send me an e-mail or have the duty officer report it,"

23 kind of thing.

24 Q.    And for the specific things that the Navy Region Southeast

25 requirement for reportings are -- include, are these optional

1 things?  Can a commanding officer just ignore the required

2 reportings?

3 A.    No.

4 Q.    What are the possible consequences for ignoring the

5 required --

6 A.    Well, it's an -- it's a directive, right?  It's an

7 instruction that says you -- you're going to do these things

8 and these -- you will report these things.  So there will be

9 ramifications for doing it, and -- and if -- if you didn't

10 report it, you could potentially face disciplinary action if it

11 was a major thing.  And it certainly wouldn't make your boss

12 happy if you didn't do what he or she asked you to do, right?

13 Q.    And are -- some of those incidents that have to be

14 reported as part of the Navy Region Southeast reporting

15 requirement, does it include some of those same things you

16 talked about earlier, that -- also the Navy requires you to

17 report it all the way to Washington?

18 A.    Yeah.  Some of them are -- are the same, right?  Others

19 are -- the regional instruction provides additional information

20 that the -- the -- the regional commander requires as well, so

21 it goes into a little more detail and oftentimes a little more

22 specificity.  And -- and has additional things that the OPREP

23 instruction may not have.

24 Q.    So like misconduct by the commanding officer, senior

25 officers that need to be reported?

1    A.    Yes, absolutely.

2    Q.    What about missing personnel and information -- complete

3    information about the missing personnel?

4    A.    Yeah.  Missing personnel, death or injury, death or

5    serious injury, you know, an incident with a weapon on the

6    base.  There's -- you know, there's a lot of similarities.

7    Q.    And, similarly, are commanding officers in the Region

8    Southeast required to -- to update their reports to the Region

9    Southeast when new information becomes available?

10   A.    Very similar to the OPREP.  If -- if you make a report and

11   then you get information that's relevant to what's going on,

12   you are required to report that up as well.

13   Q.    And, Admiral, we're almost done with -- with the black

14   letter stuff.

15          Admiral, can you explain -- you mentioned this

16   earlier.  You used the phrase "the Uniform Code of Military

17   Justice."

18          Can you explain what the Uniform Code of Military

19   Justice is?

20   A.    I would characterize it as the foundational document of --

21   of military justice, right?  It outlines the -- what the laws

22   are for the military, and how military justice system will be

23   administered, and so it --

24   Q.    And how does the Uniform Code of Military Justice like --

25   the conduct that's prohibited by it, how does it compare to,

1  say, like, the conduct governing civilians like me?

2  A.   A lot of it is very similar.  Like, you know, assault and

3  murder and theft and just -- you know, it's similar to the --

4  all of the things that a civilian might get in trouble for are

5  in the Uniform Code of Military Justice as well, but because of

6  the unique -- unique nature of the military, there are other

7  things in the Uniform Code of Military Justice that the

8  civilians wouldn't normally be held accountable for.

9        For instance, there's a -- there's an article that

10  is, you know, conduct unbecoming an officer, which can be --

11  you know, it can be vague things.  Like, you know, anything

12  that could bring discredit upon the Navy through the conduct of

13  an officer.  You know, if it was drunk in public or something

14  like that, or -- or using untoward language towards somebody

15  that was discriminatory, or that kind of thing, you could be

16  held accountable for it.

17        Similarly, adultery is -- in the military is a crime,

18  as opposed to, you know, nobody in the civilian world goes

19  to -- you know, gets -- goes to jail for adultery.  So there

20  are -- there are -- the same things that the civilian folks are

21  held accountable for in the laws are also in the -- in the

22  Military -- Uniform Code of Military Justice, but there are

23  other elements that are different and unique to the military as

24  well.

25  Q.   And for the prohibitions on adultery, sir, does it have to

1   be, an actual, like, relationship or can it be even less than

2   that?

3   A.   Well, it's -- you know, I think adultery is, you know,

4   having sexual relationship with somebody else's spouse, right,

5   and so that is kind of cut and dry, right?  But if you had an

6   unduly familiar relationship --

7          MR. VOKEY:   Your Honor.

8          THE WITNESS:   -- especially with somebody --

9          MR. VOKEY:   Objection.  I ask for a sidebar.

10     (Sidebar conference:)

11          MR. VOKEY:   Your Honor, the objection -- objection

12   here is that the witness has going too far afield.  To describe

13   adultery as an offense under UCMJ is fine, but now to start

14   explaining the law would be improper for the witness to do so.

15   So if we're talking about a matter of law, and that's what I'm

16   hearing the answer as coming out, this is going too far.

17          THE COURT:   What are you trying to -- you got him to

18   say what it was, and what -- now he's talking about if you have

19   a relationship.  I'm not really sure where we're going with

20   this.

21          MR. GEE:   He was just explaining, Your Honor, that

22   adultery that's prohibited by the UCMJ includes not just

23   relationships but intercourse, and I think what he's about to

24   finish saying is that it includes even less than intercourse,

25   untoward conduct towards other people.

1            MR. VOKEY:  One, sir, having been doing military

2   justice for 20 years, I absolutely disagree with that

3   assessment of the law of what adultery is under the UCMJ.  And

4   it falls under Article 134.  It doesn't involve relationships.

5            What the -- what the admiral just stated, that it's

6   sex with another person's spouse is accurate.  We don't need

7   any further explanation.  That's what the law says.  And I can

8   pull up -- I've can get on my laptop, sir.  I can pull you up

9   the manual for court-martial.

10           THE COURT:  Yeah.  I just don't -- I mean, I'm not

11  sure that it -- I mean, in this case you're -- the proof, so

12  far at least, is that there was a sexual relationship, at least

13  one time, between Ms. Tur and Captain Nettleton, and I take it

14  that that would be potentially adultery under the UCMJ, right?

15  Is that true?

16           MR. GEE:  Yes.

17           THE COURT:  All right.  You know, if you start

18  talking about being overly friendly with somebody or whatever,

19  I don't have any idea whether that would be adultery under the

20  UCMJ, and I'd be a little reluctant to let this witness, who's

21  not really a lawyer or a JAG or anybody else, go into that.  So

22  why don't we just leave it where it is.

23           MR. GEE:  That's fine.  Can I clarify, though, this

24  point, since he sort of got cut off mid sentence?

25           THE COURT:  Well, I think he's already answered

```
 1    what -- what it is.

 2            What do you -- what else do you want to clarify?

 3            MR. GEE:  Well, I wanted to -- I'd like to have

 4    him -- because the objection came in the middle of his

 5    explanation.  I'd like to have him simply say that it includes

 6    sexual intercourse --

 7            MR. VOKEY:  He's already said that.

 8            MR. GEE:  -- with someone outside of marriage.

 9            THE COURT:  He already said that.

10            Let's just move on.

11        (The following proceedings occurred in open court, in the

12    presence of the jury:)

13    BY MR. GEE:

14    Q.   Now, Admiral, can you explain what a court-martial is?

15    A.   It's a -- it's a military trial, essentially, like this,

16    with military jurors.

17    Q.   And the violations that you -- that a person in the

18    military would be charged with in a court-martial would be what

19    kind of violations?

20    A.   Generally serious violations, right?  Some of the things

21    we talked about, murder or serious assault --

22    Q.   Like the Uniform Code of Military Justice violations?

23    A.   Yes.

24    Q.   And in your 30-plus years in the military, have you even

25    seen people get in trouble for adultery under the Uniform Code
```

1   of Military Justice?

2   A.    Many times.

3   Q.    Now, who investigates -- and we talked about the Uniform

4   Code of Military Justice.

5          On top of that, are there federal laws that apply to

6   Navy officers?

7   A.    Yes.

8   Q.    Like, can you take a bribe?

9   A.    No.  Of course not.

10         THE COURT:  Mr. Gee, I was thinking we were going to

11  finish what you called the "black letter" before we took a

12  break.  How much more do you have?  If you have a little bit

13  more --

14         MR. GEE:  This is a good place to stop.  This is

15  pretty much it on the black letter.

16         THE COURT:  Let's go ahead -- ladies and gentlemen,

17  we're a little bit off schedule because we got the late start.

18         But let's go ahead and take a ten-minute break.  You

19  can be back in the jury room -- make it 12 minutes.

20         You can be back in the jury room at ten minutes to

21  12:00.  Take a little break.  And then we'll come back and

22  we'll take our lunch sometime -- maybe not exactly 12:30, but

23  in that -- in that ballpark.  Ten minutes.

24         COURT SECURITY OFFICER:  All rise.

25     (Jury exits, 11:38 a.m.)

1          COURT SECURITY OFFICER:  Please be seated.

2          THE COURT:  And, Admiral, you can take a 10-minute

3   break as well, sir.

4          And anything from counsel?

5          MR. GEE:  (Shakes head negatively.)

6          MR. VOKEY:  (Shakes head negatively.)

7          THE COURT:  All right.  Ten minutes.

8          COURT SECURITY OFFICER:  All rise.

9      (Recess from 11:39 a.m. to 11:51 a.m.; all parties

10   present.)

11          COURTROOM DEPUTY:  All rise.  This Honorable Court is

12   back in session.

13          Please be seated.

14          THE COURT:  All right.  I believe everybody is

15   present.  Are we ready for the jury?

16          Let's have the jury, please.

17          COURT SECURITY OFFICER:  All rise for the jury.

18      (Jury enters, 11:52 a.m.)

19          COURT SECURITY OFFICER:  Please be seated.

20          THE COURT:  Mr. Gee, you may proceed.

21   BY MR. GEE:

22   Q.   Good morning, Admiral, still.

23          We were talking before the break about the Uniform

24   Code of Military Justice.  When a violation of the Uniform Code

25   of Military Justice, sir, or federal law is allegedly committed

1    on a Navy base, who investigates it?

2    A.    It depends on the -- kind of the seriousness of the --

3    the -- the offense.  So there are lots of minor things that

4    happen on the installation that the security department

5    typically deals with, so if it's a traffic violation or there's

6    a minor -- an argument or something along those lines,

7    oftentimes the installation security department will respond,

8    document it, and then that information would be referred to the

9    individual's command for potential disciplinary action.

10          And then for the more serious items, Naval Criminal

11   Investigation -- Investigative Service, NCIS, would be called

12   in.  They're kind of the Navy's, you know, professional

13   investigative police.

14   Q.    And, Admiral, what about with respect to even more minor

15   potential crimes but committed by senior officers?  So give an

16   example.  Two regular low-ranking sailors in a bar fight, who's

17   likely to investigate that?

18   A.    Yeah, the security department or the command itself,

19   right, but if it's -- if it involves a senior officer and has

20   a -- a lot higher visibility and a lot -- is more likely to

21   cause more serious ramifications, so oftentimes NCIS would be

22   called in to -- to investigate the circumstances so that if --

23   if disciplinary action is warranted, it would be taken and done

24   in a professional manner.

25   Q.    So let's say, for example, a senior officer is in a bar

1    fight, who's going to investigate that?

2    A.    NCIS.

3    Q.    And as part of all that training and experience that you

4    talked about earlier that a person requires by the time they

5    become a commanding officer, does that include training and

6    experience with working with Navy law enforcement entities like

7    security departments, NCIS?

8    A.    Yes.  I mean, over the course of, you know, your career --

9    when you get to installation command, you typically have 25 or

10   26 years command and you've been in an -- again, in a squadron

11   command and other commands.

12          So it -- it would, be I'll, say fairly routine to

13   have dealt with NCIS on multiple occasions throughout your

14   career and certainly with the installation security department

15   for people -- you know, enlisted folks or officers under your

16   command who had gotten in trouble.  So, yeah, it would be very

17   familiar to folks.

18   Q.    And, Admiral, I'd like to turn your attention now a little

19   bit to the time frame of January 2015.  Who was in command of

20   Guantanamo Bay in January of 2015?

21   A.    Captain Nettleton.

22   Q.    Do you see him here in court today?

23   A.    I do.

24   Q.    Can you describe an article of clothing that he's wearing?

25   A.    Dark jacket with a reddish tie.

```
 1              MR. GEE:  May the record reflect an in-court
 2  identification?
 3              THE COURT:  Yes, sir.
 4              MR. VOKEY:  And, Your Honor, we will stipulate that
 5  this is Captain Nettleton throughout the rest of the trial so
 6  we don't have to keep doing the --
 7              THE COURT:  That's fine.  I think everybody knows
 8  that.
 9              All right.  Go ahead, sir.
10  BY MR. GEE:
11  Q.   When you became the chief of staff for Admiral Jackson,
12  was the defendant already the commander of Guantanamo Bay?
13  A.   Yes, he was.
14  Q.   And had you known the defendant prior to when you started
15  interacting with him as the chief of staff for the Navy region?
16  A.   No.
17  Q.   Can you describe -- so once you became the chief of staff,
18  would you interact with him in his position as the commander of
19  GTMO?
20  A.   Yes, pretty regularly.
21  Q.   Can you kind of describe the types of ways in which you
22  would be interacting with him?
23  A.   We had -- like, every other week we had a, kind of,
24  leadership meeting, a department head meeting for the --
25  through the Region, which included the commanding officers, and
```

1    so during those meetings we would put out information and then

2    give the commanding officers an opportunity to talk about

3    issues that they were having and ask for help if they needed it

4    or just keep us informed of things that were going on.  So that

5    was a regular recurring opportunity to engage with them.

6          And then in my role as the chief of staff, I was

7    essentially the number two in charge of the Region behind

8    Admiral Jackson.  And, you know, Admiral Jackson was new, and I

9    was new, but whenever you get a new boss, you're interested in

10   what your boss is interested in, right?  And so I would

11   oftentimes get calls from installation commanding officers and

12   they'd say, "Hey, I had this happen.  You know, do you think

13   the boss needs to know about it?"

14         And I would say, "Yes or no."

15         And, you know, "Have you thought about certain" -- so

16   essentially mentoring them and making sure that I was setting

17   them up for success to -- to make the boss happy and to ensure

18   that the boss got all the information that she needed and --

19   and -- and, you know, so that the commanding officer can deal

20   with things effectively.

21   Q.   And prior to January 2015, can you just give us an --

22   examples of the types of things generally you recall even

23   speaking with the defendant about and his duties, what kinds of

24   things would you have to talk to him about and he'd be

25   reporting up?

A.    Yeah, there were -- there were a couple of unique things
about Guantanamo.  I mean, I remember one instance was a
wildfire.  A wildfire broke out on the base, I think -- I don't
know what the exact time frame was, but he had called and said
that they had a wildfire, the fire was -- his fire department
was responding to it, and that no -- you know, no -- no
structures or people were -- were threatened at the time and
kept us up-to-date until the fire was controlled and contained.

There were other things -- it was kind of a unique
circumstance in Guantanamo where there were a couple of Navy
airplanes there, and some years before there had been some
allegations of -- and I believe it was -- I believe it was
before Captain Nettleton, but there were some allegations that
the -- the planes were misused.

So in order to kind of provide some top cover and a
QA of the use of those airplanes, we had pulled approval
authority for the use of them for certain things up to the
Region, so oftentimes he would call and he would say, "Hey,
I've got -- I've been asked to do this with an airplane and it
entails me sending, you know, an air crew in this airplane
to -- to this location and then that location.  They're going
to overnight and come back."

And then we would kind of QA it against the rules and
regulations and then give them approval, and that way it kind
of gave them a buffer and some top cover that -- that they were

1  being used properly.

2  Q.    So even as nuts and bolts as wildfires that don't burn

3  anything and flying planes?

4  A.    Absolutely.  Disciplinary action, you know, there were

5  times when installation COs would call and say, "Hey, I -- I

6  had to hold some civilian person accountable who was acting

7  badly on the installation in -- in whatever way, and, you know,

8  that person is -- is, you know, writing -- writing letters to

9  the newspaper and complaining that I'm not treating them

10  fairly" and -- and that kind of thing.

11        And so you -- again, general situational awareness of

12  things that were going, on so that you didn't get caught off

13  guard or blind-sided if it shows up in the newspaper the next

14  day, or if somebody from, you know, their congressman office

15  calls and says, "Hey, what's going on with this," you're not

16  lying.

17        Those type of things were regular and routine.

18  Q.    And when the defendant's reporting to you as Admiral

19  Jackson's chief of staff and -- and reporting something, what

20  is that a report to?

21  A.    Well, it's an official report up his chain of command.

22  Q.    Who are you going to communicate it to?

23  A.    I'm going to go tell the admiral, you know.  I -- you

24  know, I'm the funnel through which that information would flow.

25  Q.    You talked some about sort of the mentoring that you would

1   do with the defendant and other commanders.  Would you discuss

2   with the defendant Admiral Jackson's expectations for being

3   kept informed and things like that?

4   A.    Sure.  You know, like -- as I alluded to earlier, when you

5   get a new boss, everybody's interested to know what their --

6   the expectations from that boss was.

7              And so she was new.  I was relatively new.  By then I

8   had been there -- I had been there for about four months.  She

9   had been there for about five months.  So oftentimes the -- the

10  COs knew that I interacted with her, you know, on a daily

11  basis.  And so I -- I knew her the best.

12             And so they would often call and say, "Hey, I had

13  this happen.  Do you think that raises to the level where I

14  need to call her -- it's -- it's 1 o'clock in the morning --

15  and wake her up for this type of thing?"

16             And -- and I would oftentimes say, "Nah, you know

17  what, that's" -- you know, I'd give them advice.  So, you know,

18  "Have you thought about this?  She's going to ask you if you've

19  done this, have you done that.  You know, you better be

20  prepared to answer this question" to -- to make sure that they,

21  you know, kind of were prepared and, again, set them up for

22  success.

23             And oftentimes I would say, "No.  That's important

24  enough you need to call and wake her up and tell her directly

25  or I will tell her in the morning and be prepared to follow

1  up -- for some follow-up questions."

2  Q.   Now, Admiral, you talk about how you didn't know the

3  defendant prior to your chief of staff position.  Were you

4  familiar with the defendant's new executive officer in January,

5  Captain -- or now captain but then-Commander Alonza Ross?

6  A.   I was.  Initially I -- I -- I wasn't aware that Commander

7  Ross had -- had recently reported as the XO until this kind of

8  kicked off.  It just had kind of eluded me.  But, yes, I had

9  served previously with Commander Ross when I was -- when he was

10  a lieutenant commander and I was a commander on the USS

11  Eisenhower for a couple of pretty arduous deployments.

12  Q.   And in those arduous employments, did you have an

13  opportunity to form an opinion about Captain Ross' character

14  for truthfulness?

15       MR. VOKEY:  I'm going to object, Your Honor.

16  Sidebar.

17     (Sidebar conference:)

18       MR. VOKEY:  Your Honor, I was not permitted to elicit

19  character truthfulness of Ross with the first government's

20  witness.  It would be improper for them to elicit such an

21  opinion now.

22       THE COURT:  He just said he barely remembered working

23  with him, right?

24       MR. GEE:  No, sir.  He just said that he worked with

25  him on numerous arduous deployments on the aircraft carrier.

1        THE COURT:  Yeah.  I guess I'm --

2        MR. GEE:  Your Honor, if I may.

3        THE COURT:  Yeah.

4        MR. GEE:  The defense elicited from Kelly Wirfel

5   testimony about how she had had prior observations of Captain

6   Ross engaged in specific incidents where she felt that he had

7   been untruthful.  That was elicited through Ms. Wirfel.  So

8   they've attacked the character for truthfulness of Captain Ross

9   through opinion testimony, were permitted under Federal Rule of

10  Evidence 608 to provide character for truthfulness testimony in

11  response to that.

12       MR. VOKEY:  I was not allowed to get the opinion from

13  Kelly Wirfel on this.  It was objected to by the government and

14  ruled by yourself and I was not allowed to, so...

15       MR. GEE:  Your Honor, that is correct.  Mr. Vokey

16  asked two series of questions.  First he had asked her, "Were

17  there specific instances where you felt that he had been

18  untruthful?"

19       And she answered, "Yes."

20       Then he moved to the opinion question.  And that is

21  where we objected and the Court sustained it.  But he did ask

22  and obtain answers about specific incidents of untruthfulness.

23       THE COURT:  Well, having sought -- having sought and

24  obtained a successful objection to me allowing them to do it,

25  how am I letting you to do it now?

1    I mean, if you -- did you object to the question that
2    was originally asked?  I don't recall that.  I mean, it just
3    seems odd that I would allow you to do it when I -- when you
4    objected to them doing it and I sustained the objection.
5            MR. GEE:  Because, Your Honor, the -- they
6    have brought -- they brought in specific incidents of
7    misconduct, so we're allowed to rebut that under 608
8    understanding maybe we missed an objection when they brought it
9    in originally, but they did.  We then objected to the opinion
10   when we caught that in the second string of questions, but the
11   first question nonetheless was -- was admitted into evidence.
12   They've challenged his character for truthfulness.
13           THE COURT:  And what were the -- what were the
14   specific instances?  I don't recall them.
15           MR. GEE:  He moved on to opinion very quickly
16   thereafter, so he didn't elicit those.  He simply asked her,
17   "Was there times when you served with him on GTMO where you
18   observed him being untruthful?"
19           She said, "Yes."
20           THE COURT:  Okay.
21           MR. GEE:  So they've attacked him under 608 and we're
22   allowed to rebut that.
23           MR. VOKEY:  And what I was attempting to do was to
24   lay the foundation for the opinion, but I was not able to
25   elicit the ultimate opinion over -- after the objection of the

1  government.

2        THE COURT:  Yeah.  I'm going to have to sustain the

3  objection.

4     (The following proceedings occurred in open court, in the

5  presence of the jury:)

6        THE COURT:  And we'll have further discussions about

7  that issue outside the presence of the jury.

8        But, go ahead, sir.

9  BY MR. GEE:

10  Q.   Prior to January 2015, had you ever met Christopher Tur or

11  any members of his family?

12  A.   No.

13  Q.   I want to direct your attention to Saturday, January 10th.

14  A.   Uh-huh (affirmative).

15  Q.   Did -- did you learn about an event occurred -- that had

16  occurred at GTMO -- or was occurring at GTMO on Saturday,

17  January 10th, 2015?

18  A.   I did.  I believe it was mid-morning I got a phone call

19  from the Region duty officer and he said that he had received a

20  report from Guantanamo Bay that -- the duty officer at

21  Guantanamo Bay, that they had a missing person and that they

22  were searching for that person.

23       And so in receiving that information with not much

24  amplifying information, I asked the Region duty officer to call

25  down to Guantanamo and have him -- have the commanding officer

1  contact me directly to provide me some additional information.

2  Q.    And can you explain a little bit, Admiral, in this time

3  frame, in January of 2015, how the communication systems worked

4  in GTMO?

5  A.    Yeah.  It was -- it was a bit of an antiquated system.

6  And so you could call out from Guantanamo and get a cell phone

7  in the States, but a cell phone couldn't call directly to

8  Guantanamo.  And so I -- since it was a Saturday and I was at

9  home when I received the call, I -- I wasn't, you know, there

10 to use a -- a -- kind of a landline phone.  So oftentimes when

11 that occurred I would just ask them to have somebody from the

12 installation call me directly or I'd go into the office and --

13 and call.

14 Q.    And after you made that request for the CO to call you,

15 did the defendant call you?

16 A.    He did.  I -- I -- you know, it was probably 20 --

17 20-or-so minutes later I received a call.  And he provided me,

18 you know, kind of the basic information.  He essentially said

19 that there was a missing individual, had gone out partying the

20 night before, had been drinking, had been seen at one of the

21 establishments on the base drinking, and hadn't shown up at

22 home that morning -- that evening or that morning, and that at

23 some point the individual's spouse reported that he wasn't

24 home.

25        And then he went on to say that this type of behavior

1   wasn't unusual for this individual, that he had done this type

2   of thing before, had gone out drinking and -- and not showed up

3   until later.

4           And so I -- I -- we talked kind of through the things

5   that he was doing.  You know, he had people driving around the

6   base and kind of starting -- beginning the process of having

7   folks knocking on doors and -- and just looking around to see

8   if they could find the guy.  It was kind of the initial stages

9   of it after the report.

10          And so we talked through all of those things that he

11  was doing.  And then based on the things that he had-- he had

12  told me, that this individual had a history of doing this kind

13  of thing, I said, "Okay.  Well" -- you know, we talked through

14  it.

15          And I said, "It sounds like you're doing all

16  reasonable things."

17          And in the back of my mind I'm thinking, "Well, you

18  know, you're going to go through all this effort and -- and,

19  you know, it's 10:30 or 11 o'clock and at -- at 12:30 or

20  1 o'clock, this guy is going to walk through his front door and

21  it will -- it will be a wasted effort based on what you're

22  telling me that there's a history of this kind of thing."

23  Q.   So based on the information that he was providing you,

24  were you concerned about the missing person yet?

25  A.   Well, there is always some concern, but given that he had

 1    said that this type of behavior wasn't unusual, I thought -- I

 2    thought, "Well, okay, this is" -- again, whenever you have --

 3    anybody is missing, it's -- it's concerning, but given the

 4    history, it just kind of led me to think, "Well, okay, this

 5    is -- he'll show up and he" -- it's -- again, it's 10:30.

 6    He'll probably sleep it off.  Depending on how much he drank

 7    and how late he stayed out, he might -- he might wake up at

 8    noon and -- and walk through the door at 1 o'clock at his

 9    house, you know, so...

10    Q.    In this first call with him on Saturday, did he give you

11    any impression that he, himself, had had any kind of personal

12    interactions with the missing person the night before?

13    A.    No, he -- you know, he reported it as if something had

14    been reported to him and that he was relaying the information

15    and then based on that information he was acting to go find

16    someone.

17    Q.    Now, Admiral, if in this very first call on Saturday he

18    had told you that he had been in a verbal altercation with the

19    missing person, would you have had a different reaction?

20    A.    It would have completely -- yes, I would have been much

21    more concerned and asked many more questions and it would have,

22    for me, changed the entire nature of the -- this incident.

23    Q.    What if he had told you he had a physical altercation?

24    A.    Even more so, right, because of the ramifications that it

25    would have for him and for the Navy, and then, you know, a

1    tie -- the tie of a senior officer to a missing person is, you

2    know, something that would immediately garner the attention of

3    the highest levels in the Navy chain.

4    Q.    Now, Admiral, did you continue speaking with the defendant

5    throughout that Saturday?

6    A.    I did.  I got updates throughout the day and into the

7    evening.  He -- you know, he -- I asked him to call me at -- at

8    various intervals and just keep me up-to-date as to how it's

9    going, anticipating that I would get a call at some point to

10   say, "Hey, he just walked in his front door," again, based on

11   the information that was -- was provided.

12         And I think midafternoon I -- I may have gotten a

13   call, and certainly in the evening I got a call that said,

14   "Hey, you know, we've been out looking, we haven't found him.

15   It's getting late.  I've got a bunch of people who are driving

16   around and in some cases they're walking through the -- through

17   the hills and it's getting dark and I'm starting to get worried

18   about their safety, and I want -- you know, we don't want to

19   hurt anybody looking for -- looking for the guy.  We haven't

20   been able to find him."

21         And so by this time, you know, my expectation was

22   like we would have -- he would have already shown up, and so I

23   was more concerned, and we talked through again all the things

24   that he was doing, you know.  You know, had he -- you know, had

25   he made -- the security -- security department was fully

1    engaged.  You know, he was -- he was getting volunteers from

2    the community to go out and look.  Had he talked to NCIS, at

3    least made them aware that that was going on.  You know, the --

4    the Coast Guard boats and his own security boats, were they

5    looking in the water.

