IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

     Plaintiff,                   Case No. 3:19-cr-1-J-32PDB

vs.                                January 13, 2020

JOHN R. NETTLETON,                 9:02 a.m.

     Defendant.                   Courtroom No. 10D

_____

JURY TRIAL
(VOLUME V)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

       Shannon M. Bishop, RDR, CRR, CRC
       221 North Hogan Street, #150
       Jacksonville, FL  32202
       Telephone:  (904)549-1307
       dsmabishop@yahoo.com

    (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

        **TODD GEE, ESQ.**
        **PETER MARSHALL NOTHSTEIN, ESQ.**
        US Department of Justice
        1400 New York Avenue NW
        Washington, DC  20005

DEFENSE COUNSEL:

        **COLBY VOKEY, ESQ.**
        The Law Firm of Colby Vokey, P.C.
        6924 Spanky Branch Court
        Dallas, TX  75248

        **TERENCE LENAMON, ESQ.**
        Terence Lenamon P.A.
        245 SE 1st Street, Suite 404
        Miami, FL  33131

        **DANIEL SCHWARZ, ESQ.**
        Daniel Schwarz, P.A.
        245 SE 1st Street, Suite 404
        Miami, FL 33131

# T A B L E   O F   C O N T E N T S

Page No.

WITNESSES FOR THE GOVERNMENT:

**CHRISTOPHER JOSEPH GORDON**
Direct Examination................................   15
Cross-Examination................................   59
Redirect Examination.............................   73
Recross-Examination..............................   77
**JASON BOSWELL**
Direct Examination...............................   86
Cross-Examination................................  115
Redirect Examination.............................  117
**CARRIE MCNAMARA**
Direct Examination...............................  118
Cross-Examination................................  125

# E X H I B I T S   R E C E I V E D

Page No.

Government's Exhibits:

  4 ............................................. 14
30, 31, and 32................................... 82
305, 307, 308, 311, 315, 317, 328, 329, 335, and . 11
338

1                   P R O C E E D I N G S

2    January 13, 2020                              9:02 a.m.

3                           - - -

4         COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session.  The Honorable Timothy J. Corrigan presiding.

7             Please be seated.

8         THE COURT:  Good morning.  There were two topics that

9    were on the table when we adjourned on Thursday evening.  One

10   was the proposed testimony of the medical examiner, and the

11   other was the 1006 chart that the government was proposing to

12   use in connection with the testimony of the agent.

13            Mr. Gee, are those still topics of discussion?

14        MR. GEE:  No, Your Honor.  We're not seeking to admit

15   the chart.  And the -- we -- we're not going to seek to ask the

16   question about what the -- what is consistent with having

17   caused the blunt-impact injuries.

18        THE COURT:  Okay.  Well, that was easy.  I guess I

19   could have watched football on Saturday afternoon instead of

20   looked at all that.

21        Okay.  So, Mr. Gee, tell me -- just give me a -- tell

22   me where we are and what's going to happen today, please.

23        MR. GEE:  The -- the -- the first witness this

24   morning will be Dr. Gordon, the medical examiner.  The second

25   witness will be NCIS Agent Jason Boswell, regarding sort of

1  recovery of some of the swabs.

2       The third agent will be Agent McNamara regarding also

3  sort of recovery of some of the swabs.  And then I think we'll

4  likely rest.  I don't think we'll be calling Agent Dunwoodie.

5       THE COURT:  All right.  And just so I'm -- just so I

6  can be listening and understanding, here -- here's my

7  understanding of why you're calling the medical examiner, and

8  that is to -- primarily to have him describe the non-lethal

9  injuries, the rib fractures and so forth, in an attempt to show

10 that they were consistent with a -- a fight and that that fight

11 was of some magnitude that would have been memorable.

12      MR. GEE:  And, also, Your Honor, that the -- the

13 decomposed state of the body, the body floating in the water

14 for an extended period made it more difficult to diagnose cause

15 of death, injuries, et cetera.  And then obviously he'll also

16 testify about, you know, the cause of death and manner of death

17 determination.

18      THE COURT:  Okay.  All right.  And so I had

19 previously -- Mr. Vokey, I had previously told you that you did

20 not need to start your case until tomorrow morning, and so I'll

21 stick to that pledge, even though it sounds like we may well

22 finish early today.

23      Is that still your request?

24      MR. VOKEY:  It is, Your Honor.

25      THE COURT:  And did you notify the government of your

1  likely witnesses?  And if you did, can you tell me who they

2  are?

3          MR. VOKEY:  I can, sir, and it also arises a new

4  issue.  We have a witness that was not on our witness list or

5  not on the government's witness list that we've given them

6  notification of, so...

7          THE COURT:  Okay.  All right.  Well, let's talk about

8  the ones that were on the witness list first and then we'll

9  talk about the new witness.

10          MR. VOKEY:  We have Kelly Wirfel, Dr. Gordon,

11  Mr. McManus, Mr. Bisesi, and we had Dr. Sperry, but because of

12  the -- as fast as the trial moved, we can't get him here for

13  tomorrow, so we will have him here for Wednesday it looks like.

14          THE COURT:  And what's he going to say?  When I read

15  his report -- or at least I read some of it.

16          MR. VOKEY:  It depends on Dr. Gordon's testimony,

17  sir.

18          THE COURT:  Well, I guess what I'm saying to you is

19  that it seemed to me that Dr. Sperry and Dr. Gordon were

20  largely in alignment, weren't they?

21          MR. VOKEY:  That's what we believe.

22          THE COURT:  Okay.

23          MR. VOKEY:  And then the -- the -- the additional

24  witnesses, Ms. Karla Wolfe.  That's one that --

25          THE COURT:  So let's go back a minute here.  So you

1   gave me Ms. Wirfel.  You have additional questions to ask her

2   that were not asked in her previous examination?

3          MR. VOKEY:  That's correct, sir.

4          THE COURT:  All right.  Dr. -- you're going to call

5   Dr. Gordon in your case?

6          MR. VOKEY:  Possibly, depending on the direct and the

7   cross-examination.  If -- we have a few questions for him that

8   could possibly be outside the scope of the direct that we can

9   ask him on cross, but we'll be done with Dr. Gordon.

10         THE COURT:  Yeah, I'm -- I'm -- I'm favoring that.

11         MR. VOKEY:  Yes, sir.

12         THE COURT:  Because then the government can redirect

13  and they can -- you know, in other words --

14         MR. VOKEY:  Yes, sir.

15         THE COURT:  So I would -- I would think we'd only

16  need to hear from Dr. Gordon once.

17         All right.  McNamara is an agent?

18         MR. VOKEY:  No, McManus.

19         THE COURT:  Okay.  Who -- who is that?

20         MR. VOKEY:  McManus was a -- a diver at Guantanamo

21  Bay.

22         THE COURT:  Okay.  And who else?

23         MR. VOKEY:  Agent Bisesi.

24         THE COURT:  Okay.  All right.  And those have been --

25  you gave those to the government?

1              MR. VOKEY:  We did, sir.

2              THE COURT:  Okay.  Mr. Gee, did you have something

3     you wanted to say?

4              MR. GEE:  Your Honor, I don't know if you want to

5     talk about it now or later when we've rested, but we have some

6     issues to raise with respect to some of those defense witnesses

7     based on sort of our understanding of what they might be

8     testifying about.

9              THE COURT:  Okay.  Well, it sounds like we may have a

10    good bit of time on our hands today, so we'd probably have time

11    to do all that.

12             All right.  And who -- who's the other witness?

13             MR. VOKEY:  Karla Wolfe.

14             THE COURT:  Who is Karla Wolfe?

15             MR. VOKEY:  Formally known as Karla Pagan.

16             THE COURT:  Okay.

17             MR. VOKEY:  And Karla Pagan was at Guantanamo

18    January 9th in that period.

19             THE COURT:  Okay.

20             MR. VOKEY:  And we anticipate her as a witness.  She

21    came to court last week.  Our client recognized her and said,

22    "Hey, that's -- that's Karla Pagan," and so I just sent

23    Mr. Schwarz out to go get her phone number.  I thought perhaps

24    she was a government rebuttable witness.  So we contacted or

25    called her and we met with her yesterday and she has incredibly

1   relevant information for this case.

2          She will be testifying she is the last person to see

3   Chris Tur alive --

4          THE COURT:  Okay.

5          MR. VOKEY:  -- after leaving Captain Nettleton's

6   house.

7          THE COURT:  All right.  Well, I agree with Mr. Gee

8   that those sound like interesting topics to discuss, and it

9   sounds like, though, that we would be able to do that after the

10  close of the government's case.  And so what we'll do this

11  morning is we'll go ahead and finish the government's case.

12  Once the government announces rest, I'll dismiss the jury for

13  the day, tell them to come back tomorrow, and then we'll do all

14  the things we need to do.

15         If the defense wants to make a motion, I'll hear the

16  motion.  If we want to talk about witnesses -- we'll have

17  plenty of time -- we've actually been looking at the jury

18  instructions, so we can probably give you another version of

19  those.  So we -- we can make some use of the time today as long

20  as it makes sense.

21         And then we'll just adjourn until tomorrow morning

22  for the defense case.

23         All right.  Preparatory to the jury coming out and

24  hearing the rest of the government's case, are there any

25  matters, Mr. Gee, that -- Mr. Nothstein, are there any matters?

1          MR. NOTHSTEIN:  Just we're going to pre-admit a few

2     exhibits, Your Honor.

3          THE COURT:  All right.  Let's go.

4          MR. NOTHSTEIN:  Government's Exhibit 305, 307, 308,

5     311, 315, 317, 328, 329, 335, and 338.

6          There may be a few others that you may bring on after

7     the break, Your Honor, but we'll bring those to the Court's

8     attention at that time.

9          THE COURT:  Those exhibits, 305, 307, 308, 311, 315,

10    317, 328, 329, 335, and 338, Government's, will be admitted

11    without objection.

12       (Government's Exhibits 305, 307, 308, 311, 315, 317, 328,

13    329, 335, and 338 received into evidence.)

14         MR. NOTHSTEIN:  And the only thing I would bring to

15    your attention, Your Honor, is that, as the Court knows, there

16    were many swabs taken of suspected blood that then later turned

17    out to be blood.  We, of course, have all of those, Your Honor.

18    Our intent was not to introduce all that biohazard to the jury

19    so that they can see it and so forth.  We did, however, intend

20    to use one of the bags just as a demonstrative to accompany the

21    agent's testimony about how they collected it and how they

22    marked it and so forth.  So we just want to flag that for the

23    Court.

24         THE COURT:  All right.  Mr. Vokey, are you aware of

25    any other matters that we could take up now in preparation for

1    the government completing their case?

2              MR. VOKEY:  No, sir.

3              THE COURT:  All right.  Well, we're a little early.

4    We anticipated, of course, some discussion about the ME

5    testimony and so forth and -- but -- so that's why we met at

6    9:00.  Sounds like we've resolved all the issues we need to

7    resolve for the moment.  I'm going to stand in recess.  The

8    jury is not all present yet.

9              They were not due to be here until 9:15 for a 9:30

10   start.

11             Since they're not all here yet -- well -- how many is

12   missing?  Two?  Okay.  So let's be in recess for ten minutes.

13   We'll plan on starting at 9:25, assuming we have everybody on

14   the jury.  If we don't, we'll start at 9:30.  Okay?  We're in

15   recess.

16             COURT SECURITY OFFICER:  All rise.

17        (Recess from 9:12 a.m. to 9:28 a.m.; all parties present.)

18             COURT SECURITY OFFICER:  All rise.  This Honorable

19   Court is back in session.

20             Please be seated.

21             THE COURT:  All right.  Let's get a witness up here,

22   please, and let's have the jury.

23        (Dr. Gordon enters the courtroom.)

24             THE COURT:  Good morning.

25             DR. GORDON:  Morning, sir.

```
1          COURT SECURITY OFFICER:  All rise for the jury.
2      (Jury enters, 9:29 a.m.)
3          COURT SECURITY OFFICER:  Please be seated.
4          THE COURT:  Well, ladies and gentlemen, I always take
5  it as a good sign when we have a three-day weekend and
6  everybody shows back up, so thank you very much.  I appreciate
7  your continued service.
8          I understand that we have a birthday today, so happy
9  birthday.
10          And we are ready to go forward with the -- the
11  completion of the government's case, and we have a new witness.
12          And Ms. Diaz will swear that witness right now.
13          COURTROOM DEPUTY:  Do you solemnly swear that the
14  testimony you are about to give before this court will be the
15  truth, the whole truth, and nothing but the truth, so help you
16  God?
17          THE WITNESS:  I do.  Yes, ma'am.
18          COURTROOM DEPUTY:  Please state your full name and
19  spell your last name for the record, sir.
20          THE WITNESS:  Christopher Joseph Gordon, and last
21  name is spelled G-o-r-d-o-n.
22          COURTROOM DEPUTY:  Thank you, sir.
23          Please be seated.
24          THE COURT:  All right.  Mr. Gee, you may proceed.
25          MR. GEE:  Thank you, Your Honor.
```

1      Your Honor, before we proceed, we have a stipulation

2  to read.

3      THE COURT:  Yes.  All right.

4      Remember, ladies and gentlemen, a stipulation --

5  which in this case is Government's Exhibit 4.

6      A stipulation are agreed-to facts that you should

7  consider as evidence in the case without the need of any

8  further testimony.

9    (Government's Exhibit 4 received into evidence.)

10      THE COURT:  And, Mr. Gee, you may publish the

11  stipulation.

12      MR. GEE:  Thank you, Your Honor.

13      Counsel for the government, counsel for the defense,

14  and the defendant hereby stipulate and agree to the following:

15  Blood and tissue samples taken from the body of Christopher Tur

16  during the autopsy conducted by Dr. Christopher J. Gordon, MD,

17  Major, United States Air Force, on or about Tuesday, January

18  13, 2015, were submitted for testing and evaluation by

19  Dr. Gordon Jackson, a toxicologist for the U.S. Department of

20  Defense's Armed Forces Medical Examiner System.

21      Dr. Jackson completed toxicology reports that

22  describe the results of the tests he performed and provided

23  those reports to Dr. Gordon for use in formulating his

24  conclusions in his final autopsy report.

25      The parties agree and stipulate that Dr. Gordon may

1   testify as to the contents of Dr. Jackson's reports and the

2   conclusions he reached based on the reports without any

3   objection.

4           THE COURT:  All right.  And that's the stipulation,

5   Government's Exhibit 4.  Again, you'll have these back with you

6   in the jury room when -- when you deliberate.

7           You may proceed, sir.

8           MR. GEE:  Thank you, Your Honor.

9   **CHRISTOPHER JOSEPH GORDON, GOVERNMENT'S WITNESS, SWORN**

10                      **DIRECT EXAMINATION**

11  BY MR. GEE:

12  Q.   Good morning.

13  A.   Good morning, sir.

14  Q.   Would you introduce yourself to the jury and tell us a

15  little bit about where you work?

16  A.   Yes, sir.  I'm Christopher Gordon.  I'm a forensic

17  pathologist.  And I currently work at Vance Air Force Base in

18  Oklahoma, where I'm the chief of the medical staff at the

19  clinic there.

20  Q.   And I see you're actually in a uniform today.  What is

21  your rank and position?

22  A.   Yes, sir.  I'm a lieutenant colonel in the Air Force.

23  Q.   What is it that you do there presently at Vance Air Force

24  base?

25  A.   So as the chief of the medical staff, I'm basically

1    responsible for the overall delivery of health care at that

2    facility.

3            It's a small clinic.  There's a few docs and some

4    dentists and mental health workers.  But I just make sure that

5    the quality of health care is good.  And I kind of oversee

6    that -- the management of that.

7    Q.    And prior to your position at Vance Air Force Base, what

8    was your position just before that?

9    A.    So I was the director of the Office of the Armed Forces

10   Medical Examiner.  So the medical examiner's office for the

11   military, which is stationed at Dover Air Force Base.

12   Q.    What's done there?

13   A.    Autopsies.  So federal autopsies on military members and

14   then people that die at federal installations that are under

15   our jurisdiction --

16   Q.    How long were you --

17   A.    -- over the whole world.

18   Q.    How long were you there at AFMES?

19   A.    So I got there in 2012, sir.

20   Q.    All right.  And can you tell us a little bit about what

21   your educational background and experience is that ultimately

22   led you to that position at AFME?

23   A.    Yes, sir.  So I graduated with a bachelor's degree in 2003

24   from La Salle University in Philadelphia in biology.  And then

25   I went on to Georgetown and got a medical degree, an MD, in

1   2007.  Then I went to the University of North Carolina in

2   Chapel Hill for five years and did anatomic and clinical

3   pathology and forensic pathology.  And then I passed the board

4   certifications for all three of those.

5   Q.    What is forensic pathology?

6   A.    So forensic pathology is basically science and medicine

7   and its application to criminal law, specifically with the

8   investigation of death.  So we're charged with doing autopsies

9   essentially to determine the cause and manner of death.

10   Q.    And what kinds of positions have you had in the field of

11   forensic pathology?

12   A.    So I was a -- an assistant medical examiner when I first

13   arrived there at Dover Air Force Base in 2012.  And then once I

14   became board certified, I became a deputy medical examiner, and

15   then served in that capacity for about four years.

16          And then I stepped up to the director of the Armed

17   Forces Medical Examiner for about two years before I went out

18   to Vance Air Force Base.

19          And right now I don't do quite as many autopsies for

20   the military.  Just because of the location I'm at, it doesn't

21   really have that many fatalities, fortunately.  But we did have

22   some, unfortunately, in November that I got involved in.

23          So right now I'm a regional medical examiner for

24   them, but I don't really do that many autopsies for them

25   currently.

1    Q.    Do you do autopsies on your own time?

2    A.    Yes, sir.  I engage in what's called off-duty employment.

3    So I got it approved that -- in order to maintain currency as a

4    pathologist, I needed to do autopsies.  So I work for the

5    Baltimore office of the chief medical examiner, as well as the

6    office of the chief medical examiner in Mississippi.

7    Q.    And you conduct autopsies and render opinions for them as

8    well?

9    A.    Yes, sir.

10   Q.    All right.  Doctor, have you ever testified before as an

11   expert in forensic pathology?

12   A.    Yes, sir.

13   Q.    In which courts and approximately how many times?

14   A.    Probably about 15 times in total over the last eight

15   years.  I've done military court-martials.  I've done federal

16   court such as this.  I was involved in the grand jury one time.

17   But also for state and local offices, county, county court,

18   murder trials predominantly.

19   Q.    Have you ever been involved in publishing in the field?

20   A.    Yes, sir.  I probably have my name on about seven or eight

21   papers.  I did a couple at the Armed Forces Medical Examiner

22   System.  Some things in radiology and its application to

23   autopsy, things like that.

24   Q.    And have you ever been involved in teaching or training

25   others in your field?

1  A.   Yes, sir.

2        As a medical examiner there at Dover, we would get

3  the residents from Walter Reed to come over from D.C.  So we

4  would teach them.

5        And I was also an assistant professor at the USUHS,

6  which is the military's medical school in D.C.  So I would go

7  there once a month maybe and teach some students.

8        MR. GEE:  Your Honor, at this point we tender

9  Dr. Gordon as an expert in the field of forensic pathology,

10 qualified to render an expert opinion in the cause and manner

11 of death.

12       THE COURT:  Did you want to voir dire the witness or

13 not?

14       MR. LENAMON:  No, Judge.

15       THE COURT:  All right.  Then you may proceed, sir.

16       MR. GEE:  Thank you, Your Honor.

17 BY MR. GEE:

18 Q.   Dr. Gordon, can you explain for us what are the basic

19 steps that are done during an autopsy procedure?

20 A.   Yes, sir.

21       So when we start an autopsy, the first thing is we

22 get whatever circumstances that were associated with the death.

23 You know, it may not be a lot.

24       Like, for instance, at the medical examiner's office

25 with the military, like, I'll just get a little snippet from

1   the death investigator that said, "NCIS just made this call.

2   There was a fatality in this case at GTMO.  And all we know at

3   this time is that the remains were recovered from the water,"

4   something like that.  It's usually not a lot of information.

5   So that's what starts the process for me.

6           And then we fly out there and then we begin the

7   autopsy.  By the time we get out there, usually the radiology

8   has been done.  So we do a full-body CT scan and x-ray in all

9   the cases that we do in the military.  So a lot of times that's

10  available for me before I even start the autopsy.  So I can

11  take a look at it and see if there's any foreign objects that I

12  need to recover, any fractures, obvious injuries, things like

13  that.

14          And after that's done, then we actually start the

15  autopsy.  So we'll go into the room.  Typically the remains are

16  still sealed in the body bag, or we call it the human remains

17  pouch, and I'm in there with a photographer, an autopsy

18  technician, and whoever else is going to attend the autopsy.

19          And we start from there.  We unzipper the bag, we

20  take photos as we go, and then we begin what we call the

21  external examination.

22          So we're looking at the outside of the body from head

23  to toe.  We're documenting any distinguishing features.  We're

24  documenting what they've been wearing, hair color, eye color,

25  all that.  And we take notes as we go.  And we start

1  documenting injuries at that point as well.

2  Q.    And, Doctor, can you explain when you're done with the

3  external and internal autopsy procedure, examination, what are

4  some of the next steps that you do typically in the course of

5  your investigation?

6  A.    Yes, sir.  So after we've done that external examination,

7  then we do the internal examination.  And that's when we

8  actually go into the body to take a look at the organs and we

9  document any injuries or evidence of natural disease, things

10  like that.

11      At the course of that point we also take samples of

12  all the organs and we submit them to the lab to look at them

13  under the microscope.  We call that histology.  And we also

14  take samples of the organs and we submit them for toxicology

15  testing, as well as DNA analysis if it's required.  And in the

16  military we do DNA on every body for scientific identification.

17      So after all that's done, it takes about 30 days from

18  that point to get all the results of all this back.  So all the

19  toxicology testing takes time for me to look at the slides

20  under the microscope.  And at that point we'll prepare a report

21  where we'll say what the cause and manner of death are.

22  Q.    And you mentioned the word "toxicology."  What is

23  toxicology?

24  A.    So toxicology in this sense is we take these tissues, we

25  take blood and we take urine and we take fluid from the eye,

1   and we take pieces of all the organs, we submit it to the lab,

2   and then they're going to look for things that could contribute

3   to death in some way.  So drugs, alcohol, things like that.

4   That's what toxicology testing is in this case.

5   Q.   Doctor, does your report discuss cause and manner of

6   death -- do autopsy reports discuss cause and manner of death?

7   A.   Yes, sir.  So on the front page of our autopsy report

8   we'll have the cause and manner of death in our opinion.  And

9   then in the back of the report is the opinion section where we

10  will sometimes elaborate a little bit more if it's confusing in

11  some way.  And it's also stated on the death certificate as

12  well.

13  Q.   Can you just explain what cause of death means generally?

14  A.   Yes, sir.  So cause of death is essentially the injury,

15  the illness, or the disease, right, that starts a physiologic

16  cascade of events that ends in someone's demise, right?  So

17  they don't have any brain function and their heart stops.  But

18  it's those insults that start a process that ends in your

19  death.

20  Q.   So just to sort of use a hypothetical illustrative

21  example, if a person shows up for you at an autopsy with a

22  gunshot wound to their head, what's the cause of death most

23  likely?

24  A.   Right.  So the cause of death is gunshot wound to the

25  head.  But a lot of times in court they'll want me to

1  elaborate, well, what exactly caused the death.  And that's

2  where we're getting into the mechanisms of death.  So the

3  gunshot wound was the cause, but that actually caused

4  intracranial hemorrhage, which caused the brain to herniate.

5  That's the actual mechanism of death.  But the cause is that

6  underlying insult, injury, illness that actually started the

7  whole cascade.

8  Q.    And what does manner of death mean?

9  A.    So the manner of death is the circumstances that surround

10  the death, right?  It's the how.  So for a gunshot wound to the

11  head, it's -- I can't just look at that and say, well, this is

12  a homicide.  I need to have all that investigative information

13  that surrounds it.  Because a gunshot wound to the head could

14  be an accident, it could be a suicide, and it could be a

15  homicide.  So we rely on the investigative information to be

16  able to give the manner.

17         And so -- just so -- just so we throw it out, the

18  manner of death, the certifications in the United States are

19  natural, accident, homicide, suicide, and undetermined.

20  Q.    And are you always able to decide the cause and manner --

21  sorry, the manner of death, rather?  Are you able to decide the

22  manner of death always just based on your autopsy procedure and

23  those laboratory tests alone?

24  A.    No.  Rarely am I going to be able to give the manner of

25  death just based on me in the autopsy room.  I need that

1  investigative information.  We need the whole case.  And I need

2  to see the toxicology results.  I need to look at the

3  microscopy.  We need to get whatever witness statements and

4  investigative information there is out there in order for me to

5  complete the case.

6  Q.    Explain to us how you rely on the information, the

7  investigative information from the agents.

8  A.    Right.  So, as I was saying, you know, that's absolutely

9  important.  I need to know the how behind how everything

10  occurred -- you know, the circumstances, what surrounds the

11  death.  And this is typically a collaborative experience

12  between us and the investigative bodies, right?  As a medical

13  examiner, I'm often just stuck, unfortunately, in the morgue.

14  You know, I don't often get to go out to the scene and

15  interview witnesses, nor am I trained to do any of that.  So we

16  rely on the investigative agencies, you know, typically the

17  detectives, right?

18        In the military we work with the FBI, NCIS, OSI, CID.

19  So those are the people that we collaborate with in order to

20  get all that background information.

21  Q.    So in our gunshot wound example, what is it you're looking

22  to hear from agents to help you --

23        MR. LENAMON:  Objection.  Relevance.

24        THE COURT:  I'll overrule it.

25  BY MR. GEE:

1    Q.    In the gunshot wound example, just as an illustration,

2    what kind of information are you looking to hear from agents to

3    be able to help make your manner of death determination?

4    A.    Right.

5            So in cases like that, we would like to know, you

6    know, is the weapon at the scene?  Was the decedent holding the

7    weapon?  Did they leave a suicide note?  Do they have any

8    suspects otherwise that might have killed that person?  Was the

9    person cleaning their weapon?  You know, so those are the

10   things that -- we need that information in order to decide

11   accident, homicide, or suicide.  Without it, it's always going

12   to be undetermined.

13   Q.    Okay.  Now, Dr. Gordon, did you conduct an autopsy of the

14   body of Christopher Tur on or about January 13th, 2015?

15   A.    Yes, sir.

16   Q.    And at the time you conducted the autopsy, who were you

17   still working for then?

18   A.    I was working for the Armed Forces Medical Examiner

19   System.

20   Q.    What was your position at that point in January 2014?

21   A.    I was deputy medical examiner at the time.

22   Q.    And where was the autopsy of Mr. Tur done?

23   A.    We did it at Guantanamo Bay.  It was on the campus, from

24   what I recollect, of the medical facility, but it was -- it was

25   in a separate building.

1  Q.   And, Dr. Gordon, as part of your autopsy procedure, did

2  you determine a height and estimated weight for Mr. Tur?

3  A.   Yes, sir.  He was approximately 72 inches tall.  We didn't

4  have a scale there, so we have to estimate it -- I just

5  estimated it based on his height and, you know, his body

6  habitus.

7          He looked to be somewhere around 190 pounds.  And

8  then when I looked in the medical records later, it seemed that

9  he was weighing at about 185 I think at his last medical

10  appointment.

11  Q.   Did you conduct that kind of exterior examination like you

12  described normally doing for autopsies?

13  A.   Yes, sir.

14  Q.   Tell us about the exterior examination of Mr. Tur and the

15  state of his body that you observed.

16  A.   Yes, sir.  So when we opened the body bag, we noticed that

17  he was wearing jeans I believe with a belt and socks and shoes.

