IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,        Jacksonville, Florida

     Plaintiff,               Case No. 3:19-cr-1-J-32PDB

vs.                              January 14, 2020

JOHN R. NETTLETON,               8:30 a.m.

     Defendant.               Courtroom No. 10D
_____


JURY TRIAL
(VOLUME VI)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE


COURT REPORTER:

       Shannon M. Bishop, RDR, CRR, CRC
       221 North Hogan Street, #150
       Jacksonville, FL  32202
       Telephone:  (904)549-1307
       dsmabishop@yahoo.com

     (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

**TODD GEE, ESQ.**
**PETER MARSHALL NOTHSTEIN, ESQ.**
US Department of Justice
1400 New York Avenue NW
Washington, DC  20005

DEFENSE COUNSEL:

**COLBY VOKEY, ESQ.**
The Law Firm of Colby Vokey, P.C.
6924 Spanky Branch Court
Dallas, TX  75248

**TERENCE LENAMON, ESQ.**
Terence Lenamon P.A.
245 SE 1st Street, Suite 404
Miami, FL  33131

**DANIEL SCHWARZ, ESQ.**
Daniel Schwarz, P.A.
245 SE 1st Street, Suite 404
Miami, FL 33131

<u>T A B L E   O F   C O N T E N T S</u>

<u>Page No.</u>

WITNESSES FOR THE DEFENDANT:

**KARLA WOLFE**

Direct Examination................................  44
Cross-Examination.................................  54
Redirect Examination..............................  80
Recross-Examination...............................  83

**JOHN ROBERT NETTLETON**

Direct Examination................................  88
Cross-Examination................................. 243

E X H I B I T S   R E C E I V E D

Page No.

Government's Exhibits:

350.......................................... 263

Defendant's Exhibits:

41, 42, 45, 47, 53, 57 and 58 ...................  38
41A, 42A, 45A, 47A, 53A and 57A .................. 201

1                    P R O C E E D I N G S

2    January 14, 2020                              8:30 a.m.

3                         - - -

4              COURT SECURITY OFFICER:  Good morning.  All rise.

5    All rise.  The United States District Court in and for the

6    Middle District of Florida is now in session.  The Honorable

7    Timothy J. Corrigan presiding.

8              Please be seated.

9              THE COURT:  Good morning.  The witness is present?

10             MR. VOKEY:  Present.

11             THE COURT:  Where is she?

12             MR. VOKEY:  In the defense room.

13             THE COURT:  Okay.  All right.  Let me just make sure

14   I've got the lay of the land here.

15             So, Mr. Vokey, have y'all had any further interviews

16   or discussions with Ms. Wolfe?

17             MR. VOKEY:  We did, sir.

18             THE COURT:  Okay.

19             MR. VOKEY:  She -- she came to the -- came by where

20   we were staying last night because she wanted a copy of her

21   original statement to NCIS.

22             THE COURT:  Okay.

23             MR. VOKEY:  And we provided that to her.

24             THE COURT:  All right.  And, Mr. Gee, did the

25   government seek an interview or have an interview with

1    Ms. Wolfe?

2         MR. GEE:  Yes, Your Honor.  We had some agents speak

3    to her I think late yesterday afternoon, or something like

4    that, over the telephone.

5         THE COURT:  Okay.

6         MR. GEE:  She still didn't tell us that -- this new

7    Wirfel information.

8         THE COURT:  She didn't?

9         MR. GEE:  We asked if there was anything new that she

10   had recalled since the January interview and she said no.

11        THE COURT:  Okay.

12        MR. GEE:  By "we," I mean the agents asked that, of

13   course.

14        THE COURT:  Okay.

15        MR. GEE:  Your Honor, I'd also note -- and this might

16   be easiest if we could have the ELMO.

17        Your Honor, we went back through the transcript of

18   Ms. Wirfel's testimony and it caused us to have some, I guess,

19   questions that I guess maybe we should have answered about the

20   timing of all this.

21        Ms. Wirfel was actually asked about Ms. Pagan.  This

22   is page 172 of the transcript.  And it seems to imply, Your

23   Honor, that defense counsel as of the day that Ms. Wirfel

24   testified, which the Court will recall was the very first day

25   of trial, prior to Commander Ross, that they had some sort of

 1   new knowledge about Ms. Pagan and this new information she was

 2   going to testify about.

 3           This says, "As a matter of" -- this is a question to

 4   Ms. Wirfel.

 5           "As a matter of fact, concerning the Bayview, you

 6   actually talked to somebody else that day as well who says that

 7   Chris Tur went back into the Bayview?

 8           "Yes.

 9           "And it was Ms. Pagan?

10           "Yes.

11           "Because you mentioned to government counsel about

12   picking up and dropping off at Karla Pagan's house.  That's one

13   of the things she mentioned to you, is that Chris had gone back

14   in the Bayview after you left."

15           This is in conversation about on Saturday when she's

16   picking up and dropping off the kids she was taking care of.

17           She said she'd seen him after he left.  I believe

18   that's in her statement as well.

19           So apparently defense counsel has shown Ms. Wirfel

20   Ms. Pagan's statement.

21           MR. VOKEY:  I had not.

22           THE COURT:  All right.  That's okay.  Go ahead.

23           MR. GEE:  "So she tells you that Chris Tur had gone

24   back in after you and Lara had left the Bayview?

25           "Yes.

1        "Which would have been after you received the phone
2   call, the knock-out phone call?"
3        So, again, how did they know to ask her that
4   question?  That's not in her original interview.  This
5   timing -- first off, the knock-out comment is not in her
6   original interview nor the timing.  I mean, I think we'd just
7   like to sort of have a little more information about all that
8   as part of this process.  Because it seems as though they knew
9   more information about Ms. Pagan at the time of the very first
10  day of trial, yet Ms. Pagan seems to emerge on the second or
11  third day of trial.
12       THE COURT:  All right.  Mr. Vokey, you'd like to
13  respond, sir?
14       MR. VOKEY:  Sir, what we knew was from Ms. Wirfel.
15  We had never talked to Ms. Pagan ever before.  And the -- the
16  only information we got was from Mrs. Wirfel saying she had
17  talked to Ms. Pagan.  So the purpose of this was to show that
18  not that Chris Tur had actually been at the Bayview.  It was --
19  this is the information that was known to witnesses like Kelly
20  Wirfel and they informed Captain Nettleton.  That was the
21  point.
22       We had no idea that -- what Ms. Pagan actually knew.
23  We had never spoken with her.  At that time we had no
24  intention -- we had no idea she would be a witness whatsoever.
25       It wasn't until she showed up in court, what was it,

1    Wednesday or Thursday, and my client saw her here in the

2    courtroom and said, "What she's doing here?"  And we thought

3    that perhaps she might be a government rebuttal witness.  So

4    that's why I sent my co-counsel, Mr. Schwarz, to go out, get

5    her phone number so we can contact her, and we did this

6    weekend.

7              MR. GEE:  And, Your Honor, understanding and

8    accepting, of course, Mr. Vokey's representations, but that

9    would just further show if they knew this from the conversation

10   with Ms. Wirfel, that Ms. Pagan should have been on their

11   witness list and thereby excluded from the courtroom.

12             MR. VOKEY:  Sir, if I might respond to that.  If we

13   look at that -- the small -- kind of page-and-a-half report

14   that I gave you, one of the big reasons why we didn't pursue

15   Ms. Pagan, and kind of an after thought, was in that report it

16   says in there that she saw Chris Tur about 2030, 8:30 p.m.

17             So nothing clicked in our mind at that point that,

18   okay, that must have been before all this stuff happened.

19             So nothing clicked in our mind that she was the last

20   person to see Chris Tur.

21             Now, whether that's -- that was incorrectly noted by

22   the agent or Ms. Pagan gave the wrong time, I don't know.  But

23   that didn't clue us in that she was actually aware of it.

24             So the point was -- with Ms. Wirfel was information

25   that she received where she believed that he was last seen at

1    the Bayview, and that was related, you know, to

2    Captain Nettleton.  That was the point, not that she had

3    actually seen it and certainly the level of detail.  And we

4    didn't know that until, again, we contacted her.

5              And as far as whether we had spoken to Ms. Pagan at

6    all before this, what we can surely do is bring in Ms. Pagan

7    and ask her that.

8              This is not defense sandbagging, sir.

9              THE COURT:  I understand.  So is -- can I have -- can

10   I please have a copy of her statement?

11             MR. VOKEY:  Yes, sir.  I believe you still have it

12   from yesterday.  You didn't give it back to me.

13             MR. GEE:  I have an extra if the Court needs it.

14             THE COURT:  No, this is it.

15             And she -- and the witness goes by Ms. Wolfe now.  Is

16   she married?

17             MR. VOKEY:  She has married since then.  That's

18   correct, sir.

19             THE COURT:  So what I think I will do is bring her

20   in.  I don't -- what I don't want to do is for her to feel

21   badly about being here.  And while certainly there will be

22   appropriate questioning and counter-questioning of her if she

23   testifies, I assume everybody will treat her with the respect

24   that any witness would be due.

25             What I think I will do, though, is bring her in --

1   and I think I'll ask her a few questions, just to establish the

2   matters that have been talked about here. And -- and then

3   if -- if those answers are satisfactory, then I would just let

4   her be called as a witness and be examined and cross-examined

5   like any other witness.

6           I had thought yesterday I might actually engage in a

7   proffer of her testimony because I was concerned that the

8   government might be disadvantaged by having just learned about

9   this and not having had an opportunity to talk to her.

10          But it sounds like the agents did talk to her. The

11  government's view is she's reaffirmed her statement, and I'm

12  sure that will be the line of questioning or at least one of

13  the lines of questioning the government will pursue.

14          And so I don't really think we need to actually have

15  a proffer of her substantive testimony, but I think it's

16  probably appropriate for me to -- given that she is a

17  potentially noteworthy witness and that her -- that her

18  testimony is going to come to us in a less-usual way, I think

19  I'll probably just talk to her for a minute and establish for

20  the record a few things.

21          And assuming those are all satisfactory, then I'll

22  probably just let her testify like any other witness.

23          If -- I may -- at the end of my questioning, I may

24  call up counsel and ask if there's anything else that they

25  would want me to pursue with her. But at the moment I'm not

1   proposing that either lawyer have an opportunity to directly

2   question her until she actually testifies on the stand.

3            Anybody want to object to that or offer a different

4   way for me to proceed?

5            MR. VOKEY:  No.  No, Your Honor.

6            MR. GEE:  No, Your Honor.  Thank you.

7            THE COURT:  All right.  So, Mr. Schwarz, since she's

8   in your room, will you mind going and getting Ms. Wolfe and

9   asking her to come in.

10       (Ms. Wolfe enters the courtroom.)

11            COURTROOM DEPUTY:  Good morning, ma'am.

12            THE COURT:  Good morning, ma'am.  How are you?

13            MS. WOLFE:  Good morning, Your Honor.

14            THE COURT:  I'm going to ask you to be sworn in as a

15   witness, please.

16            COURTROOM DEPUTY:  Do you solemnly swear that the

17   testimony you are about to give before this court will be the

18   truth, the whole truth, and nothing but the truth, so help you

19   God?

20            THE WITNESS:  Yes.

21            COURTROOM DEPUTY:  Please state your full name and

22   spell your last name for the record.

23            THE WITNESS:  My name is Karla Wolfe, W-o-l-f-e.

24            COURTROOM DEPUTY:  Thank you.

25            Please be seated, ma'am.

1      THE COURT:  So, ma'am, as you know, we're in trial

2  here.  And -- and you've been now proposed as a witness in the

3  case.  And I just wanted to talk to you for a few minutes this

4  morning before we -- before we proceed with that.

5      Okay?

6      THE WITNESS:  Okay.

7      THE COURT:  So I imagine you're a little nervous.

8      THE WITNESS:  I am.

9      THE COURT:  That's okay.  That's understandable.

10      I will tell you that all of us are going to treat you

11  with the respect that you're due and all anybody wants is for

12  you to tell the truth as you know it.

13      Okay?

14      THE WITNESS:  Okay.

15      THE COURT:  So can I just establish some obvious

16  things that will be obvious to you, but maybe not to everybody.

17  So at the time of these events back in 2015, what was your

18  name?  What name did you go by?

19      THE WITNESS:  Karla Pagan.

20      THE COURT:  Okay.  And now I understand you have --

21  you're married and you're now Karla Wolfe; is that right?

22      THE WITNESS:  That's correct, sir.

23      THE COURT:  Okay.  And how long were you in

24  Guantanamo Bay down there?

25      THE WITNESS:  Five years.

1          THE COURT:  And what did you do down there?

2          THE WITNESS:  I worked at migrant operations.

3    Basically it was a security contract.  We housed Cuban

4    migrants.

5          THE COURT:  Okay.  And when did you leave Guantanamo

6    Bay?

7          THE WITNESS:  Around the end of 2016.

8          THE COURT:  Okay.  So you know -- I think you know

9    the events we're talking about occurred in January of 2015.

10   And were you -- were you at Guantanamo during that time?

11         THE WITNESS:  I was.

12         THE COURT:  So where did you go when you left

13   Guantanamo in 2016?

14         THE WITNESS:  In Jacksonville, here.

15         THE COURT:  All right.  And what do you do now?

16         THE WITNESS:  I work for the lottery, Florida

17   Lottery.

18         THE COURT:  Okay.  And has that been true ever since

19   you came to Jacksonville?

20         THE WITNESS:  I was here in Jacksonville for two

21   years, then I moved to Virginia, was there for about a year,

22   and I moved back.

23         THE COURT:  Okay.

24         THE WITNESS:  And I'm back at the lottery again.

25         THE COURT:  So I wanted to ask you about your

1 connections to this case in a very general way.  If you're

2 called to testify, the lawyers will be asking you probably lots

3 of questions.  But do you recall in connection with the

4 investigation in this matter that -- do you recall being

5 interviewed by agents of NCIS?

6          THE WITNESS:  I do.

7          THE COURT:  And I think -- I think it turns out that

8 that interview was likely at -- near the end of January of

9 2015.

10          Does that sound about right to you?  Or at least

11 that's when it was reported.

12          Does that sound about right?

13          THE WITNESS:  I believe so, yes.

14          THE COURT:  When I say recorded -- I mean, I have --

15 I'm looking at the statement and it has a date of January 19th

16 of 2015 on it.

17          Does that -- does that sound about right?

18          THE WITNESS:  It does, Your Honor.

19          MR. VOKEY:  Your Honor, I believe it's 28 January.

20 The report is dated 29 and the interview 28.

21          THE COURT:  Well, anyway, you probably don't remember

22 whether it was the 28th or 29th.  But does the end of January

23 2015 sound about right?

24          THE WITNESS:  It does, Your Honor.

25          THE COURT:  Okay.  All right.

1    Was that the first time you were interviewed in

2  connection with this matter?

3    THE WITNESS:  Yes, Your Honor.

4    THE COURT:  Were you interviewed in connection with

5  this matter after that?

6    THE WITNESS:  No, Your Honor.

7    THE COURT:  Did you have any connection with the

8  investigation, with NCIS, with the government, with the defense

9  lawyers, any -- any connection with any of them in the

10  intervening years?

11    THE WITNESS:  No, Your Honor.

12    THE COURT:  Say it again.

13    THE WITNESS:  No, Your Honor.

14    THE COURT:  Okay.  Would it be fair to say that the

15  one and only time you had a connection to this investigation

16  was when you gave this statement back in late January of 2015?

17    THE WITNESS:  Yes, Your Honor.

18    THE COURT:  Is that -- that's true?

19    THE WITNESS:  That's correct.

20    THE COURT:  Okay.  So --

21    MR. VOKEY:  Your Honor, just to clarify, I believe

22  she was also contacted another time, but just not interviewed

23  by the government.

24    THE WITNESS:  Yes.  I was not interviewed.  They

25  called me and asked me, "Hey, do you remember any -- do you

1    want to add anything else?"  I had nothing to add.

2            THE COURT:  And when did that happen?

3            THE WITNESS:  Last year sometime.

4            THE COURT:  And it was NCIS that called you?

5            THE WITNESS:  Yes.

6            THE COURT:  Okay.  Any other contacts or connections?

7            THE WITNESS:  They called me yesterday.

8            THE COURT:  Right.  Okay.  We're going to get to

9    that.

10           THE WITNESS:  Okay.

11           THE COURT:  All right.  So -- so you gave the

12   statement.  There was a follow-up phone call sometime, and any

13   other connection, discussion about the investigation with

14   anybody with any of these folks?

15           THE WITNESS:  Then I spoke with the defense team.

16           THE COURT:  Right.  All right.  So -- and that was

17   after the trial started; is that right?

18           THE WITNESS:  Correct.

19           THE COURT:  All right.  So let me -- let me back up.

20   Why -- you -- did you just decide to come to the trial on your

21   own?

22           THE WITNESS:  Yes, Your Honor.

23           THE COURT:  All right.  And why did you decide to

24   come?

25           THE WITNESS:  I lived in Cuba for five years.  I was

1  there that night.  I decided to come by.  I live in Jackson- --

2  like, less than 30 minutes away.

3  THE COURT:  Okay.  Did anybody ask you to come?

4  THE WITNESS:  No, Your Honor.

5  THE COURT:  Did anybody ever say that you were going

6  to be a witness in the case up until now?

7  THE WITNESS:  No, until now.

8  THE COURT:  Okay.  Were -- were you here just as a

9  spectator?

10  THE WITNESS:  Yes, Your Honor.

11  THE COURT:  All right.  And -- and what day did you

12  come?  Was it --

13  THE WITNESS:  Last Thursday.

14  THE COURT:  Last Thursday?

15  Whose testimony were you here for?

16  THE WITNESS:  Captain Ross.

17  THE COURT:  Okay.  Were you here for any other

18  testimony?

19  THE WITNESS:  Admiral Gray.

20  THE COURT:  Admiral Gray.  Okay.  Any other

21  testimony?

22  THE WITNESS:  No.  Then you broke for lunch and I

23  went home.

24  THE COURT:  Okay.  All right.  And then what happened

25  in connection with the case?  Who first contacted you?

1          THE WITNESS:  The defense.

2          THE COURT:  All right.  And who -- do you remember

3  who you talked to?

4          THE WITNESS:  The gentleman in the back.  I don't

5  know his name.

6          THE COURT:  Mr. Schwarz?

7          THE WITNESS:  Yes.  I spoke with him first and then

8  the defense.

9          THE COURT:  Okay.  So -- and how did they contact

10  you?

11          THE WITNESS:  I gave them my number.

12          THE COURT:  All right.  And how did that come about?

13          THE WITNESS:  They just asked me, "Hey, are you

14  Karla?"

15          I said, "Yes."

16          They said, "Can we -- is it okay if we have your

17  number?"

18          I gave them my number and then they reached out and

19  asked if they could speak with me.

20          THE COURT:  And that was Mr. Schwarz at first, the

21  fellow in the back there?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay.  Are you saying he approached you

24  while you were here watching the trial?

25          THE WITNESS:  No.  Outside of court.

1        THE COURT:  Okay.  Out in the hallway or --

2        THE WITNESS:  Yes.

3        THE COURT:  Okay.  And before that time, was that the

4   first -- had you ever talked to anybody associated with

5   Captain Nettleton's defense before that?

6        THE WITNESS:  No, Your Honor.

7        THE COURT:  Okay.  And so he asked you to call.

8        Did they call you or did you call them?

9        THE WITNESS:  They called me.

10        THE COURT:  All right.  And what happened then?  Did

11   they -- what happened then?

12        THE WITNESS:  Then I spoke with them.  They asked me

13   about that night.  They went over -- had some questions.  I

14   answered them.  They wanted to know every single detail that I

15   recalled from that night.

16        THE COURT:  Okay.  All right.  And when did that

17   interview -- was that a face-to-face interview?

18        THE WITNESS:  Yes.

19        THE COURT:  All right.  When did that take place?

20        THE WITNESS:  On Sunday.

21        THE COURT:  Okay.  And how long did it last?

22        THE WITNESS:  Two hours.

23        THE COURT:  Okay.  Did you -- at the end of that or

24   during that, did you agree to come and testify if they asked

25   you to do so?

 1              THE WITNESS:  I did.

 2              THE COURT:  Okay.  All right.  So after Sunday, what

 3     was your next contact with anybody?  Did you talk to the

 4     defense team again at some point?

 5              THE WITNESS:  The next would be NCIS calling me.

 6              THE COURT:  Okay.  And that was yesterday?

 7              THE WITNESS:  Yes.

 8              THE COURT:  And who called you?  Do you know their

 9     names or...

10              THE WITNESS:  I don't remember the -- it's the one

11     that I spoke with originally five years ago.

12              THE COURT:  Okay.  And what did they -- did y'all

13     have the same kind of discussion?

14              THE WITNESS:  Yes.  He just wanted to know was there

15     anything that he could have possibly missed, that he was told

16     that I was coming in to testify.

17              And the words he used was something of the lines that

18     he didn't want anything pulled under the table or some --

19     something along those lines.

20              THE COURT:  Okay.  And how long did that discussion

21     last?

22              THE WITNESS:  Maybe about ten minutes, if that.

23              THE COURT:  Okay.  All right.  Then what was your

24     next connection before you came here this morning?

25              THE WITNESS:  Who else I spoke with?

1          THE COURT:  Yes.

2          THE WITNESS:  I spoke with the defense.  And that was

3    it.

4          THE COURT:  All right.  When was that?  Last night?

5          THE WITNESS:  Last night.  Yes.

6          THE COURT:  All right.  And tell me about that.

7    What --

8          THE WITNESS:  I stopped by.  I spoke with them for a

9    couple of minutes.  And then I went back home.

10         THE COURT:  Okay.  Did they provide you a copy of

11   your statement?

12         THE WITNESS:  Yes, I read my statement.

13         THE COURT:  And do you have a copy now or did you

14   just read it when you were there?

15         THE WITNESS:  No.  I have a copy.

16         THE COURT:  Okay.  Other than those conversations and

17   discussions we've just talked about now, have you had any other

18   connection or discussions concerning this matter with either

19   side?

20         THE WITNESS:  No, Your Honor.

21         THE COURT:  Okay.

22         THE WITNESS:  When you say that, you're referring to

23   me speaking with the prosecution as well, correct?

24         THE COURT:  Yes.

25         THE WITNESS:  No, I have not spoken to the

 1 | prosecution.

 2 |        THE COURT:  And have you spoken to the defense any

 3 | more than you've already told me?

 4 |        THE WITNESS:  Oh, no.

 5 |        THE COURT:  Have you spoken to anybody about it -- I

 6 | don't mean -- well, have you spoken to anybody about it?

 7 |        THE WITNESS:  Well, I spoke with Kelly Wirfel.  She's

 8 | my son's stepmother.  So when she picks up Noah while she's

 9 | here.  Other than that, I know she's involved.

10 |        THE COURT:  Okay.  And when did you speak with

11 | Ms. Wirfel about it?

12 |        THE WITNESS:  Oh, no, just picking up my son when

13 | she -- which I know she's part of.  So I do have contact with

14 | her because she's my son's stepmother.

15 |        THE COURT:  Have you spoken with her since the trial

16 | started?

17 |        THE WITNESS:  Yes.

18 |        THE COURT:  Okay.  And when was that?

19 |        THE WITNESS:  Yesterday when she came to say good-bye

20 | to Noah.

21 |        THE COURT:  Okay.  And what's the family connection

22 | there?

23 |        THE WITNESS:  She's now his stepmother.

24 |        THE COURT:  Okay.

25 |        THE WITNESS:  So...

1          THE COURT:  And is Noah your child or...

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  How old is Noah?

4          THE WITNESS:  He is 12.

5          THE COURT:  Okay.  Did you -- what did you all talk

6    about yesterday?

7          THE WITNESS:  We spoke about Noah, spoke about our

8    personal stuff.  Noah's birthday.  It's coming up in April.

9          THE COURT:  Yeah.  And I -- I didn't really mean

10   everything you talked about.

11          THE WITNESS:  Oh, okay.

12          THE COURT:  Did you talk about -- anything about the

13   case or about your testimony or about her testimony, anything

14   like that?

15          THE WITNESS:  She knows -- I -- I did tell her I was

16   called to testify.  She told me that I'm probably going to be

17   nervous but just take a deep breath, be honest, recount

18   everything you remember, and that I would be okay.

19          THE COURT:  Did you talk about it any more than that?

20          THE WITNESS:  No.

21          THE COURT:  Anything about the substance of it, like,

22   what happened when or anything like that?  Did you have any

23   discussions with Ms. Wirfel about that?

24          THE WITNESS:  Not that I can recall.

25          THE COURT:  And this was just yesterday?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  All right.  When you say "not that

3    I can recall," it kind of leaves a little --

4          THE WITNESS:  It does, because, honestly, we talk all

5    the time.  Even besides -- now that this situation has come up,

6    she's a friend of mine.  We constantly talk, so --

7          THE COURT:  Yeah.

8          THE WITNESS:  -- at some point could have -- could I,

9    yes, at some point I could have.  But we talk so much that...

10          THE COURT:  All right.  Do you mind just sitting

11    there just for a second while I talk to the lawyers?  Thanks.

12          Just stay right there.

13      (Sidebar conference:)

14          THE COURT:  If we want to have a -- more argument

15    about this, we can, but is -- but before I turn her loose, is

16    there anything else y'all want me to ask her about the -- these

17    circumstances?  I'm not going to get into her substance.

18          Is there anything else that you want me to follow up

19    with on?

20          MR. VOKEY:  No.

21          MR. GEE:  Your Honor, just briefly, it was a

22    little -- she said that she's been seeing Ms. Wirfel since she

23    was down here, and then the Court's question sort of ended up

24    directed to her conversation yesterday.

25          We would just ask if -- if we -- a more direct

1  question, can say about over the last couple of weeks while she

2  was down here.  And then I think it might be helpful to ask her

3  if she's seen any media, has she read the indictment, has

4  she -- that would be it.

5          Thank you, Your Honor.

6      (The following proceedings occurred in open court, in the

7  presence of the jury:)

8          THE COURT:  Ma'am, where does Ms. Wirfel live?

9          THE WITNESS:  Virginia.

10         THE COURT:  Okay.  And...

11         So other than yesterday when y'all had the discussion

12 you described, have you had -- have you talked to her over the

13 last couple of weeks or so, because, you know, she came to

14 Jacksonville to testify and so forth?

15         THE WITNESS:  Yes.

16         THE COURT:  Have you talked to her before yesterday?

17         THE WITNESS:  Yes.

18         THE COURT:  All right.  How many times?  Do you know?

19         THE WITNESS:  Several times.

20         THE COURT:  Okay.  And was there discussion of the

21 case and her testimony, or what happened that night or anything

22 during -- during --

23         THE WITNESS:  She just -- like I said, she -- she

24 gave me her advice.  She told me it is a little nerve-racking,

25 but once you sit down it gets a lot easier.  I'm trying to

1    think of what else she told me.  I'm sorry, Your Honor.

2         THE COURT:  That's okay.  What I'm really wanting to

3    know is whether you actually talked with her in these last

4    couple of weeks or so about what happened back in 2015 or what

5    she remembers or what you remember or that kind of thing.

6         THE WITNESS:  Yes, Your Honor.

7         THE COURT:  Okay.

8         THE WITNESS:  At some point.  I can't exactly, but

9    it's been a while.

10        THE COURT:  Okay.

11        THE WITNESS:  We -- you know, we have discussed it.

12        THE COURT:  When you say "a while," sometime in the

13   last two weeks or longer ago?

14        THE WITNESS:  Sometimes in the last two weeks.

15        THE COURT:  Okay.  And was that a deal where she was

16   telling you what she remembered or you were saying, "Oh, yeah,

17   I remember this happened"?

18        How did that go?

19        THE WITNESS:  It was something the lines that she

20   remembers that she received a phone call from Chris.  And I

21   told her, "Yes, I was there when you told me about it," that

22   night that she received the phone call at Rick's.

23        THE COURT:  Okay.  Anything else that you can

24   remember?

25        THE WITNESS:  No.

1          THE COURT:  Okay.

2          THE WITNESS:  Like I said, we -- we talk a lot.

3          THE COURT:  Sure.

4          THE WITNESS:  Like even before the trial, we are

5    constantly in touch.

6          THE COURT:  Sure.  Sure.

7          Now, how did you know this trial was going on?

8          THE WITNESS:  The news.

9          THE COURT:  Okay.  And what news did you read the --

10   about the trial in?

11         THE WITNESS:  It was the local news.

12         THE COURT:  Okay.  Do you remember which outlet?  Was

13   it --

14         THE WITNESS:  (Shakes head negatively.)

15         THE COURT:  Was it *First Coast News* or *News4Jax*?

16         THE WITNESS:  Probably.  Whatever alert I have on my

17   phone.  One of those I always get alerts, and it said it

18   started.

19         THE COURT:  Okay.  Have you read articles about the

20   case?

21         THE WITNESS:  Yes.

22         THE COURT:  Have you read articles about the case

23   while it's been going on during the trial here?

24         THE WITNESS:  Yes, Your Honor.

25         THE COURT:  Okay.

1          And have you read -- like, have you read any of the

2    papers in the case, like the indictment or any of the official

3    papers in the case or anything like that?

4          THE WITNESS:  Whatever was -- I read on the news

5    is...

6          THE COURT:  Did anything about that -- reading those

7    articles or reading about things online, did that jog your

8    memory in any way?  Did it -- did it make you think about

9    things in any different way?  Did it help you remember things?

10   Or what -- what would you say about that?

11         THE WITNESS:  Yes, Your Honor.  I'd say it just

12   brought back memories and I could just remember certain details

13   from that night, so, yes.

14         THE COURT:  Well, we're going to have to figure some

15   things out, so we're going to probably let you go back and sit

16   there for a minute while we figure them out.

17         But let me just ask you this:  The reason I'm having

18   this discussion with you -- we don't do this for every witness,

19   but the reason I'm asking you is that typically witnesses

20   aren't allowed to come sit and watch the trial.  They have to

21   wait until they're called.  Typically witnesses aren't allowed

22   to talk to other witnesses about the case.  Typically

23   witnesses -- so we have some rules.

24         And because of the way this came up, in kind of an

25   unusual way, we're having to try to figure out how to apply

1    those rules to your situation.

2         What I'd like to ask you -- you know, you're under

3    oath, of course, and you know that's important.

4         THE WITNESS:  Yes, Your Honor.

5         THE COURT:  But what I'd like to ask you is what

6    assurance you can give me that, if you do testify in front of

7    this jury, that you'll tell the truth; that you won't try to

8    favor one side or the other; that you'll just answer the

9    questions to the best of your knowledge; if you don't remember

10   something, that you'll say you don't remember it; if somebody

11   tries to suggest something to you that's not the way you

12   remember it, that you'll tell them so; and that you'll just do

13   the best you can to just come tell the truth, whatever that

14   truth is, and whatever you can remember.

15        Do I have that assurance from you?

16        THE WITNESS:  Yes, Your Honor.

17        THE COURT:  What motivated you to say that you would

18   agree to testify?

19        THE WITNESS:  Your Honor, when I came and sat down,

20   Captain Ross failed to mention some key details of that night.

21   And I felt like I had the obligation to at least let someone

22   know that there was more to his story.

23        THE COURT:  All right.

24        THE WITNESS:  It takes a lot for me to be here,

25   Your Honor.  I'm a shy person.  I -- I'm very private about my

1  life.  And coming here, I'm nervous, but I felt that it was

2  important that they know that Captain Ross was missing some key

3  details to his story as well.

4  THE COURT:  All right.  Thank you very much.  And

5  whatever decisions are made, I want you to know I appreciate

6  you coming in, I appreciate you talking to me this morning.

7  And, you know, it's my job to run a fair trial.

8  THE WITNESS:  Understood.

9  THE COURT:  And so sometimes what makes a fair trial

10  is not always that easy to understand.  And so I'm going to --

11  what I'm going to do is ask you to go sit back in that room

12  you've been in, not talk to anybody else about it.  Okay?

13  And we're going to talk about it and -- and then --

14  it may very well be that you'll be called in to testify in

15  front of the jury.

16  Now, if that happens, it's going to be a little

17  different than this.

18  THE WITNESS:  Okay.

19  THE COURT:  You'll be sitting there, the jury will be

20  there.  Okay?

21  And then the --

22  Mr. Vokey, are you going to --

23  Mr. Vokey will be asking you questions.

24  THE WITNESS:  Okay.

25  THE COURT:  You'll answer them the best you can.

 1   And, again, if you don't know or you don't remember, just tell

 2   him, okay?

 3          THE WITNESS:  Okay.

 4          THE COURT:  And then, Mr. Gee, are you --

 5          MR. GEE:  Yes, sir.

 6          THE COURT:  -- likely the one?

 7          Mr. Gee would be the one to ask you questions on

 8   behalf of the government.  Same deal.  You just answer his

 9   questions the best you can.  And sometimes they get to go twice

10   and we go until -- and so that's the way it will go.  And

11   you'll be under oath, and you just do the best you can.  And

12   that's all anybody can ask.  Okay?

13          THE WITNESS:  Okay.

14          THE COURT:  All right.  So thank you, ma'am.

15          And I'm going to ask you to go --

16          And, Mr. Schwarz, maybe you can escort Ms. Wolfe back

17   to the room.  And we -- we're scheduled, ma'am, to start with

18   the jury at 9:30.  So it may -- you may be sitting there for a

19   few minutes.  If you need some water or anything, just tell

20   Mr. Schwarz and we'll make sure.

21          THE WITNESS:  Okay.

22          THE COURT:  If you need to use the restroom, whatever

23   you need to do.  Probably we would -- if we call you, it will

24   be about 9:30, okay?

25          THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  Thank you very much.

2      (Ms. Wolfe exits the courtroom.)

3          THE COURT:  All right.  The witness is excused.

4          Mr. Gee, I'll hear from the government.

5          MR. GEE:  Your Honor, I think in light of the

6   witness's testimony as well as Mr. Vokey's explanation, we

7   don't think that there's a reason to exclude her testimony

8   based on anything sort of intentional the defense has done.

9          So we would remove our objection with respect to

10  that.

11         I do think, Your Honor, that we would -- we would ask

12  for -- for sort of three things, given sort of how this has

13  evolved.

14         Number one, we would ask for some leeway, obviously,

15  in the cross-examination of her, as well as Ms. Wirfel, about

16  the conversations, relationship, et cetera, so we can establish

17  all of this.

18         And number three is that in the -- given that --

19         THE COURT:  Wait, wait, wait.  I don't mean to -- you

20  said "number one" and then you said "number three."

21         MR. GEE:  Well, number one would be her and number

22  two would be Ms. Wirfel.

23         THE COURT:  Okay.

24         MR. GEE:  And number three would be, Your Honor,

25  given how all this has developed and because -- well, while

1    they didn't appear to have done anything intentional, they

2    certainly knew of her potential importance from Ms. Wirfel.

3            I think that it would be improper in the questioning

4    of her to ask questions along the lines of what -- you know, in

5    other words, they should simply ask her what she remembers that

6    night, not what does she remember last night that Captain Ross,

7    in her view, failed to mention.

8            In other words, these are not inconsistent

9    statements.

10           THE COURT:  I agree.  I agree with that.  I also

11   agree that there's no -- there's no questioning that's

12   necessary of the witness as to how she got to be a witness.  I

13   think she is just a witness that got called.

14           And -- now, I think she -- I think she could be

15   cross-examined by you as to a conversation she had with

16   Ms. Wirfel and so forth.  I think that's fine.

17           But I don't think that the fact that she was sitting

18   in the courtroom and that they -- that the defense called her

19   and so forth, I think -- I don't think any of that -- I mean,

20   that's just -- that's just the sausage being made.  That has

21   nothing to do with her testimony.  And the purpose of my

22   proffer with her was to establish all of that for the record.

23   And so I think that's right.

24           MR. GEE:  Well, Your Honor, if I may.

25           THE COURT:  Yeah.

1    MR. GEE:  I do think it would be proper for us to --

2   because, obviously, she's -- in other words, Your Honor,

3   she's trying to remember an event from five years ago --

4        THE COURT:  I agree.

5        MR. GEE:  -- that she's never really spoken with

6   anyone about until her memory had been, sort of, more recently

7   infected by things like media, what she saw in court, the

8   two-hour interview with the defense.

9        So, I mean, while I --

10       THE COURT:  No.  That's fine.  What I'm saying is, I

11  don't think we --

12       MR. GEE:  In other words --

13       THE COURT:  It'll be fine.  It --

14       MR. GEE:  I don't think we'd want to -- we're going

15  to try to paint a picture she did anything improper about

16  coming to court, but I do think that we should be allowed to

17  paint a picture that she heard all this, had a two-hour

18  interview, all this other stuff, and now she's trying to piece

19  back together events under a short -- from a very short time

20  frame.

21       THE COURT:  Fine.  And I assume also you have her

22  statement and that will be a subject of examination.  Sure.

23       MR. GEE:  Yes.  Thank you.

24       THE COURT:  I just -- I feel like that Ms. Wolfe

25  ought to be allowed to testify.  I found her very credible.

1    And as to how the matter came to her attention, I found her --

2    I think she's a -- a witness that ought to be -- come into

3    court and be treated like any other witness and give her

4    testimony and be subject to cross-examination, and -- and it's

5    up to the jury, then, to determine what -- what weight to give

6    to it.

7            But I -- I think -- I think she's a proper witness.

8    And I understand that she came to us in an unusual way, but

9    that happens sometimes, especially in criminal trials, which

10   can be dynamic.  And sometimes unexpected things happen.  And

11   when they do, we just have to deal with them the best we can.

12   And I think that's what we will do.

13           MR. GEE:  I think -- we think so, too, Your Honor.

14   We would just ask -- again, the key for us is, I think it's

15   inappropriate to ask, you know, about, you think Captain Ross

16   left these things out.

17           And we would just simply ask that just before she

18   testified she be instructed not to supply that information

19   gratuitously, that that's her opinion.  She should testify

20   about what she remembers -- or things she remembered.

21           THE COURT:  Mr. Vokey, I tend to agree with that in

22   the sense that if you -- if you want to argue to the jury later

23   that Captain Ross left out details and so forth --

24           MR. VOKEY:  I don't intend to elicit that from the

25   witness, Your Honor.

1           THE COURT:  Okay.  All right.  Then I think perhaps

2    either you or Mr. Schwarz should so instruct her, okay?

3           MR. VOKEY:  Okay.

4           THE COURT:  Because he -- obviously that's something

5    that's on her mind and sometimes witnesses start to give

6    answers that -- that they're not even asked.  So somebody

7    should instruct her on that point.  Okay?

8           All right.  Anything else on that point?

9           MR. VOKEY:  No, sir.  We have another preliminary

10   matter.

11          THE COURT:  Yeah.  I'm waiting for Mr. Gee to make

12   sure that --

13          Mr. Gee, are we -- anything else on Ms. Wolfe?

14          MR. GEE:  No, sir.  Thank you.

15          THE COURT:  All right, Mr. Vokey, go ahead.

16          MR. VOKEY:  Sir, we have a number of exhibits that we

17   want to preadmit.  The government is not opposed.

18          THE COURT:  All right.  Go ahead.

19          MR. VOKEY:  They are Defense Exhibits 41, 42, 45, 47,

20   53, 57, and 58.

21          THE COURT:  Defense Exhibits 41, 42, 45, 47, 53, 57,

22   and 58 are admitted without objection.

23          MR. VOKEY:  And, sir, I'm also pointing out there was

24   a -- our exhibits are -- I think almost all of these are

25   identical to government exhibits.  We took those and made them

 1    ours.

 2            There were some that the government had changed out,

 3    so we have also changed out.  And that would be Defense

 4    Exhibit 47 and 53.  So we replaced with Ms. Diaz those correct

 5    copies so she has the correct copies for the Court.

 6            The government has the corrected copies.

 7            And, Your Honor, I don't know if you have a separate

 8    corrected -- separate copies that you need as well.

 9            THE COURT:  That's fine.  I'll look at them on the

10    screen when they come up.  But that's fine.

11            MR. VOKEY:  All right.

12            THE COURT:  So are you saying these are, in effect,

13    duplicates of exhibits that the government's already put into

14    evidence or not?

15            MR. VOKEY:  Yes, they are.

16            THE COURT:  All right.

17            MR. VOKEY:  But we're making them our own exhibits.

18            THE COURT:  All right.  Since there's not a lot of

19    them, at least at this moment, I'll let you do that.  I

20    generally try to avoid that, but I'm not going to -- I'm not

21    going to get in the way of what you're doing.  So I think

22    that's fine.

23            MR. VOKEY:  All right.

24        (Defendant's Exhibits 41, 42, 45, 47, 53, 57 and 58

25    received into evidence.)

1      THE COURT:  All right.  So we're going to hear from

2  Ms. Wolfe first, Mr. Vokey?

3      MR. VOKEY:  That's correct.

4      THE COURT:  And then who are we going to hear from?

5      MR. VOKEY:  Captain Nettleton.

6      THE COURT:  Okay.  And then anybody else?

7      MR. VOKEY:  I think we're going to be done at that

8  point, sir.

9      THE COURT:  Okay.  All right.  So we'll hear from

10  Ms. Wolfe.  Captain Nettleton will come to the stand.  We'll

11  get -- obviously, he'll probably be on there a while.  And

12  we'll take an appropriate break at some point this morning.

13      Are there any other -- the one thing that I -- I'm

14  wondering about with Ms. Wolfe is do you feel as though --

15  since she was not on the witness list, do you feel a need for

16  me to ask anybody on the jury whether they know her or not?

17      I -- it seems a little unlikely, but I -- I don't --

18  I mean, we ask about every other witness.

19      MR. VOKEY:  I would -- just out of caution, sir, I

20  probably would.

21      THE COURT:  Okay.  So I think --

22      Mr. Gee, do you have an opinion?

23      MR. GEE:  We agree, Your Honor, with both her names.

24      THE COURT:  So it's Karla -- she pronounced it

25  Pa-gan, I guess, and Karla Wolfe.

1    All right.  I'm just going to tell the jury that I
2   neglected -- I'll put it on me -- I neglected to call out the
3   name of a witness that we might -- that is going to testify and
4   I just want to run it past the jury to see if anybody knows a
5   person by that name.
6           That's the way I'll do it.  And so we'll do that the
7   first thing with the -- with the jury.
8           All right.  What else do we need, Mr. Gee, before we
9   proceed this morning?
10          MR. GEE:  Nothing else before we proceed, Your Honor.
11  We've got a few things about instructions we can talk about
12  later.
13          THE COURT:  Yeah.
14          Mr. Vokey, what else before we proceed?
15          MR. VOKEY:  Nothing, Your Honor.
16          THE COURT:  All right.  Yeah.  I -- we're planning on
17  having a charge conference.  We -- Mr. Burns and I have been
18  working on the instructions.  We have some thoughts, too.
19  So -- and some -- and we looked at your page 22.  We can talk
20  about that.
21          So we're -- we can -- we can -- we can have those
22  discussions at a charge conference later on.
23          All right.  I'm told we're missing two jurors, which
24  is fine.  They're not due to be here until 9:15.  What I'm
25  going to do, though, is I'll -- I'll stand in recess for ten

 1   minutes.  Hopefully we'll have them all and we'll get a 9:25

 2   start.

 3            So the parties are at liberty for ten minutes and

 4   we'll be back and get started.

 5            We're in recess.

 6            COURT SECURITY OFFICER:  All rise.

 7       (Recess from 9:14 a.m. to 9:25 a.m.; all parties present.)

 8            COURT SECURITY OFFICER:  All rise.  This Honorable

 9   Court is back in session.

10            Please be seated.

11            MR. VOKEY:  And, Your Honor, just to point out, her

12   name is actually pronounced Pag-an.

13            THE COURT:  Pagan.

14            MR. VOKEY:  She says -- I asked her -- I thought it

15   was Pag-an.

16            She said, "Well, I say Pa-gan because nobody can say

17   Pag-an."

18            Just so you know.  And she said it with a little bit

19   of an accent, so...

20            THE COURT:  So I should say Pag-an.

21            MR. VOKEY:  Pag-an.

22            THE COURT:  All right.  Let's have the jury, please.

23            I understand one of.

24            Them may be in the restroom, so we may have to wait a

25   minute.

1        MR. VOKEY:  Your Honor, while we're waiting, after

2   Ms. Wolfe's testimony, if we can take a short break so we can

3   get set up for Captain Nettleton.

4        COURT SECURITY OFFICER:  All rise for the jury.

5        (Jury enters, 9:26 a.m.)

6        COURT SECURITY OFFICER:  Please be seated.

7        THE COURT:  Well, good morning, ladies and gentlemen.

8   I want you to see that we got you out here early, and I

9   appreciate you-all being here early and being ready to go.

10       As you recall yesterday afternoon, the government

11  rested its case-in-chief.  You may remember at the very

12  beginning of the case when I was talking to you about how this

13  goes, I told you that under our law the -- the defendant is not

14  required to put on a case at all, that -- that's not a

15  requirement, and because it's the government's burden to prove

16  a case beyond a reasonable doubt.

17       But a defendant certainly has the right to put on a

18  case, and in this case Captain Nettleton has chosen to put on a

19  case, and so we will be hearing from witnesses called by

20  Captain Nettleton's lawyers.

21       As we begin this morning, I -- when -- way back when,

22  when we read the list of who the witnesses were going to be and

23  asked you if you knew any of them -- remember that, way back

24  with Judge Barksdale?

25       And so I neglected to add a person or have a person

1    on that list, and so we've got a witness this morning that I

2    didn't read out to you, so I'm going to give you her name and

3    just ask you if anybody happens to know her.

4            She -- she -- her name is -- is Karla Pagan,

5    P-a-g-a-n.  That was her maiden name.  Her married name is now

6    Karla Wolfe.

7            Anybody know a person by that name?

8        (Negative response.)

9            THE COURT:  Okay.  Very good.  All right.  She's

10   going to be our first witness this morning.

11           And, Mr. Vokey, are you handling this?

12           MR. VOKEY:  I am, Your Honor.

13           THE COURT:  All right.  Are you calling Ms. Wolfe?

14           MR. VOKEY:  Your Honor, the defense calls Ms. Karla

15   Wolfe.

16           THE COURT:  All right.

17       (Ms. Wolfe enters the courtroom.)

18           COURTROOM DEPUTY:  Do you solemnly swear that the

19   testimony you are about to give before this court will be the

20   truth, the whole truth, and nothing but the truth, so help you

21   God?

22           THE WITNESS:  I do.

23           COURTROOM DEPUTY:  Please state your full name and

24   spell your last name for the record.

25           THE WITNESS:  Karla Wolfe, W-o-l-f-e.

1          COURTROOM DEPUTY:  Thank you, ma'am.

2          Please be seated.

3          THE COURT:  All right.  Ms. Wolfe, if you'll do me a

4   favor and scoot up a little bit.  And there's a microphone --

5   you see that black thing in front of you with a green dot?

6   That's the microphone, so if you could speak toward it.  And I

7   hear your voice is a little bit soft, and I know you're

8   probably a little nervous, but just try to keep your voice up,

9   if you will.  All right?

10          THE WITNESS:  All right.

11          THE COURT:  All right.  Mr. Vokey, you may proceed.

12          MR. VOKEY:  Thank you, Your Honor.

13          **KARLA WOLFE, DEFENDANT'S WITNESS, SWORN**

14                     **DIRECT EXAMINATION**

15   BY MR. VOKEY:

16   Q.   Good morning, Ms. Wolfe.

17   A.   Good morning.

18   Q.   So your name now is Wolfe?

19   A.   Yes, sir.

20   Q.   You used to -- you used to go by Pagan?

21   A.   Pagan, yes.

22   Q.   And were you -- did you used to live in Guantanamo Bay

23   Naval Station?

24   A.   I did.

25   Q.   And when was that?

1   A.   From 2011 to 2016.

2   Q.   Okay.  And what were you doing there in Guantanamo Bay?

3   A.   I worked for a company, NVM.  They have a security

4   contract at the migrant operations.  We housed Cuban migrants.

5   Q.   So you did migrant operations --

6   A.   Yes.

7   Q.   -- as -- as part of a contractor -- or defense contractor?

8   A.   Yes.  I was the admin lieutenant there.

9   Q.   Okay.  So -- so certainly in that capacity you didn't work

10  directly for Captain Nettleton, then?

11  A.   No, sir.

12  Q.   All right.  And did you have the occasion while you were

13  there to see Captain Nettleton?

14  A.   Yes, sir.

15  Q.   And about how frequently would you see him?

16  A.   I'd see him in meetings that we would have when he'd come

17  to the migrant operations center.  And once in a blue moon I'd

18  see him at Rick's.

19  Q.   Rick's -- Rick's being the bar in the Bayview?

20  A.   Yes, the Officers Club.

21  Q.   All right.  And -- and ever attend any functions at his

22  house?

23  A.   I did.

24  Q.   Okay.  So would you say that you -- you were very close to

25  Captain Nettleton or just had occasional contact with him?

```
 1   A.    Occasional contact with him.

 2   Q.    Okay.  So I want to -- I want to take you to January 9th

 3   of 2015.  Okay?

 4   A.    Yes, sir.

 5   Q.    Now, did you attend a Hail -- the Hail and Farewell that

 6   was going on there?

 7   A.    No, sir.

 8   Q.    All right.  Were you there at Bayview in Rick's that

 9   evening?

10   A.    Yes, sir.

11   Q.    And can you tell the jury about, you know, what were you

12   doing and why were you there?

13   A.    I just went there to have a couple of drinks, meet up with

14   some friends.

15   Q.    All right.  And did you get intoxicated that night?

16   A.    No, sir.

17   Q.    All right.  You're not -- are you a big drinker?

18   A.    No, I'm not a big drinker.

19   Q.    Okay.  So while you were there, you -- did you see some

20   kind of kerfuffle?

21   A.    Yes.

22   Q.    Can you tell us about that?

23   A.    When I went outside to meet up with Jackie Powell to ask

24   if she wanted to meet up somewhere else, I saw an altercation.

25   There -- I guess there was an argument between Chris and
```

1  Captain Nettleton.  Chris came up to me.  He said that --

2  Q.  All right.  Let me stop you there?

3  A.  Yes.

4  Q.  So just to make sure I know -- with the location.

5  Where -- where is this happening?

6  A.  Outside by the bus stop.

7  Q.  So right outside the front of the Bayview?

8  A.  Yes.

9  Q.  Okay.  And what happened to Captain Nettleton?  You saw

10  this -- this argument.  What happened to Captain Nettleton?

11  Where did he go?

12  A.  Captain Ross escorted him, I believe, back to his house.

13  Q.  Okay.  And that was -- he was Commander Ross at the time?

14  A.  Yes, Commander Ross.  He was an XO.

15  Q.  All right.  So he starts Captain Nettleton going towards

16  his house?

17  A.  Yes.

18  Q.  And is this when you had discussions with Mr. Chris Tur?

19  A.  Chris, yes.  I tried to calm him down.  He was really

20  upset.  He was intoxicated.  He made -- excuse my language.  He

21  said that he was -- his marriage was falling apart, that he'd

22  rather fucking die than not be with his wife, that Captain

23  Nettleton and Lara were going to fucking pay for what they did.

24       I told him just to calm down, that he's had one too

25  many drinks, that tomorrow is a new day, he'll see things

1  differently, and he was just completely out of control.  There

2  was no calming him down.

3  Q.    And -- and did he address you by your name?

4  A.    He did, which was -- I was kind of surprised, because I

5  don't know him that well.  It's a small island, you run into

6  people, but not to that extent where I know him that well for

7  him to just reach out to me and start talking to me.

8  Q.    So when Chris Tur is saying these things to you, what is

9  going through your mind?

10  A.    I just couldn't believe it.  I just tried to calm him

11  down.  Because one minute he was like, "I love Lara, I love my

12  wife, been married 20 years.  Since she got promoted, she's

13  completely changed.  Her friends are a bad influence, too."

14           The next minute, I was like, "Calm down."

15           And he's telling me basically, you know, "Fuck off.

16  I'm going to -- you know, I'd rather be fucking dead than be

17  without them."

18  Q.    So you just kind of walked into the middle of this?

19  A.    I did.

20  Q.    Okay.  So what did you do after talking with Chris Tur?

21  A.    After talking with him, I just went inside.  I went inside

22  the Bayview.  I went into the restroom.  That's where I saw

23  Lara and Kelly Wirfel.  They were having a discussion.  I told

24  them -- you know, I told her to, you know, "Calm down, stop

25  drinking," she's had one too many.

1    She told me she hates her husband.

2    "He's a douchebag."

3    I went back out and went into Rick's.  At that point

4  I was like, "I'm just going to stay away from this."

5  Q.    Too much drama for you?

6  A.    Too much drama for one night.  I just went out to have a

7  drink and meet up with friends and somehow I'm in the middle of

8  this, so I just step out, go into Rick's, and then sometime

9  later Kelly goes in there.  Kelly and I start talking.

10  Q.    So let me get this straight.  So you left the bathroom

11  with -- with Kelly and Lara?

12  A.    Yes.  They were in there.

13  Q.    And went to Rick's, the bar?

14  A.    Yes.

15  Q.    And you said at some point Kelly came in there.

16  A.    Yes.

17  Q.    You talking about into Rick's?

18  A.    Yes.  I went into Rick's.  I stayed there for a little

19  bit.  I saw Chris come into Rick's.  He came in.

20  Q.    So let me stop you right there.

21  A.    Yes.

22  Q.    So while you were in Rick's, you -- you see Chris Tur?

23  A.    Yes.

24  Q.    And what did you see when you saw him?

25  A.    He just came in, he got a drink, and he left right back

1    outside.

2    Q.    Okay.

3    A.    And then Kelly comes out, she comes and talks to me,

4    and -- and a little bit later we have a drink and we're still

5    talking and she says, "Chris called me.  He said that he

6    knocked Captain Nettleton out."

7    Q.    So you're in Rick's talking with Kelly and she has just

8    reported to you about this phone call from Chris Tur?

9    A.    Yes.  Sometime later we started talking sitting down and

10   she tells me, "Chris called me.  He said he knocked the captain

11   out."

12   Q.    Knocked as in past tense?

13   A.    Yes.

14   Q.    So -- and -- and what was Kelly doing?  Why was she in

15   Rick's with you?  Do you know?

16   A.    At that point, she was -- she was going to call Safe Ride

17   at some point to get -- take Lara, and they were going to go

18   home, but while she was waiting she went in there.  I went out

19   to the Tiki Bar.  She followed me out to the Tiki Bar.  We met

20   up with the XO at the time, which is Captain Ross.  He was kind

21   of shook up as well.

22          I said, "Hey, let me buy you a shot."  Remind you

23   when I say, "shot," I'm not a drinker, so a shot to me is

24   Pineapple Upside Down, which is just Malibu and pineapple

25   juice.  So I purchased the shot.  He said, "I hope this stays

 1   between the people that were involved."

 2   Q.   That is -- that is Commander Ross saying that?

 3   A.   Yes.

 4   Q.   Okay.

 5   A.   And I laughed and looked at Kelly, too, and I'm like,

 6   "This is GTMO.  It's hard -- everyone's going to know by

 7   tomorrow."

 8   Q.   Okay.  So -- so Kelly saw you and -- if I got -- if I got

 9   this right, Kelly saw you in Rick's, and then you guys went out

10   to the Tiki Bar?

11   A.   Yes.

12   Q.   And how long did Kelly stay with you there at the Tiki

13   Bar?

14   A.   She had the shot, we spoke for a little bit, and then she

15   said she had to leave.

16   Q.   And did she say where she was going?

17   A.   Home.

18   Q.   And was she going home by herself?

19   A.   No, with Lara.

20   Q.   Okay.  So she's telling you she -- the Safe Ride is there,

21   she's going to take Lara home?

22   A.   Yes.

23   Q.   Okay.  And so you're still there at the Tiki Bar?

24   A.   Yes.

25   Q.   And did Commander Ross stay or did he leave?

1   A.   No.  After our conversation, he left.

2   Q.   Okay.  So where did you go after that?

3   A.   I went back inside to Rick's.

4   Q.   Okay.  And you were at Rick's for a little while?

5   A.   Yes.

6   Q.   And who were you with there?

7   A.   I was with Virgil Howard.

8   Q.   Okay.  Somebody you work with?

9   A.   Yes.  He's a coworker and a friend.

10  Q.   Okay.  So -- and you stay in Rick's until you -- until you

11  leave?

12  A.   Yes.

13  Q.   Until you -- or you stay in Rick's until you leave the

14  Bayview complex?

15  A.   Yes.

16  Q.   Okay.  And any idea what time you left Rick's?

17  A.   I'd say about 11:00, 11:30.  I'm -- I'm not the best with

18  time, but if I had to, it would be about 11:00, 11:30.

19  Q.   Okay.  So before you left, did you see Chris Tur again?

20  A.   I did.

21  Q.   And tell us about that.

22  A.   I was sitting at the bar close to the door.  So at Rick's

23  there's a door that you can exit the back to get to the Tiki

24  Bar.  I was sitting on that side, and he walked past me.  He

25  just walked past, violently opened the door, and slammed the

1  door closed shut, and left.

2  Q.   And when you saw Chris Tur, did you see any injuries on

3  him in any way?

4  A.   No.

5  Q.   Now, just -- just so we're absolutely clear on this, when

6  you see Chris Tur the second time, this is after Ms. Wirfel has

7  told you she's received the phone call?

8  A.   Yes, sir.

9  Q.   And when you saw Chris Tur that second time, Ms. Wirfel

10  and Lara Tur had already left the Bayview?

11  A.   They had already left.

12  Q.   And based on your -- the phone call that Kelly Tur [sic]

13  told you about, the knock-out phone call --

14  A.   Yes.

15  Q.   -- means you saw Chris Tur after he had knocked out

16  Captain Nettleton?

17  A.   Yes, sir.

18  Q.   After he had been at Captain Nettleton's house?

19  A.   Yes, sir.

20  Q.   And you said you -- when -- when you walked out, you saw

21  no injuries on him?

22  A.   No injuries, no.

23  Q.   And was he holding his side or limping in any way?

24  A.   No, he was not.

25          MR. VOKEY:   Thank you very much.   I have no more

1    questions.  They're probably going to ask you some questions.

2         THE WITNESS:  Okay.

3                        **CROSS-EXAMINATION**

4    BY MR. GEE:

5    Q.   Hi.  Good morning, Ms. Wolfe.

6    A.   Hi.  Good morning.

7    Q.   Ms. Wolfe, just want to start with a -- a few questions

8    about -- about these events and -- and sort of the -- the times

9    where you've -- you've had to recollect them for.  Okay?

10   A.   Okay.

11   Q.   All right.  So, Ms. Wolfe, as you said, first off, you're

12   not very good with time, right?

13   A.   Yes.

14   Q.   And so some of these timestamps that you're talking about

15   here today, it's not like you were looking at your watch at

16   that exact moment and saying, "Oh, it's 11 o'clock when I saw

17   this"?

18   A.   That's correct.

19   Q.   And you're just doing the best you can to remember times

20   five years later?

21   A.   Yes.

22   Q.   And -- and, Ms. -- Ms. Wolfe, you know, you -- you -- you

23   weren't intoxicated that night, but you had been drinking,

24   right?

25   A.   Yes.

1    Q.    And you even had a shot before you left, right?

2    A.    Yes.

3    Q.    And the -- you'd agree with me this was -- this was pretty

4    crazy, all this stuff you saw that night, right?

5    A.    It was.

6    Q.    Like, when you go outside, you're just trying to -- to

7    catch up on what's going on outside, right?  I mean, things are

8    already happening, in other words, when you went outside,

9    right?

10   A.    I wouldn't say catch up, but I was outside, yes.

11   Q.    But when you walked outside, the argument and so forth was

12   already going on, right?

13   A.    Yes.

14   Q.    So you're trying to figure out what's going on?

15   A.    Yes.

16   Q.    Is that right?

17   A.    Well, I wouldn't say figure out because Chris came up to

18   me and just started sharing this information that I did not

19   even ask.  At that point, I did not even care to know, but he

20   decided to come and tell me.

21   Q.    But when you first walk outside, there's already words

22   being said?

23   A.    There's a commotion, yes.

24   Q.    There's already a commotion going on?

25   A.    Yes.

1    Q.    So fair to say you're -- you're shocked by that commotion?

2    A.    Oh, yes, I was.

3    Q.    And trying to figure out what the commotion was all about?

4    A.    Yes.

5    Q.    And -- and fair to say as the evening, you know, went on,

6    you were still sort of shocked by everything you've seen and --

7    and heard and --

8    A.    Yes.

9    Q.    -- trying to catch up on things, right?

10   A.    Yes.

11   Q.    Now, you -- you were interviewed by NCIS back on

12   January 28th, 2015, right?

13   A.    Yes.

14   Q.    And that was the first time NCIS interviewed you?

15   A.    Yes.

16   Q.    And so when they interviewed you, that was already 20 days

17   after that Friday night, right?

18   A.    Yes.

19   Q.    So even for that first interview, you're trying to

20   recollect things like timestamps, sequences of events from

21   something that happened 20 days earlier, right?

22   A.    Correct.

23          THE COURT:  Ma'am, if you'll do me a favor and just

24   keep your voice up just a little bit.

25          THE WITNESS:  I'm sorry, Your Honor.

1       THE COURT:  That's all right.  Thank you.

2       Go ahead.

3   BY MR. GEE:

4   Q.   But you also knew what NCIS was -- was asking you was

5   important, right?

6   A.   Yes.

7   Q.   So you were -- you were doing the best you could to try to

8   remember things?

9   A.   Yes.

10  Q.   And -- and in that interview with NCIS -- you've had a

11  chance to review that statement before your testimony here

12  today, right?

13  A.   Yes.

14  Q.   You -- you -- you -- you met with the defense last night

15  and they gave you a copy of the statement to review, right?

16  A.   Yes.

17  Q.   Was that the first and only time you've ever seen your

18  statement in this case?

19  A.   Yes.

20  Q.   Okay.  And you'd agree with me you never told NCIS about

21  Kelly telling you about the phone call, right?

22  A.   That is correct.

23  Q.   And this sort of -- some of the timing that you've

24  testified about today, like -- like when Kelly's phone call

25  occurred in relationship to when you saw Chris coming back and

1    forth to the Bayview, you didn't provide NCIS that sequence of

2    events back in January 2015, did you?

3    A.    I believe I did -- I did tell NCIS that I saw Chris once

4    at the Bayview and then at Rick's before I left.

5    Q.    Yes, ma'am, but you didn't provide this sort of sequence

6    way back then in January of when that is in relationship to

7    Kelly telling you about the phone call, right?

8    A.    Don't recall.

9    Q.    Well, you didn't even mention to NCIS that Kelly told you

10   about this phone call, right?

11   A.    I answered what they asked.

12   Q.    I understand.

13         You've read your report, right, Ms. Pagan?

14   A.    Yes.

15   Q.    You did not tell them --

16   A.    Yes, that is correct.

17   Q.    -- about Kelly telling you about this phone call?

18   A.    Yes.

19   Q.    Ms. Pagan, we're -- just let me finish the question, and

20   then you can answer, and that way it will be clear for the poor

21   court reporter so we're not talking over each other.  Okay?

22   A.    Okay.

23   Q.    So -- so you didn't -- you didn't tell NCIS about the call

24   with Ms. Wirfel, correct?

25   A.    Correct.

1  Q.   And so, therefore, you -- way back then in January, you

2  didn't tell them about this sort of sequence of when that fits

3  in with when you saw Chris, right?

4  A.   Yes.

5  Q.   And you'd agree with me that would have been when all of

6  this was freshest in your mind was way back in January 2015?

7  A.   Honestly, I don't know.

8  Q.   Does your memory somehow get better with time, Ms. Pagan?

9  A.   Well, at that moment, you're still, you know -- still

10  trying to remember, and as time goes you're like, "Oh, you know

11  what, this also happened.  I had this conversation," you know.

12  Q.   Okay.  And, Ms. Pagan, let's talk about that.

13          MR. VOKEY:  And, Your Honor, just a small matter.

14          MR. GEE:  I'm sorry.  I got that.

15          MR. VOKEY:  It's Ms. Wolfe now.

16          MR. GEE:  Yeah.  I completely apologize.  Ms. Wolfe.

17  I'm sorry.

18  BY MR. GEE:

19  Q.   And -- and, Ms. Wolfe, let's talk about sort of continued

20  conversations.

21  A.   Okay.

22  Q.   So after that initial interview with NCIS, you -- you were

23  never interviewed again by anyone until defense interviewed you

24  last week, correct?

25  A.   Yes.

1  Q.   Okay.  But you did continue talking with people in

2  Guantanamo Bay about what you saw, what they saw, things like

3  that, right?

4  A.   Yes.

5  Q.   This -- this became kind of what happened at the Bayview,

6  it became a topic of discussion for those of you that were

7  there that night, right?

8  A.   Yes.

9  Q.   So some of your memory could have been affected by what

10  other people were telling you they saw.  Would that be fair to

11  say?

12  A.   I'd say facts are facts, and what I saw, it has not

13  changed.

14  Q.   Okay.  And, Ms. Pagan, one of those people that you talked

15  with when you were still on GTMO was Ms. Wirfel, right?

16  A.   That is correct.

17  Q.   In fact, the day after the party at the Bayview, you spent

18  part of the day with Ms. Wirfel because y'all were hanging out

19  with your son, Noah, right?

20  A.   Yes.

21  Q.   Because back then she was dating her now husband, who is

22  the father of Noah, right?

23  A.   That is correct.

24  Q.   Okay.  So even that next day, on Saturday, you're talking

25  with Ms. Wirfel about sort of the night before, what she saw,

1   what you saw, things like that, right?

2   A.   Yes, that is correct.

3   Q.   And -- and, Ms. Wolfe, over the next couple of years,

4   Ms. Wirfel's relationship continued to develop with your --

5   with your now ex-husband and with Noah, right?

6   A.   Yes.

7   Q.   She eventually became Noah's stepmother?

8   A.   Yes.

9   Q.   And so fair to say that -- and y'all are good friends,

10  right?

11  A.   That is correct.

12  Q.   And so fair to say you -- you talk with her on a pretty

13  regular basis over the years since 2015?

14  A.   We do.

15  Q.   And over the years, y'all have talked about that night as

16  well, right?

17  A.   Yes.

18  Q.   Ms. Wirfel telling you what she remembers, you telling her

19  what you remember, swapping stories, right?

20  A.   Yes, that is correct.

21  Q.   And while Ms. Wirfel has been down here for the last two

22  weeks or so for this trial, she's been picking up Noah, and

23  y'all have been hanging out, right?

24  A.   Yes.

25  Q.   Because you live here in Jacksonville?

1    A.    I do.

2    Q.    Okay.  And while she's been here, y'all have been talking

3    about -- y'all have talked about what she was here for, to

4    testify in this trial?

5    A.    Yes.

6    Q.    And you talked a little bit about -- about some of what

7    she remembered that night as well while you were -- over the

8    last two weeks, right?

9    A.    We could have, yes.

10   Q.    Well, you did, didn't you?

11   A.    Yes.

12   Q.    Okay.  Not could have, you did, right?

13   A.    Yes.

14   Q.    Okay.  And -- and she told you a little bit about some of

15   the things she remembered like this phone call with Chris,

16   right?

17   A.    Yes.

18   Q.    And -- and that was just in the last two weeks, right?

19   A.    That is correct.

20   Q.    And then you were interviewed by defense counsel after

21   those conversations with Ms. Wirfel, correct?

22   A.    Correct.

23   Q.    For the first time interviewed by defense counsel this

24   week, right?

25   A.    That is correct.

1  Q.   And the first interview was about two hours long, right?

2  A.   Yes.

3  Q.   And in that first interview, Ms. Wolfe, they -- they asked

4  you questions about what you remembered, right?

5  A.   Yes.

6  Q.   And in that first interview, they asked you all those

7  questions before showing you a copy of your statement to

8  refresh your recollection, right?

9  A.   Yes.

10  Q.   You -- you told them what you remembered and the various

11  sequence of events last week before you finally saw your

12  statement last night, right?

13  A.   Yes.

14  Q.   Okay.  So your sort of sequence of events that you

15  remember as best you can, you were sort of locked into it last

16  week before you saw your statement, right?

17  A.   Yes.  I saw my statement as well as he -- I was going over

18  everything.

19  Q.   I'm sorry?

20  A.   I saw my statement as I was going over everything.

21  Q.   Yeah.  Well, you didn't get to see your statement last

22  week during the two-hour interview, right?

23  A.   I -- honestly, don't recall.

24  Q.   You saw your statement for the first time last night?

25  A.   I saw -- I could confirm that, yes, I saw my statement

 1   last night.

 2   Q.   Okay.  So when you were sort of doing the best you could

 3   to remember the sequence of events in this two-hour interview

 4   with defense counsel, that's before you have had a chance to

 5   see your statement and refresh your recollection, right?

 6   A.   I believe so.

 7   Q.   And as we talked about, your statement doesn't have

 8   anything about sort of the sequence of the phone call with

 9   Chris in relation -- I mean, with -- with Ms. Wirfel in

10   relationship to when Chris comes in and out?

11   A.   That is correct.

12   Q.   And -- and, Ms. -- Ms.  Wolfe, you've also seen some of

13   the media reporting about this case, right?

14   A.   Yes.

15   Q.   You've even seen some of the media reporting about this

16   case after the trial had already begun, right?

17   A.   That is true.

18   Q.   And, Ms. -- Ms.  Wolfe, let's talk a little bit about --

19   about some of the sequence of events as best you can remember

20   here today --

21   A.   Okay.

22   Q.   -- five years later.  Okay?

23   A.   Yes.

24   Q.   So -- so, first off, when you first went outside to --

25   to -- and saw the commotion --

```
 1   A.   The commotion.
 2   Q.   -- you were going outside because you wanted to catch up
 3   with your friend, Jackie Powell, right?
 4   A.   Yes.
 5   Q.   Because you wanted to try to catch up with Jackie Powell
 6   and -- and have another drink somewhere else if y'all could,
 7   right?
 8   A.   Yes.
 9   Q.   And Jackie Powell's husband is Eric Powell, right?
10   A.   Yes.
11   Q.   And so -- and Jackie and Eric were leaving when you went
12   to go catch up with them, right?
13   A.   Yes.
14   Q.   So they had already settled up their bar tab when they're
15   leaving, right?
16   A.   Yes.
17   Q.   And they settled up their bar tab at about 9:22 p.m.,
18   didn't they?
19   A.   I -- I wasn't downstairs with them or -- so I -- I don't
20   know what time they settled their --
21   Q.   Well, they're leaving at about 9:22 p.m. after settling up
22   their tab.  Does that sound about right?
23   A.   Uh-huh (affirmative).
24   Q.   Is that a yes?
25   A.   Yes.
```

1    Q.    So the commotion that you see outside is about 9:22 p.m.

2    Does that sound about right?

3    A.    Yes.

4    Q.    And on the way out, you see broken plates on the Bayview

5    floor, right?

6    A.    Yes.

7    Q.    So the broken plates had already happened when you see

8    part of the commotion, right?

9    A.    Yes, I saw broken plates.

10   Q.    And -- and when you get out front and Mr. Tur is yelling

11   these things, he -- he's already extremely intoxicated, right?

12   A.    He is.

13   Q.    And the defendant seemed to be drunk, too, right?

14   A.    Yes.

15   Q.    And Mr. -- Mr. Tur is actually yelling some of these

16   things at the defendant, correct?

17   A.    Correct.

18   Q.    And Captain Ross was trying to send the defendant home and

19   Mr. Tur in the other direction, right?

20   A.    Yes.

21   Q.    So he was trying to break it up, right?

22   A.    Yes.

23           THE COURT:  Ma'am, I'm going to again remind you --

24           THE WITNESS:  I'm sorry.

25           THE COURT:  First of all, it has to be an audible

1  response so it can be written down, and if you could just keep

2  your voice up, that would be great.  Thank you.

3        THE WITNESS:  Okay.

4  BY MR. GEE:

5  Q.  There's a little water right there, Ms. Wolfe, if you need

6  some water.

7  A.  Thank you.

8  Q.  And while you were out front, you heard things like Lara

9  yell back to Chris "I don't love you," right?

10 A.  "I don't love you," yes.

11 Q.  And you saw Lara drop her phone and pick it up and try to

12 call someone, right?

13 A.  Yes.

14 Q.  And you even heard Kelly -- you even saw Kelly take the

15 phone from her and say, "Stop.  You're making it worse," right?

16 A.  Yes.

17 Q.  And you tried to calm everybody down?

18 A.  I did.

19 Q.  And -- and -- and finally just gave up and went inside,

20 right?

21 A.  Yes, I did.

22 Q.  And once you went back inside, you were only inside for

23 about another 20 minutes, right?

24 A.  I went inside.  I went to the restroom.  I came back out,

25 spoke with Kelly.  At some point, I made it to the Tiki Bar,

1 | had a drink there, came back, and came back into Rick's.

2 | Q.    Do you remember telling NCIS back in January that after

3 | you went back inside you were only inside for about another 20

4 | minutes when you told them that in January of 2015?

5 | A.    I honestly don't remember.

6 | Q.    Would taking a look at the notes from your conversation

7 | with NCIS refresh your recollection about what you told them

8 | back then?

9 | A.    No, sir.  I believe you --

10 |         MR. VOKEY:  Objection, Your Honor.

11 |         THE WITNESS:  -- if you're telling me that that's

12 | what they asked and I responded.  Is that a statement that I

13 | made?

14 | BY MR. GEE:

15 | Q.    I'm asking, would it refresh your recollection about

16 | whether you told --

17 |         MR. VOKEY:  Your Honor, objection.

18 |         THE COURT:  I understand.  Let him finish the

19 | question, and then I'll let you make your objection.

20 |         Go ahead, sir.

21 | BY MR. GEE:

22 | Q.    Would it refresh your recollection about whether you told

23 | NCIS back in January of 2015 that when you went back inside you

24 | were only inside for 20 minutes, to take a look at the notes

25 | from your conversation with NCIS back then, would that refresh

1   your recollection?

2   A.   No.  I'm good.  Thank you.

3   Q.   So inside for about 20 more minutes, that sound about

4   right?

5   A.   At Rick's, inside Rick's.  I could have.  I'm not good

6   with time, as I mentioned before.

7   Q.   You would agree with me your memory was freshest back then

8   about the timing, right?

9   A.   I've always been bad with time.  That's something like if

10  they say, you know, "What's your thing," it's time.

11  Q.   And -- and Mr. Tur is -- comes back in and he --

12  A.   Yes.

13  Q.   -- at -- at some point, then he orders another drink,

14  right?

15  A.   Yes.

16  Q.   Kind of like the drink he had outside, right?

17  A.   Yes.

18  Q.   And -- and then he -- and you're actually at the bar at

19  Rick's, right?

20  A.   Yes.

21  Q.   That's -- as you walk into the Bayview, that's on the

22  right-hand side, right?

23  A.   Yes.

24  Q.   Okay.  And then he leave's Rick's?

25  A.   He does.

1  Q.    Did you see which direction he went?  Towards the Tiki Bar

2  or back towards the main Bayview?

3  A.    Back to the main Bayview he left.

4  Q.    And -- and then he returns a few minutes later -- well,

5  first off, when he comes in to get the drink that's like the

6  one he had outside, that was -- that was soon after you had

7  just come back into the Bayview, wasn't it?

8  A.    Can you repeat that?  I'm sorry.

9  Q.    When he first comes back in to get another drink that

10  looked like the one he had outside, that was soon after you had

11  first come back into the Bayview, right?

12  A.    I went into the Bayview, he went and he -- he purchased

13  his drink, and he left.

14  Q.    I understand.

15        And when -- and when he came in to purchase that

16  drink at the Bayview, that was soon after you had just come

17  back into the Bayview, correct?

18  A.    I could say yes, possibly yes.

19  Q.    Did you tell NCIS back in January of 2015 it was soon

20  after you had come back into the Bayview?

21  A.    I honestly don't remember my exact words that I said.

22  Q.    Would looking at your report refresh your recollection

23  about whether you told them it was soon after you went back

24  into the Bayview?

25  A.    No.  If you are telling me that's what I said, I believe

 1   you.

 2   Q.    And -- and then after he orders this drink, goes back into

 3   the main Bayview area, he -- he comes back in a few minutes

 4   later to order a second drink, right?

 5   A.    The last time I saw him was towards the end of when I was

 6   there --

 7   Q.    I didn't --

 8   A.    -- so...

 9   Q.    Yes, ma'am, I understand that, but when he comes back in

10   to order this second drink, that's just a few minutes after he

11   ordered the first one, right?

12             MR. VOKEY:  Objection, Your Honor.

13             THE WITNESS:  I wouldn't say it's a few minutes from

14   the first drink, sir.

15             THE COURT:  Hold on.

16             MR. VOKEY:  Objection, Your Honor.  It's misleading.

17   I do not believe that Ms. Wolfe testified that she saw Chris

18   Tur purchase a drink the second time, just that she saw him

19   with a drink the second time.

20             THE COURT:  Okay.  Well, all right.  Just rephrase

21   your question and let's see where we can go here.

22             THE WITNESS:  Okay.

23   BY MR. GEE:

24   Q.    Ms. Pagan --

25   A.    Yes.  Wolfe.

1          THE COURT:  Wolfe.

2    BY MR. GEE:

3    Q.   Ms. Wolfe, I apologize.  Back in January 2015, you told

4    NCIS that you saw Mr. Tur come back in a few minutes after

5    ordering the first drink and order a second drink.  That's what

6    you told them back in January of 2015, isn't it?

7    A.   I didn't see him order a second drink.  I saw him -- the

8    second time I saw him, he walked past me, opened a door to get

9    to the Tiki Bar, slammed the door, and that was the last time I

10   saw him.  And that was towards the end of my night.

11   Q.   Did -- I understand that's what you're saying now.  I'm

12   just asking back in January of 2015, did you tell NCIS that you

13   saw him order a second drink?

14   A.   No, I don't believe I did.

15   Q.   Would -- would taking a look at your report refresh your

16   recollection about whether you told them you saw him order a

17   second drink?

18   A.   No, sir.  I'm telling you that I did not see him order a

19   second drink.  I saw him with one drink, and then when I was

20   leaving, he was leaving the Tiki -- he left and opened the door

21   to the Tiki Bar and left.

22   Q.   Okay.  That -- that's what you remember now, five years

23   later, right?

24   A.   Yes.

25   Q.   And, Ms. Wolfe, regardless of whether he orders a second

1    drink or not, when he comes back in to Rick's, that was just a

2    few minutes after he'd ordered the first drink, when he came in

3    and then left, correct, just a few minutes later he comes back

4    in; is that right?

5    A.    Honestly, I wouldn't say a few minutes, but...

6    Q.    Do you remember telling NCIS back in January of 2015 that

7    it was just a few minutes after he came in and ordered the

8    first drink?

9    A.    No.

10   Q.    Would taking a look at your report refresh your

11   recollection about whether you told them that back in January?

12   A.    I read the report, sir.

13   Q.    I'm sorry?

14   A.    I read the report, sir.

15   Q.    Would it refresh -- and -- and that is what you told them

16   back in January of 2015, right?

17   A.    I -- I would like to see the report.

18   Q.    Okay.

19          MR. GEE:  May I approach, Your Honor?

20          THE COURT:   Sure.

21   BY MR. GEE:

22   Q.    Ms. Wolfe, take a look at this.  Is that a copy of your

23   report, Ms. Wolfe, of the report on the interview with you?

24   A.    It's the interview, yes.

25   Q.    Okay.  Take a look at it.

1    A.    Okay.

2    Q.    And I'll direct your attention, Ms. Wolfe --

3    A.    Okay.

4    Q.    -- to paragraphs 8 and 9.

5    A.    Okay.

6    Q.    Read as much as you like, but if you could direct your

7    attention to those, and then just look up when you're -- when

8    you're done reading.

9    A.    Okay.

10   Q.    Okay.  And so -- well, taking it from the top, does --

11   does that refresh your recollection about whether back in

12   January 2015 you told NCIS that Mr. Tur walked in and ordered

13   the first drink soon after you had come back into the Bayview?

14   Does that refresh your recollection about that?

15   A.    Yes.

16   Q.    And you told them it was soon after, didn't you?

17   A.    If that's what's on the report, yes.

18   Q.    And did it refresh your recollection about whether he

19   returned -- whether he returned a few minutes after he left?

20   Is that what you told NCIS back then?

21   A.    Yes, I told them.

22   Q.    And did that refresh your recollection about whether you

23   told NCIS back then that when he came back a few minutes later

24   he ordered a second drink?  That's what you told them back

25   then, right?

1   A.    Honestly, I don't remember.

2   Q.    That's what's in your report, right?  Is that right?

3   A.    It's -- those are interview questions, yes, that he asked

4   me, yes.

5   Q.    And after he comes back in the second time, you never see

6   him again, right?

7   A.    I don't.

8   Q.    And when he leaves the second time, he heads back into the

9   Bayview?

10  A.    No.  He -- the last time I saw him, he was leaving out the

11  back door, which is the Tiki Bar.

12  Q.    The Tiki Bar?

13  A.    Yes.

14  Q.    Okay.  And when you see him either time, the first time or

15  the second time, you don't see him bleeding?

16  A.    No.

17  Q.    You don't see him holding, say, a paper towel to his face?

18  A.    No.

19  Q.    You don't see any blood on him?

20  A.    No.

21  Q.    Nothing on his hands?

22  A.    No.

23  Q.    No blood on his clothes?

24  A.    No.

25  Q.    And was he still -- did he still appear to be drunk when

1  you see him --

2  A.   Yes.

3  Q.   -- these second two times in Rick's?

4  A.   Yes.

5  Q.   You know, could you see like his mobility affected, like,

6  in other words, was he sort of staggering a little bit or, you

7  know, walking like a drunk person?

8  A.   He was -- yes.

9  Q.   Talking like a drunk person?

10  A.   Yes.

11  Q.   Okay.  And -- and did he appear in any way to have been --

12  like he had just -- when you saw him, say, the second time, did

13  he appear to have been running?

14  A.   He was walking quickly, like walking and slammed open the

15  door and slammed it closed.  That's what I saw.

16  Q.   Was -- was he sweating like he just ran 2- or 300 yards?

17  A.   No.

18  Q.   And other than slamming the door, does he appear to be

19  hurrying any?

20  A.   He was walking quickly.  That's the only thing I noticed.

21  Q.   But not running?

22  A.   Not running, no.

23  Q.   Not running as though he just completed a fight at 10:58

24  p.m. per text message, right?

25  A.   I honestly wouldn't know -- no.

1  Q.   And after you see Chris the second time is when you went

2  to the bathroom before leaving, correct?

3  A.   No.   The -- what -- are you saying the last time I saw

4  him?

5  Q.   Yes, ma'am.

6  A.   The last time I saw him, when he was leaving out the Tiki

7  Bar -- going to the Tiki Bar, that was the last time I saw him.

8  Q.   I understand.   And then after you saw Chris Tur for the

9  last time, Mr. Tur for the last time, that's when you were

10  getting ready --

11  A.   Ready to leave, yes.

12  Q.   And before leaving, you went to the bathroom, right?

13  A.   Yes.

14  Q.   And in the bathroom is when you encountered Ms. Tur and

15  Ms. Wirfel, right?

16  A.   No.   They had already left.

17  Q.   Okay.   Back in January 2015 --

18  A.   Yes.

19  Q.   -- you told NCIS, correct --

20  A.   Yes.

21  Q.   -- that after you saw Mr. Tur, you headed to the bathroom

22  before you were going to leave the bar.   That's what you told

23  NCIS back in January, right?

24  A.   Yes.   Before I was leaving Rick's, yes.   But I went to the

25  Tiki Bar after that.

1  Q.   You'd agree with me you didn't mention anything to NCIS

2  back then about going to the Tiki Bar, right?

3  A.   That's correct.  They never asked me.

4  Q.   Well, they were asking questions like what happened next,

5  didn't they?

6  A.   They didn't ask me about the Tiki Bar.  They said -- I

7  responded to some of the lines about Rick's.  They were focused

8  on Rick's.  And I told them this is what I saw at Rick's.  This

9  is what happened when I went into the bathroom with Lara

10  conversation.

11  Q.   And let's go back to the bathroom.

12  A.   Yes.

13  Q.   You -- you told them that after you were in Rick's for a

14  while and after you had seen Mr. Tur leave the second time --

15  A.   Yes.

16  Q.   -- you headed to the bathroom before going to leave the

17  bar.  That's what you told them back then, right?

18  A.   Yes.

19  Q.   And you told them that in the bathroom Lara was lying on

20  the couch?

21  A.   Yes.

22  Q.   And then you went back into Rick's to settle your bill?

23  A.   Yes.

24  Q.   And then while you were back in Rick's settling your bill,

25  Ms. Tur came into Rick's with another person who you didn't

1  recognize, helping her into Rick's, right?

2  A.    I don't remember.

3  Q.    That's what you told NCIS back then, right?

4  A.    I understand.  I'm just saying I don't remember, sir.

5  Q.    Would taking a look at your report refresh your

6  recollection about whether you told NCIS back then --

7  A.    No, sir.

8  Q.    -- that you saw Ms. Tur come back into Rick's with another

9  person helping her?

10  A.    No, sir.

11  Q.    But if you told NCIS that back then, you were doing what

12  you could to tell the truth, right?

13  A.    That is correct.

14  Q.    Okay.  And -- and then you told NCIS that after you saw

15  Ms. Tur come into Rick's with the assistance of this other

16  person is when you and Mr. Howard left, right?

17  A.    That is correct, we did.

18  Q.    So back then in January of 2015 you described it to NCIS

19  as you leaving before Ms. Tur, correct?

20  A.    I don't remember what I told them at that point.

21  Q.    Would looking at your report refresh your recollection

22  about whether you told them that -- that Lara was still in

23  Rick's when you left?

24  A.    No, sir.  I'm good.  Thank you.

25  Q.    Would it refresh your recollection about the sequence of

1  events with this person helping her in and then you leaving?

2  A.    No.

3  Q.    You want to take a look at it?

4  A.    I'm good.  Thank you, sir.  I read it.

5  Q.    Okay.  All right.  And -- and you'd agree with me that the

6  bathroom that Ms. Tur was on the couch in when you saw her in

7  the bathroom, that's on the way out --

8  A.    Out.

9  Q.    -- of the Bayview, correct?

10  A.    Yes.

11          MR. GEE:  The Court's indulgence.

12      (Counsel confer.)

13          MR. GEE:  Thank you, Your Honor.

14          Thank you, Ms. Wolfe.

15                    **REDIRECT EXAMINATION**

16  BY MR. VOKEY:

17  Q.    Mrs. Wolfe, a lot of questions about what happened before,

18  how long, what's a few minutes.  That's all a little bit

19  confusing?

20  A.    Yes.

21  Q.    For example, Counsel was asking you that -- that when the

22  Powells -- the Powells settled their bar bill at 9:22 and you

23  saw them afterwards, you didn't see the Powells actually settle

24  the bar bill, did you?

25  A.    No.

1    Q.    You have no idea what time they paid their bill?

2    A.    No.

3    Q.    So there was a -- and in an interview where you're telling

4    them, "Yeah, a few minutes later, soon after, I'm not really

5    specific on the amount of time that's going past," during this

6    interview --

7    A.    Yes.

8    Q.    Is that fair to say?

9    A.    That's fair to say.

10   Q.    So when you were interviewed by NCIS back in January of

11   2015, can you describe to the -- to the jury kind of what

12   that -- that conversation was like?

13   A.    They asked me a couple of questions.  They asked me if I

14   am aware of a rumor that was going on at the time that

15   Nettleton was having an affair.  And they asked me about that

16   night.

17          Some of the questions I honestly -- I'm on that base.

18   I did not want to get involved with the drama.  I didn't want

19   to be tied to anything that happened that night.  I went back

20   inside and was minding my business.  But I didn't want to

21   answer any rumors because I'm not there -- I don't know the

22   rumor, I don't know what's going on.  I just answered some of

23   the questions that they asked to the best of my ability at that

24   time.

25   Q.    You didn't do anything to intend to mislead anyone?

1  A.   No.

2  Q.   But -- so the nature of the conversation where he keeps

3  asking you about rumors when NCIS is interviewing you, how did

4  that make you feel?

5  A.   I just felt that I can't answer on rumors and at that

6  point I don't want to be involved in anything that has to do

7  with rumors.

8  Q.   Okay.  So -- and I know you said you're not very good at

9  time --

10  A.   No.

11  Q.   -- which is probably what's causing a lot of these

12  questions?

13  A.   Yes.

14  Q.   But regardless of what time things happened, the one thing

15  I want to be absolutely sure of, you saw Chris Tur in Rick's,

16  and that was after Ms. Wirfel had told you about the knock-out

17  phone call?

18  A.   Yes.

19  Q.   That you're -- you're positive, 100 percent?

20  A.   Yes.

21  Q.   And the next day, when there's a search going on for

22  Mr. Tur, on Saturday, the 10th, did you tell Ms. Wirfel when

23  the search is going on that, "Yeah, I saw him at the Bayview

24  after"?

25  A.   Yes, I did.  I told her that I saw him at the Bayview.

1    Q.    And how did that even come up?

2    A.    Because I remember that one of my questions was, like,

3    "Well, did you -- did you tell Lara that Chris knocked

4    Nettleton out?  How did she -- what did she say?"

5          And then I said, "You know, I saw him -- that night

6    before I left, I saw him."

7    Q.    Okay.  And, again, no question in your mind, you saw Chris

8    Tur after Ms. Wirfel had told you about the knock-out phone

9    call?

10   A.    Yes.

11         MR. VOKEY:  Okay.  That's all the questions I have,

12   sir.

13                       **RECROSS-EXAMINATION**

14   BY MR. GEE:

15   Q.    Just briefly, Ms. Wolfe.  First off, about the Powells

16   leaving, because you were leaving to follow the Powells,

17   correct?

18   A.    Yes.  I was trying to get -- before they got into their

19   vehicle, I was trying to get ahold of them.

20   Q.    And would taking a look at their closed-out bar tab

21   refresh your recollection about them closing their bar tab at

22   9:22 p.m.?

23   A.    No.  If you're telling me that they closed at 9:22, I

24   believe you, sir.

25   Q.    That sounds about right to you, right?

1  A.   That would be.

2  Q.   And -- and when NCIS was interviewing you back then in

3  January of 2015, they asked you what rumors you had heard about

4  the affair, right?

5  A.   Yes.

6  Q.   But they were also asking you about what you had seen that

7  night, of Friday night, correct?

8  A.   Yes.

9  Q.   Okay.  And you -- you didn't want to get involved?

10  A.   That is correct.

11  Q.   But you knew that Mr. Tur was dead and this was a serious

12  matter, right?

13  A.   Yes.

14  Q.   But you didn't tell them about the phone call from

15  Ms. Wirfel, right?

16  A.   No.

17  Q.   And you didn't tell them about where that is in

18  relationship to these events of Mr. Tur coming in and out back

19  then in January when it was freshest in your mind, you didn't

20  tell them about it back then, did you?

21  A.   I did tell them about when I saw Chris.  Yes, I did tell

22  them.

23  Q.   But not in relationship to the timing of all these other

24  things, like the phone call back then in January when this was

25  freshest in your mind?

1    A.    No, I did not.

2          THE COURT:  Thank you very much, ma'am.  You may step

3    down.

4          Mr. Schwarz will walk you out.  Okay?  Thank you very

5    much.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  You want the -- you want -- ladies and

8    gentlemen, we -- we've got to do some setup for the next

9    witness, so -- I know you haven't been out here that long, but

10   let's -- I tell you what, we'll go ahead and take a full

11   15-minute break now and that way we'll be able to go for a

12   while after that.  So 15 minutes.  Please remember all my

13   instructions.  We'll get started at 10:30.

14         COURT SECURITY OFFICER:  All rise for the jury.

15       (Jury exits, 10:14 a.m.)

16         MR. GEE:  Please be seated.

17         THE COURT:  All right.  Captain Nettleton is the next

18   witness; is that correct?

19         MR. VOKEY:  That's correct, Your Honor.

20         THE COURT:  Okay.  All right.  Anything from counsel?

21         MR. VOKEY:  No.

22         THE COURT:  All right.  We're back --

23         MR. GEE:  Oh.

24         THE COURT:  Yes.

25         MR. GEE:  I'm sorry, Your Honor.

1          THE COURT:  Yes.

2          MR. GEE:  I guess since the defendant is

3     testifying --

4          THE COURT:  Yes.

5          MR. GEE:  -- did the Court ever end up making a

6     decision about the appropriateness of questioning him about how

7     when he was read his Uniform Code of Military Justice rights on

8     the 20th and was told, you know, about the allegation of the

9     affair, he spontaneously denied it?

10          THE COURT:  I think I have reached a conclusion on

11     that, but let me confer and I will give you a final ruling when

12     I come back out.

13          MR. GEE:  Thank you, Your Honor.

14          MR. VOKEY:  We have no objection to it, sir.

15          THE COURT:  All right.  Well, then, there you go.

16     Since there's no objection -- all right.  10:30.

17          COURT SECURITY OFFICER:  All rise.

18        (Recess from 10:15 a.m. to 10:32 a.m.; all parties

19     present.)

20          COURT SECURITY OFFICER:  All rise.  This Honorable

21     Court is back in session.

22          Please be seated.

23          THE COURT:  Mr. Vokey, I'm told you requested a lapel

24     microphone.  Unfortunately we don't really have one that we

25     could make available to you right now.  We might have been able

1    to do something if we had known sooner, but we just don't

2    really have --

3            MR. VOKEY:  Yes, and I talked to Ms. Diaz yesterday.

4    I was not clear on why specifically we wanted that one.  That's

5    fine.  We've got the other handheld mic.  We'll make that work.

6            THE COURT:  Okay.

7            MR. VOKEY:  That's my fault not communicating to her.

8    Not hers.

9            THE COURT:  Okay.  Are we ready?

10           MR. VOKEY:  We are.

11           THE COURT:  Let's have the jury.

12           COURT SECURITY OFFICER:  All rise for the jury.

13       (Jury enters, 10:34 a.m.)

14           COURT SECURITY OFFICER:  Please be seated.

15           THE COURT:  All right.  Ladies and gentlemen, welcome

16   back.

17           Mr. Vokey, who's your next witness?

18           MR. VOKEY:  Sir, the defense calls Captain Nettleton.

19           COURTROOM DEPUTY:  Do you solemnly swear that the

20   testimony you are about to give before this court will be the

21   truth, the whole truth, and nothing but the truth, so help you

22   God?

23           THE WITNESS:  I do.

24           COURTROOM DEPUTY:  Please state your full name and

25   spell your last name for the record, sir.

1      THE WITNESS:  John Robert Nettleton,

2   N-e-t-t-l-e-t-o-n.

3      COURTROOM DEPUTY:  Thank you.

4      Please be seated, sir.

5      THE COURT:  All right.  Mr. Vokey, you may proceed.

6      MR. VOKEY:  Thank you, Your Honor.

7   **JOHN ROBERT NETTLETON, DEFENDANT'S WITNESS, SWORN**

8                  **DIRECT EXAMINATION**

9   BY MR. VOKEY:

10  Q.   So, Captain Nettleton, we want to tell the jury -- give

11  them a little background where you're from.

12  A.   I'm from Haines City, Florida.

13  Q.   And I won't go through all your earlier years, but when

14  did you first go in the military?  Tell them about that.

15  A.   In 1984, I graduated high school.  I went to the Marine

16  Corps.  I went to infantry training school.  And I came back to

17  the Marine Corps Reserve and I went to school at Polk Community

18  College, Polk State College, as it was called then.  And then

19  following that, I got accepted into the naval aviation cadet

20  program, which was a two-year -- if you had a two-year degree,

21  you could go to flight school for the Navy at that time.  So I

22  joined that program and went to flight school in 1987.

23  Q.   All right.  So after going to flight school, did you later

24  actually get a commission in -- in the Navy?

25  A.   I did.  That program required you to complete flight

1    school before you could get a commission.  So the same day I

2    got my wings, I got my commission as an officer and became an

3    ensign in the Navy.

4    Q.    So you've gone from being an enlisted infantryman, a

5    Marine, to now a naval officer.  A little bit different?

6    A.    Yes.

7    Q.    Tell them about how -- kind of how it's different.

8    A.    It's just the responsibilities kind of change.  Once --

9    you know, Marines are kind of all about getting out there and

10   getting dirty, and now -- and now I'm a pilot and I'm

11   leading -- leading men and women at this point.

12   Q.    Different culture?

13   A.    Completely different culture.

14   Q.    So after you got commissioned, where did you go next?

15   A.    Following that, I went to -- I came to Jacksonville.  I

16   went to HS-1, the Seahorses, which was a training squadron

17   here.  I learned to fly the H-3, which was -- the best way to

18   describe it to you is it's the helicopter the President used to

19   fly around in, the big -- you know, the big bulky one you see

20   him getting on there.  That's what -- that's what I was flying.

21   It's called the "Sea King."

22   Q.    And so, while you were a helicopter pilot -- we'll go on

23   to your assignments in a little bit, but while you were a

24   helicopter pilot, did you receive any kind of specialized

25   training as a helicopter pilot?

1    A.    I did.  So the community I was a part of is -- we'd go on

2    the aircraft carriers, and so we do search and rescue.  We do

3    anti-submarine warfare, and later, you know, combat search and

4    rescue and special operations.

5    Q.    And any training in flying in the mountains?

6    A.    Yes.  I did attend a mountain flying school out in Fallon,

7    Nevada.  It's a four- to six-week course on all the -- all the

8    intricacies in mountains.

9          There's a lot of turbulence and different --

10   different -- higher elevations, there's some different

11   considerations you have to take.

12   Q.    All right.  So after your initial training, you said that

13   you were assigned to HS-1.

14         Did you deploy anyone?

15   A.    I reported to HS-9, the Sea Griffins.  And we -- we

16   deployed -- my first deployment was actually Desert

17   Shield/Desert Storm on the USS Roosevelt.

18   Q.    And was this combat operations there?

19   A.    It was.

20   Q.    All right.  And also in 1991, any significant events that

21   happened then?

22   A.    19- -- 1991 my son was born.

23   Q.    Your son was born in '91?

24   A.    Sorry.  1991 I -- I got married.  I guess that would come

25   first.  So I got married to my ex-wife, Leslee.

```
 1  Q.    All right.  A little bit nervous.

 2          You've got some water in front of you if you need it,

 3  Captain Nettleton.

 4  A.    Thank you.

 5          THE COURT:  Mr. Vokey, can you do me a favor while

 6  you're just taking a little break there?

 7          MR. VOKEY:  Yes, sir.

 8          THE COURT:  I think we've got a little trouble with

 9  sight lines for some of the audience that's trying to see.

10          Could we -- could we move that just a little bit so

11  that we -- maybe you could angle it a little bit, the board

12  there.  You can put it in front of the jury, maybe like right

13  there or something, but just angle it so -- a little bit more.

14  No.  I'm talking about angling it -- bring it down and angle

15  it.

16          MR. VOKEY:  This way?

17          THE COURT:  Yes.  But bring it towards you.

18          MR. VOKEY:  Okay.

19          THE COURT:  I think that might help a little.  I

20  don't know if I made it any better or not, but anyway -- all

21  right.  Thank you.

22          I'm really looking to the audience.

23          Is that any better out there or not?  No.

24          Because I can see people straining to see and I

25  just -- I tell you what, until you use it, can we put it up to
```

1    the side or --

2              MR. VOKEY:   We can -- we can just -- absolutely.

3              THE COURT:   There you go.   When you want to use it --

4              MR. VOKEY:   Okay.   We're good.

5              THE COURT:   When you want to use it, just -- we can

6    bring it out.

7              Thank you, sir.

8              MR. VOKEY:   Yes, sir.

9    BY MR. VOKEY:

10   Q.   All right.   So I think we were -- you were married in

11   1991?

12   A.   That's correct.

13   Q.   And your wife's name?

14   A.   Leslee.

15   Q.   Okay.   So let's take you to the next year, 1992.   Tell us

16   about your first search and rescue.

17   A.   It was off the coast of Jacksonville here.   We picked up

18   three fishermen.   There was a pretty heavy sea state and their

19   boat had taken on water.   So we -- we picked up three fishermen

20   off -- I was on the USS Saratoga at the time and we -- myself

21   and another helicopter, we picked up three survivors.

22   Q.   Okay.   That would be the first of many search and rescues

23   that you've been a part of?

24   A.   That's correct.

25   Q.   So after that what was your next job that you had in 1992?

1    A.    After I left HS-9, I went to HS-1, which is also in

2    Jacksonville, and that was the Fleet Replacement Squadron.

3    It's where I learned to fly the H-3.  Now I was teaching people

4    how to fly the H-3.

5    Q.    You were an instructor now?

6    A.    Yes.

7    Q.    Okay.  And -- and you were there -- that tour lasted how

8    long?

9    A.    That was about three years, I believe.

10   Q.    Okay.  So -- and during that three-year tour, what

11   significant event happened during that time?

12   A.    My son Riley was born.

13   Q.    All right.  And we heard him referred to as John but you

14   call him Riley?

15   A.    I do.

16   Q.    John Riley Nettleton?

17   A.    Yes.

18   Q.    And 1996, another significant event?

19   A.    Yeah.  1996 Jacob was born in Mississippi.

20   Q.    So going to 1997, where were you -- what was your job

21   then?

22   A.    Okay.  So 1997 I was the navigator for the USS Inchon.  It

23   had been converted from a troop carrier, an LPH, to a MCS.  It

24   was a mine counter-measure ship.  So we did anti-mine.  We were

25   anti-mine warfare, doing that.  And I was a navigation officer.

1   Q.   So this was not a pilot job, this was actually a --

2   A.   Correct.  I was ship's company.

3   Q.   Okay.  So after that tour, where did you go next?

4   A.   Following that tour, I went to the Pentagon.

5   Q.   And what did you do at the Pentagon?

6   A.   I was a CNO briefer.

7   Q.   When you say "CNO," is that Chief of Naval Operations?

8   A.   That's Chief of Naval Operations.

9   Q.   And your job was to provide briefings?

10  A.   That's correct.

11  Q.   Okay.  And after that did you do anything else at the

12  Pentagon?

13  A.   I did.  I went over to the Anti-Terrorism Force Protection

14  Cell that they had there and worked with those guys.

15  Q.   And what was your rank during this time?

16  A.   While I was there, I was a lieutenant.  I got promoted to

17  lieutenant -- lieutenant commander while I was in the Pentagon.

18  Q.   And the ranks, you said you started as ensign and -- just

19  so the jury knows --

20  A.   It goes ensign, which is the gold bar; lieutenant junior

21  grade, which is a silver single bar; lieutenant two -- we call

22  them the railroad tracks, two silver bars; and then at this

23  time I got promoted to O-4, which is a gold oak leaf; and then

24  just to round it up, commander goes up to a silver oak leaf;

25  and captain is a silver eagle.

1  Q.  And then after that is admiral?

2  A.  Correct.

3  Q.  All right.  So -- and July 1999, another significant

4  event?

5  A.  You guys met Julia.  She was born in San Diego.

6  Q.  Okay.  And what were you doing in San Diego at that time?

7  A.  San Diego I was -- I was -- I reported there to train in a

8  new helicopter, SH-60 foxtrot, which was -- it's the -- it's

9  like the Army Black Hawk, but it's called a "Sea Hawk."  It's

10  the naval version of it.  So it's the same shell as a Black

11  Hawk, but it's got a lot more equipment in it, had a lot of ASW

12  equipment --

13  Q.  You say -- and you're throwing out acronyms.  We want to

14  make sure --

15  A.  I'm sorry.  Anti-submarine warfare.

16          So it had a dipping sonar.  And then the other

17  variant was the HH-60, which had a lot of gear on it to help

18  us -- safe when we're doing a combat search and rescue

19  environment.

20  Q.  And how long did you do that training for?

21  A.  That was about eight months in San Diego.

22  Q.  All right.  And 1999, where else did you go then?

23  A.  I reported to HS-11 here in Jacksonville to be a

24  department head.

25  Q.  All right.  And when you say a "department head," what's a

1  department head?

2  A.    A department head takes care -- basically, when you first

3  get in there as a lieutenant through -- you know,

4  lieutenant JG, lieutenant, you're kind of a worker bee officer,

5  you're doing that.

6        You have a division or something.  A department head

7  owns a bunch of divisions.  So there's generally four in a

8  squadron.  There's maintenance, there's operations, there's

9  safety, and there's administration.

10 Q.    And which department heads were you serving as?

11 A.    So I started out as the safety department head and then I

12 fleeted up during the tour to the operations officer and then

13 finally I wound up as the maintenance officer.

14 Q.    I want to ask you a little bit about being the department

15 head for safety.

16        Can you tell us what that encompasses?  What's that

17 mean?

18 A.    So there's a lot of safety programs that are in place

19 to -- in general for naval aviation.  It's a very, very

20 dangerous profession.  So we have a lot of standard programs we

21 do, but we also have -- you know, as you're -- as you're

22 talking about safety, you have to -- you have to monitor the

23 pilots, you have to make sure that everybody is following to

24 it.

25        We have what we call a naval operations and

1  standardization manual.  It was the NATOPS manual.  So you make

2  sure the pilots are flying and -- according to the -- and it's

3  kind of monitoring and tweaking, as you need to, as new stuff

4  comes up for -- for -- you know, anytime you're deploying, it's

5  a -- it's a lot faster, more frantic -- frantic environment.

6          So there's a lot of pressure on guys to take

7  shortcuts, or the boss wants you to land at this time or do

8  it -- so just trying to keep everybody to do it safely.

9  Q.   So as a safety officer, you're responsible -- you want to

10  make sure that there's no -- you know, the safety of the air

11  crew, that nobody -- nobody is injured or killed when they're

12  flying and that the airplanes don't crash?

13  A.   Correct.

14  Q.   All right.  So -- and moving forward, just go to 2002, did

15  you -- where did you go -- did you deploy after 2002?

16  A.   Okay.  After 2002 I left the department head -- I did

17  deploy in 2002.  I went -- we went to the North Arabian Gulf.

18  I deployed to Pakistan for a short period of time.  We had a

19  combat search and rescue detachment in Pakistan so that we

20  could reach southern Afghanistan in case one of our planes went

21  down.

22          And we got to do some -- a ship takedown also in the

23  Gulf where we had some suspected terrorists on the ships.  So

24  we took a bunch of Marines and SEALs and dropped them off on

25  the ship.

1   Q.   Okay.  So combat operations there after 9/11?

2   A.   Yes.

3   Q.   Okay.  So -- okay.  After that where did you go next?

4   A.   Following that I went back to HS-10 in San Diego.  We

5   moved there permanently.  I became the XO of the squadron.

6   That squadron is a training squadron, so it has a senior O-5 or

7   O-6 as the CO.

8   Q.   And when you say "O-5" and "O-6," you're saying commander

9   and captain?

10  A.   Commander and captain, right.  And then the -- the XO --

11  there was a junior XO.  He's never been a XO before, so it's --

12  they have a senior guy kind of -- letting a junior department

13  head come in and -- former department head be the XO.

14  Q.   Okay.  And 20- -- so, during this time in San Diego in

15  2004, what was -- what did your rank become?

16  A.   I became a commander.

17  Q.   And that's, as you mentioned before, an O-5?

18  A.   Yes.

19  Q.   That's one step below captain; correct?

20  A.   Yes.

21  Q.   So after this time -- after this tour, where did you go

22  next?

23  A.   Next I -- I got selected for command, for squadron

24  command, so I went back to HS-11 --

25  Q.   Here in Jacksonville?

1    A.    Here in Jacksonville.

2          And became the XO.  And then in 2005, I fleeted up to

3    CO.

4    Q.    Commanding officer?

5    A.    Correct.

6    Q.    It sounds like there's a lot of going back and forth

7    between Jacksonville and San Diego in your career?

8    A.    That's the two main areas where carrier-based helicopters

9    are -- they're training in, the squadrons are located, at least

10   at the time.

11         Now there's a lot more in Norfolk that go in the

12   carrier also.  But at the time I was in, it was -- San Diego

13   and Jacksonville were the main hubs.

14   Q.    Okay.  Well, while as the CO of HS-11, did you do any

15   deployments then?

16   A.    I did.  We deployed on the USS Enterprise.  And we did

17   combat interactions in Iraq.  We went to Basra and had a

18   detachment.  It was -- we had -- had really good crews.

19   Q.    Okay.  And so, during this deployment, were you involved

20   in combat search and rescue, combat ops?

21   A.    Yes.

22   Q.    And when you were out there at this time doing search and

23   rescue, is this on land, is this over sea, is this both?

24   A.    Both.  I mean, we do the -- when I was in Basra, obviously

25   it was land-based.  It was right -- Basra was right on the

1  corner of the -- where the gulf meets, and then Iraq and Iran,

2  right there.  So it's just a little hot spot.  It's also a big

3  port.  So we were right in the middle of it.  The British

4  were -- had that section.

5  Q.   Okay.  So after this tour, where did you go next in your

6  career?

7  A.   Following that I went to the National War College in

8  Washington, D.C., and spent a year there and got my Master's

9  degree.

10  Q.   And after that?

11  A.   After that I got selected to go back to HS-10 as the CO,

12  and I was the CO of the -- they call it a "bonus command," but

13  I was the CO of the Fleet Replacement Squadron there in

14  San Diego.

15  Q.   And we're almost at the end now, so -- so 2010, what

16  happened then?

17  A.   I got promoted to captain.  And I went to -- well,

18  actually, I went to Naval Forces as the Force Safety Officer.

19  And then during that tour, at some point I got promoted to

20  captain.

21  Q.   All right.  And I want to ask you about this Force Safety

22  Officer.

23  A.   Okay.

24  Q.   Who were you working for?

25  A.   I was working for the Chief of Naval Air Forces.  He's a

1   three-star admiral.  And I was responsible for the safety

2   programs that -- that he owned as -- and he -- basically, he's

3   responsible for all the aircraft carriers, all the squadrons,

4   and everybody as a three-star.  He resources and makes sure

5   that everybody has assets they need and kind of controls the

6   flow and movement of the entire naval aviation enterprise.

7   Q.   But your job for him is safety officer?

8   A.   That's correct.

9   Q.   And you've already mentioned a little bit about the

10  importance of safety, but when you're a safety officer at this

11  level, it's got to be a little bit of a different job than you

12  had before?

13  A.   It was.  We -- I was responsible for the safety programs

14  for all 11 aircraft carriers and about a hundred thousand

15  sailors in all -- in all the naval aviation squadrons.

16  Q.   A big responsibility.

17       And what are your biggest considerations in that job?

18  A.   Well, you're -- you're trying to ensure that everybody --

19  really, job one is the culture.

20       You've got to run the culture of naval aviation and

21  make sure everybody is concentrating on safety and doing things

22  correctly.

23       And then the second area part is coming up with new

24  and better ways of doing it, or new technology where we had a

25  lot of focus on trying to implement new technology.

1  Q.   This is all a way to keep aircrafts safe, keep the people

2  safe?

3  A.   Correct.

4  Q.   All right.  And you said you were promoted to captain

5  while you were in that job?

6  A.   I was.

7  Q.   And then after you were promoted to captain, what was the

8  next thing that happened in your career?

9  A.   I got selected for major command while I was at that job

10 and I got major shore command, and I -- I decided -- I picked

11 Naval Station Guantanamo Bay.

12 Q.   And that's when you became the CO of GTMO?

13 A.   I did in 2012.

14 Q.   Okay.  All right.  Captain Nettleton, can you just tell

15 the members of the jury kind of what is the purpose of Naval

16 Station Guantanamo Bay?

17 A.   So Naval Station Guantanamo Bay is the -- it's a logistics

18 hub really is the best way to describe it for all the SOUTHCOM

19 area of operations.  So Guantanamo is uniquely -- uniquely

20 located where -- all of the shipping that comes from the east

21 coast and goes through the Panama Canal kind of goes right

22 through what we call the "Windward Passage," which is right off

23 that.

24       It's also -- you're not that far from Venezuela and

25 some of the other -- you know, all the South American countries

 1  we're -- we have an interest in and everything are right in

 2  there, too.

 3          So it is just right in the heart of the Caribbean.  A

 4  lot of counter-drug operations, a lot of shipping, and then, of

 5  course, our main focus was the resupply, refuelling of Navy and

 6  Coast Guard ships, because they were down there.  We're the

 7  main place that they're going to come get resupplied and

 8  refuelled, and refreshed, I guess.

 9  Q.   Okay.

10          MR. VOKEY:  Your Honor, with your permission, I'm

11  going to have Captain Nettleton come down and -- on what's been

12  admitted as Defense Exhibit 45, and he's going to point some

13  things out for the members of the jury.

14          THE COURT:  That's fine.

15  BY MR. VOKEY:

16  Q.   Captain Nettleton.

17          All right.  So if you could stand on the side, I

18  don't want to block any of the jurors' view.

19          So what's this -- what's this exhibit, Defense

20  Exhibit 45?  What are we looking at?

21  A.   You're looking at the outline of the base for Naval

22  Station Guantanamo.  This is the fence line where the red is.

23  Q.   Okay.  And we've heard the term "leeward" and "windward."

24          Which side is leeward and which side is windward?

25  A.   Okay.  This is leeward and this is windward.  The bay goes

1  through the middle.

2  Q.    And if you are arriving in Guantanamo by plane, so not by

3  boat, where do you have to land?

4  A.    You have to land on leeward at the airstrip.

5  Q.    And how do you get from there over to the other side, to

6  the windward?

7  A.    You're going to have to take either the ferry or one of

8  the other boats.  Some of the other units had boats they could

9  use also.

10  Q.    Okay.  And where is most of -- well, first of all, what is

11  on the -- the leeward side?

12  A.    Leeward side has a migrant ops area where we have a

13  migrant operations center for -- a lot of them were Cuban

14  migrants that had come in, but maybe some others that were --

15  they are processed.

16         We also have the airfield.  You can see the airstrip

17  right here.  And then we have, of course, a few -- a few homes,

18  but also we have a -- a barracks for the people that work on

19  this side and the Marines.

20  Q.    Okay.  Now, it was a little tough to see on the overhead

21  projector, but on there, there appeared to be a red line on --

22  on that exhibit.

23         Can you kind of run that -- just -- with your finger

24  go along the edge of that red line and make sure the jury can

25  see the red line where it is.

1  A.   Okay.  So this is the fence line and it goes all the way

2  up across the Guantanamo River.  Right here is a -- inlet that

3  goes into Caimanera, so sometimes Cuban vessels will come

4  through here escorted by us.  This is coming down and this is

5  the, of course, eastern side of the border, or the fence line.

6         THE COURT:  Mr. Vokey, could you suspend for just one

7  second, please.

8         MR. VOKEY:  I could, sir.

9         THE COURT:  Thank you, sir.  You may proceed.

10        MR. VOKEY:  And, sir, I'm kind of standing between a

11  board and the court reporter.  I told her to throw something at

12  me if she's not picking it up.

13        Are we good on sound?

14        THE COURT:  I think we're good.

15        MR. VOKEY:  Thank you.

16        THE COURT:  As long -- as long as Captain Nettleton

17  uses the microphone, we're good.

18        MR. VOKEY:  All right, sir.

19  BY MR. VOKEY:

20  Q.   All right.  So you kind of outlined the Cuban border

21  there.  So I want to ask you a little bit more about that.

22        So I'm assuming while you're there you just can't

23  cross into Cuban land or cross Cuban airspace?

24  A.   That's correct.  So the Cuban -- the fence line on their

25  side has minefields all around it, not, obviously, in the water

 1  areas, but on their side.  And it's designed not for us; it's

 2  designed to keep their citizens from coming to the base.

 3          And that's kind of a source of problems for us

 4  sometimes.  They're trying to reach it because if -- they know

 5  if they get to the side of the base, then they could get to the

 6  migrant operations center, and then they'll at least get

 7  interviewed or -- they're either going to get interviewed or

 8  repatriated back to Cuba.  But most of them -- people take that

 9  chance sometimes.

10  Q.   Okay.  And we heard it mentioned -- keep the microphone up

11  enough so it's loud.  Okay.  Perfect.

12          And we heard Ms. Wolfe testify a little bit earlier

13  that she worked for migrant operations.  Is that where she was

14  working there, on the leeward side?

15  A.   They had an office on both sides.  I don't recall which

16  office she worked in.

17  Q.   You mentioned minefields.  Are there minefields across the

18  fence line both leeward and windward?

19  A.   Yes.

20  Q.   And did we used to have land mines also?

21  A.   We did.  We did.  We had to -- we cleared most of ours up.

22  There were a few areas where they attempted to clear them but

23  they couldn't locate all the mines.

24  Q.   Okay.  Let me grab that microphone from you.  You can have

25  a seat again.

1        MR. VOKEY:  Sir, I'll just have him come down when we

2    need him, instead of having him stand up there the whole time.

3        THE COURT:  Thank you.

4        MR. VOKEY:  Let me grab the bag, sir.  I don't want

5    to break Ms. Diaz's microphone.

6        THE COURT:  It would be good if you turn it off, too.

7        MR. VOKEY:  Just did.

8        THE COURT:  Okay.  Thank you.

9    BY MR. VOKEY:

10   Q.   So relations with Cubans -- I mean, they were -- a foreign

11   country not exactly our -- our ally or friend can sometimes

12   be -- how would you describe Cuban relations?

13   A.   Well, you know, on the national level, they're pretty

14   rocky, back and forth.  On a local level, for me, I had a

15   monthly meeting with them, with the people on their side.

16        And that came about, you know, years before I got

17   there.  We started doing meetings with them, just because -- to

18   avoid anybody getting killed over, you know -- there's armed

19   people on each side of the fence, right?

20        The Cubans did, and we had the Marines guarding the

21   fence line.  So one of the things that was done a long time ago

22   is we started meeting with them once a month.  And we would

23   advise them of upcoming activities.  They would advise us of

24   upcoming activities that were fence-to-fence line.

25        What we were trying to avoid is anybody think -- you

1    know, getting shot because there was a miscommunication or

2    misunderstanding from the other side.  So we would meet with

3    them.

4              And so on the local level I had a good relationship

5    with the Cubans.

6    Q.   All right.  And also -- I know we heard testimony this

7    is -- the southern tip of Cuba is where Naval Station

8    Guantanamo Bay is?

9    A.   Correct.

10   Q.   So if someone was to fly out of Guantanamo, how would they

11   have to go?

12   A.   So they have to take off from the airport there and

13   they'll -- depending on, obviously, which side of the room we

14   were using, but most of the time -- either way they're going to

15   have to turn to the south, they're going to have to go all the

16   way around the tip of Cuba and then through the Windward

17   Passage and then back over and then up to the United States.

18   Q.   Okay.  Now, while you were the CO down there, did you have

19   discussions with the Cubans regarding any kinds of certain air

20   flights?  Tell the jury about that.

21   A.   We have a hospital in Guantanamo that is very capable,

22   very good.  But there are some cases where you want to get them

23   back to the United States depending on the severity.  It could

24   be -- it could be a massive heart attack or injury or

25   something.

1            So it was -- it's taken a lot of time and we were

2      able to work with the FAA down in Miami, and we were able to

3      negotiate with the Cubans, and they -- they wouldn't agree to

4      letting the military or any other flights -- everybody else had

5      to keep going around the tip, but they agreed to let a civilian

6      medevac fly.

7            If we needed to call one, we let them know and they

8      would open the airspace and let them come down -- straight down

9      and land.  It ended up saving about 90 minutes of time on a

10     medevac flight, which, of course, is a lot of time if you have

11     a really severe medical emergency.  So we were -- we were

12     pretty happy about getting that done.

13     Q.   And this brokered agreement only applied, if I heard you

14     right, to civilian medevac -- medical evacuation airplanes?

15     A.   Right.  So the rotator and every other aircraft still have

16     to come the long way.  But --

17     Q.   All military airplanes and helicopters still cannot go

18     into Cuban airspace?

19     A.   Oh, that's correct.

20     Q.   And is that a big deal?

21     A.   It is a big deal.  It's a -- anything to the left of the

22     red line on this side or right -- anything that is Cuban

23     territory we can't fly into their sovereign airspace.  And that

24     goes from ground level all the way up to the atmosphere.

25           So you have to be really cognizant of where you are,

1  where you're flying as you come in there.  And that's one of

2  the harder things about doing the approaches flying in and

3  around Guantanamo.

4  Q.  So as the commanding officer -- I think there's actually

5  several thousand people in Guantanamo?

6  A.  Correct.

7  Q.  As far as who you actually directly commanded, how many

8  people did you command?

9  A.  I had about 600 civilians and sailors working for me.

10  Q.  And what did that constitute?  What was part of your

11  command?

12  A.  I'm sorry.  I don't --

13  Q.  So what you were commanding.  So, like, for example, the

14  JTF we heard about you did not command?

15  A.  Right.  Okay.  I'm sorry.  So I -- I commanded Naval

16  Station Guantanamo Bay -- that's what the command was called --

17  and the civilians and sailors that worked for me were under my

18  command.

19  Q.  So, for example, the airfield, that fell under your

20  command?

21  A.  It did.

22  Q.  You had -- you had boats there?

23  A.  We did.  We had security boats.  We also had a lot of

24  utility boats.  And, of course, you heard about the 480.  So

25  all of that was mine.

1    Q.    Okay.  And you said that -- I think you said earlier that

2    boats would often come in there for refitting or refuelling.

3    We're talking about big Navy ships?

4    A.    We're talking about big Navy ships.  We're also -- you

5    know, Coast Guard was kind of down there.  If they needed

6    something, they would -- it's a lot cheaper to have them come

7    in and get what they need -- minor repairs, things like that,

8    they'd come in and we'd help them out.  But big Navy ships.  We

9    had a couple of submarines come in a couple times.

10   Q.    Okay.  So -- now, there were also things on your base,

11   services, that were provided for the people that lived there?

12   A.    Correct.

13   Q.    Can you just tell the jury a little bit about some of

14   those?

15   A.    So the -- the way the island is structured it's really

16   hard to get on and off the island, so we had a pretty good,

17   robust morale, welfare, and recreation program.  So we had a

18   nice gym, we had really nice playing fields, we had tournaments

19   and things like that.

20         We have the commissary, which is like a Publix, I

21   think you heard it described before.  We have the NEX, which is

22   like a -- you know, like a Walmart.  And then we had the Fleet

23   and Family Service Center which takes care of all the -- you

24   know, the needs -- they plan activities for the sailors and do

25   things like that, but also they help with the family and

1  provide things like that as they go through.

2  Q.   Well, let me ask you:  So there's activities for them to

3  do.  There's sports and that -- those kind of things?

4  A.   Right.  Right.  Everything is kind of self-contained, so

5  you're -- there's always, like, some kind of sports tournament

6  every weekend, there's always something to do.

7         We also, you know, had several restaurants.  We had

8  a -- you know, the Bayview complex had a nice restaurant in it.

9  We had the Jerk House close to that.  We had a Cuban restaurant

10  while I was there.

11         We also had a galley.  And this was kind of unique in

12  that, like, none of us could go in -- you know, just go eat in

13  the galley at NAS Jacksonville, but there everybody was

14  welcome, and we'd feed civilians, too.

15         So it was just -- you had to make a -- there's a lot

16  of accommodations that you wouldn't find on a normal base that

17  we made down there.

18  Q.   And the galley is like -- well, I would know as a "chow

19  hall"?

20  A.   Chow hall, correct.

21  Q.   So, now, a lot of these things that are on the base don't

22  actually directly fall under your command.  So, for example,

23  like the Navy Exchange --

24  A.   Correct.  That did not --

25  Q.   -- that's a tenant command?  I hope we heard that term.

1   A.   Yes.   Tenant command means that, you know, they don't

2   report directly to me, but they're on the base, so they support

3   me and I try to support them.

4   Q.   And Fleet and Family Service Center, that's one of those

5   as well?

6   A.   No.   Fleet and Family Service Centers work -- works for

7   me.

8   Q.   Works directly for you?

9        And as we heard from Ms. Tur before, she would later

10  become the director of the Fleet and Family Service Center?

11  A.   That's correct.

12  Q.   So, Captain Nettleton, I want to ask you a couple of very

13  direct questions right now, okay?

14  A.   All right.

15  Q.   So, first of all, did you intend to obstruct any

16  investigation or anybody in the -- the investigation to the

17  death of Chris Tur?

18  A.   I did not.

19  Q.   Now I'm going to ask you another direct question.   Your

20  relationship with Lara Tur, did you have sex with Lara Tur in

21  November of 2014?

22  A.   I did.

23  Q.   And do you know what date that was?

24  A.   I believe it was November 6th, maybe November -- the night

25  of November 5th.

1  Q.    Okay.  And where did that happen?

2  A.    It happened at NAS Jacksonville in the Gateway Inns &

3  Suites.

4  Q.    Is that the only time that you had sexual intercourse with

5  Lara Tur?

6  A.    Yes, it was.

7  Q.    So I want to ask you about your marriage and talking to

8  her about her marriage, okay?

9  A.    Okay.

10  Q.    So, first of all, your marriage.  And we're talking about

11  summer of 2014.

12        What was going on with you in your marriage?

13  A.    We were -- we were having some issues.  Leslee and I had

14  talked about getting a divorce, but we -- we were trying to

15  work it out.  She had -- she had suggested we get some

16  counseling maybe, but I -- I wouldn't do it because we were on

17  GTMO and I just felt like it would be everybody's business and

18  too long, which, you know, was probably a decision I regret.

19  Q.    So -- but there was no -- while you were on Guantanamo,

20  there was no definite plans to get a divorce, it was something

21  you just discussed?

22  A.    Exactly.

23  Q.    Now, with Lara Tur we heard that -- I think it was in June

24  of 2014 where you complimented her and she complimented you and

25  kind of after that there was some flirtation for several

1   months; is that correct?

2   A.   That's correct.

3   Q.   And there was also some -- you had some kind of

4   discussions with Lara Tur?

5   A.   I did.

6   Q.   And did she talk to you about her marriage and Chris Tur?

7   A.   She did.

8   Q.   And -- and tell the jury about that.

9   A.   Well, she -- she told me -- she didn't give me a lot of

10  details.  She told me that he could be abusive, and I told her

11  that she didn't have to put up with that.  You know, if --

12  if -- is there something I -- you know, maybe we should do

13  something about it, or maybe you should get some help or seek

14  some things, and -- but she didn't -- she didn't want to do

15  that.

16          In fact, she told me that, you know, "I'll deny

17  even" -- and said it, "I'll deny even -- any of it, because I

18  don't -- I don't want to -- I don't want everybody" --

19  honestly, the reason she gave me I don't even remember, but she

20  just told me, "Hey, I'm not going to -- I'm not going to, you

21  know -- I'll deny it."  I remember her saying that, "I'll deny

22  it if you say that, because I don't want that going all over

23  the island," or something to that thing.  She just -- she

24  didn't want her personal business out there.

25  Q.   So she told you not to -- not to report it or do anything

 1   about it?

 2   A.   She did.

 3   Q.   All right.  So now let's get into -- we're going to now

 4   move to January 9th.  All right?

 5   A.   All right.

 6   Q.   So --

 7           MR. VOKEY:  Going to pull up Defense Exhibit 42.

 8           Let's see if this works.  Hold on one second.

 9           We'll just set it on top.  Make sure everybody can

10   see that.

11           All right.

12   BY MR. VOKEY:

13   Q.   So, Captain Nettleton, I -- I put up there on the board

14   Defense Exhibit 42.  And what are we looking at here?

15   A.   You're looking at the blowup of Deer Point.

16   Q.   And what is in the center of Deer Point there?

17   A.   You can see the Bayview complex and the park- -- you can

18   see the parking lot pretty well, the big square area, and then

19   the dock down to the Officers Landing boat -- boat dock.

20   Q.   Okay.  And we'll -- we'll come back to that in just a

21   minute.

22           So what was going on January 9th there at the

23   Bayview?

24   A.   We had a Hail and Farewell.  We were saying good-bye to

25   Commander Caswell and a few other officers, and we were

 1  welcoming Commander Ross and a -- a few other people onto the

 2  island.

 3  Q.   All right.  And so we've heard about the Hail and Farewell

 4  and giving plaques and stuff like that, right?

 5  A.   Right.

 6  Q.   And did the actual Hail and Farewell and stuff, did it go

 7  off without incident?

 8  A.   It did.  It was -- you know, Commander Caswell had been

 9  with me for about a year-and-a-half on the island, and so we

10  were good friends, so it was -- it went fine, and everybody was

11  having a pretty good time at that one.

12  Q.   Okay.  So after the formal Hail and Farewell stuff --

13  well, was there drinking going on?

14  A.   There was.

15  Q.   So after the Hail and Farewell, did the -- did the

16  drinking continue or increase?

17  A.   It did.  Both.  It continued and -- and it got -- so

18  Commander Caswell doesn't normally drink, but he -- he will on

19  occasionally on certain occasions have a drink.

20        And so he had -- I think he had bought a round of

21  shots, and then that just -- it's almost like a chain reaction.

22  Other people were buying shots.  And we ended up, all of us,

23  probably consuming too much alcohol.

24  Q.   And did you become intoxicated that night?

25  A.   I did.

1    Q.    So while you -- and, I'm sorry.  This was going on --

2    because we threw out a lot of terms.  We have Bayview, Rick's,

3    Hangar Deck or the Hangar bar.  And all that is within the

4    Bayview complex, right?

5    A.    That's correct.  Rick's -- Rick's is the Officers Club.

6    But down below it is the -- the Hangar bar.  And then their --

7    their main restaurant is off to the -- the left if you were

8    walking in the front door.

9    Q.    Okay.  And all of this is happening down -- downstairs in

10   the Hangar Deck?

11   A.    Correct.

12   Q.    So we've -- you've heard testimony of Ms. Wirfel, who says

13   that you were being inappropriately close with Lara Tur while

14   at the Hangar Deck.

15         Do you recall that?

16   A.    I recall her testimony.

17   Q.    And do you recall being inappropriate with her?

18   A.    I do not.

19   Q.    Any reason to question Ms. Wirfel -- her evaluation of

20   what she was seeing?

21   A.    No.  I absolutely believed her when she told me.

22   Q.    Okay.  And after -- after -- at the time -- when it was

23   time to leave the Hangar Deck, were there plans to go anywhere

24   else?

25   A.    So I had spoken earlier -- probably that first couple of

1   shots I was talking to the some of the pilots about, "Hey, if

2   you want to go back" -- I had a big back porch on the back of

3   the house, and I said, "If you" -- "If you guys want to come

4   back there and have a beer on the back porch, come on -- come

5   on back."

6           And so they told some people, and they told some

7   people, and pretty soon like I think half the bar was planning

8   on coming back to my house.

9   Q.   All right.  So by the time you were leaving, there was a

10  big gathering that was going to head to your house?

11  A.   Yes.

12  Q.   And did that happen or did something stop it?

13  A.   No.  XO Ross -- I -- I believe when we were walking up the

14  stairs or maybe possibly down, when we were still down at the

15  Hangar Bay, I told him, "Hey, everybody is going to come to the

16  house.  You know, come on and have some drinks."

17          And he said, "I don't think that's a very good idea

18  at all."

19  Q.   And did you agree with him?

20  A.   I did.  When he said it, it's kind of like, "Yeah, you're

21  right.  This is not very appropriate."

22  Q.   All right.  So did you walk out of the Bayview?

23  A.   We walked --

24  Q.   Did you leave the Bayview at that point?

25  A.   We did.  XO and I left the Bayview.

1    Q.    So when you get outside the Bayview, what happens?

2    A.    So Chris comes out of the Bayview behind us.  And he's --

3    and he's yelling.  He's -- he's -- I didn't -- honest, I

4    don't -- I heard some of the testimony of what was being said,

5    but I -- I'm not sure exactly what he was yelling and when,

6    because it was hard for me to hear.  The XO and I were walking

7    away.  But XO kind of just looks at me and says, "Hey, just go

8    home.  I got this."  And he -- and he turned around to deal

9    with Chris, and I -- and I kept walking to my house.

10   Q.    Okay.  And I'm going to have you, with the Court's

11   permission, go ahead and step down and approach the Defense

12   Exhibit 42.

13         And if you would, with the marker that's there on the

14   easel -- when you came out and -- and there was yelling out in

15   front of the Bayview, can you just put a little X there as to

16   where you were at the time?

17   A.    (Indicating).

18   Q.    Make it a little bit bigger so we can kind of -- so we can

19   identify that.

20         Okay.  Now, you testified that the XO kind of pushed

21   you along and said, "Go home," and that's what you did?

22   A.    Yeah.  He said, "You just need to go home," and then he

23   turned around --

24   Q.    Keep the microphone up.

25   A.    Yeah.  He said, "Just you need to go home."

1  Q.   Okay.  And can you take that marker and draw the route

2  that you took going home?  You can kind of explain it as you're

3  drawing it.

4  A.   Okay.  So I -- I turned to the right coming out, and then,

5  you know, my house is here.  This -- this white line is

6  actually a sidewalk, and then the -- the gray line that you

7  can't -- can't see very well is the -- is the road.  So I

8  walked along this sidewalk to my house.

9  Q.   Okay.  Now -- so you've got the sidewalk next to the road.

10 And that's a -- a way that you can go directly from the Bayview

11 to your house and vice versa?

12 A.   Correct.

13 Q.   All right.  Is there any other passage or road that goes

14 from your house back to the Bayview?

15 A.   Yes, there is.

16 Q.   And go ahead with that marker, mark whatever other route

17 there is going from the Bayview back to -- from your house back

18 to the Bayview.

19 A.   From my house to the Bayview?

20 Q.   Yes.

21 A.   Okay.  Then it would be from my house down these stairs,

22 there's a road right here that's used to access the dock and

23 the -- and there used to be a boat ramp as part of this.  This

24 house used to be the admiral's quarters back in the '60s.  And

25 right there.

1    Q.    Okay.  Now, one of the things on here that we -- I think

2    we heard -- I believe it was one of the agents describe that

3    road is lime rock; is that -- sound like an accurate

4    representation?

5    A.    It -- it does.  It is a -- it's a hard-packed road, lime

6    rock, just lime pebbles like you would -- would put on any --

7    any road.  Like, you know, up here it would probably be, you

8    know, crushed rock or whatever, but it's a -- it's a

9    hard-packed road.

10   Q.    Okay.  And did that, in fact, used to actually be a road

11   that was used as a road?

12   A.    Yes.

13   Q.    For what?

14   A.    Well, they -- there was -- like as I said before, there

15   used to be a ramp here, but, also, people would be able to

16   drive their vehicles and park right here when that -- when it

17   was the admiral's house.

18   Q.    Okay.  And -- but when you were living there, there was

19   nobody doing that?

20   A.    No.

21   Q.    Okay.  Also, at the bottom, I think you mentioned

22   before -- if you go directly from the Bayview south along -- it

23   looks like a path, there seems to be an object there in the

24   water.

25            What is that?

1    A.    Like, this right here?

2    Q.    Yes.  It's a, you know, a longer piece -- a little

3    rectangular --

4    A.    So that -- that's -- so most of the names on the island

5    are from the '50s and '60s, when GTMO was -- had a lot more

6    Navy traffic down there.

7              This is called Officers Landing.  So this is where

8    the -- the boats would pull in and the officers would embark.

9    Because you -- you've got to -- you've got to think about 20 or

10   30 ships in the harbor.  They're all anchored and they're

11   getting out.

12             And so they'd have the boats, and they would bring

13   the officers right here and let them off, and then they would

14   go up to the restaurants, whereas the -- there's a different

15   landing where they would have the -- the enlisted guys go.  It

16   was, again, '50s, '60s Navy.

17   Q.    A little more elitist back then?

18   A.    Yeah, it was.  There was a bigger gap, I think.

19   Q.    Okay.  All right.  And you can put that pen down.  And let

20   me take that microphone and let you have a seat.

21             So going back to you walked home.  So when you walked

22   home, what did you do?

23   A.    I walked in the house and Julia was sitting on the couch,

24   so I went down and I sat in that -- next to her and talked to

25   her for a little bit.

1   Q.   And do you know how long you talked to her?

2   A.   No.

3   Q.   Okay.  I'm going to now put up Defense Exhibit 57.

4        And, Captain Nettleton, can you see that from where

5   you are?

6   A.   I can.

7   Q.   Okay.  So at first we'll see how much we can do while you

8   just stay on the witness stand.

9        So when you get to -- home, where is it that you sit

10  and talk to Julia?

11  A.   It would be in the section of the living room to the

12  right, just -- you know, if you -- if you look at the words

13  "living room," you've seen the photos, she was on the couch off

14  to the right side where the word "room" is.

15  Q.   Okay.  And you sit down.  And what happens after you sit

16  down and talk to her?

17  A.   We talked for a few minutes, and then she said she was

18  going to bed.  And I think she said, "You know, hey, you should

19  probably go to bed, too."

20       And I said, "Yeah.  I'm going get something to eat

21  first, though."

22  Q.   Okay.  And did Julia leave?

23  A.   She did.  She went upstairs.

24  Q.   Okay.  And where did you go?

25  A.   I went into the kitchen.

1  Q.   So after you -- you go to the kitchen, what's the next

2  thing that you remember?

3  A.   I remember being woken up.

4  Q.   What do you mean, "woken up"?

5  A.   I was -- I just -- I just remember someone -- someone

6  shaking me and saying, "Wake up, Marine.  Wake up, Marine.

7  Come on.  Get up, Marine."

8  Q.   So we -- we've heard Julia Nettleton testify about -- and

9  you heard her testify about Mr. Tur coming in the house, you

10  confronting him after he broke into your house, and then

11  hearing some argument that's going on in the house, correct?

12  A.   Correct.

13  Q.   You don't have any memory of that?

14  A.   I do not.

15  Q.   Any reason to doubt what Julia said or her evaluation, at

16  least roughly?

17  A.   None whatsoever.

18  Q.   So anything that happened in those arguments that she

19  discussed, you have no memory of, up until the time that he's

20  waking you up?

21  A.   That's the first thing I remember after -- I know I -- I

22  was walking towards the kitchen, and the first thing I remember

23  is him shaking me.

24  Q.   And where are you at that time?

25  A.   I'm laying in the -- laying on the kitchen floor.

1  Q.   All right.  Mr. Nettleton, if you will again -- Captain

2  Nettleton, if you'd come down and step down, and I will hand

3  you a marker and the microphone.

4        And what I'd like for you to do is your best stick

5  figure that you can where you were when he was waking you up

6  from unconsciousness.

7  A.   (Indicating).

8        MR. VOKEY:  So let the record reflect that -- that

9  Captain Nettleton has placed a little stick figure in the

10 kitchen.  And it looks like the -- from what I can tell from

11 the -- the drawing, the head is in the kitchen, going -- is

12 pointed down, and the feet are closer to the entrance of the

13 kitchen in the barroom.

14 BY MR. VOKEY:

15 Q.   Is that correct?

16 A.   That's correct.

17 Q.   All right.  So you hear him say, "Wake up, Marine.  Wake

18 up, Marine."

19        What's going through your mind when you're hearing

20 this?

21 A.   I -- I was -- I was just confused.  I was disoriented.  I

22 was trying to figure out what was going on, because I -- a

23 voice saying, "Get up, Marine.  Wake up, Marine."

24        I'm being -- being shaken.

25 Q.   And does -- is Chris Tur talking to anyone else?

1   A.    No.  No, he's not.  He was -- it -- it was Chris that was

2   shaking me, saying, "Hey, wake up, Marine."

3          And I kind of woke up and -- like, trying to figure

4   out what was going on.

5   Q.    And -- and I asked a poor question.  Did you hear Chris

6   Tur talking on the phone to someone?

7   A.    Well, after I woke up, I did -- I did hear him telling

8   somebody, "Hey, I just knocked the Skipper out."

9   Q.    And how were you feeling when you're -- when you're coming

10  to, physically?

11  A.    Well, I had -- I had a -- a really sharp pain in the back

12  of my head, right -- right to the neck area.  I was

13  disorientated.  I was, you know, obviously a little

14  intoxicated.  And I think disorientation would probably be the

15  best word for it.

16  Q.    So given the pain in the back of your head, he's waking

17  you up, and the "I just knocked out the Skipper" phone call,

18  what did you assume from that?

19  A.    I assumed that I had just gotten knocked out.

20  Q.    Okay.  And what other noises were going on at that time

21  when you woke up?

22  A.    My two dogs were just barking like crazy.

23  Q.    And were they there on the first floor as well?

24  A.    They were.  Cash was pretty close to me, and Toby was in

25  the sitting room area.

```
 1  Q.   Okay.  And just -- just so -- just so we know, if you
 2  would take that marker and place a D where -- approximately
 3  where the dogs were.
 4  A.   Okay.  I saw Cash here, and then Toby -- I -- I didn't
 5  initially see him, but I assume that's where he was, because he
 6  wouldn't leave the carpet.  He -- he didn't do so well on the
 7  tile floor, because he was an older Lab, so he would usually
 8  stay on the carpet, but I know -- I know I heard him barking
 9  right -- right in the next room.
10  Q.   Okay.  You can put the marker down.
11         MR. VOKEY:  And the witness has taken the witness
12  stand again.
13  BY MR. VOKEY:
14  Q.   So do you remember Chris Tur coming into your house at
15  all?
16  A.   I do not.
17  Q.   And you heard testimony from your daughter, Julia, say
18  that he just walked in and that you met him.  Any reason to
19  doubt that that's how that went?
20  A.   No.
21  Q.   But you don't remember any of that?
22  A.   I do not remember that portion of the night at all.
23  Q.   So tell us, after you -- he woke you up and you kind of
24  came to, what did you do next?
25  A.   Next, I -- you know, I -- I got up, and I was talking to
```

1   Chris.

2   Q.    And what were the dogs doing?

3   A.    The dogs were barking like crazy, so the first thing I did

4   was -- they were still barking at him, so I -- I walked out to

5   the living room, the hallway, and put the dogs outside just so

6   they'd shut up.

7   Q.    And the door that you took the dogs outside, is that at

8   the very top of -- of Defense Exhibit 57?

9   A.    It is.  If you look above where it says, "Open hallway,"

10  it would be that door.  That goes out into the backyard, and

11  it's all fenced in back there so they can just run around.

12  Q.    Okay.  So after letting the dogs out, where did you go?

13  A.    After I let the dogs out, I came back into the bar area.

14  Q.    And what did you do when you got to the bar area?  Is that

15  where Chris was?

16  A.    He was.

17  Q.    So -- and do you start talking to Chris at this point?

18  A.    I do.  He -- he was all over the map.  We were -- we were

19  talking about -- you know, I was trying to figure out what

20  happened, and he's telling --

21  Q.    Sorry.  Hold on.  Before you get to -- to the

22  conversation, let me ask you one question first.  Why didn't

23  you call security or somebody at that time?

24  A.    I was still trying to figure out what was going on.  But

25  when he -- when he woke me up, it wasn't -- he wasn't angry.

1  It was concern.

2      I mean, you know, he was -- he was -- I don't know

3  how to describe it other than, when he was waking me up, I

4  didn't feel like I was in danger at that point.

5      He was like, "Wake up, Marine.  Get up, Marine.  You

6  know, come on.  Get up, get up, man."

7      And -- and it was -- it -- it wasn't angry.  It

8  was -- it was more, "Oh, crap.  Wake up, man."

9  Q.  Okay.  So after you let the dogs in and come back and talk

10  to Chris, you're not feeling any danger?

11  A.  No.  I -- I -- I -- I was not.

12  Q.  Okay.  So now -- now you have this conversation with Chris

13  Tur.  Can you tell the -- the jury members kind of about this

14  conversation?

15  A.  So, he -- you know, he -- he was cycling.  So he wanted to

16  know -- he's like, you know, "Why were you fucking with my

17  wife?"

18  Q.  Is that the words he used?

19  A.  It is.  He said, "Why are you -- "Why are you fucking with

20  my wife?"

21      And I'm like, "I -- dude, I wasn't trying to fuck

22  with your wife at all."

23      So -- and -- and we were talking --

24  Q.  And in your mind was he referring to at the Bayview

25  earlier?

1    A.    I didn't -- I didn't -- you know, I didn't -- what I

2    remember from the Bayview is I had my arms around Kelly and

3    Lara at some point.

4            The following morning Kelly would tell me, no, I was

5    acting inappropriate with -- with Lara.  So I assumed -- now I

6    assume that's what he was talking about.  At the time I was

7    like, "What are you talking about?"

8            You know, I -- so I'm like, "Dude, I just had" -- you

9    know, "No, I wasn't" -- and so I -- I told him -- I said, "I'm

10   not -- I wasn't messing around.  You know, I wasn't doing

11   that."

12           And -- and -- and then -- and then he -- so he was --

13   he -- but he was asking it in a way like, "Hey, why -- why were

14   you doing that?"

15           I'm like, "You know, man, I wasn't trying to do any

16   of that."

17           And then he -- and then he wanted to go -- he -- so I

18   guess the best way to describe, he was cycling, and -- and just

19   through different emotions.

20           And then he's like, "Well, hey, let's" -- you know,

21   "Let's get a beer.  I want to -- I want to smoke a cigarette."

22           And -- and he'd go through several different cycles

23   of emotions in a -- in a short period of time in that -- and,

24   honestly, I was just -- I was trying to figure out what the

25   heck was going on during this period.

1  Q.   So when you said he wanted to smoke a cigarette, what

2  happened next?

3  A.   Well, I -- I -- I said, "Okay" --

4  Q.   And I'm going to have you step back down.  And if you'd

5  grab that -- that red marker.

6        So is that what happened?  Did -- did he go outside

7  to smoke a cigarette?

8  A.   Yeah.  I -- I told him --

9  Q.   Don't do it -- mark yet.  Just tell us what -- what

10  happened, and then I'll tell you where to mark.

11  A.   I told him he couldn't smoke in the house, but I said,

12  "Hey," and so I said, "you can smoke right here on the steps if

13  you want."

14  Q.   Okay.  And when you say, "smoke right here on the steps,"

15  what are you -- what are you describing?

16  A.   Well, there's a set of steps right here, and there's a

17  little sidewalk going right here on the back side of the

18  barroom, and there's a little curve and area right there, and

19  that's just -- if he wanted to smoke, I said he could smoke in

20  there.

21  Q.   And is that where he went, outside on the porch?

22  A.   Yeah.  And I -- I went out there with him and we were

23  talking some more.

24  Q.   Okay.  So if you would, just write the letters c-i-g, kind

25  of short or "cig," about, you know, where it was.  And that

1    area is what we're looking at.

2    A.    (Indicating).

3    Q.    So is the -- how do you get out to that porch?

4    A.    Well, we were in the barroom, so we went out through this

5    door.  This is all the -- a hallway.  It's enclosed.

6    Q.    And -- and, Captain Nettleton, I'm going to ask you to

7    step on this side, because I -- I'm getting the hatred looks

8    over here --

9    A.    Sorry.  I'm sorry.

10   Q.    -- that they can't see, so...

11   A.    Okay.  So this is all a closed-in hallway and windows and

12   everything, but there's a door right here that goes into that

13   hallway, but also off the hallway there's a little door right

14   here that goes out, and then there's a sidewalk right above

15   where it says, "cig," there's a sidewalk that goes out to the

16   gravel driveway area.

17   Q.    Okay.  So he goes out to have a cigarette?

18   A.    He did.  I feel like I grabbed a couple of beers from the

19   fridge and walked out there and we were talking out there for a

20   bit.

21   Q.    Are you sure that's what you did or that's the best you

22   remember?

23   A.    I'm -- I'm -- that's my best memory, but I'm pretty sure

24   that's what we did.

25   Q.    Okay.  So he goes out to smoke a cigarette, and you went

1  to go get some beers, and you came -- came back a couple

2  minutes later?

3  A.    Yeah.

4  Q.    And how long were you out there with him?

5  A.    Five, ten minutes, maybe.  You know, probably five

6  minutes.  That's how long it takes to smoke a cigarette.

7  Q.    So as long as it takes to smoke a cigarette?

8  A.    Yeah.  It was just one cigarette.

9  Q.    Okay.  And while you're talking to Mr. Tur out there, did

10  it appear that he was intoxicated?

11  A.    Yes, it did.

12  Q.    And why do you say that?  What -- what were some of the

13  physical signs that clued you in?

14  A.    Well, it -- I noticed when we were inside he had really

15  bloodshot eyes.  But he was also, you know, slurring his words

16  a little bit.  And he was just -- I don't know.  He was just

17  kind of not well-coordinated, I guess is the best way to put

18  it.  You know, I'm...

19  Q.    Okay.  And you've seen people intoxicated before?

20  A.    I have.

21  Q.    And at the time, did it just look like another drunk guy?

22  A.    It -- it was.

23  Q.    Okay.  So -- and while you're out talking on the back

24  porch, what are the conversations you're having out there?

25  A.    So out there we're talking -- we're talking about his --

1  he's talking about his marriage, and I told him I understood

2  what -- what was going on.  And he said, you know, he didn't

3  know what to do.  And then -- then he would talk about, "Hey,

4  let's go down, let's go to the club, let's go back to the club

5  and have some beers and -- and -- and do this while we're

6  sitting there."

7              I don't know that he used the term "beers."  I think

8  he said "drink".

9              But he said, "Let's go get some drinks at the club."

10             And I'm like, "No, I'm not -- I'm not going

11  anywhere."

12  Q.   Well, is -- is -- when he's outside -- talking to him, are

13  you going through the cycling thing again?

14  A.   It -- it was, and he -- and -- and then he'd get upset

15  and, you know, say, you know, "What the hell is going on,"

16  and -- and he said -- he was just cycling through his emotions.

17  Q.   Okay.  Now, at this time, when you're having this

18  conversation with Chris Tur in your house, this whole time, to

19  your knowledge, was he aware of -- that you and Lara Tur had

20  actually had sex several months ago?

21  A.   No, he was not.

22  Q.   And any comments he said where it made you believe he was

23  aware of that in any way?

24  A.   No.

25  Q.   You believe that his comments were to your -- putting your

1    arm or getting too close to Lara Tur at the club?

2    A.    Yeah.  It was all related to the Bayview.

3    Q.    Okay.

4    A.    The -- you know, an hour before or however long before.

5    Q.    Okay.  So after he finishes his cigarette -- and you're

6    out there when he finishes it, right?

7    A.    Yes.

8    Q.    You go back inside?

9    A.    We go back inside.

10   Q.    And where did you go to?

11   A.    We went back to the barroom, to the bar.

12   Q.    Okay.

13   A.    Right here (indicating).

14   Q.    So going to the -- to the barroom -- and let me have you

15   take a seat for just a second.  Leave the marker.

16          So now that you're back in the barroom, are you guys

17   having conversations again?

18   A.    We are.  We -- we're talking and we're -- it's --

19   honestly, I think the two of us are having the same discussion

20   about two or three times in a row.  I mean, we just -- it

21   really just felt like a big circle of the same -- same

22   conversations over and over, you know.

23   Q.    So this is talking about his marriage, angry at you, and

24   then "Come on, buddy.  Let's go get a drink"?

25   A.    Exactly.

1    Q.    All right.  And how did this -- this conversation now in

2    the barroom, did this thing escalate?

3    A.    It did.  The -- at some point I told him I wasn't going to

4    go to the club, you know, I was done for the night, I'm not

5    going back.  And -- and he started getting angry, started

6    getting a little pissed off at me.

7    Q.    A little angry or -- or very angry?

8    A.    Well, probably the second or third time he suggested it

9    and I just -- I was kind of like, "No, dude.  You -- you've got

10   to leave, you've got to get -- get out of the house."

11   Q.    And what was his reaction the second or third time you

12   said no?

13   A.    So he had a really weird reaction because he just -- he

14   just got red and angry and, you know -- I don't know how to

15   describe it, but when all of a sudden someone is just really

16   pissed off at you, that was -- that was the look he got on his

17   face, and he --

18   Q.    His eyes, his face?

19   A.    Yeah.  He's just -- he's just like very all of a sudden

20   intent, and I just -- and I -- I just remember thinking in my

21   mind, "Oh, shit.  Here it comes," you know.

22   Q.    Okay.  So there's about to be a physical altercation in

23   your house, isn't there?

24   A.    There -- there is.

25   Q.    So would it assist you in explaining to the jury what

1  happened if you could demonstrate what happened in your house?

2  A.   Yes, it would.

3  Q.   With the Court's permission, Captain Nettleton, would you

4  please step down?

5        MR. VOKEY:  Hold on.  Let me make sure I just didn't

6  push the button wrong.

7  BY MR. VOKEY:

8  Q.   So, Captain Nettleton, what I want to do -- and we'll have

9  to just pass the microphone back and forth.  I want you to take

10  us there when you're having this conversation before this

11  actual physical confrontation happens.  Okay?

12        And where are you standing?

13  A.   I am standing right about here, right where the D for the

14  dog was.  I'm standing right there in front, right -- right in

15  front of this doorway and right here.

16  Q.   And where is -- where is Mr. Tur standing?

17  A.   He had been -- he was over there by the bar, on -- on the

18  bar counter thing kind of leaning on that.

19  Q.   Okay.  So I want you to take us there and set the scene

20  for -- I want you -- you're standing -- you're standing right

21  there in the barroom right now?

22  A.   Right.

23  Q.   And I want you to take us there and describe to the

24  members of the jury where everything is.  Without using the

25  chart, just use -- this is going to be the barroom.  Yep.

1  A.   Okay.  So without using the chart, I've got my -- I'm

2  right by -- like, where the doorway is and then there's a shelf

3  on this side.  The kitchen doorway is right here.  And the

4  shelf -- there's another shelf right there.  The bar was --

5  would be about where the counselor is just sitting there,

6  and --

7  Q.   And where is Chris Tur?

8  A.   And Chris Tur is standing right there.

9  Q.   All right.  I want you to reverse roles and stand where

10  Chris Tur is and show us where he's standing in relation to

11  you.

12  A.   He's standing right here, he was kind of like against the

13  bar, and he -- we're talking and he's looking at me from this

14  point.

15  Q.   So after you tell him, "No, you've got to go home," and

16  that you just testified that he gets -- he gets angry and you

17  can see it in his face, show us what Chris Tur does.

18  A.   All right.  You want the -- you want me to keep holding

19  the mic?

20  Q.   As best you can.  If we need to, I'll come hold the mic

21  for you.

22  A.   Okay.  So I told him, "Hey, you've got to get out of here.

23  I'm not going to back to the club.  I've got to go to bed.  I'm

24  done."  And he just gets this look of rage and he comes at me

25  and just grabs my shirt and pushes me back against the wall.

1   Q.   All right.  So I want you to become Captain Nettleton

2   again.  You're back up against the wall?

3   A.   Okay.

4   Q.   Aside from pushing you into the wall, was he pushing you

5   down?  What was he doing?

6   A.   So he -- he -- he grabbed right here.  I just was wearing

7   a shirt.  And he grabbed right here and he pushes me up against

8   the wall and he pulls down.  And he said, "I don't want to go

9   down," and the shirt just rips, my shirt just rips.  So he's

10  grabbing and pulls me down.  And then -- and then I just -- he

11  had his hands right here, I just broke it, and pushed him in

12  the chest and pushed him backwards.  And he took like --

13  Q.   Okay.  Hold on right there.  So you broke it, you pushed

14  him backwards, Chris Tur goes backwards a little bit?

15  A.   Correct.

16  Q.   I want you to reverse roles, come be Chris Tur again, and

17  I want you to show us what Chris Tur does after you push him.

18  A.   Okay.  So he grabs and pushes and then he comes back like

19  this, and then he -- he comes at me again like that.  He's

20  coming at me again like this.

21  Q.   Okay.  I want you to flip back and be Captain Nettleton

22  again.  We just had Chris Tur is coming at you again.

23  A.   Correct.

24  Q.   So when he's coming at you again, what's going through

25  your mind?

1  A.    Well, I -- the fight is on.  I mean, he's coming at me.

2  You know, he's not going to stop, is what I was thinking.

3  Q.    He's attacking you?

4  A.    He is.

5  Q.    So what do you do?

6  A.    So the first time it kind of caught me by surprise, and I

7  pushed him off.  Neither -- you've got to keep in mind, neither

8  one of us were in that great of shape anyway.  But he -- so I

9  push him off, he goes back, and he comes running in again.  And

10 then -- and right as he's running in, I just throw a quick

11 punch and I hit him.

12 Q.    And where do you hit him?

13 A.    I hit him on the nose.

14 Q.    Okay.  And you hit him in the nose.  What happens?

15 A.    When I hit him on the nose, he goes down on his knee -- he

16 didn't -- he didn't fall over, but he -- he kind of stumbled

17 and went down on a knee and his hand.

18 Q.    Okay.  I'm going to come and grab the microphone from you,

19 and you can show us how he went to his knee.  Okay?

20 A.    Okay.  So --

21 Q.    And without -- without saying anything, just show us how

22 he went to a knee.

23 A.    He came in and I hit him and he -- and he goes down

24 like -- like that and puts his hand right here.

25 Q.    Okay.  You can go ahead and stand back up and take the

1   witness stand again.

2        So -- and make sure we memorialize it, because I'm

3   not sure -- to make sure the court reporter got that down.  You

4   said that he took a knee.  You say he put his right hand down

5   and you said his left hand went to his nose, correct?

6   A.   That's correct.

7   Q.   So, Captain Nettleton, he's kneeling and he's in the

8   barroom when he's doing this?

9   A.   Correct.

10  Q.   And while he's kneeling, is his nose bleeding?

11  A.   It started to bleed, yes, as soon as -- when he went down.

12  Q.   And is he saying anything or doing anything?  Tell us what

13  he was doing.

14  A.   He's MF'ing me.  He's calling me an MF'er.  I'm calling

15  him an MF'er, to, you know, knock it off, and he's cussing at

16  me.  And he -- and at some point he takes his hand and he's

17  going like that with the blood and just -- and I'm like, knock

18  it off, you know.  He's -- he's putting blood on there.  And

19  he's like, "F you."  And I'm like F him.  And it's just a

20  pretty...

21  Q.   Okay.  And he's doing that with his left hand?

22  A.   Correct.

23  Q.   And is he throwing the blood in one direction or is it

24  kind of going everywhere?

25  A.   It's going everywhere.

1  Q.   Throwing it different directions?

2  A.   Yes.

3  Q.   And that's with his which hand, left hand?

4  A.   Left hand.

5  Q.   And while this is going on while he's kneeling, is he

6  doing anything with his right hand?

7  A.   He -- he would -- every now and again he would hit the

8  wall, like this (indicating).

9         You know, he was -- so you've got to think of it --

10 he's pissed off that he's got this thing on there.  He's like

11 MF.  You know, he's just cussing.  He's just pissed.  He's

12 hitting the side of the wall, and it's just like -- but it --

13 it wasn't that loud.

14        But he's just hitting the side of the doorway and --

15 and just during that I'm yelling at him, telling him to knock

16 it off, and he's yelling back at me.  It was kind of chaotic.

17 Q.   And I want you to step back down again -- step back down

18 from the witness stand, Mr. Nettleton.  And I'll hand you this

19 microphone.

20        And I -- and using that blue marker, I want you with

21 the letters "CT" put down where Chris Tur was when he was

22 kneeling down.

23 A.   Right there.

24 Q.   And while he's kneeling and you said that he's kind of

25 flinging blood with his nose -- I mean, I'm sorry, he's

1  flinging blood with his left hand, about how many times while

2  he's kneeling does he do that?

3  A.    Well, when -- when he went down right here -- I don't

4  actually -- he probably did that three or four times right

5  there.

6  Q.    Three or four times while kneeling?

7  A.    Yes.

8  Q.    Okay.  At some point, does he stand up?

9  A.    He does.  He stands up and moved back towards the bar

10  area.

11  Q.    All right.  You just drew a line going from where you had

12  labeled "CT" towards the room where the word says "Barroom,"

13  correct?

14  A.    Correct.

15  Q.    All right.  And does he stop there or does he keep moving

16  in the room?

17  A.    No.  He -- he is there and then he walks over -- I was

18  over here and --

19  Q.    All right.  So go ahead and place an "N" for where you

20  were, for Nettleton.

21  A.    All right.  I was about right here.

22  Q.    And show us where he ends up.  Just kind of draw a line,

23  as best you can remember, of where he was walking.

24  A.    He walked through -- the bar and then over -- over to

25  here.

1  Q.    And did he stop there?

2  A.    He did stop there.

3  Q.    All right.  So where he stopped, the -- after he gets up

4  and walks around the bar a little bit, put a "CT 2."  So while

5  he's standing up and walking over to that spot, is he still

6  cussing?  Is he still spitting blood?

7  A.    Yeah.  Yeah.  We were both -- we were still yelling at

8  each other, but, you know, I was telling him just -- I was

9  trying to tell him just stop because he's just --

10 Q.    And if you can estimate, about how many times do you think

11 while he's walking does he, you know, flick the blood?

12 A.    Three or four.  I mean --

13 Q.    Okay.

14 A.    -- it wasn't -- it was just when he would get some on his

15 hands and just do it, or fling it.  It wasn't -- you know, I

16 couldn't tell you the exact number of times.

17 Q.    Okay.  So he stops there at "CT 2."  What do you do next?

18 A.    I tell him to quit and I go into the kitchen and grab a

19 paper towel.

20 Q.    Okay.  And do you get a paper towel?

21 A.    I do.

22 Q.    And when you return and come back to the kitchen, where is

23 Chris Tur now?

24 A.    Now he's right here.  He met me at the doorway.

25 Q.    All right.  And you can mark that with a "CT 3."  Okay.

1          So by the time you went and got a paper towel and by

2     the time you came back to give it to him, he's actually moved

3     again in that barroom?

4     A.    Yeah.  He's right -- he's right here by the doorway,

5     because I'm sure he's trying to see where the heck I was going.

6     Q.    Make sure you keep that microphone up.  Okay.

7          All right.  So when you give him the paper towel, did

8     he put it to his nose?

9     A.    He did.

10    Q.    Okay.  And what do you do now?

11    A.    Then I tell him to -- to sit down.  I say, "Hey, you need

12    to sit down," and then I walked back over to get more --

13    Q.    And where do you have him sit down?

14    A.    At the kitchen table.

15    Q.    Okay.  Hold on one second.

16          I put up Defense Exhibit 53.  And this is the room

17    where you had Chris Tur sit down again?

18    A.    I had him sit at the kitchen table.

19    Q.    All right.  So with -- with that marker, with the "CT 4,"

20    put where you had him sit.

21    A.    There's not a chair in this diagram, but there was a chair

22    there then.

23    Q.    Okay.  And how was Mr. Tur's demeanor at this point?

24    A.    I think he's -- he'd calmed down a little bit, but he's

25    still pretty pissed off at me.

1  Q.   Okay.  Once you sit him at the kitchen table, what do you

2  do next?

3  A.   Then I go back in and get more paper towels, and I go to

4  the freezer and get some ice cubes and put -- and I said,

5  "Here, hold this one on your nose."

6  Q.   Does he -- so does he put this wad of paper towels and the

7  ice to his nose?

8  A.   He does.

9         MR. VOKEY:   The defendant has taken the witness stand

10 again.

11 BY MR. VOKEY:

12 Q.   So you sit down with the paper towels and the ice to his

13 nose.  About this time, did you get any phone calls?

14 A.   Yeah.  I heard the phone in my office ringing, and so I

15 walked in and it was my son Riley who was calling.

16 Q.   Okay.  And at this time did you talk to Riley?

17 A.   I did.

18 Q.   How long did that conversation last?

19 A.   Three to four minutes.

20 Q.   And what was Riley telling you?

21 A.   He was telling me...

22         I'm sorry.  He was telling me...

23         He was telling me that Julia was upstairs and she was

24 terrified.

25 Q.   And did you continue to talk to Riley and kind of assure

1   him that everything is okay?

2   A.   He wanted to know what was going on.  He was pissed off at

3   me.  I told him everything was fine.  You know, I don't know

4   what I said, but I just said, "Oh, don't" -- you know,

5   "Everything is fine.  Everybody's okay.  It's okay."  I kind of

6   reassured him.  And then I -- then I hung up with him.

7   Q.   Okay.  So after that you said the phone call -- you said

8   was about four minutes?

9   A.   Yeah.

10   Q.   So after that phone call, where did you go?

11   A.   So I walked back into the -- into the kitchen to talk to

12   Chris.

13   Q.   And Chris Tur was still in the kitchen at the time?

14   A.   No, no.  He was not.

15   Q.   So do you -- after the phone call with Riley, do you go --

16   go back and actually see Chris Tur before you go see your

17   daughter?

18   A.   Oh, yeah, he actually was sitting at the table because I

19   had the conversation with him -- I said, "Hey, I've got to go

20   talk to Julia because Riley just called me and said she's --

21   she's terrified."

22   Q.   And what did Chris Tur respond to that?

23   A.   He was a dad.  He -- he totally got it.

24   Q.   What did he respond?

25   A.   He said, "Okay."

1  Q.   So do you leave the kitchen again and Mr. Tur -- and where

2  do you go?

3  A.   I go upstairs, but I stop and took off my shirt real quick

4  and threw it, because I didn't want her to see --

5  Q.   The ripped shirt?

6  A.   -- the ripped shirt on.  So I go up to her room, I knock

7  on her door.  She doesn't answer.  I open it.  She's not in her

8  room.  I go to the Jack and Jill room and that door is locked.

9  I knock on it and then she answers it.  And I -- I said, "Hey,

10  everything is okay.  You know, don't worry about it."

11          But she was really not -- she was pretty -- pretty

12  angry at me also.

13  Q.   Okay.  Is this a short conversation with Julia?

14  A.   Yeah.  She didn't want to talk.  It was probably 20, 30

15  seconds.  I don't know.

16  Q.   Okay.  So after you -- you talked to Julia up there, where

17  did you go?

18  A.   Then I walked back down to -- downstairs to talk to Chris

19  again.

20  Q.   And was Chris there at this time?

21  A.   He was not.

22  Q.   So what do you do?

23  A.   So --

24  Q.   Did you call out his name?

25  A.   I did call out his name.  I just said, "Hey" -- I said,

1   "Chris, where you at?"  Or something like that.  And then the

2   phone rings again.

3   Q.   And do you answer it?

4   A.   I did.

5   Q.   And who was calling this time?

6   A.   It was Riley again.

7   Q.   And what did you talk to Riley about?

8   A.   I told him, "Hey, I just -- I went up and saw Julia.

9   Everything is good.  You know, it's okay.  Don't worry about

10  it."

11          And he was -- he was, again, you know, pretty angry

12  with me, also.  So we had -- had a conversation -- two,

13  three -- I don't know -- I don't know how long the phone call

14  was.  It wasn't very long.

15  Q.   A couple of minutes?

16  A.   Yeah.

17  Q.   So after you hang up with Riley the second time, what do

18  you do next?

19  A.   Well, next I go -- I go figure out where Chris went and

20  tried -- I mean, I was calling out for him.  So I walked back

21  in the kitchen.  He wasn't in there.  I thought he was probably

22  in the -- maybe out having a cigarette or something.  I walked

23  out to the backyard and --

24  Q.   Hold on one second.

25          THE COURT:  While Mr. Vokey is doing that, sir, you

```
 1   testified a minute go about the conversation with your son, the
 2   second one.
 3          You testified, at least according to the transcript,
 4   that it was very long, and then Mr. Vokey said, "A couple of
 5   minutes?"
 6          What -- did you mean it was not very long?  What --
 7   or what -- what's your testimony on the length --
 8          THE WITNESS:  I thought I -- I thought I just said it
 9   was not very long.
10          THE COURT:  Okay.
11          THE WITNESS:  I don't -- I do not think it was long
12   at all.
13          THE COURT:  Okay.  Thank you, sir.
14   BY MR. VOKEY:
15   Q.   So in looking at Defense Exhibit 57 again, so you -- I
16   think you were just saying that you walked out the same place
17   where you smoked the cigarette before, was that the first place
18   you were checking for him?
19   A.   That was.
20   Q.   And that's out where you marked "cig" on Defense Exhibit
21   57?
22   A.   Correct.
23   Q.   Okay.  So -- and was he out there?
24   A.   He was not.
25   Q.   So where is the next place you go?
```

1  A.   Next place I go is to -- I walk back towards where -- I'm

2  still outside.  I walked to the corner of the house, looked

3  at it.  I think the dogs were still out in the backyard.

4  Q.   When you say "the corner of the house," you're talking

5  about the corner of the house towards the top of that diagram?

6  A.   To where it says "open hallway".  Correct.

7  Q.   Okay.

8  A.   And then I -- I walked back up to the corner of the house,

9  where it says "storage pantry".  And I looked -- I didn't go

10 down the dock, but I looked down that way.

11          And then I looked -- from that corner of the house,

12 you can see the sidewalk.  And I looked to see if I saw him

13 walking on the sidewalk or down the street anywhere.  And I

14 didn't see him.

15 Q.   You didn't see Chris Tur anywhere?

16 A.   I didn't.

17 Q.   Okay.  So what do you do now?

18 A.   I go back in the house and, you know, at that point I -- I

19 was -- I went back -- I think I went back and took a shower

20 and --

21 Q.   Okay.  So let me stop you right there.  And where are the

22 dogs at this point?

23 A.   The dogs are still outside.

24 Q.   And did you let the dogs in?

25 A.   I did let the dogs back in.

1    Q.    And you just had this incident in your house where he's

2    attacked you and you punched him in the nose.

3    A.    Yeah.

4    Q.    Why are you not calling security now?

5    A.    I mean, if I had -- if I would have called security on --

6    on Chris and -- and -- it would have been one of those things

7    where, you know, he was probably going to get fired over the --

8    over the whole thing, the way he was acting and attacking me

9    and doing that.  And I wasn't going to do that to him.

10   Q.    Okay.  Is it maybe because kind of deep down, you --

11              MR. GEE:  Objection.

12              THE COURT:  Yeah.  Don't -- don't lead so much, sir.

13   Just ask a question.

14   BY MR. VOKEY:

15   Q.    What else were you feeling or thinking at the time?

16   A.    I was thinking about, you know, who -- it's kind of one of

17   who is the most wrong questions.  And he wasn't the most wrong,

18   you know.

19   Q.    And why do you say that?

20   A.    Because I had slept with Lara in November.  And he didn't

21   know it, but I did.

22   Q.    So after you let the dogs in, what do you do?

23   A.    I went -- I went -- I took a shower.  I was getting ready

24   to go to bed and the phone rings again.

25   Q.    And who was calling this time?

1    A.    It was -- it was Riley calling one more time.  And I --

2    and he was really worried.  And I just -- I talked to him for a

3    few more minutes again.  I told him everything was fine.  I'd

4    call him in the morning.

5    Q.    Okay.  All right.  Well, I want to move now to the next

6    day, January 10th, Saturday, January 10th.  Okay?

7    A.    All right.

8    Q.    So when you woke -- or how did you wake up?  Tell the jury

9    how you woke up.

10   A.    I woke up.  The doorbell was constantly just ringing.  And

11   I heard my dogs barking.  And I later learned that the doorbell

12   was stuck, but it was just ding-dong, ding-dong, ding-dong, and

13   the dogs were barking.

14   Q.    And when you're getting up, how do you feel?

15   A.    Pretty lousy.

16   Q.    And why?

17   A.    I was hung over.

18   Q.    Okay.  So what do you do?

19   A.    So I got up, threw on a pair of shorts and a shirt, and I

20   went to the front door.  First I let the -- because the dogs

21   are going nuts, so I put them in the backyard, went back,

22   opened the front door.

23   Q.    Okay.  And when you opened the front door, is anybody

24   there?

25   A.    Yeah.  Kelly Wirfel was there.  She had -- she was walking

1    up.  And that's the only person I saw at first.  But then when

2    I looked to the side, Randy Barger was coming out of my garage.

3    Q.    Okay.

4    A.    And then I think the first thing I did was unstick the

5    doorbell.  It was --

6    Q.    Because it was just going off?

7    A.    Yeah.

8    Q.    And who's the first person to say something to you right

9    there at your front door?

10    A.    Kelly.

11    Q.    And what does Ms. Wirfel say?

12    A.    She says that -- she says, "Have you seen Chris?"

13    Q.    And what was your answer?

14    A.    I said no.

15    Q.    And when she asked you, "Have you seen Chris," what did

16    you think she meant?

17    A.    I thought she meant that morning, because it was like,

18    10 o'clock or something in the morning at that point.

19    Q.    Okay.  What else is said in this conversation?

20    A.    A bunch of stuff.  She --

21    Q.    Are you informed that Chris Tur is missing?

22    A.    She said, "Yeah, he hasn't come home last night."

23    Q.    Okay.

24    A.    And -- and then either her or Randy said, "But he does

25    this -- he's done this before.  You know, he does this

1  sometimes."

2  Q.    Okay.  And what else is said in this conversation?

3  A.    I asked Kelly why -- why he was so -- I said, "Why was

4  Chris so pissed at me last night?"

5          And -- because up and to this point, I didn't --

6  honestly, the only thing I remember is my arms around her.  And

7  she goes, "You and her were acting pretty inappropriate at the

8  bar."

9          And I said, "Okay."

10  Q.    And what did you tell Ms. Wirfel?

11  A.    I told her, well -- I think that's when I told her, "Have

12  him call me when you see him, you know, if -- it sounds like I

13  need to apologize."

14  Q.    Okay.  So -- so during that discussion, does it come up

15  that Chris Tur had come into your house?

16  A.    Yeah.  She -- she asked did he come over.  I said, "Yeah,

17  he did come over to the house.  He came inside."

18          And I described to her the -- just the crazy up and

19  down that he was having.  And, I mean, it -- I told her, you

20  know, "He said, 'Hey, you know'" -- I said, "One minute he was

21  my best friend, and the next minute he was trying to ask me

22  advice, and then the next minute, you know, 'You want to go

23  drink at the club?'  The next minute he wanted to just, you

24  know, be pissed off."

25          And it was just -- I told her it was just cycling and

1  I said it was just -- I didn't really understand it at the

2  time.

3  Q.    So -- and just, sir, remind the members of the jury,

4  Ms. Wirfel was a -- one of your staff officers there at --

5  A.    She was -- she was my public affairs officer, yes.

6  Q.    And Chief Warrant Officer Barger also worked for you.  He

7  was, what, personnel?  Or did he not work for you?

8  A.    No, he did not work for me.

9  Q.    He was part of the tenant command?

10  A.    Right.  He was -- they did all the pay and services

11  related to kind of like a pay administrator would be, but

12  worked for the Navy a different -- he worked for a captain that

13  was off island that -- you know, I think Norfolk or

14  Jacksonville.

15  Q.    Okay.  So while the -- while they're there -- was this a

16  lengthy conversation or a pretty short conversation you had

17  with her?

18  A.    It was just a few minutes, I believe.

19  Q.    Okay.  And at any point during this conversation did you

20  tell Chief Warrant Officer Barger that he cannot search your

21  residence?

22  A.    I did not.

23  Q.    So how did this conversation end?

24  A.    They said they were going to go continue looking for

25  Chris.

1  Q.    All right.  And were you worried at that point?

2  A.    No.  We -- we talked about it for a little while with

3  them.  But they said he does this all the time.  He's probably

4  just, you know, somewhere sleeping it off, or that he -- you

5  know, he had done this before.  So I wasn't -- I wasn't that

6  worried.  If it was a habit pattern, I wasn't that worried

7  about it.

8  Q.    Okay.  So after they left, what did you do?

9  A.    I went back into the house.  I think I may have let the

10 dogs back in and I went and -- go get myself a drink of water.

11 Q.    All right.  And did you do anything to leave the house

12 next?  Oh, I'm sorry.  All right.  You said you went to go get

13 yourself a drink of water?

14 A.    Yeah.

15 Q.    All right.  So when you went to get yourself a drink, did

16 something happen when you went to get yourself a drink?

17 A.    Yeah, I saw --

18 Q.    And where were you?

19 A.    Well, I left the front door, went in to get a drink of

20 water, and I walked through the bar area and the kitchen.  And

21 at that point, you know, I saw some blood in about two or three

22 areas in the thing, and I started cleaning it up.

23 Q.    Two or three areas in where?

24 A.    In the barroom.

25 Q.    Okay.  And is this blood from the night before --

1   A.   It was.

2   Q.   -- where Chris Tur was flicking it with his hands?

3   A.   It was.

4   Q.   So what did you do about that?

5   A.   I grabbed some paper towels.  I grabbed spray cleaner and

6   I cleaned it up.

7   Q.   Okay.  All right.  So after cleaning this up, what did you

8   do next?

9   A.   Julia wasn't home.  I think...

10  Q.   And let me back up.  Hold on.  Let me put up a -- the

11  diagram of the house again.  It's up there.

12         So looking at Defense Exhibit 57, just tell the jury

13  where was it you cleaned up the blood, if you can kind of

14  explain to them on there.

15  A.   Okay.  So on the -- if you look at the barroom, there was

16  some -- in front of -- between the -- the first shelf unit and

17  the -- you know, where I first hit him when he first went down

18  on his knees, where I said that, he -- there's some blood

19  there.  There's some blood over by the top of the counter,

20  where the actual bar counter was, it was underneath where he

21  had been standing there.  And then I saw some blood by the

22  butcher block right by the entrance, kind of right above where

23  the D for dog is right there.

24  Q.   And how about any in the kitchen that you saw?

25  A.   There was some on a -- on a -- a few drops on the

1    tabletop.

2    Q.    Okay.

3    A.    Where he was -- where he was sitting.

4    Q.    Okay.  So after cleaning this up, did you leave your house

5    after that?

6    A.    I believe I got dressed and I did -- at some point I left

7    the house and went to the office.

8    Q.    Okay.

9    A.    Actually, I -- I think I went to the Bayview first and

10   checked for my credit card.

11   Q.    Why did you do that?

12   A.    Because I didn't see it in my wallet and I wanted to see

13   if they had it.

14   Q.    And did you get your credit card from the Bayview?

15   A.    I did.  The office -- the Bayview -- you know, the

16   restaurant runs -- although there's no bars open or anything,

17   the restaurant has -- they're open and serving.  So I went in

18   there and the young lady that was the office manager, I got my

19   card back from her because I had left it downstairs.

20   Q.    Okay.  And did you go to your office after that?

21   A.    I did.

22   Q.    All right.  So -- and when we say "office," we're not

23   talking about -- because you have a home office in your home

24   with an official government line, right?

25   A.    That's correct.

 1  Q.   You went to your office office?

 2  A.   I went -- I drove to the -- to Bulkeley Hall, where my

 3  office was.

 4  Q.   Okay.  And while you're there at your office, do you hear

 5  from anybody concerning a search for Chris Tur?

 6  A.   Kelly called me back and said they still hadn't found him

 7  at some point and I believe I talked to Lara at some point

 8  later on.

 9  Q.   Okay.  And what happens that afternoon?  Is there some

10  kind of gathering?

11  A.   Yeah.  I believe Lara had called and I -- and she said,

12  "You know, he's usually -- he's usually not gone this long when

13  he's gone.  When he does this, he's usually back by now."

14           I said, "Well, hey, why don't you guys come to my

15  office and let's figure it out."

16  Q.   So you called for a meeting?

17  A.   I did.

18  Q.   And we've heard some about this office meeting.  And who

19  was at the office meeting?

20  A.   Kelly Wirfel, Lara Tur, and Randy Barger.

21  Q.   All right, sir.

22           MR. VOKEY:  And, Your Honor, I don't know if you want

23  to look for a logical stopping break.  I've got quite a bit

24  more to go.  This could be a stopping point if you so desire.

25           THE COURT:  Yeah, that's fine.  I was looking for

1   somewhere in the next ten minutes.  So let's go ahead and stop

2   now.

3          All right.  Ladies and gentlemen, it's 12:20.  We'll

4   go ahead and take our lunch break.  Let's -- we'll do an hour

5   and ten minutes.  Let's be back in session ready to come out at

6   1:30.

7          Very important to keep remembering all my

8   instructions.  Stay away from anything about the case while

9   you're on lunch, please.  Don't talk to anybody.  And I'll see

10  you back here ready to come out at 1:30.  Thank you.

11          COURT SECURITY OFFICER:  All rise for the jury.

12      (Jury exits, 12:20 p.m.)

13          THE COURT:  And, sir, you may step down and go to

14  your table.

15          THE DEFENDANT:  Thank you, sir.

16          COURT SECURITY OFFICER:  Please be seated.

17          THE COURT:  All right.  So, Mr. Vokey, you indicated,

18  I think, earlier that it is likely that when

19  Captain Nettleton's testimony is completed -- and I recognize

20  there will be cross-examination as well, so we -- I'm sure

21  it'll take some more time, is it still your belief that you'll

22  rest at that point?

23          MR. VOKEY:  Yes.

24          THE COURT:  Okay.  Mr. Gee, at this point, does the

25  government intend to have a rebuttal case?

1           MR. GEE:  I think we'll discuss it over lunch, but I
2   don't think so, Your Honor.
3           THE COURT:  All right.  Well, we'll complete
4   Captain Nettleton's testimony and then we'll figure out where
5   we are.
6           So anything else from counsel?
7           All right.  I'll see everybody promptly at 1:30.
8           COURT SECURITY OFFICER:  All rise.
9      (Recess from 12:21 p.m. to 1:32 p.m.; all parties
10   present.)
11          COURT SECURITY OFFICER:  All rise.  This Honorable
12   Court is back in session.
13          Please be seated.
14          THE COURT:  Captain Nettleton, if you'll resume the
15   stand, please, sir.
16          THE DEFENDANT:  Yes, sir.
17          THE COURT:  We ready for the jury?
18          Let's have the jury, please.
19          COURT SECURITY OFFICER:  All rise for the jury.
20      (Jury enters, 1:33 p.m.)
21          COURT SECURITY OFFICER:  Please be seated.
22          THE COURT:  Welcome back, ladies and gentlemen.
23          Mr. Gee -- I'm sorry.
24          Mr. Vokey, you may proceed.
25          MR. VOKEY:  Thank you, Your Honor.

1  BY MR. VOKEY:

2  Q.   Captain Nettleton, when we -- we broke for lunch, we were

3  just getting to the office meeting, okay?

4  A.   (Nods head affirmatively.)

5  Q.   So let me ask you, this office meeting -- and this was

6  afternoon on Saturday, the 10th?

7  A.   It was.  I think it was around 2 o'clock in the afternoon.

8  Q.   And why did you call this meeting?

9  A.   I heard from Kelly and Lara at various times.  I was

10  starting to get concerned because they said this -- usually

11  when he'd gone missing before, he wasn't gone this long.

12       So I said, "Hey, why don't y'all stop by the office

13  and let's talk about it."

14  Q.   Okay.  So who came by?

15  A.   Kelly and Lara Tur -- Kelly Wirfel, Lara Tur, and Randy

16  Barger.

17  Q.   Okay.  So when you're in the meeting -- and was -- to your

18  memory was Warrant Officer Barger actually in -- in your office

19  in the meeting?

20  A.   So Kelly and Lara were in there for about five or ten

21  minutes.  Randy did come in and sit down at some point during

22  the meeting.

23  Q.   He just wasn't in there the entire time?

24  A.   Correct.

25  Q.   So let me ask you, what are some of the things that you

1  were learning in this meeting?

2  A.   So a couple of things.  One, that he -- he had done

3  this -- like I had just said, he'd done this before, but never

4  for this long, you know, that -- that -- they were -- that was

5  their big concern, is, like, "Hey, he's always come back by

6  this time of day when he -- when he's done this before."

7        But probably the most important thing I learned was

8  that he had attempted suicide on the base before and that --

9  had expressed suicidal ideations.

10 Q.   Were you aware of this before?

11 A.   I was not.

12 Q.   So when you hear this, that he's gone -- he's never gone

13 this long and you hear it's suicidal, what is going through

14 your mind now?

15 A.   Well, now I'm pretty concerned because I -- you know, I

16 didn't know this before and -- you know, I'm a little

17 frustrated because I didn't know it before and I -- and it

18 changes the whole urgency of the situation in my mind.

19 Q.   So in this meeting, was there a discussion of where Chris

20 Tur might have gone?

21 A.   There was.  We had several areas.  So we just --

22 Q.   All right.  Hold on right there.  Pause one second.

23        And, Captain Nettleton, if you would again step down

24 from the witness stand and approach Defense Exhibit 45.  And

25 I'll hand you the mic.

1          So, Captain Nettleton, you said you were learning

2    places where he might have gone -- he might be hiding; is that

3    correct?

4    A.    That's correct.

5    Q.    So the things that you learned in the meeting from Ms. Tur

6    and Ms. Wirfel, can you show us on the map -- where are these

7    locations that are coming up as to where he might be?

8    A.    I can.  Well, first -- and they said they had already been

9    by to check it.  His boat is right here at the marina.  So

10   right there.

11   Q.    And you circled the marina area?

12   A.    I did.

13   Q.    Okay.

14   A.    The other thing they said is that -- that sometimes he

15   goes up in the hills, up around the area -- there's two -- two

16   different areas up -- up behind his house, the hills here, and

17   then over by some of the old Marine bunkers on this ridge here.

18   Q.    Okay.  And can you step aside for just one minute so that

19   all the jurors can see where you just marked.  Maybe you can

20   point it out with your finger where you just marked.

21   A.    Okay.  So that -- that is the marina right there.  That's

22   the ridge where there's some old Marine Corps artillery posts

23   and some tunnels that go in there.  And then that is the hills

24   up behind his house.

25   Q.    And can you circle his housing area as well?

1    A.    That's it -- that's his housing area.

2    Q.    Okay.  So were there other locations that were mentioned

3    in this meeting?

4    A.    There were some other locations.  The -- well, they talked

5    about that he -- he hid out, you know, by his house at some

6    point.  They also talked -- so they had the -- had the housing.

7    They had the two places.  We had the boat that he might have

8    gone.

9    Q.    And there was some testimony yesterday about abandoned

10   houses or former houses?

11   A.    Oh, thank you.

12   Q.    Was that brought up in the meeting?

13   A.    Yeah.  There's some abandoned houses -- so -- so when you

14   have a demo house, the house you used to live in was listed on

15   the demo list, so they quit funding the maintenance for it and

16   they quit doing it.  It was just too old, so they quit

17   operating it.  I don't remember if it was Lara or Kelly, but

18   one of them mentioned that he had gone there before in the --

19   in the old housing, and that was in this area, these houses

20   here.

21   Q.    And did you circle that area?

22   A.    Yes.

23   Q.    Okay.

24   A.    It's right here.

25   Q.    All right.  We also heard earlier testimony that the

1   mention of the -- a credit card used at 2:00 in the morning.

2   Was that mentioned in the meeting?  Did you hear that?

3   A.   It was.  So they -- so they mentioned that he had used his

4   credit card -- that there's a hit on the Marine Mart, which is

5   right here on Marine Hill, that he'd used his credit card at

6   2 a.m., and they also told me that he had been seen at the

7   Bayview, which is -- I mean, we talked about that, but that's

8   right there.

9   Q.   Okay.  So, as you're sitting in the meeting, these are the

10  locations that are being offered as possible places where Chris

11  Tur might be hiding out?

12  A.   Correct.

13  Q.   Was there any discussion about -- in this meeting about

14  Chris Tur knocking you out in your house?

15  A.   No, there was not.

16  Q.   And, to your knowledge, did you believe that Ms. Wirfel or

17  Mr. Barger already knew this?

18  A.   Yes.  We talked about it that morning and she talked about

19  the phone call.

20  Q.   Okay.  So was there any discussion amongst the two -- the

21  three or four of you about the incident at the Bayview the

22  night before?

23  A.   Not at that meeting, no.

24  Q.   Okay.  Although all three people that were there knew

25  about that?

 1  A.    Right.

 2  Q.    So let me ask you about Lara Tur's demeanor while --

 3  during this meeting.  What was she kind of like?

 4  A.    She was worried.  And it -- she was worried about him, but

 5  she was also -- she told me that when he -- when he came back

 6  that she wanted her own house.  So she was worried, but she's

 7  also angry.

 8  Q.    Okay.  Let me grab the mic and have you sit back down

 9  again.

10        So you said that she wanted a new house.  Can you

11  tell the jury what -- what she was talking about?

12  A.    Well, she -- she wanted -- she didn't want Chris to come

13  back to her house.  And she -- what she was telling me was,

14  "Hey, I want a different location.  I don't want him coming

15  back and staying at my house based on everything that happened

16  on Friday night."

17  Q.    Okay.  And how about you?  What's your state of mind?  Are

18  you worried at this point?

19  A.    Once I found out that he's possibly suicidal, I was -- I

20  was very concerned.

21  Q.    Okay.  So what did you do about it?

22  A.    So I -- I called the XO and we started to search for

23  Chris.

24  Q.    So you started the search for Chris Tur?

25  A.    I did.

```
 1   Q.    And we heard testimony from -- from Captain Ross,

 2   Chief Thibodeaux, all right, all these folks in the search.

 3             So did you tell the XO or Chief Thibodeaux where you

 4   believed the last place he was seen?

 5   A.    I told him basically all those locations I just circled.

 6   I told him, "Hey, this is where -- this is where we think he

 7   may be."

 8             And I -- and I believe at some point during the day

 9   we -- we had a report that he had had a -- a hit on his phone

10   at the Bayview.

11   Q.    Okay.  Let me ask you about that real quick, then.  So at

12   some point during that day, you get a report of a -- his cell

13   phone pinged at the Bayview?

14   A.    That's right.

15   Q.    That's what you were informed?

16   A.    Right.

17   Q.    Now, you would later found out, but much later, days,

18   weeks later -- or maybe days later --

19             MR. GEE:  Objection.  Leading.

20             THE COURT:  I'll let -- let me hear the question.

21             Go ahead, sir.

22             MR. VOKEY:  I was doing very poorly on that question,

23   sir, so...

24   BY MR. VOKEY:

25   Q.    You had later learned what about that -- that ping at the
```

1   cell phone?

2   A.   So I later learned that what we were all interpreting as

3   it pinged on the Bayview, the restaurant, what -- what the

4   technician that had informed that meant was the Bayview tower.

5   So it was -- it was on a cell tower.  So he clearly wasn't on

6   the cell tower, but we interpreted that morning was he was at

7   the Bayview.  So we -- we -- that's one of the reasons we put

8   that on there.

9   Q.   Okay.  So -- and when did you find out that that was just

10  a Bayview tower and didn't mean as much?

11  A.   I don't remember.  But it -- like you said, I mean, it was

12  days later.

13  Q.   Okay.  So you're doing this search.  To your knowledge,

14  the last place that he was -- that he was located was where?

15  A.   So the last --

16  Q.   The last -- I'm sorry.  The last place he was seen was

17  where?

18  A.   At the Bayview, or the -- actually, I think -- probably

19  more accurately I think the last place he was seen was at the

20  mini mart at 2 a.m.

21  Q.   Okay.  And the search was started with that knowledge?

22  A.   Yes.

23  Q.   All right.  Now, you said you spoke to the XO.  You told

24  the XO to start the search.

25          Did you also speak with the command duty officer, the

1  CDO, Chief Thibodeaux?

2  A.    Yeah.   Chief called me back probably two or three times

3  just to get additional information, trying to figure out what

4  we were talking about with search areas and that kind of stuff.

5  Q.    So we've heard a lot about this search.   There's a lot of

6  moving pieces going on, right?

7  A.    Correct.

8  Q.    Can you give the members of the jury kind of an idea of

9  how this mechanism worked -- works and all the pieces that go

10  into it and what your role is in the search?

11  A.    So once I called the XO and asked him to do it, the CDO

12  started the search with the duty section, which is probably a

13  small amount of people, and then at some point the XO and the

14  CDO got Lieutenant Tidd involved who set up a command post.

15  And that's -- and the nexus of the command post, that's where

16  all the information is coming in and out of and flowing, and

17  Lieutenant Tidd, w.

18        Ho, you know, was trained to do this kind of thing,

19  he runs the search, he reports back to the XO, the XO reports

20  back to me.

21        But -- so every -- everything -- by the end of the

22  afternoon, everything was being run out of the Bayview

23  headquarters there, where they set -- they set up a command

24  post in the parking lot.

25  Q.    And -- all right.   So after the search is started, do you

1    contact anyone from NCIS that afternoon, Saturday afternoon?

2    A.   I did, between 5:00 and 6:00 -- probably about 5:30, I

3    called Agent Bisesi of NCIS and told her I wanted her to help

4    out, we had a missing person.

5    Q.   And what was her response?

6    A.   She said that they couldn't start a missing person for

7    24 hours, they couldn't do a missing person report for

8    24 hours.

9    Q.   Okay.  So now we're into kind of the late afternoon.

10   Search is in -- is going on fully, right?

11   A.   Correct.

12   Q.   And give us an idea -- besides the duty section, what

13   other assets are being used to search for Chris Tur?

14   A.   So we had the -- the duty section was involved, and then

15   we -- we started getting some volunteers to come help search as

16   word, you know, kind of spread through GTMO, but also we used

17   Marines -- the Marines sent 50 of their Marines out, and we --

18   we kind of pulled -- we were just pulling more people in to

19   start a search -- as we had -- as we kept expanding it because

20   the area is pretty big.

21   Q.   And you said we got Marines involved.  These were Marines

22   that don't work for you?

23   A.   Correct.

24   Q.   Are so these are Marines from the -- for the security

25   forces?

1  A.   So they don't -- I'm not their administrative thing, but

2  operationally they do work for me.  So I had -- it's a small --

3  there's operational control and administrative control.

4       So administrative means that's the person that makes

5  sure they're where they're supposed to be and fills the billets

6  and does that stuff.

7       But when they're on the base and they're working on

8  the fence line, they work for me operationally.  So, for

9  instance, if a migrant comes up or they have activity in a

10 minefield or a mine goes off, then they report to me on those

11 issues.

12      So -- so operationally, yeah, we -- we tasked them

13 to -- we -- you know, with the Marine commander, we just call

14 him up and say, "Hey, if you've got any extra people we can

15 use" -- and he sent 50 Marines over.

16 Q.   Okay.  So you've got volunteers.  You've got the 50

17 Marines.  You've got the duty section out.  And at this point,

18 who's running the actual search, I mean, really kind of at the

19 center of it?

20 A.   Lieutenant Tidd was running it, and then it -- you know,

21 XO was also heavily involved and kind of monitoring it.

22 Q.   Okay.  So how about the -- did you have -- so they have

23 this command post that you said Lieutenant Tidd started.

24      Is there also an operations center on Guantanamo?

25 A.   There is.  So when I first got there, we -- we figured out

1   that we had, like, four or five different Armed Forces that --

2   that weren't really talking to each other.  We had the Coast

3   Guard that's out there with their boats, they're protecting

4   JTF.

5           You have the Army people that are going -- and

6   they're all -- belong to the military, but they're different

7   units with different SOPs.  So we had the Army guys --

8   Q.   And SOPs is what?

9   A.   Standard operating procedures.

10  Q.   Okay.

11  A.   So the Navy may do something differently or even have

12  different phrases for things than the Army would.

13          So we had -- I had five different law enforcements.

14  I had the Coast Guard, I had the Navy security force that was

15  armed, we had the Marines that were armed, we had the JTF folks

16  that were armed, and --

17          So trying to meld all of those people together, they

18  weren't -- there was no one room.  So what we did at Bulkeley

19  Hall is we created an operations center where we had a

20  representative from each one of those sitting in so they could

21  instantly get in.

22          So we had an Army guy talking to the JTF.  We had a

23  Coast Guard guy talking to the Coast Guard.  So it took us a

24  little while.  But once we did it, we had a pretty good

25  coordination center.

1          And so they were involved, too.  And they were -- you

2   know, as soon as we started the search, then the Coast Guard

3   guys -- you know, they directed their Coast Guard guys to look

4   out for -- and the Army guys.

5          So every -- all of a sudden -- they call it a

6   "BOLO," be on the look-out, for the security force dude.

7   That -- that instantly went to all the military people on the

8   island, too, if they saw anything.

9   Q.    Through this operations center you created?

10  A.    Yes.

11  Q.    Okay.

12         All right.

13         MR. VOKEY:  With the Court's permission,

14  Captain Nettleton, can you please step down again?

15         THE COURT:  Yes, sir.

16         THE DEFENDANT:  Sorry.

17  BY MR. VOKEY:

18  Q.    So we've heard about the land areas that are being

19  searched.  I think you indicated on -- on Defense Exhibit 45 a

20  bunch of the areas that came up in the meetings.

21         So -- but when this notice goes through your

22  operations center and goes out, are there waterways that are

23  being searched?

24  A.    Yes.  Via -- like I was talking about the communication

25  through the operations center, the -- we had two Navy boats,

1    two Coast Guard boats out on the water looking.

2            So, basically, the -- the bay was being searched.

3    And one of the Coast Guard guys is usually out on the -- on

4    the -- on -- somewhere on the out -- outboard coast there, you

5    know, the southern coast.

6    Q.   Okay.  So before this search happened, are there -- are

7    there boats -- is there activity that is happening in the bay

8    there?

9    A.   Yeah.  There's always boats in the bay.

10   Q.   All right.  And looking at Defense Exhibit 41, the photo

11   at the top, the closer-up one, where are these Coast Guard and

12   Navy boats coming from?  If you could kind of circle that on

13   there.

14   A.   Okay.  So the -- what we call the Boat House is right

15   here.  And on this map it's going to be -- it's going to be

16   right here.

17   Q.   Okay.  And so these boats that are aiding in the search,

18   these -- and we're talking about small Coast Guard boats,

19   right?

20   A.   Correct.

21   Q.   Not like a big Coast Guard cutter that's --

22   A.   No.  They're probably 30-foot, 32-foot boats, something

23   like that.

24   Q.   And the Navy boats that are searching, also small boats?

25   A.   Yeah.  Yeah.

1  Q.   So anytime they -- they leave and they go to -- go to --

2  whether it's for this search or for anything, can you show us

3  the route that they would take?

4  A.   Okay.  So when they're leaving, they're going to go -- so

5  I'll show you on this one first.  They come out -- well, you --

6  what you can barely see on this chart is the reefs, so the --

7  the actual channel through here, so it's really shallow except

8  for where the channels are.  So they'll come out --

9  Q.   Can you go ahead and draw a line of -- kind of roughly the

10 route that these boats must take coming out?

11 A.   So they're going to come out -- and they're going to go

12 out like this because of the channel and the depth of the

13 water.

14 Q.   All right.  Step aside so some of the jurors on the end

15 can see where you marked.  Kind of point out where you just

16 marked.

17 A.   So they're going to come out and go like this.  On a

18 bigger scale -- on this point -- you can't see this picture,

19 but there's a long -- a long pier that's about a foot in the

20 water.  And so every now and then someone will cut that corner

21 and can take off the bottom of their outboard motor.  Usually

22 the civilians with motors would.

23        But right here it goes out, so you've got to come

24 out -- I'm just putting a dotted line here for you -- got to

25 come out and go that way.

1  Q.   All right.  So looking at the -- at the -- at Defense

2  Exhibit 41, when they leave from their moorings, whatever you

3  call it in the Navy -- when you leave there with the boat, you

4  said they have to kind of go back in towards the land and then

5  back out again because of this sunken pier?

6  A.   Correct.

7  Q.   Right?

8  A.   Just the way the channel markers are set up.

9  Q.   So -- and this is for anytime these small Coast Guard and

10 Navy boats are going in and out?

11 A.   Correct.

12 Q.   Not just during the search, that's anytime?

13 A.   Correct.

14 Q.   So when they are going in and out, are they going past

15 your house and your dock?

16 A.   Yeah.  Every time.

17 Q.   So, roughly, on an average day, how many times are small

18 boats going past your -- your dock, your -- your property into

19 Deer Point there?

20 A.   I would say probably about -- at least 48, probably more

21 than that, because there's two, you know, out per hour.  But

22 they also get relieved.  So the relieving boat's got to come

23 out and relieve them and come back out.

24       So I'd say 48.  It's probably -- the outside boats

25 from the marina, they're coming by the house also.  And

1    that's -- on the weekends, that's a bunch of boats from the

2    civilian side.

3    Q.    Okay.  So -- and you said "the marina."  That's where you

4    marked where Chris Tur's boat was?

5    A.    That's correct.

6    Q.    And with Lieutenant Tidd running the search, were you

7    aware that there were searches of the coastline, that you were

8    aware of searches of the coastline?

9    A.    Yeah.  He did.  He ordered a search from the hospital, K,

10   to all the way through Deer Point.

11   Q.    All right.  And looking at Defense Exhibit 41 at the top,

12   can you kind of give us an idea of this area that he was having

13   searched?  I'm not sure if that's big enough.

14   A.    It's not.  But basically he said Deer Point, so it's going

15   to come to along here, all the way around.  And on this one the

16   search is going to go -- so all the way to the hospital, which

17   is right around there.

18   Q.    Okay.  All right.  So, while the search for Chris Tur is

19   going, there is a constant -- there's constant motion of

20   different boats that are in the water?

21   A.    Correct.

22   Q.    Navy boats, Coast Guard boats?

23   A.    And civilian boats.

24   Q.    Okay.  All right.  And you can set the pen down and I'll

25   take the microphone and you can have a seat again.

1          So the command center was located where?

2     A.    In Bulkeley Hall.

3     Q.    And where did Lieutenant Tidd set up his -- his command

4     center?

5     A.    He -- oh, I'm sorry.

6     Q.    I say "command center."  Where the --

7     A.    Yeah.

8     Q.    Command center for the search, whatever that was called.

9     A.    That was in the parking lot of Bayview.

10    Q.    Okay.  And what was brought there to do this?

11    A.    They have a -- a mobile -- I don't know what you call it,

12    a mobile setup, you know, a truck that has the fold-outs.  And

13    they'll bring out -- and bring tables and everything out and

14    coordinate the search from there.  It's also got all the

15    communications suite in it, so they could talk to everybody.

16    Q.    Okay.  So as the search -- going later and nightfall was

17    coming, what happens?

18    A.    I get a call from the XO telling me that they wanted to

19    stand down the search because it -- you know, it's starting to

20    get -- it's starting to lose light out there.

21    Q.    And what's the concern about searching when it's getting

22    dark?

23    A.    The terrain in Guantanamo is pretty hilly, and they're

24    worried about somebody, you know, getting hurt -- you know,

25    hurting one of the searchers while we were trying to look for

1  Chris.

2  Q.    Okay.  And did you have any discussions with anybody about

3  continuing the search at night?

4  A.    I did.  I told XO I didn't want to end the search until we

5  go in there.  And then Lieutenant Tidd called me back and said

6  that he was concerned about his guys.

7          And so we talked through it.  And we came up with,

8  "Okay.  Let's" --  in the -- in the terrain areas, he said he

9  had BOLOs out for all of his patrols and that he'd notified JTF

10  and everybody was going.

11          So we just -- we agreed in the -- in the terrain

12  areas we'd use two-man dog teams that -- they were trained in

13  night vision goggles, and so we'd search those.

14          And then -- but we'd stand down the people who didn't

15  have night vision goggles or weren't used to going in the

16  terrain because, you know, we didn't want to hurt more people.

17  Q.    Okay.  So you continue the search in the night with dog

18  teams with -- with night vision goggles?

19  A.    We did.  We did that for another hour or two, and then

20  Tidd called me and said, "I'm -- even now I'm just a little

21  worried about it," so -- so we shut down the search at some

22  point that night.

23  Q.    Okay.  Now, how about on the water?  Did you have people

24  that were trained with night vision goggles?  Or we heard about

25  FLIR, Forward-Looking Infrared.

1   A.    Yeah.  So the boats had FLIR and night vision goggles.

2   And we trained to -- we had done training with putting Navy

3   swimmers in and then having the boats try to find them, because

4   we had a couple of instances in the past year of migrants

5   swimming up.

6         You know, people will actually come around the fence

7   line and swim on to the base.  And then when they do that, you

8   know, the Marines have to pick them up and take them to the

9   migrant operations center to process, and then -- there's an

10  entire long process that goes on to determine if that migrant

11  is staying or being repatriated, is what we call it, back to

12  Cuba.

13  Q.    And you've also had occasions where migrants didn't make

14  it safely to the shore?

15  A.    They made -- right.  They washed up on shore because they

16  tried to swim around and drowned and washed up.

17  Q.    Okay.  So these boat crews were trained.  Were they able

18  to continue the search at night?

19  A.    They were.

20  Q.    All right.  So what was your guidance to Lieutenant Tidd

21  on when to start the land search again?

22  A.    We -- I think we agreed that we'd start, you know, as soon

23  as it was safe, first light.

24  Q.    And so also on Saturday, you've got a missing person out

25  there.

1              Did you have to send some kind of message?

2   A.    I did.  We sent a message.  It was an operational report.

3   And it went up -- it went up the chain to the Region.

4   Q.    Is this the Navy Blue that we heard about?

5   A.    It is.

6   Q.    Okay.  So let me ask you about that Navy Blue.  You said

7   it's an operational report.

8              So who drafted this Navy Blue?

9   A.    The -- Lieutenant Crabtree drafted the Navy Blue.

10  Q.    And why Lieutenant Crabtree?

11  A.    He is our expert on it.  He was the -- what we call the

12  command -- so, you know, we have the command duty officers.

13  Well, he was the senior watch officer.

14             And what that means is, he was the highest ranking of

15  the guys who stood watch.  And -- and his watch was to make

16  sure that all the watch standards were training in the

17  proper -- I mean, that was his job, making sure the watch

18  standard was good.

19             But he was also -- so every Navy Blue that went out,

20  he either sought -- he might not send them all, but he kind of

21  helped the CDO, who -- might not send them, but he saw every

22  one.  So he was our expert.

23             So if it's a -- so we sent out a lot more OPREPs than

24  just Navy Blues.  Navy Blue's a higher precedence order.  So

25  the normal OPREPs, he would see those a couple of times a day

1  as we sent things out.  So he was our expert.

2  Q.   So, I mean, that's just kind of his job to -- at least one

3  of his jobs is to draft, prepare these kind of things?

4  A.   Correct.  Correct.

5  Q.   And we heard Commander Ross say that he discussed the Navy

6  Blue with you at some point during the day there on Saturday;

7  is that correct?

8  A.   That's correct.

9  Q.   Did you tell Commander Ross what to put into the Navy

10  Blue?

11  A.   I did not.

12  Q.   What was the discussion with Commander Ross concerning the

13  Navy Blue?

14  A.   We talked about -- he said he was going to -- we talked

15  about the location.  We -- pretty much the whole thing we're

16  talking about the search.  I just told him, you know, make sure

17  we send it.

18  Q.   That was the conversation, make sure we send the Navy

19  Blue?

20  A.   Correct.

21  Q.   And we've seen those -- the e-mail where at 8 p.m.

22  Lieutenant Crabtree sent to both you and Commander Ross, here's

23  a template, here's a Navy Blue, correct?

24  A.   Correct.

25  Q.   And then at 8:09, Commander Ross said, "Send it."  He

1    approved it, right?

2    A.    He said he made a couple of edits and then he sent it.

3    Q.    All right.  Did he consult with you in that time between

4    when Lieutenant Crabtree sent the draft and nine minutes later

5    when he e-mailed it out?

6    A.    No, he did not.

7    Q.    All right.  So after it went out, you sent an e-mail -- I

8    think we have that one in evidence as well that says, "Thanks,

9    Weps."

10   A.    I did.  I thanked Lieutenant Crabtree for sending -- you

11   know, for -- he did all the grunt work.

12   Q.    And at that point, when you said thanks, had you been able

13   to look at the Navy Blue that went out?

14   A.    I had.

15   Q.    Okay.  And did you see anything on there that looked in

16   error or any big problems with it?

17   A.    Absolutely not.  I think they both did a good job on it.

18   Q.    So also on Saturday, while this -- while this -- the

19   search is getting kicked up, are -- are you searching yourself

20   or are you driving around and checking on the search?  Kind of

21   give us an idea of what you were doing.

22   A.    I drove -- I did drive around a little bit.  You have to

23   be careful, because when you're the CO, it's pretty easy to get

24   distracted.  But I drove around, checked some of the positions

25   to just see what they were doing.  I went by the command post,

1  and then I went to the office.

2  Q.   Okay.  And were you receiving updates during that day, the

3  next day?

4  A.   I was.

5  Q.   So at some point did -- we -- and we heard that you gave

6  Captain Gray a call?

7  A.   So I -- I believe the order of it was that the message

8  went out and the -- and the -- he saw the message either

9  through his duty section or somebody called him, and then he --

10  he asked me to call him.  I don't -- I think it was my

11  operations center that called and said, "Hey, you know, when

12  you get a chance, Captain Gray would like to talk to you," so I

13  did give him a call that night.

14  Q.   Okay.  And in that conversation with Captain Gray, what

15  was discussed between the two of you?

16  A.   We -- we talked about the search.  We talked about what

17  was going on and what we were doing.

18  Q.   Did you get into any details about Chris Tur's

19  disappearance, anything from the Bayview the night before?  Was

20  that discussed during that phone call?

21  A.   It was not.

22  Q.   And did he give you any guidance as to contacting Admiral

23  Jackson?

24  A.   No.  I -- I feel like I got an e-mail from her with some

25  questions later, but I don't believe he gave me any guidance on

1    it.

2    Q.    Okay.  So you got contacted by Admiral Jackson by e-mail?

3    A.    Yeah.  I -- and I assume he informed her.

4    Q.    Okay.  And what -- what was Admiral Jackson asking you

5    about in that e-mail?

6    A.    She was asking me, you know, what -- what was the status

7    of the search, was he -- was there any -- she asked me if he

8    was possibly suicidal, if -- if he had done this before,

9    pretty, you know, standard questions just trying to feel out

10   what kind of -- what kind of situation we had.  It was just

11   a -- you know, she was trying to determine the seriousness of

12   it, I believe.

13   Q.    All right.  Asked if there was -- if there was any

14   suicidal thoughts or domestic arguments?

15   A.    That is what she said, I believe.

16   Q.    And did you respond to her by e-mail?

17   A.    I did.  I told her -- I said yes to suicidal, yes to

18   domestic, and that -- that he had done this before.

19   Q.    And during those e-mails, did you go into any more detail

20   about what occurred at the Bayview the night before or that

21   Chris Tur had been at your house?  Did you --

22   A.    I did not.

23   Q.    Okay.  And why not?

24   A.    At that point, we were in the middle of the search, we

25   were kind of -- we were doing everything we wanted to do and,

1  you know, we were -- we were kind of full on in search mode at

2  that point.

3  Q.    And I think we heard Captain Gray testify -- or now

4  Admiral Gray testify about he had a comment with you where your

5  response was, "Well, it wasn't relevant," referring to -- at

6  this point you're not -- you're not saying that.

7  A.    Correct.

8  Q.    Can you explain by what you meant by saying it wasn't

9  relevant?

10 A.    Well, when I said it wasn't relevant, I meant, you know,

11 we were on full-on search mode.  We had a lot of -- we had a

12 lot of balls in the air I guess is the best way to put it, so

13 we were trying to -- we were trying to figure out, you know,

14 where he had gone, what we were doing, are we running a good

15 search, are we making sure that we're looking in the right

16 spots, are we doing a thorough search, and are we keeping our

17 searchers safe.  So that -- that was kind of priority there.

18 Q.    Okay.  So going to Sunday, January 11th, what -- what did

19 you do when you woke up Sunday?

20 A.    Sunday morning -- so on that e-mail, the admiral also

21 asked me to call her in the morning, so Sunday morning I got up

22 and drove to the office at about 7:30.

23 Q.    And did you --

24 A.    I called Admiral Jackson at -- at 08.

25 Q.    Okay.  And we'll come back to that conversation with

1  Admiral Jackson, but later that morning did you also talk to

2  Lara Tur about anything?

3  A.    I believe I spoke to Lara.  And I talked to her -- so I

4  believe that's a conversation where I talked to her about if

5  she was -- you know, if we -- if we had to notify her, did she

6  want -- I believe I asked her, "Hey, if we have to notify you,

7  do you -- you know, your kid -- your daughter is home.  Do you

8  want her to be there?  Do you want her not to be there?"

9        I was kind of feeling her out for exactly who she

10  would want if things were -- did not turn out well.

11  Q.    Okay.  And this may sound like a very odd conversation for

12  you to have with somebody -- and if somebody hasn't been in the

13  military, this may kind of seem strange.

14        But can you tell members of the jury, when it comes

15  to these notifications of such, what your experience is and

16  where you were coming from when you called Lara Tur?

17  A.    Okay.  So my -- my first cruise was -- like I said, we

18  were Desert Shield and Desert Storm.  And our CO at the time

19  came in one day and we were, you know, almost done with

20  work-ups.  We were getting ready to deploy.  Work-ups is

21  hanging around this Jacksonville operational area and doing --

22  and getting your certifications.

23        And then we were getting ready to deploy over to

24  Desert Shield and Desert Storm, and he came in one day and

25  handed us all these forms, and it was who you would like to be

1  notified, you know -- you know, if -- if in the event of your

2  death or serious injury, who do you want to notify, your

3  family, and what -- are there anybody -- you know, maybe --

4  maybe Aunt Sally is there and, you know, you want her there

5  because she's a comfort to your spouse or something, but maybe

6  you don't want Aunt Sandy because she's -- you know, she's just

7  going to make it -- make it worse and -- and do that.

8         So -- so it -- it is very specific to the individual.

9  How do you -- "if something happens to you, how do you want" --

10  and -- and if you think about it, it's a very -- it's -- it's

11  more of a -- kind of a thoughtful thing, because you're --

12  you -- all your friends -- if you think about the Navy, all --

13  all your best friends are the guys that fly with you every day,

14  or do that -- or the guys that you're going off, we'll -- as a

15  squadron, we all deploy together.  We're all -- so all of my

16  best friends -- or, you know, most of my best friends are out

17  there on the boat with me.

18         So -- so you have very little control on, you know,

19  when it's your time.  But you do have some control on how the

20  notification process -- so it's kind of a thoughtful way of,

21  "Hey, who should be there?  Is there any particular thing that

22  we want" -- or we -- or, you know, "that you want to go on?"

23         So it's a sheet that -- and then you fill out the

24  sheet.  You put it -- they tape it up.  They put it in a box.

25  And, like, at the time we were doing it, the CO's wife held it.

1    Now I believe they do it at the wings -- they hold it

2  at the wings when they're doing it.  But it's -- it's just

3  something that -- you know, something you don't think about,

4  especially when you're a young man, or doing anything -- you

5  just kind of go.  But that kind of affected me, the whole

6  thing.

7    So when I asked her that, I just wanted to know,

8  "Okay, you know, worst-case scenario, do you want -- do you

9  want your daughter there?  Do you not want your daughter there?

10  Do you want -- how -- how do you want to know?"  And so that --

11  and that was why I asked that question.

12  Q.   Okay.  Also Sunday morning a search started again.  It

13  started at first light; is that correct?

14  A.   That's correct.

15  Q.   And did you add more searchers Sunday morning?

16  A.   We did.  We had a lot more people from the community in at

17  this point.  You know, most of GTMO knew, so we had a lot -- a

18  lot more searchers.  We had 50 Marines, 50 probably different

19  Marines this time, but more Marines coming out going through

20  the -- through the hills and everything, a lot more volunteers.

21  It was a more robust search on Sunday.

22  Q.   And did NCIS start getting involved on Sunday?

23  A.   They did.  You know, they came at I think around 10:30,

24  11:00 and went to command post and started getting a brief from

25  Lieutenant Tidd.

1   Q.   And did you ever tell any NCIS agents to not get involved?

2   A.   I did not.

3   Q.   Did you ever tell any searchers to not search in any

4   location?

5   A.   I did not.

6   Q.   Did you hinder any searchers or leaders from conducting

7   any search?

8   A.   I did not.

9   Q.   And did you do everything possible to find Chris Tur?

10  A.   I did.

11  Q.   Now, we also heard from Captain Ross about a conversation

12  he had with you concerning use of a helicopter.

13        Do you remember that?

14  A.   I do.

15  Q.   And this -- this occurred Sunday morning?

16  A.   It did.  He -- he called me sometime Sunday morning.

17  Q.   And what was it that Commander Ross told you that he had

18  done and what was your reaction?

19  A.   He told me that he had called up the captain of the Coast

20  Guard ship and was trying to get -- ask her if she could get a

21  helicopter up for him and -- and do that, something to that

22  effect.

23  Q.   Okay.

24  A.   I don't know the exact words.

25  Q.   And what was your response to -- to Commander Ross?

1  A.   I told him he should have called me first before he went

2  out and -- and called the other one, and I probably was a

3  little upset with him.

4  Q.   All right.  So are you upset with the idea of getting a

5  helicopter to search?

6  A.   No, I was not.

7  Q.   So what -- what are your concerns here about him just

8  contacting a Coast Guard commander?

9  A.   Well, it wasn't -- it was the fact that he'd been XO for a

10 day-and-a-half at that point and he's trying to arrange things

11 and, you know, he -- he had me that he could have called and

12 said, "Hey, let's -- let's talk this through," but he also had

13 a very experienced air operations officer, a commander that

14 worked for him that he could have called and said, "Hey, how do

15 we set this up and do that kind of thing," because -- and that

16 was Eric Powell.  He was just sitting in on every, you know,

17 fence line meeting that I had and every -- every negotiation,

18 and -- and Eric is the guy that had to handle the airspace

19 violations when we have them.

20      So he -- I -- I was just I think a little upset that

21 he just was running out on his own and getting ahead of

22 everybody instead of coming and seeing what was going on.

23 Q.   So let's talk a little bit about some of those concerns

24 about just, again, launching a helicopter out there.

25      So what are some of the concerns that you had --

1  first, let's talk about Cuban airspace.  Let's talk about

2  concerns you had over -- violations for Cuban airspace.

3  A.   Right.  So --

4  Q.   Had there been violations before this?

5  A.   There -- in fact, in 2014, I think I had four different

6  violations or I think maybe two violations and two incidents

7  with Coast Guard helicopters involved in that.  One -- one of

8  them was the NAVSTA's fault.  It wasn't the Coast Guard's

9  fault.

10  Q.   So this is, what, helicopters crossing over into Cuban

11  airspace across that -- that red line without permission?

12  A.   So we had a -- we had a fixed-wing aircraft cross over,

13  went into Cuban airspace.  So there's a -- I guess the best way

14  to explain it is there's a series of checkpoints that you have

15  to go through, so it -- it goes down and it's very specific on

16  when you turn and when you don't.  But sometimes people cut the

17  corner on those thinking they're okay and they'll go right

18  through the Cuban ADIZ, which is the air defense intercept

19  zone.

20        What happens when that happens, I have to call the

21  Cubans.  I have a line to call them immediately, and I have to

22  call them and say, "Hey, we just -- you know, this happened,

23  here's why, here's what happened, it was this guy.  He cut the

24  corner.  He didn't realize he was entering Cuban airspace."

25  Q.   I mean, is this an international incident that's just

1  starting right then?

2  A.   It -- it -- it's a pretty big deal.

3  Q.   And you already testified earlier that you had just set up

4  this exception for civilian aircraft that would be used for

5  medical evacuation, right?

6  A.   Yes.

7  Q.   Are you concerned if there are violations of Cuban

8  airspace that that agreement might be in jeopardy?

9  A.   I am.   I was worried about that the whole time we had the

10  agreement.

11  Q.   All right.   So what about safety?   Did you have any safety

12  concerns about just, you know, having -- having a -- telling a

13  helicopter to launch and go search?

14  A.   So I -- I don't -- I never had any concern about the Coast

15  Guard pilots.   I mean, they're naval aviators.   They're --

16  they're some of the best helicopter pilots in the world, you

17  know.

18        But the concern is, "How well do they know

19  Guantanamo?"   You know, "Have they been there ten times and

20  flown in back and forth all that time, or have they never been

21  to Guantanamo and they have no idea where the fence line is?"

22  Q.   And let me stop you real quick.

23        So these Coast Guard helicopter pilots are not

24  stationed at Guantanamo Bay?

25  A.   No.   They're coming in on ships.   There is -- there is no

1   helicopter station at Guantanamo.

2   Q.   All right.  So what are some of the concerns that -- that

3   you worry about about these pilots that they may not know?

4   A.   Well, it's -- it just goes, you know, to local knowledge,

5   right?  It's like trying to drive around Jacksonville would be

6   the only thing I could tell you, is, you know, if you don't

7   know Jacksonville and you start driving around, you're going to

8   add a half hour to your time if you don't know the way to go.

9           It's the same thing with Guantanamo if you don't know

10  the airspace and where markers are and what you're supposed to

11  do.  We -- we have a very rigid entry and exit point for the

12  fixed-wing aircraft, but if we've got a helicopter out there

13  searching, it would not be hard to fly right over the fence

14  line.

15          And now if they're on the wrong side of it, you know,

16  there's mine fields on the Cuban side, there's Cubans with guns

17  on the Cuban side, so it was -- it was about their safety, too.

18          Plus we have to send -- and I don't think the XO

19  realized it at the time, but if we're going to do an operation

20  where I'm flying helicopters around the fence line or anything

21  of that nature where the Cubans are going to be visually -- and

22  so it's not provocative, we would send them a message -- to the

23  Cubans and say, "Hey, here is the operation we're going to

24  conduct on this date, and this, that, you know.  Note here's

25  what we're trying to do."

1    So all of that went into place and the XO didn't know

2  any of that, so, yeah, I was -- I wasn't thrilled about his

3  call.

4  Q.   And what about the -- the -- the -- when you're launching

5  a helicopter for a search and rescue, do you have to anticipate

6  possibly that he may have to land somewhere, either emergency

7  landing or landing to pick somebody up?  Is that a safety

8  concern there?

9  A.   For a helicopter, there's -- there's a couple of

10  components where you've got to put it down like immediately, no

11  matter where.

12    I -- I landed over in a school in Mandarin one time

13  in a backyard.  And the baseball team came out and took a tour

14  of the helicopter while we were waiting, because we had a chip

15  light.

16    So some things you've got to put it down wherever you

17  are right now and -- you know, because you don't know if

18  it's -- if it's a -- you don't know if it's a little piece of

19  metal that's just hitting the detector or don't know if you're

20  about to lose your tail rotor and go spinning off with no

21  control.

22  Q.   So you have to, I guess, anticipate or plan for the

23  possibility of landing places you normally wouldn't land?

24  A.   Correct.

25  Q.   And what are some of the dangers in Guantanamo dealing

1  with that?

2  A.   Well, there's mine fields on the other side of the fence.

3  There's -- there is a lot of ordnance around the base.  Like,

4  we -- probably once a month we'll find unexploded ordnance

5  around.  We call it -- call the EOD team from Mayport and have

6  them come up.

7        So there -- there is -- and there's areas where we --

8  we had mine fields and we recovered, but we were missing, you

9  know, X amount of mines, so...

10       But probably the most dangerous thing would be some

11  of the terrain out there.  There's some areas there's no level

12  area to land a helicopter and -- if you're flying over and

13  doing it.

14       So all of those are -- you can mitigate all of that,

15  but it takes a discussion with a crew, and you have to talk to

16  the crew and see what kind of experience they have and do all

17  that stuff, so, I mean, it's --

18  Q.   And you didn't know what kind of qualifications that these

19  Coast Guard pilots had or what experiences they had?

20  A.   Right.  All we did was call the CO and say, "Hey, can we

21  use your helicopter?"

22       And we didn't do any more research.  And that's

23  what -- that's kind of what upset me.  It was like, "Hey,

24  there's more to this than just saying, 'Hey, let's -- let's

25  crank it up and pull it out of the garage and go flying.'"

1  Q.   And were -- were there concerns about a helicopter taking

2  off from pier side?

3  A.   Yes, because if they take off from pier side, you've

4  got -- you know, the reason they're -- they're coming in is to

5  refuel, reload, they're taking on stores is what we call it,

6  they're -- they're taking on food and boxes and, you know,

7  extra paper, you know, office paper.  Whatever they needed and

8  whatever they asked for, we've got it on the pier waiting for

9  them.  So you take off from there, you're going to have what we

10 call foreign object damage risk, which is something flying up

11 into the rotor blades or into the engine, so...

12 Q.   And -- and finally, was there any concern about, aside

13 from crossing the Cuban airspace, sensitive areas where these

14 pilots could not fly over?

15 A.   Yes.

16 Q.   And can you tell -- without going into any classified

17 information, can you tell the jury a little bit about that?

18 What are those sensitive areas about?

19 A.   Well, I don't think it's a surprise by anybody there's a

20 a -- a Joint Task Force Guantanamo area.  And -- and they have

21 detainees.  And so there -- there are areas where you wouldn't

22 want flying over, just for -- just because --

23 Q.   Well, let's just say there are areas you can't fly over.

24 Is that fair to say?

25 A.   That is probably the best way to put it.

1   Q.    Okay.

2           MR. VOKEY:  And, sir, I -- I do not think I need the

3   exhibits anymore, and so I was going to move the easel out of

4   the way at this point.

5           THE COURT:  That's fine.  Thank you.

6           MR. VOKEY:  And, Your Honor, I have these same

7   exhibits that were previously admitted, but now they've been

8   marked on, and what I was going to do -- I talked with

9   Ms. Diaz -- is change them to Defense Exhibits, we have 41, 42,

10  45, 47, 53, and 57, and just make an A after them.

11          THE COURT:  That's fine.

12          MR. VOKEY:  And then ask that they be admitted into

13  evidence.

14          THE COURT:  Be received.

15      (Defendant's Exhibits 41A, 42A, 45A, 47A, 53A and 57A

16  received into evidence.)

17          THE COURT:  You can do it.

18          MR. VOKEY:  During the break?

19          THE COURT:  During the break, yes, sir.

20          MR. VOKEY:  Very well, sir.

21  BY MR. VOKEY:

22  Q.    So, Captain Nettleton, this discussion with Captain Ross

23  about a helicopter, you didn't really have time to look into

24  that any further.  Is that fair to say?

25  A.    That's fair to say.

1  Q.    And what happened there about 11 o'clock on -- on Sunday?

2  A.    I got a phone call from Lieutenant Tidd and -- and said

3  that the -- one of the Coast Guard boats we had searching had

4  found a -- a body.

5  Q.    And what happens next?

6  A.    I told -- I told Lieutenant Tidd if -- you know, if

7  they -- if they could identify it.  He says he -- that he was

8  going out there and not to make any notifications or anything

9  yet.  He was headed out to the body, I think.  And he and Agent

10  Bisesi proceeded out to -- to get the body.

11  Q.    Okay.  And what's the next word you get?

12  A.    Next thing I got was a call from Lieutenant Tidd or

13  possibly Agent Bisesi.  They both called me at some point.  I

14  don't remember which one told me, but they -- they told me that

15  it was Chris Tur's body they found.

16  Q.    Okay.  So when you found out that Chris Tur had passed,

17  what did you do?

18  A.    At that point, I called Nancy DeVore, who is the head of

19  the Exchange where Chris worked, and I asked her to come to my

20  house, and I called the chaplain and asked him to come to my

21  house.  They arrived.  We talked about the notification.

22        I put on my dress blues, and we went down.  And we --

23  we were trying to figure out where Lara was, but she had -- she

24  was actually at the NCIS building at that time, so we drove

25  down to the NCIS building and we -- we notified her that Chris

1   was dead.

2   Q.   Are you the one who notified her?

3   A.   I was.

4   Q.   Tough thing to do?

5   A.   Worst job in the military.

6   Q.   So after the notification, you leave the NCIS building at

7   that point?

8   A.   I did.

9   Q.   And did any agents ask you anything as you were leaving?

10   A.   Yes.  Agent Austin -- when we were walking out, Agent

11   Austin pulled me aside and asked if I could get her -- if I

12   could have my port ops guys get her the most likely place that

13   Chris had entered the water based on the location that he was

14   found.

15   Q.   And you said "port ops."  Port operations?

16   A.   Yes.

17   Q.   And what did you do?

18   A.   So I called the duty diver -- I believe it was Chief

19   Whisenhunt -- and told him what we needed.  Chief McManus

20   called me back and -- to get some detail.

21          And I told him what Agent Austin had asked me for.

22   And I told him he didn't -- he didn't need to go through me, he

23   could just -- he could just have a straight conduit to NCIS.  I

24   said, "You can call them, figure out what they want, and get it

25   to them."

1  Q.   So you had your diver section -- your Port Operations

2  section provide NCIS the information they needed?

3  A.   I did.

4  Q.   When -- let me back up a little bit.  So when they brought

5  Chris Tur back after they -- they picked him out of the water

6  and they brought him back, did you meet them at the dock?

7  A.   I -- so I had made the notification.  And then I went to

8  the -- to the dock.  I briefly talked to Agent Bisesi and asked

9  her, you know, any -- "What did -- you know, could you tell

10  what happened," something to that effect.

11        And she -- or I -- I think I said, "You know, did

12  you -- did we learn" -- you know, "Where was he?  What

13  happened?"

14        I just kind of was trying to get some details.

15        And she said, "Impossible to tell" -- or she couldn't

16  tell from first look.  It looked like there were some marine

17  bites on the body.

18  Q.   Okay.  When they brought the -- the body in, was there a

19  body bag -- was -- was Chris Tur in a body bag?

20  A.   He was in a body bag, and I never saw the -- saw the body.

21  Q.   You never saw the body?

22  A.   Right.

23  Q.   So when you later sent in an e-mail about marine bites to

24  Admiral Jackson, that was information that you got from Agent

25  Bisesi?

1  A.   It was.

2  Q.   Just that comment?

3  A.   Right.

4  Q.   But -- but you never actually saw the body?

5  A.   I did not.

6  Q.   So after you're there and you meet -- you're at the dock

7  when they bring the body in, what happens next?  Where did you

8  go?

9  A.   I walked over and thanked the Coast Guard boat crew,

10  because that's -- you know, they're the ones that found him.  I

11  told them, "Thank you."

12        And I -- I think where his position was, we would

13  have -- you know, there's a -- we would have never found him if

14  they -- if they hadn't have been looking and done that.  So I

15  thanked them for that.  And it's just -- it's just a rough job

16  pulling a body out of the water.

17        So I -- I told them thank you.  Then I walked back to

18  my truck and offered Lieutenant Tidd a ride back up to the

19  command post.  So we rode back up there and I dropped him off

20  at the command post and I went home.

21  Q.   Okay.  What do you do when you get home?

22  A.   Change out of my uniform -- I was in my dress blues, so I

23  changed out and changed -- just changed into regular clothes.

24  Q.   So what's going through your mind at this point, Captain

25  Nettleton, after having just done the notification and met the

1  body and Chris Tur's past?  You know, how are you feeling?

2  A.   I'm -- you know, I just felt despondent is probably the

3  best word, you know.  It was -- just felt -- you know, I think

4  on Saturday all of this was were we going to find him just

5  fine, and then actually finding his body, it was just like, oh,

6  just failure, you know.  I mean, it's just horrible.

7  Q.   So while you're home, you get a phone call?

8  A.   I did.  Lieutenant Tidd called me and he -- he said that

9  the -- that one of the searchers or somebody found a -- a --

10  what he called a bloody rag down by the dock, by my dock, and

11  he -- he was just saying, "Hey, I'm just giving you a heads-up

12  we're going to go down there and -- and grab it."

13  Q.   Okay.  And what did you do?  Did you go out there and meet

14  them?

15  A.   When they -- when they arrived, I -- I walked out and

16  followed them down the -- the stairs down to the dock area.

17  Q.   And who was there when this happened?

18  A.   It was Lieutenant Tidd, Agent Bisesi.  I believe NCIS

19  Special Agent Gamble was there.  I think that's the right name.

20  She had -- she had been on the island for some training issues.

21  And then Petty Officer Vaughan, Petty Officer Bohyer, and there

22  was a couple of civilians down there that I didn't -- didn't

23  recognize down.

24  Q.   Okay.  And we heard about this -- the picking up of these

25  paper towels.  And did you see someone actually pick up the

1    paper towels?

2    A.    I did.  I saw Agent Gamble go under the railing of -- of

3    my dock and walk over and -- and pick up paper towels and put

4    them in a bag, an evidence bag.

5    Q.    And what happened after that?  Where did everybody go?

6    A.    So then they said they were going to do a -- a presumptive

7    blood test on it, so everybody walked up -- not everybody, but

8    probably five or six of us walked up to the top the dock.

9    And they had -- where Lieutenant Tidd parked was right by the

10   entrance to my dock, the stairs on top.  So they walked up, and

11   they opened up the back hatchback and -- and it was a -- it was

12   one of the security vehicles, but it was the CID, the head

13   command investigator's, and so they opened up the back trunk

14   and pulled out their -- their blood tests and -- and tested the

15   rag for -- for blood.

16            And -- and I believe it...

17   Q.    And while they're conducting the -- you got some --

18   several people conducting the test; is that right?

19   A.    Two of them were.  I think it was -- I think it was

20   Gamble, because that's what she did for a living.  I believe

21   there was Petty Officer Vaughan helping her, but...

22   Q.    Okay.  So while they're doing this stuff, this activity is

23   going on, does anyone say something?

24   A.    Yeah.  So somebody say -- said -- and I -- I want to say

25   it was Agent Bisesi, but I'm not 100 percent, because she was

1 standing next to me on one side and somebody was on the other,

2 but I thought she said, "Oh, it's probably nothing -- like,

3 it's probably nothing, huh?"  And I said, "It looks" -- and I

4 said, "It looks like blood to me."

5 Q.   And we heard Petty Officer Bohyer say that it was you that

6 said it was probably nothing.  Is that not the case?

7 A.   I did not say that, but I -- I heard it.  I don't -- I

8 mean, he's not -- it wasn't me that said it, but I -- I did

9 hear somebody say it.

10 Q.   All right.  And when you saw that they had these bloody

11 paper towels, did you pretty much know, you know, where those

12 paper towels came from, who they belonged to?

13 A.   I -- I -- I was 99 percent sure it was probably the towels

14 I gave Chris, you know, on Friday night.

15 Q.   And did you say anything to anybody around you there?

16 A.   No, not at that time I did not, no.

17 Q.   Okay.  And why not?

18 A.   I don't know.  I mean, I -- I don't think I have a great

19 answer for that.  I think I was just emotionally exhausted at

20 that point.  I'd just made a death notification.  I'd just

21 found out that he was gone.  I think I just -- my tank was

22 empty.

23 Q.   Okay.  So did you go back home after they left with the

24 blood test?

25 A.   I did.

1    Q.    And did you make any phone calls?

2    A.    I did.  I called -- I believe that I called Captain Gray

3    and told him, and then I called Leslee and told her that, you

4    know, we had found Chris and -- and he was passed.

5    Q.    Okay.  And -- and Leslee is off island at this point?

6    A.    She is.  She was seeing her father in Pensacola.  He'd had

7    some surgery, so she was with him.

8    Q.    All right.  And so we heard about the -- the first Navy

9    Blue about somebody missing.  Is there a requirement for

10   another Navy Blue that needs to go out?

11   A.    There is.  There's a -- you have to -- you have to close

12   out the missing person and then -- then another one for death,

13   you know, death notification, death on a base notification.

14   Q.    And who -- who -- who took care of that -- those Navy

15   Blues, those following Navy Blues?

16   A.    Lieutenant Crabtree and the XO took care of it.

17   Q.    Okay.  And did you see any of those before they went out?

18   A.    No, I did not.

19   Q.    Okay.  Any issue with how they sent the Navy Blues?

20   A.    No.

21   Q.    So -- and what about the search?  Was -- was the search

22   still going on, or what did you do with regard to the search?

23   A.    So Lieutenant Tidd had to stand down the search and -- you

24   know, so it was over a widespread area, so it probably took us

25   an hour or two to get everybody notified, like, "Hey, you know,

1  we -- we found him," but it wasn't the way you wanted to find

2  him, but the search was over at that point, so we had to notify

3  everybody.

4  Q.    And what happened to Chris Tur's body?

5  A.    It was taken to the hospital.

6  Q.    Okay.  So now that -- now that Chris Tur has passed, we

7  have a shift in the mission and focus of what's going on now?

8  A.    Correct.

9  Q.    The search before, now it's something else.  What is it?

10  A.    Now we have a -- we have to take care of the family,

11  number one, you know, make sure we're doing everything we can

12  for them.  The chaplain and his team are all over that.  We

13  have to do an investigation now because there's been a death on

14  a naval installation.

15        And we had to do, you know, just the -- a whole bunch

16  of logistics pieces that go along with all of it.

17  Q.    Okay.  And you said you have to do the investigation.  Is

18  this the standard death investigation that we've heard about?

19  A.    It is.

20  Q.    And how about for -- we -- we -- we heard Dr. Gordon

21  testify.  Somebody had to request a medical examiner and get a

22  medical examiner there; is that correct?

23  A.    That's correct.

24  Q.    And who requested the medical examiner?

25  A.    We did.  Well, actually -- actually, I take that back.

1   The hospital contacted me, the hospital requested a medical

2   examiner, but the -- the -- the question was how do we get him

3   down here, because we need him down here sooner rather than

4   later.

5           So we coordinated, we had a plane, I believe, in

6   the -- in the United States, and so I called Air Ops.  We -- we

7   coordinated all of that to make sure we could go pick up the

8   medical examiner.  And the hospital -- the hospital was working

9   with the medical examiner to get him and handle where he needed

10  to be when.

11          We -- we called the crew and said, "Hey, you have got

12  a different mission.  We're going to switch and get the medical

13  examiner to come down."

14  Q.   All right.  You didn't do anything to stop the medical

15  examiner from coming down to Guantanamo?

16  A.   Absolutely not.

17  Q.   You were actually coordinating and facilitating supporting

18  that effort?

19  A.   Correct.

20  Q.   So I want to ask you about some conversations that we

21  heard from -- that Captain Ross testified about a few days ago.

22          All right?

23  A.   All right.

24  Q.   So Captain Ross on one occasion said that he just came to

25  you out of the blue and said, "Did Chris come to your house?"

1          And you responded, "No."

2          Do you recall him testifying to that?

3   A.   He -- the only conversation we had about Chris coming to

4   my house was on the 15th.

5   Q.   Okay.  So, first, did Captain Ross -- or Commander Ross

6   ever come to you and say, "Did Chris come to your house," and

7   you told him, "No"?

8          Did that ever occur?

9   A.   That never occurred.

10  Q.   So the other question of where he asked you if Chris had

11  been to your house -- do you recall that?

12  A.   I do.

13  Q.   So tell us about that conversation.

14  A.   That conversation occurred on -- after he had been

15  interviewed by NCIS, he came back and he said, "Hey, Captain,

16  you know, did Chris come over to your -- did Chris ever come

17  over to your house" -- the way he said it -- and I -- and I was

18  like, well, I -- I think I responded to him, "I didn't let him

19  in," you know.

20  Q.   All right.  Let me freeze you right there.  So he asked

21  you, "Did Chris come over to your house?"  And your response

22  was, "I didn't let him in"?

23  A.   That's correct.

24  Q.   Is that true?  Did you let him into your house?

25  A.   No, I did not.

1  Q.    Did Chris Tur come into your house?

2  A.    He did.

3  Q.    We know from your earlier testimony that he came in,

4  right?

5  A.    Right.

6  Q.    And, to your knowledge, did the XO already know this?

7  A.    Yes, because Kelly had told me that she told him he came

8  to the house.  So I thought he was asking me about the manner

9  that he came into the house, because I knew he already knew

10  he'd been in the house, because Kelly had already told him, and

11  she told me she told him.

12  Q.    So when you said you were -- you thought he was asking

13  about the manner when he came into the house, is that

14  whether -- are you talking about whether you invited him in or

15  he broke in?

16        Is that what you thought he was asking you about?

17  A.    I -- I think -- at the time I thought he was asking me,

18  like, "Hey, did Chris" -- you know, "Did you and Chris go back

19  to your house or something at some point?"

20        And I'm like, "Hey, I didn't let him in, but, yeah,

21  he came in."

22  Q.    Okay.  So Monday, January 12th, you spoke with Captain

23  Gray.

24        Do you recall that?

25  A.    I do.

1   Q.    He testified to it.  And can you tell us about that

2   Monday, the 12th, phone call with Captain Gray?

3   A.    So I believe I had two conversations with him.  The first

4   one he was calling me -- kind of walking me through -- I, you

5   know, had never -- I had never had a death investigation, you

6   know, on any of my commands.  We never had a death.  So I

7   hadn't -- I wasn't familiar, you know, and he -- I think he was

8   just kind of walking me through it, would be the best way to

9   say it.

10  Q.    He had some experience?

11  A.    He did.  I think he had a couple of people die on his

12  command when he was a base commander.  So he was walking me

13  through it and just kind of, "Hey, here's what you need to be

14  looking for and doing, these kind of things."

15  Q.    And how about -- did you guys discuss any logistics needs

16  during that call?

17  A.    We did.  He said he needed help -- he's going to need some

18  help getting NCIS, you know, that we're going to have to get

19  NCIS down on the island to do the investigation, probably need

20  more people.

21  Q.    And what did you do about that?

22  A.    Well, later on that evening -- I'm not exactly sure when

23  the e-mail -- we had the e-mails, but when the e-mail came in,

24  it was NCIS talking to him saying, "Hey, we need some -- you

25  know, we're going to need some help getting stuff down there."

1    So he -- he forwarded that to me, CC'd I believe it was

2    Agent Snowdon, NCIS, and -- and told me, "Hey, can you help

3    out?"

4              And I wrote back to Agent Snowdon, and I said, "Hey,

5    you know, we're working on logistics.  We'll get you what you

6    need.  I just need to know, you know, how many -- what -- tell

7    me what you need, and we'll make that happen."  Something to

8    that effect.

9    Q.    And did you-all make that happen?

10   A.    We did.

11   Q.    As far as flights down there, places for them to stay?

12   A.    Yes.

13   Q.    At any point did you tell this Agent Snowdon or any other

14   NCIS agent not to come to Guantanamo Bay?

15   A.    No, I did not.

16   Q.    Not to conduct an investigation?

17   A.    No, I did not.

18   Q.    So a little bit later I want to go to -- still on Monday,

19   January 12th, did you learn something that day that caused you

20   great concern?

21   A.    On Monday -- yes.

22   Q.    Tell the jury about that.

23   A.    Okay.  So I went to -- once that phone call is finished, I

24   did some other work and I went to -- there's a place in

25   Guantanamo called the -- the Jerk House or there was -- I

1    understand it may be gone now, but -- and it's kind of like

2    where the Jamaicans go and make food like they would make it in

3    Jamaica, but they sell the -- they sell it and it's really

4    delicious food and it's a good place to go to lunch, but it's

5    also -- the Jamaicans are the main labor force on the island.

6             So -- and they come over and work and make pretty

7    good wages and send money back to their -- and they're pretty

8    funny.  But they're also, you know -- they're also kind of a

9    good source of information, too, if you want to know what's

10   going on on the island sometimes.  So I always go down and talk

11   to them and ask them what they're hearing.

12            So on Monday, I went to get some lunch, asked them,

13   "Hey, you know, what are you guys -- what's the rumors you're

14   hearing at this point?"  And they told me two rumors that were

15   pretty disheartening and disconcerting to me.

16            The first rumor they said is, "Hey, we heard you got

17   into a fistfight out in front of the Bayview with Chris Tur."

18   And -- and the second thing they said that was going around the

19   island was that Chris Tur had come into my house and had caught

20   Lara and I in bed together, and that's -- and that's why the

21   fight happened and all that stuff.

22            And so I -- I was -- I was pretty shocked when they

23   said that.  And to hear those going around -- and you'll --

24   GTMO is nothing but a big rumor mill most of the time anyway,

25   but those are very specific -- and it bothered me greatly.

```
 1   Q.   So after hearing these -- these two rumors, this fistfight

 2   in front of the Bayview and you were caught in bed in your

 3   house with Lara Tur, what do you do about that?

 4   A.   I was a little -- to be honest with you, I was a little

 5   freaked out, because, I mean, I called -- I called Captain Gray

 6   and I said -- and I just told him, I said, "I'm hearing some

 7   wild-ass rumors down here in GTMO and" --

 8   Q.   Did you tell him that they weren't true?

 9   A.   I did tell him they weren't true.

10   Q.   Now, let me ask you:  Did you tell Captain Gray what --

11   those specific rumors that you just heard?

12   A.   No, I did not.

13   Q.   And did Captain Gray ask you what are those specific

14   rumors that you heard?

15   A.   He didn't.  I just told him I was hearing some wild-ass

16   rumors and I was kind of just going -- was kind of like, "Dude,

17   what do I do?"

18   Q.   So let me ask you, at that point, we've heard Admiral Gray

19   testify that he had received an IG complaint, an inspector

20   general complaint, which had a specific rumor of you having --

21   were having an affair with Lara Tur.

22        Did you know about that IG complaint?

23   A.   No, I did not.

24   Q.   Captain Gray tell you in this meeting about that?

25   A.   He did not.
```

1  Q.   Did he ever tell you about this IG complaint?

2  A.   No, he did not.

3  Q.   So when you're mentioning these wild-ass rumors and you're

4  not telling him what they are, is he asking follow-on questions

5  from you?

6  A.   He did not ask any questions.

7  Q.   He didn't ask what specific rumors they were?

8  A.   No, he did not.

9  Q.   Now, during this -- this call where you're mentioning the

10 rumors, did you tell him about the -- the Bayview -- well, I'm

11 sorry, did you tell him that there had been -- that Chris Tur

12 attacked you in your house?

13 A.   I did not.

14 Q.   Now, did you tell him that Chris Tur had come to your

15 house?

16 A.   I did.  I told him that Chris had come to my house and

17 that he accused me of fucking with his wife.

18 Q.   And are those the words you used, "fucking with his wife"?

19 A.   Yeah.

20 Q.   Okay.

21 A.   And I told him that, you know, I -- that he was all over

22 the map, that he was angry with me and then he wanted to be my

23 best friend and then he wanted to go get beers and then he was

24 telling me about his marriage.  And then he'd get back to being

25 angry.  And I told him it was just kind of -- you know, what

1    I -- I just told him what I saw that night.

2    Q.    And you told Captain Gray about that there had been an

3    incident at the Bayview as well, correct?

4    A.    I did.

5    Q.    But you didn't tell him that Chris had attacked you?

6    A.    I did not.

7    Q.    Or that you punched him in the nose after he attacked you?

8    A.    I did not.

9    Q.    So the next day, Tuesday, January 13th, you have a phone

10   conversation with Admiral Jackson, and I think we heard from

11   her about that?

12   A.    Yes.

13   Q.    This is after you had the phone call with Captain Gray the

14   night before?

15   A.    Correct.

16   Q.    So what did Admiral Jackson ask you right off the bat in

17   that phone call?

18   A.    She asked me, "Hey, I need to know if any of these rumors

19   are, you know -- between you and Lara Tur are true."

20   Q.    Okay.  What rumors did you believe Admiral Jackson was

21   asking you about?

22   A.    I was sure she was asking me if, you know, Chris came to

23   the house and found me in bed with Lara Tur, because that's the

24   rumor I just heard the day before.

25   Q.    All right.  So the same crazy rumors you referred to as

1   "wild-ass rumors" to Captain Gray?

2   A.   Correct.

3   Q.   Did -- and did Admiral Jackson have you ever say what

4   specific rumors she was talking about?

5   A.   No.  I don't think either one of us said specifically what

6   the rumor was.

7   Q.   Did she ask any clarifying questions?

8   A.   She did not.

9   Q.   And you told Admiral Jackson about what happened at the

10  Bayview, and that Chris Tur had come to your house, just like

11  you told Captain Gray?

12  A.   I did.  I told her that he had come -- I told her the same

13  thing, that -- what he was accusing me of, and just, I mean --

14  yeah, I did.

15  Q.   And did you tell her about him -- him attacking you and

16  you punching him in the nose?

17  A.   I did not.

18  Q.   And did you get into a great level of detail about that --

19  about what happened during that phone call?

20  A.   I did not.

21  Q.   And is she asking you about details during that phone

22  call?

23  A.   She was not.

24  Q.   And did Admiral Jackson inform you that there had been an

25  IG complaint with specific allegations against you?

1   A.   No, she did not.

2   Q.   And did Admiral Jackson read you your rights at all?

3   A.   She did not.

4   Q.   And at that time, did you have any knowledge that there

5   was an IG complaint with these specific allegations against

6   you?

7   A.   I did not.

8   Q.   And did Admiral Jackson ever tell you about this IG

9   complaint?

10   A.   She never did.

11   Q.   Neither her or Admiral Gray ever told you about this?

12   A.   They did not.

13   Q.   So after you described this to her, does she direct you to

14   do anything about it?

15   A.   She did.  She said she was concerned and that she thought

16   I needed to tell NCIS what I just told her.

17   Q.   Okay.  Now, was there more of the phone call after that

18   section?  Did you guys talk about other things on the call?

19   A.   We did.  She -- once she said that, then we moved on to

20   talking about the service for Chris's family members.  At that

21   time I told her we were sending a C-12 to pick up the family

22   from Miami.  That later got turned off and they had to drive

23   all the way to Jacksonville to catch the rotator to come down.

24          And then the majority of that conversation, though,

25   was spent on preparation for the visit from the -- we had the

1   Assistant Secretary of the Navy for Installations, Environment,

2   and Energy coming in.

3          So that's -- that was the majority of the phone call

4   spent, on talking about the press for her, what we were going

5   to talk about, what he was probably most likely interested in,

6   and doing that.

7   Q.   Okay.  And did the phone call end after that?

8   A.   It did.

9   Q.   So you just said that she told you to go tell NCIS exactly

10  what you told me, right?

11  A.   She did.

12  Q.   All right.  So as a result of that, did you contact anyone

13  from NCIS?

14  A.   I did.  I contacted Agent Bisesi.

15  Q.   And what did you tell Agent Bisesi?

16  A.   I told her, "Hey, I need -- I need to make a statement.  I

17  would like you to come take my statement."

18  Q.   And what was her response?

19  A.   She said -- she either said "They'll get to you" or "We'll

20  get to you."  I'm not sure which one.  But it was --

21  Q.   Okay.

22  A.   -- it was, "Hey" -- it was kind of like, "Hey, okay, we'll

23  get to you."

24  Q.   All right.  And did you have any other calls with Special

25  Agent Bisesi over the next few days as well?

1   A.   I did.

2   Q.   Okay.  And hold on one second.

3        (Counsel confer.)

4   BY MR. VOKEY:

5   Q.   So, Captain Nettleton, earlier in the trial it was brought

6   up about this e-mail that you sent to Admiral Jackson from a

7   teacher who had been kicked off the island.

8             Do you recall that?

9   A.   I do.

10  Q.   I think it was Kendell Stone; is that correct?

11  A.   Yes.  That's correct.

12  Q.   So tell the jury exactly kind of what was going on and --

13  how did that even come up?

14  A.   So Kendell Stone was a teacher down at Guantanamo.  I

15  believe Admiral Scorby was my boss at the time when I first got

16  down there.

17            And we had a report of a young man running down the

18  road, he had a bloody nose, and the police saw him and pulled

19  him over and asked him what happened.  And it -- the child

20  accused his father of child abuse.  And that was Kendell.

21            But the -- the issue kind of grew into -- so when

22  that happens, you have to go through a process where it's --

23  you know, we got NCIS involved and we got the Fleet and Family

24  Service into it.

25            And there's a board that the XO runs.  And they go

1   through a whole process of trying -- you know, you can't

2   just -- you've got to go through the whole process, making sure

3   there's -- the allegations are valid and that things are going

4   down -- and there's an entire process that Mr. Stone had to go

5   through.

6           During that process, we couldn't let the boy go back

7   to his house, so we put -- we put him in with one of the

8   teachers.

9           Mr. Stone was a teacher, so, like, the next day we

10   get a call and say, "Nobody -- none of the teachers want to put

11   the kid up because they think he's lying," or whatever.

12           So I remember having a conversation with Admiral

13   Scorby and he says, "Hey, you know" -- I said, "I don't have

14   any place to put him.  We're not -- we don't have Child

15   Protective Services on GTMO.  We don't have a place to put an

16   unattended kid."

17           So we ended up taking -- Leslee and I ended up just

18   taking the boy -- he was Jacob's age, so we just ended up

19   letting him live with us until it was all resolved.  When it

20   was resolved, they kind of -- and I ended up barring Mr. Stone

21   from Guantanamo, so he had to leave the island.

22           And his -- and his children went back to their

23   grandmother until -- and then they got it all settled out in

24   Texas court.  But we didn't have the ability to handle that.

25   So --

1   Q.   Okay.  And so you barred Mr. Stone from the island?

2   A.   Yeah.

3   Q.   So how did he come up in this -- in this e-mail chain?  I

4   think what we saw in the e-mail that came in, you had sent out

5   something, a notification about the loss of Chris Tur, and he

6   did something with this e-mail?

7   A.   Yeah.  So I did -- I did send out an e-mail to the entire,

8   you know, island and talking about Chris.  And he -- somebody

9   had sent that to him and he forwarded it back to me with some

10  pretty, you know, sarcastic and -- comments to me.

11        So when he -- when he did that -- I guess the whole

12  point of this is that, you know, it was somebody -- now -- now

13  all the rumors are off island, there's somebody off island

14  coming back at me with rumors and everything.

15        So I sent that e-mail to Admiral Jackson and said,

16  "Hey, you know, here we go.  It's getting -- it's -- the rumors

17  are spreading off island."

18  Q.   Now, it says in there -- you say, "Heads-up that the last

19  time that" --

20        THE COURT:  Mr. Vokey, let me see you a second.

21     (Sidebar conference:)

22        THE COURT:  I thought I excluded that e-mail.  I

23  thought it wasn't in evidence.

24        MR. VOKEY:  Oh, did you?

25        MR. GEE:  You did, but I'm going to ask about it now

1     in cross.

2             MR. VOKEY:  That's my mistake.  I -- I was thinking

3     it had come in, so --

4             THE COURT:  No.  You asked me to exclude it and I

5     did.

6             MR. VOKEY:  All right.

7             THE COURT:  Okay.

8             MR. GEE:  Your Honor, we can discuss it over the

9     break, but obviously now I'm going to show that e-mail on

10    cross.

11            MR. VOKEY:  Sure.

12            THE COURT:  Okay.

13            MR. VOKEY:  Sure.

14       (The following proceedings occurred in open court, in the

15    presence of the jury:)

16            THE COURT:  Y'all need a break?  Yeah.  All right.

17            I think, Mr. Vokey, this is probably -- we've been

18    going an hour-and-a-half.  It's probably a good time to take a

19    break.

20            So, ladies and gentlemen, we'll go ahead and do 15

21    minutes.  And please remember all my instructions and have a

22    good break.

23            COURT SECURITY OFFICER:  All rise for the jury.

24       (Jury exits, 3:02 p.m.)

25            COURT SECURITY OFFICER:  Please be seated.

1          THE COURT:  You can step down, too, sir.

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  All right.  Anything from counsel?  All

4   right.  We'll be -- Mr. Vokey, could you estimate for me how

5   much longer on your direct?

6          MR. VOKEY:  Yes, sir.

7          THE COURT:  Just an estimate.

8          MR. VOKEY:  I would say about -- no more than a half

9   hour, maybe a little less, Your Honor.

10         THE COURT:  All right.  Well, obviously we'll just

11  proceed as we're advised.

12             And, Mr. Gee, I understand you'll have

13  cross-examination.  And, you know, we'll just see how it goes,

14  and if it has to go over to tomorrow, it will go over to

15  tomorrow.

16         MR. GEE:  Thank you.

17         THE COURT:  All right.  We are in recess.

18         COURT SECURITY OFFICER:  All rise.

19      (Recess from 3:03 p.m. to 3:21 p.m.; all parties present.)

20         COURT SECURITY OFFICER:  All rise.  This Honorable

21  Court is back in session.

22             Please be seated.

23         THE COURT:  Let's have the jury, please.

24         COURT SECURITY OFFICER:  All rise for the jury.

25      (Jury enters, 3:22 p.m.)

1        COURT SECURITY OFFICER:  Please be seated.

2        THE COURT:  You may be seated.

3        All right.  Welcome back, ladies and gentlemen.

4        Mr. Vokey, you may proceed.

5        MR. VOKEY:  Thank you, Your Honor.

6   BY MR. VOKEY:

7   Q.   So, Captain Nettleton, we were just talking about this

8   Kendell Stone situation.  So, as you described it, when you

9   were putting up this young man in your own home, did that

10  violate Navy regulations?

11  A.   I don't believe there were any regulations about that at

12  all.  But it didn't make Admiral Scorby very happy that, you

13  know -- but I didn't have a lot of options.

14       It's -- so, like I said, GTMO is kind of a weird

15  place, where they don't have the normal services that you have

16  for everybody else, which is why -- you know, which is why it's

17  so -- the screening becomes very important.

18       But in this case, usually a family will step up and

19  say, "Hey, we'll keep him until this is all over."

20       But I think there's so much -- there was a lot of

21  angst among -- and kind of nobody stepped up.  So Leslee and I

22  just said, "Hey, we'll -- he goes to school with Jake.  We'll

23  do that."

24       I talked it over -- Agent Bisesi was my lead agent

25  for a couple of years.  And so I talked to her and just said,

1    "Hey, we'll keep him at the house.  If there's an issue, you

2    know, I'll let you know.  But right now he can just stay at our

3    house.  You know, there's plenty of room in that place.  So

4    we'll keep him until -- until the professionals and the --

5    that" --

6           THE COURT:  Mr. Vokey, I really feel like we've kind

7    of covered this.

8           MR. VOKEY:  Yes, sir.

9    BY MR. VOKEY:

10   Q.   So, as a result of that -- so you sent the e-mail to

11   Admiral Jackson informing her of this.  And what does she tell

12   you in regards to this e-mail that Mr. Stone has sent you?

13   A.   She told me to send it to NCIS.

14   Q.   And did you do that?

15   A.   I did.

16   Q.   And did you respond to Kendell Stone?

17   A.   I did not.

18   Q.   And the -- Admiral Jackson also told you not to do that?

19   A.   Correct.

20   Q.   So in this e-mail, did you mention anything about Chris --

21   Chris Tur attacking you and you punching him in the nose in the

22   house in this series of e-mail?

23   A.   I did not.

24   Q.   That didn't have anything to do with that, it was dealing

25   with the Kendell Stone?

1    A.    Correct.

2    Q.    Okay.  So you -- before the break you had said that you'd

3    called Agent Bisesi and was told that they would get back with

4    you -- NCIS would get back with you?

5    A.    That's correct.

6    Q.    So let me ask you:  On January 14th, did NCIS get back to

7    you?

8    A.    They did not.

9    Q.    How about the 15th?

10   A.    They did not.

11   Q.    16th?

12   A.    They did not.

13   Q.    17th?

14   A.    Nope.

15   Q.    18th?

16   A.    No.

17   Q.    19th?

18   A.    No.

19   Q.    All right.  So also during this week, during this period

20   of time -- is this a busy week going on at Guantanamo?

21   A.    It was.  We had a lot of moving parts.  We were bringing

22   in -- like I said, we had to get the medical examiner down.

23        On Tuesday we had some events.  I had General Ary

24   coming down.  He was the head of the -- OMC at the time, Office

25   of Military Commissions.  So I had dinner with him and his

1    representatives on island.

2            On Wednesday we had the NCIS augmentation group that

3    we brought down on Wednesday, brought those guys down and got

4    them down.  Plus the normal workday schedule.

5            On Thursday I had the Assistant Secretary of the Navy

6    for Energy, Installations and Environment down.  I had him

7    Thursday and Friday.  So it was a pretty busy week.

8    Q.    And were there also coordination being made for the

9    service for Christopher Tur?

10   A.    There was.  The service was on Saturday.  And then we were

11   kind of scrambling to make sure we could get the family on

12   the -- on the rotator.  Because, like I said, they turned off

13   the C-12 on me.

14           So there's a -- there's a lot of moving parts that

15   week.

16   Q.    Okay.  Now, I want to go to Monday, January 19th.

17           What did you hear that day -- did you hear anything

18   that day that was significant?

19   A.    I did.  My wife called me up and said -- she said, "You're

20   not going to believe the latest rumor that I just heard."  And

21   she said -- she goes --

22           And I said, "What is it this time?"

23           And she goes, "The rumor is" -- you know, "The latest

24   rumor going around is that you killed Chris Tur."

25   Q.    So when you hear this rumor, I mean, what's going through

 1    your mind, Captain Nettleton?

 2    A.    I was blown away.  I was just shocked.  I mean, I don't

 3    know a better way to describe it.  I'm just shocked and -- and

 4    it explained some of the ways -- you know, it just explained a

 5    lot to me, like, oh, my god, they really think I did this,

 6    they're listening to the rumor mill.

 7    Q.    So the next day, Tuesday, January 20th, what did you do

 8    after learning of this -- this shocking rumor?

 9    A.    I went -- I went to NCIS and -- and I told them that, you

10    know, they needed to interview me now, because -- I think I

11    walked up and I told Agent Bisesi, who, I believe, a couple of

12    days previously had told me she had been taken off the case.

13    And so I told her -- I didn't go to see her.  I went -- as I

14    pulled into the parking lot, she was walking up to the

15    building, and I said, "Hey, I need to do my interview today."

16              And so she said, "Okay."  You know, she -- she put me

17    in a conference room -- in one of the rooms, and then said, you

18    know, "They'll -- they'll come get to you in a little while."

19    Q.    Okay.  So did you have to wait for a while?

20    A.    Yeah.  I was waiting in the conference room, but -- I

21    waited for them to come take my statement for a period of time.

22    Q.    And then what happened?

23    A.    Then they -- two agents came and got me and they took me

24    to an interview room.

25    Q.    And so when they first walked in the interview room, what

1  are the things that they're saying to you?

2  A.   They're saying, "Hey, you know, we're hearing a lot of

3  rumors."

4        And I'm like, "Yeah, yeah, so am I."

5  Q.   So when they're saying they're hearing a lot of rumors,

6  what's going through your mind?

7  A.   The wild-ass rumors, you know, that they -- I thought they

8  heard the two -- same two rumors I was hearing.

9  Q.   Well, what were those two rumors?

10  A.   That -- that I had got into a fight with Chris outside the

11  Bayview and that I had gotten into -- that Chris had come into

12  my house and found me and Lara in bed and we got into a fight.

13  Q.   So you think the NCIS agents are aware of those same

14  rumors based on those comments?

15  A.   I did.

16  Q.   So as you're in there in the interview room, what happens

17  next?

18  A.   They're -- they're talking to me.  I -- I don't remember

19  the exact sequence.  I know at some point they're saying

20  they're hearing a lot of rumors.  They're hearing things are

21  coming up.  They gave me -- at some point they gave me my

22  rights advisement form.

23  Q.   All right.  So prior to that, do they mention that this is

24  a death investigation?

25  A.   They did.

1  Q.    And you were assuming this was a standard NCIS death

2  investigation?

3  A.    Correct.

4  Q.    While you're in there and they're asking you questions,

5  are you getting a different feeling about why you're there?

6  A.    Well, it was a weird interview, because it wasn't -- you

7  know, I worked with NCIS before and -- but they're going,

8  "Hey" -- you know, one of them's kind of cracking jokes, the

9  other one's like, "Hey, you know, you're a captain.  We -- you

10  know, you know all our tricks.  You're going to -- you're going

11  to do all this stuff, we can't fool you," you know, and it was

12  just a weird -- I got a weird vibe from it.

13          And one guy, you know, they're asking me my personal

14  information -- where am I from, all that, and saying, well,

15  where -- you know, "Where are you from"?

16          I'm from Haines City.

17          And they go, "Oh, ho, yeah.  Hanes underwear."

18          And so one's just kind of clowning around.  The other

19  one's telling me, "Well, we can't fool you."

20          And then the other guy says, "You know all our

21  tricks.  You know all our tricks.  You know, we can't fool

22  you," and...

23  Q.    So were these kind of comments -- this is not what you

24  expected when you walked over there to give your statement; is

25  that correct?

1    A.    That's correct.

2    Q.    And at this point are you thinking that they think you're

3    a suspect of something?

4    A.    I was.  I was starting to get my -- the hair on the back

5    of my neck was going up.

6    Q.    And, also during this interview, do they mention the

7    rumors again?

8    A.    They do.  They mention the rumors two more times in the

9    interview.  And they say, "I hear -- I hear rumors."  And the

10   other one goes, "A lot of rumors.  There's a lot of rumors."

11   Q.    So you were -- mentioned rights advisement form.  At some

12   point they give you a rights advisement form where they're

13   reading you your rights, correct?

14   A.    Correct.

15   Q.    And do they hand this form to you?

16   A.    They do.

17   Q.    So when you get this form and you look at it, what's going

18   through your mind?

19   A.    Honestly, the only thing I saw was involvement in the

20   death of Chris Tur.  That was -- that was what they showed to

21   me and I just saw that and...

22   Q.    So when you saw that, I mean --

23   A.    Yeah.  It just --

24   Q.    -- what's your state of mind?

25   A.    It blew my mind.  I just think, oh, my god, they're --

```
 1   they are believing every rumor that's out there right now.
 2   Q.   Including the one you learned from Leslee the day before?
 3   A.   Yes.
 4   Q.   So -- and Agent Scherach actually reads the form to you?
 5   A.   He does.
 6   Q.   And says what you're suspected of.
 7   A.   He does.
 8   Q.   Right?
 9   A.   He --
10   Q.   Adultery and involvement in the death of Christopher Tur?
11   A.   He did.
12   Q.   Those are the two things he says?
13   A.   That's what he said to me.
14   Q.   And did he ask you if you understand everything there?
15   A.   I said, "I do," but -- and then he comes -- he comes back
16   with, you know, "We're not saying you committed any of these."
17           And I said, "I know I didn't commit any of these.
18   This is" -- I said, "I know I didn't do any of these things,"
19   or something to that effect.  And I said -- you know, I was
20   trying -- I was trying to say, "I want" -- that I just -- I
21   said, "I -- I know I didn't do any of these.  I'd like to
22   invoke my right to counsel now."  And I believe I added
23   something on the end of that, because I didn't -- I know I
24   didn't -- oh, I said, "I want to invoke my right to counsel
25   right now, because I know I didn't" -- you know -- "I know" --
```

1    I said, "I want to invoke my right to counsel if you're -- if

2    you are accusing me of adultery and the involvement with the

3    death of Chris Tur."

4    Q.   All right.  And you mentioned the adultery.

5         What adultery do you think NCIS is talking about at

6    that point?

7    A.   The -- the coming to my house and finding Lara and I in

8    bed.  That -- that rumor.

9    Q.   Okay.  And do you invoke your rights at that point?

10   A.   I do.

11   Q.   So the next day, January 21st, what happens?

12   A.   I'm relieved from command.

13   Q.   And do you leave Guantanamo that same day?

14   A.   Julia and I left.

15   Q.   And where did you go from Guantanamo?

16   A.   We flew to Jacksonville.

17   Q.   And Leslee remained on island?

18   A.   She did.

19   Q.   For a little while?

20   A.   (Nods head affirmatively.)

21   Q.   And then she joined you back in Jacksonville?

22   A.   Yeah.  Yes, she did.

23   Q.   When you got back to Jacksonville, you're no longer the

24   commanding officer at Guantanamo, did you have -- did they

25   assign you a job working back at Jacksonville?

 1  A.   I did.  I was special projects officer for Admiral Jackson

 2  for a little bit, and then I went over to Cecil Field.  They

 3  had all the Navy planes going over there, so I was the

 4  leadership liaison officer.

 5         Basically I -- I kind of just -- you know, Cecil is

 6  not a Navy base -- it used to be, but it's not, but we had a

 7  really good working team over there, and I was there to

 8  coordinate with the base CO of Jacksonville because half his

 9  planes were over there at Cecil now.

10  Q.   And you were in that job for about how long?

11  A.   I did that for about a year until the runway -- they had a

12  big runway project in Jacksonville.  I had to fix it.

13  Q.   And then back to -- back to NAS Jacksonville after that?

14  A.   I did.

15  Q.   Now, I want to ask you, when you -- back -- when you first

16  got back here to Jacksonville, had you already told your wife,

17  Leslee, that you had had sex with Lara Tur back in November of

18  2014?

19  A.   No, I had not.

20  Q.   And did you tell her after you-all got back to

21  Jacksonville?

22  A.   I did.

23  Q.   And what was the result of you telling her that?

24  A.   I think it's probably the final nail in the coffin on our

25  relationship.  You know, we -- we ended up getting divorced in

1   2016.

2   Q.   Okay.  So you were living together in 2015 even after you

3   told her about this?

4   A.   Yes.

5   Q.   And you were divorced when?

6   A.   October of 2016.  I think that's right.

7   Q.   Okay.  Did you continue to live together even after you

8   were divorced?

9   A.   We lived together until Julia graduated high school.  We

10  were -- I mean, you know...

11  Q.   Be there for the kids?

12  A.   Yeah.

13  Q.   Okay.  You didn't tell her right away when all this

14  happens -- you know, there's a delay.  Why didn't you tell

15  Leslee right away?

16  A.   It was a hard conversation.  I told you earlier I

17  didn't -- we didn't really embrace the counseling.  We were

18  trying to -- trying to fix the relationship.  So, you know, I

19  think I knew what was going to happen.

20  Q.   Hard conversation to have.  It was going to hurt her.

21  A.   It did hurt her.

22  Q.   All right.  And we've also heard from Ms. Tur that after

23  you were back in Jacksonville after being relieved and you're

24  back to stateside, that you had a few telephone calls with Lara

25  Tur?

1  A.   I did.

2  Q.   How many times do you think you talked to her?

3  A.   Two to three times, I believe.

4  Q.   Okay.  And why are you calling Lara Tur?  Why are you

5  talking with her?

6  A.   Well, I was calling to check on her.  Once everything

7  broke, you know, I think she had an even rougher time than I

8  did.  I think it was pretty brutal for her.  I was calling to

9  see how her kids were.

10       You know, my daughter was friends with her daughters.

11 Jake graduated with one of her daughters.  So, I mean, they --

12 it was just kind of, "Hey, how are you doing?  You holding up?"

13 Q.   So -- and we've heard in this -- this conversation there

14 was a discussion about Lara was called in a court-martial.

15       Do you recall her -- hearing her talk about that?

16 A.   I do.

17 Q.   And how did that come up when you were talking to Lara Tur

18 on one occasion?

19 A.   I think she was venting about NCIS.  I think -- I think

20 there's -- I think she was just venting about the process, and

21 that -- you know, she felt she was being interrogated, and --

22 into Guantanamo, just all the rumors and everything going

23 around.

24       And so that -- so she was talking about that.  And

25 she said something to the effect of, you know, "If" -- I don't

1   remember why court-martial got brought up, but it got brought

2   up in the context of, "Hey, if you're going to" -- she said,

3   you know -- she was asking what was going on with me.

4           And I said, "Don't worry."  I said, "If anything --

5   you know, you don't have to worry about having to go to a

6   court-martial if I have one."

7           I said, "They probably wouldn't even, you know, bring

8   you up," or something like that.  I was just kind of telling

9   her, "You don't -- don't worry about that, don't worry about

10  any of that, take care of your family, don't worry about any

11  legal issues."

12  Q.   Because a court-martial can't do anything to her.  Was

13  that the point?

14  A.   That was the point.

15  Q.   Okay.  And what did she say about if she were called about

16  a court-martial?  What did she tell you?

17  A.   She said if she was called on a court-martial -- she said,

18  "Well, if they -- you know, they try to talk to me, I'm not

19  going to tell them anything.  I don't want to" -- she was

20  just -- she was just venting.

21  Q.   And what was your response?

22  A.   I said, "Okay, good."

23          I didn't -- I didn't -- I responded very broadly,

24  like, "Okay" -- I either said "okay" or "okay, good,"

25  whatever.  But it wasn't -- but it wasn't an encouragement.  It

1  was a "Hey, don't even worry about that stuff."

2  Q.   So at any point in that phone call or in any other phone

3  call, did you encourage her not to talk to anyone?

4  A.   I did not.

5  Q.   Did you tell her not to talk to anyone?

6  A.   I did not.

7  Q.   Did you advise her or counsel her not to talk to anyone or

8  not participate in any proceedings?

9  A.   Absolutely not.

10 Q.   Did you convince her or threaten her or hold something

11 over her to make sure she doesn't participate in a

12 court-martial?

13 A.   No, I did not.

14 Q.   All right.  You mentioned that you were -- you were --

15 back in Jacksonville, a special projects officer at Cecil

16 Field, and then back to NAS Jacksonville.

17         And what did you do when you got back to NAS

18 Jacksonville?

19 A.   I worked for Admiral Bolivar as a special projects officer

20 for her.  And she replaced Admiral Jackson.

21 Q.   And when did that last until?

22 A.   March of 2019.

23 Q.   And what happened in March of 2019?

24 A.   I retired from the Navy.

25         MR. VOKEY:  So that is all the questions that I have

1  for Captain Nettleton.

2          THE COURT:  Cross-examination?

3          MR. GEE:  Thank you, Your Honor.

4          THE COURT:  That's fine.  Sure.  You can raise it up,

5  too, if you want.

6          MR. GEE:  Thanks.

7                        **CROSS-EXAMINATION**

8  BY MR. GEE:

9  Q.   Good afternoon, Captain Nettleton.

10  A.   Good afternoon.

11  Q.   Captain Nettleton, you're about 54 years old now, right?

12  A.   Correct.

13  Q.   In January of 2015, you would have been about 49 years

14  old, right?

15  A.   Correct.

16  Q.   And you had a long career in the Marines and the Navy,

17  right?

18  A.   I did.

19  Q.   You talked about some of it at length, but let's talk

20  about that a little.  So you're in the Navy -- I mean, you're

21  in the Marines first for about three years, right?

22  A.   Correct.

23  Q.   And in the Marines you learned that you need to take care

24  of your fellow Marines, right?

25  A.   Absolutely.

1   Q.   You learned you need to follow orders, right?

2   A.   Right.

3   Q.   You learned you need to be honest with your superior

4   officers, right?

5   A.   Absolutely.

6   Q.   Joined the Navy in about 1987, correct?

7   A.   Correct.

8   Q.   And you learned to fly, right?

9   A.   Yes.

10   Q.   Both helicopters and later on planes, right?

11   A.   Actually, planes first, then helicopters.

12   Q.   And you -- you got a good bit of education even after you

13   joined the Navy, right?

14   A.   Yes.

15   Q.   You got a Bachelor's in science in aeronautics in 1994,

16   right?

17   A.   Yes.

18   Q.   You got further education.  You got a Master's in -- from

19   the Industrial College of the Armed Forces, the War College,

20   right?

21   A.   Right.

22   Q.   And you took thousands of hours of flights in helicopters

23   and planes, right?

24   A.   I did.

25   Q.   People depending on you for their lives in those planes,

1  right?

2  A.    Yes.

3  Q.    And you took continuing education throughout your career

4  in the Navy, right?  Classes, courses, things that were

5  required of you?

6  A.    That is correct.

7  Q.    Courses like at the naval postgraduate school, management

8  of accident prevention, you took that course, didn't you?

9  A.    I had -- I'm assuming.  I mean, I'm not arguing with you.

10 I don't remember it.

11 Q.    Don't specifically remember, but seems like the kind of

12 course you would have taken, right?

13 A.    It does.

14 Q.    And you took classes -- multiple times, in fact, you took

15 introduction to suicide prevention throughout your career in

16 the Navy, didn't you?

17 A.    I don't know, but I'm assuming.  It sounds like a course

18 we would have had, yes.

19 Q.    You got some training throughout the Navy on preventing

20 suicide.  Would that be accurate?

21 A.    Yes.

22 Q.    Okay.  And you held positions like flight instructor,

23 correct?

24 A.    Correct.

25 Q.    Squadron executive officer?

1   A.   Correct.

2   Q.   You end up being a squadron commanding officer twice,

3   correct?

4   A.   Correct.

5   Q.   You're the Assistant Chief of Staff for Force Safety to

6   the Commander of Naval Air Forces in San Diego, right?

7   A.   Yes, sir, testified to that.

8   Q.   So admiral -- I mean, so, Captain -- I mean, in the end,

9   you even get chosen to be the commander of a major base,

10  correct?

11  A.   Correct.

12  Q.   One of about 72 bases, correct?

13  A.   Correct.

14  Q.   And GTMO, a pretty sensitive base, you're chosen to

15  command, correct?

16  A.   Correct.

17  Q.   And you'd agree with me, throughout the course of your

18  career, hundreds of Navy officers, if not thousands, you served

19  with who didn't get chosen to be base commanders, correct?

20  A.   Correct.

21  Q.   So you're a pretty elite officer, aren't you?

22  A.   I would say I was.

23  Q.   You were an elite officer chosen for an elite command,

24  correct?

25  A.   Correct.

1  Q.   And throughout that elite career, you learned that in the

2  Navy you don't just get to do what you want, correct?

3  A.   Well, I guess you have to be more specific for me.

4  Q.   You learned that there are rules and regulations and

5  orders you have to follow, correct?

6  A.   Correct.

7  Q.   You learned about those rules and regulations and orders

8  that you have to follow throughout your 20-something-year

9  career, correct?

10 A.   Yes.

11 Q.   You knew you had to listen to superior officers, correct?

12 A.   Correct.

13 Q.   You knew you had to follow their orders, correct?

14 A.   Correct.

15 Q.   You knew you had to be honest with superior officers?

16 A.   Correct.

17 Q.   And you knew that you couldn't conceal things from

18 superior officers, correct?

19 A.   Correct.

20 Q.   You knew that you had to take care of the people under

21 your command, correct?

22 A.   Correct.

23 Q.   Make sure that they get home safe as best you can,

24 correct?

25 A.   Correct.

1  Q.    And a lot of these rules were even embodied in that charge

2  of command document that you got when you first became a wing

3  commander and later when you became the commander of GTMO,

4  right?

5  A.    Okay.  So I was never a wing -- an air wing commander is

6  completely different.

7  Q.    I'm sorry.  When you became a squadron commander, you got

8  given a charge -- that charge of command document, correct?

9  A.    I assume so.

10 Q.    And when you got made commander of --

11 A.    So I think the charge of command document -- I already had

12 my first command before those came out.  So I'm assuming that I

13 saw it.  But, you know, there's nothing in the charge of

14 command I would disagree with.

15 Q.    So the parts of the charge -- and you got the charge of

16 command document, obviously, when you became the commander of

17 GTMO, right?

18 A.    I believe I did, but --

19 Q.    And all the principles that are in it, as you said, you

20 don't disagree with them?

21 A.    I do not.

22 Q.    Things you're familiar with from throughout your time in

23 the Navy, correct?

24 A.    Correct.

25 Q.    Principles like adhering to the highest standard of

1  ethical conduct?

2  A.    Correct.

3  Q.    Principles like accountability through trust with your

4  follow officers?

5  A.    Correct.

6  Q.    Principles like it is your duty to know your

7  responsibilities before even assuming command?  You knew that,

8  right, that it was your duty to know your responsibilities

9  before you even assumed command?

10  A.    I think that -- that's a given.  You wouldn't be given

11  command without it.

12  Q.    Okay.  And after you were chosen for command before

13  becoming command -- before taking command, you even went to the

14  prospective major command force in Newport, Rhode Island.  You

15  had formal training on becoming a commanding officer, correct?

16  A.    I did.

17  Q.    And you even went to the Senior Shore Leadership command

18  course at the Washington Navy Yard in D.C. before you took

19  command at GTMO, right?

20  A.    I did.

21  Q.    So you were prepared to become the commander, right?

22  A.    Absolutely.

23  Q.    You were familiar with your duties and obligations?

24  A.    Yes.

25  Q.    And you took command on June 29, 2012, correct?

1  A.    Yes.

2  Q.    Now, the change of command ceremony, it even had sort of a

3  specific script that went along with it when you took command,

4  right?

5  A.    Yeah.  I mean, there's a script that goes with the command

6  and then each -- you know, the relieved and the relieving write

7  their own speeches.

8  Q.    Who's going to announce what, who's going to give flowers

9  to who, what speech is going to be given --

10  A.    That's done by the change of command coordinator, but,

11  yes, all of that happens.

12  Q.    And it was even said in the command -- in your change of

13  command that the change of command is a transfer of total

14  responsibility, authority, and accountability from one

15  individual to another.  Sound like that -- that's right, that

16  that would have been said at your change of command?

17  A.    That's -- that's exactly right.

18  Q.    So you would agree with me, Captain, that you being chosen

19  to be one of 72 base commanders and of GTMO, that was the Navy

20  showing some trust in you to give you that assignment, correct?

21  A.    Yes.

22  Q.    And you knew as part of that assignment that you had to

23  keep your superior officers informed about events at GTMO,

24  correct?

25  A.    That is true, but when you say you have to keep them

1  informed, I mean, you're -- if you're -- of course, you're

2  going to keep them informed on the stuff that you believe is

3  important to you as a commander.

4  Q.    Relevant --

5  A.    And important to them.

6  Q.    You knew you had to keep them informed of relevant

7  information, correct?

8  A.    Yes.

9  Q.    You don't have to tell them that you painted a new stripe

10  on the sidewalk in front of your building, but you need to tell

11  them about major things, right?

12  A.    Correct.

13  Q.    And you were familiar, for example, with the OPREP

14  requirements for the Navy Region Southeast, correct?

15  A.    Correct.

16  Q.    Like, for example, those requirements require reporting

17  about injuries to personnel in your command.  You're aware that

18  that was in the OPREP requirements, correct?

19  A.    Obviously, I'm sure it is.  Do I remember seeing it in

20  there, no, I don't.

21  Q.    And you're aware that it had information in there,

22  information about missing persons and OPREP requirements for

23  missing persons?

24  A.    Right.

25  Q.    And there was also requirements in there about death,

1  notifications regarding death of persons under your command,

2  correct?

3  A.    Correct.

4  Q.    And there's also requirements in there for notifications

5  concerning misconduct, correct?

6  A.    Correct.

7  Q.    And you were also familiar with some of the other OPREP

8  requirements that go all the way back to Washington, some of --

9  there are many of them, but Navy Blue is just one of them,

10 right?

11 A.    There's -- so there's an Operational Reports system.  And

12 there's -- there are a lot of reports in that system.

13 Q.    Yep.  And -- and some of those reports require it to go

14 back -- all the way back to Washington, right?

15 A.    Well, I mean, when you say, "all the way" -- it doesn't go

16 all the way back to Washington.  It goes all the way back to a

17 specific commander.  So it may go to the CNO, it may just go to

18 your flag, or it may just go -- you know, maybe something that

19 comes to me from one of the units on the base.  So it just

20 depends on the situation.

21 Q.    In -- in the case --

22 A.    I mean, Washington -- Washington is a place, not a -- it

23 goes to a person.  Most of the time, if it's a significant one,

24 it will go to the Chief of Naval Operation.

25 Q.    Who's in Washington, right?

1  A.    He is in Washington.

2  Q.    And the -- those operation -- OPNAV instructions, those

3  ones that go to those kinds of commanders, OPNAV is what they

4  call those, right?

5  A.    Well, yeah, OPNAV is all the instruction, you know,

6  operation of the Navy, so it's not -- that's a whole -- whole

7  series of instructions.

8  Q.    Okay.  And I'll call those reports to the Navy, these

9  reports to the Navy?

10  A.    Yeah, operational reports are OPREPs.

11  Q.    Okay.  Those OPREPs to the Navy, many of them overlap with

12  the ones that you're required to make to the Navy Region

13  Southeast, right?

14  A.    When you say they -- they overlap -- so if I send one to

15  the Navy Region Southeast, usually I'm sending it -- if it's an

16  operational report, it's going all the way -- it's going

17  through Navy Region Southeast.

18  Q.    They're kind of checking both boxes?

19  A.    Correct.

20  Q.    So the missing person requirements, you might send it to

21  Navy Region Southeast and also check the box sending it to --

22  to D.C. at the same time, as an example?

23  A.    Correct.

24  Q.    Okay.  And when -- and you'd agree with me that these

25  relevant things that you keep the -- your superior officers

1  informed of, these relevant things would sometimes be somewhat

2  minor things, like, for example, flight schedules, correct?

3  A.   No.  Flight schedules would not be something that I

4  informed her about unless it affected her or somebody outside

5  of the command.  So flight schedules were things that I would

6  sign out locally.

7  Q.   Well, Admiral -- you heard Admiral Gray's testimony about

8  how there was a point where he would have to talk with you

9  about C-12 schedules in and out of GTMO.  Did that happen, sir?

10  A.   So for specific flights that he or the admiral were

11  involved with, of course it happened.  Or if it was something

12  of -- of a high-level interest to him like -- you know, like

13  getting the NCIS agents down, he talked to me about that one.

14  Q.   And so relevant kinds of things you would need to inform

15  your superior officers about includes things as simple as

16  flight schedules, right?

17  A.   So, I mean, the word "relevant" means if it's relevant to

18  something that is either important to me or important to them,

19  then it is, but that's kind of in the -- you know, that --

20  that -- I think that's in the -- I think there's some

21  discretion there.

22  Q.   Okay.  And you remember when Admiral Jackson took over in

23  the fall of 2014, right?

24  A.   I do.

25  Q.   And she talked to you and the other commanders in a big

1    conference call when she took over, right?

2    A.    Correct.

3    Q.    She told you about her expectations for being kept

4    informed, correct?

5    A.    She did.

6    Q.    Told you things like she didn't want stove pipes for

7    information, correct?

8    A.    Correct.

9    Q.    Like information being kept in one pipe and not putting it

10   into the other pipes that also needed it, told you about that,

11   right?

12   A.    She told me about that.

13   Q.    Told you about how you need to be timely in your

14   notifications; is that right?

15   A.    I don't remember, but I believe she testified to that, and

16   I -- I believe her, so...

17   Q.    And she emphasized the principle you guys have in the Navy

18   called BLUF, bottom line up front.  She told you she cares

19   about that in these conference calls as well -- in that

20   conference call as well, didn't she?

21   A.    Yeah.  So what BLUF means is no one wants to read a

22   400-page document.  Put -- put what you're telling her in -- in

23   the -- just front load it -- put -- that's for anybody.  Put it

24   in the front.  "Hey, you know, here's what's going on," and

25   then all the details.  She would -- you know, she doesn't have

1  time to read all the details from 29 bases every day, so put

2  the BLUF in there.  She'll -- if it's important to her, she'll

3  give it to cause or do something like that.

4  Q.   Put the bottom line up front when -- when you're

5  communicating?

6  A.   Exactly.

7  Q.   And she talked about how you own what happens on your

8  installation, correct?

9  A.   She did say that.

10  Q.   And the inherent responsibility of command?

11  A.   That I think all commanders are familiar with.

12  Q.   And she even got as -- in the weeds in that conversation

13  as about how you as the commander need to focus on even the

14  little things, like the trash on your base, right?

15  A.   Yes.  She was -- that was one of her particularities.

16  She -- trash on the base was one of the things that really

17  would set her off.

18  Q.   Now, Captain, once you became the commander of GTMO, you

19  expected the people under you to follow your orders, right?

20  A.   Absolutely.

21  Q.   You expected the people under you to adhere to good order

22  and discipline, correct?

23  A.   Correct.

24  Q.   You expected the people under you to be honest with you,

25  correct?

1  A.   I did.

2  Q.   And you expected the people under you not to conceal

3  information from you, correct?

4  A.   Correct.

5  Q.   And, Captain, you had even enforced the Uniform Code of

6  Military Justice as the commander of GTMO, correct?

7  A.   I did it in all three commands, correct.

8  Q.   You are familiar with what court-martials are, correct?

9  A.   Correct.

10 Q.   You've even participated as a -- as a member of the

11 presiding officers in court-martials, correct?

12 A.   That's not correct.

13 Q.   But you're familiar with what court-martials are?

14 A.   I am.   It's a -- it's similar to this, only it's done by

15 the military.

16 Q.   Okay.   Now, Captain, at GTMO -- the security department at

17 GTMO, it works for you, correct?

18 A.   It -- it --

19 Q.   The head of the security department reported to you,

20 correct?

21 A.   He did.

22 Q.   He was not a tenant command?

23 A.   Correct.

24 Q.   In fact, the security department is the largest personnel

25 section you had under your command at GTMO, wasn't it?

 1  A.    I believe that is true.

 2  Q.    And you were the head law enforcement officer for the

 3  base, weren't you?

 4  A.    No.  I was never designated a law enforcement officer.

 5  Lieutenant Tidd was the head law enforcement officer for -- for

 6  the base.

 7         I mean, I'm not trying to play games.  I'm saying,

 8  no, I was never a law enforcement officer.  I think that's a

 9  different qualification and it is very specific.

10         So was I in charge of Lieutenant Tidd, who was the

11  head, yes, I was.

12  Q.    I understand.

13         You're not exactly putting cuffs on people yourself,

14  correct?

15  A.    I did do ride-alongs with them occasionally, with the

16  sailors, but I did not put cuffs on people, right.

17  Q.    Correct.  But the law enforcement section reports to

18  you --

19  A.    That is true.

20  Q.    -- and maintains the discipline on your base, correct?

21  A.    Correct.

22  Q.    And, sir, while you were commander of GTMO --

23  A.    So, let me -- when you say, "maintains the discipline on

24  the base," so that's -- that's everybody.  You know, I mean,

25  the chiefs, the -- so the second class maintains the discipline

1    of the third class.  So, I mean, it's a whole -- you know,

2    discipline isn't like -- I'm not walking around disciplining

3    people.  You know, if there's a first class messing up, the

4    chief is going to be on him.  I'm not going to go yell at the

5    first class.

6            I mean, you know what I mean?  It's a -- it's a -- it

7    sounds -- some of these terms sound great, like you're going to

8    walk around, but it doesn't really work.

9    Q.    In other words, in the Navy, sir, everyone in the Navy is

10   in charge of enforcing discipline, correct?

11   A.    That is correct.

12   Q.    And, Captain, you -- you had worked with NCIS before --

13   let's talk about before January of 2015.  You had worked with

14   NCIS before then, correct?

15   A.    I had.

16   Q.    You had worked with them on numerous investigations,

17   actually, that they briefed you on, they were doing on your

18   base, correct?

19   A.    Correct.

20   Q.    Things like sex assaults, correct?

21   A.    Yeah.

22   Q.    Regular assaults, correct?

23   A.    Correct.

24   Q.    You -- you hadn't, while you were commander, had a death.

25   But a person on the base had committed suicide shortly before

1  you took command.  And the investigation NCIS did carried over

2  while you were still in command, correct?

3  A.    That is correct, right.

4  Q.    A gentleman who had gone missing for a couple of days and

5  then hung himself, and NCIS had to investigate what happened,

6  you were familiar with that investigation, right?

7  A.    So I wasn't on board when that happened.  When I took

8  over, they had not closed out the investigation.  So what I

9  remember reading, it was a -- if I'm getting this right, it was

10  a Russian citizen who jumped off a tanker that was at GTMO in

11  the '70s, and then he got hired on the base, and then he had

12  some mental issues, and then he went to the leeward side and

13  hung himself.

14          So, I mean, he would -- he should have never been at

15  GTMO.  He wasn't ever screened properly.  So I -- I -- I am

16  familiar with that case, because -- I remember it because it

17  was an interesting read on how -- how the hell did a Russian

18  get on GTMO.

19  Q.    And -- because the investigation kept going for a while,

20  even after you kept command, correct -- even after you took

21  command, correct?

22  A.    No.  I -- I saw the close-out -- I mean, okay, I

23  believed -- obviously it would have had to have not been closed

24  out for me to have seen it.

25          I didn't participate in it, but they were -- were

1    working on the investigation.  And they said, "Hey, here's the

2    final of this."

3            And I'm like -- you know, I hadn't ever seen it

4    before.  But, you know, things -- when change of commands

5    happen, things don't stop.

6            You know, if you're in the middle of a case, you

7    don't close all the cases.  If they're in the middle of their

8    case, when they finish their case, they send it to me.  And

9    that's what happened in this instance.

10   Q.    And so you got a brief on how NCIS had done a missing

11   person and suicide investigation, correct?

12   A.    It was a death investigation.

13   Q.    That was ultimately determined to be a suicide, correct?

14   A.    Yeah.  And I think we agreed on that.

15   Q.    And it included a missing person component for a while,

16   correct?

17   A.    Correct.

18   Q.    So you were familiar with how NCIS investigates missing

19   persons and potential suicides and deaths, correct?

20   A.    Well, it was a -- I mean, so it was a close-out.  I read

21   the report on what happened, but it -- you know, the report

22   doesn't contain how they do the investigation.

23   Q.    And you knew that the NCIS investigations, they could end

24   for members of the Navy in things like court-martials, correct?

25   A.    They -- they could -- I'm sorry.  They could what?

1  Q.    You knew that NCIS investigations for the members of the

2  Navy, you knew that they could end in penalties like

3  court-martials?

4  A.    Could end in it, yes.

5  Q.    And you knew that things like NCIS investigations could

6  lead to things like federal grand jury investigations, you knew

7  that, right?

8  A.    I don't know that I was aware of that, but, I mean, it

9  makes sense.  I mean, I -- obviously, I know it now.

10  Q.    And you had -- you'd even -- as commander of GTMO prior to

11  January of 2015, you had even met senior members of NCIS,

12  hadn't you, people like the SAC, the Special Agent in Charge?

13  A.    Yes.  I -- I -- we -- we had a case we were working

14  where -- that we had a big case where contractors were holding

15  Filipino passports and not giving them their passports back, so

16  Agent Bisesi and I worked for a long time on that case trying

17  to get it prosecuted.

18  Q.    Special Agent Dunwoodie here in court, he -- he even came

19  and visited you in GTMO in October 2014 and introduced himself

20  to you and explained he was the supervisor of the people on the

21  island, right?  Do you remember meeting him back in October

22  2014?

23  A.    I don't.

24  Q.    Okay.  You still had his business card next to your

25  bedroom table on January 20th, 2015; is that right?

1  A.   When I say I don't remember him, I'm not -- I'm not

2  doubting that I met him.  I'm just saying I don't -- I don't

3  remember --

4  Q.   I got it.

5  A.   You know, I absolutely believe he was down there and

6  talked to him.

7  Q.   You're busy as captain.  It's hard to remember everybody

8  you meet?

9  A.   Exactly.

10  Q.   But you held on to his business card, and it was still on

11  your bedside table on -- when NCIS searched your house

12  January 20th, correct?

13  A.   I don't know what was on my bedside table.

14  Q.   Let's take a look.  I'm going to show you what's been

15  previously marked as Government's Exhibit 350.

16           MR. GEE:  May I approach, Your Honor?

17           THE COURT:  Yeah.

18  BY MR. GEE:

19  Q.   Captain, is that a photograph of your bedside table there

20  at GTMO?

21  A.   I think so.

22           MR. GEE:  Move to admit Government's Exhibit 350.

23           MR. VOKEY:  Objection.  Relevance.

24           THE COURT:  I'll allow it.

25      (Government's Exhibit 350 received into evidence.)

1          MR. GEE:  Can you put it on the screen, please?  And

2   can we zoom in on the top area?

3   BY MR. GEE:

4   Q.    Captain, that's a -- that's an NCIS business card on your

5   business shelf -- on your bedroom dresser next to your -- next

6   to your bed, correct?

7   A.    It looks like it.  I can't -- honestly, I don't see -- I

8   see NCIS on there.

9   Q.    Okay.  Little hard to read what the agent's name is, but

10  it's an NCIS card, correct?

11  A.    Correct.

12  Q.    So even next to your bedside table, you had a number if

13  you had to call someone at NCIS, right?

14  A.    Well, I had agents on the island, and I did call them,

15  and -- but I think Agent Dunwoodie was down trying to help us

16  with the -- the case that I had previously mentioned that was

17  going on, that -- I believe we had a pretty good case against

18  some contractors for holding the Filipino things, and I believe

19  that it was declined prosecution.

20  Q.    So now you remember meeting Agent Dunwoodie?

21  A.    No, I don't, but I do -- I mean, that -- it makes sense

22  that he's down there.

23  Q.    And this bedside table, this is next to your master

24  bedroom bed, correct?

25  A.    Correct.

 1  Q.   The one you went to sleep on on January 9th, 2015,
 2  correct?
 3  A.   Yeah.  I don't think it looked like this, though.
 4  Q.   You slept in your master bedroom at the end of the night
 5  on January 9, 2015, right?
 6  A.   I did.  I did.
 7  Q.   Now, let's talk a little bit about the night of
 8  January 9th, 2015.  So when the party at -- the Hail and
 9  Farewell party was wrapping up, you talked some on direct
10  examination about sort of how -- your offer to have people come
11  back to your house had sort of snowballed into a bigger --
12  bigger group than you planned on potentially coming, correct?
13  A.   Correct.
14  Q.   And that -- that group included Lara.  She was starting to
15  head to -- to your house with the others, correct?
16  A.   That's what I -- I believe that is true.  I -- I did not
17  invite her.
18  Q.   And your wife was off the island at this time?
19  A.   She was.
20  Q.   And, Captain, you'd had other people to your house for all
21  kinds of social parties as the commander on numerous occasions,
22  correct?
23  A.   Correct.
24  Q.   Barbecues, picnics, potluck dinners, things like that at
25  your house, right?

1  A.    Right.

2        So a lot of times we would do stuff at the wardroom.

3  You know, I had a big house and a lot of guys were living at

4  BOQs.  It was nice to just get everybody out and do -- do

5  things there.

6  Q.    Normal sort of social gatherings, right?

7  A.    Correct.

8  Q.    Not really drunken parties at your house, correct?

9  A.    Correct.

10 Q.    So when Commander Ross suggested that having all these

11 people after the Hail and Farewell come back to your house was

12 a bad idea, you agreed with him, right?

13 A.    I thought it was a good call on his part.

14 Q.    And you agreed with him because you already knew it would

15 be inappropriate to have this many drunk people back at your

16 house, right?

17 A.    I knew it was a bad idea when I heard it.

18 Q.    And it was a bad idea because everybody was drunk, right?

19 A.    Well, I don't know how -- if everybody was drunk.  I know

20 that I was intoxicated.

21 Q.    And the other people were intoxicated?

22 A.    Well, again, tell me the people, and I'll tell you who was

23 -- I mean, you know, I don't think I was in a really good shape

24 to be judging whether other people were intoxicated or not.

25 Did I think I was -- I have already testified that I was pretty

1   intoxicated myself, so...

2   Q.   A party at your house with yourself intoxicated and

3   others, that would be inappropriate, correct?

4   A.   No.  It just depends.  I mean, what if I'm sitting around

5   watching football with the -- you know, if I'm watching the

6   Super Bowl, am I not allowed to sit at my house and -- and have

7   a few drinks?  So, I mean, you -- I think you're going to have

8   to narrow it down for me.

9   Q.   Okay.  I'll narrow it down.

10          There were multiple people about to come back to your

11  house?

12  A.   Yes, there were.

13  Q.   You were intoxicated, as you're describing it, correct?

14  A.   Yes, I -- yes.  Yes, I was.

15  Q.   And you knew that Lara was intoxicated, right?

16  A.   I -- I'm -- I'm pretty sure she was.  What -- what --

17  whether I knew she was intoxicated right then or not, I -- you

18  know, I --

19  Q.   And -- and whether you invited her or not, she's one of

20  the people that was starting to head towards your house,

21  correct, sir?

22  A.   That is -- that is pretty clear.

23  Q.   Okay.  And Ms. Wirfel, she's one of the people that was

24  starting to head towards your house?

25  A.   I think she was chasing after Lara.

1    Q.    Okay.  And Mr. Tur is coming up right behind y'all, right?

2    A.    Yes.

3    Q.    And other people coming from the bar, right?

4    A.    Correct.

5    Q.    And you knew that it would be a bad idea to have all of

6    those people coming back to your house for a party?

7    A.    I -- I think I thought it was a great idea until the XO

8    said it's a bad idea.  And then I think I went, "Oh, you know

9    what, he's right.  It's a bad idea."

10   Q.    Because that could be drunk and disorderly conduct, right?

11          MR. VOKEY:  Objection.  And sidebar, Your Honor.

12          THE COURT:  All right.

13   (Sidebar conference:)

14          MR. VOKEY:  Your Honor, I think what we're going to

15   get into is an area here where there are specific offenses that

16   they're going to say that he had a duty to report himself for,

17   and now this is where we have this conflict with the Fifth

18   Amendment that he did not have a duty to --

19          THE COURT:  All right.  Okay.

20          MR. VOKEY:  -- report himself.

21          THE COURT:  What are we trying to get to here,

22   Mr. Gee?  I'm not really following.

23          MR. GEE:  Your Honor, the point is -- is that the --

24   like everything else at the Bayview, he -- he does -- he

25   conceals that it's a drunken party, he doesn't provide those

1    kinds of details, et cetera, and that's all because he does not

2    want questions to be asked about what's going on there, what

3    had happened there, and he knows that because he knows that if

4    the admiral knows that these things had occurred, that it could

5    lead to potential questions about drunk and disorderly conduct,

6    that would uncover the affair, that would uncover all these

7    things.  Bottom line is he knows that this is drunk and

8    disorderly conduct.  He knows if he talks about it that that

9    could lead to further questions.

10           THE COURT:  Well, I guess -- I mean, I think it's --

11   you've asked him like four times now whether it was a bad idea

12   or not, and you are kind of sparring with each other.  But

13   if -- if there's a point -- if you can ask him a question that

14   will get to your -- get you where you're going, that's fine,

15   but I don't want to just keep asking the same question over and

16   over again.

17           So -- all right?

18           MR. GEE:  Yes, sir.

19       (The following proceedings occurred in open court, in the

20   presence of the jury:)

21   BY MR. GEE:

22   Q.   Captain, you knew that it was a bad idea because it could

23   be -- well, it could be drunk and disorderly conduct?

24           MR. VOKEY:  Objection, Your Honor.

25           THE COURT:  I'm going to sustain the objection.

 1          What's your next question?
 2    BY MR. GEE:
 3    Q.    Now, you remember today, as you've described, how you
 4    realized it was a bad idea, right?
 5    A.    Well, in -- and what are we talking about here?
 6    Q.    You can remember realizing it was a bad idea to have all
 7    these people come back to your house, correct?
 8    A.    I -- I -- I remember, yes.
 9    Q.    But you have a memory gap about what Mr. Tur was saying to
10    you at this moment in front of the Bayview, correct?
11    A.    I -- no.  I testified I heard him yelling.
12    Q.    You just have a memory gap about what he was yelling at
13    you, correct?
14    A.    Well, I believe -- I believe what I said was that there's
15    music at -- at the thing.  The XO was talking to me.  I didn't
16    hear all the content.  I knew he was yelling at me.  I knew he
17    was pissed at me.  But I -- I don't have a memory gap.  I just
18    said I didn't hear clearly what he was saying to me.  There's
19    music at the Tiki Bar that's playing, there's other stuff, the
20    XO and I are talking.  I mean, I knew he was yelling, and I
21    also knew the smart thing to do was just walk away and not
22    cause any more confrontation.
23    Q.    So your -- I want to get this straight now to clarify the
24    record.  So your inability to be able to tell members of the
25    jury what Mr. Tur said to you in front of the Bayview is due to

1   the volume of the music, not your memory, as you said earlier

2   today?  Which one is it, sir?

3          MR. VOKEY:  Objection.  He's misstating.  He did not

4   state earlier today that he had no memory of that.

5          THE COURT:  I tell you what.  We'll just let Captain

6   Nettleton explain what he -- what he meant and what he knows.

7          Go ahead, sir.

8          THE WITNESS:  All right.  So my -- my memory of what

9   happened out there is that XO was telling me I should just keep

10  on walking home.  We heard yelling behind us.  It was Chris.

11  He says, "I'm going to handle this," or some words to that

12  effect.  He goes, "Just keep on going home, Skipper.  We're

13  going to go handle this."

14         Now, I -- you know, I think I have been pretty clear

15  that Chris wasn't happy with me when he came to my house.  I

16  mean, I haven't tried to hold anything back.  I'm just saying

17  what I remember of that is XO saying to keep on walking, and

18  I'm like, "All right.  You know, I'm gone."

19  BY MR. GEE:

20  Q.   So you didn't hear Chris yell, for example, "You're F'ing

21  my wife?"

22  A.   No.  He said that to me later in the house.  He said, you

23  know, "Why are you fucking with my wife?"

24  Q.   Let's talk about in front of the Bayview.  You didn't hear

25  him yell "You're F'ing my wife," correct?

1  A.   I -- I don't remember hearing that.  I remember hearing

2  him yelling.  I'm not disputing that he said that.  I'm saying

3  I don't -- I don't clearly recollect him saying that.

4  Q.   And you didn't hear him say, "You must have a" -- in

5  reference to your penis "this big" (indicating)?

6  A.   No, I did not.

7  Q.   And, of course, you never told Admiral Jackson or --

8         MR. VOKEY:  Objection, Your Honor.  The witness

9  already stated he didn't hear anything specific.

10         THE COURT:  I think we need to hear the question,

11 Mr. Vokey.

12         Go ahead, sir.

13 BY MR. GEE:

14 Q.   You never told Admiral Jackson or Captain Gray that he was

15 accusing you of F'ing his wife in front of the Bayview?

16         THE COURT:  I'll overrule the objection and allow the

17 witness to answer.

18         THE WITNESS:  Okay.  Could you repeat the question,

19 please?

20 BY MR. GEE:

21 Q.   You never told Admiral Jackson or Captain Gray that he was

22 accusing you of F'ing his wife in front of --

23 A.   I did.  I told him that he -- in front of the Bayview, no,

24 I did not.

25 Q.   Because you didn't hear it?

```
 1   A.   I -- I think I remember it differently than -- than what
 2   was -- what you're projecting right now.
 3   Q.   So let's talk now about the -- the -- the incident in
 4   your -- in your house.
 5          So, Captain, first off, you recall coming home,
 6   correct --
 7   A.   I do.
 8   Q.   -- on the night of January 9th?  I'm sorry.  Yes, sir.
 9   A.   I do.
10   Q.   And you remember talking to Julia?
11   A.   I do.
12   Q.   You remember talking to her for a few minutes?
13   A.   Yes.  It was a little while.
14   Q.   You even remember details like -- that she told you you
15   should go to bed, too.  And you said, "I'm going to get
16   something else to eat first."
17          You remember that detail, too, right?
18   A.   I do.
19   Q.   But you -- you have amnesia about how Mr. Tur first
20   confronted you inside the house, correct?
21   A.   Correct.
22   Q.   You have amnesia about him saying you're F'ing his wife in
23   the front area of your house, correct?
24   A.   I do remember we had that -- that conversation.  We had it
25   about ten times when he was going around, you know.  He -- but
```

1    he -- he said -- what he said was, "Why were you fucking with

2    my wife?"

3              THE WITNESS:  And -- and, you know, I apologize, Your

4    Honor, but that's what he kept repeating.  He was cycling

5    through all of this stuff.

6              So I don't remember when the discussion had --

7    which -- which -- which is the first one I remember and all

8    that.  But, you know, I -- he was accusing me of things.  I --

9    I have testified to that.

10   BY MR. GEE:

11   Q.   We're going to -- we're going to focus in on what you

12   recall in a second.  Let's focus on what you don't recall

13   first.  Okay?  So prior to waking up --

14   A.   You want -- you want me to testify to what I don't recall?

15   Q.   I'm going to ask you some questions about what you don't

16   recall, yes, sir.  That's how this works.

17   A.   Okay.  Yes, sir.  Go ahead.

18   Q.   So -- so, Captain Nettleton, prior to waking up on the

19   kitchen floor as you described earlier, you don't remember

20   anything about what Mr. Tur said when he first came in your

21   house, correct?

22   A.   That's correct.

23   Q.   Now, when you wake up on the floor, you said that you

24   didn't feel like you were in any danger as Mr. Tur was talking

25   to you, correct?

1  A.    When he was waking me up, that's correct.

2  Q.    And you didn't feel like you were in any danger, but you

3  realized by this point he'd knocked you out, correct?

4  A.    That is correct.

5  Q.    And you knew your daughter was upstairs, correct?

6  A.    I did.

7  Q.    And you remember he spoke to someone on the phone about --

8  and said something about he knocked the Skipper out.  You

9  remember that, right?

10 A.    I do.

11 Q.    But you have amnesia about you agreeing -- you heard

12 Ms. Wirfel's testimony about how she heard that same part of

13 the conversation, but she then heard you be asked, "Didn't I

14 knock you out, Skipper," and you agreed, and she heard you guys

15 laughing, thought you guys were joking?  You heard all that

16 testimony from Ms. Wirfel, correct?

17 A.    I don't remember laughing at any point.  I do remember the

18 rest.  I did hear him tell somebody on the phone that he had

19 just knocked the Skipper out.

20 Q.    Okay.  But you heard Ms. Wirfel's testimony about how he

21 asked you about that and you agreed that -- to that, correct?

22 You remember hearing her description of the call, right?

23 A.    Oh, I'm -- I do remember hearing her description of the

24 call.

25 Q.    But today the part that you're telling us you remember is

1  just Mr. Tur saying he knocked you out?

2  A.    I -- I -- I guess I don't see the -- the difference here.

3  I -- I think it was the same conversation we're both talking

4  about.

5  Q.    Okay.  That's what I'm talking about, is that

6  conversation.  You remember him telling someone about the

7  knocked out part, but you don't remember yourself agreeing that

8  he'd knocked you out; is that right?

9  A.    I don't -- I don't -- I don't recall it, but it could have

10  happened.  I'm not disputing it could have happened, I'm just

11  saying, yeah, there's a lot of things that are kind of patchy

12  on -- on that whole night.

13  Q.    You don't recall it because that's the part of the call

14  that makes it seem like a joke, doesn't it, Captain?

15  A.    Oh, no.  I think Kelly believed it was a joke.  I'm not

16  disputing that, you know.  And -- and I may have said it.  I'm

17  just telling you I don't recall it.

18  Q.    Now, after you wake up and y'all are -- you and Mr. Tur

19  are outside and he's having this cigarette and drinking,

20  he's -- he's talking cyclically as you said, right?

21  A.    Correct.

22  Q.    And this cyclical conversation is happening outside where

23  he is smoking the cigarette.  That's right underneath the

24  bedroom window where you later found Julia, correct?

25  A.    Yeah, it was pretty close to under it.

1  Q.   And let's talk a little bit about the -- the actual

2  physical part of the altercation that you remember.

3            At the time, Captain, you were about 6 foot 3, 230

4  pounds; is that right?

5  A.   That's correct.

6  Q.   And, Mr. Tur, you'd agree with the medical examiner, about

7  6 feet tall, 185, 190 pounds, sound about right for Mr. Tur?

8  A.   I have no idea, but it sounds -- I mean, I -- Dr. Gordon

9  seemed like he was a pretty reliable witness.

10 Q.   So Mr. Tur, a good bit smaller than you?

11 A.   A good bit smaller than me?

12 Q.   You would agree with me he's smaller than you?

13 A.   He is small -- he was smaller than me.

14 Q.   And when you talked about how during this -- during the

15 fight you realized that there was a point where it was -- it

16 was going to happen, "it was on," as you said earlier this

17 morning, right?

18 A.   Yes.

19 Q.   And you said that you realized "he's attacking me,"

20 correct?

21 A.   Correct.

22 Q.   You would agree with me that's the same as you realized

23 he's going to assault you, correct?

24 A.   I think -- I think I said that he was going to -- yeah.  I

25 mean, yes, that he's --

1   Q.   Attack, assault, same thing, right?

2   A.   Yeah, exactly.

3   Q.   And when you -- when you punched him, he starts bleeding

4   from his nose, correct?

5   A.   Correct.

6   Q.   And, Captain, I mean, you've had a nosebleed before,

7   right?

8   A.   I have.

9   Q.   Okay.  Is -- you know, some nosebleeds, just a little bit

10  of blood, you can just kind of wipe off with your finger, other

11  nosebleeds, it's actually pooling into your hand, correct?

12  A.   Correct.

13  Q.   This one, you hit him so hard it's actually pooling,

14  right?

15  A.   You know, I -- it was -- it wasn't pooling anywhere

16  because he was slinging it off as fast as he'd get it on there.

17  So, I mean, I never saw a pool of blood.  I saw him slinging

18  it.

19  Q.   Well, Captain, you'd agree with me those kinds of

20  nosebleeds that you just kind of can wipe off with your finger,

21  that's not a whole lot of blood, right?

22  A.   I would agree with that.

23  Q.   So this was a nosebleed that -- it's a lot of blood?

24  A.   Absolutely.

25  Q.   It's so much blood that even after you gave him that paper

1  towel at the kitchen table, later on, when things calmed down,

2  there's still blood on the paper -- on the kitchen table, even

3  after you gave him the paper towel at the table, right?

4  A.   Correct.

5  Q.   And, Captain, you -- prior to this trial, you were

6  provided with discovery in this case, correct?

7  A.   Yes.

8  Q.   Things like the reports on where the blood was found,

9  correct?

10  A.   I think I -- I believe that y'all gave me everything you

11  had.

12  Q.   Photographs of where the blood was found?

13  A.   That would be included.

14  Q.   And you -- you -- you've read those reports, right?

15  A.   You gave me 500,000 pages worth of documents.  I would

16  venture to say there's probably some reports I haven't read.

17  Q.   You read the blood recovery reports about where the blood

18  was found, correct, sir?

19  A.   Yes.

20  Q.   And you looked at the photos about where the blood was

21  found, correct, sir?

22  A.   I did.

23  Q.   Now, once you punch him and he's -- he goes to one knee --

24  correct?

25  A.   Correct.

1   Q.    And you have a good memory, it sounds like, that his left

2   hand is on the ground and his right hand goes to his nose?  Or

3   is it vice versa?

4   A.    So his right hand was catching him when he fell.

5   Q.    Got it.

6   A.    And -- and then he used his right hand to hit the wall, so

7   I'm pretty sure it was his left hand that went to his nose, but

8   I think the only reason it was his left hand was because he

9   was -- he was going to fall over if he didn't use his right

10  hand.

11  Q.    Got it.  So you have a good memory about even which hand

12  went to the floor, huh?

13  A.    You know, if you're in the middle of a fight and

14  adrenaline is going, I think that's something you're not going

15  to forget.

16  Q.    And while he's down there with his -- with his left hand

17  to his nose and his right hand to the floor, he also sort of

18  bangs on the wall, as you said, correct?

19  A.    Well, I think -- you know, it's hard to describe it.  This

20  stuff was all happening, you know -- it's easy to say, well, he

21  was standing on the floor hitting the thing and rubbing his --

22  it's all happening in real time and I'm -- I'm telling you the

23  best I can recollect of it.  But there's -- certainly I -- I

24  know the -- when he fell, he put his right hand down, I know he

25  grabbed his nose, and I know -- and I know he hit the wall a

1 few times and cussed at me, came after me.  I MF'd him back.

2 We were pissed off at each other and -- but I also know that

3 was the end of it.

4 Q.   And he's hitting the wall a few times while he's still on

5 the ground after he went down to his knee, correct?

6 A.   Yes.

7 Q.   And you would agree with me Mr. Tur is pretty intoxicated

8 still at this point?

9 A.   Yes.

10 Q.   So intoxicated Mr. Tur manages to stay on one knee while

11 cupping his bleeding nose and banging on the wall without

12 falling over?  That's what your testimony is?

13 A.   Yeah.  Because, I mean, you can bang on the wall, you're

14 going to keep propping yourself up with it, too.  He was -- he

15 wasn't banging the wall to try to hold himself up, though.  He

16 was banging the wall because he was pissed.

17 Q.   And your testimony about the fight today is that you

18 pushed him in the chest at one point during the fight; is that

19 right?

20 A.   I did push him.  I pushed him back.  I don't know -- yeah,

21 it was probably one -- on the chest area.

22 Q.   But you don't think you broke his ribs, right?

23 A.   I know I didn't break his ribs.

24 Q.   You were just unlucky and somehow he broke his ribs after

25 he left your house, huh?

1  A.    Well, yeah, that's exactly what happened.

2  Q.    Now, let's talk about that, when he left your house.  So

3  you knew when you leave him at that kitchen table to go

4  upstairs to check on your daughter, you knew he's in emotional

5  distress, right?

6  A.    I knew that he was angry and pissed off that his nose was

7  bleeding and he's sitting at a table.

8  Q.    Okay.

9  A.    I mean, look, he was in emotional distress.  Did I

10 recognize it correctly?  No.  Did I understand what the cycling

11 of the emotions was?  No.  I mishandled that completely.

12 Q.    And when you come back downstairs from checking on --

13 on -- on your daughter, he's not there anymore, right?

14 A.    Correct.

15 Q.    And at this point you knew he had been angry, correct?

16 A.    Correct.

17 Q.    Cyclical in his -- in sort of his conduct with you?

18 A.    Yes.

19 Q.    You had seen it at the Bayview earlier even, right?  Him

20 yelling at you?

21 A.    Well, when he -- yeah.  I mean, it was -- it seemed like

22 it was a continuation, but I don't -- again, the Bayview -- the

23 Bayview piece is less clear to me than it was at the house.

24 Q.    You knew he was being emotionally cyclical at your house?

25 A.    Yes.

1  Q.   And you knew, of course, he was violent at this point,

2  correct?

3  A.   He was not violent at the point once he's sitting down at

4  the table.  He was fine.

5  Q.   You knew he had just been violent with you a short time

6  earlier?

7  A.   For the second time that night, yes.

8  Q.   And you knew he's acting erratically, correct?

9  A.   Yes.

10 Q.   And when he's not there in your house, you know that Lara

11 Tur lives -- that he lives with Lara Tur, right?

12 A.   Correct.

13 Q.   And you know that their 15-year-old daughter lives with

14 them also, right?

15 A.   Right.

16 Q.   And you knew he had been violent with Lara before,

17 correct?

18 A.   I -- she said abusive, so, yes, I -- you know, I would

19 take that as being violent.  So I'll say yes to that.

20 Q.   But with your knowledge of all that and of what had just

21 happened and then him vanishing, you didn't call Lara, did you?

22 A.   No, I didn't.

23 Q.   You let this erratic man just go home to Lara?

24 A.   I don't think anyone is going to argue with you that I

25 could have done a better job that night.

1  Q.    And let's talk about the search for him when you didn't

2  find him at the table.  You talked some about --

3          MR. GEE:  May I just grab one of the exhibits, Your

4  Honor?

5          THE COURT:  Yes.

6  BY MR. GEE:

7  Q.    This is Defense Exhibit 27.  You talked some about how you

8  went outside and you checked the left side of the house for

9  Mr. Tur, right?

10 A.    Correct.

11 Q.    You even checked this storage pantry area?

12 A.    No.  I said I walked around the outside of the house and

13 looked so I could see the sidewalk.

14 Q.    And you said you even looked down towards the dock area,

15 but you didn't go down there, right?

16 A.    Correct.

17 Q.    And then you went back inside and you took a shower,

18 right?

19 A.    I think I went back inside and -- yeah, I think I took a

20 shower and then I talked to my son.  I believe that's correct.

21 Q.    And you would agree with me, Captain, this is a -- it's

22 actually a -- it's a beautiful home, right?

23 A.    It was an amazing home.

24 Q.    It's a big home, right?

25 A.    It was Admiral Buckley's house when he was down there.

1  Q.   And you didn't, for example, that night go and look to see

2  if he was in the garage, did you?

3  A.   I did not.

4  Q.   You didn't look to see if he's over on the right side of

5  the house, did you?

6  A.   I did not.

7       MR. GEE:   And, in fact, let's call up Government's

8  Exhibit 181, please.   It's already been admitted.

9  BY MR. GEE:

10 Q.   This is the picture of the tip of Deer Point where you

11 lived, right?

12 A.   Right.

13 Q.   And right underneath that -- Mr. Nothstein will help me

14 out -- right underneath that big tree we see at the end, that's

15 your house right underneath that big tree just a little higher

16 up, right?   We can see, like, part of the white wall of your

17 house, right?

18 A.   Correct.

19 Q.   So your house is actually surrounded on all sides, except

20 for the Bayview side, with cliffs, right?

21 A.   Correct.

22 Q.   And you didn't walk around those cliffs to see if he was

23 around the cliffs, did you?

24 A.   Well, I don't think you could get to him.   But if he -- if

25 he had gone down those cliffs, that's where we would have found

1    him.  There's only about a foot of water or more there.

2    Q.    You didn't walk around the edge of your yard where it

3    drops off into those cliffs --

4    A.    Well --

5    Q.    -- to look for him, did you?

6    A.    -- if he -- if he would have gone out in my yard, my dogs

7    would have, you know, been all over him barking again, and they

8    didn't bark, so I don't believe he went back there.

9    Q.    Well, we can see the white part of your house, right?

10   It's just -- it's also on the screen in front of you, Captain

11   Nettleton.

12   A.    Yeah.  I --

13   Q.    And we can see the white wall of your house, right?

14   A.    Correct.

15   Q.    So there's also cliffs in front of your house even

16   regardless of the backyard cliffs where your dogs are, right?

17   A.    There are cliffs all the way around the house.

18   Q.    And you'd agree with me you don't go into the backyard to

19   see if he's in the backyard, right?  Because your dogs are back

20   there.

21   A.    No.  I think I testified earlier that I looked over the

22   fence to see was he back there.  But if he had gone in the

23   backyard, the dogs would have been barking at him.  The reason

24   they were outside is because they were barking at him so much.

25   Q.    And you don't walk all the way around your house to check

1  the area on the other side of your house where there are cliffs

2  also, correct?

3  A.   That's correct.

4  Q.   And you don't walk down here to the dock to check on him

5  down there, right?

6  A.   That's correct.

7  Q.   And you didn't call the GTMO security department, did you?

8  A.   That's correct.

9  Q.   And you certainly had the number for the GTMO security

10  department, didn't you?

11  A.   I did.

12  Q.   You'd called from your house on other occasions to do

13  regular work, right?

14  A.   I could have reached them instantly if I -- if I wanted

15  to.

16  Q.   And, Captain, you knew if you had called them, that it

17  would have been their duty to investigate any kind of assault

18  that had occurred in your house, correct?

19  A.   Correct.

20  Q.   Regardless of who's -- who did the assaulting, right?

21  A.   Correct.

22  Q.   And you knew that the findings that they had would be

23  reported to the Navy, right?  If they were investigating

24  assault, their findings would be reported to the Navy, correct?

25  A.   Right.  It would have been reported to the commanding

1  officer.

2  Q.   And given that you, the commanding officer, yourself, was

3  involved, you're aware that if there was an assault involving

4  the commanding officer, that NCIS would get called in to -- you

5  know that when it's an incident involving a commanding officer,

6  right?

7  A.   I assume that's true, but --

8  Q.   You didn't think the people under your command would be

9  who'd investigate an assault at your house, did you?

10  A.   Well, you know, the only thing I knew about investigating

11  assault at my house is that it would cost Mr. Tur his job.

12  Q.   And let's talk about that.  So Mr. Tur, whose job you

13  didn't want him to cost -- I mean, Mr. Tur and you, it's not

14  like y'all hung out together, did you?

15  A.   No.  We -- we had a good work relationship.  And I would

16  say we were -- I'd say we were acquaintances, but we didn't

17  hang out like on a super regular basis.  But we did see each

18  other and I liked him.

19  Q.   And, of course, you were sleeping with his wife, right?

20  A.   I did.

21  Q.   And you've reported -- or you were aware of law

22  enforcement investigating other assaults that had occurred on

23  GTMO during your time in command, right?  There had been other

24  assaults on GTMO during your time in command, right?

25  A.   You have to be more specific.

1    Q.    Other people that got in bar fights, other types of

2    altercations that were investigated during your time in

3    command, correct?

4    A.    Yes.

5    Q.    And you knew that Lara Tur, even if Chris lost his job,

6    that she could still get sponsorship on the island, you knew

7    that, right?

8    A.    I -- I don't think I ever thought about it that way at

9    all.

10   Q.    Well, there were other directors besides her on the island

11   who they had sponsorship, correct?

12   A.    So I think her sponsorship was never in question.  I mean,

13   she -- she could have been sponsored as a department head.  She

14   would have -- that was a sponsored job.

15   Q.    So even if Chris lost his job, you knew that she'd be able

16   to stay on the island?

17   A.    I think you're missing the point, that I didn't really

18   want him to lose his job.  I don't think -- you know, I think

19   he had some issues that the Navy failed to recognize and

20   clearly I failed to recognize.

21   Q.    You knew that even if Chris lost his job, Ms. Tur could

22   stay on the island due to her job, correct?

23   A.    Yes.

24   Q.    And so your plan was this person that had just assaulted

25   you in the house, you were going to keep it quiet so he could

1  keep his job and stay at GTMO?  That was your plan?

2  A.    I didn't have a plan.  I mean, does anything about that

3  night sound like I had a plan?

4  Q.    Well, you certainly didn't plan on calling the security

5  department, did you?

6  A.    No, I didn't.

7  Q.    And you -- as you were -- earlier, as you were going

8  upstairs to check on Ms. Nettleton, your daughter -- you took

9  your shirt off, right, the shirt that had been -- the torn

10  shirt?

11  A.    Correct.

12  Q.    And what did you do with it after that?

13  A.    So I threw it in my -- I just threw it into the study and

14  then walked up the stairs, and then I -- the next morning I

15  threw it away.

16  Q.    Let's talk about that.  So the next morning, when Randy

17  and Ms. Wirfel come to your house, they -- they informed you

18  that Mr. Tur was missing, right?

19  A.    They did.

20  Q.    We're going to talk more about that conversation in a

21  second.  But after that conversation is when you throw away the

22  ripped shirt, right?

23  A.    No.

24  Q.    When do you throw away the ripped shirt, sir?

25  A.    You know, it probably was after, because they woke me up.

1    Yeah.  You're absolutely right.

2    Q.    So you know Mr. Tur is missing and this shirt of yours

3    that had been torn in the struggle you threw away after you

4    learned he was missing?

5    A.    I threw it away because it was ripped.

6    Q.    And you're aware that all the trash on GTMO is burned,

7    right?

8    A.    I am.

9    Q.    And after you learned that Mr. Tur was missing from

10   Ms. Wirfel and Mr. Barger, that's when you cleaned up some of

11   the blood that you observed, right?

12   A.    That is correct.

13   Q.    You actually got paper towels and cleaning solution to do

14   that, right?

15   A.    Correct.

16   Q.    Even got on your hands and knees to clean up some of that

17   on the ground, right?

18   A.    I -- I'm assuming I did, yes.

19   Q.    Working hard to get up that blood, right?

20   A.    I mean, you know, you -- you're going to use a cleaning

21   solution because it's blood.  I mean, you're not just going to

22   use water.

23   Q.    And you talked about how Mr. Tur was bleeding into his

24   hand and sort of casting it off during the altercation the

25   evening before, right?

1   A.   I did.

2   Q.   And how when you -- when you hit him and he went down to

3   his knee, he's got his hand to the -- he's got his hand to his

4   nose there on the floor, right?

5   A.   I'm sorry.  Say that again.

6   Q.   He's got his hand to his nose while he's on the floor

7   there, right?

8   A.   Yeah.  He's not -- he doesn't have his hand like this.

9   He's like holding his nose because it's bleeding.

10  Q.   And when you put him at the kitchen table, you even give

11  him a paper towel, right?

12  A.   I gave him a paper towel before and then I put him at the

13  table.  And then I went and got paper towels and put ice in

14  them and gave them to --

15  Q.   So he's got blood all over his hands, right?

16  A.   Yeah.  I --

17  Q.   And he's touching things in your house, right?

18  A.   Well, he -- the only thing he would -- you know, I sat him

19  down at the table, so he was touching the table.

20  Q.   And so he's leaving things like bloody handprints in your

21  kitchen that you cleaned up, too, right?

22  A.   Honestly, I don't remember any bloody handprints.  The

23  whole reason I gave him the paper towel was to keep him from

24  getting blood anywhere else, because he was slinging it.

25  Q.   And when you're cleaning up that blood, you know that it's

1  evidence of the assault from the night before, right?

2  A.    Now, I promise you I never thought it would be evidence.

3  Q.    Because you thought you were just going to keep the

4  assault quiet?

5  A.    No, because I -- I didn't think of it -- you know, you're

6  saying -- you keep saying, oh, it's an assault, it's this, it's

7  that, but that wasn't how I was thinking of it at all.

8  Q.    Now, the next morning, Saturday morning, you wake up in

9  your house, right?

10  A.    I did.

11  Q.    And you've got phones in your house, correct?

12  A.    I've got phones in my house, yes.

13  Q.    You didn't use those phones to call the security

14  department and report what happened the night before, did you?

15  A.    I did not.

16  Q.    You didn't use those phones to call NCIS and report what

17  had happened the night before, right?

18  A.    No, I did not.

19  Q.    And you knew if you called them, they'd ask, "Well, what

20  was he accusing you of when he came to your house, Captain?"

21        You knew that'd happen, didn't you?

22  A.    I honestly never thought about that once.

23  Q.    So when Mr. Barger and Ms. Wirfel come to your house,

24  first they ask you had you seen Mr. Tur and you said no, right?

25  A.    That's correct.

1  Q.   And then they informed you that he was missing, right?

2  A.   Right.

3  Q.   And I want to make sure we -- we got this right now for

4  the record, Captain.  This -- this afternoon you talked about

5  how at some point Ms. Wirfel told you about getting the call

6  from Mr. Tur and how he told her that he'd knocked you out.

7  But this morning when you were talking about this encounter

8  with Mr. Barger and Ms. Wirfel, you didn't mention the phone

9  call being told to you in that encounter at your front door.

10  Did she tell you about it at your front door or not?  Let's

11  just be clear.

12  A.   I believe it was the front door when she told me.

13  Q.   You just forgot to mention that this morning?

14  A.   You know, I thought I did mention it.  But if I didn't,

15  then -- I mean, we did talk about -- that Chris had been at my

16  house.  I do remember testifying to that.

17  Q.   Okay.  So now we've got that straight.  So she actually

18  tells you that Mr. Tur called her and said he'd knocked you

19  out.  Right there at your front door, she tells you this

20  Saturday morning, correct?

21  A.   I'm sorry.  Ask that again, because --

22  Q.   I'll rephrase, yes.

23  A.   Okay.

24  Q.   Right there at your front door, Saturday morning, she

25  tells you she had gotten a call from Mr. Tur in which he told

1    her that he had knocked you out?

2    A.   I -- I don't remember her specifically saying that, but

3    she could have.  What I do remember is that she talked to me

4    about Chris coming to the house, and I told them, you know, he

5    was all over the -- the place.  You know, I know we -- we

6    talked about it.  I -- I assume it came up.  But what I

7    remember talking to her about was what I testified earlier, is

8    that I was telling them, "Hey, he was all over the place."

9          I think she did tell me, but, you know...

10   Q.   And regardless, you'd agree you did not tell her or

11   Mr. Barger that he had come inside and there had been a

12   physical altercation inside, you didn't tell her that, right?

13   A.   I think -- I believe that is correct.

14   Q.   And at this point, of course, no one has told you that

15   Mr. Tur went back to the Bayview or was seen at Marine Hill,

16   you don't have any of that information at your front door with

17   Randy Barger and Ms. Wirfel that Saturday morning?  None of

18   that has come to you yet, has it?

19   A.   No, but I -- I'm pretty sure I assumed he went back to the

20   Bayview, because that's what he -- that's where he was trying

21   to get me to go.

22   Q.   So at this point as they're at your front door, you know

23   you're the only -- you're the last person that had seen him and

24   yet you don't tell them about the fight; isn't that right?

25   A.   I think you're -- you're incorrect.  What I -- I think --

1  that's not why I didn't tell them.  I've already testified that

2  I didn't tell them about the fight because I didn't want

3  anybody to know because I didn't want him to lose his job.

4  That was my motivation, so...

5  Q.   Let's break it down.  By this point when they're at your

6  front door --

7  A.   Right.

8  Q.   -- no one has told you he went back to the Bayview, no one

9  has told you that, right?

10  A.   No.  I -- I'm not basing it on someone telling me about

11  the Bayview, I'm basing it on him trying to get me to go to the

12  Bayview.

13  Q.   And no one has told you this stuff about a bill at the

14  Marine Hill, no one's told you that, right?

15  A.   A bill at Marine Hill.  You're talking about the credit

16  card charge?

17  Q.   Yep, uh-huh.  No one has told you about that yet, right?

18  A.   That's correct.

19  Q.   Okay.  So they're asking you if you've seen Chris and

20  telling you he's missing, telling you about this knocked-out

21  call, and you don't tell them about the fight inside your

22  house, correct?

23  A.   Okay.  I'm not sure what I'm saying "correct" to --

24  read -- if you can repeat the question.

25  Q.   I'll move on.  It's fine.

1          All right.  Now, you knew if you had told them about

2    Mr. Tur assaulting you inside, that they would have reported

3    it; you knew that, right?

4    A.    I don't think so.  I think they probably would have gone,

5    "Yep, sounds about right."

6    Q.    You thought that their friend was missing and that you

7    could tell them there had been a physical altercation with him

8    inside your home and that they would not report that?

9    A.    I didn't say that.  I -- you asked me what -- all I was

10   saying is I don't think they would have been shocked.

11   Q.    After they leave and you clean things up, that's when you

12   go to the Bayview to look for your credit card, right?

13   A.    That's correct.

14   Q.    And you talked about how in the Bayview you had to talk to

15   one of the managers to get your credit card, right?

16   A.    He was one of the Filipino workers, yes.

17   Q.    And we'll just use this map because it's easiest right

18   here.  This is Exhibit 41A.  This is a map of Deer Point,

19   right?  So your house is at the tip of Deer Point, right?

20   A.    Right.

21   Q.    And there are a couple of people, just a couple of senior

22   officers that live between you and the Bayview, right?

23   A.    Right.

24   Q.    But the Bayview is the first major structure off Deer

25   Point from your house, right?

1    A.    Tell me what you mean by "major structure."

2    Q.    It's the first commercial structure with people working in

3    it, right?

4    A.    That is true.

5    Q.    And when you arrive at this first commercial structure

6    with people working in it that morning, you don't ask any of

7    them, "Have you seen Mr. Tur?  He's missing," do you?

8    A.    No, I didn't.  It was the morning shift.

9    Q.    Now, let's talk about this meeting --

10          MR. GEE:  And, Your Honor, I don't know if you want

11   me to keep going or break here.

12          THE COURT:  Why don't you -- come on back for a

13   second.

14          MR. GEE:  I'm happy --

15      (Sidebar conference:)

16          THE COURT:  What's your estimate?  You got a while?

17          MR. GEE:  Yes, sir.

18          THE COURT:  Yeah.  That's what I figured.  Okay.

19          But we should -- we should finish with him certainly

20   by lunchtime, right?

21          MR. GEE:  (Nods head affirmatively.)

22          THE COURT:  Okay.  So I think what I'm going to do is

23   tell them to come back -- you think if we start at 8:30 and do

24   the charge conference at 8:30, do you think we'll be ready to

25   go at 9:30?

1          MR. VOKEY:  I would think we would.

2          MR. GEE:  I don't think we have a lot for the charge

3   conference.

4          THE COURT:  Yeah.  All right.  So maybe we'll do a

5   charge conference at 8:30.  We'll get them -- we'll start back

6   with them at 9:30.  We'll finish him, maybe we'll have lunch,

7   and then we'll go right into closings, I guess, if that's --

8   are we still -- you're done after him?

9          MR. VOKEY:  Yes, sir.

10          THE COURT:  And you're not going to rebut?

11          MR. GEE:  I don't think so, no, Your Honor.

12          THE COURT:  Okay.  All right.  So does that sound

13   like a plan?

14          MR. NOTHSTEIN:  Yeah, Your Honor.  Has the Court made

15   a decision on when you're going to instruct, before or after

16   closings?

17          THE COURT:  We can talk about it when they leave.

18          MR. NOTHSTEIN:  Okay.

19          THE COURT:  Yeah.  Is that all right?

20          MR. VOKEY:  Yes, sir.

21      (The following proceedings occurred in open court, in the

22   presence of the jury:)

23          THE COURT:  All right.  Ladies and gentlemen, this --

24   we're not going to be able to finish this examination today, as

25   you might have expected.  So -- so I'm going to go ahead and

 1    turn you loose.

 2              Let's go ahead and be back at 9:15 tomorrow morning,

 3    please.  And we'll get a 9:30 start, just like this morning.

 4    And -- and we'll go from there.

 5              So please remember all my instructions.  It's really

 6    important to keep them all in mind.  And -- but I'll go ahead

 7    and turn you loose for the evening.  We'll see you all back

 8    here tomorrow at 9:15.

 9              Thank you, ladies and gentlemen.

10              COURT SECURITY OFFICER:  All rise for the jury.

11         (Jury exits, 4:56 p.m.)

12              COURT SECURITY OFFICER:  Please be seated.

13              THE COURT:  Captain Nettleton, you can join your

14    counsel if you want to, sir.

15              THE DEFENDANT:  Thank you, sir.

16              THE COURT:  Let me...

17              So Mr. Nothstein asked me whether I was going to

18    instruct first or let the closings be first, and I understood

19    there was a disagreement about that among you.

20              But I think in this case I'm going to go ahead and

21    instruct first.  And I think so because the jury has already

22    asked for the elements of the charges previously, so it's

23    obviously something they're interested in.

24              The elements are a little bit complicated and

25    involved, and I think the jury will be better informed as to

1    the closing arguments, and the lawyers can play off of the

2    instructions a little better if I -- if I do it first.

3            So I'm going to go ahead and do that.

4            I will tell you just so you're -- because I know

5    different courts do things differently.  When I instruct, I put

6    it up on the screen, they follow along.  I read it, of course,

7    but then I also give them printed copies of the instructions

8    back in the jury room.

9            So even if I instruct first, they'll have the

10   instructions back with them after -- after the closing

11   arguments.  So -- so I think that's -- I think that's what I'm

12   going to do.  It's a discretionary matter and I think that -- I

13   think I'm going to do that in this case.

14           Do we -- is it profitable for us to discuss jury

15   instructions now or would you prefer to wait until 8:30

16   tomorrow morning?  We've gone through them and there's a --

17   there's a few things we want to clean up and point out.

18           I know -- and so I guess I'm wondering whether it

19   makes sense to spend a little time with it now or is it --

20   would everybody be better prepared at 8:30 tomorrow morning?  I

21   want to make sure we get them settled and then be able to go

22   into the testimony, so...

23           MR. VOKEY:  Probably in the morning.

24           THE COURT:  Okay.  All right.  I'm willing to do

25   that.

1    Let me just tell you a couple of things as you're

2  going through it that -- obviously now that Captain Nettleton

3  has testified, certain of the alternates will -- will come out

4  and we'll include the ones that -- that apply when a defendant

5  testifies.

6    Regarding the substantive charges, we're -- we're

7  looking at -- I believe it was --

8    (Judge confers with law clerk.)

9    THE COURT:  With respect to Count One, we're -- I'm

10  relatively happy with it.  There's a few tweaks.  But we'll

11  probably take out the reference to the aiding and abetting.

12  That's at least what I'm thinking about doing.

13    With respect to Count Two, which is Jury Instruction

14  No. 10, we're going to take out all the references to the

15  federal grand jury proceeding, because, as I understood it,

16  Mr. Nothstein, y'all are not pursuing that aspect of the

17  1512(c)(2); is that correct?

18    MR. NOTHSTEIN:  That's correct, Your Honor.

19    THE COURT:  Okay.  So we'll have to conform the

20  instruction.  Not only are the references to the federal grand

21  jury, but then in the penultimate paragraph it talks about

22  plural proceedings, and so we're going to have to tidy that up

23  a little bit.  And so we're -- we've got that in process.

24    With respect to Count Four and Five, the government

25  asked me to consider the additional instructions which were in

1   the joint instructions.  I am considering those.  I note that

2   the Fifth Circuit pattern does include some of the language

3   that the government has requested, maybe all of it.  I notice

4   that the two cases that the government cited that -- or that

5   the parties did, I guess jointly, are some of my colleagues

6   from around the district, and I note that they did not include

7   that language.  They stopped where we did.

8          So there's a split of authority there, I guess, so to

9   speak.  But I'm willing to listen to why we ought to include

10  either some or all of the Fifth Circuit language in -- with

11  respect to Counts Four and Five.

12         And then I am -- right now we have not done it, but I

13  think we discussed the fact that we're likely to take the

14  aiding and abetting instruction and attach it to Count Four but

15  not to any other count, and so we have not physically done that

16  or tried to do it, but that's something I assume that we'll do

17  as part of our final run-through with respect to the

18  instructions.

19         So those are things that we're looking at.

20  Obviously, we'd be happy to hear any other things y'all want to

21  talk about in the morning.

22         Did we give out the verdict form or not?

23         LAW CLERK:  I e-mailed it to them.

24         THE COURT:  So we also provided you with a proposed

25  verdict form.  So I'll ask you to take a look at that and give

1   me any comment on it.  And we'll plan on meeting at 8:30 to do

2   the charge conference and testimony will resume at 9:30.

3           Anything else from the government?

4           MR. GEE:  Can I just have the Court's indulgence?  I

5   want to ask the defense about the defendant's statement and see

6   if we have agreement or not.

7           THE COURT:  Sure.

8       (Counsel confer.)

9           MR. GEE:  It sounds like, Your Honor, we have

10  agreement about the -- the defendant's videotaped invocation

11  that the government would play at some point in

12  cross-examination, if we choose to, but we play it up to the

13  invocation part and then cut it off.  And now that that's

14  happening, I think we'll just play the whole tape, if I choose

15  to.

16          Sounds like there's no objection.

17          THE COURT:  When you say "the whole tape," how long

18  is it?

19          MR. GEE:  Oh, it's not -- it's probably -- it's --

20  I'd have to time it.

21          MR. VOKEY:  There's a lot of nothing after the

22  invocation, sir, and fingerprinting and that kind of stuff.

23          MR. GEE:  We'll cut it off after the invocation, but

24  the opening stuff that was testified about is --

25          THE COURT:  And I was asked to rule on whether to

 1   admit it, but I was not required to do so because

 2   Captain Nettleton, through counsel, decided that they were not

 3   going to object to it.  So I'll -- we'll follow along with

 4   that.  That will be fine.

 5              Anything else from the government?

 6              MR. GEE:  I don't think so.  Thank you, Your Honor.

 7              THE COURT:  Anything else, Mr. Vokey?

 8              MR. VOKEY:  No, sir.

 9              THE COURT:  All right, then.  We'll see everybody at

10   8:30.

11              COURT SECURITY OFFICER:  All rise.

12       (Short pause.)

13              THE COURT:  Counsel, I just want to be clear.  We --

14   I do plan -- if we finish with Captain Nettleton in the

15   morning, as I expect, I do expect that we will go straight to

16   charge and closing argument either right after lunch or

17   whenever that break is.  I mean, I'm intending to go straight

18   through.  Okay?

19              MR. VOKEY:  Understood.

20       (Short pause.)

21              THE COURT:  All right.  Let's go back on one more

22   second.  Sorry.

23              Now that we're talking about closing, Mr. Burns

24   pointed out to me that we haven't talked about the length of

25   those closings.  And if you're going to prepare them, you

1    probably need to get some direction from me.

2           So what I'll do is entertain requests for -- because

3    I -- I do -- of course, I want the parties to have the time

4    they need, but I have found from experience that time deadlines

5    are a useful thing, even for the lawyer actually making the

6    argument.  So I'll start with the government.

7           What is --

8           And, of course, the government gets the first closing

9    and it gets rebuttal.  But the total time is going to be the

10   same as the defendant's.

11          And so what is the request of the government in terms

12   of time?

13          MR. NOTHSTEIN:  Your Honor, I'd ask for 90 minutes in

14   total between opening, close, and rebuttal.

15          MR. VOKEY:  I think that's right on.

16          THE COURT:  Boy, that's a long time.

17          MR. NOTHSTEIN:  Your Honor, I know that -- I know

18   that it is.  You know, openings, I would note, were 45.  But,

19   again, we have pretty complicated instructions.  I think it's a

20   pretty complicated fact pattern of what happened not only on

21   the night of the 9th, but in the days afterwards.

22          THE COURT:  So here's where I was.  I -- I have gone

23   on record before as saying that any closing argument that lasts

24   longer than an hour is too long.

25          But in deference to the relatively complicated nature

1  of the law and the facts in the case, I was going to give you

2  an hour and 15.  Now you're asking for an hour and 30.  That is

3  a long time.

4          Are you going to use all that?

5          MR. VOKEY:  I think I might, sir.  I mean, we -- I

6  think my direct of Captain Nettleton lasted -- I don't know how

7  long, but it was pretty long.

8          THE COURT:  Yeah.

9          I know I'm going to regret this, but all right.  If

10  that's what y'all really think.

11          However, the rebuttal can be no longer than

12  15 minutes, then, all right?  You can't load up on -- you can't

13  load up -- you can't back-end load.

14          MR. NOTHSTEIN:  Understood, Your Honor.  I think my

15  intent was to do an hour and save 30 in case it was necessary,

16  but 15, of course --

17          THE COURT:  Well, all right.  I'll say 20 then.  But

18  I don't like rebuttals to -- you know, to be -- to trump the

19  beginning part of it, so.

20          MR. NOTHSTEIN:  No, Your Honor, just to rebut what is

21  said, not for a second closing argument.

22          THE COURT:  Okay.  Then -- and Ms. Diaz is the

23  timekeeper.  If -- if you want to -- if you want her to, you

24  know, give you certain signals as you go along, that's fine.

25  But I will tell you this, if I give you that much time, I'm

1   going to mean it.

2            And so you need to land within that time.  Okay?

3   We're not going to extend it.  We're not going to go another

4   ten minutes or whatever.  90 minutes is plenty of time.

5            And so -- all right?

6            MR. NOTHSTEIN:  Yes, Your Honor.

7            THE COURT:  Ms. Diaz, anything else?

8            COURTROOM DEPUTY:  No, sir.

9            THE COURT:  Anything else?

10           LAW CLERK:  No, sir.

11           THE COURT:  All right.  We are officially in recess.

12       (The proceedings adjourned at 5:08 p.m.)

13                              - - -

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a true
and correct computer-aided transcription of my stenotype notes
taken at the time and place indicated herein.


        DATED this 14th day of January, 2020.




                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC