IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Jacksonville, Florida |
| Plaintiff, | Case No. 3:19-cr-1-J-32PDB |
| vs. | January 15, 2020 |
| JOHN R. NETTLETON, | 8:33 a.m. |
| Defendant. | Courtroom No. 10D |

_____

JURY TRIAL
(VOLUME VII)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

Shannon M. Bishop, RDR, CRR, CRC
221 North Hogan Street, #150
Jacksonville, FL  32202
Telephone:  (904)549-1307
dsmabishop@yahoo.com

(Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

        **TODD GEE, ESQ.**
        **PETER MARSHALL NOTHSTEIN, ESQ.**
        US Department of Justice
        1400 New York Avenue NW
        Washington, DC  20005

DEFENSE COUNSEL:

        **COLBY VOKEY, ESQ.**
        The Law Firm of Colby Vokey, P.C.
        6924 Spanky Branch Court
        Dallas, TX  75248

        **TERENCE LENAMON, ESQ.**
        Terence Lenamon P.A.
        245 SE 1st Street, Suite 404
        Miami, FL  33131

        **DANIEL SCHWARZ, ESQ.**
        Daniel Schwarz, P.A.
        245 SE 1st Street, Suite 404
        Miami, FL 33131

*JURY TRIAL – VOLUME VII*

T A B L E   O F   C O N T E N T S

Page No.

WITNESSES FOR THE DEFENDANT:

**JOHN ROBERT NETTLETON**
Cross-Examination................................. 50

E X H I B I T S   R E C E I V E D

Page No.

Government's Exhibits:

```
355............................................  49
388............................................ 115
```

1          P R O C E E D I N G S

2    January 15, 2020                                    8:33 a.m.

3                          - - -

4          COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session.  The Honorable Timothy J. Corrigan presiding.

7              Please be seated.

8          THE COURT:  Good morning.  We're going to settle the

9    charges this morning.  And the way that we're going to go about

10   this is that -- Mr. Burns has provided you with a proposed set

11   of jury instructions that the Court has worked up.  Those are

12   based on the joint submissions of the parties and other

13   research and discussion between Mr. Burns and myself.

14             And I recognize that we had a couple of issues that

15   had been -- we discussed already, but had not been incorporated

16   into this version, but -- but I have learned over the years not

17   to keep putting out different versions because people get mixed

18   up about where we are.  So everybody ought to be looking at the

19   same document.

20             And the way we're going to do this is that I'm going

21   to go through the instructions that we've given you, many of

22   which I think are uncontroversial.  And I'll just announce

23   them.

24             Unless somebody says "Stop," I'm going to assume that

25   we're okay on that instruction.  And then, obviously, as soon

1   as we get to an instruction that somebody wants to discuss, we

2   will do that.

3         I received overnight -- I didn't try to figure out

4   when it was filed, but I received overnight a request from

5   Captain Nettleton for an additional instruction, or set of

6   instructions.

7         And obviously in the -- there was no case law

8   provided with it or any other guidance, really.  So in the

9   limited amount of time we've had, we've tried to take a look at

10  a couple of cases to see if -- see what we should do with that.

11  But we can talk about that when we get to it.

12        Okay.  So we're going to start, obviously -- and

13  these will -- the headers on these will be changed once we

14  finalize the instructions.

15        I haven't decided for sure exactly what's going to be

16  in the header, but it won't -- it won't contain all the

17  information that it has right now.  We have those just to help

18  everybody follow along.

19        All right.  We'll start with the proposed jury

20  instructions -- the initial introduction to the jury.  The duty

21  to follow the instructions and presumption of innocence, Jury

22  Instruction No. 1 is a pattern instruction.

23        We will be using that -- we were using B2.1 and we

24  will be getting rid of B2.2 as an alternate, since

25  Captain Nettleton did testify.

1    Jury Instruction No. 2 is the pattern definition of

2  reasonable doubt.  And when I say "pattern," I mean the

3  Eleventh Circuit Court of Appeals patterns.

4    Jury Instruction No. 3, consideration of direct and

5  circumstantial evidence, pattern instruction.

6    Jury Instruction No. 4, credibility of witnesses,

7  pattern instruction.

8    Jury Instruction No. 5, we have an alternate.  And so

9  the B6.1 will come out and we'll be giving B6.3, which is the

10 impeachment instruction, but it -- it contains language when a

11 defendant without any convictions testifies, so we'll be

12 including that instruction in the final version.

13    Jury Instruction No. 6 is expert witnesses.

14    Jury Instruction No. 7 is the Eleventh Circuit

15 pattern on or about, knowingly, and willfully.  Obviously those

16 terms "knowingly" and "willfully" do apply to a number of the

17 charges, but the definition of "knowingly" and "willfully"

18 is -- is contained in Jury Instruction No. 7.

19    And then we begin the actual substantive instructions

20 that apply directly to this case.  We have -- Jury Instruction

21 No. 8 is an introduction to the counts.

22    As you will recall, we have constructively amended

23 the indictment so that it's now Counts One through Eight.  And

24 so that's the way they'll be referred to in these instructions

25 and that's the way they'll be referred to in the verdict form.

1    But there is an order of the Court that was entered that

2    explains that so that any reviewing court or anybody later

3    would understand why we did what we did.

4            All right.  So that's the introduction.

5            Now we get to Count One and, of course, that's the

6    first substantive count.  And we -- I'm intending -- at least

7    my intention right now is to take out the reference to -- to

8    the aiding and abetting in this count.  So that would affect

9    the title of it.  It would also affect the second paragraph at

10   the very end, in violation of 18, U.S.C., 1512(b)(3).  It will

11   just stop right there.

12           And I think -- I have a little language tweak there

13   on page 14 on the dash.  I'm just going to change that for --

14   for grammar purposes.  But other than that, I'll entertain any

15   discussion of Jury Instruction No. 9.

16           MR. GEE:  Your Honor, there was just a minor thing.

17   And I don't think this was in our joint instructions, but --

18   but it wouldn't be controversial.

19           I noticed in the misleading conduct definition --

20           THE COURT:  Yes.

21           MR. GEE:  -- one of the -- one of the types of things

22   is -- is concealing a, quote, material fact.

23           And in other instructions we define what a material

24   fact is, but we didn't in Count One, so I would suggest maybe

25   right before the definition of trick, scheme, or device, you

1  define material fact the same way you do in the later charging

2  instructions for the other 1001 counts, et cetera.  It's just

3  missing in this count.

4          THE COURT:  All right.  Hold on a second.

5      (Judge confers with law clerk.)

6          THE COURT:  I was just talking with Mr. Burns.  Would

7  it make sense since materiality is in a number of the counts --

8  would it make sense to just put that in -- the definition of

9  materiality, would it make sense to put it as part of Jury

10  Instruction No. 7, where we're offering definitions?  And that

11  way we just have to say it one time.

12          Do you have a problem with that, Mr. Gee?

13          MR. GEE:  That's fine, too, Your Honor.

14          THE COURT:  Okay.  I think that's what I'm going to

15  do.

16          Any objection to that -- who's handling the charge?

17  Mr. Schwarz.

18          MR. SCHWARZ:  No, no objection.

19          THE COURT:  All right.  I'm just going to take -- any

20  time we've defined materiality, I'm just going to put it in No.

21  7.  It's the exact same definition.  So everybody can -- if you

22  want to talk to the jury about materiality, you can tell them

23  that definition will be the same for every count that requires

24  it.

25          So we'll take it out of the substantive counts and

1  put it into the -- put it into Jury Instruction No. 7.  That

2  will be how we'll handle that.

3          All right.  What else, sir?

4          MR. GEE:  That was it for Count One.

5          THE COURT:  Okay.  Anything, Mr. Schwarz, on Count

6  One from the --

7          MR. SCHWARZ:  When we did the joint submission,

8  Judge, we submitted our request for the unanimity instruction.

9          THE COURT:  Unanimity as to what?

10          MR. SCHWARZ:  As to what misleading conduct that the

11  jury is going to be considering here.  In other words, we had

12  asked for if you don't unanimously agree as to what --

13          THE COURT:  I tell you what, you're going to need to

14  get to a microphone.

15          MR. SCHWARZ:  Sure.

16          THE COURT:  Is it on?  I don't think it is.  Or

17  you -- whatever you want to do, but...

18          Is there a green dot there?

19          MR. SCHWARZ:  I'm just trying to see how to turn it

20  on.  Is that any better, Judge?

21          THE COURT:  Okay.  Sorry.  We don't have -- it's not

22  connected.  So -- Ms. Diaz says.  So why don't you trade places

23  with Mr. Lenamon for a second or something.  I need you to get

24  to a microphone.

25          MR. SCHWARZ:  Judge, we had submitted our joint

1  proposal of unanimity instruction.  This is the one that reads,

2  "If you do not unanimously agree as to what misleading conduct

3  the defendant knowingly engaged in, you cannot find him

4  guilty."

5      We had done this because the government is going to

6  argue a number of different acts that they're going to claim

7  constitute the obstruction.  So our concern is that you have

8  one juror who potentially could find A, another juror B,

9  another juror C.  So you have potentially X number of jurors

10  disagreeing on exactly what conduct the defendant engaged in,

11  but potentially coming to an agreement on the obstruction

12  itself, Judge.

13      THE COURT:  Mr. Gee?

14      MR. GEE:  Your Honor, it's all the same discussion we

15  had pretrial, page 7 of the joint brief.  The government

16  addressed this.  The jury is required to -- as the Eleventh

17  Circuit has held, the jury must decide unanimously that the

18  government has proved each element of the crime, but it need

19  not decide unanimously as to which of several means the

20  defendant used to commit the crime.

21      THE COURT:  Well, I understood the unanimity

22  instruction in Count Two before the government took out the

23  grand jury aspect of it; that is, that -- I understood why we

24  needed to have some instruction about unanimity there.

25      I'm not -- I'm just not sure that it's required in

1    this scenario.  And I don't even know that it's the law.

2         So I'm going to overrule the objection on that.  I'm

3    not going to give a separate unanimity requirement in Jury

4    Instruction No. 9.

5         Now, having said that, I do remind everybody that --

6    that the jury is instructed that -- that they do have to be

7    unanimous on every -- on -- in order to convict.

8         So I think that does -- I understand it doesn't

9    directly address what you're saying, Mr. Schwarz.  But I don't

10   think that's required, and I -- so I'm going to overrule that

11   request.

12        All right.  Anything else in that one, Mr. Schwarz?

13        MR. SCHWARZ:  No, Judge.

14        THE COURT:  Okay.  All right.  Now we're on Jury

15   Instruction No. 10.  And we do have some changes on this.  The

16   government has decided not to pursue the federal grand jury

17   aspect.

18        So we -- obviously, all of it will just refer to the

19   Department of Navy court-martial, and so we'll -- and also

20   we're going to take out the aiding and abetting.  And so we're

21   prepared to do that.

22        It appeared to -- Mr. Burns and I had this discussion

23   last night.  It appears that the penultimate paragraph, which I

24   discussed with you yesterday briefly, it may be that we don't

25   need it at all.  It clearly was designed for the -- for the

 1 | unanimity issue on the two -- if you had more than one aspect
 2 | of it.
 3 |         I'm not -- I looked at it to see what was in there.
 4 | So the first sentence just says that -- what the charge is
 5 | again.  It says, "The government need not prove beyond a
 6 | reasonable doubt the defendant intended to obstruct this
 7 | proceeding," is the way it would read now, I think.  It used to
 8 | say "both of these proceedings."
 9 |         "Instead, the government must prove beyond a
10 | reasonable doubt that the defendant intended to obstruct this
11 | proceeding."
12 |         I just -- I'm wondering whether this whole paragraph
13 | just has to do with if you have more than one way to prove it.
14 | So I'm wondering whether we ought to just eliminate it.
15 | Because I don't -- I think the rest of the elements -- I mean,
16 | the elements are, I think, correct.
17 |         Then we define official proceeding.  And then -- so
18 | that's -- that's my wonderment.
19 |         So, Mr. Gee, what -- what is the government's view of
20 | that, and any other objections to this instruction?
21 |         MR. GEE:  We agree, Your Honor.  That language had
22 | come from, I believe, the Seventh Circuit pattern instruction,
23 | as in our discussion on page 14 of the joint filings.
24 |         And the Seventh Circuit had that language to be
25 | inserted where the defendant is charged with obstructing more

 1    than one official proceeding.  So it isn't needed anymore now.

 2              THE COURT:  Okay.  Mr. Schwarz?

 3              MR. SCHWARZ:  That's fine, Judge.  The only other

 4    objection is the same as Count One, the unanimity.

 5              THE COURT:  All right.  I'll -- I'm going to

 6    eliminate the penultimate paragraph.  I'm going to overrule the

 7    objection on unanimity.  I don't think that's the law.  And so

 8    I will -- so we will then -- and then we will make some

 9    other -- obviously we'll take out references to -- any

10    reference to the federal grand jury proceeding and any

11    reference to aiding and abetting, we'll take out of the

12    instruction.

13              MR. GEE:  And, Your Honor, one other change here.

14              THE COURT:  Yeah.

15              MR. GEE:  And I don't know if the Court has in front

16    of it the joint filing.

17              THE COURT:  I can.  Hold on a second.

18              Yes, sir.

19              MR. GEE:  Docket 55.

20              THE COURT:  Right.

21              MR. GEE:  Page 14.

22              THE COURT:  Okay.  Hold on a second.

23              Yes, sir.

24              MR. GEE:  There's a final sentence there -- not that

25    the government sort of adds -- loves adding sort of extra

1  burden to itself, but this was some language from the Eleventh

2  Circuit *Frisk* opinion, this last sentence that was in the

3  suggested instruction, and I see that it sort of fell out of

4  the Court's proposed instruction.

5        I think that that extra clarity, given it's from this

6  Sixth Circuit opinion, it is sufficient if the defendant knew

7  of or foresaw an official proceeding and knew that his actions

8  were likely to affect it.

9        That's a direct quote from *Frisk*.  I just think given

10  it's in the Eleventh Circuit, wouldn't want to have a problem

11  later, I think we'd suggest that that sentence still be at

12  the -- at the end here of this instruction.

13     (Judge confers with law clerk.)

14        THE COURT:  So, Mr. Gee, I guess we were -- I was

15  looking at it here.  So I see what you're saying.

16        Now, if you look at the first element, No. 1, the

17  defendant knew of or foresaw an official proceeding and knew

18  that his actions were likely to affect it, which is exactly the

19  language from *Frisk*.

20        MR. GEE:  Not enough sleep, Your Honor.  That's

21  fantastic.  I missed that it's -- thank you.

22        THE COURT:  Okay.  Mr. Schwarz, do you have anything

23  further on that instruction?

24        MR. SCHWARZ:  No, Judge.

25        THE COURT:  Okay.  All right.  Now we get to Jury

1   Instruction No. 11, which is Count Three.  And I do believe we

2   had some debate about this.

3              I will set up the debate.

4              All right.  Well, let's start with -- let's start

5   with what we have.  I think the government had requested --

6   that's 4 and 5.  I'm mixing them up.  Sorry about that.

7              Let me start all over again.

8              Number 11 is an instruction on the 1001(a)(1) count,

9   Count Three, and at this moment I am not suggesting any

10  additional changes to it based on my review, but I want to hear

11  from the parties.

12             Does the government have any suggestions as to Jury

13  Instruction No. 11?

14             MR. GEE:  Well, Your Honor, yes, in the sense that

15  this -- this special instruction that the defense is

16  proposing --

17             THE COURT:  Oh.  Well, I know.

18             MR. GEE:  I think this is where we should discuss it

19  and put it in.

20             THE COURT:  That's fine.  I'm going to -- I'll talk

21  to them in a minute.

22             I'm just asking you, are you -- are you -- is there

23  anything else you're proposing?

24             MR. GEE:  No, Your Honor.  It's fine otherwise.

25             THE COURT:  Okay.  So, Mr. Schwarz, is this -- this

 1   is the count that you're -- what are you looking for by the

 2   special instruction?

 3          MR. SCHWARZ:  Are you referring to the one filed

 4   yesterday, Judge, regarding the UCMJ?

 5          THE COURT:  Yes.

 6          MR. SCHWARZ:  So in that what we're looking to do is

 7   to put something in there just making sure -- I actually don't

 8   think it would go here.  I think it would be much better in the

 9   generals beforehand.

10          But the idea that we have is that we don't want folks

11   thinking that you can find the captain guilty for a UCMJ

12   violation or for violating any Navy regulations.  So that's the

13   first paragraph of the special.

14          The second one goes to the Fifth Amendment.  We don't

15   believe that there's any law saying that he's under an

16   obligation to report any violations of the UCMJ.  So what this

17   does is it gets us so that the jury understands he doesn't have

18   that obligation to report that he may have or may not have

19   committed adultery, disorderly conduct, or conduct unbecoming

20   of an officer.

21          And then the last sentence, I think, is

22   straightforward, that the admiral -- her expectations and

23   guidelines aren't going to create a legal duty.

24          By the way, Judge, just -- the reason that I actually

25   think this would be better in the generals -- and I have one

1  other relating to concealment -- is because the government is

2  going to argue concealment on multiple counts.

3        I believe that all of these things will be

4  applicable, especially for Counts One and Two.  So that's why I

5  don't believe it would go here.  But the same argument is going

6  to apply to multiple counts.  It should go to 4 and 5 as well.

7        THE COURT:  All right.  I want to break it out.

8        The first paragraph:  "The defendant cannot be found

9  guilty of any count merely for violating provisions of the UCMJ

10  or for violating Navy regulations."

11        I'm open to the possibility of giving some type of

12  instruction that says that the defendant cannot be convicted

13  merely for violating UCMJ or Navy regulations, that he has to

14  be -- he can only be convicted if the government proves the

15  elements of the crimes charged beyond a reasonable doubt,

16  or some -- I'm open to some language.  We'd have to agree on

17  what it is.

18        So let me -- let me -- let me make -- see what the

19  government thinks.  We're just talking about the first sentence

20  now.

21        Is the government -- what's the government's view

22  of -- of an instruction along those lines?

23        MR. GEE:  So, Your Honor, if I may, I can sort of

24  explain the view and why we think it's appropriate to insert

25  something here but not this, which is this first paragraph

1    as -- as presently written is confusing for the jury in the

2    sense that the defendant's failure to -- to talk about, you

3    know, his own UCMJ violations, that goes to the concealment

4    charge only.

5            Other offenses, for example, the misleading offense,

6    the obstruction offense, those are things like misleading by

7    concealing information, or misleading by admitting, et cetera,

8    not duty, and here.

9            And so this whole sort of issue that we're getting at

10   is appropriately applied here within Count Three, not as some

11   sort of a global thing.

12           And to that end, I think that the -- the point that

13   the defense is getting at is really what's addressed in the

14   second paragraph, which we don't oppose inserting here into

15   Count Three with a slight modification to the language, but

16   their whole point about sort of his -- he doesn't have to -- he

17   doesn't have a legal duty to come forward and sort of confess

18   his own crimes.  That's about this concealment count.

19           And the reason that's so confusing, Your Honor, and

20   can confuse the jury is because his UCMJ violations are issues

21   in other counts.

22           So, for example, in Count One he misled other people

23   to prevent them from reporting violations of federal crimes.

24   UCMJ violations are federal crimes, as the Court has heard in

25   evidence.

1         So a jury could conclude, for example, that he made

2    misleading statements to the admiral, misleading statements to

3    Captain Gray, obviously in order to prevent them reporting an

4    assault, to, you know, murder, whatever.  But, also, it could

5    even be to prevent an investigation of disorderly conduct, of

6    conduct unbecoming of an officer, these other more minor

7    offenses, just like you can be convicted of misleading persons

8    for a federal misdemeanor.

9         The bottom line is that his -- his UCMJ violations

10   are at issue in some of the other counts.  It can also be

11   confusing, for example, in the later 1001 counts where he's

12   denying the affair to provide this kind of global instruction.

13        So we do not agree that this sort of global

14   instruction in the way it's proposed is appropriate.  We think

15   that sort of this point they're making is -- is fine, but it

16   should be applied in Count Three and not with the first

17   paragraph either.

18        THE COURT:  Mr. Schwarz?

19        MR. SCHWARZ:  Judge, the reason we put in the word

20   "merely" was -- I think that does clarify that he just cannot

21   be found guilty for the violations itself or the alleged

22   violations.

23        It kind of ties in with another instruction that

24   we're asking for, which is a general one, which would read, in

25   order to find that the defendant concealed any information, he

1    had -- the jury would have to have found that the defendant had

2    a legal duty to con -- to disclose the concealed information

3    and that the defendant has a legal duty to disclose information

4    only when the response would be required by a statute,

5    government regulation, or government forum.

6          The reason I say that as a general is I do think it

7    would apply to other counts where the government is alleging

8    concealment.

9          I don't believe that they can allege concealment

10   without there being an underlying legal duty to actually

11   disclose what it is that's being concealed.  So that's why this

12   is a general, that's why this really goes potentially to

13   Counts One through Five.

14         I don't think it's confusing because I'm not saying

15   that he can't be found guilty for the concealment, we're not

16   saying he can't be found guilty for what's alleged.  What we're

17   saying is that he can't be found guilty for violating the UCMJ

18   or Navy regulations.

19         And, again, the use of the word "merely" is

20   specifically to point that out.

21         THE COURT:  And, Mr. Gee, you indicated that you were

22   in agreement with providing some version of the second

23   paragraph in Count Three; is that correct?

24         MR. GEE:  Yes, Your Honor.  The -- Count Three is the

25   one that describes how concealment -- I'm sorry, how legal duty

1   is an element of concealment.

2         And I think it would be appropriate in sort of the --

3   you know, the -- after the elements part of Count Three, so, I

4   don't know, after the definition of a Navy department, for

5   example, or -- wherever it sort of falls in the chronological

6   way with the -- yeah, I think it would be all right after that,

7   actually, with the elements.

8         Something -- the defendant's whole second paragraph

9   is fine with us except modification -- this obligation

10   language, I think, should be converted to the language of the

11   instruction, so simply beginning with, "The defendant had no

12   legal duty to report to any person his alleged violation," and

13   then the rest of that second paragraph is -- is fine, in our

14   opinion, for -- for -- to be given there in Count Three.

15         And I think that addresses this overall point the

16   defense is trying to make.

17         I also -- this new -- I think this is the first time

18   we're hearing it, but this new second paragraph that

19   Mr. Schwarz just read --

20         THE COURT:  Yeah.

21         MR. GEE:  -- about what establishes legal duty, I

22   didn't catch the whole paragraph, but I think his -- I gather

23   the drive of it is this language about how a legal duty is

24   established by a statute, regulation, or government form.  That

25   is the language from a ton of these cases defining legal duty.

 1          We would not -- in fact, I think I've seen it in some

 2    instructions before, having tried one of these cases myself

 3    last year, I think we did it.

 4          We've got no problem with something like maybe an

 5    element for "the defendant had no legal duty to disclose the

 6    concealed fact," or maybe it would be in the miscellaneous

 7    section.

 8          But a legal duty is -- is established by a statute,

 9    regulation, or government form.  That's literally the quote for

10    most of the cases.  So we're fine with that somewhere in here.

11          THE COURT:  Is that -- is that -- are you saying

12    that's only relevant to Count Three?

13          MR. GEE:  Oh, absolutely, Your Honor.  That's what --

14    those cases are all about concealment, 1001, legal duty

15    definition.  And that's what they say establishes the legal

16    duty is statute, regulation, or government form.  And we'd be

17    fine with providing that definition of legal duty somewhere in

18    here --

19          THE COURT:  Okay.

20          MR. GEE:  -- as Mr. Schwarz has suggested.

21          THE COURT:  So, Mr. Schwarz, I'm inclined to do at

22    least what the government is not objecting to in Count Three.

23    I know that doesn't go -- I want -- okay.

24          So let's say that I include your second paragraph in

25    Count Three and I include in the Count Three instruction

1　that -- that the legal duty to disclose information arises only

2　when the response is required by statute, government

3　regulation, or government form.

4　　　　　So let's say I add all that into -- into the

5　instruction on Count Three.  I think you would agree with all

6　that, because you've -- you've suggested it, but I want to make

7　sure that I'm understanding -- you're actually asking for that

8　language to apply, in effect -- in effect, to all of the

9　counts; is that correct?

10　　　　　MR. SCHWARZ:  It would really be to One to Five,

11　where the allegations are, in various forms, concealment or

12　omission.

13　　　　　So, for example, in Count One, you have similar

14　allegations saying that the defendant concealed X, Y, and Z,

15　let's say from Admiral Gray and Admiral Jackson.  We believe

16　that concealment, omissions, these only come into play if you

17　have a legal duty to actually disclose the information.

18　　　　　So that's why this instruction would be relevant for

19　Counts One through Five.

20　　　　　THE COURT:  And, Mr. Gee, your reason for disagreeing

21　is what again?

22　　　　　MR. GEE:  Because in those other counts, Your Honor,

23　it's -- there are other provisions to the element that provide

24　the -- the point of them.

25　　　　　So, for example, in Count One, misled by concealment

1  is one of the examples of misleading, and, moreover, this --

2  well, because that's the element.

3          I'd also note that this sort of court-created case

4  law about legal duty is specific to the definition of legal

5  duty and even inclusion of that as an element.

6          This is all specific to 1001 concealment counts.

7  There's never been a court that's held that such a definition

8  needs to be in 1512, in other places.

9          THE COURT:  All right.  What I'm going to do is I'm

10 going to modify Jury Instruction No. 11 along the lines that

11 have been suggested here this morning.

12          I will consider whether to make it more universally

13 applicable.  Right now I'm not thinking I'm going to do that,

14 but I'll -- I'll think about it.  I want to see what the

15 Count Three instruction looks like.

16          And then -- and then we'll give that back to you

17 before -- we'll give you a final set before we -- obviously,

18 before we argue it.

19          So I'm going to modify Count Three.  I'm going to

20 think about it with respect to Counts One, Two, Four, and Five.

21 My inclination right now is not to include it.  I think the

22 elements of the -- of those offenses are different and I think

23 that the elements speak for themselves, and I think -- so I'm

24 not likely to do it, but I'll -- I'm not ruling it out quite

25 yet.

1      I'll take a look at it.

2      All right.  So now we're on Counts -- Jury

3   Instruction No. 12 on Counts Four --

4      I'm sorry.

5      Mr. Schwarz.

6      MR. SCHWARZ:  Sorry.  I just wanted to -- we did have

7   other objections to 3 that we've raised in our joint filing.

8   One is the unanimity and then another is we were asking for an

9   extra element here which is that the defendant acted for the

10  purpose of misleading a federal department or agency.

11     THE COURT:  And where does that come from?

12     MR. SCHWARZ:  From 1001's -- the Eleventh Circuit has

13  held that the intent to mislead is an element in the subsection

14  (a)(2).  And I think it's equally applicable to subsection

15  (a)(1) of the 1001 count, Judge.

16     It also goes toward our defense here.  And I think

17  it's very reasonable to include that for the concealment here.

18     It adds the intent to mislead element which I think

19  is important, Judge.

20     THE COURT:  Well, the -- it requires that the

21  defendant acted knowingly and willfully according to Element 5.

22  "Willfully" is defined as the -- "an act being committed

23  voluntarily and purposefully with the intent to do something

24  the law forbids; that is, with bad purpose or to disobey or

25  disregard the law."

1        So isn't that the same thing?

2        MR. SCHWARZ:  Judge, I think the additional part of

3   misleading the department or the agency is slightly different.

4   I recognize that it's not a completely different world, but I

5   do believe that you do have slightly different meanings that

6   are -- come from that.  So that's why I think that it's still

7   necessary despite "willfully."

8        THE COURT:  Okay.  Mr. Gee.

9        MR. GEE:  Your Honor, we addressed this in Footnote 7

10  on page 17 of the joint filing where they asked for this

11  instruction.

12        As we said, this is a higher standard of specific

13  intent than what is an element of the charge.  The government's

14  proposed -- or the joint proposed instructions except for this

15  that come from primarily the federal -- the Seventh Circuit's

16  pattern instruction specific to this charge are appropriate.

17        We'd note that the Eleventh Circuit, as we noted in

18  that footnote in *United States v Clay*, specifically talked

19  about the specific intent for 1001.  It said, "As to specific

20  intent, Section 1001 criminalizes false statements made

21  'knowingly and willfully.'

22        "The Supreme Court has said that to establish" --

23        THE COURT:  Yeah.  I'm reading it, so -- it's saying

24  the same thing I just said, which is that the way you get to

25  intent is through "willfully," right?

1        MR. GEE:  Exactly, Your Honor.  Not the extra higher

2    standard they're asking for.  Exactly.

3        THE COURT:  Okay.  All right.  I'm going to overrule

4    those -- the unanimity issue and the additional instruction

5    requested by Captain Nettleton in that regard.

6        I do think that no question that, in order to be

7    convicted under Count Three, the jury will have to find that

8    Captain Nettleton acted both knowingly and willfully, and

9    "willfully" is defined as we previously stated.  And I think

10   that sufficiently addresses the requirement that he had

11   criminal intent.

12       All right.  Now, anything else on Count Three?

13       MR. SCHWARZ:  No.

14       THE COURT:  All right.  Then now we're on Counts Four

15   and Five.  And this is the one I think that the government

16   talked to me about the other day.

17       Let's start with -- without talking about whether

18   we're going to add anything to it or not, let's start with what

19   we've got.

20       Is there objection or requests regarding Counts Four

21   and Five as to the texts that are -- is present here?

22       Mr. Gee.

23       MR. GEE:  Just sort of a conforming thing,

24   Your Honor, to make it conform to the rest of the instructions

25   so it doesn't look odd, Element No. 3 on page 20 of the draft

 1   instructions, I guess.  It's No. 3.

 2          THE COURT:  Yes.

 3          MR. GEE:  We would suggest to conform with the rest.

 4   The elements say -- and this wasn't in our joint, so I think

 5   this is our fault originally -- but that the matter was within

 6   the jurisdiction of a department or agency of the

 7   United States, which is the language of the statute.

 8          And then outside of the elements, as the Court has

 9   done elsewhere, say the United States Navy is a department or

10   agency of the United States.  I think that's kind of how we've

11   handled it elsewhere and would recommend --

12          THE COURT:  I guess I don't really -- I mean, isn't

13   that -- that's the only way the jury would be authorized to

14   convict, right?

15          MR. GEE:  Absolutely, Your Honor.  It's just

16   elsewhere --

17          THE COURT:  I understand it may not be directly

18   parallel to the way we've done it in other places, but I guess

19   I'm not --

20          MR. GEE:  Exactly, Your Honor.  And I just wouldn't

21   want the jury to get back there and somehow think that -- you

22   never know what those folks will come up with.

23          And so I wouldn't want them to get back there and

24   think, "Well, this one's worded differently than the others and

25   it must be for some reason."

1          THE COURT:  Okay.  Mr. Schwarz, what's your view of

2     that?

3          MR. SCHWARZ:  Just as far as that paragraph is

4     concerned?

5          THE COURT:  Yeah.

6          MR. SCHWARZ:  I'm fine with the way the Court has it

7     now, Judge.  I have an objection to --

8          THE COURT:  Hold on a second.

9          So, Mr. Gee, point me to -- point me to another place

10    in the instructions where it says what you want it to say.

11         MR. GEE:  Well, it's slightly different every time,

12    Your Honor, because sometimes the statutes say "department" and

13    sometimes they say "agency" and sometimes they say both.  Here

14    it's -- this one's both.

15         But, for example, in -- well, in your next count, in

16    paragraph 13, you say, in Element 5 --

17         THE COURT:  Yeah.

18         MR. GEE:  -- the false statement was made at or

19    not -- near -- in a matter within the jurisdiction of a

20    department or agency of the United States.  And that's how you

21    have it in the element.

22         And then literally the next paragraph outside of the

23    elements, you simply say the Department of the Navy is a

24    department of the United States.

25         THE COURT:  Well, maybe we should change Five to be

1    the way we have it in Three here.

2         MR. GEE:  That would be fine, too, Your Honor.  I

3    just wanted consistency so that they don't -- you never know,

4    they might think that there's something weird because it's --

5         THE COURT:  All right.  I'm just going to change

6    that, page 22.  We'll just change it to say the same thing.

7    Assuming that's the correct statement of the law.  And I think

8    it is.

9         I guess we would just say the matter is within the

10   jurisdiction of the Department of the Navy, which was a --

11   which was a department or agency of the United States, right?

12        MR. GEE:  Well, no, I mean, I guess what I'm -- the

13   problem with the way it's phrased right now, Your Honor, is it

14   makes it seem as though the jury has to decide if the Navy is a

15   department or agency of the United States, as opposed to being

16   instructed that's an element and the Navy is that thing.

17   That's why the sort of current wording and the consistency

18   issue is a problem.

19        The current wording --

20        THE COURT:  Okay.  Okay.  All right.  We'll do that.

21   We'll change the instruction, No. 12, to conform.

22        All right.  Mr. Schwarz, you said you had another

23   objection to -- to -- and we haven't gotten, I think, to what

24   the government wants to talk about yet, but what do you want to

25   talk about?

1      MR. SCHWARZ:  Just for Count Five, I think there

2   should be a unanimity instruction on that one, too, Judge.

3   It's talking about e-mails to different persons.

4      THE COURT:  And, Mr. Gee, what about that?

5      MR. GEE:  It -- it's the same point, Your Honor.

6      THE COURT:  And the point is what, that -- is that

7   the -- six of them could decide the e-mail to Admiral Jackson

8   was bad and the other six could decide the e-mail to

9   Captain Gray was bad and that would still be okay?  That's what

10  the law is?

11     MR. GEE:  I mean, Your Honor, the -- the jury doesn't

12  have to agree -- they have to agree the elements were met.

13  They don't have to agree -- the means of admitting -- of

14  agreeing to that element.

15     THE COURT:  You sure about that?

16     MR. GEE:  Yeah.  Yes, Your Honor.  That's what the

17  Eleventh Circuit has said repeatedly with respect to overall

18  unanimity.  And so the Court's overall unanimity instruction

19  about elements, you know, addresses this point throughout.

20     THE COURT:  So you're saying -- in answer to my

21  direct question, you're saying to me that if they get back

22  there and six of them think that Admiral Jackson's e-mail is

23  the bad thing and six of them think that Captain Gray's is the

24  bad thing, that they would be authorized to convict?

25     MR. GEE:  The Court's indulgence.

1          (Counsel confer.)

2          MR. GEE:  All right.  I'll defer to Mr. Nothstein's

3   judgment here.  I think we'd agree that it has to be the same

4   e-mail, but that that point is addressed by the Court's overall

5   unanimity instruction.

6          It doesn't require a special instruction here,

7   thereby further confusing things, because we're not giving

8   special unanimity instructions in other places either.

9          And, indeed, Your Honor, I'd just note -- I mean,

10  Element 1, for example, says, "He altered, concealed, covered

11  up, falsified, or made a false entry in a record document or

12  caused another to do so."

13          And I think that that's why it makes the point when

14  combined with the Court's unanimity instruction.

15          THE COURT:  Well, just to be clear, my unanimity

16  instruction -- I mean, I'm not excited about doing it, because

17  I don't like to add things in there that are not necessary, but

18  the unanimity instruction simply says that your verdict,

19  whether guilty or not guilty, must be unanimous; in other

20  words, you must all agree.

21          And you're -- you are -- you're telling me -- even

22  though you agree that it has to be the same e-mail, you're

23  telling me that I'm not going to tell them that, I'm just going

24  to assume that's what happened once they convict, if they do.

25          And I'm -- I'm just wondering about that.  It's kind

1    of an odd -- it may be that it's just the way -- it's just the

2    way that Count Five was charged.  I don't know.

3              And, of course, if you really wanted to parse it,

4    there may have been more than one e-mail to each one of these

5    folks.  But I'm...

6              I do feel like I've been a little snookered about how

7    long this was going to take.  I wanted to do this yesterday

8    afternoon and I was persuaded not to.

9        (Judge confers with law clerk.)

10             THE COURT:  Well, the law we looked at -- now, this

11   was in context of the obstruction, but I think it's the same

12   idea.  And it's the idea that Mr. Gee raised.

13             And we -- because we looked at this, the *United*

14   *States v Williams*, 2019, Eleventh Circuit case:  "Simply put,

15   although a jury must decide unanimously that the government has

16   proved each element of a crime, it need not agree unanimously

17   as to which of several means the defendant used to commit each

18   element," citing *Richardson v United States*, 526 U.S. 813, at

19   817.  That's a 1999 case.

20             Now, the case -- the Eleventh Circuit 2019 case is a

21   fed appendix case, 785 F.App'x 692, *U.S. v Williams*.  But it --

22   I think it's repeating what the law is.

23             And so, based on that, I think I will not -- I will

24   overrule the objection requesting unanimity and I will allow

25   the instruction to go forward without it.

1        I guess -- I guess -- I understand the reason for it.

2   I could see giving it, but it seems like giving it would

3   actually be not -- not only not necessary, but it might be

4   wrong to give it, based on this case law.

5        And so I don't -- I don't think I'm going to do it.

6        All right.  Mr. Schwarz, anything else on the text

7   that we have in front of us here?

8        MR. SCHWARZ:  No, Judge.

9        THE COURT:  Okay.

10        MR. SCHWARZ:  I'd just really briefly point out, the

11   difference, at least in part, is that here they're essentially

12   alleging different offenses here, different crimes here for

13   different people.

14        In *Williams*, it was false entries in -- I think it

15   was a loan application or applications.  So we're talking about

16   two very different things here, Judge.

17        THE COURT:  I hear you and I'm not unsympathetic.

18   But I just -- I don't -- you know, if it was just something I

19   think that I could do for -- for you and it would either be --

20   maybe not necessary, but maybe helpful to -- I would do it.

21   But I think -- I don't want to give an instruction that's

22   actually contrary to the law.  I don't want to tell the jury

23   they have to make a unanimous finding on which exact e-mail it

24   is if that isn't the law.  And it doesn't appear to be the law

25   to me.  So I'm declining your request.

1        Okay.  All right.  Now, Mr. Gee, I think you wanted

2   to be heard on additional language for Count Four?

3        MR. GEE:  Yes, Your Honor.  There was additional

4   language in the joint instruction.

5        THE COURT:  And we're on page what?

6        MR. GEE:  Page 22 of the joint instruction.

7        THE COURT:  22?  All right.  Go ahead.

8        MR. GEE:  And this is language, Your Honor, that is

9   in the instruction that comes from the Fifth Circuit's pattern

10  instructions --

11       THE COURT:  Right.

12       MR. GEE:  -- for this particular offense.  And,

13  frankly, it puts sort of -- you know, it -- it in some ways

14  burdens the government more, but it's providing sort of extra

15  illustrative information to the jury that I think is helpful to

16  a jury when trying to figure out these elements, as well as

17  clarifying the government's burden.

18       So --

19       THE COURT:  All right.  Well, let me stop you.

20  Before I -- before we spend a lot of time on it, it wasn't in

21  the joint instructions.  Maybe there's not an objection, and if

22  there's not an objection and if it's part of the Fifth Circuit

23  pattern, that means obviously that the Circuit has adjudged it

24  to be appropriate.

25       Apparently there's no Eleventh Circuit pattern,

1    right?

2          Is that right, Mr. Gee, there's no Eleventh Circuit

3    pattern?

4          MR. GEE:  There's not, Your Honor.

5          THE COURT:  Okay.

6          MR. GEE:  Although some of this language, like the --

7    the first paragraph we're suggesting, these are in other

8    Eleventh Circuit pattern instructions, like for 1001.

9          THE COURT:  Right.

10         Mr. Schwarz, it was in the joint, so maybe there's no

11   objection to this; is that --

12         MR. SCHWARZ:  There is, though.  After hearing the

13   evidence, Judge, I think the way the Court has it is the way we

14   would prefer it, so we would object to anything additional at

15   this stage.

16         THE COURT:  Okay.  All right.  Let me take a look at

17   it.

18         MR. VOKEY:  Your Honor, with the Court's permission,

19   I'm just going to step out in the hallway real quick.

20         THE COURT:  Oh, sure.  Yeah.  Go ahead.

21         And, Mr. Gee, you're -- you're comfortable that,

22   especially with respect to the second paragraph, in order to

23   meet its burden, you're comfortable that the -- the *Rehaif*

24   decision and those decisions that have come after it are not

25   implicated -- does not implicate that instruction?

1        MR. GEE:  Correct, Your Honor.  We don't think so

2    with respect to this statute.  It has to be a matter within a

3    federal jurisdiction, not that the defendant knew it was

4    federal.

5        THE COURT:  Well, I don't really necessarily agree

6    with you that it puts more burden on the government.  It's

7    really designed to say what the government doesn't have to do

8    after the elements have been given.

9        I do think that the paragraph 1, there's no

10   requirement that the -- the investigation had been pending or

11   imminent, is -- is a helpful addition to the instruction,

12   because that would be something the jury -- if -- that appears

13   to be the law.  And I think that is something that might be

14   helpful to the jury.

15       I am less sure about the second paragraph, and I --

16   I'm disinclined to do it.

17       I do note that my colleagues who have given these

18   instructions in the cases cited by Mr. -- by -- by the parties,

19   they did not add the additional Fifth Circuit language that the

20   government's now requesting, at least that's what I'm advised,

21   and so I don't think it's necessary in order for there to be a

22   proper instruction.

23       I think a proper instruction -- a lawful instruction

24   would just be the elements of the crime.  I don't think the

25   additional language is necessary, but my judgment is that the

 1 | first paragraph is a helpful statement of the law that would
 2 | potentially help the jury decide the case and decide whether
 3 | the elements have been met.
 4 |       I'm not going to -- I'm not going to give the second
 5 | paragraph.  I don't -- I think it's potentially a little
 6 | confusing.  I just don't think it's necessary, and so I'm --
 7 | I'm not saying it's not a correct statement of the law.  I'm
 8 | just not -- not going to give it, so...
 9 |       MR. GEE:  Thank you.  Thank you for hearing us there,
10 | Your Honor.
11 |       THE COURT:  Okay.
12 |       MR. GEE:  On the third piece, this is -- this is the
13 | definition of a tangible object.
14 |       THE COURT:  Yes.
15 |       MR. GEE:  So, first off, that is literally the
16 | Supreme Court's definition from the Eighth's opinion.
17 |       THE COURT:  I think that's fine.  I don't have any
18 | problem with that.
19 |       I'm not going to do the knowingly, because that's
20 | already been covered.
21 |       So I'm going to give 1 and 3, but not 2 and 4.
22 |       So to the extent that Mr. Schwarz objected to
23 | anything, I'll overrule that objection.  To the extent the
24 | government wanted 2 and 4, I will overrule those objections.
25 |       And when I say, "2 and 4," I mean the paragraphs --

1  it's a little confusing.  I -- I guess I better for the

2  record -- so there is at doc 55 a -- these were jointly

3  submitted jury instructions or proposed jury instructions.

4       I'm on Jury Instruction No. 12, and I'm on page 22.

5  Right after the elements which are listed as 1, 2, and 3, there

6  are four paragraphs that the government and the parties -- and

7  -- and Captain Nettleton originally requested.  Captain

8  Nettleton has now asked me not to give any of those four

9  paragraphs.  The government is asking me to give all of them.

10       I'm agreeing to instruct on the first paragraph,

11  there is no requirement, and the third paragraph, a tangible

12  object.

13       But I am not instructing on the second paragraph in

14  order to meet its burden, and I am not instructing on the word

15  "knowingly," because that's already covered by a prior

16  definition that's in the instructions.

17       MR. GEE:  And just to clarify here, Your Honor, both

18  with respect to this and overall, we -- we weren't -- we're no

19  longer -- we're fine with the universal definition of knowingly

20  with respect to all the statutes.

21       THE COURT:  Okay.  All right.  The false statement

22  counts, anybody want to be heard?  Okay.

23       MR. SCHWARZ:  Judge, the -- in our joint submission,

24  we had asked for the additional elements, which are

25  obstruction, which is that the defendant made the false

1   statement for the purpose of misleading a department of the

2   United States.

3           This is something that goes directly to the meaning

4   of false.  The Eleventh Circuit has held that for purposes of

5   1001 the word "false" requires an intent to deceive or mislead,

6   and it is --

7           THE COURT:  So where -- so show me in the joint

8   instructions what you were looking for.

9           MR. SCHWARZ:  If you go to page 25, Judge --

10          THE COURT:  Yes.

11          MR. SCHWARZ:  -- you'll see the footnote.

12          THE COURT:  Yes.

13          MR. SCHWARZ:  It's going to be there.

14          THE COURT:  All right.  Hold on a second.

15          All right.  Mr. Gee?

16          MR. GEE:  It -- it's the same point as before, Your

17  Honor.  The -- the knowing and willful standard in the statute

18  addresses this -- I mean, in the element.

19          MR. SCHWARZ:  Judge, I -- I could point you to two

20  cases from the Eleventh Circuit that indicate what I'm asking

21  for.

22          THE COURT:  All right.  Can you give -- can you give

23  them to me?

24          MR. SCHWARZ:  Yeah.

25          THE COURT:  Were they -- were they in the

1   submissions?

2           MR. SCHWARZ:  May I approach, Judge?  No.  I came up

3   with them afterward.  I can give copies to the Court and to the

4   government.

5           THE COURT:  That's fine.

6           MR. SCHWARZ:  If I could approach, Judge?

7           THE COURT:  Yeah.

8           MR. SCHWARZ:  The top one is a published.  The one

9   below is an unpublished.

10          THE COURT:  All right.  Point me to the language.

11          MR. SCHWARZ:  Sure, Judge.  If you go to page 3 for

12   that *Boffil-Rivera* one and you go down on the left column, the

13   very last paragraph.  It's subsection (b).  It says first full

14   sentence, "For the purpose of the statute, the word false

15   requires an intent to deceive or mislead."

16          THE COURT:  All right.  And the second?

17          MR. SCHWARZ:  The second one, the *Batista* case, if

18   you go also to page 3 and then you go halfway on the left

19   column, it's a sentence beginning "The elements of making a

20   false statement under 1001," and for subsection (3) there, the

21   defendant acted with the specific intent to mislead.

22          THE COURT:  It sure does say that.

23          So what I'm going to do -- it's a -- it's a fair

24   point.  I'm going to take a look at the case law.  Mr. Gee,

25   I'll let you take a look at it.  I'll make a final decision

1    before we -- before we instruct, but I just need to take a look

2    at it.  And I don't want to --

3         MR. GEE:  And -- and if I may, Your Honor, just to --

4    to be informative here.

5         THE COURT:  Yeah.

6         MR. GEE:  This is the same point that the Eleventh

7    Circuit addressed more recently in *Clay* in 2016 when they said

8    what the specific elements are.  We talked about *Clay*

9    originally on page 17 --

10        THE COURT:  Right.

11        MR. GEE:  -- footnote 7, which is a more recent

12   opinion.  I'd also note this -- the willful knowing standard is

13   a higher standard, and that is what is in the Eleventh

14   Circuit's pattern instructions, which, of course, were updated

15   as recently as 2019.

16        And so this -- this extra language that's in these

17   older opinions is -- is sort of gratuitous and subsumed by that

18   knowing, willful stuff.

19        THE COURT:  Okay.  We'll -- we'll take a look at that

20   and make a final decision on that.  It will be easy to fix,

21   depending on what we do.

22        All right.  What about any -- anything else on -- on

23   the 8, 9, and -- actually -- actually, it was 6, 7, and 8 now,

24   right?

25        Anything else, Mr. Gee?

1          MR. GEE:  No, Your Honor.

2          THE COURT:  Mr. Schwarz?

3          MR. SCHWARZ:  No, Judge.

4          THE COURT:  All right.  We'll take a look at that.

5          All right.  On the aiding and abetting, I'm going

6     to -- we're going to incorporate that.  And that -- we've

7     determined that that only will apply to Count Four, and so we

8     will incorporate it appropriately as part of the Count Four

9     instruction.  And we -- we haven't done that yet, but we will.

10         All right.  Anything else on the instructions?  I

11    think the rest of it is just vanilla stuff.

12         MR. SCHWARZ:  Judge, we did have one which is going

13    backward.  It's regarding the definition of "willfully."

14         THE COURT:  Yes.

15         MR. SCHWARZ:  For Count Number Three where there's

16    exclusively in the elements the legal duty, that would bring up

17    the definition of willfully, which is in B9.1(b) for the

18    Eleventh Circuit.  It's slightly different.

19         And then depending on how the Court rules on that

20    instruction, we'd ask regarding the concealment and legal duty

21    if the Court applies it to 1 to 5 that would potentially mean a

22    different definition of willfully would go toward 1, 2, 4, and

23    5 in addition to 3.  It gets a little confusing because --

24         THE COURT:  So when I said yesterday are we going to

25    have a hard time settling the charges and y'all told me no, you

1   meant yes?

2            MR. SCHWARZ:  This is the last --

3            THE COURT:  You meant yes?

4            MR. SCHWARZ:  This is the last one for us, Judge.

5            THE COURT:  Well, it's a fairly big deal to be

6   talking about whether the definition of willfully is properly

7   instructed or not, isn't it?

8            MR. SCHWARZ:  It is, Judge.  It's something we

9   realized would apply specifically again to Count Three as we

10  were going through it again because of the legal duty issue and

11  potentially 1, 2, 4, and 5, depending on the Court's ruling on

12  our instruction as to whether it's going to apply to those

13  counts.

14           THE COURT:  And so what are you saying to me?

15           MR. SCHWARZ:  The definition of willfully that would

16  apply would be the word willfully means the act was done

17  voluntarily and purposefully with the specific intent to

18  violate a knowing legal duty, that is, with the intent to do

19  something the law forbids, disagreement with the law, or a

20  belief that the law is wrong does not excuse willful conduct.

21           THE COURT:  And you're saying that -- that's a --

22  that's a pattern instruction on willfully that you think

23  applies in these -- in -- to which counts?

24           MR. SCHWARZ:  As of now, the way the Court's

25  instructing it to Count Three, because Count Three specifically

1   indicates in one of the elements the defendant had a legal duty

2   to disclose the concealed fact.

3          If the Court will agree with us for the others, it

4   would apply to 1 to 5 as opposed to just 3.

5          THE COURT:  Mr. Gee?

6          MR. GEE:  Your Honor, briefly.  That is a pattern

7   instruction.  It's the cheek pattern instruction that is the

8   higher standard of willfully for statutes like tax crimes that

9   have that higher standard of willfully.  It doesn't apply to

10  crimes like this that have the -- the -- the lower, regular

11  standard of willful that you just have to know you did

12  something against the law, not the specific statute you're

13  violating, which is the chief standard, and that's this pattern

14  instruction they're asking for.

15         THE COURT:  All right.  Anything else?

16         All right.  We'll take a look at that.

17         All right.  Any questions on the verdict form?

18         Mr. Gee?

19         MR. GEE:  Looks fine, Your Honor.

20         THE COURT:  Any questions, Mr. Schwarz, on the

21  verdict form?

22         MR. SCHWARZ:  No, Judge.

23         THE COURT:  Okay.  Okay.  All right.  We will --

24  we've already agreed to much.  We will look at the couple of

25  issues that -- that have been raised this morning and we will

1  come up with a final set of instructions.  Obviously, to the

2  extent I haven't already made final rulings on the matters, I

3  will make those rulings as I finalize the instructions.

4          So, okay.  So we'll go ahead and finish up Captain

5  Nettleton's testimony this morning.  We will -- and then as I

6  understand it, Mr. Vokey, you'll be resting; is that correct?

7          MR. VOKEY:  That's correct, sir.

8          THE COURT:  All right.  And, Mr. Gee, is the

9  government going to have a rebuttal case?

10          MR. GEE:  Not at this time, unless something new

11  comes up.

12          THE COURT:  Okay.  So what will happen then is that

13  both -- once he completes his testimony, both parties will

14  rest.  I'm sure at that point, depending on what time it is, it

15  will either be lunchtime or we'll take a break and kind of get

16  organized before we -- and I'll have to make my final rulings

17  about the jury instructions and hand those out to you.

18          So we'll do all that.  And we'll do it in a

19  deliberate way.  We're not going to -- we're not going to rush

20  around, because we're -- we're fine on time, we're well within

21  the time that we told the jury, so I -- if they have to wait a

22  little bit, I'm not too concerned, but I have a feeling the

23  lunch hour will help us out to -- to have a natural transition,

24  so...

25          All right.  Are there any other matters for the Court

1   before we get started this morning from the government?

2          MR. GEE:  Can we just take a brief break before?

3          THE COURT:  Yeah, we're going to break.  Yeah, we're

4   going to break.

5          Anything else?

6          Okay.  Ms. Parks, will you tell the jury that we will

7   be starting at ten minutes to 10:00 if they need to take a -- a

8   restroom break or anything?  We'll bring them out at ten to

9   10:00.  Okay?

10         COURT SECURITY OFFICER:  Yes, sir.

11         THE COURT:  Thanks.

12         COURT SECURITY OFFICER:  All rise.

13     (Recess from 9:42 a.m. to 9:53 a.m.; all parties present.)

14         COURT SECURITY OFFICER:  All rise.  This Honorable

15   Court is back in session.

16         Please be seated.

17         THE COURT:  Let's have the jury, please.

18         COURT SECURITY OFFICER:  Yes, sir.

19         MR. GEE:  Your Honor, there will be an exhibit to

20   pre-admit, the video clip.

21         THE COURT:  Okay.

22         MR. GEE:  And we're going to -- in the final version,

23   it goes in the back, I believe, where he reads his social

24   security number.  Mr. Vokey and I agree that we're just mooting

25   that today, but we'll clip that out.

1          THE COURT:  And is the video just limited to the

2    beginning part?

3          MR. GEE:  It is through that invocation.  It's about

4    ten minutes long.  And, Your Honor, it is Exhibit 3- --

5          MR. NOTHSTEIN:  419.

6          MR. GEE:  No, 355.  It's Exhibit 355, I believe.

7          COURT SECURITY OFFICER:  All rise for the jury.

8       (Jury enters, 9:54 a.m.)

9          THE COURT:  And are you putting the transcript in,

10   too?

11         MR. GEE:  The transcript will not be in.  It's just

12   for the Court's reference.

13         THE COURT:  So 355 is admitted without objection.

14      (Government's Exhibit 355 received into evidence.)

15         MR. VOKEY:  Your Honor, on the -- on the condition

16   that the social security number is removed, that shouldn't

17   be --

18         THE COURT:  Yeah.  That's fine.

19         COURT SECURITY OFFICER:  Please be seated.

20         THE COURT:  Well, good morning, ladies and gentlemen.

21   I apologize for the -- for the late start this morning.  We had

22   some matters to discuss that in the long run will make the

23   trial, I think, go better, but I underestimated how long it was

24   going to take us, so we did -- we did start meeting earlier

25   this morning, and it just took us a little longer than I

1    thought, and so that's my -- my bad.

2         But we are ready to -- to resume this morning.  And

3    as you recall, Captain Nettleton is on the stand and Mr. Gee is

4    in his cross-examination of Captain Nettleton.

5         And, Mr. Gee, you may proceed.

6         MR. GEE:  Thank you, Your Honor.

7    **JOHN ROBERT NETTLETON, DEFENDANT'S WITNESS, SWORN**

8                    **CROSS-EXAMINATION**

9    BY MR. GEE:

10   Q.   Good morning, Captain.

11   A.   Good morning.

12   Q.   Sir, when we left off yesterday, we were -- we were about

13   to talk about the -- the meeting that occurred in your office

14   with Ms. Wirfel, Mr. Barger, and Ms. Tur on the afternoon of

15   Saturday, October the 10th.  Okay?

16   A.   Okay.

17   Q.   So before we talk about what happened in the meeting, I

18   want to talk about your -- your sort of state of mind going

19   into that meeting.

20        You said yesterday -- you testified yesterday that

21   after finding out from Ms. Wirfel and Mr. Barger that morning

22   when they -- when they came to your front door that Mr. Tur was

23   missing, you -- you weren't worried yet, right?

24   A.   That's correct.

25   Q.   And you weren't worried yet because you -- you had been

1  told by them that he had gone missing before and he -- he'd

2  come home the next day, right?

3  A.    Correct.

4  Q.    And you described that yesterday as, quote, his habit

5  pattern.  That's the words you used, right?

6  A.    I'm sure if you're telling me it is, it's probably on the

7  transcript.

8  Q.    Okay.  So you -- you viewed it as his habit to get in

9  arguments with Ms. Tur and not come home until the next day?

10  A.    Yeah.  That's what I was told at the meeting.

11  Q.    And so as part of that "habit," did they explain to you

12  anything about it -- it's part of his habit to get in physical

13  fights, get in arguments with Lara and then not come home the

14  next day?

15  A.    Not that I recall.

16  Q.    Okay.  But you weren't worried yet going into that office

17  meeting when he's still missing, right?

18  A.    No.

19  Q.    And you'd even been called by one of them before the

20  meeting and told he's still missing, that's what prompted the

21  meeting, right?

22  A.    Yes.

23  Q.    Now, in this meeting is when you say that you learned for

24  the first time that he had had prior suicidal ideations, right?

25  A.    That is correct.

1  Q.   And you said that --

2  A.   Not -- actually, I believe I said not ideation.  I believe

3  they told me he had had prior suicide attempts.

4  Q.   Yeah.

5  A.   And I was wondering how I -- I didn't know that.

6  Q.   And -- and this made you, quote, very concerned, right?

7  A.   It did.  The reason -- to clear it up, the reason I called

8  the meeting was because Lara was concerned at that point

9  because it hadn't been that long, and I said, "Well, why don't

10  you guys come to -- come to my office and let's -- let's try to

11  figure something out."

12  Q.   And so when you learned in that meeting that he had had

13  prior -- what you used being suicide attempts, you were, quote,

14  very concerned, right?

15  A.   When you say what I view as being suicide attempt, there

16  was an actual suicide attempt.  They caught him in his garage

17  with a hose with the car running.  So, I mean, it's not my

18  view, it -- it was everyone's view.

19  Q.   You're the commander of the base, right?

20  A.   Right.

21  Q.   If a person goes to, say, the hospital for an actual

22  suicide attempt, you would have found out about it, right?

23  A.   If he went to the hospital, I would have.  And I should

24  have found out when it happened at the house and --

25  Q.   You'd agree with me carbon monoxide poisoning, if it

1    really happened, it would require a trip to the hospital,

2    right?

3    A.    Well, I mean, you're saying it really happened.  As far as

4    I'm concerned, we had three witnesses testify to it, and I

5    believe that to be a factual thing.

6    Q.    You actually heard some of their testimony.  Ms. Tur

7    talked about how she never told you he had previously attempted

8    suicide.  You -- you heard that testimony, right?

9    A.    I -- I don't remember Ms. Tur saying that, but I believe I

10   got the information from Kelly, so...

11   Q.    All right.  So moving on, when -- when you found out that

12   he'd previously attempted suicide, you were very concerned,

13   right?

14   A.    Correct.

15   Q.    And that concern is what led you to order the search,

16   right?

17   A.    Correct.

18   Q.    Now, in this meeting -- let's just take it as a side for a

19   second.  In this meeting is when you also found out information

20   about other places where he sometimes goes, like his boat,

21   right?

22   A.    Yes.

23   Q.    And you found out information like maybe there was a

24   credit card transaction at Marine Hill sometime the night

25   before, right?

1  A.    Correct.  I believe that was at a meeting.

2  Q.    And let's just take that as an aside, sir.  Originally

3  there was thought that maybe he had made a credit card

4  transaction at Marine Hill at the commissary -- at the -- at

5  the convenience store up there at, like, 2:00 in the morning on

6  Friday night, right?  That's kind of what y'all were thinking

7  in that meeting, right?

8  A.    Correct.

9  Q.    Now, you knew by Sunday morning before his body is found

10 that the security department had confirmed that purchase had

11 actually been 2:00 in the afternoon on Friday, you knew that

12 before his body was found, right?

13 A.    I -- I believe the CID investigators went and -- and

14 talked to the Jamaican that was working at the mini mart.  And

15 I believe the CID investigators may have known it before Sunday

16 morning, but I don't believe it made it back to me before then.

17 Q.    All right.  And so you'd agree with me he didn't make a

18 2 a.m. transaction at the mini mart?

19 A.    Yeah.  That was proved to be false.  I think I testified

20 to that previously.

21 Q.    Okay.  So -- so you're very concerned about him because of

22 this potential for suicide, right?

23 A.    Yes.

24 Q.    All right.  And you didn't -- in response to that concern

25 about suicide, you didn't inform them that he'd been in a fight

1   with you and lost, right?  You didn't say that in this meeting,

2   did you?

3   A.   I did not say he got in a fight with me and lost.

4   Q.   And you would agree with me, sir, being in a fight and

5   losing is -- is an upsetting experience, right?

6   A.   Well, I mean, I don't know what you consider -- I don't

7   think anybody won on that one.  I mean, there's -- there's no

8   winners here.

9   Q.   Well, sir, you punched him in the nose, he fell to the

10   ground, bled everywhere, and left your house.  You don't agree

11   that you won the fight?

12   A.   Well, I think you may have left out the part where he

13   knocked me out first and he was attacking me for the second

14   time, so I -- I don't think I won any fights.  I think I got a

15   lucky shot and punched him in the nose.

16   Q.   Well, you'd agree with me that that entire physical

17   altercation with you was an upsetting experience for Mr. Tur,

18   right?

19   A.   I think there's no way I can fully understand what Mr. Tur

20   was thinking.  I think that, of course, it was an upsetting

21   experience.  I think he had a lot of upsetting experiences.

22   And I think a lot of us failed to recognize that at the time.

23   Q.   And -- and you'd agree with me that upsetting experiences

24   make potential suicide more likely, right?

25           MR. LENAMON:  Objection.

```
 1              THE COURT:  I'll -- I'll let him answer the best he
 2   can.
 3              THE WITNESS:  Can you restate --
 4   BY MR. GEE:
 5   Q.   You had training in suicide prevention as an officer,
 6   right?
 7   A.   Yeah.  I would -- I would think that it would.  I will
 8   tell you I don't have any professional experience in it.  But,
 9   yeah, I -- I have thought about that, but, you know...
10   Q.   And even though, as you say today, of course, this was an
11   upsetting experience, this fight with you, you didn't provide
12   them that information when you learned he was suicidal, did
13   you?
14   A.   Provide who?
15   Q.   Kelly or Randy or Ms. Tur in this meeting, you didn't
16   provide them with the information about the fight?
17   A.   I did not.
18   Q.   And you talked -- you testified yesterday that you didn't
19   even bring up the fight because you thought Ms. Wirfel and
20   Mr. Barger already knew about it since they told you about
21   getting the call from Mr. Tur in which he said he'd knocked out
22   the Skipper?
23   A.   Right.  I believe I was testifying that -- that I knew
24   they knew that he had knocked me out at the house.
25   Q.   And that's your explanation for why you didn't bring it up
```

1  in this meeting, the fight, right?

2  A.   I don't know that I was making an explanation.  I mean,

3  that's my explanation of what happened.

4  Q.   Well, is that or is that not why you didn't bring up the

5  fight in this office meeting?

6  A.   Is -- is what?

7  Q.   Knowing -- sir, well, let's just ask you, you didn't bring

8  up the fight in this office meeting why, sir?

9  A.   Okay.  I didn't bring up the fight in the office meeting

10  because at the time we were having a pretty -- it was about

11  trying to get -- get to -- to figure out where he could have

12  gone, where he could be.  We -- we kind of thought, let's start

13  a search because he's done this before.  It was more about

14  gathering information and getting it to the search party and

15  starting a search.

16  Q.   And in gathering information, you didn't think it was

17  important that he'd been injured by you and in a fight with

18  you?

19  A.   At the time I did not.

20  Q.   And at this point in this office meeting, you have no

21  reason to even believe that Ms. Tur knows about the phone call

22  from Chris Tur in which he joked about knocking you out, right?

23  A.   I think I probably assumed that she knew, because Kelly

24  told her.

25  Q.   You assumed she knew and you still didn't tell her about

1    the fight, right?

2    A.    That's correct.

3    Q.    Now, you know, according to your story, you're still

4    focused on -- you still have a concern that if you talk about

5    the fight, that Mr. Tur is going to lose his job, right?

6    A.    Absolutely.

7    Q.    And he's missing by this point, correct, sir?

8    A.    That's why we started the search.

9    Q.    And you're ordering a base-wide search, correct, sir?

10   A.    Correct.

11   Q.    And if he had been found in that base-wide search, you

12   didn't think he was going to lose his job in light of a

13   base-wide search for him, him going missing and getting in a

14   fight with you, you didn't think that was already going to

15   happen by this point?

16   A.    No, I didn't.

17   Q.    Because you thought you were going to keep it all quiet,

18   didn't you, sir?

19   A.    I just didn't think he would lose his job because he was

20   passed out somewhere.

21   Q.    And so you'd agree with me that whether it's because of

22   your concern about him losing his job or not, you're leaving

23   out what happened in the fight in the -- in your house with the

24   fight in this meeting, right?

25   A.    Okay.  Break that down for me, please.

1  Q.   Yeah.

2  A.   I'm agreeing --

3  Q.   You'd agree with me in this entire conversation in your

4  office you're leaving out that there had been a fight at your

5  house, right?

6  A.   I -- yeah.  I previously testified to that.  I did not

7  mention the fight in the office.

8  Q.   Now, after the office meeting -- let's talk about the

9  geographic location of your office.  You -- your office is

10  literally yards away from the NCIS office, isn't it, sir?

11  A.   No.

12  Q.   It's like 100 yards up the street to the NCIS office from

13  your office, isn't it, sir?

14  A.   I don't know the exact thing, but it's not far.  I mean,

15  it's -- it's a short -- it's probably half a mile maybe.

16  Q.   A half a mile to the NCIS office from your office?  You're

17  on the same peninsula, aren't you?

18  A.   I don't -- I don't know the difference, you know.  It's

19  been five years since I've been on the base, so...

20  Q.   You'd agree with me you could have just walked to the NCIS

21  office from your office?

22  A.   I could have.

23  Q.   Don't even need to drive to get there, right?

24  A.   Correct.

25  Q.   And you didn't go to the NCIS office right after this

1  office meeting and say, "Hey, this guy that's missing got in a

2  fight with me last night," did you?

3  A.   About an hour after the meeting or maybe -- I guess 1700,

4  sometime around there, called NCIS and said, "I need your help

5  for this missing person."  And they said, "We won't do anything

6  for 24 hours, and that's standard procedure."

7  Q.   We'll come to that.  After the office meeting -- and you

8  agree with me the office meeting doesn't -- you said 1700

9  hours.  Let's translate that.  1700 hours is 5 p.m., correct,

10 Captain?

11 A.   That's correct.

12 Q.   You'd agree with me the office meeting is earlier in the

13 day, it's not anywhere close to 5 p.m.  It's several hours

14 earlier, correct?

15 A.   I believe it's around 2:00 -- 2:00 to 3:00, so maybe a

16 couple of hours.

17 Q.   And the office meeting is, what, like 10, 15 minutes long?

18 A.   I don't know.  But what I know is we were getting

19 information together.  We called the XO from that meeting and

20 said, "Hey, let's start a search."

21         And then we were thinking of what else -- things we

22 could do.  One of the things is -- I said, "Hey, I" -- I said,

23 "Let me call NCIS and ask them to help out with this for the

24 thing."

25         So, you know, your intimation that I'm trying to wait

1  several hours before I call NCIS, I did call as soon as, you

2  know --

3  Q.   Sir, you did wait several hours to call NCIS, didn't

4  you --

5  A.   Right.

6  Q.   -- after the officer meeting, correct?

7  A.   So -- and if I had called them at 1400, they'd have said

8  "We're going to wait 24 hours.  So what's your point?"

9  Q.   Not if you had called them at 1400 and said, "I want you

10 to know I got in a fight with him at my house."  You'd agree

11 that they wouldn't have said, "We've got to wait 24 hours after

12 that."  You'd agree with me about that, right, Captain?

13 A.   I don't know what they would have done.

14 Q.   You think if you had called an NCIS agent and said, "I got

15 in a fight with this missing person at my house," they would

16 have said, "We'll see you tomorrow, Captain"?

17        Is that your testimony here today?

18 A.   I don't know what they would have done.  I --

19 Q.   You agree with me that after the office meeting you didn't

20 walk to NCIS --

21        MR. VOKEY:  Objection.

22 BY MR. GEE:

23 Q.   -- correct?

24        THE COURT:  I tell you what, everybody just -- y'all

25 are talking over each other, so we need to slow it down just a

 1    little bit.

 2           Mr. Gee, you ask a question.  Captain, you answer it.

 3    And then you wait for his answer and then you ask a question.

 4           And what's your objection, sir?

 5           MR. VOKEY:  Objection that he wasn't letting the

 6    witness answer the question.

 7           THE COURT:  Okay.  That objection is sustained.

 8           All right.  So, Mr. Gee, what's your question?

 9    BY MR. GEE:

10    Q.    You'd agree with me after the meeting in your office you

11    didn't walk to NCIS and tell them about the fight the night

12    before, correct, sir?

13    A.    I do agree with you on that point.

14    Q.    Okay.  Instead, you talked with Chief Duty Officer

15    Thibodeaux and you ordered the search, right?

16    A.    No.  I called Commander Ross.  And then later on Chief

17    Thibodeaux called me back to get more information.

18    Q.    And he then asked you, you know, "Where should we start

19    searching?  Where is the last place he was seen?"  Right?

20    A.    Yes.

21    Q.    And you told him the last place was the Bayview, right?

22    A.    I told him Bayview, but also we thought he may have been

23    at the mini mart.

24    Q.    You heard Chief Thibodeaux's testimony.  He didn't say you

25    told him could also be at the mini mart.  He said you told him

1  Bayview, right?

2  A.   Well, and it turned out --

3         MR. VOKEY:  Objection.  Improper impeachment.

4         THE COURT:  Overruled.

5  BY MR. GEE:

6  Q.   You heard that testimony, right?  Are you just saying

7  Chief Thibodeaux is wrong?

8  A.   No.  Chief Thibodeaux is one of the most honest people

9  I've ever met in my life.

10 Q.   Now, you knew that if you told Chief Thibodeaux that he

11 had been in a fight with you at his house, that Chief

12 Thibodeaux would have had to report that; you knew that, right?

13 A.   He would have -- if I had told him, he would have reported

14 it to me?  I mean, I'm trying to follow your logic here.  I

15 mean, I was the base CO, so, yes, he would have -- if I told

16 him something, there would have been no need for him to report

17 it to me.

18 Q.   You would think that Chief Thibodeaux, if told this

19 missing person had been in a fight with you at your house, you

20 think what he would have done is just turned around and

21 reported it to you as opposed to, say, Lieutenant Tidd or NCIS?

22 A.   I don't know what he would have done.  I mean, I don't --

23 I don't understand your point, I guess.

24 Q.   And later that day, Captain, you speak with Lieutenant

25 Tidd.  He's the chief of the GTMO security department, correct,

1    sir?

2    A.    Yes.

3    Q.    And you knew that Lieutenant Tidd had not been in front of

4    the Bayview during the incident where Chris is yelling at you;

5    you knew that, right?

6    A.    I did not see Lieutenant Tidd there that night.

7    Q.    But you didn't tell Lieutenant Tidd, the head of GTMO

8    security, about that verbal incident in front of the Bayview,

9    did you?

10   A.    I did not.

11   Q.    You didn't tell Lieutenant Tidd about what -- about

12   Mr. Tur coming to your house, did you?

13   A.    I did not.

14   Q.    And you didn't tell the chief of GTMO security about the

15   fight at your house either, did you?

16   A.    I did not.

17   Q.    You just talked with him about logistics of the search,

18   right?

19   A.    Correct.

20   Q.    And you even let him set up a command post at the Bayview,

21   right?

22   A.    Yes.  The last place that Mr. Tur was seen.

23   Q.    Which as we all agree is just a quarter of a mile or less

24   from your house, right?

25   A.    Correct.

1  Q.   And you didn't tell him to do any kind of searching over

2  by your house, did you?

3  A.   Well, he ordered the search by my house.  He ordered the

4  marine boats -- you know, where the boats that come around and

5  do that, and I think we heard several witnesses testify they

6  did search around the house.

7  Q.   Well, let's talk about that.  The search that was around

8  your house, sir, you let -- you let boats search around -- you

9  said that boats searched around your house, right?

10 A.   I did.

11 Q.   You'd agree with me that the mangroves that surround the

12 cliffs at your house, they're very thick, aren't they, sir?

13 A.   They are.

14 Q.   They're -- they're actually several rows of mangroves

15 thick, aren't they?

16 A.   That's correct.

17 Q.   Let's look at Government's Exhibit 235, please.  It's

18 already in evidence.

19        This is actually a picture standing -- it will be in

20 front of you, too, Captain.

21        This is actually a picture standing in front of --

22 standing on your dock looking up Deer Point back in the

23 direction of the Bayview, right?

24 A.   Correct.

25 Q.   And we can see here some of those thick mangroves at the

1  base of the cliffs of Deer Point that we're talking about here,

2  right?

3  A.    Right.  That's not underneath my house, though.  That's

4  over underneath those other houses there.

5  Q.    I understand.  We're standing on your -- you would agree

6  this is the view standing on your dock, right?

7  A.    Yes.

8  Q.    The dock that's literally right -- the entrance to it is

9  literally in your front yard, right?

10  A.    Yes.

11  Q.    And these mangroves, they're so thick that we can't even

12  see the base of the cliffs, can we?

13  A.    That is correct.

14  Q.    And you didn't think it would be helpful to Lieutenant

15  Tidd and his boats searching to know maybe they should be

16  searching in this area near the mangroves near where he had

17  been in a fight with you the night before?  You didn't think

18  that was important?

19  A.    I think you can't make any assumptions when you're doing a

20  search, and I think the last place he was seen was at the

21  Bayview, so I think Lieutenant Tidd had the information he

22  needed.  And if they -- I mean, we didn't find his body -- if

23  he had fallen in the mangroves, he would have been in the

24  mangroves.  That's where we would have found him.  We didn't

25  find him in the mangroves.

1   Q.   So you let people keep searching throughout the day,

2   correct?

3   A.   Yes.

4   Q.   Including into the evening, right?

5   A.   Yes.

6   Q.   Still not supplying to anyone involved in the search that

7   he had been at your house the night before, correct?

8   A.   That is true.

9   Q.   And as you testified, around 5 to 6 p.m. you called Agent

10  Bisesi with NCIS, correct?

11  A.   Yes.

12  Q.   And you told her there was a missing person and -- and

13  asked about starting a missing person investigation, right?

14  A.   I did.

15  Q.   And she explained to you that NCIS policy is it needs to

16  be 24 hours or more before they'll launch a missing person

17  investigation, right?

18  A.   She did.

19  Q.   And -- and that -- you know, we've all seen TV, that's

20  pretty standard for law enforcement across the country, right?

21  A.   That -- I mean, you just argued against that like five

22  minutes ago, but, yes, it is.

23  Q.   And by this point you knew -- when you're on the phone

24  with Agent Bisesi, you knew he had been missing since Friday

25  night, right?

1   A.    Correct.

2   Q.    And you didn't tell Agent Bisesi about the fight?

3   A.    I did not.

4   Q.    Didn't tell her, "Need to launch an investigation of Chris

5   Tur's assault on me and my self-defense of it," did you?

6   A.    I did not.

7   Q.    All right.  And then let's talk about your conversations

8   with Captain Gray that day.  Captain Gray was Admiral Jackson's

9   chief of staff, correct?

10  A.    He was.

11  Q.    And you knew what you report to him is going straight to

12  Admiral Jackson, right?

13  A.    That's a good assumption.

14  Q.    And in direct exam you -- you testified that you -- you

15  talked to him that evening about the search, right?

16  A.    Yes.

17  Q.    You'd agree with me, though, you actually spoke with him

18  multiple times?  You talked to him earlier in the day and first

19  told him the person was missing, and then later in the evening

20  you called him with updates on the search, right?  You talked

21  to him more than once, right?

22  A.    I don't recall that I -- I mean, it sounds -- it sounds

23  like probably what would have happened.

24  Q.    And you said yesterday that in that conversation in the

25  evening we -- we -- quote, "We talked about the search, we

1    talked about what was going on, and what we were doing."

2    Right?  That's what you said yesterday, right?  Right?  And

3    that's what you talked about in the search, right?

4            That's what you talked about in your conversation

5    with him.  I'm sorry, sir.

6    A.    I believe so.  Like I said, I don't remember how many

7    calls I made to him.  But, I mean, it -- it sounds like what we

8    would have talked about.

9    Q.    And you testified you didn't get into any details with him

10   about Mr. Tur's disappearance, right?

11   A.    Correct.

12   Q.    Now, you actually did give him some details about

13   Mr. Tur's disappearance, though, didn't you, Captain?  You told

14   him he had argued with his wife, that's a detail, you'd agree

15   with me, correct, sir?

16   A.    That sounds like a detail I probably would have given him.

17   Q.    You told him he disappeared before.  You'd agree with me

18   that's a detail, right?

19   A.    Yes.

20   Q.    You told him he was potentially suicidal --

21   A.    Yes.

22   Q.    -- and so you were concerned -- you would agree with me

23   that's a detail, right?

24   A.    Yes.

25   Q.    And you told him the last place he was seen was the

1  Bayview, and you'd agree with me that's a detail, right?

2  A.   Yes.

3  Q.   But you left off the detail about him yelling and accusing

4  you of sleeping with his wife at the Bayview; you left that

5  out, right?

6  A.   Which -- so which day are we talking?  Are we talking

7  Saturday?

8  Q.   Yes, sir.  Your Saturday conversation.

9  A.   I did leave that out.

10  Q.   And you left out that he'd come to your house, correct?

11  A.   I did.

12  Q.   And you left out the detail that you'd been in a -- that

13  you injured him in that fight, right?

14  A.   I did.

15  Q.   And you left all that out in the same conversation where

16  you're telling him he's suicidal, correct?

17  A.   I don't know.  I -- I mean -- I don't know if it was the

18  same conversation or not, but, I mean, within the same couple

19  of hours I did.  You know -- I mean, I'm not -- I'm not arguing

20  with your point.  My point is I don't know which conversation

21  was where.

22  Q.   And you testified yesterday that you didn't think the

23  details about the verbal incident at the Bayview and what

24  happened at your house were relevant to Captain Gray?

25  A.   It wasn't relevant, because the mission at the time was to

1  find him.  We were pretty sure we were going to find him alive

2  and well, and that the rest -- the search was the search.  And

3  it was the most important thing they had going on.  So that was

4  my relevance statement.

5  Q.    And you thought that what was only relevant to him was the

6  search and what was going on, even though, as you testified

7  yesterday, you understood that you needed to keep your

8  commanders informed about, quote, what was important to them?

9  You knew that that's what you needed to keep your commanders

10  informed of?

11  A.    Right.  So -- and I made -- I made a judgment on what was

12  important to me and what was important to them.

13  Q.    You thought it wasn't important to him to know that there

14  had been this incident at the Bayview --

15  A.    At that time it was not -- he wanted to know about the

16  search and that was what was on my mind also.  I didn't think

17  it was important to him at that time.

18  Q.    And you'd agree in this conversation with him you never

19  told him in any way, shape, or form you had any personal

20  interaction with this missing person the night --

21  A.    I did not tell him that until Monday.

22  Q.    And, sir, when you're talking with Captain Gray on

23  Saturday, you definitely knew if you told him about the

24  incident at the Bayview or the fight, that he called -- he

25  would call NCIS, you definitely knew that at that moment,

1  didn't you, sir?

2  A.   No.  It never crossed my mind.

3  Q.   Now, let's turn to Saturday night.  You testified that

4  Captain Gray didn't give you any guidance on how you should

5  contact Admiral Jackson, right?

6  A.   That he didn't give me any guidance on how I should

7  contact Admiral Jackson?

8  Q.   I don't know, sir.  That's what you said yesterday.

9        Did he -- did he give you any guidance that you

10  should contact Admiral Jackson or not, just to make it clear

11  for the record?

12        Which one, sir?

13  A.   I don't believe he did.  He -- Saturday night -- Saturday

14  night he -- we talked.  He -- the guidance I got was from the

15  admiral in an e-mail, "Hey, call me in the morning, on Sunday

16  morning."

17  Q.   Okay.  And so after your conversation with Gray, you --

18  you testified yesterday about how you were contacted by Admiral

19  Jackson by e-mail, right?

20  A.   I'm sorry.  Repeat that again.

21  Q.   You were asked yesterday:

22        "QUESTION:  So you got contacted by Admiral Jackson

23  by e-mail?

24        "ANSWER:  Yes.  And I assume he informed her.

25        "QUESTION:  Okay.  And what -- what was Admiral

1    Jackson asking you in the e-mail?

2           "ANSWER:  She was asking me about what is the status

3    of the search, was he -- was there any -- she asked me if he

4    was possibly suicidal, if he had done this before, pretty, you

5    know, standard questions, and just trying to feel out what kind

6    of situation this was."

7    A.   Okay.  And your question was did she e-mail me or did I

8    e-mail her first?

9    Q.   Uh-huh (affirmative).

10   A.   I don't remember.  It could have gone either way.  Captain

11   Gray may have told me to e-mail the admiral, if that's what

12   you're getting at.  That's certainly a possibility.  And I

13   wouldn't argue that.  I'm not real clear on -- on which way it

14   went.

15   Q.   Okay.  Well, let's look.  Let's call up 359.  It's in

16   evidence.  And please go to the second page on the bottom.

17          MR. GEE:  Can we zoom in on the bottom e-mail,

18   please, Ms. Reid?

19   BY MR. GEE:

20   Q.   This is you at 7:55 p.m. e-mailing her.  You'd agree with

21   me, right?

22   A.   Right.  And so I think what you're trying to get to, then,

23   is that Admiral Gray asked me to send her this e-mail.

24   Q.   Well, sure.  And, also, sir, it doesn't start with her

25   saying, "Tell me about the search."  It starts with you

1  deciding what to tell her, correct?

2  A.   That's usually the case.

3  Q.   And, sir, you'd agree with me nowhere in here do you

4  mention any kind of personal interaction with Mr. Tur the night

5  before, correct?

6  A.   Correct.

7  Q.   Don't mention what happened at the Bayview?

8  A.   So the first thing I write to her is, "Admiral, we are

9  searching for an NEX employee."

10       So that was forefront on my mind.  The search and

11  the conduc- -- conduct of the search was exactly what was on my

12  mind.  That's that first thing I listed.  And that was where my

13  thought process was.

14  Q.   And then you go on to say, "This is the spouse of our

15  FFC [sic] director, Lara Tur.  Alcohol is a factor.  This has

16  happened before."

17       You go on to give some details, right, sir?

18  A.   Right.  The details I learned in the meeting.

19  Q.   And the subject line is "Missing person," correct, sir?

20  A.   It is.

21  Q.   So this is you deciding what to tell her; you'd agree with

22  me, correct?

23  A.   I usually did decide what to -- I was going to tell her.

24       MR. GEE:  And scrolling up -- can we just go down a

25  little bit, please?

1    BY MR. GEE:

2    Q.    She asked you for details, further details now, doesn't

3    she?  "Give me some understanding of the extent searched,

4    whether there are places he might be sleeping this off.

5    Friend?  NCIS involved?  Is spouse frantic?"

6            She asked you those questions, right?

7    A.    She did.

8    Q.    And then she even asked you a question that relates to

9    what happened to him, doesn't she, sir?  She says, "And was

10   there a domestic argument involved?"

11           You'd agree with me that's a question about what

12   happened to him, right?

13   A.    Yes.

14           MR. GEE:  And scroll up, please.

15   BY MR. GEE:

16   Q.    You respond giving some details about the search.  And you

17   respond to her question about what happened to him with, "Yes

18   to domestic and yes to suicidal.  Spouse said he got physical

19   with her at the Bayview, which is why she left."

20           So you tell her a little bit about what happened to

21   him in your e-mail back, didn't you, sir?

22   A.    Yes, I did.

23   Q.    So you're not just telling her about the search, correct,

24   sir?

25   A.    Thank you.  That's exactly right.  I didn't just tell her

1    about the search.  I told her, you know, details as I thought

2    they were important.

3    Q.    And you're leaving out here anything about the incident at

4    the Bayview or the fight at your house, correct?

5    A.    I did.

6    Q.    And, Captain, you'd agree with me there's not an exception

7    to the OPREP requirements to report information you know

8    because of middle-of-the-search exception?  You'd agree with me

9    there's not a middle-of-the-search exception to OPREP

10   requirements, correct, sir?

11   A.    I don't believe there is a middle-of-the-search exception.

12   Q.    There's not a middle-of-the-search exception to your duty

13   to be honest and forthright with your superior officer, is

14   there, sir?

15   A.    I was honest and forthright with my superior officer,

16   Mr. Gee.

17   Q.    You'd agree there's not a middle-of-the-search exception

18   to that duty, correct, sir?

19   A.    Yes.

20   Q.    Well, later that night -- and the e-mail ends with her

21   telling you to call her the next morning, correct?

22           MR. GEE:  We can just scroll up.

23   BY MR. GEE:

24   Q.    She tells you to call him -- call her and you say, "Will

25   do," correct?

1    A.    Right.

2    Q.    So even going to bed that night, you knew the admiral was

3    going to want an update in the morning, correct?

4    A.    Correct.

5    Q.    And, you know, Saturday night --

6           MR. GEE:  Let's call up Exhibit 357A, please.  Just

7    zoom in on this e-mail.

8    BY MR. GEE:

9    Q.    There's a lot of discussion in this e-mail, sir.  This is

10   the draft Navy Blue that gets sent to you and Captain Ross,

11   correct?

12   A.    That's the e-mail -- this is the e-mail from Crabtree that

13   is -- I've got the message on it that he drafted up.

14   Q.    Okay.  And we all agree that in response to this e-mail,

15   Captain Ross makes some edits, sends it back, says it's okay to

16   release.  We don't need to go through those e-mails.  We agree

17   on that, right?

18   A.    We do.

19   Q.    And we agree that when that's done, you thank Lieutenant

20   Crabtree, correct?

21   A.    Correct.

22   Q.    Okay.  Now, we -- we all agree, though, that prior to this

23   draft getting sent, sir, you had discussed with XO Ross what

24   needed to be in the Navy Blue throughout the day, correct?

25   A.    Absolutely.

1          MR. GEE:  And let's scroll through the draft of the

2    Navy Blue to paragraph 20.  I think it's on the last page.

3    BY MR. GEE:

4    Q.   And, Captain, you'd agree with me that this summary/brief

5    incident -- that this information -- this is information that

6    you had been conveying since you first ordered the search with

7    Captain Ross and spoke with CDO Thibodeaux?

8          You'd agree with me this is the information you've

9    been conveying, correct, like, "Spouse reported victim missing

10   when he did not return home"?

11   A.   Yeah, all the information on there appears correct to me.

12         MR. GEE:  And can we scroll up a little bit?  I

13   believe there's a location.

14   BY MR. GEE:

15   Q.   Location of incident, Bayview complex.  That's the

16   information that you'd been providing since that morning,

17   correct?

18   A.   Correct.

19   Q.   So when you discussed with them what needs to be in this

20   Bayview [sic], nowhere do you tell them, "needs to have" --

21   that "there was an altercation with me," correct?

22   A.   I'm sorry.  You're going to have to repeat that question.

23   Q.   Sure.  When you're supplying information to be provided in

24   this Navy Blue --

25   A.   Yes.

1  Q.    -- you did not tell Lieutenant Crabtree or XO Ross to

2  include anything about the verbal altercation with you at the

3  Bayview or what happened at your house, correct?

4  A.    Well, they were both there, so, no, I didn't have to tell

5  them anything.  The XO was walking me out.  I mean -- I mean,

6  that's like me telling you tomorrow, "Hey, you and I had a

7  cross-examination yesterday."

8         I mean, I'm not -- of course I'm not going to say

9  that.  You know it and I know it.

10  Q.    You as the commanding officer are ultimately responsible

11  for what goes in the Navy Blue, correct?

12  A.    I'm just answering your -- look, Mr. Gee, I'm just

13  answering your question.  You asked me did I talk to him about

14  it, but -- but put yourself in my place.  Why would I talk to

15  him about it -- the XO was there.  The XO told me to go home.

16  I mean, he knew, so, no, I didn't talk to him about it again.

17  Q.    And you're ultimately responsible for what goes in Navy

18  Blues, correct, as the commander of the base?

19  A.    I am ultimately responsible for just about everything when

20  you're the CO.

21  Q.    And so you just thought that XO Ross would put into the

22  Navy Blue about the verbal altercation at the Bayview without

23  you telling him to put that in there?  You just thought he'd

24  put it in there?

25  A.    I don't think it would have gone in there in any -- in any

1    case.  It's -- you know, if you saw it on the message, it says,

2    "Provide location, brief comments."  You don't put a lot of

3    details in those things.

4           And, to be honest, sir, when you send them, the

5    information changes most of the time.  That's -- you know, you

6    send out a message.

7           So, I mean, you're imputing something when you have a

8    very limited amount of information and you're sending it up to

9    D.C. and you know -- you know things and information will

10   change.  And everybody knows that with that system.  But you

11   send it out with what you know at the time and you amend it as

12   you have to later.

13   Q.   You'd agree with me that there's enough room on that form,

14   sir, to write something like, "Verbal altercation with

15   commanding officer occurred"?  You'd agree with me there's

16   enough room on the form to write that, right, sir?

17   A.   Sure.  There would be -- you could -- I could have written

18   that.

19   Q.   And you'd agree with me there's enough room on that form

20   to write something like "Physical altercation with commanding

21   officer occurred," right?

22   A.   Yes, there was enough room on the form to write that.

23   Q.   And at this point Captain Ross doesn't know that there had

24   been an actual physical altercation inside your house, did he?

25   You hadn't discussed that with him yet, had you?

1  A.    I don't believe I had.

2  Q.    And, of course, you can update Navy Blues at any time,

3  correct, sir?

4  A.    Correct.

5  Q.    And you never updated these Navy Blues to mention the

6  verbal altercation with you at the Bayview or the physical

7  altercation at your house, correct?

8  A.    No.  The next Navy Blue he sent out was a close-out of

9  this one, once we found him and we had to send the death

10  notification in the Navy Blue at that point.

11  Q.    Yep.  Even when you included in the Navy Blue about his

12  death, you didn't put in about what happened at the Bayview

13  between the two of you or what happened at your house, correct?

14  A.    I did not.

15  Q.    Let's turn our attention now to Sunday, January 11th.

16  We'll focus first, Captain, on that time frame for those couple

17  of hours before Mr. Tur's body was found.

18  A.    All right.

19  Q.    There was a lot of discussion yesterday about this -- this

20  helicopter search that Captain -- I'm sorry, that Commander

21  Ross talked to you about.

22         MR. GEE:  Can we have Government's Exhibit 9?

23  BY MR. GEE:

24  Q.    This is a map of GTMO, right, sir?

25  A.    Correct.

1    MR. GEE:  And, Mr. Nothstein, can you just draw on

2    the -- highlight around the red border.

3    BY MR. GEE:

4    Q.   And you testified yesterday, sir, that you weren't upset

5    at the idea of the helicopter, you were just upset that he

6    hadn't run the idea with you -- the idea past you first before

7    checking on whether the Coast Guard could do it, right?

8    A.   I think you're paraphrasing.  I -- but that's -- I'd say

9    that's a pretty good -- a pretty good estimation of what I had.

10   It was more the mechanisms of the way to do it.  I don't think

11   the helicopter is a bad idea.

12   Q.   But he wasn't saying, "Sir" -- "Sir, we got a helicopter

13   up"?

14        He was asking you for permission to get a helicopter

15   up, correct?

16   A.   No.  What -- he called and he said, "Hey, I just talked to

17   the, you know, Coast Guard ship's commanding officer and asked

18   her -- her or him if we could get a helicopter."

19        And I said, "Hey, you should have talked to me about

20   that first."

21   Q.   So he conveyed to you that he was -- he wanted to know

22   whether he could ask permission to get the helicopter up from

23   the Coast Guard, correct?

24   A.   No.  I don't think that's how I'd characterize it at all.

25   I think he --

```
 1   Q.   Well, sir, you'd agree with me --
 2            MR. VOKEY:  Objection.
 3            THE COURT:  He's allowed to finish his answer to your
 4   question.
 5            MR. GEE:  I'm sorry.  I thought he was done.
 6   BY MR. GEE:
 7   Q.   Go ahead.
 8   A.   So my point is, he wasn't asking -- he was telling me what
 9   he already did, and he didn't do it the right way.  And I told
10   him, "Hey, that's not the way we do it."  And there's a lot of
11   things he didn't realize yet because, as I said, he had been on
12   island -- you know, he had been XO for a day-and-a-half.  And
13   so I was just -- I testified yesterday I -- I probably reacted
14   a little poorly, but I -- I said -- but what he was asking and
15   the way he was doing it was wrong.  He should -- there's a
16   right way to do it.  And there's a lot of other things going on
17   in Guantanamo that, you know, you have to take everything into
18   account.  And he didn't.
19   Q.   He hadn't launched the helicopter without talking to you,
20   had he, sir?
21   A.   No.
22   Q.   He had just discussed the possibility and whether it was
23   possible to launch the helicopter?
24   A.   What he had done is he had reached out to another command
25   and asked them to get their helicopter, and I told him I
```

 1    didn't -- you know, there's a lot of considerations that he

 2    probably is not aware of that he needs to get in there.

 3    Q.    All right.  And so when you -- when you have this reaction

 4    to him, you did not respond by saying, "Let's launch the

 5    helicopter.  Put them in touch with our air operations guy,

 6    Mr. Powell, and he'll explain the areas where the helicopter

 7    could go," did you?

 8    A.    I believe I did say, you know, "You need to be talking to

 9    the air operations guy and talk to them."

10    Q.    Oh, so your testimony now is that you approved a

11    helicopter going up as long as they talked to the air

12    operations guy?

13    A.    If -- if he had -- yes.  My testimony yesterday was had he

14    done it the right way, had he gone and said, "Hey, we could do

15    this," we absolutely could have put a helicopter up.

16    Q.    Sir, he's standing in front of you, you'd agree with me,

17    asking your permission to request from the Coast Guard to get a

18    helicopter up?

19          That's the bottom line of this conversation, right?

20    A.    I do not agree with that.  He called me up and said, "Hey,

21    I just talked to the commander."

22          He didn't -- he wasn't standing in front of me asking

23    for a helicopter to launch.  I mean, it's -- having a

24    helicopter search is a good idea.  Putting together that search

25    is like a six- to seven-hour -- just to -- just to verify the

1    crew.

2            I testified to this at length yesterday.  And the

3    point of it is that you've got to have a qualified crew.

4    They've got to know GTMO.

5            And that's what I needed to find out.

6            "Have you ever flown around GTMO?"

7            You know, nobody flies around the fence line.

8    Q.   And you didn't tell him to take any of those steps, did

9    you, sir?  You just shut down the idea, correct?

10   A.   I did shut down the idea.  I told him that he did it the

11   wrong way and to come see me.  But the -- I actually thought it

12   was a good idea to get the helicopter, but it didn't really

13   matter because an hour or two later we found the body.

14           So there was no way from that point on that we would

15   have gotten it done.  As I told you, it's a two- or three-hour

16   evolution.

17   Q.   And, Captain, you were in command of GTMO for several

18   years, correct?

19   A.   Correct.

20   Q.   You'd agree with me that within the border of GTMO that

21   we've highlighted here --

22   A.   Uh-huh (affirmative).

23   Q.   -- helicopters do fly within that border?

24   A.   Absolutely.  They -- they fly on a very defined route.

25   They fly from their ship to the airport and fly back.  They

1    don't fly around any of the other areas where we would be

2    looking.

3    Q.    The airport, sir, that's one of the areas they fly around,

4    correct, sir?

5    A.    I just said that.

6    Q.    Mr. Tur's body was found by the airport, you'd agree with

7    me, right?

8    A.    I agree.

9    Q.    Now, later that morning you have a conversation with

10   Admiral Jackson per her -- per her e-mail, right?  You talked

11   about that, right?

12   A.    Right.

13   Q.    And you'd agree that Commander Ross is present in the room

14   with you when you call Admiral Jackson, right?

15   A.    No.  He was not in the room with me.  He was outside my

16   door.  And so when I was talking to Admiral Jackson, he stuck

17   his head in the door, and that's when he's, like -- and he was

18   trying to get my attention and trying to tell me stuff while

19   I'm talking to the admiral.

20   Q.    So part of his body is in your office while you were

21   speaking to the --

22   A.    No.  Okay.  He was listening outside the door and at some

23   point he came in my office trying to get my attention.

24   Q.    So he then prompted you to tell her more information

25   during that call, correct, sir?

1  A.   He did.  He asked me if I was going to talk to her about

2  the Bayview, and I'm kind of like waving him off, because I was

3  right in the middle of a discussion.

4  Q.   Because you knew if you told Admiral Jackson in this first

5  conversation with her about what happened at the Bayview, that

6  there would be an investigation about what was going on, didn't

7  you, sir?

8  A.   No.  It would be like somebody coming up and talking to

9  you while you're doing the cross-examination right now and

10  trying to get your attention and tell you something while

11  you're trying to talk to me.  I was talking to my boss.

12  Q.   You didn't think it was relevant to Admiral Jackson in

13  this first conversation to know what had happened at the

14  Bayview?

15  A.   I don't -- I don't know that I thought it was relevant or

16  not.  I think I -- really I was -- you know, he's -- he's

17  trying to say stuff about the Bayview and I'm just like, "Hey,

18  knock it off."

19  Q.   Now, there was some testimony about -- by Commander Ross

20  about how after this conversation he asked you whether or not

21  Mr. Tur ever came to your house, right?

22       You remember that testimony, right?

23  A.   He did not ask me on Sunday.

24  Q.   I understand that.  Your testimony is he did not.  But you

25  heard him testify that he did, correct?

1  A.   I did.

2  Q.   And you heard him testify that your response was no.  You

3  heard that, correct?

4  A.   I did.

5  Q.   But your testimony here today is flat out, no, that didn't

6  happen, right?

7  A.   It is.

8  Q.   So you also heard Kelly Wirfel testify about how

9  Commander Ross told her that he had asked you that Sunday

10 whether he came to your house and that you had answered no.

11 You heard Ms. Wirfel testify about that, didn't you?

12 A.   I don't remember her testimony saying that at all.

13 Q.   Well, if she said that, sir, the -- the recollection will

14 control.  But if that's what was in the evidence, you don't

15 have any reason to doubt Ms. Wirfel, do you?

16 A.   I don't.

17 Q.   Now, about 10:30 or 11 a.m., before Mr. Tur's body was

18 found, you testified about how NCIS started getting involved,

19 started launching that missing person investigation, right?

20 A.   Correct.

21 Q.   They sent an agent to the command post that morning and

22 started taking other steps, right?

23 A.   Correct.

24 Q.   So now you knew NCIS has an actual missing person

25 investigation open, correct?

1   A.   I did -- I didn't know that at the time.  You know, we --

2   NCIS didn't call me and say, "Hey, we're going to go down to

3   the command post," or do anything like that.  They just went

4   down there.  I know it now, but -- and you're asking me if I

5   knew that then.  I didn't.

6   Q.   So let's be clear for the record, you didn't know it then?

7   A.   Well --

8   Q.   You know it now but not then?

9   A.   Okay.  So let's be clear on what we're asking here.

10  You're asking me did I know that Agent Bisesi went down to the

11  command post?  I knew that after it happened and I knew it -- I

12  knew that she was down there and that's how she was able to get

13  on the boat and go help Lieutenant Tidd recover the body.  But

14  did I know it -- did she call me or did anybody call me and

15  say, "Hey, we're going to go down to the command post and

16  start" -- no, I didn't know that.

17  Q.   So your testimony yesterday was about 10:30 or 11:00 NCIS

18  "started getting involved."

19  A.   Yes.

20  Q.   Your testimony here today, you didn't actually know that

21  back then, even though that's kind of what you testified to

22  yesterday?

23  A.   I testified that because I know that to be factual,

24  because that's what happened.  They went down there at 10:30 or

25  11:00.  And you're asking me if I knew that on -- at 10:30 or

 1   11 o'clock on Sunday.

 2           And I'm saying, no, I found out about it later.

 3   Q.   You found out about it later, what, reading the reports in

 4   discovery?

 5   A.   No.   Talking to Agent Bisesi on Sunday.

 6   Q.   Now, let's talk about when the body gets recovered.

 7           So after the body is recovered, you go to your house

 8   to change into your dress blues so that you could notify

 9   Ms. Tur, correct?

10   A.   I was -- I was already at the house when I got the phone

11   call.

12   Q.   Yes, sir.   And you're at your house changing into your

13   dress blues so you can do the notification, correct?

14   A.   Correct.

15   Q.   And you called over to your house Nancy DeVore, Mr. Tur's

16   boss?

17   A.   Yes.

18   Q.   And you called over to your house the Navy chaplain,

19   correct?

20   A.   Correct.

21   Q.   The chaplain is a member of the United States Navy,

22   correct?

23   A.   Yes, he is.

24   Q.   And you talked with them about the notification to

25   Ms. Tur, correct?

1  A.   We did.  We talked about, you know, how are we going to do

2  it.

3  Q.   And y'all are actually inside your house at this moment,

4  when you're having this conversation?

5  A.   Yes.

6  Q.   The very house where less than 48 hours earlier you'd been

7  in this physical altercation with Mr. Tur, correct?

8  A.   Same house.

9  Q.   And at no point when standing in the same house with

10  Ms. DeVore or the Navy chaplain do you tell them what had

11  happened there less than 48 hours before with this person who's

12  just been found dead, did you, sir?

13  A.   No, Mr. Gee.  We were talking about how we were going to

14  go tell a spouse that her husband was deceased.  So nothing

15  else came up except that.

16  Q.   And then when you -- later that morning you made the

17  notification to Ms. Tur.  You didn't tell her then about what

18  happened at your house, did you?

19  A.   No, I did not.  I...

20  Q.   Now, let's talk about the recovery of this paper towel a

21  little while later that afternoon.  You'd gotten a phone call

22  that -- from Lieutenant Tidd that they were coming over to

23  recover this, as you described it yesterday, a bloody rag,

24  correct?

25  A.   I didn't describe it.  That's what I was told.  He said,

1    "Hey, they found a bloody rag."

2    Q.    And then when NCIS agents -- there were two of them,

3    Agent Bisesi and Agent Gamble, correct?

4    A.    Correct.

5    Q.    And Agent Gamble, you even knew, as you described

6    yesterday, that her actual job is as an evidence collector for

7    NCIS, correct?

8    A.    Correct.  Well, I -- I don't know that I knew that at the

9    time.  I knew that from reading all the evidence and all the

10   reports from NCIS in preparation for the case.  But I did know

11   she was there to do some training.  I don't know that I knew

12   exactly what her job was.

13   Q.    It's something you learned from reading the discovery like

14   reading the discovery about blood reports?

15   A.    The -- I didn't need the discovery for the blood reports.

16   Q.    So when they arrive, along with Lieutenant Tidd and some

17   MAs, you actually walk down and observe them collecting the

18   bloody paper towel, correct, sir?

19   A.    Correct.  I walked down when they got there.  I followed

20   them down and looked at it and watched what they were doing.

21   Q.    And you saw what they were collecting, correct, sir?

22   A.    I did.

23   Q.    And as you testified yesterday, you knew with 99 percent

24   certainty it was the paper towel you'd given Mr. Tur that he

25   bled on, correct?

1    A.    Yes.  Yes.

2    Q.    And you knew that at this point they are picking up this

3    paper towel as evidence, didn't you?

4    A.    Yes.

5    Q.    You saw him putting it in one of those actual evidence

6    bags.

7    A.    I did.

8    Q.    Correct?

9    A.    I did.

10   Q.    And your testimony is that this -- this "It's probably

11   nothing" comment, it wasn't made by you, it was made by

12   somebody else, right?

13   A.    It absolutely was made by somebody else.

14   Q.    You say that what you actually said was, "Looks like

15   blood."

16   A.    That's what I said.

17   Q.    So Mr. Bohyer is just wrong about that?

18   A.    No.  I believe Mr. Bohyer heard it, because I heard it

19   also, but he -- I didn't say it.  And, yeah, I do believe he's

20   wrong about it.

21   Q.    Well, sir, even if we accept your version of events that

22   you said, "It looks like blood," that that's what you said, you

23   don't add that you actually knew it was blood, did you, sir?

24   A.    No.  I didn't say -- I didn't say anything to anybody at

25   that time.

1  Q.   You have two --

2  A.   And I think I testified yesterday I probably should have.

3  And I wish I would have.

4  Q.   You have two NCIS agents standing in front of you

5  collecting the evidence and you say, "It looks like blood,"

6  not, "It is blood," even though you were 99 percent certain it

7  was the paper towel you'd given him and he bled on?

8  A.   Well, I mean, they knew it was blood.  They have to do the

9  presumptive blood test.  They did it and it came back as blood,

10  you know, so, I mean, I -- we -- that's what we were -- that's

11  what they were doing.

12  Q.   You'd agree with me that's being deceptive to say, "It

13  looks like blood" when you were 99 percent certain it was the

14  towel you gave him that he bled on, correct, sir?

15  A.   I don't think I was being deceptive at all.  I think I was

16  making a statement, "It looks like blood to me."

17  Q.   You'd agree with me saying, "It looks like blood," instead

18  of saying, "I'm 99 percent certain that's the one I gave him

19  that he bled on," that that's concealing information from these

20  two NCIS agents standing in front of you?

21  A.   No, I would not agree with that at all.

22  Q.   And you didn't tell these two NCIS agents standing in

23  front of you collecting evidence, "Hey, in my house right now

24  is a shirt that Mr. Tur tore when fighting with me."  You

25  didn't tell them that, did you?

1   A.   I did not.

2   Q.   You didn't tell them that, "In my house right now are more

3   paper towels covered in blood and cleaning solution," did you?

4   A.   I did not.

5   Q.   And you'd agree with me that that would be evidence of

6   this physical altercation between you and Mr. Tur that's in

7   your house with these two NCIS agents standing right in front

8   of you?  Or had you already thrown it away by then, sir?

9   A.   I'm -- I'm sorry.  Can you just repeat that whole --

10  because I --

11  Q.   Yeah.  You'd agree with me --

12  A.   Uh-huh (affirmative).

13  Q.   -- that the paper towels that you used to clean up the

14  blood and the torn shirt are evidence of the assault within

15  your house, correct?

16  A.   I don't think I was thinking of them as evidence at the

17  time.  I think I was just cleaning up my floor and throwing

18  them away.  So I'm sure that they would be considered evidence,

19  but I think you're making the assumption that I was trying to

20  hide something, and I wasn't.  I -- I think I told you

21  previously that was probably one of the worst days of my life,

22  where, you know, not only had we lost Chris and I had to go

23  notify her, and I think I was just exhausted.  I probably

24  should have said something.  I didn't.

25  Q.   And, in fact, sir, your testimony yesterday was you didn't

1    tell them about this, you think, because, quote, your tank was

2    empty, you were, quote, emotionally exhausted?

3    A.    That's -- and that is the truth.

4    Q.    Now, sir, you are a trained pilot in the United States

5    Navy, correct, sir?

6    A.    I am.

7    Q.    You have flown combat operations for the United States

8    Navy, correct, sir?

9    A.    I have.

10   Q.    You'd agree with me combat operations are a stressful

11   experience, correct, sir?

12   A.    They are.

13   Q.    You'd agree with me that combat operations like flying

14   trips into Afghanistan and Iraq, they're more stressful than

15   what you'd been through that day, wouldn't you agree with me,

16   sir?

17   A.    I would.  Well, okay, I would not agree with that, because

18   what you just said is that flying a combat operation is more

19   stressful than what I'd been through that day.  So, no, what

20   I'll say is it's about the same stress as when -- as when a

21   plane full of your friends or a helicopter full of your friends

22   crashes and everybody dies, that's about the same feeling that

23   I had that day.

24           And so, yeah, I -- I was -- you know -- you can make

25   a joke about it if you want, but I was emotionally exhausted.

1    I was completely and utterly just wiped out.  And, yeah, I --

2    I -- I could have said something.  I didn't.  Got it.

3    Q.    Now, later on that day, you talked with Admiral Jackson

4    again that afternoon, correct?

5    A.    I did.

6    Q.    And this is when she asked you if there are any injuries

7    to the body, and you told her what Agent Bisesi had told you,

8    that there were -- appeared to be marine bites, right?

9    A.    Correct.

10   Q.    So Admiral Jackson is actually asking you about injuries

11   to the body, correct?

12   A.    Correct.

13   Q.    And in response to that question about injuries to the

14   body, you don't tell her that you had injured him 48 hours

15   earlier, did you, sir?

16   A.    I did not.

17   Q.    And you knew on Sunday, as you testified yesterday, that

18   after the body was found, that there was a shift in focus to

19   taking care of the family and investigating the death, right?

20   A.    Correct.

21   Q.    And you knew that you had a piece of the puzzle about what

22   had happened in Mr. Tur's last hours, correct?

23   A.    Correct.

24   Q.    But you didn't share that piece of the puzzle with NCIS

25   that Sunday afternoon, did you?

1  A.   No.  I called NCIS on Tuesday and asked them to interview
2  me.
3  Q.   And you didn't share that piece of the puzzle with anybody
4  else that Sunday afternoon, did you?
5  A.   No, I did not.
6  Q.   Now, let's talk about Monday, January 12th.  This is the
7  day that you went to -- to the Jerk House, correct?
8  A.   Correct.
9  Q.   And as you described it, you knew that the Jerk House is a
10 place where you can sort of go to kind of get your ear to the
11 ground of the rumors in GTMO, right?
12 A.   Well, I mean, you go there for the food, but you do hear
13 the rumors.
14 Q.   And you knew that even going there, that that's a place
15 where you hear rumors, right?  You'd had that experience before
16 Monday, January 12th?
17 A.   Well, I didn't go there looking for rumors.  I went there
18 looking for food.
19 Q.   That was going to be my next question, sir.
20        So you don't actually go there because you want to
21 know what rumors are going on at GTMO?
22 A.   No.  It's -- trust me.  You just go in there and you'll
23 hear them anyway.  It's GTMO.
24 Q.   So there, these unspecified persons -- because you don't
25 remember specifically who it was, correct, sir?

1  A.   I don't.  I don't remember their names.  I mean, I'd

2  probably recognize them if they walked in the courtroom, but I

3  don't remember their names.

4  Q.   And you recall these unspecified persons told you, the

5  commanding officer of Guantanamo Bay, two very specific rumors,

6  correct?

7  A.   I do.  I absolutely do.

8  Q.   That you got into a fight at the Bayview with Mr. Tur, an

9  actual physical fight, and that he'd come to your house and

10  caught you with -- with Ms. Tur in bed?

11  A.   That's correct.

12  Q.   That must have been an awkward conversation with these

13  folks when they were telling you about these rumors, huh, sir?

14  A.   Well, when they -- they just said they were hearing some

15  rumors, and so I pried into it a little bit:  "So what are you

16  hearing?"  And -- well, I -- I don't think they believed them

17  either.

18  Q.   So then later that day you have a conversation with

19  Captain Gray and you tell him you want to tell him about

20  some -- some -- what you described in that call as, your words,

21  quote, wild-ass rumors?

22  A.   Correct.

23  Q.   Now, you'd agree with me, Captain, this conversation with

24  Captain Gray is the very first time you told him about any

25  personal interaction you'd had with Mr. Tur, correct?

1    A.    I believe that to be true.

2    Q.    And as testified yesterday, Captain Gray's not asking you

3    follow-on conversations in this, correct?

4    A.    That's correct.

5    Q.    And so you told him that there are these wild-ass rumors,

6    but you didn't tell him what the specific rumors were; that's

7    your testimony, right?

8    A.    That is correct.

9    Q.    But you told him these rumors weren't true, right?

10   A.    Correct.

11   Q.    And it's your testimony today that when you were

12   describing the wild-ass rumors, you're talking about these two

13   specific things you'd learned at the Jerk House?

14   A.    Those were the ones I was talking about with Captain Gray,

15   yes.

16   Q.    And -- and he didn't ask you any follow-on questions about

17   what these wild-ass rumors were?

18   A.    No, he did not.

19   Q.    So you tell this chief of staff to the admiral, "There are

20   wild-ass rumors," but you don't tell him what the rumors are;

21   is that a normal course of conversation for you, Captain?

22   A.    I -- so what I said is, "Hey, I'm hearing some wild-ass

23   rumors," and it was -- he was asking how I was doing and I'm,

24   like, "You won't believe the wild-ass rumors going on around

25   here."  So, yeah.  I mean, he didn't ask, I didn't tell him.

1  Q.    You'd agree with me that's not an everyday conversation to

2  have with a chief of staff for the admiral that there are

3  wild-ass rumors?

4  A.    I agree.

5  Q.    All right.  And after you told him about these wild-ass

6  rumors and didn't tell him about the content of the rumors, you

7  then told him about how Mr. Tur came to your house, correct?

8  A.    Right.

9  Q.    And you testified yesterday that you told him that when he

10 came to your house he -- he accused you of, quote -- and these

11 are your words, sir -- of "F'ing with his wife," correct?

12 A.    Correct.

13 Q.    So you didn't tell him that he actually accused you of

14 F'ing his wife, of having sexual intercourse with his wife.

15 That's your testimony is you're not telling Admiral Jackson

16 that?

17 A.    Well, what I -- what I told you is what Chris said and

18 what I've testified to.  Chris said, "You're F'ing with my

19 wife" -- "Why were you F'ing with my wife?"  And he was talking

20 about in the Bayview down in the club is what he was referring

21 to.

22        And I told Captain Gray that.  And, in fact, rolling

23 back to your previous question, I told him about the wild-ass

24 rumors, and we rolled right into that conversation of, "Hey,

25 let me tell you what happened."

1  Q.   So your testimony now is that you did tell him what the

2  wild-ass rumors were?

3  A.   No.  What I'm telling you is we talked about the wild-ass

4  rumors and I -- then immediately I told him about what Chris

5  was saying to me at my house.  He didn't ask me about that

6  either, but I told him.  And that was the next piece of the

7  conversation.

8  Q.   So you did tell him that Mr. Tur was accusing you of

9  having sex with his wife?

10  A.   No.  I told him that Mr. Tur said, "Hey, why were you

11  F'ing with my wife?"

12  Q.   So the distinction you want to make for this jury, sir, is

13  "F'ing with my wife" versus "F'ing my wife"?

14  A.   The distinction I'll make to the jury is that I'm not

15  lying, that I told him what I knew.  And you can try to twist

16  it however you want, but, you know, what I'm trying to say is I

17  told him exactly what I told him.  And I told him exactly what

18  I said I told him.

19  Q.   And, sir, you knew back then that the Uniform Code of

20  Military Justice prohibits adultery for officers, correct?

21  A.   I did know that.

22  Q.   And you knew that --

23          MR. VOKEY:  Objection.  Sidebar.

24      (Sidebar conference:)

25          MR. VOKEY:  Your Honor, I think these are improper

1    questions in that they are going to implicate that there's a

2    duty to report himself for adultery.  I think this is what we

3    were talking about when we -- during the instructions as well.

4    I think these are improper questions on cross-examination.

5           The jury is going to take from this that if there --

6    was committing adultery, that he should have reported himself.

7           MR. GEE:  Your Honor, we're talking about a

8    conversation where he made a specific false statement that he

9    was not having sex with Ms. Tur as alleged in the indictment as

10   testified by Captain Gray, et cetera.

11          So it is entirely appropriate to ask him about how at

12   this time he knew that sex with a person outside of his

13   marriage was a crime.  It's his entire motivation for lying in

14   this conversation.  This isn't about the concealment.  This is

15   about the false statement.

16          MR. VOKEY:  Well, it is in response to the

17   concealment.  Again, they can take that as a duty to report it

18   as well.  I mean, it's the whole point for the instruction.

19   And they can ask about what statement was made, but not about

20   adultery under the UCMJ.

21          THE COURT:  Okay.  The objection's overruled.

22      (The following proceedings occurred in open court, in the

23   presence of the jury:)

24   BY MR. GEE:

25   Q.   Captain, you knew -- at this point on the phone call with

1  Captain Gray, you knew that the Uniform Code of Military

2  Justice prohibits adultery, correct, sir?

3  A.    I did.

4  Q.    And you knew that it prohibits -- it defines as adultery

5  sex outside of marriage, correct?  You knew that back then,

6  correct, sir?

7  A.    I don't know that I knew the legal definition, but I do

8  know -- I knew it -- you know -- I knew at the time adultery...

9  Q.    Well, let's put it this way, sir:  You had been in the

10  Navy for 20-something years, correct?

11  A.    Sure.  I'm not arguing with you on that.

12  Q.    You knew the Navy prohibits having sex outside of a

13  marriage?

14  A.    Yeah.  All I was saying was I don't know the specific

15  language.

16  Q.    All right.  And then -- and in this conversation with

17  Captain Gray, you -- you told him that Mr. Tur came to your

18  house, but you'd agree with me you didn't tell him about the

19  physical altercation in your house?

20  A.    I would agree with that.

21  Q.    Now, you testified yesterday about other things you do on

22  Monday to help the investigation, like logistics to get the

23  medical examiner down there, correct?

24  A.    Correct.

25  Q.    And how you didn't obstruct the medical examiner coming

1  down to GTMO, correct?

2  A.   Did I say that?

3  Q.   Well, sir, did you obstruct the medical examiner coming to

4  GTMO?

5  A.   No, I did not.

6  Q.   And when the medical examiner arrived later in the week,

7  you didn't tell him, "Hey, look for any injuries up his nose,"

8  did you, sir?

9  A.   I did not tell him -- the medical examiner.  I didn't talk

10  to the medical examiner.  I never even met him before

11  yesterday.

12  Q.   Now, let's talk about Tuesday, January 13th, your

13  telephone call with Admiral Jackson that day.  You spoke with

14  her that day, right?  Correct, sir?

15  A.   I did.

16  Q.   And you'd agree with me that this conversation with

17  Admiral Jackson on Tuesday, the 13th, is the first time you

18  told her you had any personal interactions with Mr. Tur the

19  night he went missing, correct, sir?

20  A.   I believe that is true.

21  Q.   And your -- your -- the events you described yesterday is

22  that she started a call by telling you she needed to know if

23  these rumors were true, correct?

24  A.   She did.

25  Q.   And you thought she meant, again, these specific rumors

1  you'd learned from the Jerk House about you being in a physical

2  fight with Mr. Tur at the Bayview and him catching you in your

3  house with Ms. Tur in bed?

4  A.   No, I didn't -- I thought that -- the only one I thought

5  was the -- the second one, where -- where the rumor was that he

6  had come to my house and caught me in bed, because she -- she

7  specifically mentioned Lara Tur, so I didn't think anything

8  about the fight outside the Bayview.

9  Q.   And you told her the rumors were not true, correct?

10  A.   I did.

11  Q.   And you'd agree with me she didn't ask you any follow-up

12  questions, she didn't interrogate you in response, correct?

13  A.   She did not.

14  Q.   And you then went on to tell her the same things you told

15  Admiral Gray about how he was yelling at you at the Bayview and

16  then came to your house and was being emotionally cyclical,

17  correct?

18  A.   I did.

19  Q.   And, same thing, you told her that he accused you of F'ing

20  with his wife?

21  A.   Because that's what he said.

22  Q.   Because you didn't want to admit he said "F'ing his wife"?

23  A.   No, because that's what he said.  I mean, you can keep

24  trying to get me to say that, but he said, "F'ing with my

25  wife."  I mean --

1   Q.   I understand.

2   A.   -- I'm not sure what the difference is in your mind or why

3   it's important to you, but that's what he said.  That's what I

4   told her.

5   Q.   And this conversation with Mr. Tur where he's accusing you

6   of these things and you have this specific memory of the word

7   "with," this is the same interaction with him where you have

8   amnesia about large segments of your interaction with him,

9   right, sir?

10  A.   I know what he said.

11  Q.   And in direct exam you were asked, "And you did not get

12  into any great detail about that, about what happened during

13  the phone call?"

14          And you answered, "I did not."  Correct?

15  A.   Correct.

16  Q.   But you did give her some details, didn't you, Captain?

17  Didn't you?

18  A.   Well, I -- I guess the conversation I already told her

19  that I had.

20  Q.   Exactly, yes, sir.  Even by your own account, you gave her

21  details like about his emotional cyclical nature, right?

22  A.   So, you know, yesterday I told her what I said, you know,

23  maybe -- I don't even understand your question.  Maybe --

24  Q.   You'd agree with me, sir, you told her some details about

25  your interaction with Mr. Tur at your house in this

1    conversation on Tuesday?

2    A.    Yeah.  And I think I described those details yesterday

3    when I testified.

4    Q.    I understand, sir.  I'm questioning you about them now.

5    A.    Okay.

6    Q.    In that conversation --

7    A.    Uh-huh (affirmative).

8    Q.    -- you gave her details like the way he was acting -- or

9    the way he was speaking cyclically, right?

10   A.    Yes.

11   Q.    Want to be your friend, want to go back and have another

12   drink, want a cigarette, and then accusing you of F'ing with

13   his wife, right?

14   A.    Yes.

15   Q.    So those are details you gave her, right?

16   A.    Those are details.

17   Q.    But you left out other details like that there was a

18   physical altercation?

19   A.    I did.

20   Q.    And the conversation ends with her even referencing NCIS,

21   correct?

22   A.    Correct.

23   Q.    Telling you to tell what you had just told her to NCIS?

24   A.    Yes, she did.

25   Q.    And even when she brings up NCIS, you don't respond by

1  saying, "Well, you know, Admiral, there's something else I need

2  to tell you."  You didn't do that, did you, sir?

3  A.   No.  I think -- if you'll remember the testimony

4  yesterday, she said, "Okay, J.R., I want you to go tell NCIS

5  what you just told me," and then we moved on to the next topic,

6  which was the family and the service, and then we moved on to

7  the next topic, which was the one that was -- we spent the most

8  time discussing was the Secretary of the Navy coming in.

9         So, I mean, that's what happened.

10  Q.   Sir, in response to her bringing up the Naval Criminal

11  Investigative Service --

12  A.   Yes.

13  Q.   -- you did not tell her, "Admiral, there's some other

14  detail I need to" --

15  A.   You know what I said?

16         She said, "I think you need to contact NCIS."

17         And you know what I said?  I said, "Yes, ma'am," and

18  then I contacted them.

19  Q.   Let's talk about that contact.  So you contact

20  Agent Bisesi, correct?

21  A.   Agent Bisesi was the lead agent for me for two years.

22  Q.   But she wasn't the lead agent on Mr. Tur's

23  investigation -- death investigation, was she, sir?

24  A.   Do you think NCIS came and told me who their lead agent is

25  or anything about the investigation?  I don't know.

1  Q.   We're now three days after Mr. Tur's body had been

2  recovered and you didn't know who the lead NCIS agent was yet

3  at this point?

4  A.   For the investigation?

5  Q.   Yes, sir.

6  A.   No, I don't believe I did.  And I don't think it really

7  matters, because I -- I called the NCIS agent that I knew and

8  the one I trusted and I told her I needed to make a statement,

9  so, I mean, I'm not sure what difference the lead -- lead agent

10  for the investigation would have made.

11  Q.   And let's talk about what you told her.  You said, "Hey, I

12  need -- I need to make a statement, I would like you to come

13  take my statement."  That's what you told her, right?

14  A.   I did.

15  Q.   You didn't tell her that the statement was anything to do

16  with Mr. Tur, did you?

17  A.   Okay.  I told her I needed to make a statement.  I didn't

18  say anything else.  I told her I needed her to interview me so

19  I could make a statement.

20       Did I say anything else on the phone?  No, I did not.

21  Q.   And you didn't tell her that this was about the fight that

22  you wanted to make a statement about?

23  A.   Mr. Gee, I didn't tell her anything else.  I needed --

24  Q.   Gave her no additional context, right?

25  A.   I -- I needed -- no.  I needed her to interview me and I

1  told her that she needed to come interview me and it was

2  important.

3  Q.   And, sir, that Sunday, the same day that Mr. Tur's body

4  was found, there was actually a sexual assault on GTMO that

5  Agent Bisesi was also investigating, wasn't there, sir?

6  A.   I don't know.  It may have been with the JTF.  It wouldn't

7  surprise me.  We had -- that was probably our biggest thing

8  that we did down there.

9  Q.   And by this point, the admiral's told you to convey this

10  information to NCIS, so you knew it was important for you to

11  convey it, right?

12  A.   Which is why I called her immediately.

13  Q.   But you didn't give her any context at all about what

14  statement it would be about, did you, sir?

15  A.   Well, I mean, she wasn't going to interview me over the

16  phone.

17          MR. VOKEY:  Objection.  Asked and answered.

18          THE COURT:  All right.  What's your next question,

19  sir?

20  BY MR. GEE:

21  Q.   Now, sir, you also were in frequent contact by this

22  Tuesday with the NCIS special agent in charge back in the

23  United States, Andrew Snowdon, correct?

24  A.   I did talk to him several times helping to arrange to get

25  the additional agents down.

 1  Q.   And at no point did you tell the special agent in charge

 2  that you needed to make a statement about what you knew with

 3  respect to Mr. Tur, did you?

 4  A.   Well, he wasn't the special agent in charge down in GTMO,

 5  but, no, I did not.

 6  Q.   He's actually the boss of the agents on GTMO, correct,

 7  sir?

 8  A.   He was.

 9  Q.   And you didn't -- and you didn't tell the boss that you're

10  in frequent communication with, "I need to make a statement

11  about what I know," did you, sir?

12  A.   No, I didn't.  I called -- I called the agent on island

13  and said, "I need to make a statement."

14  Q.   And you talked some yesterday about how during that week

15  you even helped with some of the logistics to get the extra

16  NCIS agents down to the -- down to GTMO, correct, sir?

17  A.   Correct.

18  Q.   In -- in fact, you even used -- you have down there, sir,

19  an actual commander's boat, correct?

20  A.   Correct.

21  Q.   You even used the commander's boat yourself to go and pick

22  up some of those additional NCIS agents when they flew in and

23  bring them to the windward side so they didn't have to take the

24  ferry, you did that, didn't you, sir?

25  A.   I think they got -- I think they got in late and there

1   wasn't a ferry, so they were either going to have to take the

2   other boat and -- plus Leslee was on the flight, and so I went

3   to -- I was going to pick her up anyway, so I said, "Let's just

4   take the gig and we'll get everybody."

5   Q.   And so you pick up your wife?

6   A.   I do.

7   Q.   And a couple extra NCIS agents that are flying in for the

8   Tur investigation, correct?

9   A.   Absolutely.

10  Q.   And so you are literally on a boat full of NCIS agents and

11  you don't tell them about the fight at your house, do you, sir?

12  A.   I do not.

13  Q.   Now, there was some testimony yesterday --

14  A.   I think maybe at this point you need to remember I

15  contacted Agent Bisesi and she said, "They'll get to you."  And

16  that is -- that put me in a passive stance, not an active.  I

17  reached out to her and she said, "Yeah, we'll get to you."

18  Q.   And, sir, you remained in communication with NCIS agents

19  even after that Tuesday conversation with Ms. Bisesi, didn't

20  you?

21  A.   Yes, I did.

22  Q.   There was some testimony at length yesterday about this

23  man, Mr. Stone, that sent you an e-mail in this time frame,

24  correct?

25  A.   Correct.

1   Q.   And how you forwarded that e-mail to Admiral Jackson and

2   she told you to forward it to NCIS, right?

3   A.   Right.

4   Q.   And so good for you, you forwarded it to NCIS, right?

5   A.   Good for me.

6   Q.   And you testified that you didn't mention anything in your

7   e-mail forwarding it about you punching Mr. Tur in his nose,

8   correct?

9   A.   Correct.

10  Q.   And you said that the e-mails didn't have anything to do

11  with that, it had to do with Kendell Stone, correct?

12  A.   That's correct.

13  Q.   Well, let's look at that e-mail.  I'm going to show you

14  what's been marked as Government's Exhibit 388.

15          MR. GEE:  May I approach, Your Honor?

16          THE COURT:  You may.

17  BY MR. GEE:

18  Q.   Take a second to look at that, Captain, and when you're --

19  when you've had a chance to look at it, you can just look up.

20  A.   Okay.

21  Q.   Is this the e-mail exchange we're talking about where you

22  forwarded Mr. Stone's e-mail to Agent Bisesi pursuant to

23  Admiral Jackson's instructions?

24  A.   It is.

25          MR. GEE:  Move to admit Government's Exhibit 388.

 1          MR. VOKEY:  No objection.

 2          THE COURT:  Be received, 388.

 3      (Government's Exhibit 388 received into evidence.)

 4          MR. GEE:  Can we call 388 up on the screen, please,

 5  and go to the second page at the bottom?

 6  BY MR. GEE:

 7  Q.   So, Captain, just to put it all in context -- the --

 8  the --

 9          MR. GEE:  No, no.  You just had it right, Ms. Reid.

10  Thank you.

11  BY MR. GEE:

12  Q.   The -- the e-mail chain starts with an e-mail from you on

13  January 13th to -- to basically a whole bunch of people in

14  GTMO.

15          MR. GEE:  Can we scroll down, please?

16  BY MR. GEE:

17  Q.   And you're telling them about how the community is

18  saddened over the loss of Mr. Tur, right?  This is a big e-mail

19  that you sent out to the base, right?

20  A.   That is correct.

21  Q.   Standard e-mail when something tragic like this happens,

22  correct?

23  A.   Correct.

24          MR. GEE:  Okay.  Now, let's scroll up, please.

25  BY MR. GEE:

1  Q.   So --

2           MR. GEE:  Keep going, please.

3  BY MR. GEE:

4  Q.   So Mr. Stone responds --

5           MR. GEE:  Can we scroll up a little bit more?

6  BY MR. GEE:

7  Q.   Mr. Stone responds, correct?

8  A.   He does respond.

9  Q.   He responds directly to you, correct?

10  A.   He does.

11  Q.   And he writes, "I am saddened by your e-mail below.  I

12  certainly hope you and NCIS are thoroughly investigating this

13  death on your base under your careful watch."

14           So he's e-mailing you back about Mr. Tur's death,

15  right?

16  A.   Correct.

17  Q.   "I completely understand how you're responsible for the

18  safety and security of the residents of GTMO, and I know you

19  will do your very best to get to the bottom of this situation.

20  I have also heard someone previously got into a fight with the

21  deceased person at the Bayview over some alleged sexual

22  harassment of the victim's wife.

23           "Have you heard about this, too?  I hope you find the

24  person involved and suspected of being responsible for this

25  sexual harassment/death and immediately debar them.  Have a

1    good" -- "have a wonderful and sunny day in GTMO."

2         Now, this is the guy, Mr. Stone, that as you

3    testified yesterday, he's got like an ax to grind with you

4    because you -- you rightfully barred him from the base over a

5    situation with his child, correct?

6    A.   That is correct.

7    Q.   But you would agree with me in this e-mail, Captain, he's

8    kind of gigging you a little bit.  He clearly knows a little

9    bit about what's happened at the Bayview, doesn't he, sir?

10   A.    He -- he just, himself -- just talked about one of the

11   wild-ass rumors that I was talking to Admiral Gray about.

12   Q.   He -- he -- he's -- he's gigging you a little bit because

13   you knew reading this e-mail he knows that I'm the person that

14   was at the Bayview in this argument?

15   A.   What I test to -- testified to previously is that now I

16   knew the wild-ass rumors had left GTMO.  I mean, this is

17   what -- this is what that tells me, he's hearing the same rumor

18   that I heard on Monday.

19   Q.   And you'd agree with me in reading this e-mail you knew

20   that he was gigging you and subtly suggesting to you that he

21   knew you were the person involved in these rumors, correct?

22   A.   Yes.  That -- that's exactly right.

23         MR. GEE:  And scroll up, please.

24   BY MR. GEE:

25   Q.   And you just forward it to Agent Bisesi and all you write

1   is "Kendell Stone"?

2   A.   That's really all I needed to write.

3   Q.   You don't tell her, "Hey, these rumors about a fight, it's

4   got a little bit of accuracy in it, there was a fight," you

5   don't tell her that, do you?

6   A.   So when I sent Kendell Stone -- Agent Bisesi worked with

7   me on that case.  We spent quite a lot of time -- I really --

8   it's one of those things where you don't really need -- you

9   just kind -- it was kind of -- Kendell Stone.  You know, I

10  mean, it's -- it's like two years from now, you send an e-mail

11  and say, "Oh, Nettleton."  You know, it's going to be the

12  same -- it's going to be the same thing.  It's just like

13  what -- what are you -- you know, what are you doing?

14  Q.   So Kendell Stone's prodding you about rumors that include

15  you being in a fight with Mr. Tur?

16  A.   Yes.

17  Q.   And you just forward it to Agent Bisesi and you don't tell

18  her anything about how you were actually in a fight with

19  Mr. Tur, do you, sir?

20  A.   I -- I am pretty confident by that point in time Agent

21  Bisesi had heard other rumors that I had heard.  And it's

22  Bisesi, actually.

23  Q.   You didn't, did you, sir?

24  A.   Bisesi.

25       I'm sorry?

```
 1   Q.    In answering my question, you didn't, did you?
 2   A.    No, I did not.
 3              THE COURT:  Mr. Gee, I'm looking for a break.  Is
 4   this a good point?
 5              MR. GEE:  It is, Your Honor.  Not too much more, but
 6   it is a good break point.
 7              THE COURT:  All right.  Ladies and gentlemen, let's
 8   go ahead and take our break.  It's 11:20.  I'll give you the --
 9   the 15 minutes.  So 25 to 12:00 be back here ready to come out.
10   Have a good break.  Thanks.
11              COURT SECURITY OFFICER:  All rise for the jury.
12        (Jury exits, 11:20 a.m.)
13              THE COURT:  You may step down, too, sir, and have a
14   break.
15              THE DEFENDANT:  Thank you, sir.
16              COURT SECURITY OFFICER:  Please be seated.
17              THE COURT:  Mr. Gee, can you give me an estimate on
18   how much longer you're going to be, sir?
19              MR. GEE:  Your Honor, I actually don't think too much
20   longer.  It's -- it's maybe another 15, 20 minutes of
21   questioning, and then the video is ten minutes long, Your
22   Honor, and there might be a few follow-up questions to that,
23   but -- so probably 40 minutes, probably, 45 minutes, something
24   like that.
25              THE COURT:  And, Mr. Vokey, do you have a sense of
```

 1  how much re -- how much redirect you're going to do?

 2          MR. VOKEY:  I don't have a sense yet, sir.

 3          THE COURT:  Okay.  All right.

 4          All right.  Anything from counsel?  Mr. Burns is up

 5  trying to finalize the jury instructions.  I'm going to go

 6  check on that and see where we are on that, and we'll be back

 7  starting at 25 till.

 8          COURTROOM DEPUTY:  All rise.

 9      (Recess from 11:22 a.m. to 11:38 a.m.; all parties

10  present.)

11          COURT SECURITY OFFICER:  All rise.  This Honorable

12  Court is back in session.

13          Please be seated.

14          THE COURT:  Let's have the jury, please.

15          MR. GEE:  Your Honor, can we approach?

16          THE COURT:  Sure.

17          MR. GEE:  Mr. Vokey, I asked to approach.

18      (Sidebar conference:)

19          MR. GEE:  Your Honor, I just -- I just wanted to make

20  sure it was clear, too, for the record as I get to playing this

21  video, which will -- shortly of the defendant's interview that

22  it's going to stop at page -- right after page 15, line 7 --

23          COURT SECURITY OFFICER:  All rise for the jury.

24      (Jury enters, 11:39 a.m.)

25          MR. GEE:  -- per agreement with defense counsel.  So

1  where the clip will be stopping is after he says, "Continue

2  with this interview," period, and then it will stop.  And

3  that's by agreement with defense counsel.

4           THE COURT:  That's fine.

5           MR. GEE:  And -- and also the final version we'll --

6  we'll bleep out where he provides his social security number by

7  agreement with defense counsel.

8           THE COURT:  Thank you.

9      (The following proceedings occurred in open court, in the

10  presence of the jury:)

11          COURT SECURITY OFFICER:  Please be seated.

12          THE COURT:  All right, sir.  You may proceed.

13          MR. GEE:  Thank you, Your Honor.

14  BY MR. GEE:

15  Q.   Captain, let's move forward now to approximately Thursday,

16  January 15th.

17          Now, this is the day where Captain Ross spoke to you

18  again, correct?

19  A.   That's when he talked to me after he came back from NCIS,

20  and told me -- and asked me some questions.

21  Q.   And -- and he told you he -- he'd just come back from an

22  NCIS interview, correct?

23  A.   He did.

24  Q.   And he -- he asked you, after telling you that, if Chris

25  ever came over to your house, and your answer was, "I didn't

1  let him in"?

2  A.    I believe I said, "Yes, but I didn't let him in."

3  Q.    "Yes, but I didn't let him in," that -- that was what you

4  told him?

5  A.    I believe that's what I said.

6  Q.    Now, I want to make sure that I understand your

7  explanation for why you told him that in answer to that

8  question.

9        So you -- you explained that the reason you told him

10  that is kind of three things, it's that Ms. Wirfel had already

11  told you that she had told Commander Ross about the call from

12  Mr. Tur where he said he'd knocked you out, and so you thought

13  that Commander Ross already knew that Mr. Tur came to your

14  house, and so you thought he was asking about the manner that

15  he came into your house, whether he broke in or you let him in,

16  that was your testimony yesterday, right?

17  A.    That sounds about right.

18  Q.    And you thought all this, even though, as you said

19  yesterday, you knew that Kelly thought the phone call from

20  Mr. Tur was a joke, right?

21  A.    I believe she did think it was a joke.  I think it's

22  possible she thought it was a joke.

23  Q.    Today it's possible she thought it was a joke.  Yesterday

24  it was she thought it was a joke?

25  A.    No, yesterday it was I think it's possible that she

1    thought it was a joke.  That's what I said yesterday.

2    Q.    And you'd agree with me you never told Ms. Wirfel that

3    there had actually been a physical fight in your house,

4    correct?

5    A.    That is correct.

6    Q.    And so you're making these -- according to your

7    explanation, you're making these -- these assumptions about

8    what Mr. Ross thinks -- I mean, what Commander Ross thinks,

9    because Kelly, who probably thought it was a joke, had told him

10   about the knock-out call, so he must have already known he came

11   to your house, that's your logic?

12   A.    You're going to have to go through that again.

13   Q.    Now, later in the week --

14   A.    So you're not going to read the question again?

15   Q.    We'll keep going over it if that -- if that will help.

16   A.    Okay.

17   Q.    So --

18   A.    Well, I just -- I just asked you to read it again is what

19   I'm telling you.

20   Q.    Sure.  Sure.  I'm happy to hear more explanation.

21          So Ms. Wirfel, who thought -- who probably thought it

22   was a joke, as you say today, about this call from Mr. Tur that

23   he'd knocked you out, and she conveyed that to Commander Ross,

24   so you thought he already knew Mr. Tur came to your house, even

25   though it was a joke, so you thought he was asking about the

1   manner he came to your house?

2          MR. VOKEY: Objection. Compound question. I don't

3   even understand that one.

4          MR. GEE: Don't understand it either, Your Honor. I

5   can move on.

6          THE COURT: Yeah, let's -- let's move on.

7   BY MR. GEE:

8   Q.   So conversations with Admiral Jackson by the end of that

9   week, you'd agree you even offered to resign, correct?

10  A.   I was -- I think Thursday or -- yeah, I believe it was on

11  Thursday I -- I told her, you know, I didn't -- all the rumors

12  that were going around GTMO, I didn't -- I told her I didn't

13  know how I was going to be able to, you know, maintain command,

14  and so I -- I did talk to her about that.

15  Q.   But you didn't tell her you want to resign because you'd

16  been in an altercation with Mr. Tur you hadn't told her about,

17  you didn't tell her that, did you?

18  A.   What I told her was I was worried about my ability to

19  maintain my status as commanding officer at Guantanamo Bay with

20  all of the rumors going around. You know, there's a moral

21  authority piece, and I felt like I was losing it.

22  Q.   All right. And let's talk now about January 20th. This

23  is Tuesday, January 20th. And just to timestamp it for us,

24  this is also the same day that NCIS executes the search warrant

25  on your house, correct?

1  A.    Correct.

2  Q.    Okay.  And the next day, of course, after they started

3  searching your house is when you were removed from command, on

4  the 21st, and leave GTMO, correct?

5  A.    Correct.

6  Q.    Okay.  So focusing on that day, the 20th, now, you talked

7  yesterday about how when you get to NCIS you actually bumped

8  into Agent -- and I'm going to apologize if I can't pronounce

9  it right, sir, but Agent Bisesi in the parking lot, right?

10 A.    That is correct.

11 Q.    But you actually went to NCIS, though, because they had

12 called you and asked you to come down, correct, sir?

13 A.    I -- it's -- it's possible, but I -- I believe that I went

14 down there because I may have -- I may have talked to NCIS, but

15 it -- I don't -- I don't believe so.  I believe I went down

16 there because I was just frustrated that they hadn't called me

17 yet.

18 Q.    So it just happened to be the same day they searched your

19 house later that day that you decided to come down there, it

20 wasn't because they called you and said they want you to come

21 down?

22 A.    No.  I -- I walked over there and she explicitly said to

23 me, "Okay.  I don't think they're ready for you.  Sit in this

24 room," and then it was another 30 to 45 minutes before I went

25 to an interview room with the two agents.

1   Q.   And, sir, you'd agree with me that after the -- the

2   interview was over is when they told you they were searching

3   your house, correct?

4   A.   They -- they said --

5          MR. VOKEY:  Objection.  Relevance.  Sidebar.

6      (Sidebar conference:)

7          MR. VOKEY:  Your Honor, just out of precaution that

8   things concerning his refusal to consent to the search happened

9   after the invocation, and I don't know if that's where this --

10  this question is getting at -- what -- what the answer is

11  getting at, but that was my concern.

12         MR. GEE:  No.  We're definitely not getting to that,

13  Your Honor.  What -- what we're getting into is he is trying to

14  paint a picture that he shows up at NCIS voluntarily and -- or

15  of his own accord, rather, and we're simply asking him

16  questions to confirm that this is all in the time frame where

17  they were telling him "We're executing the search."  They

18  called him to have him come down and attempt the interview and

19  then tell him they're executing the search.

20         It's not his own accord and he just happens to be the

21  same day as the search is done.

22         MR. VOKEY:  Sir, if you look at the video, he's not

23  told that they're executing the search until after the

24  invocation of rights.

25         THE COURT:  I guess I'm not -- Mr. Gee, I'm a little

1    concerned about this whole area.  I mean, I don't think there's

2    been any problems so far.

3           But are you -- I mean, I think -- I mean, I guess you

4    could ask him whether they asked him to come.  Is that the

5    point?  In other words, not that he went voluntarily, but that

6    they asked him to?

7           MR. GEE:  And I did, Your Honor.  That's exactly

8    right.

9           THE COURT:  Okay.  Then -- so --

10          MR. GEE:  And then what's relevant is this is the

11   same day that the search was done, and he was informed of it.

12   In other words, you know, he'd have to be the unluckiest person

13   alive that the very day he volunteers to come down is the same

14   day the search is done.

15          MR. VOKEY:  But, again, the subject of the search

16   comes up after his invocation of the rights.

17          THE COURT:  I just -- I'm not understanding, Mr. Gee,

18   why we need to be doing this.

19          MR. GEE:  That's fine.  I'll move on.

20          THE COURT:  Okay.

21       (The following proceedings occurred in open court, in the

22   presence of the jury:)

23   BY MR. GEE:

24   Q.   All right.  And, Captain, when you are talking to NCIS in

25   this interview, this is the interview that you talked about

1   yesterday where you were -- you felt that the agents were being

2   weird because they asked you questions like, "Did you spell

3   your hometown the same way as Hanes underwear," right?

4   A.   I think -- I think they were -- that was one of the ways.

5   But the other -- I think there was a couple of other things

6   they did, like, "You're -- you're a captain.  We can't trick

7   you," saying that kind of thing.

8        I mean, you know, it was just -- it just was weird.

9   Q.   You understood all their questions, though, right?

10  A.   I believe I did.

11  Q.   And after talking to you for a little bit, they tell you

12  what your rights are, correct?

13  A.   They talked about the rumors.  They mentioned the rumors a

14  couple of times.  At some point they did give me a rights

15  advisement sheet.

16  Q.   And that includes the rights that you have to know what

17  you're potentially under investigation for under the Uniform

18  Code of Military Justice, correct?

19  A.   That's correct.

20  Q.   And they told you that you were under investigation for

21  suspected -- for -- suspected of adultery and involvement in

22  Christopher Tur's death, correct?

23  A.   That's correct.

24  Q.   And you understood what they were telling you at that

25  point as they're reading you your rights, correct?

1  A.    Yeah.  And I understood they -- they now bought into those

2  two rumors that I had previously heard.

3  Q.    And in response to that, you said, "I know I haven't

4  committed any of this," didn't you, sir?

5  A.    I certainly did.

6  Q.    So let's watch that.  This is Government's Exhibit 355.

7          It's about ten minutes or so long, Captain.  So if

8  you need a drink of water or anything like that.

9  A.    I was there.

10    (Video played.)

11  BY MR. GEE:

12  Q.    We're going to make it quiet for a second while he reads

13  your Social, sir.

14    (Video stopped.)

15  BY MR. GEE:

16  Q.    Now, Captain, you'd agree with me the things that you

17  described as giving you a, quote, weird vibe, like the

18  reference to Hanes underwear, that's just them trying to figure

19  out how to spell your hometown, right?

20  A.    Yeah.  I'm telling you the whole interaction was

21  inappropriate and it was just weird, and that's what -- that's

22  the vibe I was getting from them.  "Oh, we can't trick you.  We

23  can't tell you anything.  Rumors" -- they mentioned rumors like

24  four or five times.  So, no, I wouldn't agree with you at all.

25  Q.    You thought it was inappropriate for them to tell you what

1    they wanted to talk to you about?

2    A.   No.  I think the entire interview was --

3    Q.   All right.

4    A.   You know, I got a weird vibe from them.  That's what I

5    have testified to.

6    Q.   Captain, they -- you were on GTMO for ten days after

7    Mr. Tur's body was recovered, correct, sir?

8    A.   That's correct.

9    Q.   And in those ten days, you know, Mr. Tur wasn't in danger

10   of losing his job anymore, correct, sir?

11   A.   That's correct.

12   Q.   He was dead, right?

13   A.   That's correct.

14   Q.   And yet in those ten days you never told Lara Tur about

15   the physical altercation at your house, did you, sir?

16   A.   No, I did not.

17   Q.   You didn't finally tell her until both of you were off

18   GTMO and media reports came out about the investigation of

19   Mr. Tur, correct?

20   A.   That's correct.

21            MR. GEE:  The Court's indulgence.

22        (Counsel confer.)

23            MR. GEE:  Nothing further.

24            Thank you, Your Honor.

25            THE COURT:  Redirect?

1     MR. VOKEY:  One minute, sir?

2     THE COURT:  Sure.

3     (Counsel confer.)

4     MR. VOKEY:  No redirect.

5     THE COURT:  You may step down, sir.

6     THE DEFENDANT:  Thank you.

7     (Witness excused.)

8     THE COURT:  Let me see counsel at sidebar briefly.

9     (Sidebar conference:)

10     THE COURT:  Are you going to rest?

11     MR. VOKEY:  We are, sir.

12     THE COURT:  And are you resting as well?

13     MR. GEE:  Yes, sir.

14     THE COURT:  All right.  I'm just going to ask you to

15   announce that to the jury when I ask -- when I call on you.

16   And then we'll go ahead and give them a break.  I'm thinking

17   maybe 1:30, give everybody a chance to get their act together.

18     Is that good?

19     MR. VOKEY:  Yes, sir.

20     MR. GEE:  Yes.

21     THE COURT:  Thank you.

22     (The following proceedings occurred in open court, in the

23   presence of the jury:)

24     THE COURT:  Mr. Vokey, what says Captain Nettleton?

25     MR. VOKEY:  We have no further evidence.  The defense

1    rests, Your Honor.

2            THE COURT:  And, Mr. Gee, what says the government?

3            MR. GEE:  The government has no further evidence,

4    Your Honor.

5            THE COURT:  So are you announcing rest?

6            MR. GEE:  Oh, yes.  Yes.  Thank you, Your Honor.

7            THE COURT:  Ladies and gentlemen, the evidence is

8    concluded in the case.  We now will move to the next phase of

9    the case where I will be instructing you on the law and then

10   you'll hear the closing arguments of the lawyers.

11           In order to give us the opportunity -- as you can

12   see, we have moved faster -- I think I told you to plan for

13   three weeks, and we're only in a week-and-a-half.

14           I know it probably seems like three weeks, but we

15   have moved quite a bit faster than we thought we would.  And

16   that's attributable to the hard work of the lawyers in trying

17   to put the case together.

18           So what I -- what's going to happen is we're going to

19   go ahead and give you lunch now.  You can go out and have --

20   have lunch and so forth.  And we'll get you back in here and

21   then I'll be instructing you on the law and -- and then hear

22   the arguments.

23           That will likely take most of the afternoon.  And

24   we'll see whether or not we can get the case to you early

25   enough to have you do some deliberation today or whether we

1  just finish with the arguments and then have you come back

2  tomorrow and start your deliberations.

3          We'll just see how -- how that goes.

4          So -- but it is five after 12:00.  In order to give

5  everybody a chance to move into this new phase and get prepared

6  for the closing arguments, I'm going to go ahead and give you

7  an hour and 25 minutes.

8          So I'm going to ask you to be back in the jury room

9  at 1:30 ready to go.

10          It's still very, very important you remember all my

11  instructions.  It is not time to start talking about the case

12  yet, nor let anybody talk to you about it.  It is not

13  appropriate to do any of the things I've been asking you not to

14  do the entire trial.

15          Of course, once we finish with the arguments and I

16  send you back, you can talk about the case all you want.  But

17  not until that point.

18          So all the rules still apply.

19          Have a nice lunch.  We'll see you back in the jury

20  room ready to come out at 1:30.

21          COURT SECURITY OFFICER:  All rise for the jury.

22      (Jury exits, 12:07 p.m.)

23          COURT SECURITY OFFICER:  Please be seated.

24          THE COURT:  Ms. Parks -- will you get -- tell them

25  not to go anywhere yet.

1        I was just concerned because I -- we may -- I may

2   need to talk to the lawyers a little bit, so the 1:30 may be a

3   little bit -- but that's all right.  They'll be back in there.

4   It won't be very much longer.

5        COURTROOM DEPUTY:  She's having them come back.

6        THE COURT:  All right.  Will you -- you can go in and

7   tell them, Mari.  Just tell them it may take us a little

8   longer, so it could be as late as 1:45 before I actually get

9   them out here.  But I'll ask them to go ahead and start

10  gathering at 1:30, but it might be 1:45.  Okay?

11       Thank you.  Appreciate it.

12       All right.  With respect to the jury instructions,

13  I'm going to be reviewing what we talked about this morning and

14  making my final decisions, so -- so why don't we -- why don't

15  we plan on reconvening at 1:20.  If I can do it -- do y'all

16  have -- would it help you if Mr. Burns e-mailed it to you in

17  advance?  Would that help or not?

18       MR. NOTHSTEIN:  Yes, Your Honor.

19       THE COURT:  So -- okay.  I'll try to get him to do

20  that once I've signed off on it.  That way when we come back, I

21  can tell you what I've done, and we can all look at it and make

22  sure that we're in the right place before I instruct.  Okay?

23  That's why I -- that's why I told them it might be 1:45 before

24  we actually got to them.

25       So I'm going to ask you-all to reconvene, let's say,

 1   at 1:20, so an hour and ten minutes.  Is that good?

 2         All right.  1:20 we'll reconvene and -- and we'll

 3   make sure we've got the charges settled and we'll get the jury

 4   out here just as soon as we can after that, so --

 5         MR. SCHWARZ:  Rule 29, Judge.

 6         THE COURT:  I'm sorry?

 7         MR. SCHWARZ:  The Rule 29.

 8         THE COURT:  Okay.  Sure.  Let's do that.

 9         MR. SCHWARZ:  Judge, we'll renew our motion for

10   judgment of acquittal under Rule 29 for all of the reasons

11   stated before which we will adopt, and submit that the

12   government failed to present sufficient evidence to sustain the

13   conviction on each and every one of the counts, Judge.

14         THE COURT:  Thank you.  And I -- I assume that the

15   arguments are the same.  I've listened to the defense case.  It

16   does not change my view that at this juncture the Rule 29

17   motions are due to be denied.

18         Did you want to say something else?

19         MR. SCHWARZ:  We -- as I said, we'd adopt each and

20   every argument submitted at the first JOA.

21         THE COURT:  I -- I think -- I think the jury is

22   entitled to consider all the charges.  You know, I -- I don't

23   have any predictions as to -- depending on how the jury -- what

24   the jury's verdict is, obviously the parties will have rights

25   post verdict, and I'll -- I'll take a fresh look at any legal

1   argument made to me post verdict, but as I sit here right now,

2   I believe that Rule 29 relief is not available to the defendant

3   in this situation.

4          And I -- in order to grant Rule 29 relief, I would

5   have to determine that the evidence is insufficient to sustain

6   a conviction on any of the counts.

7          I'm unable to make such a determination at this time.

8   I do think a jury question has been presented on each count.

9   However, as I said, if -- if I'm asked to consider post verdict

10  any -- any legal issues, I will take a fresh look at that time.

11         All right.  We're in recess until 1:20.

12         COURT SECURITY OFFICER:  All rise.

13     (Recess from 12:12 p.m. to 1:32 p.m.; all parties

14  present.)

15         COURT SECURITY OFFICER:  All rise.  This Honorable

16  Court is back in session.

17         Please be seated.

18         THE COURT:  Let me say that you-all have tried a good

19  case.  I mean, all of the lawyers, very professional, very -- I

20  feel like there's been a high level of professionalism in the

21  way the case has been tried, especially given its relatively

22  high-profile nature and also the -- the complexity of it.  So I

23  want to compliment you in that regard.

24         However, I don't think these jury instructions have

25  been your finest hour, in the sense that we really should have

1    done this yesterday when I suggested, because, you know, the

2    number of changes we've had to make quickly, the -- the things

3    we've had to think about that we didn't -- weren't thinking

4    about before, because nobody had really focused us on it.  I

5    think we're going to be fine, but I'm -- I'm going to go

6    through it with you right now.

7             We -- we tried to -- we e-mailed it to you.  I hope

8    you got it.  But I think Mr. Burns has a copy -- a paper copy

9    for you if you need it.

10            So -- but one thing I don't want to do is -- because

11   we were a little bit under the gun, I don't want to rush my

12   instructions to the jury.  I want to have another chance to

13   take a look at it.

14            I'll have that chance during closings.  And so my --

15   contrary to what I said before, it's my -- my preference that

16   you go -- go ahead and do your closings, which is the way I

17   normally do it.

18            I had been considering doing it in front, but I --

19   I -- I have learned a long time ago that you can take all the

20   care in the world with something, and then if you rush right at

21   the end, that's when you make mistakes.

22            And so -- so I want to make sure that we've done

23   everything we can to have the instructions correct.  And I know

24   that's what you want as well.  And so that's -- that's my

25   thinking at the moment.

1          Does anybody want to try to talk me out of that?

2          MR. GEE:  No, Your Honor.

3          THE COURT:  Okay.  All right.

4          So what that will mean is we're going to try to talk

5   about these instructions now.  I think we'll try to finalize

6   them.  Then when -- when we're ready to do so -- and, you know,

7   I don't want to keep the jury waiting too long, but this is an

8   important part of the case.  We're already well ahead of where

9   the projections were, and so I think the jury will understand.

10          We'll -- we'll -- we'll finalize the charges, and

11  then I'll make -- I want to review them.  And we may have to

12  make a change or two even after our discussions in a -- in a

13  minute or so here.

14          So that's what I'm going to do.  And I'll be

15  reviewing the charges, along with Mr. Burns, while you're

16  making your closings, and -- just so I feel comfortable before

17  I actually instruct the jury.

18          So -- so here's what we did.  This is --

19          Did you send this to them?

20          LAW CLERK:  I just gave it to you, sir.

21          THE COURT:  Okay.  So here are all the bullet point

22  changes we had to make this morning after our discussion, and I

23  also had to make some rulings on some matters that you-all

24  asked about.  So I think I've done all that.

25          And let me just go through this with you.

1        We, also, of course, have taken the headers out,

2   and -- except for the -- the actual substantive crimes, we left

3   the headers in.  We thought that would be helpful to leave them

4   in, and -- and so we did that.  But other than that, we took

5   the headers out.

6        And so let me just go through our -- our changes with

7   you.  And I'm just going to state all these, and then -- and

8   then I'll state what my rulings are, and then I'll entertain

9   any -- any problems.

10       So we have taken the definition of material fact out

11  of the substantive instructions and put -- put it into Jury

12  Instruction No. 7, as we said we were going to.

13       We have modified Jury Instruction No. 9.  Right now

14  it -- before it said "hinder, delay, and prevent," and the

15  statute actually says "or," so we changed the statute --

16  changed it to the statutory language so it now says "or".  We

17  also made some minor grammatical changes in No. 9.

18       We have removed the references in No. 9 and 10 to the

19  aiding and abetting instruction.

20       We have removed the references to the grand jury

21  proceedings in No. 10 and removed the penultimate paragraph.

22       We have added in Jury Charge No. 11 a -- a statement

23  that the -- that a legal duty to disclose facts can only be

24  imposed by statute, government regulation, or form.

25       We have added to No. 11 the -- that the defendant had

1    no legal duty to report to any person his alleged violations of

2    the UCMJ, and -- and the following language.

3        And Jury Instruction No. 12, we have -- I believe as

4    requested by the government -- an Element No. 3 on page 18.  We

5    have tried to conform that to the other instructions.

6        I am looking at these.  I think sometimes we refer to

7    the Department of the Navy as a department and maybe another

8    time we refer to it as an agency.  I don't think that matters,

9    but I -- I do note that we probably have it said two different

10   ways.  I think that was as it was proposed to us, but I -- I

11   think -- I think that doesn't affect the bona fides of it, but

12   I'm just pointing it out to you.

13        We have added to para- -- or Jury Instruction No. 12,

14   the falsification, we have added from the joint proposed

15   instructions.

16        Underneath the elements, we've added that there's no

17   requirement that the matter or investigation had been pending.

18   That was the paragraph that I told you about this morning.

19        We have also added the tangible object language which

20   was requested.  And we have not added the other two paragraphs

21   as we discussed this morning, for the reasons that the Court

22   has already stated.

23        So in -- I want to talk to you briefly -- I guess

24   maybe this is the only substantive question I have.  I am just

25   having a hard time figuring out this aiding and abetting.

1    When you read it, I mean, we -- we tried to play

2  around with it, we tried to take some of it out.  I just don't

3  understand how this is aiding and abetting.  What -- what --

4  the -- the instruction itself, the substantive elements of the

5  instruction in No. 12, No. 1 under the elements, says that "The

6  defendant knowingly altered, concealed, covered up, falsified

7  or made a false entry in a record, document, tangible object,"

8  and here's the language, "or caused another to do so."

9    And my question is, isn't that what we're talking

10  about?  I mean, we're not really talking about -- if you were

11  aiding and -- if -- if Commander -- if Captain Nettleton is

12  aiding and abetting Commander Ross in the commission of a

13  crime, that is not the government's theory, it's not what the

14  evidence is.  I just don't understand what aiding and abetting

15  has to do with anything, question mark.

16    MR. GEE:  The Court's indulgence.

17    THE COURT:  It seems to me if -- if the government

18  wants to argue that Captain Nettleton falsified the Navy Blue,

19  that -- and that we know that Commander Ross at the time was

20  the one that actually sent it, it seems to me the government,

21  based on this element, can argue that Captain Nettleton caused

22  Commander Ross to send a knowingly altered, concealed, or

23  covered-up entry.

24    When you start getting into aiding and abetting, I

25  just -- I'm just not -- I'm reading the definition of aiding

1    and abetting.  It doesn't make any sense to me and --

2            All right.  Hold that thought while you're looking at

3    it.

4            And -- and in Jury Instruction -- we -- we -- right.

5    We -- we moved the -- we added to No. 12 -- I think I've

6    already read that one, the imminent and tangible object.

7            We added a portion of the aiding and abetting.

8    That's the portion we're on now.  We did change Ms. Tur's name

9    to Lara Sabanosh formerly known as Lara Tur so there would be

10   no question about who we're talking about.  And we removed No.

11   14 and added that into 12, which we discussed this morning.

12   That was the aiding and abetting.

13           We've added to Jury Instruction No. 14 a sentence

14   which is designed to be accurate as to both parties.

15           "While the Uniform Code of Military Justice, known as

16   the UCMJ, and Navy regulations may be relevant to certain

17   aspects of this case, the defendant is not charged with

18   violating the UCMJ or Navy regulations.  The defendant can only

19   be found guilty of a specific count if you unanimously find he

20   violated all of the elements for that count."

21           That's -- we added that in -- under No. 14.  It

22   seemed to go there.  I think it's -- I'm happy with it, but

23   we'll see if anybody wants to fuss about that.

24           With respect to the rulings -- things that we didn't

25   necessarily put in there -- and, of course, the defendant

1    requested proposed special instructions, in 108.  That's what

2    we spent some time on this morning.

3            So the Court has agreed with the defendant in some

4    respects on those special instructions, adding the language I

5    just said.  We've also changed the wording in certain counts,

6    particularly Count Three concerning imposing a legal duty.

7            Thus, the Court believes that it has -- it honored

8    the proposed special instruction of the defendant to the extent

9    the Court was willing to do so.

10           For the second portion of the special instruction, we

11   did revise a portion of Instruction No. 11 regarding no legal

12   duty to report.  And the government agreed to that.

13           And although the defendant asserts that this

14   statement about having no legal duty to report to any person

15   has more general applicability to the entire body of

16   instructions, I believe the Counts One through Five, at least

17   was what the defendant proposed, the Court disagrees.

18           The Court thinks that Count Three is the only count

19   that directly discusses that legal duty issue, and so I've just

20   put it into Count Three, but none of the others.

21           I have added, again, the legal duty to disclose facts

22   can only be imposed by statute, government, or regulation.

23           So I think I have honored the special instruction

24   request by the defendant.  To the extent that I have not done

25   exactly what they asked me to do, those objections would be

1    overruled.

2            The defendant also requested that the definition of

3    willfully from the Eleventh Circuit pattern, B9.1(b) be used in

4    place of B9.1(a).

5            The Court has looked at that and determines that the

6    defendant is incorrect about that.

7            *U.S. versus Benton*, 890 F.3d 697, 715, Eighth

8    Circuit, 2018, supports the view that the defendant is

9    incorrect about which willfulness standard to use.

10            In addition, the Sixth Circuit pattern instructions

11    supports the -- the Court's decision not to change the willful

12    instruction in the counts, as suggested by the defendant.

13            In fact, the Eleventh Circuit's pattern instruction

14    for willfulness requires the jury to find that the defendant

15    acted with the intent to do something the law forbids.  That's,

16    in fact, a more heightened standard that the Sixth Circuit's

17    requirement.

18            I found no authority to support that the enhanced

19    definition of willfully requiring the defendant to act with the

20    specific intent to violate a known legal duty applies to a 1001

21    case.  Therefore, the Court will use the same pattern

22    instruction definition of willfully for all counts.

23            The defendant also requests to include in Count Three

24    the element that the defendant acted for the purpose of

25    misleading a department or agency of the United States.  Based

1  on our review, that is not the law.  The defendant -- I'm

2  sorry.

3  　　　In *United States versus Clay*, 832 F.3d 1259, 1308

4  (11th Cir 2016), the Eleventh Circuit says that the knowingly

5  and willfully language from the pattern instructions which I'm

6  going to give is the appropriate standard in 1001 cases, and,

7  therefore, that's what I'll be giving.

8  　　　So I believe that rules on all the matters that were

9  outstanding.  I want to circle back and ask the government

10  about the aiding and abetting, and then I'll entertain any

11  further objections or any further requests at this time.

12  　　　Mr. Gee?

13  　　　MR. GEE:  So, Your Honor, just looking at it a bit

14  more, I think the -- the problem is sort of in the -- in the

15  verbiage we're using here.  The -- the -- the indictment

16  charges the defendant under 18, U.S.C., 2, which is both the

17  aiding and abettings provision, but it's also the agency

18  principle provision.

19  　　　And looking at the -- going back to the -- to the

20  actual 18, U.S.C., 1519, the statute itself doesn't have this

21  "or cause another to do so" provision that's in the elements.

22  　　　That -- that seems to be coming from the pattern jury

23  instructions that this was lifted from.  And the statute itself

24  doesn't have that "or caused another."  And so obviously that's

25  why the government has charged under 18, U.S.C., Section 2.

1          So I think all this is resolvable.  In other words,

2     it's confusing because we have an aiding and abetting in here,

3     and that's how we're sort of referring to it, because that's

4     the overall form instruction, but it's agency principle theory

5     that really is what needs to be in here.

6          So I would suggest page 19 of the Court's proposed

7     instructions leading in the first paragraph about ordinarily

8     any act a person can do, et cetera, it -- it's the next line

9     about aiding and abetting, "A defendant aids and abets a

10    person," that sentence can be removed.

11         The next sentence, "A defendant is criminally

12    responsible for the acts of another person if the defendant

13    aids or abets that person," that sentence can be removed.

14    That's -- that's the form instruction for aiding and abetting.

15         And then the rest of the instruction is appropriate

16    to leave in.  That's -- this is the -- the rest of the

17    instruction that applies to aiding and abetting or agency

18    theory.

19         So, in other words, we keep calling it the aiding and

20    abetting instruction, but it's really the aiding and abetting

21    or agency instruction, and the reason it charges here -- we

22    need it here is agency theory.

23         THE COURT:  Well, but the entire instruction was what

24    was proposed, correct?

25         MR. GEE:  Absolutely, Your Honor, and -- but I think

1   the Court's point is -- is well taken that 18, U.S.C., 2 has

2   two parts, aiding and abetting and agency.  And aiding and

3   abetting isn't really what's happening here.  It's agency

4   theory that is what -- what was happening here.

5           THE COURT:  All right.  So, Mr. Schwarz, here's what

6   I'm inclined to do -- so, Mr. Gee, look at -- look at the page

7   18.  Then that needs to be modified as well.  It should say,

8   "For Count Four" -- we ought to take the aiding and abetting

9   language out, right, under --

10          MR. GEE:  I agree, yes, that as well, Your Honor.

11          THE COURT:  Yeah.  So it should say, "For Count

12  Four" -- or "as to Count Four" would probably be better.

13          "As to Count Four, it's possible to prove the

14  defendant guilty of Count Four, even without evidence that the

15  defendant personally performed every act charged."

16          "Ordinarily any person" -- that seems all right.

17          All right.  I think that will -- I think that will

18  more or less work.

19          Does -- Mr. Schwarz, you wish to be heard on that?

20          MR. SCHWARZ:  Judge, I would -- I would suggest then

21  taking out the language in -- on page 18 for No. 1, the "or

22  caused another to do so."

23          THE COURT:  Well, where does that -- is that part of

24  the joint submission?  Where -- where does that --

25          MR. SCHWARZ:  It -- it probably was, but it's not --

1 when I looked at the statute again, that language doesn't come

2 from the statute.  If we're going agency, it's really that he

3 willfully caused another to do so, then there's some language

4 that comes after that.

5          So I think that last clause in subsection (1) should

6 go, then.

7          THE COURT:  You might be right.

8          I don't -- I guess, Mr. Gee, if you want -- if you

9 want the agency, I guess, and -- and you say the other is not

10 part of the statute, I -- should -- should I just take it out?

11          MR. GEE:  I think we agree.  It's intriguingly in the

12 Fifth Circuit instructions even though it's not in the statute.

13 It sounds like it's their problem.  I think it's fine to come

14 out.

15          THE COURT:  All right.  So then the -- the period

16 would be after the word "object"?  Is that correct?

17          MR. GEE:  Yes, Your Honor.

18          THE COURT:  All right.  In -- in Element 1, I'm going

19 to stop at the word "object," and then as to the rest of it, it

20 will -- it will read down at the bottom as to Count Four.

21 "It's possible to prove the defendant guilty of Count Four even

22 without evidence that the defendant personally performed every

23 act charged."

24          "Ordinarily, any act a person can do may be done by

25 directing another person or agent, or it may be done by acting

1    with or under the direction of others."

2         Then I'm going to omit the next sentence and the

3    first sentence of the next paragraph and then leave everything

4    else in; is that right?

5         MR. GEE:  Yes, Your Honor.  It would restart with

6    "The defendant is also responsible."

7         THE COURT:  Okay.  Is that acceptable to you,

8    Mr. Schwarz?

9         MR. SCHWARZ:  One sec.

10        THE COURT:  It seems to me the -- the last two

11   paragraphs are defendant friendly, aren't they?

12        MR. SCHWARZ:  Just to be sure, so the Court is

13   leaving "The defendant's also responsible if the defendant

14   willfully directs or authorizes"?  That sentence will stay?

15        THE COURT:  It will.

16        MR. SCHWARZ:  Okay.  That's fine, Judge.

17        THE COURT:  Okay.  So that's how we'll handle that.

18        All right.  So that's one change we're going to make.

19   I've now told you what we did and I have told you what we

20   didn't do.

21        Does the government wish to be heard on any matter?

22        MR. GEE:  I don't think so, Your Honor.  I'm -- I'm

23   double-checking through it, but I think the changes -- we have

24   no further suggestions.

25        THE COURT:  Mr. Schwarz, does the defendant have any

1   further suggestions?

2           MR. SCHWARZ:  Judge, obviously our prior objections

3   we would still maintain.  I just wanted to make sure.  You

4   didn't mention -- or at least I don't -- maybe I missed it --

5   you're overruling for Counts Six, Seven, Eight, the language

6   the -- that he acted for the purpose to mislead --

7           THE COURT:  Isn't that -- isn't that the willfully

8   that you wanted me to use?

9           MR. SCHWARZ:  Judge, we wanted the addition for -- as

10  the -- it would be in the sixth element is that he acted for

11  the purpose of misleading the department or -- or agency.

12          THE COURT:  I understand.  Is that the same -- is

13  that the same argument you made with respect to using the

14  different willfully, or was that a different argument?

15          MR. SCHWARZ:  No.  They're independent of one

16  another, Judge.  That was the argument that was just based

17  on -- I gave you those two cases.

18          THE COURT:  Yes.

19          MR. SCHWARZ:  It was based upon that.

20      (Judge confers with law clerk.)

21          THE COURT:  I think, Mr. Schwarz, I did rule on that.

22  That's what I was confused about.  I -- I said that the

23  defendant had requested to include the element that the

24  defendant acted for purposes of misleading a department or

25  agency of the United States and that that was not the law.

1          You cited the *Batista* case, and I cited the *Clay*

2   case, right?  Isn't that the issue?

3          MR. SCHWARZ:  Yes.  I had took it to be you were

4   referring to the 1001(a)(1) count, but I --

5          THE COURT:  No.  I'm making the same ruling with

6   respect to the other counts.

7          All right.  Anything else, sir?

8          MR. SCHWARZ:  No, Judge.

9          THE COURT:  All right.  The charges are settled.

10          Mr. Burns will change the one instruction that we

11   just changed.  I will then -- while y'all are arguing, I will

12   be reviewing the final version, as well as the verdict form

13   again, just to make sure we're -- we're okay.  You're welcome

14   to use the language in your closings.  You know what it's going

15   to be now.

16          Mr. Burns can give you a final, final set as soon as

17   he can get up and do it and give it back to you.

18          But do you -- Mr. -- who -- who's doing the closing?

19          MR. NOTHSTEIN:  I am, Your Honor.

20          THE COURT:  Do you need that, Mr. Nothstein, or are

21   you okay to go?

22          MR. NOTHSTEIN:  I should be fine, Your Honor.

23          THE COURT:  Okay.  All right.  So that gives you

24   time.  And then once -- once we've -- once you've -- once

25   you've fixed that one and you have the final-final, you can go

1    ahead -- even if he's arguing, you can go ahead and distribute

2    it to me and to them, and I'll be reviewing it while -- while

3    he's arguing.  Okay?

4            LAW CLERK:  Yes, sir.

5            THE COURT:  Thank you.

6            All right.  What else do we need to do before I

7    recognize Mr. Nothstein in front of the jury?  Anything?

8            MR. NOTHSTEIN:  Not from the government, Your Honor.

9            MR. VOKEY:  No.

10           THE COURT:  All right.  Ms. Parks, will you tell the

11   jury we're going to start in five minutes so if anybody needs a

12   break that now is the time to do it?

13           COURT SECURITY OFFICER:  Yes, Judge.

14           THE COURT:  All right.  We're in recess for five

15   minutes.

16           COURT SECURITY OFFICER:  All rise.

17       (Recess from 1:59 p.m. to 2:05 p.m.; all parties present.)

18           COURT SECURITY OFFICER:  All rise.  This Honorable

19   Court is back in session.

20           Please be seated.

21           THE COURT:  Are we ready for the jury?

22           MR. NOTHSTEIN:  Yes, Your Honor.

23           COURT SECURITY OFFICER:  All rise for the jury.

24       (Jury enters, 2:06 p.m.)

25           COURT SECURITY OFFICER:  Please be seated.

1           THE COURT:  Well, I apologize again for the

2    misestimating how long it would take us.  That's my fault.

3           I will tell you that what we were doing while you

4    were gone is finalizing the jury instructions that I'm going to

5    be giving to -- giving you, and -- and it's important that --

6    that they be correct.  And so it just took us a little longer

7    than -- than I hoped it would.

8           I can't remember what sequence I told you.  Sometimes

9    I give you jury instructions and then you have closing

10   arguments.  Sometimes we have closing arguments and then I give

11   you jury instructions.

12          So today we're going to have the closing arguments

13   first and then -- and then I'll give you your instructions

14   after they occur.

15          So the closing arguments work like this.  I have

16   given each side a -- what I think is a generous amount of time,

17   but I have given them an amount of time.  And you may hear

18   Ms. Diaz give them time cues from time to time if they've

19   requested them.

20          But in terms of sequence, as I told you and as I will

21   tell you again, the government has the burden of proof in the

22   case.

23          So the government goes first in closing.

24          Then Mr. Vokey, on behalf of Captain Nettleton, will

25   go next.

1          And then the government gets the last word,

2     "rebuttal," we call it, and -- because the government does have

3     the burden of proof.

4          So while the government gets to go first and last,

5     the total amount of time the government gets is the same as

6     Mr. Vokey will get.

7          So it may well be that Mr. Vokey's argument will be

8     longer in one session.  The government may split theirs up

9     between the beginning and the end, but it's the same amount of

10    total time.

11         Of course, there's no requirement they use it all,

12    but generally speaking they do.

13         And so -- so I'm going to ask you to give them your

14    close attention.  They'll be talking to you about what they

15    believe the case has shown you, in terms of evidence.  They'll

16    likely also talk to you about some of the elements of the -- of

17    the various crimes that are charged and how they view them as

18    fitting into the -- to the case.

19         But I will remind you that, after they do that, I'll

20    be giving you kind of a comprehensive look at what the -- what

21    the charges are and -- and how they could be proved and so

22    forth.  So you'll have that.

23         And I will also remind you you'll have copies of

24    those instructions back with you, so that -- so you'll have all

25    the tools you need to -- to make a decision.

1          So is everybody good?  We ready to go?

2          All right.  Then I'm understanding that Mr. Nothstein

3  is going to give the closing argument on behalf of the

4  government.

5          And you may proceed, sir.

6          MR. NOTHSTEIN:  Thank you, Your Honor.

7          Good afternoon, ladies and gentlemen.

8          This case is about the defendant's conduct.  It is

9  about how he misled multiple Navy members about what happened

10  on the night of January 9th, 2015, to keep them from reporting

11  to federal law enforcement, at Master-at-Arms, and NCIS, what

12  they knew about that night.

13          It is about his efforts to conceal from his superior

14  officers information he had a legal duty to report, information

15  about his personal involvement and physical altercation with

16  Chris Tur, who was reported missing and then found dead in the

17  waters off Guantanamo Bay, Cuba.

18          It is about the defendant's efforts to obstruct the

19  potential court-martial he foresaw.  It is about the false and

20  misleading statements and documents that the defendant made to

21  further his misleadings and concealment.

22          Now, throughout this trial, the defendant has tried

23  to push your focus anywhere other than the defendant's conduct.

24  The defendant did the same in his testimony, trying to push the

25  focus and attention away from what he did.

1          This is same as his conduct at Guantanamo Bay in

2     January of 2015 when he concealed, misled, and lied to divert

3     attention away from his conduct, because he knew that the truth

4     invited more questions and each answer to those questions led

5     right back to him, to the truth that he was trying desperately

6     to hide from his superiors, from law enforcement, and from his

7     wife.

8          But he was not able to do so.

9          The truth caught up with him in this courtroom.  Here

10    he has to face his actions.  Here we have proven to you beyond

11    a reasonable doubt that he is guilty of all counts.

12         Now, before I talk to you about the facts that we

13    have proven during this trial and then how those facts support

14    a verdict of guilty on each and every count, I want to spend a

15    moment discussing with you why the defendant would go through

16    all these efforts, why he would act in a manner so contrary to

17    his prior impeccable service record and so contrary to his

18    professional interests.

19         It's all about what he was hiding, the affair.  Now,

20    to be certain, this case is not about whether or not the

21    defendant had an affair.  We know that he did.  And we're not

22    here to make any moral judgments about that.  He is not charged

23    with having an affair.

24         But at this time, January 9, 2015, the affair was

25    going on.  And in the military that's a huge deal.  It's not

1    just a ticky-tack violation.  It's a crime.  It can be a crime.

2           As Admiral Gray explained to you, that's because

3    adultery is harmful to the good order and discipline of the

4    Navy.

5           And the defendant knew that if it got out, he could

6    be removed from command, he could be court-martialed, and his

7    marriage could end.

8           So when Christopher Tur started accusing the

9    defendant of having that affair and then came to his house,

10   where there was a fight because of the affair, the defendant

11   initially had to hide all of it, because every fact -- that

12   Chris Tur had accused him, that he had come to his house --

13   invited more questions, and those questions all got back to,

14   "Well, why is he accusing you of this?"

15          Those questions could lead back to Lara Tur who could

16   give up their secret.

17          And it's not only a law enforcement issue.  The

18   answers to these questions about his conduct make it up to his

19   command to Admiral Jackson, where he could be disciplined, and

20   they may make it to his wife.  So he had to hide everything to

21   cut off any question from getting to a logical conclusion.

22          And then when Chris Tur went missing and then is

23   found dead, the defendant's problem got worse.  He knew there

24   would be a death investigation by NCIS, and if it got back to

25   him, there would now be much more serious questions about the

1    fight he got into with the now dead man whose wife he was

2    having an affair with, about the blood in his house that he

3    admits he cleaned up, about the shirt -- the ripped shirt that

4    he admits he destroyed, about why he lied and concealed the

5    fight initially.

6              And what was the reason for the whole thing?  The

7    affair.  And so the defendant, once Christopher had died, had

8    to double down on his efforts to conceal, mislead, and lie.

9              Now, I want to talk to you first about the facts we

10   have proven to you in this case beyond a reasonable doubt, and

11   then the law, how the facts apply to that law to prove the

12   defendant's guilt.

13             So let's talk first about what happened at the

14   Bayview on the night of January 9th.  I'm sure you don't want

15   to hear us go into everything again, so we're not going to go

16   into a lot of detail about the Bayview, but there's just a

17   couple of important things of -- particularly about some of the

18   accusations made by Chris Tur that are relevant to some of the

19   denials the defendant later made.

20             So we know that a Hail and Farewell and a lot of

21   shenanigans and drinking are going on downstairs.  Okay.

22             What happens there leads to Christopher Tur making

23   very crude and very specific allegations against the defendant

24   that he is having a sexual relationship with his wife.

25             Both Kelly Wirfel and Captain Ross testified that

1   Chris Tur made these specific allegations:  How do you like

2   F'ing my wife?  Your such and such must be this big.

3          And both of them said the defendant was close by

4   facing Christopher Tur as he's having -- as he's making these

5   allegations.

6          But in his testimony, the defendant now conveniently

7   can't remember specifically what Chris Tur said.  Or maybe it

8   was that the music was too loud.  You saw his testimony.  You

9   saw the explanations continue to shift.

10          He seemed to remember what was said directly before

11   these allegations and what was said after the allegations but

12   can't remember the specific allegations.  And we'll see that's

13   a common theme with the defendant's testimony:  tailoring the

14   facts which he heard as he sat through the trial to his

15   testimony.

16          Now go back to his specific memory lapse by the

17   defendant just a bit.  But we know Captain Ross breaks up the

18   altercation and everyone goes their separate ways.  The

19   defendant goes to his home, Chris Tur goes somewhere else,

20   apparently comes back to the Bayview and has another

21   altercation with Kelly -- with his wife.  Kelly Wirfel is

22   there.  More awful things are shared.  Ms. Wirfel puts Lara Tur

23   on the couch at the Bayview and she passes out.  Kelly Wirfel

24   prepares for them to go home.

25          Now, while she waits, Christopher Tur makes his way

1    to the defendant's home down the peninsula at Deer Point.

2           Now, there aren't many things that we can put a

3    timestamp on for Friday evening.  As I said, everyone's

4    drinking quite a lot.  But there's one thing we can, one series

5    of events we can, and that's thanks to Julia Nettleton.

6           Now, we know from the text messages that Julia

7    Nettleton was sending that evening -- this is Government's

8    Exhibit 29.  I encourage you to look at this closely because

9    it's very important.

10          At 10:22 she texts her boyfriend, "There's this dude

11   at my house.  He was at the party with my dad.  I hear voices.

12   This dude is yelling at my dad about something to do with his

13   wife, and he's alternating from threatening him and complaining

14   about his marriage."

15          Now, one of the reasons that this exhibit is so

16   important is that Julia Nettleton is narrating everything she

17   is seeing and hearing as it's happening.

18          So we know that Christopher Tur got to the

19   defendant's home around 10:22 -- it's very close to the Bayview

20   as you heard -- and right away he's confronting the defendant

21   about the affair.  That's what Julia is telling us.

22          And it's important how Julia describes that because

23   she describes to what she hears as yelling, threatening,

24   complaining.  It's important because that's about to change.

25          And it's also important because this is another time

1   that Christopher Tur made an accusation about the affair

2   between Lara Tur and the defendant that the defendant

3   conveniently forgets due to his amnesia.

4              So now it's 10:46.  24 minutes later the dogs are

5   barking.  You've heard about this from Kelly Wirfel, as well,

6   on the phone call.

7              She says, "Oh, my god, my dogs won't stop barking

8   because there's people outside.  I'm literally about to tear my

9   hair out."

10             Now, the dogs keep barking.  And it gets so bad that

11  at 10:55 Julia goes downstairs to see what's happening, and

12  what she sees terrified her.

13             She sees her father lying face down on the ground

14  with a strange man standing above him.  She runs back upstairs

15  and sends this text message:  "I just went downstairs to get

16  the dog to stop barking literally what I see is this dude

17  standing there on his phone above my dad I'm so confused didn't

18  even notice me I ran back upstairs."

19             Now, we all know that people aren't necessarily

20  writing great works of literature on their iPhones, but it's

21  notable that in this -- in this text there's not a single

22  punctuation.  This is Julia Nettleton spilling out her fear to

23  the only person she could talk to at that moment.  Remember

24  she's on an island.  She can't make any phone calls.  Her

25  mother's gone, her brother's gone, her father is the only one

1   home, and the only thing she can do is text people.

2          Now, this text is also important because Chris Tur

3   has been there for 33 minutes at this point.  Remember he got

4   there at 10:22.  If we are to believe the defendant's

5   testimony, when this happens, when Julia sees him lying on the

6   ground, that's when he's about to come to and realize he's been

7   knocked out.

8          And according to the defendant, he has been knocked

9   out and lost more than a half an hour of memory due to that

10  punch.

11         Now, you-all are the judges of credibility.  I can't

12  tell you who's lying, I can't tell you who's telling the truth.

13  It is for you to decide.

14         So it's for you to decide:  Did he actually forget

15  all that time or did he conveniently forget yet another time

16  Chris Tur specifically accused him of having an affair with his

17  wife.

18         Now, when considering that, also consider that no one

19  who saw the defendant, who testified in this trial, said that

20  he was injured the next day at all.  You didn't hear any

21  evidence of the defendant going to the doctor for any kind of

22  head injury or anything like that.  He just said now on the

23  stand he can't remember more than a half an hour.

24         But this time is also important for another reason,

25  about what happens immediately.

1    Remember, Julia goes downstairs, sees her father on

2    the ground.  We know from the defendant's testimony that's when

3    he was apparently knocked out by Christopher Tur.  According to

4    the defendant, he got right up, Chris Tur made the call to

5    Kelly Wirfel and said the thing about, "I just knocked the

6    Skipper out."

7    Well, two minutes later, Julia Nettleton is texting

8    to her boyfriend, Keegan McManus.  She said, "So I can hear

9    them fighting really loudly I've locked myself in my room."

10   And a minute later she writes, "Literally I feel uncomfortable

11   and unsafe in my own home."

12   So now they're fighting.  We're going to talk a good

13   bit about the seriousness of this fight because this shows that

14   this fight was memorable, one that should have been reported to

15   law enforcement, one that would have been relevant to the

16   defendant's superior officers, and it would have given anyone

17   concern about Chris Tur's safety and well-being.

18   And the specific language they told you before that

19   Julia Nettleton uses is important, because she's already

20   described the two men yelling at each other but now she's using

21   the word "fighting" for what she hears.  She described what she

22   hears -- on the stand she said it sounded like thumping and

23   banging.  And just to corroborate, another friend texts her at

24   10:56.  This is her friend Tyler Heath.  He just lives right

25   down the road, Deer Point.  He just says, "Hey, what's up?"

1    She says, "My dad's really drunk and some other dude

2    is here they're like getting into a fight downstairs and I'm

3    hiding."

4    "I don't know who this dude is" -- now, she'll

5    eventually say it was Christopher Tur, on the stand -- "but I

6    hope they don't break anything."  She's hiding.  She feels

7    unsafe in her own home.  That's how serious this fight is.  She

8    has locked herself in her bedroom.

9    And you saw her when she testified.  This was a

10   traumatic event and she has a front-row seat.  Remember, her

11   room is right above that barroom and kitchen.  So she can hear

12   everything.  And she is all alone.  The only person there to

13   protect her -- she's alone on that island -- is her father and

14   she last saw him face down on the kitchen floor.  And it's

15   important because it gives her text messages credibility.  She

16   has no reason to lie, no reason to embellish, to downplay, to

17   do anything but tell her friends what she's hearing.  She's

18   telling it like it is:  There's a fight going on downstairs.

19   And she goes further.  11:25 she texts again to

20   Keegan, "I'm hoping nobody is dead."  Again, that's how serious

21   this is.

22   11:26 Tyler writes back, right on time:  "How are the

23   drunks?"

24   And she says, "They've been fighting for a while and

25   like I was scared texted Riley he tried calling dad and must

1   have stopped because it got quiet again."

2          And here's what's important about her conversation

3   with Tyler as it continues.

4          Tyler says, "Were they just yelling?"

5          And she -- and Julia says, "No.  I could hear them

6   actually fighting each other."

7          And Julia continues, "I walked downstairs because I

8   didn't know where this dude was standing over my dad he's

9   laying on the kitchen floor and ran upstairs and after that I

10  could hear them fighting."

11         And, not surprisingly, Tyler's response is just, "oh,

12  my god."  But it's right, too.  It's a serious fight.

13         But Julia's texts are not the only way we know this

14  is a serious fight.  We also know that because Chris Tur's

15  blood is everywhere.  Drops are scattered all over the house,

16  or at least this side of the house.

17         This is Exhibit 60.  Take a careful look at it when

18  you get back into the jury room, please.

19         The blood is found in several rooms in many places:

20  walls, furniture, behind the butcher's block.

21         Now, I want to talk for a minute about these blood

22  diagrams and so forth.  So what I have here is Defense

23  Exhibit 47A.  And I want to submit to you, when you saw this --

24  this is -- this is the diagram that the defendant drew on,

25  where Chris Tur went and when he went there and the places he

1    walked.  I want you to think carefully about what you saw when

2    you saw this.

3         When you evaluate his testimony, remember that all

4    his time at Guantanamo Bay, before he was relieved of command,

5    the defendant didn't make any statements about what happened in

6    the house.

7         But in the lead-up to this trial he told us.  He got

8    the discovery, he got the reports about where the blood was

9    found, he got the blood diagrams.  He reviewed them.  He sat

10   through the witness testimony about where this blood was.

11        What you saw here was a carefully crafted routine to

12   connect the dots.  He knew where the blood was, so he asked

13   Chris to do a side step, a pirouette, to go from place to place

14   where all the blood is, to tailor his testimony to fit the

15   facts.

16        Now, it's for you to decide whether or not he's being

17   truthful, but consider that carefully in evaluating his

18   testimony.

19        Now, that's what the investigation found.  And it's

20   important to note that blood is found on many low places, such

21   as the butcher's block, and this foot there, right near the

22   end.  Agent Boswell told you it's nowhere anywhere high or on

23   ceilings, anything like that.

24        And speaking of where the blood's found, I want to

25   talk a minute about the defendant's testimony about what

1  happened between himself and Chris Tur and how this blood got

2  everywhere.

3          So if you remember, the defendant said that right

4  before the fight, the defendant's standing -- I'm sorry,

5  Christopher Tur is standing in the barroom facing the kitchen

6  which is down through this doorway on the bottom edge of the

7  diagram.

8          And the defendant says he was in the kitchen and

9  Christopher Tur is in the barroom facing him.  So that puts the

10  bar, which is right by where it says "barroom," on his right,

11  and sort of the butcher's block behind him to the left -- or

12  off to his left.  And that's where the red arrow is.  That's

13  where Chris Tur would be pointing -- or standing.

14          According to the defendant, they struggled back and

15  forth.  The defendant gives him one punch right in the nose.

16  So enough that he's bleeding a lot.  And then there's a lot of

17  very specific testimony from the defendant who just got off his

18  30 minutes of amnesia.

19          Christopher Tur goes to one knee, right hand goes to

20  the ground, right?  Left hand covers his mouth.  And what does

21  he say?  How does he explain the blood gets everywhere?  He

22  says Christopher Tur is pounding on the side of the bar making

23  noise and taking his left hand where the blood is and flinging

24  it, flinging it back.

25          So I have to ask you, if that's the case, one, why is

1  there no blood up on the walls on the left side?  The defendant

2  didn't say he cleaned anything up, up there.  He said it was

3  all on the floor.

4          But, more importantly, how did the blood get over

5  here on the right?  How did it get there between the shelves?

6  How did the blood get under the shelf?  How did it get over

7  there?  How did it get under this low-lying shelf, this

8  20.5-inch shelf?

9          Because Agent Boswell and Agent McNamara told you in

10  order for that blood to be on the bottom of the shelf, it's got

11  to start low and come up high.  That motion he described,

12  that's not going to do that.

13          How does the blood get on the back side of this side

14  of the shelf?  And how does the blood get here behind this

15  little lip, behind this little ledge?

16          Blood follows the rules of physics.  The other

17  question is how did the blood get to the sitting room?  This

18  door here, where it says "swabs," that's the one that goes to

19  the barroom.  How does it get all the way over to the far side

20  of the sitting room?  The defendant never said Chris Tur went

21  in there, never said he went near the trunk.  So I encourage

22  you to think about all these questions when you're evaluating

23  the defendant's testimony.

24          Now, setting those questions aside, the evidence

25  shows the fight is serious, memorable and one that should have

1   been reported to law enforcement, to the defendant's superior

2   officers.  It's not some bang, bang event.  It's one punch and

3   one punch.

4        We also know it's a one-sided fight because none of

5   the defendant's blood is -- DNA is anywhere in the house.

6        And this evidence, particularly the text messages,

7   are important for another reason:  They show that the

8   defendant's testimony about what happened next could not

9   possibly be correct.

10       Now, again, your recollection controls, but if you

11  recall, the defendant testified to the following series of

12  events:  He wakes up on the ground after being knocked out.

13  Chris Tur calls Kelly.  They go outside to have a beer and

14  Chris Tur has a cigarette.  They're outside about five, ten

15  minutes.  Then they go back in.  Chris Tur tries to convince

16  the defendant to go back to the bar.  Chris Tur eventually gets

17  angry.  Then Chris attacks the defendant.

18       Now, the problem with this is that his story is

19  starting with him being on the ground.  And Julia's text

20  messages are as well.

21       But according to her, she sees him on the ground

22  right around 10:55, because she says, "I just -- I just went

23  downstairs and he's on the ground.  The dogs are barking."

24       One minute later, one minute later, she says the

25  fight's going on downstairs, this serious fight that scares her

1    so much she locks herself in her room is immediate.  It's one

2    minute later, not five to ten minutes later.

3              It simply couldn't have happened that way.

4              Now, it's also important -- and she also texts Keegan

5    McManus, by the way, as we said before.

6              It's also important to point out that the defendant

7    said that they went out the side door.  And he agreed with

8    Mr. Gee that Julia's window is right above where they were

9    standing.  Julia Nettleton didn't say a word about hearing

10   anything outside.  And we know drunk people aren't particularly

11   quiet.

12             And all this evidence shows us, this was a serious,

13   memorable fight, one that should have been reported to law

14   enforcement, one that should have been reported to superior

15   officers, and anyone concerned.

16             And it happened the way Julia described it.  She saw

17   her dad on the ground, the fight started immediately.

18             It's also important to remember that when Chris Tur

19   was found, he had six different injuries.  He's got a contusion

20   on his forehead that we heard about, he's got the laceration

21   above his eye, four different broken ribs.

22             Again, there's no other explanation that you saw in

23   the evidence other than he got these injuries in this serious

24   fight.

25             But I want to stop for a second and I want to just do

 1   away with some of these distractions relating to Christopher

 2   Tur and the fight.

 3        The defense has brought them up during the

 4   examination and I believe will -- may again in closing.

 5        Let's just say, for example, that you believe the

 6   defendant's story, that he was just defending himself from

 7   Chris Tur's assault.  That has nothing to do with the

 8   defendant's guilt of the charges.

 9        Even if the defendant was defending himself, it was

10   self-defense all the way, the MAs, the security department, or

11   NCIS would still have investigated this assault against the

12   commanding officer, no matter who started the fight.

13        So misleading people to prevent them from reporting

14   about it is still a crime.  And I know that it's been a while

15   since you got your initial instructions, but I'll talk with

16   you -- or just a few minutes about what the charges are and how

17   these facts prove them.

18        And I'll also tell you -- you'll also see the

19   defendant still had a duty to disclose the facts about this

20   serious encounter he had.

21        And it doesn't matter if Chris left the house after

22   the fight and went to the Bayview and someone else attacked him

23   and broke his ribs.  I mean, that would be quite the

24   coincidence, but it wouldn't affect the defendant's guilt of

25   the charges.  I mean, even if Christopher Tur left his house

1  and committed suicide, that would not affect the defendant's

2  guilt.

3           And that's because, even if those things happened,

4  even if that's how it happened -- and I would submit the

5  evidence does not support that -- NCIS was still going to

6  investigate the possible federal offenses, and the defendant

7  has a duty to report a lot of that information.

8           But ultimately we don't know what happened to Chris

9  Tur the rest of that evening.  We know his blood is found at

10 the dock.  We know the bloody towel is found there.  And we

11 know that at some point Christopher Tur went into the water

12 where he drowned.  We don't know how he got there.

13          As Mr. Gee told you last week, that's not a mystery

14 we're going to solve in this courtroom.  And it's also not a

15 question for you to answer.  The only question is whether the

16 defendant is guilty of the charges against him based on the

17 defendant's conduct.

18          So let's look at that conduct.  Let's look at what he

19 did right away.  Immediately following this serious fight,

20 where a man on base had just attacked him in his home, where he

21 was alone with his teenage daughter, what did the defendant do?

22 He called no one.

23          He didn't make a call to the security department; not

24 one to his executive officer, Captain Ross; not one to his

25 superior officer; and no call to Lara Tur.

1          Think about that one for a second.  Lara Tur

2   testified that she had told the defendant about prior abusive

3   incidents by her husband, and the defendant testified he knew

4   about that.

5          The defendant even witnessed one of those incidents

6   and asked Lara if she needed help.  And in this moment, the

7   defendant knew that Christopher Tur was drunk, acting erratic,

8   believed Lara to be cheating on him, and was distraught enough

9   to attack the commanding officer of the Navy base where he

10  lived.  And the defendant did nothing.

11         He let this man who had just attacked him in his own

12  home go right back to where he and his wife live with their

13  teenage daughter:  no warning, no efforts to protect Lara Tur

14  at all.

15         Now, the defendant admitted in cross-examination he

16  didn't do this but that he should have.  And his explanation

17  that he didn't call, and didn't tell anyone for that matter,

18  was because he thought Chris might lose his job if anyone

19  learned of this assault.  This is not a legal defense to these

20  charges.  His motivation for breaking the law does not excuse

21  it.

22         You can't steal a car because you need to get to

23  work, you can't rob a bank because you need to pay your mom's

24  rent.  But, more importantly, that excuse that he did not want

25  to get Chris Tur fired, that just doesn't hold up.

1    First of all, it wasn't his motive.  With all of what

2  he knew about the danger of Chris in his state, it's just not

3  believable he sent him home to Lara just to save his job.

4    But it becomes even more clear the next day.  We

5  talked a lot about this meeting at the defendant's office

6  around 2 p.m.  In the meeting in his office the defendant

7  learns that Chris is potentially suicidal and, as he said, he

8  was very concerned.  But he still says nothing because Chris

9  Tur might lose his job?  There's no point in his job if he's

10  dead.

11    The motive to stay silent is gone, but he still does

12  nothing because he's afraid that Chris will lose his job.

13  That's just not believable.

14    Also during that meeting, Lara Tur says she wants a

15  divorce and wants to get her own house.  So if he's concerned

16  about Lara not having a provider or home, that's out the

17  window, too.

18    But that motive is really gone when Chris is found

19  dead on Sunday.  He can't work if he's dead.  There's no reason

20  to protect his job at that point.  But did the defendant do

21  anything?  Did he share any information at this point?  No.

22  That's because the defendant was never trying to hide the

23  assault to protect Chris Tur's job.  It was to protect himself

24  and keep people from finding out about the affair.

25    And now that Chris Tur is dead, he has an even

1    stronger motive to keep NCIS from investigating him, because he

2    knows this man is dead, was last in his house and bleeding

3    because of their fight.  He knows the NCIS is going to have to

4    conduct a death investigation, and he knows if he comes clean

5    now, NCIS will have lots of questions.  And their question will

6    be, why did you lie?  Why did you hide this?  And the problem

7    is he doesn't have good answers, because even if you believe

8    exactly what he said about why he did it, he knows that

9    eventually the answers are coming back to, "I was having an

10   affair with Lara Tur."

11           So let's move to the next day, Saturday,

12   January 10th, and we'll discuss all the times that the

13   defendant misled, concealed, or outright lied.

14           Now, Ms. Wirfel testified that morning, around

15   10 a.m., she and Randy Barger visited the defendant's home.

16   The first thing they asked him is very simple:  Have you seen

17   Chris Tur?

18           His response is no.

19           Kelly Wirfel reminds him about the phone call when he

20   claimed he had knocked out the Captain.  And this is where the

21   misleading starts.  The defendant's response was, "Yeah, he

22   came to my house last night, but I just eventually told him to

23   get out of the house."

24           He doesn't say, "Oh, yeah, he did try to knock me

25   out, Kelly, he did sucker punch me," and explain what happened

1   to Chris's friends who are trying to find him, are worried

2   about him.  No.  He leaves out the key facts and just says he

3   was here but he made him leave.

4           And he does this because, as Randy Barger told you

5   and many people told you, if they -- if the defendant had told

6   them the truth, that he came to the defendant's house and they

7   fought, no matter who started it, Randy Barger is calling the

8   security department, he's calling NCIS.

9           In some way it's getting reported up the chain, which

10  will inevitably lead back to the defendant and his actions.

11          So now you move on to the meeting in the office.

12  It's, again, Ms. Wirfel, Mr. Barger, and now it's Lara Tur.

13  And they've been searching for the defendant and they -- I'm

14  sorry, for Mr. Tur and they can't find him.  They're getting

15  worried because he's disappeared before but now it's been a

16  little longer, it's more serious.

17          And they're sitting around, they're worried about

18  him.  As I said, the defendant now is very concerned, he said

19  many times, because of suicide attempts, and he doesn't say a

20  word.  He doesn't offer anything up to try and help them, try

21  to give any additional information.

22          He gave a bunch of different explanations on

23  cross-examination and I'll leave it to you-all to decide

24  whether you think any of them are accurate.

25          But it's undisputed he does not say a thing at this

1    time.  He never says, "I have important facts to share.  I'm

2    going to tell you what happened last night."

3         But even after the meeting, he doesn't tell Lara Tur.

4    That's what makes no sense about this "Christopher Tur losing

5    his job" explanation.

6         Lara can't fire him.  There's no reason [sic] to tell

7    Lara Tur what happened to her husband the night before.  But he

8    still doesn't do it.  And, yes, she's upset, maybe her marriage

9    is over, but it's still the father of her children.

10        But, again, the defendant doesn't do any of that.  He

11   continues to mislead them all into thinking nothing happened.

12        So the defendant -- we've heard a lot about the

13   search.  He starts the search of the command duty officer.

14   They start this big search.  And it goes all over the base.

15   There's no dispute about that.  It ends up going all over the

16   place.  But he doesn't tell the command duty officer, "Hey, he

17   was in my place at like 11 o'clock and we got in a fight.  You

18   might want to look around there for any clues or see if he's

19   there or anything like that."

20        He doesn't do that.  He lets people search all

21   throughout the base, dangerous areas often, all the time never

22   telling them what he knows from the night before.

23        Now, the defendant told you this morning that the

24   reason he said -- he didn't tell anyone to focus on Deer Point

25   was because you -- I think he said "can't assume in a search,

1    assume where someone might be.  Search everywhere."

2            Now, are we to believe that searchers are better off

3    without the information that might be helpful because it might

4    make them assume something?  Not at all.

5            He doesn't tell them because that points back to him

6    and it starts the questions about what was happening.  Why was

7    he at your house?  What happened?  Where did he go?  What did

8    he say?  He wants to avoid those.

9            So, now, as we've heard today, at some point during

10    the day, the defendant has contact with Admiral Gray, lets him

11    know what's going on, continues the concealing and misleading.

12            The defendant tells Admiral Gray the bare basics:  A

13    man is missing, fought with his wife the night before, and he's

14    disappeared like this before.  Doesn't tell him any of the

15    specifics about his own involvement, of his personal

16    involvement.

17            And Admiral Gray told you, "I thought he had nothing

18    to do with this, I thought he got it all secondhand."

19            No.  All of that was concealed.

20            And when asked why, today -- I believe it was today,

21    the defendant said -- he was asked on cross-examination, "Well,

22    why did you tell Admiral Gray all this stuff?"

23            The defendant's answer now is, "Well, I thought that

24    they would find Chris Tur safe and sound."

25            This is the same guy that was very concerned about

 1   his potential suicide.  So was it very concerned or going to

 2   find him safe and sound?

 3          No.  The answer is he didn't want to tell

 4   Admiral Gray anything to point it back at him.  This is

 5   continuing his misleading and concealment.

 6          And we can see in the defendant's e-mail at 8 p.m. --

 7   approximately 8 p.m. -- to Admiral Jackson -- this is

 8   Exhibit -- Government's Exhibit 359 -- this is what

 9   Admiral Jackson told us was officially in the record.  He gives

10   the same misleading barebones recitation of the facts.  And he

11   misleads Admiral Jackson and Admiral Gray, but he's leaving out

12   many details.  But he's also not forthright in one of the

13   answers.

14          So she asks if domestic violence -- I don't know if

15   they have this here, but she asks if domestic violence is an

16   issue.  We'll take a look at that in a moment.

17          And the defendant's response was simply, "Yes."

18          He doesn't say, "Well, I witnessed the -- the missing

19   man attacking her -- accosting his wife.  I was attacked by

20   this man last night."  He just says, "Yes."

21          That is misleading.  Not giving additional details,

22   that is concealing and misleading.  And, remember, this is not

23   a friendly heads-up e-mail.  As Admiral Jackson explained, this

24   reporting was required under the Commander's Critical

25   Information Requirement, which is a Navy -- required by Navy

1   regulations:   to provide information, provide complete

2   information.

3          As Admiral Jackson describes, she wants -- the

4   regulations require you to get the who, what, when, where, why.

5          Now, Admiral Jackson asked some follow-up questions.

6   And the defendant testified, I believe, that he left out the

7   key facts about his personal involvement, the allegations of

8   the Bayview, the fact that Chris Tur assaulted him in his home,

9   because they were in the middle of a search, so it wasn't

10  relevant.

11         Now, Mr. Gee, I think, explored, there's no exception

12  for middle of the search to your reporting requirements,

13  required information to be given under the Navy regulations.

14         It wasn't as if the defendant was out with a

15  flashlight looking for Chris Tur at this moment.  He's got a

16  great opportunity right here in front of his computer or at his

17  Blackberry or whatever it is to give Admiral Jackson a fulsome

18  explanation of what happened.  He has a perfect opportunity not

19  to mislead her, a perfect opportunity not to conceal

20  information, but he didn't take that opportunity.

21         Now, right around the same time the defendant

22  authorizes the Navy Blue.  We talked a lot about that and we'll

23  go back into everything the Navy Blue is about.  But, again,

24  not an FYI e-mail.  This is required by Navy regulations.  It's

25  an operational report.  It goes all the way up to the Pentagon.

1    You heard that many times.

2           And the defendant made clear to you, he is the

3    approver of this message and today he said he absolutely

4    discussed the content of this with Captain Ross that day, which

5    is exactly what Captain Ross told you.

6           While they're doing that, the defendant is the only

7    one who knows what happened about the fight at the house.  He

8    never shares that information so it can be included.

9           And he never shares the information so they can even

10   discuss whether it should be included.  He's doing that because

11   he's continuing to -- to mislead Captain Ross to make sure he

12   doesn't find out what happened because it will lead to

13   additional questions.

14          In fact, the defendant said that with Navy Blues -- I

15   think he said you send everything you know at the time.  But

16   that's not what he did.  Because just reading this right here,

17   the defendant knew a lot more than what's going on in this

18   e-mail.

19          No, he did not send everything he knew.  He left out

20   what pointed at him.

21          Now, there's also testimony the defendant is in touch

22   with an NCIS agent that day.  But apparently they told him he

23   couldn't start a missing person's investigation.

24          But surely if the defendant said, "Hey, I have

25   information about where Chris Tur was on January 9th and where

1    he committed an assault on me," NCIS would be all ears.  But he

2    didn't do that.

3          So that's one NCIS encounter and there's more to

4    come.

5          So the next day, concealment, misleading and lies

6    continue.

7          That morning the defendant calls Admiral Jackson.

8    You heard about it this morning.  I don't think we need to go

9    back into it in too much detail other than to just point out,

10   Captain Ross is telling the defendant, "Tell her about the Hail

11   and Farewell.  Tell her about the Hail and Farewell."

12         And even if he's brushing him off at the moment,

13   because he can't talk, you know, and have a conversation and

14   have someone bugging him at the same time -- I get that.  That

15   happens all the time.

16         But afterwards, when Captain Ross says, "Hey, why

17   didn't you tell her about the Hail and Farewell," he says, "She

18   doesn't need to know."  He didn't think it was relevant.  He's

19   continuing to conceal and mislead this entire time.

20         But then the defendant goes a step further.  Because

21   of what he has heard over the past day or so, his concern about

22   the helicopter, some of the defendant's actions, Ross asks the

23   defendant, "Hey, did Chris Tur come to your house Friday

24   night?"  And the defendant's response point blank is, "No."

25         That's a lie.  That's a lie to his executive officer,

1   his second in command, the officer who the defendant testified

2   yesterday was managing the search for Christopher Tur.  That is

3   material information.  Because if he had known that Christopher

4   Tur was there, he could have pointed the search in that

5   direction, could have told NCIS, could have done something with

6   it.

7           And Chris Tur, to remind you, he's not been found

8   yet.  They're not trying to figure out just what happened to

9   him.  They're still actively looking for Christopher Tur.

10          Without a doubt, that information would have been

11  important to Captain Ross.

12          Now, in his testimony about the statement, the

13  defendant is again trying to connect the dots, to tailor his

14  story to fit the facts, but this is a tricky one.  He can't

15  explain it away with some tortured hairsplitting like he does

16  with the next statement with Captain Ross, so he just flat out

17  denies it.

18          But the problem is, Kelly Wirfel talked to Captain

19  Ross too, and he told her the exact same thing.  And today on

20  the stand the defendant said, "I don't remember Kelly's

21  testimony about that, but I have no reason to doubt that's what

22  she said."

23          Now, a little later that day, Christopher Tur's body

24  is found.  There's no early indication of how he died, so there

25  are many questions that are still to be answered.

1        The situation is very different now.  This isn't a

2    missing person who will show up after blowing off some steam.

3    NCIS has to conduct a death investigation.  The defendant meets

4    with NCIS agents as the body is being recovered.  Says nothing

5    about it.  That's now two times with an NCIS agent.

6        And the defendant calls Admiral Jackson -- I'm sorry,

7    after the death, he doesn't call Lara Tur to let her know --

8    let her know anything that's happened.  And if his motive is to

9    keep Chris from losing his job, that certainly is out the

10   window now.

11       Calls Admiral Jackson to inform her.  But, again, he

12   doesn't come clean.

13       Now, later that day the defendant is present when the

14   bloody towel is found near his dock, just steps from his house.

15   There's some questions about who said what, but let's set that

16   aside for a moment.  The really important part of this is that

17   the defendant -- the defendant said that as soon as he saw it,

18   he was 99 percent sure that bloody paper towel was the one he'd

19   given Chris Tur on January 9th.  The defendant is standing

20   there with two NCIS agents who are collecting evidence for

21   their investigation.  They're literally bagging and tagging

22   evidence.

23       Now, he explained it away by saying, "Well, they were

24   confirming it was blood, so I didn't need to tell them that."

25   But he knew not only that it was blood, but whose blood it was,

1  the blood of the man who's the subject of a death

2  investigation.  The defendant said he didn't say anything

3  because he was emotional.  And let's just -- let's buy that.

4  Let's believe that.  That was why he didn't say anything that

5  day.

6  That's not the case the next day.  It's not the case

7  the day after that.  He never tells them the bloody towel was

8  Christopher Tur's.

9  So the next day we get into these denial of these

10  rumors.  The defendant calls Admiral Gray and he says, "Hey,

11  I've been out and about on the base talking to folks, and there

12  are these rumors going out there" -- and this is according to

13  Captain Gray -- "rumors I had an affair with Ms. Tur and that

14  there's a relationship."

15  And he says, "None of this is true.  None of that

16  stuff occurred."

17  Now, as Captain Gray told you, this was all news to

18  him.  The defense -- addressing that night, it was a perfect

19  time to bring everything up, but he doesn't do that.  He

20  continues to conceal and mislead.

21  But back to the denial of the affair, the defendant

22  testified that he didn't specifically mention what rumors he

23  was talking about.  He wants us to believe that he called up

24  this high-ranking Navy officer and says, "Hey, you know those

25  rumors?  They're not true."  And that's the whole conversation.

1  That's it.  That's not how it would have gone.  And, after all,

2  what -- what is he even denying at that point?

3          But, most importantly, the reason we know it's not

4  the way it went is that Captain Gray put it in this e-mail.

5  This is his end-of-day e-mails.  Very hard to read.  I

6  apologize.  It's Government's Exhibit 362A.  And I'll pull out

7  the statement that Captain Gray wrote at the end of the day.

8          I thought I would.

9          "He stated Mr. Tur made many wild and unfounded

10  allegations that night and none of them were true."

11          That is why the defendant is claiming he doesn't

12  remember what Christopher Tur alleged on January 9th, because

13  what he said was, "Christopher Tur made a bunch of allegations.

14  They're not true."  The only allegations Christopher Tur made

15  was the defendant was having an affair with his wife.

16          The next day is the same conversation with Admiral

17  Jackson.  Again, perfect time to tell her everything, tell her

18  exactly what's going on.  Tell her about the command event that

19  was at the Bayview, that there was a confrontation, that

20  Christopher Tur came to his house and accused him just as well.

21  But he never says anything about what happened inside the

22  house.

23          And the defendant, again, denies to Admiral Jackson

24  that he was not -- that he was having an affair with Lara Tur.

25  And this is, again, the problem with the defendant's claim that

1  Admiral Gray and Admiral Jackson are just confused, it was all

2  these wild rumors.

3          Both of them testified that he specifically denied

4  having an affair with Lara Tur.  They don't have any reason to

5  lie.  They don't have any bias against the defendant.  In fact,

6  Admiral Jackson testified how well he was doing.  Does the

7  defendant have a motive to lie about that?  Absolutely.

8          Now, this is where the defendant says he approached

9  the agent, the one he liked, and told her he needs to be

10  testified -- or needs to be interviewed.  Gives her no context,

11  no sense of urgency, no information what -- whatsoever.  But he

12  just sits back and waits for NCIS to contact him.

13          And this is also at that time when he actually is

14  literally on a boat with a boatload of NCIS agents.  He never

15  reaches out and says, "Hey, you know, Erica hasn't gotten back

16  to me.  Can I set up my interview?"  No.  Because he's not

17  trying to be interviewed.  He's not trying to provide this

18  information.

19          Now let's move to January 15th.  And Captain Ross is

20  interviewed by NCIS.  And he comes to the defendant and he

21  says, "Did Christopher Tur actually come to your house?"

22          And he says, "Well, yeah, but I didn't let him in."

23          Now, I won't go through the entire justification of

24  what that meant.  Apparently the -- according to the defendant,

25  he thought he was asking him what was the actual manner in

1    which he entered the home, through the door, the window,

2    something along those lines.

3            You all saw those answers.  I'll leave that to you

4    whether or not that was credible is what he meant.  Or if

5    Captain Ross, with no motive to lie, who says he denied him

6    coming inside the house, was the one telling the truth.

7            Now, during the rest of the week the defendant's at

8    Guantanamo Bay doing his job.  He is dealing with Kelly Wirfel,

9    Captain Ross.  NCIS agents are coming and going.  They're

10   trying to coordinate the search.  They're trying to coordinate

11   the logistics.  During all this time, he never mentions to

12   anybody all these things he knows.  Never tells anyone about

13   Christopher Tur coming into his house.  And he's in frequent

14   contact with Admiral Gray and Admiral Jackson about all those

15   issues.  And at no time does he tell them all what happened.

16           And Admiral Jackson, she's a little troubled by the

17   information she's been provided, so she's considering what to

18   do.  But she's also concerned about the defendant.  So what

19   does she do?  She reaches out to check in on him.  Look at this

20   e-mail.  Let's go through -- take a look at it.  It's

21   Government's Exhibit 379.

22           The subject is, "Just checking in."  She's

23   concerned -- she's genuinely concerned for his well-being

24   because he's so worried about the investigation.  This is a

25   perfect time, if there's something on his chest, he's concerned

1   about what happened, it's the perfect time to come clean.

2         Because, after all, if you believe what the defendant

3   said about what happened that night, he was defending himself,

4   he was in the right, he did nothing wrong.

5         So why not pick up the phone?

6         She said, "If you want to talk, give me a call."

7         Pick up the phone and talk about it.  He never does

8   that.

9         The next day they have a call.  And he's very

10   concerned about whether he should step down or what's going on,

11   really -- really distraught.  Again, another opportunity to

12   tell Admiral Jackson what happened.  But he doesn't do that.

13         In fact, he acknowledges here, "I'm grateful for your

14   support.  I apologize for being a mess yesterday."

15         These are two people with a good relationship,

16   someone he can talk to.  Not someone who's interrogating him.

17   But he never offers up what he knows.

18         And on the 17th of January he attends a memorial

19   service for Chris Tur.  He sits there, knowing that Christopher

20   Tur's family wants to know what happened to him, knowing that

21   Lara Tur wants to know what happened to him.

22         Knowing that NCIS is investigating his death.  And as

23   Mr. Gee said today, the defendant had a piece of the puzzle, a

24   piece of this puzzle they were trying to solve that no one else

25   had, but he kept silent.

 1          And on January 18th everything changes.  NCIS found

 2   out about the Tyler Heath text messages and it became clear

 3   there's a fight in his house.  So they get the search warrant

 4   we've heard about.  They locate the blood.  And the next day

 5   the defendant is relieved of command by Admiral Jackson and

 6   leaves the island.

 7          Those are the facts.  By and large, they're not in

 8   dispute.  The defendant -- you saw him in his testimony.  He

 9   didn't really disagree that he didn't provide information.  He

10   didn't disagree, really, that many of the statements were

11   misleading.  He didn't really have an explanation for it

12   either.

13          Now, I'd like to talk to you about how these facts we

14   have proven establish each and every one of the elements beyond

15   a reasonable doubt.  And the judge has not yet instructed you,

16   obviously.  You're going to get those instructions at a later

17   date.

18          But generally what these offenses are about are

19   obstruction of -- obstruction of justice.  There's two counts

20   about that.  There's a count of concealing material facts.

21   There are two counts of making false documents and three counts

22   about writing false statements.

23          So let's look at the first count.

24          Count One charges the defendant with obstructing

25   justice by knowingly and willfully engaging in misleading

1    conduct towards another person.

2           Now, the first element, not surprisingly, is the

3    defendant knowingly, willfully engaged in misleading conduct

4    towards another person.  And the judge will instruct you that

5    misleading conduct can mean any of the following four things

6    that we see the defendant engaged in throughout the course of

7    conduct here.

8           The first is making false statements.  We have many

9    in this case.  January 10th he tells Randy Wirfel -- I'm sorry,

10   Kelly Wirfel and Randy Barger, Tur did not come to his house.

11   Tells Ross that Tur never came to his house.

12          On the 12th he tells Gray he was not having an affair

13   with Lara Tur.

14          On the 13th he tells Admiral Jackson he's not having

15   an affair with Lara Tur.

16          And on the 15th he makes his next false statement

17   to -- to Captain Ross.

18          The second way in which the defendant can act in

19   misleading conduct is to intentionally omit information from a

20   statement, thereby causing a portion of the statement to be

21   misleading.

22          Now, this is where the majority of this information,

23   the majority of the misleading is really going on.  It's

24   omitting key information from statements.

25          So, for example, that first day on the 10th, not

 1   telling Kelly Wirfel and Randy Barger that Chris Tur had been

 2   in his home that day -- the night before and that they had

 3   fought.  They were clearly looking for him.  And he gave a

 4   little bit of information.  "Well, he came here, but then he

 5   left."  He leaves out the key stuff.

 6         Same time the next -- the meeting later that day.  He

 7   tells them that -- he doesn't tell Lara Tur that they fought.

 8   Doesn't tell the CDO that Chris Tur came to his house.

 9         And he omits those key facts from the Navy Blue we

10   took a look at.

11         He continues omitting information in his

12   conversations with Admiral Gray and Admiral Jackson.  It's

13   really bad on January 9th when he essentially tells them

14   nothing, no personal involvement whatsoever, so they don't ask

15   any questions.

16         But then later on January 12th, that's Monday, and

17   January 13th, that's Tuesday, he tells a little more

18   information as he realized he kind of has to get them out there

19   because these rumors are swirling.  He says, "Oh, yeah, I saw

20   him that night.  There was this argument at the Bayview.  He

21   and Lara were fighting.  Came to my house and kind of accused

22   me of some stuff, but then he left."

23         Again, he's leaving out the key facts, that serious,

24   memorable fight that should have been reported and should have

25   been -- should have been reported to the security department

1   and should have been reported to his commanding officers.

2           Now, the third type of information is with the intent

3   to mislead, knowingly submitting, or inviting reliance on a

4   writing or recording that is false, forged, alters, or

5   otherwise lacking in authenticity.

6           We lawyers love a lot of words.

7           Now, we've got two basic kinds of writings here.

8   Again, it's the Navy Blue we talked about and e-mails to

9   Jackson and Gray.  As we discussed when we talked about those,

10  both of those documents are incomplete and omit key facts.

11          The fourth type of misleading conduct is knowingly

12  using a trick, scheme, or device, and this is basically all the

13  defendant's conduct.

14          COURTROOM DEPUTY:  20 minutes remaining, sir.

15          MR. NOTHSTEIN:  Thank you, ma'am.

16          This is essentially all the defendant's conduct from

17  the beginning to the end.  All the concealing, putting together

18  the false statements, the misleading statements, the omissions.

19  He's making those statements to everyone he's dealing with, all

20  the witnesses you saw here today, Ms. Wirfel, Ms. Barger, Lara

21  Tur, but most importantly, the other people in his chain of

22  command, his second in command and his superior officer.  He's

23  keeping it from all of them.

24          Now, we have to show the defendant acted willfully in

25  all this.  Now, this means that -- the judge will tell you --

1   that the acts were committed voluntarily and purposely.  They

2   intend to do something the law forbids with the bad purpose to

3   disobey or disregard the law.

4          Now, the evidence has shown the defendant knew

5   exactly what he was doing when he violated the law.  We hear a

6   lot of information about the training the commanders receive on

7   Navy laws, regulations, and rules.

8          And, more importantly, his willfulness is showing

9   that he is lying about facts he knows to be true.  I mean, just

10  an example that Chris Tur came to his house.

11         Also, he's shifting explanations of things, telling

12  Captain Ross one thing one day and another thing a few days

13  later.  He's giving a little bit of information to Admiral

14  Jackson and then changing it down the line.  All of that shows

15  he's acting willfully.

16         That's a lot for one element, I do realize, but the

17  others don't have quite as many subparts.  But we showed it in

18  various ways the defendant misled others about what he knew.

19         Now, the second element is that the defendant acted

20  with the intent to hinder, delay, or prevent the communication

21  of information to a federal law enforcement officer of the

22  United States.

23         This is the crux of why the defendant was doing what

24  he's doing.  He's been in the Navy for nearly 30 years.  The

25  security department is under his command, works closely with

1    NCIS.  Did you notice when he talked about some NCIS cases from

2    the past and he said, "Here's what we were doing, we were

3    trying to get this indictment."  He's well acquainted with how

4    law enforcement works on the base.  So he knew that everyone he

5    was dealing with were going to report to the security

6    department or NCIS the fact that Chris Tur had come to his

7    house and they had fought, if he told them.

8            And how do we know that?  The witnesses told us,

9    Randy Barger, Chief Thibodeaux, Admiral -- or Captain Ross,

10   Admiral Gray, Admiral Jackson, all said if they had known the

11   facts -- the true facts about what happened on Friday, January

12   9th, they would have immediately told NCIS and the security

13   department.

14           In fact, Admirals Gray and Jackson, even when they

15   got a fraction of the information, directed him immediately to

16   go to the NCIS.  That's how you know what their reaction is.

17   That's what the defendant was trying to avoid.

18           And, finally, it's -- the final element is that the

19   information related to a possible commission of a federal

20   offense.  And this is plainly met.

21           You heard a lot of testimony about possible UCMJ

22   offenses, assault, murder, manslaughter, adultery.  Federally

23   it is assault, manslaughter.

24           And it doesn't have to be information that would

25   prove the offense.  No one has to be guilty of the offense.

 1 | Simply has to be information about a potential offense.

 2 | So back to that self-defense thing, didn't matter --

 3 | doesn't matter who hit who, there's an assault involving a

 4 | commanding officer, there's going to be an investigation to

 5 | figure it out.  And the investigation is what the defendant was

 6 | afraid of because it would have turned up information he was

 7 | trying to keep secret.

 8 | So that's a lot.  We've proven all these elements

 9 | beyond a reasonable doubt.  But bottom line, to sum up what

10 | this means, is the defendant throughout his conduct was

11 | misleading others so they wouldn't tell federal law enforcement

12 | agents what they knew.

13 | And there's a lot of conduct here we can rest a

14 | conviction on.  But as an example, the defendant is guilty as

15 | soon as he sent this e-mail to Admirals Jackson and Gray

16 | January 10th at 8 p.m.

17 | You could convict him on this e-mail alone, because

18 | of this misleading conduct.  He's misleading them so that they

19 | do not tell NCIS what he did.

20 | Now, there's a lot more comments.  There's a lot

21 | more.  But Government's Exhibit 359, you can convict him on

22 | that alone.

23 | Now, Count Two also charged the defendant with

24 | obstruction of justice, but in a slightly different way.  It

25 | charges him with corruptly obstructing, influencing an official

1   proceeding.

2         So the first element, that he knew of an official

3   proceeding and his actions are likely to affect it.  Here it's

4   the court-martial.  You heard a lot about the potential

5   court-martial.

6         Those UCMJ offenses, the end-of-the-line

7   investigation can be a -- can be a court-martial for one of

8   those offenses.  The defendant -- with all of his experience,

9   he knows based on his conduct that's certainly possible.

10        Now, the second element -- sorry, that's too much --

11  is that he engaged in conduct which constitutes a substantial

12  step towards a commission of a crime, the obstruction of an

13  official proceeding.

14        Now, it's just a lawyerly way of saying he took

15  action to try and obstruct and interfere with that proceeding.

16  That's exactly what he was doing with all of his conduct.  He

17  knew that he -- if the information he had got out, people found

18  out more, he could potentially be court-martialed.

19        And the third element is he acted corruptly, and that

20  is with the dishonesty with specific intent to subvert or

21  impede the foreseen official proceeding.

22        And these are all the knowing lies he made.  His

23  lying to the Navy personnel.  On those phone calls after Lara

24  and he left the base, encouraging her to lie about the affair.

25  Saying that's probably nothing.  Destroying or cleaning up

1  evidence, which he admits he did.  These are all things he does

2  to prevent a potential court-martial down the line.

3       And finally we just have to show that there was a

4  natural and probable effect of the conduct with interference of

5  the due administration of justice.  This means it's going to

6  get away -- in the way of that official proceeding.  That's

7  exactly what the point of the conduct was and that's exactly

8  what it was designed to do.

9       So we have proven Count Two beyond a reasonable

10  doubt.

11       Now, Count Three is a little more complicated.  It

12  shows the defendant -- charges him with concealing material

13  facts he had a legal duty to disclose.  We've been talking a

14  lot about this misleading.  And I really just want to kind of

15  sum this up really simple.

16       As you heard from Admiral Gray, Admiral Jackson,

17  there are a lot of Navy regulations that require you to provide

18  certain information, give you duties to protect.  Those things,

19  like the OPREPs, CCIRs -- OPREP is one term for a Navy Blue --

20  those required the defendant to make certain reports.  Those

21  gave him a legal duty to provide certain information.

22       So in the end, what kind of information did he need

23  to provide?  Well, first of all, he has to use a scheme, trick,

24  or device.  This is, again, the defendant concealing

25  information, not telling people what's going on, misleading

1   others, not disclosing the key facts.

2          And those facts had to be material.  This one was

3   easily met in Admiral Jackson telling you how important all of

4   those facts you learned about him and the things he kept from

5   her were.  Material is just another word for important.

6          And the fact is that frankly after she learned about

7   the fight, she terminated him in light of those facts.

8          As I mentioned, there is a lot of testimony about the

9   legal duty that he had based on the Navy regulations that the

10  admirals talked about.  And we even introduced some.

11         Take a look at this.  This is Government's

12  Exhibit 35.  This is a charge of command.  And explains what

13  commanders are told when they are brought on as a commander.

14  And you can see in the actual -- it talks about the actual --

15  United States Code in Title -- Title 10, Section 5947, about

16  all the duties of virtue, honor, patriotism, and subordination

17  that commanders have.

18         Now, Counts Four and Five relate -- again, these are

19  to the false documents in this case, the Navy Blue and the

20  e-mail on January 10th, to an e-mail chain with Admiral Jackson

21  and Admiral Gray.

22         They basically show that he -- the defendant was

23  knowingly altering, concealing, covering up, falsifying, or

24  making a false entry in a record or document or tangible

25  object.  And this is something that relates to the Navy, which

1    you'll hear from the judge is taken care of in this case.

2           And the documents themselves, as Admiral Jackson told

3    you, the e-mails, the Navy Blue, they're official records.  And

4    as we've described, both the Navy Blue and the e-mails show the

5    intent of the defendant to conceal the key information to

6    mislead them basically.  That is the basis of the false

7    statement charges.

8           And you'll see that on -- you'll get some

9    instructions on Count Four with regard to the -- to the Navy

10   Blue -- Count Five, the Navy Blue.  The defendant acted with

11   someone else as his agent.  This is him directing Captain Ross

12   to send out this Navy Blue he knows to be false.

13          Finally, there are three false statement charges.

14          And this essentially, again, requires this to be a

15   false statement, which means it's not true.  There's no legal

16   duty required in this count -- or these three counts, that is,

17   but it has to be a false statement about a material matter --

18   again, an important one -- and this is the defendant has to act

19   willfully, knowing the statement was false.

20          And here are the three statements.

21          First, the statement to Admiral Ross -- I'm sorry,

22   Captain Ross that Christopher Tur did not come to his house.

23   This is about January 11th.  That is false.  Christopher Tur

24   came to his house.

25          Second is the other statement to Captain Ross, "Did

1    Christopher Tur actually show up at your house?"

2         And the defendant saying, "Yeah, he did, but I didn't

3    let him in."

4         That is false.  The defendant can try and thread the

5    needle and say this was about how he got in the house, not

6    whether he was in the house, but that statement was false.

7         Ask yourself if he was trying to answer honestly or

8    trying to deceive, and I think you'll arrive that, in this

9    count, the answer is he was being false.

10        And, finally, Count Eight are the statements or the

11   denials of the affair to Admirals Gray and Jackson.

12        There was a lot of questions about the rumors and

13   which rumor was being talked about and so forth.  Again, this

14   is the defendant tailoring his testimony to the facts.

15        The facts are very inconvenient for him here, because

16   both Admiral Gray and Admiral Jackson, neither of whom have any

17   motive to lie, any expressed bias against the defendant -- both

18   of them say, "He told us he wasn't having an affair with Lara

19   Tur."

20        That wasn't true.  We know adultery is false [sic] in

21   the Navy.  That is exactly what he was denying when he told

22   them, "I wasn't having an affair with Lara Tur."

23        Those are the counts.  That's the evidence we

24   presented to you.  We appreciate your attention through this

25   case.  I know it's been a bit long.

1        You've been instructed -- or you'll be instructed on

2   the law.  And you've seen the defendant's conduct in the days

3   that followed his fight with Christopher Tur.

4        At each and every step of the way, he acted to

5   protect himself by misleading, concealing, and making false

6   statements.  He ignored his -- he ignored his duties and put

7   his own interests first.

8        Based on the evidence we have presented to you, we

9   have proven beyond a reasonable doubt the defendant is guilty

10  of all counts.  And I ask you to return the only verdict that

11  is commanded by the evidence, guilty on all counts.

12        THE COURT:  Thank you, sir.  Let me see counsel at

13  sidebar, briefly.

14      (Sidebar conference:)

15        THE COURT:  I'm going to -- I'm going to have to give

16  them a break at some point.  Would you prefer me to give them

17  one now so we can just stay through yours?

18        MR. VOKEY:  Yes, sir.

19        THE COURT:  Okay.  That's what we'll do.

20      (The following proceedings occurred in open court, in the

21  presence of the jury:)

22        THE COURT:  All right.  Ladies and gentlemen, I know

23  we haven't been out here that long, but this is a good time to

24  take a break so that you can give the same attention to

25  Mr. Vokey that you -- you did to Mr. Nothstein.

1    So let's keep it to ten minutes, though.  It's -- so

2  we'll get back a little after 20 after.  Okay?  All the

3  instructions apply.  Thank you.

4    COURT SECURITY OFFICER:  All rise for the jury.

5    (Jury exits, 3:11 p.m.)

6    COURT SECURITY OFFICER:  Please be seated.

7    THE COURT:  All right.  I'm going to let Mr. Burns

8  hand out the instructions.  I think they're ready to go.  I'm

9  still going to look at them one more time.  We did make one

10  additional change.  We -- we fixed the aiding and abetting, we

11  think, so take a look at that.

12    In Instruction No. 9, Element -- under the term

13  "misleading conduct," on page 11 -- it used to say "with the

14  intent to mislead, knowingly using a trick, scheme, or device."

15    We just switched it around.  It -- it makes it

16  consistent.  So it now says, "knowingly used to trick, scheme,

17  or device with the intent to mislead."  So we just flipped

18  the -- flipped the phrases there.  And that's consistent with

19  the rest of it.  So that's the only other change we've made.

20    Okay.  So Mr. Burns will hand that out, and take a

21  look at it.  I'll make sure everybody is good with it before I

22  instruct.

23    And we're in recess for ten minutes.

24    COURT SECURITY OFFICER:  All rise.

25    (Recess from 3:12 p.m. to 3:21 p.m.; all parties present.)

1            COURT SECURITY OFFICER:  All rise.  This Honorable

2    Court is back in session.

3            Please be seated.

4            THE COURT:  You ready to go, Mr. Vokey?

5            MR. VOKEY:  I am, sir.

6            THE COURT:  We got a jury ready to go?  Let's have

7    them, please.

8            COURT SECURITY OFFICER:  All rise for the jury.

9        (Jury enters, 3:22 p.m.)

10           COURT SECURITY OFFICER:  Please be seated.

11           THE COURT:  Well, we're getting towards the end,

12   ladies and gentlemen, but I hope you'll give Mr. Vokey the same

13   attention that you gave to the government.

14           And, Mr. Vokey, you may proceed.

15           MR. VOKEY:  Thank you, Your Honor.

16           This case is like putting a square peg in a round

17   hole.  But in this case it's the government trying to cram that

18   square peg into a hole to get you to convict Captain Nettleton

19   of some pretty serious federal offenses.

20           And the Navy, as we heard over and over again,

21   they're more concerned about the media and publicity than

22   anything else.

23           But look at what the government has tried to do in

24   this case.  So look -- look -- let's look at some of the

25   witnesses that they have brought you.

1          So, first of all, let's talk about Randy Barger,

2     Warrant Officer Randy Barger.  And you remember his testimony

3     and you remember what he came in here and said?  And the issue

4     with him was whether Kelly Wirfel had told him that Chris Tur

5     had knocked the Skipper out.

6          And when he -- he gave his first statement to NCIS

7     way back in January of 2015, that's exactly what he said.  But

8     that didn't fit with NCIS in the government's story.

9          So by the time he gets to the grand jury, the story

10    is now different.  Oh, no, no, no.  It was "going to knock the

11    Captain out."

12         Now, why is that a big deal?  Because they want to

13    paint Captain Nettleton, number one, as the aggressor, as the

14    main person who did something wrong here.  And they also wanted

15    to make sure that anybody else who heard this, you know, it's

16    all on Captain Nettleton.  And then they can say, "Oh, we just

17    heard that he was going to knock him out."  So that's why they

18    wanted to change that story.

19         And they did it with -- with Petty Officer -- I mean,

20    Warrant Officer Barger.  When he first gave the statement,

21    says, "knocked him out."  Fast-forward a couple of years later,

22    gets to the grand jury, and now the story has changed.

23         And how about Commander Ross, now Captain Ross?

24    Let's talk about that one.

25         We also have the same issue of "going to knock out"

1   or "knocked out," but in Commander Ross's case, two times he

2   goes to NCIS, two statements, January of 2015, March of 2015,

3   and says, "knocked out."

4         And when he gets to the grand jury, now it's changed

5   to "going to."

6         Now, one of the curious things about this little

7   statement is there is only one person who actually heard what

8   was said, and it's the government's own witness, Kelly Wirfel.

9   So the government wants you to believe these people -- this

10   change of story and not believe their own witness, Kelly

11   Wirfel, who is the one who actually heard it.

12         So is that the only thing they've done?  Not at all.

13   We heard from Chief Thibodeaux who came in here.  And you

14   remember Chief Thibodeaux was the command duty officer.  He was

15   doing the search.

16         And when he was questioned in here in this case, he

17   was questioned by my co-counsel about when he was at the grand

18   jury and was trying to tell them that they did search around

19   the cap -- the captain's residence.

20         Do you remember that?

21         And when he told them that in the grand jury, boy,

22   they got to another subject real quick.  Nothing further come

23   into the grand jury about his belief that the search was

24   conducted around there.  Nothing from the government in this

25   case any further about that search.

1     As a matter of fact, the one person who could

2  probably tell us the most would be the security officer who was

3  running that center right at the Bayview, Lieutenant Tidd.  And

4  did they bring him here to tell you about it?  They did not.

5     Perhaps one of the most crucial witnesses in the

6  conduct of the search, and they didn't bring him here.

7     Now, we have brought you some evidence, but as the

8  judge will tell you, we have absolutely no duty to bring you

9  one piece of evidence.

10     Captain Nettleton and I and my co-counsel could have

11  turned the other way and looked at the wall for the whole

12  trial, because we have no duty to present anything.

13     There is a presumption of -- of innocence here, and

14  the government has this total burden themselves.

15     So you have got to ask yourself, "Why didn't they

16  present that piece?"  And are there other pieces of -- of what

17  happened here in January of 2015 that they didn't bring to you?

18     And as we've gone through this trial, we have heard

19  the testimony, and the answer is yes.

20     So, for example, they tell you a little bit about

21  this search, just a little bit about this search.  And we know

22  that Kelly Wirfel and Randy Barger and Lara Tur herself went

23  around and did some searching, and that Captain Nettleton

24  himself ordered a formal search to begin, but not a whole lot

25  else about that other search, trying to intimate that there was

1  something going on in Deer Point in the Bayview complex that

2  was untoward or something he was concealing.

3          But as you look at Defense Exhibit 45 alpha -- and

4  this is the large map of Guantanamo.  And what we have on here

5  is Captain Nettleton indicating all those areas that were

6  brought up in the meeting of where they were looking at

7  possibly searching and the waterways.

8          THE COURT:  Mr. Nothstein, if you want to switch

9  seats, you're welcome to do so.

10          MR. NOTHSTEIN:  Thank you, Your Honor.

11          MR. VOKEY:  And placing on top of that Defense

12  Exhibit 41 alpha.

13          So the question is, why didn't the government tell

14  you about everything that was going on in the water for that

15  search, things that Captain Nettleton was aware of or ordered

16  himself?  Why didn't they want to point that out to you?

17  Because one thing we definitely heard from Captain Nettleton

18  as -- and we look here at Deer Point where his house is, which

19  is, again, very close to the Bayview in the first place, all on

20  Deer Point, that all of these boats that are out there

21  searching, there are Coast Guard boats, there are Navy boats

22  that are out in those waterways, all in these waterways 24

23  hours a day, in and out.

24          And during the search, there's more boat activity.

25  And every single one of those boats is moored right here.  And

1   if you remember, he explained to you it has to go around this

2   little -- the land area, and because of an old pier that's out

3   there, has to jag in and jag out going right by Captain

4   Nettleton's pier and his house.  48 to 50 times a day those

5   boats are going by.

6           Did the government want you to know that?  No.

7           Did they bring you that information?  No.

8           And why?

9           Because if you know that there's that much activity

10   going around by boats going by -- right by Captain Nettleton's

11   house, that would certainly tend to show that there's no

12   concealment going on, because what we do know is Captain

13   Nettleton didn't say, "I want to order all boats to stop.  No

14   more boats in the harbor."  Right?

15           That's the kind of thing that we would expect if we

16   were going to have an obstruction of justice or somebody trying

17   to stop a search, conceal something by a search.  No, this

18   happened.

19           Additionally, we also heard after we -- we got into

20   evidence of the search that was ordered by Lieutenant Tidd of

21   the coastline where he explained that it went all the way from

22   the hospital all the way to Deer Point, all the way around.

23           So there was a water search that happened all around

24   Deer Point and all the way up the coast.  And we heard from

25   Chief Thibodeaux that -- what did he say?  "Yeah, I think

1  security searched that area."  And he's talking about the land

2  around Captain Nettleton's house.

3          But the government doesn't want you to focus on that.

4  They don't want you to see that.  They want to see only a few

5  different aspects of the search.  And that should bother you

6  quite a bit.  In a criminal court where we're trying to take

7  away somebody's liberty, that should bother you quite a bit.

8          What are the things that they've done that they want

9  to kind of minimize or hide?

10          Well, let's look at Dr. Gordon.  Now, Dr. Gordon, the

11  medical examiner, comes in here and he's testifying as to what

12  he found.

13          Now, first of all, if you'll remember how Dr. Gordon

14  actually got to Guantanamo -- who was coordinating the

15  transportation to get them down there as soon as possible?

16          It was Captain Nettleton, right?

17          He wasn't doing anything to stop the -- the medical

18  examiner from coming to do an autopsy.  He wasn't doing

19  anything to delay it.  As a matter of fact, he was trying to

20  get him on the earliest flight, and he even got in there before

21  the NCIS agents.  That was Captain Nettleton's doing.

22          And when he gets in here and he conducts the autopsy,

23  is there any evidence that Captain Nettleton went to Dr. Gordon

24  and said, "Hey, you know, don't look at certain things"?

25          No.  As a matter of fact, he never even spoke with

1  Dr. Gordon.  He brought him there to do his job and never spoke

2  to him.  Doesn't sound like obstruction of justice to me.

3         And Dr. Gordon comes down there and he's trying to do

4  his job.  He has a job to do, he has examinations to do, he has

5  opinions to render.

6         And on February 8th he conducts -- he issues his

7  autopsy report.  He comes down to Guantanamo -- and I believe

8  it was on the 15th of January -- and on February 8th issues

9  this autopsy report.

10        One interesting thing is before he issues that

11 autopsy report, there had been interviews, two interviews of

12 Lara Tur and other people on the island that suggested that

13 suicide may be a factor here, that he's attempted suicide, or

14 there have been suicide gestures.  And none of that information

15 is ever passed on to Dr. Gordon before he does his report.

16        We know those interviews with Lara Tur happened

17 before that, but Dr. Gordon, when he's on the stand, says, "I

18 never received any of that information."

19        So when he issues his report -- and then just over

20 two weeks later, he's contacted again.  Then they provide him

21 an e-mail about the interviews of Lara Tur and -- and the other

22 folks there in Guantanamo relative to suicide.

23        And what's Dr. Gordon's response?  "Look, I'm 100

24 percent confident that this was drowning complicated by fatal

25 levels of Prozac and alcohol.  I believe suicide to be the most

1    likely cause of death."

2            So he is providing that despite the fact that they

3    didn't provide him that suicide information beforehand.  So are

4    they done trying to mess with Dr. Gordon?  And the answer is

5    no.

6            Because in July, in dealing with some issues with a

7    toxicology, right?  You remember him talking about that, the

8    toxicology?

9            And they're trying to talk to him about these --

10   about the levels of Prozac, of whether it was a dose that he

11   would have taken.

12           Now, one of the things that they did not tell him is

13   that Lara Tur had said that he had been doubling up on his

14   Prozac.  That information was not provided to Dr. Gordon.

15           And they are pushing Dr. Gordon.  Now, Dr. Gordon

16   came up here and said, "Look, I don't feel like I was

17   influenced.  I -- I think I made my decision."  And Dr. Gordon

18   is about as honest, a hardworking guy, coming out with the best

19   opinions he can.

20           But what's important here is that e-mail that you

21   heard about on cross-examination of Dr. Gordon after Special

22   Agent Dunwoodie is reaching out to him on this issue.

23           And what does he say in his e-mail?  "Any idea what

24   Special Agent Dunwoodie is hoping for?"

25           I mean, what do we have here?  We have a conclusion

1    that's already been reached and now they need the investigation

2    to back that up.  That's what's important.

3          Where else are we seeing this?  So as we go through

4    the investigation, and even through trial here, there are

5    things that are being omitted or not highlighted to you that

6    should be important to you as to Captain Nettleton's actions,

7    whether -- what kind of a search was being conducted, what did

8    he omit and why?

9          But the government doesn't want to point those things

10   out to you, because those are not good for their case.

11         So Captain Nettleton has eight counts against him,

12   eight federal charges against him, and I'm going to go through

13   those.  I'm not going to go through them and put all the

14   elements up and go through them like Mr. Nothstein did, but I

15   want to go through and mention a few things to you so when you

16   get the judge's instructions and you go back and you review

17   those, a few things I just want you to take with you.

18         So Count One -- there are two obstruction counts.

19   Count One is the obstruction of hindering or -- the intent to

20   hinder or delay or prevent communication to law enforcement

21   officers, that is, NCIS and the Naval Station Guantanamo Bay

22   security department.  That's what Count One is, obstruction of

23   them.

24         So the thing to focus on here and what the government

25   seems to be arguing I gather from their closing argument is

 1   that this is all because of some information that has been

 2   omitted.  And they want you to make this jump to he's

 3   hindering, delaying, preventing, obstructing justice because he

 4   didn't say some things.

 5           But what you have got to look at is Captain

 6   Nettleton's intent as to when he's taking these actions and

 7   when he's making these statements.

 8           Now, Captain Nettleton came in here -- didn't have to

 9   take the stand.  He did.  And then he subjects himself to two

10   days of cross-examination.

11           And when you're in your deliberations, I want you to

12   go back and I want you to sit about -- sit there and think and

13   remember what Captain Nettleton said to you, how he looked to

14   you, and then you judge Captain Nettleton's word.  That's what

15   your job is.

16           And I think what you're going to find is that Captain

17   Nettleton is not perfect.  He did some things wrong.  He

18   certainly did some missteps.  I think one of the things he said

19   in here when he was asked about a plan is that, "I think

20   everybody in this room would agree I didn't have a plan."

21           But that's not why he's on trial.  He's on trial in

22   these two counts for obstructing justice.

23           So what does obstruction of justice look like?  So,

24   for example, in this case it could be telling Julia Nettleton

25   to lie.  Is there any evidence of that?  Absolutely not.

1       How about preventing persons from searching anywhere

2   on the island, whether it's his house or certain areas of

3   Guantanamo?  Did -- do we have one piece of evidence that said

4   that he ever did that?

5       The answer is no.

6       Matter of fact, to the counter, it was a pretty

7   robust search.  And Lieutenant Tidd was running that search.

8       And do we have anything to say that he told

9   Lieutenant Tidd, "Hey, don't search these areas"?

10       No, because we didn't even hear from Lieutenant Tidd.

11       And we heard from Captain Nettleton that there was

12   blood in his house and that he cleaned up some of the blood.

13   What we didn't hear is that he scrubbed his entire house clean

14   with bleach.  As a matter of fact, he did a pretty bad job.

15       He came in, he saw some blood, he cleaned up the

16   blood he saw, but he didn't go through with a fine-tooth comb

17   and try to clean every drop of blood that was in his house.

18   That would look like obstruction.  That's not what happened

19   here.

20       Did he try to sway the medical examiner?  No.

21       Did he tell any NCIS agent, "Hey, I don't want you to

22   search here, or let's not talk to this person"?

23       Not once.

24       As a matter of fact, after the notification of Lara

25   Tur, if you remember that, after -- after Christopher Tur is

1    found dead and he puts on his uniform with the chaplain, and

2    Ms. DeVore goes over and does that notification -- which if

3    you've never had to do anything like that, I'm here to tell you

4    it's about the most difficult thing you could ever do in your

5    life.  It really, really sucks.

6            And after that's over and he goes to the -- the pier

7    to meet the body coming in, an NCIS agent even asks him a

8    question.  "Hey, can you have some of your divers go out there

9    and do a study so that we can find out if we know where the

10   body drifted?"

11           And did Captain Nettleton say, "No, you're not

12   talking to my guys" or directed another way?

13           No.  He calls up the divers and says, "NCIS wants

14   this.  Do it for them."

15           Does that sound like obstruction?  Absolutely not.

16           What we know he -- that Captain Nettleton did do is

17   he is the one who ordered the search in the first place.  Not

18   exactly an act of obstruction.  He got the medical examiner on

19   the island.  He coordinated his travel and logistics and a

20   place to stay.  He's the one who coordinated the NCIS agents to

21   travel to the island, the ones who were going to do the death

22   investigation, and unbeknownst to Captain Nettleton were

23   investigating a little bit more as well.  He's the one who got

24   them there.

25           Lieutenant Tidd runs -- sets up the -- that -- the

1    search center, right, at the Bayview?

2         What the government didn't tell you is that

3    Nettleton -- Captain Nettleton went to the operations center --

4    the base operations center so that all the other entities on

5    Guantanamo, the JTF and the Coast Guard, can now be notified,

6    get their BOLOs, be involved with the search.

7         Did they tell you about that?  Not at all.

8         They continued the search all Saturday, January 10th,

9    and went into the night.

10        Now, it was getting dangerous.  But as Captain

11   Nettleton, who was talking with Lieutenant Tidd, had to say,

12   "Look, can we go a little bit further in the night?  You know,

13   we got guys with dogs who are trained with night vision

14   goggles.  Maybe they could keep searching a little more."

15        And they did until that became too dangerous.  But

16   that was Captain Nettleton who was doing that, not trying to

17   shut down the search.  He's trying to extend it as much as

18   possible safely.

19        And then the government pointed out the fact that the

20   boats kept running because they had night vision goggles and

21   FLIR, and they can keep searching at night, and that Captain

22   Nettleton through his operations center is the one making that

23   happen and working with Lieutenant Tidd.

24        And the government has brought you what may be one of

25   the most ridiculous allegations in here, is that -- this idea

1   of this conversation with Commander Ross about the helicopter,

2   that Captain Ross simply picks up the phone Sunday morning,

3   calls the commander of the Coast Guard and says, "Hey, we have

4   got a missing guy.  How about a helicopter?"

5          And when he tells Captain Nettleton about that,

6   Nettleton's like, "Whoa.  You should have talked to me first."

7   And you -- you know what, he's absolutely right, because if

8   there is a person within hundreds of miles who knows the

9   dangers and what's a requirement and training requirements for

10  the pilots and sensitivities of what should go on, it's that

11  man right there, the man who was -- who was aware because they

12  had had numerous violations of Cuban airspace becoming kind of

13  international incidents.

14         He's the one who negotiated an exception to that

15  policy for civilian Medicare -- medevac aircraft.  And if we

16  violate the airspace, we can lose that agreement, an agreement

17  that could save lives.  If somebody has a heart attack, per se.

18         But Captain Nettleton, who has got the experience and

19  the training in search and rescue, combat operations, special

20  operations, mountain flying -- I mean, Captain Nettleton has

21  all these special trainings as a helicopter pilot and is aware

22  that you can't just launch a helicopter willy-nilly and say,

23  "Go search."

24         Because we don't want to have a search for one

25  missing man turn into a crashed aircraft and a dead pilot and

1  crew, because there are a lot of things to consider in

2  Guantanamo.

3          There's the mine fields in case they have to land.

4  There's the cliffs, the uneven terrain.  All of these have to

5  be planned for.

6          There's a sensitive area that Coast Guard pilots just

7  coming in with a ship may not know that they can't fly over.

8  They may not know about where the lines are and what's the

9  ramifications of flying over Cuban airspace.  These are all

10 things that Captain Nettleton knew.  And when Commander Ross

11 came to him, he said, "You should have talked to me first."

12 That's what Captain Nettleton was saying.  And he told you on

13 the stand it's not that it was necessarily a bad idea, right,

14 but you can't just start and do it.  It's going to take hours,

15 maybe days to make that work.

16         And the last thing you want to do is have a

17 helicopter out there with an untrained pilot who is unfamiliar

18 with the area, unfamiliar with the dangers or the sensitivities

19 or the limitations flying around there making it worse.

20         So we also have Count Two.  Count Two is another

21 obstruction -- and this is where the obstruction is that he is

22 trying to obstruct a court-martial.

23         Now, you have got to look at this one very

24 critically, and the law says it doesn't have to be a

25 court-martial out there, just the possibility that there would

1  be one.  And that's what the judge will tell you.  But in this

2  case, what we do know is there never was a court-martial.

3  There were never even charges of a court-martial against

4  Captain Nettleton.

5          As a matter of fact, the only way this whole

6  court-martial really has ever come up was that phone call we

7  heard about with Lara Tur.  You remember that one where she

8  talked about it, that while she's there venting about NCIS and

9  she mentions that, you know, if they talk to me, I'm not going

10  to talk to them about it?  They want to do a court-martial, I'm

11  not going to talk to them about it.

12          And what's Captain Nettleton's response?  "Okay.

13  Good."

14          And the government wants you to believe that that's

15  somehow obstruction of justice by saying, "Okay.  Good."

16  There's no affirmative action there.  He's not saying, "Lara,

17  yeah, don't mention this to anybody."  He doesn't do that.  He

18  doesn't order her or advise her.  He -- as you heard her

19  testify, he doesn't even encourage her to do so.

20          Now, this is another one of those cases of a

21  government witness and they don't want you to listen to that

22  part of their government witness, just like they don't want you

23  to listen to part of Kelly Wirfel's testimony.

24          But, ladies and gentlemen, this is not Burger King

25  where you can have it your way, where they can hold the pickles

1  and hold the lettuce.  Remember that old jingle?  "Special

2  orders don't upset us?"  This isn't Burger King.  You have got

3  to look at the whole hamburger.  That's all the evidence.

4  That's what everybody says, and that's what you have to

5  consider.  But they want you to hold the pickles and hold the

6  lettuce.

7          So Count Three is this scheme to conceal material

8  facts.

9          Now, as we go through this and as you're reading them

10 and the instructions and they all sound very confusing, that's

11 because they are, because the facts of this case don't fit very

12 well for what he's been charged with, and that's what makes

13 them so confusing.

14         And one thing that's interesting that Mr. Nothstein

15 said in his closing argument, he said that whether Chris Tur

16 went to the Bayview or not doesn't matter.  And he's trying to

17 brush that off.

18         Ladies and gentlemen, it matters a whole lot.

19 Because here -- this is a scheme to conceal material facts.

20         Now, what we do know is when Captain Nettleton went

21 to have that -- ordered that office meeting, "Hey, let's meet

22 in my office" -- you remember that?

23         He said, "Let's meet in my office, let's talk about

24 it."

25         And people are telling him information, and he's

1    getting some new information that he didn't know at that time.

2    He's getting information that he's possibly suicidal, that he's

3    done this not just once before, but many times before, and he's

4    getting all this information that's coming in to him, right?

5           And one of the big pieces of information that starts

6    the whole search and where they search is where is the last

7    place Chris Tur was seen.  And he is told there the Bayview.

8           And who is he told by?  People know -- Kelly Wirfel,

9    who knows that Chris Tur was in Captain Nettleton's house.

10          And Captain Nettleton obviously knows that Kelly

11   Wirfel knows that.  Why?  Because she came to his house the

12   next day and -- and talked about it where Captain Nettleton

13   that Saturday morning says, "Yeah, he was here, he was cycling

14   through these emotions, and I told him to leave."

15          So Kelly Wirfel knew that he had been at the house.

16   So did Randy Barger.

17          So when she's telling Captain Nettleton he was at the

18   Bayview, this is a game changer.  This is ground zero of where

19   the search must begin.  And when Captain Nettleton learns that

20   possibly there's a suicide issue here, it -- it's all about the

21   search.  We've got to find Chris Tur.

22          Where is the last place he was seen?  The Bayview.

23          Now, and as we heard in evidence, that's what Kelly

24   Wirfel heard from Chief Warrant Officer Barger, who heard from

25   one of the Jamaican bartenders, right, this kind of chain of

1    events.  There's two things that are important here.  One is

2    that's the information that's related to Captain Nettleton in

3    that office meeting on Saturday afternoon.

4         And the other thing that's important is we do know he

5    was at the Bayview.  And interesting how government counsel

6    didn't mention Ms. Karla Wolfe in their closing arguments.

7         You remember her?  Karla Wolfe came in here and she

8    told you she wasn't part of the Hail and Farewell, but she had

9    that conversation with Chris Tur out front when Captain --

10   Commander Ross is making Captain Nettleton go home and she's

11   talking to Chris Tur and he's saying all these things, some --

12   some very disturbing things.

13        She goes back and she's actually in the bathroom with

14   Kelly Wirfel and Lara Tur for a while when that incident

15   happens.  We get the breaking of the dishes.

16        And she goes back in the bar because she's not with

17   this group, she's by her -- she's kind of away from this group

18   and wants to get away from the drama.  And she sees Chris Tur

19   two more times, two more times.

20        One time he's walking through with a drink and she

21   sees him.  You remember that?

22        And then the second time, now, the second time is

23   what's so important for this case and it's so important for

24   this charge.

25        That second time is so important because what she is

1   absolutely positive of is the -- when she saw Chris Tur the

2   second time, that Kelly Wirfel had already told her about the

3   knockout phone call.

4          And what does that mean?  That means Chris Tur had

5   been at Captain Nettleton's house, they called Kelly, Tur had

6   knocked him out.

7          When she sees him after that, that means he's back in

8   the Bayview after that event.  So we know without a doubt with

9   the evidence in here that Chris Tur went back to the Bayview

10  after that confrontation at Captain Nettleton's house.

11          And how did he go?  I think we probably know -- I

12  think nobody knows for sure, but I think one thing you can

13  probably figure out from it is that -- where they found those

14  bloody paper towels.  Remember that?  Just off of his -- off of

15  his dock?  And there was actually a drop of blood over in that

16  same area as well?  Right there.

17          And we heard Captain Nettleton talk about it.

18  There's two ways, really, to walk from his house to the

19  Bayview.  It can be along this road and the sidewalk, or this

20  old lime rock road that used to be operational for boats.  But

21  it's still a road and you can walk right up to the Bayview.

22          That's where Chris Tur likely went, that he walked

23  down there, he had his -- his paper towel full of ice, covered

24  in blood and water and smearing that everywhere.  He drops

25  that.  He stopped -- he stopped bleeding at that point and he

 1  goes to the Bayview.

 2         And when Ms. Wolfe sees him in the Bayview, he walks

 3  right past her as he's heading for the door.  No sign of

 4  injury, no laceration above the eye, no holding his side, no

 5  limping.  As a matter of fact, he's walking quickly and he

 6  slams the door.

 7         So not only is the last place he was seen at the

 8  Bayview, when he's seen at the Bayview, he's not injured.

 9         And this charge, this scheme to conceal material

10  facts, is that the defendant intended to falsify and conceal

11  the facts.  He knew about the disappearance, injury, and death

12  of Christopher Tur.

13         Well, the disappearance of Christopher Tur:  He was

14  last seen at the Bayview.  That's what Captain Nettleton was

15  told and that was confirmed by Ms. Wolfe.

16         The injury of Christopher Tur:  He did have a bloody

17  nose at Captain Nettleton's house, because -- we heard

18  Captain Nettleton say he punched him in the nose.  But when he

19  got to the Bayview, is he injured, is he limping, is he holding

20  some area of any visible injuries?  There's not.

21         And then the death of Chris Tur, which as government

22  counsel said, no one knows.

23         So in order for the government to get you to convict

24  him of this, they had to -- they have to convince you beyond a

25  reasonable doubt that he's concealing material facts relative

1    to the disappearance, injury, and death of Chris Tur.

2         Captain Nettleton did not do that, since the last

3    place he was seen was the Bayview.  When he was seen at the

4    Bayview, he was not injured, and no one knows how he died.

5         Now, the judge is also going to give you another

6    instruction here, because it's easy to get confused here.

7         We heard a lot of military stuff, right, and

8    regulations and OPREPs and Navy Blues and all that stuff.

9         One of the things the judge is going to tell you is

10   he's going to give you an instruction that says that

11   Captain Nettleton had no legal duty to report to any person his

12   alleged violations of the UCMJ, the Uniform Code of Military

13   Justice, including adultery, disorderly conduct, or conduct

14   unbecoming an officer.

15        So he has no duty to report those military offenses

16   under the UCMJ to anyone, including Admiral Gray, Admiral

17   Jackson.

18        What this is about is concealing material fact --

19   material facts about the disappearance, injury, and death of

20   Chris Tur, and Captain Nettleton absolutely did not do that.

21        Now, we have -- the next two counts are

22   falsifications of records.  There's Counts Four and Counts

23   Five.

24        Count Four may be -- well, Count Four should be one

25   that you should look at pretty quickly and dismiss pretty

 1   quickly.  I'll put it that way.  This deals with the Navy Blue

 2   being sent out.

 3          As we heard, there's a reporting requirement.  These

 4   are requirements that go out all the time.  There's reports.  I

 5   mean, it's the military.  We get reports coming out our ears,

 6   right?  And there are certain kinds of reports that are more

 7   important.

 8          If it's something and it's urgent -- for example, a

 9   Navy Blue, that's an urgent report.

10          And how this happens on Saturday, January 10th, when

11   that first Navy Blue is sent out, is they have Lieutenant

12   Crabtree, Weps.  He's the expert in this message system, the

13   reporting, what goes into these reports.

14          And when you're in the military and you've got a

15   cognizant area -- I tell you what, the commanding officer is

16   not typing up all these reports, somebody else is.  And that's

17   Lieutenant Crabtree.  And he types up this report --

18          Now, did Captain Nettleton talk to Lieutenant Ross

19   about, "Hey, we've got to do a Navy Blue?"

20          Of course he did.  That's a requirement that needs to

21   go out.

22          Was Captain Nettleton involved in exactly what's

23   going in the Navy Blue when it's being typed?  No.

24          So Lieutenant Crabtree types this report up, he sends

25   it to -- he e-mails it to both Commander Ross and

1    Captain Nettleton.  Nine minutes later Commander Ross says, "I

2    made some edits, send it."

3         Captain Nettleton does not weigh in.  No one talks to

4    Captain Nettleton in those nine minutes.

5         So Captain Nettleton hasn't falsified anything in

6    there.  As a matter of fact, what Captain Nettleton said when

7    he was on the stand is, "I'm looking at the Navy Blue now and

8    there's nothing wrong with it."

9         And the government wants you to believe that this

10   Navy Blue has to be like this novel of including all these

11   different facts.  And that's not the purpose of a Navy Blue.

12   The purpose of a Navy Blue, as you heard, listening to

13   Commander Ross, Admiral Gray, I think Admiral Jackson as well,

14   is you got to get out that basic information, you got to get it

15   out fast.  Let's put those people in the know.  That's what was

16   in the Navy Blue and that's what was sent.

17        And one of the things that was sent in the Navy Blue

18   is that Chris Tur was last seen at the Bayview at approximately

19   0030, which is 12:30 our time.

20        Now, it turns out that may be a little bit later than

21   he was seen.  If we listen to Ms. Wolfe, it's probably more

22   like 11:30.  But that information isn't incorrect as the last

23   place he was seen, at the Bayview.  Matter of fact, it's spot

24   on.

25        So there's no falsification of a record, especially

 1    since Captain Nettleton isn't the one who typed it up, drafted

 2    it, made the edits, or sent it.  His folks did.

 3           Now, Count Five is -- is charging with --

 4    Captain Nettleton with altering, concealing, covering up,

 5    falsifying, making a false entry in a record, document, or

 6    tangible object, and what he's talking about is the e-mails to

 7    Admiral Jackson and Captain Gray.

 8           So this is another one of those times where the

 9    government wants to include some things and not others.  Just

10    look at the e-mails, don't listen to the phone calls.

11           So what we do know is that as -- is this is an

12    ongoing situation and -- and Captain Nettleton is talking to

13    Captain Gray, "We've got a missing guy.  Here's what we're

14    doing for a search."

15           The next day, talking to Admiral Jackson, on Sunday,

16    "Here's some of the other things we're doing with the search."

17           And does he provide all those details, does he talk

18    about punching Chris Tur in the nose?  Absolutely not.

19           Now, it's interesting, the government says that --

20    somehow makes light of the fact that Captain Nettleton says

21    before -- before Chris Tur is found dead that, didn't want to

22    get him fired.

23           And, ladies and gentlemen, regardless of anything

24    Captain Nettleton did, if you believe for a minute that a

25    Department of the Navy worker, who goes in and assaults and

1    punches and knocks out the commanding officer of a U.S. naval

2    installation and -- is not going to pay the price for it,

3    you've got another thing coming.

4            Captain Nettleton is absolutely right.  If he tells

5    people about this, regardless of his own actions, Chris Tur is

6    gone, he's fired, he's off the island.  That's what's surely

7    going to happen.  And that makes sense.

8            Now, after Chris Tur is found and they find his body,

9    he still doesn't talk about that fight in the house.  And one

10   of the things -- if you know, if you remember -- and I won't go

11   through it all -- I asked Captain Nettleton about that.

12           And if you remember his answer of why he's not

13   talking about Chris Tur, I just want you to take that back into

14   the jury room.

15           So -- and I'm going to come back to the Admiral

16   Jackson and the Admiral Gray piece a little bit because we need

17   to talk about this -- the thing that they didn't want you to

18   know about, they didn't want to bring out, this IG complaint

19   and the failure to read Captain Nettleton his rights.

20           So let's come back to that.  Okay?

21           And then the last three counts -- six, seven, and

22   eight -- are false statement counts.

23           The first false statement count is -- well, the first

24   two involve statements to Commander Ross, all right?  The first

25   one is -- well, Commander Ross says that Captain Nettleton --

1    that he asked him, "Did he come to your house?"

2          And Captain Nettleton allegedly says, "No."

3          All right.  So let's break that down a little bit.

4    So did that conversation ever happen?  Did Captain Nettleton

5    give that answer?  And the answer is no.  No, no, no.

6          First of all, Commander Ross, at that point, already

7    knew that Chris Tur had been to his house.  He already knew.

8    He heard it from Kelly Wirfel.

9          He knew because -- in his first two statements to

10   NCIS, that Kelly Wirfel told him that the CO had knocked him

11   out -- past tense, right?

12         So the CO knew, so why would he be asking that

13   question?  Did he ask the question to trick Nettleton?  He

14   wouldn't do that because he should also realize that Nettleton

15   would realize the XO already knew.  So asking the question

16   doesn't make any sense.

17         And if Captain Nettleton believes Commander Ross

18   already knew about it, why would he deny it?

19         But there's another reason why Commander Ross would

20   be saying these statements.  All right?

21         Now, the judge is going to give you a number of

22   different instructions.  And one of those instructions is

23   concerning the impeachment of the witnesses because of

24   inconsistent statements.

25         And you should -- when you get this from the judge,

1  you should be thinking Commander Ross, that -- the judge is

2  going to ask you whether you should ask yourself whether there

3  was evidence that a witness testified falsely about an

4  important fact.

5         And in that instruction, and it says, "So if a

6  witness misstated something, you must decide whether it was

7  because of an innocent lapse in memory or an intentional

8  deception."

9         Now, we already know with Warrant Officer Barger

10 about his morphing memory about when he was first talked to,

11 that it's "knocked out," and then it gets to the grand jury and

12 now it's "going to knock out."

13        But Commander Ross is a whole another story, because

14 Commander Ross has some skin in the game here.  Commander Ross

15 is the one guy on that island besides Captain Nettleton who

16 should have been doing a whole lot more.

17        And the government doesn't want you to think that,

18 because Commander Ross is the one who sent Captain Nettleton

19 home and just told Chris Tur to go home without taking other

20 further action.

21        And some of the things that -- Commander Ross got up

22 there on the stand and he's telling little lies.  Some of them

23 don't even make sense why.

24        If you remember, I got into it with him about whether

25 he went back into the club and he had one beer or two, you

1  remember that?  I mean, it seems like a very silly little

2  thing.  His statement says he went in there and had two beers.

3  And he said, "No.  It was only one beer."  I didn't understand

4  why he's hiding it.

5         Now, the ironic thing about that is we know that

6  neither one of those are true, because after Ms. Wolfe came in

7  here and told us that she bought him a shot of pineapple

8  upside-down cake, whatever the heck that is, and he drank the

9  shot.  So he even had more drinking.

10         And why is Commander Ross doing this?  Because he

11  doesn't want to make it look like he should have been doing

12  something and he didn't.

13         "Going to knock out" versus "knocked out" -- he

14  should be doing something.

15         And all along he's interviewed by NCIS one, two,

16  three, four, five times and called in to the grand jury.

17         And if there's a guy out there that wants to make it

18  look like he had no part in it, that would be Commander Ross.

19         And one thing that Ms. Wolfe said that really kind of

20  really finishes this circle is, while Kelly Wirfel is still

21  there at the club and she's sitting with Commander Ross and

22  Karla Wolfe waiting for the Safe Ride to take them -- to take

23  them home, what does -- what does Commander Ross say to her, to

24  both of them?  "I hope we can keep this between ourselves."

25         You remember that?  Now, why would Commander Ross be

1    saying that?  Because he doesn't want anybody else to know.

2            What else does he say there?  "I just want to do my

3    time."  Those are the statements that Commander Ross says to --

4    there to Kelly Wirfel and Karla Wolfe.

5            So when you're looking at -- fast-forward now to this

6    conversation where NCIS is saying, "Well, didn't you ever ask

7    Captain Nettleton if Chris Tur was there?"

8            "Oh, I did.  And he said no."

9            Is that right?

10           Boom.  We've got a false statement charge, a federal

11   false statement charge in court.

12           And how about the next statement?  The next count

13   here, Count Seven, is that Commander Ross, after coming back

14   talking to NCIS, said, "Did you let Chris Tur in?"

15           You remember that's the question?

16           He says, "I didn't let him in," which is an

17   absolutely true statement.

18           So this may be the biggest laughter of all of them,

19   because that's an absolutely true statement.  He did not let

20   him in.

21           Now, the government makes a big deal about this

22   amnesia, kind of making light about it, and I'm going to talk

23   about that in a minute.  Okay?

24           But what we do know is that -- from the testimony of

25   Julia Nettleton that Captain Nettleton did not let him in.

1    Now, did Captain Nettleton think that he had broke in the

2    house?  Sure.  Because what he remembers, the first thing he

3    remembers after Julia going to bed and him going to the kitchen

4    is he is face down on the floor being woke up by Chris Tur.

5    "Wake up, Marine, wake up, Marine."  And as he gets up and has

6    this pain in the back of his head -- and he hears Chris Tur

7    talk on the phone, "Hey, I just knocked out the Skipper."

8            So is it reasonable for Captain Nettleton to assume

9    at that point that this guy just broke in and knocked me out?

10   Absolutely it is.

11           What would anyone think?  But we have the added

12   advantage of knowing what the truth is, is that Julia Nettleton

13   when she hears this -- first hears noises in her house, walks

14   out of the room, looks down there, and Chris Tur has already

15   walked in the house, and then she sees her father walking

16   toward him.  And that's when they started this first argument.

17           You remember that?  So we do know that Chris Tur

18   broke in the house.

19           So Captain Nettleton's statement of "I didn't let him

20   in," he's not guilty of this for two reasons:  one, because

21   that's what Captain Nettleton believed; and, two, because it's

22   true.

23           And the final count that he is charged with, Count

24   Eight, are false statements to Captain Gray and Admiral

25   Jackson.  And I told you I'd come back to that, because we've

1   got a whole dance going on here.

2          So when everything is first happening and Chris Tur

3   is -- at first goes missing, the wheels start going.  When

4   Captain Nettleton learns of these serious things, he orders the

5   search.  The search is going on.  And at some point he lets the

6   chief of staff -- COS, right?  They call it chief of staff,

7   C-O-S -- lets COS know that we've got a guy missing, and

8   providing him a little bit of information.  As time goes on,

9   he's providing more information.  And the focus is on the

10  search.

11         And he contacts Admiral Jackson and Admiral Jackson

12  asked him questions.  And does he answer those questions?  Yes.

13         Does he ever tell them about Chris Tur attacking him

14  in his house and him punching him in the nose?  No.

15  Captain Nettleton is the first one to tell you that.

16         He's not doing it with the intent to impede anybody.

17  The intent to defraud -- he's not doing it with any -- any ill

18  purpose at all.

19         Now, does he later tell them the cause, Captain Gray

20  and Admiral Jackson, that Chris Tur is in his house?  And does

21  he also later tell them about Bay -- events at the Bayview?  He

22  does.  And you ask yourself, well, why did he start telling

23  them?

24         And now we're dealing with Monday, January 12th.  And

25  this is a very, very important day for all these offenses and

1   all these things that Captain Nettleton is saying and being

2   accused of.

3           Because at that point, Chris Tur, we know, has been

4   found dead.  The focus has shifted from a search for him

5   to what Captain Nettleton thinks is a standard NCIS death

6   investigation.

7           But on January 12th, Captain Gray and Admiral Jackson

8   get the IG complaint.

9           You remember hearing about that?

10          And the IG complaint contains allegations of -- that

11  Captain Nettleton is having an affair, present tense, with --

12  with Lara Tur.  That's in this IG complaint -- and other

13  allegations are in there.

14          Captain Gray gets it.  Admiral Jackson gets it.

15  Admiral Jackson talks to the IG.  And she makes a decision

16  there.

17          Now, there's nothing nefarious or wrong with the

18  decision she makes.  And don't get me wrong.  I don't believe

19  there is.  But she makes the decision of, well, we've got NCIS

20  going out to the death investigation, we're going to have them

21  investigate that, too.

22          She knows that.  Captain Gray knows that.  NCIS knows

23  that.  The IG knows that.  Who does not know that?

24  Captain Nettleton.

25          So why is that important?  Because the information

1  they're getting about the events that are going on in

2  Guantanamo is not just coming from Captain Nettleton.  They're

3  getting it from other sources.

4          So when Captain Nettleton then hears -- goes to the

5  Jerk House to get some -- some goat or Jamaican chicken, or

6  whatever he ate that day, and hears these wild-ass rumors --

7  number one, that he got into a fistfight with Chris Tur in

8  front of the Bayview; and, number two, that Chris Tur came into

9  his house and found him in bed with Lara Tur -- those are the

10  rumors that he hears.

11          And what do you -- what did you hear

12  Captain Nettleton say?  "Hey, if I know them, I'm afraid

13  they're going to be spread quickly."  So he calls up the COS,

14  calls up Captain Gray and says, "Hey, there's these wild-ass

15  rumors going here.  I got to tell you that they're not true.

16  You know, what am I going to do?"

17          And this is the point, from then on, through all the

18  communications the rest of the week, that you got to look at

19  with a different kind of view.  We have these conversations

20  that are going like this:  You ever had that where you have

21  knowledge about one thing and you're talking to somebody who

22  doesn't have that knowledge and you're not playing on the same

23  level playing field?  That's what's going on the rest of this

24  week with phone calls and e-mails.  Because what they know is

25  that additional information that's coming from the IG

1    complaint.

2          They are believing certain rumors or allegations as

3    they're listed in the IG complaint.  They are not the same

4    rumors that Captain Nettleton is hearing.

5          And the ironic thing, as we heard Admiral Gray and

6    Admiral Jackson talk about, when Captain Nettleton mentions

7    rumors, does Admiral Gray -- well, he was Captain Gray then --

8    follow back with follow-on questions of, "Hey, let's talk

9    exactly what these rumors are"?

10          The answer is no.

11          Does he ask any specific questions?

12          The answer is no.

13          And why?

14          Because both Admiral Jackson and Admiral Gray know

15    that, now that they have this IG complaint, he is now suspected

16    of an offense that they can't ask him questions unless they

17    read him his rights.  That's the military law.

18          So they don't.  So you have this dance of they want

19    him to talk but they can't really ask direct questions.  So

20    they're not quite getting the direct information.  But they are

21    getting it from a different source, this IG complaint, and now

22    NCIS investigating.

23          And all along this whole period, no one tells

24    Captain Nettleton that there are these additional allegations,

25    these specific allegations about Lara Tur that are different

 1   from the ones he's aware of.  No one tells him.

 2           Now, could they?  Certainly.  Do they have to?  No.

 3           But if they really wanted to get to the truth of it,

 4   they could have said, "Captain Nettleton, I need to ask you

 5   some questions, but before I do, I need to read you your

 6   rights."

 7           They could have read him his rights and found out if

 8   Captain Nettleton at that point wanted to go forward and make a

 9   statement or invoke his rights.  And if he wanted to talk, they

10   could ask him all the questions.  That would be the way to do

11   it to get the information the straightforward way.

12           But they don't want to do that.

13           And I understand that, because now they're

14   investigating it and they don't want to tip off

15   Captain Nettleton.  And that's fine.  But the problem here is

16   all of Captain Nettleton's conversations with them are tainted

17   with that light of -- of people that are not reading the same

18   lines.

19           So when he is now charged with this -- this false

20   statement charge by telling both Admiral Gray -- or

21   Captain Gray and Admiral Jackson that he was not having an

22   affair with Lara Tur, now Captain Nettleton, in their

23   roundabout discussions, says, "I am not having an affair with

24   Lara Tur."

25           And the question is:  Well, is that false or is that

1  true?

2      I'll submit to you -- here's the calendar.

3  November of 2014 to January of 2015.

4      At the time in -- later in January when he says

5  this -- this statement to Captain Gray, Admiral Jackson, "I'm

6  not having an affair," and let's even give the benefit -- the

7  government a little benefit of the doubt that he means on the

8  9th of January, where the event happened at Bayview, that "I

9  was not having an affair on that day."

10      So give them the benefit of the doubt.

11      The question is:  Is that false or is that true?

12      Now, you're going to hear the judge instruct you

13  that -- that he has no duty -- and I mentioned it before -- to

14  report his own military offenses to them.  All right?  There's

15  no requirement.  And that's not what he's on trial for.  He's

16  on trial for saying that, "I was not having an affair with Lara

17  Tur," meaning, "I was not having an affair with Lara Tur on the

18  9th of January."

19      So what do we know?  We know from the testimony of

20  both Lara Tur and Captain Nettleton that they had sexual

21  intercourse one time, that they had kind of a flirty

22  relationship, and when they both were in Jacksonville

23  traveling, that they crossed the line, they had sexual

24  intercourse, no doubt about it.  Not supposed to do it.  And

25  it's wrong.

1          That was on 5 November 2014.  Right?  I think

2     everybody can agree that was the date that came out, because

3     Captain Nettleton was there between the 4th and the 6th at

4     whatever conference.

5          And what we also know is from the testimony of Lara

6     Tur, who said, "After that, there was nothing else.  After that

7     I needed to focus on my marriage."

8          And we also heard her talk about the -- this kind of

9     30-day contract, the weird thing that she had with -- Chris Tur

10    had given her.

11         So there's nothing else with Captain Nettleton after

12    that rendezvous in Jacksonville.  No more.  And that's the

13    government's witness telling you that.  That's not just me.

14    And, again, you can't hold the pickle, hold the lettuce when

15    we're talking about evidence in a criminal trial.

16         So how much time goes by where they're not having

17    sex, where there is no affair?  So starts at the 6th, right?

18    And all the next week.  And the next week.  And the next week.

19    All through December.  All through December.  In January.  And

20    we'll stop it at the night when the incident happens.

21         So all of that time had elapsed and there was no

22    further sexual intercourse, there was no affair happening

23    during that period of time.

24         So when he's saying, "I was not having an affair" --

25    and, again, generous to the government -- "on 9 January of

1    2015," it's absolutely the truth.

2           Was he saying, "I've never had sexual intercourse

3    with Lara Tur"?  No, that's not what he was saying.

4           And did they ask him questions to clarify that?  No,

5    because they can't.

6           But what we do know is it's more than two months

7    after he has this -- this rendezvous, he sleeps with Lara Tur

8    with nothing happening.  So on January 9, 2015, are they having

9    an affair?  They are not.  That's long since been over.

10          So I also wanted to mention to you about some things

11   that Captain -- I'm sorry, Lieutenant Colonel Gordon came in

12   here, Dr. Gordon came in here and told you about.

13          So -- and I want to highlight some of it -- his

14   testimony here, too, because this goes as to -- I mentioned the

15   importance of the injury to Chris Tur, if you remember that in

16   those counts that I talked about.

17          Where Dr. Gordon says about what he can tell from

18   Chris Tur from the autopsy is that the laceration -- that

19   little laceration above the eye -- I think it was this eye --

20   can't tell whether that happened before he died, after he died,

21   before he went in the water, after he went in the water, can't

22   tell.

23          The ribs, the broken ribs, no idea when that

24   happened.  But what we do know about the ribs is we know of

25   what happened in Captain Nettleton's house.  And none of those

1  events that happened at Captain Nettleton's house could

2  possibly reasonably result in broken ribs.

3         Now, we know he was -- had a blood alcohol content of

4  almost point three -- I think it was point 28, I believe it

5  was, more than three times the legal limit.  Chris Tur was

6  really drunk.

7         And as Dr. Gordon puts it, it was the fatal level of

8  alcohol and Prozac which do not mix well.  And what did he say

9  can happen if you mix alcohol and Prozac to high levels?

10  Arrhythmia.  You can have seizures.

11         So how did Chris Tur break his ribs?  We'll never

12  know.  Could it have been the -- he had arrhythmia or he had a

13  seizure as a result of these toxic levels of alcohol and Prozac

14  and fell and hit something?  It could.

15         Could he have encountered some other individual in

16  his drunken state, something happen there?  He could.  We don't

17  know.  What we do know is what happened at Captain Nettleton's

18  house and we do know how he appeared in the Bayview after he

19  left from -- hearing from Ms. Wolfe.  That's what we do know.

20         So we know that the cause of death was probable

21  drowning with fatal levels of alcohol and Prozac and that

22  Dr. Gordon in his e-mail said that he was a hundred percent

23  confident of that.

24         But we also know that he did -- he was not aware, was

25  not told that Lara Tur said that sometimes he doubled up on his

1    Prozac.  So don't know if he was -- it was a regular course of

2    taking what he should or he was taking too much.  We don't

3    know.

4            So there's two other things that -- that Captain --

5    that Colonel Gordon talks about that I wanted to highlight for

6    you.

7            COURTROOM DEPUTY:  30 minutes remaining, sir.

8            MR. VOKEY:  Thank you.

9            First of all, this is a government witness.  So this

10   is not a defense witness.  This is a government witness.

11           And he talks to you about the bloody nose, right?

12           We know that Chris Tur had no broken nose.  But you

13   get hit in the nose and you can bleed -- and if anybody's ever

14   been in that position -- I know I have -- you get hit in the

15   nose and your -- your nose can bleed a lot.

16           You can do it in a football game or playing in a

17   rugby game.  I've had a lot of bloody noses that way.  You get

18   punched.  It doesn't have to be a broken nose.  And as

19   Dr. Gordon told you, the inner lining is fairly delicate and it

20   easily bleeds a lot.  And alcohol will make it bleed more

21   because it thins the blood.  And at three times the legal

22   limit, that blood is flowing out that nose.

23           So a bloody nose, given the punch that

24   Captain Nettleton gave him in the nose, absolutely makes sense.

25   And that came from the government's own witness.

1           And the other thing is this unconsciousness.  And I

2   think the government is trying to suggest that -- we know he

3   was knocked out.  Chris Tur's own words, says, "I knocked him

4   out."

5           And the government wants you to believe that some

6   kind of amnesia period before that is somehow made up or

7   unreal.  But from the government's own witness -- the

8   government's own expert, Dr. Gordon, tells you that

9   unconsciousness from being knocked out can commonly cause

10  memory loss of what happens before the knockout.  And it can be

11  permanent.  That can be amnesia.  That's not unusual at all.

12          That happens all the time.  It's common.  People get

13  knocked out and they can lose part of that memory.  And the

14  period of time that they're knocked out can also affect the

15  period of time of the amount of memory that's lost.

16          So Captain Nettleton, they say, conveniently doesn't

17  remember what happens when Chris Tur first walks in the house

18  until he is knocked out.

19          And I would submit to you that it's most unconvenient

20  for Captain Nettleton.  It would be a whole lot better if he

21  could remember exactly what happened there in the time before

22  he got knocked out.

23          But at least, fortunately, what we do have is we have

24  Julia Nettleton to give us those events of what happened.

25          So the government brought up some of these phone

1   records of Julia Nettleton.  And I've got to tell you, I think

2   they're misleading you and I think they got it wrong.  So I

3   want to talk about those just a little bit.

4           Now, we're going to put up Government's Exhibit 29

5   again up on the screen.  And page 1.

6           All right.  This was -- this is page 1 of the phone

7   records of Government's Exhibit 29.  You'll have this to go

8   over, right?  And they mention that 10:22 seems to be the time

9   that we know of that something is going on in the house.  It's

10  probably more like about at least 10:21, maybe 10:20, because

11  we know that when Julia hears something, she walks out, looks

12  down, sees this, and then goes back to her room and then she's

13  texting, right?  Or messaging or whatever these kids do.  I

14  think it's an iPad message thing, right?  So that's at 10:22.

15  So we know Chris Tur is in the house at that point.

16          And the next page, please, Danny.

17          And they have that second entry on there that they

18  read to you, which is 10:55, as they try to say that's the

19  definitive time where there's a physical confrontation going

20  on, this knocking out happens.  And I've got to tell you,

21  they're leading you down the wrong path.  That can't be what

22  happens.

23          And if you look at the language of what she's

24  written -- and you've got to remember we're dealing with

25  teenagers who text, right?  And they ramble on and say all kind

1  of things, but if you read the text here, this is historical.

2  She is telling Keegan what had already happened.

3           Okay.  If you go back to the first page, Mr. Schwarz.

4           And what the government didn't highlight is -- if you

5  remember Julia Nettleton's testimony -- you remember her

6  talking?  That she'll never forget what she saw.

7           She hears this commotion.  She goes downstairs.  The

8  dogs are barking, the one dog won't go off the carpet.  She

9  turns and she looks and what does she see?  You remember?  Her

10  dad face down on the floor, feet closer to her and head that

11  way.  And somebody is standing over her and looks like he's

12  pressing buttons on the phone.

13           You remember that?  And what her reaction to that

14  was?  She was terrified.

15           As a matter of fact, she initially thought her father

16  might be dead.

17           And do you remember what she told us what she did is

18  she got out of there without being seen, she ran upstairs.  And

19  who does she first reach out with?  It was her brother.  It was

20  her brother, Riley.

21           And if you look on there -- because of these -- we

22  don't have the exact language, but what we do know is at 10:40

23  we have these three text, slash, messages between Julia

24  Nettleton and Riley.  That's what we know.

25           And we know from her testimony is the first person

1   she contacts, she's freaking out, she contacts Riley.  So 10:40

2   is the time just after Captain Nettleton has been knocked out.

3          Okay.  Thank you, Mr. Schwarz.

4          So why is that important?  Because we have to look at

5   the timing of when everything happens.  Because Julia's texts,

6   as you go through them, also do provide a guide.  I agree with

7   one thing they say, they are very helpful.

8          The one text a little later that they put up earlier,

9   which is, "My dogs won't -- my dogs won't stop barking because

10  there's ducking people outside."  What is going on at 10:46?

11  At this point, is it -- is it the timeline that the government

12  gives you, or is it the timeline that makes more sense based on

13  Julia Nettleton and what Captain Nettleton said happened in his

14  house?

15         And I'll tell you it's the latter.  Why?

16         "My dogs won't stop barking because there's ducking

17  people outside."

18         Now, at this point there's already been people in the

19  house.  At what point did they go outside?  It's when Chris Tur

20  went out and smoked a cigarette.  This is after the knockout.

21  This is before the punch in the nose.  And we also heard that

22  Julia's room is not far above -- is on the second floor and

23  would be right outside that window.

24         So that's what she's saying when, "My dogs won't stop

25  barking because there's ducking people outside."  At 10:46,

1   that's what's going on.  They're out on that side porch, Chris

2   is having a cigarette, having a beer before they go in, before

3   Chris gets enraged and attacks Captain Nettleton.

4           And at 10:57 where she's now texting, "I can hear

5   them fighting really loudly," that's where we -- is where the

6   real fight occurred, at 10:57.  Right there when she's texting

7   "I can hear them," that's when Chris gets enraged that he won't

8   go to the club -- to Rick's and get a beer with him.  He

9   attacks Nettleton, pushes Nettleton up against the wall,

10  Nettleton pushes him back.  He comes at Nettleton again.  He

11  hits him right in the nose, his bloody nose, and he goes to a

12  knee.  And he's on his knee and he's throwing the blood while

13  he's on his knee and Captain Nettleton says, what, four or five

14  times while he's on his knee and he's banging the wall with his

15  fist, and these are these banging noises that Julia Nettleton

16  is hearing, is Chris Tur banging that wall at the same time

17  he's throwing that blood.  And he gets up and he's -- as

18  Captain Nettleton says, "MF'ing" Captain Nettleton and

19  Captain Nettleton is doing the same thing.  And he gets up and

20  he's pissed.  He walks around a little bar and he gets there

21  before Nettleton says, "Stop."  And he goes and gets him a

22  paper towel and hands it to him.

23          And when he comes back from getting him the paper

24  towel -- when he comes back with the paper towel -- so as we

25  have here on -- on -- this is Defense Exhibit 47, when Chris

1   Tur -- they had the struggle.  Chris Tur is punched.  He goes

2   down to a knee.  He's approximately right there where it says

3   "CT."  He's on his knee.  He's slinging blood.  He's banging

4   the wall and he's mad and he's yelling at Nettleton, and

5   Nettleton is yelling at him.

6           He gets up and it's not he gets up and he calmly

7   walks over to what we've labeled as "CT 2."  He's angry and

8   he's slinging blood.  And he walks around kind of by the bar

9   over by the butcher block, and Nettleton says, "Stop."  And he

10  goes to give him a paper towel.  And he goes into the kitchen,

11  goes to give him a paper towel and he comes back and Chris Tur

12  is now standing here.  And Captain Nettleton says when he's

13  standing he remembers two or three times he's flicking blood,

14  but who knows while he's getting the paper towel what he's

15  doing.

16          And we know that he gets to the kitchen,

17  Captain Nettleton sits him down, he's got the paper towel to

18  his nose, there's a blood spot here, there's a blood spot on

19  the table.  There's a few blood spots all in this area.

20          And he goes and gets a wad of paper towels, puts ice

21  in it, gives it to him, and Chris Tur puts it to his nose.  And

22  you have the ice to the nose to reduce the swelling, stop the

23  bleeding.  And we know it does.  Because after this,

24  Captain Nettleton gets a phone call from Riley who's angry and

25  upset.  And then Captain Nettleton comes back to Chris Tur and

 1   says, "I've got to go check on Julia."

 2         He goes upstairs to check on Julia, comes back down,

 3   and Chris Tur is gone.  And I think what we know now is he

 4   walked down by the dock, dropped the paper towels there next to

 5   the dock on that lime rock road, walked back to the Bayview.

 6         So when you look at the blood and you look at the

 7   blood chart that the government has presented to you of where

 8   all the blood is -- if you look at this, it's going to be a

 9   little bit deceiving, right?  What you need to do is focus on

10   the -- where the end of the lines are.  And the ends of the

11   line tell the story about what was going on.

12         So we're looking at here, here, here, here, here,

13   here, here, here, here, here.  And with -- oh, I'm sorry, and

14   here.

15         And with the exception of this one errant spot of

16   blood over here, they're all within a very -- very confined

17   area, and consistent with bleeding in the barroom, flinging

18   with the nose.

19         And I will tell you, as Mr. Lenamon pointed out with

20   both of the -- the special agents who testified, Boswell and

21   McNamara, when you're flinging blood, it's like being in a

22   church where you dip the thing in the water and you go like

23   this.  And water can fly, so can blood.

24         So this spot here, could this be when

25   Captain Nettleton was upstairs talking to Julia, and Chris

1  Nettleton [sic] left, could he have walked here and that's

2  where that blood came from?  Sure.  Or it could have been when

3  he's flinging blood, this is a drop of blood that comes flying.

4  We don't know for sure.  But what we do know is that the

5  location of the blood in this house is exactly consistent with

6  Captain Nettleton's story.

7         So, ladies and gentlemen, when you look at all eight

8  counts that Captain Nettleton is facing, and as confusing as

9  they can be, and they are confusing, I'm here to tell you that

10  Captain Nettleton is not guilty of every single one of these

11  counts.

12         And when you go through the evidence and you realize

13  the things that were not presented to you by the government,

14  the things that we had to bring up to you, you consider the

15  things that -- what obstruction would look like that didn't

16  happen here.  The false statement charges, the Navy Blue, the

17  materiality dealing with the disappearance of Chris Tur, all

18  those issues I talked to you about, you're going to realize

19  that not only is Captain Nettleton -- they haven't proved

20  beyond a reasonable doubt, but he is actually not guilty of

21  these offenses.

22         COURTROOM DEPUTY:  15 minutes, remaining, sir.

23         MR. VOKEY:  Sorry, ma'am?

24         COURTROOM DEPUTY:  15 minutes.

25         MR. VOKEY:  Thank you.

1    So what I am asking you to do today is to find

2  Captain Nettleton not guilty of all counts.  And I want you to

3  do that because I want you to send a message.

4    You're going to be able to send a message that the

5  justice system needs to be fair and we don't like manipulation

6  and we don't like hiding of evidence.  That we won't convict

7  anybody on these charges because of some military violations or

8  regulations, and that we won't convict any citizen of any

9  offense unless the government has proved every element of every

10  offense beyond a reasonable doubt.

11    So I've got to talk to you just a little bit about

12  reasonable doubt.

13    So the judge is going to give you an instruction.

14  And it's likely one of the most important instructions you're

15  going to get.  And he's going to read you this -- it's

16  basically three paragraphs long and you will get a copy of

17  this.

18    And he will talk -- he'll talk to you about the

19  government's burden of proof is heavy, but he doesn't have to

20  prove the defendant's guilt beyond all possible doubt.  Proof

21  only has to exclude any reasonable doubt.

22    But let's go to -- focus on the one sentence in the

23  last paragraph of this, and when you get these instructions,

24  please look at this very carefully.  That proof beyond a

25  reasonable doubt is proof so convincing that you would be

1    willing to rely and act on it without hesitation in the most

2    important of your own affairs.

3           It's got to be proof that convincing.  And the

4    question is, has the government done that here?  And the answer

5    is no.

6           And the concept of proof beyond a reasonable doubt is

7    one of the most important concepts we have in the law.  It's

8    one of the things that makes the United States of America

9    great.  But I'm here to tell you this standard is not to the

10   benefit of Captain Nettleton.  This standard exists per you.

11          We have the standard here to protect you so that you

12   won't be forced to choose and try to convict somebody on I

13   think he may have done it or I think he may not have done it.

14   It's to protect you that if the government hasn't proved beyond

15   a reasonable doubt every element of every offense, that you

16   find him not guilty, and that you go home with a clear

17   conscience.  That's what beyond a reasonable doubt is here to

18   protect.

19          Now, I'm almost done with my time.  And the way this

20   works is the government gets to do their closing, I talk, and

21   I -- I don't get to talk again.  It's just the way the system

22   is set up.

23          And I know when Mr. Nothstein gets up there, he's

24   talking, I want to stand up and I want to say, "Yeah, but let

25   me tell you about this thing," and I want to argue that, and I

1   won't be able to.  That's just the way it works.  So you're

2   going to have to do that for me.  And you're going to have to

3   keep in mind while he's giving his final comments of why didn't

4   you bring certain of these pieces of evidence up, why isn't

5   Lieutenant Tidd here testifying, why didn't you tell me about

6   this or that that Mr. Vokey told me about?

7           And keep that in your mind.  You're going to have to

8   be the one arguing for me.

9           So this is a very complex case.  It's very involved.

10  I've been doing this a long time.  And it's difficult for me to

11  say I'm done with the case and I have to turn it over to people

12  that I don't really know to make a decision.  But I've got to

13  do that.

14          So before I sit down I just want to tell you one

15  quick story.  So there's an old man and a young man in the

16  village, and the young man is there thinking, you know what,

17  I'm going to prove to this old man that I'm smarter than him.

18  And he says, I'm going to go get a bird and I'm going to put it

19  in my hand like this, and I'm going to walk up to the old man

20  and say, "Old man, old man, there's a bird in my hand.  Is it

21  alive or is it dead?"  And if the old man says, "Oh, the bird

22  is dead," I open my hand, the bird flies away.  I win the

23  argument.  If he says that the bird is alive, then I'll crush

24  it with my hands and say, "No, the bird is dead."  The young

25  man thinks, no matter what I can't lose.

1        So he goes and he picks up the little bird and he

2   walks it to the old man and says, "Old man, old man, I've got a

3   bird in my hand.  Is it alive or is it dead?"

4        And the old man looks at him and he says, "Son, the

5   bird's life is in your hands."

6        Ladies and gentlemen, I give you John Nettleton.

7   He's yours.

8        THE COURT:  Mr. Nothstein, do you -- Mr. Nothstein,

9   do you prefer the board?

10        MR. NOTHSTEIN:  I'll keep the easel there, Your

11   Honor.

12        THE COURT:  I'm sorry?

13        MR. NOTHSTEIN:  I'll keep it for the --

14        THE COURT:  Okay.

15        MR. NOTHSTEIN:  -- easel.  Thank you, Your Honor.

16        Thank you, Your Honor.

17        Ladies and gentlemen, when I stood up here before,

18   one of the first things I said to you is that throughout the

19   trial the defense has tried to push your focus anywhere other

20   than the defendant's conduct.  And I think you've seen

21   throughout the defense attorney's closing argument that's

22   exactly what they're still trying to do.

23        The defendant would like to have you look at

24   everyone's conduct other than his own.  He wants you to look at

25   and blame Captain Ross and say he wasn't doing things the right

 1   way at Guantanamo to respond to the disappearance and death of

 2   Christopher Tur, who had been there less than two weeks.  He

 3   wants you to believe that NCIS told everybody what to do, told

 4   everyone what to say.  Wants you to believe the prosecutors are

 5   hiding evidence.  Or that Admiral Gray or Admiral Jackson, if

 6   they'd just asked the right questions, then we'd have the

 7   truth, then we'd have it there.

 8          As we told you, the case is not about other people.

 9   It is about this conduct of the defendant.  It is about his

10   false statement, his misleading, his concealing.  And as I told

11   you, the base bottom line for all that was to keep himself out

12   of trouble.  That is why he was doing all of this.

13          Now, I want to touch on -- I don't have very long.

14   I'm just going to touch on a couple of things Mr. Vokey

15   mentioned.

16          And if I might have the calendar, please, Mr. Vokey?

17          MR. VOKEY:  My defense -- my defense demonstrative?

18   No.  I --

19          MR. GEE:  Very well.

20          Well, Mr. Vokey came up and he gave you this

21   calendar, and showed all these days, all these days that there

22   hadn't been any kind of sexual activity between Ms. Tur and

23   Captain Nettleton.  Well, apparently Mr. Vokey thinks that in

24   order for someone to accurately answer they're having an

25   affair, they have to be asked while they're actually in the

 1   act, in flagrante delicto with their partner.  I don't know how

 2   that necessarily goes over, but I submit that's simply not the

 3   case.

 4        More importantly, the defense is saying that he

 5   denied the affair because the affair had ended and they weren't

 6   asking if he was committing adultery.  Now, that requires some

 7   pretty tortured logic.  Let's use our common sense here.

 8        The UCMJ prohibits adultery, which you've heard again

 9   and again is sex outside the marriage, which the defendant had

10   done, had done, by his admission, just two months before.

11        The admirals don't care about relationships.  They

12   care about potential UCMJ violations.  Because, as they told

13   you, adultery hurts good order and discipline.  This is a great

14   example of why.  They can't have people having these adulterous

15   relationships on base.  It hurts their ability to command.  It

16   hurts good order and discipline.

17        So when the defendant is denying having an affair, I

18   guess is his term he wants to use, he knows what he is denying.

19        And, more importantly, I think it's pretty hard to

20   say that this affair is actually over.

21        The testimony was that this flirtation was going on

22   all summer.  There's stolen moments of kissing and some

23   touching here and there, as I said, flirting, texting, that

24   kind of thing.  It's only when they can get away to

25   Jacksonville, because, remember, they live on this tiny little

1    island, that they can actually consummate their affair.

2         And then what's happening on January 9th?  The

3    defendant and Ms. Tur are in the corner inappropriately

4    touching, drinking too much, making Kelly Wirfel uncomfortable,

5    Chris Tur uncomfortable, other people uncomfortable.  And where

6    are they going when the big fight starts outside the Bayview?

7    They are going to the defendant's house to drink more.  His

8    wife isn't there.  Afterwards, Lara Tur is saying "I love him.

9    I love him."  She's trying to call the defendant.  I don't

10   think you can say this affair is over.

11        And, more importantly, there's a -- a lot of

12   argument, not facts, argument that Captain -- or that Admiral

13   Jackson and Admiral Gray got confused with the IG report.  You

14   saw them testify.  They are very clear.  The defendant denied

15   the allegations of an affair with Lara Tur.  They were very

16   clear in their testimony.

17        Now, I also want to talk about this knock-out thing,

18   cold call.  And, again, this is another example of the

19   defendant trying to get you to look at other people, what other

20   people are doing.  Want you to suggest -- want to suggest that

21   because other people knew the defendant came to his house -- or

22   that Chris Tur came to his house, they knew that because of

23   this phone call.  Well, first of all, as the defendant said on

24   the stand, he -- he knew that Kelly thought it was a joke.

25        People thought it was a joke.  No one thought it

1   actually happened for two really good reasons.  One, the

2   defendant never told anyone he came there.  And, in fact, when

3   asked -- he asked Captain Ross, Captain -- or the defendant

4   denied it.

5           More importantly, so many of the witnesses when they

6   were questioned about this, I think you could see them, they

7   were struggling with the logic of whether they knew he knocked

8   him out or not, because, as I think a few of them said, "Well,

9   if Chris Tur came and knocked him out, the captain would have

10  reported it.  He would have told the security department."  So,

11  no, people didn't know Chris Tur came there because they heard

12  about this phone call.  And they didn't even believe he came

13  there because of this phone call.

14          That is a complete red-herring.

15          He wants to -- he wants -- he wants you-all to

16  believe that other people knew about this without actually

17  telling anyone that it happened, which is what he should have

18  done, but what he did not do, because he knew it would get him

19  in trouble.  He knew it would get NCIS looking at him.  He knew

20  it would get his superior officers looking at him.  That's why

21  he didn't tell anyone.

22          And sticking with Ms. -- Ms. Wirfel and the Bayview,

23  you know, there's this witness, Ms. Wolfe.  And, look, again --

24  I've said it many times and I'll say it again.

25          You-all are the ones to determine credibility.  But I

 1   just want to point out, when it comes to Ms. Wolfe, this is a

 2   woman who was, by her account, trying to recall events from

 3   five years ago -- I think she hadn't -- at least been

 4   interviewed about any time since this all happened, five years

 5   ago.  She's saying things in court that by her own admission

 6   she did not say five years ago.

 7          And in the intervening years she's been talking to

 8   Kelly Wirfel all the time.  They're close friends.  They're

 9   constantly in contact, as she said.  She read about the trial.

10   She -- and so the question I'd ask, this is for you-all, is

11   this a woman who actually recalled this really important event

12   five years later?  Or is it someone that's just kind of gotten

13   a little mixed up because of what she's been hearing, things of

14   that nature?

15          And I say that because she says she saw Chris Tur,

16   but she didn't see him bleeding.  As Mr. Vokey just pointed

17   out, sometimes bloody noses bleed like crazy.  There's no sort

18   of blood around his nose, no blood on his hands from all of the

19   flicking he was doing.  He doesn't have a wad of paper towels

20   in his hand.  It's because she didn't see him after he left the

21   defendant's house.

22          And here's another reason.  Because Kelly Wirfel

23   testified that when she got that knocked-out phone call from

24   the defendant, and it ended, that she hung up with defendant,

25   and Safe Ride was arriving then.

1      According to her testimony, she and Lara left shortly

2  after -- or right after the knock-out phone call.  So how is

3  she hanging out there with Karla telling her what happened so

4  that she can signpost that?  She couldn't because it didn't

5  happen.  They're friends.  They probably talked the next day.

6  She got it mixed up.  And then in all the hullabaloo in talking

7  about the case, got it confused.  Chris Tur did not go back to

8  the Bayview.

9      Now, Mr. Vokey brought up a lot of points saying that

10  we had concealed from you-all all these facts about the search.

11  You had no idea that this search happened during the

12  government's case in chief.  Well, first let me ask Ms. Reid to

13  put up Government 359.  This is an e-mail one of the first --

14  most important e-mails in the case.

15      And what we'll see is that this is the e-mail that we

16  introduced and it is the defendant telling Admiral Jackson

17  about this search that's going on of the bay with Coast Guard

18  and other people.  So the boats he said we didn't tell him

19  anything about --

20      Oh, I apologize.  I've got it here.

21      I'll ask you to look at Government's Exhibit 359 when

22  you go back in the jury room.  There's representation there

23  from the defendant that they're searching with boats.

24  Something that Mr. Vokey says we didn't tell you.

25      He says we didn't tell you about the night vision

1    goggles and the FLIR they were using.  Again, that's in the

2    e-mail.  That's something Admiral Jackson talked about.

3             Says we didn't tell you about the search itself.

4    Brought you Officer Bohyer, who was part of the search team,

5    Chief Thibodeaux, who was part of the search team.

6             We brought you Captain Ross, who is the number two in

7    charge at the base, who was in charge of the search.  They

8    described the search.

9             And let me go back to Captain Ross and Ms. Wirfel for

10   just a minute.  There's a lot of discussion there in closing

11   argument about the lack of credibility of Captain Ross, the

12   things he said that -- that they're alleging were made up, his

13   inconsistent statements.

14            Again, I'll leave you to judge the credibility of

15   Captain Ross.  But I'll remind you regarding that statement,

16   the alleged false statement, where the -- Captain Ross said to

17   the defendant, "Did Mr. Tur come to your house?"  And, again,

18   this is in part because he had heard this knocked-out thing,

19   right?  And he wants to confirm.  Is this a joke or is it real?

20   And he asked the defendant, "Did he come to your house?"  And

21   the answer is no.

22            Kelly Wirfel also says that Captain Ross did that.

23   So apparently she's lying, too, according to the defense.

24   That's not the case.  Neither one is lying.  The defendant lied

25   when he denied that Mr. Tur went to his house.

1        Now, Dr. Gordon -- there's some questions about

2  testimony about amnesia, whether the defendant had amnesia.  If

3  you recall, he was not asked if Captain Nettleton had amnesia

4  or how one gets amnesia, how long it affects you, what might

5  bring it on, things like that.  He asked a few offhanded

6  questions.

7        And there's been no evidence whatsoever that the

8  defendant visited a doctor anytime to get checked out for this

9  terrible head injury, treated for a concussion, examined for

10  amnesia, anything along those lines.  The point is -- is

11  that -- you recall the defendant's testimony, forgetting some

12  things and remembering other things really, really well, and a

13  lot of those things he's forgetting are extremely convenient.

14        We also want to mention about the Julia text

15  messages, because I think that definitely got a little

16  confused.  And you'll have Government's Exhibit 29.  Please

17  take a look at it.  But also recall the reason that 10:55 text

18  message is so critical is it's clear in that text message that

19  Julia says, I just -- just went downstairs and saw her dad on

20  the ground.

21        Well, all the testimony of what happens in the house

22  is from Julia and from the defendant.  And the defendant says

23  he went to the ground once, by his testimony, one time.  And

24  according to the defendant, when he got up, Christopher Tur

25  called Kelly Wirfel and made that knocked-out phone call.

1              So we're not just divining it from this chart,

2     although I will point out that the dogs are barking at that

3     time, and Kelly Wirfel says when she made the knocked-out phone

4     call, she could hear dogs in the background.  But by the

5     defendant's testimony, 10:55 is when he wakes up and the

6     knocked-out phone call is made.

7              Now, yes, she says that prior to that she heard

8     noises.  She testified about that.  Said she heard some noises

9     beforehand, voices, them arguing, things of that nature.

10    That's what led her to send the text messages to her brother

11    that we talked about at 10:40 and so forth.  But it was not

12    that fight.  The fight did not happen until 10:55 and it

13    happened immediately after she came upstairs.

14             The defendant was trying to confirm -- or conform his

15    testimony to the facts, and he wasn't able to do so and should

16    have.

17             Now, again, let's talk a little bit about some of

18    these specific counts.

19             So the -- the Navy Blue, the defense wants to argue

20    that this was just some thing that happened, right?  Was no big

21    deal, the defendant wasn't involved.  But that's not what

22    Captain Ross said and that's not even what the defendant said

23    in his testimony.  He said, as did Captain Ross, that

24    throughout the day the two of them were discussing what facts

25    should go in this Navy Blue.

1     So the content of the Navy Blue e-mail was decided

2   upon by the both of them, with the defendant being the one

3   authorized to actually issue it.

4     Now, he delegated -- once it was good, he delegated

5   it out to Captain Ross so it could go out.  But the content was

6   decided on by the both of them.

7     And it was the defendant that knew the additional

8   facts that needed to go in.  No one else did.  Like I said, he

9   didn't run it by Captain Ross and say, "Hey, Chris Tur came to

10   my house and we got in this fight.  Should we throw that in

11   there?  Is that relevant to Navy Blue?"

12     No.  Because, again, he is misleading and concealing.

13   He wants people to think there's no big deal, nothing happened.

14   Because any of those facts -- if he lets any of those out,

15   which is, again, why he's denying this knocked-out phone call,

16   that Chris Tur came to his house -- if those facts get out, it

17   starts the chain of events of questions that lead back to his

18   affair, and later on would lead back to the fight in his house

19   that he concealed.  So his motive to lie gets even greater.

20     But that very day, while the search is going on, he

21   is concealing Chris's allegations --

22     COURTROOM DEPUTY:  Five minutes remaining, sir.

23     MR. NOTHSTEIN:  Thank you, ma'am.

24     -- because it leads back to him.

25     And I want to talk -- Mr. Vokey made a bunch of

1   points about all the things the defendant didn't do that are

2   obstructive.  And we don't disagree.  He did not tell his

3   daughter to lie.  He didn't burn evidence.  He didn't, you

4   know, shoot down the medical examiner's plane.  But he

5   certainly didn't give the medical examiner all the information

6   he needed, now, did he?

7           He didn't tell the medical examiner, "Well, this man

8   who died, I was in a fight with him the night before he died,

9   or very close therein."  No.  He is charged with engaging in

10   misleading conduct.

11          That's why we walked through all four of those types

12   of examples, the false statement, omitting key facts, relying

13   on false or misleading documents.

14          That is what he's charged with.  He's charged with

15   misleading the people because he had to do that or they would

16   report what they knew to law enforcement.  And that brings the

17   attention back on him.

18          That is what Count One is all about, his misleading

19   conduct.  He doesn't have to do something crazy like put out

20   the tires of the search vehicles.

21          Yes, that would be obstruction maybe, but that's not

22   what he's charged with.  He's charged with the misleading

23   conduct we have walked you through and shown you examples of.

24          And, finally, I agree with Mr. Vokey.  The standard

25   of reasonable doubt in our justice system does make us great.

1   Makes this country great and protects us all.  And we have no

2   fear of the burden.  We embrace it.  We have met and exceeded

3   that burden in this case.  We have proved this case beyond a

4   reasonable doubt on all charges.

5          I ask you to return the only verdict commanded by the

6   evidence.  Guilty on all counts.

7          Thank you.

8          THE COURT:  I guess I'm just going to stand up

9   because I can't see all of you.

10         MR. VOKEY:  I'll move it.  I'll move it.

11         THE COURT:  That's all right.  That's all right.

12  We're going to -- so, ladies and gentlemen, what -- what I'm

13  going to do is -- that concludes the closing arguments.  And --

14  but since it's 5 o'clock, I think I'm going to go ahead and

15  turn you loose for the evening.  And when you come back

16  tomorrow morning, I'll give you the instructions on the law and

17  then I'll let you start deliberating on the case.

18         And those instructions take about a half-hour or so,

19  something like that.  And once I give you those instructions,

20  then I'll be able to send you back in and you can start

21  deliberating on the case.

22         I will remind you that all the instructions still

23  apply.  Even though you've heard the closing arguments, until I

24  instruct you on the law, until I ask you to actually go back

25  and start deliberating, you should not talk about the case,

1   don't let anybody talk to you, don't let -- don't look at any

2   media, don't do your own research, don't get on social media,

3   all the same instructions still apply.  And then we'll be back

4   here tomorrow.

5          Now, a couple of logistical things.  Would it

6   inconvenience anybody on the jury if we -- if we started at 9

7   o'clock instead of 9:30?  Is there anybody that would have

8   trouble getting here, like, 8:45 or so, so we could get a

9   9 o'clock start?  Is that going to inconvenience anybody?

10         Let's do that.  So I'm going to ask you to be in the

11  jury room at 8:45.  Because all -- you know, all we have to do

12  is bring you out and I can start charging you.  There's nothing

13  else left to do in the case.  So we won't be late tomorrow like

14  we were this morning.

15         So I'm going to ask you to be in the jury room at

16  8:45.  Remember all of you have to be here so we can get

17  started.  So please don't be that person.  All right?  And we

18  will get started at 9 o'clock.  I'll instruct you.  And so then

19  you'll be sent back and you'll begin to deliberate on your

20  verdict.

21         Now, normally when a jury is deliberating, we do not

22  have a formal lunch break and let you go out and get a sandwich

23  like you've been doing.  We actually bring lunch in for you.

24  And so we will plan to do that.  So if you've been bringing

25  your lunch, you can still bring it if you want to, because I

1    can't guarantee you how good ours will be.  It usually is -- we

2    have three or four different places.  I'm not sure where the

3    administrator will go.  I will give you a tip.  If it's from

4    Quizno's across the street, the sandwiches are okay, but the

5    cookies are really good.

6           So make sure you get -- make sure you get cookies.

7    And I heard there's been doughnuts and other things in there,

8    so I know somebody has a sweet tooth back there, so -- but we

9    will provide lunch.  We don't -- we don't really like you out

10   walking around and all that while you're deliberating.

11          So -- and -- and, but, of course, you'll get breaks

12   and everything, so don't -- don't worry about that.  But it's

13   just a little different when you're in there deliberating.  We

14   like to kind of keep you together and -- and -- and keep a

15   check on that.

16          So other than that, everything -- everything will be

17   the same.  The only difference tomorrow when I send you back

18   in, you will be able to take your notepads with you, you'll

19   have those as I instructed you at the beginning of the trial.

20          We'll also provide you the exhibits and all that.

21          So everything tomorrow will be focused on me giving

22   you the instructions and then you beginning your deliberations.

23          So 8:45 tomorrow.  All the instructions apply.  We'll

24   get a 9 o'clock start.

25          Thank you, ladies and gentlemen.

 1          COURT SECURITY OFFICER:  All rise for the jury.

 2      (Jury exits, 5:03 p.m.)

 3          COURT SECURITY OFFICER:  Please be seated.

 4          THE COURT:  All right.  Counsel, I had a chance to

 5  review the jury instructions while the arguments were being

 6  made.  They appear to conform to the final version of the

 7  instructions that -- that I announced earlier today with a

 8  couple -- with a couple of changes we announced, and so I am

 9  satisfied with the instructions and the verdict form.

10          Obviously if somebody sees something out of place

11  overnight, I'll -- I'll be happy to hear about it, but as far

12  as I'm concerned, the instructions are closed, and -- and all

13  previous objections are preserved.

14          I will also ask you-all to be in places by 8:45 in

15  the morning so we can make sure we get a crisp 9 o'clock start.

16          Anything else, Mari?

17      (Judge confers with courtroom deputy.)

18          THE COURT:  The -- the video of the interview that

19  was played for the jury of Captain Nettleton, we're -- we're

20  showing a marking here of Government's 419.  I believe it was

21  identified as Government's 355, so we're a little confused

22  about that.  What's --

23          MR. GEE:  That's correct.  It's Exhibit 355.  It may

24  have been that when they made the clip they just -- our -- our

25  paralegals just made it the last thing on the exhibit list and

1   that -- that's an error.  It should be 355.  We'll fix it.

2         THE COURT:  All right.  I'm going to -- I'm going to

3   turn it back to you.

4         Now, this is the version that deletes the social

5   security -- I mean, this is the one that was played for the

6   jury.

7         MR. GEE:  Yes.  And we're going to -- we'll play it

8   with defense counsel --

9         THE COURT:  That's fine.

10        MR. GEE:  -- this evening to make sure we're all on

11   the same page.

12        THE COURT:  Okay.  But I'm going to hand it back to

13   you and ask you to remark it to 355, because that's the way it

14   was admitted.

15        MR. VOKEY:  And I think the one that was displayed

16   actually didn't have it deleted.  We just turned the volume

17   down for today.

18        THE COURT:  All right.  Well, that's fine.  We'll --

19        MR. VOKEY:  I just want to make sure that the social

20   security does not go back.  That's all.

21        THE COURT:  All right.  So what we're going to do

22   overnight is we're going to change it to 355 and we're going to

23   make sure that it's appropriate for playing to the jury.  All

24   right?  Right?  That's what we're going to do?

25        MR. GEE:  Yes, Your Honor.

1           THE COURT:  All right.

2           MR. GEE:  It will be the correct version.

3           THE COURT:  All right.

4           MR. LENAMON:  Judge, brief question.

5           THE COURT:  Hold on one second, sir.

6      (Judge confers with courtroom deputy.)

7           THE COURT:  Yes, sir.

8           MR. LENAMON:  What is the Court's procedure with the

9   alternates?

10          THE COURT:  So usually my procedure is to turn them

11  loose, but tell them to keep themselves pure in case we have to

12  call them back.

13          In certain cases, and I think this is going to be one

14  of them, I'm actually going to keep them here.  I'm going to

15  keep them here.  We -- we did this in another case that had

16  some high profile to it, and it turned out we needed one.  And

17  so -- so I'm going to keep them here.  They'll be in a -- what

18  was the phrase back in the day, "a secret, undisclosed location

19  in the -- in the courthouse."

20          And I will instruct them to keep themselves away from

21  anything.  And -- and then -- that -- that's my plan, because

22  I -- and I'm doing that in this case because of the resources

23  that have gone into this and the effort that's gone into this

24  and the difficulty of having to retry it if -- if that were to

25  happen.  I think it's a -- a more prudent course to keep the

1   alternates here just in case we need one.  I certainly don't

2   expect we will, but I've now had experience where we did need

3   one, and so that's my plan.

4           MR. LENAMON:  Yes, sir.

5           THE COURT:  Okay.  And, obviously, they will be off

6   limits to anybody, the press, anybody, and we will have them

7   somewhere, and nobody is to talk to them or to approach them.

8           Anything else?

9           MR. LENAMON:  And we do -- and I know I don't have to

10  remind the Court this, but we did have the switch with the one.

11          THE COURT:  Yes.  I understand.  Matter of fact, if

12  you want me to, I'll review this with you right now.  I

13  actually made the -- I actually made the list.

14          So Jurors 1 through 8 are -- are live.

15          Juror No. 9 is actually the fourth alternate.

16          Jurors No. 10, 11, 12, and 13 are live jurors.

17          Jurors No. 14, 15, and 16 are alternates 1, 2, and 3.

18          Juror No. 9 is alternate 4.

19          Is that correct?

20          MR. LENAMON:  Yes, sir.

21          THE COURT:  Okay.  So -- and what I'll do is I'll

22  just ask the four of them to remain in the courtroom when I

23  send the jury out, and then I'll instruct the alternates after

24  I -- after I do that.

25          Last time we got them games and we let them bring

1    their computer in to -- you know, so we -- we try to make them

2    as comfortable as possible, but -- and we will do the same

3    thing.

4              Anything else from the government before we adjourn?

5              MR. GEE:  No, Your Honor.  Thank you.

6              THE COURT:  Anything else, Mr. Vokey?

7              MR. VOKEY:  No, Your Honor.

8              THE COURT:  All right.  Have we got anything?  We

9    good?

10             LAW CLERK:  No, sir.

11             THE COURT:  Okay.  All right.  So I'll ask you to be

12   in places at 8:45.  I will call the jury out and begin the

13   instructions at 9 o'clock.

14             Court's in recess.

15             COURT SECURITY OFFICER:  All rise.

16        (The proceedings adjourned at 5:10 p.m.)

17                              - - -

18

19

20

21

22

23

24

25

## CERTIFICATE

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


     I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


     DATED this 15th day of January, 2020.




            s/Shannon M. Bishop
            Shannon M. Bishop, RDR, CRR, CRC