UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 3:19-cr-00001-TJC-PDB |
| | ) | |
| JOHN R. NETTLETON, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**

## I.    INTRODUCTION

The United States of America, by and through undersigned counsel, respectfully submits this response to Defendant's post-trial Motion for Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29, Dkt. 129 ("Defendant's Motion").   For the reasons discussed herein and at any hearing before the Court, the Government respectfully submits that the Defendant's motion should be denied.

## II.    PROCEDURAL BACKGROUND

On January 8, 2019, the Defendant, John R. Nettleton ("Defendant"), then a Captain in the U.S. Navy, and the former commanding officer of Naval Station Guantanamo ("GTMO") in Guantanamo Bay, Cuba, was charged by a grand jury sitting in and for the Middle District of Florida in a ten-count Indictment (Dkt. 1) with one count of Obstruction of Justice, in violation of 18

U.S.C. § 1512(b)(3) (Count One); one count of Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(2) (Count Two); one count of Concealment of Material Facts, in violation of 18 U.S.C. § 1001(a)(1) (Count Three); two counts of Falsification of Records, in violation of 18 U.S.C. § 1519 (Counts Four and Five); and five counts of False Statement, in violation of 18 U.S.C. § 1001(a)(2) (Counts Six through Ten).   Prior to trial, the Government dismissed Counts Six and Seven.   Dkt. 100.

Trial began on January 6, 2020.   On January 13, 2020, with the consent of the parties, the Court constructively amended the Indictment such that Count Eight became Count Six, Count Nine became Count Seven, and Count Ten became Count Eight.   Dkt. 107.

At the close of the Government's evidence, the Defendant made an oral motion for a judgment of acquittal pursuant to Federal Rule of Evidence 29 ("Rule 29"), which the Court denied.   Trial Tr. Jan. 13, 2020 [Dkt. 109] at 162. The Defendant renewed his motion after the close of all the evidence and the Court again denied his motion. Trial Tr. Jan. 15, 2020 [Dkt. 111] at 135-36.

On January 17, 2020, the jury delivered a verdict finding that the Defendant was guilty of Counts One, Two, Three, Five, Six and Seven and not guilty of Counts Four and Eight.   Dkt. 127.

On January 31, 2020, the Defendant filed a Motion for Judgment of

Acquittal Pursuant to Federal Rule of Criminal Procedure 29, Dkt. 129.

### III.   <u>LEGAL STANDARD</u>

Crucial to the evaluation of the Defendant's post-verdict motion for acquittal is the legal framework that applies under Federal Rule of Criminal Procedure 29(c).   "In seeking a post-verdict judgment of acquittal, [a defendant] faces an uphill climb." *United States v. Nelson*, 3:10–cr–23–J–32TEM, 2011 WL 3897959, at *1 (M.D. Fla. Sept. 6, 2011).   The Defendant only is entitled to relief if the evidence—examined in a light most favorable to the prosecution—was insufficient to support the jury's guilty verdict. *United States v. Williams*, 390 F.3d 1319, 1323 (11th Cir. 2004); *see United States v. Hernandez*, 433 F.3d 1328, 1334 (11th Cir. 2005) ("That [a defendant's] statements and behavior are subject to innocent explanations is also immaterial. A jury is free to choose among reasonable constructions of the evidence." (citation and internal quotation marks omitted)).

In making this determination, "[a]ll credibility choices must be made in support of the jury's verdict." *Williams*, 390 F.3d at 1323 (citations omitted) (reversing grant of judgment of acquittal because the district court erroneously credited defendant's testimony).   Thus, a motion for judgment of acquittal is not the vehicle for rehashing "jury arguments" that failed to convince at trial. *Nelson*, 2011 WL 3897959 at *2.   Rather, if any reasonable jury could find that

the evidence established guilt beyond a reasonable doubt, then the court must deny the motion for acquittal. *Williams*, 390 F.3d at 1324.

