UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 3:19-cr-00001-TJC-PDB |
| | ) | |
| JOHN R. NETTLETON, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, respectfully submits this Sentencing Memorandum.  For the reasons discussed herein, the government respectfully submits that a sentence within the advisory Guidelines range, 37 to 46 months of imprisonment, is the appropriate sentence in this case.

## I.   INTRODUCTION

There is no question that John R. Nettleton ("Defendant") misled, concealed, and lied about facts he knew regarding the disappearance and death of Christopher Tur ("Tur").  Although the Defendant was not tried for or convicted of involvement in the death of Tur, the inescapable reality is that if the Defendant did what he should have done—what his legal duty and common human decency commanded—and reported his interactions with Tur when they happened, Tur may still be alive today.

The gravity of the Defendant's malfeasance is compounded by the fact that the reason for his actions may be both unremarkable and shallow.   The Defendant did not want to get in trouble for having an affair, even though according to his own testimony, the affair was brief and in the past, he was planning to retire from the Navy, and he and his wife had already agreed to separate.   Nevertheless, the Defendant chose to lie, mislead, and obstruct for months after Tur's disappearance.   He even chose to lie during his testimony in the trial itself—as demonstrated directly by the jury's verdict of guilty for Counts Six and Seven.

The Defendant's selfish actions violated his duty and the storied tradition of accountability and honesty carried by Navy commanders as old as our country.   His actions required the Naval Criminal Investigative Service ("NCIS") to conduct a lengthy and expensive investigation to attempt to determine the events surrounding Tur's disappearance and death.   While the Defendant had a right to demand a trial and to testify in his own defense, he continued to act only in his own self-interest when he took the witness stand, swore to tell the truth, and then provided to the jury a carefully curated tale comprised of exaggerations, contortions, and outright lies.   But perhaps worst of all, the Defendant's misleading conduct, concealment, and lies will forever prevent Tur's family from

obtaining a full accounting of the events surrounding Tur's disappearance and death.[1]

For all of these reasons, the appropriate sentence in this case is a sentence of incarceration within the Guidelines range of 37-46 months.

## II.   **PROCEDURAL BACKGROUND**

On January 8, 2019, the Defendant, then a Captain in the U.S. Navy and the former commanding officer of Naval Station Guantanamo ("GTMO") in Guantanamo Bay, Cuba, was charged by a grand jury in the Middle District of Florida in a ten-count Indictment (Dkt. 1) with one count of Obstruction of Justice, in violation of 18 U.S.C. § 1512(b)(3) (Count One); one count of Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(2) (Count Two); one count of Concealment of Material Facts, in violation of 18 U.S.C. § 1001(a)(1) (Count Three); two counts of Falsification of Records, in violation of 18 U.S.C. § 1519 (Counts Four and Five); and five counts of False Statements, in violation of 18 U.S.C. § 1001(a)(2) (Counts Six through Ten).   Prior to trial, the government

---

[1]   Several members of the Tur family have submitted written statements to the Court regarding the impact of this matter on them. Additionally, at their request, the government respectfully requests that the Court permit a limited number of them to also speak at the sentencing hearing.

dismissed Counts Six and Seven.   Dkt. 100.

Trial began on January 6, 2020.   On January 13, 2020, with the consent of the parties, the Court constructively amended the Indictment such that Count Eight became Count Six, Count Nine became Count Seven, and Count Ten became Count Eight.   Dkt. 107.

At the close of the government's evidence, the Defendant made an oral Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"), which the Court denied.   Trial Tr. (Jan. 13, 2020) [Dkt. 109] at 162.   The Defendant renewed his motion after the close of all the evidence and the Court again denied his motion.   Trial Tr. (Jan. 15, 2020) [Dkt. 111] at 135-36.

On January 17, 2020, the jury delivered its verdict finding the Defendant guilty of Counts One, Two, Three, Five, Six and Seven and not guilty of Counts Four and Eight.   Dkt. 127.

On January 31, 2020, the Defendant filed a Motion for Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29 and a Motion for New Trial.   Dkt. 129, 130.   On May 11, 2020, this Court denied both Motions.   Dkt. 139.

