UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO. 3:19-cr-00001-TJC-PDB

UNITED STATES OF AMERICA,

v.

JOHN R. NETTLETON,
      Defendant.
_____/

## JOHN R. NETTLETON'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

     Defendant JOHN R. NETTLETON, by and through below counsel, files this Sentencing Memorandum and Motion for Downward Variance, in advance of his October 8, 2020, sentencing hearing, requesting this Court to impose a lesser sentence that the advisory guidelines range, and states the following in support:

### I.     INTRODUCTION

     John R. Nettleton is before this Court for sentencing to face the consequences for the absolute worst decisions he has ever made. One thing that is clear from the many letters submitted in support of Mr. Nettleton is that the actions which have brought him before this Court are in no way representative of the person he truly is. Mr. Nettleton has genuinely dedicated himself to his family and his country, and he has made a positive and lasting impact on so many people throughout his life. This Court is now tasked with sentencing a man who not only has contributed greatly to his community for decades, but a man who surely will continue to do so throughout the remainder of his life.

     This Court has already sat through the trial in this matter, and so this memorandum will not rehash in any great detail the circumstances surrounding Mr. Nettleton's convictions. Instead,

this memorandum, which relies largely on direct quotes from Mr. Nettleton's family, friends, and peers who know him best, will focus on showing this Court the true John Nettleton. As anybody who knows Mr. Nettleton well will attest, he is a truly good man who made some terrible, uncharacteristically poor choices that have brought him here today.

We simply ask for this Court to take into consideration Mr. Nettleton's entire life, rather than merely the mistakes that he made over a brief period of time in and around January 2015, more than five years ago. As Judge Jed Rakoff has aptly written:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x 93 (2d Cir. 2008).

For the many reasons stated herein, we ask this Court to vary significantly downward from the advisory guidelines range to a sentence that will justly punish Mr. Nettleton, yet allow him to move on to the next chapter in his life so he can continue to improve the lives of his family and friends as he has done for so many years.

## II. JOHN NETTLETON'S PERSONAL CHARACTERISTICS AND HISTORY STRONGLY SUPPORT A DOWNWARD VARIANCE

### a. John Nettleton's Personal Characteristics

Throughout his life, Mr. Nettleton has time and time again demonstrated the kind of personal characteristics that show him to be a good and decent person, and a positive influence on others. As the numerous letters written by people close to him demonstrate, Mr. Nettleton is the type of person who goes out of his way to make things better for the people around him, and to

take care of his family, friends, and fellow service members. As his father states, "From his early childhood he has had a helpful attitude and a desire to protect others from harm." (*Letter from Robert Nettleton*).

To give one example of Mr. Nettleton's concern for the people around him, Robert Kiem, who has known Mr. Nettleton for 20 years, states that

> CAPT Nettleton is one of the most caring and loyal friends to my father and to my family as well. During massive wildfires in San Diego during the early 2000's he opened his house to my family so that we would have a safe place to evacuate. He never hesitated to let us into his home even though he already had three young children and a dog or two. He did not care that my family of five had two cats, a rabbit, and a guinea pig. While we were staying at his family's home, he went out in the middle of the night in dangerous conditions to make sure that our house did not burn down in the wildfires. He was never prompted by any one in my family to do this or even ask us to accompany him, he went on his own accord because he cared so greatly about others than himself.

(*Letter from Robert Kiem*). This is not an isolated opinion; nearly everybody who knows Mr. Nettleton well can tell you about his selflessness and how much he cares about other people. Another friend writes:

> Judge Corrigan, I must truthfully admit it is my experience that John is one of the finest individuals I have ever known. I say this in spite of his current situation and no matter what his future may hold. He is a courageous man and a kind and loyal friend. One second, he can be brutally honest with you but in a way that will make you laugh and doesn't hurt. The next second he is sympathetic, caring and doing anything he can to help you overcome your problem. It is my experience that he just naturally would do this for anybody. I've seen it many times.

(*Letter from Thomas Ogden Ellis*).

Likewise, Mr. Nettleton's ex-wife, Leslee Stafford Stateler, who has every reason in the world to begrudge Mr. Nettleton for his actions which ultimately led to the dissolution of their marriage, writes that

> John is kind, one of the kindest people I have ever known. Every year he always included single sailors and sailors that couldn't be with their families for holiday events such as Thanksgiving. My children grew up thinking that this was absolutely

normal. It's not that common in our communities where everyone always seems so busy. I think it takes a selfless person to have empathy and to include everyone. We always made room. No matter the number, the more the merrier, John always believed that. John has always gone the extra mile for people, I've seen him arrange to have sailor's cars fixed with his own money because he believed in people and treated the people that worked for him with respect and never like he was better than them.

(*Letter from Leslee Stafford Stateler*).