6            We -- we talked through the -- kind of the full

7    gamut, and by the end of the conversation, I felt comfortable

8    that he was doing all the things that he needed to be doing.  I

9    couldn't think of anything more that he should be doing, and I

10   concurred that given that it was getting dark and -- and he

11   didn't want to hurt somebody or lose somebody else in any way,

12   that it was best to conclude for the night and then pick up in

13   the beginning in the morning and -- and --

14   Q.   And why did you discuss with him making sure that NCIS was

15   in the loop?

16   A.   Well, you know, they're additional people who can get out

17   and start helping beat the bushes, right?  And while it wasn't

18   necessarily a criminal matter, they -- they should be made

19   aware that when you have a missing persons -- because you don't

20   know what the circumstances are, right?  And so typically in

21   that case I would think that the response of NCIS would be,

22   "Okay.  Thanks for letting us know."

23           They may volunteer to help go search, but in most

24   cases they would say, "Okay.  Well, it's not really a criminal

25   matter, so keep us informed," but at least they would be made

1   aware of the general circumstances of it and so that if it did

2   take a turn they would be -- they would know those

3   circumstances and be able to hit the ground running.

4   Q.   And so throughout these Saturday conversations with you

5   when he's giving you updates on what's happening, at any point

6   did he tell you he had been in a verbal or physical altercation

7   with the missing person?

8   A.   Absolutely not.

9   Q.   At any point on Saturday, did he leave you with the

10  impression that he had had any kind of personal interaction

11  with the missing person the night before at all?

12  A.   Everything that he conveyed was as if it was relayed

13  through other parties and it was just information --

14          MR. VOKEY:   Objection.   Speculation.

15          THE WITNESS:   -- he was just passing on.

16          MR. VOKEY:   Speculation as to what Captain Nettleton

17  knew or did not know as he's relaying this.

18          THE COURT:   Let me just see what -- I'll overrule it.

19          All right.   Well, I tell you what.   Why don't you

20  rephrase, ask the question, and then I'll hear the admiral's

21  answer.

22  BY MR. GEE:

23  Q.   Admiral, what impression did he leave you with about

24  whether he had had any personal interactions with the missing

25  person?

1    THE COURT:  And I'll overrule the objection if there

2  is one to that question.

3    Admiral, you may answer the question.

4    THE WITNESS:  Okay.  He led me to believe that -- the

5  way he described the situation, that there had been no personal

6  involvement with him in any way.

7    And -- and in his words and in his wordings, both

8  verbally and in -- and in e-mails, it was clearly articulated

9  in a way that seemed to indicate that he was getting the

10  information through other people -- it was being reported to

11  him and he had no prior -- you know, prior knowledge of the

12  involvement.

13    MR. VOKEY:  Objection.  Witness is testifying as to

14  knowledge of Captain Nettleton.  I object.

15    THE COURT:  All right.  I'll sustain on that basis.

16    And let's -- let's limit it to the question, please.

17  And, Mr. Gee, what's your next question?

18    MR. GEE:  Thank you, Your Honor.

19  BY MR. GEE:

20  Q.   Now, Admiral, as the evening came, did you direct the

21  defendant to do anything?

22  A.   At some point in -- in the day, I think it was in the

23  early afternoon, I said, "Okay.  Well, this person hasn't shown

24  up.  You need to -- you need to send the admiral an e-mail and,

25  you know, articulate what happened and what you're doing about

1    it, and then I'm sure she's going to have some follow-up

2    questions for you," and he -- he essentially did that at some

3    point.

4              MR. GEE:  We're going to call up Government's

5    Exhibit 359, please, Ms. Reid.  And can we scroll?

6    BY MR. GEE:

7    Q.    Admiral, this is an e-mail chain, so we're going to start

8    at the bottom of the e-mail chain.  Okay?

9              MR. GEE:  Second page, please.

10             THE WITNESS:  Do I have this in this document?

11   BY MR. GEE:

12   Q.    It is in the -- it is in the binder in front of you, sir.

13   A.    Okay.

14   Q.    It's at 3 -- the Tab 359, and it will also be on the

15   screen in front of you.

16   A.    Okay.

17   Q.    Take a moment.

18   A.    Okay.  And you're working from the back forward.  Okay.

19             Yeah, so this is the initial e-mail that he sent

20   notifying the admiral that I asked him to send.

21   Q.    And were you -- and were you copied on this e-mail, sir?

22   A.    I was.

23   Q.    And there's a -- there's a couple of other -- first off,

24   it's -- it's -- there is another person CC'd, Steven Holmes.

25   Who is Steven Holmes, sir?

1   A.   He -- he was the senior captain on the Navy Region

2   Southeast staff, and he was also the director of the Fleet and

3   Family Services, kind of -- department.

4           Ms. Tur was the Fleet and Family Service director, so

5   kind of indirectly through, you know, the chain of -- he was

6   the head of that chain of command for that director.

7           And so that's one of the reasons -- for two reasons

8   he was info'd.  He was the senior captain and -- and a -- and a

9   leader, and then also he was responsible for that director that

10  Ms. Tur had worked for.

11  Q.   And I see that now-Captain Ross was copied on it.  Is that

12  normal in reports to the admiral, copying the XO, things like

13  that?

14  A.   Typically, yeah, you keep your chain of command so that --

15  you know, you may not be together, you may be at different

16  locations.  And in -- in this instance, you're working hard to

17  try and coordinate a search.

18          And so he may be at one location.  And you want to

19  make sure you all remain in sync and -- and there's no --

20  information is -- is flowing.

21  Q.   Now, Admiral, I'm going to turn you into a bit of a Navy

22  lingo interpreter, if you will, because of this e-mail and some

23  of the lingo that's in it.  Okay?

24  A.   Okay.

25  Q.   So, first, Admiral, it says, "We're searching for an

1  NEX" -- what's NEX?

2  A.    Navy Exchange.  It's the -- it's the installation's

3  Walmart, for -- for example.

4  Q.    Okay.

5        "He was last seen at the O Club around 0100" -- for

6  civilians, 0100 means what time?

7  A.    1 a.m.

8  Q.    -- "and may have walked to the Marine Hill mini mart,

9  based on charge card info, sometime after that.  We have

10 security, Marines, and dogs searching windward."

11       What is windward in GTMO, sir?

12 A.    It's -- the base at -- in Guantanamo is kind of split by

13 an inlet that comes in from the ocean and then there's a big

14 bay behind it, so there's two sides, the windward side and the

15 leeward side.  And so the -- the bulk of folks and activity

16 occurs on the windward side of the island, and so what he was

17 saying is where this all occurred, we're searching that -- that

18 area, essentially.

19 Q.    It says, "Security and Coast Guard are conducting searches

20 of the bay."

21       Is that right?

22 A.    Right.

23 Q.    It mentions the Coast Guard.  Was the Coast Guard down

24 there on GTMO, too?

25 A.    They were.  They -- they supported the Joint Task Force

1  Guantanamo Bay, the prisoner detention mission, and because of

2  the -- the nature of that mission, the Coast Guard was deployed

3  there with a fairly significant number of patrol boats to

4  provide security -- additional security to the installation and

5  for that facility as well.

6  Q.    Did the Coast Guard also have assets in GTMO?

7  A.    Not all the time.  But they typically would have a

8  helicopter down there for search and rescue type things.

9  Q.    And in your time on -- commanding GTMO, did you end up

10 having to work with the Coast Guard?

11 A.    I worked with them very closely all the time, yes.

12 Q.    How did you find them to be, in terms of receptiveness to

13 requests by the Navy for assistance?

14 A.    Extremely accommodating.  They were -- they would bend

15 over backwards to do whatever they could to help you.

16 Q.    It says, "This is the spouse of our FFSC director."

17        What's that?

18 A.    That's Fleet and Family Service Center.  It's -- it's the

19 -- it's where, you know, training -- you know, spousal training

20 and counseling services are available.  It's a department that

21 provides services to the -- to the community.

22 Q.    "Alcohol is a factor and this has happened before, never

23 for this long, though.  We're preparing for the worst and

24 hoping for the best.  Chaplain's ready if needed.  We will

25 expand the search parties tomorrow morning with the help from

1    the tenants."

2            What are the tenants?  What does that mean?

3    A.    Commands that are -- other commands that are on the base.

4    So typically on a Navy installation you might have a -- a

5    squadron, you may have -- in -- in -- in the instance of

6    Guantanamo Bay, the Joint Task Force, Guantanamo Bay was a

7    command -- was its own command that was resident on the

8    installation and had its own admiral as its leader.  So there

9    are a number of kind of independent units that call your base

10   home, and so when he says, "the tenants," he's talking about

11   those other units that he's reaching out to for assistance

12   to -- to get bodies and assets to go out and search for the

13   individual.

14   Q.    And then it says, "OPREPS going out shortly."

15           What's an OPREP again?

16   A.    It's what I referred to earlier.  It's the operational

17   report.  It's the official mandated -- Navy-mandated reports

18   that makes the chain of command aware of incidents that are

19   going on throughout the Navy.

20   Q.    "Nothing needed at this time."

21           All right.  And, Admiral, this e-mail at -- at 7:55

22   on Saturday, is this generally consistent with the kinds of

23   things he had been telling you throughout the day?

24   A.    Yes.

25   Q.    All right.

1          MR. GEE:  I think if you can just scroll up.  Don't

2    have to zoom out, just scroll up.

3    BY MR. GEE:

4    Q.    All right.  Let's look at the next e-mail in the chain.

5    Admiral Jackson writes back.

6          And are you still copied, Captain?

7    A.    Yes.

8    Q.    "Can you give me some understanding of the extent of

9    search conducted and whether there could be places that he

10   might be sleeping this off, friend or other?  NCIS involved?

11   Is spouse frantic?  And was there a domestic argument involved?

12   Any thoughts he would be suicidal?"

13   A.    Right.

14          MR. GEE:  Can you scroll up, please?

15          THE COURT:  Mr. Gee, I know you just -- you just

16   called the witness captain.  I guess he was captain at the

17   time, but he's now an admiral.  So I just wanted the jury to be

18   clear.

19          So it was Captain Gray at the time of the events.

20   It's now Admiral Gray.  Same person.

21          All right.  Go ahead.

22   BY MR. GEE:

23   Q.    My apologies, sir.

24   A.    No problem.

25   Q.    All right.  Now, the next e-mail, 10:45 -- you still

1    copied on this one, Captain?

2         MR. VOKEY:  Admiral.

3    BY MR. GEE:

4    Q.   Admiral.  My goodness.  I'm sorry.  It's been a long

5    morning.

6    A.   10:45 --

7    Q.   I do not mean to demote you, sir.

8    A.   No, I understand.  At 10:45, yes, I was copied on it.

9    Q.   All right.  It says, "Same e-mail.  Forgot reply all.

10   Admiral, search as much as we could get into the hills before

11   nightfall, still searching some with flashlights, NVG."

12        What's NVG, sir?

13   A.   Night vision goggles.  Allows you to see at night.

14   Q.   "Told them to take it easy during the night search.

15   Harbor using FLIR and/or NVGs."

16        What's FLIR and NVGs?

17   A.   FLIR is forward-looking infrared.  It's a system that

18   attracts heat.  It's essentially a -- for the layman, another

19   form of night vision.

20   Q.   "We went door to door in the BOQ and in the neighborhood."

21        What's the BOQ?

22   A.   BOQ is bachelor officers' quarters.  It's where the single

23   officers live.  It's kind of like their apartment if you don't

24   have a family.

25   Q.   "Yes, trying to find the places to sleep it off.  We're

1   also checking new and demo housing and warehouses."

2          What's demo housing on GTMO?

3   A.   There were a couple of neighborhoods, old neighborhoods

4   where there were multiple houses that were -- that had been

5   essentially abandoned, were meant to be torn down at some point

6   in the future because they weren't needed any longer and

7   because they were, you know, not very high quality.  So there

8   are a bunch of empty houses that were either open, you know,

9   the doors were missing, or that were easily accessible.  So it

10  would be natural to think, okay, well, you know, maybe this guy

11  walked the wrong direction and found himself somewhere and

12  could have gone inside and slept.

13  Q.   It says, "Spouse is calm.  She is waiting.  Had to call

14  one of her daughters in college in Pennsylvania.  Other is here

15  with her.  NCIS is involved.  Yes to domestic argument and yes

16  to suicidal.  I say that only because he is on several meds and

17  was drinking heavily.  Spouse said he got physical with her at

18  the Bayview, which is why she left."

19  A.   Right.

20  Q.   Can you scroll up a little bit more.

21         Did Admiral Jackson respond, sir?

22  A.   Yes.  She said, "Please call me" -- "thanks for the

23  information."

24         Essentially, "Please call me in the morning at

25  8 o'clock," and essentially provide her an update.

1  Q.   Did the defendant agree to do that?

2  A.   "Will do."  Yes.

3  Q.   Do you recall him providing any details by the end of

4  Saturday, January 11th about himself getting in a physical

5  altercation with Chris Tur at all?

6  A.   No.

7  Q.   What about a verbal altercation with Chris Tur at all?

8  A.   No, no.

9  Q.   Admiral, I'd like to turn your attention now to Sunday,

10  January 11th, 2015.  Was there a point that day when you found

11  out that Mr. Tur's body had been located?

12  A.   There was.

13  Q.   All right.  Let's talk about before that.

14  A.   Okay.

15  Q.   Did you speak with the defendant before the body was

16  located that Sunday morning?

17  A.   I'm sure I did.  I -- I likely would have called him and

18  gotten an update and followed up to see what things he was --

19  he was doing and the like.

20       Especially having had the admiral called him, I would

21  have synced up on him -- with him about what -- what she had

22  done, and then amplified or provided additional information

23  based on what he would -- she would have said if he had

24  questions about her or wasn't sure how to proceed.

25  Q.   And prior to Mr. Tur's body being discovered in these

1  conversations on Sunday, when he's still missing, did he ever

2  tell you he had gotten in a physical or verbal altercation with

3  Mr. Tur?

4  A.   No, absolutely not.

5  Q.   Did he ever tell you he had any kind of personal

6  interactions with Mr. Tur at all on Friday night?

7  A.   No.

8  Q.   After you found out that the body was recovered, did you

9  speak to him that Sunday?

10 A.   Yes, absolutely.

11 Q.   And tell us what those conversations were like on Sunday.

12 A.   I believe I got notified again by the command duty officer

13 that said that they found Mr. Tur's body.  And, of course, as

14 soon as that happened, I said, "Okay, have -- again, have the

15 Skipper call me."  And at some point soon thereafter, we spoke.

16         And so the -- you know, kind of the nature of the

17 event changed.  It went from, "Okay.  Now we've got a guy who

18 has done this kind of thing before who we just can't find.

19 It's a little longer than normal," to "Holy cow, now we have a

20 body," right?

21         And so kind of the focus has to shift from finding

22 somebody to, okay, now dealing with the body, making sure that

23 all the investigative services or -- and the things shift to a

24 criminal type -- from a -- you know, let's -- an

25 administrative where we've got a guy missing.  Now it's --

1   there's potentially criminality, right, because there's a body

2   and you don't know what the nature is, although early on we

3   didn't necessarily know that.

4          So making sure that NCIS takes over, gets fully

5   involved.  Disposition of the body.  Taking care of the family,

6   you've got a family there that just lost their -- their husband

7   and their father, and it's complicated by the fact that they're

8   in this isolated location.  It's not -- you know, we can't just

9   fly somebody from Norfolk to Jacksonville to -- you know, we've

10  got to coordinate and there are only a certain number of

11  flights that go into Guantanamo Bay.  So there's a lot of

12  logistical challenges that wouldn't otherwise be there if it

13  were here in the United States.

14         And so we -- we shifted to, okay, you know, you're

15  going to have to plan a memorial service.  You need to get

16  chaplains and counselors not only over to the family, but some

17  of his coworkers and people that might be negatively affected

18  by his unexpected death.  And, you know, all the logistical

19  things that were -- were needed -- were needed to be done.

20  Q.   And, Admiral, in these Sunday conversations, where -- you

21  mentioned that you would have discussed with him -- you

22  discussed with him, in making sure NCIS is involved, in what

23  kinds of ways did you discuss with him how --

24         MR. VOKEY:  Objection.  Leading.  That's not what the

25  witness stated.

1          THE COURT:  Overruled.

2    BY MR. GEE:

3    Q.    In what kind of ways did you discuss NCIS involvement with

4    him after the body was recovered?

5    A.    Well, I essentially said, okay, this is NCIS's game now,

6    you've got to turn everything over to them, and they need to

7    run the investigation.  So any information that you have

8    gathered through talking to people or -- or witness statements

9    or that kind of thing that you may have done at a lower level

10   when you have a missing person, it's all got to go to NCIS to

11   do a formal investigation.

12   Q.    At any point in these conversations with him on Sunday

13   after the body was recovered, did he tell you that he had been

14   in a physical or verbal altercation with Mr. Tur?

15   A.    Absolutely not.

16   Q.    At any point in these conversations with him on Sunday

17   after the body was recovered, did he tell you that he had -- or

18   lead you to have any impression at all that he had any personal

19   interactions with Mr. Tur the Friday -- that Friday night?

20   A.    No.

21   Q.    All right.  Admiral, let's direct your attention to the

22   next day, Monday, January 12th, 2015.  When you came into the

23   office that day, did you learn that there had been an Inspector

24   General anonymous report filed online?

25   A.    I did.  I -- because of everything --

1  Q.   Admiral, I'm just going to -- is that a yes?

2  A.   Yes.

3  Q.   Okay.  And this Inspector General's report -- first off,

4  what is the Inspector General's Office?

5  A.   It's -- it's essentially an oversight body in the Navy

6  that ensures -- that does compliance inspections and

7  investigations for compliance.  They oversee our programs and

8  things that happen on the installation and provide

9  recommendations and they do investigations that tell you, hey,

10  you know, you have -- you might have a program that's not

11  running effectively, it's not following these regulations, or,

12  you know, there may be an investigation where there is an

13  incident -- you know, perhaps an allegation of discrimination

14  and they -- they would go in and interview everybody for you

15  and then come back and say, "Based on the evidence, we found

16  that this is substantiated and disciplinary action might be

17  warranted against somebody."  Those type of things.

18  Q.   And so they had various hotlines and online ways to file

19  anonymous complaints?

20  A.   Right.  Yeah.  There's a phone, there's a computer system

21  where they can, you know, file it either anonymously or they

22  can put their name to it.

23  Q.   And did you learn that Monday morning that -- that this

24  anonymous complaint referred to some of the activity on

25  Guantanamo Bay that Friday night?

1  A.   I did.  Yes.

2  Q.   And, in general, Admiral, this anonymous complaint, did it

3  provide information about a possible verbal altercation at the

4  Bayview and at the defendant's home on that Friday night?

5  A.   It -- it did.  It said in general --

6  Q.   And, Admiral, just -- is that a yes?

7  A.   Yes.

8  Q.   And, Admiral, did it also provide information about an

9  alleged affair between the defendant and Ms. Tur?

10  A.   It -- as I recall, it alluded to a possible affair.

11  Q.   Now, Admiral, in response to receiving this IG report, did

12  the nature of your response shift to what was going on down

13  there in GTMO?

14  A.   Somewhat.  You know, it's not unusual to get allegations,

15  right, from folks.  So certainly when the IG came in and told

16  me about this, it was concerning and I immediately directed

17  that he would -- I essentially directed my IG to conduct an

18  investigation and that I would be sending him down to

19  Guantanamo to look into these allegations to determine the

20  veracity of them.

21  Q.   Okay.  And, Admiral, just fast-forwarding for a few

22  minutes, as the week went on, did you end up sending the IG or

23  did someone else stay in charge of the investigation?

24  A.   Well, there's only -- typically Wednesday is the rotator,

25  the flight that goes to -- so I told him on Monday, get your

1  stuff ready to go, we'll put you on the plane on Wednesday.

2  And then in the intervening period between Monday morning and

3  Wednesday, circumstances had changed.  We found the body.  NCIS

4  took over.  I -- we sent additional NCIS agents down there to

5  augment the folks that were there.  So it -- by the time the

6  plane was to leave to take him, it became a moot point, right?

7  It was -- it was now a criminal investigation.  We had more

8  information.

9  Q.   Now, after that Monday when you learned about this IG

10  report, did you have conversations with the defendant that

11  Monday in which he discussed with you rumors on GTMO?

12  A.   Yeah.  Early in the week, I'm not sure if it was Monday --

13  I think it was actually Tuesday, but he -- I had spoken to him

14  a couple of times in the morning about, again, logistical

15  things.  And then I recall sometime fairly soon thereafter,

16  maybe an hour after we'd had these conversations, he called me

17  and my front office said, "Hey, we've got Captain Nettleton on

18  the line.  He wants to talk to you."  So I was a little

19  surprised, because I had just recently gotten off the phone

20  with him.  And I picked up the phone and he was -- he -- he

21  said, "Hey, I need to -- to let you know, I've been out and

22  about on the base and talking to folks, and as I'm, you know,

23  kind of doing my coordination here" -- and he said, "I ran into

24  a couple of people and there's a bunch of wild rumors going

25  around, people are coming up and telling me about these rumors

1   and, you know, that I had an affair with Mrs. Tur, that, you

2   know, there was a -- there was a relationship there and -- and

3   various other things."

4        And he said, "I just want to tell you there's

5   absolutely no truth to that.  It's not true.  None of that

6   stuff occurred."

7        But, you know, I -- I feel like, as a commanding

8   officer, you're held to a very high standard.  So he was

9   obviously very concerned, given what had occurred --

10       MR. VOKEY:  Objection.  Speculation as to the state

11  of mind of my client.

12       THE COURT:  I think you've answered the question for

13  now, Admiral.

14       What's your next question, Mr. Gee?

15  BY MR. GEE:

16  Q.   Now, Admiral, in this conversation with you about the

17  rumors of the affair, did he tell you that he'd had any kind of

18  physical or verbal altercation with Mr. Tur?

19  A.   No.

20  Q.   Did he tell you that he had any kind of personal

21  interaction with him at all that Friday night --

22  A.   No.

23  Q.   -- in this first rumors conversation?

24  A.   No.

25  Q.   And, Admiral, as part of sort of your daily work there

1    at -- as the chief of staff, would you provide reports to

2    Admiral Jackson about kind of what had happened each day?

3    A.   Yes, all the time.  Verbally, sometimes in e-mails.  It

4    depends whether she was in the office or what was going on.

5    Q.   And I'm going to show you an exhibit that -- an e-mail

6    that's been admitted as Government's Exhibit 362A.

7    A.   Is that in the book as well?

8    Q.   Yes, sir, it is.

9    A.   Okay.

10          THE COURT:  And, Mr. Gee, I'm going to be looking for

11   a natural stopping point for lunch.  So we'll do this exhibit

12   and then maybe you can tell me when a good place to stop would

13   be.

14          MR. GEE:  Yes, sir.

15   BY MR. GEE:

16   Q.   So first, Admiral, we're just going to get the timestamp

17   at the top --

18          MR. VOKEY:  And, Your Honor, I'm just -- I'm sorry.

19   That was 362A?  I just wanted to clarify.

20          THE COURT:  It is.

21          MR. VOKEY:  Sorry about that.

22          THE COURT:  Previously been admitted.

23          MR. VOKEY:  Yes, sir.

24   BY MR. GEE:

25   Q.   So this e-mail is sent on January 12th; is that right?

1  A.   Yes, Monday, January 12th.

2  Q.   And it's from you to who, sir?

3  A.   It was from me to Admiral Jackson and info'ing the

4  executive director.

5  Q.   And we're going to zoom in now on the text.

6        All right.  Admiral, I'm going to focus on the middle

7  paragraph -- well, first off, just the top paragraph and the

8  bottom paragraph, is this sort of -- what's kind of going on

9  here?

10 A.   It's unrelated -- it's unrelated information, additional

11 information that she -- I was making her aware of, but that was

12 unrelated specifically to this incident.

13 Q.   So like the stuff about some CO not wanting to leave his

14 house --

15 A.   Right.

16 Q.   -- unrelated to this incident?

17 A.   Right.

18 Q.   Now, the middle part of the e-mail, where you say

19 "Received a call from Skipper Nettleton" --

20 A.   Uh-huh (affirmative).

21 Q.   -- can you just read for us, Admiral, what you wrote

22 there?

23 A.   "Received a call from Skipper Nettleton.  He -- he had

24 received several calls from individuals around the installation

25 about the rumor mill regarding the death of Mr. Tur.  He was

surprised at the nature of the allegations and articulated his

concerns about the implications for him personally.  He

described the events the night before when Mr. Tur became

confrontational and was concerned because the story and the

allegations were circulating.

He stated that Mr. Tur made many wild and unfounded

allegations that might and that none of them were true.  He

asked my advice on how to handle the rumor mill swirling

around.  I did not mention the IG complaint, but that we knew

NCIS was investigating the circumstances of the death, and I

was sure they would be thorough.  I asked if the installation

had put out anything officially about the death and he said

they had not.  I recommended that he coordinate a statement

with the public affairs officer and the family to notify the

community officially, advise what was being done, and notify

everyone when the memorial would be, i.e., 'It's with a sad

heart to announce that we lost a treasured member of the

community.  Mr. Tur was found deceased this weekend and the

circumstances are being investigated.'

"Told him I thought that putting something out

officially was important and ensuring everyone knew an

investigation was occurring would tend to quell the rumor mill

and rampant speculation.  He intended to work up a statement

for release.  I advised him to be completely honest when

interviewed by NCIS.  I will check in with him daily and make

1　sure things are going okay.  I spoke with him several times

2　today."

3　Q.　And, Admiral, does this sort of summarize some of those

4　kinds of conversations you're having with him about the rumors

5　and so forth?

6　A.　Yes.

7　Q.　Now, Admiral, turning your attention to later in the week,

8　was there --

9　　　　　　　THE COURT:  Would this be a good time, Mr. Gee?

10　　　　　　　MR. GEE:  It would be a good time, yes, Your Honor.

11　Thank you.

12　　　　　　　THE COURT:  Okay.  All right.  Ladies and

13　gentlemen -- let's have the lights, please.

14　　　　　　　All right.  Ladies and gentlemen, we'll take our

15　lunch break now.  It is 20 minutes to 1 o'clock.  Let's go

16　ahead -- we'll do an hour and ten minutes.  So if you could be

17　back in the jury room ready to come out at ten minutes to 2:00,

18　right?  Ten minutes to 2:00.  Please remember all my

19　instructions, very important to keep all those instructions in

20　mind.  You can leave your pad in the seats.  Have a nice lunch.

21　We'll see you back.

22　　　　　　　COURT SECURITY OFFICER:  All rise for the jury.

23　　　　(Jury exits, 12:42 p.m.)

24　　　　　　　THE COURT:  Admiral, you may step down, too, sir.

25　Ten minutes to 2:00.  Okay?

 1          THE WITNESS:  Yes, sir.

 2      (Witness temporarily excused.)

 3          COURT SECURITY OFFICER:  Please be seated.

 4          THE COURT:  Okay.  Let me just get a sense of where

 5   we are here.  How much -- Mr. Gee, how much more do you have

 6   with the admiral?

 7          MR. GEE:  I'd be surprised if it was 10, 15 minutes

 8   more, Your Honor.

 9          THE COURT:  Okay.  All right.

10          MR. GEE:  Probably not even that long.

11          THE COURT:  All right.  And then, of course, there

12   will be cross-examination.  And then Admiral Jackson is next?

13          MR. GEE:  Correct.

14          THE COURT:  And I take it she'll be a good bit of

15   time, I'm guessing, probably equivalent?

16          MR. GEE:  Maybe a little shorter.

17          THE COURT:  Okay.  And then who's after that?

18          MR. GEE:  Dr. Gordon.

19          THE COURT:  Okay.  That could be our day, right?

20          MR. GEE:  I think most likely, yes, sir.

21          THE COURT:  Yeah.  Okay.  Just in case, who would be

22   after that?