18  He didn't have a shirt.  I do recall that he had what we call

19  decomposition changes.  So obviously once you die, your body

20  starts to break down, right?  There's a couple of different

21  processes going on when you're decomposing.  I'm trying not to

22  throw too many fancy words at you.  But one of them is

23  putrefaction.  This is basically the breakdown of your body by

24  microorganisms, right?  So bacteria and other small organisms

25  like fungus.  They break you down and what happens is you start

1   to have these changes, right?  So you start to get green

2   discoloration of your skin.  The stiffening of your muscles.

3   The rigor mortis goes away because your muscles start to break

4   down.  You have what's called lividity.  So basically when you

5   die, your heart stops, and then the blood begins to just fall

6   with gravity.  So whatever position you're in, the blood will

7   just settle.

8          MR. LENAMON:  Objection.  Rule 11 violation, Judge.

9          THE COURT:  Overruled.

10  BY MR. GEE:

11  Q.   You may continue.

12  A.   Okay.  So that's lividity.  You know, basically -- I'm

13  explaining this first, and then I'll say what I saw on

14  Christopher Tur.  So we're looking for these decomposing

15  changes, lividity, and his rigor mortis.

16          So his rigor mortis was gone.  His lividity was fixed

17  on the front of his body.  So basically in his chest area and

18  on his face and head.  That's where most of the blood had

19  fixed.

20          And then the decomposition changes that I saw, he had

21  some skin slippage.  So the outer layers of your skin as you

22  decompose can actually start to fall off a little bit, and that

23  can be worsened by water.  Water can make it happen a little

24  bit faster.

25          He had the discoloration of his skin, that

1    green/purple discoloration.  And then he also had kind of a

2    strong odor.  Because as these bacteria produce gases, it can

3    make a strong odor.

4          And then also he had some vascular marbling.  Just a

5    fancy term for -- when you're dead and you're starting to

6    decompose, you can actually start to see the vessels kind of

7    pronounced in your skin.  And that's, again -- it's from

8    basically bacteria creating gases that create a color change,

9    and you can see it.

10         So those were the features that we saw related to the

11   decomposition on Christopher Tur on external examination.

12   Q.   After noting the exterior appearance of the body, did you

13   evaluate it for any external injuries?

14   A.   Yes, sir.  So after we do that part of our examination and

15   we note, you know, hair color, eye color, and things like that,

16   we look for tattoos, and once that's all done, then we move on

17   to doing the injury documentation.

18         And what we saw in this case, going from head to toe,

19   he had a small laceration, about a half an inch, under his

20   right eyebrow.  And he had a contusion, a bruise, on the top of

21   his forehead on the right side that was about an inch.  And

22   that was it for the most part for the external definitive

23   injuries of his head.

24         He did have some swelling around his eyes which could

25   be related possibly to swelling from some type of an injury,

1   but more than likely also in this case -- we haven't really

2   talked about bodies when they're floating in water, they float

3   face down, right?  When they eventually surface to the top.

4   And their heads are often below the rest of their body.  So, as

5   you can imagine, that's where the biggest part of gravity is.

6   So a lot of that blood from your body may drain into your head.

7   And as you decompose, things can start to swell.

8            So what I'm saying in this case, it might be a little

9   bit difficult to interpret that as an injury, because it may

10  just be from postmortem changes.

11           His lips, when you pull his lips back -- I looked at

12  his teeth and there was some discoloration there of the

13  gingiva.  But, again, that could also be related to

14  decomposition change as well.

15           So that was what we saw on the external of his head.

16  So essentially what I could say was definitively an injury, the

17  laceration under his eye and a contusion to his forehead.

18  Q.   And this contusion of the forehead, how -- what did it

19  look like?

20  A.   Right.  So it was like an oval-shaped bruise, basically,

21  just a little green in color.

22           But, again, this is hard to interpret some of this

23  stuff, because his head in general was very congested from how

24  we just talked about, him laying in the water for a period of

25  time, and with that decomposition change.  It can make it kind

1  of hard to interpret.

2  Q.  Were you able to say whether or not the bruise to the top

3  of his head was before or after his death?

4  A.  Right.  So that contusion there, it appeared to be, based

5  on the skin around it, something that would have occurred

6  before death.  Typically, you know, you don't bruise after

7  you're dead, except for something that we could talk about when

8  we go into the internal examination.

9  Q.  What about the laceration above his eye?

10  A.  Yeah.  So the laceration above his eye, again, all I can

11  say is that, yeah, it's a rip in the skin, right?  It's a

12  half-inch laceration.  There's nothing about it that I can look

13  at and say it definitely occurred before death or after death.

14  Because as the body is floating in the water, a lot of that

15  water can kind of leach the blood out, so it's difficult to

16  interpret that as well.

17  Q.  We're going to call up -- was this injury to his eye

18  photographic?

19  A.  Yes, sir.

20  Q.  Okay.  I'm going to call up what's been previously

21  admitted as Government's Exhibit 86.

22       Dr. Gordon, what's this a photograph of?

23  A.  So this exhibit is a photograph that's zoomed in of the

24  right eye, which shows this laceration that we just mentioned

25  below the eyebrow there.  With the scale there, you can see it

1  was about a half an inch in length and about a quarter inch in

2  width.

3  Q.    And, Dr. Gordon, were you able to make a determination

4  whether or not this laceration was received before or after

5  death?

6  A.    Yeah.  As we --

7            MR. LENAMON:  Objection.  Asked and answered.

8            THE COURT:  I'll -- I'll let him answer it again.

9            THE WITNESS:  Yes, sir.  Yeah.  I cannot tell.  This

10  is essentially a rip in the skin.  It's a laceration, but I

11  can't tell you if that occurred before or after death.

12  BY MR. GEE:

13  Q.    What type of injury is this?

14  A.    So these injuries that we're describing, lacerations and

15  contusions, these are blunt-force injuries, right?

16            So, you know, we can categorize injuries broadly in

17  forensics, right, sharp force, gunshot.

18            All of these injuries we see in this case are blunt.

19  So either a blunt object --

20  Q.    Dr. Gordon, just -- what is a blunt -- what does a blunt

21  force injury mean?

22  A.    Oh, okay.  So a blunt force injury is an impact to the

23  skin with a blunt object that creates lacerations, contusions,

24  and abrasions.  And then -- but the -- the ambiguous nature of

25  blunt force injury in general, though, is I can't tell you if a

1    blunt object impacted his eye or if he impacted a blunt object.

2    We just -- we can't tell just by looking at this.

3    Q.    And this type of laceration, Dr. Gordon, if this had been

4    received before death, what -- what kind of bleeding, if any,

5    would it have produced?

6    A.    So an injury such as this you just have to think -- your

7    head is highly vasculature, right?  There's a lot of blood

8    vessels in your head.  So, even an injury like this that may

9    not look very large, it can bleed quite a bit.  I mean, just

10   think about the contact sports that you guys may or may not

11   watch, even a small laceration above the eye could -- could

12   hemorrhage quite a bit.

13   Q.    And can alcohol -- a high amount of alcohol potentially

14   increase that amount of bleeding?

15   A.    Yes, sir.  There -- so alcohol can have some inhibitory

16   effect on some of the things in your blood that clot, right, so

17   platelets in particular.  So if you do have high alcohol

18   levels, it -- it may or may not affect your ability to clot.

19   Q.    And, Dr. Gordon, we'll talk a little bit more about your

20   internal examination in a minute, but, with respect to this

21   injury, did you in your internal examination look underneath

22   this injury to see what, if any, internal observations there

23   were with respect to it?

24   A.    Yes, sir.  Yeah.  I mean, for this particular injury,

25   there was no underlying fracture.  There was no intracranial --

1    there was nothing going on inside the head.  And we can talk

2    about that more when I go into the internal examination, but,

3    no, this particular injury did not cause anything beneath it.

4    Q.   So was -- this particular laceration below his right

5    eyebrow, was this a fatal injury?

6    A.   I have no evidence at autopsy that could lead me to

7    believe that this injury was fatal.

8    Q.   All right.  Let's talk about the rest of your external

9    examination.

10         Were there any injuries to Mr. Tur's nose?

11   A.   Right.  So we -- as I mentioned in the beginning, we do a

12   CT scan, an x-ray, and also at autopsy, I'll palpate the nose

13   and feel it and I'll take a look at it.  It was not fractured.

14   Q.   And what about the inside of his nose?  Were you able to

15   make any definitive determinations about the inside of his

16   nose?

17   A.   Yes, sir.

18         So there's some limitations at autopsy for me to be

19   able to go in there and take a good look at his nose without,

20   you know, greatly doing some insane dissection.

21         I can't really see, is what I'm saying.  I mean, we

22   don't have a scope that goes up the nose.  But I -- I can just

23   tell it -- it didn't on the external or by me feeling it appeal

24   fracture -- appear fractured in any way.

25   Q.   And how does the body being in water affect your

1  examination of the nose?

2  A.   I mean, just with any of these external injuries -- I

3  mean, being in water can kind of wash out things.  So the blood

4  will eventually just leach out.  So, I mean, if his nose was

5  bloody and it did have some drying on the face, that would be

6  gone after you're in the ocean for a period of time.

7  Q.   Did he have any other -- you talked some of -- so you

8  talked about this laceration, the bruising, and some of the

9  swelling that you observed.

10       Did he have any other external injuries or potential

11  external injuries that you observed?

12  A.   Not of the head, other than, you know, again, what we had

13  mentioned, there was some discoloration of the -- of the mucosa

14  inside the mouth.  There was that contusion on the head, the

15  laceration here, and some swelling around the eyes, but,

16  again -- I mean, you can appreciate even in that picture how

17  just diffusely discolored and congested his head was.  So you

18  can imagine, there's -- it's some difficulty doing this

19  interpretation.

20  Q.   Dr. Gordon, did you then conduct an internal -- excuse me,

21  an internal examination?

22  A.   Yes, sir.  Of the head.  If you want to stick with that.

23  Q.   Why don't we start from the top down, yes, sir.

24  A.   Okay.  But -- so bottom line, though, with the rest of the

25  external examination, we didn't see any other external injuries

1    that were clearly obvious.

2          He had a small abrasion on the one knee, but nothing

3    else, and no obvious fractures of his extremities that I could

4    feel or see.

5          So after we're done with the external, we proceed to

6    the internal examination.  So we take our scalpels and we make

7    an incision across the head and we move the skin forward over

8    the face, so I can look at the scalp underneath and the top of

9    the skull.

10          In this case, as soon as we made that incision, an

11    extensive amount of blood came out of that incision.  So there

12    was a lot of blood between the scalp and the top of the skull.

13    And it was -- a lot of it was on the left side.  There wasn't

14    as much on the right, I noticed, when we made that incision.

15          And then, when we finally reflected the skin over,

16    what I saw was basically a diffuse scalp hemorrhage, from the

17    front of his head all the way to the back, mostly on the left

18    side.  The right side didn't have it quite as much.

19          And then there's a muscle that sits here on top of

20    your skull called the "temporalis muscle."  On the left was

21    also diffusely hemorrhagic.

22          And what I was thinking when I saw this is, "Wow,

23    that is a lot of hemorrhage."

24          For not having anything on the top of his scalp, on

25    external exam -- I didn't see any abrasions, I didn't see any

1   lacerations, I didn't see any obvious contusions.  So for me to

2   reflect the scalp and see all that, it was unusual.

3              And, also, the skull immediately beneath it was not

4   fractured.  There were no skull fractures at all.  And that's

5   when I began to think that this may represent something that's

6   clearly documented in the forensic literature.  I don't know if

7   you want me to elaborate on this now.

8   Q.   What's that?

9   A.   Something called "postmortem hemorrhagic lividity."

10             Again, I'm sorry for these long terms like this.  So

11  basically what this is is that bodies -- we talked about bodies

12  floating in water a little bit.  So they -- when they begin to

13  decompose, they float to the top -- top of the surface.

14  They -- typically they float face down.  And, again, their

15  heads will go below the rest of the body.  So all that blood in

16  your body can start to pool forward and, again, your head can

17  become very congested.

18             So what happens is, is you have all that blood going

19  into your head as you're floating for X amount of hours in the

20  ocean -- I don't know how long it was in this case.  And then

21  once decomposition starts, all those blood vessels can start to

22  break and deteriorate.  So all that blood leaches out into your

23  scalp.  So that's, in my opinion, what happened in this case.

24             And that's in a lot of the forensic textbooks.  They

25  call it "diffuse scalp hemorrhage" due to, you know,

1  essentially floating in the water in that position for a

2  certain amount of time with decomposition setting in.

3  Q.   And this would be sort of postmortem pooling of the blood,

4  in other words?

5  A.   Yes, sir.  This is all postmortem.  This didn't occur, in

6  my opinion, before he was dead.

7  Q.   Did you --

8         THE COURT:  Mr. Gee, I'm sure the -- most on the jury

9  know, but will you ask the doctor to define "postmortem,"

10  please.

11  BY MR. GEE:

12  Q.   Can you tell us what postmortem means?

13  A.   Yes, sir.  So -- I'm sorry, when I'm saying "postmortem,"

14  it means after death and "antemortem" means before death.

15  Q.   And when you were describing this -- the blood that you

16  saw when this scalp was cut open, you called it a "diffuse

17  hemorrhage."  What does that kind of mean?

18  A.   Right.  So when I looked at it --

19         MR. LENAMON:  Objection.  This is irrelevant, Judge.

20         THE COURT:  I'm -- I'm wondering a little bit myself,

21  Mr. Gee.  But --

22         Let me see you a second.

23      (Sidebar conference:)

24         THE COURT:  What are we -- what's our point here?

25         MR. GEE:  He's about to explain, after explaining

1   what diffuse hemorrhage is, that the -- that the amount of

2   blood that's inside the head due to sort of floating in the

3   water for so long can make it more difficult for him to

4   identify injuries, et cetera.

5           Again, it's another effect of the --

6           THE COURT:  I understand.  And you object to that?

7           MR. LENAMON:  No.  As long as he gets to it, Judge.

8           THE COURT:  Overruled.

9      (The following proceedings occurred in open court, in the

10  presence of the jury:)

11          MR. GEE:  May I proceed, Your Honor?

12          THE COURT:  You may.

13  BY MR. GEE:

14  Q.   What does -- what does diffuse hemorrhage mean in this

15  context in terms of what you observed?

16  A.   Right.  So, again, in this case, I feel that the blood I

17  saw in the scalp was postmortem.  It probably occurred after he

18  died, you know, based on everything we had just talked about

19  with his body positioning, the decomposition, "diffuse" just

20  meaning that it was hard to tell where it began and where it

21  ended, I mean, just looking at it.  And I know we don't have

22  these photographs to look at, but it covered basically the

23  frontal, temporal, parietal, and some of the occipital scalp.

24  So there was just -- there was a lot.

25  Q.   And did -- all this diffuse blood that you believe to be a

1    result of floating in the water, did it affect your ability to

2    make any determinations as you're -- in the head area?

3    A.    So after I saw it, you know, and after the autopsy, we put

4    the skin back, you know.  And at this point, it's a good

5    opportunity to take another look, because a lot of the blood

6    will have drained from the head.  And, again, I didn't see any

7    abrasions, lacerations, or anything on the scalp -- on the

8    scalp surface.

9           So looking at all this, I think that if there were

10   contusions, like literal bruises in the scalp, I just can't

11   tell you, because there was so much of this postmortem

12   "artifact" is what we call it.

13   Q.    Moving down from the head area, what, if anything, did you

14   observe on your internal examination below the head?

15   A.    Right.  So we -- after the head, we do the -- we examine

16   the neck.  So I -- I didn't see any hemorrhage in the muscles

17   or the neck.

18          The larynx was intact.  The hyoid bone, which is the

19   U-shaped bone that sits on top of the larynx, also intact.  So

20   no neck injury.  And we confirmed that also with CT scan.

21          The cervical spine wasn't fractured.  And at that

22   point, we do the examination of the torso.  So we take a

23   Y incision and we look at the tissues over the rib cage.

24          At that point I did see an injury there.  I saw a

25   bruise.  It was about a 2-by-1-inch contusion or a bruise in

1    the left side of the chest wall.

2            And immediately beneath that, there were rib

3    fractures.  There were fractures of ribs 2, 5, 6, and 7 on the

4    left chest wall, and with the bruise right on top of it.

5    Q.   And, Doctor, so first you used the word "fracture."  What

6    is -- what's another word for fracture?

7    A.   So fracture, broken, right?  So broken bone.  So ribs 2,

8    5, 6, and 7 were broken.

9    Q.   And, Doctor, can you just stand up for us briefly and show

10   us where ribs 2 and 5 are?

11   A.   Right.  So rib 2 is up pretty high.  It would be about --

12   I'm sorry -- about this location on me -- and rib 5, quite a

13   few inches lower than that on this part of your chest.  So rib

14   2, rib 5, a few inches in between them.

15           And these were the injuries that I clearly saw at

16   autopsy, ribs 2 and 5 fractured.

17   Q.   And where are 6 and 7?

18   A.   So 6 and 7 -- if you continue down, 6 and 7 would just be

19   a little bit lower than that.  So 6/7 being kind of the lowest

20   part of the ribs that you can feel here.  So 6 and 7 being

21   right below 5 there.

22   Q.   All right.  Let's focus first on the injuries you saw to

23   those higher-up ribs, 2 and 5.

24           Can you describe those?

25   A.   Yes, sir.  So -- so ribs 2 and 5 were what I call

1   "complete fractures."  I mean, I clearly saw them at autopsy.

2   I removed the soft tissue around it and I could see that the

3   bone there was almost a little bit displaced and a little bit

4   splintered.

5         So clearly fractured.  And then there was blood right

6   around that as well in the soft tissues around the fracture

7   sites.  And then, again, the soft tissue of the chest wall

8   above that was also bruised.  So those were the ones that I

9   could clearly identify at autopsy.

10   Q.  And based on this -- the observations that you made of the

11   chest wall and the area around the fractures, were you able to

12   make any determinations about whether the injuries to ribs 2

13   and 5 were received before or after his death?

14   A.  Yes, sir.  So these injuries are consistent with before

15   death, because they have blood around them.  There's clear

16   demarcation and there's clear hemorrhage right around that

17   fracture site.  So, in general, you know, other than this stuff

18   we talked about with postmortem hemorrhagic lividity, you need

19   your heart to pump in order to have blood oozing out from

20   fracture sites.  So it's consistent with something that

21   occurred before he died.

22   Q.  And, Doctor, you mentioned about the fractures of 6 and 7.

23         Can you tell us about how those were discovered and

24   what they looked like?

25   A.  Yes, sir.

1          So the fractures at 6 and 7 were not complete

2   fractures that I immediately saw at autopsy.  We have a

3   radiologist back at Dover, Dr. Harcke, who reviewed the CT

4   scans.

5          And he has a much better eye than I do at reviewing

6   CTs.  He's got 50 years of experience.  But he saw that there

7   were small -- what he called "buckle fractures" at 6 and 7.  So

8   just -- the outer cortex of the bone was a little bent, but it

9   wasn't fractured all the way through.

10  Q.   And you observed those results as well?

11  A.   He showed them to me when I got back to Dover and looked

12  at them on the CT, but, again, I did not see those at autopsy.

13  Q.   And the -- these -- these broken ribs and the bruising

14  that you're referring to near them, were these fatal injuries?

15  A.   No.  No, sir.

16  Q.   Did you observe any other internal injuries?

17  A.   No, sir.  So after that, we remove the chest plate and

18  then we take a look at all the organs in the chest.  Important

19  things I did not see -- I didn't see any blood pooling in the

20  chest cavities.

21         The heart is encovered [sic] -- encased by the

22  pericardium -- it's a sac -- there was no blood inside of that.

23  There was no blood in the abdomen, no internal organ injuries

24  that I could see at all.

25  Q.   So, in addition to conducting your -- the actual autopsy

1  procedure, what else -- what is the next steps in your

2  investigation?

3  A.  Right.  So as we had mentioned earlier -- so I'm also

4  taking samples as I go that I'm submitting to the lab so I can

5  look at them under the microscope, and we're also submitting

6  samples to toxicology for them to test to look for the drugs

7  and the alcohol.  And so, you know, again, about 20 to 30 days

8  can go by before all those results are back.  And I took a look

9  under the microscope at all those major organs and I didn't see

10 anything that would have contributed to death, no evidence of

11 natural disease really that were significant, and no other -- I

12 mean, usually we don't see new injuries under the microscope.

13 But I didn't see anything else.

14 Q.  Okay.  Tell us what else was determined from the

15 toxicology results.

16 A.  Right.  So the toxicology results -- again, during the

17 autopsy, we're taking a lot of samples.  We take blood from two

18 sources, we'll take urine, bile, fluid from the eye, and

19 samples from all the organs.

20      So we ran those at Dover.  And what we saw is we had

21 alcohol come back, both in the blood from the aorta, which is

22 that big artery coming off your heart, and also in the

23 vitreous, the fluid from your eye, also had the alcohol

24 detected as well.  And its level was 0.26 in the blood and

25 0.25 in the vitreous fluid.

1    I don't know if you guys are familiar with blood

2  alcohol levels, but, I mean, typically in the United States,

3  0.08 is the driving limit for being intoxicated or not.  So,

4  you know, roughly three times the legal driving limit in the

5  United States.

6  Q.    And are you able to say with any kind of scientific

7  certainty, like, how many drinks he would have had to have to

8  get to that level?

9  A.    No, sir.  That's not something that we can typically do

10  with any reasonable degree of scientific certainty, no.

11  Q.    Was the ethanol level affected by the -- the decomposition

12  floating in the water, et cetera?

13  A.    Yes, sir.  So -- yeah.

14    So bacteria, as they're -- as the body is

15  decomposing, the bacteria can actually make alcohol.  And even

16  if somebody didn't have any drinks at all, if they were very

17  decomposed, we can see blood alcohol levels get up to like

18  0.12, -13 at times.

19    But what helps us resolve that in this case is the

20  vitreous fluid.  So that fluid from your eye is shielded, it's

21  somewhat protected from decomposition, the bacteria don't

22  really like to get in there quite in the same way.

23    So because those levels are very similar, it leads me

24  to believe that this is a pretty true representation to what

25  his alcohol level was at when he died.

1   Q.    And would his ethanol level alone be fatal?

2   A.    No.  0.26 in the blood in and of itself would not be

3   considered to be a fatal alcohol level.  Typically in someone

4   that doesn't drink a lot -- I mean, we like to see that level

5   higher than like 0.35 moving up to .4, so...

6   Q.    And does this -- this kind of ethanol level, three times,

7   you know, the -- approximately the legal limit, does this

8   affect other kinds of things like ability to walk straight,

9   swim, things like that?

10  A.    So, sure.  I mean, it really depends on your tolerance and

11  how often you drink.  But, yeah, for someone that doesn't drink

12  alcohol, for instance, if your blood alcohol is at .25, that's

13  pretty substantial.  I mean, you're going to have coordination

14  issues.  Your speech might be slurred.  You're going to have

15  slower thought processing.  Coordinated movement might be

16  difficult.  Things like that.

17  Q.    All right.  What else did you determine from the

18  toxicology?

19  A.    So in the vitreous fluid, or on -- on the -- the

20  examination where we were looking for alcohol, we saw a couple

21  of other things, acetaldehyde.

22          So if you drink a lot, as a byproduct of that, you

23  might have acetaldehyde build up.  So that's not unheard of

24  when your -- alcohol is where it was.  And then propanol, which

25  is a product of decomposition.

1          So those were the volatiles that we saw on

2     toxicology.  And then, of course, we do a full drug screen as

3     well.  And we -- we have a very thorough drug screen at Dover

4     and what we found was fluoxetine, which is Prozac.  That's

5     something typically prescribed for -- as an antidepressant.

6     And in this case the levels of both the Prozac and its

7     metabolite were very high.  They were 3.5 milligrams per liter.

8     And just to give you a reference, typically in postmortem

9     cases, if we have that level over 2, we could consider it to

10    possibly be fatal.  So it was elevated.  3.5 is very elevated.

11    Q.    And you used the word there "metabolite" when talking

12    about fluoxetine.  What does that mean?

13    A.    Right.  So drugs -- the enzymes in your body, they

14    metabolize them and they might create other compounds during

15    this process.  So bottom line is that fluoxetine was in there

16    and also its primary metabolite, which is norfluoxetine.

17    Q.    And were you provided with information during the course

18    of your investigation about the pill count for Mr. Tur and

19    whether he had missing Prozac pills?

20    A.    Yes, sir.  So just in general, you know -- in all these

21    autopsies we're going to want the medical records, and I did

22    note that he was prescribed fluoxetine, so it wasn't like it

23    was something he wasn't given.

24          And what we do is we -- we ask the investigative

25    agencies, because keep in mind, you know, I'm at Dover and

1    they're still down there in Cuba, so they're going to help us,

2    and they're going to take the pill bottle and they're going to

3    see when it was prescribed, how many pills are left, and if he

4    was taking one pill a day, did that make sense based on about

5    the time that he died.

6           And it was in their opinion, that, yes, if he was

7    taking one pill a day that the prescription seemed to match up

8    with what was left in that bottle.

9    Q.   And for fluoxetine, Doctor, can you just sort of describe

10   fluoxetine as sort of a -- a drug, like how does it compare

11   to -- to other types of things people are prescribed?

12   A.   Yes, sir.  So fluoxetine isn't typically considered to be

13   a very toxic drug.  These are very good drugs to take because

14   you can take kind of a lot of them and not really have any

15   really serious toxic effects from them.

16          At the levels he was at, especially with the alcohol,

17   whenever you add alcohol to certain drugs -- it's just like

18   when you look at the bottle, it's going to say, "Please do not

19   take this with alcohol," it's because it can increase the bad

20   effects of these drugs.

21          So he -- at that level, I mean, it's been described

22   in the literature that you can potentially have seizures and

23   arrhythmias, like, irregular heartbeats and things.  So it was

24   at a high level.  But I'll also say that at autopsy there's a

25   concept known as "postmortem redistribution of drugs."

1    Okay.  So when you die, you know, certain drugs may

2 continue to diffuse through your body.  So they may seem more

3 elevated than they actually were at the time of your death.

4    And this particular drug has been known to do that.

5 So that's why we try to take blood samples from different

6 locations, especially blood samples that are far away from the

7 core of your body.

8    So in this case, that blood sample came pretty far

9 down into the pelvis, from the inferior vena cava, which should

10 be a little less affected by this process known as postmortem

11 redistribution.

12    So these are the things that we attempt to do to try

13 to, you know, dis- -- you know, put, I guess, less of a chance

14 that this is postmortem redistribution.

15    But in this case, again, it was -- it is what it is.

16 It's a number.  And it was at 3.5, with 2 being considered

17 fatal in some cases.

18 Q.    So did the body being found in the water, the state of the

19 body that you described earlier, did that affect your ability

20 to -- you know, to make any scientific determinations about

21 this elevated fluoxetine of it?

22 A.    I mean, sir, it's hard to tell.  I don't know -- with this

23 particular drug level, if he had been discovered sooner or

24 later, I don't know if it would have been any different because

25 there's no way to prove that scientifically.

1    Q.    Doctor, any other drugs detected during the toxicology

2    screening?

3    A.    No, sir.  Not that I -- not that I can recall.

4    Q.    No Percocet detected?

5    A.    No, sir.  Yeah.  And, again, we do a very thorough drug

6    screening.  We use the urine, and -- and that can detect drugs

7    that may be -- have even been in your body for a couple of days

8    depending on the type of drug.  There was nothing else

9    detected.

10   Q.    Doctor, based on what you observed in your physical

11   exam -- the toxicology, what you learned during the course of

12   the investigation -- were you able to render an opinion about

13   the cause and manner of Mr. Tur's death?

14   A.    Yes, sir.  So in my opinion he likely drowned, and I

15   believe that the ethanol and fluoxetine intoxication would have

16   contributed to that.  And, based on the circumstances and

17   everything we have, I feel that the manner of death, again, the

18   circumstances surrounding it, is undetermined.