A defendant carries a "heavy burden" in challenging the sufficiency of evidence under Rule 29.  *See United States v. McCarrick*, 294 F.3d 1286, 1290 (11th Cir. 2002) (noting the defendant's sufficiency of the evidence burden on appeal); *United States v. Evans*, 149 F. Supp. 2d 1331, 1336, 1345 (M.D. Fla. 2001) (in considering the defendants' post-trial motions for judgment of acquittal, the trial court noted that the defendants have the burden to establish that no reasonable jury could have found them guilty beyond a reasonable doubt), *aff'd in part, vacated in part*, 344 F.3d 1131 (11th Cir. 2003); *see also United States v. Irving*, 452 F.3d 110, 119 (2d Cir. 2006) (holding that the trial court did not err in denying the defendant's Rule 29 motion and noting that defendant did not meet his "weighty" burden).

## IV.   DISCUSSION

### A.   The Government Presented Ample Evidence to Allow a Reasonable Jury to Find that the Defendant Acted with the Required Specific Intent for Count One.

The Court properly instructed the jury that in order to find the Defendant guilty of Count One, it must find the following elements beyond a reasonable doubt.

(1)   the Defendant knowingly and willfully engaged in misleading conduct toward another person;

(2)     the Defendant acted with the intent to hinder, delay, or prevent the communication of information to a Federal law enforcement officer of the United States; and

(3)     that such information related to the commission or possible commission of a Federal offense.

Dkt. 126 at 10-11.

The Defendant claims that the Government's evidence failed to prove that the Defendant acted with the required specific intent; to the contrary, the trial record is replete with evidence that would allow a reasonable jury to conclude that the Defendant acted "with the intent to hinder, delay, or prevent the communication of information to a Federal law enforcement officer of the United States."[1] *Id.*

The Government's evidence established that the Defendant knew, as early as Saturday, January 11, that both the GTMO Security Department and NCIS were involved in the search for Christopher Tur ("Tur"). *See, e.g.* Gov.

---

[1]     The Defendant's Motion claims that Section 1512(b)(3) requires "a specific intent to interfere with the communication of information." Def.'s Mot. at 2 (citing *United States v. Veliz*, 800 F.3d 63, 73 (2d Cir. 2015) and *United States v. Genao*, 343 F.3d 578, 586 (2d Cir. 2003)). Neither *Veliz* nor *Genao* purported to alter the specific intent explicitly stated in Section 1512(b)(3); indeed, both cases affirmed that the specific intent is stated in the statute. The language quoted by the Defendant appears to be merely the Second Circuit's description of the specific intent already contained in the statute. Insofar as the cited cases do not purport to impose a different specific intent and the Eleventh Circuit has never articulated the specific intent as quoted by the Defendant, the Government will use the specific intent as stated in the statute, and as the Court properly instructed the jury. To the extent the Defendant maintains that the *Veliz* and *Genao* courts articulated a higher standard which this Court should now apply, this Court should refuse to do so because the Defendant did not ask for an instruction consistent with this higher standard (Dkt. 55 at 6) or move for a new trial based on improper jury instructions on this point (*see* Dkt. 130).

Ex. 359 (Jan. 11 email from the Defendant to Adm. Jackson and Adm. Gray referencing the involvement of Security Department and NCIS).   Further, there was ample testimony of the training and experience of commanding officers such as the Defendant in dealing with military justice and the law enforcement components of the Navy.  *See, e.g.*, Trial Tr. Jan. 9, 2020 [Dkt. 105] at 99 (Adm. Gray testifying that the commanding officer is the "head law enforcement officer" of his command); *id*. at 115-16 (testifying as to the experience of commanding officers dealing with NCIS).

The government's evidence included multiple examples of the Defendant misleading every Government witness with whom he interacted, either downplaying his interactions with Tur, as he did with Ms. Wirfel, initially omitting and concealing his personal interactions with Tur, such as he did with Adm. Jackson and Adm. Gray, or outright lying about his interactions with Tur, as he did with Capt. Ross.  *See, e.g.* Trial Tr. Jan. 7, 2020 [Dkt. 103] at 135-37 (Wirfel); Trial Tr. Jan. 9, 2020 [Dkt. 105] 128, 132, and 158 (Adm. Gray); *id.* at 223, 228-31, and 246-47 (Adm. Jackson); and Trial Tr. Jan. 8, 2020 [Dkt. 104] at 268-69 (Capt. Ross).