## III.   **SENTENCING GUIDELINES**

The   Presentence   Investigation   Report   ("PSR")   accurately

calculates the base offense level as 14, pursuant to U.S.S.G. § 2J1.2(a). Final PSR [Dkt. 150] at ¶ 56. The PSR also correctly applies three enhancements, resulting in an offense level of 21. *Id.* at ¶¶ 57, 59, 60. Each enhancement is addressed below.

### A.   Substantial Interference With the Administration of Justice, § 2J1.2(b)(2)

The PSR correctly concludes that the Defendant's "behavior caused the unnecessary expenditure of substantial governmental resources" and so adds three levels to the offense level under U.S.S.G. § 2J1.2(b)(2) because "the offense resulted in substantial inference with the administration of justice." U.S.S.G. § 2J1.2(b)(2); PSR at ¶ 57. The application notes to § 2J1.2(b)(2) clarify that "substantial inference with the administration of justice" can take many forms, including "the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2(b)(2), cmt. n.1. The Defendant's obstruction of NCIS's investigation into the "disappearance and death" of Tur caused NCIS to expend extensive resources in an effort to determine what happened to Tur. Dkt. 1 at ¶ 61(a); PSR at ¶ 48.

The Defendant held the answers to several questions central to the investigation, such as the nature of his interaction with Tur at the Bayview,

where Tur went after the Bayview, who saw Tur last, and how Tur received his injuries.   Had the Defendant not misled, concealed, and lied from the beginning of the NCIS investigation, Tur may have been found before he died or his body may have been found before decomposing for more than a day in the water, which may have allowed NCIS to determine more conclusively how Tur died.   NCIS also would not have had to (1) canvas GTMO to determine who saw Tur; (2) engage in extensive and expensive serology and DNA testing to determine whether Tur was in the Nettleton home; (3) conduct toxicology testing on substances in the Nettleton home; and (4) conduct a years-long grand jury investigation to answer simple questions, such as how Tur's blood ended up in the Nettleton home and where the bloody paper towels containing Tur's blood found near Nettleton's private dock came from.   All of these investigative steps cost NCIS more than one million dollars in agent time, travel, and lab tests.

The Eleventh Circuit has found that the three-level enhancement is appropriate where, like here, an individual who is able to provide a complete account of an incident instead provides false testimony or statements that require the government to conduct further investigation. In *United States v. Johnson*, 485 F.3d 1264, 1270-72 (11th Cir. 2007), an

environmental consultant was convicted of making false statements to an FBI agent and grand jury concerning his client's violations of the Clean Water Act.   After Johnson's false testimony to the grand jury, the government incurred additional expenses investigating his client and had to reconvene the same grand jury, resulting in additional travel expenses. *Id.* at 1272.   The court noted that Johnson's false statements "disrupted and interfered with the investigation" of his client's violations of the Clean Water Act, resulting in the denial of information to the government, foreclosure of further inquiry, and changes to prosecution strategy.   *Id.* at 1270-71.   On this basis, the court held that enhancement under U.S.S.G. § 2J1.3(b)(2), which is parallel to the enhancement under § 2J1.2(b)(2), was appropriate.   *Id* at 1272; *see* U.S.S.G. §§ 2J1.2, cmt. n.1; 2J1.3(b)(2) cmt. n.1.

Similarly, in *United States v. Rodriguez*, 499 F. App'x 904, 906 (11th Cir. 2012), Rodriguez was convicted under 18 U.S.C. § 1001(a)(2) after making false statements to both an agent of DOJ and an FBI agent that she had been sexually assaulted by a prison officer.   She also presented those same officers with hair and clothing allegedly containing bodily fluids of the prison officer.   *Id.*   The Court held that the application of the U.S.S.G. § 2J1.2(b)(2) enhancement was appropriate, since the

7

government was required to conduct multiple interviews with different agents, Rodriguez was moved to a different jail during the investigation, the government prepared a search warrant for DNA of the alleged attacker, and DNA was collected and tested.   *Id.* at 908.