Mr. Nettleton has throughout the course of his life demonstrated a sense of fundamental decency for people who need a little help in their lives. Mr. Nettleton's cousin explains the impact Mr. Nettleton had on her during her long battle with breast cancer:

Through these 18 difficult years, his support towards not only me, but to Tommy and our girls is something I will never forget. He would run errands for me, pick the kids up from school and take them for ice cream and even cook our family dinner. He'll never know how valuable those visits were to our family but we will never forget and still reminisce on his impact here

(*Letter from Sylvia Ellis*).

These are just a few of the glowing assessments of Mr. Nettleton's character that are contained in the letters that are being submitted to the Court for consideration. A defendant's personal "history and characteristics" should be considered right along with "the nature and circumstances of the offense." 18 U.S.C. 3553(a)(1). But a defendant's history and characteristics are in no way reflected in the guidelines calculation. As the Supreme Court has explained, "The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics." *Rita v. United States*, 551 U.S. 338, 364 (2007). Accordingly, factors such as a person's history of good deeds, or a defendant's military, civic, or public service "are not ordinarily considered under the Guidelines." *Id*. at 364-65. "These are, however, matters that § 3553(a) authorizes the sentencing judge to consider." *Id*. at 365.

Thus, post-*Booker*, there is no doubt that a defendant's personal history and characteristics can support a significant downward variance from the guidelines range. *See, e.g., United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007), *abrogated on other grounds by Nelson v. United States*, 555 U.S. 350 (2009) (affirming downward variance of more than 50 months from the bottom of the guidelines where the district court's sentence was based, in part, on the defendant's excellent character, low risk for recidivism, and strong family support). Therefore, we ask this Court to balance the guidelines calculation against the many non-guidelines factors discussed herein, such as Mr. Nettleton's lifetime of demonstrating a good moral character, that warrant a lesser sentence. In this memorandum, we provide the Court with merely a glimpse of Mr. Nettleton's character. In addition to his characteristics and life history discussed herein, the two-dozen or so letters submitted on his behalf make clear that an approximately 3-year prison sentence, as recommended by the low-end of the guidelines, is substantially greater than necessary.

### b. <u>John Nettleton's Family</u>

Many defendants facing sentencing have a personal story to tell, a family that loves them, and children that will be negatively impacted by the sentence. And Mr. Nettleton will be the first to tell you that this is something that he should have recognized and taken into consideration back in January 2015. In this sense, Mr. Nettleton is no different than any number of persons who have come before this Court. Nonetheless, it is important to understand that despite his unfortunate conduct, Mr. Nettleton remains indisputably a caring and loving father to his three children. One of his greatest regrets, unsurprisingly, is the deleterious effect his mistakes have had on his daughter and sons, and on their mother.

It is no secret at this point that Mr. Nettleton's 25-year marriage to Leslee Stafford Stateler was destroyed because of his infidelity. Under such circumstances, it would only make sense that Mrs. Stateler's family would feel nothing but contempt and anger for Mr. Nettleton. In fact, it

would be quite difficult to fault them for feeling that way. But contrary to such expectations, the letters from Mrs. Stateler's family actually show that, despite the harm he has caused his ex-wife, Mr. Nettleton is still regarded as a wonderful father and supporter of his children, and a necessary part of their lives.

Jeff Stafford, Mrs. Stateler's brother, states that "I've known John personally for decades. As a family man I considered him a shining example of what an engaged father should be." (*Letter from Jeff Stafford*). Another of Mrs. Stateler's brothers, Nickolas Stafford, writes that "I will always consider John Nettleton to be one of the most caring and devoted fathers I've ever known." (*Letter from Nickolas Stafford*).

Mr. Nettleton's former father-in-law states that Mr. Nettleton impressed him through his interactions with his military staff and crew which "showed professional military conduct and a sincere respect and comradery." But "John if possible impressed me even more by always showing extreme love and devotion for both my daughter and grandchildren. Regardless of his posting, John and my daughter provided a loving home environment." (*Letter from Larry Stafford*).

And Mrs. Stateler explains that, because she lives outside of Florida, "I greatly depend on John to be able to help our children when any crisis may arise. John has always been available to our children and he is a huge part of all of their lives." (*Letter from Leslee Stafford Stateler*).

It is clear that Mrs. Stateler and her family still continue to hold Mr. Nettleton in the highest regard, despite his indiscretions that have caused so much pain and discomfort for Mrs. Stateler. Nicholas Stafford goes so far as to state that

> John is a solid citizen and aside from this single, horrible situation that spiraled out of control so quickly it was beyond his ability to diffuse, he has led a most admirable life. His 30 years of exemplary service to our country should also be taken into consideration.

> If I could, I would volunteer myself to serve whatever sentence he is given to allow him the freedom to continue being the man and father that I will always have the utmost respect for.

(*Letter from Nickolas Stafford*).

In this section we've highlighted only the statements from Mr. Nettleton's former in-laws because, as mentioned above, these are people whom one would normally expect to express enmity and ire - with good reason - toward Mr. Nettleton. But even Mrs. Stateler and her family, despite the grief that Mr. Nettleton's actions have caused them, still recognize that despite his terrible mistakes and poor judgment, Mr. Nettleton is still a good man and a good father worthy of redemption for his errors.