23          MR. GEE:  Jason Boswell, crime scene tech.

24          THE COURT:  Okay.  All right.  Anything else from

25   counsel at the moment?  All right.  Then we'll be back in

1    session at ten minutes to 2:00.  We're in recess.

2            COURT SECURITY OFFICER:  All rise.

3            (Recess from 12:43 p.m. to 1:52 p.m.; all parties

4    present.)

5            COURT SECURITY OFFICER:  All rise.  This Honorable

6    Court is back in session.

7            Please be seated.

8            THE COURT:  I'm told that I may have referred to the

9    CNO as being Commander of Naval Operations when, in fact, it's

10   the Chief of Naval Operations, so if I said that, I want to

11   correct the record.

12           I also -- you know, I went back and looked at the

13   testimony of Kelly Wirfel --

14           It's Wirfel, right?

15           LAW CLERK:  Yes, sir.

16           THE COURT:  -- regarding Captain Ross, and there's --

17   at Volume II, page 180 of the -- of the transcript, there was

18   questions by Mr. Vokey about character for truthfulness.  It

19   consisted of two answers, one about his stories not matching

20   exactly with what she had heard and one about small lies.

21           And then the question was, "So is it your opinion

22   that Commander Ross is not a truthful person?"

23           Objection by Mr. Nothstein.

24           I sustained the objection.

25           And then they went on to something completely

1    different.

2         In light of that, that's why I sustained the

3    objection to Admiral Gray being asked about the same question,

4    since the government successfully got me to sustain the

5    objection.  And I'm comfortable with both of those rulings.

6         I will say this, that there is this little bit of

7    testimony from Ms. Wirfel.  I'm going to be instructing the

8    defendant, however, that there should be no reference to that

9    testimony in closing argument or anything else.

10         I think -- I think it was -- you were trying to lay a

11   foundation that I would not ultimately allow you to give the

12   opinion.  And so I don't think we need to be hearing about

13   Ms. Wirfel's opinions about Commander [sic] Ross in closing or

14   anyplace else.

15         Now, that does not mean that -- of course,

16   Captain Ross's credibility can be questioned based on his own

17   testimony, based on any inconsistencies that were thought to be

18   in it, based on all -- all the things that a cross-examination

19   is designed to bring out.

20         So I'm not suggesting that Captain Ross's credibility

21   can't be questioned in closing or anyplace else that's

22   appropriate, but I am suggesting that I'm not going to allow

23   any further argument along the lines of Ms. Wirfel's testimony

24   coming from her.

25         And so what that means is there will be no character

1  evidence regarding Captain Ross's truthfulness by either side.

2           All right.  Are we ready for the admiral?

3           MR. GEE:  We are.

4           THE COURT:  Okay.  Anything else?

5           MR. GEE:  No.  Thank you, Your Honor.

6           THE COURT:  All right.  Let's have the jury.

7       (Admiral Gray enters the courtroom.)

8           THE COURT:  You got some lunch?

9           THE WITNESS:  I did.  Yes, sir.  Thank you.

10          COURT SECURITY OFFICER:  All rise for the jury.

11      (Jury enters, 1:56 p.m.)

12          COURT SECURITY OFFICER:  Please be seated.

13          THE COURT:  Welcome back.  Hope you had a good lunch.

14          Mr. Gee, you may proceed.

15          MR. GEE:  Thank you, Your Honor.

16  BY MR. GEE:

17  Q.   Good afternoon, Admiral.

18  A.   Good afternoon.

19  Q.   Admiral, we were talking about some of your conversations

20  you had with the defendant earlier in the week about rumors.

21          Was there a point later in that same week of

22  January 11th where you discussed with -- where you had more

23  conversations with the defendant and he provided you any

24  additional information about what had happened on the night of

25  Friday, January 9th?

1   A.   He did, yeah.   On Wednesday, I'd say Wednesday

2   mid-morning -- I'd -- I'd had some conversations with him early

3   in the morning on, again, logistical things, coordination,

4   making sure he had the support that he needed, the things that

5   he was doing.   And so we wrapped those conversations up.

6        And then maybe 45 minutes or an hour later, I got a

7   call that said, "Hey, Captain Nettleton wants to speak to you

8   again."

9        And so I picked up the phone and he -- he essentially

10   said, "Hey, there's something I need to tell you.   On the night

11   of -- on the Saturday night, I guess it was, at the event -- it

12   was a Hail and Farewell, you know, kind of event -- I was

13   actually there when -- when the -- with the Turs at the party."

14   And he said the -- there had been some verbal kind of

15   altercation at the party, some, you know, alcohol and the like.

16        He said that, you know, when the altercation

17   occurred, folks stepped in to break it up, it was calmed down,

18   that Mr. Tur's behavior was kind of cyclical during the party,

19   that he would -- you know, he would go from being angry and

20   saying things like, "Hey, you're having an affair with my wife"

21   and, you know, kind of being belligerent to, you know, "I think

22   you're a great guy, you're a good CO, and, you know, you're a

23   good buddy," that kind of thing.   So it was just kind of an odd

24   cyclic nature of it.   And I guess toward the end of the night

25   things broke up, there was some discussion.

1    And then he said, "The party broke up and I went back

2    to my house and then later that evening Mr. Tur showed up at my

3    house, he wanted to talk to me some more.  He wanted to come

4    in.  I refused to let him in.  We talked at the front door and

5    we kind of went through the same cycle where he was -- it was a

6    cyclical -- you know, again, you're having an affair with my

7    wife and why would you do this kind of thing and -- and back

8    to, you know, I think you're a great guy."

9    And so he essentially said at some point they wrapped

10   up the conversation and he didn't let him in because his

11   daughter was in the house and he didn't think it was right.

12   And they ended it and Mr. Tur left and he went to bed.

13   Q.   Did he describe any kind of physical altercation

14   occurring?

15   A.   No.

16   Q.   Did you -- what did you do?  What was your reaction in

17   response to these new details?

18   A.   I was stunned, to say the least, because -- because of --

19   all the things that had been said up until that point had --

20   had -- he had led me to believe that there was no, you know,

21   personal involvement or interaction, that the data he was

22   passing to me was second- or thirdhand, and things that were

23   being reported to him.  And so I was stunned.

24   You know, over the course of the four-or-so months

25   that I'd been there, I'd gotten reports from many COs.  And,

1  frankly, he was -- he was one of the few of the people that I

2  had gained some relative confidence in about reporting -- he

3  was very good about reporting information and knowing what was

4  important to tell me so that I could pass it to the boss or the

5  like.

6          And so obviously when he told me this, I was -- I was

7  stunned.  My jaw dropped to the ground and I -- you know, I --

8  before -- without me asking, he essentially said, "I" -- you

9  know, at the end -- at the end of his conversation of telling

10 me what had occurred, he said, "I -- I didn't say anything

11 about it previously because I didn't think it was particularly

12 relevant," which, again, was stunning to me knowing that, you

13 know, in the past he had been very good about knowing what

14 information to pass and -- and how -- it was incomprehensible

15 that -- I thought, that he would feel that this was in no way

16 relevant to a person who had been missing and had shown up

17 dead, right, and that the last person that had probably seen

18 him was himself at his own house and the greater implications

19 because of it.

20 Q.   Now, Admiral, on or about -- or later that week, did you

21 have another conversation with the defendant where he had some

22 career discussions with you?

23 A.   I did.  He -- I believe it was Thursday morning.  I got

24 another call from him.  And he essentially went back into, you

25 know, the rumors and that none of it was true and that, you

1  know, he hadn't had an affair, and all those same things he had

2  been saying before.

3          But he said he realized that as the commanding

4  officer he was in a very bad position, that the perception, at

5  least the -- at a minimum, was bad and that he was worried

6  about the -- the perception of the command and how it would

7  look for the Navy.

8          And so essentially he asked me -- he said, "Hey, is

9  there a possibility that I could just resign," or "maybe I

10  should just resign to kind of take the pressure off and not

11  make the Navy" -- "or have this event reflect badly on the Navy

12  or the command?"

13          And he wanted to know what I thought about that.

14          And I said, "Well, it's kind of moot now.  There's an

15  investigation" -- I said, "You have -- you've got a crisis down

16  there in your installation and you've got to make sure that you

17  take care of the family and that you are doing all the right

18  things that need to be done to get people on and off and manage

19  the investigation and run -- continue to run the installation

20  that still has 5,000 people operating on it."

21          I said, "The investigation is -- is happening.  It's

22  going to be carried through to fruition and -- and so whatever

23  will be will be.  They'll find -- they'll find -- get to the

24  bottom of it, and so it doesn't make any sense for you to

25  resign at this point because it's going to carry through to its

1  natural -- natural conclusion."

2  Q.   And, Admiral, did that reach a conclusion a few days

3  later?  Was -- in other words, was he removed from command a

4  few days later on or about June 21st?

5  A.   He was.  Over the course -- you know, we had -- extra NCIS

6  folks had been sent to the island.  They were out interviewing

7  people.  So over the course of Friday, Saturday, and Sunday, we

8  were getting periodic reports from NCIS about the results of

9  interviews and additional information, so when we -- when we

10  left work late on Friday, we knew that we would likely have to

11  make a decision based on information that we would get through

12  the weekend, and we did get additional information that was

13  different.

14       And so when we came in on Monday, we immediately all

15  huddled up and the decision was made that we were going to --

16  Admiral Jackson was going to relieve him because of the

17  circumstances.

18  Q.   And after he was relieved from command, did you see the

19  defendant in person on one of -- on another occasion?

20  A.   I -- I did.  I -- I went down on the rotator, the -- on

21  Wednesday.  I -- I flew down on the airplane, and he was to be

22  there waiting to get on the airplane to -- to leave.  And so

23  as -- when I arrived, I -- I got off the airplane and went

24  into -- went into the air terminal, and he was waiting there to

25  get on the airplane, and we just, you know, chatted in passing

1    for a couple of moments before he got on the airplane and

2    departed.

3    Q.    Admiral, all the way up, including that final

4    conversation, in any of your conversations with the defendant,

5    did he ever tell you he got in a physical altercation?

6    A.    No.

7    Q.    Did he ever tell you he injured Mr. Tur in any way, no

8    matter how minor?

9    A.    No.

10         MR. GEE:   The Court's indulgence?

11         (Counsel confer.)

12   BY MR. GEE:

13   Q.    Admiral, if at any point he had told you that there had

14   been a physical altercation at any point in your communications

15   with him, what would you have done?

16   A.    Well, I -- I would -- it would have dramatically turned

17   the situation, especially if it were earlier on.  You know, if

18   he were to come forward and said, "Hey, I -- you know, I had a

19   physical altercation," and, you know, later he came -- if all

20   that information would have come out earlier, I think it would

21   have been -- he would have probably been relieved much earlier

22   than he otherwise would have, and certainly it would have

23   immediately gone from "let's think about sending the IG down to

24   do an investigation" to an immediate criminal matter that NCIS

25   would have gotten involved in from the get-go.

1       MR. GEE:  Thank you.  Nothing further, Your Honor.

2       THE COURT:  Cross-examination.

3                   **CROSS-EXAMINATION**

4    BY MR. VOKEY:

5    Q.   Good afternoon, Admiral.

6    A.   Good afternoon.

7    Q.   So I'm going to ask you a bunch of different questions, a

8    lot of things that the government counsel just asked you about.

9    A.   Okay.

10   Q.   So, first, for those of -- for those folks who haven't

11   served in the military, I want to ask you a little bit about

12   your billet as chief of staff.

13   A.   Uh-huh (affirmative).

14   Q.   So when all this stuff is going on in January of 2015,

15   you're a Navy captain?

16   A.   Right.

17   Q.   And Captain Nettleton was a Navy captain?

18   A.   Yes.

19   Q.   You guys were both the same rank?

20   A.   Yes.

21   Q.   So you're not his commander.  That would be

22   Admiral Jackson?

23   A.   Correct.

24   Q.   So you're in a -- you're in a job as the chief of staff

25   where your job is to run the staff for Admiral Gray?

1    A.    Uh-huh (affirmative).

2    Q.    And then you also have contact with other commanding

3    officers who work directly for Admiral Jackson?

4    A.    Yes.

5    Q.    So, for example, you would call Captain Nettleton and

6    you'd say -- say, "J.R." and he would call you either "Scotty"

7    or "COS," right?

8    A.    Uh-huh (affirmative).

9    Q.    "COS" being chief of staff, kind of a nickname?

10         So definitely two different jobs.  You worked

11   directly for Admiral Jackson, kind of preparing the staff, he's

12   the commanding officer of the base.  And you were kind of a

13   conduit of -- between -- is that accurate?

14   A.    Accurate.

15   Q.    So -- and prior to this, I'm assuming that you -- I think

16   I heard you had served as a commanding officer before you were

17   the chief of staff down there?

18   A.    Correct.

19   Q.    And commanding officer can be a pretty difficult job?

20   A.    Yes.  Absolutely.

21         THE COURT:  Admiral, I'll ask you to keep your voice

22   up, please.  Thank you.

23         THE WITNESS:  Yes, Your Honor.

24   BY MR. VOKEY:

25   Q.    And when you're a commanding officer, there's constantly

1    things going on around you.  You have operations, you'll

2    have -- you have investigations, events going on, I mean, this

3    constant motion of things going on?

4    A.    Absolutely.

5    Q.    And you've got staff who are handling certain things and

6    you're trying to be apprised of everything that's going on?

7    A.    Yep.

8    Q.    Sometimes you're making the decisions for the way certain

9    things are, sometimes your staff makes decisions for you?

10   A.    That's true.  If you delegate that authority to -- you're

11   ultimately responsible -- if one of your staff does something

12   wrong and you've delegated that authority --

13   Q.    You're responsible.

14   A.    You're the CO.  You're the one who's --

15   Q.    Of course.  Absolutely.

16         But there are staff members who have certain specific

17   functions and sometimes it's like clockwork.  They know what to

18   do in certain situations, right?

19   A.    Right.

20   Q.    So if you have -- say you have an operations officer and

21   there's something operational going on, I mean, he knows

22   certain things to do, there are standard procedures, right?

23   A.    Right.

24   Q.    Same thing with the logistics officer or administrative

25   officer or any kind of staff officer?

1   A.   Correct.

2   Q.   And sometimes as the commanding officer you're making

3   decisions based on the information you have at the time?

4   A.   That's correct.

5   Q.   Or you always are?

6   A.   Right.

7   Q.   Sometimes that information changes?

8   A.   Uh-huh (affirmative).

9   Q.   Sometimes it's kind of an evolving process, but you make

10  the best decision you can based on the information you have?

11  A.   Uh-huh (affirmative).

12  Q.   Is that fair to say?

13  A.   Correct.

14  Q.   And sometimes you'll find out that even that decision you

15  made may have been based on information that wasn't true or

16  wasn't quite accurate?

17  A.   Yes.

18  Q.   And you just kind of adapt and you change?

19  A.   Correct.

20  Q.   Now, with this -- with this going on on -- on Saturday,

21  January 10th, when you were first notified that Chris Tur was

22  missing, what we have here is a missing person and a search for

23  him?

24  A.   Correct.

25  Q.   And I think what you -- you testified is a little later

1  on, that -- let me see if I can -- I don't want to misquote

2  you -- that "After the body was found, the nature of the events

3  changed."

4          That's correct?

5  A.   The circumstances changed, yes.

6  Q.   Okay.  So at first we're dealing with the search, and

7  Captain Nettleton as the CO of the base is responsible for he

8  and his people conducting this search?

9  A.   Uh-huh (affirmative), yes.

10  Q.   All right.  And he called you up to tell you that we had

11  this missing person and that a search has been commenced,

12  correct?

13  A.   Correct.

14  Q.   Now, he's telling you some of the -- kind of the overview

15  of what's happening with the search, right?

16  A.   Correct.

17  Q.   So, for example, he's not telling you which personnel were

18  searching where?

19  A.   Well, he -- he told me, "Hey, security is out.  We've got

20  military working."

21  Q.   Sure.

22  A.   I mean, some elements of it.  It was in -- it was general,

23  but, you know, he didn't use names or anything specific like

24  that.

25  Q.   Sure.  And so he -- he wants to make sure he's providing

1   the information that -- that -- that you need to get to

2   Admiral Jackson, kind of the basics of, "We've got a missing

3   person and we're doing something about it"?

4   A.   Correct.

5   Q.   At that point he doesn't have to say, "Here's who I

6   called, here's the exact people that are doing the search"?

7         That's unnecessary at that point?

8   A.   That's true.

9   Q.   Okay.  So -- and we've heard some discussion about -- at

10   one point you told Captain Nettleton, I think you said, to go

11   talk to NCIS.  That was later on?

12   A.   Correct.

13   Q.   So were you aware of the times that Captain Nettleton did

14   try to contact NCIS prior to that?

15   A.   No, because it was early on, and it -- the conversation

16   that we had was kind of going through a mental checklist of all

17   the things that we were talking about, about -- to ensure that

18   we were doing everything appropriately.

19         So in talking to him, I -- I asked him if he had

20   contacted him.  I believe I asked him if he had contacted NCIS,

21   and I don't remember what his response was, but I said, "Make

22   sure that they're aware and that they -- you get them

23   involved."

24   Q.   Okay.  So there may be some things that he was doing that

25   you were not aware of?

1    A.    Potentially.

2    Q.    Okay.  So -- and when the search was going on -- and I

3    don't know if you were aware of it at the very beginning, but

4    as the search goes on, you ordered the search that -- the duty

5    section to go search?

6              MR. GEE:  Objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  I -- I believe he said that.

9    BY MR. VOKEY:

10   Q.    Okay.  And they -- at one point they started doing

11   door-to-door searches?

12   A.    Said that in the e-mail.

13   Q.    Okay.  And that he got the Marines out searching?  Were

14   you aware of that?

15   A.    Yes.

16   Q.    They had the Navy -- the Navy boats, the patrol boats

17   going out and searching?

18   A.    Yes, sir.  Yeah, the Coast Guard was out looking, right.

19   Q.    Coast Guard and the Navy -- and the Navy boats?

20   A.    I don't recall that, but I -- I would have expected that

21   to have occurred.

22   Q.    Searching the coastline?

23   A.    Right, exactly.

24   Q.    Okay.  And then after Mr. Tur was found and his body

25   recovered, like you said, there was a -- there's a shift there.

1    Now something else has to happen, right?

2    A.    Uh-huh (affirmative), correct.

3    Q.    So -- because whether there's a -- then you -- it doesn't

4    even have to be a suspected crime.  If an unexplained death

5    happens, there must be that death investigation?

6    A.    Correct.

7    Q.    Pretty standard across the services.  There's a death,

8    there must be a death investigation?

9    A.    Mandated, yeah.

10   Q.    Okay.  Doesn't matter what the cause of death, manner of

11   death, whatever we think it is, we're going to do a death

12   investigation?

13   A.    Right.

14   Q.    Okay.  So -- and then a number of other things are

15   happening at that point as well.  So -- so, for example,

16   when -- we know now it's a death investigation, a bunch of

17   other NCIS agents need to get down to the island?

18   A.    Correct.

19   Q.    And Captain Nettleton talked with you about coordinating

20   to get transportation down for these agents.

21         Do you recall that?

22   A.    Well, I -- I think I coordinated with NCIS before I even

23   talked to Captain Nettleton to say, "NCIS called me and they

24   knew what was going on and -- and asked me, hey, we want to get

25   additional agents down there."

1    I said, "That's a great idea.  We're going to need

2    them."

3    And so I said, "Plan on putting them on the airplane

4    on Wednesday to get them down there."

5    And then I believe subsequently I talked to Captain

6    Nettleton, and I think I sent him an e-mail that I had spoken

7    to NCIS on it and said, "Hey, Captain Nettleton, make sure that

8    you coordinate to ensure that these folks get on to come down

9    and help you."

10   Q.    Sure.  And Captain Nettleton reached out to the NCIS

11   stateside and coordinated to make sure there was transportation

12   billeting, they could get on there and do their job?

13   A.    Right.

14   Q.    He didn't tell you, "No, we're not going to bring these

15   guys" or try to, you know, make a flight disappear or anything

16   like that, he actually coordinated and brought them there to

17   get places to stay and transportation?

18   A.    He did.

19   Q.    And the same thing there, you have an unexplained death,

20   you need to get a medical examiner there, right?

21   A.    Right.

22   Q.    So Captain Nettleton coordinated to make sure that they

23   included medical examiners so an autopsy could be performed?

24   A.    There were -- there were hundreds of logistical things

25   initiated that were facilitated by the installation to make

1    this all work, for sure.

2    Q.    And there was also the issue of -- of there's going to

3    be -- there has to be a memorial service.  There's a lot of

4    things going on?

5    A.    Right.

6    Q.    In fact, I think you had a conversation with him where --

7    one of those conversations where you were kind of -- kind of in

8    your mentor role saying, "You know, hey, J.R., you know, I've

9    had deaths happened in my command, and I can offer you some

10   advice.  Here's some things you need to do."

11            Do you remember that?

12   A.    Yes.

13   Q.    Okay.  And you guys are having this talk about things that

14   must happen?

15   A.    Correct.

16   Q.    So one of the things that -- you had to have a memorial

17   service.  And there was also the issue of getting the Tur

18   family down to Guantanamo?

19   A.    Correct.

20   Q.    Matter of fact, there was a little bit of a disagreement

21   here.  He was trying to get a C-12 military aircraft to fly

22   them.  He had checked with his legal folks and saying, "Hey, I

23   think we checked out.  I think it would be legal to get them

24   down."

25            But that was -- ended up turned off, I think by

1   yourself --

2   A.    Correct, it was.

3   Q.    -- saying that they had to -- "No, they had to drive down

4   and catch a -- catch a -- a non-military flight."

5         Right?

6   A.    Well, it wasn't a non -- I don't believe it was a

7   non-military flight.  He --

8   Q.    A rotator?

9   A.    They wanted to bring them in earlier with a dedicated Navy

10  airplane to go get them specifically --

11  Q.    Right.

12  A.    -- and I -- I -- I think I said "No, they can take the

13  normal rotator," you know, so...

14  Q.    Okay.  I think the point is Captain Nettleton was trying

15  to get them down as soon as possible?

16  A.    He was.

17  Q.    There are -- one of the questions that government counsel

18  asked you was who investigates UCMJ things, and -- and I guess

19  it's better -- who investigates misconduct or things that may

20  have gone wrong, and what you answered was "Kind of low-level

21  stuff was the security department.  The bigger stuff would be

22  NCIS"?

23  A.    In general.

24  Q.    Although there are some things that don't even have to go

25  to the security department.  So if you have something pretty

1    minor, COs often handle things internally without even dealing

2    with MPs or MAs or anybody like that, right?

3    A.    Potentially, yes.

4    Q.    I mean, commanders hold non-judicial punishment all the

5    time for minor offenses that maybe just a -- a senior chief

6    brought to the commander's attention?

7    A.    Correct.

8    Q.    Okay.  So there is a -- a certain level of discretion

9    that -- that commanders have as to how to handle certain

10   situations?

11   A.    Correct.

12   Q.    And -- and we heard you talk a lot about the kind of rules

13   and responsibilities of commanders and there's lots of

14   regulations out there?

15   A.    Right.

16   Q.    And you talked about some of your interactions with

17   Captain Nettleton while he was in command there at Guantanamo.

18   One involved a wildfire, I think you said?

19   A.    Uh-huh (affirmative), right.

20   Q.    Something about a misuse of airplanes prior to him being

21   in command, so he had to make sure about airplanes?

22   A.    Right.

23   Q.    Because you don't want to misuse government assets like

24   that, that can get all kinds of people in trouble?

25   A.    Correct.

1  Q.   So that's why you and Captain Nettleton were talking to

2  make sure that, "Hey, we want to do this the right way"?

3  A.   Correct.

4  Q.   And there was also another event down there that I think

5  you spoke with Captain Nettleton about, another one of these

6  kind of interactions involving an issue of accusation of abuse

7  of a child where Captain Nettleton -- where the -- the child

8  had to be removed from the house and Captain Nettleton had

9  decided to put the child -- him and his wife have the child in

10  his house because there was no other place for him to stay.

11           Do you recall that one?

12  A.   I -- I don't specifically, but...

13  Q.   What -- and maybe -- maybe talk to you a little further.

14  There was some -- some discussion where you pointed out to

15  Captain Nettleton that, "This is -- isn't quite -- this is kind

16  of against the regulations, you probably shouldn't be doing

17  this," but he says, "Yeah, but I'm going to do it anyway."

18           Do you recall that?

19  A.   I don't specifically remember the incident, but it -- it's

20  not beyond -- it wouldn't -- it wouldn't -- it doesn't seem

21  unusual for me to say, "You as the commanding officer probably

22  ought not to be the one to do that because of, again, the

23  potential ramifications that it could cause you and -- and

24  potentially, if it went bad, to negatively -- you know, reflect

25  negatively on the Navy."

1   Q.    Okay.  But in that case he decided to do it anyway?

2   A.    He did.  I mean, I -- I -- you're telling me he did, yeah.

3   Q.    All right.  You also said that -- that on 10 January is

4   when you learned of a missing person because of the duty

5   officer calling -- the duty from Guantanamo called the Region,

6   right?

7   A.    Correct.

8   Q.    You're aware that's because Captain Nettleton contacted

9   the -- the command duty officer and that resulted in the

10  reporting to the Region?

11  A.    That's generally how it worked, yes.

12  Q.    Okay.  So that first call that you had with Captain

13  Nettleton, there was -- you said that he gave you kind of the

14  basics, and you mentioned about this has happened before.

15  A.    Right.

16  Q.    And -- and when you -- when you testified to that, you

17  were referring to the fact that Chris Tur had disappeared

18  before; is that correct?

19  A.    That was my understanding from what he told me, yes.

20  Q.    Okay.  And so having someone go missing is -- especially

21  for a short duration is not unusual at all, as a matter of

22  fact, it kind of routinely happens.  Is that fair to say?

23  A.    I wouldn't say it's routine.  I mean, it happens on

24  occasion.  So, you know, the -- the circumstances that he

25  relayed that this had happened multiple times before led me

1    to -- it lowered my level of anxiety because I thought, "Well,

2    if it's happened multiple times before, the -- the individual

3    is likely to show up and maybe not something that I need to be

4    overly concerned about with that information."

5    Q.    Okay.  And -- and you testified in front of the grand jury

6    in 2016?

7    A.    Uh-huh (affirmative).

8    Q.    Okay.  And in that you told the grand jury that, "That's

9    kind of where we're focused.  Then, as I alluded to earlier,

10   you know, a missing person over a short duration of time is not

11   necessarily something that doesn't -- it happens fairly

12   routinely."

13   A.    Okay.

14   Q.    So fair to say it's something that happens fairly

15   routinely?

16   A.    Well, I --

17   Q.    Maybe not all the time, but it's not uncommon?

18   A.    I -- I would recharacterize -- I don't know that I

19   would -- I would say today that it's routine.  It does happen

20   on occasion and -- and people show up.

21   Q.    Sure.

22   A.    You know, I -- in the course of my career as a CO and as a

23   chief of staff, it's probably -- you know, I might venture to

24   guess I might have gotten, you know, five or six or eight

25   reports of people missing who later showed up, you know, kind

1 of walked through the door later.

2 Q. And -- and I think you kind of alluded to it earlier, too,

3 but even if you tell NCIS, they wouldn't necessarily do

4 anything at that point, it's like they've got to wait 24 hours,

5 right?

6 A. Yeah. Generally, NCIS has got a lot to do, right? And so

7 if you go to them with something and make them aware of it,

8 they'll say, "Hey, thanks for letting me know, that's

9 interesting, but I don't -- there's no -- there's nothing

10 criminal that would merit" --

11 Q. Right.

12 A. -- "necessarily our immediate attention to this, but keep

13 us informed as to how it goes and we'll track it, and if we

14 feel like we need to start getting involved, we will."