19   Q.    And, Doctor, let's talk a little bit about that drowning

20   determination for the cause of death.

21         Can you tell us about that?

22   A.    Yes, sir.

23         So to certify in forensics a death as a drowning --

24   obviously, first and foremost, the body has to be associated

25   with some body of water in some degree, right, bathtub, pond,

1  whatever, what have you?

2        So we have that in this case.  He was recovered from

3  water.  But the next biggest thing that we like is a witness

4  statement.

5        Obviously, that's kind of like something that's good

6  to have, to say, "Hey, yeah, I saw him.  He fell in the water,"

7  or "I saw him jump in the water," or "I saw him thrown in the

8  water" or "pushed in the water."

9        We didn't have that witness statement in this case.

10  So that makes it hard.  It makes it very difficult.  Because in

11  the end I can sit up here and speculate of what I thought the

12  manner of death was, but it's undetermined because we don't

13  have that witness statement.

14  Q.   And just focusing on the cause of death for a second more.

15  In terms of drowning, during your autopsy or as a result of all

16  of this, are you able to sort of describe the -- the -- what,

17  if any, physiological observations you were able to make with

18  respect to drowning, or sort of how you're able to determine

19  that the drowning is what caused his death?

20  A.   Yes, sir.  Yes, sir.  So -- yeah.  To certify a death in

21  forensics as drowning, right, we already talked about the one

22  thing that we need, and they need to be associated with water

23  in some way.

24        But what do we see at autopsy, right?

25        So, unfortunately, there's nothing at autopsy that I

1  can point at with my finger and say, "Okay, yes, he drowned."

2  It's a constellation of things that we look for, right?

3          And we don't always get them, unfortunately.  And the

4  postmortem interval -- the longer they've been dead floating in

5  water, makes it less likely that we see some of these things.

6          So what we're looking for is -- we look fluid in the

7  sinuses of the head.  Right?

8          So the skull bone has all these little holes in it.

9  And it might actually fill up with fluid.  And that can get in

10  there through your nose and your mouth.  We like to see that.

11  If we see it, fine, great.  It can help support the cause of

12  death as drowning.

13          We look for heavy lungs.  So you get edema.  Fluid

14  begins to back up in the lungs.  And they can be very heavy at

15  autopsy.  I mean, lungs typically weigh, you know, 2- to 300

16  grams.  Well, at autopsy and drowning, they might weigh a

17  thousand or 1200 grams, so four times heaver.  Can be very

18  heavy.

19          And with all this edema you get foam, right?

20          So a foam flooey -- excuse me -- foamy fluid may back

21  up in your airways.  So you might see it in the bronchi, the

22  trachea, the entire windpipe, right?  And it may actually start

23  to come out of your nose and mouth.  So when you see that in

24  the movies, you know, a big foam cone, you know, that's

25  something that we can look for to support drowning.

1        Other things as well:  fluid in the stomach and,

2   depending on the aqueous environment, maybe they have stuff in

3   their hand, maybe they grabbed at seaweed.

4        So you have to understand, when we look at all this

5   stuff, that it helps support the diagnosis of drowning, but we

6   have to exclude other causes of death first, because not

7   everybody that's recovered from water drowned.  So that's

8   basically the process in our -- in our forensic field.

9   Q.   And you said that your final determination was drowning in

10  the setting of this high ethanol and high fluoxetine.

11       What do you mean by "in the setting"?

12  A.   Right.  Those were just the words that I had chosen.  You

13  could probably just say drowning with ethanol and fluoxetine

14  intoxication.

15       What I mean is that I truly feel -- I put it on the

16  top of my cause of death line because I felt that that alcohol

17  level with that fluoxetine level would make it very difficult

18  to swim.  So I most certainly think it contributed to drowning.

19  Q.   And, Doctor, you said that your cause of death was

20  probable drowning in this setting.

21       What do you mean by "probable"?

22  A.   Right.

23       And so what I had just referenced -- like, there's no

24  test at autopsy to say this is a drowning.  That's the reason

25  behind that word, right?

1    So if --if we take everything else out from this case

2  and he wasn't recovered from water -- say he was found in his

3  bed and he had an ethanol and fluoxetine level that high and he

4  was decomposing like that, potentially we would have certified

5  this as ethanol and fluoxetine intoxication, still undetermined

6  for manner.  So that's basically what that means.  I believe,

7  given everything, that he did drown; however, I can't prove it.

8  Q.    And you mentioned that the fluoxetine and ethanol would

9  have made it more difficult for him to swim.

10    What about those -- those broken ribs and the

11  bruising?

12  A.    Right.  So, I mean, this starts to get a little

13  subjective, right?  Pain, pain thresholds.  I mean, from my

14  personal experience.

15    MR. LENAMON:  Objection.

16    THE COURT:  I guess the question is going to be,

17  Mr. Gee, is that is these -- are these opinions that he's going

18  to talk about now going to be within a reasonable degree of

19  medical certainty or is this just possibilities?  And I don't

20  know the answer to that.

21    I'm not sure you do either, but I'll -- I'll let you

22  ask a question and let's see what happens.

23  BY MR. GEE:

24  Q.    Dr. Gordon, can you explain what the potential impact of

25  broken ribs is?

1    MR. LENAMON:  Objection, Judge.

2    THE COURT:  Well, I don't know the answer to the

3  question, so I'll let him answer whether he -- whether -- the

4  question is can you explain the potential impact.  And I think

5  he can answer that based on his training and experience, and if

6  he -- I'll let you answer the question.

7    THE WITNESS:  Yes, sir.

8    So we'll talk about the mechanics first.  The rib

9  fractures, mechanically just with the physics, that would not

10  make it difficult to swim in any way.  It's not like you

11  fractured your arm and you can no longer keep yourself afloat

12  with one side.

13    But the pain issue, yeah, I think that does get a

14  little bit more subjective.  I --

15  BY MR. GEE:

16  Q.    How do, for example, ribs operate when you're, say,

17  breathing?

18  A.    Right.  So --

19    MR. LENAMON:  Objection, Judge.

20    THE COURT:  Yeah.  I -- Mr. Gee, I feel like -- I

21  feel like he's answered the question.

22    MR. GEE:  That's fine.  Thank you, Your Honor.

23  BY MR. GEE:

24  Q.    All right.  Now, you mentioned that the manner of death

25  was undetermined.  In this case, since -- since you determined

1   that the drowning is what caused his death, what is "manner of

2   death" just sort of a fancy word for?

3   A.   Well, right.   In this case, again, it's more of the how.

4   How did he get in the water is not something that I can answer,

5   based on anything that I've seen in this case.

6   Q.   Now, Doctor, you talked earlier about how -- sort of the

7   information you seek from investigative agents.

8        Did you meet with NCIS agents and speak with NCIS

9   agents over the course of this investigation?

10  A.   Yes, sir.

11  Q.   Is there anything unusual about that?

12  A.   No, sir.   Again, I mean, that's just a -- a natural

13  collaboration between the medical examiner's office and the

14  investigative agencies.   And I -- I work for state agencies as

15  well, county.   I mean, I work with law enforcement, all sorts

16  and types.   And I -- yeah, we need that relationship in order

17  for me to come down to the manner of death.

18  Q.   Prior to the issuance of your autopsy report on

19  February 13th, did you feel that NCIS was improperly pressuring

20  you in any way?

21  A.   No, sir.

22  Q.   After the issuance of your report on February 13, 2015,

23  did you feel you were improperly pressed to change your opinion

24  in any way?

25  A.   Not at any point, no, sir.

1  Q.   Over the next couple of years, did NCIS continue sharing

2  with you more information they were discovering during the

3  course of their investigation?

4  A.   Yes, sir.

5  Q.   Any of that information change your opinion about the

6  cause or manner of death?

7  A.   No, sir.  It did not.  We did some additional toxicology

8  testing down the line based on their investigation.  They had

9  found some veterinary medications, I believe, that could have

10 been --

11        MR. LENAMON:  Objection.  Motion.  Sidebar.

12     (Sidebar conference:)

13        MR. LENAMON:  Your Honor, I object to this.  So the

14 Court gets the context of this:  During their investigation,

15 they seized medication from my client, maybe from Ms. Tur as

16 well.  NCIS was going down the road of trying to discover

17 whether he was drugged, and there was some discussion amongst

18 the parties of that happening.  It never panned out.

19        But clearly the fact that this prosecutor has allowed

20 this information to be put before this jury is extremely

21 prejudicial and I'm moving for a mistrial.

22        MR. GEE:  He -- Your Honor, obviously, we know from

23 what the defense has said throughout the trial that they intend

24 to argue that there was some sort of pressure on Dr. Gordon.

25 What he's about to explain is simply that -- that they

1    recovered veterinary medicine during the course of the

2    investigation and, as part of their process to continue, you

3    know, sort of running down all angles, they checked to see

4    whether or not the veterinary medicine could have caused any of

5    the toxicology rates, and it didn't.  I'm not sure what

6    Mr. Lenamon is referring to about the rest of this, but he's

7    just talking about the vet medicine.

8              THE COURT:  From where was the veterinary medicine

9    recovered?

10             MR. GEE:  I believe it's recovered from the

11   defendant's home.

12             THE COURT:  Yeah.  We're not -- we're not going to do

13   that.  I mean, you got him to say that they didn't improperly

14   pressure the investigation.  That's what you needed.  And I

15   think going beyond that is -- he said he worked with him

16   afterwards and at no time afterwards did they improperly

17   pressure him.  I think that's as far as it goes.  I don't think

18   it's anywhere close to a mistrial.  I'm not even sure the jury

19   picked up on the reference.  If you want me to, Mr. Lenamon,

20   I'll ask them to disregard the last answer or we can just leave

21   it sitting there.

22             MR. GEE:  Your Honor, I'd just note this veterinary

23   medicine was seized pursuant to the -- a search warrant --

24             THE COURT:  I understand.

25             MR. GEE:  -- we're all discussing here.

```
 1          THE COURT:  I understand.  I'm not I saying it
 2   wasn't.  I'm just saying that there's no evidence that that had
 3   anything to do with anything, right?  And I just don't think we
 4   need to get into it.
 5          And -- but it's not -- certainly not worthy of a
 6   mistrial.  But if you want me to ask the jury to disregard the
 7   half-answer that he just gave, I will do that.  If you want me
 8   to just move on, we'll do that.
 9          Your choice.
10      (Counsel confer.)
11          MR. LENAMON:  Yeah.  I'd ask for you to...
12          THE COURT:  Sure.  Thank you.
13      (The following proceedings occurred in open court, in the
14   presence of the jury:)
15          THE COURT:  Ladies and gentlemen, as sometimes
16   happens, the question asked by Mr. Gee elicited an answer from
17   the witness that gets into areas that are really not relevant
18   to the case, so I'm going to ask you to just disregard the last
19   answer he gave and not consider that as part of any
20   consideration in the case.  All right?
21          Thank you, ladies and gentlemen.
22          Mr. Gee, you may proceed.
23   BY MR. GEE:
24   Q.   Dr. Gordon, did any information that you learned over the
25   next couple of years, the investigation, cause you to change
```

1  your opinion about cause or manner of death?

2  A.   No, sir.

3  Q.   Did you ever feel, even after issuing your autopsy report,

4  that you were ever pressured to change your opinion about cause

5  or manner of death?

6  A.   No, sir.

7  Q.   Is AFMES that you work for even in the same chain of

8  command as NCIS?

9  A.   No, sir.

10        MR. GEE:  The Court's indulgence.

11        THE COURT:  Sure.

12     (Counsel confer.)

13        MR. GEE:  Nothing further.  Thank you, Your Honor.

14        THE COURT:  Cross-exam.

15                    **CROSS-EXAMINATION**

16  BY MR. LENAMON:

17  Q.   Good morning, sir.

18  A.   Good morning.

19  Q.   How are you?

20  A.   Good, sir.  How are you?

21  Q.   Good.  Thank you very much.

22        Now, you mentioned that you are currently medical --

23  chief of medical staff; is that correct?

24  A.   Yes, sir.

25  Q.   You are a medical doctor; is that right?

1    A.   Yes, sir.

2    Q.   And obviously you're trained in a number of different

3    things as a medical doctor; is that right?

4    A.   Yes, sir.

5    Q.   And you certainly are aware that when someone suffers an

6    injury to the head and becomes unconscious, that that

7    unconsciousness can last from anywhere -- 90 seconds to 5 or

8    10 minutes?

9    A.   I agree.

10   Q.   Is that fair to say?

11   A.   Yes, sir.

12   Q.   And you'd agree with me that there are occasions when a

13   person loses unconsciousness that they lose a piece of that

14   memory that they said had occurred before?

15   A.   Possibly, sir.

16   Q.   Okay.  And that's -- that's called "amnesia," correct?

17   A.   Yes, sir.  From a concussion.

18   Q.   Okay.  And obviously someone under the influence, that's

19   enhanced even more?

20   A.   Potentially, yes, sir.

21   Q.   Okay.  Now, one of the things that happens to a body

22   that's immersed in water is that water passively flows down

23   into the lungs in the airways?

24   A.   Yes, sir.

25   Q.   I think you testified that a little bit, correct?

1    A.    Yes, sir.

2    Q.    The lungs are decomposing inside the body and there's body

3    fluid that builds up, correct?

4    A.    Sir, when you say, "body fluids build up" --

5    Q.    Well, when someone is taken out of the water, it's not

6    unusual for them to expel blood and mucus and things, correct?

7    A.    Yes, sir.  We -- we'll refer to that as purge.

8    Q.    Purge.

9    A.    That may happen even when you're not in the water, yes,

10   sir.

11   Q.    Okay.  So if someone observed that in this particular

12   case, that when the body was pulled out and Mr. Tur was

13   spitting up blood, that would be from the decomposition that's

14   going on inside, correct?

15   A.    Yes, sir.

16   Q.    Okay.  Now, you indicated that the Prozac level that you

17   were referencing on -- reference to -- that you were relying on

18   was some information that was transmitted from NCIS about the

19   pill bottles they found; is that correct?

20   A.    I'm sorry, sir.  What -- what did you mean by that?

21   Q.    That -- that there appeared to be a number of pills taken

22   consistently, meaning that if the dose said once a day, the

23   information you were given was that he was taking it once a

24   day?

25   A.    Yes, sir.  So -- yeah.  Typically what happens is they'll

1  take a picture of the bottle with the prescription, how much

2  was suspensed on the day it was suspensed.  Then typically

3  you'll line up the pills right beside it so that you can kind

4  of see the whole picture.

5  Q.   Okay.

6  A.   And then we match that with the medical record in this

7  case.

8  Q.   And you -- you testified, and we'll talk a little bit more

9  that NCIS continued to provide you information at various

10  points?

11  A.   Yes, sir.

12  Q.   Even after you prepared your autopsy report?

13  A.   Yes, sir.

14  Q.   Did they ever tell you that they received information from

15  his spouse that there occasions that Mr. Tur would double up on

16  his Prozac?  Were you ever told that by NCIS?

17  A.   No, sir.  I -- I don't recall being told that.

18  Q.   Okay.  That would be double the dosage, correct?

19  A.   Yes, sir.

20  Q.   And is that something that would be important for you to

21  know?

22  A.   I mean, yes, sir.  I mean, it would be good to know that

23  information.

24  Q.   Okay.

25  A.   But I don't know if it would change my ultimate

1    certification at all in this case.

2    Q.    I understand.

3          And, you know, and it's fair to say that you are a

4    medical doctor and you are being driven by science; is that

5    correct?

6    A.    Yes, sir.

7    Q.    You're looking at things scientifically, correct?

8    A.    Yes, sir.

9    Q.    Okay.  Now, you testified that the .26 is approximately

10   three times what the legal limit is to drink in most

11   jurisdiction -- drive in most jurisdictions; is that correct?

12   A.    Yes, sir.

13   Q.    Okay.  Someone who drinks a lot is going to be affected

14   from someone who doesn't drink at all afterwards, correct?

15   A.    Absolutely.  Yes, sir.

16   Q.    And were you given information about how much Mr. Tur had

17   been drinking that night or how often he drank or any patterns

18   from NCIS?  Did they communicate any of that information to

19   you?

20   A.    I do not recall a specific discussion on his drinking

21   history, sir, no.  I -- I do remember somehow that I think that

22   night someone had referenced that he might have had quite a few

23   drinks, though, but I don't remember exactly the amount.

24   Q.    Okay.  And that would be consistent with the .26?

25   A.    Yes, sir.  Could be, yes, sir.

1  Q.    Okay.  Now, you testified that it's not unusual for

2  someone who has had a lot of alcohol to have some form of

3  abnormal bleeding.  That means they're going to bleed more,

4  correct?

5  A.    Potentially, yes, sir.

6  Q.    Okay.  And you are aware, of course, that 90 percent of

7  nosebleeds arise from the interior part of the nose; is that

8  correct?

9  A.    Yes, sir.  Yeah, I agree.

10  Q.    Okay.  And so growing up, before you became a doctor,

11  you're familiar with someone gets hit in the nose, they

12  bleed --

13  A.    Yes, sir.

14  Q.    -- right?  Bloody nose?

15  A.    Yes, sir.

16  Q.    May not be fractured, correct?

17  A.    No.

18  Q.    And you'd agree that the -- I guess it's called the

19  mucosa, which is the inner lining of the nose and Naval --

20  nasal cavities is thin and delicate, correct?

21  A.    Yes, sir.

22  Q.    That's what causes a bloody nose, right?

23  A.    Yes, sir.  And there are a lot of vessels in there.  If

24  they rupture, they could easily bleed.

25  Q.    And someone would bleed a lot, right?

1    A.    Yes, sir.

2    Q.    Now, you don't know how or when any of the injuries -- and

3    we'll talk about the premortem injuries first -- occurred,

4    correct?

5    A.    No, sir.

6    Q.    Okay.  You don't know how the rib injuries occurred?

7    A.    No, sir.

8    Q.    And you don't know how or when this small laceration

9    occurred, whether it was pre- or postmortem, you don't know how

10   it occurred?

11   A.    I don't know, sir.

12   Q.    And you couldn't tell that it was before or after; is that

13   correct?

14   A.    No, sir, I could not.

15   Q.    And you said that the contusion to the forehead was in and

16   of itself very difficult injury to interpret; is that correct?

17   A.    Yes, sir.  I feel that a lot of the injuries on the head

18   were difficult to interpret.

19   Q.    What other injuries are you talking about?

20   A.    Yes, sir.  Just the laceration, but then the swelling

21   around the eyes and then the discoloration of the mucosa inside

22   the mouth difficult to interpret.

23   Q.    And you said that because that's directly related to the

24   amount of time he was in the water?

25   A.    Yes, sir.  And the position of the head.

1    Q.    And -- and the position of the body?

2    A.    Yes, sir.

3    Q.    Okay.  So you can't even say that they're -- those were

4    injuries; is that correct?

5    A.    Yes, sir.  The -- the -- the discoloration that I saw

6    inside the mouth may or may not represent injury.

7    Q.    Okay.

8    A.    That laceration may or may not have occurred before or

9    after death.  It's just -- a lot of these are very ambiguous.

10   Q.    And other than the contusion to the head, there was no

11   other injuries?

12   A.    That's correct.  And more importantly nothing internally

13   in the head.  So the brain actually was not that decomposed in

14   this case, which is really great for us to maintain that

15   architecture.  And there was no intracranial hemorrhage, no

16   blood inside the head, and there were no bruising -- there was

17   no bruising on the brain.

18   Q.    Okay.  Now, the prosecutor spoke to you about the cause of

19   death and you said, "Probable drowning in the setting" -- I

20   think you put in your autopsy, "In the setting of ethanol and

21   Prozac."

22         It's fluetine [sic] I think it's called, right?

23   A.    Fluoxetine, yes, sir.

24   Q.    Fluoxetine?

25   A.    Yes, sir.

1   Q.    But that's Prozac; is that correct?

2   A.    Yes, sir.

3   Q.    And you said that the manner of death was undetermined,

4   correct?

5   A.    Yes, sir.

6   Q.    And I think you went through a laundry list.  Natural

7   causes, accidental, suicide, homicide?

8   A.    Yes, sir.

9   Q.    That's the manner of death you're talking about?

10  A.    Yes, sir, those are the choices we have.

11  Q.    And you say that you rely in part with information that

12  you received from the investigators throughout your process; is

13  that correct?

14  A.    Absolutely.  Yes, sir.

15  Q.    Now, when you prepared your autopsy report on February 9th

16  of 2015, that was a little less than a month after you actually

17  conducted the autopsy; is that correct?

18  A.    Yes, sir.

19  Q.    Okay.  And I think you testified already that caution must

20  therefore be exercised when interpreting tissue swelling, skin

21  bruising, and soft tissue hemorrhage in this setting, setting

22  referring to the way the body was found?

23  A.    Yes, sir, with the decomposition.

24  Q.    And you talked about that already on direct and a little

25  bit with me on cross?

1  A.   Yes, sir.  I stand by it.

2  Q.   Okay.  And one of the things when you were looking at

3  manner is you thought suicide, but you didn't have any

4  information, so you put it in your report, "No notes expressing

5  suicide ideation were discovered by the investigative agency."

6  Is that right?

7  A.   That's correct.  Sir, so bottom line in this case for

8  manner of death, again, you know, accident, suicide, and

9  homicide, and I cannot tell you which of those three.

10  Q.   But you believed suicide to be the most likely manner of

11  death; isn't that right?

12  A.   So, sir, you're referencing not my report but an e-mail?

13  Q.   Yes.

14  A.   Yes, sir.  So in an e-mail that was dated before my

15  report, I did say that I thought that suicide could be the

16  leading manner of death in this case, and I could elaborate on

17  that if you'd like.

18  Q.   Okay.  Well, is there an e-mail -- I'm assuming there is

19  an e-mail that -- that talks about it before, but the e-mail I

20  have talks about it afterwards.  Okay?

21  A.   Yes, sir, I -- okay.

22  Q.   And I'll show it to you.  Okay?

23  A.   Yes, sir.

24       MR. LENAMON:  As a matter of fact, in all fairness,

25  Judge, if I can approach him just to show him the e-mail?

1        THE COURT:  Sure.  Sure.

2    BY MR. LENAMON:

3    Q.    Remember you got to read -- I guess -- I don't know if you

4    read from the top or the bottom.  Whatever.

5    A.    Yes, sir.  Yes, sir.  Yes, I'm seeing the date.

6    February --

7    Q.    Does that refresh your recollection?

8    A.    Yes, sir.  So February 23rd would be after I published my

9    report.

10   Q.    Okay.  So when you did the -- can I approach so I can just

11   read it?

12   A.    Yes, sir.

13   Q.    If you need it back, I'll give it to you.

14   A.    Yes, sir.

15   Q.    When you did your autopsy report, you were basing it on

16   information you had at the time.  Is that fair to say?

17   A.    Yes, sir.

18   Q.    Okay.  And that would have been a little less than 30 days

19   after -- or you did the autopsy, correct?

20   A.    Correct, sir.

21   Q.    Okay.  On February 23rd, you said that you believed

22   suicide was the most likely manner of death, but you needed

23   more information.  "The more information the better."  That's

24   exactly what you told NCIS; isn't that right?

25   A.    Yes, sir.

1  Q.   Okay.  And for the first time on that date, they told you

2  that they had interviewed twice Ms. Tur, who had revealed that

3  Mr. Tur threatened to harm himself on numerous occasions and

4  ran away from home many times prior to the 9th of January 2015,

5  and they informed you that two separate interviews with

6  Mr. Tur's associates revealed in 2014 Mr. Tur attempted to harm

7  himself via monoxide poisoning inside his closed garage.

8          And they said, "I will make contact with Lara Tur a

9  third time to see if she can provide details."

10         Isn't that what they told you?

11  A.   Yes.  Yes, sir.  These are things that would support the

12  certification of suicide.

13  Q.   Certainly.  But they didn't provide you that information

14  before your autopsy report, correct?

15  A.   Not that I recall, sir.

16  Q.   And had you been provided that information at the time of

17  your autopsy report, having already believed that it was

18  possibly suicide, you may have considered the manner of death

19  being suicide?

20  A.   Sir, honestly undetermined is the best way to certify this

21  death --

22  Q.   Okay.

23  A.   -- because there's no witness to it.  If he had left a

24  suicide note, if it was clear that he had swallowed a bunch of

25  this -- of this fluoxetine, then potentially I could certify it

1    as a suicide if homicide had been completely excluded.

2    Q.    I understand.  I understand.

3          Now, you continued to have communications with NCIS

4    about this investigation; is that correct?

5    A.    Yes, sir.

6    Q.    Okay.  And at some point you were feeling a little

7    frustrated that they wanted something from you that you weren't

8    willing to give?

9    A.    Sir, so -- yeah, at that time I -- I think that they --

10   they wanted to scientifically prove or disprove why the

11   fluoxetine level was what it was at, right, and say that, you

12   know, potentially this could have been definitely from

13   postmortem redistribution or not.

14         And, you know, Dr. Jackson and I, you have to keep in

15   mind we talked about this case every day for years.  And --

16   and, you know, he was a close colleague of mine, and he felt

17   that it was scientifically impossible even to set up some

18   experiment where we could, you know, recapture the exact

19   setting, and -- and it was -- it's just -- it was

20   scientifically impossible we felt.

21   Q.    And as a matter of fact, you communicated in July of 2015

22   with someone from one of the -- I guess the FBI lab?

23   A.    Yes, sir.

24         MR. LENAMON:  And may I approach the witness and just

25   show him this e-mail, Judge?

```
 1   BY MR. LENAMON:
 2   Q.   Just take a look at that when you get a chance.
 3   A.   Yes, sir.  Yes, sir.
 4   Q.   Do you remember that?
 5   A.   Well, sir, I remember reviewing it recently.
 6   Q.   Okay.  And you communicated with them and your --
 7            MR. VOKEY:  May we approach just really quickly?
 8            THE COURT:  Yes, sir.
 9       (Sidebar conference:)
10            MR. VOKEY:  Sir, I don't mean to stop the
11   examination, but I just need to step out for a little bit.  I'm
12   having some intestinal distress.  I didn't want to just walk
13   out.
14       (The following proceedings occurred in open court, in the
15   presence of the jury:)
16   BY MR. LENAMON:
17   Q.   And you communicated with this person about that issue
18   that you were talking about --
19   A.   Yes, sir.
20   Q.   -- that you were somewhat in disagreement?
21   A.   Yes, sir.  And I meant no disrespect by that particular
22   e-mail.  It's just -- that's an e-mail, you know --
23   Q.   I understand.
24   A.   -- and I probably spoke a little informally in that.  But,
25   yeah, I just -- we -- Dr. Jackson and I felt that there would
```

1   just be no way to scientifically prove or disprove postmortem

2   redistribution in this case.

3   Q.   And your response in that e-mail was to this person, "Any

4   idea what SA Dunwoodie is hoping for?"

5        Correct?

6   A.   Yes, sir.  Special Agent Dunwoodie, yes, sir.

7   Q.   And so you're referring to NCIS Special Agent Dunwoodie,

8   correct?

9   A.   Yes, sir.

10  Q.   That's the gentleman sitting at the end of the table?

11  A.   Yes, sir.

12  Q.   Okay.

13       MR. LENAMON:  I think those are all the questions I

14  have.

15       Thank you, Doctor.

16       THE WITNESS:  Thank you.

17       THE COURT:  Any redirect?

18       MR. GEE:  Yes.  Thank you.

19                    **REDIRECT EXAMINATION**

20  BY MR. GEE:

21  Q.   Let's start there at the back, Dr. Gordon.  Anything in

22  your review, did you view anything as wrong with NCIS trying to

23  work with you to determine scientifically what may have caused

24  the fluoxetine levels?