The Defendant also misled and concealed critical facts from Navy personnel directly involved in the search.  He did not tell Chief Thibodeaux that Tur had been to his house, which caused Chief Thibodeaux to initiate a

search not focused on the most important part of the island—Deer Point.  *Id*. at 196-203.   When members of NCIS and the Security Department nevertheless located near the Defendant's house a key piece of evidence—the paper towel with suspected blood on it—the Defendant, by his own admission, concealed another critical fact, that he knew for a fact that the blood on the paper towel was Tur's blood.   Trial Tr. Jan. 14, 2020 [Dkt. 110] at 208 (Defendant).

The record also contains testimony from nearly every witness who dealt with the Defendant that had they known that Tur and the Defendant had fought on January 9, they would have reported that fact to NCIS, the Security Department, or other Navy components.   *See, e.g.* Trial Tr. Jan. 7, 2020 [Dkt. 103] at 237-38 (Barger); Trial Tr. Jan. 8, 2020 [Dkt. 104] at 202 (Chief Thibodeaux); *id.* at 259 (Capt. Ross).   Others, such as Adm. Gray and Adm. Jackson actually did instruct the Defendant to report the information about his interactions with Tur to NCIS when they learned of them.   Trial Tr. Jan. 9, 2020 [Dkt. 105] at 129-30 (Adm. Gray); 225, 228, 234 (Adm. Jackson).   A reasonable jury could have concluded that, given his knowledge of Navy procedures and Navy law enforcement, the Defendant was misleading, concealing, and lying for the very purpose of preventing those reports.

The Defendant's intent was also evident to the jury in the how he handled

two instructions from Adm. Jackson to report information to NCIS.   On Monday, January 13, the Defendant told Adm. Jackson, for the first time, about some of his interactions with Tur on January 9.   Adm. Jackson instructed the Defendant to report that information to NCIS.   Trial Tr. Jan. 9, 2020 [Dkt. 105] at 234 (Adm. Jackson).   He did not.   A few days later, the Defendant informed Adm. Jackson about an email he had received from a man on base which referenced the incident but did not directly implicate the Defendant.   Ex. 388; Trial Tr. Jan. 15, 2020 [Dkt. 111] at 114.   Adm. Jackson instructed the Defendant to report that information to NCIS, and he did so, promptly.   Gov. Ex. 388.   A reasonable jury could have concluded that the Defendant intentionally did not report to NCIS his own involvement with Tur because it could implicate him in Tur's death and lead NCIS to learn of his affair with Lara Sabanosh.   A reasonable jury could also find that this was evidence that the Defendant's other misleading, concealing, and lying was done with the specific "intent to hinder, delay, or prevent the communication of information to a Federal law enforcement officer of the United States"—NCIS and the GTMO Security Department.   Dkt. 126 at 10.

> **B.     The Government Presented Ample Evidence of a Nexus Between the Defendant's Obstructive Conduct and the Foreseeable Official Proceeding—a Court Martial—to sustain the Obstruction of Justice Convictions in Counts One and Two**.

The Eleventh Circuit has held that to be convicted of 18 U.S.C. §

1512(c)(2) there must be a "nexus" between the obstructive conduct and the official proceeding—"the act must have a relationship in time, causation, or logic with the judicial proceedings." *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)). The Eleventh Circuit also recognized in *Friske* that "an official proceeding need not be pending or about to be instituted at the time of the offense." *Friske*, 640 F.3d 1292 (quoting 18 U.S.C. § 1512(f)(1)). The Eleventh Circuit explained that "[t]he nexus limitation is best understood as an articulation of the proof of wrongful intent that will satisfy the *mens rea* requirement of 'corruptly' obstructing." *Id*. at 1291 (internal citations omitted).

However, the court acknowledged "[i]t is . . . one thing to say that a proceeding need not be pending or about to be instituted at the time of the offense, and quite another to say a proceeding need not even be foreseen." *Friske*, 640 F.3d 1292 (quoting *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707–08 (2005). Therefore, in a Section 1512(c)(2) prosecution, the government must show that the defendant knew of, or at least foresaw, the official proceeding. *Friske*, 640 F.3d 1292.