## B.   Adjustment for Role in the Offense, § 3B1.3

The PSR correctly adds two levels because the Defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."   PSR at ¶ 59; U.S.S.G. § 3B1.3.   This enhancement is appropriate where the government establishes the following elements: "(1) that the defendant held a place of public or private trust; and (2) that the defendant abused that position in a way that significantly facilitated the commission or concealment of the offense." *United States v. Ward*, 222 F.3d 909, 911 (11th Cir. 2000) (citing *United States v. Kummer,* 89 F.3d 1536, 1547 (11th Cir. 1996)).

"The determination of whether a defendant occupied a position of trust is extremely fact sensitive." *United States v. Louis*, 559 F.3d 1220, 1225 (11th Cir. 2009).   Typically, the Eleventh Circuit divides defendants between upper and lower-level employees, so that, "[f]iduciaries and employees of a public or private agency who exercise considerable

discretion are subject to [U.S.S.G. §3B1.3].   Lower-level, closely supervised employees who exercise little discretion are not."   *Id.* at 1226. Furthermore, "[t]he enhancement also requires that the offender occupy a position of trust in relation to the victim, not another party," *Id.*, but "[t]he relationship between the defendant and the victim must be more significant than that of an arm's-length business transaction." *United States v. Coleman*, 330 F. App'x 787, 790 (11th Cir. 2009) (quoting *United States v. Harness,* 180 F.3d 1232, 1236 (11th Cir. 1999)).

It is undisputed that the Defendant held a position of public trust and that in that position he owed a duty to protect Tur.   The Defendant held the most senior position at GTMO as its commander, and as such, he was required by statute to "promote and safeguard the morale, the physical well-being, and the general welfare of the officers and enlisted persons under [his] command or charge." 10 U.S.C § 5947.   His responsibility for his command was "absolute" and he had a "continued responsibility for the safety, well-being, and efficiency of the entire command."   32 C.F.R. § 700.802.   Further, as a Navy commander of an important overseas installation, he enjoyed a significant level of trust from both his superior officers and those he commanded.

The Defendant abused his position in a way that significantly

facilitated the commission or concealment of the offense; he leveraged the trust placed in him by the Navy and the authority he held over his subordinate officers—essentially everyone at GTMO—to further his scheme to mislead, conceal, and lie about what he knew about Tur's disappearance and death.   The Defendant knew that in the unique position of trust he held, his commanding officers and his subordinates would not suspect that he knew anything about Tur's disappearance if he kept silent about it.   He knew that they would expect that by training, law, and moral obligation, a commanding officer would be forthcoming and honest with any information about a missing person under his command. The Defendant used the trust conveyed by his command to further his crimes, and he largely succeeded.   Due to his silence, critical physical evidence that could have provided answers to how Tur ended up in the water was likely lost.   If not for the discovery of Keegan McManus's text messages with Julia Nettleton in which she discussed Tur coming to her house, the Defendant may have succeeded completely.

The Eleventh Circuit has upheld the application of the § 3B1.3 enhancement in analogous situations.   In *United States v. Eichholz*, 395 F. App'x 532, 533 (11th Cir. 2010), Eichholz, an attorney, was investigated by the U.S. Department of Labor regarding his management

of various retirement and pension benefit programs he established at the law firm he owned.   Over the course of several interviews, Eichholz made misrepresentations to Department of Labor investigators; he later pleaded guilty to obstruction of justice under 18 U.S.C. § 1505 for lying about the ownership of an entity to which the benefit programs made a loan.   *Id.* at 534-36.   While the plea deal between Eichholz and the government prevented the government from seeking a § 3B1.3 enhancement, the district court independently imposed the enhancement.   *Id.* at 537.   The court noted that while Eichholz was pleading guilty to an obstruction of justice charge, he was the "sole fiduciary" of the benefit programs, "the PSI identified the plan participants as victims of the offense," Eichholz was in a position of trust vis-à-vis the victims, and Eichholz used his position to interfere with the investigation with the Department of Labor.   *Id.* at 537.   The Eleventh Circuit affirmed the application of the § 3B1.3 enhancement, noting that by "making false statements as to the plans' assets, Eichholz further abused his fiduciary duties to the plans' participants and at the same time 'significantly facilitated' his obstruction of the DOL's investigation into his suspected plan mismanagement."   *Id.* at 539.   Like Eichholz, the Defendant was the sole commander of GTMO, he used his position to interfere with the

11

investigation of Tur's disappearance and death, and he made numerous false statements to his superior officers and others about his interactions with Tur and his wife and his knowledge of Tur's last known location.