### c. John Nettleton's Three Decades of Service in the United States Military

Mr. Nettleton joined the U.S. Marine Corps Forces Reserve when he was 19 years old and served in the infantry and as an anti-tank missile man from 1984 – 1987. Then in 1987, he entered the Naval Aviation Cadet Program. He went to two years of flight school, and he got his wings and was commissioned as an officer in 1989. At that time, he was transferred to Jacksonville and joined a fleet squadron.

Mr. Nettleton was deployed to the Middle East and flew helicopter combat missions in the First Gulf War, as well as anti-mine and search and rescue missions. After the war, he returned to Jacksonville, and then deployed again in 1992 to the Mediterranean Sea for six months. Upon his return to Jacksonville he became an instructor pilot. In 1995, he became a navigation officer on the USS Inchon.

In 1997, Mr. Nettleton went to Washington, D.C., and worked in the Pentagon as a Chief of Naval Operations briefer and was part of the anti-terrorism task force. In 1999, he came back to Jacksonville as a department head for HS 11 (Helicopter Anti-Submarine Warfare Squadron).

After the attacks of September 11, 2001 (where many of the people he served with and befriended at the Pentagon were killed), he was deployed to the Middle East for combat operations.

In 2002, he went to San Diego as the Executive Officer (XO) of HS 10 (a training squadron). In 2005, he returned to Jacksonville as the XO of HS 11, and then the Commanding Officer (CO) in 2006. During his time as CO, he was deployed on the USS Enterprise and again served in the Middle East, including off-carrier in Basra, Iraq, at the height of the insurgency there.

In 2007, Mr. Nettleton went to the National War College and in 2008 earned his master's degree. In 2008, he was selected as the CO of HS 10 and returned to San Diego. In 2010, he became the safety officer for Commander, Naval Air Forces and was responsible for the safety programs for 11 aircraft carriers and 200,000 personnel. In 2012, he was selected for major command and went to Guantanamo Bay and became the CO of the Naval base.

Mr. Nettleton served his country honorably for three decades, including in multiple combat missions in the Middle East. He was a decorated officer, and was awarded three Air Medals (which are given for heroism or meritorious achievement while participating in aerial flight) for his extensive role in combat operations.

Although Mr. Nettleton surely had other paths he could have taken when he finished high school, he chose to join the military. Jim Hogg, a friend of Mr. Nettleton's for 50 years, explains why Mr. Nettleton made the decision to serve:

> John Nettleton is someone everyone looked up [to], someone everyone admired, someone that everyone was surprised went into the military as his academics proved he could do anything he wanted in business, but as the years went by everyone understood he joined the military to fight for his country to stand up for what he believed in and [to] protect me and everyone in the United States. John truly cares about everyone and would do anything to help anyone.

(*Letter from Jim Hogg*).

Mr. Nettleton's attitude toward service and his conduct as a member of the armed forces, even early on when he had just joined the Navy, were an inspiration to many people who served with him. Joe Evans, who attended the Navy's Aviation Officer Candidate School at Pensacola with Mr. Nettleton in 1987, writes:

> Of those classmates, JR is the singular one that inspired me when I wanted to give up, that give me a hand when I was down, and who showed me how to lead when others were only looking out for themselves. When I look back on my life, I see several key pivotal moments in time. JR was at the crux of one of those points. I suspect that any success that I have had since, I owe in no small way to him and his resolute strength of character.

(*Letter from Joe Evans*).

As Mr. Nettleton rose through the ranks of the Navy in the following years, his leadership was a model for so many people he served with:

> For the two years I had the honor to serve with John, I can honestly say that he was an Outstanding and Superb Naval Officer and a better Human Being. He exhibited an uncanny and unselfish attitude and was a big supporter of the GTMO community. A true gentleman, well respected by the entire GTMO community.
>
> [ ] John's character, leadership, and attitude are nothing short of "Outstanding." He is a man of integrity and courage. I have served with many Commanding Officers while in the Navy and I consider John one of the best if not the best Captains that I have had the privilege to serve with. Additionally, a family man who sacrificed many years to provide and support his family and to defend our country and protect our freedom. I can honestly say that John will do anything and everything to help any Sailor.
>
> …
>
> I would never write a letter of support to anyone unless I really and truly believe that the person deserves it. John is an exception. He is one of the greatest human beings and leader that I have had the pleasure to know.

(*Letter from Jose A. Cabret*).

Edward J. D'Angelo, who was stationed with Mr. Nettleton at Naval Air Station Jacksonville, notes of Mr. Nettleton:

I observed him on a daily basis for a total of about three years while we were in the same units. I always admired the way he handled his duties because he was an officer who was able to relate very well with his subordinates, as well as with peers and senior officers. I flew with him several times and trusted him implicitly. John was well liked in each squadron because he displayed impressive competence, while also possessing a friendly personality that put others at ease.