15 Q. And are you aware if Captain Nettleton did that at all?

16 A. Well, he -- when I talked to him, I said, "Hey, make sure

17 they're aware," and at some point later in the conversation I

18 think he said in the -- in the e-mail that he sent to Admiral

19 Jackson, that NCIS is involved. I believe that's where I heard

20 it.

21 Q. Okay. And -- and I'm asking you these questions, and this

22 is probably not fair because you had a number of conversations

23 with Captain Nettleton starting on January 10th, 11th, all

24 throughout that week, correct?

25 A. Right.

1  Q.    And it's easy for these conversations to kind of blend

2  together what was said in which conversation?

3  A.    Right.

4  Q.    I know we had the e-mail that really tells us, but

5  sometimes things are said in one conversation and trying to go

6  back and remember where you said what in what conversation can

7  be sometimes a little bit tough.

8  A.    Sometimes.

9  Q.    We do know that at some -- one of those conversations

10 on -- on Saturday, you told him to send the admiral an e-mail

11 and he did?

12 A.    Yes.

13 Q.    Okay.  So you're -- you're up there in Jacksonville,

14 you're kind of in the receipt mode, you're getting -- there

15 will be an e-mail or a phone call, but down in Guantanamo

16 there's a -- there's a wheel turning, there's a lot of things

17 happening.  Fair to say?

18 A.    Yes.

19 Q.    And when you're the CEO, you have all of these pieces

20 moving, everything is constantly going on, ever-changing

21 situation.  That's the nature of the business, isn't it?

22          THE COURT:  You said -- you said, "CEO."  I assume

23 you mean CO; is that right?  You said, "CEO."

24          MR. VOKEY:  Oh, did I?

25          THE COURT:  Yes.

1          MR. VOKEY:   Then yes.

2          THE COURT:   I'm look -- I'm looking at it right here.

3    Okay.

4          MR. VOKEY:   I blame the court reporter.

5    BY MR. VOKEY:

6    Q.    So when you're the CO, things are constantly moving and

7    changing.   Sometimes, you know, keeping your hands on it can be

8    a difficult thing?

9    A.    Right, it can be.

10   Q.    Yes.   Okay.

11         And it's easy to judge someone in that seat when

12   you're sitting afar, but it's -- it's -- it's different when

13   you're in that commanding officer's seat.   Is that fair to say?

14   A.    Sure, sure.

15   Q.    So when -- something happens significant on Monday,

16   January 12th, when you get notified of the IG complaint?

17   A.    That's right.

18   Q.    Now, the IG complaint was actually filed, I think, on the

19   11th, which you found out early on the 12th; is that -- is that

20   correct?

21   A.    Monday morning when I came into work.

22   Q.    Okay.   So this IG complaint was making very specific

23   allegations against Captain Nettleton, correct?

24   A.    Yes.

25   Q.    And --

1  A.    And Lara Tur, I think.

2  Q.    And Lara Tur, right.

3  A.    There's a little bit of a -- you know, I guess for a point

4  of clarity, you know, there's -- it was a little bit sensitive

5  because it was a -- an anonymous IG complaint sent via text,

6  right, and so my -- the IG was aware of what had been going on

7  and that there was a missing person.

8        And so the -- to protect the integrity of the system

9  and to ensure that, you know, people don't -- you know, you

10 don't find out who that person -- or you -- oftentimes you can

11 put together from the information in there who -- who might

12 have put in this anonymous IG complaint.  So the IG was kind of

13 jealously guarding -- he was very careful about what he

14 revealed to me --

15 Q.    Sure.

16 A.    -- because he didn't -- he wanted to protect the integrity

17 of the system, so he -- he essentially summarized for me the --

18 the allegations that were made.

19 Q.    Okay.  So now for the first time you have a specific

20 allegation of -- of misconduct of -- of a possible criminal

21 offense on Captain Nettleton?

22 A.    Correct.

23 Q.    And you didn't call Captain Nettleton up and say, "Hey,

24 we've got this IG complaint where they make the specific

25 allegations," right?

1    A.    I did not.

2    Q.    So -- and I think one of the things that -- I think as you

3    testified in your grand jury, that you were in a position where

4    you felt like you couldn't tell him about it and you had to be

5    very careful on how you were talking or asking questions of

6    Captain Nettleton, right?

7    A.    Correct, right.

8    Q.    And so -- so the members of the jury understand, when

9    we're dealing with the military, if there is -- if you suspect

10   someone of an offense, just suspect them, you don't have to

11   have hard evidence or believe that he did it, but if you

12   suspect him of it, before you question him or talk to him to

13   elicit a response, you have to read them their rights, correct?

14   A.    Uh-huh (affirmative), correct.

15   Q.    And that's under Article 31(b) of the UCMJ?

16   A.    Correct.

17   Q.    It's pretty standard.  I mean, it's something that you

18   mentioned training for commanders.  That's something that we

19   officers get all the time?

20   A.    Right.

21   Q.    I mean, when you first come into the Navy, they're

22   teaching you that.  They often give you a little rights of

23   advisement card that you laminate and put in your wallet?

24   A.    Right.

25   Q.    Okay.  So now you find yourself in that kind of position.

1  I think that's what you were referring to in the grand jury,

2  right?

3  A.    Yes.

4  Q.    Okay.  So --

5  A.    Again, unsubstantiated, anonymous complaint, right, so --

6  Q.    But as we know, if it's suspected, then you can't ask

7  somebody unless you read him his rights, and -- and so you were

8  put in kind of a weird position?

9  A.    A little bit of a weird position, for sure.

10 Q.    Okay.  So -- so as you told the grand jury, you said that,

11 "I had to be very careful in my discussions with him because if

12 I were to begin probing him and asking him those types of

13 questions without first reading him his rights, that

14 information -- any information that I might have asked him that

15 he might have revealed I wouldn't have been able to use in the

16 subsequent military, you know, disciplinary proceeding, so I

17 had to be very careful."

18 A.    Right.

19 Q.    Okay.  So we kind of begin this dance a little bit of you

20 know something that Captain Nettleton doesn't, correct?

21 A.    Right, yes.

22 Q.    You're not telling him of the IG complaint?

23 A.    Correct.

24 Q.    Admiral Jackson is apprised of the IG complaint?

25 A.    She is.

1   Q.   But not Captain Nettleton?

2   A.   Right.

3   Q.   So when you're talking to him about events there, you want

4   to get information, you need to get information from Nettleton,

5   but if you're asking him -- you've got to be careful if you're

6   asking him questions, you're doing something to elicit a

7   response, but you have to read him his rights before he does so

8   because he's a possible suspect?

9   A.   Right.

10  Q.   So it's like they have this conversation where they don't

11  quite meet.  You know what I'm talking about?

12  A.   Well, I just had to be -- I was very careful.  I didn't

13  solicit information about the IG because I didn't want to --

14  you know, in confrontation with my lawyer there at the Region.

15  I was careful not to ask questions that would, you know, kind

16  of play into that, and then put him in a bad position, or put

17  the command in a bad position if it turned out to not be true,

18  I guess is the way I would characterize it.

19  Q.   Okay.  So -- and that's what I wanted to ask you about.

20  So there was -- for example, you were testifying earlier, you

21  said it was -- I think you said it was Wednesday.

22          I think that would be the 14th of January when you

23  had this discussion and -- with Captain Nettleton, and you

24  indicated that, "He's talking about a verbal altercation, Tur's

25  behavior was cyclical, party broke up, Tur came to his house,

1    refused to let him in.  I didn't let him in.  At some point he

2    didn't let him in because the daughter was there."

3          Do you remember those -- those are the things that

4    you told government counsel?

5    A.    Right, yes.

6    Q.    So, I mean, how did this conversation even come up?

7    A.    He -- he called me and said, "Hey, I -- I -- I've got

8    something I need to tell you, and" --

9    Q.    And you said okay?

10   A.    Yeah, I said okay, because I had no idea what it was.

11   Q.    Okay.

12   A.    And he said, "Hey, I had" -- and he described what he --

13   what I just described earlier, that he was at the party and he

14   saw it and -- and that he had seen a -- the verbal -- all the

15   information I provided.

16   Q.    Okay.  So he's calling you up because -- well, he's got a

17   duty to call you up and tell you these things, right?

18   A.    Correct.

19   Q.    So he's required to tell you in the course of his duties

20   as far as you're concerned, right?

21   A.    He's required to be truthful to his boss about events that

22   occurred if they're relevant to the -- this case.

23   Q.    Right.  But if there's a reporting requirement -- I mean,

24   we -- you talked about that quite a bit.

25   A.    Right.

1    Q.    So at that point, why didn't you say, "You know, J.R.,

2    just stop right there.  Before you say any more, I need to read

3    you your rights"?

4    A.    Because he was revealing the information to me which was

5    contrary to everything that he had previously revealed to me --

6    Q.    Okay.

7    A.    -- and only -- I had only -- you know, it had been an

8    unfounded allegation before, so I listened to what he had to

9    say.

10   Q.    So those things that he's telling you, you can't really

11   ask questions to clarify them then?

12   A.    No, I didn't.  I didn't because I didn't want to, again,

13   compromise him or compromise the ability of the command to

14   evaluate the data.

15   Q.    Okay.  And one thing you just told government counsel here

16   was after he gave you those facts, what you told them just a

17   few minutes ago was, "Without me asking, J.R. said he didn't

18   think it was relevant"?

19   A.    Correct.

20   Q.    Now, you testified in front of the grand jury December 8,

21   2016, right?  Does that sound familiar?

22   A.    That sounds familiar.

23   Q.    And in there you're talking about this conversation, and

24   it says, "Well, again, I had to be very careful from military

25   justice that I didn't start, because, you know, as an

1 inquisitive person I wanted to start going, I wanted to get

2 some of the details, but I couldn't do that because I would

3 have been soliciting information that would have been tainted

4 for any type of military justice."

5      Sound familiar what you said?

6 A.   Yes.

7 Q.   "So -- but, you know, to me, again, it was shocking

8 information.  I, you know -- I, you know, said,"Why didn't you

9 tell me this before?"

10      Is that what you asked Captain Nettleton?

11 A.   I may have.  If it says --

12 Q.   I mean, that's what you testified to.  I'm assuming you

13 were being truthful here.

14 A.   Right.

15 Q.   Right?

16 A.   Right, absolutely.

17 Q.   So now you're asking him a question and you didn't say,

18 "Well, why didn't you tell me this before, but before you

19 answer, Captain Nettleton, I need to read you your rights"?

20 A.   No, I didn't.  No, I didn't.

21 Q.   You did not?

22 A.   I did not.

23 Q.   But that's what's required under military justice, right?

24 A.   You know, I -- perhaps in talking to my lawyers they

25 essentially said as long as I didn't solicit direct information

1  about, you know, things that he, you know, was revealing to me,

2  then I -- you know, I -- I -- I didn't think it was relevant to

3  information to ask him why he didn't tell me as opposed to me

4  asking him specifically what information had he not told me.

5  You see what I'm saying?

6  Q.   So you're making a decision that you didn't think it was

7  relevant, so you didn't read him his rights, and J.R. is

8  saying, "I didn't tell you this information before because I

9  didn't think it was relevant."

10        I mean, it sounds like you guys were both having

11  relevance decisions here.

12  A.   I was listening to what -- he called me and said, "I want

13  to tell you something."

14  Q.   Sure.

15  A.   So I listened to what he had to say.

16  Q.   But at -- but at the point that you say -- asked him a

17  question, you should have read him his rights.  You're asking

18  for -- a question and you're expecting a response.

19        But you didn't read him his rights, did you?

20  A.   I did not.

21        MR. GEE:  Objection.

22        THE COURT:  What's the objection?

23        MR. GEE:  Irrelevant.

24        THE COURT:  I -- I'm not sure that's true, but I

25  think the -- I think the questions have been asked and the

1   answers have been given, and I think we need to talk about

2   something else.

3           MR. VOKEY:  I -- I am absolutely moving on.

4   BY MR. VOKEY:

5   Q.   So -- but, again, this -- these conversations you have,

6   like -- I think like you testified to is you want more

7   information, but you can't ask these questions.  I mean, it's

8   kind of a difficult thing?

9           THE COURT:  Yeah.  You've already made that point,

10  sir, so let's talk about something else.

11  BY MR. VOKEY:

12  Q.   So some of these conversations that you're having with

13  Captain Nettleton, almost like two ships passing in the night,

14  you're not quite meeting, because he may be saying one thing

15  and you're thinking another?  Is that fair to say?

16  A.   Not necessarily.  I mean, I don't -- I'm not sure what

17  you're -- what your implication was.

18  Q.   Okay.  And so as you're receiving -- you're receiving the

19  information from Captain Nettleton, you've also -- you're

20  receiving information from a different way, you have got

21  information coming from the IG complaint, correct?

22  A.   Correct.

23  Q.   And I guess you're starting to get information from

24  NCIS --

25  A.   That's correct.

1    Q.    -- that's independent from Captain Nettleton?

2    A.    That's correct.

3    Q.    So in Government Exhibit 362A, which is the e-mail from

4    you to Admiral Jackson that said that -- that we displayed

5    earlier, that "Received a call from Skipper Nettleton.  He had

6    received several calls from individuals around the installation

7    about the rumor mill regarding the death of Mr. Tur."

8    A.    Right.

9    Q.    Now, and it may seem like a small point, but I want to ask

10   you.  So he said he had received several calls from

11   individuals.  Do you recall speaking to Captain Nettleton to

12   whether he received calls or he spoke to people in person?

13   A.    I don't recall.  He communicated to me that he was hearing

14   rumors one way or another.  I don't recall.

15   Q.    Okay.  And, again, a lot of phone calls, and I'm assuming

16   you don't have a transcript, a verbatim transcript of your

17   conversations with him.  These are summaries as you remember

18   them?

19   A.    Right.

20   Q.    Using the knowledge that you have kind of interpreting

21   them telling Admiral Jackson?

22   A.    Correct.

23   Q.    So it -- it could be that -- although, again, a minor

24   point, the fact that he -- when you said you received calls

25   from individuals, that could be what you assumed, but, in fact,

1    it could have been he talked with somebody in person?

2    A.    I would have expected it to be a combination of both,

3    right, out and about on the base, or getting calls or people

4    contacting him to tell him -- according to him, he was saying

5    people that he knew on base were reaching out to him one way or

6    another to communicate that they were hearing these rumors.

7    That's what he --

8    Q.    Yeah.  Actually, I mean, bottom line, he called you up and

9    said, "Hey, there's these wild-ass rumors going around."

10         That's actually the language he used, correct?

11   A.    That's exactly what he said.

12   Q.    "These are wild-ass rumors."

13         And you were already aware of some of these rumors or

14   at least allegations in the IG complaint?

15   A.    Right.

16   Q.    So did he specify exactly what those rumors were?  I mean,

17   do you remember his exact language as to what the rumors were

18   or did you not go into it?

19   A.    I think he communicated -- he did.  He communicated that

20   the rumors were that he was having an affair with the Tur --

21   the -- Ms. Tur and that -- you know, that there was absolutely

22   no truth to that.

23   Q.    So, I mean, that's certainly the allegations in the IG

24   complaint.  Do you remember the specific language that Captain

25   Nettleton used in that phone call?  I mean, if you don't,

1    that's fine.  If that's the general -- what you took away from

2    it, that's fine.

3    A.    In reference to what the rumors were?

4    Q.    Yes.

5    A.    I recall that he said to me that there's -- "People are

6    contacting me telling me that there are lots of rumors going

7    around."

8           It's a small, insular community, and he was concerned

9    about it because there were lots of rumors going around that he

10   was having an affair with Ms. Tur.

11   Q.    Okay.  That's how you recall it?

12   A.    That's how I recall it.

13   Q.    Okay.  That's fine.

14          And this rumor mill in Guantanamo, we always -- a lot

15   of places have rumor mills, but in Guantanamo, having spent

16   some time there, that's a -- that's a real thing at GTMO?

17   A.    There's nowhere else to go, right?

18   Q.    Yes.

19   A.    Yeah.  It's --

20   Q.    That stuff spreads like wildfire, right?

21   A.    Absolutely.

22   Q.    All right.  So -- so he's telling you that there are these

23   wild-ass rumors and he's telling you that these wild-ass rumors

24   are not true, correct?

25   A.    That's correct.

1    Q.    All right.

2    A.    You know, the other thing I will say is that whenever any

3    incident like this happens on a base, there's -- there's a lot

4    of scrutiny from the higher-level chain of command, and so the

5    fact that Captain Nettleton from the beginning unequivocally

6    said, "None of this stuff is true, it's -- it's all rumor, and

7    I can assure you that that's not the case" --

8    Q.    Well, let me stop you right there.

9    A.    Okay.

10   Q.    Were those his exact words or are you summarizing?

11   A.    Well, summarizing over the course of Saturday, Sunday,

12   Monday, Tuesday, Wednesday, right, so --

13   Q.    Because he speaks to you about these wild-ass rumors and

14   says they're not true, and then you relay those to

15   Admiral Jackson and she asked him about these rumors as well,

16   right?

17   A.    I don't know that she asked him.  I know that she was

18   aware of the call because I communicated to her -- I don't know

19   if she went back and -- and said, "What are these rumors?"

20         I know he communicated to her via an e-mail about

21   an -- an e-mail that he had gotten from some former resident

22   that had -- had said they had heard about the rumors, and he

23   was worried that this person was harassing them.  And so there

24   was some discussion about rumors and -- and innuendo and

25   accusations.

1          But Admiral Jackson up until that point had

2    supported -- had stood by Captain Nettleton.

3    Q.    Sure.  Oh, sure.

4    A.    You know, wanted to believe him and -- and believed that

5    what he was saying was true --

6    Q.    Sure, absolutely.

7    A.    -- and despite pressure from above to say, "Hey, this

8    doesn't look so good," right, as -- as the -- as the situation

9    developed.  So she stood by him and -- and gave him the benefit

10   of the doubt.

11   Q.    Sure.

12         But when you're having this wild rumors conversation

13   with him, you can't ask any direct questions, specific

14   questions more about these rumors, right?  I mean, you had

15   this -- you're not allowed to ask him questions, right?

16   A.    Uh-huh (affirmative).

17   Q.    So if he's soliciting information to you, I mean,

18   unsolicited telling you that, "Hey, there are these wild-ass

19   rumors" --

20   A.    Right.

21   Q.    -- you can't turn around and start asking questions

22   specific about that, because you would have had to have read

23   him his rights?

24   A.    Well, that's true, but I -- you know, frankly, I didn't

25   need to because he was pretty comprehensive in what he was

1  telling me.  He was explaining and --

2  Q.   I understand that.

3  A.   -- as a result of those rumors he was expressing his

4  concern for his status as the CO and -- and how it looked

5  and...

6  Q.   I understand that, but I know you're -- like you said

7  earlier, you're a person who likes the details.  This is a time

8  when you can't -- if there's any questions or anything left

9  unresolved, you want some more details, you can't ask those

10  questions of Captain Nettleton?

11  A.   That's right.  When he said, you know, "This happened, and

12  I didn't think it was particularly relevant," you know, my --

13  my reaction is I bit my tongue, was thinking, "How in the world

14  can you think that's not particularly relevant?"  You know,

15  I -- but I didn't express it.

16       I said -- I said, "Okay.  You know, thank you for

17  telling us and, you know, you've got a crisis to manage, you

18  have got to keep doing your job, so keep your head up.  You

19  know, make sure you're doing the things that you need to do,

20  and -- and the investigation will play out the way it needs to

21  and all the -- you know, the truth will come out in the wash.

22  So, you know, keep -- keep your head down and keep doing your

23  job.  You've got 5,000 people there that are depending on you

24  and the family that's lost their -- their husband or their

25  father."

1    Q.    Okay.   But, of course, the relevant comment was after you

2    asked him the question of "Why didn't you tell us this before?"

3              MR. GEE:   Objection.

4              THE WITNESS:   No, I don't -- I don't believe it was.

5    I believe he --

6              MR. GEE:   Objection.

7              THE COURT:   What's the objection?

8              THE WITNESS:   I believe he kind of gave me the --

9              MR. VOKEY:   Hold on, Admiral.

10             THE COURT:   What's the objection?

11             MR. GEE:   Asked and answered.

12             THE COURT:   Yeah.   I feel like we're going a little

13   bit in circles here, so --

14             MR. VOKEY:   The only reason I circled back to this is

15   because the Admiral -- he kind of brought the same thing out,

16   so I wanted to clarify that, Your Honor.

17             THE COURT:   I understand, but let's -- maybe we can

18   do something else.

19   BY MR. VOKEY:

20   Q.    So as -- so on the 12th is when you found out about this

21   IG complaint, right?

22   A.    That's right.

23   Q.    So Captain Nettleton is in command until January 21st?

24   A.    Right.

25   Q.    So all these conversations from the 12th all the way to

1   the 21st, you're in that same position, you and Admiral Jackson

2   are in the same position of you can't ask him any specific

3   questions concerning these things, that he might be involved in

4   some kind of misconduct, without reading his rights, correct?

5   A.    Yes.

6   Q.    And at no point during that time did you read

7   Captain Nettleton his rights?

8   A.    No.

9   Q.    At no point during that -- that period did you ever inform

10  him that there was an IG complaint?

11  A.    No.

12  Q.    And at some point the standard NCIS death investigation

13  takes a little bit of a different turn and they actually start

14  looking at Captain Nettleton, correct?

15  A.    At some point, yes.

16  Q.    And did you inform Captain Nettleton of when that

17  happened?

18  A.    When what happened?

19  Q.    When NCIS started looking at him as a person of interest

20  or investigating him criminally.

21  A.    I would say -- did we inform him directly?  I think it was

22  self-evident because, you know, towards the end of the week as

23  additional -- you know, NCIS got there late on Wednesday, I

24  think it was.  They went out and started doing interviews of

25  witnesses that had been at the party and -- and another one.

1    And then so information started to come out toward the end of

2    the week, Thursday, Friday, that we were getting some feedback

3    from -- from those interviews that seem to indicate more had

4    occurred.  And so I don't know --

5    Q.    Well, it was becoming self-evident to you because you're

6    receiving all of that information, but that information you're

7    talking about, what NCIS is finding, is not getting to

8    Captain Nettleton, is it?

9    A.    Only in the sense that he was probably interviewed and

10   then I understood that he was asking questions of folks on

11   Guantanamo about what they had seen and heard.  So I assume

12   that he was --

13   Q.    The rumors that we're talking about?

14   A.    Well, no, not only that, but going out and speaking to

15   people and asking them what they saw and what they had seen had

16   occurred, that kind of thing.

17   Q.    So let me go back.  Did you ever tell Captain Nettleton

18   that NCIS is focusing on you?

19   A.    No, I don't believe I did.  I think -- I think that didn't

20   become completely evident until late Friday, Saturday, when

21   those interviews -- when we were getting information over the

22   weekend that was leading, pointing more toward

23   Captain Nettleton's involvement.

24   Q.    So when you say --

25   A.    The decision was very quickly made on Monday to move in a

 1   different direction.

 2   Q.   Well, you said "we were getting that information."  That

 3   "we," does that include Captain Nettleton or no?

 4   A.   I assume not, no.

 5   Q.   Okay.

 6   A.   We were getting reports from NCIS about what they were

 7   beginning to find.

 8   Q.   Right.  Okay.

 9         MR. VOKEY:  Admiral, I appreciate it.  Thank you for

10   your time.

11         THE WITNESS:  You're welcome.

12         THE COURT:  Any redirect?

13         MR. GEE:  Yes.  Thank you, Your Honor.

14                    **REDIRECT EXAMINATION**

15   BY MR. GEE:

16   Q.   Admiral, there were some questions asked just then about

17   whether you ever told the defendant that he was the -- that

18   NCIS was focusing on him by -- at some point, I guess, later in

19   the week.

20         Do you remember those questions?

21   A.   Yes.

22   Q.   Is it standard to tell the subject of an investigation

23   that NCIS is investigating it?

24   A.   Not normally, no.

25   Q.   There was some --

1   A.   I'll also say that, you know, initially, when the body was

2   found, there was -- there was a belief that --

3            MR. VOKEY:   Objection.

4            THE WITNESS:   -- an attempted --

5            MR. VOKEY:   Nonresponsive.  Relevance.

6            THE COURT:   Admiral, I'll just ask you to wait for a

7   question.  Thank you, sir.

8            THE WITNESS:   Yes, Your Honor.

9   BY MR. GEE:

10  Q.   And, Admiral, there were also some questions asked about

11  these -- the conversations that you had with the defendant

12  after finding out about the IG report.

13           Admiral, you talked some about how you weren't trying

14  to question him.  Why is that?

15  A.   Well, because we are his next level of chain of -- of

16  chain of command.  And so if -- the decision to -- to relieve

17  him or to discipline him or hold him accountable would come to

18  us for adjudication.  And so we needed to -- while managing the

19  situation, we needed to maintain, you know, kind of some

20  objectivity.

21  Q.   And so did you restrain yourself throughout that week?

22  A.   Absolutely.

23  Q.   Admiral, were there any restrictions on what he could tell

24  you?

25  A.   No.

1  Q.   So, for example --

2  A.   It was expected that he would provide relevant information

3  about what was occurring -- truthful and relevant information

4  about what was occurring so that we knew what we were actually

5  dealing with.

6  Q.   And did he ever tell you about the fight in his house, for

7  example?

8  A.   No.

9  Q.   There were also some questions asked about chief -- chief

10 operating -- excuse me, I'm about to say CEO now -- about

11 commanders of bases and how there's a lot going on for them and

12 how there's a -- a different view from the COC.

13 A.   Right.

14 Q.   Is there a different view from the COC about reporting

15 things like fistfights with the CO?

16 A.   No.  No.  There's never -- no.  That -- especially for a

17 senior officer, right?  That has very severe ramifications.

18 And that should have been something normally that would have

19 been clearly and rapidly articulated up the chain of command.

20 Q.   There were some questions asked about discretion for a CO

21 and how there are some kind of things that a CO can handle on

22 their own.  Are -- are fistfights, even involving a CO, the

23 type of thing they can handle on their own on their base?

24 A.   No, absolutely not.  That would have been something

25 that -- again, it's articulated in the -- you know, it's

1  specifically articulated in the OPREP instruction and then the

2  Commander's Critical Information Requirements of, you know,

3  untoward things happening that involve senior officers, again,

4  because of the ramifications and because of their involvement

5  in those types of things call into question their ability to

6  continue to command.

7          MR. GEE:  Thank you, Admiral.

8          THE WITNESS:  Yes, sir.

9          MR. VOKEY:  One minute, sir.

10     (Counsel confer.)

11         MR. VOKEY:  I have no more questions, sir.

12         THE COURT:  Thank you, sir.  You may step down.

13         THE WITNESS:  Thank you.

14         THE COURT:  Who is the government's next witness?

15         MR. NOTHSTEIN:  The government calls Admiral Mary

16  Jackson.

17         THE COURT:  All right.  While we're waiting, ladies

18  and gentlemen, if you want to stand and stretch for a minute,

19  feel free.

20     (Witness excused.)

21     (Admiral Jackson enters the courtroom.)

22         COURTROOM DEPUTY:  Do you solemnly swear that the

23  testimony you are about to give before this court will be the

24  truth, the whole truth, and nothing but the truth, so help you

25  God?

1          THE WITNESS:  I do.

2          COURTROOM DEPUTY:  Thank you.  Please state your full

3   name and spell your last name for the record.