25  A.   No, sir.  You know, we -- I think the last line in my

```
 1   opinion on my autopsy report said that, you know, "If
 2   additional investigative information comes to light, we can
 3   re-review the case."  And that's not uncommon for an
 4   undetermined certification to leave that in there so that if
 5   something comes up two years later, yeah, I can take another
 6   look at it and see if it changes the cause or manner of death,
 7   so this is a natural collaboration.
 8   Q.   Anything about the NCIS agents hoping that you could
 9   provide some kind of answer about the fluoxetine level?
10   A.   No, sir.  They were doing diligent work.
11   Q.   You were asked about this e-mail from a couple of weeks
12   after your -- your autopsy.
13          MR. GEE:  I'll just -- may I approach, Your Honor --
14   approach him again?
15          THE COURT:  Sure.
16   BY MR. GEE:
17   Q.   This is the February 23rd e-mail.
18   A.   Yes, sir.
19   Q.   Take a look at that again for a second.  Just let me know
20   when you've -- when you've looked up after reading the top
21   e-mail.
22   A.   Yes, sir.
23   Q.   And, Doc -- and this is the e-mail chain, correct, Doctor,
24   where they were informing you about some of the mental health
25   issues that Lara Tur described in her interview, correct?
```

1   A.   Yes, sir.

2   Q.   And --

3   A.   There was -- there was a lot of -- lot of e-mail chains.

4   Q.   And Mr. Lenamon read a part about how you said that you

5   believed suicide to be the most likely manner of death, but

6   that is not always good enough to trump undetermined.  Is that

7   what you wrote?

8   A.   Yes, sir.  I -- there is --

9   Q.   What did you mean by that?

10  A.   So there's no way I could certify this case as a suicide

11  based on even the totality of evidence that we have now five

12  years later, because, again, in the end, it's speculative, and

13  we don't have a witness that says, "Yeah, I saw him hold his

14  nose and jump in the water.  I saw him fall in the water."

15  There was never that witness statement.

16          So, you know, to call this a suicide based on the

17  cause of death, it's really because of that fluoxetine level,

18  but, you know, if there's any chance that some of that is due

19  to postmortem redistribution, then, you know, it's -- it's

20  difficult to say one way or the other.

21  Q.   And you also wrote in the sentence before that, "We are

22  100 percent confident that this was probable drowning

23  complicated by fatal levels of fluoxetine and alcohol"?

24  A.   Right.  We stand by our certification of cause of death.

25  I've got nothing else here that would compete with it.  I mean,

1    it was a body recovered from water, everything is consistent

2    with drowning, and that ethanol and that fluoxetine level would

3    certainly make it difficult to swim.

4    Q.    So did learning that additional information about his

5    various mental health issues that Ms. Tur described, did that

6    affect your determination that you had issued in your autopsy

7    report a few weeks earlier?

8    A.    No, sir.  We didn't change anything about the cause and

9    manner of death based on that additional information.

10   Q.    And, again, anything unusual about them continuing to

11   provide you information about their learning?

12   A.    No, sir.  Like I said, we leave it open, and yeah, if more

13   information comes to light, then we'll -- we'll take a look at

14   it.

15   Q.    And with respect to this information about him potentially

16   doubling up on Prozac, et cetera that Ms. Tur provided, if --

17   if -- if a person is doubling up on Prozac, would that affect

18   whether there's more or less Prozac when a pill count is

19   conducted?

20   A.    Yes, sir.  It would certainly affect the count.

21   Q.    And -- and here, as you explained, the pill count was

22   consistent with him taking overall the -- the prescribed

23   amount?

24   A.    Yes, sir, based on the interpretation that NCIS gave us of

25   that pill count.

1  Q.   So if he was missing doses and catching up, in the end

2  he's taking the right, proper dose?

3  A.   Yes, sir.  I mean, well, no, not as prescribed.  If it's

4  prescribed once a day and, you know, he's taking it every other

5  day and doubling it up, that's not how it's designed to be

6  taken.

7  Q.   Right total number of pills?

8  A.   But total number of pills will end up being the same.

9       MR. GEE:  The Court's indulgence.

10      (Counsel confer.)

11      MR. GEE:  Nothing further.  Thank you, Your Honor.

12      THE COURT:  Anything else, sir?

13      MR. LENAMON:  Yes, Judge.

14                    **RECROSS-EXAMINATION**

15  BY MR. LENAMON:

16  Q.   Doctor, when you work -- you had testified that you work

17  as a contractor for some government agencies doing medical

18  examination on the side?

19  A.   Oh, yes, sir, but for state.

20  Q.   All right.

21  A.   Right.

22  Q.   So when you do that work, you actually work for the

23  medical examiner's office, correct?

24  A.   Yes, sir.

25  Q.   Which is different than the police department?

1  A.    Absolutely.  Yes, sir.

2  Q.    Which is, you know, different from other investigative

3  agencies, correct?

4  A.    Yes, sir.

5  Q.    Okay.  In this particular case, you are in the Navy?

6  A.    I'm Air Force, sir.

7  Q.    Air Force.  Okay.  So you're in the armed forces and

8  you're working with armed forces investigators; is that

9  correct?

10  A.    Yes, sir.

11  Q.    Okay.  And you testified that you wouldn't have changed

12  your opinion based on that information that you were given on

13  February 23rd from one of the NCIS agents; is that correct?

14  A.    Yes, sir.

15  Q.    And so we understand that, in your autopsy report, you

16  say, "No notes expressing suicidal ideation were discovered by

17  the investigative agency."

18          Is that correct?

19  A.    Right.  Yes, sir, yes.

20  Q.    And I think you testified you hadn't received any

21  information about that, correct?

22  A.    We -- yeah.  I just knew at the time that they hadn't

23  discovered anything written by Christopher Tur by his own hand

24  saying, "I intend to take my life."

25  Q.    Okay.  But had you -- in the hypothetical sense, because

1    you had talked about a gunshot wound, had you been given

2    information that there was a gunshot wound to someone's head in

3    their house and there's no explanation for it, and you were

4    provided four or five different sources saying that the person

5    had been suicidal, you still would have not put in your autopsy

6    report under those circumstances that suicide was the cause of

7    death?

8    A.    So in a case like that, if you have someone that's in a

9    secure house, the weapon's there, and it was a single-contact

10   gunshot wound to the head, four or five witnesses saying that

11   this person expressed suicidal ideation, I would manner that as

12   suicide as long as the investigative agency doesn't think it's

13   a homicide in some way.  So, yeah, we give it a little time for

14   the investigation to go forward, but I would most certainly

15   call that a suicide.

16   Q.    Okay.  And you said you received no pressure from this

17   gentleman or anyone else about not to call this a suicide; is

18   that correct?

19   A.    Sir, I -- I didn't feel that they were pressuring me to

20   put any particular certification for the manner, no.

21         MR. LENAMON:  Thank you, Dr. Gordon.  I appreciate

22   your testimony.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  All right, sir.  You may step down.

25   Thank you.

1          THE WITNESS:  Yes, sir.

2      (Witness excused.)

3          THE COURT:  Let me see counsel briefly.

4      (Sidebar conference:)

5          THE COURT:  Who's the next witness?

6          MR. NOTHSTEIN:  Jason Boswell, Your Honor, NCIS

7    agent.

8          THE COURT:  Okay.  Are you okay or do you need to

9    break now?  You want to take a break?  We can take a break now

10   if you want to, if that would be helpful.

11         MR. VOKEY:  Yes, sir.

12         THE COURT:  Okay.  All right.  We'll do that.

13         MR. GEE:  Can we ask -- Your Honor, can we release

14   Dr. Gordon now?

15         MR. VOKEY:  Yes.

16         MR. LENAMON:  We got what we need.

17         MR. VOKEY:  We got what we need.

18         THE COURT:  Okay.  Thank you.

19     (The following proceedings occurred in open court:)

20         THE COURT:  All right.  Ladies and gentlemen, we have

21   got a little bit of setup to do for the next witness, so let's

22   go ahead and take our break.  It's a little bit early, but

23   that's okay.  We're going to take a 15-minute break.  It is ten

24   minutes to 11:00.  I'll ask you to be back and ready to come

25   out at five after 11:00.  Please remember all my instructions.

1          Thanks, ladies and gentlemen.

2          COURT SECURITY OFFICER:  All rise for the jury.

3     (Jury exits, 10:50 a.m.)

4          COURT SECURITY OFFICER:  Please be seated.

5          THE COURT:  Ms. Diaz -- Ms. Diaz tells me I did not

6     formally admit Government's Exhibit 86.  We had a discussion

7     about it.  There was no objection to it.  I said I was going to

8     admit it, but it never actually got officially admitted.

9     Obviously it was referred to in this examination.  So I will

10    admit Government's Exhibit 86 without objection.

11         Anything else from counsel?

12         MR. GEE:  No, Your Honor.

13         THE COURT:  15 minutes.

14         MR. VOKEY:  Thank you, Judge.

15    (Recess from 10:51 a.m. to 11:08 a.m.; all parties

16    present.)

17         COURT SECURITY OFFICER:  All rise.  This Honorable

18    Court is back in session.  You may be seated.

19         MR. NOTHSTEIN:  Very briefly, Your Honor.

20         THE COURT:  Yeah.

21         MR. NOTHSTEIN:  The government -- or the parties have

22    agreed to preadmit more exhibits.

23         THE COURT:  All right.

24         MR. NOTHSTEIN:  These would be Government's Exhibits

25    30, 31, and 32.

1           THE COURT:  Okay.

2           MR. NOTHSTEIN:  And further, Your Honor, I would just

3    note I'm going to be reading from Stipulation 2, Your Honor,

4    and with the agreement of Mr. Lenamon, the stipulation lists

5    all of the blood swabs that were taken, even ones that were not

6    tested.  We are only going to be reading about the results of

7    the swabs that tested positive for Mr. Tur's blood, which are

8    reflected on one of our exhibits.

9           THE COURT:  That's fine.

10          MR. NOTHSTEIN:  So I have a copy there for Your

11   Honor.

12          THE COURT:  Now, what are we going to give to the

13   jury, though?  Are we going to -- are we going to re-visit the

14   exhibit -- that's probably what we should do.

15          MR. NOTHSTEIN:  I think so, Your Honor.  I think we

16   can speak with the defense and come up with an amended exhibit.

17          THE COURT:  Right.  And so they don't need to worry

18   about that now.  You'll just read the ones that are pertinent

19   and then we'll come up with an exhibit later to attach to the

20   stipulation.

21          MR. NOTHSTEIN:  Yes, Your Honor.

22          THE COURT:  Okay.  That's fine.

23          So 30, 31, and 32 will be received.

24       (Government's Exhibits 30, 31, and 32 received into

25   evidence.)

 1              THE COURT:  And Government's Exhibit 2 is the

 2   stipulation that Mr. Nothstein is going to be utilizing.

 3              Let's have the jury, please.

 4              COURT SECURITY OFFICER:  All rise for the jury.

 5         (Jury enters, 11:11 a.m.)

 6              COURT SECURITY OFFICER:  Please be seated.

 7              THE COURT:  Welcome back.  We have a new witness.

 8              Ms. Diaz, please.

 9              COURTROOM DEPUTY:  Do you solemnly swear that the

10   testimony you are about to give before this court will be the

11   truth, the whole truth, and nothing but the truth, so help you

12   God?

13              THE WITNESS:  Yes, ma'am.

14              COURTROOM DEPUTY:  Please state your full name and

15   spell your last name for the record, sir.

16              THE WITNESS:  Jason Boswell, B-o-s-w-e-l-l.

17              COURTROOM DEPUTY:  Thank you, sir.

18              THE COURT:  You may proceed, sir.

19              MR. NOTHSTEIN:  Thank you, Your Honor.

20              Your Honor, before I begin, I'd like to read from

21   Government's Exhibit 2, which is a stipulation between the

22   parties.

23              THE COURT:  Here's another stipulation, ladies and

24   gentlemen, and you'll have it with you in the jury room.

25              Go ahead, sir.

1          MR. NOTHSTEIN:  Thank you.

2          Counsel for the government, counsel for the defense,

3     and the defendant hereby agree and stipulate to the following:

4     In or about 2016, NCIS agents provided several swabs of

5     suspected blood to U.S. Army Criminal Investigation Laboratory,

6     or USACIL, so the swabs could be tested to determine whether

7     they were, in fact, blood, whether a DNA profile could be

8     extracted, and whether any DNA profile that could be extracted

9     could be matched to Christopher Tur or the defendant.

10         Each swab had been assigned an identification number

11    and item letter by NCIS listed in the chart below as the NCIS

12    number, which is the same as the government's exhibit number

13    listed below.

14         USACIL personnel conducted tests on the swabs for the

15    presence of blood and DNA using commonly accepted methods and

16    using properly calibrated equipment.

17         USACIL assigned the swabs it received with a separate

18    two- or three-digit identification number listed in the chart

19    below as the USACIL number.

20         As is indicated below on the table, USACIL testing

21    revealed that some samples were found to be blood, others were

22    possibly found to be blood, others found not to be blood.

23         USACIL also extracted a DNA profile from certain

24    samples which had been found to be blood, and found that the

25    DNA profile from those samples matched a profile for Tur,

1   meaning that the DNA profiles from those swabs are 230

2   quadrillion times more likely to have originated from Tur than

3   from an unknown individual, or were a partial match for Tur's

4   DNA profile, which means that it is 37 quadrillion times more

5   likely that it originated from Tur than from an unknown

6   individual.

7           None of the DNA profiles generated from the swabs

8   listed below match the DNA profile of the defendant.

9           Government's Exhibit No. 36E, a partial DNA profile

10  was obtained which is consistent with the DNA profile of Tur.

11          37I, DNA profile obtained which matches DNA profile

12  of Tur.

13          39H, DNA profile obtained which matches the DNA

14  profile of Tur.

15          39K, DNA profile obtained which matches the DNA

16  profile of Tur.

17          44A, DNA profile obtained which matches the DNA

18  profile of Tur.

19          44C, DNA profile obtained which matches the DNA

20  profile of Tur.

21          44F, DNA profile obtained which matches the DNA

22  profile of Tur.

23          44I, DNA profile obtained which matches the DNA

24  profile of Tur.

25          44K, DNA profile obtained which matches the DNA

1    profile of Tur.

2            44O, DNA profile obtained which matches the DNA

3    profile of Tur.

4            44V, DNA profile obtained which matches the DNA

5    profile of Tur.

6            44W, DNA profile obtained which matches the DNA

7    profile of Tur.

8            44Z, DNA profile obtained which matches the DNA

9    profile of Tur.

10           44GG, DNA profile obtained which matches the DNA

11   profile of Tur.

12           53D, DNA profile obtained which matches the DNA

13   profile of Tur.

14           53F, DNA profile obtained which matches the DNA

15   profile of Tur.

16           53J, DNA profile obtained which matches the DNA

17   profile of Tur.

18           **JASON BOSWELL, GOVERNMENT'S WITNESS, SWORN**

19                   **DIRECT EXAMINATION**

20   BY MR. NOTHSTEIN:

21   Q.   Good morning, Agent Boswell.

22   A.   Good morning.

23   Q.   Could you please introduce yourself to the jury and tell

24   us where you currently work?

25   A.   Yes, sir.  So I'm the supervisory special agent in charge

1  of technical operations or technical services for NCIS, and I'm

2  stationed at the Russell-Knox Building, which is in Quantico,

3  Virginia.

4  Q.    And what are technical operations?

5  A.    So in our side technical operations would be technical

6  surveillance.  So concealed cameras, concealed microphones for

7  investigations, for criminal investigations or operations or

8  counterintelligence investigations and operations.

9  Q.    How long have you served in that position?

10  A.    I've been the supervisory special agent since March of

11  last year.  I was a field agent in tech services for the three

12  years prior to that.

13  Q.    And prior to serving as a field agent in tech services,

14  what was your assignment with NCIS?

15  A.    I was assigned to Naval Submarine Base Kings Bay, Georgia,

16  where I was a reactive crim agent, investigating all types of

17  criminal allegations, and also served as the leader of the

18  Major Case Response Team for the Southeast field office.

19  Q.    How long had you been -- or how long overall have you been

20  with NCIS?

21  A.    I started NCIS in January of 2009.

22  Q.    Prior to joining NCIS in January of 2009, what kind of

23  experience did you have in law enforcement?

24  A.    I worked here in Northeast Florida.  I was with the

25  Florida Fish and Wildlife Conservation Commission as a

1    conservation officer.  I investigated fatality boating

2    accidents, hunting accidents, and commercial abuses of

3    wildlife.

4    Q.    How long did you serve in that position?

5    A.    I was with FWC for seven years.

6    Q.    But you mentioned that you -- at the -- in your previous

7    assignment were part of the Major Case Response Team.  What is

8    the Major Case Response Team?

9    A.    The Major Case Response Team's role is any investigation

10   that is going to have probably more in-depth forensic

11   collection or documentation of scenes or evidence.  We have

12   agents that go to advanced training to learn about photography,

13   evidence collection, a variety of techniques to either collect

14   or document a scene.

15   Q.    And did you receive that type of advanced training?

16   A.    Yes, sir, I did.

17   Q.    And generally what does that cover?

18   A.    Again, photography, using alternative light sources, but

19   being able to take close-up photography overall in low light or

20   using alternate light sources.  Collection techniques to

21   collect hairs, fibers, blood or trace evidence.  Scene mapping

22   documentation to diagram the scene.  Video and photograph it in

23   its entirety.

24   Q.    You mentioned scene examination.  Is there an NCIS policy

25   regarding whether or not scenes must be examined in the event

1  of any death?

2  A.    Yes, sir.  So NCIS's stance on death scenes is that

3  anytime there's a death aboard a naval installation or Marine

4  Corps installation or involving a Navy or Marine Corps person,

5  the death investigation will be conducted in its entirety until

6  we can exclude criminal liability.  So we -- in every case we

7  try to locate the scene where whatever transpired and whatever

8  happened there that resulted in the death.

9  Q.    Were you serving in this capacity on the Major Case

10  Response Team in January of 2015?

11  A.    Yes, sir.

12  Q.    Were you asked to investigate or join the investigation of

13  the death of Christopher Tur at Guantanamo Bay, Cuba?

14  A.    Yes, sir.

15  Q.    Approximately when were you made aware of your -- that you

16  were going to be joining this investigation?

17  A.    I believe I was notified the 11th, 12th, somewhere -- we

18  only had a couple of days' notice before we actually boarded

19  the plane to fly down.

20  Q.    When did you actually travel to Guantanamo Bay?

21  A.    So we traveled on the 14th of January.

22  Q.    Okay.  When you got to the airport at Guantanamo Bay, how

23  did you get to the other side of the island, to the windward

24  side?

25  A.    It was on the ferry.

1    Q.    Was anyone else on the ferry with you?

2    A.    The agents that traveled with me.  The CO met us, and his

3    wife and daughter were also on the flight down with us.

4    Q.    And who was the CO?

5    A.    Captain Nettleton.

6    Q.    Did you and the other agents take any investigative steps

7    on the 14th?

8    A.    No, sir.  Apart from the travel and arrival, no,

9    everything was about logistics and getting bedded down for the

10   night, because we arrived fairly late at night.

11   Q.    Did you do any -- did you start the investigation the next

12   day?

13   A.    Yes, sir.

14   Q.    Now, Agent Boswell, based on what you understood at the

15   time, and you and the other agents, what questions or

16   investigative steps were you taking at the time to sort of

17   figure out what you -- what you needed to do for the

18   investigation?

19   A.    So at the time we were aware of the Hail and Farewell

20   party that had happened on the night of the 9th, that there was

21   a --

22              MR. LENAMON:  Objection.  Hearsay.

23              MR. GEE:  Effect on the listener, Your Honor.

24              THE COURT:  Overruled.

25              THE WITNESS:  There was an altercation or argument

1  that had happened there and that Mr. Tur had gone missing that

2  evening and hadn't been seen again.  There was the IG

3  allegation or complaint -- the anonymous complaint that there

4  had been an argument --

5          THE COURT:  I'll let you just leave it at that on the

6  IG complaint.

7          MR. NOTHSTEIN:  Yes.

8          THE COURT:  What's your next question?

9  BY MR. NOTHSTEIN:

10  Q.   So what sort of -- what steps were you and the other

11  agents taking in the days from January 15th forward to further

12  the investigation?

13  A.   So each day we -- each morning we would meet up at the

14  office there in Guantanamo Bay and discuss what -- what we had

15  left to do or who we needed to talk to.  And in those initial

16  days it was a list of witnesses that attended the Hail and

17  Farewell or that we thought would have any knowledge at all of

18  where Chris went or what had happened.

19  Q.   And, generally, Agent Boswell, sort of what questions were

20  you trying to get answered through the investigative steps you

21  decided to take?

22  A.   Anybody that had seen him, had anybody -- who was the last

23  person to have seen Chris alive, where was that, at what time

24  was that, who had communicated with him either by phone or

25  text, and, again, where he was, what the -- the last-known time

1  that Chris was alive and witnessed by -- by somebody.

2  Q.    You mentioned there was some allegations you had heard of

3  confrontations and so forth.  Were you also investigating

4  whether or not there were confrontations between Mr. Tur and

5  the defendant?

6  A.    Yes, sir.

7  Q.    Were you also investigating whether or not --

8  investigating adultery allegations you had heard?

9  A.    That was the component just in the -- it was another -- it

10  was part of the allegation that had come in and it was just

11  another component of the case to try to assess what had

12  happened and where.

13  Q.    So you mentioned that you had morning debriefings, did you

14  also have debriefings in the evenings to share the information

15  among the agents?

16  A.    Yes, sir.

17        So each day we would split up.  And it was

18  generally -- we paired off to go conduct interviews.  And so

19  the island being the way it was, at the end of each day we

20  would gather back at the office, and everybody would kind of go

21  through and clarify -- after all the witness interviews had

22  happened that day -- what had we learned, had we been able to

23  firm up any time, date, or location based on that.

24  Q.    Without getting to specifically what was shared, was it

25  your understanding that someone from the team was sharing the

1  findings on a daily basis up the chain of command?

2  A.   Yes, sir.

3  Q.   Now, I'd like to turn your attention to January 18th of

4  2015.  What investigative steps did you personally take that

5  day?

6  A.   So on that day we were -- what would be called a

7  canvassing interview of the neighborhood, Deer Point Street,

8  the CO's house was on.

9       And we were asking -- just knocking on doors, talking

10  to the members that lived there, their spouses, their

11  dependents, was anybody home that evening, the night of the 9th

12  or early hours of the 10th?  Were they -- did they hear the

13  dogs barking?  Were they outside at any time?  Did they hear

14  anything or see anything that would establish Chris Tur had

15  been past there, through there at any time?

16  Q.   During that canvassing, did you conduct an interview of a

17  young man by the name of Tyler Heath?

18  A.   Yes, sir.

19  Q.   What did you learn from Mr. Heath that affected your

20  investigation?

21       MR. LENAMON:  Objection.  Hearsay, Judge.

22       MR. NOTHSTEIN:  Effect on the listener, Your Honor.

23       THE COURT:  I think it's all right.  I'm going to

24  overrule it.

25  BY MR. NOTHSTEIN:

1  Q.    Agent Boswell, what did you learn from Mr. Heath that

2  affected your investigation?

3  A.    So the night of January 9th Tyler Heath was home and he

4  was texting with Julia Nettleton on just kind of life in

5  general and how things were going, and Julia had advised him in

6  the text that her father was in a physical altercation with an

7  unknown person downstairs.

8  Q.    Did you seek permission from Mr. Heath to download his

9  text messages?

10  A.    Yes, sir, I did.

11  Q.    And did you personally do that?

12  A.    Yes, sir, I did.

13  Q.    After receiving this information, what was the next --

14  what investigative step did NCIS take with that -- with that

15  information?

16  A.    So that was the first really solid piece of information

17  that we had that, in fact, Chris Tur had been to the CO's house

18  and that there -- there wasn't just an argument or a

19  confrontation.  There was a physical altercation that had

20  happened.

21        We sought through our chain to get what's called an

22  oral wire intercept, which was the opportunity for Tyler to

23  make a phone call or text message with Julia to try to get more

24  information to clarify more than just the couple of statements

25  that were in the text messages.

1   Q.   Now, Agent Boswell, without getting further into those,

2   did those investigative steps happen?

3   A.   No, sir.

4   Q.   After that, what was the next investigative step you took?

5   A.   Then we pursued writing up the affidavit to get a command

6   authorization for search of the CO's house.

7   Q.   What is a command authorization for search?

8   A.   So in -- within the UCMJ it's the equivalent of a search

9   warrant.

10  Q.   Who actually signs those?

11  A.   It would be the commander in charge of that place.  And

12  since it was the CO's house, we had to go to the admiral that

13  was up at Region in Jacksonville, Mary Jackson.

14  Q.   Now, Agent Boswell, I believe you mentioned before that in

15  the event of any death, NCIS investigates to determine the

16  cause and rule out potential criminality?

17  A.   Yes, sir.

18  Q.   When you received this information, what type of potential

19  criminal offenses were you looking at?

20  A.   So -- so at the time that we had the information of the

21  altercation, we're looking at -- I guess assault would be

22  assault or battery of -- the fight, possible murder, and

23  obstruction based on -- on the things that were going on with

24  the case at the time.

25  Q.   Now, were those offenses -- potential offenses, were those

1  UCMJ offenses?

2  A.   They are.

3  Q.   Does NCIS investigate other crimes other than the UCMJ?

4  A.   Yes, sir.

5  Q.   What other types of crimes do you investigate?

6  A.   Depending on the location where we work, we've been known

7  or we are able to work cases locally with state law enforcement

8  and also with federal jurisdictions.  So we also apply federal

9  statutes.

10 Q.   Were other federal offenses also possible in this

11 situation?

12 A.   Yes, sir.

13 Q.   In the event that you find -- just generally, NCIS finds

14 evidence to support a potential federal offense, how did that

15 case go to charges?

16 A.   So we, as the -- the investigating agents, we -- our job

17 is to go collect facts, collect evidence.  And we present that

18 forward to the U.S. Attorney's Office or to command or the JAG

19 lawyers that make those decisions.

20 Q.   And if it's presented to the U.S. Attorney's Office, are

21 you familiar what the, sort of, mechanism is to use that

22 evidence to generate charges?

23 A.   Yes, sir.

24 Q.   What is that?

25 A.   It's through the grand jury, correct?

1  Q.    Thank you.

2          After obtaining the command authorized -- the CAS --

3  is that what it's called?

4  A.    Yes, sir, the abbreviation.

5  Q.    Did you actually execute the search?

6  A.    Yes, sir, we did.

7  Q.    Okay.  How was the search executed?

8  A.    So on that day, on the 20th of January, a couple of agents

9  went to the CO's house to interview Julia and Leslee Nettleton,

10 and at the conclusion of the interview, they informed them of

11 the command authorization for search, allowed them to gather

12 some personal effects that -- while they were supervised,

13 because they were not going to be in the house for a while, and

14 they were escorted from the house.

15          The rest of the team showed up on scene and we

16 started the search.  Do you want me to --

17 Q.    Well, approximately what time of day did you start the

18 search?

19 A.    It was early afternoon, I think about 2 o'clock in the

20 afternoon.

21 Q.    In general, what were you authorized to search for under

22 the CAS?

23 A.    So the CAS authorized us to search -- we were --

24 specifically based on the information from Tyler, we wanted the

25 electronics that were in the house that would have been used to

1  communicate about the events that night.  We were also looking

2  for any evidence that Chris Tur was present in the house, and

3  that included blood or DNA evidence.  And that would also go to

4  whether or not there was a physical altercation or a fight

5  within the house.

6  Q.    Were you also authorized to search for clothing?

7  A.    Yes, sir.

8  Q.    So you said you started the search.  What was the first

9  thing that you and the other agents did?

10 A.    So the first thing that we do when we arrive on scene is

11 we -- we try to establish what the scene looks like when we

12 arrive there, and for a variety of reasons.