The Defendant argues in his Motion for Judgment of Acquittal that there was insufficient evidence to convict him of Counts One and two because the Government failed to prove such a nexus, arguing: "[t]here simply was no

showing at trial that Defendant foresaw a court martial, that he believed his actions would affect a court martial, or that his actions were designed in any way to obstruct such a court martial." Defendant's Motion at 4. The Defendant is incorrect; the Government presented evidence that the Defendant specifically discussed with Ms. Sabanosh the impact she could have on a court martial against him by providing truthful information to the Navy. Ms. Sabanosh testified that after she left GTMO, she had additional phone calls with the Defendant. Trial Tr. Jan. 8, 2020 [Dkt. 104] at 164. During one of those calls, Ms. Sabanosh told the Defendant that she would not admit the affair if asked by NCIS. *Id.* at 166. The Defendants' response was "okay, good." *Id.* Ms. Sabanosh testified that these conversations occurred in the specific context of a court martial:

> Q. Were there ever any conversations with the defendant about any aspects of the investigation?
>
> A. Pertaining to a UCMJ.
>
> Q. Okay. Tell us about that.
>
> A. There was talk if the -- if we -- we went to a UCMJ. I was -- I'm not military, so I felt -- I was tired of hearing about these stupid articles and thought, "I'm not military, I shouldn't have to do this, and I wasn't participating in one." I didn't -- I no longer wanted my business dragged out anymore, so I just wasn't going. I wasn't going to do it.
>
> Q. And -- and you were explaining to him you wouldn't participate in what?

> A.    In a UCMJ hearing.

*Id.* at 115-16.   Ms. Sabanosh explained that by "UCMJ hearing" she was

referring to a court martial.   *Id.* at 116.   Ms. Sabanosh further testified that she

explicitly discussed with the Defendant that if she never admitted the affair, the

Defendant could not be convicted at a court martial for adultery:

> Q.    Now, let's be clear, were there any discussions in that period
> of time on the phone with the defendant of the investigation
> and how it might relate to your relationship?
>
> A.    Yes.
>
> Q.    And in those conversations, did he ever advise you that --
> did he ever advise you that if you never admit to the
> relationship, then it won't be an issue, if -- so if neither one
> of us ever tell? Did he ever say that to you, that you recall
> today?
>
> A.    Yes.

*Id.* at 171-72.

A reasonable jury could have concluded that the Defendant was

encouraging Ms. Sabanosh to lie about their affair if she was ever asked about

it by NCIS or any other Navy officials because the Defendant could not be

found guilty in a court martial if she falsely denied the affair.

Given the Defendant's explicit discussions with Ms. Sabanosh of the

need for her to falsely deny the affair in the context of a potential court martial,

as well as the Defendant's extensive knowledge of and experience with military

justice, a reasonable jury could have found that all of the Defendant's

misleading, concealing, and lying towards others was done with the "specific intent to subvert, impede, or obstruct the actual or foreseen official proceeding"—a court martial.   Dkt. 126 at 13.

**C.   The Government Presented Ample Evidence to Sustain the Defendant's Conviction for Count Three by Proving that the Defendant Had a Legal Duty to Disclose the Facts He Knew About the Disappearance of Tur.**

This Court properly instructed the jury that in order to find the Defendant guilty of concealing a material fact, as charged in Count Three, it must find that "the Defendant had a legal duty to disclose the concealed fact."   Dkt. 126 at 15.   The Eleventh Circuit has held that "[f]alsity through concealment exists where disclosure of the concealed information is required by a statute, government regulation, or form."   *United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir. 1996) (citing *United States v. Tobon-Builes,* 706 F.2d 1092, 1096 (11th Cir. 1983)).[2]

---

[2]     The Defendant cites to an out-of-circuit case which has never been cited by the Eleventh Circuit, or any other federal court in Florida, suggesting that the Government must prove that the Defendant had a "a duty to disclose material facts on the basis of specific requirements for disclosure of specific information."   Def.'s Mot. at 6 (citing *United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008)).   It is unclear if the Defendant asserts that this standard is different than the standard articulated by the Eleventh Circuit in *Calhoon*, but the language of *Safavian* strongly suggests it is not.   The District of Columbia Circuit supported the quote used by the Defendant by citing *Calhoon*, among other cases from other circuits, suggesting the *Safavian* court was simply stating the *Calhoon* standard in the context of the facts in *Safavian*.   *See Safavian*, 528 F.3d at 964.   To the extent the Defendant maintains that the *Safavian* court articulated a higher standard which this Court should now apply, this Court should refuse to do so.   The Eleventh Circuit has never accepted a standard for Section 1001 concealment cases other than that articulated in *Calhoon*, and the Defendant did not ask for an instruction consistent with this higher standard (Dkt. 55 at 16-17) or move for a new trial based on improper jury instructions on this point (*see* Dkt. 130 at 3-4).