### C.   Obstruction of Justice, § 3C1.1

The PSR correctly adds two levels for obstructing or impeding the administration of justice.   PSR at ¶ 60.   The Guidelines provide for a two-level enhancement where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction."   U.S.S.G. § 3C1.1.   The advisory committee notes provide two examples where this enhancement is proper: (1) where a defendant commits perjury when testifying; and (2) where a defendant provides "materially false information to a judge or magistrate judge."   *Id.* at cmt. n.4(C), (F).

The Guidelines make clear that § 3C1.1 "is not intended to punish a defendant for the exercise of a constitutional right," and "[a] defendant's denial of guilt . . . [ or] refusal to admit guilt . . . is not a basis for application of this provision." U.S.S.G. § 3C1.1, cmt. n.2.   However, the Eleventh Circuit has made clear that a "court may apply the obstruction

12

enhancement where the defendant testifies on his own behalf and perjures himself while doing so."   *United States v. Singer*, 963 F.3d 1144, 1164 (11th Cir. 2020).

For example, in *United States v. Perez*, 451 F. App'x 864, 867 (11th Cir. 2012), Perez, convicted of conspiracy with intent to distribute cocaine, appealed an obstruction of justice enhancement under § 3C1.1, n.4(f).   The Eleventh Circuit noted that the district court "made an express finding that Perez intentionally obstructed justice and committed perjury in front of the magistrate judge," and noted support in the record, including "testimony at the change of plea hearing [that] conflicts with his post-arrest statements regarding his knowledge about the involvement of another individual in the drug trafficking scheme."   *Id.*   On that basis, the court upheld the use of the obstruction of justice enhancement.   *Id.*

Similarly, in *United States v. Singh*, 291 F.3d 756, 759-63 (11th Cir. 2002), Singh pled guilty to conspiracy to commit wire fraud after being charged in a scheme to defraud various phone service providers of fees for long distance calls.   The scheme involved contacts in Kuwait, but at sentencing, Singh denied "a Kuwaiti connection to his . . . scheme," "denied placing the telephone calls himself," and "denied using the names and social security numbers on his customer list in order to fraudulently

establish telephone service in the United States as his part of the … scheme." *Id.* at 763.  On this basis, the district court made findings to support an U.S.S.G. § 3C1.1 enhancement.  *Id.*  The Eleventh Circuit affirmed, noting that the trial record clearly established the facts that Singh denied, and called his "continued denial . . . incredible," and "the result of a willful intent to provide false testimony."  *Id.* at 764.

The two-level enhancement for obstruction of justice is applicable here because the jury verdict demonstrates it found the Defendant's testimony to be false on two specific material matters.   These statements were material because the jury could not credit both the Defendant's testimony and the contradicting testimony and still have convicted him. Therefore, the jury's verdict alone supports the enhancement.[2]

<u>First</u>, the Defendant denied that he told Capt. Ross that Tur did not come to the Defendant's home on the evening of January 9:

> Q.   Okay. So, first, did Captain Ross -- or Commander
>      Ross ever come to you and say, "Did Chris come to

---

[2]   The government submits that the Defendant testified falsely several times in his testimony, such as when he claimed that he did not recall key facts because he was too drunk, suffered implausible temporary amnesia, clearly conformed his testimony to other evidence he heard during the trial, and made statements clearly contradicted by the evidence.   The two-level obstruction enhancement could be applied to any of this false testimony, but the two examples demonstrated by the jury's verdict are sufficient to apply the § 3C1.1 enhancement.

your house," and you told him, "No"? Did that ever
occur?

A.     That never occurred.

Trial Tr. (Jan. 14, 2020) [Dkt. 110] at 212; *see also* Trial Tr. (Jan. 8, 2020)
[Dkt. 104] at 268 (Ross testimony about the same).   This statement by
the Defendant to Capt. Ross was the basis of the false statement charge
in Count Six, on which the jury convicted the Defendant.   There is no
way both Capt. Ross and the Defendant could both be telling the truth.
Notably, the Defendant did not claim that he simply did not recall making
the statement—he affirmatively represented that it did not happen at all.
In convicting the Defendant of Count Six, the jury expressly credited Capt.
Ross's testimony and rejected the Defendant's testimony.