(*Letter from Edward J. D' Angelo*).

Julius McManus also writes admirably of Mr. Nettleton's leadership style toward those who served below him:

He was an influential leader who demonstrated reflective leadership. During one particular instance when we had a Sailor who had made some errors that could be considered for NJP [Non Judicial Punishment], Captain Nettleton considered the factors that influenced the Sailors error. As a result of this, Captain Nettleton did not NJP the Sailor, but rather assigned an Extra Military Instruction that provided a valuable life lesson for the Sailor and aided the Guantanamo Bay communality.

(*Letter from Julius McManus*).

Gregory Nosal, who was one of Mr. Nettleton's superior officers, personally observed Mr. Nettleton while the latter was XO and CO of HS-11 in Jacksonville:

As the commanding officer of HS-11 [Helicopter Sea Combat Squadron 11] he was loved and highly respected by his officers, sailors, and fellow commanding officers. As a naval aviator, he was without peer. Not being a helicopter pilot, I learned to trust John as my go-to person to enhance my knowledge and experience within the helicopter community. His professional competence and leadership were recognized by the Navy resulting in his selection for command of the largest helicopter training squadron in the Navy and eventually command of a naval station.

[ ] John Nettleton is an excellent teacher and his leadership and tutorship was evident throughout his commands. He treated everyone fairly and equally.

(*Letter from Rear Admiral (ret.) Gregory M. Nosal*).

Mr. Nettleton's mother notes how during her visits to military bases where her son was stationed, she "observed how he was admired by his peers. I heard stories of great admiration and

support for John. I was often told by Navy personnel how much they appreciated serving with and for John. He was a respected comrade and leader." (*Letter from Sue Condermann*).

Moreover, Mr. Nettleton's admirable conduct extended not only toward fellow service members, but also to civilians whom he encountered during his course of service. Jana Aguilar, who first met Mr. Nettleton when she was in California with her husband (who was stationed there with the Navy) beginning in the fall of 2008, describes the role that Mr. Nettleton played in helping her get through her husband's deployment:

> I was a brand new Navy wife and I knew nothing about the culture. Because he deployed twice in one tour, my new husband was absent more than present for the three years that he was stationed at Naval Air Station North Island.
>
> My husband asked John and Leslee to look after me, while he was away and John made good on his promise.
>
> The Nettleton family took me in during this time and included me in ways that I can never repay.
>
> …
>
> Had it not been for John Nettleton–his friendliness, honesty, humor and generosity towards me – I honestly do not think that I would have made it, [through] those first few years, that first Navy tour.
>
> Speaking to John's character, I would say that the man never had to follow through with his promise to my husband that he'd look after me, and yet he did, going far past any realistic expectation.

(*Letter from Jana Aguilar*).

DeAnna Shaw-Berget, who taught at the elementary and high school at the Guantanamo Bay Naval Base while Mr. Nettleton was CO there, states:

> I always found Captain Nettleton to be a very friendly and gregarious CO. He is the only CO in my time at W.T. Sampson [school at Guantanamo Bay] to make an effort to attend all school functions (when his schedule allowed) including quarterly awards ceremonies at both the elementary and high school. He knew most of the high school students by name as he and his wife would host the students at their home. My impression at the time was that he was very dedicated to his family.

As a CO he was very approachable to base residents. When my son missed a flight to the island at Christmastime, Captain Nettleton offered suggestions for how he could catch another flight and personally took me to the ferry in time to meet my son. My family holds him in very high regard.

(*Letter from DeAnna Shaw-Berget*).

A very similar sentiment is echoed by Michelle Robarge, who also met Mr. Nettleton

during his time at Guantanamo Bay:

I first met John when he visited our school. It was obvious from the first moment I met him that he was genuinely interesting in finding out how he could help our staff and students. He began by listening to our team and finding out what our concerns were and what students needed. It was clear he understood the challenges in this remote location. It was a common thing for him to stop in and listen to what was being taught and he would never miss a chance to spend time with students. It was obvious it was not a political act, but one that was done from his love for those who served and a concern for ensuring their families and children were appreciated. Leading by example, he volunteered his time to assist with school events and was always willing to lend a helping hand.

(*Letter from Michelle Robarge*).

Colin Caswell, who served as Executive Officer at Guantanamo Naval Station and worked

with Mr. Nettleton on a daily basis, writes that

Captain Nettleton often reminded me of our responsibilities to residents who he called "our neighbors", and importance of leaving behind a positive legacy. Mission accomplishment and continuous improvement were important, but never at the expense of quality of life for all base residents.

(*Letter from Colin Michael Caswell*).

The letters from people who have known Mr. Nettleton through his military service make

it abundantly clear that he was an exemplary, honorable, and dedicated peer and leader who helped

and inspired numerous people across the country, both servicemembers and civilians alike.

Courts have not hesitated to recognize that a defendant's military career is one factor

supporting a downward variance. For example, in *United States v. Howe*, 543 F.3d 128 (3d Cir.