4          THE WITNESS:  Mary Marcella Jackson, J-a-c-k-s-o-n.

5          COURTROOM DEPUTY:  Thank you.

6          Please be seated.

7          THE WITNESS:  Thank you.

8          THE COURT:  All right.  Counsel, you may proceed.

9          MR. NOTHSTEIN:  Thank you, Your Honor.

10      **MARY MARCELLA JACKSON, GOVERNMENT'S WITNESS, SWORN**

11                    **DIRECT EXAMINATION**

12   BY MR. NOTHSTEIN:

13   Q.   Good afternoon, Admiral Jackson.

14   A.   Good afternoon.

15   Q.   Would you please introduce yourself to the jury and tell

16   us where you're currently employed?

17   A.   Yes.  I am Mary Marcella Jackson.  I'm a vice admiral in

18   the United States Navy.  I'm currently assigned as Navy

19   Installations Command, which is headquartered in Washington,

20   D.C.

21   Q.   Admiral Jackson, I'd like to take a bit through your

22   background and education.  Where did you go to college?

23   A.   I went to the United States Naval Academy.

24   Q.   What year did you graduate?

25   A.   I graduated in 1988.

1  Q.   After graduating from the United States Naval Academy in

2  1988, what did you do?

3  A.   I was commissioned as a surface warfare officer, so the

4  first 20 years of my career were spent in that career path

5  serving on and off ships.  And so I did that for 20 years.  I

6  commanded a destroyer, the USS McFaul.  Between that tour, my

7  shore tour after that, I had the opportunity to go command at

8  the captain level at a base.  It was about 21 years of service.

9  I commanded Naval Station Norfolk in Virginia.  During that

10 time, I was there as executive officer first, because at that

11 assignment you serve as XO first and then commanding officer.

12      And then from that assignment I went to be a chief of

13 staff at a region, similar to what Captain Gray did for me when

14 I was Region Southeast.  During that time I was selected for

15 flight officer, and then was assigned my first flight

16 assignment, which was as commander, Navy Region Southeast, here

17 in Jacksonville.

18 Q.   Is that where you were serving in January of 2015?

19 A.   That is correct.

20 Q.   I'd like to back up just a little bit, Admiral Jackson.

21 Before you took on your first command, and I believe you

22 mentioned the USS McFaul, did you have a level of command

23 before that on a ship?

24 A.   I did not.

25 Q.   Had you ever served as an XO on a destroyer?

1  A.    I did.  My executive assignment was on USS Stout.

2  Q.    And prior to serving as the XO on the USS Stout, how long

3  had you served as an officer on various ships?

4  A.    My -- up through Stout, about 18 years of commissioned

5  service.

6  Q.    And approximately how long were you the executive officer

7  on the USS Stout?

8  A.    For approximately a year-and-a-half.

9  Q.    And, just generally, approximately how many sailors and

10  people serve above a ship -- or aboard a ship like the USS

11  Stout?

12  A.    Arleigh Burke class destroyers, which -- of which Stout

13  and McFaul are, have just shy of 300 people.

14  Q.    And how long were you the commanding officer on the USS

15  McFaul?

16  A.    Just shy of 18 months, right about 18 months.

17  Q.    Are there a similar number of people on that type of ship?

18  A.    That is correct.

19  Q.    I believe you mentioned that after that you served as the

20  executive officer at Naval Station Norfolk?

21  A.    That is correct.

22  Q.    How long were you the executive officer there?

23  A.    So I was the executive officer for 16 months.

24  Q.    And approximately how many people live on and are involved

25  with Naval Station Norfolk on a daily basis?

1  A.    So Naval Station Norfolk has a very large supported

2  population, upwards of 40,000 people.  Of course, not that many

3  people are there every day because of deployed ships and people

4  working at other locations, but it is a large -- it is our

5  largest supported base.

6  Q.    After serving as the XO, how long did you serve as the

7  commanding officer of Naval Station Norfolk?

8  A.    I served as the commanding officer for two years.

9  Q.    And I believe after -- you said that your next assignment

10 after that was at the Navy Region Southeast.  Is that what you

11 said?

12 A.    No, I went to Mid-Atlantic still as a captain to serve as

13 the chief of staff for the admiral that was in charge of that

14 region.  That is headquartered out of Norfolk.

15 Q.    And how long did you hold that position?

16 A.    For about 14 months.

17 Q.    And after that did you serve in the Navy Region Southeast?

18 A.    That's correct.

19 Q.    And what was your rank as you were serving there?

20 A.    At Southeast?

21 Q.    Correct.

22 A.    I was promoted to one star just prior to going to that

23 assignment, so I was a rear admiral.

24 Q.    Now, we've heard a couple of acronyms here and levels, I

25 believe, in the Navy.  Is there a command in the Navy that's

1   responsible for managing Navy installations or its bases?

2   A.   Yes.  That --

3   Q.   What -- what's the name of that?

4   A.   So it's Commander Navy Installations Command.  It's the

5   assignment I'm in now.  And it's also referred to sometimes as

6   CNIC.

7   Q.   If we can just get the hierarchy here.  At the -- the base

8   level is overseen by what entity in the Region?

9   A.   A region commander.

10  Q.   So that would be the Navy Region Southeast, such as the

11  position you held?

12  A.   Yes.

13  Q.   And what is the supervision -- supervising body above

14  that?

15  A.   So all the Region commanders, of which there are ten

16  total, report to Commander Navy Installations Command, which is

17  in D.C., and it's the job I'm currently holding.

18  Q.   And what is the command to which you report to as -- as

19  the CNIC?

20  A.   As CNIC, I report to the Chief of Naval Operations.

21  Q.   And where is the Chief of Naval Operations based?

22  A.   Headquartered in Washington, D.C.

23  Q.   Is that at the Pentagon?

24  A.   Yes.

25  Q.   Now, I'd like to turn to when you assumed your role as the

1  chief of the Navy Region Southeast.  Approximately when was

2  that?

3  A.    I assumed command in July of 2014.

4  Q.    And as the chief of the Navy Region Southeast, how many

5  installations, approximately, did you oversee?

6  A.    There were 18 installations in the Region that I was

7  responsible for.

8  Q.    Was one of the installations that you oversaw Naval

9  Station Guantanamo?

10  A.    Yes, Naval Station Guantanamo.

11  Q.    Before we get to that, Naval Station Guantanamo, when you

12  first took command at the Naval Region Southeast, did you have

13  a call or a meeting with the commanders of the installations

14  you oversaw to communicate your expectations with them?

15  A.    Yes, I did.  I had a meeting with my immediate staff,

16  which was essentially my department heads at the Region, and

17  all the commanding officers called in to that call, because

18  they're all remotely located, called in.  That was my

19  opportunity to just say thank you for the turnover that we had

20  had, to give them an opportunity to hear what my priorities

21  were, kind of walk through some early expectations of what they

22  could expect from me, but then also to give them the

23  opportunity to -- to ask me questions.

24  Q.    And in communicating your expectations to the commanders,

25  did you discuss with them your expectations regarding the flow

1   of information to you?

2   A.    Yes, I did.  I talked to them about how -- how important

3   communication protocols were to me, which meant -- and

4   especially in this day and age we communicate in so many

5   different manners -- making sure we have the ability to filter

6   out the really important information.  That there are

7   appropriate times for phone calls versus other times when

8   information can be communicated in e-mail or communicated to

9   the staff instead of me directly.

10           I also told them that I am the type of person

11  especially early in a job where I would like to get as much

12  information as possible so that I can make sure I'm learning at

13  the same time and understanding what their complex issues are,

14  and then I'll tell them to back off if they need to.  So --

15  that I was really thirsty to make sure that we had that

16  communication flow back and forth.

17  Q.    Are you familiar with the term in the Navy CCIR?

18  A.    I am.  CCIR is Commander's Critical Information

19  Requirements.

20  Q.    And generally what is the Commander's Critical Information

21  Requirements?

22  A.    So CCIRs are intended to outline those items that need to

23  be reported to the commander, to the next senior person in the

24  chain of command.  So it is a list of items that can be pretty

25  thought out and predefined so that it sets kind of the initial

1    rule-set of what a junior knows they need to report to a

2    senior.  It is not all-inclusive, but there are certainly some

3    obvious ones that need to be listed.  And that is articulated

4    in different types of instructions so that it's both written as

5    well as reiterated verbally.  And during that meeting I did

6    discuss CCIRs as well.

7    Q.    And generally what did you discuss during that meeting

8    about CCIRs?

9    A.    That I expected CCIRs to be followed, that we expected

10   them to follow that information.  Don't delay.  Timeliness is

11   important.  Sometimes you don't have all the information in the

12   beginning, but pass to me what you have and we will work

13   through updates to get information.

14   Q.    Did you have a saying with regards to bad news that you

15   like to share with your commanders?

16   A.    I -- I typically use the phrase that "Don't be the senior

17   person with the secret."  We also say that "Bad news doesn't

18   get better with age."  Two very common terms.

19   Q.    On this call, or, I'm sorry, this time when you had the

20   call with your different commanders that were underneath you,

21   who was the commander of Naval Station Guantanamo?

22   A.    Captain J.R. Nettleton.

23   Q.    Was he on this phone call?

24   A.    Yes.

25   Q.    When you took -- assumed your command of the Navy Region

1  Southeast in 2014, were you previously acquainted with

2  Captain Nettleton?

3  A.    No.

4  Q.    Were you -- are you -- did you become familiar with his

5  prior history with the Navy after assuming command?

6  A.    Yes.  Part of the turnover process is you get a book with

7  everybody's bios.  Before you even assume command, everyone

8  that you're responsible for, the commanding officers, you

9  review their bios, spend time with the person that I was

10  relieving talking about the various issues at their respective

11  bases, how they were doing in terms of how they were

12  commanding, what might be issues on the horizon.

13          And then, of course, when I had the opportunity to

14  meet with Captain Nettleton on the base personally, you know,

15  as -- through those months as they proceeded, or past, I got to

16  know him more through that.

17  Q.    And had Captain Nettleton previously held command prior to

18  being the commanding officer at Naval Station Guantanamo?

19  A.    Yes.  Captain Nettleton had had slightly unusual -- he had

20  two O-5 or commander level commands of helicopter squadron

21  HS-11 and HS-10.

22  Q.    Generally in your experience with Captain Nettleton, was

23  he doing a good job as the commander?

24  A.    Yes.

25  Q.    In your experience, did he always share information with

1  you?

2  A.    Pardon me?  Say that again.  I'm sorry.

3  Q.    Did he share information with you --

4  A.    Yes, he did share information with me.  He shared

5  information with me via phone calls and via e-mail.  He

6  communicated with me on a myriad of topics.  It could have been

7  something small like the -- working with the school there on

8  base.  We had environmental issues that we were working with

9  the base.  Making sure I understood -- we talked about how he

10  was supporting the various tenants on the base, like the

11  hospital or Department of State or JTF command that was on

12  there.  So we talked about many things is -- kind of in this

13  first several months.

14  Q.    Did you actually visit Naval Station Guantanamo to visit

15  with Captain Nettleton?

16  A.    Yes.  So it was imperative after I took command that I got

17  an opportunity to go to all the bases so that I could see, walk

18  the walk with the commanders, see what they were dealing with,

19  and understand better what was going on, what their landscape

20  and seascape was, so to speak.  So it was very important for me

21  to do that.

22        I had been to several other bases from July to the

23  time that I visited Naval Station Guantanamo.  I visited Naval

24  Station Guantanamo in the October time frame.  It was about a

25  three- to four-day visit, partially because of how you get in

1   and out of there, but also you really needed that amount of

2   time to be able to see the extent of the functions and missions

3   that are carried out at that base.

4   Q.    Is Naval Station Guantanamo, as far as the other

5   installations that were under your command, was Naval Station

6   Guantanamo somewhat unique?

7   A.    Yes, sir.  Naval Station Guantanamo is very unique.

8   Unlike a base here in the United States where you can leave the

9   fence line and go out into the community, Naval Station

10  Guantanamo is obviously in Cuba and does not have the ability

11  to leave the fence -- fence line to go into Cuba.  There's a

12  neutral zone around it.  We -- we have a very specific rule-set

13  about how we operate with the Cubans there.  So it is very

14  unique in that respect.

15         Also has very significant missions that occur out of

16  there in terms of supporting of the Southcom commander, the

17  ships that pull in and operate down in his area of

18  responsibility -- his being Southcom's area of responsibility.

19  So significant support there with regards to migrants.  So a

20  very critical base of strategic importance.

21  Q.    And during your visit to Naval Station Guantanamo -- I

22  believe you said it was October 2014?

23  A.    Yes, sir.  October.

24  Q.    Did you have a discussion with Captain Nettleton about the

25  potential for his promotion to higher rank, into higher

1   command?

2   A.   Yes.   It was very important to me that when I was with any

3   of my commanding officers in person that we would talk a little

4   bit about kind of how they're doing, what did they think was in

5   the art of the possible when they left command, what were they

6   interested in doing.

7             Captain Nettleton had assumed command I believe in

8   July of '12, so he had been in command for quite a while.  So I

9   was very interested in knowing -- it was kind of toward the

10  latter part of my visit, but I do, again, intentionally sit

11  down with all COs to say these are some types of things you can

12  do as a follow-on tour.  Are you interested in still remaining

13  competitive to compete for the next pay grade?  In this case,

14  it would be a one-star admiral that he would have been

15  competing for.  So I had that conversation with

16  Captain Nettleton.  I know that he was considering retirement,

17  which many COs leaving installation command consider doing,

18  they think about leaving, retiring at that point.  So

19  retirement is one of the things we talked about.  I also

20  expressed to him that based on everything I had seen I thought

21  he could compete at the next level, for him to keep that in his

22  mind.  So we talked a little bit about what those type of

23  assignments might be, such as going to a chief of staff.

24            I also know that Captain Nettleton and I knew at the

25  time that he had had prior enlisted time as a Marine.  So he

1    was a little bit -- we use the expression a little bit longer

2    in the tooth.  He was a little older than some of our other

3    commanding officers.  So that may have weighed into whether or

4    not he intended and desired to retire or not.  So we did have

5    that conversation.

6    Q.    Thank you.  Now, Admiral Jackson, I'd like to turn your

7    attention to -- to an incident that happened in January 2015 at

8    Naval Station Guantanamo.  Do you recall the incident regarding

9    the death of Christopher Tur?

10   A.    Yes.

11   Q.    Okay.  I'd like to first -- I'll just ask you, how did you

12   first become aware of the incident?

13   A.    I became aware of the incident via an e-mail that I

14   received on Saturday evening, I believe it was the 10th of

15   January.  The e-mail had been sent around 2000.  I didn't

16   actually see it until a bit later, around 2200.

17            MR. NOTHSTEIN:  And, if I may, Ms. Reid, may we

18   please have Government's Exhibit 359?

19   BY MR. NOTHSTEIN:

20   Q.    Admiral Jackson, there should be a binder in front of you

21   with some documents, but the e-mails also show on the screen.

22   Can you see it there?  We'll enlarge it.  I know the print

23   is --

24   A.    I can -- it's a little blurry.  I can see it.

25   Q.    If we can go to page 2, please.  And it's also in the

1    binder behind tab for 359, Admiral.

2    A.    Thank you.

3    Q.    So, Admiral, taking a look at this, is this the e-mail

4    that you referenced?

5    A.    Yes.

6    Q.    Okay.  So take a look at the information you received.  If

7    we could, I guess, just look through it a bit, it states --

8    well, actually, if you wouldn't mind just reading me the first

9    sentence there.

10    A.    Well, the first thing that jumps out is "Missing person."

11    That's the subject line.  I mean, that's the bottom -- that's

12    an important piece.  The subject line is, "We are searching for

13    a Navy Exchange" -- that's what NEX stands for -- "Navy

14    Exchange employee, Mr. Chris Tur.  He was last seen at the

15    Officers Club around 0100, and may have walked to Marine Hill

16    mini mart, based on a charge card info, some time after that."

17    Q.    Now, Admiral Jackson, we discussed before the information

18    you expected to be shared, information about a missing person

19    such as this, is that the type of information you expected to

20    be shared with you?

21    A.    Yes.

22    Q.    Is that based on the Navy regulations and the instructions

23    we discussed?

24    A.    Yes.

25    Q.    Was it unusual to receive something like this late at

1  night or on the evening on a Saturday?

2  A.    Not -- it -- I would not say that it was unusual, because

3  I had articulated that it doesn't matter, I want to be notified

4  regardless of the hour when something happens.

5  Q.    And the e-mail continues, I suppose, to discuss the -- the

6  search and so forth is going on.  Do you recall receiving this

7  information?

8  A.    I do.  Yes.  And a search requires the CCIR, as well,

9  search and rescue.

10  Q.    And I notice here at the bottom of the e-mail, it notes --

11  I'm going to circle it for you -- "OPREPS going out shortly."

12        What are the OPREPS?

13  A.    So OPREPS is a -- is a -- like, a code word used for

14  operational reports.  There is all -- Navy guidance that all

15  commanding officers are expected to adhere to.  It's put out by

16  the Chief of Naval Operations.

17        It's one of their -- his directives, that says how

18  all commanders are supposed to make reports.  There are various

19  levels detained within that instruction, depending on the

20  incident.

21        So some of them require, you know, the highest level

22  of notification.  And OPREP 3 Navy Blue, which is what this

23  would be, would require notification to the Chief of Naval

24  Operations, so it would meet that level.  And then there was a

25  lower level of reporting just to the -- your next senior, which

1    would have been me.

2    Q.    And is there something called a voice report as well?

3    A.    There is a part -- there are really two parts -- two

4    primary parts of an OPREP.  One is a voice report and the

5    second is written reports, both the initial and then follow-up

6    and final reports that occur.

7    Q.    And because -- well, was there something funny about this

8    phone at Naval Station Guantanamo that made it difficult to

9    make phone calls?

10   A.    In this case, yes.  My phone had not been programmed and

11   my -- my predecessor's phone hadn't been programmed for

12   international.  So I was not able to call him -- "him" being,

13   excuse me, Captain Nettleton.  Captain Nettleton could call me.

14   But we also have this ability to communicate via e-mail.

15   Q.    And so under those regulations did you consider this a

16   voice report?

17   A.    I did.

18   Q.    Okay.  So is this e-mail an official Navy record?

19   A.    Yes.

20        MR. NOTHSTEIN:  If we could please scroll up to the

21   response.

22   BY MR. NOTHSTEIN:

23   Q.    Now, do you see your -- is this your -- do you see where

24   I'm highlighting?  Is that your e-mail, Admiral Jackson?

25   A.    Yes.

1  Q.    Now, you see that your -- your response.  What did you ask

2  in response to the e-mail you received?

3  A.    So I was looking for some expanded information related to

4  the context of this missing person.  In particular, I wanted to

5  know what was being done to search for the individual.  I also

6  was interested in knowing whether or not law enforcement, both

7  NCIS -- I would have -- well, it doesn't specifically say

8  this -- was interested in knowing whether security forces

9  were -- were assisting.  And then also trying to understand the

10  greater context of why someone might have disappeared.  Could

11  it have been a domestic abuse, violence, argument.  Or could it

12  have been someone had been drinking and potentially might be

13  suicidal.

14  Q.    And, just generally, why was this information important to

15  you?

16  A.    It helped answer really the who, what, when, where, why,

17  what are you doing about it, and how are we going to solve the

18  problem, are all questions that I was looking for answers for.

19         MR. NOTHSTEIN:  And if we could scroll up to the

20  response, please.

21  BY MR. NOTHSTEIN:

22  Q.    And here in the response e-mail, do you recall receiving

23  this response from Captain Nettleton?

24  A.    I do.

25  Q.    And with regards to the information here in the second

1  paragraph, do you see the information that I'm highlighting

2  there?

3  A.    Yes.

4  Q.    With regard to NCIS involvement.  Again, was that an

5  important fact to you, that NCIS was involved?

6  A.    Yes.

7  Q.    And why was that?

8  A.    Because the commanding officer is -- is responsible for

9  safety and security and law enforcement on his base, and the

10  commanding officers had access to law enforcement professionals

11  that are supposed to help them maintain, you know, good order

12  and discipline and make sure everyone is safe.  And so in this

13  case it was important to know that that was -- that those

14  assets and resources were being directed accordingly.

15          MR. NOTHSTEIN:  If we can scroll up to the top two

16  e-mails.

17  BY MR. NOTHSTEIN:

18  Q.    And now here it appears as though you directed the captain

19  to call you?

20  A.    I did.  I asked him to call me first thing in the morning.

21  Q.    Okay.  Admiral Jackson, on the evening of January 10,

22  2015, did you learn any additional information about this

23  incident?

24  A.    No.  This was the extent of the communication flow between

25  myself and Captain Nettleton or anyone else for that matter.

1   Q.   At any point on January 10th, did Captain Nettleton tell

2   you that there had been a -- well, did he tell you that he had

3   had any personal interaction with the missing person,

4   whatsoever?

5   A.   No.

6   Q.   Did he tell you that there had been a verbal altercation

7   between himself and the missing person?

8   A.   No.

9   Q.   Did he tell you there had been a physical altercation

10  between himself and the missing person?

11  A.   No.

12  Q.   Admiral Jackson, if you had been told those things on

13  January 10, 2015, what would you have done?

14  A.   I would have been very -- I would have asked some other

15  questions that would have been searching for further details

16  related to the commanding officer's personal involvement in the

17  situation.  I would have made sure that there were additional

18  communications with other people on the CO's staff, for

19  example, the executive officer.  I would have began to question

20  whether the CO could be objective in directing a search, and

21  whether or not he had the ability to do that.

22          So I would have ensured that I would have been more

23  directive and more inquisitive in terms of questions back to

24  the installation.

25  Q.   What about involving other components of the Navy to

1   respond?

2   A.    So I -- I would think about what assets I would have had

3   available to me.  I mean, the -- the executive officer,

4   certainly, you know, making sure that he is carrying out duties

5   that, you know, perhaps I needed to direct from Region

6   Southeast, not just the CO.  There is another senior officer

7   assigned to JTF Guantanamo.  It's the one star assigned --

8   excuse me, assigned to naval station as a tenant, and that is

9   the JTF commander.  So I might have picked up the phone that

10  night to make sure that there's flag officer engagement and

11  situational awareness of what's going on to make sure that

12  there was proper searching.

13  Q.    Yes, ma'am.  Now, you directed the defendant to call you

14  in that last e-mail.  Did you -- the next day did you, in fact,

15  have a conversation with the defendant?

16  A.    I did.  Captain Nettleton called me the next morning.

17  Q.    Who else was on the call, that you recall?

18  A.    On the -- on Sunday morning, I believe it was just me and

19  Captain Nettleton.

20  Q.    And what did he tell you?

21  A.    Captain Nettleton told me that they were continuing to

22  search for the body.  The body had not been located.  That they

23  were doing both harbor patrol searches as well as continuing

24  foot patrols.  He had people going door-to-door at people's

25  houses, trying to look at some of our less-frequented

1   buildings, like warehouses, on the base.

2          He -- he was telling me the search was continuing.   I

3   was concerned about Ms. Tur, how she was doing, what kind of

4   support she was getting.   So that's -- that's my recollection.

5   Q.   Did the defendant give you any additional information

6   regarding the events of Friday, January 9th, that preceded

7   Mr. Tur's disappearance?

8   A.   I'm just trying to make sure that I have the sequence

9   right.   Either -- so we may have discussed that this

10  individual -- and I think it was an e-mail the preceding night,

11  that this was a common practice for this individual, that he

12  did drink, that he was jealous of -- that the domestic dispute

13  is -- you know, concern about it, jealousy of his wife, and

14  that he had gone off but never this long -- had gone off and

15  kind of disappeared.

16  Q.   Did the defendant tell you that he had any personal

17  interaction with Mr. Tur the night he disappeared?

18  A.   No.

19  Q.   Did he tell you there was a verbal altercation between the

20  two of them?

21  A.   No.

22  Q.   Did he tell you there was any kind of physical altercation

23  between the two of them?

24  A.   No.   No.

25  Q.   After the call, did you later find out that day that

1  Mr. Tur's body had been found?

2  A.    Yes.  I -- I had directed the CO to keep me posted on what

3  had happened.  I had to travel to -- from Jacksonville to

4  Washington, D.C.  When I landed in Washington, I had a missed

5  call from Captain Nettleton, so I e-mailed him and said, "Call

6  me back."

7          So he called me back.  It was late in the afternoon.

8  And he -- at that time he notified me that Mr. Tur's body had

9  been found floating in the harbor by the U.S. Coast Guard that

10  was doing the search.

11  Q.    And what did you -- I guess -- what else did you discuss

12  with Captain Nettleton?

13  A.    I was curious if there was any sort of marking or

14  indication, status of the body, condition on the body that

15  might have revealed and given us information about cause of

16  death.  And when I queried about that, Captain Nettleton told

17  me that there were -- the body had marine bites on the body,

18  but that was the extent -- there was nothing else that would

19  provide any indication of what had happened.

20  Q.    Did you have any further conversation with the defendant

21  about Mr. Tur that day?

22  A.    Part of our conversation would have been making sure that

23  we now work through the process of having a death on board a

24  naval station, so how to make sure that -- the proper

25  notifications for family, next of kin, medical examiner, making

1    sure -- the death of an individual on a naval station requires

2    NCIS involvement, so making sure that NCIS was involved.  So we

3    would have talked through the mechanics of making sure all

4    those were going to occur.

5    Q.    And, again, during this phone call or anytime on

6    January 11th, did the defendant tell you that there had been --

7    he had any personal interaction with Mr. Tur that day?

8    A.    No.

9    Q.    Did he tell you he had any verbal or physical altercation

10   of Mr. Tur?

11   A.    No.

12   Q.    The next day, did you have to attend a -- a meeting at the

13   Pentagon?

14   A.    Yes.

15   Q.    And after attending that meeting, did you receive a notice

16   from your inspector general?

17   A.    I did.  In fact, it was mid -- I think mid-afternoon.  I

18   was able to check my phone -- the phones had to be locked up

19   for the duration of the -- the course -- or the meeting.  We

20   were able to check our phones, so I checked my phone after

21   lunch and I had an e-mail from my inspector general at Region

22   Southeast that said, "We have a new complaint.  Please call me

23   as soon as possible."

24          So I called my inspector general.

25   Q.    And what did you learn generally from your inspector

1    general?

2    A.    My inspector general told me that through the hotline to

3    Region South -- excuse me -- Region Southeast, the IG hotline,

4    that a complaint had been made that there was an inappropriate

5    relationship between the commanding officer of the base and

6    Ms. Lara Tur.

7    Q.    Okay.  Now, did that information you learned from the

8    inspector general, did that change how you knew you had to

9    interact with Captain Nettleton going forward?

10   A.    It -- I don't know that it necessarily changed how I had

11   to interact with him.  But I knew that I needed to determine

12   the way that we were going to initiate and to -- make sure that

13   the allegation got addressed in accordance with governing

14   policy.

15   Q.    So did you have a discussion with your inspector general

16   about possibly initiating an investigation?

17   A.    I did.

18   Q.    What's the name of that type of investigation?

19   A.    So the -- one option available to commanders is to do a

20   command investigation.

21   Q.    What's a command investigation?

22   A.    A command investigation would, in this case, be where I

23   would assign -- as the Region commander, I would assign an

24   individual to do essentially a fact-finding mission to find as

25   many facts about the allegation and then to provide opinions

1    and recommendations back to me based on what they find out

2    pertaining to those allegations.

3    Q.    And at the end of a command investigation, once you've

4    received the facts and opinions and so forth, what are the

5    potential outcomes as far as discipline?

6    A.    So commanders have various levels of discipline that they

7    can proceed with for officers.  They can do judicial

8    punishment, which might be -- like a court-martial.  A

9    non-judicial punishment is also an option where the commander

10   takes the individual to admiral's mast.  And then there are

11   administrative actions.  Administrative action might be

12   something like a -- like a letter of instruction or

13   non-punitive letter of instruction that says, "We think that

14   you have deviated from how you're supposed to be performing in

15   such a manner, we want you to correct them within a certain

16   number of days."  So that would be an example of an

17   administrative action.