13        So I started off with a video and I videoed the

14 interior of the house.  It's a basic walk-through of the house.

15 We just want to establish what the scene looked like when we

16 arrived there.

17        Another agent did a photographic walk around the

18 outside of the house.  When we had both completed that, we

19 swapped roles.  She went inside and photographed the interior

20 of the house and I videoed the outside.

21 Q.    And as the other agent was performing the interior

22 photography of the house, did that agent notice something that

23 affected the investigation?

24 A.    Yes, sir.  She saw what she suspected was blood.

25 Q.    And when this agent found the suspected blood, what did

1    you and the other agents do?

2    A.    So at that point we put on the -- the appropriate personal

3    protective equipment, booties and gloves, so that we wouldn't

4    be touching biological hazards.  And we started our search

5    of -- of the house, specifically in that area of what was the

6    suspected blood drops and then working our way backwards.  And

7    then there were agents that searched around the house for the

8    clothing and electronic devices that we were also after.

9    Q.    And did you and the other agents looking for suspected

10   blood do anything when you found what you thought was blood

11   around the house?

12   A.    Yes, sir.  As we noticed the blood drops, we were using

13   the small Post-it tabs, color Post-it tabs to stick out -- some

14   of the drops were very small, and so to be able to kind of see

15   those and not step on them or obliterate them, we were tabbing

16   them with the Post-it notes.

17   Q.    Approximately how long did it take to do the visual

18   canvass of the house for suspected blood and mark it?

19   A.    So the very first day we were there until 3 o'clock in the

20   morning and we realized that we were -- we were at a point

21   where there was no way to finish that night.  So we stopped

22   that day and secured the residence.

23          MAs held the house for us to preserve it.  And it

24   took the next day-and-a-half beyond that to finish our search,

25   documentation, and collection.

1  Q.   Once you finished surveying the house for suspected blood

2  and putting the Post-it tabs there, did you all take

3  photographs of this blood you -- suspected blood you found?

4  A.   Yes, sir.

5  Q.   After taking the photographs, did you collect samples of

6  the blood for later testing?

7  A.   Yes, sir, we did.

8  Q.   What is the process that you and the other agents went

9  through to collect the blood samples for further testing?

10  A.   So the -- the equipment that we used -- or the items we

11  used for doing that are essentially they're large Q-tips.  It's

12  a wooden stick with a cotton swab on the end of it.  It has a

13  plastic cap that goes over that cotton swab to protect it.

14          We would take that out, use a small caplet of sterile

15  water, drop a couple of drops of water on there, just enough to

16  moisten the tip of the cotton swab, then roll and swab up the

17  stain with the wet swab.  Follow behind it in the same area

18  with the dry swab.  Both of those get capped, dropped into a

19  paper bag, and later sealed.  We would also write on the paper

20  bag the location from where the swabs were taken.

21  Q.   Who actually conducted the swabbing testing?  Or the

22  swabbing collection.

23  A.   The swabbing was done by myself and Agent Rachel Clergy.

24  Q.   Were other agents assisting you with further processing

25  the collected swabs at the scene?

1   A.   Yes.

2   Q.   And what were they doing in general?

3   A.   So to avoid contamination or -- and efficiency of the

4   process, when we would swab -- when Rachel and I would swab, we

5   would walk over and drop them into a bag that was held by

6   another agent, and they would fold the top shut.  And that way

7   we are not coming in contact with the inside of every bag and

8   they are not coming in contact with the swabs themselves.

9           MR. NOTHSTEIN:  May I approach, Your Honor?

10          THE COURT:  Yes.

11  BY MR. NOTHSTEIN:

12  Q.   Agent Boswell, I'm going to show you what has been marked

13  as Government's Exhibit 39H for identification purposes.

14          Do you recognize Government's Exhibit 39H?

15  A.   Yes, sir.

16  Q.   What is it?

17  A.   This would be a sample of one of the bags we collected

18  with the swabs inside.

19          MR. NOTHSTEIN:  With the Court's permission, I'll put

20  this up as a demonstrative.

21          Ms. Diaz, may I have the document, please?

22  BY MR. NOTHSTEIN:

23  Q.   So, Agent Boswell, there's several markings and other

24  things on this bag.  I might just start at the top.  What is

25  this that I've circled at the top?

1   A.   So that would be the evidence tape used to seal the bag

2   and the date of the person that sealed it -- the date written

3   by the person that sealed it.

4   Q.   Is that date written across the tape for a reason?

5   A.   Yes, sir.  It needs to go from the tape onto the

6   packaging.  So the tape is fracture tape.  You can't peel it

7   off.  If you try to, it comes off in a thousand pieces.  But

8   the idea is that it's clear that that is the tape that was used

9   to seal it because the lines are unbroken on the letters and

10  the characters.

11  Q.   And the large white label that's here in the middle of the

12  bag, what -- what is indicated on this?

13  A.   That is the evidence custody tag that is generated when

14  we -- when we take everything back to the office to write it up

15  and produce our evidence custody document.

16  Q.   And is there an indication in the -- where I'm circling

17  here, what is that information?

18  A.   So the very top right corner, there is the -- the case

19  number.

20  Q.   Okay.  And below that, there's a name written.  Who's that

21  name?

22  A.   That would be the person that collected it.

23  Q.   And, in this case, who is that person?

24  A.   That was Agent Clergy.

25  Q.   At the very bottom of the white label I'm highlighting

1   looks like an address.  What is that?

2   A.   That is the location where it was seized.

3   Q.   And finally in the large text box in the middle, what do

4   we have here?

5   A.   That is the description of what -- what the item is.  The

6   same tag is used for a variety of things.  So here it's just

7   the description of the swabs taken from the corner of the green

8   trunk located downstairs in the sitting room.

9   Q.   And it looks as though in marker of some kind there is a

10  number written here in the top left.  What is that?

11  A.   That would be the log number -- evidence log number.  And

12  so everything -- everything else on the tag is generated that

13  night when we seized it.  The evidence log number is generated

14  by our evidence custodian which sits back in Jacksonville.  So

15  that's a number that's added later.

16  Q.   And I see -- let me clear this.  I see on the back there

17  is some writing as well.  What is this text?

18  A.   So that -- that's just -- again, when we're taking these

19  things, it's just a blank paper bag.  So to make sure the swabs

20  that go in there, we know what they are, that's just somebody

21  had written on there that that was from the corner of the green

22  trunk, and 1600 is probably the time it was collected.

23  Q.   Okay.

24        MR. NOTHSTEIN:  May I have the computer again,

25  Ms. Diaz?

1  BY MR. NOTHSTEIN:

2  Q.    Agent Boswell, let's call up Government's Exhibit 59.  Do

3  you recognize this document?

4  A.    Yes, sir.

5  Q.    What is it?

6  A.    This is the first floor layout of the CO's residence on

7  Guantanamo Bay.

8          MR. NOTHSTEIN:  If I could have Government's

9  Exhibit 60, please, Ms. Reid.

10  BY MR. NOTHSTEIN:

11  Q.    Agent Boswell, do you recognize Government's Exhibit 60?

12  A.    Yes, sir.

13  Q.    And what are these red markings we have here?

14  A.    The red markings are tags or indicators of the evidence

15  that was located -- the swabs that were taken that were

16  positive for Chris Tur's blood.

17  Q.    Now, let's go -- let's start room by room.

18          MR. NOTHSTEIN:  If we could have Exhibit 301, please.

19  BY MR. NOTHSTEIN:

20  Q.    Do you recognize Government's Exhibit 301?

21  A.    Yes, sir.

22  Q.    What is this?

23  A.    That is the -- well, what we label the sitting room in the

24  CO's residence.

25  Q.    Now, you mentioned that agent -- I believe it was

1    Agent Clergy was taking photographs of the interior of that

2    house.

3          Was she taking them at sort of different intervals,

4    if you will?

5    A.    So she did the initial walk-through and photographed

6    everything as she went, and then when we came back to start --

7    to start the processing, generally with photography with crime

8    scenes, you want an overall, a mid range, and then a close-up.

9    Q.    Let's take an example of those.

10          MR. NOTHSTEIN:  Can we have Government's Exhibit 305,

11    please?

12    BY MR. NOTHSTEIN:

13    Q.    What is Government's Exhibit's 305, Agent Boswell?

14    A.    That would be a mid range view of the green trunk that's

15    sitting in the middle of the sitting room.

16          MR. NOTHSTEIN:  And let me have Government's

17    Exhibit 307, please.

18    BY MR. NOTHSTEIN:

19    Q.    What is this?

20    A.    That would be more of a close-up showing the side of that

21    trunk and then the top.

22    Q.    Now, I believe you mentioned there were Post-it flags.

23          Can we see those in this picture?

24    A.    Yes, sir.  There appears to be five in that picture.

25          MR. NOTHSTEIN:  Ms. Reid, may we have Government's

1  Exhibit 308, please?

2  BY MR. NOTHSTEIN:

3  Q.   Agent Boswell, can you -- there's a stylus there next to

4  you.  If you could just -- in this photograph, if you can see

5  where the suspected blood was, please, just circle it for the

6  jury.

7        And the sort of size and general shape of the blood,

8  is that relatively consistent with what you saw in other

9  places?

10  A.   Yes, sir.

11        MR. NOTHSTEIN:  Ms. Reid, may we have Government's

12  Exhibit 55, please?

13  BY MR. NOTHSTEIN:

14  Q.   Okay.  Agent Boswell, do you recognize Government's

15  Exhibit 55?

16  A.   Yes, sir.  That would be a more isolated floor layout of

17  the sitting room.

18  Q.   Looking at the markings for 39H, what does that indicate

19  for us?

20  A.   So 39H is the two Post-it notes that you saw on the top of

21  the trunk that were in that corner.

22  Q.   And was -- were those swabs found positive for blood?

23  A.   Yes, sir.

24  Q.   Looking at 37I, what do we have there?

25  A.   That was the blood swab -- or blood swabs that we took off

1    the wall on that outside edge there.

2    Q.   Okay.  And 39K?

3    A.   Was one of the swabs -- or one of the drops we found on

4    the floor.

5    BY MR. NOTHSTEIN:

6    Q.   Moving on to Government's Exhibit 312.  What room is this,

7    Agent Boswell?

8    A.   We labeled that the "barroom."

9    Q.   Okay.

10        MR. NOTHSTEIN:  Let's bounce back to Government's

11   Exhibit 60 for a moment.

12   BY MR. NOTHSTEIN:

13   Q.   Could you just indicate on Government's Exhibit 60 where

14   the barroom is?

15   A.   (Indicating.)

16        MR. NOTHSTEIN:  And now back to 312, please,

17   Ms. Reid.

18   BY MR. NOTHSTEIN:

19   Q.   And I see here on the left, Agent Boswell, that the shelf

20   containing items and so forth, did you-all take some swabs from

21   near there?

22   A.   Yes, sir, we did.

23   Q.   Okay.

24        MR. NOTHSTEIN:  Can we have Government's Exhibit 311,

25   please?

1   BY MR. NOTHSTEIN:

2   Q.   Do you see on here, Agent Boswell, where swabs were taken

3   from?

4   A.   Yes, sir.

5   Q.   Would you please indicate it?

6   A.   Right there.

7   Q.   About how high off the floor was that, Agent Boswell?

8   A.   Four -- 4 or 5 inches, maybe.

9        MR. NOTHSTEIN:   And may we please have Government's

10  Exhibit 315, Mrs. Reid?

11  BY MR. NOTHSTEIN:

12  Q.   What is this, Agent Boswell?

13  A.   That is a -- a close-up of the same -- that's the larger

14  blood drop and you can see some smaller -- right there.

15       MR. NOTHSTEIN:   Ms. Reid, can you pull up

16  Government's 60, please -- I'm sorry, Government's 57, please?

17  BY MR. NOTHSTEIN:

18  Q.   Do you recognize Government's Exhibit 57, Agent Boswell?

19  A.   Yes, sir.   That would be the barroom with the -- the

20  labels on it.

21  Q.   Now, looking at Government's Exhibit -- or what's marked

22  here as 44F and 44I, what do those indicate?

23  A.   So 44F is what you were just looking at, the -- the

24  suspected blood stain that was there on that bottom shelf of

25  the -- shelf with the bric-a-brac on it, I guess.   And then I

1  was -- the wall that was in between them was another swab that

2  was taken from the wall in between those two shelves.

3       MR. NOTHSTEIN:  Now I'd like to turn to

4  Government's 314, please, Ms. Reid.

5  BY MR. NOTHSTEIN:

6  Q.   Agent Boswell, what are we looking at here in Government's

7  Exhibit 314?

8  A.   So you're looking at the corner of the barroom.  The

9  doorway to the right goes out to the sitting room.  The doorway

10 kind of straight in front of you there to the left of that

11 butcher block is kind of a hallway that goes around the

12 outside living -- or the living room area that's out there.

13 Q.   Okay.

14       MR. NOTHSTEIN:  Could we please have Government's

15 Exhibit 317?

16 BY MR. NOTHSTEIN:

17 Q.   Agent Boswell, what is Government's Exhibit 317?

18 A.   So as we searched -- the Post-it notes that are here on

19 the side of the butcher block and on the side of the doorway

20 there, and on the butcher block leg, are the suspected blood

21 drops.

22       MR. NOTHSTEIN:  Okay.  And if we can please have

23 Government's Exhibit 318, Ms. Reid.

24 BY MR. NOTHSTEIN:

25 Q.   What is this a photograph of, Agent Boswell?

1  A.    That would be a close-up of the blood drops and the

2  Post-it notes on that leg of the butcher block.

3  Q.    And are these the -- if you can please just indicate on

4  the screen in front of you, Agent Boswell, where the suspected

5  blood was.

6  A.    We got a drop there, there, there, there, and there.

7          MR. NOTHSTEIN:   And, Ms. Reid, if we can have

8  Government's -- or, I'm sorry, 60 again -- I'm sorry, 57?  My

9  apologies.

10 BY MR. NOTHSTEIN:

11 Q.    Looking here in the top right of the diagram of

12 Government's Exhibit 57, Agent Boswell, I see Government's --

13 or Exhibits 44K, 44O, 44V, Z, and W.

14          What do those indicate?

15 A.    So W was the -- the floor under the butcher block table.

16          The 44Z, I believe, is the drop that was right on the

17 edge of the wall -- the light switch that was just above the

18 butcher block on this wall right here.

19          The wall surrounding the butcher blocks was -- this

20 back side here was V.

21          And then K and O are the side and the leg of the

22 butcher block.

23 Q.    You say the "leg."

24          Was that the photograph that was generated earlier --

25 A.    Yes, sir.

1   Q.    -- the photograph that we looked at?

2   A.    Yes, sir.

3   Q.    And I believe you said that 44V was the wall sort of

4   behind the butcher block?

5   A.    Yes.

6   Q.    Now I'd like to show you Government's Exhibit 327.

7         What is this a photograph of, Agent Boswell?

8   A.    So this would be standing kind of right beside the butcher

9   block looking -- if you can imagine you're standing in -- you

10  walked in from that hallway that I described, you're standing

11  by the butcher block looking through an open doorway into the

12  kitchen.

13  Q.    So you said this photograph would be if we were standing

14  in front of the butcher block?

15  A.    You're -- in front of it being a relative term.  You're

16  standing basically in the doorway -- or right beside the

17  doorway that goes out to the barroom would be to your left --

18  or the sitting room would be to your left.  The rest of the

19  barroom would be to the right.  Those two bookshelves would be

20  off -- off picture to the right.

21  Q.    Okay.

22        MR. NOTHSTEIN:  Can we have Government's Exhibit 328?

23  BY MR. NOTHSTEIN:

24  Q.    What do we see in this photograph, Agent Boswell?

25  A.    This is a mid range photograph, and you can see on the --

1   the doorway there, there's more Post-it tabs here.  There's

2   also some down on the floor, on the legs of the chair, and also

3   on the edge of the table.

4           MR. NOTHSTEIN:  Can we have Government's 329, please?

5   BY MR. NOTHSTEIN:

6   Q.   What's this a photograph of, Agent Boswell?

7   A.   This would be another mid range, just from a little bit

8   closer and a different angle to show the Post-it notes that

9   were on the table and chair.

10          MR. NOTHSTEIN:  And may we have Government's

11  Exhibit 56, please, Ms. Reid?

12  BY MR. NOTHSTEIN:

13  Q.   Agent Boswell, what does -- what's indicated here on

14  Government's Exhibit 56?

15  A.   This is the floor plan with just a kitchen area.

16  Q.   And I see there's a mark for a 44A and 44C.

17          What does that indicate?

18  A.   Yes, sir.  Those are the labels for the swabs that were

19  positive for Chris Tur's blood.

20  Q.   And 44A, I see an arrow there, but can you explain to us

21  where that was recovered from?

22  A.   It was the -- the edge of the table there.

23  Q.   All right.  Agent Boswell, did you also -- was there also

24  a swab taken from outside of the defendant's home?

25  A.   Yes.

1           MR. NOTHSTEIN:  May we please have Government's

2   Exhibit --

3   BY MR. NOTHSTEIN:

4   Q.   Well, generally, where was that swab taken from?

5   A.   It was on the walkway going down to the dock.

6           MR. NOTHSTEIN:  Can I see Government's Exhibit 338,

7   please?

8   BY MR. NOTHSTEIN:

9   Q.   Can you indicate generally on this photograph,

10  Agent Boswell, where the swab was taken from?

11  A.   It was on the stairs here.

12  Q.   And those were the sort of --

13  A.   They walk down to that lime rock or dirt there on the left

14  side.

15  Q.   And, Agent Boswell --

16          MR. NOTHSTEIN:  Or, Ms. Reid, may we have

17  Government's Exhibit 335, please?

18  BY MR. NOTHSTEIN:

19  Q.   What is this a photograph of, Agent Boswell?

20  A.   That's a closer picture of those stairs going down.

21  Q.   And could you again indicate generally where the positive

22  swab came from?

23  A.   I believe it was down here.

24          MR. NOTHSTEIN:  And, Ms. Reid, may we have

25  Government's Exhibit 61, please?

1          May we have the projector, Ms. Diaz?

2    BY MR. NOTHSTEIN:

3    Q.   I'm going to show you Government's Exhibit 61,

4    Agent Boswell.

5          Let me just zoom out.

6          Do you recognize this document?

7    A.   Yes, sir.  It's the diagram of the dock and the walkway

8    going down to it.

9    Q.   And where it says "36E," what does that indicate?

10   A.   That's the approximate location of where those stairs are

11   going down off the concrete walkway down to that patch of dirt.

12   Q.   Look at page 2.

13          What is this?

14   A.   That's a side view of the same area.

15   Q.   And, finally, page 3?

16   A.   Yes, sir.  Just a -- a closer picture.

17   Q.   Okay.  Now, Agent Boswell, you mentioned that the -- the

18   CAS authorized you to search for other items such as

19   electronics.

20          Were electronics seized during the search?

21   A.   Yes, sir.

22   Q.   And, also, it authorized you to search for clothing.

23          Was clothing seized during the search?

24   A.   Yes, sir.

25   Q.   To your knowledge, were any ripped items of clothing

1  recovered?

2  A.  No, sir.

3      MR. NOTHSTEIN:  Nothing further, Your Honor.

4                    **CROSS-EXAMINATION**

5  BY MR. LENAMON:

6  Q.  Good morning, Agent.

7  A.  Good morning.

8  Q.  So one of the things is that you're trained on how to

9  recover evidence; is that right?

10  A.  Yes, sir.

11  Q.  And the evidence that we've talked about -- we spent a

12  great deal talking about is blood evidence that was recovered

13  from Captain Nettleton's house; is that right?

14  A.  Yes, sir.

15  Q.  And you certainly are aware that there are various ways

16  that blood evidence is transferred to a particular area, are

17  you not?

18  A.  Sure.

19  Q.  If someone has blood on them, they could transfer it

20  directly from themselves or from a piece of clothing or

21  something like that; is that correct?

22  A.  Yes, sir.

23  Q.  But there's also something called "cast-off."

24      You're familiar with cast-off; are you not?

25  A.  Yes, sir.

1    Q.    Okay.  And the best way to think of cast-off is -- you

2    ever go to a religious service where the priest or somebody

3    dips that little round thing in water and then goes like this

4    (gesturing) to everybody?

5    A.    Sure.

6    Q.    That's cast-off; is that right?

7    A.    Yes, sir.

8    Q.    Water goes everywhere.  A person may be sitting over there

9    in the corner and feel that water hit them.

10           And that's the same thing when talking about blood.

11   If there's something that has blood on it and it's directed in

12   a location, the blood will go there, and that's called

13   "cast-off"; isn't that right?

14   A.    Sure.

15   Q.    And it would depend on -- where it goes, the position of

16   the item casting it off.  If someone is pointing down, pointing

17   far, on a knee, that's all variable as to where the blood could

18   go; is that right?

19   A.    Sure.

20   Q.    Now, you're familiar that the Navy never conducted any

21   kind of court-martial against Captain Nettleton --

22           MR. NOTHSTEIN:  Objection, Your Honor.  Relevance.

23           THE COURT:  Sustained.

24   BY MR. LENAMON:

25   Q.    Did you testify in front of the grand jury?

1  A.   No, sir.

2           MR. LENAMON:  If I could have a moment, Judge?

3           THE COURT:  Yes.

4       (Counsel confer.)

5           MR. LENAMON:  Nothing further, Judge.

6                    **REDIRECT EXAMINATION**

7  BY MR. NOTHSTEIN:

8  Q.   Agent Boswell, you were asked some questions about

9  cast-off.

10          In your experience, to your knowledge, once a liquid,

11 water, or blood is cast off from something, does it follow the

12 laws of physics?

13 A.   Yes, sir.

14          MR. NOTHSTEIN:  Nothing further, Your Honor.

15          MR. LENAMON:  No further questions.

16          THE COURT:  You may step down, sir.  Thank you.

17          Who's the government's next witness?

18          MR. NOTHSTEIN:  Carrie McNamara, Your Honor.

19          THE COURT:  Feel free to stretch, ladies and

20 gentlemen, if you care to.

21      (Witness excused.)

22      (Ms. McNamara enters the courtroom.)

23          COURTROOM DEPUTY:  Do you solemnly swear that the

24 testimony you are about to give before this Court will be the

25 truth, the whole truth, and nothing but the truth, so help you

1    God?

2              THE WITNESS:  I do.

3              COURTROOM DEPUTY:  Please state your full name and

4    spell your last name for the record, ma'am.

5              THE WITNESS:  My name is Carrie McNamara,

6    C-a-r-r-i-e, M-c-N-a-m-a-r-a.

7              COURTROOM DEPUTY:  Thank you.

8              Please be seated.

9              MR. NOTHSTEIN:  May I proceed, Your Honor?

10             THE COURT:  You may.

11         **CARRIE MCNAMARA, GOVERNMENT'S WITNESS, SWORN**

12                    **DIRECT EXAMINATION**

13   BY MR. NOTHSTEIN:

14   Q.    Afternoon, Agent McNamara.  I'm sorry.  Good morning.

15   A.    Good morning.

16   Q.    Could you please introduce yourself to the jury and tell

17   us where you work.

18   A.    Yes.  My name is Carrie McNamara.  I'm a special agent

19   with the Naval Criminal Investigative Service.  I'm currently

20   working at our virtual operations center in Washington, D.C.

21   Q.    And, Agent McNamara, what are virtual operations?

22   A.    We conduct -- it's a national security assignment.  We

23   conduct counterterrorism and counterespionage investigations in

24   an online environment.

25   Q.    I'd like to take it back a little bit.

1          Can you just tell us your educational background?

2    A.    Yes.  I have a Master's in forensic science from George

3    Washington University and a Bachelor's in science from -- in

4    cellular and molecular biology from the University of Michigan.

5    Q.    How long have you worked for NCIS, Agent McNamara?

6    A.    For 18 years.

7    Q.    What was your first assignment?

8    A.    I was assigned as a criminal investigator at the Marine

9    Corps Air Station in Miramar in San Diego, California.

10   Q.    Several years ago did you become certified as something

11   called a "forensic consultant"?

12   A.    Yes.  I was assigned in a billet where I was the forensic

13   consultant -- this was from 2015 through August of 2019.  I was

14   the forensic consultant for the southeast field office here in

15   Jacksonville, Florida.

16   Q.    What is a forensic consultant?

17   A.    A forensic consultant assists the field office with all

18   major cases.  So all death investigations --

19          MR. LENAMON:  Objection.  Relevance as to time,

20   Judge.  It's not relevant to her --

21          THE COURT:  Overruled.  Go ahead.

22   BY MR. NOTHSTEIN:

23   Q.    Please continue, Agent McNamara.

24   A.    We assist with all death investigations, cold case

25   homicides, sexual assault investigations, domestic violence

1    involving injuries, child abuse and child neglect.

2         We primarily focus on evidence and assist the case

3    agent with getting the evidence to the lab, interpreting the

4    lab results, but we also conduct witness and victim interviews,

5    research, and we follow investigative leads as part of the

6    investigative team.

7    Q.   And, Agent McNamara, did you serve as a forensic

8    consultant investigator on the investigation of the death of

9    Christopher Tur?

10   A.   Yes, I did.

11   Q.   When did you get assigned to this case?

12   A.   In August of 2015.

13   Q.   Now, after becoming assigned to the case in August of

14   2015, did you have the occasion to be transporting some

15   furniture from Guantanamo Bay, Cuba, back to the United States?

16   A.   Yes.  In February of 2016, I went down to Guantanamo Bay

17   to retrieve furniture and other evidence that was being stored

18   at the NCIS office evidence facility there.

19   Q.   And while you were --

20        MR. NOTHSTEIN:  Well, may we have Government's 311,

21   please, Ms. Reid -- I'm sorry, 312?

22   BY MR. NOTHSTEIN:

23   Q.   Agent McNamara, do you recognize Government's Exhibit 312?

24   A.   Yes, I do.

25   Q.   What is it?

1  A.   It's a picture of the barroom in the defendant's

2  residence.

3  Q.   Okay.  I see here in the foreground of the left side of

4  the photograph there is a shelf.

5        Did you have the occasion to transport that shelf?

6  A.   Yes, I did.

7  Q.   And while transporting the shelf, did you notice

8  something?

9  A.   Yes.  So when I went down to transport the furniture, I

10 had to put the furniture in the luggage hold of a commercial

11 plane, and so I wanted to package it so that nothing would be

12 lost or damaged while -- during transport.  And so when I was

13 packaging the shelf and examining it, I noticed that there was

14 what I suspected to be blood on the underside of several of the

15 shelves.

16        MR. NOTHSTEIN:  And may we have Government's

17 Exhibit 31, please -- sorry, 32?

18 BY MR. NOTHSTEIN:

19 Q.   Agent McNamara, do you recognize Government's Exhibit 32?

20 A.   Yes, I do.

21 Q.   What is it?

22 A.   It's the underside of the second shelf which was labeled

23 with a manufacturer label "E," but it's actually the second

24 shelf from the floor.

25 Q.   And I see there is a Post-it flag there.  What is that?

1  A.    That's a -- a flag that I put near what I suspected to be

2  blood so that when I took a picture, it would stand out in the

3  picture and I would know later where I took the specific swab

4  from of the blood.

5  Q.    Okay.

6          MR. NOTHSTEIN:   Now may we have Government's

7  Exhibit 31, please, Ms. Reid?

8  BY MR. NOTHSTEIN:

9  Q.    What is Government's Exhibit 31, Agent McNamara?

10  A.    That is the suspected blood that I saw on the underside of

11  the shelf.

12          MR. NOTHSTEIN:   Now if we could go back to

13  Government's Exhibit 312, please, Ms. Reid.

14  BY MR. NOTHSTEIN:

15  Q.    Agent McNamara, what you see here on the shelf in this

16  photograph, could you please use the pen there in front of

17  you -- stylus, I guess, and just mark for us which shelf the

18  blood was on the underside of?