The Government presented testimony and documents that would allow a reasonable jury to find that the Defendant was required by Navy laws and regulations to disclose what he knew about the disappearance and death of Tur. Adm. Gray testified that there are numerous laws and regulations that govern the conduct of the commanding officer of a Navy installation, such as the Defendant:

> [I]t's laid out in federal regulations, right, the Code of Federal Regulations, Navy regulations, the Uniform Code of Military Justice, various regulations and instructions in the Navy. And as you're -- you know, as you come in as a new person, you're not that familiar with many of those things, but you learn them either through formal schooling or through experience as you -- you know, kind of -- you're trained on the job.

Trial Tr. Jan. 9, 2020 [Dkt. 105] at 92-93.   Adm. Gray further explained that by the time a person becomes a commanding officer,

> You're very familiar with them because you deal with them all the time. Again, as a young officer, you begin to learn how the Navy works and you experience, you know, and learn the rules of the road to -- so to speak, and then as a department head, you may go to certain schools to educate you on various aspects of your job, additional aspects of your job.
>
> And then as you go to command, there are schools specifically for CO command and for military justice and for safety and for other aspects of the job and the additional responsibilities that you'd be taking on.

*Id.* at 93.   Adm. Gray explained that the laws and regulations make clear that

command authority is based on "essentially three principles: accountability, responsibility, and authority." *Id*. at 95. These principles, taken together, mean that a commanding officer has total responsibility over his command, so the Navy grants him total authority over the command, and given that authority, the commanding officer is held "absolutely accountable" for the status of the command. *Id*.

Adm. Gary explained that those laws and regulations, which grant such extensive power to commanding officers, require commanders to report up the chain of command information about specific types of incidents, including an incident that is likely to garner media attention, the death or injury of a person under their command, and misconduct by senior officers. *Id*. at 103-05. Each region, including the Navy Region Southeast in which GTMO is located, has additional regulations which provide additional detail as to what must be reported. *Id.* at 108. Adm. Gray and Adm. Jackson testified that there are region-specific regulations that further explain to commanding officers what they must report, and that the Defendant specifically was reminded of these regulations by Adm. Jackson when he took command. Trial Tr. Jan. 9, 2020 [Dkt. 105] at 106-07 (Adm. Gray), 209-10 (Adm. Jackson). Navy officers can face disciplinary action if they do not provide the required information. *Id.* at 107.

14

The Defendant apparently understood these regulations, as he made the required voice report, followed by an OPREP (Navy Blue).   *See id*. at 216-18 (Jackson).   The information provided by the Defendant in the emails to Adm. Jackson and Adm. Gray was part of the information required to be reported regarding incidents subject to the OPREP regulations: the "who, what, when, where, why, what are you doing about it, and how are we going to solve the problem."   *Id*. at 219; *see id*. at 102 ("When something like that occurs, you want to make sure that you keep them fully informed and apprised of what's going on or what you're doing about it.").   There is no question that the Defendant was required to report what he knew about Tur's disappearance and death and that he knew he had to report; he simply chose not to report the complete required information in order to protect himself.

That the Defendant knew that he was required by Navy regulations to report the information he was concealing from Adm. Jackson is evident in the reaction of other commanding officers—Adm. Gray and Capt. Ross—when confronted with the fact that the Defendant had concealed the facts about his personal interactions with Tur.   Adm. Gray testified as to his reaction when the Defendant told him part of what happened between himself and Tur on January 9:

> And so obviously when he told me this, I was -- I was stunned. My jaw dropped to the ground and . . . he

> said, "I -- I didn't say anything about it previously because I didn't think it was particularly relevant," which, again, was stunning to me knowing that, you know, in the past he had been very good about knowing what information to pass and -- and how -- it was incomprehensible that -- I thought, that he would feel that this was in no way relevant to a person who had been missing and had shown up dead, right, and that the last person that had probably seen him was himself at his own house and the greater implications because of it.

*Id*. at 159.