Second, the Defendant testified that he was being truthful with
Capt. Ross when, a few days later, Capt. Ross asked the Defendant if
Tur had come to his house on January 9 and the Defendant replied "Well,
yeah, he showed up there, but I didn't let him in."   Trial Tr. (Jan. 8, 2020)
at 269; *see* Trial Tr. (Jan. 14, 2020) at 212-13 (Nettleton testimony).   The
Defendant explained that he was not falsely denying that Tur came inside
his home that night, but rather honestly describing the method by which
Tur entered the home:

Q.    Is that true? Did you let him into your house?

A.    No, I did not.

Q.    Did Chris Tur come into your house?

A.    He did.

Q.    We know from your earlier testimony that he came in, right?

A.    Right.

Q.    And, to your knowledge, did the XO already know this?

A.    Yes, because Kelly had told me that she told him he came to the house. So I thought he was asking me about the manner that he came into the house, because I knew he already knew he'd been in the house, because Kelly had already told him, and she told me she told him.

Q.    So when you said you were -- you thought he was asking about the manner when he came into the house, is that whether -- are you talking about whether you invited him in or he broke in?   Is that what you thought he was asking you about?

A.    I -- I think -- at the time I thought he was asking me, like, "Hey, did Chris" -- you know, "Did you and Chris go back to your house or something at some point?" And I'm like, "Hey, I didn't let him in, but, yeah, he came in."

Trial Tr. (Jan. 14, 2020) at 212-14.   In other words, the Defendant was

saying that he was being truthful in responding to Capt. Ross's question,

which he understood to be about *the manner* in which Tur entered the

house, not *whether* Tur entered the house.   The testimony was material

16

because if the jury had credited the Defendant instead of Capt. Ross, it would have had to acquit the Defendant of this count.   The jury rejected this testimony in finding the Defendant guilty of Count Seven.

The jury's verdicts on Counts Six and Seven mean that it necessarily rejected the Defendant's testimony and found him to be untruthful.   These false statements about material matters were not errors in memory or differences in perception between the two witnesses. They were lies by the Defendant.   Accordingly, it is the government's position that the Defendant's testimony went beyond merely denying guilt and constituted false testimony, for which the obstruction of justice enhancement under § 3C1.1 is appropriate.

## IV.   <u>ARGUMENT</u>

The most salient sentencing factors under 18 U.S.C. § 3553, the nature and circumstances of the offense and history and characteristics of the Defendant, weigh in favor of sentencing him to a substantial term of incarceration in accordance with the advisory Guidelines range of 37-46 months of imprisonment.   18 U.S.C § 3353(a)(1).

The gravity and impact of the Defendant's false statements, concealment, and obstruction are greater than implied by the nature of the crimes of conviction.   If the Defendant had followed his legal duties

as a Navy commander and his moral obligations to those under his command, he would have promptly reported what happened on January 9, including the presence of Tur at his house near the waters of Guantanamo Bay.  If he had done so, Tur may have been found more quickly—perhaps while still alive—or his body may have been recovered in a less decomposed condition that may have permitted investigators to better determine what happened to him.  At the very least, if the Defendant had been forthcoming, investigators, the Navy, and the Tur family could have learned more quickly and thoroughly about the interactions at the Bayview and the Nettleton home between the Defendant and Tur on the night of January 9.

Instead, the Defendant chose not to be honest and forthcoming about what he knew.  He concealed information and lied, at the very least to avoid suspicion of his affair with Tur's wife.  As a result, Tur's family will never have complete answers as to what happened to him. The nature of these offenses—the Defendant's decision to commit false statements, concealment, and obstruction because he thought it was more important to avoid embarrassment than to fulfill his duties to Tur and the Navy—and the seriousness of their impact on the Tur family deserves serious punishment.