2008), the court affirmed a sentence of probation with three months home confinement where the

guidelines range was 18-24 months. The district court's sentence was based in part on the defendant's 20 years of service in the Air Force. The Third Circuit pointed out that

> the Supreme Court included military service as a reason to affirm the district court's below-Guidelines sentence in *Kimbrough v. United States,* --- U.S. ----, 128 S.Ct. 558, 575, 169 L.Ed.2d 481 (2007) ("he had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps, and that he had a steady history of employment").

*Id*. at 139; *see also United States v. Chase,* 560 F.3d 828 (8th Cir. 2009) (noting that the defendant's prior military service "would warrant a downward variance without running afoul of the statutory factors under § 3553(a)").

## III.   NO PRIOR CRIMINAL OFFENSES

For nearly five decades, Mr. Nettleton has lived an honest, law-abiding, and highly admirable life. He has been an upstanding citizen who dedicated 34 years of his life to serving his country. First, he served three years in the Marine Corps reserves, and the remainder of his service time in the Navy. Mr. Nettleton's conduct in this case is unquestionably a blemish in an otherwise upstanding and exemplary life.

This Court certainly may look to Mr. Nettleton's lack of any criminal history whatsoever as supporting a downward variance. Mr. Nettleton is a true first-time offender with no prior criminal activity. In the context of Mr. Nettleton's entire life, his actions underlying this case are isolated mistakes.

Under these circumstances, this Court can consider his lack of any criminal history as a mitigating factor at sentencing. *United States v. Howe*, 543 F.3d at 133 (affirming a downward variance from 18 – 24 months' guideline range of imprisonment to probation, including home confinement, where the district court found that the defendant had made an "isolated mistake" in committing the offenses because, although the offenses were committed over a course of years,

the district court could have determined that the criminal activity was isolated in the context of the defendant's entire life); *see also United States v. Chase*, 560 F.3d at 831 ("factors that have already been taken into account in calculating the advisory guideline range, such as a defendant's lack of criminal history, can nevertheless form the basis of a variance.").

### IV.    THE NEED FOR JUST PUNISHMENT FOR THE OFFENSE

18 U.S.C. § 3553(a)(2)(A) requires a court to consider the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Here, a sentence of approximately three years, as per the bottom of the advisory guidelines, is substantially more than necessary to satisfy the requirements of § 3553(a).

Mr. Nettleton has already experienced (and continues to experience) significant consequences due to his actions. Mr. Nettleton's fall from grace has been stark. From a respected and beloved head of a crucial Navy base to convicted felon. He has lost his military career to which he had dedicated three decades of his life. He lost his marriage of 25 years. His children have had to watch their father's name and reputation be dragged through the mud countless times on television and on the internet. He has been subject to very heavy and very negative publicity in numerous media outlets since the investigation in this case began.[1] The Government even issued a public press release after Mr. Nettleton's conviction. "Former Commander of Naval Station Guantanamo Bay Convicted of Obstructing Justice in Connection with Civilian Death," Jan. 17, 2020, available online at https://www.justice.gov/opa/pr/former-commander-naval-station-guantanamo-bay-convicted-obstructing-justice-connection.

---

[1] This Court is already aware of the publicity this case has generated. Just a brief internet search will reveal that Mr. Nettleton's case and investigation has been covered in The New York Times, The Washington Post, USA Today, CNN, and extensively in numerous Jacksonville media outlets.

In *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) the First Circuit approved the lower court's reasoning which recognized the inherent punishment imposed on a person who is put into the criminal justice system for the first time. The *Prosperi* court quoted from the lower court's reasoning:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

*Id*. at 48.

The public embarrassment and immense shame that Mr. Nettleton, a man with a previously impeccable military record for nearly 30 years, has experienced is immeasurable. For the rest of his life, Mr. Nettleton will carry the stigma of being a convicted felon. One friend writes that Mr. Nettleton has paid the price for his mistakes "every day for the last five years with the loss of his career, his financial security, his marriage, and his reputation." (*Letter from Barbara Berry*).

But much worse than the toll this case has taken on Mr. Nettleton, the psychological and emotional harm that this case and investigation has brought on his family is immense.[2] He and his family have been living in the shadow of this case for more than five years. "He has lost forever the companionship of an amazing woman. He has lost forever the feeling of normal family life." (*Letter from Jeff Stafford*). His brother-in-law further explains:

> The John I know will punish himself with guilt and regret for the rest of his life. I do believe his withholding of the facts were to protect those he cared about …
>
> His children – my niece Julia and nephews Jacob and JR, need him more than you can imagine. This incident has taken their toll on them and if I thought their

---

[2] Mr. Nettleton fully acknowledges that it was his actions which initially set this ball rolling. Nonetheless, we write here to point out that he and his family have already been dealing with certain consequences from his actions for more than five years now.

> situation would be better off without him in the picture I wouldn't have taken the
> time to write this letter. If I thought, he wasn't deserving, I wouldn't have taken the
> time to write this letter. They do need him, and he is deserving.