18   Q.    And after having these discussions with your inspector

19   general, what did you decide to do with regard to the

20   investigation?

21   A.    So in situations where there are other things going on,

22   one of the things that I wanted to think about is how do you

23   make sure that you don't have conflicting investigations going

24   on simultaneously.  So -- because I knew at this point we had

25   NCIS on the ground in -- in Guantanamo doing the investigation

1    with regards to Mr. Tur's death.  I talked with the inspector

2    general as to whether or not it would be appropriate, whether

3    we could verify with NCIS whether or not they could incorporate

4    to look at the whole piece, not only the death of Mr. Tur but

5    also the allegation.  That way you don't have conflicting --

6    people trying to make statements.  And then we would --

7    potentially would have -- if I sent someone down there trying

8    to make statements, potentially that could have infringed on

9    the NCIS investigation.  So we decided to proceed -- I decided

10   to proceed to have NCIS, who agreed that they could look at

11   both at the same time and that that would proceed in that

12   manner.

13   Q.   After making that decision, did you have a conversation

14   with your chief of staff later that day?

15   A.   So this is Monday.

16   Q.   I'm sorry.  This is Sunday -- I'm sorry, yes, Monday, the

17   12th, yes.

18   A.   So this is Monday.  Yes.  So my chiefs of staff would send

19   me, at the end of every day, something we call an "end of day,"

20   which just says, "Here are some things we were working on, this

21   is what was going on."

22           And so my chief of staff, Captain Scotty Gray, had

23   sent me an e-mail with some things that were being worked.  And

24   in that e-mail he said he had talked to Captain Nettleton, that

25   Captain Nettleton had denied any sort of relationship with

1  Ms. Tur and was concerned about that investigation, and that --
2  the other critical piece that Captain Gray mentioned to me was
3  that there was a command function, what we would consider a --
4  a -- an official function that Friday night which was what we
5  call a "Hail and Farewell," a welcoming and a -- and a bidding
6  farewell, for the executive officer.
7  Q.    Admiral Jackson, you just mentioned a command event.
8          What's a command event?
9  A.    So a command event is a -- is a -- it could be a meeting,
10 it could be a social function, but it's intended where the
11 wardroom comes together to -- in this case for a Hail and
12 Farewell, the CO is present.  It is considered, you know, an
13 official event.
14 Q.    You mentioned wardroom.
15         Is a command event sometimes called a "wardroom
16 event"?
17 A.    It is -- it is sometimes.  It's not always synonymous.
18 Q.    You said that that fact was significant to you.
19         Why was it significant to you that there had been a
20 command event involved on Friday, January 9th?
21 A.    Because it introduced to me the concept that there was an
22 event where there were multiple people, including the
23 commanding officer there, and had potentially witnessed the
24 disagreement that occurred between the Turs, and the
25 expectation is that command events are to be held, you know, to

1    our standards; in other words, there's not supposed to be any

2    alcohol-related incidents, although alcohol can be served.  But

3    the idea is it's still -- good order and discipline is

4    expected.

5    Q.   I believe you said that this was information you were

6    receiving in your end-of-day e-mail from, right now,

7    Admiral Gray.

8         Did you later speak to him on the phone that evening?

9    A.   I did.  I spoke to him, and so there may have been greater

10   detail, some of what I just said, that also came out in the

11   phone call.

12   Q.   But in general did he relay similar information to you on

13   that phone call?

14   A.   Yes.

15   Q.   As a result of that, what did you do with regard to

16   Captain Nettleton for the next day?

17   A.   So I asked -- I directed Captain Nettleton to call me the

18   next day, so that would have been Tuesday.  I was between

19   commitments in D.C., so I was transitioning from the Pentagon

20   meeting to meetings that were occurring in Crystal City.  I

21   wanted to be very focused so that I could really listen and be

22   very focused to what Captain Nettleton told me.  So I took the

23   call in my hotel room and wanted to make sure that I understood

24   what was going on.

25        So Captain Nettleton called me and then I asked him

1   to tell me what was going on.

2   Q.   So when you're in your hotel room and Captain Nettleton

3   calls you, what do you remember him telling you on that day,

4   January 13th?

5   A.   So on January 13th, Captain Nettleton told me it was a

6   Hail and Farewell for his outgoing executive officer.  He told

7   me that there had been a lot of drinking.

8           He told me that there -- in the -- in the Officers

9   Club bar area, there had been an argument between Mr. and

10  Ms. Tur, and that that had been -- also proceeded out into the

11  parking lot.

12          He told me that he went home alone.  He said that he

13  wanted to have people -- more people -- kind of everything

14  seemed to calm down and he wanted to have more people over

15  afterwards, from the O Club, to go to his residence, but that

16  the new XO, Captain Al Ross -- or then Commander Al Ross said,

17  "That's not a good idea.  You just need to go home."  That --

18  Captain Nettleton told me that he had been home for about 30

19  minutes and Mr. Tur came to his house and confronted him.

20          He described the interaction as being a roller

21  coaster.

22  Q.   If I can stop you for a minute, Admiral Jackson.  Before

23  we get to the time back at the defendant's home, I just want to

24  ask you a couple of follow-up questions on what the defendant

25  told you about what happened at the Officers Club.

1    The defendant, I think you said, told you that there

2  was a lot of drinking at this command event, this Hail and

3  Farewell.

4    Did he tell you that he was drinking a lot?

5  A.   No.

6  Q.   And he also described, I believe you said, that he had

7  witnessed an argument between Christopher Tur and his wife,

8  Lara Tur.

9    Did the defendant tell you that Mr. Tur had actually

10 made allegations at him, at the defendant?

11 A.   Not that I recall, no.  Not at that point.

12 Q.   And did he tell you that Mr. Tur had accused him of having

13 an affair with his wife?

14 A.   Not at the Officers Club.

15 Q.   All right.  Now, you also mentioned there was someone

16 there that stopped the defendant from taking people back to his

17 house, I believe you said it was then Captain -- or

18 then-Commander Ross?

19 A.   That is correct.

20 Q.   Are you -- were you personally acquainted with

21 Captain Ross at that time?

22 A.   I had served with Captain Ross in a previous assignment.

23 Q.   All right.  So taking back -- I believe you said now that

24 the defendant told you that maybe 30 minutes after he returned

25 home, Mr. Tur came to his house.

1         What did the defendant say happened at that time?

2  A.   So Captain Nettleton described the interaction between

3  Mr. Tur and himself as being a roller coaster and that one

4  minute Mr. Tur was acting like Captain Nettleton was his best

5  friend and then the next minute would be yelling at him and

6  being very confrontational.

7         He said that his daughter, Julia, was upstairs and

8  heard the entire conversation and that Julia heard Mr. Tur yell

9  at Captain Nettleton, quote, you're fucking with my wife, end

10  quote.

11         He said that he was able to get Mr. Tur to calm down

12  and that Mr. Tur left his home and returned to the Officers

13  Club.

14         Captain -- in that conversation Captain Nettleton

15  also denied having any sort of personal relationship with

16  Ms. Tur.

17  Q.   Now, you mentioned, Admiral Jackson, that the defendant

18  said that Mr. Tur came to his house.

19         Did he tell you whether or not Mr. Tur actually came

20  inside the house?

21  A.   No.  I do not recall a discussion about whether it was

22  outside on the steps or inside.

23  Q.   Did he tell you that Mr. Tur hit him?

24  A.   He did not.

25  Q.   Did he tell you that he hit Mr. Tur back?

1   A.   He did not.

2   Q.   Did he tell you that there was any kind of physical

3   altercation whatsoever?

4   A.   No.

5   Q.   Did he tell you that at any point Mr. Tur was bleeding?

6   A.   No.

7   Q.   After learning this information, what did you do?

8   A.   Well, I spent some time focusing on what the -- what could

9   potentially be happening.  I did -- there's another part of the

10  conversation I would like to reiterate.

11  Q.   Please do.

12  A.   I told Captain Nettleton that he needed to go talk to NCIS

13  and tell them everything that he had just told me.  So I then

14  started thinking through how we were going to -- how I and we

15  as a command and Naval Station Guantanamo Bay were going to get

16  to the heart of what happened.

17  Q.   Admiral Jackson, please explain for us, in your position

18  as the chief of the Navy Region Southeast, why was it important

19  to get to the heart of what happened, for you as a commander?

20  A.   Because I was in command of those bases by extension

21  through those commanding officers.  So I was equally as

22  accountable for what took place on that base and that I wanted

23  to make sure that I was processing and directing in accordance

24  with higher headquarters guidance how to work through these

25  types of situations.

1    So it was very important.  And I owned it just like I

2    expected Captain Nettleton to own it.

3    Q.    And as far as owning it, Admiral Jackson, were there any

4    decisions regarding the continuation of -- or I guess, of the

5    continued command of the naval station you had to make at that

6    time?

7    A.    Certainly this was going through my mind, whether or not

8    Captain Nettleton was still capable of commanding a place like

9    Naval Station Guantanamo Bay.  I already mentioned it has

10   significant strategic importance.  It was my -- aside from life

11   and health, safety, my next priority was making sure that that

12   base could continue to carry out all the missions that are

13   supposed to occur from that base.

14        So I was -- I was beginning to think through what

15   our -- the methodologies by which we can make sure the base is

16   still continuing, like, to operate and also make sure that --

17   that the investigation was properly being investigated by the

18   proper individuals.  So I was starting to think through what

19   the options were.

20        At that point I did not -- I was not at a point at

21   that moment to think that Captain Nettleton needed to be

22   relieved.  There are quite a few logistics associated with

23   relieving someone from command.

24        Number one is you have to have someone to assume

25   command and that takes some time.

1    Q.    And, Admiral Jackson, let me just jump in for a second

2    there.  You said at that point you had not yet decided whether

3    you needed to relieve Captain Nettleton of command.

4            Was that the kind of decision that you would make as

5    Commander of Navy Region Southeast?

6    A.    Yes.

7    Q.    And is there a term that's generally used as to whether or

8    not you would need to relieve someone of command?

9    A.    Sometimes it is referred to as a DFC, which stands for

10   Detachment for Cause.

11   Q.    Is there a reference to your confidence in the CO?

12   A.    Yes.  Another -- so a Detachment for Cause can occur for

13   several reasons.  One of the reasons that a commander can

14   relieve someone is a loss of confidence in their ability to

15   command.

16           THE COURT:  Mr. Nothstein, I'm looking for a break

17   point.

18           Is this a good one?

19           MR. NOTHSTEIN:  Yes, sir.

20           THE COURT:  Okay.  Ladies and gentlemen, let's go

21   ahead and take a break.  Let's -- let's try to keep it to ten

22   minutes, if we can.  So go ahead and take a ten-minute break.

23   Please remember my instructions.  We'll see you back here at

24   ten till.

25           COURT SECURITY OFFICER:  All rise for the jury.

1        (Jury exits, 3:39 p.m.)

2        THE COURT:  Admiral, you may take a break as well.

3   Ten minutes.

4        THE WITNESS:  Thank you.  Excuse me, sir.

5        COURT SECURITY OFFICER:  Please be seated.

6        THE COURT:  All right.  I told the admiral she may

7   take a break, but let me talk to the lawyers for a second.

8        So I certainly want to complete the admiral's

9   testimony today.

10        How much more -- can you estimate, Mr. Nothstein --

11   how much more do you have with the admiral on direct?

12        MR. NOTHSTEIN:  Your Honor, we'll be maybe 20 minutes

13   or so.  I don't think it's going to be terribly long.  We're

14   trying to move a little more quickly.

15        THE COURT:  Well, it's my intention to finish her

16   testimony today and I'm not going to -- you know, if I have to

17   go a little beyond the 5 o'clock hour to do it, I probably will

18   do that.  Since we're going to be out of session tomorrow, it

19   makes sense to do so.

20        So I will ask everybody -- I'm not asking anybody to

21   hurry, I'm not asking anybody to do anything that compromises

22   their examinations, but I am asking you to be cognizant of the

23   time.  It does not look like we'll get farther than that,

24   though, it doesn't appear to me, and so we'll be in recess

25   after Admiral Jackson finishes her testimony, assuming it takes

 1   us beyond the 5 o'clock hour.  It will either take us up to or

 2   beyond it, I'm guessing.

 3            Unless I'm wrong --

 4            Mr. Vokey, are you -- can you estimate the length of

 5   your cross?

 6            MR. VOKEY:  I -- kind of depends on how much more

 7   there is, sir.

 8            THE COURT:  Okay.

 9            MR. VOKEY:  It won't be -- it will be similar to

10   probably Admiral Gray's.

11            THE COURT:  So that's likely about the end of the

12   day, then.  So I think everybody ought to kind of plan on that.

13            So I guess that means Dr. Gordon will end up

14   testifying next week.

15            All right.  Anything else from counsel at the moment?

16            MR. NOTHSTEIN:  No, Your Honor.

17            THE COURT:  All right.  Then we'll be back in ten

18   minutes.

19            COURT SECURITY OFFICER:  All rise.

20       (Recess from 3:41 p.m. to 3:54 p.m.; all parties present.)

21            COURT SECURITY OFFICER:  All rise.  This Honorable

22   Court is back in session.

23            Please be seated.

24            THE COURT:  Ready for --

25            MR. NOTHSTEIN:  Ready, Your Honor.

1          THE COURT:  Let's have the jury, please.

2          COURT SECURITY OFFICER:  All rise for the jury.

3      (Jury enters, 3:54 p.m.)

4          COURT SECURITY OFFICER:  Please be seated.

5          THE COURT:  Welcome back, ladies and gentlemen.

6          Mr. Nothstein, you may proceed.

7          MR. NOTHSTEIN:  Thank you, Your Honor.

8  BY MR. NOTHSTEIN:

9  Q.   Admiral Jackson, I believe when we broke you had just

10 finished telling us about the day in which you had this phone

11 call with the defendant in which he provided new information to

12 you.

13         In the preceding days of that week in January, were

14 you dealing with several issues that had arisen because of the

15 death of Mr. Tur and other issues at Guantanamo?

16 A.   I was -- I was certainly working through this issue.  We

17 also had the mission that needed to continue at Guantanamo.  We

18 had the Assistant Secretary of the Navy for energy

19 installations and environment was making a -- a distinguished

20 visitor -- visit to the base going down on Thursday and Friday,

21 so I was very focused on -- on that visit as well as -- and

22 just making sure that the -- the CO was still capable of

23 commanding and assessing that situation.

24 Q.   And were you also receiving updates -- not specifically

25 what you were being told, but were you being updated regularly

1    about the NCIS investigation that was ongoing?

2    A.    Yes, I was getting regular updates.

3    Q.    And were you taking this information -- were you --

4    without getting into the content of what you were reporting,

5    were you reporting back up your chain of command about what you

6    found out?

7    A.    Yes, I was reporting to my boss via phone call and

8    e-mails.

9    Q.    And why was it important for you to do that?

10   A.    Because I had essentially the same CCIR criteria that I

11   needed to be informing my boss of the circumstances, the

12   situation, what we were doing about it, and most importantly to

13   be able to communicate to him whether we had a safe, secure

14   situation at the Naval Station Guantanamo Bay.

15   Q.    Now, moving towards the end of that week, Friday,

16   January 16th, did you have a phone call with the defendant

17   regarding his -- his command and about what was going on?

18   A.    Yes.  I had -- I had left D.C. and returned to

19   Jacksonville, and I had a phone conversation with Captain

20   Nettleton on Friday after the Assistant Secretary of the Navy

21   had departed.  And in that -- the -- my lawyer was with me

22   during that phone conversation.  And my focus was, one, to hear

23   Captain Nettleton, hear his voice, try to see how he was doing,

24   to also make sure that we were carrying out everything we

25   needed to do to make sure we were taking care of the Tur

1    family, because the memorial was scheduled for that Saturday,

2    so making sure that they had gotten down to the island and that

3    they were able to execute that memorial.

4    Q.    Admiral Jackson, you mentioned that your lawyer was on the

5    phone with you during this call.  Why did you have your lawyer

6    on the phone with you?

7    A.    I thought at that point given everything that I knew,

8    which was really revealed on that Tuesday phone call with

9    Captain Nettleton, that at this point it would be very prudent

10   that my lawyer be present during any of my conversations with

11   Captain Nettleton.

12   Q.    And was there something specifically you were concerned

13   about with regard to speaking with Captain Nettleton?

14   A.    I just wanted to make sure that I was focused on the --

15   the mission and what needed to be done down there.  I did not

16   want to be alleged of having tried to question him on things I

17   shouldn't be doing that would be part of the investigation.  I

18   did not want to get cross-threaded with the investigation at

19   that point.

20   Q.    And so due to those concerns, were you following legal

21   advice on what to ask and what not to ask?

22   A.    Yes.  And I had been following legal advice all along.

23   Q.    Now, during this conversation, did Captain Nettleton ask

24   you -- what did he -- what did he tell you during this

25   conversation?

1    A.    He sounded extremely tired.  He told me about the visit

2    with Secretary McGann, that that had gone well.  He told me

3    that he was -- that he was very tired and that his family was

4    doing fine, but they were horrible at the same time trying to

5    work through this.

6    Q.    Did he ask you anything about his continued command?

7    A.    Yes.  He asked me whether he should step down as

8    commanding officer of the naval station.  It is my belief that

9    that was based on the fact that there was now starting to be

10   some social media and public affairs information coming out

11   about the incident.  So the question was whether or not he had

12   the credibility to continue to command Naval Station -- or

13   excuse me -- Naval Station Guantanamo Bay.

14          At the time I was very focused on really three

15   questions I had posed to NCIS that would be beneficial for me

16   to know those answers to then decide whether or not I needed to

17   relieve him from command.

18          So at that point I needed him to stay focused on the

19   mission, and I told him that I did not think he needed to step

20   down.

21   Q.    Now, did you tell him what the three things were you were

22   waiting to hear back from on -- from NCIS?

23   A.    I did not tell Captain Nettleton those things.

24   Q.    Why did you not tell him that?

25   A.    I don't know that that would have been pertinent for him

1  to know at that point.

2  Q.   Okay.

3  A.   I mean, there were -- I had asked questions associated

4  through at least one of those, which was whether or not it was

5  a suicide.  That was one of the things we were interested in.

6  He knew I was interested in the autopsy and the medical

7  examiner's piece.

8         MR. VOKEY:  I'm going to object of speculation as to

9  what Captain Nettleton knew.

10         THE COURT:  I tell you what, why don't you just ask

11  another question, please?

12         MR. NOTHSTEIN:  Thank you, Your Honor.

13  BY MR. NOTHSTEIN:

14  Q.   Did Captain Nettleton ask you if you still had confidence

15  in him or if he should step down?

16  A.   He asked me whether he should step down.

17  Q.   And what was your response?

18  A.   My response was, "I do not think you should step down.  I

19  don't need you to step down.  I need you to focus on the

20  mission."

21  Q.   At that point had you lost confidence in Captain

22  Nettleton?

23  A.   No, but I was asking myself a lot of questions.

24  Q.   During that conversation, did he tell you that there was

25  any kind of physical altercation between himself and

1   Christopher Tur?

2   A.   No.

3   Q.   Did he tell you at all that Christopher Tur was injured in

4   his home on January 9th?

5   A.   No.

6         MR. NOTHSTEIN:  May we please have Government's

7   Exhibit 379?

8   BY MR. NOTHSTEIN:

9   Q.   Do you see the e-mail in front of you, Admiral Jackson?

10  A.   I do.

11  Q.   What is this e-mail?

12  A.   So this e-mail was sent to me -- the original e-mail was

13  sent -- sorry -- from --

14  Q.   It's on your screen there, ma'am.  There is one of the

15  e-mails.

16  A.   I apologize.

17        MR. VOKEY:  And I'm sorry to the Court.  I just lost

18  what exhibit number this was.

19        THE COURT:  What number is it, sir?

20        MR. NOTHSTEIN:  379, Your Honor.

21        MR. VOKEY:  Thank you.

22        THE COURT:  Thank you.

23  BY MR. NOTHSTEIN:

24  Q.   Admiral Jackson, the e-mail here that we see from

25  January 15th that you had sent, what did you want to know here?

1    A.    I was very interested in trying to assess Captain

2    Nettleton's frame of mind.  I was concerned about the pressure

3    of the allegations and the circumstances and I wanted to make

4    sure, one, he was personally okay.  I was concerned about his

5    family.  Leslee is his wife.  She had not been on island

6    initially, but she had since returned to the island.  And I

7    wanted to make sure that he knew that I was available to talk

8    if he needed to have a conversation with me.

9              MR. NOTHSTEIN:  Please scroll up, Ms. Reid.

10   BY MR. NOTHSTEIN:

11   Q.    And the response from Captain Nettleton, do you recall

12   receiving this response?

13   A.    I do.

14   Q.    And the phone call we just discussed where the captain

15   asked you about whether he should step down or so forth, did

16   that come after this series of e-mails?

17   A.    Yes.  Yes.  I'm pretty sure it did time-wise.  Because

18   that conversation was on Friday, and this was a Thursday

19   e-mail, and then Friday -- sometimes the times on these e-mails

20   get messed up, so it's hard to tell when this Friday e-mail was

21   sent from Captain Nettleton back to me.  It was most likely

22   before the phone call.

23   Q.    Thank you.

24             MR. NOTHSTEIN:  Now, if we could please have

25   Government's Exhibit 381.

1    BY MR. NOTHSTEIN:

2    Q.    Do you see Government's Exhibit 381, Admiral Jackson?

3    A.    Yes.

4    Q.    And what are we looking at here?

5    A.    So we're looking at an e-mail from Saturday after I had

6    spoken to Captain Nettleton the previous Friday.

7    Q.    You say after you had spoken to him.  Was that the

8    conversation where he said he was a little rattled?

9    A.    Yes.

10   Q.    And what did Captain Nettleton tell you in this e-mail?

11   A.    He told me he had had a good night's rest, caught up on

12   sleep, that he had talked to his father.  And I was aware that

13   his -- his father was an attorney.

14        He said he that is ready to stay focused, do the best

15   job that he can, focus again on his family and the Skipper.

16   Grateful for my support and apologized for being a mess the

17   previous day.

18   Q.    Now, the time errors notwithstanding, it looks like this

19   e-mail was sent on Saturday or at the very least after your

20   phone call on Friday.  Over that weekend, the weekend of

21   January 17th to 18th, did you learn additional information from

22   NCIS that was important to you?

23   A.    Yes.  Late Saturday afternoon I received information from

24   NCIS and my chief of staff.

25   Q.    What kind of information did you receive?

1    A.    At this point I received information that there had been a

2    physical altercation at the Nettleton residence.

3    Q.    And prior to learning that information, did you have any

4    idea at all that there had been a physical altercation between

5    Mr. Tur and the defendant?

6    A.    No.

7    Q.    Was this information important to you?

8    A.    Absolutely.

9    Q.    How was it important to you?

10   A.    It completely informed me of the extent to which the

11   captain was now involved in everything that had occurred up to

12   date, so it not only pointed out an egregious situation that

13   the commanding officer had put himself in, but it also pointed

14   out to me that he had not briefed me on any of these really

15   pertinent matters of which are -- are significant and require

16   reporting.

17   Q.    And based on -- or after receiving this information, did

18   you make a decision regarding the commander of Guantanamo Bay?

19   A.    I did.   NCIS also told me at this point that --

20            MR. VOKEY:   Objection.   Hearsay.   Relevance.

21            MR. NOTHSTEIN:   Effect on the listener, Your Honor.

22            THE COURT:   Overruled.

23   BY MR. NOTHSTEIN:

24   Q.    Please continue.

25            What did NCIS tell you, Admiral Jackson?

```
1    A.    NCIS told me at this point that now Captain Nettleton was

2    a person of interest, which was something we had been

3    discussing and asking about leading up to this point.

4    Q.    And what decision, if any, did you make regarding your

5    command at Guantanamo Bay?

6    A.    So I started going through the steps that need to occur to

7    officially relieve a commanding officer from a base due to loss

8    of confidence.

9    Q.    And why had you lost confidence in Captain Nettleton?

10   A.    I had lost confidence because he --

11             MR. VOKEY:  Your Honor, can we approach?

12             THE COURT:  Yeah.

13        (Sidebar conference:)

14             MR. VOKEY:  Your Honor, this is something that we

15   discussed earlier where we -- where I think it was fine that

16   she discussed the lost trust in confidence but can't discuss

17   the underlying reasons behind that because we're getting into

18   her providing opinion on the ultimate issue --

19             THE COURT:  Uh-huh (affirmative).

20             MR. VOKEY:  -- so that's why I suggested this was

21   a -- a good time to come up here and talk about it, so...

22             THE COURT:  I guess I'm wondering -- because there's

23   lots of reasons why -- I mean, there's lots of items that she

24   listed as reasons she was relieving him, and the protocols and

25   so forth.
```

1        But isn't the point you want to make that -- the

2   thing she just talked about, that is, the -- the two things she

3   just talked about were -- were really motivating factors for

4   her in losing confidence in it?  Isn't that really all you need

5   to establish?

6           MR. NOTHSTEIN:  Not all, Your Honor.  The -- the

7   charge of concealment need to conceal material facts.  The

8   admiral has already testified that one of her responsibilities

9   as commander of the Region Southeast was to decide whether or

10  not the commanders of her installations were fit to command for

11  a variety of reasons.

12          I believe the admiral's testimony will be that there

13  was a host of reasons why she had lost confidence, including

14  that he hadn't told her about the command event, he hadn't --

15  he had kind of contributed to an environment -- to the drinking

16  and so forth that was deleterious to good order and discipline,

17  and several things other than just the physical altercation.

18          THE COURT:  Yeah, but this isn't a trial about

19  whether she lost confidence in him or why.

20          MR. NOTHSTEIN:  It is not, Your Honor, but the

21  question is whether he concealed those facts and whether they

22  were material.

23          THE COURT:  Material to what, though?

24          MR. NOTHSTEIN:  Material to the Navy, Your Honor.

25  He's -- he is accused of concealing them from the Navy.

1        THE COURT:  Hasn't she already testified that she --

2   that -- that she had -- that he had withheld information from

3   her that she considered to be important in making her

4   decisions?

5        MR. NOTHSTEIN:  She has, Your Honor, but she has --

6   also what she is saying now is that because of the totality of

7   information she decided to relieve him of command.

8        MR. VOKEY:  And -- and the underlying -- those other

9   additional underlying -- I think based on our conversations

10  earlier, she already went forward and talked about some of

11  those things that were concerning her, but she made a decision

12  to relieve him of command.  What she is going to be doing now

13  is talking about all those other underlying reasons.

14       Now, whether it's -- something is a -- it is material

15  is something for the jury to decide based on the facts that are

16  presented, not based on the opinion of a witness, which is what

17  we're getting here, and that's what we were talking about

18  earlier today.

19       MR. NOTHSTEIN:  Your Honor, if I may.  This is not an

20  opinion.  She knows why she relieved him.  And we bear the

21  burden to show beyond a reasonable doubt that this was material

22  to the admiral.

23       MR. VOKEY:  Well, why she relieves him based on her

24  opinions on certain matters such as whether he lied, whether he

25  withheld, I mean, that's for the jury to decide.

1    And why does it matter?  If we're looking at

2  obstruction and misrepresentation, it's those actions of

3  Nettleton, not what she decides.  What we're doing here is

4  we're bringing in the admiral's opinion, which is going to

5  carry great weight with this jury and --

6    THE COURT:  All right.  Step back.

7    (The following proceedings occurred in open court, in the

8  presence of the jury:)

9    THE COURT:  Give us a minute, ladies and gentlemen.

10  Thank you.  I'll get you right back out.

11    COURT SECURITY OFFICER:  All rise for the jury.

12    (Jury exits, 4:11 p.m.)