19  A.    (Indicating.)

20  Q.    So am I correct it's the second shelf from the ground?

21  A.    Yes.

22  Q.    Agent McNamara, did you measure the distance from the

23  floor to the bottom of that shelf?

24  A.    Yes.   It was 20.5 inches.

25  Q.    Was that the only blood you found on the shelf that you

*JURY TRIAL - VOLUME V*

1   swabbed?

2   A.   No.

3   Q.   Where else did you find blood?

4   A.   I found blood on the underside of Shelf C.  And then --

5   it's hard to see in this photo, but between -- on the back side

6   of this railing, which would be facing the wall between the

7   bottom shelf and the second-from-the-bottom shelf.

8   Q.   So that would be on the back side of the railing that was

9   beneath the shelf that was 20 inches off the ground?

10  A.   Correct.

11  Q.   And did you submit those -- those swabs for testing?

12  A.   Yes, I did.

13  Q.   What was the result?

14  A.   They were positive for Christopher Tur's DNA.

15  Q.   Agent McNamara, did you also have the occasion to deal

16  with a paper towel that was found during the investigation of

17  Christopher Tur's death?

18  A.   Yes, I did.

19  Q.   And I want to show you Government's Exhibit 30.

20       What is this a photograph of, Agent McNamara?

21  A.   This is a photograph of the paper towel that was found at

22  the scene at the defendant's -- at the dock.  And I took it out

23  of the evidence and took a picture of it.

24  Q.   Okay.  I see there are some -- what looked like

25  rectangular strips cut out of the towel.

1    What are those?

2  A.   That's where the lab would do its processing.  So when the

3  lab did the DNA, they would cut out a piece of the evidence to

4  extract the DNA.

5  Q.   And, Agent McNamara, the testing that was conducted on

6  this towel, whose blood did that appear to be -- or whose blood

7  did it turn out to be?

8  A.   That was Christopher Tur's DNA.

9  Q.   I'd like to show you Government's Exhibit 61, please --

10 I'm sorry, 60.

11    Are you familiar with this diagram, Agent McNamara?

12 A.   Yes, I am.

13 Q.   And throughout this investigation -- I know you didn't

14 start until later in 2015, but have you familiarized yourself

15 with the results of testing from the various military labs that

16 were conducted on the swabs in this case?

17 A.   Yes.

18 Q.   And what does this diagram represent?

19 A.   This diagram represents where all the positive -- the

20 swabs that were taken of blood were positive for Christopher

21 Tur's DNA.

22 Q.   Agent McNamara, based on your review and your submission

23 of swabs and other samples taken, did anything come back as the

24 defendant's blood?

25 A.   No.

1   Q.   Or the defendant's DNA more specifically?

2   A.   No.

3        MR. NOTHSTEIN:  Nothing further, Your Honor.

4                      **CROSS-EXAMINATION**

5   BY MR. LENAMON:

6   Q.   Good afternoon, ma'am.  How are you?

7   A.   Good.  How are you?

8   Q.   Great.

9        So the paper towel that we saw, those were paper

10  towels, right?

11  A.   Yes.  It's five sheets.

12  Q.   Five sheets.  So five individual sheets, correct?

13  A.   Yes.

14  Q.   Okay.  And you are certainly familiar with the collection

15  of blood.  I think you've been trained and talked about it,

16  right?

17  A.   Yes.

18  Q.   Okay.  So you're aware that when you have a -- a dry item

19  like a paper towel and there's blood on it, it's the blood

20  alone that's on the paper towel; isn't that right?

21  A.   The blood was on the paper towel, yes.

22  Q.   All right.  So what I'm saying is, hypothetically, if I

23  picked up a paper towel right now and held it to my nose and

24  I'm bleeding, the only liquid coming out of my nose is going to

25  be the blood -- or the only liquid hitting the paper towel is

1  going to be the blood, correct?

2  A.    You could have DNA from your hand on the paper towel, you

3  could have mucus and saliva which would have cells in it that

4  could have your DNA.

5  Q.    Yeah.  And I'm not refuting that.  It's not a DNA

6  question.

7          This is Chris Tur's blood.  We agree to that, okay?

8  A.    Okay.

9  Q.    But if you're -- just putting this to my nose, assuming

10  I'm not spitting up blood, then the only liquid on this is

11  blood, correct?

12  A.    Yes.  There was blood on the paper towel, yes.

13  Q.    Okay.  Now, if you add another liquid to that, then what's

14  going to happen to the blood and the other liquid?

15          MR. NOTHSTEIN:  Objection, Your Honor.  This is

16  outside the scope of the direct, for one, and the witness is

17  not an expert.

18          THE COURT:  I'm not exactly sure what the question

19  is, but I'll let her answer it if she understands it.  If she

20  doesn't, she can ask you to clarify it.

21  BY MR. LENAMON:

22  Q.    Do you understand my question?

23  A.    Is there another substance on the towel other than blood?

24  Q.    Yeah.  Let me say hypothetically I dipped this paper towel

25  in water first and then I applied it to the nose --

1      MR. NOTHSTEIN:  Again, Your Honor --

2   BY MR. LENAMON:

3   Q.   -- and there's blood --

4      MR. LENAMON:  Let me finish my question, please.

5   BY MR. LENAMON:

6   Q.   -- and there's blood and water mixing, what does that do

7   to the appearance of the paper towel?

8      MR. NOTHSTEIN:  Your Honor, we object to the

9   hypothetical.  The witness has not been testifying as an

10  expert.  It's outside the scope of the direct as well.

11      THE COURT:  Do you have an answer to that, ma'am, or

12  is that outside of your area of expertise?

13      THE WITNESS:  That would be outside of my area of

14  expertise, sir.

15  BY MR. LENAMON:

16  Q.   Okay.  And so I imagine if someone has ice in the paper

17  towel, that would be outside of your expertise, too, the

18  melting ice on the nose with blood coming out?

19  A.   Right.  Yes.

20  Q.   Okay.  Now, you testified about the underside of these two

21  shelves, and I think you said it was approximately 20.5 inches,

22  so that would be less than 2 feet?

23  A.   Yes.

24  Q.   So we're talking about one-and-a-half feet?

25  A.   One foot, 8.5 inches.

1   Q.   Okay.  And you said there was blood underneath, correct?

2   A.   Yes.

3   Q.   And you're obviously familiar with spatter?

4   A.   Yes.

5   Q.   You're familiar with cast-off?

6   A.   Yes.

7   Q.   You're familiar with transfer?

8   A.   Yes.

9   Q.   And cast-off is basically when you take an item that has

10  blood on it and you cast it and blood goes flying, right?

11  A.   Yes.

12  Q.   I think the example I gave last time was if you're in

13  church and they dip that thing at the people, that person over

14  there may be seeing -- feeling the little drop of water; is

15  that correct?

16  A.   Yes.

17  Q.   And these all were little drops that you guys were

18  collecting, the blood evidence, right?

19  A.   Yes.

20  Q.   And so if someone is on one knee -- on one knee and takes

21  their hand and goes like this (gesturing), would the blood go

22  under there if it was cast off?

23  A.   They would need to be below the level of the surface for

24  the blood to go up on the underside.

25  Q.   So if my hand's down here, it's below 20.7 inches, isn't

1   it?

2   A.   Yes.   The source of the blood would deem to be below the

3   surface that it was deposited on.

4           MR. LENAMON:   Thank you, ma'am.

5           THE COURT:   Mr. Nothstein?

6           Not required.

7           MR. NOTHSTEIN:   No further questions, Your Honor.

8           THE COURT:   You may step down.   Thank you.

9       (Witness excused.)

10          THE COURT:   Who's the government's next witness?

11          MR. GEE:   Your Honor, may we approach?

12          THE COURT:   Sure.

13      (Sidebar conference:)

14          MR. GEE:   Your Honor, we would rest, subject to just

15   confirming with Ms. Diaz that all the exhibits that we've

16   discussed are in evidence, but other than that, we have no

17   further witnesses.

18          THE COURT:   Okay.   So you're prepared to announce

19   rest in front of the jury?

20          MR. GEE:   We can do that, yes.

21          THE COURT:   All right.   So if that happens, then I'm

22   going to tell the jury that we've gone a little faster than we

23   thought and that the government has rested and that I have

24   decided that we'll start the defendant's case tomorrow morning

25   and I'll just release them for the day.

1          Good with everybody?

2          MR. GEE:  Yes, sir.

3          MR. VOKEY:  Yes.

4     (The following proceedings occurred in open court, in the

5  presence of the jury:)

6          THE COURT:  What says the government?

7          MR. GEE:  Thank you, Your Honor.

8          With that, the government rests.

9          THE COURT:  Ladies and gentlemen, the government has

10  rested its case in chief, meaning that they have completed the

11  presentation of their evidence in this case.

12          Now, I will remind you that, because the government

13  has the burden of proof, it is possible after we hear the

14  defendant's case that the government may have some rebuttal

15  evidence.  We don't know that at this time.  But they have

16  rested presenting their case in chief.

17          I had been advised earlier that the government's case

18  was going faster than we thought and I knew that we were going

19  to probably finish sometime today, I wasn't sure exactly when.

20          This is even a little quicker than I had thought and

21  so I -- we had already made plans for the defendant to be able

22  to begin the presentation of his case tomorrow morning, Tuesday

23  morning.  And so what that means is you get the afternoon off.

24  We've already made those arrangements.  Obviously, witnesses

25  have to come in and we have to decide when they're going to be

 1   here, and it was my call to allow the defendant to start

 2   tomorrow morning, because we weren't really sure when we were

 3   going to finish today.

 4           So, instead of sending you off for lunch, I'm just

 5   going to send you off and we'll get started again tomorrow

 6   morning.

 7           So we'll ask you to be back in the jury room at 9:15,

 8   same as this morning, and we'll get going again for the -- and

 9   the defendant's case will be presented at that time to you.

10           While you're gone, please remember all my

11   instructions.  If I promise not to repeat them, will you all

12   promise to follow them?

13       (Affirmative response.)

14           THE COURT:  Very important, though.  You know,

15   sometimes, you know, you get into things, you get a little

16   comfortable and you kind of forget what your rules are, but

17   remember you're -- as soon as you walk through that door, the

18   case is over with until you come back here tomorrow morning.

19           So everybody okay?  Any problems?  We good?

20       (Affirmative response.)

21           THE COURT:  All right.  So -- so I'll let you go now

22   and I'll see everybody back in the jury room at 9:15 tomorrow

23   morning.

24           Thank you, ladies and gentlemen.

25           COURT SECURITY OFFICER:  All rise for the jury.

 1     (Jury exits, 12:07 p.m.)

 2          COURT SECURITY OFFICER:  Please be seated.

 3          THE COURT:  So we -- I assume that, Mr. Vokey, you're

 4     going to want to make some motions; is that correct?

 5          MR. VOKEY:  Yes, Your Honor.

 6          THE COURT:  All right.  We also have the issues

 7     regarding -- you mentioned some witnesses this morning.

 8          Is the government -- you mentioned that there was a

 9     witness that had been previously not listed and is -- my

10     question for you is -- so that we can be prepared to have that

11     discussion, is the government going to be objecting to that

12     witness's testifying or not?

13          MR. GEE:  Your Honor, we don't object on the basis

14     that she wasn't listed.  I think we'd like to hear a little bit

15     more information about what she was present for, given the rule

16     against witnesses.

17          THE COURT:  Okay.  That's fine.  Well, we'll have

18     that discussion.

19          What other matters -- and we also have jury

20     instructions.  Mr. Burns and I actually met this morning on

21     instructions.  We're going to have a -- a new version for

22     you -- not -- not much different, but there are a few

23     differences.

24          We're going to have a new version for you probably

25     after lunch or so, or sometime certainly today.

1        We might be able to have those discussions with you.

2   We'll see.  We'll see where we are.

3        What I'm kind of inclined to do is to let everybody

4   go to lunch first and then come back and argue and do whatever

5   else we need to do and then I'll let you go off.

6        Is that okay with everybody?

7        MR. VOKEY:  That's fantastic, sir.

8        THE COURT:  Okay.  All right.  Good.

9        All right.  So it's ten after 12:00.  You want to

10  take an hour?  Is that good with everybody?  All right.  So

11  we'll come back into session at ten minutes after 1:00 and

12  we'll hear motions and talk about whatever else we need to talk

13  about.  Okay?

14       We're in recess.

15       COURT SECURITY OFFICER:  All rise.

16    (Recess from 12:09 p.m. to 1:14 p.m.; all parties

17  present.)

18       COURT SECURITY OFFICER:  All rise.  This Honorable

19  Court is back in session.

20       Please be seated.

21       THE COURT:  The record will reflect that all parties

22  are present, including Captain Nettleton.

23       Mr. Vokey, if you're the one, or Mr. Schwarz, whoever

24  is going to argue the motions, I'll entertain the motions at

25  the close of the government's case at this time.

1              I suspected it might be you.

2              MR. SCHWARZ:  There, Judge?  Is that easier for you?

3              THE COURT:  Yeah, that's fine.  You can turn that

4    around if you want to.

5              MR. SCHWARZ:  Sure.

6              Judge, so we're moving for a Rule 29 judgment of

7    acquittal on all counts.  What's easier for you?  For me to go

8    count by count?

9              THE COURT:  I think so.  I think so.  I know some of

10   them are the same charge in the various counts, but -- but they

11   are distinct elements in -- in the various counts, so I think

12   probably count by count.  To the extent you're just going to

13   say the same thing on another count, you can just incorporate

14   your argument.

15             MR. SCHWARZ:  Sure.

16             Judge, so for the first two counts, obstruction, our

17   argument is that the government failed to show any intent to

18   obstruct justice.

19             Specifically for Count One, there hasn't been any

20   evidence shown that Captain Nettleton actually intended to

21   prevent any communication being given to any law enforcement,

22   be it NCIS or GTMO security, relating to the commission of any

23   federal offense or possible offense, Judge.

24             On Count Two, same general argument.  There's no --

25             THE COURT:  Well, wouldn't the -- wouldn't the jury

1   be authorized to infer intent?  I mean, you don't -- you know,

2   you don't necessarily have a -- somebody saying, "I intend to

3   do this or I didn't intend to do it," but isn't intent

4   something that can be proved by circumstantial evidence?

5          MR. SCHWARZ:  Correct, but we don't believe that

6   there's sufficient circumstantial evidence to give the

7   reasonable inference that his actions were done for the

8   particular intent that's necessary for the obstruction count.

9          For Count Two, Judge --

10         THE COURT:  It raises a question in my mind we were

11  discussing.  And I want to -- so -- I tell you what, I'm going

12  to hold on to that question.

13         Go ahead, sir.

14         MR. SCHWARZ:  And then, Judge, for Count Two, same

15  argument with the lack of intent to actually obstruct justice.

16         Here, we don't believe there's been any evidence

17  shown that Captain Nettleton foresaw or would have even

18  reasonably foreseen in this instance -- pardon me -- that he

19  would have foreseen in the first place whether it be a

20  court-martial or a grand jury.  I think both of those are so

21  far removed from the circumstances that, again, there isn't any

22  circumstantial evidence that would lead to the reasonable

23  inference that he would have foresaw being court-martialed or

24  to actually have a grand jury be impanelled here.  We know

25  there were -- there was no court-martial.  We know there was no

 1   grand jury at this time.

 2         THE COURT:  Well, was it -- was it Ms. Wirfel who

 3   testified that after the events in question -- and I think both

 4   after Captain -- Captain Nettleton had been relieved and after

 5   she had left, did they not have some conversations in which at

 6   least the idea of a court-martial was discussed?

 7         Now, I recognize that's post event, so I'm not sure

 8   if that's evidence of it, but am I misremembering that, or is

 9   that not the type of evidence that can be used for

10   foreseeability?

11      (Counsel confer.)

12         MR. SCHWARZ:  Yeah.  I think you're -- you may be

13   confusing Lara Tur, Judge, which would have been quite a ways

14   down the road.

15         THE COURT:  I probably am.  You're right.  I was

16   trying to make sure it was -- you're right.  Ms. Tur.  So

17   they -- they were -- there was testimony of conversations they

18   had post events, right?

19         MR. SCHWARZ:  There were some conversations that they

20   had, but that testimony --

21         THE COURT:  And that testimony -- that discussion did

22   at least touch on court-martial issues, did it not?

23         MR. SCHWARZ:  Judge, I mean, their testimony -- from

24   what I recall, the testimony largely was that Ms. Tur

25   essentially said, "I'm not going to show up for proceedings,"

 1    and Captain Nettleton said, "Okay," or "good," or something to

 2    that effect.

 3            So I don't think we're getting close, in terms of

 4    that, to going back months -- whatever the time period is, the

 5    relevant period -- in terms of the reasonable inference that

 6    you would need to actually get to the intent, Judge.

 7            THE COURT:  All right, sir.

 8            MR. SCHWARZ:  So, again, we don't believe especially

 9    for Count Two there's any evidence for the corrupt prong, which

10    would require the specific intent to obstruct or impede the

11    proceedings, being the court-martial or a grand jury, Judge.

12            That's -- takes care of Counts One and Two.

13            THE COURT:  Go ahead.

14            MR. SCHWARZ:  Judge, I'm going to skip over Three

15    because it's a 1001, so I'll just go through that when I go

16    through Counts Eight, Nine, and Ten.

17            Count Four, Five are the --

18            THE COURT:  That's fine, but it is slightly

19    different, right?

20            MR. SCHWARZ:  It is slightly different, but because

21    there is the intent to mislead, that would go for each of them,

22    Judge.  It will make it easier, I think.

23            THE COURT:  That's fine.

24            MR. SCHWARZ:  It will save us some time.

25            THE COURT:  That's fine.

1          MR. SCHWARZ:  So for Four and Five, our argument is

2    that there is no intent to actually obstruct or impede the

3    investigation into the death and disappearance of Tur.

4          If we look at Number Four, that's a Navy Blue count,

5    Judge.  All the testimony is that the Navy Blue was not written

6    or sent out by Captain Nettleton.

7          So I'm assuming it's an aiding/abetting -- aiding or

8    abetting issue.  I don't see any evidence that Captain

9    Nettleton did anything to persuade anyone to send out this Navy

10   Blue, Judge.

11         I don't believe that sending it out in the first

12   place is a crime.  I don't believe you can aid or abet anything

13   of this nature, so I'm not sure I fully even understand the

14   theory here, especially -- because, again, he did not send it

15   out personally, he did not tell someone to lie about it, he did

16   not tell someone to just make it up.

17         At most, he had some discussions with Captain Ross,

18   and then he said "Thanks" to the person who sent it out via

19   e-mail, Judge.

20         THE COURT:  Hold on one second.

21         Can I get a current draft of the instructions?

22   Thanks.

23         I wanted to look at the aiding and abetting because

24   this was something I -- we're -- we're going to have the

25   discussion at some point anyway.

1        Part of the instruction says, "Ordinarily, any act a

2   person can do may be done by directing another person or agent,

3   or it may be done by acting with or under the direction of

4   others.

5        "A defendant is criminally responsible for the acts

6   of another person if the defendant aids and abets the other

7   person.

8        "A defendant is also responsible if the defendant

9   willfully directs or authorizes the acts of an agent, employer,

10  or other associate."

11       Is the evidence -- does the evidence admit of an

12  inference that Commander Ross's actions in sending out the Navy

13  Blue -- in doing so, he acted as the agent of Captain

14  Nettleton, or under his direction, and that Captain Nettleton

15  willfully directed or authorized his acts?  Does the evidence

16  admit of that possibility, or not?

17       MR. SCHWARZ:  I don't believe it gets anywhere toward

18  directing it.  At very most, you'd be talking about authorizing

19  it, in the sense that there were discussions with Captain Ross

20  about what Mr. -- I believe the name was Crabtree, had put

21  together.

22       THE COURT:  Right.

23       MR. SCHWARZ:  I believe that's as close as you can

24  get.  I don't believe that's sufficient here.  I don't believe

25  that you're talking about authorizing any illegal act.

1          I mean, sure, if you were talking about person

2     committing a murder and you say, "Yes," you know, a person

3     says, "Here's" -- you know, says, "Underling, go ahead and

4     murder X, Y, and Z."  I get aiding and abetting.  Not even

5     complicated.

6          This is a lot different.  You're talking about

7     sending out this Navy Blue communication that did not have any

8     false information on it.

9          At best, you'd be talking about omissions.  I don't

10    believe there's really even evidence to say -- to show that

11    there was a requirement to put in X, Y, and Z that would

12    purportedly have been omitted here.

13         Because there's nothing false there, there's nothing

14    in the Navy Blue that in my mind or in -- I think any

15    reasonable jury would be able to see anything illegal there.  I

16    don't see how you can get the aiding and abetting, Judge.

17              THE COURT:  All right.

18              MR. SCHWARZ:  And then for Count Five --

19              THE COURT:  I tend to agree with you that the only

20    way that Count Four works is if it's an aiding and abetting

21    count.  I don't -- I'm not sure there's any direct evidence

22    that would allow -- or there's no evidence of his -- of Captain

23    Nettleton's direct -- taking direct actions that would have

24    constituted the crime, but I'll -- I'll see what Mr. Gee thinks

25    when -- or whoever is going to talk.

1          So go ahead, sir.

2          MR. SCHWARZ:  And then for Count Five we just put in

3    there's no intent to obstruct or impede the investigation into

4    the death and the disappearance of Mr. Tur, which would bring

5    us to the 1001 counts, Judge, which is Three, Eight, Nine, and

6    Ten.

7          So generally, again, we don't believe there's any

8    evidence showing that there's an intent to mislead regarding

9    any material fact on these charges, Your Honor.

10          I think for Counts Eight and Nine, these are the ones

11    -- in Eight I believe it's where Captain Nettleton supposedly

12    told Captain Ross that Mr. Tur didn't come into -- did not come

13    to the residence.  Then you've got Count Nine saying that

14    Captain Nettleton purportedly told Captain Ross that Mr. Tur

15    did not go inside the residence, Your Honor.

16          Again, I don't believe there's any materiality here.

17    We did hear some testimony from Kelly Wirfel indicating that

18    she had indicated to the captain prior to these particular

19    events discussed in Eight and Nine that the last place Tur was

20    seen was by the Bayview by the bartender subsequent that night.

21          So with that in his mind, I don't believe that you

22    really have any intent to obstruct justice or to engage in

23    anything misleading.

24          And then just very briefly, Judge, for Count Number

25    Ten, the indictment specifically says that the captain said

1    that he was not having an affair with Ms. Tur.  The evidence is

2    pretty clear they had the one night together in November.

3    Regardless of whether you call this an affair, come January,

4    two months later, there's no evidence that they were actually

5    having an affair at the time.

6          I understand the government's probably going to say,

7    "Well, the lie was that he had the affair," but the indictment

8    does specifically say in that first main sentence "The lie was

9    stating that he was having an affair."  And so when you have a

10   two-month gap, I don't believe there's any reasonable inference

11   that someone can say that he was actually having an affair in

12   January.

13         Had you asked that question November 2014, different

14   story.  Two months later, with no other sexual interactions

15   between them during that time, I don't see any evidence

16   whatsoever that one could actually argue that you're still

17   having an affair at that time, Judge.

18         THE COURT:  Okay.

19         MR. SCHWARZ:  And that covers all the counts, Judge.

20         THE COURT:  All right.  Thank you, sir.

21         Who's going to respond on behalf of the government?

22         MR. GEE:  I am, Your Honor.  Thank you.

23         Would the Court just like me to go count by count?

24         THE COURT:  Yeah, I think so.  That's probably

25   easiest.

1          MR. GEE:  Sure.

2          THE COURT:  I may have a question or two as well.

3          MR. GEE:  Of course.  Thank you, Your Honor.

4          So first, Your Honor, with respect to Count One,

5    there was a -- I was getting a little confused there in the

6    discussion just a second ago.

7          To be clear, an element of Count One is not that an

8    official proceeding existed, so regardless -- it will be for

9    one of the other counts, but it's not for Count One.

10          So for Count One, it's just he knowingly engaged in

11    misleading conduct.  We would submit that there was a ton of

12    evidence that he engaged in knowing, misleading conduct within

13    the definition of that.

14          Toward another person he acted with intent to hinder,

15    delay, or prevent the communication of information to a law

16    enforcement officer.  The GTMO security department and the NCIS

17    meet the definition of a law enforcement officer for purpose of

18    this statute.

19          And as -- as the Court well pointed out, you can

20    infer his intent from the overall situation, given the -- the

21    gravity of what had happened between Mr. Tur and himself, as

22    well as, frankly, his shifting story over time.

23          All of that is evidence of his intent to hinder,

24    delay, and that such information relayed to the commission or

25    possible commission of a federal offense.

1          There was numerous evidence from several witnesses

2    regarding the various federal offenses at issue.  First off,

3    the Uniform Code of Military Justice, and all of those offenses

4    are federal offenses.

5          And, also, other regular federal offenses.  As

6    Admiral Gray explained, members of the Navy are also subject to

7    all of those, and as he explained, that includes also things

8    like assault, murder, et cetera.  And other witnesses spoke

9    about these things.

10          So we would submit that in the light most favorable

11   to the government, the elements of Count One are -- are met.

12   There's no official proceeding requirement for that count.

13          With respect to Count Two, the -- this is the count

14   that requires him to have known or foreseen an official

15   proceeding and knew that -- knew that his actions were likely

16   to affect it.

17          Your Honor, in light of the way the evidence has come

18   in, I think the government would be moving to proceed only at

19   this time that the official proceeding was a Navy

20   court-martial.

21          We included in the indictment federal grand jury, but

22   I think in light of the way the evidence has come in, we would

23   just proceed with that single official proceeding and ask that

24   the instructions be modified accordingly.

25          THE COURT:  Hold on one second.

1          All right.  Go ahead, sir.

2          MR. GEE:  Thank you, Your Honor.

3          So the elements are that he knew or foresaw an

4     official proceeding.

5          There was a ton of evidence through, for example,

6     Admiral Gray about -- as well as to a certain extent through

7     Ross and Jackson about the kinds of training and experience,

8     et cetera, that a -- that an officer of the defendant's rank

9     would receive, and that by -- that would include things like

10    Uniform Code of Military Justice, court-martial, active

11    involvement in these kinds of things.  So clearly we

12    established that the defendant would certainly know about

13    court-martial proceedings being potential, would know about

14    Uniform Code of Military Justice proceed -- provisions, common

15    things like assault, disorderly conduct, adultery.

16          And obviously the -- that the -- you can also infer

17    that from the defendant's own actions in that he did not

18    disclose these things that he engaged in conduct with -- which

19    constituted a substantial step towards the commission of

20    obstruction.

21          Again, within the definition of this term, that

22    includes all the various things in the indictment, the

23    omissions, the direct false statements, the misleading

24    statements.

25          He acted with an improper purpose -- well, corruptly

1   with an improper purpose and to engage in conduct knowingly and

2   dishonestly with the specific intent to subvert, impede,

3   obstruct.  Again, can be inferred from the overall

4   circumstances, his conduct here, and that the natural and

5   probable effect would be to interfere with the due

6   administration of justice.

7          There were numerous witnesses -- first off, a jury

8   can just infer that in the light most favorable to the

9   government given all the evidence here, but there was also

10  testimony, for example, about what might have happened had the

11  defendant been truthful that would also all go to this fourth

12  element.  In addition, obviously, to Count One, but it would go

13  to this fourth element in Count Two.

14         So we would submit that in the light most favorable

15  to the government, the evidence would support the charge for

16  Count Two as well.

17         Should I proceed to the third count, Your Honor?

18         THE COURT:  Yes, please.

19         MR. GEE:  Thank you, Your Honor.

20         The third count, the scheme to conceal material facts

21  he concealed by trick, scheme, or device.  You know, obviously

22  the -- the trick, scheme, or device is just merely a plan to

23  conceal.