When asked about why he didn't believe there was an altercation between the Defendant and Tur simply based on Wirfel's description of the call from Tur, Capt. Ross testified:

> Well, I think if she had informed me that an assault on a commanding officer had occurred, he would have taken action and sound the alarm from his home or called security. It would have happened long before Kelly Wirfel talked to me. That's what I would expect would have happened.

*Id*. at 66.   As Adm. Gray explained, the expectations of command imposed by Navy laws and regulations are drilled into Navy officers as they climb through the ranks, up until an officer is selected for command as one of the best of the best.   The Navy laws and regulations, combined with the prolonged instillation of the expectations of command contained in those regulations—and the potential penalties if the expectations were not met—undoubtedly establish as a matter of law and would allow a reasonable jury to find that the Defendant

was "required by a statute, government regulation, or form" to disclose what he knew about the disappearance and death of Tur.   *United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir. 1996) (citing *United States v. Tobon-Builes*, 706 F.2d 1092, 1096 (11th Cir. 1983)).

> **D.** **The Government Presented Ample Evidence to Prove that the Defendant Knowingly Falsified Records as Charged in Count Five**.

The Defendant's Motion argues that he should be acquitted of Count Five because the Government failed to prove that the Defendant falsified records with the intent to interfere with the "investigation into the circumstances surrounding the disappearance, injury, and death of Christopher Tur" because neither Adm. Jackson nor Adm. Gray were "personally investigating the disappearance and death of Mr. Tur."   Defendant's Motion at 7; Dkt. 126 at 17.   This assertion is both incorrect and irrelevant.

It is incorrect that Adm. Gray and Adm. Jackson were not involved in investigating the circumstances of his disappearance and death; Adm. Jackson, both personally and through her chief of staff, Adm. Gray, was directing the response to the situation at the region level.   *See generally*, Trial Tr. Jan. 9, 2020 [Dkt. 105] at 203-81 (Adm. Jackson testimony); *see id*. at 118 (Adm. Gray explaining that the chief of staff is the "number two in charge of the Region behind Admiral Jackson").   In addition to this general supervisory authority,

Adm. Jackson was personally directing the Navy's efforts to determine what happened to Tur.   She testified that she had the power to, and was considering whether to, begin a command investigation into the circumstances of Tur's disappearance and death.   *Id*. at 226-28.   The command investigation would have been conducted by another officer, but it would have been directed by Adm. Jackson, based in part on the information the Defendant communicated to her.   *Id*.   She ultimately decided not to initiate such an investigation, instead relying on the NCIS death investigation to collect the relevant facts.   *Id*. at 228.

However, the Defendant's guilt on Count Five does not turn on the personal involvement of Adm. Jackson or Adm. Gray, but rather the Defendant's knowledge of what they would have done with the truth, had they known it.   The jury did not need to speculate what either officer would have done if they had known what happened between the Defendant and Tur on January 9.   Indeed, when the Defendant told each officer just a portion of the events of that night, they both had the same reaction; they told him to provide that information to NCIS.   *See, e.g.*, *id*. at 151 (Adm. Gray instructing the Defendant to be honest with NCIS, after learning some of the Defendant's interaction with Tur on January 9); *id*. at 234 (Adm. Jackson similarly instructing the Defendant).   A reasonable jury could have found that the Defendant sent emails to Adm. Jackson and Adm. Gray on January 10, which

18

concealed and covered up the truth about his personal interaction with Tur the night before, because he believed that Adm. Jackson and Adm. Gray would order the Defendant to report that information to NCIS or report it themselves.

### E.  The Government Presented Ample Evidence to Prove that the Defendant Made False Statements Regarding a Matter Within the Jurisdiction of the Executive Branch as Charged in Counts Six and Seven.

The Court properly instructed the jury that one of the elements it must find in order to find the Defendant guilty of Counts Six through Eight was that the false statement made by the Defendant was "made or used for a matter within the jurisdiction of a department or agency of the United States."  Dkt. 126 at 21.