The Court should also consider the history and character of the Defendant when sentencing him.   The government expects the Defendant will rely heavily on his prior exemplary service record in asking for leniency.   Yet that record illustrates the Defendant's awareness of the very duties that he rejected when he made false statements, concealed information, and obstructed justice, thereby favoring a greater sentence rather than leniency.   As a former enlisted Marine, Navy officer, and combat pilot who commanded units of increasing size until he took command of GTMO, the Defendant knew full well the legal and moral duty he had to protect Tur, to say nothing of his duty to conduct himself in a manner worthy of the U.S. Navy and the lofty position he held. Nevertheless, with full knowledge of what was expected and required of him, he chose—repeatedly—to mislead, conceal, and lie to benefit himself and avoid embarrassment, and in the process he inflicted an indelible scar on the lives of the entirety of Tur's family.

The Defendant's prolonged strategy of false statements, concealment, and obstruction was not a temporary error in judgment. The Defendant did not lie reflexively on the morning of January 10 and then immediately correct himself.   Instead, during the entire search for Tur, including even after the Defendant learned that Tur had expressed

19

suicidal thoughts, the Defendant kept misleading others and concealing critical information about Tur's condition and last known location. The Defendant continued this scheme even after Tur's body was discovered, NCIS began an extensive death investigation, members of the Tur family arrived at GTMO to attend a memorial service hosted by the Defendant, and everyone from the Tur family to the Defendant's commanding officers searched for answers about what happened. Even after he was removed from his command, the Defendant continued to speak with Tur's wife on a regular basis and encouraged her not to admit to investigators that they had an affair.

The Defendant continued this scheme even during his testimony at trial. While the Defendant had the constitutional right to put the government to its proof, he had no right to provide false testimony filled with incredible statements that, if believed, would have absolved him of all liability. The jury's explicit rejection of two of these lies is detailed above, but the Defendant's calculated inability to accept his own actions and admit the truth pervaded his testimony. For example, the Defendant's claim that he was unable to hear Tur's accusations outside the Bayview and his convenient amnesia for more than 30 minutes when Tur entered his house and confronted him about the affair—events not in

doubt given the testimony of numerous witnesses, including the Defendant's own daughter—were clearly made so that he could also claim that when he denied the validity of "rumors" to Admirals Jackson and Gray he was referring not to Tur's accusations that the Defendant had an affair with Lara Tur, but rather some other rumors he heard from unnamed employees of the local Jamaican restaurant. *See* Trial Tr. (Jan. 14, 2020) at 216-220.

The Defendant's willful deception was also evident in the narrative he spun regarding his fight with Tur. His explanation more than strained credulity—he claimed that Tur attacked him, prompting the Defendant to respond with a single punch in the nose. Trial Tr. (Jan. 14, 2020) at 142. This one punch supposedly knocked Tur to one knee and caused Tur to bleed profusely enough to spread blood splatter in multiple rooms in the house. *Id.* at 142-43. Of course, this does not explain how blood ended up on the underside of the low-lying shelf, or the backside of the support of the same shelf. Ex. 31, 32, 60, 311. The evidence much more strongly suggests that Tur, who suffered broken ribs before his death, was involved in a much more violent altercation with the Defendant than the Defendant testified.

The truth is that during all his false statements, concealment, and obstruction, the Defendant's goal has always been to protect himself no matter the costs to others.   The nature and seriousness of this criminal conduct merits a substantial punishment.

**V.     <u>CONCLUSION</u>**

For the reasons stated herein, the United States respectfully submits that the Defendant should be sentenced to a term of imprisonment within the Guidelines range of 37-46 months of incarceration.

Respectfully submitted,

___*/s/ Peter M. Nothstein*_____
*Counsel for the Government*

TODD GEE
Deputy Chief
Todd.Gee2@usdoj.gov
PETER M. NOTHSTEIN
Senior Litigation Counsel
Peter.Nothstein@usdoj.gov
Public Integrity Section
Criminal Division
U.S. Department of Justice
1331 F Street NW
Washington, DC, 20005
Telephone: (202) 514-1412

DATED:   September 23, 2020

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the Defendant.

_____*/s/ Peter M. Nothstein*_____

Todd Gee
Deputy Chief
Peter M. Nothstein
Senior Litigation Counsel
Public Integrity Section
Criminal Division
U.S. Department of Justice

Dated: September 23, 2020

23