*Ibid.* Mr. Nettleton's other brother-in-law writes along the same lines about the impact this has had

on the Nettleton family:

> I've seen first-hand the toll the last 5 years has taken on John, Leslee, Riley, Jacob
> and Julia and it's changed them all forever. John will have to live with his actions
> for the rest of his life, which for a man like John, is more punishment than
> incarceration could ever be.

(*Letter from Nickolas Stafford*).

Courts have looked to collateral consequences such as those experienced by Mr. Nettleton

as mitigating factors for purposes of sentencing. *See, e.g., United States v. Baird*, 580 F. Supp. 2d

889 (D. Neb. 2008) (granting a below-guidelines sentence and noting that, due to the defendant's

criminal offenses, the defendant had suffered serious consequences for his criminal activity,

including losing his military career as a captain in the Air Force and now had a felony conviction

on his record); *United States v. Samaras*, 390 F. Supp. 2d 805 (E.D. Wis. 2005) (one factor

supporting a below-guidelines sentence was that the "defendant lost a good public sector job,

another factor not considered by the guidelines.").

## V.     THE NEED FOR ADEQUATE GENERAL DETERRENCE

18 U.S.C. § 3553(a)(2)(B) requires a sentencing court to consider the need for the sentence

"to afford adequate deterrence to criminal conduct." One thing that has become clear through

research in recent years is that the severity of punishment does not have as much of a general

deterrent effect on crime as does the certainty of being apprehended and punished. According to

the U.S. Department of Justice's National Institute of Justice[3]:

---

[3] The National Institute of Justice "is the research, development and evaluation agency of the U.S. Department of Justice." About NIJ, https://nij.ojp.gov/about-nij

- "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment."

- "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime."

- "The certainty of being caught is a vastly more powerful deterrent than the punishment."

- Crime is deterred "by increasing the perception that criminals will be caught and punished."

National Institute of Justice, *Five Things About Deterrence*, pg. 1 (May 2016).

Contrary to widespread belief, the most powerful deterrent of criminal activity is not severity of punishment, but instead certainty and promptness of punishment. Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006), available online at https://scholarship.law.umn.edu/faculty_articles/495 (noting that "[i]maginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects."); Valerie Wright, *Deterrence in Criminal Justice Evaluating Certainty vs. Severity of Punishment*, pg. 1, THE SENTENCING PROJECT (Nov. 2010), available online at https://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/ ("Research to date generally indicates that increases in the certainty of punishment, as opposed to the severity of punishment, are more likely to produce deterrent benefits."). Thus, for purposes of general deterrence of similar offenders, it's important that persons know that they will be punished for their unlawful actions. But imposing an imprisonment sentence in this particular case won't itself necessarily serve any meaningful general deterrence purpose. *Id*. at pg. 4 ("punishment certainty is far more consistently found to deter crime

17

than punishment severity, and the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences.") (*quoting* Daniel Nagin and Greg Pogarsky. *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*, Criminology, 39(4), 2001).

In *United States v. Prosperi*, 686 F.3d at 48, the court rejected the view that the sentencing goal of general deterrence can only be achieved by imposing a custodial sentence. In *Prosperi*, the defendants were convicted after a jury trial of conspiracy to commit mail fraud and make false statements on a highway project; conspiracy to defraud the United States by submitting false claims; eighty-three counts of making, and aiding and abetting the making of, a false statement on a highway project; and fifty counts of mail fraud, and aiding and abetting mail fraud. *Id*. at 37. The defendants' guidelines range was 87 to 108 months imprisonment. *Id*. at 39. The district court imposed a sentence of six months home monitoring, three years of probation, and 1,000 hours of community service for both defendants. *Id*. at 41.

The First Circuit affirmed the significant below-guidelines sentence imposed by the trial court. *Id*. at 48. Regarding general deterrence, the district court stated:

> There is one benefit, and only one, that I see in this case to incarceration, and that is the sanction of deterrence that an incarcerated [sic] sentence would pose for others. Beyond that, society's interest in incarceration as opposed to atonement does not weigh heavily. There is no risk of recidivism on the part of either of these defendants. Incarceration will incur a large cost to taxpayers …

*Ibid*. The First Circuit held that "the district court fulfilled its obligation to consider the importance of general deterrence in fashioning its sentences." *Ibid*. The First Circuit affirmed the decision of the district court to impose sentences of home confinement with community service, which "rejected the view that the interest in general deterrence could only be served by incarceration." *Ibid*.

# VI.   NO RISK OF RECIDIVISM

A sentencing court must also consider the need for a sentence imposed to protect the public from future crimes committed by the defendant. 18 U.S.C. § 3553(a)(2)(C). Mr. Nettleton's actions that gave rise to this case represent aberrations in an otherwise law-abiding life. As one friend notes:

> Based on the capacity in which I know Captain Nettleton, these convictions are surprising and entirely out of character. I have only known Captain Nettleton as a man of integrity with a great work ethic. He went out of his way to provide encouragement, support, and advice throughout the construction of my Eagle Scout project for the Boy Scouts of America. When I faced difficulties in my personal life, Captain Nettleton would take time out of his schedule to provide mentorship to me.