13    THE COURT:  You can be seated.  Thank you.

14    So here's the answer:  "Was this information

15  important to you?

16    "Answer:  Absolutely.

17    "Question:  How was it important to you?

18    "Answer:  It completely informed me of the extent to

19  which the captain was now involved in everything that had

20  occurred up to date.  So it not only pointed out an egregious

21  situation the commanding officer had put himself in, but also

22  pointed to me that he had not briefed me on any of these really

23  pertinent matters of which are significant and require

24  reporting.

25    "Question:  Based on -- after receiving this

1  information, did you make a decision regarding the commander of

2  Guantanamo Bay?

3            "Answer:  I did."

4            And I think you can ask then what was that decision,

5  and I think the decision, I take it, is going to be --

6            MR. VOKEY:  That she --

7            THE COURT:  You already -- she already testified that

8  she lost confidence and that she relieved him.  I just don't

9  know what else you need.

10            MR. NOTHSTEIN:  But, Your Honor, the -- what we would

11  proffer is -- as we put out and we tried to admit -- through

12  Government's Exhibits 383 and 411 -- are the reasons that were

13  articulated by Admiral Jackson as --

14            THE COURT:  And aren't those the exhibits I excluded?

15            MR. NOTHSTEIN:  Yes, Your Honor.  This is a proffer.

16  I'm just making a proffer of what the government's proof would

17  be.

18            THE COURT:  Yeah.

19            MR. NOTHSTEIN:  That these were the reasons, and

20  among them, particularly if I may -- well, assure the Court in

21  Government's Exhibit 383, she discloses all of the items that

22  were not disclosed to her, which go to Count Three, the

23  concealment count, and the materiality of the facts that were

24  not -- or the facts that were concealed.

25            So the point we're trying to make here, Your Honor --

1    and I agree the admiral has stated the information was

2    important and she made the decision to relieve the captain of

3    command, and -- but at this point what we are asking her is

4    essentially "What were the reasons you decided to relieve him

5    of command?"

6              THE COURT:  And hasn't she already said that?

7              MR. NOTHSTEIN:  I didn't understand that to be fully

8    articulated yet, Your Honor.

9              And, Your Honor, if I may, just as an offer of proof,

10   I can ask the question to the admiral and see what her answer

11   would be.

12             THE COURT:  All right.  Go ahead.

13   BY MR. NOTHSTEIN:

14   Q.   Admiral Jackson, you just testified that after receiving

15   information over the weekend of January 17th and 18th, you

16   decided to relieve Captain Nettleton of command.  What were the

17   reasons you decided to relieve him of command?

18   A.   So I -- I decided to relieve him of command because he

19   had -- I mean, he's responsible for the safety of the entire

20   installation and everyone that's on that installation.  There

21   was an event that occurred that was not safe due to drinking

22   that he was no -- in an inebriated state and not able to be of

23   sound mind to carry out his duties as commanding officer.  That

24   is also exemplified in there being a physical altercation.

25   That he had withheld information from me for reasons that made

1  no sense to me.  And that I thought that -- that he could no

2  longer command that installation.

3  Q.   And specifically what information had he withheld from

4  you?

5  A.   He had withheld from me that it was a command -- that he

6  was present at any time during that night.  He had withheld

7  from me that it was a command event.  It took several days for

8  him to tell me that there was a physical altercation -- or,

9  excuse me -- a verbal altercation, which I received on Tuesday

10  of a -- for an event on Friday, and then I did not learn that

11  there was a physical altercation until the following Saturday,

12  and I never learned that from Captain Nettleton.  I learned

13  that from NCIS.

14  Q.   And, Admiral Jackson, was one of the reasons also that he

15  misled the CDO on where to search for the body?

16  A.   That was -- I was -- I had --

17       THE COURT:  That's a leading question by far, but go

18  ahead.

19       MR. NOTHSTEIN:  It is, Your Honor.  I just want to

20  proffer.  We could refresh her recollection as well.

21       THE WITNESS:  I was getting updates from NCIS, and

22  some of the updates from NCIS suggested that Captain

23  Nettleton's direction to the search parties may have been in

24  either the opposite direction or not comprehensive enough that

25  they should have been.

1          MR. NOTHSTEIN:  Thank you.

2          As we know, Your Honor, these reasons are contained

3     in Government's Exhibit 383.

4          THE COURT:  Mr. Vokey, your point is what?

5          MR. VOKEY:  Sir, my point is the admiral has already

6     testified as to the conversations with Captain Nettleton and

7     has been asked repeatedly "Did he say this, did he say that,"

8     so that's the evidence that's forth -- already before the jury.

9          And then -- and then the -- the reasons she just gave

10    on the record as to the relief and then saying, "Yes, I decided

11    to relieve him," there's nothing else that -- that is required

12    legally.  Everything else now is not relevant to the charges

13    here, and it's going to give the jury a misimpression.

14         So of those additional reasons that we just heard now

15    from the admiral, we heard that the event's not safe, that

16    he would -- that Captain Nettleton was in an inebriated state,

17    that he withheld info, that he misled the CDO, and then based

18    on updates from NCIS investigators.

19         So we have an admiral now who is basically saying to

20    the jury, "I determined that he was in an inebriated state, so

21    I'm passing an opinion on that."

22         Misleading the CDO is certainly a question that's up

23    in the air in this case.  It's a fact in issue.  And updates

24    from -- based on updates from NCIS.  Translation, because of

25    what NCIS is telling her what they believe they find, that's --

1  that's another reason.

2      So those may all be fine that she -- she's

3  considering, but that's certainly improper to add to reasons to

4  tell the jury of why she relieved him.  We've already gotten

5  into evidence that he was relieved, and we have the questions

6  and answers of what Captain Nettleton said to her and --

7  and what he didn't, and the government has gone through

8  extraordinary lengths to say, "Did he tell you this, did he

9  tell you that," so just like your ruling on 383, it -- it --

10 it's no different.

11     THE COURT:  You get the last word.

12     MR. NOTHSTEIN:  Thank you, Your Honor.  I would

13 simply say that we have the burden to prove beyond a reasonable

14 doubt that the statements or the concealment were of material

15 facts and this is relevant to materiality.

16     (Judge confers with law clerk.)

17     THE COURT:  In looking at the admiral's previous

18 answer that -- that you asked her why this information -- the

19 new information was important to her, important being material,

20 she said, "Absolutely it was.  It completely informed me of the

21 extent to which the captain was now involved and everything

22 that had occurred.  Not only it pointed out an egregious

23 situation he had put himself in, but that he had" -- and I'm

24 paraphrasing -- "but that he had not briefed the admiral on

25 those significant matters.

1     "And based on that, did you make a decision regarding

2  his being commander?

3     "I did."

4     I overruled that objection on -- an objection on

5  hearsay grounds.

6     She identified Captain Nettleton as being a person of

7  interest -- or NCIS, and that was something else she learned.

8     And -- and then what decision did she make regarding

9  whether he could continue, she lost confidence and relieved

10  him.

11     I think that's all that is -- is necessary.  The

12  materiality of the information you're putting forward now would

13  be material as to the reasons that she relieved him from

14  command, but he's not being charged with being relieved of

15  command.  He's being charged with making false statements or

16  obstructing justice, and I think the materiality of her

17  testimony -- the -- the testimony she's given as to materiality

18  up to this point is what the government's entitled to and not

19  entitled to anything further.

20     The objection is sustained.

21     I will -- let me see.  I will let you ask him whether

22  she, in fact, determined to relieve him of duty, because she

23  didn't quite say that yet.  She can say -- you can ask her if

24  she lost confidence and did she relieve him of duty, and that

25  will be all.

1     MR. NOTHSTEIN:  Yes, Your Honor.

2     THE COURT:  That's the ruling.

3     Let's have the jury, please.

4     I think we have a juror in the restroom, so it might

5  be a second, but we'll stand by.

6     COURT SECURITY OFFICER:  All rise for the jury.

7     (Jury enters, 4:22 p.m.)

8     COURT SECURITY OFFICER:  Please be seated.

9     THE COURT:  Thanks for your patience, ladies and

10  gentlemen.

11     Mr. Nothstein, you may proceed.

12  BY MR. NOTHSTEIN:

13  Q.   Admiral Jackson, did you ultimately conclude that you had

14  lost confidence in the defendant, Captain Nettleton?

15  A.   Could you restate that?  I'm sorry.

16  Q.   Did you ultimately conclude you had lost confidence in the

17  defendant, Captain Nettleton?

18  A.   Yes.

19  Q.   And did you determine to relieve him of command?

20  A.   I did.

21  Q.   Without getting into what you said, did you communicate

22  those reasons to the defendant?

23  A.   I did.

24  Q.   And what was his response?

25  A.   His response was that he -- he understood that he had not

1   met my expectations.

2   Q.   And after relieving the defendant of command, I guess,

3   where does he go?

4   A.   So I -- I relieved him on that Wednesday.  It took several

5   days to go through that process.  He -- I had arranged the

6   timing such that his relief, which was temporary relief, was

7   going to be my chief of staff, so I had arranged for my chief

8   of staff to get to Naval Station Guantanamo Bay so that he

9   would be on the ground when I had the phone call with Captain

10  Nettleton.  And we arranged for Captain Nettleton to return

11  back to my headquarters in Jacksonville where he would be

12  temporarily assigned for the duration of the investigation.

13  Q.   And after the defendant returned to Jacksonville, did you

14  see him a few days later?

15  A.   I did.

16  Q.   And did you speak with him?

17  A.   I did speak with him.

18  Q.   And what did he say to you?

19  A.   I was -- wanted to make sure that he was okay.  He again

20  reiterated that he understood why I relieved him and that he

21  did not meet the expectations and that the truth will

22  eventually come out.

23  Q.   Thank you.

24          MR. NOTHSTEIN:  Nothing further, Your Honor.

25          THE COURT:  Cross-exam?

1           MR. VOKEY:  Yes, Your Honor.

2           Give me one second, Admiral.  I've just got to get

3    set up here.

4           THE WITNESS:  Yes, Mr. Vokey.

5           THE COURT:  While Mr. Vokey is getting ready, ladies

6    and gentlemen, we may go a little past the 5 o'clock hour in

7    order to finish the testimony of Admiral Jackson.  As you know,

8    we're not going to be in session tomorrow, and I -- I would

9    prefer to finish up her testimony today, so I'll ask your

10   indulgence.

11          Remember you're getting a whole day off tomorrow, so

12   if you can give me a -- a little extra time, I'll appreciate

13   it.

14          All right.  Go ahead, sir.

15          MR. VOKEY:  So I better not go too long, Your Honor.

16   I'll tell you that.

17          THE COURT:  All right.

18                       **CROSS-EXAMINATION**

19   BY MR. VOKEY:

20   Q.   Okay.  So good afternoon, Admiral Jackson.  How are you?

21   A.   Afternoon.  Good.

22   Q.   Okay.  A number of questions I want to ask you.  First,

23   one little, small thing I just wanted to clear up.  Government

24   Exhibit 379 is when Captain Nettleton sent you an e-mail on

25   Friday, the 16th of January, and it says -- you were asking how

1  he was doing, right?

2  A.   That's correct.

3  Q.   And he said, "We're good, ma'am.  We had a good dinner

4  with the secretary."

5       Just so that the members of the jury know what we're

6  talking about, he's referring to the Assistant Secretary of the

7  Navy who came to visit at Guantanamo that he had to escort him

8  around and everything?

9  A.   That is correct.

10  Q.   Okay.  All right.  One of the things you -- one of the

11  very first things you said about yourself is that you're the

12  type of person who wants info early and one of the things you

13  always say is, "Bad news doesn't get better with age"?

14  A.   Correct.

15  Q.   Now, I -- I don't mean to be flippant or dismissive of

16  that, but I've heard that from about every general I've ever

17  met.  Isn't that pretty much something just about every

18  commander puts out of, "Hey, bad news doesn't get better with

19  age"?

20  A.   I think that's something we all learn from the beginning

21  of joining service.

22  Q.   I mean, that's not something -- again, not to -- not to

23  lessen the importance, but that's not something just you say.

24  That's pretty much what about everybody -- including commanders

25  you've dealt with?

1   A.    Absolutely, yes, sir.

2   Q.    Okay.  I'm going to have a few little, tiny questions

3   that -- that -- just to clarify some things.  So you were being

4   asked about some of the phone calls and some of the e-mails,

5   and I know there were a lot of them, and you said you wanted to

6   make sure you got the sequence right and you may have discussed

7   something.  It's kind of tough to keep track of what was said

8   in one phone call versus another.  Fair to say?

9   A.    I think that is fair to say, yes.

10  Q.    Okay.  And I'm assuming that you weren't taking verbatim

11  notes or recording the calls, all these calls that you had with

12  Captain Nettleton?

13  A.    I was not recording the calls.  When I made my statement

14  in April, the written statement that I've provided -- that I

15  provided to NCIS, I went through and looked at the call log

16  records --

17  Q.    Sure.

18  A.    -- so I could determine when phone calls took place, as

19  well as then the e-mails were -- were documented already.

20  Q.    Okay.  Sure.  And I was referring more to the actual what

21  was said in the phone calls, and part of that is based on as

22  best you can remember.

23          So, I mean, something that you may be attribute to

24  one phone call could have come from another phone call, but the

25  best you can remember, that was put in your statement.

1          Is that fair to say?

2    A.   That is true.

3    Q.   Now -- and you talked about your statement, and one thing

4    I found interesting in here, Admiral Jackson, is that in your

5    interview, the statement that you gave in April of 2015, it

6    says that you actually didn't write the statement, that

7    Agent Dunwoodie wrote it for you.

8          Is that true?

9    A.   I'm trying to think.  I -- I don't recall whether I was

10   the person that started the blank sheet of paper, but...

11   Q.   Well, have you -- have you seen your statement lately?

12   A.   Yes.

13   Q.   And it's a written typed statement, correct?

14   A.   Yes.  Yes.

15   Q.   And the notes attached to your statement indicate that --

16   that the reporting agent, Agent Dunwoodie, is the one who typed

17   this thing for you and you reviewed it over and signed it.

18         Do you recall that?

19   A.   May I see the statement again?

20   Q.   You may.  Absolutely.

21         MR. VOKEY:  May I approach, Your Honor?

22         THE COURT:  Please.

23         THE WITNESS:  Yes.

24   BY MR. VOKEY:

25   Q.   Let me retrieve that from you and then we can keep

1    talking.  Hold on.

2         All right.  So a statement was drafted for you, you

3    had the opportunity to review it, initial, and sign it?

4    A.   And make changes to it.

5    Q.   And make changes to it.

6    A.   Yes, sir.

7    Q.   So -- and I asked you this, not to say that there's

8    anything untoward about -- about your actions in this, okay,

9    but when we're talking about your memory of best what happened,

10   the first draft of this statement is coming from someone else

11   other than yourself, right?

12   A.   That is correct.

13   Q.   Okay.

14   A.   Based on verbal with my opportunity to go back and

15   validate the contents and the truthfulness of the contents,

16   because my signature is on it and it's my statement.

17   Q.   Sure.  Absolutely.  But you would -- you would have to

18   agree with me that the possibility of exact words or -- or as

19   you talked about before, sometimes it's hard to tell where you

20   got one thing from one phone call to another, but when you have

21   somebody else drafting the statement for you, that's going to

22   increase that possible problem of confusing things.

23        Wouldn't you agree?

24   A.   I think the fact that I -- I had it up on my computer

25   screen and modified it, that it is a statement from me based on

1   the words that I agreed to, and in some cases changed.

2   Q.   Okay.  So I want to ask you something else that's

3   mentioned in that statement, and you've also testified to this

4   today, is after the body of Chris Tur was recovered, you said

5   that Captain Nettleton specifically mentioned that the body had

6   marine bites, right?

7   A.   That's correct.

8   Q.   Do you know where he got that information?  And if you

9   don't, that's fine.

10  A.   I can tell you what I recollect about where he got that

11  information.

12  Q.   Did he tell you where he got that information?

13  A.   I don't remember specifically.

14  Q.   Okay.  All right.  All right.  So I want to talk to you a

15  little bit about the IG complaint.

16  A.   Uh-huh (affirmative).

17  Q.   So when you're the commander of the Navy region, when you

18  get a lot of installations that you're managing, that's a big

19  job; is that correct?

20  A.   I mean, it's a job.

21  Q.   Yeah.  And when I'm -- when I'm kind of pushing you for an

22  answer is we have to have something verbal so the court

23  reporter picks it up.

24  A.   I understand.  Yes, sir.

25  Q.   So, I mean, sometimes that job can be kind of like herding

1    cats because you've got bases all over the place.  I don't -- I

2    don't mean to sound that's -- sound like it's a -- those jobs

3    aren't important.  If it sounds that way, it's probably poorly

4    phrased.  But you've got to manage a lot of different things at

5    the same time?

6    A.    As Region Southeast -- as commander of Navy Region

7    Southeast, I was responsible for those 18 bases and the

8    commanding officers that were leading those bases.

9    Q.    Okay.  So you get this IG complaint and you have a

10   conversation with your IG, your inspector general?

11   A.    Correct.

12   Q.    So when you're getting this information, this has got to

13   be kind of a shift in what's going on.  I mean, it -- kind of

14   got blind-sided a little bit?

15   A.    That's correct.

16   Q.    So, once you got this information, you don't know whether

17   it's true or whether it's not?

18   A.    That is true.

19   Q.    It's a complaint, it's an allegation.

20   A.    Yes.

21   Q.    But at this point, you also now have an allegation

22   against, among others, Captain Nettleton, that he's committed

23   some kind of misconduct, correct?

24   A.    Correct.

25   Q.    So you don't call and tell Captain Nettleton, "Hey, we got

1    an IG complaint on you," do you?

2    A.    I did not personally call Captain Nettleton to tell him

3    there was an IG complaint.

4    Q.    In fact, I think what you told us earlier is that after

5    talking with the IG on whether the -- you need to start a

6    separate investigation, you guys -- or you agreed -- you

7    decided to say, "We're going to let NCIS handle both," I think

8    is what your testimony was.

9    A.    That is correct.  That is correct.

10   Q.    And by "both" -- I want to make sure we understand what

11   "both" means.  So NCIS was already doing the standard death

12   investigation?

13   A.    Circumstances of the death.

14   Q.    Right.  That's -- anytime someone dies on an installation

15   that's unexplained -- that's not clearly explained, it's

16   standard procedure you do this investigation?

17   A.    That is correct.

18   Q.    All right.  You do it -- so when you say "both," you're

19   now saying that NCIS can handle both the standard death

20   investigation and now handle these additional allegations

21   against Captain Nettleton as well?

22   A.    Yes.

23   Q.    Okay.  And you made that decision?

24   A.    I made that decision because they were making -- taking

25   statements from --

1  Q.    Okay.

2  A.    -- everyone in Guantanamo that they needed to take

3  statements from.

4  Q.    Sure.  It made sense, right?  You had one agency do both,

5  right?

6  A.    The intent was not to -- to jeopardize either

7  investigation.

8  Q.    Okay.  So NCIS is now doing both of these.  And I think

9  the next thing you said was that you told Captain Nettleton to

10  call you the next day, correct?

11  A.    What -- so I just want to make sure I --

12  Q.    Well, the IG complaint was on the 12th?

13  A.    It was on Monday.

14  Q.    Monday, the 12th of January?

15  A.    The 12th, yes.

16  Q.    And then your testimony was, "I told Nettleton to call me

17  the next day."  And I'm assuming that was Tuesday, the 13th?

18  A.    That's correct.

19  Q.    And you asked him -- I wrote down exactly what you said.

20  I think it was, "I asked him to" -- "to tell me what was going

21  on."  Correct?

22  A.    Yes.

23  Q.    All right.  So in the military, if someone is suspected of

24  an offense, you can't ask them questions about that offense

25  unless you read him his rights, correct?  Article 31(b) of the

1  UCMJ.

2  A.   I -- I think it depends on what you're asking him.

3  Q.   If you suspect someone of an offense, you cannot ask him

4  about that offense unless you read him his rights.  I mean,

5  that's kind of a basic right of every service member, isn't it?

6  A.   Yes.  But I was asking him what is -- what is the status

7  of what's going on at Naval Station Guantanamo Bay.

8  Q.   Okay.  All I'm asking is that's a basic right, correct, of

9  every service member?  Yes?

10  A.   I believe so.  I mean, I --

11  Q.   I mean, Article 31(b) applies to the seaman apprentice and

12  it applies to the admirals and everybody in between.

13  A.   Yes.

14  Q.   Okay.  So when you called him the next day and you said

15  that you want him to tell you what's going on, that's when you

16  said he started talking about the Hail and Farewell, this

17  roller coaster of Chris Tur, the comment, as you said in this

18  conversation, "You're fucking with my wife," and denied having

19  any personal relationship.  That's what you said that he told

20  you in that phone call.

21  A.   Yes.

22  Q.   Now, those are all about things from -- that relate to the

23  allegation that was in that IG complaint, yet you didn't read

24  him his rights?

25  A.   I did not read him his rights.

1   Q.   And is there some reason why Captain Nettleton shouldn't

2   enjoy those same rights that all service members enjoy?

3          MR. NOTHSTEIN:  Objection, Your Honor.

4   Argumentative.

5          THE COURT:  I'll let the -- I'll let the admiral

6   answer the question.

7          THE WITNESS:  So I knew that the night before

8   Captain Nettleton -- from my conversation with Chief of

9   Staff Gray, that Captain Nettleton had already had the

10  discussion about the command event and the allegation with

11  Captain Gray.

12  BY MR. VOKEY:

13  Q.   Yes, but, Admiral, the law states that if you suspect

14  someone of an offense, you can't ask him a question about those

15  events unless you read him his rights.  Now, we're talking

16  about you told Nettleton to call you the next day?

17  A.   Correct.

18  Q.   I mean, he's going to follow that order.  He had to call

19  you, right?

20  A.   Well, he could choose not to if he'd like to.

21  Q.   He's required to by law, right?  If you give him an order,

22  he has to follow it, right?

23  A.   He should follow it.

24  Q.   Right.  And he -- and he follows it and he calls you back

25  and you ask him a question and don't read him his rights?

1    MR. NOTHSTEIN:  Objection, Your Honor.  This is all

2    about legal conclusions.  It's not relevant for the jury.

3    THE COURT:  Yeah.  I'm going to sustain the

4    objection.

5    BY MR. VOKEY:

6    Q.   So in that conversation with Captain Nettleton, you

7    mentioned the phrase there that I want to focus on.  One of the

8    things he said was -- he told you that Mr. Chris Tur had said

9    to him, "You're fucking with my wife."  Those were the -- the

10   words, correct?

11   A.   Yes.

12   Q.   Okay.  You -- you definitely -- specifically remember

13   those?

14   A.   That's what I remember those words to be.

15   Q.   Okay.  Good.

16         And did he tell you that Chris Tur actually came into

17   his house?

18   A.   I do not recall part of the conversation, including

19   whether or not it was on the steps or inside.

20   Q.   All right.  Now, for this case, you interviewed with NCIS.

21   I believe it was -- the first time was on 14 April when you

22   gave that statement that we were discussing?

23   A.   Correct.

24   Q.   All right.  I think there's been three that I know of.

25   The next one was 11 September 2015, and you were -- it looks

1    like you were interviewed by Agent Dunwoodie.

2            Do you recall that?

3    A.   I --

4    Q.   That Reporting Agent Dunwoodie and Trial Attorney Mark

5    Cipolletti conducted an interview of you at Commander -- the

6    interview was conducted at your office located at NAS Jax --

7    Jacksonville, I'm sorry.  Correct?

8    A.   Okay.

9    Q.   And in that interview you said that -- that you disclosed

10   it was your understanding, based on information that Nettleton

11   provided, that Chris Tur was inside of Nettleton's residence

12   during the verbal altercation; is that correct?

13   A.   Well, I presume it's correct because of the statement.

14   Again, I don't remember from ten years -- or five years ago.

15   Q.   And I don't want to misquote it.

16            MR. VOKEY:  May I approach, Your Honor?

17            THE COURT:  Yes.

18   BY MR. VOKEY:

19   Q.   This is the re-interview of you.  And if you look at the

20   first highlighted area there -- and when you've had a chance to

21   look at it, just look up and I'll come get the document from

22   you.

23   A.   Okay.  Yeah.

24   Q.   Okay.  So, in fact, Captain Nettleton did tell you that

25   Christopher had been inside his residence?

1  A.    It would -- it definitely appears that -- from that

2  statement, that's correct.

3  Q.    Okay.  And after he tells you this, you direct him to go

4  to NCIS.  I mean, if you're directing him to go to NCIS, you're

5  ordering him to go to NCIS, because you wanted him to talk to

6  NCIS, correct?

7  A.    I wanted him to talk to NCIS, that's correct.

8  Q.    You wanted him to tell you [sic] the same things that he

9  had just told you?

10  A.    Correct.

11  Q.    And you hadn't read him his rights beforehand.  Did you

12  read him his rights --

13         MR. NOTHSTEIN:  Objection, Your Honor.  Same issue.

14         THE COURT:  All right.

15         Finish your question.

16  BY MR. VOKEY:

17  Q.    Did you read him his rights before you told him to go to

18  NCIS?

19  A.    No.

20         MR. NOTHSTEIN:  Your Honor --

21         THE COURT:  I'll allow -- I'm going to allow it and

22  then that's going to be the last we're going to hear about

23  that.

24         All right.  Go ahead.

25  BY MR. VOKEY:

1  Q.  Now, the -- later on you had a conversation with

2  Captain Nettleton -- and I think what you told the government

3  is you had your lawyer on the call?

4  A.  That's correct.

5  Q.  And when you say "your lawyer," you're talking about the

6  staff judge advocate?

7  A.  That is correct.

8  Q.  So he's not your personal lawyer.  He's the lawyer for the

9  command?

10  A.  That is correct.

11         And Captain Nettleton was aware that a lawyer was on

12  the line.

13  Q.  I'm just clarifying that you didn't have some personal

14  lawyer for some other issue, this was the staff judge advocate.

15  A.  I understand.

16  Q.  And you said that he sounded tired.  He told you about the

17  visit with the Assistant Secretary of the Navy and asked if he

18  should step down.

19         And you said, "No, don't step down.  You need to

20  focus on the mission."

21         And what you told government counsel is that you were

22  focused on three questions, but these are not the three --

23  these three questions you didn't tell Captain Nettleton,

24  correct?

25  A.  I did not say these are three things that I'm looking for,

1    that is correct.

2    Q.    Right.

3          And those -- those -- the focus from those three

4    questions -- you're getting that information from

5    investigators?  I mean, that's where your source of

6    information -- that they help you on those three questions?

7    A.    That's correct.  I mean, I was -- I was trying to

8    determine what would be further information, trip wire, so to

9    speak, that would either validate or invalidate my loss of

10   confidence for Captain Nettleton to continue to command.

11   Q.    Okay.  And government counsel then asked you did he tell

12   you about events at the Bayview?  Did he tell you about a

13   physical altercation at his house?  And you said no, during

14   that call?

15   A.    Correct.

16   Q.    Did you ask about anything -- anything resembling the --

17   the actual events that night?

18   A.    No.  I listened to what Captain Nettleton told me about

19   what happened.  That's what I -- I recollect him telling me.

20   Q.    Okay.  I'm just making sure that you didn't ask him any

21   questions on it either.  But he didn't volunteer that

22   information?

23   A.    No.

24   Q.    Okay.

25          MR. VOKEY:  Hold on one second, Admiral Jackson, Your

1  Honor.

2         THE WITNESS:  Yes, sir.

3      (Counsel confer.)