24         That can be inferred by the overall evidence here,

25  his continuing falsities starting that morning, the way that he

1    provides direct false statements to some people, or what can be

2    inferred to be direct false statements, as well as his

3    omissions, his shifting stories, et cetera, that all goes to a

4    plan to conceal.

5            The fact was material.  We would submit that

6    materiality was established in numerous ways here with respect

7    to the information that he falsified, concealed, omitted,

8    et cetera, and the impact that that information would have had.

9            It was within the jurisdiction of a federal

10   department, obviously within the jurisdiction of the Navy here.

11   He had a legal duty to disclose these matters.  Admiral Gray

12   testified at length about his duty both to Mr. Tur to safeguard

13   him, protect him, et cetera.  And so, for example, that would

14   have applied Friday night to report it.  It also would have --

15   would have applied during the period when he was missing still,

16   a duty to safeguard him, report him, report what had happened

17   so that that information could be taken into account in an

18   attempt to find him.

19           And, additionally, Admiral Jackson testified at

20   length about just generally his duties to report complete

21   information to his superior officers in a variety of different

22   ways, but he [sic] specifically talked about the requirements

23   for reporting for the Navy Region Southeast as well as the Navy

24   generally.

25           We would submit that all of that establishes a legal

1  duty.  "Legal duty" means, you know, by statute, regulation, or

2  government form, and we would submit that all of that is met

3  here.  And then knowingly and willfully, again, I think you can

4  infer that from his conduct here, and we would submit that

5  there was sufficient evidence of that.

6          Moving on to the -- to the false statement charges,

7  so the -- the false statement charges that exist, first Count

8  Eight where he falsely stated to Captain Ross that Mr. Tur did

9  not come to his home, Captain Ross directly testified about

10  that.  We would submit that it meets the elements.  He made the

11  statement.  It was false.  It concerned a material matter.

12          Captain Ross, for example, testified about the impact

13  of -- of that false statement on him, what he would have done

14  differently, that sort of thing.

15          THE COURT:  So, now, just to make sure I'm following

16  you here, you're on -- are you on Count Eight now?  Is that --

17          MR. GEE:  I am now, yes, Your Honor.

18          THE COURT:  Okay.

19          MR. GEE:  I moved on to -- oh, I'm sorry.  I skipped

20  over the -- I apologize, Your Honor.  Let me go back.

21          The -- I skipped over the -- Counts Four and Five.

22  My apologies, Your Honor.

23          THE COURT:  Okay.

24          MR. GEE:  Count Four and Five are all the 1519

25  counts.  These counts he -- well, the first one relates to the

1    Navy Blue provision.  We would agree, Your Honor, that that's

2    an aiding and abetting, slash, agency theory.  The defendant

3    didn't actually press enter himself to send the Navy Blue.

4            THE COURT:  You know, when I looked at that

5    sequencing and the way it played out, I mean, I'm not saying

6    that a jury couldn't find it, but it looked to me like

7    Commander Ross had sent it before Captain Nettleton knew that

8    he had done so, if I recall the sequencing.

9            I guess -- now, he testified that he discussed it

10   with him, but I guess I -- I was a little concerned about -- in

11   terms of the sufficiency of it just the way it played out.

12           Can you talk to me about what you think the

13   evidence -- what a jury would be authorized to determine with

14   that sequencing?

15           MR. GEE:  Yes, Your Honor.

16           Captain Ross testified first -- excuse me, Your

17   Honor.  He testified about this on direct exam, but frankly, a

18   little more vehemently on cross-exam about the point being that

19   this -- that Navy Blues don't just get sent, that this was a

20   discussion that had been ongoing with the defendant throughout

21   the day about what the content of the Navy Blue would be, and

22   that the ultimate approver of the Navy Blue is the commander of

23   the base, and that he had those conversations with him

24   throughout the day of what the content is.

25           And then the evidence shows that the draft of the

1   Navy Blue was sent by Lieutenant Crabtree to the defendant and

2   Executive Officer Ross.  Executive Officer Ross then did what

3   he had been delegated as agency --

4            THE COURT:  Is that the e-mail that referred to it as

5   a template?  Is that -- is that what you're talking about?

6            MR. GEE:  I believe so, Your Honor.

7            THE COURT:  Yeah.

8            MR. GEE:  These are -- I can call up the exhibit

9   numbers with the Court's indulgence.

10           THE COURT:  That's fine.  Then go -- you go ahead.

11   If I recall, he -- there was a communication, and it may have

12   been Crabtree, and he is saying this is a template for the

13   Blue, or something like that, but --

14           MR. GEE:  That's correct, Your Honor.  I believe it

15   starts with 357 or 357A.  And then -- so he gets sent the draft

16   to Captain -- to Captain Ross and to the defendant.

17           THE COURT:  And does that -- what I couldn't

18   remember -- a template sometimes is just a form that you --

19   then you go fill in, right?  I mean, this -- was this -- did

20   this template actually have content in it?

21           MR. GEE:  It does.  It has an actual -- it has the

22   actual draft of the Navy Blue.  And the Court may recall that

23   I, for example, went to paragraph 20 of it -- the -- the key

24   sort of, omission, false statement, concealment is that

25   paragraph 20, says the incident is at the Bayview and has no

1  mention, of course, of the fight.  And so that's the draft that

2  Lieutenant Crabtree sends to both of them.

3       Then Executive Officer Ross e-mails back and has

4  some, sort of, minor tweaks to it.  And then Lieutenant

5  Crabtree e-mails out what -- you know, he -- he sends the Navy

6  Blue that Executive Officer Ross sent him back.  And then the

7  defendant thanks Lieutenant Crabtree for sending it.

8       There was testimony also by --

9       THE COURT:  And Lieutenant Crabtree was also called

10  "Weps"; is that right?

11       MR. GEE:  Yes, Your Honor.

12       THE COURT:  All right.

13       MR. GEE:  And there was also testimony about how it

14  was within the defendant's power to immediately withdraw,

15  amend, et cetera, the -- the Navy Blue.  So we would submit

16  that given all that, in the light most favorable to the

17  government, that that -- that count was met.

18       The -- the Count Five is with respect to his e-mails

19  to the admiral.  I don't -- I think we -- we feel that it's

20  pretty obvious the concealment, the false statements,

21  et cetera, in the e-mails with the admiral that -- that

22  Saturday night.

23       Six and Seven, of course, we dismissed pretrial.

24       So -- so moving on to Number Eight, which I was

25  speaking about earlier.  Number Eight is just the direct false

1    statement to -- to Captain Ross, his initial false statement to

2    him that he didn't come to his house at all.  We would submit

3    that for all the various reasons that that was material, that

4    it was false, all the various elements.

5            THE COURT:  An interesting theory in the sense that

6    in what capacity -- at the time that -- does it matter -- does

7    it matter that -- at the time he was Commander Ross, right?

8            MR. GEE:  Yes, Your Honor.

9            THE COURT:  Does it matter he was a junior officer to

10   Captain Nettleton?  Does it matter that he wasn't a law

11   enforcement officer or that he wasn't investigating anything at

12   the time really?

13           So any statement that Captain Nettleton made to

14   Commander Ross during this sequence could produce a 1001

15   charge?

16           MR. GEE:  Well, to be clear, Your Honor, there's no

17   requirement, no element requirement, for example, that it be to

18   a superior officer.  It -- it is merely a -- a matter within

19   the jurisdiction of the department or agency.

20           We'd submit this is within -- I'd also note, though,

21   just factually here, Your Honor, that that first false

22   statement, for example, that's Captain Ross.  He has that

23   conversation with the defendant prior to Chris Tur's body being

24   discovered.

25           Captain Ross was having a conversation with him after

1    his, sort of, concerns had been raised by the defendant's

2    denial of the helicopter and after the defendant spoke to

3    Admiral Jackson that morning in Captain -- Commander Ross's

4    presence, and Commander Ross heard him not tell her about

5    things like the Hail and Farewell party, et cetera.

6            So then he asked the defendant that same day "Did he

7    come to your house?"  But, you know, it's not a requirement,

8    but those are all facts that are sort of in the -- in the -- in

9    the pattern here.

10            Count Nine, Your Honor, is the false statement to

11    Command -- to Commander Ross a few days later, that he came to

12    his house but didn't come inside.  Again, for all the same

13    reasons, we would submit that those are -- those are false

14    statements and meet the various requirements as well.

15            And then Count Ten is the false statements to Admiral

16    Gray and Captain [sic] Jackson that there was no affair.  I

17    mean, understanding they're certainly entitled to try to argue

18    to the jury what the definition of an affair is, but we would

19    submit that in the light most favorable to the government, that

20    that phraseology was met.

21            Lara Tur testified about how this had been going on

22    for several months, they had had physical contact on GTMO, they

23    certainly had numerous intimate conversations, and obviously

24    the events here in Jacksonville.

25            And there was also even testimony about what happened

1   on January 9th.  There was testimony by some folks that she

2   seemed to be heading back to the defendant's residence,

3   et cetera.  I think in the light most favorable to the

4   government, we would submit that that -- that there was

5   sufficient evidence for -- for that charge as well.

6           I'm happy to answer any other questions the Court

7   has.

8           THE COURT:  Does the aiding and abetting charge

9   pertain to any of the crimes charged other than Count Four?

10          MR. GEE:  It does, Your Honor.  Because, for example,

11  the -- the defendant's just sort of taking it -- as example --

12  for example, the defendant's concealment and things like that,

13  he is -- let me see if I got this right.  For example, when he

14  is concealing information from, say, Command Duty Officer

15  Thibodeaux, or he is making false statements to them,

16  et cetera, I suppose he is also aiding --

17          THE COURT:  I guess I've always thought of aiding and

18  abetting as you're helping somebody else to commit a crime,

19  aren't you?  And -- and -- and just by talking to all these

20  other folks, I'm not really sure what kind of aiding and

21  abetting that is.

22          MR. GEE:  I think I'd agree with the Court in a

23  general sense.  But with these particular types of crimes,

24  where it's making false statements to others, and, therefore,

25  not causing them to do other things, et cetera, I think that

1 aiding and abetting also would apply to all those other crimes.

2 But I -- I -- I think it would be fair to say that of

3 the crimes here, the one that most is at issue for is the Count

4 Four Navy Blue.

5 THE COURT: Well, the reason I asked is I was

6 considering whether in the jury instructions to move the aiding

7 and abetting language to Count Four and not giving it as a

8 general charge because I wasn't sure it was universally

9 applicable.

10 It -- as it sits in the instructions right now, it

11 just seems like it's just sitting there, and it doesn't really

12 give the jury a whole lot of guidance.

13 MR. GEE: Your Honor, I think it -- I think it

14 could -- I think it could apply to all the charges.  I -- I

15 think I understand the Court's point.

16 Can we just have a chance to look at that briefly and

17 see whether or not we would prefer it just be subsumed --

18 subsumed under Count Four and then it would be clear to them?

19 I do think it might potentially apply to others.

20 But, frankly, for clarity purposes, I think we might be willing

21 to forego that.  But if the Court would indulge us to chat

22 about that briefly?

23 THE COURT: Yeah.  That's fine.

24 All right.  Does that conclude your argument?

25 MR. GEE: It does unless the Court has other

 1    questions.

 2            THE COURT:  Thank you.

 3            MR. GEE:  Thank you.

 4            THE COURT:  Mr. Schwarz, did you want to add any

 5    rebuttal, sir?

 6            MR. SCHWARZ:  Just one thing really briefly, Your

 7    Honor.

 8            THE COURT:  Sure.

 9            MR. SCHWARZ:  I wanted to make sure that we renew all

10    our prior motions and objections.

11            THE COURT:  Yes.

12            MR. SCHWARZ:  In part, the reason is because

13    regarding Count Three I know the Court had already overruled

14    our objection to the introduction of some of these regulations

15    for the Navy that the government's claiming form the basis --

16            THE COURT:  Although they didn't end up actually -- I

17    don't think they actually introduced them.  They just testified

18    about them, right?

19       (Counsel confer.)

20            MR. SCHWARZ:  I believe --

21            THE COURT:  Yeah.

22            MR. SCHWARZ:  I think one --

23            THE COURT:  Okay.  All right.

24            MR. SCHWARZ:  I think some did -- at least one got

25    in, Judge.

1          THE COURT:  All right.

2          MR. SCHWARZ:  The reason I mention it, though, is

3    because these regulations, when you read them, they're

4    extremely vague.  I believe they are constitutionally too vague

5    to actually form the basis of any legal duty.  They're too

6    vague to actually give the defendant notice of what is required

7    under them or in any way sufficient to create a legal duty that

8    would create any liability.  And that goes directly to Count

9    Three, Judge.

10         THE COURT:  Okay.  Mr. Gee, you want to respond to

11   that?

12         So are you talking about -- if you could point me to

13   the specific exhibit that's in evidence, that would help me,

14   but I do recall that Admiral Gray talked about them.

15         Mr. Schwarz, are you talking about -- it was -- had

16   to do with the duties of a commanding officer and what their --

17         MR. SCHWARZ:  Precisely, Judge.

18         THE COURT:  -- what their responsibilities are and so

19   forth?

20         MR. SCHWARZ:  Those are precisely it, Judge.

21         THE COURT:  And what -- and your objection to that is

22   what, that it -- that it's a regulation that applies to the

23   commanding officers, but it doesn't give rise to a duty that

24   the criminal law is interested in?  Is that your point?

25         MR. SCHWARZ:  It's too vague to give rise to any duty

1    that would create liability under the Count Three, Judge.

2          THE COURT:  Okay.  All right.

3          Mr. Gee?

4          MR. GEE:  Thank you, Your Honor.

5          Yes, Your Honor.  I mean, in light of the Court's

6    rulings, these actual regulations didn't come in, although

7    Count -- Exhibit No. 35, the charge of command --

8          THE COURT:  Yes.

9          MR. GEE:  -- which sort of describes the -- the --

10   well, first of all, it describes, you know, the statute that is

11   the basis for officers, and a number of other things came in,

12   but --

13         THE COURT:  By the way, to be perfectly clear, I'm

14   pretty sure I just said I don't want you dumping all this paper

15   on the jury and not having them understand the context.  I

16   don't think I ever actually over -- I don't think I actually

17   sustained an objection to it.  I just told you what I thought.

18   And I guess you-all decided to handle it the way you did, which

19   is fine.

20         And the way I recall that being handled was that

21   we -- we put in that -- or you put into evidence that short

22   exhibit about the duties of commanding officers and then you

23   essentially had Admiral Gray testify to the point.

24         MR. GEE:  Yes, Your Honor.  You didn't make a ruling.

25   We kind of caught your drift and so we moved on.

1      THE COURT:  Yeah.

2      MR. GEE:  But, Your Honor, we would submit that --

3  that Admiral Gray testified about these as not just being --

4  not being some sort of a general -- these are not general

5  principles.  He spoke with specificity both about the duties

6  owed to Mr. Tur, but he also spoke in considerable detail about

7  the duties owed directly to commanding officers, direct

8  reporting requirements, the kinds of direct things that have to

9  be reported on, et cetera, how the defendant knew those things.

10      Admiral Jackson even testified about how when she

11  first took command, part of her initial conference call

12  included reminding them about those kinds of reports back,

13  those OPREP reports, so we submit that all of that, you know,

14  shows a specific legal duty.

15      THE COURT:  Well, obviously Captain Nettleton

16  couldn't be charged in the United States District Court with

17  not following Admiral Jackson's desire to have information

18  given to her on a timely basis.  I mean, that's -- that's --

19  that -- there may be other venues where he could be brought to

20  task for not doing that, but it wouldn't give rise to a

21  criminal charge, right?

22      And so what is the -- what is the hook that allows

23  that evidence that -- that I did entertain -- what's the hook

24  that allows that to be relevant to a federal criminal

25  proceeding?

1    MR. GEE:  Well, the -- the -- the definition of a

2  legal duty is a duty contained in a statute, regulation, or

3  government form, and the statutes make it clear that, among

4  other things, officers have a duty to the -- to safeguard,

5  protect, et cetera, the folks under them and also have a duty

6  of loyalty, honesty to those above them.  So that's established

7  by statute.

8    And then, also, they spoke about the Navy

9  regulations, these things like these OPREP requirements that

10  are very specific, and they also -- Admiral Gray testified

11  about how these are orders from their superior officers to

12  provide these things.  So that would establish a legal duty in

13  this -- in this framework.

14    So, yeah, you know, if Admiral Jackson is like, "Call

15  me every 30 minutes" about something, you know, any time the

16  garbage needs to be taken out, that might not be what we're

17  talking about here.  But this isn't sort of Admiral Jackson's

18  preference at issue here.  This is a discussion about very

19  specific legal -- legal duties and -- and -- and what was owed

20  to them.

21    There was also evidence that -- that she's a

22  particularly demanding person that likes it even more, and --

23  and that's relevant evidence as well.  But his actual legal

24  duties were specified.

25    THE COURT:  Thank you.

1          MR. GEE:  Thank you.

2       (Judge confers with law clerk.)

3          MR. GEE:  And -- and, Your Honor, I think --

4   reserving the right if we change our mind overnight.

5          But I think, Your Honor, we -- we would be fine with

6   just subsuming the aiding and abetting and giving a specific

7   direction that you may find the defendant committed this

8   account [sic], this -- something like that, because of this

9   theory.  I think we -- we would be fine with it just applying

10  to Count Four.

11         THE COURT:  Thank you.

12         MR. GEE:  Thank you.

13         THE COURT:  Under Rule 29 of the Federal Rules of

14  Criminal Procedure, after the government closes its evidence,

15  or after the close of all the evidence, but in this case we're

16  at the close of the government's case, the Court on the

17  defendant's motion must enter a judgment of acquittal of any

18  offense for which the evidence is insufficient to sustain a

19  conviction.

20         The law says that in this context that the evidence

21  is considered in the light most favorable to the government.

22  And I have heard the arguments.  I have considered it.  I've

23  been looking at the various elements of the offenses in

24  connection with the jury instructions.

25         And while I think that there are some valid arguments

1  that the defendant can make regarding some of these charges and

2  the strength of them, my view at the moment is that those

3  arguments are going to have to be made to the jury, and that

4  they do not provide a legal basis for me to direct a verdict on

5  any of the counts.

6         I do think that there are several counts, Count Four

7  comes to mind, Count Ten comes to mind, that are -- that --

8  that I think the defendant's arguments have some weight to

9  them, but considering the standards for a directed verdict

10 practice, considering the ability of the jury to infer certain

11 matters, considering the evidence that I've heard, even on --

12 even as to those counts, I am not persuaded that under Rule 29

13 at this point that those counts are legally deficient.

14        And so, of course, there are other points in a trial

15 at which Rule 29 motions can be made.  I'll entertain those

16 motions when and if they're made and whenever they're made,

17 and -- and I always take a fresh look.

18        But at this moment, I -- at the close of the

19 government's case, I'm denying all Rule 29 motions as to all

20 counts, and the matter will proceed from there.

21        So now, Mr. Vokey -- now that you've heard the

22 completion of the government's case, now that you've heard the

23 Court's rulings on the Rule 29 motions, can you give me a

24 playbook for tomorrow how the -- how you're intending to

25 proceed?

1       MR. VOKEY:  Yes, Your Honor.  And I'd like to bring

2  up one other point, Your Honor.

3       THE COURT:  Sure.

4       MR. VOKEY:  So -- something that -- the last couple

5  of days has kind of raised me some concern.  And hearing this

6  duty to report, I'm concerned that the jury may get confused

7  that if Captain Nettleton has committed something that's a

8  military offense, that he has a duty to report himself.  So

9  it's almost this duty to report versus a Fifth Amendment.

10       For example, we're referring to the November -- you

11  know, a couple of months before the November sexual encounter

12  with Lara Tur.  And I'm wondering if the testimony of Admiral

13  Jackson and what the government is arguing now is going to make

14  the jury believe that he is required to report himself for a

15  federal -- for a military criminal offense which cannot be the

16  law.

17       So I guess I -- I'm raising that now and perhaps

18  there may be an instruction that we maybe give the jury that

19  says that he does not have to -- he has no duty to report

20  himself for a criminal offense.

21       THE COURT:  All right.  And I hear you.  Certainly

22  you can tell them that, if that's true, which I assume it is.

23  And -- but I'll be happy to entertain -- when we do the charge

24  conference, I'll be happy to entertain an instruction -- I'm

25  not saying I'll give it, but I'll be happy to entertain it,

 1  hear what the government has to say, and take a look at it.

 2        I do -- I do agree with you to this extent, and I

 3  think the government hopefully will thread this needle, we

 4  cannot make this a case about whether Captain Nettleton

 5  violated the rule book that Admiral Jackson gave to him or --

 6  it can't be just about that.  It has to be more than that.

 7        And I think I allowed the evidence that I did for the

 8  reasons that I stated.  I think I was right to do so.  But,

 9  you're right, that evidence could be misused if we're not

10  careful.  I assume the government will be careful.  I assume

11  you will be telling the jury from your perspective what all

12  that means.

13        But -- but I'm also willing to look at an

14  instruction, but I would think it would have to be one proposed

15  by you-all.  I don't think I can -- I'm not sure enough as to

16  what you want or what the appropriateness of it is to try to

17  craft my own.

18        So I --

19        MR. VOKEY:  I understand, sir.  And we will -- we

20  will draft something.  And my concern is based on some of the

21  broad statements that Admiral Jackson testified to that

22  basically he needs to report everything to me, jury members

23  could believe that he would be required to do that, and that

24  would be at odds with the laws.

25        THE COURT:  Well, I assume what this case is about is

1    specific things that he allegedly didn't report.  That's what I

2    think the case is about, not just he has to talk about

3    everything there is to know.

4            And so I assume in closing arguments we'll be talking

5    about specific things that the government has alleged and that

6    there is some evidence of, that either Captain Nettleton

7    reported incorrectly or he failed to report, as opposed to some

8    broader context about just general conduct and deportment of a

9    commanding officer.  So that's what I'm assuming.  I'll be --

10   try to be vigilant about making sure that's what we're talking

11   about.

12           MR. VOKEY:  I understand, sir.

13           MR. GEE:  And, Your Honor, if I may add there --

14           THE COURT:  Yeah.

15           MR. GEE:  -- especially if we're talking about

16   instructions.  When we're talking about the regulations and

17   legal duties, these all go to Count Three and his duty not to

18   conceal something he had a duty to disclose.

19           The government did not indict, did not charge in

20   Count Three, that he had a duty to disclose the affair.  And so

21   if that's what Mr. Vokey is referring to -- of course, we don't

22   have any objection to extra language being placed in the

23   instructions that the government is not alleging that he had a

24   duty to report the -- the -- or the duty to conceal the affair

25   with respect to this count, that sort of thing.

1    But it would absolutely be both against the evidence

2  and inappropriate, Your Honor, for Mr. Vokey to say something

3  to the jury in closing arguments that is about sort of his own

4  legal view.  Like, for example, saying the defendant had a

5  Fifth Amendment right not to tell Admiral Jackson about the

6  fight, that would be not proper under the law, not accurate

7  with the evidence.

8    THE COURT:  And I don't -- I don't think that's going

9  to happen.

10    MR. GEE:  But if we're speaking about Count Three,

11  we've got no problem indicating that the affair is not covered

12  by Count Three, the concealment count.

13    THE COURT:  All right.  We'll see.  We'll see what

14  they propose.

15    All right.  Anything else, sir?

16    MR. VOKEY:  No, sir.

17    THE COURT:  Okay.  So y'all -- the value of -- the

18  value of these discussions, even if they don't lead to a ruling

19  at the moment, is that it gets people thinking about what

20  they're worried about and making sure that we're in the right

21  place, or at least as close to the right place as we can get.

22    So -- so what we'll be looking for from you,

23  Mr. Vokey, is any proposed instruction that you have.  Okay?

24    MR. VOKEY:  I understand.

25    THE COURT:  All right.  So, now, sir, what -- what --

1    what are we going to do tomorrow?

2            MR. VOKEY:  So -- put on evidence, sir.

3            THE COURT:  All right.  Tell me who the first witness

4    is.

5            MR. VOKEY:  Ms. Wolfe.

6            THE COURT:  All right.  So tell me about Ms. Wolfe.

7    She was an undisclosed witness.  The government says that the

8    fact that she was undisclosed, meaning she wasn't listed on

9    your exhibit list, is not a matter that they're going to object

10   to.  But I think the circumstances of her becoming a witness

11   are probably germane.  And -- and so tell me what you can tell

12   me, and then I'll hear from the government in response.

13           MR. VOKEY:  Sure, sir.  It was either Wednesday or

14   Thursday, Ms. Wolfe, who -- formerly known as Pagan, apparently

15   came in the courtroom and was watching testimony.

16           THE COURT:  And who is she?

17           MR. VOKEY:  She was living in Guantanamo Bay.

18           THE COURT:  Yes.

19           MR. VOKEY:  There is a -- NCIS had interviewed her

20   back in 2015.

21           THE COURT:  I saw -- we -- I asked Mr. Burns -- she

22   was actually on the no-contact list in Captain Nettleton's

23   conditions of release.  There were -- the government had listed

24   a ton of people that they did not want Captain Nettleton

25   talking to.

1          MR. VOKEY:  Sure.  Sure.

2          THE COURT:  She was on there.  So that led me to

3   believe that people knew who she was, at least.

4          MR. VOKEY:  Yes, sir.  And I don't think either us or

5   the government thought she was a substantial player in this

6   case.  So when she showed up in court, it was actually my

7   client pointed out to us, that, you know, that looks like --

8   that's Karla Pagan.

9          THE COURT:  And she showed up unexpectedly?

10         MR. VOKEY:  Unexpectedly.  Had no idea if she was

11  going to be here.  What she said was she had some knowledge of

12  the case and she was interested and she came to watch.  So I

13  had --

14         THE COURT:  Does she live here?

15         MR. VOKEY:  She lives in Jacksonville.

16         So I had Mr. Schwarz right afterwards run out there

17  and get her phone number.  My thought was she's not on the

18  government's witness list, is she a rebuttal witness, let's

19  call her and find out, you know, why she's here and what she

20  has to say.

21         So we contacted -- I called her and then we met with

22  her yesterday.  She, in her interview with NCIS, said some

23  things that -- that were -- she was there at the Bayview that

24  night, not part of the Hail and Farewell.  She said some things

25  that she heard were going on.  But it didn't appear to be

1    something to the level of anything incredibly important.

2           But when we talked to her, holy cow, there is.  So

3    she was actually -- she actually talked to Chris Tur in the --

4    going out in front of the Bayview, when that happened and

5    Mr. Tur was yelling at Captain Nettleton, and Captain Nettleton

6    is -- Commander Ross was walking Captain Nettleton away,

7    Ms. Pagan has a conversation there with Mr. Tur.

8           After that, Mrs. Pagan actually goes into the

9    restroom with Ms. Wirfel and Lara Tur for a time.  And we've

10   heard testimony about that at the Bayview with the breaking of

11   the dishes.

12          Ms. Pagan leaves there and goes back to Rick's.  So

13   she was there, had nothing to do with that party, just kind

14   of comes encounter with it when she goes outside, and becomes

15   part of what she calls this drama, walks into the restroom with

16   Kelly Tur -- with Kelly Wirfel and Lara Tur, and then she

17   leaves and goes back to the bar.  So -- so some conversations

18   with Mr. Tur about what was going on that night.

19          So what's particularly significant here is that she

20   sees Chris Tur two more times that night.  So when she goes

21   back into Rick's bar in the Bayview, she sees Chris Tur walk

22   back -- walk back in the bar.  And then he leaves, kind of

23   slams the door and leaves.  And then somewhere around 45

24   minutes later, sees Mr. Tur again.