The Defendant claims that the evidence does not support the jury's verdict on Counts Six and Seven because the Government failed to prove that "Captain Ross wasn't actually investigating Defendant in any official capacity in relation to said circumstances."  Mot at 9.  This argument fails because there is no requirement that Capt. Ross be involved in investigating *the Defendant*; only that the Defendant's false statement involved a "matter within the jurisdiction of a department or agency of the United States."  Dkt. 126 at 21.  Capt. Ross was not simply a "colleague"; he was the Executive Officer of GTMO, the second in command.  *See* Defendant's Motion at 9.  He was responsible for the "[m]anning, training, organization [of GTMO]" and to "basically ensure the

rules are enforced on the base and [to] carry out the --the commanding officer's orders."   Trial Tr. Jan. 8, 2020 [Dkt. 104] at 246.   Capt. Ross described himself as the "right and left hand" of the commanding officer, and explained that a Naval Station is led by the "triad, CO, commanding officer, the executive officer, and the command master chief.   So we are -- one hand is always looking to see what the other hand is doing. It's a close relationship."   *Id*.   In short, Capt. Ross, as XO of GTMO was a critical component of the leadership structure of GTMO, responsible for the good order and discipline of the command, just as the Defendant was.

Further, the Defendant's argument is factually incorrect; Capt. Ross *was* personally involved in the matter before the Navy, that is, the investigation into the disappearance and death of Tur:

> Q.    And -- and were you involved in searching for him?
>
> A.    Yes, I was involved in searching for him.

*Id*. at 256.

Not only was Capt. Ross personally searching for Tur, he was also involved in the command decisions relating to the search, such as the decision to stop the search after sundown on January 10 for safety concerns.   *Id*. at 260. Capt. Ross affirmed that he was still involved in the search the next day, including suggesting to the Defendant that they should seek permission to use a U.S. Coast Guard helicopter that was located at the base.   *Id.* at 264-66.

20

Capt. Ross was also involved in the drafting of the OPREP, the Navy Blue, which was issued regarding the disappearance of Tur. *Id.* at 260-64. Indeed, defense counsel cross-examined Capt. Ross at length regarding his involvement, and argued to the jury that it was Capt. Ross, not the Defendant, who was responsible for issuing the Navy Blue.   Trial Tr. Jan. 9, 2020 [Dkt. 105] at 48-53; Trial Tr. Jan. 15, 2020 [Dkt. 111] at 226-27.

It is in this capacity and context that Capt. Ross asked the questions of the Defendant which prompted the Defendant's false statements at issue in Counts Six and Seven.   Capt. Ross testified that these were official inquiries of the XO, not "arbitrary" conversation from a colleague as the out-of-context quote in the Defendant's Motion suggests, because the information the Defendant had given him contradicted what Mr. Wirfel had told him:

> Q.   Now, did you speak with him that Sunday further about events on the Friday night?
>
> A.   I did.
>
> Q.   Tell me about that.
>
> A.   I was going through the day's events, I think it's later on after we'd found Tur and stuff and I just arbitrarily asked him, "Hey, did -- did he ever -- did he ever show up at your house?" And he told me, no, he hadn't.
>
> Q.   And why did you think to ask him that at this point, did he show up at his house?
>
> A.   When I was coming back Saturday, when I talked to Kelly, she said that -- which at first I didn't think much of it, but

now all of this is happening and I just decided, let me just
ask him again, maybe she was mistaken or something. And
he simply told me, "No, he didn't."

Trial Tr. Jan. 8, 2020 [Dkt. 104] at 267-68.

The Government presented ample evidence to allow a reasonable jury to
find that the Defendant's false statements to Capt. Ross related to a "matter
within the jurisdiction of a department or agency of the United States."   Dkt.
126 at 21.

## V.   **CONCLUSION**

For the reasons stated herein, the United States respectfully submits that
the Defendant's motion should be denied.

Respectfully submitted,

_____/s/ Peter M. Nothstein_____
*Counsel for the Government*
TODD GEE
Deputy Chief
Todd.Gee2@usdoj.gov
PETER M. NOTHSTEIN
Senior Litigation Counsel
Peter.Nothstein@usdoj.gov
Public Integrity Section
Criminal Division
U.S. Department of Justice
1331 F Street NW
Washington, DC, 20005
Telephone:   (202) 514-1412

DATED:   February 28, 2020
**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendant.

Dated: February 28, 2020         */s/ Peter M. Nothstein*
                                    Todd Gee
                                    Deputy Chief
                                    Peter M. Nothstein
                                    Senior Litigation Counsel
                                    Public Integrity Section
                                    Criminal Division
                                    U.S. Department of Justice