(*Letter from Benjamin Daniel Frasco*).

In March 2016, the United States Sentencing Commission released a study entitled Recidivism Among Federal Offenders: A Comprehensive Overview (available online at https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview). According to the study, offenders such as Mr. Nettleton who have zero criminal history points are less likely to recidivate than any other offenders with higher criminal history levels (page 18). Offenders with zero criminal history points are far and away the least likely offenders to recidivate. Persons with zero points are even significantly less likely to recidivate than persons with one criminal history point. Tracey Kyckelhahn and Trishia Cooper, U.S. Sentencing Commission, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders, pgs. 6 – 9 (March 2017) (available online at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf).

In an earlier Sentencing Commission study, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, May 2004 (available online at https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines), the Commission found that persons over the age of 50 are less likely to recidivate than any other age group (page 28), persons with a college degree (Mr. Nettleton obtained a master's degree from the National War College) are less likely to recidivate than others without such a degree (page 29), that persons such as Mr. Nettleton who did not use illicit drugs within one year of their offense are less likely to recidivate than those who did (page 29), and persons who had stable employment for the year prior to their offense are less likely to recidivate than those who were unemployed (page 29).

This factor, that Mr. Nettleton is not a risk to recidivate, which is not adequately accounted for in the guidelines, supports a downward variance in this case. In *United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007), the court affirmed a sentence substantially below the guidelines range (60 months imprisonment where the guidelines were 188-235 months) for a defendant who "poses a lesser risk to the community." The court explained that "the Guidelines calculations and the sentencing factors of section 3553(a) require a judge to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." *Id*. at 745.

Mr. Nettleton's "moral character is strong and I know he will not repeat any of his mistakes. He has always learned from his mistakes and agreed that learning from his mistakes has made him a better man." (*Letter from Barbara Workman*).

## VII.    COVID-19 IN THE BUREAU OF PRISONS SYSTEM

The Bureau of Prisons keeps a running tally of Covid-19 infections in its prison system. The following information is taken directly from the Bureau of Prisons website (on September 24,

20

2020), indicating the substantial number of Covid-19 infections and deaths amongst federal inmates:

> The BOP has **126,659** federal inmates in BOP-managed institutions and **14,172** in community-based facilities. The BOP staff complement is approximately **36,000**. There are **2,013 federal inmates** and **687 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **12,443** inmates and **1,113** staff have recovered. There have been **123** federal inmate deaths and **2** BOP staff member deaths attributed to COVID-19 disease. Of the inmate deaths, **4** occurred while on home confinement.

https://www.bop.gov/coronavirus/ (emphasis original).

According to a recent article, if the BOP were a country, "it would have the most active infections per 100,000 population than any of the top ten most infected countries on earth, which, of course, includes the United States" and "it would have the most deaths from COVID-19 per 100,000 population than any of the top ten most infected countries on earth." Alan Ellis and Mark H. Allenbaugh, *The State of Compassionate Release,* For the Defense, Volume 5, Issue 3, pgs. 53-54.[4]

## VIII.   SENTENCING GUIDELINES

The final Presentence Investigation Report finds a total offense level of 21, and therefore calculates an advisory guidelines range of 37 to 46 months imprisonment. ¶ 98. Mr. Nettleton objected to the 2-level enhancement for obstruction of justice which was based on his purported false testimony at trial.

The Government takes the position that Mr. Nettleton made materially false statements at trial, in particular 1) when he testified that he never denied to Capt. Ross that Mr. Tur came to Mr.

---

[4] Available online at:
https://www.nxtbook.com/nxtbooks/PACDL/FORTHEDEFENSE_vol5_issue3_2020/index.php#/p/1

Nettleton's home on the evening of January 9 (Trial Tr., Jan. 14, 2020, pg. 212), and 2) that Mr. Nettleton falsely testified that he was being truthful with Capt. Ross when Capt. Ross asked him a few days later if Mr. Tur had come to his house on January 9, and Mr. Nettleton replied "Well, yeah, he showed up there, but I didn't let him in." (Trial Tr., Jan. 8, pg. 269; Trial Tr., Jan. 14, pg. 212-14). According to the Government, Mr. Nettleton "was saying that he was being truthful in responding to Capt. Ross's question, which he understood to be about the *manner* in which Tur entered the house, not *whether* Tur entered the house." Govt. Sentencing Memorandum, pg. 16 (emphasis original).

The Government contends that the jury's verdicts on Counts 6 and 7 mean that it necessarily rejected Mr. Nettleton's testimony; had the jury believed Mr. Nettleton's testimony, it would have had to acquit him. At the upcoming sentencing hearing, the defense will contest the Government's claim that the obstruction of justice enhancement under USSG § 3C1.1 is appropriate here. The defense intends to show why Mr. Nettleton's testimony does not amount to obstruction of justice, and that Capt. Ross' testimony does not prove that Mr. Nettleton's testimony was perjurious.