4         MR. VOKEY:  I have not forgot anything.  So I have no

5  more questions, Your Honor.  Thank you, Admiral.  I appreciate

6  it.

7         THE WITNESS:  Thank you, Mr. Vokey.

8         MR. NOTHSTEIN:  In my time, Your Honor, I'll be

9  brief.

10        THE COURT:  All right, sir.

11        MR. NOTHSTEIN:  May I approach, Your Honor?

12        THE COURT:  You may.

13                    **REDIRECT EXAMINATION**

14  BY MR. NOTHSTEIN:

15  Q.    Admiral Jackson, I'm going to show you what's been marked

16  for identification purposes as Government's Exhibit 1.  I'm

17  going to ask you to please take a look at that document and

18  just without getting into the content, tell me what it is,

19  please.

20  A.    This is my statement, signed, that I made after being

21  interviewed.  It was a statement from June, June of 2015.

22  Q.    And you mentioned an interview, Admiral Jackson.  When was

23  that interview conducted?

24  A.    April time frame.

25  Q.    And, Admiral Jackson, could you please explain for us what

1  were the circumstances of the interview?  Basically, how did it

2  go?

3           THE COURT:  What do you mean by that?

4  BY MR. NOTHSTEIN:

5  Q.    I'm sorry.  In other words, who was there at the

6  interview?  How did you prepare?

7  A.    Well, I prepared by getting as many e-mails as I had, as

8  well as reviewing call logs.  And I believe that the staff

9  judge advocate was present with me, as well as Mr. Dunwoodie.

10  Q.    Is that Special Agent Dunwoodie from NCIS?

11  A.    Yes.

12  Q.    And you mentioned the staff judge advocate was there.  Is

13  that the staff lawyer we heard some questions about?

14  A.    That is correct.

15  Q.    And I think you mentioned when talking about this

16  statement -- and just to clear up, is this the same statement

17  Mr. Vokey was asking you about?

18  A.    The first statement, yes.

19  Q.    Admiral Jackson, in -- you think you said there was a

20  verbal component.  So did the interview first sort of go along

21  as an interview, an oral interview?

22  A.    That is my recollection.

23  Q.    And after that interview, I guess, how was this written

24  statement prepared?

25  A.    I can tell you that I can remember this written statement

1  on my computer and modifying it.  I -- the -- it -- it -- it --

2  I take ownership of these words.  It reads like my words, so...

3  Q.   Did anyone from NCIS tell you what to say in the

4  interview?

5  A.   No.

6  Q.   Did anyone from NCIS tell you what to put in that

7  statement?

8  A.   No.

9  Q.   Is anything in that statement false, Admiral Jackson?

10  A.   No.

11  Q.   If you could turn to the back page of the statement,

12  please.  If you please -- without reading the content, what is

13  the final typed paragraph, generally?

14  A.   It says that the statement was prepared with the

15  assistance of Special Agent Dunwoodie following my interview

16  from April, and I signed it.

17  Q.   And, following that, do you swear and affirm that the

18  statement is a true and accurate account of your involvement in

19  the events involving Mr. Tur's reported disappearance and

20  death?

21  A.   Yes.

22  Q.   And did you sign this statement?

23  A.   I did.

24  Q.   Prior to having that interview and finalizing the

25  statement, Admiral Jackson, did you conduct an exhaustive

1  review of your e-mails, communications, and phone calls to

2  assure that the information was accurate?

3  A.   Yes.

4  Q.   I'd like to ask you about -- or Mr. Vokey asked you a

5  couple of questions about the second interview, or a second

6  interview from, I think, September 11th, 2015.  And you were

7  asked some questions about --

8          MR. NOTHSTEIN:  If I may approach again, Your Honor.

9          THE COURT:  You can.

10 BY MR. NOTHSTEIN:

11 Q.   You were asked some questions about whether or not the

12 verbal altercation was inside or outside.  And if you'd please

13 take a look at the starred sentence there, Admiral Jackson.

14 Tell me if you recall what you said regarding whether or not

15 you were apprised of a physical altercation by

16 Captain Nettleton.

17 A.   It's -- it states, "Rear Admiral Jackson reaffirmed that

18 at no time, as Nettleton disclosed to her" --

19          MR. VOKEY:  Objection.  Hearsay.

20          MR. NOTHSTEIN:  Prior consistent statement, Your

21 Honor.

22          THE COURT:  Okay.  Overruled.

23 BY MR. NOTHSTEIN:

24 Q.   Please continue, Admiral Jackson.

25 A.   "Reaffirmed at no time, as Nettleton disclosed to her,

1  that a physical confrontation occurred between the two of

2  them."

3          MR. NOTHSTEIN:  Nothing further, Your Honor.

4          THE COURT:  Any recross?

5                    **RECROSS-EXAMINATION**

6  BY MR. VOKEY:

7  Q.   So, Admiral Jackson, just so we all understand this, on

8  this April -- I'm sorry, this June 2015 statement that you did,

9  I think you said it was -- there was a -- April was the

10 interview, but the -- that the statement was dated June 5th,

11 2015; is that correct?

12 A.   On this statement, that's correct.

13 Q.   Okay.  So Special Agent Dunwoodie prepares this and you

14 said you made corrections.

15 A.   Yes.

16 Q.   So were there things on that statement that -- and you

17 actually did -- you recall making corrections?

18 A.   Yes.

19 Q.   Do you have any idea what those corrections were?  Do we

20 have any record of those?

21 A.   No.

22 Q.   So there were -- there were things that were put into that

23 statement that weren't true that you had to change?

24 A.   I can't answer that question.  I can tell you that the way

25 that I wanted to make sure that the events, as I knew them to

1  be, were articulated and -- and are in this manner in this

2  sworn statement.

3  Q.   Okay.  I mean, would it have been better if you had just

4  written the statement yourself from scratch?

5           MR. NOTHSTEIN:  Objection, Your Honor.

6           THE COURT:  I'll allow it.

7  BY MR. VOKEY:

8  Q.   I mean, if you had written this statement yourself, that

9  would be better, we wouldn't have to worry about who was

10  suggesting what; isn't that correct?

11  A.   Well, I would agree it's adding controversy now.

12           MR. VOKEY:  Okay.  No more questions.

13           THE COURT:  All right.  Thank you very much, ma'am.

14  You may step down.

15           THE WITNESS:  Thank you, Your Honor.

16           Excuse me, sir.

17           THE COURT:  Yes, ma'am.

18      (Witness excused.)

19           THE COURT:  All right.  Ladies and gentlemen of the

20  jury, I guess we did finish on time.  So good for us, I guess,

21  huh?

22           So here's your situation.  We will not be in session

23  tomorrow, so you do not come here tomorrow.  Obviously we're

24  not in session on Saturday or Sunday.  So the next time you

25  need to be here is Monday morning, 9:15, like normal, and we

1   will be in session all next week as -- as needed for the case.

2   So there will be no days off next week, and so we'll go Monday

3   through Friday.  And we'll keep pretty much the same schedule

4   that we've kept the last couple of days.

5          So what that means is you have a fairly long break

6   here, about a three-day break.  And that's fine.  I hope you'll

7   use it wisely.  But it requires that I remind you in detail

8   again of what your responsibilities are.

9          So the good news for you is once you walk through

10  that door, nothing about the case for three days.  So nothing

11  about this case until you come back Monday, we bring you out

12  here at 9:30, and we get going again.

13         So that means please do not discuss the case with

14  anybody at all, family members, anybody else.  Don't let

15  anybody talk to you about it.  Don't read any news articles,

16  online, media, anything at all about this case, nothing.  And

17  please do not do any of your own independent research.  Don't

18  Google anybody.  Don't go online.  Don't -- nothing about the

19  case at all.  Don't talk to anybody about your service online.

20  Don't let anybody talk to you.

21         So if you do all that, what it means is, of course,

22  you're following the Court's instructions and the law, but it

23  also means you just get three days where you don't have to

24  worry about this case.  And then you just come back Monday and

25  we'll get started again.

1    So everybody good with that?  Everybody understand

2  what I'm saying?

3    (Affirmative response.)

4    THE COURT:  It's really important.  Because it's a

5  long time, so you won't have me in your ear every 15 minutes.

6  So you're on your own.  But that's the instructions.

7    We continue to appreciate your service.  I hope you

8  enjoy your three days.  And obviously everybody needs to be

9  back here in the jury room 9:15 on Monday morning and we will

10  resume the trial.

11    Thank you very much, ladies and gentlemen.

12    COURT SECURITY OFFICER:  All rise for the jury.

13    (Jury exits, 4:56 p.m.)

14    COURT SECURITY OFFICER:  Please be seated.

15    THE COURT:  Okay.  Let's take a temperature check

16  here to see where we are in the case.  So do I assume that

17  Dr. Gordon will be the next witness; is that correct?

18    MR. GEE:  Yes, Your Honor.

19    THE COURT:  All right.  And then would you run

20  down -- let's run down at the moment who you believe your

21  remaining witnesses to be and in what order.  Can we do that?

22    MR. GEE:  Yes, Your Honor.

23    We would have Dr. Gordon.  We'd have Special Agent

24  Jason Boswell.

25    THE COURT:  Now, he was a crime technician; is that

1    correct?

2         MR. GEE:  Well, he's an investigator, but, yes, Your

3    Honor.

4         THE COURT:  Okay.  But his -- he was the investigator

5    in the -- in Mr. Tur's disappearance and death?

6         MR. GEE:  Correct.  He recovered some of the blood.

7         THE COURT:  Okay.

8         MR. GEE:  Special Agent Carrie McNamara, she's also

9    involved in the blood recovery and processing.

10        THE COURT:  All right.  Sounds like both of those

11   will be relatively brief?

12        MR. GEE:  Yes, Your Honor.

13        THE COURT:  Okay.

14        MR. GEE:  Photos and things, but relatively brief.

15        THE COURT:  Nothing like what we've been doing, I

16   wouldn't think.

17        MR. GEE:  I would not think so.

18        THE COURT:  Okay.

19        MR. GEE:  And especially given that they stipulate

20   the blood is Mr. Tur's blood.

21        THE COURT:  Right.

22        MR. GEE:  And then Special Agent Rick Dunwoodie.  And

23   that will likely be it, Your Honor.

24        THE COURT:  So --

25        MR. GEE:  I expect we would rest, you know, depending

1  on cross-examination, but I think we'd rest by lunch or

2  probably pretty shortly after lunch.

3          THE COURT:  On Monday?  Okay.  That's quicker, of

4  course, than we thought.  But that's fine.

5          So, Mr. Vokey, that means that likely there would

6  be -- that we would be calling on you to determine whether

7  Captain Nettleton wishes to present a case and -- and whether

8  he wishes to testify or not.

9          What -- what's your timing?  What's your information

10 that you can give to me, since it looks possible we might rest

11 the government's case sometime on Monday, although --

12         MR. VOKEY:  We'll be ready to go starting Tuesday

13 morning, sir, if that's all right.  We'll plan on Tuesday

14 morning.  And I will -- we will this weekend contact our

15 witnesses.  This has all gone faster, I think, than we all

16 anticipated.

17         THE COURT:  I think that's fair.  I think that's

18 fair.  So we'll finish the government's case on Monday.  I

19 don't know if y'all have any motions to bring at the close of

20 the government's case.  If you do, I'll entertain those motions

21 on Monday.  And then you'd be prepared to start on Tuesday.

22         And can you give me any information at the moment as

23 to who your witnesses are going to be?

24         MR. VOKEY:  Sir, not really.  This -- this week has

25 gone a little differently than I think we anticipated.  We've

1   got to do some serious re-evaluating.  I don't know at this

2   time.

3          THE COURT:  Okay.  I will remind you that you are

4   required to disclose to your opponents who your witnesses are

5   going to be, and I would say that in keeping with kind of the

6   spirit of it, I would like you to disclose your Tuesday

7   witnesses on Sunday evening to your opponents, so that they can

8   at least know who they are.  All right?

9          MR. VOKEY:  Understood, sir.

10          THE COURT:  All right.  And, Captain Nettleton, if I

11   can just address you briefly.  You will recall at a -- you will

12   recall at a pretrial hearing in this case some time ago, I

13   indicated to you that the decision as to whether you testify or

14   not rests with you and you alone, that your lawyers, of course,

15   can advise you, and they have good counsel for you, but

16   ultimately that has to be your call and your call alone.

17          Just as an example, if they were encouraging you to

18   testify and you didn't want to, that's your call, not theirs.

19   If they -- if you want to testify and they are recommending you

20   not, ultimately that's got to be your decision.

21          And the reason the law does that is because it's an

22   important decision in a case and it rests with you and you

23   alone.

24          So I'm going to -- and, also, though, I don't -- I

25   don't interfere with your discussions with your lawyers.  I'm

1    not going to ask you anything about what your discussions are

2    about that.  But the important point I want to communicate to

3    you is that while you should take strongly into account the

4    recommendations of your lawyers, ultimately that decision as to

5    whether to testify or not is yours and yours alone.

6              And do you understand that, sir?

7              THE DEFENDANT:  I do, Your Honor.  Thank you.

8              THE COURT:  Okay.  All right.  Y'all can have a seat.

9              What else do we need to do to be ready to go?

10             So Dr. Gordon, as I recall it -- and Dr. Gordon is

11   going to discuss the autopsy.  At the prior last hearing, the

12   government indicated it was only going to use one photograph of

13   the autopsy.  And at that point Mr. Lenamon said that the

14   defendant did not object to that one photograph.  And so I'm

15   assuming that's what will happen.

16             I -- I have considered -- I guess I -- I guess I want

17   to make sure I'm -- I'm understanding.  So, Mr. -- Mr. Gee,

18   tell me what the -- what is Dr. Gordon going to testify to that

19   is pertinent to the obstruction and false statement cases that

20   you -- that you have brought here, as opposed to being

21   pertinent to another type of charge that might have been

22   brought or some other investigation?  I just want to make sure

23   that I'm understanding what it is that -- what relevant

24   information he's got that he can impart to the jury.

25             MR. GEE:  Yes, Your Honor.  So the relevant

1  information is that the -- the potential seriousness of the

2  assault is something that should be reported at any level, of

3  course, but the more serious it is, even more likely that it

4  should be reported.

5         And so --

6         THE COURT:  And that's based upon the portion of the

7  autopsy that showed fractured ribs and some other injuries that

8  might be consistent with a physical altercation?

9         MR. GEE:  That's correct, Your Honor.  And -- and --

10  and also sort of the flip side, that the body doesn't have

11  injuries that, for example, are consistent with falling off a

12  cliff from a great distance, et cetera.  You know, Dr. Gordon's

13  expected to testify that these blunt-impact injuries are

14  consistent with him striking or being struck by something that

15  is an odd-shaped object or, you know, that sort of a -- a -- an

16  event.

17         And -- and we believe that the evidence is relevant

18  because it makes it more likely than not that he received the

19  rib injuries in the altercation as opposed to just somehow

20  wandering around Guantanamo getting rib injuries and then

21  falling into the water.

22         That said, Your Honor, you know, as I think we said,

23  the -- the autopsy testimony is -- is likely to be much more --

24         THE COURT:  Truncated.

25         MR. GEE:  -- truncated than it would be in other

1　types of cases.

2　　　　I do think also, Your Honor, that -- that it is -- it

3　is important to -- to -- to simply just be able to explain to

4　the jury what -- what -- what caused the guy to die and how we

5　can't figure out that cause.  That is also important and

6　relevant because, number one, he'll talk about things like the

7　decomposition of the body, the length of time it was in the

8　water, et cetera, made it more difficult for him to find

9　injuries, to -- to determine the cause of death, et cetera.

10　　　　And so, again, the defendant's delay in notifying

11　people, all of those things, a jury could reasonably conclude

12　that had he done something different, Mr. Tur's body might have

13　been found earlier, might have been easier to make a

14　determination of cause of death, manner of death, et cetera.

15　All of that goes to the effect of his obstruction, and

16　misleading, and et cetera.

17　　　　THE COURT:  Do you want to be heard on that, sir, at

18　all or not?

19　　　　MR. LENAMON:  I do, Judge.  I think that that

20　testimony of this odd -shaped object, Judge, is the first time

21　we're hearing about it.  It's not in his reports --

22　　　　THE COURT:  I don't know about odd -- I'm not sure

23　what you're talking about.  Did I miss something?

24　　　　MR. LENAMON:  Didn't he just say that he's going to

25　have the doctor testify that these rib injuries were caused by

1    some odd-shaped object?

2             MR. GEE:  Yes.

3             MR. LENAMON:  That's what he just said, Judge.  I'm

4    sorry.  That's what I heard.

5             THE COURT:  Well, what's that about, Mr. Gee?

6             MR. GEE:  I said that Dr. Gordon is expected to

7    testify that the rib injuries are consistent with Mr. Tur

8    striking something or something striking him such as an

9    odd-shaped object.  Consistent, not -- he's not going to get up

10   there and say an odd-shaped object hit him, he's going to say

11   it's consistent.

12            MR. LENAMON:  I'm going to object, though.

13            MR. GEE:  Which is standard medical examiner

14   testimony.

15            MR. LENAMON:  That's not standard.  I don't think

16   it's standard at all.

17            MR. GEE:  If that -- if that --

18            MR. LENAMON:  If we -- if we had been provided that,

19   we may have raised a --

20            THE COURT:  All right.  So hold on.  Is that in his

21   report, Mr. Gee?

22            MR. LENAMON:  No.

23            MR. GEE:  His report talks about how he has

24   blunt-impact injuries, yes, Your Honor.

25            THE COURT:  I understand that.  Is there anything in

1   his report about an odd-shaped object?

2           MR. GEE:  No.  It talks about the injuries.  He's a

3   forensic pathologist, Your Honor.  Our expert notice talks

4   about how he'll describe the injuries, cause and manner of

5   death, et cetera.  It's well within his expert notice to be

6   able to opine on the types of things that could cause such

7   injuries.

8           THE COURT:  And so what is the -- what's the point of

9   that?

10          MR. GEE:  Again, it -- it -- it goes to show that

11  more likely than not the rib injuries are from the physical

12  altercation.

13          THE COURT:  Well, I -- I guess I had understood that

14  to at least imply that they were in some type of a fight and

15  there were fists thrown and people were -- maybe he got hit in

16  the ribs or something like that.  I -- I guess I -- I had never

17  understood that to include the fact that he might have been --

18  are you suggesting he was hit with an object?  Are you

19  suggesting -- are you suggesting that he fell into an object?

20  What -- what are you talking about?

21          MR. GEE:  What -- what it goes to show, Your Honor,

22  is that something hit him, and we believe it tends to show that

23  he was hit by something during the altercation, something

24  odd-shaped.  Could be lots of different things.  But goes to

25  show the potential seriousness of the -- of the offense.  So

1   he's hit with a whole variety of different things that could

2   be, quote, odd-shaped objects that would cause it.

3            THE COURT:  Okay.  Mr. Lenamon?

4            MR. LENAMON:  Yeah.  First of all, Judge, had that

5   been anywhere in his report, Judge, we would have provided that

6   information to our expert.  That's number one.

7            We would have probably raised a *Daubert* issue whether

8   this expert is qualified to actually testify to that.  I, a

9   person who specializes in homicides, have never had that

10  situation occur with that specificity.

11           Number -- number three, Judge, we provided our

12  expert's opinions.  And I'll be glad to pass it up to the

13  Court.

14           THE COURT:  Well, what I'm going to do,

15  Mr. Lenamon -- I hear what you're saying, and I'm -- I'm -- I'm

16  listening to you.  What I need to do, obviously, as part of my

17  homework over the weekend is I need to read the pathology

18  report or the autopsy report of Dr. Gordon and then -- do we

19  have your expert's report?

20           MR. LENAMON:  Yes, Judge, and that's what I wanted

21  to -- and I --

22           THE COURT:  Is it -- is it an exhibit or where --

23  where do we have it?

24           Do we have it, Mr. Burns?

25           MR. LENAMON:  Yeah.  I don't -- I don't know if it

1    was listed as an exhibit.

2              MR. GEE:  It is an exhibit, Your Honor.  It is

3    Exhibit No. --

4              MR. LENAMON:  But there's also an e-mail, Judge, that

5    we received that says it's from Dr. Gordon.  I took a look at

6    Sperry's opinion.  Looks almost identical to mine.  And if you

7    look at my expert's opinion, it talks about the --

8              THE COURT:  Can you give me an exhibit number,

9    please?

10             MR. GEE:  The autopsy report is Exhibit 63, Your

11   Honor.

12             THE COURT:  For the defense.

13             MR. LENAMON:  No.  That's the -- I think that's

14   their --

15             THE COURT:  You made their report your exhibit?

16             MR. GEE:  No.  The autopsy report is Government's

17   Exhibit 63.

18             THE COURT:  It is?

19             MR. GEE:  Yes, Your Honor.

20             THE COURT:  No.  I'm talking about his expert's

21   report.

22             MR. GEE:  Oh.  No.

23             THE COURT:  Okay.  I didn't think you did.

24             So 63 is Dr. Gordon's report, right?

25             MR. GEE:  Yes.

1           THE COURT:  And do we have a copy of your expert's

2  report is what I'm asking.

3           MR. LENAMON:  Yeah.  So we have a disclosure, Judge,

4  and an e-mail from the government which was forwarded --

5           THE COURT:  And what -- all I'm asking is if we have

6  it.

7           MR. LENAMON:  Yes.

8           THE COURT:  We either have it or we need to get it.

9           MR. LENAMON:  We do.

10           THE COURT:  Well, I know you do.  Do I have it?

11           MR. LENAMON:  No.

12           THE COURT:  Okay.  All right.  Well, you need to make

13  a copy of it and send it to Mr. Burns.  He'll give you the

14  ability to do that.

15           MR. LENAMON:  Okay.

16           THE COURT:  Send him the e-mail, send him the report.

17  Make sure you copy the government on whatever you send me.  And

18  I will take a look at the autopsy issue over the weekend, and I

19  will -- we'll -- we'll -- I'll have a ruling for you.

20           But, Mr. Gee, I would not -- at the moment, I

21  wouldn't count on being able to ask the doctor about an

22  odd-shaped instrument.  I'm not saying I won't allow that, but

23  that's something that's new to me, and if it's not in

24  Dr. Gordon's report, I'm going to have to really think about

25  it.

1          So I've got to -- I don't want to speak out of

2    ignorance, so let me read the reports, and then we'll have a

3    discussion about it on Monday morning.

4          MR. GEE:  That's fine.  Thank you, Your Honor.

5          THE COURT:  All right.  What else?

6          MR. VOKEY:  Nothing here.

7          MR. GEE:  Your Honor, we should just give the Court

8    a -- especially because we're trying to wrap up.  I'm hopeful

9    we will be able to reach an agreement with defense counsel.

10         But one of the exhibits that Agent Dunwoodie will put

11   in is -- is a summary chart.  I think the Court saw a similar

12   one during Ms. Nettleton's testimony that was her text

13   messages.

14         Agent Dunwoodie has compiled from numerous cell and

15   text message downloads a more lengthy chart that, in addition

16   to Ms. Nettleton's, has others.

17         We've been unable to reach an agreement with defense

18   counsel about the admissibility of that voluminous chart.

19         THE COURT:  So they have it?

20         MR. GEE:  They have it.

21         THE COURT:  Can I have it?

22         MR. GEE:  We -- we can provide it to the Court.

23         THE COURT:  Yeah.  Why don't you do the same thing.

24   E-mail it to Mr. Burns and I'll take a look at it so that I

25   can --

1     MR. GEE:  The -- the Court already has it.  It's

2  Exhibit 28, Your Honor.

3     THE COURT:  28?

4     MR. GEE:  Yes, Your Honor.

5     THE COURT:  And I -- I looked at one that was -- is

6  that the same one I was looking at or is --

7     MR. VOKEY:  No.  The one you were looking at was just

8  on Julia Nettleton's.  That was shorter.  This one has 44

9  pages.

10     THE COURT:  I think I saw one on -- I think there was

11  one on everybody.

12     MR. GEE:  There are two, Your Honor.  There's one for

13  just Ms. Nettleton and then the more lengthy one we're talking

14  about that we've been unable to reach an agreement on.

15     THE COURT:  I read that one and I saw that one, but

16  I'll look at it again.

17     And you're objecting to it, I take it?

18     MR. VOKEY:  Sir, we're still talking.  There's some

19  problems with the accuracy of the report and -- and omissions

20  and -- and the accuracy of what's in there.  That's been the

21  issue.  They have revised it.  We have not had the opportunity

22  to -- to look at the revised report that they just provided I

23  think last night or two nights ago.

24     THE COURT:  All right.  Well, will you send --

25     MR. VOKEY:  That's where we are.  We're going to be

1  talking this weekend.

2           THE COURT:  All right.  Will you send me, please, or

3  send Mr. Burns the revised Exhibit 28, and I will take a look

4  at it so I'll be ready to talk to y'all about it?

5           MR. GEE:  Thank you.  And that was exact -- we just

6  want to budget in the time, Your Honor.

7           THE COURT:  Yeah, that's fine.

8           MR. NOTHSTEIN:  And, Your Honor, I believe you-all

9  have the revised copy.  I think we have provided some updated

10 copies of it.

11          THE COURT:  I don't know.  Where would we have it?

12 Is it -- is it the 28 that we have or is there another place it

13 is?

14          MR. NOTHSTEIN:  I believe I have them here, Your

15 Honor.  I can give the hard copies to the Court.  And we can

16 send one by e-mail.  I'm sorry.  I thought it was already

17 provided.

18          THE COURT:  It's a funny thing when I ask if I have

19 something and you tell me I do because you have it.  That's an

20 interesting concept, but...

21          All right.  All right.  Mr. Burns is going to stay

22 here after I leave and make sure that we either have it or

23 we're getting it.  Okay?

24          All right.  What else?

25          MR. GEE:  I think that's it, Your Honor.

1        THE COURT:  Okay.  Anything else, Mr. Vokey?

2        MR. VOKEY:  No, Your Honor.

3        THE COURT:  Okay.  All right.  Then I'll -- I'll do

4   my homework over the weekend.  I'll be back with you-all.  I

5   tell you what.  Since we got the autopsy and we got this, why

6   don't we meet at 9 o'clock on Monday so that we can be ready

7   for the jury.  So I'll ask everybody to be in place ready to go

8   at 9 o'clock on Monday morning.  Okay?

9        MR. GEE:  Thank you, Your Honor.

10        MR. VOKEY:  Yes, sir.

11        THE COURT:  All right.  We're in recess.

12        COURT SECURITY OFFICER:  All rise.

13     (Brief pause.)

14        THE COURT:  Can I see counsel a second, please?

15     (Sidebar conference:)

16        THE COURT:  I just -- I wanted to make sure that the

17   Turs' family sensitivities are being respected.  You may -- you

18   may want to at least -- are you the ones that have dealings

19   with them?  You may want to have discussions with them about

20   whether they want to be here during the -- Dr. Gordon's

21   testimony or not.

22        Because I can imagine if you were the mother or

23   relative of somebody, that would be difficult testimony.  And I

24   know they've been here and I know this is a difficult situation

25   for them, and you may just want to at least -- and -- and --

1   and you can assure them that I -- you know, I -- everybody

2   knows they're here and everybody's understanding that they're

3   interested, but if they want to absent themselves from that

4   testimony, they shouldn't -- they should be given that option.

5              MR. GEE:  And, Your Honor, we've had that discussion

6   with them a number of times already.

7              THE COURT:  Okay.  All right.  All right.  Thank

8   y'all.

9              MR. VOKEY:  Thank you, sir.

10        (The proceedings adjourned at 5:16 p.m.)

11                             - - -

### CERTIFICATE

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


     I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


     DATED this 9th day of January, 2020.



     s/Shannon M. Bishop
     Shannon M. Bishop, RDR, CRR, CRC