25          Now, Ms. Wolfe was also present at the Bayview

1    when -- when the -- Ms. Wirfel has that conversation with Chris

2    Tur as the knock-out comment.  And Ms. Wirfel tells

3    Ms. Pagan -- or now Mrs. Wolfe, that, yeah, I just talked to

4    Chris, he said he knocked the CO out.

5         After that, while Mrs. Wirfel and Lara Tur are

6    waiting for Safe Ride, she is sitting at the bar with

7    Mrs. Wirfel and Commander Ross.

8         As a matter of fact, she buys Commander Ross a shot.

9    Commander Ross says some comments to her.  Ms. Wirfel leaves

10   because the Safe Ride comes.  Then Commander Ross leaves and

11   then she goes back to Rick's.  They had gone to the Tiki Bar

12   and back to Rick's.

13        So -- but the timing here is she's present -- she

14   sees some of this that happens outside.  She goes into the

15   bathroom with Lara Tur, Kelly Wirfel.  Goes back into the bar.

16   Sees Chris Tur in the Bayview one time at that point.

17        And then after Ms. Wirfel had gotten the phone call

18   saying that the -- "I just knocked out the CO," she sees

19   Mr. Tur again.  After Ms. Wirfel and Ms. Tur have left, after

20   Commander Ross has left, and she's in the bar sometime after

21   11 o'clock.  She says sometime -- she doesn't know the exact

22   time, between 11:00 and 11:30, she's closing out her tab and

23   she sees Mr. Tur come through the Bayview again, through Rick's

24   again.  And this time he's walking very fast.  He walks right

25   past her because she's right by the door and slams the door on

1   the way out.

2           So what we know from that now is if she was present

3   and Ms. Wirfel tells her about the knock-out phone call, that

4   means that -- and so we know Chris Tur is at the Nettleton

5   residence when that occurs and then sometime later when she's

6   closing out her tab, she sees Mr. Tur come back through, walks

7   right past her and exits, that has to be after he's left

8   Captain Nettleton's house. That means Karla Pagan, now Karla

9   Wolfe, was the last person that we know of to see Mr. Chris Tur

10  alive.

11          THE COURT: And --

12          MR. VOKEY: And had we -- of course, had we known

13  that she was such an important witness, I'm sure the

14  government, too, everybody would have been reaching out to her

15  and talking to her. So --

16          THE COURT: So what happened with her as a witness is

17  that she was interviewed by NCIS, probably a long time -- do

18  you know the --

19          MR. VOKEY: It was I think January -- January 28th,

20  2015. She didn't really want to get involved. According to

21  what she said, NCIS was asking her questions. There's nothing

22  that -- nothing to indicate that NCIS knew this and put -- you

23  know, and hid this.

24          It sounds like she didn't want to get involved,

25  didn't want to be part of the drama. She answered their

1  questions very briefly.  Didn't offer anything else.

2         But, of course, when we saw her and we reached out to

3  her and she started talking to us, you know, our jaws dropped

4  and we went, holy cow.

5         THE COURT:  Is she willing to testify?  Do you have

6  her under subpoena?  What's her situation?

7         MR. VOKEY:  We don't.  She's willing to testify.  We

8  sent a letter that she can show her employer tomorrow.  She's

9  willing and she's planning on -- we've told her to come here by

10 9 a.m.

11        THE COURT:  Okay.  Thank you, sir.

12        Mr. Gee?

13        MR. GEE:  Thank you, Your Honor.

14        Your Honor, we would submit this is exactly why the

15 rule against witnesses exists.  Ms. Pagan was interviewed by

16 NCIS in January 2015.  It was not a short interview.

17        She described at length being present at the Bayview,

18 observing the -- the sort of, you know -- Mr. Tur's verbal

19 explosion out front with Lara there, et cetera.  She described

20 how she went back into the Bayview, how a little while after

21 that, Mr. Tur came in and ordered another drink and then left.

22 And then a little while after that, he came back in and ordered

23 another one.  And then she never saw him again.  So she

24 described the -- Mr. Tur coming in and out of the Bayview way

25 back then.

1          She then said that she went to the bathroom before

2    going to leave the bar.  That's where she encountered Ms. Tur

3    in the bathroom.  And then she settled her account and she

4    left.

5          She talked about how she never saw Mr. Tur again

6    after he came back in and ordered the second drink earlier

7    before she went to the bathroom.

8          Nowhere in her interview with NCIS did she mention

9    this telephone -- you know, overhearing -- or I guess having

10   this conversation with Ms. Wirfel about her telephone call.

11         So, instead, she's now sat here, apparently --

12   literally on the day -- the key days in question, seeing

13   Ms. Wirfel's testimony, seeing Ms. Tur's testimony --

14         MR. VOKEY:  No, sir.  I think what she told us is the

15   only testimony she saw was Commander Ross.  I believe that's

16   what she told us.

17         THE COURT:  All right.  Go ahead.

18         MR. GEE:  And -- and so the defense had everything

19   they needed from discovery from this initial NCIS report to

20   know that this is a person who might be relevant to whatever

21   their defense theory is, but would be relevant to discuss

22   matters at the Bayview that night, timing of Chris Tur's

23   appearances, et cetera, that they never interviewed her, never

24   sought to interview her, even though she's here in

25   Jacksonville.

1          She shows up here at the trial and then they do -- we

2    would submit that this is all the reasons that that -- that the

3    rule exists.

4          THE COURT:  You're talking about the rule of

5    sequestration?

6          MR. GEE:  Correct, Your Honor.

7          THE COURT:  Of course, she was not listed as a

8    witness, right?  So she -- the rule of sequestration didn't

9    apply to her precisely because neither party had listed her as

10   a witness, I guess, right?

11         If y'all had listed her or they had listed her and

12   she came into the courtroom, you would have told her to get

13   out, right?

14         MR. GEE:  Correct.  Yes.

15         MR. VOKEY:  Sir, can I add one thing as well?

16         THE COURT:  Yeah.

17         MR. VOKEY:  And, again, I don't want there to be

18   any -- any mistake about -- we don't believe that the

19   government was hiding Ms. Pagan, NCIS, the Department of

20   Justice attorneys, nobody like that.  We're not alleging that.

21         One of the things that says -- we have like a

22   page-and-a-half of the results of any interview from Ms. Pagan,

23   was -- when she's talking about seeing Chris Tur, she -- I

24   believe this is around 2030, which would be 8:30 military time,

25   and soon after Tur walked in.  And I think probably when we've

1  seen that in the past, we thought, okay, well, this is before a

2  lot of this other stuff happens.  And I think this is either

3  she misspoke in the interview or this time was written down

4  wrong.

5           So after talking to her again, it changed everything.

6           THE COURT:  May I see the NCIS report, please?

7           MR. VOKEY:  Yes, sir.  I have -- it's Bates marked

8  441133.  I -- and I've written a word on the side of it, sir,

9  but that's about it.

10          MR. GEE:  And, Your Honor, I would just note that

11 Mr. Vokey noted that the 8:30 timestamp may have been a typo.

12 The -- I can represent to the Court the underlying notes which

13 were provided in discovery say 10:30 at that point, not 8:30.

14          THE COURT:  All right.  Is that everything anybody

15 wants to say?

16          All right.  I'm going to go read this, I'm going to

17 talk to Mr. Burns about it, I'll come back out, and I'll tell

18 you what we're going to do.

19          COURT SECURITY OFFICER:  All rise.

20      (Recess from 2:12 p.m. to 2:19 p.m.; all parties present.)

21          COURT SECURITY OFFICER:  All rise.  This Honorable

22 Court is back in session.  Please be seated.

23          THE COURT:  Give me a moment.

24          When this issue came up this morning, I asked

25 Mr. Burns to do a little legal research to kind of get -- get

1  some law on how to handle a late disclosed witness such as this

2  one.  It's an issue I've dealt with before.  It happens from

3  time to time in criminal cases.  Frankly, sometimes a witness

4  favorable to the government reveals themselves while we're in

5  trial.  I've had it go both ways, both defense and the

6  government.  It's not, of course, what we prefer, but -- and

7  then when you're dealing with the real world and people, then

8  it -- it can happen.

9       So -- so I'm going to momentarily get the law that we

10  found here that I discussed with Mr. Burns.  I'll talk about

11  the law for a minute and then I'll make a ruling.

12       MR. VOKEY:  And, Your Honor, while you're doing that,

13  do you need to keep that two-page NCIS?

14       THE COURT:  No, I'll give it back to you in a minute.

15       MR. VOKEY:  Okay.  All right.

16       THE COURT:  Yeah.

17       So the law as we've researched it this morning would

18  indicate that few rights are more fundamental than that of an

19  accused to present witnesses in his own defense, according to

20  the Supreme Court case of *Taylor versus Davis*.

21       But the mere invocation of that right cannot

22  automatically and invariably outweigh countervailing public

23  interest.

24       The Court should weigh the defendant's right to call

25  his own witnesses against the integrity of the adversary

1    process, which depends both on the presentation of reliable

2    evidence and the rejection of unreliable evidence, the interest

3    in the fair and efficient administration of justice, and the

4    potential prejudice to the truth-determining function of the

5    trial process.

6            Again, according to the Supreme Court in *Taylor*.

7            The Court, when faced with a situation like this,

8    inquires into the defendant's failure to identify his witnesses

9    in advance of trial.  If the omission appears to be motivated

10   by a desire to obtain a tactical advantage, then the Court may

11   exclude the witness's testimony.

12           In my view, based upon the presentation of Mr. Vokey,

13   which I have no reason to question, there did not appear to be

14   any effort by the defendant to hold this witness back and

15   present the witness at the last moment to gain a tactical

16   advantage.

17           I have no reason to doubt that what Mr. Vokey said is

18   exactly what happened; that is, that Captain Nettleton

19   recognized the witness in the audience as somebody he knew from

20   his prior time at Guantanamo Bay, that the defendant then

21   sought to interview that witness, and the witness made a

22   statement to defense counsel that they feel is important enough

23   to call her as a witness in this case.

24           And so the concern of the Supreme Court that a

25   defendant not be allowed to, in effect, sandbag, hold a witness

1    back, spring the witness on -- on -- on the government at the

2    last minute, that concern does not appear to be present in the

3    case.

4         Then you go back to the law that says that few rights

5    are more fundamental than that of an accused to present

6    witnesses in his own defense.  And the Court says that you do

7    need to look at the public interest, the integrity of our

8    process, the interest in the fair and efficient administration

9    of justice, and the potential prejudice to that

10   truth-determining function of the trial process.

11        My judgment in this matter is that what happened to

12   Mr. Tur after the altercation with Captain Nettleton has been

13   the subject of much testimony, much interest in the case, and

14   even though this is not a murder case, this is not a case in

15   which Captain Nettleton is being accused of -- of causing the

16   death directly of Mr. Tur, still the way the evidence has

17   played out and the way that these charges have been informed,

18   his whereabouts, that is, Mr. Tur's whereabouts, and his

19   activities following this altercation are a matter that have

20   been of interest and the subject of testimony and

21   investigation.

22        And so if a witness is prepared to come and testify

23   under oath that they saw Mr. Tur at a relevant time in this

24   timeline, then I think I should allow that witness to testify.

25        I recognize that it has some potential to prejudice

1    the government in the sense the government was not necessarily

2    prepared to meet this evidence, but, of course, in a federal

3    criminal trial you don't always precisely know what people are

4    going to say anyway, and there's very often surprises and

5    things that you have to deal with, and I think this is one of

6    those times.

7            Now, having read the witness's statement to NCIS, and

8    the circumstances under which she has identified herself,

9    certainly those will be fair subjects of cross-examination by

10   the government concerning this witness.

11           And I also think that it would be appropriate, given

12   the way this has played out -- and -- to make sure that the

13   witnesses -- the circumstances under which the witness has

14   identified herself -- again, I have every confidence that what

15   Mr. Vokey has told me is true from his standpoint and his

16   client's standpoint, but I think it's -- I think it would be a

17   valid exercise of the Court's discretion before I actually put

18   her in front of the jury to invite her to proffer her testimony

19   before we actually hear it in front of the jury to make sure

20   that the evidence is that which should be placed before the

21   jury.

22           So what I'm going to ask Mr. Vokey to do is to --

23   instead of having her here at 9 o'clock tomorrow, if you could

24   have her here at 8:30, and I'll take a -- a brief proffer of

25   her testimony, and then make a final decision.  But at the

1    moment my decision is that she will be allowed to testify.

2          So -- and that will also give the government an

3    opportunity to ask questions about how she came to be in the

4    courtroom and whatever else they want to ask her so that they

5    can make sure that -- that my current decision is the correct

6    one, but also, of course, prepare for any cross-examination

7    that may obtain.

8          So, Mr. Gee, I'm not necessarily asking you to agree

9    with the Court's ruling, but do you understand it?

10          MR. GEE:  Absolutely.  Thank you, Your Honor.

11          THE COURT:  Okay.  Mr. Vokey, do you understand the

12   Court's ruling?

13          MR. VOKEY:  I do, Your Honor.

14          THE COURT:  And do you have confidence you'll be able

15   to have her here at 8:30?

16          MR. VOKEY:  I will -- I think -- I think so.  We had

17   already told her to plan on being here at 9:00, anticipating we

18   may have to do some talking first.

19          THE COURT:  Okay.  Well, what I plan to do at 8:30 is

20   put her on the stand, put her under oath, let you do a brief

21   proffer, and let Mr. Gee ask her a few questions.  I'm not

22   saying it necessarily will be the whole exam, but I just want

23   to get a -- get a sense of her and also give the government at

24   least an opportunity to see her before she goes on the stand.

25   Okay?

1          MR. VOKEY:  All right, sir.

2          THE COURT:  All right.  Besides Ms. Wolfe, what do we

3    have?  Ms. Wolfe, besides that, who else are you going to call?

4          MR. VOKEY:  We have -- we are taking out Dr. Gordon.

5          THE COURT:  Okay.

6          MR. VOKEY:  We got what we needed.

7          THE COURT:  Okay.  Right.

8          MR. VOKEY:  We have Agent Bisesi, Kelly Wirfel.

9          THE COURT:  Okay.  Agent -- that's an NCIS agent?

10          MR. VOKEY:  That's correct, Your Honor.

11          THE COURT:  Okay.

12          MR. VOKEY:  Kelly Wirfel and -- and, as I mentioned,

13    we have Dr. Sperry and we have to discuss whether we still need

14    him or not, but he would have to be Wednesday.  So that's the

15    only problem.

16          THE COURT:  All right.

17          MR. VOKEY:  And that's it.

18          THE COURT:  Recognizing that --

19          MR. VOKEY:  Oh, and -- and we -- I don't think we

20    need to bring Mr. McManus any longer.

21          THE COURT:  Okay.  Again, I've already talked to

22    Captain Nettleton about his rights to testify.  I'm not going

23    to review that again.  I think I've done it twice now.  But is

24    it -- and I recognize sometimes these things change, but is it

25    Captain Nettleton's -- what -- what's Captain Nettleton's

1    current position, Mr. Vokey, on whether he will be testifying?

2            MR. VOKEY:  We were going to actually discuss that

3    this evening, sir.

4            THE COURT:  All right.  So it remains a possibility?

5            MR. VOKEY:  It does.

6            THE COURT:  So I'm trying to think out loud here.

7            We -- we're going to have Ms. Wolfe.  And even if she

8    testifies, her testimony shouldn't be that long, I wouldn't

9    think, but -- so -- and then let's assume you decide not to

10   call Dr. Sperry, which is up to you, of course, but let's

11   assume that.

12           Ms. Wirfel should be very brief, I would think,

13   Mr. Vokey, right?

14           MR. VOKEY:  Yes.

15           THE COURT:  She has already -- she already testified

16   a long time.

17           MR. VOKEY:  Yes, sir.

18           THE COURT:  Yeah.

19           MR. NOTHSTEIN:  And, Your Honor, on that point --

20           THE COURT:  Yeah.

21           MR. NOTHSTEIN:  -- if I just may, given that

22   Ms. Wirfel has already testified pretty extensively about a lot

23   of topics, I guess we were wondering if we could get a

24   potential proffer of what new information she would have to

25   testify about, but -- I think, through my knowledge of the case

 1   file, is we pretty much went through all of what she already

 2   had --

 3          MR. VOKEY:  And I'd rather not proffer, sir, if

 4   that -- if that's all right.

 5          THE COURT:  I don't think there's any requirement you

 6   so do, but I will say this, Mr. Vokey.  I'm not -- I'm not

 7   interested in plodding ground that we've already -- we've

 8   already been on, so now --

 9          MR. VOKEY:  I completely understand, sir.

10          THE COURT:  Okay.  All right.

11          Mr. McManus is -- so I guess my point is we -- and

12   then, of course, the -- the unknown about Captain Nettleton,

13   now that could change things quite substantially depending on

14   whether he testifies.

15          But I'm trying to determine -- trying to think it

16   through.  Do you-all -- is it -- does it make sense for us to

17   be prepared to close the case tomorrow, or regardless of how

18   long the evidence takes tomorrow, is it -- is it better for us

19   to have a charge conference and then to close on Wednesday

20   morning?  I guess that's my question.  I -- I mean, it -- you

21   know, this could go pretty quickly.  I mean, we could be

22   looking at 10:30 in the morning and we're done.  And I kind of

23   hate to lose a whole day.

24          On the other hand, we haven't -- you know, obviously

25   the trial hasn't taken as long as I told the jury it would, so

1  we're well within the -- the bounds here, but I -- I do want to

2  be respectful of their time as well.

3         I'm just trying to think this through.  We -- we do

4  have to talk about the jury instructions, which we could either

5  do this afternoon or we could do tomorrow.

6         So I'll start with you, Mr. Vokey.  What is your

7  request?

8         MR. VOKEY:  Close it Wednesday, sir.

9         MR. NOTHSTEIN:  Your Honor, we'll be prepared

10  Wednesday, but we'd also be prepared tomorrow as well.  We'd

11  prefer to do the closings sooner.

12         THE COURT:  When are you going to decide whether

13  you're going to call -- because you said Dr. Sperry couldn't

14  come until Wednesday, right?

15         MR. VOKEY:  I believe so, sir.  We're going to give

16  him a -- we'll give him a call again.

17         THE COURT:  Are you --

18         MR. VOKEY:  We're looking at that tonight.  We -- we

19  have got to go back and -- and we're actually going to maybe

20  hopefully review the transcript at this time and see if we have

21  got all those pieces in.  That's what we're talking about.

22         THE COURT:  You talking about Dr. Gordon's testimony?

23         MR. VOKEY:  Dr. Gordon's testimony, yes.

24         I -- I'm fairly confident that we will not need to

25  call Dr. Sperry, but I -- I -- I don't want to --

1           THE COURT:  Yeah, I don't know, but I -- it seemed

2    like Dr. Gordon was able to give pretty complete testimony to

3    both sides, and I -- as I recall it, Dr. Sperry was very

4    consistent with Dr. Gordon, but I -- of course, that's up --

5    that's your call, not mine.

6           MR. VOKEY:  Yes, sir.

7           THE COURT:  So I'm not -- I'm not going to try to

8    make it for you.

9           MR. VOKEY:  Your Honor, I think it would be smarter

10   to plan for Wednesday morning.

11          THE COURT:  I -- I know you do.

12          All right.  Here's what we're going to do.  Mr. Burns

13   is going to -- as you're leaving here today, Mr. Burns is going

14   to hand to you the current version of the jury instructions,

15   which does not yet include a verdict form, right?

16          LAW CLERK:  Correct, sir.

17          THE COURT:  Okay.  He'll e-mail you.  And make sure

18   you've got good e-mail addresses with him.  He'll e-mail you

19   later a potential verdict form.

20          We have made some, what I consider to be,

21   non-substantive adjustments to them, and so I'm going to ask

22   you to just look at them in their entirety and to make sure

23   that -- and -- and those -- those adjustments by and large

24   would -- would be in the substantive counts, not the -- not the

25   preliminaries or the -- also, right now we have two alternative

1    versions in there.

2            Depending on whether Captain Nettleton testifies or

3    not, that does change some of the patterns, but that's easily

4    accomplished, depending on how that goes.

5            So -- so, anyway, I'm going to ask you to review

6    those overnight and be prepared to have a charge conference

7    sometime tomorrow.

8            I'm -- I'm not hugely adverse to waiting until

9    Wednesday, but I -- I think that we ought to at least -- you

10   know, if -- if for some reason we're done at 9:30 tomorrow

11   morning or 10 o'clock, I -- I'm going to have to think about

12   that.  So I think you need to at least be ready to -- to

13   entertain the idea of going forward.

14           If we do that, I might -- I probably would give you a

15   little bit of time to get your ducks in a row before I made you

16   stand up there.

17           I also -- some of my colleagues actually charge

18   before the closing arguments.  I usually charge after closings.

19   But does the government have a preference one way or the other,

20   Mr. Gee, as to which side my charge is?

21           Mr. Nothstein?

22           MR. NOTHSTEIN:  Thank you, Your Honor.

23           Your Honor, if the Court would be willing to do it, I

24   think that before might be helpful in this case just because

25   the charges are complex.  We'll certainly be going through the

1    elements, you know, in detail and showing how the -- how the

2    evidence supports each element, but I think that given the

3    complexity and the fact the jury's note asking what the charges

4    were, I think the jury is eager to hear from the Court about

5    that.

6              THE COURT:  Mr. Vokey?

7              MR. VOKEY:  We believe it's more appropriate after.

8              THE COURT:  All right.  Good.  I'm glad we got

9    agreement on that.  All right.  I'll think about that.

10             So -- and -- and, by the way, it's completely

11   discretionary with the Court, so no matter what I do, I

12   don't -- I don't think I'll be finding my way to error.

13             So I guess my -- my -- Mr. Vokey, if you want to try

14   to -- tomorrow if we get finished really early and it looks

15   like we could get it -- get it to the jury tomorrow, that's

16   probably going to be what I would like to do, but I'll let you

17   try to talk me out of it, and but let's -- we'll -- we'll give

18   you the jury instructions.  Be prepared to argue those sometime

19   tomorrow, and at least be prepared to -- to give your closings

20   and so I can -- so we have that option available, but I will

21   listen to an argument to wait until Wednesday if that makes

22   more sense.

23             A lot of it depends, again, on whether Captain

24   Nettleton is going to testify or not, because that would change

25   the -- the -- how -- how much time it will take tomorrow.

```
 1              But we'll see.  I'm -- I want to make sure we're --
 2    I'm fair to everybody, and I know -- I know there's a lot of
 3    preparation that goes into all these things, including
 4    witnesses and closings, so -- Mr. Vokey, are you going to be
 5    the one giving the closing?
 6              MR. VOKEY:  I am, sir.
 7              THE COURT:  Okay.  All right.
 8              Is there anything else that we need to -- anything
 9    else we need to do this afternoon?
10              MR. NOTHSTEIN:  No, Your Honor.
11              MR. VOKEY:  No, sir.
12              THE COURT:  Okay.
13         (Judge confers with law clerk.)
14              THE COURT:  So in preparing the instructions, I think
15    I told you before that I'm not going to give the indictment to
16    the jury.  I think there's too much information in the
17    indictment that -- some of it is not even things that are being
18    pursued anymore, so I think I'm not going to give them the
19    indictment.
20              So the jury instructions reference the counts of the
21    indictment and give them the elements.  So it gives them
22    everything they need.
23              And the verdict form will be a conforming verdict
24    form, so they'll be able to go from the instruction to the --
25    to the verdict form and understand what they're doing.
```

1    But we do have this issue with Six and Seven, and it

2  makes it a little -- so we have got two possibilities.  One is

3  that when -- because Six and Seven have been dismissed, so

4  there's two possibilities.  One is we just skip over Six and

5  Seven when we're -- when we're giving them to the jury.

6    The other is that I just constructively amend the

7  indictment and just move everything up by two, so that means

8  Count Eight would now be Count Six, Count Seven would be the

9  former Count Nine, and so forth.  And, of course, since the

10  jury is not going to have the indictment, they're not going to

11  know the difference anyway.

12    So we were debating -- Mr. Burns and I were talking

13  about what made the most sense, what would be the less

14  confusing.

15    Does anybody have a preference?  Mr. Nothstein?

16    MR. NOTHSTEIN:  We prefer the charges be updated to

17  reflect the dismissal, so go right from Four, Five, Six, Seven,

18  and so forth.  Otherwise, it invites too many questions, Your

19  Honor.

20    MR. VOKEY:  I would concur.  We agree.

21    THE COURT:  All right.  So we're going to -- I'm

22  going to -- I'm going to -- and I might do this in a written

23  order just so there's a record of this, that the Court with the

24  agreement of the parties is going to constructively amend the

25  indictment so that -- in light of the dismissal by the

1 government of Count Six and Seven, that the former Count Eight

2 will now be Count Six, the former Count Nine will now be Count

3 Seven, and the former Count Ten will now be Count Eight.

4        And that will -- and I'll enter a brief order to that

5 effect.  And that way I've got a record and everybody will know

6 what we're talking about.  Okay?

7        And the only other thing I was wondering is if -- if

8 I gave y'all an hour or so to look at these -- or maybe even

9 less to look at these charges whether we could settle them

10 today.

11        Is that something people want to do or would you

12 rather go get ready for tomorrow and do it tomorrow?  Last --

13 that's my last question.  I don't usually give choices, but

14 here you go.

15        MR. VOKEY:  I'd rather look at it tomorrow and get

16 out and get ready and go --

17        THE COURT:  Okay.  All right.  Is that all right with

18 you, Mr. Gee?

19        MR. GEE:  That's fine, Your Honor.

20        THE COURT:  That's fine.  We'll do that.  Okay.

21        MR. GEE:  Your Honor, I don't know if -- I can give

22 the Court one thought.  I haven't seen the Court's final

23 draft --

24        THE COURT:  Yeah.

25        MR. GEE:  -- but I did have one thought just in

1    seeing your prior.

2            THE COURT:  Yeah.

3            MR. GEE:  In addition to the willfully, just sort of

4    food for thought.  I did notice that there were a number of

5    provisions that the parties suggested for the 1519 count that

6    are -- that is on page 22 of our joint filing but didn't make

7    it into the Court's original draft.  Maybe they've been added

8    since then, but there were some parts of the 1519 we'd suggest

9    get put in if they're not in the -- in the new revised version.

10            THE COURT:  We will take a look at that.

11            MR. GEE:  I think they were on page 22 or --

12            THE COURT:  22 of your submission, your joint

13    submission?

14            MR. GEE:  Yes, sir.

15            THE COURT:  All right.  We will take -- we will take

16    a look at that.  All right?  In the meantime, we're going to go

17    ahead and give you what we have currently.  That way tomorrow

18    we'll all be operating on the same pieces of paper.  But that,

19    of course, doesn't prevent you from asking for additions,

20    including the one you just mentioned, but we'll look at it

21    overnight since you brought -- brought it to our attention.

22            Mr. Burns, don't -- don't forget before you leave to

23    make sure Mr. Burns has a good e-mail address.  He'll e-mail

24    you the verdict form as soon as it's prepared, and that will be

25    part of our charge conference tomorrow.

1          Anything else from the government?

2          MR. GEE:  No.  Thank you, Your Honor.

3          THE COURT:  Anything else, sir?

4          MR. VOKEY:  No, sir.

5          THE COURT:  All right.  We will be back in session at

6    8:30 tomorrow.  If -- if that -- if there's any difficulty

7    having your witness be here by 8:30, will you let Mr. Burns

8    know so that we can figure out what our plan B is?

9          MR. VOKEY:  I will, sir.

10         THE COURT:  Thank you.  We're in recess.

11         COURT SECURITY OFFICER:  All rise.

12      (The proceedings adjourned at 2:43 p.m.)

13                          - - -

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

UNITED STATES DISTRICT COURT   )
                                 )
MIDDLE DISTRICT OF FLORIDA     )

      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.

      DATED this 13th day of January, 2020.

              s/Shannon M. Bishop
              Shannon M. Bishop, RDR, CRR, CRC