And the fact that Mr. Nettleton was convicted of Counts 6 and 7 should not immediately subject him to the § 3C1.1 enhancement. In *United States v. Whitebread*, 817 F. App'x 372, 374 (9th Cir. 2020) (unpublished), the court explained:

> The district court erred by not making factual findings to support the two-level enhancement for obstruction of justice, relying instead on the jury's verdict to conclude that Whitebread perjured himself at trial. A district court may not rely on the jury's verdict alone to support the obstruction enhancement, *United States v. Alvarado-Guizar*, 361 F.3d 597, 603 (9th Cir. 2004); the district court must find that a defendant's testimony was false, material, and willful, *see United States v. Dunnigan*, 507 U.S. 87, 96–97, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Express findings on all three prongs are necessary for perjury to amount to obstruction of justice. *United States v. Castro-Ponce*, 770 F.3d 819, 822 (9th Cir. 2014).

Regardless of whether this Court finds that the obstruction of justice enhancement applies, this Court, of course, has considerable discretion in deciding whether the § 3553(a) factors justify a variance and the extent of one that is appropriate. *United States. v. Shaw,* 560 F.3d 1230, 1238 (11th Cir. 2009). The sentencing guidelines should be the starting point for sentencing determinations, but the guidelines ultimately are merely advisory. *Gall v. United States.*, 552 U.S. 38, 50 (2007). The Court "may not presume that the Guideline range is reasonable," but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. Nor is there "any particular weight that should be given to the guidelines range." *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010).

In addition to the sentencing guidelines, this Court must also take into consideration all of the 18 U.S.C. § 3553 factors. *United States. v. Martin*, 455 F.3d 1227, 1236 (11th Cir. 2006). The Court must consider all the factors set forth in § 3553(a) as a whole, including whether a below-guidelines sentence is warranted. The Court is permitted to determine that the guidelines sentence should not apply "because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations." *Rita v. United States,* 551 U.S. at 351. This Court can also impose a sentence below the guidelines based on policy disagreements with the Sentencing Commission. *Kimbrough v. United States,* 552 U.S. 85 (2007).

In *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014), the court stated:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

## IX.   CONCLUSION

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). We now ask for this Court to weigh Mr. Nettleton's offenses with the lifetime of admirable behavior he has shown, and to consider his personal history and the many exemplary personal characteristics that he has demonstrated over and over again throughout his entire life.

There is no doubt that Mr. Nettleton's moral compass failed him. Mr. Nettleton's former brother-in-law sums it up appropriately: "To be blunt, my analysis is John lived 99.9% of his life as a wonderful human being that made a disastrous .1% decision." (*Letter from Jeff Safford*). But "his mistakes and failings do not define him or diminish his accomplishments." (*Letter from Colin Michael Caswell*).

One family friend writes of Mr. Nettleton that "Since his arrest he has continued to be a man of honorable character who had learned from his mistakes. He is an asset to society that we need." (*Letter from Angela Kiem*). Another says that since his arrest, Mr. Nettleton "has done all he can to protect his children from experiencing any fall-out" and "has diligently worked to provide security and love to his children." (*Letter from Barbara Berry*). And yet another friend writes: "It is this country, this nation, more than any other place, which allows imperfect people to pursue the freedoms of renewal, redemption, forgiveness and second chances. I also strongly believe these freedoms are the bedrock of whom we are as a country and what makes this country great." (*Letter from John Serralles*).

Mr. Nettleton has shown himself to be a man of great integrity, morality, and kindness toward others. Based on all of the above, we ask that this Court impose a sentence substantially below the advisory guidelines range, as a below-guidelines sentence is the only type of sentence that would be "sufficient, but not greater than necessary," to accomplish the goals of sentencing of 18 U.S.C. § 3553(a).

Submitted on Sept. 24, 2020, by:

s/ Daniel Schwarz                             Colby Vokey
Daniel Schwarz                                Texas Bar No. 24043391
FBN 84665                                     The Law Firm of Colby Vokey PC
245 SE 1st Street, Suite 404                  6924 Spanky Branch Court
Miami, FL 33131                               Dallas, TX 75248
Phone: 305-900-0481                           Phone: 214-697-0274
Fax: 305-503-6973                             Fax: 214-594-9034
Daniel@danielschwarzlaw.com                   Email: vokeylaw@colbyvokey.com

Terence Lenamon
Fla. Bar No. 970476
Terence Lenamon P.A.
245 SE 1st Street, Ste. 404
Miami, FL 33131
Phone: 305-373-9911
Fax: 305-503-6973
Email: terry@lenamonlaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Sept. 24, 2020, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF, and thereby served on all interested parties.

s/ Daniel Schwarz
Daniel Schwarz